**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **Curtis Crosland,** | : | |
| **Plaintiff,** | : | **Civil Action** |
| **v.** | : | **No. 22-____________** |
| **City of Philadelphia, John Cimino, Dominick Mangoni, Detective McNesby, Albert Nespoli, J.A. Brignola, Detective Ansel, Edward Hughes, Edward Rocks, Frederick Westerman, and John Lanzelotti,** | : | **Jury Trial Demanded** |
| **Defendants.** | : | |

## COMPLAINT

### I. Preliminary Statement

1. This action is based on the extraordinary misconduct of detectives in the Philadelphia Police Department's Homicide Division whose actions led to the wrongful arrest, prosecution, conviction, and incarceration of plaintiff Curtis Crosland for a murder he did not commit. As a result of that misconduct, Mr. Crosland spent nearly 34 years in prison.

2. On December 5, 1984, Il Man Heo, the owner of a neighborhood convenience store in South Philadelphia, was shot and killed during an attempted robbery.

3. More than three years later, on December 9, 1987, police arrested the innocent Mr. Crosland and charged him with the murder. They did so based on evidence they knew to be false and fabricated and based on testimony obtained through police coercion and pressure. And throughout the prosecution, they deliberately concealed documents proving the falsity of that

evidence, including reliable information about a suspect who matched the description of the perpetrator and who appeared to have a motive to harm Mr. Heo.

4. Mr. Crosland truthfully maintained his innocence from the moment of his arrest, but, due to the pervasive unconstitutional actions of investigating detectives, he was convicted. For more than 30 years, he fought for his release, filing repeated post-conviction challenges, all of which were denied.

5. In 2020, the Philadelphia District Attorney's Office's Conviction Integrity Unit (CIU) concluded a comprehensive review of Mr. Crosland's case and disclosed to Mr. Crosland a broad collection of exculpatory materials that had been withheld from him and his counsel. Then, in federal habeas corpus proceedings pending in this Court, the CIU conceded that Mr. Crosland was entitled to a new trial and acknowledged his apparent innocence.

6. On June 22, 2021, the Court granted Mr. Crosland's habeas corpus petition, and the District Attorney's Office dismissed the charges. Mr. Crosland was released after 33 years and six months of wrongful imprisonment.

7. Mr. Crosland brings this civil rights action under 42 U.S.C. § 1983 seeking accountability for the violation of his constitutional rights and substantial harms and losses he suffered.

## II. Jurisdiction

1. This Court has jurisdiction over the subject matter of this Complaint under 42 U.S.C. § 1983 and 28 U.S.C. §§ 1331, 1343(a)(3), 1343(a)(4), and 1367(a).

2. Venue is proper in this Court as the incidents at issue in this matter occurred within the Eastern District of Pennsylvania.

## III. Parties

8. Plaintiff Curtis Crosland, age 62, was at all times relevant to this Complaint a resident of Philadelphia, Pennsylvania.

9. Defendant City of Philadelphia is a municipality in the Commonwealth of Pennsylvania and owns, operates, manages, directs, and controls the Philadelphia Police Department, which, at all relevant times, employed the below individual defendants.

10. Defendant John Cimino, Badge No. 981, was, at all times relevant to this Complaint, a detective in the Philadelphia Police Department's Homicide Division. He is sued in his individual capacity.

11. Defendant Dominick Mangoni was, at all times relevant to this Complaint, a detective in the Philadelphia Police Department's Homicide Division. He is sued in his individual capacity.

12. Defendant McNesby was, at all times relevant to this Complaint, a detective in the Philadelphia Police Department's Homicide Division. He is sued in his individual capacity.

13. Defendant Albert Nespoli, Badge No. 9101, was, at all times relevant to this Complaint, a detective in the Philadelphia Police Department's Homicide Division. He is sued in his individual capacity.

14. Defendant Detective Brignola was, at all times relevant to this Complaint, a detective in the Philadelphia Police Department's Homicide Division. He is sued in his individual capacity.

15. Defendant Detective Ansel, Badge No. 906, was, at all times relevant to this Complaint, a detective in the Philadelphia Police Department's Homicide Division. He is sued in his individual capacity.

16. Defendant Edward Hughes, Badge No. 642, was, at all times relevant to this Complaint, a detective in the Philadelphia Police Department's Homicide Division. He is sued in his individual capacity.

17. Defendant Edward Rocks was, at all times relevant to this Complaint, a detective in the Philadelphia Police Department's Homicide Division. He is sued in his individual capacity.

18. Defendant Frederick Westerman, Badge No. 533, was, at all times relevant to this Complaint, a sergeant in the Philadelphia Police Department's Homicide Division. He is sued in his individual capacity.

19. Defendant John Lanzelotti, Badge No. 349, was, at all times relevant to this Complaint, a lieutenant in the Philadelphia Police Department's Homicide Division. He is sued in his individual capacity

20. At all times relevant to this Complaint, the defendants acted in concert and conspiracy and were jointly and severally responsible for the harms caused to plaintiff.

21. At all times relevant to this Complaint, all defendants acted under color of state law.

## IV. Facts

22. On the evening of December 5, 1984, a man walked into the H&B Grocery Store in South Philadelphia and demanded money from the store's owner, Il Man Heo, who was known by the name Tony. The man then shot Mr. Heo in the head. Mr. Heo was hospitalized and died six days later.

23. Two witnesses in the store told police at the time of the shooting that the perpetrator was wearing a hat and a scarf pulled over his face such that they could not provide

detailed identifying information, but they both stated that he was a black man about 5'5" tall. Witnesses also reported that the shooter referred to Mr. Heo as "Tony," suggesting that the shooter had been in the store before and was familiar with Mr. Heo.

24. The Philadelphia Police Department Homicide Division assigned responsibility for the investigation of Heo's murder to defendant Detective Nespoli, who was supervised throughout the investigation by defendants Lieutenant Lanzelotti and Sergeant Westerman and aided in the investigation by defendant Detectives Cimino, Mangoni, McNesby, Brignola, Ansel, Hughes, and Rocks (collectively "individual defendants" or "defendant detectives").

25. Within a week of the shooting, Detective Nespoli received reliable information that a man named Michael Ransome was the person who shot Heo. Nespoli, along with defendant Detectives Brignola and Ansel learned that Ransome lived three blocks from the H&B Grocery Store. They also learned, significantly, that Heo had been a witness regarding murder charges brought against Ransome five years earlier. Detectives later learned that Ransome was 5'6" tall and 125 pounds, matching the description of the perpetrator supplied by eyewitnesses.

26. The defendant detectives documented this information on activity sheets—Homicide Division documents used to log progress during the course of an investigation—and in other reports placed in the Philadelphia police homicide file for the Heo murder investigation.

27. Despite this reliable information concerning Ransome, the defendant detectives failed to follow up with investigation into Ransome's involvement in the crime, and the case went cold for more than two years.

28. The defendant detectives turned back to the investigation again on April 15, 1987, when Detectives Hughes and Mangoni conducted an interview with Rodney Everett, who was in

state prison for violating the terms of his parole. Everett had reported to a probation officer that he had information about a murder and that he wanted to speak with detectives.

29. Everett, who had a son with Mr. Crosland's sister, had spent years in prison during his son's childhood. With no father in the home, Mr. Crosland became the child's father figure, leading Everett to harbor feelings of jealousy and contempt for Mr. Crosland.

30. According to the defendants, in the April 15, 1987, interview, Everett told Hughes and Mangoni that at some unspecified time in late 1986, Mr. Crosland had confessed to him that he had shot Mr. Heo in December 1984. Everett claimed that Mr. Crosland stated he was wearing a jacket, a scarf, and a cap and that, after the shooting, he panicked and ran out of the store without taking anything—facts that were all available from newspaper articles at the time of the offense.

31. Everett's statement was false. Mr. Crosland did not commit the crime, nor did he tell Everett he had done so.

32. At the time of Everett's statement and in the months that followed, police learned information and created reports documenting that Everett's statement was unquestionably false.

33. Just six days after Everett's first interview, on April 21, 1987, defendant Nespoli reported that Everett was polygraphed concerning his claim that Mr. Crosland confessed to the Heo murder and that the polygraph showed deception—that is, Everett was lying.

34. Then, on July 7, 1987, defendants Detectives Rocks and Mangoni interviewed Everett and, among other things, asked him whether Mr. Crosland had told anyone else about the Heo murder. Everett named several individuals, including Michael Ransome—whom police knew as a suspect from the outset of the investigation. Knowing at a minimum that there was no

reason to believe Everett's statement, police made no efforts to interview the people Everett identified as having heard a "confession" from Mr. Crosland.

35. On July 25, 1987, defendant Detective Rocks interviewed Everett's girlfriend, Louise Woods. She had been violently assaulted by Everett in March 1987, an incident that led to Everett's incarceration on a parole violation.

36. According to Rocks' notes on an activity sheet, Woods claimed that Everett told her that Frank Turner, known by the nickname "Squirt," was the person who shot Heo.

37. Each of the defendants, through their access to the police investigation file and based on their own investigative activities, was aware of this information demonstrating the falsity of Everett's statement implicating Mr. Crosland in the Heo murder.

38. Despite that knowledge, on December 9, 1987, defendant Detective Cimino sought a warrant for Mr. Crosland's arrest. In doing so, Cimino relied exclusively on Everett's false statement from April 15, 1987, claiming that Mr. Crosland had confessed to the crime.

39. When seeking the warrant, Cimino knowingly, intentionally, or recklessly failed to disclose to prosecutors any of the above-described information proving the falsity of Everett's statement regarding Mr. Crosland's so-called confession.

40. Nor did Cimino describe to prosecutors any of the credible information learned by the defendant detectives concerning Michael Ransome's involvement in the shooting.

41. Instead, Cimino and the other defendants intentionally concealed and deliberately suppressed that information, failing to share it with anyone outside the Philadelphia Police Department.

42. On January 21, 1988, Mr. Crosland had a preliminary hearing regarding the Heo murder charges. Everett testified and stuck to the false story he had provided to police in April 1987 regarding Mr. Crosland's so-called confession.

43. At no time before or after the preliminary hearing did the defendants provide Mr. Crosland and his counsel any of the information in their possession demonstrating the falsity of Everett's testimony.

44. As Mr. Crosland's trial approached, knowing that Everett's testimony would not be sufficient to convince a jury to convict, the defendant detectives sought to fabricate additional evidence to support the prosecution by pressuring a vulnerable witness, Delores Tilghman, to testify falsely against Mr. Crosland.

45. Tilghman had been in a relationship with Mr. Crosland's cousin, Michael Turner. In March 1987, while angry at Turner over a conflict in their relationship, Tilghman falsely reported to police that Turner had committed a murder.

46. Tilghman later called the police to attempt to retract the statement, but the police would not let her do so. Wracked with guilt about her false statement, Tilghman attempted suicide and ended up in the hospital.

47. While she was in the hospital recovering from her suicide attempt, defendant Detectives Cimino and McNesby repeatedly visited her—ignoring the pleas of medical professionals to leave her alone—and pressured her to testify consistently with her earlier statement implicating Michael Turner. They told Tilghman that she could not take back her earlier statement and told her that she was going to jail.

48. In February 1988, Tilghman testified in a grand jury proceeding about the allegations against Michael Turner, and, in that testimony, claimed that at some point in the

weeks following the Heo murder, she had overheard a conversation between Mr. Crosland, Michael Turner, and another family member, Lester Turner. According to Tilghman's testimony, Mr. Crosland stated that he was afraid that someone would come forward with information about the Heo murder because a reward had been advertised.

49. That testimony was false. Mr. Crosland had made no such statement.

50. Mr. Crosland's case proceeded to a jury trial in December 1988. On the first day of trial, Everett was called to the stand but stated that he would decline to testify on Fifth Amendment grounds.

51. The trial judge then allowed the prosecution to read to the jury a transcript of Everett's testimony from the preliminary hearing. The trial judge informed the jury that Everett was unavailable but did not inform the jury as to the reasons for that unavailability, nor did he permit Mr. Crosland's counsel to do so.

52. Later in the trial, the prosecution planned to introduce Tilghman's testimony. Early in the morning of the scheduled testimony, one or more of the defendant detectives entered Tilghman's house without her permission, told her she had to testify against Mr. Crosland, and informed her that if she did not do so she would be criminally charged.

53. Tilghman, who had previously been subjected to oppressive threats from defendants Cimino and McNesby while recovering from a suicide attempt, and believing she had no choice but to go with the detectives to Mr. Crosland's trial, appeared at the trial and testified consistent with her previous grand jury testimony that Mr. Crosland had expressed concern about someone coming forward with information about the Heo murder.

54. On December 16, 1988, the jury found Mr. Crosland guilty of second-degree murder. Mr. Crosland was sentenced to life imprisonment.

55. Mr. Crosland pursued a direct appeal. The Pennsylvania Superior Court reversed his conviction on the ground that the trial court's decision to allow the introduction of Everett's preliminary hearing testimony without informing the jury as to the reasons for Everett's unavailability violated Mr. Crosland's confrontation rights.

56. Following the reversal, Mr. Crosland had a second jury trial in January 1991.

57. At this trial, Everett once again asserted a Fifth Amendment right not to testify, but the prosecution conferred immunity.

58. Everett then testified and denied that Mr. Crosland had ever confessed to murdering Heo.

59. The prosecution, however, introduced Everett's preliminary hearing testimony claiming that Mr. Crosland had given such a confession.

60. Based on false representations from defendants, the prosecution then informed the trial court that Tilghman could not be located, and, in support of that assertion, introduced the testimony of defendant Cimino—the same detective who had threatened and coerced Tilghman to give testimony while she lay in a hospital bed recovering from a suicide attempt—concerning his alleged efforts to locate Tilghman.

61. Based on that testimony, the trial judge allowed the prosecution to read to the jury Tilghman's testimony from Mr. Crosland's first trial.

62. On January 28, 1991, the jury convicted Mr. Crosland of second-degree murder and he was sentenced to life imprisonment.

63. For the next 30 years, Mr. Crosland challenged his conviction with multiple post-conviction filings.

64. Over the course of those proceedings, Mr. Crosland obtained sworn statements from Rodney Everett confirming what had been clear to the defendant detectives from the beginning: that his statement and preliminary hearing testimony implicating Mr. Crossland in the Heo murder was false and that he provided the testimony only in an effort to secure benefits in his own criminal cases.

65. Mr. Crosland also obtained a sworn statement from Delores Tilghman. She too confirmed that her testimony at trial was false and that she testified against Mr. Crosland only due to pressure and coercion from the investigating detectives.

66. Additionally, Mr. Crosland obtained statements from witnesses who observed the perpetrator of the Heo murder enter the grocery store before the shooting. The witnesses, who knew Mr. Crosland, confirmed that the perpetrator was not Mr. Crosland.

67. Throughout the litigation of Mr. Crosland's post-conviction petitions, Mr. Crosland did not have access to the Philadelphia Police Department homicide file concerning the Heo murder. Without access to the exculpatory materials the defendant detectives concealed, Mr. Crosland's petitions were repeatedly denied.

68. That changed in March 2020, when the CIU agreed to undertake a review of Mr. Crosland's case.

69. Over the course of several months, CIU lawyers conducted a comprehensive analysis of documents contained in the homicide file and in the District Attorney's Office file. They concluded from that review that the defendant detectives and suppressed and concealed multiple pieces of highly exculpatory evidence.

70. The evidence included the following:

a. Numerous notes and activity sheets identifying Michael Ransome as a suspect in the shooting and information showing the similarity in Ransome's physical description to that of the shooter;

b. An activity sheet documenting the April 12, 1987, polygraph of Rodney Everett and noting that deception was indicated;

c. Rodney Everett's interview of July 7, 1987, in which he, among other things, identified additional people to whom he claimed Mr. Crosland confessed, most of whom were not interviewed by police; and

d. A July 25, 1987, activity sheet documenting the conversation with Everett's girlfriend, Louise Woods, identifying Frank Turner as the alleged shooter in the Heo case.

71. Based on its review and interviews with prosecutors involved in Mr. Crosland's two trials, CIU lawyers concluded that this exculpatory information had never been provided to the District Attorney's Office, but, instead, had been retained only in the Philadelphia police homicide file.

72. Ultimately, the CIU concluded that Mr. Crosland was very likely actually innocent.

73. The CIU informed the Court of these findings and, as a result, on June 22, 2021, the Court entered an Order vacating Mr. Crosland's conviction and sentence.

74. Thereafter, the District Attorney's Office filed a motion to nolle pros the charges, and that request was granted by order dated June 24, 2021.

75. Mr. Crosland's unlawful arrest, prosecution, conviction, and incarceration was caused by the unconstitutional conduct of the defendants who knowing, intentionally, and

recklessly fabricated evidence, concealed and suppressed exculpatory information, and maliciously prosecuted him.

76. The conduct of the individual defendants was proximately caused by the actions of the City of Philadelphia who, with deliberate indifference, adopted policies, practices, and customs and/or failed to train, supervise, and discipline in such a way as to allow the defendants to engage in pervasive unconstitutional conduct.

77. The unlawful conduct outlined above caused Mr. Crosland to be improperly arrested, prosecuted, and imprisoned for more than thirty-three and a half years for a crime he did not commit.

78. As a direct and proximate result of defendants' actions and omissions, Mr. Crosland sustained injuries and damages, including loss of his freedom; loss of the most productive years of his adult life; pain and suffering; mental anguish; emotional distress; indignities; degradation; permanent loss of natural psychological development; and restrictions on all forms of personal freedom including but not limited to diet, sleep, personal contact, educational opportunity, vocational opportunity, athletic opportunity, personal fulfillment, sexual activity, family relations, reading, television, movies, travel, enjoyment, and freedom of speech and expression.

79. As a direct and proximate result of defendants' actions and omissions, Mr. Crosland was deprived of his familial relationships, including time with his spouse, children, and grandchildren.

80. As a direct and proximate result of defendants' actions and omissions, Mr. Crosland sustained economic injuries and damages, including loss of income and loss of career opportunities, as he was incarcerated during the most productive years of his adult life.

81. As a direct and proximate result of defendants' actions and omissions, Mr. Crosland sustained and continues to suffer physical injuries and damages, including physical pain and suffering, personal injuries, physical illness, and inadequate medical care.

82. As a direct and proximate result of defendants' actions and omissions, Mr. Crosland sustained mental health injuries and damages, including adverse psychological symptoms, mental anguish, and emotional distress, which he continues to experience to this day and which will continue into the future.

## V. Causes of Action

### Count 1
### Plaintiff v. Individual Defendants
### Fabrication of Evidence

83. The individual defendants fabricated evidence in support of a prosecution against Mr. Crosland and/or aided and abetted the introduction of fabricated evidence. The fabrication of this evidence caused Mr. Crosland's wrongful conviction and, therefore, violated his right to a fair trial and due process of law under the Fourteenth Amendment to the U.S. Constitution.

### Count 2
### Plaintiff v. Individual Defendants
### Malicious Prosecution

84. The individual defendants caused the initiation of a prosecution against Mr. Crosland without probable cause and with malice. The criminal charges they caused to issue against Mr. Crosland were terminated favorably to Mr. Crosland. These defendants, therefore, subjected Mr. Crosland to a malicious prosecution in violation of the Fourth and/or Fourteenth Amendments to the U.S. Constitution.

**Count 3**
**Plaintiff v. Individual Defendants**
**Deliberate Suppression of Exculpatory Evidence**

85. By intentionally concealing and deliberately suppressing exculpatory evidence, the individual defendants violated Mr. Crosland's right to due process of law under the Fourteenth Amendment to the U.S. Constitution.

**Count 4**
**Plaintiff v. Defendant City of Philadelphia**
**Municipal Liability**

86. Defendant City of Philadelphia, with deliberate indifference, adopted and/or acquiesced in policies, practices, and customs which were a moving force in the violation of Mr. Crosland's constitutional rights, and, further, defendant City of Philadelphia, with deliberate indifference, failed to properly train, supervise, and/or discipline officers and, as such, was a moving force in the violations of Mr. Crosland's constitutional rights.

**Count 5**
**Plaintiff v. Individual Defendants**
**Supplemental Claim – Malicious Prosecution**

87. The individual defendants, as described above, caused the malicious prosecution of Mr. Crosland, and, as such, committed the tort of malicious prosecution under the laws of the Commonwealth of Pennsylvania.

**WHEREFORE**, plaintiff Curtis Crosland respectfully requests:

A. Compensatory damages as to all defendants;

B. Punitive damages as to the individual defendants;

C. Reasonable attorneys' fees and costs;

D. Such other and further relief as may appear just and appropriate.

Plaintiff hereby demands a jury trial.

/s/ Jonathan H. Feinberg
Jonathan H. Feinberg
ID No. 88227
KAIRYS, RUDOVSKY, MESSING,
FEINBERG & LIN LLP
The Cast Iron Building
718 Arch Street, Suite 501 South
Philadelphia, PA 19106
215-925-4400
jfeinberg@krlawphila.com

/s/ Emma Freudenberger
Emma Freudenberger
Christina Matthias (ID No. 326864)
NEUFELD, SCHECK & BRUSTIN, LLP
99 Hudson Street, 8th Floor
New York, NY 10013
212-965-9081

*Counsel for Plaintiff*