**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| Curtis Crosland, | : | |
| | : | |
| Plaintiff, | : | Civil Action |
| | : | |
| v. | : | No. 22-cv-02416-AB |
| | : | |
| City of Philadelphia; John Della Rocca as personal representative of the Estate of John Cimino; Dominick Mangoni; James McNesby; John Doe 2, as personal representative of the Estate of Albert Nespoli; Joseph Brignola; Karen Ansel, as personal representative of the Estate of Francis Ansel; Edward Hughes; Edward Rocks; John Doe 4, as personal representative of the Estate of Frederick Westerman; John Doe 5, as personal representative of the Estate of John Lanzelotti; Joseph Descher; and Lieutenant Thompson, | : | Jury Trial Demanded |
| | : | |
| Defendants. | : | |
| | : | |

## SECOND AMENDED COMPLAINT

### I.     Preliminary Statement

1.     This action is based on the extraordinary misconduct of detectives in the Philadelphia Police Department's Homicide Division whose actions led to the wrongful arrest, prosecution, conviction, and incarceration of plaintiff Curtis Crosland for a murder he did not commit. As a result of that misconduct, Mr. Crosland spent nearly 34 years in prison.

2.     On December 5, 1984, Il Man Heo, the owner of a neighborhood convenience store in South Philadelphia, was shot and killed during an attempted robbery.

3.      More than three years later, on December 9, 1987, police arrested the innocent Mr. Crosland and charged him with the murder. They did so based on evidence they knew to be false and fabricated and based on testimony obtained through police coercion and pressure. And throughout the prosecution, they deliberately concealed documents proving the falsity of that evidence, including reliable information about a suspect who matched the description of the perpetrator and who appeared to have a motive to harm Mr. Heo.

4.      Mr. Crosland truthfully maintained his innocence from the moment of his arrest, but, due to the pervasive unconstitutional actions of investigating detectives, he was convicted. For more than 30 years, he fought for his release, filing repeated post-conviction challenges, all of which were denied.

5.      In 2020, the Philadelphia District Attorney's Office's Conviction Integrity Unit (CIU) conducted a comprehensive review of Mr. Crosland's case and disclosed to Mr. Crosland a broad collection of exculpatory materials that had been withheld from him and his counsel. Then, in federal habeas corpus proceedings pending in this Court, the CIU conceded that Mr. Crosland was entitled to a new trial and acknowledged his apparent innocence.

6.      On June 22, 2021, the Court granted Mr. Crosland's habeas corpus petition, and the District Attorney's Office dismissed the charges. Mr. Crosland was released after 33 years and six months of wrongful imprisonment.

7.      Mr. Crosland's conviction for a crime he did not commit was the direct result of the defendant detectives' fabrication of evidence, malicious prosecution, and intentional suppression of exculpatory information.  As seen in multiple other cases involving exonerations of people convicted of murders they did not commit, these actions were the natural product of the City of Philadelphia's long historic practice of failing to train, supervise, and discipline

detectives in the PPD Homicide Division to comply with clearly established constitutional obligations and the City's acquiescence to established customs of improper police practices.

8.     Mr. Crosland brings this civil rights action under 42 U.S.C. § 1983 seeking accountability for the violation of his constitutional rights and substantial harms and losses he suffered.

## II.     Jurisdiction

9.     This Court has jurisdiction over the subject matter of this Complaint under 42 U.S.C. § 1983 and 28 U.S.C. §§ 1331, 1343(a)(3), 1343(a)(4), and 1367(a).

10.     Venue is proper in this Court as the incidents at issue in this matter occurred within the Eastern District of Pennsylvania.

## III.     Parties

11.     Plaintiff Curtis Crosland, age 62, was at all times relevant to this Complaint a resident of Philadelphia, Pennsylvania.

12.     Defendant City of Philadelphia is a municipality in the Commonwealth of Pennsylvania and owns, operates, manages, directs, and controls the Philadelphia Police Department, which, at all relevant times, employed the below individual defendants.

13.     Defendant John Della Rocca is the future personal representative of the Estate of John Cimino, who was at all times relevant to this Complaint a detective, Badge No. 981, in the Philadelphia Police Department's Homicide Division.  John Della Rocca is sued in his capacity as the personal representative of Cimino's estate.

14.     Defendant Dominick Mangoni was, at all times relevant to this Complaint, a detective in the Philadelphia Police Department's Homicide Division.  He is sued in his individual capacity.

15.     Defendant James McNesby was, at all times relevant to this Complaint, a detective in the Philadelphia Police Department's Homicide Division.  He is sued in his individual capacity.

16.     Defendant John Doe 2, whose actual name plaintiff has been unable to ascertain despite reasonable efforts, is the current and/or future personal representative of the Estate of Albert Nespoli, who was at all times relevant to this Complaint a detective, Badge No. 9101, in the Philadelphia Police Department's Homicide Division.  John Doe 2 is sued in his capacity as the personal representative of Nespoli's estate.

17.     Defendant Joseph Brignola was, at all times relevant to this Complaint, a detective in the Philadelphia Police Department's Homicide Division.  He is sued in his individual capacity.

18.     Defendant Karen Ansel is the personal representative of the Estate of Francis Ansel, who was at all times relevant to this Complaint a detective, Badge No. 906, in the Philadelphia Police Department's Homicide Division.  Karen Ansel is sued in her capacity as the personal representative of Ansel's estate.

19.     Defendant Edward Hughes, Badge No. 642, was, at all times relevant to this Complaint, a detective in the Philadelphia Police Department's Homicide Division.  He is sued in his individual capacity.

20.     Defendant Edward Rocks was, at all times relevant to this Complaint, a detective in the Philadelphia Police Department's Homicide Division.  He is sued in his individual capacity.

21.     Defendant John Doe 4, whose actual name plaintiff has been unable to ascertain despite reasonable efforts, is the current and/or future personal representative of the Estate of

Frederick Westerman, who was at all times relevant to this Complaint a sergeant, Badge No. 533, in the Philadelphia Police Department's Homicide Division.  John Doe 4 is sued in his capacity as the personal representative of Westerman's estate.

22.    Defendant John Doe 5, whose actual name plaintiff has been unable to ascertain despite reasonable efforts, is the current and/or future personal representative of the Estate of John Lanzelotti, who was at all times relevant to this Complaint a lieutenant, Badge No. 349, in the Philadelphia Police Department's Homicide Division.  John Doe 5 is sued in his capacity as the personal representative of Cimino's estate.

23.    Defendant Sergeant Joseph Descher was, at all times relevant to this Complaint, a sergeant in the Philadelphia Police Department's Homicide Division.  He is sued in his individual capacity.

24.    Defendant Lieutenant Thompson was, at all times relevant to this Complaint, a lieutenant in the Philadelphia Police Department's Homicide Division.  He is sued in his individual capacity.

25.    At all times relevant to this Complaint, the defendants acted in concert and conspiracy and were jointly and severally responsible for the harms caused to plaintiff.

26.    At all times relevant to this Complaint, all defendants acted under color of state law.

IV.    **Facts**

   A.    **Il Man Heo is killed, and Michael Ransome is immediately identified as a suspect.**

27.    On the evening of December 5, 1984, a man walked into the H&B Grocery Store in South Philadelphia and demanded money from the store's owner, Il Man Heo, who was

known by the name Tony. The man then shot Mr. Heo in the head. Mr. Heo was hospitalized and died six days later.

28.     Two witnesses in the store told police at the time of the shooting that the perpetrator was wearing a hat and a scarf pulled over his face such that they could not provide detailed identifying information, but they both stated that he was a Black man about 5'5" tall. Witnesses also reported that the shooter referred to Mr. Heo as "Tony," suggesting that the shooter had been in the store before and was familiar with Mr. Heo.

29.     The Philadelphia Police Department Homicide Division assigned responsibility for the investigation of Heo's murder to Detective Nespoli, who was supervised throughout the investigation by Lieutenant Lanzelotti, Lieutenant Thompson, Sergeant Westerman, and Sergeant Descher, and aided in the investigation by Detectives Cimino, Mangoni, McNesby, Brignola, Ansel, Hughes, and Rocks.  These detectives and, where relevant, their estates, are referred to below collectively as the "individual defendants" or "defendant detectives."

30.     Within a week of the shooting, Detective Nespoli received reliable information that a man named Michael Ransome was the person who shot Heo. That information came from multiple sources.

31.     Initially, on December 12, 1984, someone called the Homicide Division and identified Ransome as the shooter.  The person who received the call in the Homicide Division passed this information to Nespoli in a handwritten note, which Nespoli placed in the PPD homicide file, or "H file"—the file in which the defendant detectives compiled all information they obtained about the murder.

32.     Detectives quickly learned that Ransome was 5'6" tall and 125 pounds, matching the description of the perpetrator supplied by eyewitnesses.

33.     One day after the first report identifying Ransome, Detectives Nespoli, Brignola, and Ansel learned more critical facts about Ransome that corroborated his involvement in the crime.  They learned that he lived on the 1100 block of South 26th Street, less than three blocks from the H&B Grocery Store. They learned that he had been released from prison in January 1984 after serving a sentence for the 1979 murder of a man named David Wilson.  And, significantly, they learned that Il Man Heo may have been a witness to Wilson's murder.

34.     Nespoli, Brignola, and Ansel recorded this information in a police activity sheet, a document used by homicide detectives to log their investigative work.

35.     Less than a week later, on December 19, police received two additional and highly credible reports corroborating Ransome's involvement. In one report, a member of the Philadelphia Citizen's Crime Commission informed police that a caller stated that the perpetrators were Michael Ransome and a man with the first name Clinton.  In the second, the president of the Korean Businessmen's Association reported that he had received information that the perpetrators were Ransome and a man named Robert.  Both reports were memorialized in handwritten notes that were provided to Detective Nespoli, who placed them in the homicide file.

36.     In early January 1985, Nespoli received another lead in the investigation: a report that a 16-year-old Black male named Richard Saunders had been arrested for the January 5, 1985, armed robbery of a Korean-owned grocery store in the same neighborhood as the H&M Grocery Store.  Nespoli documented this information in an activity sheet dated January 7, 1985.

37.     While pursuing this lead, the defendant detectives continued to also focus on Ransome.  They obtained the entire homicide file regarding the murder of David Wilson for which Ransome was convicted and made that file part of the Heo homicide file.

38.     As of January 7, 1985, the defendant detectives had not been able to locate Ransome.  Nespoli documented in the same activity sheet in which he referenced Richard Saunders that the defendant detectives would set up a surveillance to locate Ransome.

39.     Despite the multiple reliable sources pointing to Ransome as the perpetrator and a report identifying Richard Saunders as a potential alternative suspect, after January 7, 1985, the investigation inexplicably went cold for more than two years.

**B.     Convicted violent felon Rodney Everett gives a plainly false statement implicating Mr. Crosland in the Heo murder.**

40.     The defendant detectives turned back to the investigation again on April 15, 1987, when Detectives Hughes and Mangoni conducted an interview with Rodney Everett, a known violent felon who was then in state prison for violating the terms of his parole.

41.     Everett, who had a son with plaintiff Curtis Crosland's sister, had spent years in prison during his son's childhood. With no father in the home, Mr. Crosland became the child's father figure, leading Everett to harbor feelings of jealousy and contempt for Mr. Crosland.

42.     Everett's incarceration in April 1987 was due to an arrest on March 19, 1987, for violent and threatening conduct directed at his girlfriend, Louise Woods, and her family.  Woods, the mother of two of Everett's children, told police that Everett had beaten her in the past and that she feared him because he had killed a young girl before. On the day of his arrest, Everett choked Woods, then took what Woods believed was a shotgun, put a bullet in it, and went to look for Woods' brother, with whom he had an argument the night before. Everett also told Woods that he wanted to take the two children they shared from her, so Woods fled to her sister's house with the children to hide.

43.     Everett then called the sister's house, said he was coming to get the children, and threatened to blow up the house if he did not get the children. Woods then ran to a neighbor's

house to hide with her children.  The police later tried to apprehend Everett on the street, but he

fled and threw a pistol on the roof of a building.  He was ultimately arrested, the pistol was

recovered from the roof, and a loaded rifle was found in his bedroom.

44.     After his arrest, Everett was hospitalized, and, while in the hospital, he had a

telephone conversation with William Massey, his former probation officer. Everett told Massey

that he wanted to provide information about the murder at the H&B Grocery Store.

45.     Following that conversation, Massey went to a public library and obtained a

computer printout with news reports about the H&B Grocery Store murder.  Then, on April 3,

1987, Massey met with Everett at the hospital and brought with him the information he had

gathered from the library.  Massey talked with Everett about Everett's wishes to speak to police.

Everett made clear to Massey that he hoped providing information to police would lead to his

release from custody.

46.     On April 15, 1987, Everett gave a written statement to Detectives Hughes and

Mangoni.  He told them that at some unspecified time in late 1986, Mr. Crosland had confessed

to him that he had shot Il Man Heo in December 1984.  In response to the detectives' questions

for specifics, Everett told the detectives that Mr. Crosland stated he was wearing a jacket, a scarf,

and a cap and that, after the shooting, he panicked and ran out of the store without taking

anything.

47.     Each of the facts that Everett described regarding Mr. Crosland's alleged

confession was publicly available information that Everett gathered from the news reports that

Massey provided to him.

48.     Everett's statement was false. Mr. Crosland did not commit the crime, nor did he

ever tell Everett he had done so.

9

**C.     The defendant detectives confirm the falsity of Everett's statement but still seek Mr. Crosland's arrest based only on Everett's say-so.**

49.     From the moment Everett completed his statement to Detectives Hughes and Mangoni, the defendant detectives knew and/or recklessly disregarded that it was false.

50.     Immediately after they concluded Everett's interview, Hughes and Mangoni prepared a typed statement for Everett's probation officer, William Massey, who explained to the detectives how he had obtained news reports about the shooting at the H&B Grocery Store. Massey also told the detectives that Everett made clear to him that he wanted to provide information about the murder in order to obtain his release from custody.

51.     Based on Massey's statement and what they knew about public reporting and based on their understanding that Everett had a motive to falsely implicate someone in a murder in order to help himself with his own criminal cases, the defendant detectives had every reason to conclude that Everett's statement was false and no reason to believe it was truthful.

52.     Concerned about Everett's credibility, the defendant detectives brought Everett back to the Homicide Division for a polygraph examination on April 21, 1987.  The purpose of the examination was to assess the truthfulness of Everett's statement that Mr. Crosland confessed to the Heo murder.  As Detective Nespoli wrote in an activity sheet describing the examination, the polygraph showed deception, that is, that Everett was lying.

53.     The result of the polygraph examination thus provided the defendant detectives with even more reason to know that Everett's statement was false and that Mr. Crosland had never confessed to the Heo murder.

54.     Despite their knowledge of Everett's lies, the defendant detectives continued to rely on his information to support a prosecution against Mr. Crosland.  They did so, despite the fact that just three days later, on April 24, 1987, defendants Hughes and Mangoni located

Michael Ransome, the man who had been identified by credible sources as the person who shot Il Man Heo from the beginning.

55.     Hughes and Mangoni took a statement from Ransome, who gave non-credible denials of any knowledge of the shooting.  He also refused to take a polygraph examination regarding his statement.  While Ransome's answers gave the detectives reasons to continue their investigation into his involvement in the murder, they discarded him as a suspect and continued to rely on Everett as their means to close the investigation.

56.     They did so by bringing Everett in for yet another interview on July 7, 1987.

57.     In that interview, Detectives Rocks and Mangoni asked Everett to provide information on a number of different homicide investigations.  In response to their questions, Everett identified several different perpetrators.

58.     Rock and Mangoni also asked Everett whether Mr. Crosland had told anyone else about the Heo murder. Everett named five different people. Knowing that there was no reason to believe Everett's statement regarding Mr. Crosland, police made no efforts to interview the people Everett identified as having heard a "confession."

59.     One of the people Everett named as having heard Mr. Crosland's "confession," was Mr. Crosland's cousin, Frank Turner.  Everett explained that Frank Turner had been involved in other violent crimes, including the murder of a man named John Lamb.  According to Everett, Frank Turner shot Lamb after Lamb beat up Mr. Crosland in a fight.

60.     This information from Everett identified Frank Turner as a violent and volatile person and raised the attention of homicide detectives concerning his potential involvement in other crimes.  On July 25, 1987, Detective Rocks, who had participated in the July 7 interview

with Everett, conducted a follow-up interview with Everett's girlfriend, Louise Woods, who had been assualted by Everett in March 1987.

61.     According to Rocks' notes on an activity sheet that was forwarded to defendants Thompson and Descher and seen by each of the other defendant detectives, Woods informed Rocks that Everett told her that Frank Turner was the person who shot Heo.  This statement by Everett was directly inconsistent with what Everett had told the defendant detectives on three different occasions.

62.     Based on Woods' report to Detective Rocks, the defendant detectives had yet another suspect. And, significantly, based on Everett's inconsistent reporting, they had yet another piece of information confirming that Everett's statement implicating Mr. Crosland was false.

63.     Each of the defendants, through their access to the homicide file which contained the activity sheets and other reports prepared throughout the investigation, and based on their own investigative activities, was aware of this information demonstrating the falsity of Everett's statement implicating Mr. Crosland in the Heo murder.

64.     Despite that knowledge, on December 9, 1987, Detective Cimino sought a warrant for Mr. Crosland's arrest.  In doing so, Cimino prepared an affidavit of probable cause based exclusively on Everett's false statement from April 15, 1987, claiming that Mr. Crosland had confessed to the crime.

65.     When seeking the warrant, Cimino knowingly, intentionally, or recklessly failed to disclose to prosecutors any of the above-described information proving the falsity of Everett's statement regarding Mr. Crosland's so-called confession, including the following:

a. That detectives had received at least three credible reports identifying Michael Ransome as the perpetrator;

b. That Rodney Everett had failed a polygraph examination on April 21, 1987;

c. That Rodney Everett had been interviewed on July 7, 1987, and had inserted himself as an informant in multiple police investigations and had identified multiple people who allegedly heard Mr. Crosland's confession, none of whom police interviewed; and

d. That Rodney Everett had informed his girlfriend, Louise Woods, that it was Frank Turner who shot Il Man Heo.

66. Instead, Cimino and the other defendants intentionally concealed and deliberately suppressed that information, failing to share it with anyone outside the Philadelphia Police Department.

67. Based on the defendant detectives' knowing or reckless presentation of Everett's false statement and their suppression of information showing the falsity of that statement, the defendant detectives secured a warrant for Mr. Crosland's arrest.

68. Mr. Crosland was arrested on December 10, 1987, and charged with the murder of Il Man Heo.

**D.     The defendant detectives attempt to bolster their fabricated prosecution against Mr. Crosland by pressuring a vulnerable Delores Tilghman to provide evidence against him.**

69. On January 21, 1988, Mr. Crosland had a preliminary hearing regarding the Heo murder charges. Everett testified and stuck to the false story he had provided to police in April 1987 regarding Mr. Crosland's so-called confession.

70.     At no time before or after the preliminary hearing did the defendants provide Mr. Crosland and his counsel any of the information in their possession demonstrating the falsity of Everett's testimony.

71.     As Mr. Crosland's trial approached, knowing that Everett's testimony was unlikely to be sufficient to convince a jury to convict, the defendant detectives sought to fabricate additional evidence to support the prosecution by pressuring a vulnerable witness, Delores Tilghman, to testify falsely against Mr. Crosland.

72.     The defendant detectives had been pressuring Tilghman to provide information to help them on a number of homicide cases since the spring of 1987.  Tilghman had been in a relationship with Mr. Crosland's cousin, Michael Turner. In March 1987, while angry at Turner over a conflict in their relationship, Tilghman falsely reported to police that Turner had committed a murder.

73.     Tilghman later called the police to attempt to retract the statement, but the police would not let her do so. Wracked with guilt about her false statement causing Turner to be falsely charged with a murder, Tilghman attempted suicide and ended up in the hospital.

74.     While she was in the hospital recovering from her suicide attempt, Detectives Cimino and McNesby repeatedly visited her—ignoring the pleas of medical professionals to leave her alone—and pressured her to testify consistently with her earlier statement implicating Michael Turner.  They told Tilghman that she could not take back her earlier statement and told her that she was going to jail.

75.     One such hospital visit occurred on April 16, 1987—the day after Rodney Everett gave his first statement falsely claiming that Mr. Crosland confessed to the Heo murder.  Cimino and McNesby informed Tilghman that she would have to be as helpful as possible to police in

their investigations of a variety of homicides, or else they would seek her prosecution.  In

particular, Cimino and McNesby pressured her to give information on Michael Turner's family

members, including his cousins, Frank Turner, Lester Turner, and Mr. Crosland.

76.     As a result of that pressure and the continued threats that she would be sent to jail

if she did not provide helpful information to police, Tilghman told Cimino and McNesby that she

had information implicating Mr. Crosland in the Heo murder.

77.     Cimino and McNesby knew or recklessly disregarded that Tilghman's statements

about Mr. Crosland were false and the result of their pressure and coercion.  They did not take a

formal statement from Tilghman regarding Mr. Crosland, nor did they cite Tilghman's claims in

their affidavit of probable cause seeking Mr. Crosland's arrest in December 1987.

78.     In February 1988, Tilghman testified in a grand jury proceeding about the

allegations against Michael Turner.  In that testimony, she claimed that at some point in the

weeks following the Heo murder, she had overheard a conversation between Mr. Crosland,

Michael Turner, and another family member, Lester Turner. According to Tilghman's testimony,

Mr. Crosland stated that he was afraid that his cousin, Brenda Turner, would come forward with

information about the Heo murder because a reward had been advertised.

79.     That testimony was false. Mr. Crosland had made no such statement, and

Tilghman only gave false testimony about the statement because she had been urged to provide

speculative information by the threatening conduct of Detectives Cimino and McNesby.

80.     The defendant detectives knew the testimony was false and the product of

Detectives Cimino and McNesby's pressure and coercion, but they never disclosed to anyone

outside of the PPD their knowledge as to the falsity of that testimony.

**E.** **Mr. Crosland is convicted because of the defendant detectives' misconduct**

81.    Mr. Crosland's case proceeded to a jury trial in December 1988.  On the first day of trial, Everett was called to the stand but stated that he would decline to testify on Fifth Amendment grounds.

82.    The trial judge then allowed the prosecution to read to the jury a transcript of Everett's testimony from the preliminary hearing. The trial judge informed the jury that Everett was unavailable but did not inform the jury as to the reasons for that unavailability, nor did he permit Mr. Crosland's counsel to do so.

83.    At no time was Mr. Crosland able to introduce evidence proving the falsity of Everett's preliminary hearing testimony—including the reliable information pointing to Michael Ransome as the perpetrator, Everett's failure of a polygraph examination, Everett's July 7, 1987, statement seeking to serve as an informant for multiple homicide investigations, and Everett's inconsistent statement that Frank Turner was the perpetrator—because the defendant detectives had withheld that information from prosecutors and the defense.

84.    Later in the trial, the prosecution planned to introduce Tilghman's testimony. Early in the morning of the scheduled testimony, one or more of the defendant detectives, including Detectives Cimino and McNesby, entered Tilghman's house without her permission, told her she had to testify against Mr. Crosland, and informed her that if she did not do so she would be criminally charged.

85.    Tilghman, who had previously been subjected to oppressive threats from Detectives Cimino and McNesby while recovering from a suicide attempt, and believing she had no choice but to go with the detectives to Mr. Crosland's trial, appeared at the trial and testified

consistent with her previous false grand jury testimony that Mr. Crosland had expressed concern about Brenda Turner coming forward with information about the Heo murder.

86.     Tilghman provided this false testimony only because of the threats made by Detectives Cimino and McNesby and other defendant detectives in the time before her grand jury testimony and on the morning of her scheduled trial testimony.

87.     At no time before or during the trial did the defendant detectives inform prosecutors or Mr. Crosland about their threatening conduct toward Tilghman that caused her to provide false testimony against Mr. Crosland.

88.     On December 16, 1988, the jury found Mr. Crosland guilty of second-degree murder. Mr. Crosland was sentenced to life imprisonment.

89.     Mr. Crosland pursued a direct appeal. The Pennsylvania Superior Court reversed his conviction on the ground that the trial court's decision to allow the introduction of Everett's preliminary hearing testimony without informing the jury as to the reasons for Everett's unavailability violated Mr. Crosland's confrontation rights.

90.     Following the reversal, Mr. Crosland had a second jury trial in January 1991.

91.     At no time before or during the second trial did the defendant detectives provide to prosecutors or Mr. Crosland any of the exculpatory information showing the falsity of Everett's April 1987 statement implicating Mr. Crosland in the Heo murder, nor did they provide any information concerning their threatening conduct directed at Tilghman to secure her false testimony against Mr. Crosland.

92.     At the second trial, Everett once again asserted a Fifth Amendment right not to testify, but the prosecution conferred immunity.

93.     Everett then testified and denied that Mr. Crosland had ever confessed to murdering Heo.

94.     The prosecution, however, introduced Everett's preliminary hearing testimony in which Everett falsely claimed that Mr. Crosland had given such a confession.

95.     Based on false representations from defendant detectives, the prosecution then informed the trial court that Tilghman could not be located, and, in support of that assertion, introduced the testimony of Detective Cimino—the same detective who had threatened and coerced Tilghman to give testimony while she lay in a hospital bed recovering from a suicide attempt—concerning his alleged efforts to locate Tilghman.

96.     Based on that testimony, the trial judge allowed the prosecution to read to the jury Tilghman's testimony from Mr. Crosland's first trial.

97.      At the conclusion of the trial, on January 28, 1991, the jury informed the trial judge that it had reached an insurmountable impasse.  The trial judge directed the jury to continue deliberating, and, less than half an hour later, the jury returned with a verdict convicting Mr. Crosland of second-degree murder.

98.     Mr. Crosland was sentenced to life imprisonment and remained incarcerated for the next 30 years.

**F.     Mr. Crosland seeks to undo his wrongful conviction**

99.     Throughout the three decades of his post-conviction incarceration, Mr. Crosland challenged his conviction with filings in state and federal court.

100.     Over the course of those proceedings, Mr. Crosland obtained sworn statements from Rodney Everett confirming what had been clear to the defendant detectives from the beginning: that his statement and preliminary hearing testimony implicating Mr. Crossland in the

Heo murder was false and that he provided the testimony only in an effort to secure benefits in his own criminal cases.

101.    Mr. Crosland also obtained a sworn statement from Delores Tilghman. She too confirmed that her testimony at trial was false and that she testified against Mr. Crosland only due to pressure and coercion from the investigating detectives.  Further, and relatedly, Mr. Crosland obtained a statement from Brenda Turner, the cousin who, according to Tilghman's trial testimony, had information about the Heo murder that she might report to authorities. Turner's statement confirmed that she never had any such information as it occurred when she was a 16-year-old high school student.

102.    Additionally, Mr. Crosland obtained statements from witnesses who observed the perpetrator of the Heo murder enter the grocery store before the shooting. The witnesses, who knew Mr. Crosland, confirmed that the perpetrator was not Mr. Crosland.

103.    Throughout the litigation of Mr. Crosland's post-conviction petitions, Mr. Crosland did not have access to the Philadelphia Police Department homicide file concerning the Heo murder. Without access to the exculpatory materials the defendant detectives concealed, Mr. Crosland's petitions were repeatedly denied.

104.    That changed in March 2020, when the CIU agreed to undertake a review of Mr. Crosland's case.

105.    Over the course of several months, CIU lawyers conducted a comprehensive analysis of documents contained in the homicide file and in the District Attorney's Office file. They concluded from that review that the defendant detectives had suppressed and concealed multiple pieces of highly exculpatory evidence.

106.    The evidence included the following:

    a.   Numerous notes and activity sheets identifying Michael Ransome as a suspect in the shooting and information showing the similarity in Ransome's physical description to that of the shooter;

    b.   An activity sheet documenting the April 21, 1987, polygraph of Rodney Everett which concluded that Everett had given a false statement;

    c.   All information concerning Rodney Everett's interview of July 7, 1987, in which he, among other things, sought to become an informant on multiple homicide investigations; identified additional people to whom he claimed Mr. Crosland confessed, most of whom were not interviewed by police; and identified Frank Turner as the perpetrator of an unrelated murder; and

    d.   A July 25, 1987, activity sheet documenting the conversation with Everett's girlfriend, Louise Woods, in which she reported that Everett had identified Frank Turner as the shooter in the Heo case.

107. Based on its review and interviews with prosecutors involved in Mr. Crosland's two trials, CIU lawyers concluded that this exculpatory information had never been provided to the District Attorney's Office, but, instead, had been retained only in the Philadelphia police homicide file.

108. Ultimately, the CIU concluded that Mr. Crosland was very likely actually innocent.

109. The CIU informed the Court of these findings and, as a result, on June 22, 2021, the Court entered an Order vacating Mr. Crosland's conviction and sentence.

110. Thereafter, the District Attorney's Office filed a motion to nolle pros the charges, and that request was granted by order dated June 24, 2021.

111.    Mr. Crosland was released from prison after 33 years and six months in custody.

**G.    The defendant detectives' conduct is caused by the PPD Homicide Division's established history of unconstitutional practices and the City's deliberate indifference to those practices.**

112.    The unconstitutional conduct of the defendant detectives described above was directly and proximately caused by a long-established history of practices in the PPD in general and specifically in the PPD Homicide Division.

113.    For many years dating back at least to the 1970s, and continuing well beyond the time of the investigation of the Heo murder, the City of Philadelphia had in force and effect a policy, practice, or custom of unconstitutional misconduct in homicide investigations, and in particular, concealing or withholding exculpatory evidence; using coercive techniques in interviews and interrogations to obtain incriminating evidence; fabricating inculpatory evidence; tampering with or manufacturing evidence; fabricating incriminating statements from witnesses, suspects, and arrestees; and conducting improper identification procedures.

114.    These practices were well known to the City of Philadelphia and its policymakers as a result of newspaper investigations including Pulitzer Prize winning reporting in the *Philadelphia Inquirer* in 1977, governmental investigations, complaints from lawyers and civilians, and internal police investigations.

115.    Various cases demonstrate that this misconduct was pervasive within the PPD at the time of the Heo murder investigation, Mr. Crosland's trials in 1988 and 1991, and thereafter. The cases include the following:

   a.    **Willie Stokes:** In 1984, PPD detectives arrested a man named Franklin Lee on rape and related charges. After his arrest, homicide detectives interviewed him about a 1980 murder and falsely told him that another witness had identified

Willie Stokes as the person who committed that murder. Detectives insisted that Lee knew that Stokes was the murderer and that he needed to cooperate with their investigation, or, otherwise they would "hang" him. Lee succumbed to the pressure and agreed to sign a false statement implicating Stokes in the murder. For years, Lee continued to have contact with the investigating detectives who, in order to maintain control over their informant, arranged for him to have access to drugs and sexual encounters while incarcerated. Stokes remained wrongfully imprisoned for 39 years until December 2021 when a federal district court vacated his conviction based on the investigating detectives' pervasive misconduct.

b. **Pedro Alicea**: In 1989, after failing for four years to resolve a 1985 double homicide of brothers Hector and Luis Camacho, PPD detectives fabricated a case against Pedro Alicea out of whole cloth. To build a false case against Alicea, detectives disregarded significant evidence demonstrating that two local drug dealers were responsible, and leaned on vulnerable individuals to obtain false identifications of Alicea as the shooter. The officers pressured Angel Fuentes, a longtime informant who had a close personal relationship with the lead detective, and who was facing significant prison time on a number of open charges, to endorse a fabricated statement identifying Alicea as the shooter. They then coerced Ray Velez, who had himself been implicated in the murders, to likewise falsely identify Alicea as the shooter, by detaining him and threatening to charge him with the murders if he did not submit. Detectives suppressed substantial exculpatory evidence, including a

reliable eyewitness statement, pointing to the true perpetrators. Alicea was

convicted as a result of the detectives' misconduct and wrongfully imprisoned

for more than 31 years before the exonerating evidence was discovered by the

CIU, resulting in the vacatur of his conviction and release in 2020.

c.   **Carlos Hernandez and Ed Williams**: PPD Homicide Division detectives

coerced a false statement from a witness to a robbery and murder by detaining

the witness without food or water for days and by beating the witness.  That

statement led to the 1991 arrests of Hernandez and Williams, but it was later

proven that Williams had been in a secured-treatment facility at the time of

the crime, thus undermining all of the evidence produced by the detectives as

to both defendants.

d.   **Jackie Combs Jr**.: PPD Homicide Division detectives coerced four young

witnesses into falsely claiming that Combs committed a murder in 1990.

Each witness later provided consistent accounts of the manner in which their

false statements were secured: through the detectives' use of overwhelming

physical and verbal abuse.

e.   **Percy St. George:** A PPD Homicide detective coerced two people in 1993 to

give false statements implicating St. George in a murder.  When the detective

was asked to testify about the allegations of coercion and fabrication, he

asserted his Fifth Amendment privilege against self-incrimination and

declined to answer questions.  Despite that assertion, the detective was

permitted to remain active in PPD Homicide Division investigations for

several years.

23

f.  **Donald Ray Adams:** PPD Homicide Division detectives coerced a witness to implicate Adams in a 1990 murder by threatening the witness and also offering to provide her financial support for her testimony.  In securing the statement, detectives ignored the fact that Adams's physical description was vastly different from the description provided by witnesses at the scene. Adams's conviction was later vacated, and he was acquitted at a retrial.  His subsequent civil suit resulted in a financial settlement.

g.  **Andrew Swainson:** PPD Homicide Division detectives based their arrest of Swainson on the testimony of a single witness who had been taken into custody while running from the scene of the murder in blood-soaked clothes. The witness identified Swainson in a photo array after he was threatened with arrest and shown a photo array that included seven different pictures of Swainson.  Based on this evidence, among other instances of misconduct, in June 2020, Swainson's conviction was vacated and all charges were dismissed.

h.  **James Dennis**: PPD Homicide Division detectives investigating a murder in 1991 coerced witnesses to identify Dennis while at the same time they intentionally concealed information which provided Dennis with an incontrovertible alibi.  The detectives' conduct led to the Third Circuit's issuance of an *en banc* decision concluding that the concealment of evidence violated Dennis's due process rights.  *See Dennis v. Sec'y, Pa. Dep't of Corr.*, 834 F.3d 263, 307 (3d Cir. 2016).

i.  **Shaurn Thomas**: PPD Homicide Division detectives arrested Thomas in

1993 on charges that he was involved in a 1990 murder.  Thomas had a

documented alibi that he was present in juvenile court at the time the murder

occurred, but based on testimony from another man who was involved in the

murder, Thomas was convicted.  In May 2019, the Philadelphia District

Attorney's Office agreed to dismiss the charges after discovering, among

other things, previously undisclosed information in police files showing that

officers had questioned a suspect just following the crime who provided

police non-public facts about the murder and failed a polygraph test.

Thomas's civil rights suit resulted in a settlement for more than $4 million.

j.  **Anthony Wright**:  Wright was convicted of the 1991 rape and murder of an

elderly woman based on Homicide Division detectives' fabrication of a

confession and planting of evidence.  DNA testing later confirmed Wright's

innocence, and he was acquitted at a retrial.  His subsequent civil rights action

litigated in this Court resulted in a settlement of nearly $10 million.

k.  **Walter Ogrod:** In 1992, PPD detectives coerced and fabricated a false

confession from Ogrod, a trucker with a low-average IQ, to the 1988 murder

of a four-year-old girl. Ogrod had driven all night and had not been to bed in

36 hours when the lead detective interrogated him. Detectives interrogated

Ogrod for hours, then wrote out a fabricated statement in Q-and-A form they

falsely claimed was a verbatim record of a voluntary statement from Ogrod,

and coerced Ogrod into signing it. At his first trial, 11 of 12 jurors voted to

acquit before a mistrial was declared. At a retrial three years later, with the aid

of a notorious jailhouse snitch, the state convicted Ogrod of capital murder.

Ogrod has since been exonerated, the charges *nolle prossed*, and he was released from prison after serving more than 25 years for a crime he did not commit.

l. **Willie Veasy:** Veasy was convicted of a murder based on a 1992 confession secured by PPD Homicide Division Detectives' use of physical force.  The confession was plainly untrue in light of a fully corroborated alibi that Veasy was working in a popular and busy restaurant at the time of the murder.  Veasy's conviction was vacated in 2019 upon the motion of the Philadelphia District Attorney's Office, and his subsequent civil rights suit resulted in a multi-million-dollar settlement.

116.    As evidenced by the pervasive nature of the conduct in these cases, detectives in the PPD Homicide Division had free reign to engage in unconstitutional actions with the knowledge and acquiescence of City policymakers and PPD Homicide Division supervisors and command staff, all of whom were deliberately indifferent to this misconduct.

117.    At the time of the investigation of the Heo murder and prosecution of Mr. Crosland between 1987 and 1991, the PPD had a policy, practice, or custom of concealing and withholding exculpatory evidence, introducing fabricated evidence, and initiating prosecutions without probable cause.

118.    In particular, in the mid-1980s, PPD initiated the use of "activity sheets" for the purpose of allowing detectives in the Homicide Division to make records regarding their work on an investigation.  Soon after the introduction of activity sheets as a form of recordkeeping for PPD investigations, detectives began using activity sheets to record information exculpatory to the person or persons detectives targeted as suspects.

119.     No one outside PPD was aware of PPD's use of activity sheets, let alone the use

of activity sheets for the recording of exculpatory information.  Instead, activity sheets were used

exclusively within the PPD, and the information recorded in those sheets was never shared with

either the Philadelphia District Attorney's Office or members of the defense bar.

120.     Policymakers within the PPD were aware of these practices and, with deliberate

indifference to the risk of constitutional violations, tolerated and ratified the practice.  As a result

of these practices, defendants in homicide cases were routinely deprived of exculpatory

information.

121.     These practices, as exemplified by the investigations in Mr. Crosland's case and

in those detailed above, continued for years due to the deliberate indifference of the City of

Philadelphia.

122.     Additionally, during the 1980s and 1990s, and concurrent with the time of the

investigation of this case by the PPD, there was a pattern, practice, and custom within the

Department of violating the constitutional rights of criminal suspects and others, including

systemic violations of the Fourth and Fourteenth Amendments.

123.     On three separate occasions in the 1980s, courts in the Eastern District of

Pennsylvania issued orders enjoining the PPD from engaging in such practices.  *See Cliett v. City

of Philadelphia,* No. 85-cv-1846 (E.D. Pa. 1985) (consent decree arising out of "Operation Cold

Turkey," which resulted in the unlawful arrest and detention of 1,500 individuals through drug

enforcement practices); *Spring Garden Neighbors v. City of Philadelphia,* 614 F. Supp. 1350

(E.D. Pa. 1985) (enjoining police sweeps of Latinos in the Spring Garden area in a homicide

investigation); *Arrington v. City of Philadelphia,* No. 88-cv-2264 (E.D. Pa. 1988) (enjoining

stops, detentions, and searches of African-American men during investigation of the "Center

City Stalker").

124.    Thereafter, in the late 1980s and early 1990s, a narcotics squad operating out of the 39th Police District engaged in widespread unconstitutional practices, including fabrication of evidence, unlawful search and arrest warrants, concealment of evidence, false allegations of criminality, fabricating and planting evidence, coercive and physically abusive interrogations, and theft.  This squad engaged in these practices for years and violated the rights of thousands of persons, due to the deliberate indifference of the City of Philadelphia, including the disregard of credible complaints to the PPD Internal Affairs Division and the District Attorney, biased internal investigations, and a practice and custom of exonerating officers regardless of evidence of misconduct.

125.    These systemic and unconstitutional practices and customs were addressed only upon investigation by the FBI and prosecution of the officers by the United States Attorney's Office.

126.    As a result of this pattern of police misconduct that was in effect at the time of the investigation of the homicide for which Mr. Crosland was charged, and in light of evidence showing substantial racial bias in PPD practices, a Court in the Eastern District of Pennsylvania entered a Consent Decree requiring wide ranging reforms in the PPD, and in particular providing for specific limitations on PPD investigative practices and policies.  *See NAACP v. City of Philadelphia,* No. 96-cv-6045.

127.    In summary, at the time of the investigation and prosecution of Mr. Crosland, the City of Philadelphia and its policymakers were deliberately indifferent to PPD's policy, practice, and custom of:

       a.   Concealing and/or failing to disclose exculpatory evidence, engaging in

unlawful interrogation of suspects, using coercion and threats during

interrogations, unlawful witness detentions and interrogations, fabricating and

planting evidence, fabricating witness and suspect statements, and using

improper identification procedures;

b.   Using these practices to target people of color for unlawful treatment;

c.   Failing to take appropriate disciplinary or other corrective actions with respect

to police officers who engaged in illegal or unconstitutional conduct and/or

violated generally accepted police practices;

d.   Failing to properly train and supervise officers with respect to the

constitutional limitations on their investigative, detention, search, and arrest

powers;

e.   Ignoring, with deliberate indifference, systemic patterns of police

misconduct and abuse of civilians' rights in the course of police

investigations and prosecutions of criminal suspects and defendants,

including unlawful police interrogations, searches, and arrests, coercion of

witnesses, improper identification procedures, falsifying and fabricating

evidence, and suppressing exculpatory evidence; and

f.   Failing to properly sanction or discipline PPD officers who were aware of

and concealed and/or aided and abetted violations of constitutional rights of

individuals by other PPD officers, thereby causing and encouraging

Philadelphia police, including the defendant officers in this case, to violate

the rights of citizens such as Mr. Crosland.

128.   At the time of the investigation of the Heo murder and the prosecution of Mr.

Crosland, and for many years before and thereafter, the City of Philadelphia was deliberately indifferent to the need to train, supervise, and discipline police officers.  Specifically, the Internal Affairs Division (IAD) of the PPD failed to provide an internal disciplinary mechanism that imposed meaningful disciplinary and remedial actions in the following respects:

    a.   Excessive and chronic delays in resolving disciplinary complaints;

    b.   A lack of consistent, rational, and meaningful disciplinary and remedial actions;

    c.   A failure to effectively discipline substantial numbers of officers who were found to have engaged in misconduct;

    d.   A failure to establish an internal investigatory process that was not arbitrary and inconsistent;

    e.   Imposing incident-based, rather than progressive discipline, resulting in the failure to penalize repeat violators;

    f.   Failure to institute necessary training and supervision for IAD investigators in order to ensure proper investigations;

    g.   Institution of investigative procedures which adopted a default position that officers had not violated any rules;

    h.   Failing to institute any quality control measures to ensure valid IAD findings and conclusions;

    i.   Failing to adopt an effective early warning system to identify, track, and monitor officers with significant disciplinary histories;

    j.   Failing to interview available eyewitnesses to incidents involving citizen complaints of misconduct; and

     k.   Failing to acknowledge the disproportionate and extreme use of violence and other improper conduct used by police officers.

129.    Given all of the above, the City of Philadelphia, through its deliberate indifference, was a moving force in the violation of Mr. Crosland's constitutional rights.

**H.    The violations of Mr. Crosland's constitutional rights and his harms and losses**

130.    Mr. Crosland's unlawful arrest, prosecution, conviction, and incarceration was caused by the unconstitutional conduct of the defendants who knowing, intentionally, and recklessly fabricated evidence, concealed and suppressed exculpatory information, and maliciously prosecuted him.

131.    The conduct of the individual defendants was proximately caused by the actions of the City of Philadelphia who, with deliberate indifference, adopted policies, practices, and customs and/or failed to train, supervise, and discipline in such a way as to allow the defendants to engage in pervasive unconstitutional conduct.

132.    The unlawful conduct outlined above caused Mr. Crosland to be improperly arrested, prosecuted, and imprisoned for more than thirty-three and a half years for a crime he did not commit.

133.    As a direct and proximate result of defendants' actions and omissions, Mr. Crosland sustained injuries and damages, including loss of his freedom; loss of the most productive years of his adult life; pain and suffering; mental anguish; emotional distress; indignities; degradation; permanent loss of natural psychological development; and restrictions on all forms of personal freedom including but not limited to diet, sleep, personal contact, educational opportunity, vocational opportunity, athletic opportunity, personal fulfillment, sexual

activity, family relations, reading, television, movies, travel, enjoyment, and freedom of speech and expression.

134.    As a direct and proximate result of defendants' actions and omissions, Mr. Crosland was deprived of his familial relationships, including time with his spouse, children, and grandchildren.

135.    As a direct and proximate result of defendants' actions and omissions, Mr. Crosland sustained economic injuries and damages, including loss of income and loss of career opportunities, as he was incarcerated during the most productive years of his adult life.

136.    As a direct and proximate result of defendants' actions and omissions, Mr. Crosland sustained and continues to suffer physical injuries and damages, including physical pain and suffering, personal injuries, physical illness, and inadequate medical care.

137.    As a direct and proximate result of defendants' actions and omissions, Mr. Crosland sustained mental health injuries and damages, including adverse psychological symptoms, mental anguish, and emotional distress, which he continues to experience to this day and which will continue into the future.

**V.     Causes of Action**

138.    Plaintiff Curtis Crosland brings the below causes of actions against the City of Philadelphia and the following who are collectively identified as "individual defendants": John Della Rocca, as personal representative of the Estate of John Cimino; Dominick Mangoni; James McNesby; John Doe 2, as personal representative of the Estate of Albert Nespoli; Joseph Brignola; Karen Ansel, as personal representative of the Estate of  Francis Ansel; Edward Hughes; Edward Rocks; John Doe 4, as personal representative of the Estate of Frederick

Westerman; John Doe 5, as personal representative of the Estate of John Lanzelotti; Joseph

Descher; and Lieutenant Thompson.

## Count 1
## Plaintiff v. Individual Defendants
## Fabrication of Evidence

139.    The individual defendants fabricated evidence in support of a prosecution against

Mr. Crosland and/or aided and abetted the introduction of fabricated evidence.  The fabrication

of this evidence caused Mr. Crosland's wrongful conviction and, therefore, violated his right to a

fair trial and due process of law under the Fourteenth Amendment to the U.S. Constitution.

## Count 2
## Plaintiff v. Individual Defendants
## Malicious Prosecution

140.    The individual defendants caused the initiation of a prosecution against Mr.

Crosland without probable cause and with malice.  The criminal charges they caused to issue

against Mr. Crosland were terminated favorably to Mr. Crosland.  These defendants, therefore,

subjected Mr. Crosland to a malicious prosecution in violation of the Fourth and/or Fourteenth

Amendments to the U.S. Constitution.

## Count 3
## Plaintiff v. Individual Defendants
## Deliberate Suppression of Exculpatory Evidence

141.    By intentionally concealing and deliberately suppressing exculpatory evidence,

the individual defendants violated Mr. Crosland's right to due process of law under the

Fourteenth Amendment to the U.S. Constitution.

**Count 4**
**Plaintiff v. Defendant City of Philadelphia**
**Municipal Liability**

142.    Defendant City of Philadelphia, with deliberate indifference, adopted and/or acquiesced in policies, practices, and customs which were a moving force in the violation of Mr. Crosland's constitutional rights, and, further, defendant City of Philadelphia, with deliberate indifference, failed to properly train, supervise, and/or discipline officers and, as such, was a moving force in the violations of Mr. Crosland's constitutional rights.

**Count 5**
**Plaintiff v. Individual Defendants**
**Supplemental Claim – Malicious Prosecution**

143.    The individual defendants, as described above, caused the malicious prosecution of Mr. Crosland, and, as such, committed the tort of malicious prosecution under the laws of the Commonwealth of Pennsylvania.

**WHEREFORE**, plaintiff Curtis Crosland respectfully requests:

A.      Compensatory damages as to all defendants;

B.      Punitive damages as to the individual defendants;

C.      Reasonable attorneys' fees and costs;

D.      Such other and further relief as may appear just and appropriate.

Plaintiff hereby demands a jury trial.

/s/ Jonathan H. Feinberg
Jonathan H. Feinberg
Grace Harris
KAIRYS, RUDOVSKY, MESSING,
  FEINBERG & LIN LLP
The Cast Iron Building
718 Arch Street, Suite 501 South
Philadelphia, PA  19106
215-925-4400

Emma Freudenberger (*admitted pro hac vice*)
Owanaemi Briggs (*admitted pro hac vice*)
Gerardo Romo (*admitted pro hac vice*)
NEUFELD, SCHECK & BRUSTIN, LLP
99 Hudson Street, 8th Floor
New York, NY 10013
212-965-9081

*Counsel for Plaintiff*