**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| CURTIS CROSLAND, | : | |
| Plaintiff, | : | |
| | : | CIVIL ACTION |
| v. | : | No. 22-2416 |
| | : | |
| CITY OF PHILADELPHIA, et al., | : | |
| Defendants. | : | |

**June 8, 2023**                                                                              **Anita B. Brody, J.**

<u>**MEMORANDUM**</u>

Curtis Crosland spent nearly thirty-four years in prison for a murder he did not commit. He alleges that his wrongful conviction and imprisonment were the result of serious misconduct by Philadelphia Police Department officers, who ignored alternate suspects, credited an unreliable informant, pressured a witness into giving false testimony, and concealed crucial facts from prosecutors and defense counsel. After asserting his innocence for decades and obtaining a concession from the Philadelphia District Attorney's Office, Crosland prevailed in habeas proceedings before this court in 2021. Now a free man, he brings this § 1983 action against the City of Philadelphia and the police officers involved in the flawed investigation. The city and many of the officers move to partially dismiss the suit. I have jurisdiction under 28 U.S.C. §§ 1331, 1343, and 1367.

**I.      BACKGROUND**

On December 5, 1984, Il Man Heo, the proprietor of a South Philadelphia grocery store, was shot during an attempted robbery.[1] Second Amended Complaint ("SAC") (ECF 33) ¶ 27. He

---

[1] All facts are taken from the Second Amended Complaint ("SAC") unless otherwise noted. *See Sands v. McCormick*, 502 F.3d 263, 268 (3d Cir. 2007) ("[I]n ruling on a motion to dismiss, a district court relies on the complaint, attached

died several days later, and a team of detectives from the Philadelphia Police Department began investigating his murder. *Id.* ¶¶ 27, 29.[2] Within a week, their investigation uncovered an initial suspect: Michael Ransome. *Id.* ¶ 30. An anonymous caller identified Ransome as the killer, his physical characteristics matched eyewitness descriptions, and he had a possible motive: he spent time in prison for a previous murder that Heo may have witnessed. *Id.* ¶¶ 31-34. Over the following week, the police received two additional secondhand reports that implicated Ransome in Heo's murder. *Id*. ¶ 35.[3] Despite these leads, the investigation went cold. *Id*. ¶ 39.

Over two years later, in April 1987, detectives resumed the investigation after an interview with Rodney Everett. *Id.* ¶ 40. Everett, then in prison for violating the terms of his parole, told the police that Curtis Crosland, the plaintiff in this case, had confessed to Heo's murder. *Id.* ¶ 46. He bolstered his statement with publicly available details about the murder—information he learned from news articles that his probation officer brought him. *Id.* ¶¶ 45-47.

From the start, the detectives had several reasons to doubt Everett's truthfulness. Everett harbored personal resentment towards Crosland, who served as a father figure to his son while he was incarcerated. *Id.* ¶ 41. Everett admitted to his probation officer that he hoped to secure release from prison by providing information to the police—an admission the probation officer relayed to detectives. *Id.* ¶¶ 45, 50. He failed a polygraph examination in a follow-up interview. *Id.* ¶¶ 52-53.

---

exhibits, and matters of public record."). I treat the factual allegations in the SAC as true, as I am required to do on a motion to dismiss. *See Mayer v. Belichick*, 605 F.3d 223, 229 (3d Cir. 2010) ("We must accept all factual allegations in the complaint as true, construe the complaint in the light favorable to the plaintiff, and ultimately determine whether plaintiff may be entitled to relief under any reasonable reading of the complaint.").

[2] Albert Nespoli led the team of detectives, which included John Cimino, Dominick Mangoni, James McNesby, Joseph Brignola, Francis Ansel, Edward Hughes, and Edward Rocks. SAC (ECF 33) ¶ 29. John Lanzelotti, Lieutenant Thompson, Frederick Westerman, and Joseph Descher were higher ranking officers who oversaw Nespoli and his team. *Id.* These officers or their estates are named as individual defendants in this action. *Id.* ¶¶ 13-24.

[3] Around the same time, police also identified an alternate suspect: Richard Saunders. Saunders had been arrested for robbing a grocery store in the same South Philadelphia neighborhood on January 5, 1985—just weeks after Heo was killed. SAC (ECF 33) ¶ 36.

And his girlfriend told detectives that his statement implicating Crosland was false. *Id.* ¶¶ 60-61.[4]

Undeterred by these red flags, the detectives zeroed in on Crosland. They failed to interview the five other people whom Everett claimed also heard Crosland's "confession." *Id.* ¶ 58. They discarded their initial suspect, Ransome, after a cursory interview. *Id.* ¶¶ 54-55. And, despite these abandoned leads and inconsistencies—all of which were recorded in the case file—they obtained a warrant for Crosland's arrest based entirely on Everett's statement. *Id.* ¶¶ 63-65. In January 1988, after Crosland had been arrested and charged, Everett repeated his statement at a preliminary hearing. *Id.* ¶¶ 68-69. The detectives never told prosecutors or defense counsel about the information in their possession that contradicted Everett's account—the linchpin of their case against Crosland. *Id.* ¶¶ 66, 70, 83, 91.

As trial approached, the detectives pressured a second witness, Delores Tilghman, to testify against Crosland. *Id.* ¶ 71. Tilghman was on their radar because, the year before, she falsely told the police that her boyfriend had committed a murder. *Id.* ¶ 72. Consumed with guilt over her lie, she attempted suicide. *Id.* ¶ 73. While she was recovering in the hospital, several detectives repeatedly visited her, told her that she would go to prison for making a false accusation, and pressed her to help with their open homicide cases. *Id.* ¶¶ 74-75. She eventually told them that she had overheard a conversation implicating Crosland in Heo's murder. *Id.* ¶¶ 76-79. Tilghman's statement secured, the government's case at trial would rest on two witnesses: Everett, who had ample reason to lie and whose statement was contradicted by other evidence; and Tilghman, whose statement was obtained under significant police pressure during a vulnerable moment.

By the first day of trial in December 1988, the government's case was even shakier. Everett declined to testify on Fifth Amendment grounds. *Id.* ¶ 81. The trial judge let the prosecution read

---

[4] Everett's girlfriend told police that he had identified another man, Frank Turner, as Heo's killer. SAC (ECF 33) ¶¶ 61-62. So her statement not only contradicted Everett's account, but it also pointed to yet another suspect.

a transcript of Everett's preliminary hearing testimony but did not allow the jury to know why he would not testify at trial. *Id.* ¶ 82. On the morning she was scheduled to testify, detectives accosted Tilghman—now the prosecution's main live witness—at home. *Id.* ¶ 84. After entering her house without permission, they told her that she would be criminally charged if she did not testify against Crosland. *Id.* She relented. *Id.* ¶¶ 85-86. The detectives never told prosecutors or defense counsel about the tactics they used to secure this crucial testimony. *Id.* ¶ 87.

Crosland was convicted and sentenced to life imprisonment. *Id.* ¶ 88. He appealed, and a state appellate court ordered a new trial, finding that the trial court violated Crosland's confrontation rights when it allowed prosecutors to read Everett's preliminary hearing transcript to the jury. *Id.* ¶ 89. The new trial took place in January 1991. *Id.* ¶ 90. Over two years had passed since the first trial, and still detectives never told prosecutors or defense counsel about the evidence contradicting Everett's testimony or the pressure they used to extract Tilghman's. *Id.* ¶ 91.

Those problems became more apparent when Everett testified at the second trial. After receiving immunity from prosecution, Everett told the jury what the evidence suggested all along: that his original statement to police and testimony at the 1988 preliminary hearing were false, and that Crosland never confessed to Heo's murder. *Id.* ¶¶ 92-93. Prosecutors nonetheless introduced the preliminary hearing transcript into evidence. *Id.* ¶ 94. The detectives then falsely told prosecutors that they could not locate Tilghman, so she could not testify. *Id.* ¶ 95. The government read her testimony from the first trial to the jury instead. *Id.* ¶ 96. Crosland was convicted and sentenced to life imprisonment once again. *Id.* ¶¶ 97-98.

Following his conviction, Crosland petitioned for relief to no avail. *Id.* ¶ 99. During post-conviction proceedings, he obtained a sworn statement from Everett admitting that his testimony at the preliminary hearing was false and that he gave it to get favorable treatment in his own

criminal cases. *Id.* ¶ 100. He likewise obtained a sworn statement from Tilghman saying that her testimony was false and given in response to pressure from detectives. *Id.* ¶ 101. The government's two key witnesses, in other words, both recanted their testimony implicating Crosland in Heo's murder.[5]

Crosland's efforts were finally vindicated in 2020, when the Conviction Integrity Unit in the Philadelphia District Attorney's Office reviewed the case. *Id.* ¶ 104. That review found exculpatory material that police officers withheld from Crosland, his counsel, and the prosecutors in the 1988 and 1991 trials. *Id.* ¶¶ 105-107. The DA's office conceded that Crosland was entitled to habeas relief—and acknowledged his probable innocence—in proceedings before me and, in June 2021, I granted his habeas petition. *Id.* ¶¶ 108-110. His release from custody secured, Crosland brings this § 1983 action against the City of Philadelphia and the detectives who investigated Heo's murder.[6] His SAC includes claims for fabrication of evidence, malicious prosecution, deliberate suppression of exculpatory evidence, and municipal liability. *Id.* ¶¶ 139-143. He seeks damages for the misconduct that put him in prison for over three decades. *Id.* ¶¶ 8, 111, 130, 132.

## II.   DISCUSSION

Before the court are two motions to partially dismiss Crosland's SAC. The first motion, submitted by the City of Philadelphia and many of the individual police officers ("Phila. Mot."), asks the court to (1) grant qualified immunity to all the individual officers on the deliberate suppression of exculpatory evidence claim (Count III of the SAC) and part of the malicious prosecution claim (Count II); (2) dismiss two of the individual officers as defendants because the

---

[5] In addition, witnesses who saw Heo's killer enter the grocery store before the murder gave statements exculpating Crosland. SAC (ECF 33) ¶ 102.

[6] Where applicable, Crosland names the estates of these detectives.

SAC fails to sufficiently plead their personal involvement in the investigation; and (3) dismiss the municipal liability claim (Count IV) against Philadelphia. Phila. Mot. (ECF 36) at 2.[7] The second motion, submitted by Karen Ansel, the representative of police officer Francis Ansel's estate ("Ansel Mot."), presents the same personal involvement and qualified immunity arguments set forth in Philadelphia's motion. Ansel Mot. (ECF 47) at 11-12. For the reasons explained below, I will deny the motions.

### A. Qualified Immunity

Crosland brings this action under § 1983, which "permits suits against state government officials who deprive individuals of 'any rights, privileges, or immunities secured by the Constitution and laws.'" *Mack v. Yost*, 63 F.4th 211, 222 (3d Cir. 2023) (quoting 42 U.S.C. § 1983). Though "the statute on its face admits of no immunities," *Malley v. Briggs*, 475 U.S. 335, 339 (1986), the Supreme Court has held that most government employees, including police officers, enjoy qualified immunity from § 1983 suits. Even when they violate the Constitution or federal statute, police officers "are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).[8]

When presented with a qualified immunity defense, courts must ask two questions: first, whether the defendants violated a statutory or constitutional right of the plaintiff; and second,

---

[7] Citations to page numbers in ECF documents use the ECF pagination, not the pagination in the original document.

[8] As the Third Circuit recently observed, judges and legal scholars have advanced critiques of qualified immunity doctrine. *See Mack v. Yost*, 63 F.4th 211, 226 n.12 (3d Cir. 2023) (collecting cases and articles). Recent scholarship has cast serious doubt on core premises underpinning the doctrine. *See, e.g.*, Joanna C. Schwartz, *Qualified Immunity's Boldest Lie*, 88 U. Chi. L. Rev. 605, 609-611 (2021) (finding that "qualified immunity doctrine does not accurately reflect how officers are educated about court opinions or the role these opinions play in officers' decisionmaking"); Alexander A. Reinert, *Qualified Immunity's Flawed Foundation*, 111 Calif. L. Rev. 201, 204 (2023) (arguing that the Supreme Court's qualified immunity decisions "disregard[] the explicit (albeit obscured) statutory text of the 1871 Civil Rights Act, the original version of Section 1983, which speaks to the Reconstruction Congress's intent to create liability for constitutional violations and displace any existing common law immunities"). "Reconsidering whether the doctrine should continue in its current form, however, is not within [this court's] purview." *Mack*, 63 F.4th at 226.

whether that right was clearly established at the time of the alleged violation. *Saucier v. Katz*, 533 U.S. 194, 200-01 (2001).[9] "A right is clearly established if it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Reedy v. Evanson*, 615 F.3d 197, 224 (3d Cir. 2010) (internal quotation marks omitted). This means that there is either "a closely analogous case that establishes that the Defendant's conduct was unconstitutional" or "that the Defendant's conduct was so patently violative of the constitutional right that reasonable officials would know without guidance from a court." *Schneyder v. Smith*, 653 F.3d 313, 330 (3d Cir. 2011) (quoting *Est. of Escobedo v. Bender*, 600 F.3d 770, 780 (7th Cir. 2010)). Courts in this circuit "take a broad view of what makes a right clearly established, which can be satisfied even without a precise factual correspondence between the case at issue and a previous case." *Mack v. Yost,* 63 F.4th 211, 232 (3d Cir. 2023) (internal quotation marks omitted). At bottom, the "clearly established" standard seeks to "shield officials from harassment, distraction, and liability when they perform their duties reasonably" while still "hold[ing] [them] accountable when they exercise power irresponsibly." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009).

In this case, Philadelphia and Ansel argue that the individual police officer defendants are entitled to qualified immunity on Crosland's deliberate suppression of exculpatory evidence claim (Count III of the SAC) and part of his malicious prosecution claim (Count II). Phila. Mot. (ECF 36) at 12; Ansel Mot. (ECF 47) at 12-14. Because both rights, when properly defined, were clearly established at the time of the alleged misconduct, the motion will be denied.

### 1. *Deliberate Suppression of Exculpatory Evidence (Count III)*

Crosland alleges that the individual officers deliberately concealed exculpatory evidence

---

[9] Courts need not address these questions in order. *See Pearson v. Callahan*, 555 U.S. 223, 227 (2009). "The burden of establishing qualified immunity falls to the official claiming it as a defense." *Burns v. Pa. Dep't of Corr.*, 642 F.3d 163, 176 (3d Cir. 2011). Because the case is before me on a motion to dismiss, I will construe the SAC liberally and take its factual allegations as true when performing this analysis. *See Clark v. Coupe*, 55 F.4th 167, 178 (3d Cir. 2022).

in violation of the Fourteenth Amendment. SAC (ECF 33) ¶ 141. Philadelphia and Ansel argue that the officers are entitled to qualified immunity on this claim because the right underlying it— to have exculpatory or impeachment evidence disclosed—was not clearly established until 2005, when the Third Circuit applied *Brady v. Maryland* to police officers in *Gibson v. Superintendent of New Jersey Department of Law & Public Safety*, 411 F.3d 427 (3d Cir. 2005). *See* Phila. Mot. (ECF 36) at 12-13; Ansel Mot. (ECF 47) at 13.[10] This position mischaracterizes the relevant right.

Long before *Gibson* or even *Brady*, a constitutional right not to be convicted "through perjured testimony and the deliberate suppression of evidence favorable to the accused" was clearly established. *Dennis v. City of Phila.*, 19 F.4th 279, 290 (3d Cir. 2021); *see Pyle v. Kansas*, 317 U.S. 213, 216 (1942) (holding that the state's knowing use of perjured testimony and "deliberate suppression . . . of evidence favorable to" a criminal defendant violated the Constitution); *Napue v. People of State of Ill.*, 360 U.S. 264, 269 (1959) ("[I]t is established that a conviction obtained through use of false evidence, known to be such by representatives of the State, must fall under the Fourteenth Amendment. The same result obtains when the State, although not soliciting false evidence, allows it to go uncorrected when it appears." (citations omitted)); *see also Swainson v. City of Phila.*, No. 22-2163, 2023 WL 144283, at *4 (E.D. Pa. Jan. 10, 2023) (Pratter, J.) ("[T]he right to a fair trial, unlike *Brady* rights, was crystal clear in 1988."). A claim goes beyond *Brady* and implicates this broader right when police "knowing[ly] use . . . false testimony or other fabricated evidence or . . . conceal[] evidence to create false testimony to secure a conviction." *Dennis*, 19 F.4th at 291 (emphasis omitted).

---

[10] *Brady v. Maryland* held "that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. 83, 87 (1963). As defendants explain, the Third Circuit extended this constitutional obligation to police officers in *Gibson*, holding "that police officers and other state actors may be liable under § 1983 for failing to disclose exculpatory information to the prosecutor." *Gibson*, 411 F.3d at 443.

Crosland's SAC implicates this broader right. He alleges that Everett's preliminary hearing statement, which was introduced into evidence at both the 1988 and 1991 trials, was false, that the officers knew or should have known it was false, and that they withheld evidence contradicting it from defense counsel, prosecutors, and the court. SAC (ECF 33) ¶¶ 49, 65-66, 69-70, 82-83, 94. That buried evidence—including the information about Everett's ulterior motives, his failed polygraph, and his girlfriend's contrary statement—significantly undermined Everett's false testimony. *Id.* ¶ 65. Crosland further alleges that the officers concealed the intense pressure they used to extract Tilghman's false statement in the 1988 trial—culminating in their intimidating day-of-trial visit to her home—and then lied to prosecutors about her availability during the 1991 trial. *Id.* ¶¶ 84-87, 95-96. These allegations reflect an effort to "conceal[] from the defense the evidence that revealed that trial testimony as false." *Dennis*, 19 F.4th at 291-92. "To recharacterize [Crosland's] claims simply as *Brady* claims would run afoul of the longstanding principle that the plaintiff, as the master of the complaint, is free to choose between legal theories." *Id.* at 291. The motions to dismiss Count III against the individual officers will therefore be denied.

### 2.  *Malicious Prosecution (Count II) Under a Fourteenth Amendment Theory*

Crosland next alleges that the individual officers maliciously prosecuted him in violation of the Fourth and Fourteenth Amendments. SAC (ECF 33) ¶ 140. Though malicious prosecution is a state law tort, "a claim for malicious prosecution is actionable under [§ 1983]." *Lee v. Mihalich*, 847 F.2d 66, 70 (3d Cir. 1988).[11] At its core, "malicious prosecution . . . remedies detention accompanied, not by absence of legal process, but by wrongful institution of legal

---

[11] Under Pennsylvania law, "a party bringing a malicious prosecution claim must demonstrate that (1) the defendants initiated a criminal proceeding; (2) the criminal proceeding ended in the plaintiff's favor; (3) the proceeding was initiated without probable cause; and (4) the defendants acted maliciously or for a purpose other than bringing the plaintiff to justice." *Hilfirty v. Shipman*, 91 F.3d 573, 579 (3d Cir. 1996). To bring a Fourth Amendment malicious prosecution claim under § 1983, the Third Circuit has held that there is a fifth element: that "the plaintiff suffered deprivation of liberty consistent with the concept of seizure as a consequence of a legal proceeding." *Est. of Smith v. Marasco*, 318 F.3d 497, 521 (3d Cir. 2003).

process." *Wallace v. Kato*, 549 U.S. 384, 390 (2007).[12] This is precisely what Crosland's SAC alleges—that the individual officers initiated a prosecution against him maliciously and without probable cause. SAC (ECF 33) ¶¶ 64-65, 140.

The parties disagree, however, about which "constitutional peg" Crosland can hang his malicious prosecution claim on. *Albright v. Oliver*, 510 U.S. 266, 270 n.4 (1994); *cf. DiBella v. Borough of Beachwood*, 407 F.3d 599, 601 (3d Cir. 2005) ("§ 1983 is not a source of substantive rights but a vehicle for vindicating rights conferred by the U.S. Constitution or by federal statute."). Philadelphia and Ansel challenge the claim only to the extent that it relies on the Fourteenth Amendment.[13] They argue that the viability of a Fourteenth Amendment right to be free from malicious prosecution remains unsettled today and that such a right therefore could not have been clearly established between 1987 and 1991, when Crosland was investigated, arrested, and tried. Phila. Mot. (ECF 36) at 13-14; Ansel Mot. (ECF 47) at 14.

The distinction between Fourth and Fourteenth Amendment theories could prove significant. The Fourth Amendment's protections are limited in scope, "extend[ing] only until trial." *Halsey v. Pfeiffer*, 750 F.3d 273, 291 (3d Cir. 2014); *see Schneyder v. Smith*, 653 F.3d 313, 315, 319-21 (3d Cir. 2011). In this case, the Fourth Amendment's limitations could affect both the conduct that Crosland's malicious prosecution claim reaches and the harm it can redress. First, Crosland alleges that the officers' misconduct extended beyond the pretrial phase, through two trials that happened more than two years apart. SAC (ECF 33) ¶¶ 83-87, 91, 95-96. Second, post-

---

[12] As one court in this district summarized, "[p]olice officers (as opposed to prosecutors) may be liable for malicious prosecution if they conceal or misrepresent material facts to the prosecutor. In particular, an officer is liable if he fails to disclose exculpatory evidence to prosecutors, makes false or misleading reports to the prosecutor, omits material information from the reports, or otherwise interferes with the prosecutor's ability to exercise independent judgment in deciding whether to prosecute." *Thomas v. City of Phila.*, 290 F. Supp. 3d 371, 379 (E.D. Pa. 2018) (Pratter, J.) (cleaned up); *see also Halsey v. Pfeiffer*, 750 F.3d 273, 297 (3d Cir. 2014) (noting that police officers may be liable for malicious prosecution if they "conceal and misrepresent material facts to the district attorney").

[13] Philadelphia and Ansel do not move to dismiss Crosland's Fourth Amendment malicious prosecution claim.

trial incarceration "does not qualify as a Fourth Amendment seizure," *Torres v. McLaughlin*, 163 F.3d 169, 174 (3d Cir. 1998), meaning that "damages for post-conviction injuries are not within the purview of the Fourth Amendment." *Donahue v. Gavin*, 280 F.3d 371, 382 (3d Cir. 2002). Crosland was, of course, arrested in December 1987—a paradigmatic Fourth Amendment seizure. SAC (ECF 33) ¶ 68; *see Torres v. Madrid*, 141 S. Ct. 989, 996 (2021) ("As we have repeatedly recognized, the arrest of a person is quintessentially a seizure." (internal quotation marks omitted)). But he also suffered a far greater deprivation of liberty: over thirty-three years of incarceration following his 1988 and 1991 trials. SAC (ECF 33) ¶ 6.

Philadelphia and Ansel are right that, as of today, the status of a Fourteenth Amendment right to be free from malicious prosecution is murky. This confusion traces back to the Supreme Court's plurality opinion in *Albright v. Oliver*, 510 U.S. 266 (1994). In a fractured opinion, the plurality held that malicious prosecution claims could not be grounded in substantive due process. *Id.* at 275. Because "[t]he protections of substantive due process have for the most part been accorded to matters relating to marriage, family, procreation, and the right to bodily integrity," the plurality reasoned, they were a poor fit for a "claim to free from prosecution except on the basis of probable cause." *Id.* at 272. The plurality instead suggested—but did not decide—that a malicious prosecution claim could be viable under the Fourth Amendment. *Id.* at 274-75. And it did not address whether such a claim could fall under the Fourteenth Amendment's procedural due process protections because "the only deprivation of life, liberty or property [in the case], if any, consisted of petitioner's pretrial arrest." *Id.* at 275 (Scalia, J., concurring).

The *Albright* decision upended settled law in this circuit. Before 1994, the Third Circuit entertained malicious prosecution claims under the Fourteenth Amendment. *See, e.g., Losch v. Borough of Parkesburg, Pa*., 736 F.2d 903, 907 (3d Cir. 1984) (analyzing a plaintiff's claim of a

"violation of his Fourth and Fourteenth Amendment rights to be free from arrest without probable cause"). As long as the claim "include[d] the elements of the common law tort as it has developed," the plaintiff alleged a constitutional violation eligible for relief under § 1983. *Lee v. Mihalich*, 847 F.2d 66, 70 (3d Cir. 1988); *see also Lippay v. Christos*, 996 F.2d 1490, 1502 (3d Cir. 1993) ("Lippay's malicious prosecution claim was asserted as a violation of the due process clause. We have recognized such a claim under section 1983, so long as the plaintiff proves the existence of the elements of the common law tort of malicious prosecution.").[14]

In the wake of *Albright*, courts in this circuit struggled to pinpoint how the plurality opinion altered the consensus that prevailed before 1994. *See Merkle v. Upper Dublin Sch. Dist.*, 211 F.3d 782, 792 (3d Cir. 2000) ("*Albright* casts doubt on prior circuit precedent adopting common law malicious prosecution as the test in a § 1983 action." (internal quotation marks omitted)). The clearest post-*Albright* statement from the Third Circuit came in *Torres v. McLaughlin*, in which the court "d[id] not read *Albright* to hold that a malicious prosecution claim can only be based in a Fourth Amendment violation." 163 F.3d 169, 173 (3d Cir. 1998). While *Albright* foreclosed the substantive due process theory, the Third Circuit said that "a section 1983 malicious prosecution claim may also include police conduct that violates the Fourth Amendment, the procedural due process clause or other explicit text of the Constitution." *Id.*; *see also Washington v. Hanshaw*, 552 F. App'x 169, 174 n.3 (3d Cir. 2014) ("Our cases interpreting *Albright* have suggested that § 1983 malicious prosecution claims may be predicated on constitutional provisions other than the Fourth Amendment, such as procedural due process."). But another case, decided the same year as *Torres*, implied—but did not say outright—that the Fourth Amendment was the only viable

---

[14] At least one other circuit analyzed malicious prosecution claims under the Fourteenth Amendment. *See Spurlock v. Satterfield*, 167 F.3d 995, 1006 (6th Cir. 1999) ("Prior to January 1994 . . . this circuit analyzed [the] right [to be free from malicious prosecution] as accruing under the Fourteenth rather than the Fourth Amendment.").

constitutional hook for a malicious prosecution claim. *Gallo v. City of Phila.*, 161 F.3d 217, 222 (3d Cir. 1998); *see also Halsey v. Pfeiffer*, 750 F.3d 273, 290 n.14 (3d Cir. 2014) (acknowledging the confusion). And subsequent cases have not presented the issue for the Third Circuit to definitively resolve. *See Donahue v. Gavin*, 280 F.3d 371, 383 n.18 (3d Cir. 2002) ("[B]ecause [the plaintiff's] § 1983 malicious prosecution claim is based only on the Fourth Amendment it ought not to be analyzed under procedural due process notions . . . ."); *Halsey*, 750 F.3d at 290 n.14 ("[The plaintiff] abandoned the Fourteenth Amendment iteration of the malicious prosecution claim, thus obviating the need for us to decide its viability."); *see also Thompson v. Clark*, 142 S. Ct. 1332, 1337 n.2 (2022) (declining to address whether "the Due Process Clause could be an appropriate analytical home for a malicious prosecution claim" because the plaintiff brought the claim under the Fourth Amendment). While uncertainty still prevails, then, the balance of the Third Circuit's post-*Albright* caselaw indicates that a claim for malicious prosecution grounded in the Fourteenth Amendment's procedural due process protections remains viable.[15]

And despite the confusion *Albright* sowed, there is significant theoretical support for such a right. The Third Circuit has drawn a clear temporal line between the Fourth Amendment's protection and the Fourteenth's: while "the Fourth Amendment forbids a detention without probable cause . . . this protection against unlawful seizures extends only until trial." *Halsey*, 750 F.3d at 291 (citation omitted); *see also Manuel v. City of Joliet, Ill.*, 580 U.S. 357, 369 n.8 (2017) ("[O]nce a trial has occurred, the Fourth Amendment drops out."); *DeLade v. Cargan*, 972 F.3d 207, 212 (3d Cir. 2020) (holding "that the Fourth Amendment always governs claims of unlawful arrest and pretrial detention when that detention occurs prior to the detainee's first appearance

---

[15] Another court in this district came to a similar conclusion. *See Lewis v. City of Phila.*, No. 19-2847, 2020 WL 1683451, at *7 (E.D. Pa. Apr. 6, 2020) (Baylson, J.) ("The Court rejects Defendants' assertion that [the plaintiff's] Fourteenth Amendment malicious prosecution claim is barred as a matter of law.").

before a court"). "The guarantee of due process of law, by contrast, is not so limited as it protects defendants during an entire criminal proceeding through and after trial." *Halsey*, 750 F.3d at 291.

Crosland's allegations straddle this temporal line. He claims that the officers not only "influenced . . . the decision to institute criminal proceedings" by "conceal[ing] and misrepresent[ing] material facts to the district attorney," *id.* at 297; *see* SAC (ECF 33) ¶¶ 63-70, 77-80, but also that they perpetuated those ill-begotten proceedings by threatening a witness and lying about her availability, *see id.* ¶¶ 84-87, 95-96. As these allegations make clear, a malicious prosecution—even one that includes an arrest or other Fourth Amendment seizure—does not always end there. *Cf. Black v. Montgomery Cnty.*, 835 F.3d 358, 369 n.11 (3d Cir. 2016) (declining to distinguish between Fourth and Fourteenth Amendment claims where the alleged misconduct "infected the entirety of the criminal proceeding, from securing the indictment through trial").[16] And when that prosecution extends beyond the pretrial phase, "constitutional analysis shifts to the Due Process Clause." *Pierce v. Gilchrist*, 359 F.3d 1279, 1286 (10th Cir. 2004); *see Halsey*, 750 F.3d at 292 (noting that some of the plaintiff's allegations "do not fall under the traditional definition of a Fourth Amendment malicious prosecution claim" before proceeding to Fourteenth Amendment analysis); *Black*, 835 F.3d at 371 (describing "corruption of the trial process" as a due process "injury"); *Mondragon v. Thompson*, 519 F.3d 1078, 1082 (10th Cir. 2008) ("If [the plaintiff] has been imprisoned pursuant to legal but wrongful process, he has a claim under the procedural component of the Fourteenth Amendment's Due Process Clause analogous to a tort

---

[16] In *Albright*, as in many malicious prosecution cases, the Fourteenth Amendment was never implicated because the plaintiff was arrested but the charges were dropped or dismissed before trial. *See, e.g.*, *Est. of Smith v. Marasco*, 318 F.3d 497, 521-22 (3d Cir. 2003) ("[The plaintiff's] claim is based on the issuance of a warrant for [his] arrest and the subsequent withdrawal of charges for lack of probable cause."); *DeLade v. Cargan*, 972 F.3d 207, 213 (3d Cir. 2020) ("[The plaintiff] alleges that [the police officer defendant's] conduct caused his pretrial confinement until his extradition hearing, when the Commonwealth dropped the arrest-prior-to-requisition charge."); *Xi v. Haugen*, No. 21-2798, 2023 WL 3608347, at *4 (3d Cir. May 24, 2023) (noting that a plaintiff's claims implicated only the Fourth Amendment "because they are founded on allegations that [he] was deprived of pretrial liberty without probable cause").

claim for malicious prosecution."); *Albright v. Oliver*, 510 U.S. 266, 275 (1994) (Scalia, J., concurring) ("One can conceive of many abuses of the trial process . . . that might cause a criminal sentence to be a deprivation of life, liberty or property without due process."). This crucial temporal distinction leads me to conclude that Crosland has adequately pled a constitutional claim. *Cf. Thomas v. City of Phila.*, 290 F. Supp. 3d 371, 382 (E.D. Pa. 2018) (Pratter, J.) ("This temporal distinction suggests that a procedural due process right against malicious prosecution may exist.").

That leaves the second prong of the qualified immunity analysis: whether the officers' conduct violated clearly established law. At first glance, the fog shrouding a Fourteenth Amendment malicious prosecution claim today appears to resolve the issue in the officers' favor, as several of my colleagues have concluded. *See id.* at 382-83; *Alicea v. City of Phila.*, No. 22-3437, 2022 WL 17477143, at *4 (E.D. Pa. Dec. 6, 2022) (Sánchez, C.J.); *Lewis v. City of Phila.*, No. 19-2847, 2020 WL 1683451, at *7-8 (E.D Pa. Apr. 6, 2020) (Baylson, J.). But when evaluating a qualified immunity defense, "[t]he state of the law must be considered at the time of the challenged action." *Lee v. Mihalich*, 847 F.2d 66, 71 (3d Cir. 1988); *see also Pearson v. Callahan*, 555 U.S. 223, 244 (2009) ("[The 'clearly established'] inquiry turns on the objective legal reasonableness of the action, assessed in light of the legal rules that were clearly established at the time it was taken." (internal quotation marks omitted)). The relevant events in this case—Crosland's 1987 arrest, the 1988 trial, and the 1991 trial—all took place before *Albright*, at a time when this circuit unequivocally recognized a right to be free from malicious prosecution grounded in the Fourteenth Amendment's due process protections. During this period, the Third Circuit rejected qualified immunity defenses in cases where police officers initiated prosecutions without probable cause. *See Losch v. Borough of Parkesburg, Pa.*, 736 F.2d 903, 910 (3d Cir. 1984); *Lippay v. Christos*, 996 F.2d 1490, 1504 (3d Cir. 1993). And nothing in those pre-*Albright* cases

restricted malicious prosecution claims to the Fourth Amendment's sphere of protection. At the time of the misconduct alleged in this case, therefore, it was clearly established that a malicious prosecution violated the Constitution, and that this right was not limited to the pretrial phase covered by the Fourth Amendment.

The intervening change in the doctrinal landscape wrought by *Albright* does not alter the clearly established nature of the right from 1987 to 1991. The Third Circuit considered and rejected this argument in a case decided several years after *Albright*, noting that the misconduct at issue "occurred prior to 1994" and that the officers were therefore "not entitled to qualified immunity because the pre-*Albright* law of this circuit clearly provided that malicious prosecution violated federal law." *Gallo v. City of Phila.*, 161 F.3d 217, 220 n.4 (3d Cir. 1998); *cf. Spurlock v. Satterfield*, 167 F.3d 995, 1006 n.19 (6th Cir. 1999) (rejecting an officer's qualified immunity claim because "the fundamental principle that an individual has a constitutional right to be free from malicious prosecution . . . was clearly established well before [*Albright*] was decided"). Though *Albright* may have altered the underlying legal analysis, the right's existence was never in doubt.

The logic underpinning qualified immunity doctrine only strengthens this conclusion. "The ultimate question" in a qualified immunity inquiry "is whether the defendant had fair warning that his conduct deprived his victim of a constitutional right." *Schneyder v. Smith*, 653 F.3d 313, 329 (3d Cir. 2011) (internal quotation marks omitted); *see also Mullenix v. Luna*, 577 U.S. 7, 12 (2015) ("The dispositive question is whether the violative nature of particular conduct is clearly established." (cleaned up)). Critically, "[t]he established-right prong of a qualified immunity defense does not demand that there had been a precise preview of the applicable legal analysis underlying the defense." *Halsey v. Pfeiffer*, 750 F.3d 273, 295 (3d Cir. 2014); *see also Jacobs v.*

*Cumberland Cnty.*, 8 F.4th 187, 197 n.9 (3d Cir. 2021) (finding that an officer's conduct violated clearly established law even though it was unclear whether the Eighth or Fourteenth Amendment legal standard applied); *Jackson v. City of Cleveland*, 925 F.3d 793, 826 (6th Cir. 2019) ("Whether a defendant is protected by qualified immunity turns not on whether the defendant was on notice that his actions satisfied the elements of a particular cause of action, but instead on whether the defendant was on notice that his actions violated the laws of the United States."); *Miller v. Maddox*, 866 F.3d 386, 395 (6th Cir. 2017) (noting that a defendant's "claim that the contours of our jurisprudence concerning malicious prosecution are not entirely clear misses the point" because the proper "inquiry is whether [his] alleged actions . . . violated [the plaintiff's] clearly established constitutional rights").

This pronouncement rings with particular force in this case, where Crosland alleges a through-line of misconduct that extended from investigation and arrest until trial. He not only claims that the original affidavit of probable cause was based "exclusively" on an unreliable witness whose statement was contravened by evidence in the officers' possession, SAC (ECF 33) ¶¶ 63-65, but also that the officers took affirmative steps during his first and second trials to perpetuate those flawed charges, *id.* ¶¶ 84-87 (threatening a witness with criminal charges if she did not testify); *id.* ¶¶ 95-96 (falsely informing prosecutors that a witness was unavailable). It would strain credulity to proclaim this alleged behavior unreasonable through pretrial detention but reasonable once the Fourth Amendment's protections fall away.

From the thinly sourced affidavit through the false statement about a witness's availability, *id.* ¶¶ 64, 95, what Crosland ultimately alleges is that the individual defendants violated one of the clearest commands of our Constitution: that criminal charges must only be brought based on probable cause. *See Andrews v. Scuilli*, 853 F.3d 690, 705 (3d Cir. 2017) (remarking that "the right

to be free from prosecutions on criminal charges that lack probable cause" is "grounded in well-settled law"). At no point in his prosecution could any reasonable officer have thought otherwise. The motions to dismiss Count II against the individual officers will therefore be denied.

### B. Personal Involvement

Philadelphia and Ansel next move to dismiss defendants Joseph Descher, Joseph Brignola, and Francis Ansel from the case because Crosland failed to sufficiently plead their personal involvement in the investigation. Phila. Mot. (ECF 36) at 10-11; Ansel Mot. (ECF 47) at 11-12. Because Crosland's SAC alleges enough facts to support a reasonable inference that these officers knew of and acquiesced to the alleged misconduct, the motion will be denied.

A defendant in a § 1983 action "must have personal involvement in the alleged wrongs; liability cannot be predicated solely on the operation of *respondeat superior*." *Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988). "Personal involvement can be shown through allegations of personal direction or of actual knowledge and acquiescence." *Id.* At this early stage of the case, Crosland need only plead facts that, taken as true, "allow[] the court to draw the reasonable inference that" each defendant knew of and acquiesced to the alleged misconduct. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Crosland's SAC meets this standard for all three officers. It alleges that they all either "supervised" or "aided in" the investigation of Heo's murder. SAC (ECF 33) ¶ 29. More specifically, Brignola and Ansel allegedly uncovered facts pointing to another suspect's involvement in the murder and recorded that information in the case file. *Id.* ¶ 33-34. Descher allegedly received a document with a statement calling Everett's account into question and implicating a third suspect. *Id.* ¶¶ 60-62. These alleged actions strike at the core of Crosland's claims: that the police ignored alternate suspects, knew (or should have known) that Everett's

statement implicating Crosland was false, and concealed this information from prosecutors and defense counsel. For now, these facts are enough to plead Descher, Brignola, and Ansel's knowledge of and acquiescence to the alleged misconduct. The motions to dismiss these defendants from the case will therefore be denied.

### C. <u>Municipal Liability</u>

In addition to the individual officers, Crosland names the City of Philadelphia as a defendant. SAC (ECF 33) ¶ 142. Municipalities, like individuals, can be liable under § 1983 for violating a plaintiff's constitutional rights. *See Monell v. Dep't of Soc. Servs. of N.Y.*, 436 U.S. 658, 690-91 (1978); *City of Canton, Ohio v. Harris*, 489 U.S. 378, 380 (1989). "[A] § 1983 claim against a municipality may proceed in two ways. A plaintiff may put forth that an unconstitutional policy or custom of the municipality led to his or her injuries, or that they were caused by a failure or inadequacy by the municipality that reflects a deliberate or conscious choice" through a failure to train, discipline, or supervise its officers. *Forrest v. Parry*, 930 F.3d 93, 105 (3d Cir. 2019) (cleaned up). Crosland's SAC advances both the "policy or custom" theory and the "failure to train, discipline, or supervise" theory. SAC (ECF 33) ¶¶ 117-122, 127-128, 131, 142.

Philadelphia moves to dismiss Crosland's municipal liability claim (Count IV of the SAC) on two grounds. First, the city argues that the court must dismiss the claim in its entirety because Crosland did not plead enough facts to support it. Phila. Mot. (ECF 36) at 14. In the alternative, the city argues that the court must dismiss the claim with respect to any rights that were not clearly established at the time of the alleged misconduct. *Id.* Neither argument is persuasive.

### 1. *Specificity*

Municipal liability under § 1983 "is generally not amenable to resolution at the pleading stage, as it requires a plaintiff to plead facts outside his or her personal knowledge." *3909 Realty*

*LLC v. City of Phila.*, No. 21-030, 2021 WL 2342929, at *4 (E.D. Pa. June 8, 2021) (Kenney, J.). At this early stage of the case, Crosland has pled enough facts for the claim to survive under either the "policy or custom" theory or the "failure to train, discipline, or supervise" theory.

To succeed on the "policy or custom" theory, Crosland must point to "an official proclamation, policy or edict by a decisionmaker possessing final authority to establish municipal policy on the relevant subject," or "a given course of conduct so well-settled and permanent as to virtually constitute law." *Forrest*, 930 F.3d at 105-06. "[I]t is not necessary for a plaintiff to establish affirmative acts: 'deliberate indifference, lack of compliance and failure to adhere to . . . standards' may also constitute custom." *Swainson v. City of Phila.*, No. 22-2163, 2023 WL 144283, at *5 (E.D. Pa. Jan. 10, 2023) (Pratter, J.) (quoting *A v. Nutter*, 737 F. Supp. 2d 341, 362 (E.D. Pa. 2010) (DuBois, J.)). The plaintiff also "must demonstrate a plausible nexus or affirmative link between the municipality's custom and the specific deprivation of constitutional rights at issue." *Bielevicz v. Dubinon*, 915 F.2d 845, 850 (3d Cir. 1990) (internal quotation marks omitted).

The "failure to train, discipline, or supervise" theory requires that Crosland show that the failure "amounts to deliberate indifference to the rights of persons with whom the police come into contact." *City of Canton, Ohio v. Harris*, 489 U.S. 378, 388 (1989). This means that "(1) municipal policymakers know that employees will confront a particular situation, (2) the situation involves a difficult choice or a history of employees mishandling, and (3) the wrong choice by an employee will frequently cause deprivation of constitutional rights." *Forrest*, 930 F.3d at 106. Alleging facts about "the City's inadequate disciplinary systems and how the City was aware of repeated constitutional violations but deliberately failed to act" is sufficient to survive a motion to dismiss. *Swainson*, 2023 WL 144283, at *5.

Crosland meets these standards. His SAC describes repeated misconduct by the

Philadelphia Police Department in other high-profile cases, demonstrating a "pervasive" pattern. SAC (ECF 33) ¶¶ 115-116, 123-126. He further claims that there was a department-wide "custom of concealing and withholding exculpatory evidence" by hiding investigative records from the District Attorney's Office and defense counsel. *Id.* ¶¶ 117-121, 127. And these alleged practices are closely related to the misconduct at issue here. *Id.* ¶¶ 31, 34-37, 52, 61, 63, 65-66, 70, 83, 91, 103, 106 (alleging that officers recorded exculpatory evidence in the case file and withheld it from prosecutors and defense counsel); *see Alicea v. City of Phila.*, No. 22-3437, 2022 WL 17477143, at *6 (E.D. Pa. Dec. 6, 2022) (Sánchez, C.J.) (finding that the plaintiff had pled a nexus between the policy or custom and the deprivation of rights he suffered because "the City permitted the PPD to violate rights by, for example failing to turn over exculpatory evidence, the individual defendants failed to turn over evidence tending to show [the plaintiff's] innocence, and [the plaintiff] was wrongfully convicted"). The SAC also describes a deficient disciplinary process that failed to timely resolve complaints, adequately investigate allegations of misconduct, and deter repeat offenders. SAC (ECF 33) ¶ 128. At the pleading stage, these allegations are sufficient to "raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). The motion to dismiss the municipal liability claim entirely will therefore be denied.

## 2. *Clearly Established Rights*

Unlike individual government officials, municipalities are not entitled to qualified immunity under § 1983. *Owen v. City of Indep.*, 445 U.S. 622, 657 (1980); *Leatherman v. Tarrant Cnty. Narcotics Intel. & Coordination Unit*, 507 U.S. 163, 166 (1993); *Barna v. Bd. of Sch. Dirs. of Panther Valley Sch. Dist.*, 877 F.3d 136, 145 (3d Cir. 2017). Nonetheless, municipal liability under a "failure to train, discipline, or supervise" theory requires a showing that the municipality was "deliberate[ly] indifferen[t]" to the underlying constitutional violation. *Forrest v. Parry*, 930

F.3d 93, 106 (3d Cir. 2019); *City of Canton v. Harris*, 489 U.S. 378, 390 & n.10 (1989). Relying on several out-of-circuit cases and decisions from this district adopting their reasoning, Philadelphia argues that a municipality can only be "deliberately indifferent" to a constitutional violation if the underlying right was clearly established at the time. Phila. Mot. (ECF 36) at 20.[17] Adopting the city's analysis would import the "clearly established" inquiry from qualified immunity doctrine into the municipal liability standard.[18] *See* Joanna C. Schwartz, *Backdoor Municipal Immunity*, 132 Yale L.J. F. 136, 138 (2022). I reject this "conflation" of qualified immunity and municipal liability standards. *Id.*

   While the Third Circuit has not squarely addressed this question in a precedential opinion,

_____

[17] There is an unresolved circuit split on this question. The First, Fifth, Sixth, and Eighth Circuits have held that a municipality can only be deliberately indifferent to a clearly established right. *See Joyce v. Town of Tewksbury, Mass.*, 112 F.3d 19, 23 (1st Cir. 1997) ("[O]ur rationale here for granting qualified immunity to the officers—that the unsettled state of the law made it reasonable to believe the conduct in this case constitutional—also precludes municipal liability."); *Bustillos v. El Paso Cnty. Hosp. Dist.*, 891 F.3d 214, 222 (5th Cir. 2018) ("Because [the plaintiff] did not demonstrate a clearly established right, it follows that her claims for deliberate indifference against the [municipal defendant] also fail."); *Arrington-Bey v. City of Bedford Heights, Ohio*, 858 F.3d 988, 995 (6th Cir. 2017) (holding that for a "failure to train" claim to prevail "it must be obvious (*i.e.*, clearly established) that the conduct will violate constitutional rights"); *Szabla v. City of Brooklyn Park, Minn.*, 486 F.3d 385, 393 (8th Cir. 2007) (en banc) ("[A] municipal policymaker cannot exhibit fault rising to the level of deliberate indifference to a constitutional right when that right has not yet been clearly established."). Several courts in this district have adopted the reasoning of these decisions. *See Outlaw v. City of Phila.*, No. 21-1290, 2021 WL 3471168, at *8 (E.D. Pa. Aug. 6, 2021) (Kenney, J.); *Lewis v. City of Phila.*, No. 19-2847, 2020 WL 1683451, at *12 (E.D. Pa. Apr. 6, 2020) (Baylson, J.); *Onyiah v. City of Phila.*, No. 22-1556, 2023 WL 2467863, at *9 (E.D. Pa. Mar. 10, 2023) (Padova, J.); *Ogrod v. City of Phila.*, 598 F. Supp. 3d 253, 276 (E.D. Pa. 2022) (Padova, J.); *Thomas v. City of Phila.*, 290 F. Supp. 3d 371, 387 (E.D. Pa. 2018) (Pratter, J.); *Alicea v. City of Phila.*, No. 22-3437, 2022 WL 17477143, at *5 (E.D. Pa. Dec. 6, 2022) (Sánchez, C.J.). The Ninth and Tenth Circuits, in contrast, have rejected this categorical rule. *See Quintana v. Santa Fe Cnty. Bd. of Comm'rs*, 973 F.3d 1022, 1033-34 (10th Cir. 2020) (holding that a plaintiff adequately pled deliberate indifference despite a lack of clearly established law); *Myers v. Okla. Cnty. Bd. of Cnty. Comm'rs*, 151 F.3d 1313, 1317 (10th Cir. 1998) ("[I]f a jury returns a general verdict for an individual officer premised on qualified immunity, there is no inherent inconsistency in allowing suit against the municipality to proceed . . . ."); *Horton by Horton v. City of Santa Maria*, 915 F.3d 592, 603-05 (9th Cir. 2019) (noting that a municipal liability claim could succeed even though the law was not clearly established "if the other requisites of *Monell* liability are met"). Panels of the Second Circuit have gone both ways. *Compare Townes v. City of New York*, 176 F.3d 138, 143 (2d Cir. 1999) ("[M]unicipal liability under a failure to train theory requires, in part, that municipal employees violate or are likely to violate a clearly established federal constitutional right."), *and Young v. Cnty. of Fulton*, 160 F.3d 899, 904 (2d Cir. 1998) ("[A] claim for failure to train cannot be sustained unless the employees violated a clearly established federal constitutional right."), *with Askins v. Doe No. 1*, 727 F.3d 248, 254 (2d Cir. 2013) ("[T]he entitlement of the individual municipal actors to qualified immunity because at the time of their actions there was no clear law or precedent warning them that their conduct would violate federal law is . . . irrelevant to the liability of the municipality.").

[18] After analyzing defendants' qualified immunity arguments, I did not hold that any of the rights asserted by Crosland were not clearly established at the time of the alleged misconduct. I nonetheless address the city's argument to provide clarity to the parties.

its caselaw suggests that municipal liability should remain untethered to the "clearly established" qualified immunity standard. In two recent cases, the court found that individual defendants were entitled to qualified immunity because the relevant right was not clearly established, but nonetheless remanded the municipal liability issue to the district court. *Fields v. City of Phila.*, 862 F.3d 353, 362 (3d Cir. 2017); *Barna v. Bd. of Sch. Dirs. of Panther Valley Sch. Dist.*, 877 F.3d 136, 150 (3d Cir. 2017). This approach accords with prior circuit precedent, which "requires the district court to review the plaintiffs' municipal liability claims independently of the section 1983 claims against the individual police officers, as the City's liability . . . does not depend upon the liability of any police officer." *Kneipp v. Tedder*, 95 F.3d 1199, 1213 (3d Cir. 1996); *see also id.* (instructing the district court on remand to apply its municipal liability standards "notwithstanding the outcome as to the claims against the individual police officers"); *Mann v. Palmerton Area Sch. Dist.*, 872 F.3d 165, 174-75 (3d Cir. 2017) (separately analyzing a municipal liability claim after concluding that the individual defendants were entitled to qualified immunity); *cf. Fagan v. City of Vineland*, 22 F.3d 1283, 1294 (3d Cir. 1994) ("[T]he City's liability does not depend upon the liability of any police officer.").[19]

Requiring that a right be clearly established in a municipal liability claim would also contravene the Supreme Court's decision in *Owen v. City of Independence*, 445 U.S. 622 (1980). In that case, the Court held that "municipalities have no immunity from damages liability flowing from their constitutional violations." *Id.* at 657. Transposing the "clearly established" inquiry— the crux of the qualified immunity defense—onto the municipal liability standard would "cut away

---

[19] The Third Circuit made its view more explicit in a non-precedential opinion, in which it stated that its "conclusion that the right [the plaintiff] claims was not clearly established does not resolve his claims against the municipal defendants, which cannot assert a qualified immunity defense to claims under § 1983." *Harper v. Cnty. of Delaware*, 779 F. App'x 143, 147 (3d Cir. 2019). Given this statement's harmony with binding Third Circuit caselaw, I find it persuasive.

the core principle of *Monell* and *Owen*: [that l]ocal governments . . . should be held liable for the losses they cause." *Carver v. Foerster*, 102 F.3d 96, 103 (3d Cir. 1996); *see also Askins v. Doe No. 1*, 727 F.3d 248, 254 (2d Cir. 2013) ("To rule . . . that the City of New York escapes liability . . . because the individual officers are entitled to qualified immunity would effectively extend the defense of qualified immunity to municipalities, contravening the Supreme Court's holding in *Owen*.").

And there is simply no need to do so. The Supreme Court and Third Circuit have laid out, in great detail, the standards governing municipal liability claims under § 1983. *See, e.g.*, *Forrest v. Parry*, 930 F.3d 93, 105-06 (3d Cir. 2019) (summarizing the doctrine); *Thomas v. Cumberland Cnty.*, 749 F.3d 217, 223 (3d Cir. 2014) (elaborating on the "deliberate indifference" standard). These standards are already demanding. *See* Fred Smith, *Local Sovereign Immunity*, 116 Colum. L. Rev. 409, 430-38 (2016); Joanna C. Schwartz, *Municipal Immunity*, 109 Va. L. Rev. (forthcoming 2023). Absent binding authority from either court, I decline to impose additional requirements on Crosland. The motion to dismiss the municipal liability claim to the extent it relies on rights that were not clearly established at the time of the alleged misconduct will therefore be denied.

## III.   CONCLUSION

For the reasons discussed above, the motions to dismiss will be denied. An appropriate order follows.

S/Anita B. Brody
ANITA B. BRODY, J.

Copies ecf _____ to:

24