**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **Curtis Crosland,** | : | |
| **Plaintiff,** | : | **Civil Action** |
| **v.** | : | **No. 22-cv-02416-AB** |
| **City of Philadelphia et al.,** | : | |
| **Defendants.** | : | |

**Memorandum of Law in Support of**
**Plaintiff's Motion for Partial Summary Judgment**

## I. Introduction

In 1987, detectives in the Philadelphia Police Department homicide division framed plaintiff Curtis Crosland for a murder he did not commit. The detectives, who were investigating the December 5, 1984, shooting death of Il Man Heo, engaged in extensive misconduct. Two-and-a-half years after the murder, a man named Rodney Everett, who was facing his own serious criminal charges, told detectives that he had heard Crosland confess to the Heo murder. Everett's account contained generic information parroting facts reported in newspaper stories about Heo's murder. The account was plainly false, and the detectives had every reason to know. Despite that knowledge, they proceeded to build a prosecution relying only on Everett's claim to have heard a confession from Crosland. In so doing, they presented Everett's statement as if it were true and hid from the court and prosecutors an extensive collection of information conclusively undermining that statement. After they secured Crosland's arrest, they coerced a vulnerable witness named Delores Tilghman into falsely testifying that she overheard Crosland expressing concern that a family member would come forward with information on the murder in order to

collect a monetary award. Crosland was tried and ultimately convicted of murder and sentenced to life imprisonment based on testimonial evidence from Everett and Tilghman.

In 2020, the Philadelphia District Attorney's Office (DAO) initiated an investigation into the circumstances of Crosland's arrest and prosecution. The DAO reviewed the Philadelphia Police Department (PPD) homicide division's file from the Heo murder and located a raft of evidence proving the falsity of Everett's and Tilghman's testimony. That evidence had never previously been disclosed to prosecutors, the court, or Crosland. It showed that police had substantial information about a different suspect who, among other things, matched the physical description of the perpetrator provided by witnesses at the scene of the murder. It showed that Everett had failed a polygraph examination testing the truthfulness of his allegation that Crosland confessed to him. And it showed that detectives learned that Everett had a conversation with his wife in which he identified an entirely different person as the perpetrator of the Heo murder. This information was disclosed to Crosland who brought it to the attention of this Court in connection with pending habeas corpus proceedings. Following the DAO's concession that Crosland is "likely innocent," and that habeas relief was warranted, the Court vacated Crosland's conviction, and the charges were dismissed.

In June 2022, Crosland initiated this civil rights suit, naming as defendants the City of Philadelphia and the detectives and supervisors in the PPD homicide division who were responsible for his arrest, prosecution, conviction, and imprisonment. In the operative pleading, the Fourth Amended Complaint, ECF 73,[1] Crosland brings against the individual defendants

[1] A number of the individuals named in Crosland's previous pleadings are deceased, and as personal representatives for the estates of those individuals have been identified and served, Crosland has amended prior pleadings to properly name those representatives.

three civil rights claims under 42 U.S.C. § 1983 and a state law malicious prosecution claim, and a claim against the City of Philadelphia under *Monell v. Dept. of Social Servs.,* 436 U.S. 658 (1978).

The parties have now completed fact discovery. For most of the issues in the case, there are disputed facts, and Crosland's claims will have to be resolved by a jury. However, as to two of Crosland's claims, his federal malicious prosecution claim under the Fourth Amendment,[2] ECF 74 at ¶ 140, and the state-law analog of that claim, *id.* at ¶ 143, the evidence is overwhelming, and there are no genuine disputes of material fact as to four out of five elements of those claims against defendants Mangoni, Hughes, Rocks, McNesby, Cimino, and Descher. While summary judgment is rarely entered for plaintiffs before trial, the evidence developed in this case calls for a departure from that usual practice and demands the entry of partial judgment as a matter of law that will result in a narrowing of issues to be decided by the jury.[3]

In particular, the record establishes that the defendant detectives sought a warrant for Crosland's arrest for the Heo murder based solely on their description of Rodney Everett's

---

[2] This Court has recognized that Crosland may seek relief for malicious prosecution under both the Fourth and Fourteenth Amendments. *Crosland v. City of Philadelphia*, 676 F. Supp. 3d 364, 274-79 (E.D. Pa. 2023). This motion addresses only the Fourth Amendment claim.

[3] The discovery record provides ample support for Crosland's additional claims against the individual defendants—fabrication of evidence, ECF 73 at ¶ 139, and deliberate suppression of exculpatory evidence, *id.* at ¶ 141—and for Crosland's municipal liability claim against the City of Philadelphia. *Id.* at ¶ 142. Because summary judgment is not warranted on those claims, he limits the factual summary in this memorandum and in the attached Statement of Undisputed Facts to a recounting of facts relevant to the malicious prosecution claims. It bears noting, however, that should the defendants seek summary judgment on these other claims, Crosland will provide the Court with a comprehensive description of the expected trial presentation, including the fact that both witnesses who provided inculpatory information in support of Crosland's prosecution, Rodney Everett and Delores Tilghman, have given deposition testimony recanting their prior statements and establishing that the defendant detectives knew their inculpatory statements were false.

statement alleging that Crosland confessed to that murder while concealing from the court and prosecutors the extensive information in their possession proving the falsity of that statement. When that concealed and omitted information is considered, as a matter of law, there was no probable cause to support Crosland's arrest. Three other elements of Crosland's malicious prosecution claims—that the defendants initiated a prosecution, that the prosecution terminated in Crosland's favor, and that Crosland was deprived of liberty—are also established as a matter of law.

Under Fed. R. Civ. P. 56(a), the Court may grant summary judgment when there are no genuine disputes of material fact as to a "part of each claim" at issue in the case. Accordingly, Crosland moves the Court to enter summary judgment as to these four elements of the federal and state malicious prosecution claims. The final element of the claims—that the defendants acted maliciously—remains the only contested element, and Crosland agrees that this element should be decided by the jury. For the reasons outlined in this memorandum, the Court should grant the motion and instruct the jury at trial that the defendants initiated a prosecution against Crosland, that the prosecution caused a deprivation of Crosland's liberty, that the charges have been favorably terminated, and that the defendants did not have probable cause to support Crosland's prosecution.

## II. Facts

Crosland has provided with this Memorandum the attached Statement of Undisputed Facts ("SUF"), with citations to the evidence developed through discovery in this case. To provide context for the legal arguments in this memorandum as to why the record requires the Court to grant Crosland's motion, a summary of the facts is as follows:

On December 5, 1984, Il Man Heo, the owner and operator of a South Philadelphia grocery store was shot and killed in an apparent attempted robbery. SUF at ¶¶ 1-2, 4. Three on-scene eyewitnesses—Mona Madison, Levi Davis, and Maurice Durbin—gave statements to police, stating that the perpetrator was wearing a hat and scarf pulled over his face, he was a 5'5"-5'7" tall Black man, he referred to Heo by his nickname "Tony," and he fled north on South 27th Street after shooting Heo. *Id.* at ¶ 5.

Throughout the PPD's investigation into the Heo murder, detectives in the homicide division used documents called "activity sheets" to record their critical investigatory actions. *Id.* at ¶ 6. Detectives had discretion to determine when to document information obtained from witnesses in a formal interview record or solely on an activity sheet. *Id.* at ¶ 7. PPD homicide detectives kept activity sheets, informal interviews, and officers' handwritten notes in their internal homicide investigation file (or "H file") but did not add them to the "homicide binder" that they provided to the DAO; the binder did, however, include formal witness interviews. *Id.* at ¶¶ 8-11.

Within eight days of Heo's murder the detective assigned to lead the investigation, Detective Nespoli, had received information from multiple sources identifying a man named Michael Ransome as the perpetrator. *Id.* at ¶ 12. Detectives recorded this information in handwritten notes and activity sheets which they added to the H File. *Id.* In addition to these tips, detectives learned several facts that corroborated Ransome's involvement: he matched the eyewitness descriptions of the shooter, he lived three blocks from Heo's store in the direction the shooter fled, and he had recently been released from prison after serving a sentence for a different murder of a man named David Wilson. *Id.* at ¶ 13. In addition to recording this information about Ransome on notes and activity sheets, detectives also obtained the David

Wilson investigation file and added it to their Heo investigation File. *Id.* at ¶ 14. A few days later, detectives received two additional tips from reputable community members identifying Ransome as the perpetrator. *Id.* at ¶ 15. Detectives also learned about at least ten additional witnesses who had been at the scene of the shooting, recording some of this witness information on activity sheets and handwritten notes. *Id. at* ¶ 16. On January 7, 1985, detectives documented on an activity sheet that they had searched for Ransome but had not located him and that they learned about another potential suspect, a teenager named Richard Saunders. *Id.* at ¶¶ 17-18. Detectives did not document any investigation into Saunders, or in fact, any further investigation into the Heo murder at all for the following two years. *Id.* at ¶¶ 18-19.

In April 1987, Detectives Mangoni and Hughes interviewed a man named Rodney Everett, who was in jail on a parole violation and new pending charges based on a report that he had violently assaulted his wife and threatened to blow up her sister's house. *Id.* at ¶¶ 20-21. After his arrest in March 1987, Everett spoke with a retired probation officer, William Massey, and told Massey that he had information about the Heo murder; they spoke on at least two occasions in late March 1987 and again a week later in early April. *Id.* at ¶ 22. Massey told Mangoni and Hughes that Everett wanted to speak with them about the Heo murder and the detectives interviewed Everett on April 15, 1987—with Massey present. *Id.* at ¶¶ 22-24. In that interview, Everett told Mangoni and Hughes that in late-1986, Curtis Crosland, Everett's son's uncle, admitted to Everett that he was the person who killed Heo. *Id.* at ¶ 25.

Mangoni and Hughes then interviewed Massey, who told them Everett's stated motivation in providing information about the murder was to get himself out of jail, and that when Everett informed Massey he had information about the Heo murder, Massey researched the murder, obtained newspaper articles about it, and shared those articles with Everett prior to

Everett's police interview. *Id.* at ¶¶ 26, 31. Everett's account of the shooting that supposedly came from Crosland largely included the same facts that had been reported in newspaper articles published around the time of the murder, including that the shooting occurred during a robbery, Heo was shot in the face, the perpetrator was wearing a scarf over his face, the perpetrator fired one shot, Heo was shot while standing behind the store's counter, and the perpetrator did not obtain any money from the robbery turned shooting. *Id.* at ¶ 28. The defendant detectives have acknowledged Everett's account matched the publicly available information reported in the press and that a witness's previous review of newspaper articles about a crime raises concerns about the credibility of information that witness provides. *Id.* at ¶¶ 27, 29. Detectives documented no efforts to corroborate Everett's accusation against Crosland with any of the eyewitnesses to the shooting. *Id.* at ¶ 30.

Less than a week later, on April 21, 1987, Mangoni and Hughes brought Everett back to the homicide division for another interview; Everett could not provide them any further information about the murder or other witnesses who could corroborate his account. *Id.* at ¶ 32. Due to their doubts about his credibility, detectives subjected Everett to a polygraph examination regarding his statement that Crosland confessed to the murder, and Everett failed the examination. *Id.* at ¶¶ 33-34. They then reinterviewed Everett and documented both the polygraph and the reinterview on an activity sheet, but not in any formal witness statement. *Id.* at ¶ 36. Everett's statement remained the sole evidence detectives possessed suggesting Crosland's involvement in Heo's death; the statement included only generic information about the murder that had been reported in the press, it was uncorroborated, it was expressly motivated by Everett's need for police assistance with his own criminal cases, and Everett has failed a polygraph examination when repeating his allegation against Crosland. *Id.* at ¶ 38.

On April 24, 1987, Mangoni and Hughes located and interviewed Michael Ransome, the suspect police had developed in December 1984 immediately after the murder. *Id.* at ¶¶ 39. Ransome denied involvement, said he had been with his brother Gary and sister-in-law Delores at the time of the shooting, and acknowledged that he patronized Heo's grocery store in the past. *Id.* at ¶¶ 40-41. Additionally, Ransome lied to the police about his history of having guns and refused to take a polygraph. *Id.* at ¶¶ 42-43. Detectives did not document any efforts to speak with Ransome further or verify his alibi. *Id.* at ¶ 44-45. Instead, Mangoni and Rocks interviewed Everett for a third time in July 1987 at which point he gave them six names of people he claimed Crosland may have told about shooting Heo. *Id.* at ¶¶ 46-47. Detectives did not follow up or speak with any of these additional potential witnesses and did not take any other steps to corroborate Everett's account. *Id.* at ¶¶ 47-48. Rocks did speak with Everett's wife, Louise Woods, who told him that Everett identified to her a completely different man as Heo's shooter, which Rocks documented on an activity sheet, not in a formal statement. *Id.* at ¶¶ 49-50. Detectives did no follow up with Woods or Everett after learning about Everett's inconsistent account. *Id.* at ¶¶ 51-52.

On December 9, 1987, without developing any further evidence, detectives decided to seek Crosland's arrest for the Heo murder. *Id.* at ¶¶ 52, 55-57. At the time, Mangoni, Hughes, Rocks, McNesby, Cimino and their supervisor, Sergeant Descher, were all aware of several factors undermining Everett's credibility, including his failed polygraph and Louise Woods's account that Everett told her someone else had killed Heo. *Id.* at ¶ 56

Detectives prepared an affidavit of probable cause for Crosland's arrest based solely on Everett's April 15, 1987, statement and the fact that Crosland was a 5'5" tall Black man; Cimino signed the affidavit. *Id.* at ¶¶ 57-58. In line with established PPD homicide division practices, *id.*

at ¶ 61, detectives omitted from the affidavit all of the information in their possession undermining the credibility of Everett's statement, Everett's credibility as a witness, and the credibility of the investigation, including the following critical facts: detectives received multiple early tips and corroborating information leading them to consider Ransome as a suspect in Heo's murder; detectives did not investigate Ransome's claimed alibi or otherwise clear him as a suspect; detectives documented numerous eyewitnesses but did not speak to them once they decided to make Crosland their suspect; detectives knew Everett asked to give information about the Heo murder only after he had been arrested for a violent assault while on parole and was expressly looking for police assistance with his pending charges; Everett reviewed press coverage of the murder before providing a statement to police and in that statement gave almost exclusively publicly reported details; Everett failed a polygraph about his allegations against Crosland after which he was reinterviewed; detectives failed to corroborate Everett's account with either the witnesses Everett provided or the on-scene eyewitnesses to the shooting; and Everett's wife Louise Woods informed detectives that Everett told her someone other than Crosland killed Heo. *Id.* at ¶ 59-60.

Detective Cimino met with Barabara Christie, the chief of the DAO's homicide unit to seek approval for an arrest warrant for Crosland based on Everett's statement. *Id.* at ¶¶ 562-63. There is no evidence that Cimino informed Christie, who relied on detectives to provide a summary of all evidence they had, whether inculpatory or exculpatory, about the facts undermining the credibility of Everett's account, the credibility of Everett as a witness, or the credibility of the police investigation; without this information, Christie approved the detectives' request to proceed with charges. *Id.* at ¶ 63.

On December 9, 1987, a judge approved a warrant for Crosland's arrest based on the affidavit of probable cause, and detectives arrested Crosland the following day. *Id.* at ¶¶ 64-65. Crosland was convicted in December 1988, after which he appealed, the conviction was reversed, and he was convicted again in January 1991. *Id.* at ¶¶ 66. In 2020, the Conviction Integrity Unit (CIU) of the DAO began investigating Crosland's case, later concluding that exculpatory evidence was withheld from Crosland and conceding that he was "likely innocent" of Heo's murder. *Id.* at ¶¶ 67-68. On June 22, 2021, this Court overturned Crosland's conviction based on the withheld evidence and on June 24, 2021, the Philadelphia Court of Common Pleas granted the DAO's motion to nolle pros all charges against him. *Id.* at ¶¶ 69-71.

## III. Standard of Review

The procedural rule governing summary judgment expressly recognizes the benefit to the Court and the parties of entering a partial judgment on elements of a plaintiff's claim. Thus, "[a] party may move for summary judgment, identifying each claim or defense--*or the part of each claim or defense*--on which summary judgment is sought." Fed. R. Civ. P. 56(a) (emphasis added); *see also* Fed. R. Civ. P. 56 Advisory Committee Notes, 2010 Amendment (describing amendment to "make clear…that summary judgment may be requested not only as to an entire case but also as to a claim, defense, or part of a claim or defense"). "A motion for partial summary judgment involves the same standards as a motion for full summary judgment." *Right Way Nutrition, LLC v. Gen. Nutrition Corp.*, 421 F. Supp. 3d 78, 87 (W.D. Pa. 2019). The entry of "partial summary judgment serves the purpose of speeding up litigation by eliminating before trial matters wherein there is no genuine issue of fact." *Engage Healthcare Communications, LLC v. Intellisphere, LLC*, No. 12-0787, 2017 WL 3530268, at *2 (D.N.J. June 20, 2017) (citation and quotation omitted).

## IV. Argument

The undisputed evidence establishes that defendants Mangoni, Hughes, Rocks, McNesby, Cimino, and Descher initiated a prosecution against Crosland, that they deprived Crosland of his liberty, that the prosecution was terminated in Crosland's favor, and that the prosecution was brought without probable cause. With this factual background, summary judgment should be granted as to all elements of Crosland's malicious prosecution claims except for the element that the defendants acted with malice. That element, and that element alone, should be decided by a jury.

A malicious prosecution claim brought under the Fourth Amendment has five elements: that (1) the defendants initiated a criminal proceeding, (2) the criminal proceeding ended in Crosland's favor, (3) the defendants initiated the proceeding without probable cause, (4) the defendants acted maliciously, and (5) Crosland suffered a deprivation of liberty. *Halsey v. Pfeiffer*, 750 F.3d 273, 296-97 (3d Cir. 2014). The elements of Crosland's state-law malicious prosecution are the same, except there is no requirement that Crosland establish a deprivation of liberty. *Henderson v. City of Philadelphia*, 853 F. Supp. 2d 514, 518 (E.D. Pa. 2012) (citing *Merkle v. Upper Dublin Sch. Dist.*, 211 F.3d 782, 791 (3d Cir. 2000)) (Brody, J.).

***Elements 2 and 5: Favorable Termination and Deprivation of Liberty***

The second element (favorable termination) and the fifth element (deprivation of liberty) require little discussion. The Heo murder charges against Crosland were dismissed on the prosecution's motion for a nolle pros after this Court vacated Crosland's conviction, meaning that the proceeding ended in Crosland's favor. *See Thompson v. Clark*, 596 U.S. 36, 49 (2022) (holding that a plaintiff bringing a Fourth Amendment malicious prosecution claim "need only show that the criminal prosecution ended without a conviction"). And, after his arrest on the Heo

murder charges, Crosland remained in pretrial custody—and, indeed, remained imprisoned for more than 33 years—meaning that the prosecution caused a deprivation of liberty. *See Henderson*, 853 F. Supp. 2d at 520 (quoting *DiBella v. Borough of Beachwood*, 407 F.3d 599, 603 (3d Cir. 2005)) ("Pretrial custody and some onerous types of pre-trial, non-custodial restrictions constitute a Fourth Amendment seizure."). Because there are no disputed facts as to these elements, the Court should enter summary judgment on them.

***Element 1: Initiation***

As to the first element, that the defendants were responsible for initiating the prosecution against Crosland, any officer who has "influenced or participated in the decision to institute criminal proceedings…can be liable for malicious prosecution." *Halsey*, 750 F.3d at 297 (citing *Sykes v. Anderson,* 625 F.3d 294, 308-09, 317 (6th Cir. 2010)). Thus, officers "who conceal and misrepresent material facts to the district attorney are not insulated from a § 1983 claim for malicious prosecution simply because the prosecutor, grand jury, trial court, and appellate court all act independently to facilitate erroneous convictions." *Id.* (quoting *Pierce v. Gilchrist,* 359 F.3d 1279, 1292 (10th Cir. 2004)).

The undisputed record evidence establishes that defendants Mangoni, Hughes, Rocks, McNesby, Cimino, and Descher were all intimately involved in the development of facts that undermined the credibility of Rodney Everett's April 15, 1987, statement that was the sole basis supporting the request for a warrant to arrest Crosland. Mangoni and Hughes took Everett's April 15, 1987, statement and knew that the statement contained only generic facts that had been reported in the press, that Everett was looking for assistance with his serious criminal cases, and that Everett was unable to provide any corroboration for his account that Crosland confessed to him. They were sufficiently doubtful of Everett's credibility that they subjected him to a

polygraph examination, and the results of that examination confirmed his account was not credible. Rocks then joined Mangoni for Everett's next statement, on July 7, 1987, where, once again, he was unable to provide corroboration for his claim to have heard a confession. Rocks then learned from Louise Woods about Everett's apparent identification of an entirely different perpetrator. Thereafter, Cimino, along with McNesby, who was consistently aware of the investigative actions his partner took, prepared an affidavit of probable cause omitting all information police possessed that demonstrated the lack of Everett's credibility. Throughout this entire process, Descher supervised the detectives and, as such, was aware of what they learned in the investigation.

Each of these defendants "influenced…the decision to institute criminal proceedings." *Halsey*, 750 F.3d at 297. Accordingly, there are no disputed facts as to the initiation element of Crosland's malicious prosecution claims, and the Court should enter summary judgment on that element.

***Element 3: Absence of Probable Cause***

Crosland recognizes that the existence of probable cause is usually a fact issue for the jury. *Halsey*, 750 F.3d at 300; *Groman v. Twp. of Manalapan*, 47 F.3d 628, 635 (3d Cir. 1995); *Lischner v. Upper Darby Twp.*, No. 05-4546, 2007 WL 433170, at *3 (E.D. Pa. Feb. 5, 2007) (Pratter, J.) (citing *Wilson v. Russo,* 212 F.3d 781, 796 (3d Cir. 2000)). "A court, however, can conclude that probable cause did not exist as a matter of law if the evidence viewed in the light most favorable to the non-moving party would not reasonably support a finding of probable cause." *Lischner*, 2007 WL 433170, at *3 (citing *Sherwood v. Mulvihill,* 113 F.3d 396, 401 (3d Cir. 1997)). When evaluating probable cause, the Court looks to the "objective facts available to the police officer at the time of the arrest." *Id.*

In a case like this one, where police have obtained an arrest via the submission of an affidavit of probable cause in support of a request for an arrest warrant, the central question as to the existence of probable cause is whether the affidavit omitted facts relevant to the judge's and prosecutor's evaluation of the case. *Pinkney v. Meadville*, 95 F.4th 743, 748-49 (3d Cir. 2024). The "misstatements and omissions must have been 'material, or necessary, to the finding of probable cause.'" *Id.* (quoting *Sherwood*, 113 F.3d at 399). To evaluate the materiality of misstatements and omissions, the Court "reconstruct[s] the affidavit by 'excising the offending inaccuracies and inserting the facts recklessly omitted.'" *Id.* at 749 (quoting *Wilson*, 212 F.3d at 789) (cleaned up). The Court then "consider[s] whether the revised facts and circumstances would have 'suffic[ed] in themselves to warrant a reasonable person to believe'" that Crosland murdered Heo. *Id.* (quoting *Wilson*, 212 F.3d at 789) (cleaned up); *see also Thomas v. City of Philadelphia*, No. 17-4196, 2019 WL 4039575, at *8 (E.D. Pa. Aug. 27, 2019) (discussing analysis where detectives omitted material exculpatory facts from affidavit of probable cause).

Applying this analysis to the affidavit submitted in support of Crosland's arrest establishes that probable cause did not exist as a matter of law. The affidavit submitted by defendants relied on two sets of facts: (1) that Rodney Everett claimed Crosland confessed to him that he shot and killed Heo and (2) that Crosland's generic physical description—a Black male, 5'5", and 140 pounds—was similar to the generic physical descriptions provided by eyewitnesses. These facially inculpatory facts are overwhelmed by evidence that was omitted from the affidavit.[4] That information, summarized at greater length above, *supra* § II, falls into three categories:

[4] The defendant detectives' omission of this information from the affidavit of probable cause was consistent with established practices in the PPD homicide division. SUF ¶¶ 61. At trial, this practice will comprise a central component of Crosland's *Monell* claim against the City

- *Information that undermined the credibility of Everett's account*: that Everett reviewed newspaper articles before his first interview with detectives and his account of Crosland's so-called confession relied almost entirely on generic facts that were reported in the news around the time of the Heo murder; and that Louise Woods reported that Everett identified a different person as the perpetrator of the Heo murder. *See Lambert v. Blackwell,* 387 F.3d 210, 253 (3d Cir. 2004) (explaining that a witness statement inconsistent with another witness's testimony constitutes exculpatory evidence).
- *Information that undermined Everett's credibility as a witness*: that Everett failed a polygraph examination, and that Everett was facing significant punishment for his alleged commission of a violent assault while on parole and was providing information to police only because he wanted to get out of jail. *See Giglio v. United States,* 405 U.S. 150, 154 (1972) (explaining that evidence impeaching the credibility of an inculpatory witness is exculpatory and material).
- *Information that undermined the credibility of the detectives' investigation*: that detectives developed detailed evidence pointing to Michael Ransome's role as the perpetrator of the murder but did not investigate Ransome's claimed alibi; and that detectives did not seek to corroborate Everett's allegations regarding Crosland with any of the multiple witnesses believed to have seen the shooting or its immediate aftermath. *See Dennis v. Sec'y, Pennsylvania Dep't of Corr.,* 834 F.3d 263, 311 (3d

---

of Philadelphia. *See Thomas*, 2019 WL 4039575, at *22 (denying summary judgment as to claim that City of Philadelphia failed to train, supervise, and discipline homicide detectives regarding practice of excluding exculpatory information from affidavits).

Cir. 2016) (*en banc*) (evidence challenging detectives' "paltry investigation" is exculpatory and material).

By omitting this information raising serious questions about Everett's claim that Crosland confessed, about Everett's truthfulness as a witness, and about the reliability of the investigative work leading to the decision to seek charges against Crosland, the defendant detectives presented Everett's statement as if it were the truth, thereby providing the court and the DAO an unduly warped version of the case. *See Pinkney*, 95 F.4th at 746 (finding allegations at motion to dismiss stage to support absence of probable cause where officers "turned a shaky witness statement into a confident identification and left out evidence that undermined the identification's reliability" and where "[a] judge then relied on this altered story to issue a warrant"); *see also Wilson,* 212 F.3d at 790-91 (stating that "substantial evidence of the witness's own unreliability that is known by the arresting officers could outweigh [an] identification such that probable cause would not exist" and noting that "courts have consistently considered the context of an identification, and have not stated that police can rely on any witness accusation, however unreliable or unbelievable.").

Had the judge and prosecutors who reviewed the defendants' request for Crosland's arrest known that the only witness in the case claimed to have heard a confession of publicly-known facts after being shown newspaper articles about the murder, that the witness also identified an entirely different perpetrator, that the witness failed a polygraph and had reasons to lie, that detectives had information about an alternative perpetrator, that detectives failed to clear that suspected perpetrator with further investigation, and that detectives made no effort to corroborate Crosland's involvement by interviewing any of the more-than-ten witnesses known to them, no arrest warrant would have ever been approved. In these circumstances, the Court

should conclude that, as a matter of law, there was no probable cause to support Crosland's arrest, enter summary judgment on this element of his malicious prosecution claims, and instruct the jury that there was no probable cause to support Crosland's arrest.

***Element 4: Malice***

It has long been the rule in the Third Circuit that a defendant's malice may be inferred from the defendant's initiation of a prosecution in the absence of probable cause. *Lippay v. Christos*, 996 F.2d 1490, 1502 (3d Cir. 1993); *Henderson*, 853 F. Supp. 2d at 519. Crosland recognizes, however, that the question of malice is ultimately a question of a defendant's mental state and is, therefore, a fact issue for the jury. The Court should, therefore, instruct the jury that malice is the only issue that it must decide with respect to Crosland's malicious prosecution claim.

## V. Conclusion

For the foregoing reasons, plaintiff Curtis Crosland's motion for partial summary judgment should be granted.

Respectfully submitted,

/s/ Jonathan H. Feinberg


Jonathan H. Feinberg
Grace Harris
KAIRYS, RUDOVSKY, MESSING,
FEINBERG & LIN LLP
The Cast Iron Building
718 Arch Street, Suite 501 South
Philadelphia, PA 19106
215-925-4400

Emma Freudenberger (admitted *pro hac vice*)
Amelia Green (admitted *pro hac vice*)
NEUFELD SCHECK BRUSTIN
HOFFMANN & FREUDENBERGER, LLP
200 Varick Street, Suite 800
New York, NY 10014
212-965-9081

*Counsel for Plaintiff*