**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **Curtis Crosland,** | : | |
| **Plaintiff,** | : | **Civil Action** |
| **v.** | : | **No. 22-cv-02416-AB** |
| **City of Philadelphia et al.,** | : | |
| **Defendants.** | : | |

## Plaintiff's Statement of Undisputed Facts

Plaintiff Curtis Crosland, through the undersigned counsel, submits this Statement of Undisputed Facts in support of his motion for partial summary judgment. In support of each of the below factual assertions, Crosland cites to the deposition transcripts, documents produced in discovery, and other materials marked as Exhibits 1 through 39 and filed with this Statement.

### I. The Shooting of Il Man Heo and the Philadelphia Police Department's Initial Investigation

1. In December 1984, Il Man Heo owned and operated the H&B Grocery Store, at South 27th and Oakford Streets in South Philadelphia. He was known to his customers by the name Tony. Ex. 1, Affidavit of Probable Cause at City 5874; Ex. 2, Madison Statement at City 114.

2. On the evening of December 5, 1984, a man walked into the store, demanded money from Heo, and fired his gun. Ex. 1, Affidavit of Probable Cause at City 5874; Ex. 2, Madison Statement at City 114.

3. The perpetrator left the store and fled north on South 27th Street. Ex. 3, Durbin Statement at City 119.

4. The gunshot struck Heo in the head. He was hospitalized and died six days later. Ex. 1, Affidavit of Probable Cause at City 5874.

5. There were three witnesses at the scene who gave formal statements to police: Mona Madison, Levi Davis, and Maurice Durbin. They told the police that:

a. The perpetrator was wearing a hat and a scarf pulled over his face, and, for that reason, they could not identify him. Ex. 4, Rocks Dep. at 161:3-16; Ex. 2, Madison Statement at City 115; Ex. 5, Davis Statement at City 113.

b. The perpetrator was a Black man, who was either 5'5", 5'6", or 5'7" tall. Ex. 4, Rocks Dep. at 161:3-16, 162:8-15; Ex. 2, Madison Statement at City 115; Ex. 5, Davis Statement at City 113;

c. The perpetrator referred to Heo as "Tony," suggesting that he was familiar with the store and Heo. Ex. 4, Rocks Dep. at 164:2-9; Ex. 2, Madison Statement at City 114;

d. When the perpetrator fled the store, he ran north on 27th Street. Ex. 6, Mangoni Dep. at 342:8-17; Ex. 4, Rocks Dep. at 163:5-12; Ex. 3, Durbin Statement at City 119.

## II. PPD Homicide Division Practices for Documenting Investigative Actions

6. During the investigation, detectives reported information on documents called "activity sheets," which they used to record all critical steps in the investigation. Ex. 6, Mangoni Dep. at 154:3-9, 155:11-156:16, 175:20-176:8; Ex. 4, Rocks Dep. at 114:11-22, 115:14-116:16; Ex. 7, McNesby Dep. at 82:3-21.

7. When interviewing witnesses, detectives had discretion to decide whether information learned in the interview would be reported in a formal question-and-answer-style written statement, or, instead, on an activity sheet. Ex. 4, Rocks Dep. at 118:6-119:14.

8. In the 1980s, PPD homicide detectives maintained activity sheets in the detectives' investigative file, referred to as a homicide file, or "H file." Ex. 6, Mangoni Dep. at 158:9-17, 160:18-20; Ex. 4, Rocks Dep. at 120:16-20; Ex. 8, Descher Dep., at 48:2-4, 48:11-12, 49:3-5, 130:8-10; Ex. 7, McNesby Dep. at 83:15-84:2.

9. When detectives forwarded information to the DAO for a prosecution, they did so by using a "homicide binder," which contained a smaller set of information than all of the materials compiled in the homicide file. Ex. 6, Mangoni Dep. at 158:18-160:4; Ex. 4, Rocks Dep. at 87:21-88:1; Ex. 7, McNesby Dep. at 84:16-85:14.

10. Formal written statements from witness interviews were included in the homicide binder and sent to the DAO, but activity sheets were not included in the binder. Ex. 7, McNesby Dep. at 84:3-9, 85:11-15; Ex. 6, Mangoni Dep. at 162:11-20, 164:10-14, 189:17-22; Ex. 4, Rocks Dep. at 122:13-18; *see also* Ex. 6, Mangoni Dep. at 458:8-459:23 (discussing detectives' discretion as to what would be put in the homicide binder and stating that some detectives would include activity sheets and others would not).

11. Officers' handwritten notes from telephone messages and informal interviews were, likewise, placed in the homicide file, but not included in the homicide binder sent to the DAO. Ex. 6, Mangoni Dep. at 336:12-16, 336:21-337:2.

## III. Detectives Develop a Credible Suspect and Identify Multiple Witnesses Before the Investigation Goes Cold

12. By December 13, 1984, eight days after the Heo shooting, Detective Nespoli, who was the detective assigned to lead the investigation, received information from multiple sources

that the perpetrator was a man named Michael Ransome. Detectives documented this information in handwritten notes and on activity sheets, all of which they placed in the Heo homicide file. Ex. 6, Mangoni Dep. at 335:7-14, 337:6-338:19, 340:7-18; Ex. 4, Rocks Dep. at 167:10-168:6; Ex. 9, Ransome Tips; Ex. 10, Activity Sheet, 12/13/1984.

13. Detectives learned several facts confirming the viability of Ransome as a suspect, including:

a. Ransome was 5’6” tall and 125 pounds, matching the description of the perpetrator provided by eyewitnesses, Ex. 6, Mangoni Dep. at 344:11-20; Ex. 4, Rocks Dep. at 172:11-17, 173:2-9, 173:21-174:1; Ex. 11, Ransome Police Photos;

b. Ransome lived on the 1100 block of South 26th Street, less than three blocks from the H&B Grocery Store, and to the north of the store, the direction in which the perpetrator fled after the shooting, Ex. 6, Mangoni Dep. at 341:12-343:7, 345:21-346:2; Ex. 4, Rocks Dep. at 169:17-170:12; and

c. Ransome had been released from prison less than a year earlier after serving a sentence for the 1979 murder of a man named David Wilson, Ex. 6, Mangoni Dep. at 341:3-11; Ex. 4, Rocks Dep. at 169:12-16.

14. In addition to recording this information on notes and an activity sheet, detectives obtained the homicide file from the investigation of the David Wilson murder that led to Ransome’s prosecution and conviction for that murder. They placed that file within the Heo homicide file. Ex. 12, Wilson Homicide Record; Ex. 13, Feinberg Decl. at ¶ 3.

15. By December 19, 1984, two weeks after the Heo shooting, detectives received two additional phone calls referencing Ransome, one from a member of the Philadelphia

Citizens' Crime Commission and another from a member of the Korean Businessmen's Association. Both calls identified Ransome as a perpetrator; one call said he committed the crime with a man named Clinton, and the other said Ransome acted with a man named Robert. The calls were memorialized in handwritten notes, which were placed in the homicide file. Ex. 6, Mangoni Dep. at 337:6-338:19, 345:4-16; Ex. 4, Rocks Dep. at 165:10-166:17; Ex. 9, Ransome Tips.

16. Detectives also developed information about potential witnesses. They recorded in formal witness interviews and also in undated handwritten notes in the homicide file lists of at least ten people who were reported to have information about the Heo murder. There is no documentation in the homicide file of any efforts to locate or interview the witnesses referenced in these materials. Ex. 6, Mangoni Dep. 392:20 (referencing four teenage boys seen by Mona Madison standing in the doorway of the store at the time of the shooting and partial identifying information for two of them); *id.* at 394:6-18 (referencing names of two men standing with Maurice Durbin outside the store when the perpetrator fled the scene); *id*. at 395:9-19 (discussing handwritten list of witnesses found in homicide file); *id*. at 395:21-396:17 (discussing activity sheet referencing juvenile witnesses who police intended to interview); *id*. at 396:18-397:24 (discussing handwritten list of ten witnesses to interview); *id*. at 399:8-400:3 (discussing eleventh name of a witness to interview); *id*. at 402:6-16 (confirming that documents in homicide file showed a list of more than ten people who had been identified as witnesses with information about the Heo shooting); Ex. 2, Madison Statement at City 114, 116; Ex. 3, Durbin Statement at City 119; Ex. 14, Witness List 1; Ex. 15, Witness List 2; Ex. 16, Witness List 3; Ex. 17, Activity Sheet, 12/5/1984; Ex. 13, Feinberg Decl. at ¶ 4(a).

17. Detectives documented in an activity sheet dated January 7, 1985, that they searched for Ransome but could not locate him. Ex. 6, Mangoni Dep. at 344:2-6; Ex. 4, Rocks Dep. at 171:10-24; Ex. 18, Activity Sheet, 1/7/1985.

18. On the same January 7, 1985, activity sheet, detectives noted that they had received information about a 16-year-old Black male named Richard Saunders who had been arrested for a January 5, 1985, robbery of a Korean-owned grocery store in the same neighborhood as the H&B Grocery Store. There is no further investigation of Saunders documented in the Heo homicide file. Ex. 18, Activity Sheet, 1/7/1985; Ex. 13, Feinberg Decl. at ¶ 4(b).

19. After the January 7, 1985, activity sheet, there is no documentation in the homicide file of any investigative events for more than two years. Ex. 6, Mangoni Dep. at 191:4-9; Ex. 13, Feinberg Decl. at ¶ 4(c).

## IV. Rodney Everett Provides a Facially Unbelievable Statement Implicating Curtis Crosland in the Heo Murder

20. The next investigative action occurred in April 1987, when Detectives Mangoni and Hughes interviewed a man named Rodney Everett. Ex. 6, Mangoni Dep. at 191:13-192:9; Ex. 19, Everett Statement, 4/15/1987; Ex. 13, Feinberg Decl. at ¶ 4(c).

21. Everett had been on parole from a state sentence and was taken into custody in late March 1987 based on a report of a violent assault in which Everett, among other things, allegedly choked his wife and threatened to blow up her sister's house. Ex. 6, Mangoni Dep. at 206:16-24, 208:18-211:8; Ex. 4, Rocks Dep. at 182:16-183:22; Ex. 8, Descher Dep. at 206:18; Ex. 20, Everett Arrest Investigation Report.

22. After his arrest on the March 1987 charges, Everett spoke with a retired probation officer, William Massey, and told Massey he had information about the Heo murder. Massey

then informed homicide detectives that Everett wished to speak with them. Everett and Massey spoke on at least two occasions, once on March 27, 1987, and again on April 3, 1987. Ex. 6, Mangoni Dep. at 216:5-9, 217:14-24, 227:20-228:17, 229:14-22, 243:4-20.

23. On April 15, 1987, Mangoni and Hughes interviewed Everett. Ex. 19, Everett Statement, 4/15/1987.

24. Massey, the probation officer, was present in the room during the interview. Ex. 6, Mangoni Dep. at 205:21-206, 218:8-10.

25. The interview was memorialized in a formal written statement in which Everett told the detectives that at an unspecified time in late 1986, Curtis Crosland, who was Everett's son's uncle, admitted to Everett that he killed Heo. Ex. 6, Mangoni Dep. at 215:16-18, Ex. 19, Everett Statement, 4/15/1987.

26. Immediately after their interview with Everett, Mangoni and Hughes took a formal statement from Massey. He explained to the detectives that after Everett told him about the Heo murder, and before arrangements were made for Everett to speak with detectives, Massey went to a local library and obtained newspaper articles about the Heo murder which he then shared with Everett. Ex. 6, Mangoni Dep. at 215:10-15, 242:6-13, 243:21-244:11, 251:11-252:15; Ex. 21, Massey Statement.

27. A witness's review of newspaper articles about a murder raises concerns about the credibility of the information the witness provides because the witness's account may be based on what they read and not on their personal knowledge. Ex. 4, Rocks Dep. at 185:2-187:7, 191:5-19; Ex. 7, McNesby Dep. at 246:22-247:15, 248:5-9.

28. Several of the facts about the Heo shooting that Everett told detectives he learned from Crosland were the same facts reported in newspaper articles published about that shooting.

Ex. 6, Mangoni Dep. at 260:4-261:19, 271:3-274:12; *see also id*. at 470:23 (reviewing Everett's February 1, 1989 statement recanting allegations against Crosland and stating that Everett provided facts to detectives based on what he saw in newspapers); Ex. 22, Everett Statement, 2/1/1989. The relevant facts in Everett's statement that were reported in the news included:

a. The perpetrator shot Heo in the course of a robbery. Ex. 6, Mangoni Dep. at 261:22-262:23; *compare* Ex. 19, Everett Statement, 4/15/1987 at City 18 (Everett's statement alleging that Crosland "said he went to rob the guy") *with* Ex. 23, Media Reports at City 5769 (article reporting that Heo was shot by a man who entered the store "and demanded money").

b. The perpetrator shot Heo in the face. Ex. 6, Mangoni Dep. at 264:10-265:8; *compare* Ex. 19, Everett Statement, 4/15/1987 at City 18 (Everett's statement alleging that Crosland "said he shot the man in the face") *with* Ex. 23, Media Reports at City 5769 (article reporting that Heo "was shot in the face").

c. The perpetrator was wearing a scarf over his face. Ex. 6, Mangoni Dep. at 265:10-266:18; *compare* Ex. 19, Everett Statement, 4/15/1987 at City 19 (Everett's statement alleging that Crosland reported "[h]e had a scarf pulled down around his face") *with* Ex. 23, Media Reports at City 5770 (article reporting that the gunman "wore a scarf over the lower portion of his face").

d. The perpetrator fired only one shot at Heo. Ex. 6, Mangoni Dep. at 266:20-267:18; *compare* Ex. 19, Everett Statement, 4/15/1987 at City 19 (Everett's answer in response to question whether Crosland stated how many shots were fired: "once") *with* Ex. 23, Media Reports at City 5774 (article reporting that "Heo was shot once").

e. The perpetrator shot Heo while Heo was standing behind the cash register. Ex. 6, Mangoni Dep. at 267:20-269:15; *compare* Ex. 19, Everett Statement, 4/15/1987 at City 200 (Everett's statement alleging that Crosland reported that Heo "was at the cash register in the front part of the store" when he was shot) *with* Ex. 23, Media Reports at City 5772 (article reporting that "[a] shot rang out, and Heo collapsed behind the counter").

f. The perpetrator did not obtain any money. Ex. 6, Mangoni Dep. at 262:24-263:22, 269:16-270:17; *compare* Ex. 19, Everett Statement, 4/15/1987 at City 18 (Everett's statement alleging that Crosland reported he "went to rob the guy and the guy somehow flinched or something," which led to the shooting) *with* Ex. 23, Media Reports at City 5769, 5772 (articles reporting that Heo was shot "during a holdup *attempt*" and that "the gunman fled empty handed") (emphasis added).

29. Detective Mangoni acknowledged that nearly every detail in Everett's statement claiming that Crosland confessed to the Heo murder included facts that were reported in the press. Ex. 6, Mangoni Dep. at 275:2-275:8.

30. Following the interview, there is no documentation of any efforts by detectives to corroborate Everett's statement by asking witnesses who were in or around the store at the time of the shooting whether they knew or could identify Crosland. Ex. 6, Mangoni Dep. at 286:11-291:22, 296:18-297:1; Ex. 13, Feinberg Decl. at ¶ 4(d).

31. Massey also informed Mangoni and Hughes that Everett's primary motivation for providing information about the Heo murder was "to get out of jail." Ex. 21, Massey Statement at City 3; Ex. 6, Mangoni Dep. at 235:20-23.

## V. Detectives Continue to Develop Information Undermining Everett's Account

32. On April 21, 1987, six days after their first interview with Everett, Detectives Mangoni and Hughes brought Everett back to the homicide division for another interview. The detectives' first question reported in the statement produced as a result of the interview was whether Everett could tell them anything else about the Heo murder. Everett was not able to provide any additional information, and, in particular, he was not able to provide detectives with the names of any witnesses who could corroborate what he had told them. Ex. 6, Mangoni Dep. at 295:18-296:11, 298:18-299:4, 305:21-306:13; Ex. 24, Everett Statement, 4/21/1987.

33. The detectives decided to subject Everett to a polygraph examination about his statement that Crosland confessed to the murder. They did so to "ensure…he was telling the truth or not telling the truth," and because they had no evidence to corroborate what Everett had told them. Ex. 6, Mangoni Dep. at 306:15-18, 308:8-24; Ex. 25, Activity Sheet, 4/22/1987; *see also* Ex. 6, Mangoni Dep. at 180:3-19, 181:24-182:9, 308:2-7, 321:10-322:1 (explaining that detectives would request a polygraph when they had doubts about a witness's credibility); Ex. 8, Descher Dep. at 163:4-22 (explaining that it was not easy to get a polygraph performed and detectives would need to have a good reason to do one).

34. The detectives documented in an activity sheet prepared the next day that the polygraph showed Everett was "DI," that is, "deception indicated." This meant that Everett failed the polygraph. Ex. 6, Mangoni Dep. at 313:21-314:1, 315:2-6, 315:13-23; Ex. 4, Rocks Dep. at 201:18-204:8; Ex. 25, Activity Sheet, 4/22/1987.

35. According to the activity sheet describing the examination, after the examination was completed, the detectives conducted a "reinterview" with Everett during which Everett

"maintained he was being honest and was told by Crosland" about the murder. Ex. 6, Mangoni Dep. at 317:6-318:11 Ex. 25, Activity Sheet, 4/22/1987.

36. The detectives did not report anything about the polygraph or the "reinterview" that followed the polygraph on any document other than the April 22, 1987, activity sheet. Ex. 6, Mangoni Dep. at 307:4-5, 318:12-23, 322:12-323:4; Ex. 24, Everett Statement, 4/21/1987; *see also* Ex. 6, Mangoni Dep. at 186:8-20, 187:13-18, 188:4-189:5 (stating that ordinary procedures called for referencing a polygraph examination in a witness's formal statement).

37. There was no valid policing reason for not including reference to the polygraph in the April 21, 1987, formal statement. Ex. 6, Mangoni Dep. at 325:23-326:16.

38. At this point of the investigation, Everett's account was the sole evidence detectives had pointing to Crosland as the person who killed Heo. Everett had only provided generic information about the crime, most of which had been reported in the press; Everett had failed a polygraph; detectives had not conducted interviews with any witnesses from the scene in an effort to corroborate Crosland's alleged involvement; detectives knew Everett was looking for assistance with his criminal cases in light of his parole status and recent arrest for a violent assault; and detectives did not ask for approval of any warrants, either for a search of Crosland's home or for an arrest of Crosland. Ex. 6, Mangoni Dep. at 323:6-325:7; Ex. 4, Rocks Dep. at 192:5-193:19, 219:17-220:6; Ex. 7, McNesby Dep. at 246:4-254:4.

39. On April 24, 1987, Detectives Mangoni and Hughes were able to locate Michael Ransome, the suspect identified in December 1984 in the immediate wake of the Heo murder, and they took a written statement from him about that murder. Ex. 26, Ransome Statement; Ex. 27, Activity Sheet, 4/24/1987.

40. According to the statement, Ransome denied any involvement in the murder. He said he had heard about the murder from a teenage girl named Sharon. Ransome did not have a specific address for Sharon but told detectives she lived at the intersection of 25th and Federal Streets. Ransome gave detectives an alibi, stating that at the time of the shooting he was in his house with his brother Gary and his sister-in-law Delores. Ex. 6, Mangoni Dep. at 348:17-350:16, 352:21-354:11; Ex. 26, Ransome Statement; Ex. 27, Activity Sheet, 4/24/1987.

41. Ransome also told detectives he had been in the H&B Grocery before, stating that he used to buy cheeseburgers and fries there. This was a significant fact given the statement of witnesses in the store that the shooter appeared to have known Heo based on his using the name "Tony." Ex. 6, Mangoni Dep. at 354:13-355:17, 352:21-354:11; Ex. 26, Ransome Statement at City 6; Ex. 27, Activity Sheet, 4/24/1987; Ex. 2, Madison Statement at City 114.

42. Ransome lied to the detectives, telling them he had never owned a gun, a fact that was inconsistent with his conviction for shooting and killing David Wilson. Ex. 6, Mangoni Dep. at 356:14-358:1; Ex. 26, Ransome Statement at City 7.

43. Detectives Mangoni and Hughes asked Ransome whether he would take a polygraph, and he declined, a fact that was included in the formal interview report. His refusal to participate in a polygraph was relevant, in Mangoni's view, to show that "he may be lying." Ex. 6, Mangoni Dep. at 358:3-359:8; Ex. 26, Ransome Statement at City 7.

44. There is no documentation in the Heo murder investigation file of interviews with any of the people referenced by Ransome, including Sharon, Gary, and Delores, nor is there any documentation of efforts to show Ransome's photo to witnesses who were in the store at the time of the shooting. Ex. 6, Mangoni Dep. at 350:18-352:19, 356:1-12 Ex. 13, Feinberg Decl. at ¶ 4(e).

45. There is no documentation in the investigation file of any further efforts to speak with Ransome after the April 24, 1987, interview. Ex. 6, Mangoni Dep. at 359:9-24 Ex. 13, Feinberg Decl. at ¶ 4(e).

46. Two-and-a-half months later, on July 7, 1987, Detectives Mangoni and Rocks brought Everett to the homicide division for a third interview. At this point, the investigation was in the same status as before in that Everett was the only person who had provided information suggesting that Crosland was the person who killed Heo. Ex. 6, Mangoni Dep. at 360:1-4, 360:24-362:19; Ex. 28, Everett Statement, 7/7/1987; Ex. 29, Activity Sheet, 7/7/1987.

47. Mangoni and Rocks began the interview by asking Everett whether he could tell them anything else about the Heo murder. Everett said that he “really [did] not know anything else,” but he provided the names of six people whom he claimed Crosland may have told about the Heo shooting. Following this interview, detectives obtained the criminal records of the people Everett mentioned and looked to see whether any of them were in custody or had warrants for their arrest. They did not, however, conduct interviews with any of them. Ex. 6, Mangoni Dep. at 363:5-364:1, 368:24-373:1, 384:10-386:13; Ex. 4, Rocks Dep. at 237:5-13, 241:9-243:2, 261:18-263:16; Ex. 28, Everett Statement, 7/7/1987 at City 26; Ex. 13, Feinberg Decl. at ¶ 4(d).

48. After the July 7 interview, the only information detectives had pointing to Crosland as the perpetrator of the Heo murder was, as with before, Everett’s account. Detectives conducted no further interviews in an effort to corroborate what Everett had told them. Ex. 6, Mangoni Dep. at 382:12-20, 389:11-20, 390:12-16, 391:15-22; Ex. 4, Rocks Dep. at 270:14-272:18; *see also* Ex. 6, Mangoni Dep. at 407:9-19 (Mangoni confirms he has no “recollection of

interviews with a single person who could corroborate what Rodney Everett was telling [him]"); Ex. 13, Feinberg Decl. at ¶ 4(d).

49. On July 25, 1987, Detective Rocks spoke to Louise Woods. She was Everett's wife who had alleged that Everett violently assaulted her in March 1987. Woods reported to Rocks that Everett called her from prison and "told her that Frank Turner…the alleged shooter in the Heo case, was staying in the Tasker homes." The encounter between Rocks and Woods is described on an activity sheet. Ex. 6, Mangoni Dep. at 421:24-422:19; Ex. 4, Rocks Dep. at 292:15-293:22; Ex. 30, Activity Sheet, 7/25/1987.

50. Based on what is documented in the activity sheet, Everett told Woods that Frank Turner was the person who committed the Heo murder, a claim that was inconsistent with Everett's repeated prior statements to detectives that Crosland was the person who killed Heo. Ex. 6, Mangoni Dep. at 422:20-424:4; Ex. 4, Rocks Dep. at 293:23-295:4, 297:2-16, 301:24-302:15; Ex. 8, Descher Dep. at 292:16-293:14.

51. Following the encounter described in the July 25, 1987, activity sheet, there is no documentation in the homicide file of any follow up interview with either Woods or Everett about Everett's identification of Frank Turner as the person who killed Heo. Ex. 6, Mangoni Dep. at 424:6-427:19; *see also* Ex. 4, Rocks Dep. at 297:23-300:2, 301:7-13, 302:15-303:8, 304:4-305:5 (discussing importance of conducting follow-up interviews with Woods and Everett to clarify the statements made by Woods on July 25, 1987); *id*. at 320:23-323:15 (discussing Mangoni's January 26, 1988, follow-up interview with Everett regarding a separate murder investigation that did not address any prior statements regarding the Heo murder) Ex. 13, Feinberg Decl. at ¶ 4(f).

52. After the July 25, 1987, encounter between Rocks and Woods, there is no documentation of any investigative activity in the Heo investigation file until November 1987. Ex. 6, Mangoni Dep. at 429:17-430:2; Ex. 13, Feinberg Decl. at ¶ 4(g).

## VI. Detectives Seek Crosland's Arrest for the Heo Murder Based on Everett's Account While Hiding Information Undermining That Account

53. On November 3, 1987, Detectives Cimino and McNesby, who were investigating a different case involving the murder of John Lamb, obtained arrest warrants for Crosland and two of his cousins, Frank Turner and Lester Turner. Ex. 6, Mangoni Dep. at 377:21-378:20, 430:2-5; Ex. 7, McNesby Dep. at 229:9-12, 231:6-18; Ex. 31, Activity Sheet, 11/3/1987; Ex. 28, Everett Statement, 7/7/1987 at City 27-29.

54. After his arrest, Crosland remained in custody. Ex. 4, Rocks Dep. at 317:21-318:7.

55. On December 9, 1987, as documented in an activity sheet prepared by Detective Cimino, detectives decided to pursue charges against Crosland for the Heo murder. Ex. 32, Activity Sheet, 12/9/1987.

56. As of that date, multiple detectives knew that the only information pointing to Crosland as the perpetrator of the Heo murder was Rodney Everett's statement, knew that there were several factors undermining Everett's credibility, and knew that notwithstanding evidence undermining Everett's credibility, an arrest would be sought:

a. Detectives Mangoni and Hughes conducted two interviews together with Everett and ordered the polygraph examination that Everett failed, and Mangoni expects that they would have spoken to Cimino before Cimino sought approval for an arrest. Ex. 6, Mangoni Dep. at 432:8-434:23.

b. Detective Rocks joined Detective Mangoni for an interview with Everett and also spoke with Louise Woods about Everett's account and expects that he would have consulted the file to learn about the history of the investigation or learned about that history from a discussion with Mangoni. Ex. 4, Rocks Dep. at 154:15-155:13.

c. Detective McNesby was, by 1987, a long-time partner of Detective Cimino and generally knew what Detective Cimino was doing in each investigation. Ex. 7, McNesby Dep. at 56:18-57:3.

d. Sergeant Descher was in 1987 a supervisor in the special investigations unit of the homicide division, which investigated cold cases, and he acted as the supervising sergeant assigned to at least one of the detectives investigating the Heo murder from April-December 1987. In his position as a sergeant, detectives working under his supervision would keep Descher abreast of ongoing investigations and, in turn, he would provide them with guidance and direct their investigatory actions. Ex. 8, Descher Dep. at 15:10, 46:6-47:5, 54:19-55:6, 167:23-168:20, 265:21-267:3, 268:20-269:12, 319:17-320:21.

57. Detectives prepared an affidavit of probable cause in support of a warrant for Crosland's arrest for the Heo murder, and Detective Cimino signed the affidavit on December 9, 1987. Ex. 7, McNesby Dep. at 19:24-20:18, 233:22-234:12, 234:21-235:4; Ex. 1, Affidavit of Probable Cause.

58. The only inculpatory information pointing to Crosland as the perpetrator of the Heo murder that is described in the affidavit of probable cause is (a) the account provided by Rodney Everett on April 15, 1987, that Crosland confessed to shooting Heo; and (b) the fact that

Everett's description of Crosland as a Black male, 5'5" tall, 140 pounds, with brown skin was consistent with eyewitnesses' descriptions of the perpetrator. Ex. 6, Mangoni Dep. at 33:8-17, 34:13-35:1 37:5-10, 434:623; Ex. 7, McNesby Dep. at 244:23-245:16; Ex. 8, Descher Dep. at 306:11-24; Ex. 33, Rosen Dep. at 58:12-16, 141:18-142:22, 145:12-147:5; Ex. 1, Affidavit of Probable Cause.

59. The affidavit of probable cause did not refer to the following pieces of information documented in the homicide file:

a. Detectives received multiple tips identifying Michael Ransome as the perpetrator of the Heo murder and learned that (i) Ransome's physical description, including his height and weight, matched the description provided by eyewitnesses, (ii) Ransome lived three blocks away from the store in a location to the north of the store, which is the direction in which the perpetrator fled after the shooting, and (iii) Ransome had been convicted for a prior murder. *See supra* ¶ 13.

b. Detectives considered Ransome a suspect in the Heo murder, to the point that they made the investigation file that led to Ransome's previous arrest for murder a part of the Heo investigation file. *See supra* ¶ 14.

c. Detectives documented names and other identifying information for at least ten witnesses who were believed to have information about the Heo murder, but they did not pursue interviews with those witnesses. *See supra* ¶ 16.

d. Detectives knew that Rodney Everett asked to speak to them only after he was arrested for a violent assault while on parole and was looking for assistance with his pending criminal cases. *See supra* ¶¶ 21-23, 31.

e. Everett reviewed newspaper articles about the Heo murder before the interview with detectives in which he claimed Crosland confessed to him that he committed the murder, and nearly every detail that Everett told detectives he learned from Crosland was reported in newspaper articles published around the time of the Heo murder. *See supra* ¶¶ 26-29.

f. Six days after his statement claiming that Crosland confessed to the Heo murder, Everett was given a polygraph examination about whether Crosland did in fact tell him he committed the Heo murder, and Everett failed the polygraph. *See supra* ¶¶ 33-34.

g. Everett was re-interviewed after he failed the polygraph examination. *See supra* ¶ 35.

h. Michael Ransome provided an exculpatory statement to police and identified three people whom he claimed could corroborate the information he provided, but police interviewed none of those people. *See supra* ¶¶ 39-40, 44.

i. Everett told police about six people with whom he claimed Crosland may have discussed the Heo murder, and police interviewed none of those people. *See supra* ¶¶ 47.

j. Louise Woods informed detectives that Everett stated that the perpetrator of the Heo murder was Frank Turner, a statement inconsistent with Everett's previous accounts to detectives that Crosland was the perpetrator, and detectives conducted no follow up interviews regarding this inconsistency with either Woods or Everett. *See supra* ¶¶ 49-51.

k. Detectives did not ask witnesses who were in or around the store at the time of the shooting whether they knew or could identify Crosland. *See supra* ¶¶ 30, 48.

60. This omitted information was all relevant to the credibility of Rodney Everett's statements asserting that Crosland confessed to the Heo murder. Ex. 4, Rocks Dep. at 284:19-285:17; Ex. 7, McNesby Dep. at 246:4-254:4, 254:19-22, 264:12-265:5.

61. The omission of this information was consistent with a PPD practice of not including in affidavits of probable cause information that was inconsistent with the subject's guilt. Ex. 7, McNesby Dep. at 78:23-80:20; Ex. 6, Mangoni Dep. at 435:12-436:3.

62. As part of the process of seeking a warrant, homicide detectives would meet with the chief of the District Attorney's Office homicide unit. In 1987, that role was filled by Barbara Christie, Esq. When consulted regarding a homicide arrest, Christie would ask detectives to provide a verbal description of the relevant evidence and would depend on detectives to provide whatever information they had, whether it was inculpatory or exculpatory, and would expect detectives not to provide misleading information. Ex. 34, Christie Dep. at 15:8-14, 29:24-31:22, 46:19-47:1.

63. Cimino met with Christie on the same date that he signed the affidavit of probable cause. There is no evidence that Cimino or any other detective advised prosecutors of any information that was exculpatory to Crosland, undermined Everett's credibility, or was otherwise inconsistent with the theory that Crosland was the person who murdered Heo. Christie approved the charges. Ex. 34, Christie Dep. at 85:13-86:4; Ex. 33, Rosen Dep. 145:2-147:18; Ex. 7, McNesby Dep. at 259:3-22; Ex. 6, Mangoni Dep. at 431:18-22. Ex. 32, Activity Sheet, 12/9/1987.

64. On December 9, 1987, a judge who reviewed the affidavit of probable cause signed by Detective Cimino approved a warrant for Crosland's arrest on charges that he murdered Heo. Ex. 32, Activity Sheet, 12/9/1987.

65. On December 10, 1987, Detectives Rocks and Mangoni arrested Crosland for the Heo murder. Ex. 6, Mangoni Dep. at 441:1-18; Ex. 4, Rocks Dep. at 318:8-319:11; Ex. 35, Arrest Report.

## VII. Crosland is Arrested and, After More than 33 Years of Imprisonment, the Charges Against Him are Favorably Terminated

66. Crosland's case was presented to a jury in December 1988, and he was convicted. Crosland appealed, and the conviction was reversed. Crosland had a second trial in January 1991 and, once again, was convicted. He was sentenced to life imprisonment without parole. Ex. 36, DAO Resp. to Habeas Petition at 1.

67. In 2020, the Conviction Integrity Unit of the Philadelphia District Attorney's Office (CIU) began an investigation of Crosland's trial and conviction. Ex. 36, DAO Resp. to Habeas Petition at 1.

68. The CIU later concluded that exculpatory information had been withheld from Crosland and in a filing submitted in the U.S. District Court for the Eastern District of Pennsylvania conceded that Crosland was "likely innocent" and entitled to habeas corpus relief vacating his conviction and sentence. Ex. 6, Mangoni Dep. at 46:12-27:21; Ex. 36, DAO Resp. to Habeas Petition at 3 n.2.

69. On June 22, 2021, the Court overturned Crosland's conviction. Ex. 37, Order Granting Relief.

70. On June 23, 2021, the District Attorney's Office filed in the Philadelphia Court of Common Pleas a motion to nolle pros the charges against Crosland. Ex. 38, Nolle Pros Motion.

71. On June 24, 2021**,** the motion was granted and the charges against Crosland were dismissed. Ex. 39, Nolle Pros Order.

Respectfully submitted,

/s/ Jonathan H. Feinberg
Jonathan H. Feinberg
Grace Harris
KAIRYS, RUDOVSKY, MESSING,
FEINBERG & LIN LLP
The Cast Iron Building
718 Arch Street, Suite 501 South
Philadelphia, PA 19106
215-925-4400

Emma Freudenberger (admitted *pro hac vice*)
Amelia Green (admitted *pro hac vice*)
NEUFELD SCHECK BRUSTIN
HOFFMANN & FREUDENBERGER, LLP
200 Varick Street, Suite 800
New York, NY 10014
212-965-9081

*Counsel for Plaintiff*