IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

- - -

CURTIS CROSLAND :
Plaintiff :
:
VS. : CIVIL ACTION NUMBER
: 2:22-CV-02416-AB
CITY OF PHILADELPHIA,:
et al. :
Defendants :

- - -

November 6, 2023

- - -

Videotaped deposition of EDWARD ROCKS, was taken pursuant to notice beginning at or about 9:30 a.m. before Jeannine Cancelliere, Court Reporter and Notary Public and Ed Caswell, videotape operator, there being present.

Any reproduction of this transcript is prohibited without authorization by the certifying agency.

KAPLAN, LEAMAN AND WOLFE
Registered Professional Reporters
230 South Broad Street, Suite 1303
Philadelphia, Pennsylvania 19102



APPEARANCES:

KAIRYS, RUDOVSKY, MESSING, FEINBERG & LIN
BY: JONATHAN FEINBERG, ESQUIRE
The Cast Iron Building
718 Arch Street, Suite 501 South
Philadelphia, Pennsylvania 19106
PHONE: (215) 925-4400
gharris@krlawphila.com
Representing the Plaintiff
Also Present:
GRACE HARRIS, ESQUIRE
ANGELINE ETIENNE

CITY OF PHILADELPHIA LAW DEPARTMENT
BY: ADAM ZURBRIGGEN, ESQUIRE
DEPUTY CITY SOLICITOR
One Parkway Building
1515 Arch Street
Philadelphia, Pennsylvania 19102
PHONE: (215) 683-5448
adam.zurbriggen@phila.gov
Representing the City of Philadelphia

CLARK HILL
BY: JOHN A. DEROSE, ESQUIRE
Two Commerce Square
2001 Market Street, Suite 2620
Philadelphia, PA. 19103
PHONE: (215) 640-8420
jderose@clarkhill.com
Representing Westerman and Ansel

NEUFELD, SCHECK & BRUSTIN, LLP
BY: EMMA FREUDENBERGER, ESQUIRE (Via Zoom)
99 Hudson Street, Eighth Floor
New York, New York 10013
PHONE: (212) 965-9081
emma@nsbcivilrights.com
Representing the Plaintiff



- - -

I N D E X

- - -


| EDWARD ROCKS | PAGE |
|---|---|
| BY MR. FEINBERG | 6 |


- - -

E X H I B I T S

- - -


| EXHIBIT NO. | DESCRIPTION | PAGE |
|---|---|---|
| P-1 | Affidavit of Probable Cause | 28 |
| P-2 | Affidavit of Rodney Everett | 32 |
| P-3 | Affidavit of Delores Tilghman | 33 |
| P-4 | Affidavit of Brenda Turner | 34 |
| P-5 | Memo from Paul Paris | 42 |
| P-6 | Response to Petition | 45 |
| P-7 | Detective Rocks Transcript | 50 |
| P-8 | Activity Sheet | 77 |
| P-9 | Concise Officer History | 97 |
| P-10 | Rodney Everett Interview | 153 |
| P-11 | Mona Madison Interview | 160 |
| P-12 | Interview of Levi Davis | 162 |
| P-13 | Interview of Maurice Durbin | 163 |
| P-14 | Handwritten Notes | 165 |
| P-15 | Activity Sheet | 167 |




- - -

E X H I B I T S

- - -


| EXHIBIT NO. | DESCRIPTION | PAGE |
|---|---|---|
| P-16 | Activity Sheet | 171 |
| P-17 | Police Photos | 172 |
| P-18 | Handwritten Witness List | 175 |
| P-19 | 7549 Report | 182 |
| P-20 | Massey Statement | 184 |
| P-21 | Everett's Statement | 188 |
| P-22 | Grand Jury Transcripts | 194 |
| P-23 | Handwritten Notes | 198 |
| P-24 | Activity Sheet | 201 |
| P-25 | Polygraph | 217 |
| P-26 | Michael Ransome Interview | 224 |
| P-27 | Letter from Everett | 227 |
| P-28 | Everett Handwritten Statement | 278 |
| P-29 | Trial Testimony | 281 |
| P-30 | Activity Sheet | 285 |
| P-31 | Activity Sheet | 310 |
| P-32 | Activity Sheet | 314 |
| P-33 | Arrest Report | 314 |
| P-34 | Interview | 320 |

Page 5

VIDEOTAPE OPERATOR: We're now on the record. My name is Ed Caswell, IV. I'm the videographer retained by On the Record. This is a video deposition for the United States District Court for the Eastern District of Pennsylvania. Today's date is November 6th, 2023. The time is 9:33. This deposition is being held at 718 Arch Street, Suite 501 in Philadelphia in the matter of Curtis Crosland versus City of Philadelphia, et al. The deponent is Edward Rocks.
Counsel, if you want to introduce yourselves and who you represent.
MR. FEINBERG: Sure, for the plaintiff this is Jonathan Feinberg. I'm joined by my co-counsel, Grace Harris and also our firm's paralegal Angeline Etienne.
MR. ZURBRIGGEN: For the deponent, Edward Rocks, City of Philadelphia and the city defendants, Adam Zurbriggen from the City of Philadelphia Law Department.
MR. DeROSE: John DeRose on behalf of Linda Westerman and Karen Ansel.
\- - -

Page 6

EDWARD ROCKS, after having been first duly sworn, was examined and testified as follows:
\- - -
EXAMINATION
\- - -
BY MR. FEINBERG:
Q. Sir, could you state your name for the record?
A. Edward Rocks, R-O-C-K-S.
Q. Detective Rocks, we met earlier this morning and as I think we'll discuss, you and I met a year and a half ago in another deposition. But for purposes of the record let me tell you, my name is Jon Feinberg. I am the attorney for Curtis Crosland. As you heard me say, I'm joined by colleagues here, Grace Harris and Angeline Etienne. There may be some of our co-counsel who join us later on the Zoom, just to observe this deposition.
We represent Curtis Crosland. Mr. Crosland has brought a lawsuit against you, several other police detectives and the City of Philadelphia. In the lawsuit Mr.

Page 7

Crosland alleges that you and your fellow detectives caused him to be falsely arrested, prosecuted, convicted and incarcerated for more than 34 years for the December 5th, 1984 robbery and murder of Il Man Heo, when Mr. Crosland was in fact innocent of that crime.
You've been named as a defendant in the case and you're here today for your deposition. Do you understand that, sir?
A. Yes.
Q. You're represented in this case by Mr. Zurbriggen. Have you had a chance to consult with him before we begin today?
A. Yes.
Q. Do you need any more time to speak with him before I ask you questions in this case?
A. No.
Q. I assume that over the course of your career you've testified under oath in court many times; is that correct?
A. Correct.
Q. As I mentioned just a moment ago, I took your testimony in a deposition in a case on my

Page 8

behalf of my client named Johnny Berry. That deposition was back in February of 2021. Do you recall that deposition, sir?
A. I do.
Q. For reference, that deposition was on Zoom. So although we did not meet in person, we spent a better part of a day together discussing the case. I take it that's what you recall?
A. I don't remember that. I remember you on the Zoom.
Q. Perhaps I wasn't memorable to you but you remember testifying in a deposition, that's correct?
A. Yes.
Q. During the course of that deposition, you told me that you had testified in just one other deposition. Does that sound right, that you have now testified in two depositions, prior to today?
A. I am not 100 percent sure of that.
Q. Let me just ask a more open-ended question. Before today, how many times do you recall testifying in a deposition?

Page 9

A. I don't know exactly.
Q. A small number?
A. I don't know.
Q. Let's ask it this way, since February of 2021, have you testified in any depositions?
A. I don't know.
Q. I don't know because you just don't remember or you have --
A. I don't remember.
Q. We will come back to that, sir.
Can I assume, bottom line, that you understand what it means to testify under oath?
A. Yes.
Q. In that case I'm not going to go through a litany of instructions about what it means to testify under oath but I do just want to confirm that even though there's no judge here, there's no jury here, you understand that you have sworn to tell the truth just as if we were in a courtroom, correct?
A. Yes.
Q. Sir, we have a lot to cover today. You're the first person who is being deposed

Page 10

in this case. So there are a lot of materials that I'll need to get through, just to develop our understanding of the case.
I tell you that just to confirm for you that if at any point you need a break, you should let me know. Okay?
A. Yes.
Q. I normally try to take a break every 90 minutes or so but if you need a break earlier than that, tell me we'll accommodate it. Agreed?
A. Yes.
Q. The one qualifier I will add is that if you ask for a break while there's a question pending, you will need to answer the question before we take the break, agreed?
A. Yes.
Q. Sir, is there any reason why you cannot give truthful and accurate testimony today?
A. No.
Q. What did you do to prepare for today's deposition?
A. I read over the complaint and I read over the statement, whatever paperwork there

Page 11

was to look over.
Q. So you say a complaint and whatever paperwork. Let me break that down. The complaint, is that the Civil Rights Complaint that was filed on behalf of Mr. Crosland?
A. Yes.
Q. Paperwork, was paperwork supplied to you by your counsel, Mr. Zurbriggen; is that correct?
A. Yes.
Q. Did you meet with Mr. Zurbriggen?
A. Yes.
Q. I won't ask you about what you discussed in that meeting or those meetings, first things first, how many times did you meet?
A. Once.
Q. Was that meeting in person?
A. Yes.
Q. When did the meeting take place?
A. Approximately a week or two ago.
Q. How long was the meeting?
A. 10, 15 minutes.
Q. Was anyone else present besides you and Mr. Zurbriggen?

Page 12

A. No.
Q. Did you talk to Mr. Zurbriggen outside of the context of that meeting, in preparation for the deposition?
A. No.
Q. It sounds like you were provided documents.
A. Excuse me. I did speak to him on the phone as to where this was going to be, the exact location.
Q. So the location and the logistics?
A. Yes.
Q. I take it you were provided documents to review?
A. Yes.
Q. Can you, to the best of your recollection, let me ask that a different way, sir.
What specific documents do you recall looking at?
A. One was an interview.
Q. Let's list the documents out that you recall seeing first and then I will ask you some follow-up questions.

Page 13

What else besides the interview?
A. I believe it was just an interview and activity sheet, if I'm correct.
Q. Who was the interview of?
A. I don't know the name, it was a female.
Q. Do you recall any of the details of the interview?
A. No.
Q. Does the name Louise Woods sound familiar to you?
A. That name does but I don't know if that's the interview I took.
Q. When you say an interview, you're talking about an interview that you, yourself conducted as a detective; is that correct?
A. Myself and maybe another detective, other detectives.
Q. Which detective or detectives?
A. In that particular statement?
Q. Yes.
A. I believe it was Dominic Mangoni.
Q. Does the name Rodney Everett sound familiar?

Page 14

A. It sounds, familiar, yes.
Q. When you say that, do you mean it sounds familiar because of a recollection of something that happened years ago or because of your review of that interview?
A. My review.
Q. The activity sheet that you mentioned, my understanding is that detectives in the homicide division would often write an activity sheet to describe details that were learned in an interview. Did the activity sheet that you reviewed corresponded to the interview that you read?
A. I'd have to look at it and read both of them.
Q. I expect that we will go through documents, some of these documents as we go further today. For present purposes though, can you tell me whether you looked at anything else besides, number one, an interview and number two, an activity sheet?
A. I don't believe so.
Q. When did you look at those meetings?
A. At our meeting, at our face-to-face

Page 15

meeting.
Q. Which occurred a week or two ago?
A. Yes.
Q. When you looked at those documents, did you remember any of the details of this case?
A. No.
Q. Other than any conversations with your counsel, have you spoken to anybody else to prepare for this deposition?
A. No.
Q. As I mentioned, there are a number of detectives who have been sued as defendants in this case. I want to list those who are still living and see if that refreshes your recollection about any conversations with them about this case.
You already mentioned Detective Mangoni. Did you speak to him about this case?
A. No.
Q. When was the last time you spoke to Detective Mangoni?
A. Maybe a month ago, I don't know exactly.
Q. Is he someone who you keep in touch with

Page 16

regularly?
A. Only when one of our past workers passes away.
Q. So you see him at funerals, that kind of thing?
A. Yeah, plus notify each other.
Q. How about Detective McNesby?
A. No.
Q. You say you didn't speak to him about this deposition; is that correct?
A. No.
Q. When is the last time you spoke to Detective McNesby?
A. Probably 20 years ago, 25 years ago.
Q. I have McNesby, his first name is James; is that right?
A. Yes.
Q. Is there any relation between Detective McNesby and the McNesby who is the now outgoing head of the Fraternal Order of Police?
A. No.
Q. Just coincidental, they have the same name?

Page 17

A. Yes.
Q. How about Detective Brignola, did you speak to him about this case?
A. No.
Q. When is the last time you spoke to him?
A. 30 years ago.
Q. Detective Hughes, did you speak to him about this case?
A. Which Hughes?
Q. Edward Hughes.
A. Yes.
Q. Did you speak to him about this case?
A. No.
Q. When is the last time you spoke to Detective Hughes?
A. 25, 30 years ago.
Q. How about Sergeant Descher, did you speak to him about this case?
A. No.
Q. When is the last time you spoke to Sergeant Descher?
A. I spoke to him about five years ago.
Q. What was that about?
A. Our grandchildren were being confirmed.

Page 18

Q. At the same time, at the same church?
A. Yes.
Q. Have you spoken to him at all about your time in the homicide division at any point since then?
A. No, there was no talk about that.
Q. When you say, there's no talk about that, are you referring to your relationship with Descher?
A. You're asking me was there talk about this case with Descher?
Q. I was asking two questions. One is whether you spoke to him about this case and I take it your answer is no, correct?
A. Correct.
Q. A broader question, the last time you spoke to Descher five years ago, did you talk about anything having to do with your work as homicide detectives?
A. No.
Q. As I mentioned to you before I gave you that list, those are the people who are named in this case who are still living. There are a number of people whose estates have been

Page 19

names because the detectives who worked on this case are deceased.
I am going to list those deceased detectives and ask the last time you recall speaking to them. Okay. The first that I have is Cimino. First, did I pronounce that correctly?
A. Yes.
Q. When is the last time you recall speaking to Detective Cimino?
A. 20, 30 years ago.
Q. Next is Detective Nespoli?
A. Same.
Q. Ansel?
A. Same.
Q. Detective Westerman?
A. Same, sergeant.
Q. Sergeant, pardon me. And then Lanzelotti, who I believe is a lieutenant.
A. Lieutenant, uh-huh.
Q. First let's go back to Westerman, you confirmed you haven't spoken to him in 20, 30 years?
A. Yes.

Page 20

Q. Lanzelotti, same?
A. Yes.
Q. Moving on from the detectives who are involved in this case, I'll represent to you, sir, that Mr. Crosland was tried in two different trials. Once in 1989 and once in 1991.
At the first trial the prosecutor was Joel Rosen, do you know Rosen?
A. Yes.
Q. Have you ever spoken recently with Mr. Rosen about this case?
A. No.
MR. ZURBRIGGEN: Object to form, just for the clarity.
BY MR. FEINBERG:
Q. When is the last time you spoke to Mr. Rosen?
A. 20 years ago. These are all approximations.
Q. I understand. The prosecutor who tried the second case in 1991 was now judge, Shelley Robins New. Do you know Judge Robins New?
A. I do.

Page 21

Q. Have you ever spoken to her about this case in the past couple of months?
A. No.
Q. When is the last time you spoke to Judge Shelley Robinson New, period?
A. 30 years ago.
Q. When did you first receive notice about this case, sir, that you have been named as a defendant?
A. I really can't say. I know I received something in the mail. I think it was the complaint I received in the mail.
Q. I will represent to you, sir, that the complaint that started this case in federal court was filed in June of 2022. With that representation, can you estimate when you recall hearing about it or when you heard about it for the first time?
A. No.
Q. Suffice it to say sometime between June of '22 and now, right?
A. I don't know the start date.
Q. Let me -- and this will become clear as we go through documents. I am going to

Page 22

outline for you now the basic timeline of the case. And the reason I'm doing that is because I want to ask you what you remember as far as your last involvement. Do you understand?
A. Uh-huh, yes.
Q. The murder at issue in this case took place on December 5th, 1984 in a convenience store at 27th and Oakford Streets in South Philadelphia. Do you understand that, sir?
A. Yes.
Q. Mr. Crosland, my client, was arrested and charged with that crime about three years later on December 10th of 1987; do you understand that, sir?
A. Yes.
Q. As I mentioned before, he was tried in 1989 and 1991; do you understand that?
A. Yes.
Q. The documents that I have seen with your name on that, showing some involvement in this investigation appear to focus on a time period in July of 1987 or a little bit after. Does that sound right to you, sir?

Page 23

MR. ZURBRIGGEN: Object to form.
BY MR. FEINBERG:
Q. That's a bad question.
Do you understand, sir, that that's the timeframe of the documents that I saw with your name.
A. Yes.
Q. The documents also show that you were involved in Mr. Crosland's arrest in December of 1987?
A. That, I don't know.
Q. My question for you, sir, is this: Between December of 1987 and when you first heard about this case recently over the past couple of years, do you recall any involvement in the case at all?
A. No.
Q. I understand your answer but let me explain -- provide some follow up. There were a number of different post conviction petitions that Mr. Crosland filed in court that were answered by assistant district attorneys and there was ongoing litigation.

Page 24

Do you recall ever being asked to review any of those documents?
A. No.
Q. There also was, starting in roughly 2020, an investigation of the case that was conducted by the conviction integrity unit of the District Attorney's Office. Did anyone from that office or from that unit reach out to talk to you about the case?
A. No.
Q. Let me broaden that question, beyond just the lawyers and investigators in that unit; did anyone from the police department reach out to you and ask you questions about the case?
A. No.
Q. Is it accurate to say then, that the first time that you heard something about this case in recent times was when you learned about the lawsuit?
A. Yes.
Q. After you learned about -- strike that.
After you received notice that you had been named in the complaint, did

Page 25

you pull any documents or look into any materials to remind yourself of the details?
A. No.
Q. Did you reach out to any of your former colleagues to ask them questions about the case?
A. No.
Q. For example, you mentioned to me that you do have periodic conversations with Detective Mangoni, did I understand that correctly?
A. Yes, yes.
Q. I assume you saw -- when you saw your name in the complaint, that Detective Mangoni was also named as a defendant in this case?
A. Yes.
Q. Did you reach out to him and ask about his recollection of the case?
A. No.
Q. Have you spoken to him at all, at any time in the past two years about Curtis Crosland's case?
A. No.
Q. Let me go over a couple of other

Page 26

documents that have been prepared in this case to ask whether you've seen them.
First, you mentioned you seen the complaint, correct?
A. Yes.
Q. Did you look at that recently or was that -- did you look at that recently?
MR. ZURBRIGGEN: Object to the form. Detective, if you know.
THE WITNESS: Probably a month ago, approximately.
BY MR. FEINBERG:
Q. Did you read any of the trial transcripts from this case?
A. No.
Q. Now your counsel and his colleagues at the law department have provided us with a couple of different copies of the homicide file concerning the Heo murder. When I use the term homicide file, I take it that's something that's familiar to you; is that correct?
A. Yes.
Q. Every time there was a murder that the

Page 27

homicide division investigated, there was a separate file created regarding that decedent and any ensuing investigation; is that correct?
A. Yes.
Q. Did you look through the homicide file concerning the Heo murder?
A. No.
Q. There are a number of other homicide files that are related to this case because some of the parties who were witnesses were investigated in other cases. Did you go pull any other homicide files that may be related to this one to review them?
A. No.
Q. Did you look at the District Attorney's Office file?
A. No.
Q. Did you look at any submissions of the conviction integrity unit to the federal courts regarding this case?
A. No.
Q. I believe you already answered this question and pardon me if I am repeating it

Page 28

but do you remember any of the details of this case, in terms of any independent recollection?
A. No.
Q. What I would like to do as a start, take a look at Tab 9, is show you the affidavit of probable cause that was used to support the arrest warrant for Mr. Crosland's arrest, just to kind of set the stage for some of the details.
I will hand you a document, sir. This will be marked as Exhibit P-1.
- - -
(Whereupon Exhibit P-1 was marked for identification.)
- - -
BY MR. FEINBERG:
Q. Now that you have that in front of you, take a moment to read through it and let me know when you're finished.
Sir, have you had a chance to review that document?
A. Yes.
Q. Did reviewing that spark any

Page 29

recollection for you about the details of this case?
A. No.
Q. On the second page of the document which is labeled City-5875, there are references to three different civilian witnesses who provided information about the scene of the shooting; is that correct?
A. Yes.
Q. Do you recall meeting with any of those witnesses or talking with them about the details of the case?
A. No.
Q. If you turn to the third page, 5876, there's a discussion of an interview that took place on April 15th, 1987 between Detective Mangoni and Rodney Everett, do you see that?
A. Yes.
Q. We talked briefly just a moment ago or a few moments ago about your recollection of the name Rodney Everett. Seeing this material now, does that spark any recollection for you about your conversations with Mr. Everett?
A. No.

Page 30

Q. I will represent to you, sir, and we will get to this a little bit later, that you appear to have conducted a fairly lengthy interview with Mr. Everett on July 7th of 1987, some months after this interview with Detective Mangoni.
Do you remember anything about that, now that I told you the details?
A. No.
Q. As we mark exhibits, sir why don't I just ask you to turn it upside down and put it right next to you. We may come back to that.
Sir, sitting here today, can you tell me who shot Il Man Heo?
MR. ZURBRIGGEN: Objection to form. Detective, if you know.
THE WITNESS: I have no idea.
BY MR. FEINBERG:
Q. Why is it that you have no idea?
MR. ZURBRIGGEN: Same objection. Detective, you can answer.
THE WITNESS: I don't know why I would. I can't remember anything about the case. I have no idea.

Page 31

BY MR. FEINBERG:
Q. So you can't say one way or the other, whether our client, Curtis Crosland is guilty or innocent; is that correct?
MR. ZURBRIGGEN: Same objection.
THE WITNESS: Correct.
BY MR. FEINBERG:
Q. Are you aware of any of the evidence that has been produced in this case where various witnesses have recanted testimony that was given in the mid and late 1980s?
A. No.
Q. Are you aware of any of the details that were used by the prosecution to convict Mr. Crosland in 1989 and then again in 1991?
A. No.
Q. Does the name Delores Tilghman sound familiar to you at all?
A. Sounds familiar but I don't know why.
Q. Let's do this because I think it will be helpful to set the stage as we go through some of the investigation documents that you were involved with. I would like to show you

Page 32

recent statements from some of the key witnesses from the time of trial.
The first is, if we can have tabs 3, 4, 5. I will hand these to you one at a time, sir. This will be marked as Exhibit P-2.
\- - -
(Whereupon Exhibit P-2 was marked for identification.)
\- - -
BY MR. FEINBERG:
Q. This is an Affidavit of Rodney Everett from January of 2020. Take that, sir, and read through it and let me know once you're finished.
A. Yes.
Q. Does this refresh your recollection, in any way, about the things that Rodney Everett said at the time of trial?
A. No.
Q. I take it this is the first time you're seeing this document?
A. Yes.
Q. I am going to show you a second one.

Page 33

This will be Exhibit P-3.

- - -

(Whereupon Exhibit P-3 was marked for identification.)

- - -

BY MR. FEINBERG:

Q. Before I ask you questions about this, sir, let me fill in some of the gaps. I will ask you to accept my representation and if you need background documents on this, I'll be happy to provide them to you. Delores Tilghman was a witness who testified at the trial of Mr. Crosland back in 1989, that at some point after the Heo murder she overheard a conversation between Mr. Crosland and others where she alleged that Mr. Crosland expressed concern that someone, a young woman named Brenda Turner, would come forward and provide details about the case in return for reward money.

Do you understand the basic outlines I have given you there?

A. Yes.

Q. To be clear, I am paraphrasing dozens of

Page 34

pages of testimony there, but just so you have an understanding about what Ms. Tilghman testified to at trial. Understood?

A. Yes.

Q. I take it now that you reviewed this document in P-3 that Tilghman signed in December of 2019, you're not familiar with any of those details?

A. I am not.

Q. The final one I will show you will be marked as Exhibit P-4. This is an affidavit of Brenda Turner, also from October of 2020. Here you go, sir.

- - -

(Whereupon Exhibit P-4 was marked for identification.)

- - -

BY MR. FEINBERG:

Q. Do you recall when I described to you Delores Tilghman's testimony, I mentioned Brenda Turner in that description?

A. Yes.

Q. Do you see here that Brenda Turner is saying that that never happened, she never

Page 35

would have come forward in exchange for some reward?

A. Yes.

Q. Have you ever seen this statement before?

A. No.

Q. Sir, in the last deposition that we conducted, you and I together back in February of 2021, we talked a little bit about witnesses who recant their prior statements. Do you recall testifying on those issues?

A. No.

Q. Do you have an opinion at all about witnesses who recant testimony that was given at an earlier time?

MR. ZURBRIGGEN: Object to the form of the question. Detective, if you understand.

THE WITNESS: Do I have an opinion?

BY MR. FEINBERG:

Q. Sure.

A. No, I don't.

Q. Do you ever have any doubts about the

Page 36

credibility about recantation?

A. Yes.

Q. What are those doubts?

A. They might be doing it for a reason.

Q. What kinds of reasons?

A. A lower sentence, to get a friend out of jail, to be part of the civil case when they sue, a million reasons.

Q. Have you encountered personally any recantations where you have seen -- where you have not believed the validity of those recantations?

A. Yes.

Q. Can you give me an example?

A. Yes, in the last case that we had the deposition, the Johnny Berry case.

Q. Tell me more about that, what do you remember about the recantations that you do not believe?

MR. ZURBRIGGEN: Objection to the form of the question. Detective, you can answer.

THE WITNESS: Just vaguely if the codefendant, who the witness knew during

Page 37

the robbery, he was caught with the murder weapon right after that. He testified against the codefendant who got life and he got I believe 15 years or whatever. After he did his time, he came out and recanted.
BY MR. FEINBERG:
Q. What about that did you not believe?
A. I didn't believe -- when he recanted, he would have had to go in front of a judge and say that he lied under oath and put his co-defendant in jail for life. So I believe he was given immunity and he sued. That's his reason.
Q. He -- so let's put some names on there. You and I talked at length about this case in February of 2021. So I'll throw them out for you.
My client at that point was Johnny Berry. He was the one who got sentenced to life in prison.
A. Correct.
Q. The other co-defendant who testified against him at the time of trial was Tauheed T-A-U-H-E-E-D Lloyd. Does that name sound

Page 38

right to you?
A. Yes.
Q. Lloyd is the one who recanted after he served his time; is that what you remember?
A. Yes.
Q. When you say, he sued, who are you talking about?
A. Johnny Berry, I believe possibly both. I don't know, I know definitely Johnny Berry.
Q. What is it about that lawsuit that caused you to have doubts about the validity of the recantation from Lloyd?
MR. ZURBRIGGEN: Object to the form of the question. Detective, if you know, you can answer.
THE WITNESS: I mean Lloyd testified in court against his co-defendant and received a lengthy sentence, which I believe that he was telling the truth.
BY MR. FEINBERG:
Q. Are there any specific reasons you can point to, sitting here today, about why Lloyd's recantation was not true?
MR. ZURBRIGGEN: Same

Page 39

objection. Detective, you can answer.
THE WITNESS: Because he was given immunity. If he testified that he lied, he would have been arrested for perjury and sentenced right there.
BY MR. FEINBERG:
Q. Let's put it in the context of this case. Now that you've reviewed three statements, let's put Brenda Turner to the side for a moment. You have reviewed the statements from recent times from Rodney Everett and Delores Tilghman, agreed? Just now I showed them to you?
A. The recantations?
Q. Yes.
A. Yes, I reviewed those.
Q. I showed you -- P-2 was the recantation of Rodney Everett and P-3 was the recantation of Delores Tilghman, correct?
A. Yes.
Q. Sitting here today, do you have any reason to doubt the credibility of those two recantations?
A. Of course.

Page 40

Q. Why?
A. I doubt everything. How do you know that's the truth.
Q. By the same token -- please finish your answer.
A. I was going to say, how do you know they are telling the truth now.
Q. How did you know they were telling the truth back at the time that they gave information in the context of a homicide investigation?
MR. ZURBRIGGEN: Objection to form. Detective, you can answer.
THE WITNESS: You don't know whether any person you interview is telling the truth or not.
BY MR. FEINBERG:
Q. Let me ask one follow up and then we'll come back to this later. Can I assume --
A. Can I go back?
Q. Sure.
A. When somebody is telling you the truth in a statement, you back that up by evidence, by your investigation and evidence.

Q. In other words, what you look for are factors or details that will corroborate a statement; is that correct?
A. That's correct.
Q. If you see details or -- pardon me, if you see facts which show that a witness might be lying, that's something that will raise a red flag for you; is that correct?
A. Me personally, yes.
Q. Well, you personally or would you expect other detectives to act the same way --
MR. ZURBRIGGEN: Objection to form.
THE WITNESS: I can't answer that. I can't speak for other detectives, I'm speaking for myself.
BY MR. FEINBERG:
Q. Fair enough. But the bottom line, sir, is you, as a highly experienced detective, if you see facts which suggest to you that a witness is telling you a story is not telling the you the truth, you're going to do something about that; is that correct?
A. Yes.



Q. You're going to probe further to see why the witness might not be telling the truth, right?
A. Yes.
Q. Or you'll look for other evidence which might point in another direction; is that correct?
A. Yes.
Q. Let's come back to that.
One of the names that came up during the investigation of the Heo murder was Michael Ransome. Do you remember that name at all?
A. It sounds familiar but I don't know.
Q. Let's see Tab 7. This will be P-5.
- - -
(Whereupon Exhibit P-5 was marked for identification.)
- - -
BY MR. FEINBERG:
Q. Before you read that, sir, let me explain what this is so you have the context before you look into it.
As I mentioned to you, Mr.



Crosland was convicted of the Heo murder in 1991 and I told you that there was a lot of post conviction litigation over the years following that conviction.
A. Right.
Q. One of those post conviction petitions was filed in and around 1996. Understood?
A. Uh-huh.
Q. Is that a yes?
A. Yes.
Q. In connection with that, lawyers who represented Mr. Crosland filed affidavits that were supplied by witnesses who had information concerning the prosecution for Mr. Crosland's conviction. Understood?
A. Yes.
Q. What you have in front of you now, which I have marked as P-5 -- do you need a moment?
A. No.
Q. The document that I have in front of you now is a document that was prepared by an investigator named Paul Paris P-A-R-I-S. And I will ask you just to -- and this was filed with the post conviction petition. Take a



moment to read this page, sir, and let me know when you're done.
A. Okay.
Q. First things first, do you know Paul Paris?
A. No.
Q. Do you recall anyone by that name as a Philadelphia police detective?
A. No.
Q. You saw reference in this memorandum prepared by Mr. Paris about Michael Ransome; is that correct?
A. Yes.
Q. Does that refresh your recollection, in any way, about Ransome being a suspect in this homicide?
A. No.
Q. Are you aware, sir, of any tips that were found in the file, the Philadelphia Police Department homicide file identifying Michael Ransome as a suspect in the Heo shooting?
A. No.
Q. I will show you one more document.

Page 45

Let's go to Tab 2. This is a document that was filed in the -- we haven't Bates stamped it but it is a public document. This is P-6.

- - -

(Whereupon Exhibit P-6 was marked for identification.)

- - -

BY MR. FEINBERG:
Q. Sir, that's a long document which I will direct you to a couple of different locations.
Sir, I will represent to you that Mr. Crosland, in addition to filing a post conviction petition in state court filed various petitions in federal court. This is a document that was submitted to the federal court by the District Attorney's Office, specifically lawyers within the conviction integrity unit. Are you familiar with the conviction integrity unit?
A. Yes.
Q. Turn to page three of this document, sir. I will point you to footnote three which is at the very bottom of the page. Do you see small text there, there's a sentence that

Page 46

says: Although it is legally unnecessary --
A. Yes.
Q. I will read out to you the latter part of that sentence which says: Given the weakness of the evidence against him and the powerful nature of Brady information at issue here, the Commonwealth is cognizant that Crosland may very well be actually innocent.
Had you ever heard anyone from the D.A.'s office say that about Mr. Crosland before?
A. No.
Q. Have you ever discussed Mr. Crosland's actual innocence with anybody?
A. No.
Q. Let me direct you to another part of this filing, the bottom of page 9. Let me ask you, sir, to read -- there is a heading at the middle of page nine that says: Brady Evidence Relating to Everett.
Could you please read there onto the next page, all the way down to -- if you turn to the next page you will see a section that says materiality.

Page 47

Just read that entire section Brady Evidence Relating to Everett. Take a moment and let me know when you're done.
Had you ever seen any of that information, sir?
A. No.
Q. Were you aware of any -- strike that. Do you recall hearing at any point that information regarding the credibility of Rodney Everett was withheld from Mr. Crosland and his defense lawyer?
A. No.
Q. Do you know one way or the other whether that happened?
A. No.
Q. Does it surprise you to learn that that happened?
MR. ZURBRIGGEN: Object to the form. Detective, you can answer.
THE WITNESS: Does it surprise me?
BY MR. FEINBERG:
Q. Yes.
A. Not one way or the other.

Page 48

Q. You don't have feelings on it one way or the other?
MR. ZURBRIGGEN: Same objection.
THE WITNESS: I don't know if you're aware, I had nothing to do with this case except a couple of interviews and an activity sheet. I don't know the basics. I don't know anything about the homicide file. You're asking me questions I can't answer.
BY MR. FEINBERG:
Q. Do you know who would be able to answer those questions?
MR. ZURBRIGGEN: Same objection. Detective, if you know.
THE WITNESS: I guess the assigned detective and his squad. My squad wasn't assigned to this case. I just helped out a couple times.
BY MR. FEINBERG:
Q. Sure. I appreciate that, sir. In a few moments when we get into the details of the investigation, I will ask you to help me clarify what your role was.

Page 49

Really right now I am trying to figure out what your knowledge base is.
A. Very limited.
Q. Let me ask another question related to that. You mentioned that if anyone would be able to offer information about whether material was withheld or not disclosed, you would expect that it would be the assigned detective; is that correct?
A. Correct.
Q. Do you know who the assigned detective was in this case?
A. No. I know it was 4 Platoon who had the case.
Q. Hold onto that thought for a second, sir. We'll come back to who the members of that platoon were.
I neglected to do this earlier so let me introduce it now. I want to share with you your transcript in your prior deposition. This will be P-6. Sir, I am not going to ask you -- P-7, pardon me.
- - -
(Whereupon Exhibit P-7 was

Page 50

marked for identification.)
- - -
BY MR. FEINBERG:
Q. Throughout the day I may ask you to look back at a few things as a reminder of things you testified to earlier. And for reference, sir, this is a transcript of a deposition that you gave via Zoom back on February 11th of 2021.
Have you reviewed this transcript at any point leading up to this deposition?
A. No.
Q. Have you reviewed the transcript at any point since the deposition was given in February of 2021?
A. No.
Q. I am not going to try to find the page now but I will represent to you that you testified in response to my questions in this deposition about cases where convictions have been overturned. I asked you in particular about whether there were any cases where you were the assigned detective and a conviction

Page 51

had been vacated. Do you recall, in general, testimony about those issues?
A. No.
Q. I will represent to you that what you told me at that point is that the only case that you were aware of where a conviction had been vacated, where you were the assigned, was the Johnny Berry case.
First of all, do you agree that you were the assigned and that that conviction was vacated?
A. Yes.
Q. Since that time, since February of 2021, have you a learned of any other cases where you were the assigned detective and a conviction was vacated by a court or by the District Attorney's office?
A. No.
Q. Obviously you were involved, even if peripherally in Mr. Crosland's case and that was vacated in June of 2021. I take it you're aware of that; is that correct?
A. Could you repeat that?
Q. Yeah, Mr. Crosland's conviction was

Page 52

vacated in June of 2021. Are you aware of that?
A. Yes.
Q. Have you learned of any other cases -- let me be clear about that. Just a moment ago I was asking about cases where you were the assigned detective. Now I am asking about any cases that you were involved with. Do you recall any cases that you have been involved with where you have learned that a conviction was vacated?
A. Yes.
Q. What other case?
A. Walter Ogrod.
Q. What other cases, if any, besides Ogrod?
A. That's the only one I can think of.
Q. What was your role in the Walter Ogrod case?
A. My role was I -- at the scene of the murder on Rutland Street in Philadelphia, there was a little girl that was killed, Barbara Jean Horn. And it took years to solve the case. I came into work one day for day work, it was like 8 o'clock in the morning and

Page 53

they said there had been an arrest made on that case and the confession was on the desk.
So I read the confession. And in the confession he described a pull-down bar from a weight set that he used to beat the little girl with, the murder weapon. I understood that the detectives went to that house that night and the house was boarded up, bricked up, whatever, cleaned out by the city.
I had handled a murder -- a detective's daughter was killed in that same house, actually killed in the basement, a 16-year old girl. Her name was Maureen Dunn. When I read his confession describing the murder weapon, I had a picture of that from my scene from the detective's daughter. I testified in both trials as to the photo of the murder weapon.
Q. So you testified both times that Mr. Ogrod was tried; is that correct?
A. Correct.
Q. And your testimony was about essentially authenticating a photograph that had been taken from the scene of the murder; is that

Page 54

correct?
MR. ZURBRIGGEN: Object to the form. Detective, if you know.
THE WITNESS: It was the scene of the murder of Maureen Dunn, it was years before.
BY MR. FEINBERG:
Q. When was Maureen Dunn murdered?
A. I believe it was '85 or '86 but I am not 100 percent sure.
Q. I know about the Ogrod case, I forget the year. Do you know when Barbara Jean Horn was murdered?
A. No. It may have been around there but the arrest wasn't made until a few years later.
Q. Was there any particular -- strike that.
The item that was alleged to be the murder weapon that Walter Ogrod used to murder Ms. Horn or Barbara Jean Horn was shown in the photograph that you had from the Dunn murder; is that correct?
A. Yes.
Q. You're aware that Mr. Ogrod filed a

Page 55

civil rights suit regarding his claim that he was falsely convicted?
A. Yes, I was deposed.
Q. When did you give deposition testimony?
A. No idea.
Q. Are you aware that the Ogrod case has just recently resolved?
A. Yes.
Q. You saw news about that late last week?
A. Yes.
Q. Do you have any opinion on that settlement?
MR. ZURBRIGGEN: Object to the form. Detective --
THE WITNESS: Yes.
BY MR. FEINBERG:
Q. What's your opinion?
A. That he is guilty.
Q. Why do you say Ogrod is guilty?
MR. ZURBRIGGEN: Same objection. Detective, you can answer.
THE WITNESS: Because nobody would have known about the murder weapon except him.

Page 56

Q. Who were the detectives who took the confession from Mr. Ogrod?
A. I believe it was Martin Devlin and Paul Worrell.
Q. Do you know those detectives well?
A. I know all of the detectives well, I knew them -- not friendly well but I knew them.
Q. Have you ever heard allegations about Detectives Devlin and/or Worrell fabricating the details of a confession?
A. Yes.
Q. What do you think about those allegations?
MR. ZURBRIGGEN: Objection to form. Detective, you can answer.
THE WITNESS: I would say knowing them, they were false.
BY MR. FEINBERG:
Q. I apologize. Can you repeat yourself?
A. Knowing them and their work, I would say they were false.
Q. The allegations were false or the confessions were false?

Page 57

A. The allegations.
Q. Did you ever see Detective Devlin -- let's do one at a time.
Did you ever see Detective Devlin act in a way that was aimed at coercing a suspect to confess?
A. No.
MR. ZURBRIGGEN: Object to the form.
BY MR. FEINBERG:
Q. Did you ever see Detective Worrell act in a way that was aimed at coercing a witness or a suspect to confess?
A. No.
MR. ZURBRIGGEN: Same objection.
BY MR. FEINBERG:
Q. By the way, did you ever conduct interviews with Detective Devlin or Worrell?
A. No, I don't think we ever worked in the same squad in homicide.
Q. The two of them were typically partners; is that correct?
A. Yes.

Page 58

Q. Getting back to your point on the Ogrod case, your expectation is that if there was reference to a murder weapon, that was an inculpatory fact to Mr. Ogrod; is that correct?
A. Yes.
Q. In other words, the only person who could have known about the murder weapon would be the person who did the killing; is that correct?
A. Correct.
Q. Would you agree that another possibility in the context of a confession, is that the detectives could have fed him that detail.
MR. ZURBRIGGEN: Object to the form. Detective, you can answer.
THE WITNESS: Anything is possible.
BY MR. FEINBERG:
Q. Do you have any reason, one way or the other, to know if that happened in the Ogrod case?
A. I can only testify to what I -- I never spoke to either one of those detectives about

Page 59

anything about that case.
Q. A moment ago you told me that you believed that Ogrod is guilty; is that correct?
A. Yes.
Q. And your belief that Ogrod is guilty is based on the representations of Devlin and Worrell as to what happened in the confession; is that correct?
MR. ZURBRIGGEN: Objection to form.
BY MR. FEINBERG:
Q. So when you say that Ogrod is guilty, your opinion is based on the validity of the confession; is that correct?
A. Yes.
Q. And your view as to the validity of the conviction is based on your view that Devlin and Worrell are telling the truth about what happened during that interrogation; is that correct?
A. Yes.
Q. It's possible though, I think you said, that Devlin and Worrell could have been

Page 60

untruthful about that confession; is that correct?
MR. ZURBRIGGEN: Object to the form. Detective, if you know you can answer.
THE WITNESS: The part about the murder weapon is truthful. I did the scene. I saw it with my own eyes.
BY MR. FEINBERG:
Q. Were you present when Walter Ogrod was interviewed by Devlin and Worrell?
A. No.
Q. So you don't know one way or the other as to whether Ogrod volunteered that information; is that correct?
A. I wasn't there.
Q. So when you say that that part of the confession is truthful, and this is not a critique, it sounds like that's speculation on your part, agreed?
MR. ZURBRIGGEN: Object to the form. Detective, you can answer.
THE WITNESS: You can say speculation. It's the same thing we talked

Page 61

about earlier. You take the information from a witness and you corroborate it to see if it's truthful. And this was corroborated, therefore, I assume it's truthful.
BY MR. FEINBERG:
Q. In light of the fact that you believe Ogrod was guilty, I take it that you disagreed with whatever decision was made to vacate Mr. Ogrod's conviction; is that correct?
A. Yes.
Q. I take it you would disagree or be displeased by the fact that the City of Philadelphia agreed to pay Mr. Ogrod 9.1 million dollars?
MR. ZURBRIGGEN: Same objection.
THE WITNESS: I'm not displeased. That's the way it goes.
BY MR. FEINBERG:
Q. When you say, that's the way it goes, what do you mean?
MR. ZURBRIGGEN: Same objection. Detective, you can answer.
THE WITNESS: He sued the

Page 62

city and they gave him money, they settled.
BY MR. FEINBERG:
Q. Do you have an opinion on that one way or another?
A. Just because they settled doesn't mean he's not guilty. If he had a retrial, I might feel different.
Q. You mean if the District Attorney's Office decided to try Mr. Ogrod again?
A. Yes.
Q. And if he was acquitted in that trial, you might feel differently about the case, correct?
A. Right.
Q. I know I have asked you questions about what detectives you have spoken to. Have you talked to Devlin and Worrell about the Ogrod case?
A. We were together when Ogrod was deposed. We sat in on the deposition.
Q. When did that take place?
A. When?
Q. Yes.
A. Months ago.

Page 63

Q. Did you talk to Devlin or Worrell about Mr. Ogrod's deposition testimony?
A. May have.
Q. Were you present for any other depositions in the Ogrod case?
A. No.
Q. Other than your own obviously, right?
A. Right, my own and Walter Ogrod.
Q. Did any other detectives attend your deposition?
A. No.
Q. I asked you back at the beginning of our deposition today about other cases where you have given deposition testimony.
A. Yes.
Q. So far we know that you testified in the Johnny Berry case, correct?
A. Correct.
Q. You testified in the Walter Ogrod case; is that correct?
A. Correct.
Q. Now that we've talked more about deposition testimony, has that sparked any recollection for you about other cases where

Page 64

you've given testimony?
A. No.
Q. A similar topic, sir, on people having their convictions vacated in general, like Walter Ogrod; are you aware that the District Attorney's Office has exonerated approximately 35 people since 2018?
MR. ZURBRIGGEN: Object to the form. Detective, if you know, you can answer.
THE WITNESS: I don't know.
BY MR. FEINBERG:
Q. Have you spoken with any of your former colleagues about those decisions?
A. No.
Q. If I am understanding your testimony correctly from both the Berry deposition and today, it sounds like Detective Mangoni is the one person you keep in touch with from your former police department days; is that correct?
A. Yes.
Q. How often do you see Detective Mangoni?
A. I don't see him -- every few years

Page 65

maybe.
Q. Can you tell me the last time you were with him?
A. No.
Q. By the way, I am saying see him, let me broaden that to communicate by text, e-mail, phone, do you ever call him or text him?
A. Yes, I will call him or text him.
Q. When was the last time you called him or texted him?
A. I don't know exactly.
Q. In the past couple of months?
A. Probably was.
Q. What do you talk about?
A. Like I said, it's usually someone who is deceased, one of our co-workers.
Q. Do you ever talk with Detective Mangoni about decisions with the District Attorney's Office to vacate convictions?
A. No.
Q. Have you ever spoken with Detective Mangoni about cases vacated by the District Attorney's Office?
A. Not that I can recall.

Page 66

Q. In your deposition in the Johnny Berry case, you've got the transcript in front of you, you told me that you thought that the Innocence Project often produced fabricated recantations. Do you remember testifying about that?
A. I don't.
Q. Take a look at your deposition transcript. This is one of those documents -- first of all, it's double sided and it has four transcript pages per sheet. So if you go to pages 45 to 47, Bates stamped Crosland 13,200. Skim through, if you will, sir, pages 45 through 47. Let me know when you're finished.
A. Excuse me, 45 to 47?
Q. Yes. Are you finished reading those three pages, sir?
A. Not yet. Okay.
Q. Do you recall that testimony in the Berry deposition?
A. I don't recall it but if it's here, I said it.
Q. In sum and substance you told me that

Page 67

you had been called upon to investigate recantations that were offered by the Innocence Project in support of people challenging their convictions. Does that sound correct to you, sir?
A. I don't see that on here.
Q. You were reading the sheet. I was talking about 45 --
A. I was asking because it had nothing to do with what you were talking about.
Q. Let me show you actually what it looks like. Page 12, and you will see transcript pages 45 to 47.
A. Okay.
Q. Have you now seen the section of your deposition testimony regarding the topic that we have been discussing?
A. Yes.
Q. Now that you have seen that, do you recall any specific examples where you have determined that recantations were false?
A. I can't say specifically but in general like it says in here, we would get notified by the D.A.'s Office, I believe it was the PCRA

Page 68

section of the D.A.'s Office where they have a private detective or an attorney present them with a statement for a witness recantation and they would ask me to go out and re -- re-interview that person.
Q. And this was when you were still with the homicide division; is that correct?
A. Yes.
Q. And the District Attorney's Office would ask you to conduct interviews?
A. Yes.
Q. Sitting here today, can you come up with any specific examples of people you've interviewed who said, that wasn't me, I didn't recant that, my testimony at trial was truthful?
A. Yes.
Q. Who?
A. I would say 95 percent of the time, nothing specific. But we would have to re re-interview them. That person would say, I never said that to the attorney or the investigator for the attorney.
Q. When you said 95 percent of the time,

Page 69

95 percent of what, how many times are we talking about?
A. I don't know. It wasn't unusual that we would get assigned to do that.
Q. Can you identify for me the name of a single person -- let me ask it a different way.
Can you identify for me a single case that you recall where you went out and spoke to a witness who had recanted their testimony?
A. No, because it wasn't necessarily my case, it was just doing it for the district attorney. I would come back with the information, give it to the district attorney and that would be the end of my contact.
Q. And to confirm, you can't remember the names of any of the defendants in those cases?
A. No.
Q. You can't remember the name of any of the witnesses who you interviewed; is that correct?
A. No.
Q. It sounds like your view though remains

Page 70

that when people recant their testimony, you are skeptical of those recantations; is that correct?
A. Yes.
Q. Do you have any reason to be -- now that we have reviewed that context, do you have any reason to be skeptical about the recantations made by Mr. Everett or Ms. Tilghman in the Crosland case?
MR. ZURBRIGGEN: Object to the form. Detective, if you know.
THE WITNESS: I have no idea one way or the other.
BY MR. FEINBERG:
Q. Detective, put that to the side. Let's move on to a different topic, sir.
In your deposition back in February of 2021, I went through a lot of background questions with you about your personal history and professional history and so on. I don't think I need to repeat any of that. Can I assume that when you testified in February of 2021, you did your best to be truthful when I asked you questions about the

Page 71

case?
A. Yes.
Q. And you were truthful when I asked you about your background working in the Philadelphia Police Department; is that correct?
A. Yes.
Q. In that case, can we assume that any testimony that you gave back in February of 2021 about your background was truthful and accurate?
A. Yes.
Q. Let me just set this scene for what we're going to talk about today. Am I correct that you were in the homicide division for 28 years?
A. Yes.
Q. That would have been from 1985 until your retirement in 2013; is that correct?
A. Yes.
Q. Over the course of your time in homicide, my recollection is that you had three different assignments. Number one, the line squad; number two, the SIU; and number

Page 72

three the fugitive squad. Does that sound right?
A. Yes.
Q. Are there any assignments that I omitted from that description?
A. No, the line squad -- I was in SIU a few different times, back and forth from the line squad to SIU.
Q. I don't mean to suggest that that was the order of things but those were the three different assignments you had and you might have gone in and out over time; is that correct?
A. Yes.
Q. You also told me that after your retirement in 2013, you started working part time as a private investigator with your brother for a company called Rocks Investigations?
A. That's correct.
Q. Are you still doing private investigation work?
A. I am.
Q. Is it a full-time job or part-time job?

Page 73

A. Part time.
Q. How many hours a week are you working?
A. Sometime none. We do hand-picked cases, it's not a constant thing.
Q. When you say hand-picked cases, what do you mean by that?
A. People that we know that refer us to a case or someone we know.
Q. Is it usually lawyers who reach out and retain you?
A. Yes.
Q. Is there -- are there specific lawyers you work with?
A. Yes, Tom Malone.
Q. If Mr. Malone has a case where he needs investigation, he will contact you and ask you to handle it; is that correct?
A. Yes.
Q. Mr. Malone does mostly civil litigation?
A. Yes.
Q. Are there any other lawyers you work with besides Mr. Malone?
A. Yes.
Q. Who are they?

Page 74

A. I don't know. My brother has a license. I work under his license.
Q. Your brother is Jerry Rocks Senior?
A. Yes.
Q. My understanding is his son is the chief investigator for the D.A.'s office?
A. Correct.
Q. Is he still in that position?
A. I do not know. He was the acting chief. I don't know if he is back to being a sergeant or not.
Q. That's your nephew?
A. Correct.
Q. Have you ever spoken with your nephew about any of his work for the D.A.'s office?
A. No.
Q. I know what the answer will be but let me ask it anyway, have you ever spoken to him about any of the cases that have lead to exonerations by the District Attorney's Office?
A. No.
Q. Let's talk about your specific assignments in the time of the Heo murder

Page 75

investigation. For background, you told me when we talked about the Johnny Berry case, that investigation took place in 1994, 1995; does that sound right to you, sir?
A. I don't know the exact year.
Q. You have no reason to dispute that, right?
A. No.
Q. What you told me is that in that time period you were assigned to 1 squad under supervision of Sergeant Tucker; does that sound correct?
A. Yes.
Q. What is Sergeant Tucker's first name, by the way?
A. James.
Q. Let's go back in time. The Heo murder took place in 1984, which would have been before you arrived at homicide; is that correct?
A. Correct.
Q. Where were you assigned in '84?
A. West Detective Division.
Q. I assume that you would not have had any

Page 76

involvement in an investigation or shooting that took place in South Philadelphia; is that correct?
A. Correct.
Q. You joined homicide in 1985, correct?
A. Correct.
Q. Your involvement, as we discussed at the outset today, was in July of 1987. What squad or what assignment did you have in that time period?
A. I possibly could have been in SIU the second time.
Q. So that would have been your second turn through SIU?
A. Yes.
Q. When was your first?
A. It was about two years after I got down there, probably '86, '87. I don't know exact years.
Q. Sure. We can agree -- you're certain you arrived in homicide in '85; is that right?
A. Yes.
Q. Your recollection is that you had two quick turns in and out of SIU?

A. Yes. To cut through this, if I can see the paperwork and there's a name of a supervisor, I will know what squad it was.
Q. Let me find a document that would help you on that, sir.
- - -
(A discussion was held off the record.)
- - -
BY MR. FEINBERG:
Q. Detective Rocks, we just took a short break to address a tech issue and also have a comfort break for everyone in the room.
During the course of that break, did you realize that any of your previous testimony was incorrect or incomplete?
A. No.
Q. I also, right before we went back on the record, introduced a document which will be marked as Exhibit P-8. This was in response to your suggestion that reviewing an activity sheet from the time of investigation would be able to give you details on where you were assigned at the time.



- - -
(Whereupon Exhibit P-8 was marked for identification.)
- - -
BY MR. FEINBERG:
Q. By the way, this is a page plus long activity sheet. I will represent to you that the date, though cut of at the top, appears to be July 7th of '87. Understood, sir?
A. Yes.
Q. Based on your review of this document, can you tell us where you were assigned in July of '87?
A. You know what, I thought I could but Sergeant Descher, I did work for him in SIU but I don't remember ever working for Lieutenant Thompson.
Q. What was the focus of SIU?
A. SIU was special investigation squad or special investigations unit.
Q. What did special investigations unit do?
A. Basically they do cold case and they also assist the line squad.
Q. Some of the other detectives who were



involved in this investigation were Mangoni, Hughes, Edward Hughes, Cimino, McNesby. With that context, does that help you in any way, figuring out where you were assigned?
A. No, Hughes and Mangoni worked together as partners at one time.
Q. In 1987?
A. I don't know. I just know they were partners for a good while. I also worked with Dominic Mangoni.
Q. Did you have a partner in that time period?
A. It might have been Dominic Mangoni, partially. I don't know of anybody else.
Q. How were partnership assignments handled? Did the supervisory staff -- all right, the two of you guys are partners, you go work your cases together.
A. In line squad you're on your own. In SIU, if you team up with somebody -- if you get along with good with them, you work together good with them, you're assigned together.
Q. If you were a partner -- if you had that



relationship, it was kind of a de facto thing, that you tended to work together?
A. Yes.
Q. You don't remember from that time period having any specific partner; is that correct?
A. Correct. This may have been -- Thompson and Descher may have been supervisors in the line squad because Nespoli was a detective in 4 squad.
Q. How is a cold case defined?
A. A cold case would be after the initial detective does his investigation and goes all the way where he can't do anything else on it, he's like hit a wall, then it would go to special investigations.
Or if you're the assigned detective and you get cases, maybe once a week new cases coming in where you just didn't have time to do that case justice, you would pass it off.
Q. So in this case where the murder took place in December of 1984 and most of the investigative activities took place in 1987, does that suggest that it would have been

Page 81

handled by SIU?
A. Yes, yes.
Q. Certainly a case that started off in late 1984 would have been cold by 1987; is that correct?
A. Yes.
Q. So that's one way to explain your involvement, right, that it was an SIU case and that's where you were assigned?
A. Right. Let me explain this also, if it was still with the assigned detective and just say he was going on vacation or his days off and he needed something to do on a particular case, his supervisor would go to SIU supervisor and get someone at SIU to do the interview to bring down whatever was necessary.
Q. Who was the SIU supervisor in 1987?
A. I don't know.
Q. You remember it being supervised by Sergeant Descher; is that correct?
A. Descher was in SIU at one time. I don't know what year. I worked for him in SIU. I know he was the sergeant at one time.

Page 82

Thompson, I don't remember working for him.
Q. What is Thompson's first name, by the way?
A. Thomas.
Q. Thomas Thompson?
A. Yes.
Q. Do you remember a badge number?
A. Oh, no.
Q. You mentioned Mangoni and Hughes were in SIU as well; is that correct?
A. I believe so.
Q. How about Cimino and -- first off, were Cimino and McNesby partners?
A. Yes.
Q. What squad were they in?
A. At that time, I'm not sure. They were in SIU. I don't know if they were in the fugitive squad after that or not.
Q. In 1987 if we see Hughes, Mangoni, Cimino and McNesby, we see their names popping up on all of the paperwork in an investigation that at that point is two and a half years old, you would assume that they're all working for SIU; is that correct?

Page 83

A. Yes, yes.
Q. How about the -- strike that.
The initial assigned was Detective Nespoli?
A. Albert Nespoli.
Q. Would he have stayed the assigned once the case went to SIU?
A. Whoever is originally assigned, stays the assigned forever.
Q. Does -- if the case goes to SIU, does the assigned have any involvement in the investigation once it goes to SIU?
A. Yes.
Q. What type of involvement would you expect?
A. The involvement would be if there's an activity sheet like this on it, we would leave a copy for the assigned.
Q. How about in the day-to-day work on the case?
A. Day-to-day work should be on an activity sheet.
Q. I understand that. But to give you a fuller explanation, as I think I mentioned, I

Page 84

have looked through the entire homicide file for this case several times. Detective Nespoli's name is on paperwork from the time of the murder, December of '84 into January of '85 and then there's nothing from Nespoli after that point, including at the time in '87, two and a half, three years later, when the arrests were made. Do you understand what I've said there?
A. Yes.
Q. Is that surprising to you at all, that Detective Nespoli would not be involved in the day-to-day investigation two and a half to three years later?
MR. ZURBRIGGEN: Object to form.
THE WITNESS: Not at all.
BY MR. FEINBERG:
Q. I think you said, no --
A. Not at all, no.
Q. Does someone from SIU become the assigned or the person who leads the investigation?
A. They could.

Page 85

Q. Where would that be noted?
A. Nowhere. There was no formal -- when the job came back it was assigned to somebody.
Q. The only reason I ask is that Detective Mangoni's name appears all over the paperwork from 1987. He was clearly very heavily involved in the investigation, even though he wasn't the assigned in name, was he in effect, the assigned detective?
MR. ZURBRIGGEN: Object to the form. Detective, if you know.
THE WITNESS: I don't know.
BY MR. FEINBERG:
Q. Detective Cimino is the one who prepared the affidavit of probable cause which I had you review a little while ago.
A. Correct.
Q. Does that tell us anything about his role in the case?
A. Just that he was in SIU at the time.
Q. One of the reasons I'm asking this question is that, I think you mentioned to me before, that if evidence was supposed to be transmitted from the homicide division to the

Page 86

District Attorney's Office, it would be the assigned detective's responsibility; did I understand you correctly?
A. Could you repeat that? You lost me on that, what you're talking about.
Q. Let me start that question over. Do you recall before I asked you about whether evidence was withheld or disclosed to the District Attorney's Office?
A. Yes.
Q. I think my recollection of your testimony is that you can't answer that question because you weren't the assigned detective, right?
A. Yes.
Q. So in general, is it the responsibility of the assigned detective to transmit investigative materials to the D.A.'s office in support of a prosecution?
A. No.
Q. Whose responsibility is that?
A. The responsibility is whoever is going to perform -- do the affidavit.
Q. Okay. So you're talking about the

Page 87

affidavit of probable cause.
A. Correct.
Q. We know that that was Detective Cimino in this case; is that correct?
A. Right.
Q. I am jumping ahead to a topic I wanted to cover with you later but let me mention it now. When I took your testimony in the Johnny Berry case, we talked about the difference between a homicide file and a homicide binder. Do you recall that testimony?
A. I sure do.
Q. Those are two different things; is that correct?
A. Correct.
Q. The homicide file is the entire file which includes literally every piece of paper produced in a homicide investigation; is that correct?
A. Yes.
Q. The homicide binder is a subset of that material that is forwarded to the D.A.'s office for use in the prosecution, disclosure to the defense and so on; is that correct?

Page 88

A. Correct.
Q. I think you told me before in your previous testimony, and I'll tell you that other detectives have told me the same thing, that the assigned detective is the person who is responsible for preparing the homicide binder; is that correct?
A. Yes.
Q. In a case like this where Nespoli was assigned in '84 and then the case moves to, you think, SIU in 1987, who is responsible for preparing the homicide binder?
A. The assigned detective.
Q. That would revert back to Nespoli?
A. Yes. That binder is done. They gave you a 30. That's just for your information. They gave you 30, 60 and 90 days, you had to get that binder in. A binder was made whether there was an arrest, a suspect or not. If it was just a regular homicide that somebody found on the street, that assigned detective had to prepare a binder.
There was three copies of the same thing. It was the original and two

Page 89

copies. When it was finished, it had to go to your supervisor, sergeant or lieutenant to be signed. It had to go to the District Attorney's Office, where they retained a copy of it.
Q. What if there was no information about a suspect?
A. The binder is done. They just leave that blank.
Q. Got it. Okay, and then additional information -- let's use the facts of this case. The murder takes place in December of '84, right?
A. Right.
Q. You have seen from other information so far, Mr. Crosland is not even identified as a suspect until April of 1987, agreed?
A. Correct.
Q. And then there is a series of investigative materials prepared from April of '87 through the arrest in December of '87?
A. Agree.
Q. Who makes sure that those materials get sent to the D.A.'s office, from April of '87

Page 90

when he's named as a suspect until the moment of arrest?
A. That would be the person who did the affidavit and their supervisor.
Q. So that means that Cimino, as the person who does the affidavit; is that correct?
A. Right.
Q. How about Detective Mangoni or Detective Hughes who were the ones who were taking all of the statements from the witnesses who are ID'ing Crosland, do they have any responsibility?
A. What they would do with that is, the binder is already done. So the homicide file would contain the envelopes with just say Curtis Crosland interview, John Doe interview or affidavit for so and so. Those envelopes would be in the homicide file, not necessarily in the binder.
Q. Do they have to get added to the binder?
A. Technically they should be.
Q. First things first, the district attorney -- strike that.
Any warrant for an arrest in

Page 91

a homicide case has to be approved by the District Attorney's Office; is that correct?
A. That's correct, and it has to go through your supervisor to the chief of the homicide unit for approval. They may ask for things to get done. I want you to do A, B and C before I approve it or they may just approve it. But that's the way it went, from the person who prepared it to the supervisor, supervisor to the chief of homicide.
Q. Chief of homicide in the D.A.'s office?
A. D.A.'s office.
Q. And it's your understanding that the chief of homicide in the D.A.'s office had to sign off on an affidavit of probable cause, in order for a warrant to issue; is that correct?
A. Yes, in his or her absence it would be the assistant chief would sign off.
Q. Do you remember who those people were in 1987?
A. No.
Q. In any event, information that supported an affidavit of probable cause would typically be sent to the D.A.'s office for their review;

Page 92

is that correct?
A. I guess on occasion. They may ask for a copy of the statement, the interview or not, it depends on the case.
Q. If Cimino was preparing the affidavit of probable cause -- pull out the affidavit of probable cause there. You should have it in that stack, P-1. Turn to the third page.
Do you see the paragraph at the top of the third page, it refers to the 4/15/87 interview with Rodney Everett?
A. Yes.
Q. That interview, and we'll look at this in a little bit, is documented in an interview record, agreed?
A. Yes.
Q. Or you would expect that to be the case; is that correct?
A. Yes.
Q. Would that interview then be forwarded to the D.A.'s office before this warrant was approved?
A. Only if the district attorney asked for it, if the D.A. thought it was necessary.

Page 93

Q. In that case, is that true across the board?
A. Yes.
Q. And by that I mean, just to be clear, that at that point, when a warrant is issued, the only way the D.A.'s office sees information that was not already in the binder, is if they ask the detective to produce it?
MR. ZURBRIGGEN: Object to the form. Detective, if you understand, you can answer.
THE WITNESS: Basically yeah, but it goes always different ways. The D.A. may ask for the entire case, the file, the homicide file first to go over the whole case. It depends, each case was different.
BY MR. FEINBERG:
Q. In a case like -- strike that.
My recollection is that Rodney Everett who was the prosecution's key witness in this case, was interviewed three separate times by and homicide division, and Detective Mangoni participated in all three of

Page 94

those interviews. Do you understand that representation?
A. Yes.
Q. Would you expect in those circumstances Detective Mangoni to participate in any meetings with the D.A.'s office about Mr. Everett?
MR. ZURBRIGGEN: Object to the form. Detective, if you know.
THE WITNESS: Not at the time the warrant is issued, not at the time the affidavit is approved.
BY MR. FEINBERG:
Q. When, if ever, would you expect Detective Mangoni to be participating in those conversations or to be having conversations with the D.A.'s office?
A. Probably at the preliminary hearing.
Q. Would Detective Mangoni have any responsibility for forwarding information to the D.A.'s office?
A. Only if the D.A. asked for it.
Q. Bottom line --
A. I don't know if they had discovery back

Page 95

then but the whole case file was over for discovery.
Q. When you say the case file, what do you mean?
A. The entire case file, not the binder, the binder is in the file.
Q. You told me in the Johnny Berry case that the homicide file would be provided to the D.A.'s office, if and only if the assistant district attorney assigned to prosecute it, asked for it?
A. Correct, yes.
Q. Each D.A. had different practices; is that correct?
A. Correct.
Q. Do you recall being involved in prosecutions with Joel Rosen as the ADA?
A. Sure.
Q. Do you know what his practice was?
A. No.
Q. The other ADA who I mentioned was --
A. Shelley New.
Q. That's right. Do you recall being involved in prosecutions with her?

Page 96

A. No. Yes, yes, I do.
Q. Do you recall what her practices were, in terms of viewing homicide files?
A. No.
Q. Bottom line, that was a case by case decision to be made by D.A.s assigned to the prosecution; is that right?
A. Yes. Some D.A.'s would ask you to bring the whole file over and they'd go over the whole file themselves.
Q. And others would not?
A. Right. Some would take your homicide file and make their own file from it, your file.
Q. If that happened, would that be documented in the file somewhere, in the homicide file, that a detective provided the file to the ADA?
A. No.
Q. Do you know whether it would be documented by the ADA as to whether that happened?
A. I would think not.
MR. FEINBERG: Let's go off

Page 97

the record.
VIDEOTAPE OPERATOR: Off the record, 11:09. We're back on, 11:13.
- - -
MR. FEINBERG: We'll mark our next exhibit, this will be Exhibit P-9.
- - -
(Whereupon Exhibit P-9 was marked for identification.)
- - -
BY MR. FEINBERG:
Q. Sir, I've handed to you a document which has been provided to us by the City Law Department. This is called a concise officer history which details your background while you were working for the Philadelphia Police Department. Have you ever seen a document that looks like this before, sir?
A. No.
Q. Let me just refer you to the first bold heading, about two or three inches down, which says: Involved officer complaint against police. Do you see where I am there, sir?
A. Yes.

Page 98

Q. There's a date July 20th, 1987. There's a reference to complainant Daleann Myers regarding a complaint against police, presumably by Ms. Myers. Does that name sound familiar to you at all?
A. No.
Q. Do you have any idea what that case is about?
A. Not at all.
Q. I asked you in your last deposition about investigations by the Internal Affairs division and you told me about one case which involved you discharging your weapon. Do you recall giving testimony on that?
A. Yes.
Q. In fact, that's mentioned down here at the bottom portion of this form from October 27th, 2005. There's reference to you and Detective Burke, do you see that?
A. Yes, I do.
Q. There was a person named Rathana R-A-T-H-A-N-A Than, T-H-A-N, who was involved in that shooting incident. Do you see that?
A. Yes.

Page 99

Q. So that was one incident that you remembered and you were able to tell me about regarding Internal Affairs investigations.
Do you recall any other cases, besides those, where you were investigated by Internal Affairs for alleged wrongdoing?
A. No, not at all.
Q. To confirm, you don't remember anything concerning Daleann Myers; is that right?
A. No.
Q. I will note that I e-mailed about this. I was asking for underlying documents concerning this complaint regarding Ms. Myers. I will note that for the record, we will reserve the right to reopen on this particular issue, depending on what we get.
MR. ZURBRIGGEN: Noted and we will follow up on that.
BY MR. FEINBERG:
Q. Detective, you can put that document to the side.
Just to wrap up the issue that we were talking about before we had that

Page 100

short break, regarding interactions between the District Attorney's Office and the Philadelphia Police Department, your understanding is that it was up to the D.A. involved in the case about what and if so how much of the homicide file they wanted to see; is that correct?
A. Yes.
Q. Would you agree, and we'll talk more about this in a little bit, that if detectives were in possession of exculpatory information, they have an obligation to affirmatively give that to the D.A.'s office?
A. I can't answer that.
Q. I'll try to give it some more context and come back to that later. That's a good transition now, sir. What I want to do is talk to you about various Philadelphia Police Department policies and practices concerning your work as a homicide detective.
I take it, given that you were working as a homicide detective for 28 years, you have some familiarity with how things were done; is that fair, sir?

A. Yes.
Q. As I go through some of these topics, if I'm talking about something that you just don't know, I'll ask you to tell me. But my assumption is you'll be able to answer these questions.
The first is, on the question of exculpatory evidence, do you know what I mean when I say exculpatory evidence?
A. Yes.
Q. Tell me your definition so we're on the same page.
A. Something that's against other facts. Pros and cons.
Q. Let me tell you how I define it and we will see if we're on the same page.
When I think of exculpatory evidence, it's evidence that tends to undermine or show that someone who is accused of a crime might not be guilty. Does that sound right to you?
A. Yeah.
Q. Here's a classic case of exculpatory evidence, if a witness says to you, John Smith



is the guy who did the shooting and John Smith gets arrested, another witness comes in and says, no, it was Richard Rowe who did the shooting. That second statement is exculpatory; is that correct?
A. Yes.
Q. Because that witness or that information rebuts or responds to the first statement, agreed?
A. Yes.
Q. Exculpatory evidence is not limited to inconsistent evidence, agreed?
A. Yes.
Q. Would you agree that evidence can be exculpatory because it tends to show or can show that a witness is not being truthful?
A. Yes.
Q. Have you heard the phrase impeachment evidence before?
A. Yes.
Q. What does impeachment evidence mean to you?
A. It's something that goes against what's already being said.



Q. Or would you agree that impeachment evidence might be used to show that a person has a reason to lie?
A. I guess so.
Q. For example, if a witness gets a deal in support of a prosecution, like they get reduced charges or reduced prison time, would you agree that that evidence might be useful to show that the witness or could be used to question the witness' credibility, right?
A. Yes.
Q. Because in that case the witness has a motive to testify in support of the prosecution, in order to help themselves, right?
A. Right.
Q. So that motive might create bias; is that correct?
A. Correct.
MR. ZURBRIGGEN: Objection.
BY MR. FEINBERG:
Q. I understand I'm using hypotheticals --
A. It's a hypothetical.
Q. Just to make sure that we're on the same



page in terms of how evidence works, would you agree that if a witness might be biased, that's something that a defense attorney might want to use in front of a injury?
MR. ZURBRIGGEN: Same objection. Detective, if you know.
THE WITNESS: Yes.
BY MR. FEINBERG:
Q. Would you agree that that evidence could be exculpatory?
A. Yes.
Q. By the same token, if you have evidence that a witness might not be telling the truth, would you agree that that's exculpatory?
A. Yes.
Q. If you had, and this is the topic I was getting to before, exculpatory information in your possession as a police officer, would you have a responsibility to inform the D.A.'s office about it?
MR. ZURBRIGGEN: Object to the form. Detective, if you know and understand.
THE WITNESS: I personally

Page 105

would say yes. I wouldn't even submit that affidavit if I had a doubt about a person telling the truth, then that would get investigated.
BY MR. FEINBERG:
Q. Let's say even -- if you submitted an affidavit of probable cause in support of an arrest and then you gain information later which tells you that a witness might not be telling the truth or could be used for impeachment, you would provide that to the D.A.'s office, right?
A. Yes, immediately.
Q. You can't burry that, right?
MR. ZURBRIGGEN: Object to the form.
THE WITNESS: Burry it?
BY MR. FEINBERG:
Q. You can't hide it, right?
A. You can't hide the truth.
Q. If there's evidence which can be used to question what a witness is saying, that's something that's got to go to the D.A.'s office, right?

Page 106

A. I would say, yes. I personally would do that.
Q. One of the things we discussed in your last deposition was your interview style. I asked you about whether you ever did a quote, unquote preinterview. Do you know what I mean when I use that phrase?
A. Yes.
Q. In other words, sitting down and talking with the witness before you commit things to paper?
A. Yes.
Q. You told me that you never did that; is that correct?
A. That's correct.
Q. Why was that your practice?
A. I never did it because if it's a pertinent question and a person answers it, then that would go out of my mind. And when I took the statement, I wouldn't think of asking that pertinent question because it's already asked and answered.
Q. It sounds like your larger purpose was you wanted to make sure that the D.A.'s office

Page 107

who received that statement or would receive that statement later, had all of the information that the witness had; is that correct?
A. Yes.
Q. In other words, you wouldn't want to be in possession of information that was not provided to the D.A.'s office?
A. We're talking about the information for probable cause?
Q. Information for probable cause or information leading to trial, anything like that?
A. Information on probable cause is just enough to get the warrant. It's not the whole -- it's whatever the D.A. needs, just like a preliminary hearing, the prima fascia case, you don't have to do the whole case.
Q. I understand. So an affidavit of probable cause is just enough evidence to try to get a warrant; is that correct?
A. Right.
Q. But leading up to trial, there would be a whole, in most cases, additional set of

Page 108

information that would be provided to the D.A.'s office; is that correct?
A. Right. As I said, the D.A. would get the entire file, the case file. And the D.A. would go over everything in that file.
Q. If they asked for it, right?
A. No, that would be up to trial. If they are prepping at trial, you would have to bring the whole case file over and leave it with them.
Q. Every D.A. did the same thing?
A. I would say yes.
Q. Do you remember Mr. Rosen doing that?
A. I remember them all doing that.
Q. We will come back to that.
Bottom line, sir, when you prepared an interview for any witness, you made sure that everything that you discussed with that witness was committed to paper and was provided to the District Attorney's Office; is that correct?
A. Yes.
Q. Do you recall any situation, sir, where you interviewed a witness and that witness

Page 109

told you something about the case, but you later learned that that witness might not be telling the truth?
A. There is only one case I can remember.
Q. Tell me about that case.
A. Two rival gangs in South Philadelphia and there was a person murdered on each side of this conflict they had. And we had multiple warrants for each side. We went out and arrested them. Once they were inside, a couple of the defendants didn't speak English very well but they were saying that the one guy that was arrested wasn't the guy. It was enough to make me hesitate. I contacted the D.A.'s office and here it was another guy with the same name. He was immediately released.
We actually dropped everything, all of the paperwork just to make sure this was taken care of.
Q. Sir, would you ever -- let's talk about a different set of facts. Has there ever been a time when you're interviewing a witness and during the course of the interview where you realize, I don't think this witness is being

Page 110

truthful?
A. Sure.
Q. What do you do in those circumstances?
MR. ZURBRIGGEN: Object to the form. If you can say generally, Detective.
THE WITNESS: You try to ask questions to get them to tell the truth. Each one of these I can think of an example.
BY MR. FEINBERG:
Q. Can you give me an example of that?
A. I was doing an interview, it was a young male and female walking down the street, the female ended up shot and killed and the boyfriend that was with her was sent in and I interviewed him as an informational witness, just a witness. During the interview he described who did the shooting, it was a drive by, different things. And the things he told me, the way he answered the question, I knew he wasn't being truthful. He was a juvenile also.
So once I determined he wasn't telling the truth, I stopped the statement right there, let the parent go in

Page 111

there with him and he admitted doing the murder. And from that we got the murder weapon, where he put it.
Q. That's the only example --
A. No, it probably happened tons of times.
Q. Would you agree that if you have reason to doubt the validity and reliability of what someone is telling you, you've got an obligation to do something about that?
A. That's correct.
Q. You have an obligation to ask that witness follow-up questions, right?
A. Correct.
Q. Or see if you can corroborate what the person is saying elsewhere?
A. Yes.
Q. If you still have doubts, you have an obligation to discuss those doubts with the District Attorney's Office, agreed?
A. Yes.
Q. To use an example not unlike yours, if witness number one gives a statement and they say, I saw the shooting and here is what happened, but then you talk to witnesses

Page 112

number two, three and four who say, yeah, we were there but witness number one wasn't even at the scene; do you follow what I'm saying there?
A. Yes.
Q. That information from witnesses two, three and four might give you doubts about what witness number one told you, right?
MR. ZURBRIGGEN: Object to form. You can speak to generally --
THE WITNESS: Yes, generally.
BY MR. FEINBERG:
Q. If you ever got facts like that where witnesses kind of undermine what a previous witness told you, you would make sure to follow up on that; is that right?
A. Yes.
Q. If that gave you doubts about what the first witness told you, you would make sure to share those doubts with the District Attorney's Office; is that correct?
A. At that point it's in the district attorney's hands, once the arrest is made.
Q. If you get that information after

Page 113

arrest. But if you have that information before the arrest, you would have the obligation to share it with the D.A.'s office; is that correct?
A. And you would, by giving him the whole file to go over.
Q. And the D.A.'s office would -- strike that. Because your understanding is that the D.A.'s office needs a full understanding of the case in order to assess whether there's probable cause, correct?
MR. ZURBRIGGEN: Object to the form. Detective, you can answer.
THE WITNESS: It would be the chief or the assistant chief that determined the probable cause on the affidavit. It's up to the assigned assistant district attorney of that particular case to get the case file and go through the case file.
BY MR. FEINBERG:
Q. I'm not intending to ask you about what's in the heads of someone in the D.A.'s office, but based on your experience, would you expect that D.A.'s want you as a detective

Page 114

to be truthful and honest about the information that you have?
A. Without a doubt.
Q. And to provide full disclosure of all of the information that you have?
A. They have to prosecute the case. They're not going to prosecute a lie.
Q. So yes, they need you to be truthful and provide full disclosure?
A. Correct.
Q. Let's talk about activity sheets, sir, which we've already discussed a little bit. My understanding, and you and I talked about these in your deposition in the Berry case, is that that's a method for detectives to document their progress in an investigation?
A. Yes, also to justify overtime.
Q. So that may have been one purpose but the other purpose was to communicate information to other detectives who were involved in the case, right?
A. Yes.
Q. Homicide investigations can be sprawling over many months or many years; is that

Page 115

correct?
A. Correct.
Q. This case is a good example of one that started in '84 and then continued into '87, right?
A. Correct.
Q. So detectives may move onto a squad, may move off of a squad, right?
A. Right.
Q. When that happens, you lose the institutional memory of the detective's work on the case, right?
A. Right.
Q. So for that reason, activity sheets serve as a method to document what has been done in an investigation; is that correct?
A. Right.
Q. My understanding in terms of how activity sheets work logistically, is that they're prepared and then provided to the assigned through what you refer to as the pigeon hole, does that sound right?
A. Yes --
Q. Like a mailbox --

Page 116

A. Either that or they actually put it in the case file itself.
Q. So you're working on a case, you're brought in to do an interview, you'll prepare an activity sheet and you'll pass it on to the assigned, through the pigeon hole or put it in the file yourself?
A. It will also go to their supervisors. There's numerous copies made and it gets distributed.
Q. And the purpose of that, I know this seems obvious but just to confirm, is to make sure that everybody has access to the information you have gained based on your investigation?
A. Correct.
Q. I take it then when you're preparing an activity sheet to pass on that information, you want to be as accurate as possible, right?
A. Yes, it's just a summary.
Q. But you want to be -- you certainly don't want to make any errors, right?
A. Of course not.
Q. You want to make sure that the details

Page 117

you provide are in fact correct; is that correct?
A. Yes.
Q. Because someone who picks up that investigation, months or years later, to familiarize themselves with the case, they may start by looking at your activity sheet; is that correct?
MR. ZURBRIGGEN: Object to the form. Detective, if you can --
BY MR. FEINBERG:
Q. Let me ask it in a way that for sure you can answer. If you were brought into a case somewhere down the line, months or years after the murder takes place, would you start your review of the case by looking at the activity sheets?
A. No.
Q. Where would you start?
A. What I did was, I would always get the entire case file and the binder, the homicide binder. And I would go through the homicide binder first to give me an idea of, right from the beginning the scene, the initial

Page 118

interviews, and then I work my way through that and through each envelope that's in the file and the activity sheets. So we have an envelope with all activity sheets. That would be part of what I do.
Q. My understanding from looking through the homicide file in this and other cases is that not every witness interaction is documented in an interview form; is that correct?
A. That's correct.
Q. The PPD number 75483; is that correct?
A. Yes, that is the interview form.
Q. I will use 483, for short.
A. That's page one. It's a different number for other pages. That has the heading on it.
Q. When I say interview form, I'm talking about now, going forward, a formal interview that's completed between a detective and a witness, agreed?
A. Yes.
Q. So sometimes witnesses will be contacted but there won't be a full-fledged interview

Page 119

form prepared; is that correct?
A. Yes.
Q. The contact with the witness might be documented in just the activity sheet; is that right?
A. Yes.
Q. Those contacts might be important to the investigation, right?
A. Could be.
Q. For example, an activity sheet you might note that a witness said, go talk to these three people who have information about this case, right?
A. Yes.
Q. For some reason you can't get to that because you get transferred off the squad, the next detective who comes in says, oh look, there is more for us to do here, we have to go interview these three people; that happens, right?
A. What would happen is, the activity sheet that you give to the supervisor, he would see what has to be done and he would make sure that was done. He'd assign a detective to go

Page 120

do that.
Q. The bottom line then, when you were preparing an activity sheet, you've got that in your head, right?
A. Yeah, part of the activity sheet that I always did would be things to do, to let the supervisor know what needs to be done on it.
Q. Since you might not be the person who's going to follow up, you're going to make sure to provide as much information as possible so the next person knows everything that you know; is that correct?
A. Right, if I'm not the assigned and I am not working on the case, I'm just leaving that for the next person or the supervisor.
Q. When we talked before about activity sheets in the Berry deposition, you told me that those go in the homicide file and not the homicide binder; is that correct?
A. Yes.
Q. Do you have any knowledge whatsoever about whether activity sheets were transmitted to the D.A.'s office?
A. They go with the homicide file. There's

Page 121

an envelope with activity sheets in it.
Q. Which would only be provided to the D.A.'s office, if the D.A.'s asked to see it; is that correct?
A. No.
MR. ZURBRIGGEN: Object to the form.
BY MR. FEINBERG:
Q. When would they be seen?
A. Before trial, whatever D.A. is assigned, as I said, the detective would drop the case file off and it would remain over there.
Q. You would expect, in this case if Joel Rosen was the assistant district attorney, your expectation would be that he would have an opportunity to review the activity sheets; is that what you're saying?
A. Yes.
Q. You don't know one way or the other whether that happened; is that right?
MR. ZURBRIGGEN: Object to form. We're talking -- generally?
BY MR. FEINBERG:
Q. That's a fair point. Let me clarify.

Page 122

Do you know one way or the other whether Rosen reviewed the activity sheets in this case?
A. I had nothing to do with the trial.
Q. So you can't offer testimony on that one way or the other?
A. No.
Q. I take it the same would be true for Judge Robins New?
A. I would assume that every D.A. does it.
Q. That's an assumption that you're making but you don't have any specific information?
A. Correct.
Q. I think you told me that when you talked about activity sheets going in the binder -- pardon me, going in the file not the binder, that was how things were done for your entire 28 years in homicide?
A. Yes.
Q. One other topic, sir, we talked briefly about this in the Berry deposition. When you're talking with a witness, you're not allowed to coerce them to identify a suspect; is that correct?
A. Yes.

Page 123

MR. ZURBRIGGEN: Object to form.
BY MR. FEINBERG:
Q. Coercion is something that can take many different forms, right?
A. I don't know about that.
Q. You can't beat a witness up, right?
A. No.
Q. You can't suggest to a witness who they've got to identify, right?
A. No.
Q. You can't tell a witness that they are going to go to jail unless they identify someone; is that correct?
A. No, that is correct, yes.
Q. Do you know whether there were any special precautions that were taken back in the mid 1980s regarding people with intellectual disabilities?
A. I don't understand that question.
Q. Different topic, disregard that.
Let me be Frank about some of the details in the case. Delores Tilghman, who is one of the witnesses who we talked

Page 124

about earlier; do you remember me mentioning her to you?
A. Yes.
Q. I take it you didn't have any interactions with her?
A. Not that I remember.
Q. One of the allegations she made in this case is that she was in the hospital after a suicide attempt when detectives came and tried to speak with her.
Do you understand what I've said there?
A. Of course.
Q. Are there any special precautions that detectives should take in that type of situation?
MR. ZURBRIGGEN: Object to the form. Detective, if you understand it, you can explain.
THE WITNESS: I have no idea. I know I have had cases that involve a person in the hospital. I always ok'd it with the doctor, whatever doctor was in charge.
BY MR. FEINBERG:

Page 125

Q. So bottom line then, if someone had medical concerns whether it has to do with physical health or mental health, you would want a doctor to confirm that it was acceptable for you to --
A. I'd have to get permission and then find out if that person was able to do it.
Q. I think maybe we're saying the same thing because the concern might be if -- a doctor might have reason to say that the person is too vulnerable to speak to a detective at that point, right?
A. Sure, could be under medication, could be vulnerable.
Q. Would you agree that when a someone is either under medication or in a vulnerable position, they might not be able to provide reliable information?
A. In general, sure anything is a possibility.
Q. Would you agree that one of the things that you have to be concerned about as a detective is insuring that you get reliable information from a witness?

Page 126

A. Sure, that's your goal, to get to the truth.
Q. If a witness is in a position where they might be vulnerable, they might be more willing to tell you what they think you want to hear, right?
MR. ZURBRIGGEN: Object to the form. Detective, if you know.
THE WITNESS: I can't answer that.
BY MR. FEINBERG:
Q. Have you ever had that concern, that a witness was just telling you what they thought you wanted to hear?
A. No, not that I can remember offhand.
Q. So in every case, you thought the witnesses were just there to provide truthful information to you?
A. I would hope that would be the case.
Q. Were you ever concerned that witnesses might be threatened or feel threatened in their interactions with you?
A. No.
Q. Never had that feeling once?

Page 127

A. Never.
Q. How many interviews do you think you did over the course of your career in homicide? Thousands?
A. Yeah.
Q. Tens of thousands?
A. I can't answer that. I will tell you one thing, it was interviews every day, multiple interviews. If a murder came in, even though I wasn't SIU or fugitive squad, you had to dig in and help.
Q. Bottom line, many thousands of interviews over 28 years; is that correct?
A. Yeah, I taught classes in interviews and interrogations to new detectives.
Q. Bottom line is that in every single interview conducted -- strike that.
There's not a single interview that you can recall in those many thousands of interviews, where you thought that a witness might have felt threatened or vulnerable when speaking to you?
MR. ZURBRIGGEN: Object to the form. Go ahead and answer --

Page 128

THE WITNESS: Yes.
BY MR. FEINBERG:
Q. Yes, that's correct, right?
A. Yeah, I never thought anybody felt vulnerable or threatened.
Q. Would the homicide division periodically receive anonymous tips about perpetrators in a shooting case or in a murder case?
A. Yes.
Q. What was the practice in terms of how to deal with anonymous tips?
MR. ZURBRIGGEN: Object to the form. Detective, if you know.
THE WITNESS: The detective who is up for the next homicide was the person on the desk. One of the responsibilities was to answer the phones, but it wasn't -- other detectives answered the phones but it was his main responsibility. And to take -- if information came in, would take notes. There was a note pad there, they would put the detective's name and case number and what the information was. There was a box on the desk, it would go in the box.

Page 129

Just say when I came into work for my shift, the first thing I would do is go to that box and go through.
Q. The box, that would be your personal box, right?
A. No, this would be a box on the desk man's desk.
Q. Got it. So you would look at that box to see whether there were any messages for you?
A. Right, he could never get up and go over and put stuff in the pigeon hole --
Q. Because he was answering the phone non-stop.
A. Right, he had other responsibilities that kept him at that desk. But that's how that worked with any information coming in.
Q. So that's how you would receive information about an anonymous tip; is that right?
A. Yes.
Q. So you would have a handwritten note, so and so called or an anonymous person called with information about a suspect; is that

Page 130

correct?
A. Yes.
Q. What would you do next?
A. As the desk man or as the detective?
Q. As the detective. Let me set the stage better. You're the assigned detective in a case and you come into work and there's a note in there that someone called in and said that so and so is the shooter in your case. What do you do at that point?
A. Number one, I would see if that person left the name and a phone number or a name and an address where I could contact them. Then I would contact them.
Q. If they didn't leave information, what would you do?
A. I wouldn't have to worry about it if there was no information.
Q. I understand that. If they left information about the name of a perpetrator but there was no follow up, there was no phone number left, what would you do to look into that perpetrator, if anything? The alleged perpetrator.

Page 131

A. As being the assigned detective?
Q. Yes.
A. I would see if that sounded familiar and I would go through the files to see if that name popped up anywhere. And if it didn't, it would just be in a miscellaneous file for future.
Q. Would you do any other investigation into the person's background?
A. With just the name?
Q. Yes.
A. Probably not.
Q. What if you received multiple different tips pointing to that person?
A. Then that would probably cause me to do a record check or delve a little further into it.
Q. Would you go out and try to look for the person?
A. It depends on what I found in my investigation. The people who called in, if they didn't leave their name or phone number or anything, you might doubt if it's credible or not.

Page 132

Q. What, if anything, would you be required to do in terms of passing on information about anonymous tips to the District Attorney's Office?
A. Nothing, unless it panned out to be something pertinent.
Q. If you -- let's say -- I'm going to use hypothetical names once again. You get anonymous tips that John Doe is the shooter in a case, right?
A. Right.
Q. You get three or four different tips about John Doe. The investigation goes on and you arrest someone else, Richard Rowe, we'll use that name again, is the person who gets arrested. Do you have any obligation to pass on the anonymous tips that you got about John Doe?
MR. ZURBRIGGEN: Object to the form. Detective, if you can speak to that, generally.
THE WITNESS: If it would just be the name?
BY MR. FEINBERG:

Page 133

Q. Yes.
A. No.
Q. No obligation to tell the D.A.'s office about that?
A. No, not if it's just a name. If you investigate it and something came up, whether they lived in the same neighborhood, anything, anything in general.
Q. Is that your understanding about Philadelphia Police Department practices?
MR. ZURBRIGGEN: Same objection. Detective, if you can speak to it generally.
THE WITNESS: That's not a practice that's written down. It's just each individual detective.
BY MR. FEINBERG:
Q. First of all, do you know any detective who would individually, would decide to pass on names that were mentioned in anonymous tips?
MR. ZURBRIGGEN: Same objection, but Detective --
THE WITNESS: I don't know

Page 134

anybody but I know I wouldn't.
BY MR. FEINBERG:
Q. You know you would not?
A. I would not.
Q. Do you get that from anywhere, any specific guidance about that?
A. No just investigations. If there's nothing there, they don't want to leave their name, it's not credible, unless something else comes up later on.
Q. In fact, I think on that point, this is something we discussed in the Berry deposition, if you get information that you believe is not credible, I think you told me that you don't have an obligation to pass it on; is that correct?
A. Yes.
Q. If you make a decision that in your judgement information provided by a witness isn't believable, there's no reason to tell the District Attorney's Office about that; is that correct?
A. We're talking about two different things.

Page 135

MR. ZURBRIGGEN: Object to form.
BY MR. FEINBERG:
Q. Tell me how I'm talking about two different things.
A. I'm talking about information that comes into desk man and he puts a note with just information in a box for the detective.
Q. Yep.
A. Which, I'm the detective, when I get that, it's meaningless.
Q. There's no need to mention that to the D.A.'s office; is that correct?
A. Right. But if there's information -- say that information pans out and it could three people say that, I may notify the D.A. of that.
Q. Okay. And that's because --
A. -- because we want to get at the truth. You don't want the wrong person arrested and charged and sentenced.
Q. In that situation, and obviously that's the guiding principle of all the work you do?
A. Correct, that's correct.

Page 136

Q. If you have three tips about the same person, that suggests that perhaps there's some credibility to those tips; is that correct?
A. Not if it's just a name.
MR. ZURBRIGGEN: Object to form.
BY MR. FEINBERG:
Q. Tell me what I'm getting wrong here in my question.
A. Number one, the person who's giving the information obviously doesn't want to get involved, it's not credible, unless they want to come in and say the truth.
Q. Let me pick up on that. If you develop a belief that the information is not credible, then you're not going to pass that on; is that correct?
MR. ZURBRIGGEN: Same objection. Detective, again, if you can speak to it generally.
THE WITNESS: There's nothing to pass on.
BY MR. FEINBERG:

Page 137

Q. Fair enough. Let me come back to a topic that I kind of veered on to and let's see if we can pin this down.
When you get information from witnesses, I think you told me, sometimes you will believe that it's not true; is that correct?
A. Yes.
Q. If information that you get from a witness that's recorded either in an activity sheet or an interview statement, do you have an obligation to pass that along to the District Attorney's Office?
MR. ZURBRIGGEN: Object to form. Detective, if you can answer, generally.
THE WITNESS: As I testified in that particular case where the girl was killed on the street, he wasn't telling the truth. And then he did tell the truth. Then I had an obligation to pass that on.
BY MR. FEINBERG:
Q. Got it.
A. If he didn't tell the truth, if he stuck

Page 138

with his original story, that still would have went to the D.A.'s office.
Q. Because that's information which was provided in connection with the case, which even though you had doubts about it, you would make sure the D.A.'s office needed to see it, was able to see it; is that correct?
A. Yes.
Q. Sir, I am going to ask you two more topics here on these general topics before we dive into the investigation.
I take it when a murder investigation starts, one of the first things you want to do is find out who the potential eyewitnesses were; is that correct?
A. Yes.
Q. Do you try to interview -- strike that.
Is it the practice to interview every single eyewitness you learn about?
A. Yes.
Q. Why is that?
A. To get evidence against the doer and his conviction.

Page 139

Q. In other words, you wouldn't make a decision that at some point you've done enough and you've talked to enough witnesses; is that correct?
MR. ZURBRIGGEN: Object to the form. Again, generally, Detective, if you can answer that.
THE WITNESS: Generally if you had just one eyewitness and that was enough to get a warrant for an affidavit, you'd go with that one eyewitness. If you find out later on there was others, they're interviewed and everything goes to the D.A.'s office.
BY MR. FEINBERG:
Q. So bottom line, whenever you find out that there are other potential witnesses, you're going to do whatever you can to bring them in to interview them; is that correct?
A. Yes.
Q. Because those interviews might further corroborate your theory about who committed the murder, correct?
A. Yes, possible.

Page 140

Q. Or they could tell you that the information you got from another witness was wrong; is that right?
A. Yes.
Q. So in that case, you want to make sure that you've explored the full universe of information with potential witnesses; is that right?
A. Yes.
Q. When you try to -- I assume that when you try to locate witnesses, you might not be successful in finding every witness; is that right?
A. That's the hardest part of being a homicide detective, getting witnesses. Nobody wants to be a witness in a homicide.
Q. So locating witnesses, number one; and then number two, having them talk to you; is that correct?
A. Yes, they will talk if it's close proximity to the murder. A year later for the trial, that's a different story.
Q. If you make efforts to locate a witness but you are unsuccessful, do you document

Page 141

those efforts?
A. Yes.
Q. In an activity sheet?
A. Yes.
Q. For the same reasons we've talked about, if you get moved off the case and someone else wants to track down that witness, your record of what you've done to try to locate the witness will be helpful?
A. Yes, obviously.
Q. So if there's a witness who you know might have information, you've looked through, you've gone to the street where the person lives, you've canvassed the neighborhood and you can't find them; you're going to put that all down on paper; is that correct?
A. Yes.
Q. I want to ask you some questions about polygraphs, sir. I have reviewed a lot of documents from this and other cases in the 1980s and polygraphs are frequently mentioned in interviews. Can you tell me about what the practices were regarding the use of polygraphs in homicide?

Page 142

MR. ZURBRIGGEN: Object to the form. Detective, if you can speak generally to that.
THE WITNESS: Years ago when I first went homicide, the witnesses were polygraphed, some of them. If the supervisor said to polygraph them, they got polygraphed.
BY MR. FEINBERG:
Q. Who made -- so supervisors who made the decision?
A. Yes. Let me give you a little background on it.
Q. Sure.
A. When a murder happens there is either the sergeant or lieutenant they say runs the investigation, and he has all of the detectives. Some detectives go to the scene, some hospital, some the morgue, whatever. But the ones inside that are doing the interviews, when they send the witnesses in, you did the interview and before you could finish that interview, before you could close out the interview, you had to take it to the supervisor running the investigation. He

Page 143

would sit there and read it. And because he read every detective's statement, he had an idea and he would formulate questions for you to go in and ask the person because he knew different aspects of the case. And he would usually be the one that would say to polygraph somebody or not.
Q. By the way, you couldn't force a polygraph on a witness, right?
A. No.
Q. You would ask the witness whether they'd be willing to take a polygraph?
A. Yes. As a matter of fact, I don't know if you're familiar with this, when a person went to polygraphy, they were given their Miranda warnings in the polygraph unit.
Q. Would you have to take someone to a different location for the polygraph?
A. It was downstairs. It was in the basement of the Police Administration Building.
Q. So there is an officer, that's not a detective, it's a police officer in the polygraph unit; was that right?

Page 144

A. Some were civilians, some were supervisors. It was a whole spectrum of people.
Q. Do you have any familiarity with the different types of polygraph methods?
A. No.
Q. Have you ever heard of the Arther A-R-T-H-E-R method?
A. No.
Q. I take it -- have you seen polygraph examinations take place?
A. Sure.
Q. Am I correct that as a result of the -- during a polygraph examination, there will be charts that are prepared by the equipment that's used for the examination?
A. I know basically that -- say it was my witnesses getting polygraphed or my suspect, I would have to stay with that person down to polygraph and give them their rights and everything. And then I stayed behind a mirror, a one-way mirror and watched the polygraph. I couldn't hear it or -- I would just see it, so I'm not familiar with it.

Q. You're not the one who's interpreting the data, right?
A. No.
Q. That's done by the polygraph experts; is that right?
A. Yes.
Q. What happens to the charts that are created in the examinations, where do they go?
A. I don't know. There is a file made up on each examination.
Q. Are they made a part of the homicide file?
A. No, not that I can remember.
Q. If there was a polygraph taken as part of -- or were polygraphs taken as part of any investigation in this case concerning Il Man Heo, would you expect those documents to still exist?
A. I can't answer that. My suggestion would be to check the record storage.
Q. I take it then since you weren't reading data or charts, if a polygraph examiner polygraphs a witness who you're interviewing, the polygraph examiner will come tell you the



results of the examination, right?
A. Yes.
Q. I've seen a couple of different conclusions, one is that there is deception indicated; is that right?
A. Yes.
Q. That's another way of saying the person failed the polygraph?
A. Yes.
Q. And there's evidence that they're not telling the truth; is that correct?
A. Yes.
Q. There's another conclusion, no deception indicated; does that sound right?
A. Yes.
Q. Which means that the person, according to the exam, appears to be telling the truth; is that right?
A. Yes.
Q. Did you believe that polygraphs were reliable?
MR. ZURBRIGGEN: Object to the form.
THE WITNESS: No.



BY MR. FEINBERG:
Q. Why not?
A. Because it's just an interpretation by two people and it's not accepted by the courts.
Q. Were they useful in the course of an investigation?
MR. ZURBRIGGEN: Same objection. Detective, generally.
THE WITNESS: For me, yes.
BY MR. FEINBERG:
Q. In other words, one way they were useful is if a person had the result, deception indicated, it gives you reason to question their credibility; is that right?
A. Yes.
Q. You think that it gives you evidence that they might not be telling the truth from what they tell you; is that correct?
A. Yes.
Q. Those doubts are doubts that you're going to want to explore; is that correct?
A. Yes.
Q. Either by trying to corroborate what



they are telling you from other sources?
A. It would be, start the interview, decide to take them down to polygraph, the results of the polygraph, you bring them back up and finish the interview.
Q. Have you ever heard that second part of the interview referred to as a challenge interview or a confrontation interview?
A. No.
Q. Would you inform the person who failed the polygraph, I'm going to use that term instead of saying deception indicated because it's easier. Is that a fair characterization on my part?
A. Yes.
Q. Did you ever tell the person who has failed the polygraph, hey, you failed the polygraph, let's talk about it?
A. Actually, the polygraph examiner did that. They actually were known to take statements after the test. They would take their own statement.
Q. The polygraph examiner?
A. Yes.

Page 149

Q. If they did that, would that statement then become part of the homicide file?
A. That, I don't know. It has been so long ago, that procedure stopped years ago.
Q. When did the homicide division stop using polygraphs?
A. I don't know but they stopped at one point.
Q. We know you were there in --
A. '85.
Q. -- '85 through 2013, can you tell me how far along in that time period they stopped using it?
A. No. I can't be exact about it.
Q. Bottom line then, a witness who participated in a polygraph and if they failed, they would learn that they failed; is that correct?
A. Yes.
Q. And then there would be a follow-up interview; is that right?
A. By me if I'm doing the initial interview.
Q. Or it could be the polygraph examiner;

Page 150

is that right?
A. In any case, the detective would finish his interview no matter what the polygraphy guy did or girl.
Q. Got it. If the person tells you, I'm telling the truth, that still wouldn't satisfy you, right?
MR. ZURBRIGGEN: Object to the form. Detective, if you can.
BY MR. FEINBERG:
Q. I'm going to withdrawal that question.
I think it sounds like we're on the same page though, that if a person failed a polygraph, that would give you reasons to be skeptical about what the witness is saying; is that correct?
A. Yes.
Q. You would want to explore that; is that correct?
A. Yes.
Q. You would want to share that information about the failed polygraph with the District Attorney's Office if there ever was an arrest in the case?

Page 151

A. Yes. That would be noted in the activity sheet, about the polygraph.
MR. FEINBERG: Let's go off the record.
VIDEOTAPE OPERATOR: Going off the record, 11:58.
Back on, 12:13.
\- - -
(Whereupon a short break was taken at this time.)
\- - -
BY MR. FEINBERG:
Q. Detective Rocks, we're back from the short comfort recess. Did you realize that during the course of your break that any of your previous testimony was incorrect or incomplete?
A. No.
Q. I just want to revisit one topic that we were discussing before the break and that is the communication of information to the District Attorney's Office.
To confirm, in this case you have no idea whether or what information would

Page 152

have been produced to Mr. Rosen, the prosecutor in the first trial; is that correct?
A. Yes.
Q. You would expect that if anyone could know one way or the other, it would be Mr. Rosen, correct?
A. Right.
Q. By the same token, you don't know what or whether any information was provided to Judge Robins New; is that correct?
A. Correct.
Q. She would be the witness who could tell us what was provided to her in this case; is that correct?
A. Yes.
Q. As I mentioned, I want to talk about the specific investigation in this case. The way I want to do this, sir, since I understand your recollection you told me is a little limited, is show you the statement that you were involved in and then go provide information to provide context to that statement so we can lead up to discuss those

details.
For that purpose, let's take a look at tab ten, please. This will be actually Exhibit-10.
- - -
(Whereupon Exhibit P-10 was marked for identification.)
- - -
BY MR. FEINBERG:
Q. Sir, can we agree that this is an interview that you conducted with Rodney Everett on July 7th, 1987? I'll acknowledge--
A. Yes, it is, you can barely see it.
Q. I will represent to you that from the context of other parts of the investigation, I believe that date to be accurate.
Sir, is this one of the documents that you reviewed leading to your deposition today?
A. Yes.
Q. When you reviewed it, did you remember anything about these details?
A. No.
Q. Would you agree that the first portion



of the deposition, the first question and answer concerns Mr. Everett's statement that Curtis Crosland confessed to committing the Heo murder?
A. Yes.
Q. Do you recall how it was that you were brought in to do this interview?
A. No.
Q. Do you remember anything about what information you had in your possession before you did this interview?
A. I don't know.
Q. Can we assume, based on your previous -- strike that.
You told me not too long ago that when you were brought in to work on a case that you had had no previous involvement with, you would have gone and looked at the file and reviewed prior statements and prior activity sheets; is that correct?
MR. ZURBRIGGEN: Object to form. Detective, if you can answer.
THE WITNESS: Yes, I would.
BY MR. FEINBERG:



Q. Can you assume then that if you had no previous involvement in this investigation regarding the murder of Il Man Heo, you would have done the same thing, you would have gone back and looked in the file?
MR. ZURBRIGGEN: Same objection but Detective --
THE WITNESS: You know I may not have because of -- Mangoni was with me and he had more knowledge of the case. It's possible that he could have told me about the case or it's also possible I could have looked something over, I don't know.
BY MR. FEINBERG:
Q. By the way, your name is first on the top right corner, it says Rocks and Mangoni, does that give you any -- strike that. Let me ask it a different way.
Can you tell, sitting here, who typed this interview?
A. No.
Q. Can you tell, sitting here, who did the questioning in this interview?
A. No.



Q. Let me suggest one thing to you then, if your name is first, does that mean that you were the one who was leading the interview?
A. No, not really.
Q. Did you have a particular style in the way in which you conducted interviews?
MR. ZURBRIGGEN: Object to the form. Detective, if you can say?
THE WITNESS: No, not really.
BY MR. FEINBERG:
Q. I guess the question I'm asking is this, by reading this interview, by looking at how it's typed and so on, can you tell one way or the other whether you were leading the questions?
A. I could have if this was his first interview, but this is just a re-interview.
Q. I'm not sure I understand why you say that. If it was his first interview, what does that have to do with --
A. Because I would ask particular questions if it's a first time.
Q. I see, you had a typical set of initial questions?

Page 157

A. Yes.
Q. Can you give me an example of what those initial questions would be?
A. Can you read, write and understand the English language? Are you under the influence of any type of drug or narcotic, just things like that.
Q. So you started off with those questions to make sure that the person could communicate with you; is that correct?
A. Right.
Q. Would it typically be the case in an interview you conducted with another detective that just one person would do the talking?
A. Yes.
Q. Would it be one person does the talking and the other person does the typing or vice versa?
A. Every interview is different. It all depends on the facts. If Mangoni had knowledge of all of these people, there's a good chance that he would have been asking the questions and I might have been typing.
Q. Would it ever be the case that two

Page 158

detectives would be questioning within the same interview?
A. Sure, another detective can throw a question in here and there.
Q. I take it you don't have a recollection one way or another as to whether that happened in this case; is that right?
A. I do not.
Q. Can I assume then -- it sounds like there are two possibilities -- let me start that over.
There are two possibilities for how you got enough information to participate in this interview. One is, you went and looked at the file yourself, correct?
A. Correct.
Q. The other is that Detective Mangoni would have told you a little bit about the case; is that right?
A. Right, he could have asked me to go with him to pick him up and be with him during the interview.
Q. And you would expect that Detective Mangoni would have kind of debriefed you

Page 159

before you started the interview, right?
A. Basically.
Q. You wouldn't just be sitting there knowing nothing about the case, right?
A. I could have been. It's possible.
Q. Would that ever be the case, that you would sit there and not know anything about the case?
A. If I was typing it and it was case and he knew all of the information, sure.
Q. By the way, we previously marked your activity sheet from the same interview, that was a marked as P-8. Do you have that in front of you, sir? I can show you my copy.
Can you tell from looking at Exhibit P-8, your activity sheet, whether you typed that or Detective Mangoni typed that?
A. I would guess it would be Mangoni.
Q. Why do you say that?
A. By the way it's typed.
Q. Are you talking about just the formatting or the substance of the words?
A. Everything about it. It doesn't look like my work.

Page 160

Q. What I want to do then is to develop an understanding of what you might have known at that time. I understand it might be limited but let's see what we can do.
Sir, what I am going to do now is share with you the statements from witnesses at the scene. I will hand them to you one by one and ask you to review them.
My purpose is to understand what you knew from that time.
- - -
(Whereupon Exhibit P-11 was marked for identification.)
- - -
BY MR. FEINBERG:
Q. The first exhibit, P-11 that I'm handing you is the interview of Mona Madison. Take a moment to read through that and let me know when you're finished.
Sir, have you had a chance to review P-11?
A. Yes.
Q. I want to direct your attention to the second page near the bottom, the description

Page 161

of the perpetrator. Do you seeing the second answer from the bottom?
A. Yes.
Q. He was black, 5'5, he was just a little taller than me and I am 5'1. He was like a light brown skin, he was skinny. I couldn't see too much of his face because he had a beige scarf with checkers on it and it was covering his face from his eyes down and he had a hat on too. But I can't remember too much about the hat. He had a blue jacket, a dark blue jacket and it was the puffy kind. He had a black gun, it was real long.
Did I read that accurately, sir?
A. Yes.
Q. Sitting here today, do you remember anything about that description?
A. No.
Q. The next exhibit that I'm going to share with you is Exhibit P-12. This will be the statement of Levi Davis. I will ask you to review it and we will talk about the descriptive information in that one, as well.

Page 162

\- - -
(Whereupon Exhibit P-12 was marked for identification.)
\- - -
BY MR. FEINBERG:
Q. Have you had a chance to review it, sir?
A. Yes.
Q. Do you see on the top of the second page there's a reference to the perpetrator being 5'6, 5'7?
A. Yes.
Q. Basically consistent with what Ms. Madison said but just less detail; is that correct?
A. Yes.
Q. The final one I'll show you will be the interview of Maurice Durbin. This will be Exhibit P-13. It's a little more challenging to read with the handwriting but let me know when you're finished.
\- - -
(Whereupon Exhibit P-13 was marked for identification.)
\- - -

Page 163

BY MR. FEINBERG:
Q. Have you had a chance to review that, sir?
A. Yes.
Q. Would you agree, not a ton of descriptive information there but you have a direction of flight of the perpetrator leaving the store; is that correct?
A. Yes.
Q. Heading north on 27th Street from Oakford; is that correct?
A. Yes.
Q. Based on that information and by the way, all of these statements were taken within 24 hours, give or take, of the shooting on December 5th of '84; is that correct? Less than that, within a few hours of the shooting?
A. Yes. Two were at the Police Administration Building, one was in the store.
Q. Based on that information at the scene, there was some descriptive information about the shooter and description about the shooter's direction of flight after leaving the scene; is that correct?

Page 164

A. Yes.
Q. Do you recall seeing in Ms. Madison's statement that the shooter, referred to the decedent, Mr. Heo by his nickname, Tony?
A. Yes.
Q. So that gave some indication to police that the shooter, appeared to at least have known the decedent; is that correct?
A. Yes.
Q. A different topic, sir. Do you recall hearing at any point that there were anonymous tips that were called in -- strike that.
Do you recall learning about tips identifying Michael Ransome as the shooter?
A. No.
\- - -
(Whereupon Exhibit P-14 was marked for identification.)
\- - -
BY MR. FEINBERG:
Q. I am handing you P-13, excuse me, P-14. Can I take it back from you and write the correct number.

Page 165

This is a series of handwritten notes that were taken from the homicide file, provided to us by the city. I would ask you to review them quickly and let me know when you're finished.
A. Okay.
Q. So on the first page there are two different notes, agreed?
A. Yes.
Q. The first page is labeled City-186. The one on the left side of your page says that an unidentified caller identified Michael Ransome as the shooter of Tony, correct?
A. Yes.
Q. If you turn to the second page, labeled City-187, there are two different notes. One notes that Bo Lim, who is the president of the Korean Business Men's Association had received information that Michael Ransome was the shooter and that he acted with a person named Robert, correct?
A. Yes.
Q. Also on that page on the right side, a different note that a Bob Kotzpaner,

Page 166

K-O-T-Z-P-A-N-E-R, from the Citizen's Crime Commission -- do you remember that name by the way, Kotzpaner?
A. No.
Q. Let me go back to my question, Mr. Kotzpaner received information that the shooter or the doer was someone named Clinton and the lookout was Mike Ransome. Do you see that, sir?
A. Yes.
Q. Just to reset the stage, can we agree that as of December 19th of 1984, there were three people who called in identifying Mr. Ransome as someone involved in the shooting?
MR. ZURBRIGGEN: Object to form.
THE WITNESS: Yes.
BY MR. FEINBERG:
Q. We talked before when I asked you generally about how to deal with tips, that when you get more and more tips identifying the same person, that's something that you would want to investigate; is that correct?
A. Yes.

Page 167

Q. Do you know any of the details of what happened in terms of the investigation -- any investigation concerning Mr. Ransome?
A. No.
\- - -
(Whereupon Exhibit P-15 was marked for identification.)
\- - -
BY MR. FEINBERG:
Q. Sir, I am now showing you what will be marked as Exhibit-15. This is an activity sheet from December 13th of 1984. Take a moment to read that and let me know when you're done.
A. Okay.
Q. Would you agree this activity sheet describes efforts to find information about Michael Ransome after these calls were received?
A. Yes, this is when the assigned detective still had it. These are his supervisors, so this must be right after the murder. This is Lanzelotti and Westerman.
Q. Got it. If we look at the date on the

Page 168

top middle of the document, it says 12/13/84, right?
A. Yes.
Q. That's eight days after the murder occurs; is that correct?
A. Yes.
Q. Lanzelotti and Westerman are the supervisors of --
A. Nespoli.
Q. What squad was that?
A. 4 squad. It says it right on the top.
Q. Thank you for pointing that out.
So you say Nespoli still had it, that's before it made it to --
A. SIU.
Q. -- SIU, correct?
A. Yes.
Q. Is that correct, sir?
A. Yes.
Q. We spoke over one another, I wanted to make sure the record was clear.
It seems like -- let me not suggest that. Would you agree that the investigation that is outlined in this

Page 169

activity sheet is consistent with what you would expect if you had tips naming Mr. Ransome as a possible perpetrator in this case?
MR. ZURBRIGGEN: Object to the form. Detective, you can answer.
THE WITNESS: Yes, this is what you do.
BY MR. FEINBERG:
Q. Let me ask you one piece of information we have here. A couple pieces of information.
One is that detectives learned that Mr. Ransome had been convicted of another murder from about four or five years earlier; is that correct?
A. '79 yes.
Q. They also learned that he was living at 1147 South 26th Street; is that correct? Do you see it's the fourth paragraph down?
A. 1147 South 26th.
Q. Is your South Philly geography pretty good, sir?
A. No.
Q. I'll represent to you that 1147

Page 170

South 26th is a block --
A. Up and a block over, yeah, I got it.
Q. So we know the shooting takes place the northeast corner 27th and Oakford, we know the direction of travel of the perpetrator from one of the witnesses is north on 27th; is that correct?
A. Yes.
Q. And 1147 South 26th would be one block to the north and a block to the east; is that correct?
A. Yes.
Q. At that point you have got tips of -- just to review, you've got tips about a perpetrator, number one, who has already been convicted of another homicide, correct?
MR. ZURBRIGGEN: Object to form. We're talking just based on the documents?
BY MR. FEINBERG:
Q. Yes.
A. Yes.
Q. And number two, who lives in the direction that the perpetrator was seen

Page 171

running towards; is that correct.
MR. ZURBRIGGEN: Same objection.
THE WITNESS: Yes.
\- - -
(Whereupon Exhibit P-16 was marked for identification.)
\- - -
BY MR. FEINBERG:
Q. This will be Exhibit-16. As I am handing this to you, I'll explain that this is another activity sheet regarding Mr. Ransome. I will note that there is discussion at the top of the activity sheet about another subject. You're welcome to read that but I'm really only going to ask you about the bottom two paragraphs of this document.
A. Okay.
Q. So you see that there was surveillance set up to look for Mr. Ransome, correct?
A. Yes.
Q. And he could not be located; is that correct?
A. Yes.

Page 172

Q. The next thing that we have, by the way I've done this in chronological order here, shown you the things that happened regarding Mr. Ransome, is details about his physical description. This will be Exhibit-17.
\- - -
(Whereupon Exhibit P-17 was marked for identification.)
\- - -
BY MR. FEINBERG:
Q. These are police photos of Mr. Ransome, sir. If you look at the height and weight on the bottom one you will see what I am talking about. Do you see that, sir?
A. Yes.
Q. Height, 5, 6; weight, 125, correct?
A. Yes.
Q. Date is January 30th of 1984; is that correct?
A. Yes.
Q. I misspoke about the date. I suggested that this was in chronological order. This photo would have been taken 11 months before the shooting of Mr. Heo, correct?

Page 173

A. Yes.
Q. In any event, would you agree that the description of Mr. Ransome, at least in terms of height and weight, closely approximates what was mentioned by the witness, Mona Madison?
MR. ZURBRIGGEN: Object to form. Detective --
THE WITNESS: Yes.
BY MR. FEINBERG:
Q. Ms. Madison also mentioned that the person who was shooter appeared to have -- it was a black man but with light skin. It's a black and white photo. Can you tell from the photo --
A. I cannot.
Q. In other words, a black and white photo is not going to tell you about complexion of the skin?
A. Yes.
Q. In any event though, just to confirm, a height and weight of 5'6 and 125 pounds is close to the 5'5 and skinny description of Ms. Madison; is that correct?

Page 174

A. Yes.
Q. Do you recall, sir, seeing it in the file, any reference to eyewitnesses who were interviewed?
MR. ZURBRIGGEN: Object to form. Jon, are we talking about during an investigation?
BY MR. FEINBERG:
Q. Let me withdrawal that question.
Bear with me for a second, sir. I am handing you a document now which was pulled from the homicide file. I'm marking it as P-18.
- - -
(Whereupon Exhibit P-18 was marked for identification)
- - -
BY MR. FEINBERG:
Q. Do you know whose handwriting this is, sir?
A. No, I don't.
Q. I will represent to you that this document is pulled out of a portion of the homicide file which contains a series of pages

Page 175

with handwritten notes about witnesses, about addresses and so on. And this sheet lists ten different witnesses, would you agree?
A. I don't know if they are witnesses or not.
Q. I will represent to you, based on other information, I am trying to expedite this and not show you all of the underlying documents.
A. Thank you.
Q. I will represent to you that there are a number of documents that reference these different names and it appears that this sheet is consolidating all of those different notes into one list.
A. Do you know what that word is on the top?
Q. To interview it looks like.
A. That's a good one.
Q. Thank you, I think. I count ten different names, some with addresses, some with dates of births, some with phone numbers. Do you agree?
A. Yes.
Q. Remember, we talked before about if you

Page 176

have information about potential witnesses, if you're the assigned or if you're involved in the investigation, you're going to want to make efforts to interview every single one of those; is that correct?
MR. ZURBRIGGEN: Object to form. Detective, you can speak generally.
THE WITNESS: If their witnesses.
BY MR. FEINBERG:
Q. Do you know, one way or the other, whether any of these people were interviewed in this case?
A. No idea.
Q. You can't tell me whose handwriting this is?
A. No.
Q. In a situation where -- let me -- I am going to ask you a hypothetical but I'm going to try to base it on the circumstances of this case. We know that in 1984 the Heo murder takes place, December of 1984. We know that witness information was gathered and then the case goes cold for a while until some point,

spring of 1987.
If you picked up the case in '87 and you saw a list like this of people to interview, what would you do?
MR. ZURBRIGGEN: Object to form. Detective, if you can answer.
THE WITNESS: If I picked this, I wouldn't know what it was. I would have no idea what to do with it.
BY MR. FEINBERG:
Q. If you wanted to find out what it was, how would you get an answer to that?
A. If this was in a file, you wouldn't unless you asked the assigned detective. That is the only person who might know and he's not going to know.
Q. Detective Nespoli was the assigned detective in late '84, early '85; is that correct?
A. Right.
Q. It seems like the one person you could ask if you pulled the document from the file is, what's this, right?
A. You can ask did he do it or did somebody



in his squad do it.
Q. If these were people who were listed as interviews, one thing you could do is go look at the activity sheets, right?
A. Or look at the interviews themselves.
Q. You could look at the interviews and figure out whether any of these people were, in fact, interviewed; is that right?
A. Exactly, yes.
Q. You would expect that there would be activity sheet prepared corresponding to each interview?
A. There should be, yes.
Q. So you could look at the activity sheets, as well, to find out whether these people were interviewed?
A. If you want the information, you would go to the interview, not the activity sheet. That's a summary.
Q. Fair enough. So it sounds like if the activity sheets were relevant to anything, they might say, for example, Bruce Brooks is listed here, second on this sheet. If a detective made efforts to find Bruce Brooks



and couldn't find him because -- for whatever reason, those efforts might be outlined on an activity sheet --
A. May or may not.
Q. In other words, it sounds like you've identified three different sources of information that you could go to get details on what this list means. Number one, you could ask the assigned, correct?
A. Correct.
Q. Number two, you could look at the interviews in the file, correct?
A. Correct.
Q. Number three, you could look at the activity sheets?
A. Correct.
Q. Is there anything else you could have done?
MR. ZURBRIGGEN: Object to form. Detective, if you know.
THE WITNESS: No. The only other thing you could do is show it to the members of the squad and see if it's their handwriting.



BY MR. FEINBERG:
Q. The squad we're talking about at this point is 4 squad; is that correct?
A. Yes.
Q. That's the squad that had the initial investigation in this case?
A. Yes.
Q. By the way, some of the names that we see at that time are Brignola, do you know was Brignola part of 4 squad?
A. He was.
Q. It looks like he was actually -- participates in one of the early interviews?
A. He was in 4 squad at one time.
Q. Did he get moved over to SIU?
A. Yes.
Q. So let's pick back up with where the investigation is. We reviewed some things that happened in December of '84 with the interviews with the eyewitnesses, tips about Mr. Ransome, efforts to locate Mr. Ransome. I'll represent to you that from the homicide file, it doesn't look like much of anything happened between January of 1985 and March of

Page 181

1987. Do you have any reason to dispute that characterization?
A. No.
Q. Do you have any knowledge, sitting here today, of what caused the reopening, as it were, of the investigation?
A. No.
Q. Let me show you a document and see if this one looks familiar to you. In fact, before we do that, does the name William Massey, M-A-S-S-E-Y sound familiar to you at all?
A. Not at all.
Q. I will represent to you that he was a probation officer maybe working with juvenile probationers. With that explanation, do you know who he is?
A. No.
Q. We've already talked about the fact that you interviewed Rodney Everett in July of 1987. Do you know how Rodney Everett came to the attention of the homicide division?
A. No.
Q. The first thing I will show you, so you

Page 182

know who Rodney Everett was -- let's go tab 25.

- - -

(Whereupon Exhibit P-19 was marked for identification.)

- - -

BY MR. FEINBERG:
Q. This will be Exhibit P-19. Sir, as I'm handing you this, this is a lengthy 7549 report. I think you'll only need to answer my questions the interview that's on the first page here.
I will hand that to you and ask you to read it.
A. What paragraph do you want me to read?
Q. Interviews and interrogations, there is an interview of Louise Woods.
A. Do you want me to read that whole --
Q. Yeah, read that whole section and let me know when you're finished.
A. Okay.
Q. There is one other portion I will ask you to read. There is an interview on the second page with Police Officer Gregory

Page 183

Kapusta, K-A-P-U-S-T-A. Read that and let me know when you're finished.
A. Okay.
Q. By the way, the information that you're seeing there, have you seen any of that before or do you recall seeing any of that before, about Mr. Everett?
A. No.
Q. Seeing it now, do you understand that Mr. Everett was someone who was in custody for beating his girlfriend, Louise Woods?
A. Yes.
Q. And the document will speak for itself but he threatens to blow up his girlfriend's sister's house, he throws a gun on the roof, that's all in there, right?
A. Yes.
Q. So this is someone who obviously comes to the attention of the Philadelphia Police Department because of some pretty serious and potentially violent conduct, would you agree?
A. Yes.
Q. That's Rodney Everett. I wanted to make sure you were aware of how he came into

Page 184

custody.
Now I want to show you a statement of Mr. Massey, who I mentioned to you before. Tab 26. This will be Exhibit 20.

- - -

(Whereupon Exhibit P-20 was marked for identification.)

- - -

BY MR. FEINBERG:
Q. So this is a long interview. I will ask you to read this whole thing. Let me know when you're finished. Did you finish reviewing it?
A. Yes.
Q. Do any of these details stand out in your recollection?
A. None of them.
Q. Would you agree that this statement was taken by Detectives Hughes and Mangoni?
A. Yes.
Q. Let me direct you to the third page of the statement, sir, labeled at the bottom, City-3. There is a description there which starts, then in June of 1986, do you see that?

Page 185

A. Yes.
Q. Mr. Massey proceeds to discuss obtaining information about the homicide at the H&B, which was Heo's store, by pulling newspaper articles and records from the library. Do you see that?
A. Yes.
Q. Had you ever heard about that before?
A. No.
Q. Have you ever seen anything like that in any other case?
MR. ZURBRIGGEN: Object to form. Detective, you can state generally.
THE WITNESS: No.
BY MR. FEINBERG:
Q. Is that unusual that a witness will pull newspaper articles on a case and provide information to a witness?
MR. ZURBRIGGEN: Same objection. Detective, you can answer.
THE WITNESS: Will you repeat the question?
BY MR. FEINBERG:
Q. Is that unusual that a person will pull

Page 186

newspaper articles and give information to a witness before the witness speaks to police?
MR. ZURBRIGGEN: Same objection.
THE WITNESS: Yes.
BY MR. FEINBERG:
Q. Why would that be unusual? Let me ask a different question.
Would that give you any concerns about the credibility of the witness' information?
MR. ZURBRIGGEN: Same objection. Detective, you can answer.
THE WITNESS: Yes, it would.
BY MR. FEINBERG:
Q. Why?
A. If the person didn't have any independent knowledge and he had to go look it up to get the knowledge?
Q. It sounds like you would be concerned about the reliability of that witness' information?
A. I would be.
Q. In other words, you wouldn't be able to

Page 187

tell whether the witness was providing you with information from his own personal knowledge or that he got from a newspaper; is that correct?
A. Right. I would have to see if anything else was corroborated independent of the articles he had read.
Q. How would you do that?
A. By investigation and knowing the case.
Q. It sounds like, if I can characterize your testimony, that is a red flag about the person's credibility; is that correct?
MR. ZURBRIGGEN: Object to form.
THE WITNESS: Yes.
BY MR. FEINBERG:
Q. Something you would want to explore; is that correct?
A. Yes.
Q. Do you recall learning that Mr. Everett was brought -- strike that.
In fact, I haven't even shown you his first statement. Let's do that, Tab 27. P-21.

Page 188

\- - -
(Whereupon Exhibit P-21 was marked for identification.)
\- - -
BY MR. FEINBERG:
Q. So that is Mr. Everett's statement of April 15th of 1987, the same day that Mr. Massey was interviewed. I would ask you to take a look at that and let me know when you're finished.
A. Okay.
Q. Do you recall reviewing this statement back in 1987, sir?
A. No.
Q. Can we assume that you would have had some familiarity with what Mr. Everett said before you interviewed him on July 7th or '87?
MR. ZURBRIGGEN: Object to form.
THE WITNESS: I don't remember.
BY MR. FEINBERG:
Q. Would you agree that in sum and substance, Mr. Everett's testimony is based on

Curtis Crosland's alleged confession to the crime?
A. What was the first part of the question.
Q. Let me say that again. In summary, Mr. Everett says that Curtis Crosland confessed to him, Everett, that he committed this crime; is that correct?
A. Yes.
Q. Beyond that, there's not a lot of details about what happened at the time of the murder; is that correct?
MR. ZURBRIGGEN: Object to form.
THE WITNESS: The two things that stuck out were the caliber of the gun and he fired once. Whether that's consistent with the scene --
BY MR. FEINBERG:
Q. Do you have any idea whether that's consistent with the scene?
A. No idea.
Q. It sounds like what you've done though, is looked for facts that would be known to the perpetrator; is that correct?



A. Yes.
Q. If you're going to judge the validity of a confession, you'll want to make sure that the confession reports accurate details about the crime; is that correct?
A. Without a doubt.
Q. In other words, facts that are accurately stated that are consistent with the scene will lend credibility to the confession; is that correct?
A. Yes.
Q. Do you remember -- I understand your memory is limited but do you recall any discussion among the homicide division about this being a significant break in the case? A cold case being reopened or anything like that?
A. No.
MR. ZURBRIGGEN: Object to form.
BY MR. FEINBERG:
Q. Would you agree that if an investigation has been cold, or in this case since December of '84 all the way up until April of '87, that



a witness describing an alleged confession would be a potentially significant break in the case?
A. It would be.
Q. Reading this statement on its face, do you have any concerns about Mr. Everett's credibility?
MR. ZURBRIGGEN: Object to form. Detective, if you can.
THE WITNESS: Only because he says he got information from the library.
BY MR. FEINBERG:
Q. So that's one thing that's in your mind already, you have no idea whether he's telling you information from his own personal knowledge or information that he got from some other source; is that correct?
A. This would be just the beginning of the investigation.
Q. Understood, I will show you a few other documents about what happened next. Really, what I'm doing, to be fully transparent, sir, is to understand what would be going on in your head at this stage of the investigation.



Understood?
A. If I was the assigned.
Q. If you were the assigned or if you're involved in the interview or whatever. Okay.
By the way, I don't know that we covered when I reviewed with you the report of Mr. Everett's arrest regarding the incident with his girlfriend, do you recall seeing that Mr. Everett was then on parole?
A. Yes.
MR. ZURBRIGGEN: In the document, not his independent recollection.
BY MR. FEINBERG:
Q. Yes. The fact that he was on parole and that he had been arrested on this new charge suggests that he could be facing a parole violation; is that right?
A. True.
Q. And a parole violation could lead to additional time in state prison, correct?
A. Back time.
Q. And any time a witness is facing any time or any adverse consequence with their criminal case, that may give them a reason to

Page 193

be untruthful in providing information about a criminal investigation; is that correct?
MR. ZURBRIGGEN: Object to form.
THE WITNESS: It could be or it could be that the person does have the right information and is waiting for the right moment to use that information.
BY MR. FEINBERG:
Q. Fair enough. In any event, any time you confront a witness who is trying to get a deal out of the information that they're providing, that's another factor which causes you to look deeper into their credibility, correct?
A. Yes.
Q. Another potential red flag about potential false information, correct?
A. Right, because you know this is going to come up in trial or some other time.
Q. We talked before about Delores Tilghman. I take it you don't remember any interaction with her?
A. No.
Q. Let me show you one other thing, sir. I

Page 194

understand what you're saying but just to see if this sparks any recollection.
- - -
(Whereupon Exhibit P-22 was marked for identification.)
- - -
BY MR. FEINBERG:
Q. I am handing you -- this is a long document, sir. It's a transcript of Grand Jury testimony from Ms. Tilghman. I am going to mark the entire transcript as Exhibit P-22. Actually, to be clear for the record, this is three volumes of transcripts, over three different day that are collectively marked as P-22.
Sir, bear with me for one second and I will give you a page reference. As I am doing that, let me just set the time table for you. The statement from Mr. Everett that we just reviewed was taken on April 15th of 1987. I will ask you to keep that in your mind and then turn please to page -- you'll see bottom right, there are page references, there are four digit page

Page 195

references. Go to 8995.
A. What are these from.
Q. These are Grand Jury transcripts from Ms. Tilghman's testimony in front of the Grand Jury?
A. In what case?
Q. Let me direct you to the page and then I'll explain it in the context.
A. The page was 8995?
Q. Correct. I'll provide full representation to you, sir, that Ms. Tilghman testified in front of the Grand Jury about a couple of different cases, one involved the murder of a man named Joseph Wilkerson. Does that name sound familiar to you at all?
A. Not Joseph. I'm thinking of another Wilkerson. Lance Wilkerson was involved with the fire bombing.
Q. The Move fire bombing?
A. No, this was a fire bombing where six detectives went to prison.
Q. Understood. Joseph Wilkerson was a man who was murdered in 1983 and Delores Tilghman allegedly had information about one of the

Page 196

perpetrators of that murder.
Delores Tilghman also testified at Mr. Crosland's trial about an alleged conversation that she overheard. That is probably all unnecessary background for what I want to show you.
Do you see at the top of the page, the second question down, there is reference to an April 16th, 1987 conversation with homicide detectives?
A. Yes.
Q. Read from there down to the bottom of the page and let me know when you're finished. You're welcome to keep reading, sir, but let me tell you the question I want to ask and see if you can answer it.
I will represent to you that in or portions of this transcript that I haven't shown you, Ms. Tilghman says that the officers who came to speak to her at the hospital were -- pardon me, detectives, were Detectives Cimino and McNesby.
My question for you is, do you recall hearing from any source about

Page 197

Cimino and McNesby going to speak with this witness about the Heo murder?
A. No.
Q. One follow up to that, we know the interview with Rodney Everett took place on April 15th. This description by Ms. Tilghman is the very next day.
Do you know whether there was any planned encounter with Ms. Tilghman in connection with Rodney Everett's interview?
MR. ZURBRIGGEN: Object to form. Detective, if you know.
THE WITNESS: Not that I know of.
BY MR. FEINBERG:
Q. Detective, as I hand you different exhibits, you can probably tell, I'm trying to go through this investigation in chronological order. It's possible that I'm giving you something out of order now. We'll see if we can figure it out together. This will be marked as Exhibit P-23.
- - -
(Whereupon Exhibit P-23 was

Page 198

marked for identification.)
- - -
BY MR. FEINBERG:
Q. Let me orient you. There are a number different pages of handwritten notes here. The handwriting looks different on each page. Can you page through and tell me whether you see any of your handwriting?
A. It looks like my handwriting on the first page and the next page.
Q. So City-177 and City-179?
A. The third page is definitely not mine.
Q. Make sure we get the page references, sir. 177 and 179 are yours; is that correct?
A. Yes.
Q. 181 is not yours?
A. 180 is not mine.
Q. How about 181?
A. It looks like the writing may be mine but not the art work.
Q. The art work, the reference to Rock Man, that's close to your name; is that something you would have drawn, sir?
A. Definitely not.

Page 199

Q. Was that your nickname by any chance?
A. Definitely not.
Q. You don't recognize who made those drawings?
A. No.
Q. Let's go forward to 183. Is that your handwriting?
A. Yes.
Q. How about 185?
A. No.
Q. You can put this to one side, sir, because I think what we have here, these are notes that may have been taken during the July 7th interview. So we're going to come back to that after we talk about it.
The next step of the investigation is Mr. Everett is interviewed again on April 21st. For that purpose I'm going to show you Tab 31, please, which will be exhibit P-24.
As I'm handing this to you, sir, I'll note, this is another interview conducted by Hughes and Mangoni. Take a moment to read through that and let me know

Page 200

when you're finished.
Do you recall reading this interview any time in 1987?
A. No.
Q. Do you know why the second interview was conducted, sir?
A. I don't know why but the first question, they must have known he had additional information.
Q. Of course Mr. Everett says, no, he has got no additional information.
A. I don't see where he says no.
Q. The first page, is there anything additional that you can tell us about the murder in the H&B Market, his answer is, no, correct?
A. But then he gives information on page two, different names and who is associated with who.
Q. Agreed. Those are background factors about Mr. Crosland; is that correct?
A. Yes and other people.
Q. Do you know whether Detectives Hughes and Mangoni brought Mr. Everett back because

Page 201

they had doubts about the credibility of Mr. Everett's first interview?
A. No idea.
Q. Let's take a look at an activity sheet. This will be P-25 (SIC).
- - -
(Whereupon Exhibit P-24 was marked for identification.)
- - -
BY MR. FEINBERG:
Q. Sir, that activity sheet, as I said, just give that a careful read and let me know when you're finished.
A. Okay.
Q. Sir, have you seen this activity sheet any time recently?
A. I never seen it at all.
Q. Let me ask you about some of the details. I'm going to read the first paragraph and ask a few follow-up questions.
On 4/21/87 Rodney Everett was brought to the homicide division from the Detention Center and was re-interviewed. You agree, that appears to be the interview we

Page 202

looked at just a moment ago, Exhibit P-24, correct?
A. Correct.
Q. He was questioned about other murders in the neighborhood and did not seem to know the details of any, except the names of the persons murdered. Is that an accurate summary?
A. Yes.
Q. He was polygraphed on his original statement about being told by Curtis Crosland. Let me stop right there, his original statement had to do with an alleged confession of Curtis Crosland; is that correct?
A. Yes.
Q. And the polygraph, insofar as we can tell from this statement, was about whether he was being truthful on his representations concerning Mr. Crosland's alleged confession, agreed?
A. Yes.
Q. He was DI, deception indicated?
A. Yes.
Q. The person who conducted the polygraph

Page 203

exam was D. Reilly. Do you know who Officer Reilly is?
A. No.
Q. So can we agree that Mr. Everett failed a polygraph on the question as to whether Mr. Crosland admitted to killing Mr. Heo?
MR. ZURBRIGGEN: Object to form. Detective, if you can answer.
THE WITNESS: I can't answer that unless I could see the results of the polygraph exam.
BY MR. FEINBERG:
Q. I think we might be saying the same thing. Let me try that question again.
Deception indicated means that Mr. Everett failed the polygraph; is that correct?
A. Yes, but there's a number of questions -- it's not saying what question he failed.
Q. He was polygraphed on his original statement about being told by Curtis Crosland and was DI, deception indicated, correct?
A. That's what it says.

Page 204

Q. Would you agree that the plainest meaning of that sentence is that Rodney Everett failed a polygraph on the alleged confession by Curtis Crosland?
MR. ZURBRIGGEN: Object to form. Detective, if you can say.
THE WITNESS: Going by this, yes.
BY MR. FEINBERG:
Q. Were you ever aware of that before I showed you this document?
A. No.
Q. Can we agree, based on our previous discussion of polygraphs, that that is something that would have raised a serious red flag about the credibility of a witness?
MR. ZURBRIGGEN: Object to form. Detective, you can say generally.
THE WITNESS: Not serious, a criminal, they have problems with the lie detector.
BY MR. FEINBERG:
Q. Because they are a criminal?
A. Yes.

Page 205

Q. Would they also have problems telling the truth because they're a criminal?
A. They have a guilty conscience.
Q. Mr. Everett -- strike that.
It sounds like nothing would change though, in terms of your view, that if you learn that a witness fails a polygraph, that's something that you've got to follow up and investigate; is that correct?
A. Yes, that's what we have to do.
Q. And you've got to share that information with the D.A.'s office if you ever pursue a prosecution, based on this person's saying so; is that correct?
MR. ZURBRIGGEN: Object to form. Detective, generally you can answer.
THE WITNESS: As I testified, this information of him failing would go in the file and go to the D.A.'s office prior to trial.
BY MR. FEINBERG:
Q. Ultimately it would be Mr. Rosen's say so and Judge Robins New say so, as to whether they were ever aware of this information --

Page 206

A. Correct.
MR. ZURBRIGGEN: Same objection.
BY MR. FEINBERG:
Q. Do you recall ever, in one of your investigations where you were the assigned, basing a prosecution on the testimony of someone who failed a polygraph?
A. I don't recall.
Q. Would you have concerns about basing a prosecution on the testimony of someone who failed a polygraph?
MR. ZURBRIGGEN: Object to form. Detective, you can answer.
THE WITNESS: You can't put too much credibility in a polygraph. It's not reliable. If it was reliable, you could use it in court. It's not reliable. The fact that he failed it --
BY MR. FEINBERG:
Q. It would raise questions --
A. It would raise a question but not a serious question.
Q. In this case, we've already had

Page 207

questions raised about Mr. Everett -- strike that. We've already discussed questions that would be raised about Mr. Everett, given the fact that he apparently reviewed newspaper articles before he spoke to detectives; is that correct?
A. Correct.
Q. Now we have added to that, the fact that he failed a polygraph, agreed?
A. Correct.
Q. So those are additional reasons in your mind, why you -- strike that.
Those are now two reasons, in your mind, which would cause you to question the credibility of Rodney Everett's testimony?
A. Correct.
Q. By the way, I asked you a question a few questions ago about basing a prosecution on the testimony of someone who failed a polygraph. I want to be clear that what I'm doing there, is that the affidavit of probable cause in this case, the only substantive evidence about Mr. Crosland cited was Rodney Everett's statement about the alleged

Page 208

confession, agreed?
MR. ZURBRIGGEN: Object to form.
THE WITNESS: Yes, if that was enough to get it, yes.
BY MR. FEINBERG:
Q. We know that affidavit of probable cause was submitted, the arrest warrant was approved and Mr. Crosland was arrested, agreed?
A. Yes.
Q. Do you have any obligation -- strike that.
Would you expect that detectives who prepared an affidavit of probable cause in this case, would mention that Mr. Everett failed a polygraph?
MR. ZURBRIGGEN: Object to form. Detective --
THE WITNESS: I don't know.
BY MR. FEINBERG:
Q. If you were the affiant in this case and you were preparing an affidavit of probable cause based on Mr. Everett's testimony, would you feel obligated to mention in the affidavit

Page 209

that he had failed a polygraph?
MR. ZURBRIGGEN: Same objection.
THE WITNESS: No.
BY MR. FEINBERG:
Q. Why not?
A. As I just said, it doesn't mean anything. It's meaningless. It's a tool for the investigator.
Q. Would you feel obligated to make sure that defense counsel who represented the person who was arrested, was aware of the failed polygraph?
MR. ZURBRIGGEN: Same objection. Detective, you can answer generally.
THE WITNESS: No, for the same reason, it's not a definite that he's lying. It's a person's --
BY MR. FEINBERG:
Q. So in your judgement, there's no need to alert -- strike that.
Let's assume we're in a situation -- forget assumption. We know Mr.

Page 210

Crosland was arrested in this case, based on an affidavit of probable cause prepared by Detective Cimino; is that correct?
A. Yes.
Q. There's no reference to the polygraph in that affidavit, correct?
A. Right.
MR. ZURBRIGGEN: Objection, form.
BY MR. FEINBERG:
Q. You see no problem with that; is that correct?
A. Right. Once you get the affidavit and arrest the person, that doesn't end the investigation. The investigation continues. If there are things that have to get straightened out, you do what you got to do for the prosecution.
Q. I will represent to you that during the 34 years of Mr. Crosland's incarceration following his arrest in late 1987, he never learned about Mr. Everett's failed polygraph until early 2020.
I will ask you to accept that

Page 211

representation. Does that concern you?
MR. ZURBRIGGEN: Objection to form. Detective --
THE WITNESS: No, it does not.
BY MR. FEINBERG:
Q. Why not?
A. Because he was convicted in front of a jury. I assume it was a jury. There must be evidence other than this to convict him.
Q. Other than Mr. Everett?
A. Yes.
Q. I'll represent to you that the only two people to testify with evidence pointing to Mr. Crosland as the perpetrator of this case were, number one, Rodney Everett; and number two, Delores Tilghman. Will you accept that representation?
A. Sure.
MR. ZURBRIGGEN: Objection to form for the record.
BY MR. FEINBERG:
Q. Rodney Everett's testimony was the key to the prosecution. I will represent that to

Page 212

you. I will spare you the time of having to read the transcripts from two different jury trials. Okay. Agreed?
A. Yeah.
Q. Based on that representation, do you still have no problem with the fact that Mr. Crosland's lawyer never learned of Mr. Everett's failed polygraph?
MR. ZURBRIGGEN: Object to form, for the record. Detective, you can answer.
THE WITNESS: Yes.
BY MR. FEINBERG:
Q. Yes, you still have no problem with --
A. I don't think the lawyer did a good job investigating himself. He should have found that out.
Q. How would he have found that out?
A. His detective would have found that out. Discovery, went over everything in discovery. He could have read the activity sheet and saw that he was polygraphed.
Q. Do you know whether the defense lawyers had access to the activity sheet?

Page 213

A. If it's under discovery they did.
Q. So your expectation, maybe we're mis-communicating here, your expectations is that a defense lawyer for Mr. Crosland should have had access to that activity sheet; is that correct?
MR. ZURBRIGGEN: Object to form. Detective, again, if you have general knowledge --
THE WITNESS: Yeah, if you have an investigator that's supposed to do that, yes, he should delve into that.
BY MR. FEINBERG:
Q. Fair enough. That assumes that the Philadelphia Police Department -- strike that. Let's back up for one second, more macro level. District Attorney's Office handles discovery in criminal cases, right?
A. Yes.
Q. As the detective in the case whether you're assigned or collaterally involved, you don't go handing interviews to the defense lawyers; is that correct?
A. I know that the file goes to the D.A.'s

Page 214

office and I know there's a person there whose job is just to make copies of everything and give it to the defense.
Q. Bottom line, so that happens outside of the control of the Philadelphia Police Department; is that right?
A. Yes.
Q. Your responsibility in the police department is to get the information to the D.A.'s office; is that correct?
A. Correct.
Q. The D.A.'s office, their responsibility, as far as you understand, is to provide discovery information to the defense; is that correct?
A. Yes, that's correct.
Q. Your expectation that Mr. Crosland's defense lawyer or defense investigator should have had that activity sheet, assumes that that activity sheet was provided to someone outside the police department; is that correct?
A. Yes.
MR. ZURBRIGGEN: Object to

Page 215

form for the record.
BY MR. FEINBERG:
Q. If that activity sheet was in fact not provided to the District Attorney's Office, would you agree there's no way for Mr. Crosland's counsel to know about that failed polygraph?
MR. ZURBRIGGEN: Objection to form. Detective, you can answer if you know.
THE WITNESS: Mr. Crosland could have told his attorney that he took a polygraph.
BY MR. FEINBERG:
Q. Mr. Crosland -- that's a polygraph of Mr. Everett, right?
A. Yes.
Q. Mr. Everett is the witness against Mr. Crosland?
A. I got it.
Q. Agreed?
A. Yes.
Q. Can we agree that there's no way and maybe we're stating the obvious, let's try it anyway.

Page 216

Would you agree that the only way that Mr. Crosland and/or his counsel get this information about the failed polygraph is if that activity sheet leaves the Philadelphia Police Department homicide file?
MR. ZURBRIGGEN: Objection to form. Detective, you can answer if you can.
THE WITNESS: Yes. It's no big thing because it can't be used for anything. It's not pertinent.
BY MR. FEINBERG:
Q. I understand that. You're also making an assumption about what the evidentiary rules would have been at trial; is that correct?
A. Yes.
Q. If a defense lawyer -- let me ask about your understanding about Brady rules. Do you know what I mean when I say Brady?
A. Yeah.
Q. The duty to provide exculpatory information to defense, right?
A. Yes.
Q. Evidence doesn't have to be admissible in court in order to constitute Brady

Page 217

evidence, correct?
A. I don't know that.
Q. Okay, fair enough. Bottom line though, it sounds like your expectation is this should have made its way to Mr. Crosland and his defense lawyer; is that correct?
MR. ZURBRIGGEN: Object to form. Detective, if you can say generally.
THE WITNESS: Yes.
- - -
(Whereupon Exhibit P-25 was marked for identification.)
- - -
BY MR. FEINBERG:
Q. When I say this, I was holding up Exhibit P-25 --
A. Not the polygraph in particular, but that whole activity sheet.
Q. Let me ask that question better so we have a clear record. Your expectations is that the activity sheet from April 22nd of '87 concerning the April 21st of '87 polygraph, marked as Exhibit P-25, should have been provided to Mr. Crosland and his counsel,

Page 218

correct?
MR. ZURBRIGGEN: Object to form. Detective, you can answer.
THE WITNESS: Under discovery.
BY MR. FEINBERG:
Q. So it sounds like you're saying yes.
MR. ZURBRIGGEN: Same objection.
THE WITNESS: If this was pre-discovery, they wouldn't have got it.
BY MR. FEINBERG:
Q. I see, when you say pre-discovery, before the discovery rules were adopted in Pennsylvania?
A. Yes.
Q. I will represent to you that the Pennsylvania Rules of Criminal Procedure regarding discovery were adopted well before this prosecution took place.
A. Okay.
Q. Assuming that that was the case, that the discovery rules required it, you would expect that this should have been provided,

Page 219

correct?
MR. ZURBRIGGEN: Same objection.
THE WITNESS: Correct.
BY MR. FEINBERG:
Q. Putting aside disclosure of this information to the defense, I think we have also agreed that this polygraph result is another reason to raise questions for investigating detectives about whether Mr. Everett was telling the truth, correct?
MR. ZURBRIGGEN: Object to form. Detective, you may answer.
THE WITNESS: I don't understand the question.
BY MR. FEINBERG:
Q. Just to review so I can move on and transition into a different topic, we have talked about two different reasons for concern about Mr. Everett's credibility. One was his reference to newspapers, correct?
A. Right.
Q. Two is the failed polygraph, correct?
A. Right.

Page 220

Q. Three, we also know that he's facing a parole violation and may have incentives to try to provide false information, correct?
MR. ZURBRIGGEN: Object to form. Detective --
THE WITNESS: Correct.
BY MR. FEINBERG:
Q. What would you expect Detectives Mangoni and Hughes to have done as the next step in this investigation?
MR. ZURBRIGGEN: Object to form.
THE WITNESS: After what?
BY MR. FEINBERG:
Q. After the failed polygraph?
A. Do an activity sheet and turn it over to the supervisors.
Q. And figure out where to go from there?
A. They would determine where to go from there.
Q. By the way, I realized that before we move on, I forgot to ask you about something else on this activity sheet. We reviewed the section that says: DI, deception indicated.

Page 221

The next two sentences are, he, meaning Mr. Everett was re-interviewed and maintained he was being honest and was told by Crosland. He was then returned to the detention center. It sounds like there was a second interview that took place, agreed?
MR. ZURBRIGGEN: Object to form. Detective, if you can tell.
THE WITNESS: I don't know, sounds like it would be verbal, not written down.
BY MR. FEINBERG:
Q. Would you expect there to be any documentation of that interview?
A. No.
Q. Why not?
A. They could have just asked him the question, you failed the polygraph and he came back and said, no, I'm telling the truth.
Q. You told me before at the beginning of this deposition and you also told me in the Johnny Berry case back in February of 2021, that you never do an interview unless you're recording every single detail that's asked,

Page 222

correct?
A. That's me.
Q. So if this was you and there was a polygraph failure, you would have written down the questions that you're hypothesizing would have been asked; is that correct?
A. Yes.
Q. Do you have any idea why Detectives Mangoni and/or Hughes did not do that?
A. No idea.
Q. Do you see any problem with the fact that there is no documentation of that quote, unquote, re-interview from the activity sheet?
MR. ZURBRIGGEN: Object to the form. Detective, you can answer.
THE WITNESS: Not in the interview form but it's noted on here in the activity sheet.
BY MR. FEINBERG:
Q. Of course --
A. It's not like they didn't note it. It is here.
Q. Do you have any idea why they included it in the activity sheet but not in the

Page 223

interview?
A. I don't know. Maybe they didn't think it was pertinent for the interview.
Q. It sounds like your view is that it was pertinent; is that correct?
A. My view, yeah, but it's recorded. Whether it's pertinent or not, it's recorded on the activity sheet, somewhere.
Q. Detective Rocks, let me represent to you that after this April 21st interview, that's the second interview with Mr. Everett, the first one was on April 15th, there was no arrest warrant sought for several months. Are you aware of that fact, sir?
A. No.
Q. I will represent that to you. Do you have any idea why there was no arrest warrant sought at that time?
A. No.
Q. Do you know whether Detectives Hughes and Mangoni believed Mr. Everett's testimony?
A. No idea.
Q. We're moving on to a different topic, sir. This will be P-26.

Page 224

\- - -
(Whereupon Exhibit P-26 was marked for identification.)
\- - -
BY MR. FEINBERG:
Q. Take a moment to read through this, sir. As you're doing it, let me note, this is an interview with Michael Ransome who we talked about at length before. This interview takes place on April 24th, 1987, three days after Mr. Everett's second interview. Read through it please and let me know when you're finished.
A. Okay.
Q. Mr. Ransome, who had been the subject of notes and police investigative efforts dating back to 1984 is obviously finally brought in in April of '87, correct?
A. Yes.
Q. By the same detectives, Hughes and Mangoni, who interviewed Mr. Everett; is that correct?
A. Yes.
Q. Mr. Everett had said in his previous

Page 225

statements that Curtis Crosland had told Mr. Ransome about the murder or that Mr. Ransome had actually witnessed it; is that correct?
A. Yes.
Q. You agree here that Mr. Ransome denies all of that.
A. Correct.
Q. Would you agree that that's another fact which -- strike that.
Would you agree that Mr. Ransome's statement is something that provides further questions about the credibility of Mr. Everett's testimony?
MR. ZURBRIGGEN: Object to form.
THE WITNESS: No.
BY MR. FEINBERG:
Q. Why not?
A. This is just a waste of paper, this interview.
Q. Why do you say that?
A. It tells you nothing.
Q. The fact that Mr. Ransome declined to take a polygraph exam, do you see that's the

Page 226

last question and answer?
A. Yes.
Q. Does that tell you one thing, one way or the other?
A. No.
Q. Why not?
A. Because he doesn't have to take it.
MR. ZURBRIGGEN: Object to the form, just for the record.
THE WITNESS: If he told you, yeah, he would take it, by the time you got him down there and gave him his warnings, he wouldn't take it.
MR. FEINBERG: Let's go off the record.
VIDEOTAPE OPERATOR: Going off the record. The time is 1:35.
We're back on the record, 2:13.
BY MR. FEINBERG:
Q. Detective Rocks, we're back on the record now after a short lunch break. Did you realize during that break that any of your previous testimony was incorrect or

Page 227

incomplete?
A. No.
Q. Let me just note on the record that the document that I previously marked as Exhibit P-10, the July 7th, 1987 interview that you and Detective Mangoni conducted with Mr. Everett, we've replaced it with a correct copy of the document. The previous one was incomplete. You now have that in front of you; is that correct?
A. Yes.
Q. We'll come back to that in just a few minutes.
Before we get to that I'm going to mark a new exhibit. This will be Exhibit P-27.
\- - -
(Whereupon Exhibit P-27 was marked for identification.)
\- - -
BY MR. FEINBERG:
Q. Let me represent to you, sir, that this was pulled from the homicide file that was provided to us by the City Law Department. It

Page 228

appears to be a letter from Mr. Everett to Detective Mangoni, spelled incorrectly as Magioni.
Before you read it, I see you're starting now but let me ask you, have you ever seen a document that looks like this before?
A. No.
Q. Let's do this, take a moment to read through it and let me know when you're finished.
A. Okay.
Q. Confirmed, Detective Rocks, you have never seen this document before?
A. No, I have not.
Q. Do you recall any conversations with Detective Mangoni about this document?
A. No.
Q. Have you ever seen anything like this before, where a witness you have spoken to reaches out to you in writing to talk to you about the substance of the case?
A. No, not that I can recall. It may have happened, I just don't recall it.

Page 229

Q. The letter will obviously speak for itself, but can we agree that it appears that Mr. Everett is trying to get some help in his own cases in return for the information he provides?
A. Yes.
Q. For example, he says his, quote, unquote, legal work would help me after I get out -- help to get out after I testify?
A. Yes.
Q. He says I am receiving no help but I am willing to give it?
A. Uh-huh.
Q. Is that a yes?
A. Yes.
Q. He says he wants to work out a plan?
A. Right, yes.
Q. He is talking about further investigation tactics like wearing a wire while talking to Michael Turner?
A. Right yes.
Q. Do you know the name Michael Turner, by the way?
A. No.

Page 230

Q. I'll represent to you Michael Turner is a cousin of Curtis Crosland, whose name pops up in other locations in this case.
Would you agree that the statements made by Mr. Everett here in this letter are relevant to his credibility?
MR. ZURBRIGGEN: Object to form. Detective, if you can say generally.
THE WITNESS: No, I don't see it.
BY MR. FEINBERG:
Q. If you were a defense attorney in this case, would you want to see this letter?
MR. ZURBRIGGEN: Same objection.
THE WITNESS: Sure.
BY MR. FEINBERG:
Q. Why would you want to see this letter?
A. Because I want to see everything in the whole case from the defense attorney.
Q. One of the reasons you want to see this letter specifically is because it suggests that Mr. Everett is doing his best to get a deal; is that right?

Page 231

MR. ZURBRIGGEN: Same objection. Detective, you can answer.
THE WITNESS: It seems like he gave information and he's not getting his end of the deal held up.
BY MR. FEINBERG:
Q. We agree it's subject to interpretation. But if someone is giving information in return for a deal, the defense attorney is going to cross examine him on that every day of the week, right?
A. Sure.
Q. Your expectations would be that the defense counsel would want to see this so they can challenge Mr. Everett's credibility, correct?
MR. ZURBRIGGEN: Same objection. Detective, you can answer.
THE WITNESS: Right.
BY MR. FEINBERG:
Q. And if defense counsel believed that this might be relevant to credibility, it seems reasonable that Detective Mangoni might also think it's relevant to credibility,

Page 232

right?
A. You would have to ask him that.
Q. Would you expect that a document like this would be shared with the District Attorney's Office?
MR. ZURBRIGGEN: Object to form. Detective, if you know.
THE WITNESS: Should it be shared?
BY MR. FEINBERG:
Q. Yes.
A. Yes.
Q. In fact, there's no question about that in your mind; is that right?
A. No, it should be part of the case file and go over with the file.
Q. You would expect, in turn, that it would be disclosed to the defense --
A. That's up to the district attorney.
Q. I understand that you're not the one making Brady determinations and legal decisions, but based on your experience, you would expect that it would be disclosed to defense counsel; is that correct?

A. Yes, everything in the file should be disclosed.
Q. Let's go back and talk about your interview, sir, which was the corrected version of Exhibit P-10 that you should have at the top of your file there.
A. Yes.
Q. When we talked about this interview at the beginning of the case, I think you told me that you really don't remember any of the context, any of the details that lead you to be involved?
A. Right.
Q. Since you told me that, I've gone back and shown you what I believed to be just about everything of significance that happened in the investigation, leading up to July 7th, understood?
A. Yes.
Q. Now that I've provided you with that additional context and showed you all of these additional documents, has that sparked any recollection for you, about how you got involved in this interview?



A. Not at all.
Q. I understand that you don't have a recollection but let's proceed -- strike that.
Would it be fair to proceed under the assumption that many of the documents that I've reviewed with you, you would have reviewed in that time period?
MR. ZURBRIGGEN: Object to form. Detective --
THE WITNESS: I cannot answer that.
BY MR. FEINBERG:
Q. Because you told me before that you don't know whether you read the documents yourself or whether Detective Mangoni told you about the case going into the interview; is that correct?
A. Yes.
Q. Either way, can we agree that you would have had some knowledge base of information or some base of information about the case, either from your personal review or from your conversations with Detective Mangoni?
MR. ZURBRIGGEN: Same



objection. Detective, you can answer.
THE WITNESS: If I had any, it would be limited and I don't remember it right now.
BY MR. FEINBERG:
Q. Let's go through -- before we do that, whether you knew it or just Detective Mangoni knew it, can we agree that as of July 7th, it was known that Mr. Everett had spent a lot of time in prison?
MR. ZURBRIGGEN: Object to form. Detective, if you know.
THE WITNESS: A lot of time, no. I know he was in prison because I have a Graterford number.
BY MR. FEINBERG:
Q. He had been arrested in a serious case involving his girlfriend, Louise Woods?
A. That's what he told me, yes.
Q. You saw that from the documents we reviewed?
A. Yes.
Q. He was also facing a parole violation; is that right?



A. Yes.
Q. He had given that statement implicating Mr. Crosland back in April of; 87, correct?
A. Yes.
Q. He then failed a polygraph; is that correct?
A. Yes.
Q. Fair to say that at that point he was a witness with questionable credibility?
MR. ZURBRIGGEN: Object to form. Detective, if you can answer.
MR. ZURBRIGGEN: That's hard to say. That's an opinion.
BY MR. FEINBERG:
Q. Do you know why he was brought back for a third interview?
A. No, I do not.
Q. Is that an unusual number of interviews for a witness in a homicide case?
A. It is. It is.
Q. Typically you interview a witness once, you get what you need and then you move on with the case, right?
A. Once or twice. Just like I said about

the sergeant reading all the interviews, during your investigation you might interview somebody who gives information and you have to go back to somebody.
Q. Doesn't it stand to reason that the purpose for bringing Mr. Everett back was to find other witnesses who might corroborate what he was saying?
MR. ZURBRIGGEN: Object to the form. Detective, if you know.
THE WITNESS: Yes, I asked in this question here, is there anything else that you can add at this present time.
BY MR. FEINBERG:
Q. It seems like, you said you asked, do you know whether you asked that question?
A. I don't know. I am just saying what's written down here.
Q. The first question that's asked leads him to talk about other people who might have heard Curtis Crosland confess to the crime; is that correct?
A. It's in general, can you add anything else.



Q. And that's where he heads right away, right, to talk about other people who might have heard what Curtis said, correct?
A. Right, he says I really do not know anything else and then he goes on.
Q. I'm going to come to that in just a moment. Right now I'm trying to figure out what might have been going on in your head or more likely in Detective Mangoni's head if you knew. It seems like if you have information from a witness but the witness has credibility concerns, your next investigative step is find someone else who knows, correct?
A. Correct.
Q. I understand we're making an assumption here, can we assume that was your intent or the intent of Detective Mangoni in bringing Mr. Everett back?
MR. ZURBRIGGEN: Object to the form. Detective, if you know.
THE WITNESS: I don't know. Detective Mangoni had information on this case from the beginning, apparently. He was well aware of the facts of the case. I wasn't.



BY MR. FEINBERG:
Q. One of the things you told me before and we talked about it a couple times now, is that you don't do a pre-interview and ask questions that are not then recorded in black and white in an interview record, correct?
A. Yes.
Q. Do you know -- can you tell whether there was any conversation with Mr. Everett before this interview happened about other people who might have information?
A. I don't remember. I don't remember the whole thing.
Q. The reason I ask that and maybe it's obvious from my question is, you ask or the first question that you and Mangoni ask is a general question, what else can you tell me? And he jumps right into other people who may have heard Curtis Crosland confess, agreed?
A. Right.
Q. Do you recall or know -- do you know whether that was part of the discussion that preceded the statement?
A. I have no idea. I don't know. I don't remember.



Q. I take your answer. Let me hypothesize something that could have happened. By the way, we know from the top of the form that Mr. Everett was at that time incarcerated at Graterford; is that correct?
A. Correct.
Q. And he was brought into the District Attorney's Office for this interview; is that correct?
A. Correct.
Q. Which means, as a general matter if someone was in state prison, would you transport them in for an interview or would someone else do that?
A. I have done it a million times, from any prison I have brought them down. I did it every week, you'd get a bring down, I would sign, go to prison and bring the person down. Common occurrence.
Q. We can pull some documents that may tell us that you actually went to the prison to pick Mr. Everett up?
A. Could be.

Page 241

Q. My question for you is, do you recall any discussion in the car, on the way to the D.A.'s office if you're driving him --
A. I don't remember.
Q. Let me finish the question. Any question saying, we need to know who else has this information?
A. I don't remember.
Q. Let's look at the substance of what Mr. Everett says during this interview. Looks like he mentioned several people who might have additional information. I count four at the outset: Talmadge Garwood, T-A-L-M-A-D-G-E G-A-R-W-O-O-D; Lester Turner; Michael Turner and Raymond Crosland. Do you see the reference to those?
A. Yes.
Q. He also mentions Frank Turner and Michael Ransome, agreed?
A. Yes.
Q. Ransome had already been interviewed and denied knowledge of anything, right? We reviewed Ransome's statement from April of '87?

Page 242

A. Yes.
Q. So let's remove Ransome and agree that we have between Garwood, Lester, Michael, Raymond Crosland and Frank Turner, five witnesses who Everett says might have information, agreed?
A. Agreed.
Q. Those are people you would want to talk with, right?
MR. ZURBRIGGEN: Object to form. Detective, if you know.
THE WITNESS: Yes.
BY MR. FEINBERG:
Q. Especially given -- if we're making the assumption that Everett was brought in to find witnesses who could corroborate what he was saying, then if you have information about other witnesses, you would want to explore those, right?
A. Yes.
Q. Especially in a case where Everett has given you reasons to disbelieve his testimony in view of his review of newspapers, the failed polygraph and on so, agreed?

Page 243

MR. ZURBRIGGEN: Objection.
THE WITNESS: Yes.
BY MR. FEINBERG:
Q. After the Heo murder is discussed on the first -- actually on the first question and answer, there is then a discussion with Mr. Everett about several different murders. Do you recall how those other murders came up or can you tell me how those other murders came up?
A. No idea.
Q. Would that be a common occurrence, that you'd be interviewing one witness about one case and then veer into discussion about different cases?
A. Yes.
Q. How would that happen, I'm asking in a general sense. Would that be initiated by the witness or would detectives go in with a plan to discuss specific cases?
A. I don't know.
MR. ZURBRIGGEN: Object to form.
THE WITNESS: In this case I

Page 244

don't remember. Dominic had this information, Mangoni had the information but I don't recall any of this.
BY MR. FEINBERG:
Q. Let me Zoom out then and talk about your practice. Can you remember any instances where you had a witness who you thought might have information on multiple on different cases? Did you have a plan of attack for that interview where you would then ask about each of those different cases?
A. I wouldn't characterize it as an attack.
Q. I mean an outline or an agenda?
A. Yes.
Q. So you would go in and you would have information about each of those different murders in your head or documents, and then you would ask that witness what they knew about each of those murders?
A. Yes. Actually you shouldn't do that, that's a very bad practice.
Q. Tell me why.
A. Because you have information on different murders in one interview. Each one

Page 245

should be a separate interview and go in each separate case, separate activity sheets. It shouldn't be all in one interview.
Q. If that was your practice, then this suggests that Detective Mangoni was the one who was leading this interview, right?
MR. ZURBRIGGEN: Object to form. Detective --
THE WITNESS: I don't know. I don't remember.
BY MR. FEINBERG:
Q. It seems like -- my notes, we can look at the statement but there's a discussion about Eugene Myrick and a couple of murders, about Frank Turner and murders, about the Murder of John Lamb, about a guy named Jojo Rhoan, R-H-O-A-N.
A. Rhoan.
Q. Do you remember that case?
A. He's a famous criminal in Philadelphia.
Q. We'll come back to him. The bottom line is, I have listed three, four, five different cases that were the subject of this interview. What you're saying is, if you had been leading

Page 246

this interview, your practice would have been to do different interviews regarding each case; is that correct?
A. Yes.
Q. The reason for doing that is for organizational purposes that a statement for each case would have gone into a different homicide file; is that correct?
A. Right.
Q. Let's say in a hypothetical case if a witness gives you information on five different cases and one of those cases gets prosecuted, based on that witness' information; would you provide the district attorney with information of all of the statements that that witness gave on the multiple different cases?
MR. ZURBRIGGEN: Object to the form. Detective, if you can generally talk to that --
THE WITNESS: I cannot answer that. I have no idea.
BY MR. FEINBERG:
Q. Would you agree that it might be

Page 247

relevant for a district attorney to be aware that the witness at issue had provided information on multiple different cases?
MR. ZURBRIGGEN: Same objection.
THE WITNESS: I can't answer that either. The district attorney would be trying one case. I don't think he would care about the other cases. That would go to the other district attorneys.
BY MR. FEINBERG:
Q. Would you agree that defense counsel might want to know if a witness is providing information in multiple cases?
A. Defense counsel wants to know everything.
MR. ZURBRIGGEN: Same objection.
BY MR. FEINBERG:
Q. So for that same reason, would defense counsel want to know that this witness who they're examining about one particular case, had provided information across multiple different cases?

Page 248

MR. ZURBRIGGEN: Same objection. Detective, you can answer.
THE WITNESS: He may have wanted it but if everything -- in all of those five cases he gave information that turned out to be true, he might not want it.
BY MR. FEINBERG:
Q. So he might not want to use it -- by he, we're talking about defense counsel?
A. Yes.
Q. So defense counsel, let's use that phrase. If defense counsel had information that a witness gave information on five different murders and it didn't pan out as to four different murders, that's something that would be relevant, right?
MR. ZURBRIGGEN: Same objection. Detective, you can answer.
THE WITNESS: Generally, I guess so.
BY MR. FEINBERG:
Q. Because counsel then would be able to explain to a jury, here is someone who just tries to tell detectives information in all of

Page 249

these cases and none of it turns out to be usable, right?
A. This is all hypothetical.
Q. Yes. But you see where I'm going, right?
MR. ZURBRIGGEN: Objection --
BY MR. FEINBERG:
Q. I agree, that's not a question. That's a comment. Let me ask it as a question.
It seems like we're on the same page anyway. You understand, based on your vast experience in the criminal justice system, that a defense attorney is going to want to know about a witness who has provided information about multiple different cases?
MR. ZURBRIGGEN: Same objection. Detective, you can answer.
THE WITNESS: Yes, he would want to know but I don't think it's up to the detective to give him the information.
BY MR. FEINBERG:
Q. It's up to the district attorney to decide, right?
A. Correct.

Page 250

Q. It's up to the detective to share the information with the district attorney?
A. That's correct.
MR. ZURBRIGGEN: Object to form.
BY MR. FEINBERG:
Q. Let's go back to the Everett statement. We're going to go through quickly and look at each case that Mr. Everett discusses, especially since you told me that you know about the Rhoan case, I want to see what you know about these others, if anything.
Discussion of Myrick, that's at the bottom of the first page, the way the question is asked is: You made a mention concerning the rifle in connection with your arrest in March of '87.
Do you know what that's referring to, you made a mention?
A. No.
Q. Do you recall seeing a mention of that rifle in either of the previous statements that we reviewed?
A. Somebody mentioned the rifle, long gun,

Page 251

rifle. It might have been one of the females.
Q. Right, so Ms. Woods, who was the complainant in the case against Mr. Everett, correct?
A. Uh-huh.
Q. Is that a yes?
A. Yes.
Q. Really what I'm getting at here, sir, if you know, was there a pre-interview discussion between Mr. Everett and you and/or Mangoni about that rifle?
MR. ZURBRIGGEN: Objection to form. Detective, to the extent you know.
THE WITNESS: I don't remember.
BY MR. FEINBERG:
Q. Looks like all Mr. Everett can say is that he heard that a rifle was used in a murder; is that correct?
A. And ended up in Louise's house.
Q. The next case that's talked about or the next person that's talked about in the middle of the second page is a man by the name of Frank Turner who has the nickname Squirt. Do

Page 252

you remember anything about Frank Turner?
A. No.
Q. I'll represent to you that in connection with Mr. Crosland's case and a couple of others, Mr. Turner's name comes up frequently as a potential suspect or a potential witness. It sounds like you don't remember anything about that name.
A. I've seen it in the paperwork but I don't remember anything about it.
Q. Let me show you one other reference to Mr. Turner. I'm going to expedite things by getting this for you, sir. Remember we reviewed Ms. Tilghman's Grand Jury testimony?
A. Yes.
Q. I am going to show you pages 9,000 and 9,001. Pull your copy. If you go to page 9001.
A. Okay.
Q. Actually flip back to 9,000, the last paragraph on that page says: And let me also state, by the way, this is Ms. Tilghman testifying: In giving that statement to them, several times Cimino got real aggressive

Page 253

because McNesby was quieter. Cimino practically forced me to say that Squirt was involved.
You can read from there down to the end of the next page and let me know when you're finished.
A. Okay.
Q. Do you see the repeated references there to Squirt, also known as Frank Turner?
A. Yes.
Q. I understand your representation that you don't remember much about this, but now seeing this, do you remember any discussions with Detective Cimino or Detective McNesby about a man named Squirt as a suspect in various homicide cases?
A. No.
Q. The next homicide that is discussed in this statement involves the death of John Lamb. Do you see that at the bottom of the second page?
A. Yes.
Q. This starts at the bottom of the second page and goes all of the way down to the

Page 254

bottom of the third and onto the top of the fourth. It looks like at the bottom of the fourth page, pardon me, bottom of the third page marked City 28, you and/or Mangoni asked to clarify this incident, can you explain it again.
It seems like -- were you confused by Mr. Everett's explanation?
MR. ZURBRIGGEN: Object to form.
THE WITNESS: I don't remember.
BY MR. FEINBERG:
Q. Would you agree that the information that Mr. Everett supplied about the Lamb murder matched the same basic evidence that he described in the Heo murder, that it was an alleged confession from Mr. Crosland and Mr. Turner?
MR. ZURBRIGGEN: Objection to the form. Detective, if you can understand.
THE WITNESS: I guess they would be considered the same.
BY MR. FEINBERG:

Page 255

Q. So not a lot of detail, surface information about an alleged confession.
A. Also, when you get this information on these murders, it would be very easy to look these murders up and pull the case files and read about them to see if it does fit in, if he is telling the truth. Does he know something credible?
Q. Which goes back to a point that you made before at length, that if Everett is giving you testimony in the Heo murder or giving you information in the Heo murder and you've got questions about his credibility, you will go see if you can corroborate it, right?
A. Correct. Anything he says you corroborate. There is plenty here to corroborate.
Q. By talking to other witnesses, right?
A. By pulling the case file in each of these cases. It's all there.
Q. And looking in the case file to see what other witnesses have said, correct?
A. Correct.
Q. This interview goes back to Eugene

Page 256

Myrick. Mr. Everett implicates him in a triple murder, or at least a shooting, it's unclear of a murder, of the three white boys standing at the corner of 27th or 28th Dickinson Street.
A. Right.
Q. Do you remember anything about that murder?
A. No.
Q. It looks like he's jumping at the opportunity to provide more information about Mr. Myrick, agreed?
MR. ZURBRIGGEN: Objection to form. Detective --
THE WITNESS: Is that a question.
BY MR. FEINBERG:
Q. Yes.
A. Can you repeat it?
Q. Sure. Does it appear that Mr. Everett is trying to provide as much information as he can about as many different cases as he can?
MR. ZURBRIGGEN: Objection.
THE WITNESS: Yes.

Page 257

BY MR. FEINBERG:
Q. Now we're at Jojo Rhoan. You mentioned he was a very famous figure in Philadelphia.
A. Yes.
Q. What do you remember about him?
A. He was a member of the Black Mafia.
Q. Was he in fact a fugitive for quite some time?
A. Yes, he was.
Q. It sounds like Mr. Everett's only information is that he appears to have been in Virginia without anything specific; is that correct?
A. He mentions the Jolly Green Giant.
Q. Who is the Jolly Green Giant?
A. He was a member of the Black Mafia, a big drug dealer in Philadelphia. And they found -- a bus driver was going down the street and they found a paper bag on the step Jolly's head was in the bag.
Q. When was that?
A. That was probably the 70s, early 70s.
Q. Do you know the name Monk in connection with those same guys?

Page 258

A. No.
Q. The last thing that Mr. Everett talks about in this statement is what he was going to do with the rifle that he had left at Louise's house, agreed?
A. Yes.
Q. It looks like he's going to give it to his probation officer or his contact Mr. Massey. Do you see that?
A. No.
Q. He said, I got the rifle to give it --
A. Yes, yes. Okay.
Q. And he would turn it over to police.
A. Okay.
Q. Obviously he never did that, right?
A. I don't know.
Q. We know that there was a gun found in Ms. Woods' house after Mr. Everett was arrested for abusing her in March of '87, April of '87, agreed?
A. I think I did read that in one of the files.
Q. Do you know one way or the other whether Mr. Everett was providing credible information

Page 259

that he was going to give the gun to Mr. Massey?
A. I don't know. I don't know if any of this was checked out. I'm sure it was.
Q. You would expect that if anyone checked it out, it would have been Detective Mangoni; is that correct?
MR. ZURBRIGGEN: Same objection.
THE WITNESS: No.
BY MR. FEINBERG:
Q. Who would have done it?
A. Whoever the supervisors at the time assigned it to.
Q. Got it. So someone -- we know that Mangoni was pretty heavily involved in the investigation at this point?
A. Yes.
Q. And whether it was Mangoni or -- strike that.
Your understanding is that if Mangoni provided this statement to a supervisor, the supervisor would have said, okay, here is what we have to do next in terms

Page 260

of checking out this information from Mr. Everett; is that correct?
A. Yes, it's a lot of work, spread it out.
MR. ZURBRIGGEN: Object to form.
BY MR. FEINBERG:
Q. Let's talk about what happened following this interview. You should already have in front of you -- it's marked as Exhibit P-8. It's the activity sheet following the July 7th interview, in connection with the July 7th interview.
A. What was the number again?
Q. P-8. It looks like this, sir.
A. No, I can't find it.
Q. Does it say P-8 at the bottom?
A. No, it does not. That's why I can't find it. It's not marked.
Q. This is a long document, sir, but I think my questions and your answers will be much more efficient if you read through it now and let me know when you're finished.
Would you agree that the first six paragraphs of this activity sheet

Page 261

essentially repeat or summarize what Mr. Everett said in the interview of July 7th?
A. Yes.
Q. Was that customary to rehash what was said in an interview, in an activity sheet?
A. Yes.
Q. Why was that the practice?
A. It's up to the detective. He puts on there what he thinks, it could be a summary of like two sentences or if it's pertinent information, he wants this information to get out to the assigned and the other people in the squad.
Q. It would not be overly repetitive to have it both in the statement and the activity sheet?
A. No, definitely not.
Q. The second paragraph from the bottom of the first page, there's a reference to record checks and it looks like all of the names that are reported there match up directly with the names mentioned by Mr. Everett as people possibly having spoken to Mr. Crosland; is that correct?

Page 262

A. Yes.
Q. And that's exactly what you would expect to happen, that once potential witnesses have been names, you see what you can learn about those witnesses?
A. Correct.
Q. There is a note that NCIC, PCIC checks conducted on all of the males, negative.
A. Yes.
Q. That means that there were no active warrants for those males?
A. Yes.
Q. In other words, sometimes if you do find an active warrant for a potential witness, that would give you a basis to go take that person into custody; is that right?
A. Correct.
Q. If you take them into custody, then that would give you an opportunity to ask them questions about the case; is that right?
A. Correct.
Q. Even though there were no active warrants, there was still nothing stopping you from going out to search for each of those

Page 263

people to interview; is that correct?
A. Yes.
Q. In fact, you mentioned you do multiple witness interviews every day of your career; is that correct?
A. Correct.
Q. And most of those people who you interview, you're going out on the street and trying to track them down, right?
A. Some come, it's all different.
Q. Sounds like what you would anticipate as part of what's described here in this activity sheet, these checks were done so that somebody could go locate these witnesses to bring them in for interviews, correct?
A. Right.
MR. ZURBRIGGEN: Object to form.
BY MR. FEINBERG:
Q. There's also a note here at the scene of the crime, there were two identifiable fingerprints found and one palm print found on a glass case at the counter. Memo is prepared to Familiagetti.

Page 264

A. Familiagetti.
Q. F-A-M-I-L-I-A-G-E-T-T-I.
A. First name was Gino.
Q. Who is that?
A. He is the fingerprint identifier, he was the expert.
Q. Do you know whether any examination was done on the prints?
A. I don't know.
Q. Do you recognize either of these names, sir, in connection with this investigation Stephen Gruckin, G-R-U-C-K-I-N?
A. No.
Q. How about James Atkinson, A-T-K-I-N-S-O-N?
A. No.
Q. Let's go onto the next page of the activity sheet. The first paragraph at the top of that second page notes that Louise Woods was spoken to and I am quoting here, to let her know that we had spoken to Rodney Everett.
First of all, do you remember going to speak to Louise Woods?

Page 265

A. No.
Q. Louise Woods also provided information about Michael Everett, also known as Ralph Everett, on the 1500 block of South Napa Street, correct?
A. Yes.
Q. That was Michael Everett, also known as Ralph Everett, was one of the people who Rodney Everett mentioned as maybe having information, correct?
A. Is that in the activity sheet?
Q. If you go back to the top of the first page, you see Michael Everett is in the second to last line?
A. Okay. That's his cousin. Okay.
Q. To set the scene of why people were speaking to Louise Woods, one; she has potential information on Rodney's cousin, correct?
A. Yes.
Q. Why would it be necessary or helpful -- what's the point really, of telling Louise Woods that homicide detectives had spoken to Rodney Everett?

Page 266

MR. ZURBRIGGEN: Object to form. Detective, if you know.
THE WITNESS: I have no idea.
BY MR. FEINBERG:
Q. Let's go back, sir, to the documents that I showed you marked as an exhibit, they were the handwritten notes. I will give you Exhibit P-23. Are you able to locate those?
A. Yes.
Q. The first page, these are notes which you believe to show your handwriting; is that correct?
A. I believe so.
Q. Now that we've reviewed the substance of the July 7th interview, in terms of what Mr. Everett told you and Detective Mangoni, let's see if we can piece together what any of these notes mean.
The first reference I will show you is that Mr. Everett mentioned the name Talmadge Garwood, do you recall that name?
A. Yes.
Q. As potentially having information or

Page 267

having heard from Mr. Crosland; is that correct?
A. Yes.
Q. We see your handwritten notes here or the notes that you believe to be your handwritten notes saying Talmadge Garwood and then there's an arrow to gun, correct?
A. Yes.
Q. Now that we look at this in context, do you believe that you were making handwritten notes while sitting and listening to Detective Mangoni's interview of Mr. Everett?
MR. ZURBRIGGEN: Objection to form. Detective, if you can say.
THE WITNESS: I don't know. I could have, I have no idea.
BY MR. FEINBERG:
Q. Let me show you a couple of other places where there's information that's in these notes in your handwriting that is consistent with what Mr. Everett talked about on July 7th.
A. It could be I did it, I just don't remember.

Page 268

Q. Understood. Really, let's do this. I understand I'm not going to force a memory into your head but I'm going to show you other things that are said and see if we can perhaps draw the assumption that these must have been notes that you made.
If you turn to the third page of this document, labeled City 179, the second page of notes, third sheet. There's a note, two-thirds of the way down that says check prints on scene?
A. Yes. What this is, this page here?
Q. Yes.
A. This is a things to do page.
Q. And this is, as you're sitting, whether it's watching the interview or after the interview, you're making a list of investigative tasks that you think should be conducted, based on what you discussed in that interview; is that correct?
A. Yes. This ML number here on the bottom left, that is the fingerprint number. That's from the lab. I must have looked that up. There is procedure, how you would submit

Page 269

prints for comparison. I don't want to get into it but this is what you would need.
Q. We know from the activity sheet that around this time you and/or Detective Mangoni are talking about investigative tasks to follow up on and one of them is to compare Mr. Crosland's prints to prints taken at the scene; is that correct?
A. Not only Mr. Crosland these other names were compared Lester, Michael, Curtis, Frank Turner.
Q. Ray and Frank Turner?
A. The request was made for him to make a comparison on all of those.
Q. Have you seen any documents which show that those comparisons were actually made?
MR. ZURBRIGGEN: Object to form. Detective, if you can say.
THE WITNESS: No.
BY MR. FEINBERG:
Q. Up at the top of the page, get in touch parole office 52nd and Westminster, Agent Gilhold is it?
A. Gilhold it looks like.

Page 270

Q. And Shepherd for a meeting. And then there's a phrase ADD. Do you know what that means?
A. No.
Q. The next note down, bring down Talmadge Garwood?
A. Right. And Billy Goodman.
Q. Billy Goodman, another person who is mentioned by Mr. Everett; is that correct?
A. I don't know.
Q. Do you know whether those people were brought down?
A. I don't know.
Q. The next note says re-interview witnesses in store; do you see that?
A. Yes.
Q. I showed you back at the beginning of the deposition statements from Mona Madison, Levi Davis and Maurice Durbin, do you remember those?
A. Yes.
Q. Do you know whether there were any additional interviews of those witnesses?
A. I don't know.

Page 271

Q. It seems like the idea -- strike that.
In a case where you hadn't had a suspect for many years and then all of a sudden you have a suspect, you're going to want to do an identification procedure with the eyewitnesses; is that correct?
MR. ZURBRIGGEN: Object to form. Detective, if you can say generally.
THE WITNESS: That would be the ideal thing but not necessarily.
BY MR. FEINBERG:
Q. But just as a standard matter, if you know you have eyewitnesses who have never made an ID before and you have a suspect, that's one of the first things you consider; is that correct?
MR. ZURBRIGGEN: Same objection. Detective, if you can answer generally.
THE WITNESS: If it's someone that doesn't know the doer -- but if it's somebody -- they all know each other. It's useless, they know each other.
BY MR. FEINBERG:

Page 272

Q. So let's say hypothetically you learn that Mona Madison had known Curtis Crosland for a long time.
A. Right, so you don't need an ID.
Q. Right, but one of the things you would have asked her in an interview, in this hypothetical scenario, is whether the suspect or the perpetrator resembled Mr. Crosland.
MR. ZURBRIGGEN: Same objection. Detective, in general you can answer.
THE WITNESS: You can ask her generally, yes.
BY MR. FEINBERG:
Q. Do you know whether any additional interviews were conducted with the witnesses in the store?
A. No, I don't know.
Q. The next item on your list is to compare the ballistics evidence that was found at the scene with the rifle that was connected to Mr. Myrick; is that correct?
A. Correct.
Q. Do you know whether that happened?

Page 273

A. I don't know.
Q. Do you see anymore -- let's go back to the first page. Do you see any lists or items that are things to do on that first page?
A. The only thing is I see is who is Squirt Frank Turner, Junior.
Q. Which appears to be, if you read this first page at the same time you're reading the July 7th interview, it looks like someone or you here, you're taking notes about information that 's provided by Mr. Everett; is that correct?
A. It could be.
Q. Let's go to the page marked City-181. Is that an additional list of things to do or additional items for your list of things to do?
A. Yes.
Q. The first item on the list underneath the artistic work stating Rockman is bring Talmadge, who is Talmadge Garwood, right?
MR. ZURBRIGGEN: Object to form. Detective, if you can tell.
THE WITNESS: That's what it

Page 274

say, bring Talmadge.
BY MR. FEINBERG:
Q. And talk to the D.A. on the gun arrest, which in context suggested Mr. Garwood had a gun arrest and you wanted to speak to the D.A. on that case; is that correct?
A. Yes.
Q. Can you read the next line where it appears to be Kevin, can you tell what comes after that?
A. Kevin, brother-in-law, C-O-M-M.
Q. Then is it Marsden Street --
A. Marsden, yes, in South Philly. M-A-R-S-D-E-N.
Q. You know what that's in reference to?
A. No, it might be where this Kevin lives. It's right next to Kevin.
Q. The next reference is to Billy Goodman who we discussed was -- D/C, does that mean deceased?
A. It means Detention Center.
Q. Right. So Billy Goodman is a witness who you might want to bring in; is that right?
A. Right, says he's a white male.

Page 275

Q. And then there's another reference to re-interview guy in store, check prints. What do you say after that?
A. Check prints on scene.
Q. Got it. Another reference to Lester and a nickname Geizel, G-E-I-Z-E-L; is that correct?
A. That's what it says.
Q. Can you tell what this list is suggesting regarding Lester?
A. No.
Q. And then there's a reference once again to comparing the ballistics evidence to the rifle that was connected to Mr. Myrick; is that right?
A. Yes.
Q. Flip over two more pages. Is it still your handwriting?
A. Yes.
Q. Once again, would you agree that this looks like information that was obtained from Mr. Everett during his interview?
MR. ZURBRIGGEN: Object to form. Detective, if you can tell.

Page 276

THE WITNESS: You know what, I'm not sure. The top is my handwriting. Trina Patton just had Squirt's baby, who is she. This is not my handwriting. Anything under that line that's drawn there is somebody else.
BY MR. FEINBERG:
Q. John Lamb, fought Curtis --
A. Yes, that's not me.
Q. Can't tell whose handwriting that is; is that correct?
A. It's whoever does the art work.
Q. Sounds like you worked with Detective Mangoni quite a bit across different cases. Did you know him to be an artistic doodler like this?
A. No.
Q. When you were taking notes in an interview, did you have a standard type of paper you used, like a steno pad or plain white sheets of paper?
A. I didn't usually take notes during an interview. I used interview forms. Actually, I was thinking about that, where these papers

came from, plain white papers. Everything we used was usually on a form.
Q. Did you ever write on the back of an interview form?
A. Interviews are both sides.
Q. Double-sided lined paper?
A. Yes.
Q. Let's look at the final page with the note to Nespoli. So the handwritten note there says Nespoli, the name Crosslan, C-R-O-S-S-L-A-N, misspelled as to Curtis Crosland, comes up on your job at 27th and Oakford. Do you know whose handwriting that is?
A. No, but this paper here, it must have been written in the beginning of the investigation when Nespoli still had it. Because when this other investigation happened, he was out of it by then.
Q. Meaning -- so once Mangoni, Hughes, Cimino and McNesby get involved, Nespoli is not involved.
A. He's involved because he's the assigned, like I said, he's always the assigned. But



what I'm saying, if this information came in, when it first happened, it would go to Nespoli. If information came in years later, it would go to Cimino, McNesby, whatever.
Q. Even though none of them had been officially designated as the assigned?
A. Yes.
Q. You can put those notes to the side. We talked at the beginning of the deposition about the fact that Mr. Everett recanted all of his statements in which he suggested that Curtis Crosland confessed to the crime. You're aware of that; is that correct?
A. Yes.
Q. Let me show you the first time he did that to see if you recall learning about it. This is in Exhibit P-28.
- - -
(Whereupon Exhibit P-28 was marked for identification.)
- - -
BY MR. FEINBERG:
Q. Sir, I will hand this to you. This document does not appear to be dated but I



will note for you that -- I will represent to you that in other sources this statement is indicated as having been prepared on February 1st, 1989. About two years after -- close to two years after you spoke to him.
Take a look through it and let me know when you're finished. The date does appear on the second line. I misspoke.
A. I have no idea of this. I never saw it before.
Q. Have you finished reading it?
A. No.
Q. I will save some time for you, sir, about halfway down on the first page the text reads as follows: The statement which I made was fictitious and made from memory from reading the newspapers and seeing on the news. Then I named Curtis Crosland as the central figure. Do you see that?
A. No. Is that on page one?
Q. Yes.
A. How far down.
Q. Do you see that?
A. Yes, I do.



Q. You said you've never seen this statement before; is that correct?
A. That's correct.
Q. And you don't recall ever being made aware of this information; is that right?
A. Correct.
Q. Your also aware from having reviewed the July 7th '87 statement -- or the interview that you joined with Detective Mangoni, that Mr. Crosland -- let me start that over.
From review of the July 7th, 1987 interview, you know that Mr. Everett claimed that Mr. Crosland confessed to two different murders; is that correct? Or confessed involvement in two different murders, agreed?
MR. ZURBRIGGEN: Objection to form.
THE WITNESS: No.
BY MR. FEINBERG:
Q. The first was the Heo murder?
A. Right.
Q. The second was the John Lamb murder, where Crosland gave, according to Everett,

Crosland had gotten into a fight with John Lamb --
A. Yes.
Q. And then John Lamb got shot?
A. Right, it didn't say he was the doer.
Q. Let me represent to you that Mr. Crosland was later prosecuted for the John Lamb murder and then charges against him were discharged at the preliminary hearing. Were you aware of any of that?
A. No.
Q. I'll just make that representation to you. I'm going to show you literally one-page in this testimony or two pages about the John Lamb murder. This is Exhibit P-29.

- - -

(Whereupon Exhibit P-29 was marked for identification.)

- - -

BY MR. FEINBERG:
Q. Just hold onto it. Give me 20 seconds to get situated and I will give you the page reference. First, let me set the stage. I represented to you that Mr. Crosland was



prosecuted in the John Lamb murder and he was prosecuted along with Frank Turner. You have seen reference to him, his nickname is Squirt, right?
A. Yes.
Q. Mr. Turner went to trial and was accused of killing John Lamb. And one of the witnesses who testified at that trial was Rodney Everett, who we've talked about at length today. This transcript that I've handed to you includes Mr. Everett's testimony from that trial. Just to be clear, separate trial, not the Heo case. Different defendant, Mr. Frank Turner, not Curtis Crosland.

Turn please to page 8425. Down at the bottom of the page, line 19: By the way, sir, I know you weren't at this trial so I'm trying to expedite this and show you as little as possible to get you to answer my question. If you need to review more, you should tell me and I'll give you the time.

Line 19, the court in the middle of trial intervenes and asks Mr. Everett, the question was: Is it true that



Squirt, the defendant, Frank Turner, tell you or told you that you -- that you testified at the preliminary hearing? Witness, no, Squirt did not tell me that.

If you go back and read further back, you will see that the question was whether -- Mr. Everett claimed that Squirt, Mr. Turner had admitted to the John Lamb murder. Do you follow what I've said?
A. Yes.
Q. Would you agree that here, based on this testimony, Mr. Everett is recanting his testimony against Frank Turner?
A. Yes.
Q. The next one I will show you concerns Mr. Crosland. That's at 8429. Tell me when you're there, sir?
A. Yes.
Q. Line 14, Mr. Everett is being asked by the prosecutor, who at this point is Arlene Fisk, I assume you know Ms. Fisk?
A. I do.
Q. Ms. Fisk asks: When you stated at the preliminary hearing that you had spoken to



Curtis Crosland about this shooting, that was also a lie? Answer, yes. Do you see that?
A. Yes.
Q. Now that I've shown you these documents, can we agree that when Mr. Everett testified under oath at the Frank Turner trial, he recanted any inculpatory information he gave, both against Frank Turner and Curtis Crosland?
A. Yes.
Q. Do you recall learning about those facts at any point in that time period?
A. No.
Q. Is that at all surprising to you?

MR. ZURBRIGGEN: Objection to form. Detective, if you can --

THE WITNESS: Nothing surprises me.

BY MR. FEINBERG:
Q. Concerning Mr. Everett, once again we talked about the fact that he had consulted newspapers about the Heo case, right?
A. Right.
Q. He had failed the polygraph, right?
A. Right.

Page 285

Q. He had given only minimal surface level information, correct?
A. Yeah.
MR. ZURBRIGGEN: Objection to form.
BY MR. FEINBERG:
Q. He wanted a deal; is that correct?
MR. ZURBRIGGEN: Object to form.
THE WITNESS: Yes.
BY MR. FEINBERG:
Q. Those were all potential factors which would give you reason to question his credibility; is that correct?
MR. ZURBRIGGEN: Object to form.
THE WITNESS: Yes.
BY MR. FEINBERG:
Q. I am going to change topics and ask what I think was your least involvement in this case. Can I have Tab 37. This will be Exhibit P-30.
- - -
(Whereupon Exhibit P-30 was

Page 286

marked for identification.)
- - -
BY MR. FEINBERG:
Q. As you're reviewing that, sir, can you confirm that this is an activity sheet that you prepared?
A. I did not prepare it.
Q. How do you know that?
A. In the center there, on the right-hand side it says: Detective Rocks went to this location. I would never use my own name like that, I would say I.
Q. Can you tell who prepared this then?
A. No, I can't. Let me read it.
Q. Sure, take a moment to read it and then I'll ask you some follow-up questions.
A. I read it.
Q. Now that you read it, can you tell whether you prepared it?
A. I did not.
Q. You're saying that with certainty, why is that?
MR. ZURBRIGGEN: Objection to form. Detective, if you can --

Page 287

THE WITNESS: Number one, I can tell my typing. And as I said, the sentence starts out: Detective Rocks did this, did that.
BY MR. FEINBERG:
Q. How would we find out who wrote this activity sheet?
A. You probably never will.
Q. Okay. Is there -- can you identify any process -- strike that.
Back up. It sounds like what you're saying, back up even further. Do you dispute the fact that you went to speak with Louise Woods on July 25th, 1987?
MR. ZURBRIGGEN: Object to form. Detective, if you can recall.
THE WITNESS: That's what this says but I don't recall doing it.
BY MR. FEINBERG:
Q. If someone reported that you went to go see Louise Woods on July 25th, 1987, you would expect that to be true, correct?
A. It doesn't say went to see her, it says contacted her, it could be by phone.

Page 288

Q. That's one of my questions, whether you would speak to her by phone or whether you went to see her. Let's back up.
The address that Ms. Woods lives at, 1533 South Napa, is that right around the corner from where the old Tasker Homes Projects were?
A. I'm not sure. I don't know.
Q. Are you familiar with Tasker Homes?
A. Not now, I was at the time.
Q. My understanding is that Tasker Homes was a former Philadelphia Housing Authority development that was in South Philly, just east of Grays Ferry Avenue which would have been renovated in the 90s at some point. Any reason to dispute that?
A. No, I just don't recall the exact address where it's located.
Q. My understanding is that 1533 Napa is pretty close by to where that development was located. If you accept that representation and if this suggests that Detective Rocks went to that location and conducted a surveillance, that location meaning 1804-C Patton Drive,

Page 289

that would suggest that you were in the neighborhood, right?
A. Yes.
Q. Which would also suggest that you went and spoke to Louise Woods in person; is that correct?
A. I don't know.
Q. Let's back up and talk about the genesis of this activity sheet.
Would that ever happen that you prepared an activity sheet to describe another officer's actions in an investigation?
A. Yes.
Q. How would you write out that activity sheet?
A. Pretty much the way this is but just putting the other person's name in it, the other detective that did the activity.
Q. Would you put your name anywhere on the activity sheet to indicate that you were the person who authored the activity sheet?
A. No. Let me clear that up a little bit. If I did an activity sheet like all of the other ones you saw, the name of the detective

Page 290

or detectives would be in the upper right-hand side. If you look at the other activity sheets, you could see that. Somebody forgot to do it on this one.
Q. So whoever was writing this activity sheet out didn't put their name on it?
A. Correct.
Q. Would you expect that whoever wrote this activity sheet would have done so based on a contemporaneous report from you about your investigative actions.
MR. ZURBRIGGEN: Object to form. Detective, to the extent you can say generally.
THE WITNESS: Generally.
BY MR. FEINBERG:
Q. By the way, in your practice, let's do the reverse of this situation, where you're recording someone else's action, you would have expected that detectives for whom you were writing the activity sheet to tell you, here's what I did and here is when I did it, right?
A. Right.

Page 291

Q. And you would expect them to tell you pretty close in time to when it happened, right?
A. Yes.
Q. In fact, you would expect on the same shift, right?
MR. ZURBRIGGEN: Objection. Detective --
THE WITNESS: I don't know.
BY MR. FEINBERG:
Q. Same shift, next day, something like that, right? Is that a yes?
A. Yes.
Q. Can I assume that the more time -- strike that.
As a general matter, when you wrote out reports, whether they're activity sheets or any other documents, you try to do it as close in time as possible; is that correct?
A. Yes.
Q. Because at that point your memory was fresh, right?
A. Yes.

Page 292

Q. If you didn't do it right away, then other things would interfere and you might not ever get to it, right? Correct?
A. Yeah. That's a lot of generalizing.
Q. I am just trying to get your general practice, right, because the question I want to ask you is whether you would assume that whoever wrote this report about things that you did would have done it close in time to when it happened.
MR. ZURBRIGGEN: Object to form. Detective, if you know.
THE WITNESS: I don't know.
BY MR. FEINBERG:
Q. Let's talk about the substance. I know you don't recall but you would assume that this is based on your report that you spoke to Louise Woods, either in person or on the phone; is that correct?
A. Correct.
Q. Do you know why or can you -- I'm going to ask you to speculate. Can you speculate on why you would have gone to speak to Louise Woods after your interview of Rodney Everett?

MR. ZURBRIGGEN: Objection to form. Detective, if you know.
THE WITNESS: No, I don't know.
BY MR. FEINBERG:
Q. There's a note here that Everett is getting information to detectives in the Heo case, right?
A. Yes.
Q. In fact, up at the top of the form, there's a reference to the decedent, Il Man Heo, it's just the first two letters of his first name, correct?
A. Yes.
Q. There's a reference to the homicide number, 84-275, correct?
A. Yes.
Q. And the assigned is Detective Nespoli, right?
A. Yes.
Q. We're talking about that case, right?
A. Yes.
Q. Louise Woods, according to this document, stated that Everett called her from



prison and he told her that Frank Turner, the alleged shooter in the Heo case was staying in the Tasker Homes and then there's an address, agreed?
A. Yes.
Q. So this activity sheet is communicating that Mr. Everett reported to Louise Woods that Frank Turner was the shooter; is that correct?
A. Correct.
Q. Which is different from what Everett said before; is that correct?
A. Correct.
Q. On April 15th of 1987, Everett said that Mr. Crosland committed the murder or confessed to the murder; is that correct?
A. Yes.
Q. On April 21st of '87, Everett said that Crosland confessed to the murder; is that correct?
A. Yes.
Q. On July 7th, Everett said that Crosland admitted to the murder; is that correct?
A. Yes.
Q. This is the first time throughout the



investigation so far as you've seen, that Everett identified Frank Turner as the shooter; is that correct?
A. This is what she's saying.
Q. Got it. This is the first evidence that you have that Everett has identified a different shooter; is that correct?
MR. ZURBRIGGEN: Object to form. Based on what you reviewed, Detective, you can answer.
THE WITNESS: This is just what she's saying Everett said. It's like double hearsay.
BY MR. FEINBERG:
Q. I understand. Wouldn't you agree that if she is saying that, that would call for a follow-up discussion with Rodney Everett?
MR. ZURBRIGGEN: Objection to form. Detective, you can answer, to the extent you know.
THE WITNESS: I guess so. If I was the assigned I may do that, if I believed her.
BY MR. FEINBERG:



Q. If you had --
A. In looking at this, I think this might be a typo, that the wrong name was put down on this sheet.
Q. You're saying it's a typo, sir, but we're talking about a document that is in the Heo file with a Heo number, with a Heo assigned with reference to the Heo murder.
A. Right.
Q. That would be a pretty significant error, wouldn't it?
MR. ZURBRIGGEN: Objection to form. Detective, if you know.
THE WITNESS: Yeah, that would be an error, definitely be an error.
BY MR. FEINBERG:
Q. Isn't it more likely -- strike that.
In any event, this activity sheet at a minimum provides you with information which raises questions about Everett's credibility; is that correct?
MR. ZURBRIGGEN: Object to the form. Detective, if you know.
THE WITNESS: No.

BY MR. FEINBERG:
Q. If Everett is talking to his girlfriend and saying, let's assume the truth about what Louise Woods says as an inconsistency on Everett's part; is that correct?
MR. ZURBRIGGEN: Object to form. Detective, if you can know.
THE WITNESS: If we're saying that she's telling the truth?
BY MR. FEINBERG:
Q. Yes.
A. Yeah.
Q. Because if she is telling the truth, Everett is now naming a different person as the shooter in the Heo case, correct?
A. That's correct.
Q. If she is in fact telling the truth, that is yet another reason to question Rodney Everett's credibility in terms of what he says about the Heo murder, correct?
MR. ZURBRIGGEN: Object to form. Detective, if you can say.
THE WITNESS: The first thing I would do is re-interview her, Louise Woods.



BY MR. FEINBERG:
Q. Interview her in a formal question and answer interview, right?
A. Yes.
Q. It sounds like this is information that Louise Woods is either giving over the phone or in an interview on her doorstep or in her living room, right?
A. Right.
Q. If that's the case and she's providing information that shows a potential inconsistency in the critical witness in the Heo case, you want to know more about that, right?
MR. ZURBRIGGEN: Objection to form. Detective, you can say, if you know.
THE WITNESS: That would be me, just say I typed this up, me getting this information, giving it to the assigned or the supervisors handling it, and they would make the decision on what to do, who to re-interview, who to interview.
BY MR. FEINBERG:
Q. Two possibilities. It sounds like



you've identified two possibilities for follow up. One is, bring Louise Woods in the homicide division for a formal interview; is that correct?
A. Yes.
Q. You would ask her -- you would expect her to be asked a series of questions about her conversations with Rodney Everett; is that correct?
A. Yes.
Q. The other possibility is to bring Rodney Everett in for yet another interview, a fourth interview, asking whether he is changing his account of who is responsible for the Heo murder?
A. Yes, and straighten that out.
Q. Did either of those things happen?
A. I have no idea.
Q. That's something that you would expect, based on your vast experience as a homicide detective, you would expect that to happen in this investigation?
MR. ZURBRIGGEN: Objection to form. Detective, you can say, if you can.



THE WITNESS: I would have done that. But I can't say it wasn't done.
BY MR. FEINBERG:
Q. If anyone were to do it, you would expect the detectives who at that point were more involved in the investigation to be the ones who had done it, right?
MR. ZURBRIGGEN: Objection to form. Detective, you can answer, if you know.
THE WITNESS: It would be whoever the supervisor sent out to do it, assigned them to do that.
BY MR. FEINBERG:
Q. I know you were never a supervisor in the homicides division, right?
A. No.
Q. I assume though over time you developed an understanding for typical practices and the way things worked in the homicide division?
A. Yes.
Q. If Mangoni is the guy who has interviewed not once, not twice but three times, if there needed to be a fourth interview, would you expect that he would be

Page 301

the one to go do it?
MR. ZURBRIGGEN: Objection to form. If you can say, Detective.
THE WITNESS: No, it could be anybody who is assigned to do it.
BY MR. FEINBERG:
Q. Bottom line, regardless of who does the interview, if you're the assigned detective or you're the one making the decisions, you're going to go interview both Louise Woods and/or Rodney Everett to clear this up; is that correct?
A. Yes.
MR. ZURBRIGGEN: Objection.
BY MR. FEINBERG:
Q. By the way, if that interview didn't happen and this activity sheet were the only evidence of Louise Woods' statement suggesting that Everett identified Frank Turner, you would expect this information to be provided to the District Attorney's Office, right?
A. Yes, it would be in the envelope with the activity sheets.
Q. Because at a minimum, this is evidence

Page 302

of an inconsistent -- whether it's conclusive or not, it's evidence of an inconsistent statement made by Rodney Everett; is that correct?
A. Yes.
MR. ZURBRIGGEN: Object to form.
BY MR. FEINBERG:
Q. Evidence about an inconsistent statement is evidence that is relevant to Rodney Everett's credibility as a witness; is that correct?
MR. ZURBRIGGEN: Same objection.
THE WITNESS: Yes. That has to get straightened out. If there is a discrepancy in any of the homicide cases, that has to be ironed out. Get to the truth. Get to the truth.
BY MR. FEINBERG:
Q. I guess -- let me say this, I will represent to you and if I am wrong about this counsel will certainly tell me, I have not seen in the 12,000 pages of documents that

Page 303

I've looked at, any further interviews with Louise Woods or any follow-up interview with Rodney Everett addressing this inconsistency. I'll make that representation to you.
What you told me is that if it was you making the decision, you would have done those follow-up interviews, correct?
A. Yes.
MR. ZURBRIGGEN: Same objection.
BY MR. FEINBERG:
Q. In the alternative scenario that I've described to you, which I believe to be the real scenario where those interviews did not happen, you agree that information about this inconsistency should be provided to the D.A.'s office, correct?
MR. ZURBRIGGEN: Objection to form. Detective, you can answer.
THE WITNESS: Yes, you're assuming it didn't happen.
BY MR. FEINBERG:
Q. I am assuming that because based on however many hours I spent looking at

Page 304

documents, I don't see any evidence of it happening.
A. That doesn't mean it didn't happen.
Q. Let's address that like this, sir, if it did happen, if Louise Woods was interviewed about this glaring inconsistency, you would expect that interview to be documented somehow; is that correct?
MR. ZURBRIGGEN: Object to form.
THE WITNESS: Yes.
BY MR. FEINBERG:
Q. In an activity sheet?
A. Yes.
Q. Or in an interview record; is that correct?
A. Yes. Or both.
Q. If Rodney Everett was interviewed about this inconsistency in which he identifies Frank Turner as the shooter of Il Man Heo, you would expect that interview to be documented in an activity sheet, right?
A. And an interview.
Q. And you would expect those documents to

Page 305

be made part of the homicide file, correct?
A. Yes, that's correct.
Q. And then to be disclosed to the District Attorney's Office, correct?
A. Yes.
Q. Just to wrap this up, if that didn't happen, this activity sheet, Exhibit P-30 is what you would expect to be transmitted to the D.A.'s office; is that correct?
A. Yes.
Q. And then in turn to defense counsel; is that correct?
A. Right.
MR. ZURBRIGGEN: Object to form. To the extent you know, Detective.
THE WITNESS: I will generalize, what if the district attorney assigned to this case, she or he reads the whole thing, that would stick out and she would clarify that before the trial happened.
BY MR. FEINBERG:
Q. You would expect that, right?
A. Yes, I would expect that. If it slipped past the detectives, she would pick it up in

Page 306

the D.A.'s office prior to trial.
Q. By the same token, at the risk of hypothesizing even more, if the district attorney did not seek to -- I'm sorry, before I seen ask that, I take it you worked with a lot of homicide D.A.'s over the course of your career, right?
A. Yes.
Q. Those homicide D.A.'s tended to be the best D.A.'s in the office, right?
A. Yes, sir.
MR. ZURBRIGGEN: Objection to form.
BY MR. FEINBERG:
Q. You needed to be really good at your job in order to be promoted from a majors D.A. or a felony waiver D.A. to the homicide division, right?
A. Yes.
Q. Those lawyers, in your judgement, tended to be the most competent; is that correct?
A. Yes.
Q. You would expect them --
A. Not always.

Page 307

Q. We can talk about other cases maybe after we finish this deposition. But you would expect in those cases that if D.A.'s, those most competent D.A.'s in the homicide division observed an inconsistency like this, they would have jumped all over it and tried to figure out what was going on; is that correct?
A. Yes.
Q. If a D.A. did not do that, does that suggest to you that the D.A. did not have this information at their disposal?
MR. ZURBRIGGEN: Objection to form. Detective, to the extent you can say.
THE WITNESS: I can't answer that.
BY MR. FEINBERG:
Q. You would expect if Judge Shelley Robins New got this document and saw an inconsistency with her main witness at trial, Rodney Everett, she would try to figure out what was going on; is that correct?
A. Yes.
MR. ZURBRIGGEN: Same

Page 308

objection.
BY MR. FEINBERG:
Q. You would certainly expect that she would alert defense counsel to the fact that Everett had said something inconsistent on a previous interaction with his girlfriend, which was explained to a detective?
A. I don't know what her duty is to notify defense counsel.
MR. ZURBRIGGEN: Same objection.
BY MR. FEINBERG:
Q. Fair enough. Let me ask you about some additional elements on this activity sheet. Down toward the bottom, halfway down, Detective Rocks had prior information that Turner had a girlfriend named Trina; do you see that?
A. Yes, I do.
Q. Do you know where you got that information?
A. No, I don't.
Q. It looks like what you do -- can we assume from the end of this activity sheet

Page 309

that you are trying to locate Trina in order to locate Frank Turner; is that correct?

MR. ZURBRIGGEN: Objection to form. Detective, to the extent you can tell.

THE WITNESS: I was trying to locate Trina.

BY MR. FEINBERG:

Q. It sounds like Trina's relevance to this investigation was her connection to Frank Turner; is that correct?

A. Yes.

Q. And when you marry everything together, the fact that Everett is telling Woods about Frank Turner, you want to try to locate Frank Turner; is that correct?

A. I want to locate Trina to tell me about Frank Turner, what she knows, before I talk to Frank Turner.

Q. Fair enough.

MR. FEINBERG: Let's go off the record.

VIDEOTAPE OPERATOR: Going off the record, the time is 3:33.

Back on, 3:46.

Page 310

BY MR. FEINBERG:

Q. Detective Rocks, we're now back on the record after a short break. We're now back on the record. Did you realize during that previous break that any of your previous testimony was incorrect or incomplete?

A. No.

Q. We have talked at length about the Heo murder investigation and we also have touched a little bit on the John Lamb murder investigation. And I told you that Mr. Crosland was arrested and we also talked about Frank Turner being arrested and tried in that case; do you recall that?

A. Yes.

Q. I'm going to show you a document now. I apologize, this text is a little small. Exhibit P-31.

- - -

(Whereupon Exhibit P-31 was marked for identification.)

- - -

BY MR. FEINBERG:

Q. I'll represent to you, sir, that this is

Page 311

an activity sheet that was pulled out of the John Lamb homicide file. It's a different case from Heo, a different timeframe and so on.

I want to reference for you the bottom paragraph of this activity sheet. Would it be helpful for me to read it to you since the text is so small.

A. Can you put it on a machine and blow it up.

Q. I could but let's do this. I want to ask you literally about one sentence. So I'll read it and let's see if that works.

I'll read the entire paragraph to you and then I'll focus in on the sentence that's relevant.

The first paragraph references two detectives Cimino and McNesby who we've talked. Then there's a note, 11/3/87, same detectives, referring to Cimino and McNesby in company with other detectives from SIC. I'll stop. What is SIC?

A. It's SIU, it's a typo.

Q. Went to 2414 Federal Street and took

Page 312

Curtis Crosland into custody, and there's reference to another defendant, also Mr. Turner, and the last sentence which I want to focus on says: Defendant Curtis Crosland did make an inculpatory statement admitting not only his participation but also the roles played by both Frank and Lester Turner.

My question for you is, do you recall ever seeing a statement made by Curtis Crosland in connection with this case?

A. I never saw it. I never would.

Q. By the way, we have confirmed with reference to SIC instead of SIU, that Cimino and McNesby were part of that unit; is that correct?

A. Yes.

Q. Based on everything we've seen, your participation in this investigation suggests that you were also in SIU at this timeframe; is that correct?

A. I may have been. Do we have the whole activity sheet with this?

Q. I will represent to you that in the file that has been presented to us, this is the

Page 313

only portion of this activity sheet that we see.
A. We don't even know if it's an activity sheet.
Q. That's a fair point. I am calling it an activity sheet because it looks like a continuation page of a lot of activity sheets. Would you agree with that?
A. No.
Q. Have you ever seen a note that looks like this before?
A. No.
Q. Let me pull up the electronic version of the document I have and see if we can shed some light on this.
Sir, I am going to turn my computer screen and show you what I have.
A. That's the same as this.
Q. Right, that's all I have and that's what was provided to me by the City Law Department. What you're suggesting is that you would expect there to be another piece of paper or another document attached to it.
A. You can't leave it saying there's an

Page 314

inculpatory statement and not say what it is.
Q. In other words, this document appears to be incomplete to you; is that correct?
A. Correct. That should be in the notes of testimony. That's an important fact -- in Cimino's testimony or McNesby's testimony.
Q. We'll explore that, sir.
A. Put that on the things to do list.
Q. I am going to hand you two documents at the same time, sir. The first is an activity sheet which we will label P-32. Take a moment to read it after I hand it to you. I am also going to hand you this arrest report, which we'll label P-33.
A. Okay.

\- - -

(Whereupon Exhibit P-32 and P-33 were marked for identification.)

\- - -

BY MR. FEINBERG:
Q. Have you looked at both of these documents, sir?
A. Yes.
Q. P-32, the activity sheet, there's a

Page 315

discussion of Detective Cimino meeting with two members of the D.A.'s office, Mr. Rosen and Ms. Christie, C-H-R-I-S-T-I-E. Can you derive from that discussion that Detective Cimino was running this investigation for the homicide division at this point?
MR. ZURBRIGGEN: Object to form. Detective, if you can tell.
THE WITNESS: I would say yes, two reasons. He meets with Rosen and Christie and he also prepares the probable cause affidavit.
BY MR. FEINBERG:
Q. So he's not technically the assigned but he is kind of the de facto assigned in this case?
A. I'm just making my assumption on those two facts.
Q. Cimino and McNesby, by the way, were long time partners; is that right?
A. Yes, they were.
Q. Typically handled investigations together?
A. Yes.

Page 316

Q. Cimino is deceased so we can't ask him about this. Would you expect that Detective McNesby would have the same base of information as Detective Cimino?
MR. ZURBRIGGEN: Object to the form. Detective, if you know.
THE WITNESS: I would say no.
BY MR. FEINBERG:
Q. Why is that?
A. He is older. From what I hear -- he is old. I don't know if his health is that good.
Q. How old is he, do you know?
A. I would say he's close to 80.
Q. Flip over to 33 which you have in front of you, that's the arrest report. Can you tell who prepared this document?
A. Probably me.
Q. Why do you say that?
A. Because under arresting officer, my name is first.
Q. So you would put your name first in addition -- because you were the one who was involved in the arrest; is that correct?
A. Because I am the one that typed up this

Page 317

paperwork.
Q. That was a bad question. This arrest report suggests that you and Detective Mangoni were the ones who took Mr. Crosland into custody on this case; is that correct?
A. No, it's not.
Q. Let me not make assumptions. What happened with this arrest?
A. I don't know. First of all, I don't remember anything. But typically what would happen is, if Cimino and McNesby had the affidavit and the warrant, they would go out and make the arrest. The rest of the squad would go with them, not the whole squad but enough to cover what they're going to do. Get him shipped into homicide. And a lot of times if they were busy doing other things, other members of the squad would type the arrest paperwork for them. Obviously I typed this up.
Q. Based on what we know from the activity sheet, two activity sheets ago, P-31, this document, the small text regarding the arrest of Mr. Crosland on the Lamb case, we know Mr.

Page 318

Crosland was taken into custody on November 3rd of '87, correct?
A. If you say so.
Q. I would assume that if he was charged with a murder, he wouldn't be released on bail?
A. Yes.
Q. So then if he's in custody as of December 9th or 10th of '87, when a new warrant is issued for an arrest in a different case, it would be a matter of getting him from the Philadelphia prisons and bringing him into homicide; is that correct?
A. Yes.
Q. Does it look like that's what happened in this case?
MR. ZURBRIGGEN: Object to form. Detective, if you can tell based on the report.
THE WITNESS: Yes. I would say he was brought down somewhere and charged.
BY MR. FEINBERG:
Q. In fact, we know from P-32 that McNesby obtained a bring down for Mr. Crosland for

Page 319

December 10th, right?
A. Right, and you can tell by -- it says the exact location of arrest, room 104 PAB, homicide division. That means he was arrested inside the homicide division.
Q. If someone is arrested inside the homicide division, that's literally just informing him of the fact that he's being charged for a new case; is that correct?
A. Yes, and seeing if he wants to make a statement.
Q. Thank you for raising that. I don't see any reference here in this document to any questions or requests for an interview.
Would you typically note that on a report like this?
A. In this case here he was in custody already. So he was represented. So you had to go through his attorney, even though it's a new charge, he is represented.
Q. So if there was any request for an interview, you would expect that request to have been communicated through Mr. Crosland's lawyer?

Page 320

A. Yes, that's correct.
Q. I haven't seen any documentation of any type of communication. Do you know whether that happened?
A. You would have to check with his lawyer, I guess. No matter what, the lawyer is not going to let him make a statement. So that's the end of that.
Q. You never know, sir. In any event, do you recall any interactions with Curtis Crosland during this arrest?
A. No.
Q. I want to show you one final exhibit. I am going to give you in just a moment here, sir, what looks like the fourth interview that was conducted with Rodney Everett. I'll mark this as Exhibit P-34.
\- - -
(Whereupon Exhibit P-34 was marked for identification.)
\- - -
BY MR. FEINBERG:
Q. As I do this though, let me just remind you that when we discussed the activity sheet

concerning your apparent interaction with Louise Woods, and the record will speak for itself, but your reaction to that was, you would have expected another follow-up interview either with Louise Woods or Rodney Everett, correct?
A. Yes.
MR. ZURBRIGGEN: Objection.
BY MR. FEINBERG:
Q. I will hand you Exhibit P-34. Note that this appears to be an interview conducted solely by Mr. Detective Mangoni with Mr. Everett on January 26th of 1988.
A. Yes.
Q. Let me as you -- why don't you read the whole document and then I will ask you some questions about it.
Had you seen this document before, sir?
A. No.
Q. A little while ago you told me that if you were leading the investigation or if you were asked to pursue it, you would have wanted to ask Rodney Everett about his conversations



with Louise Woods about the Heo murder, correct?
A. Yes.
Q. We know Detective Mangoni appears to conduct this additional interview with Rodney Everett in January of 1988, correct?
A. Yes.
Q. It looks like this interview focuses just on the David Jennings murder and Eugene Myrick's potential involvement; is that correct?
A. Yes, there was a specific reason why he took this. He took it in the D.A.'s office, which is very unusual. So there must have been a D.A. asking him to do this.
Q. Can we agree that Detective Mangoni did not ask Mr. Everett about that conversation with Louise Woods?
MR. ZURBRIGGEN: Object to form. Detective, if you can answer.
THE WITNESS: Yes.
BY MR. FEINBERG:
Q. Do you have any idea one way or the other -- strike that.



Do you know why Detective Mangoni did not ask Mr. Everett about the conversation with Louise Woods on the Heo murder?
MR. ZURBRIGGEN: Same objection.
THE WITNESS: Like I just said, this is a specific interview in the D.A.'s office, probably requested by a D.A.
BY MR. FEINBERG:
Q. Bottom line, even putting this interview aside, you don't know one way or the other what Detective Mangoni did regarding Mr. Everett and that discussion with Louise Woods?
A. No.
MR. FEINBERG: Detective, I don't have any further questions for you.
MR. ZURBRIGGEN: I have none.
VIDEOTAPE OPERATOR: The deposition concluded at 4:03.
COURT REPORTER: Counsel, would you like a copy of the transcript?
MR. ZURBRIGGEN: Yes, please.
MR. DeROSE: Yes.



Read your deposition over carefully. It is your right to read your deposition and make changes in form or substance. You should assign a reason in the appropriate column on the errata sheet for any change made. After making any change in form or substance which has been noted on the following errata sheet along with the reason for any change, sign your name on the errata sheet and date it. Then sign your deposition at the end of your testimony in the space provided. You are signing it subject to the changes you have made in the errata sheet, which will be attached to the deposition before filing. You must sign it in front of a witness. Have the witness sign in the space provided. The witness need not be a notary public. Any competent adult may witness your signature. Return the original errata sheet & transcript to deposing attorney, (attorney asking questions) promptly. Court rules require filing within 30 days after you receive the deposition. Thank you.

Page 325

C E R T I F I C A T E

\- - -

I, Jeannine Cancelliere, Court Reporter and Notary Public and for Philadelphia, Pennsylvania, do hereby certify that the foregoing testimony of EDWARD ROCKS, was taken before me at 718 Arch Street, Philadelphia, Pennsylvania on November 6, 2023; that the foregoing testimony was taken by me in shorthand by myself and reduced to typing under my direction and control, that the foregoing pages contain a true and correct transcription of all of the testimony of said witness.

.............

JEANNINE CANCELLIERE
Notary Public
My commission expires
October 13, 2027

Page 326

I have read the foregoing deposition and the answers given by me are true and correct, to the best of my knowledge and belief.

............................

EDWARD ROCKS

Witness to signature

Address

My Commission expires
.............

Page 327

ERRATA SHEET

| PAGE | LINE # | CHANGE | REASON THEREFORE |
| --- | --- | --- | --- |

**A**

**A-R-T-H-E-R** 144:8
**A-T-K-I-N-S-...** 264:15
**a.m** 1:12
**able** 48:12 49:6 77:23 99:2 101:5 125:7,17 138:7 186:24 248:22 266:8
**absence** 91:17
**abusing** 258:19
**accept** 33:9 210:24 211:17 288:21
**acceptable** 125:5
**accepted** 147:4
**access** 116:13 212:24 213:5
**accommodate** 10:10
**account** 299:14
**accurate** 10:19 24:17 71:11 116:19 153:16 190:4 202:7
**accurately** 161:14 190:8
**accused** 101:19 282:6
**acknowledge--** 153:12
**acquitted** 62:11
**act** 41:11 57:5 57:11
**acted** 165:20
**acting** 74:9
**action** 1:4 290:19
**actions** 289:12 290:11
**active** 262:10,14 262:22
**activities** 80:23
**activity** 3:17,24 4:5,13,19,20 4:21 13:4 14:7 14:10,11,21 48:8 77:21 78:7 83:17,21 114:11 115:14 115:19 116:5 116:18 117:7 117:16 118:3,4 119:4,10,21 120:3,5,16,22 121:1,16 122:2 122:14 137:10 141:3 151:2 154:20 159:12 159:16 167:11 167:16 169:1 171:12,14 178:4,11,14,18 178:21 179:3 179:15 201:4 201:11,15 212:21,24 213:5 214:19 214:20 215:3 216:4 217:18 217:21 220:16 220:23 222:13 222:18,24 223:8 245:2 260:10,24 261:5,15 263:12 264:18 265:11 269:3 286:5 287:7 289:9,11,14,18 289:20,21,23 290:2,5,9,21 291:17 294:6 296:18 301:17 301:23 304:13 304:22 305:7 308:14,24 311:1,6 312:22 313:1,3,6,7 314:10,24 317:21,22 320:24
**actual** 46:14
**ADA** 95:17,21 96:18,21
**Adam** 2:9 5:20
**adam.zurbrig...** 2:12
**add** 10:13 237:13,23 270:2
**added** 90:20 207:8
**addition** 45:12 316:22
**additional** 89:10 107:24 192:20 200:8,11,14 207:11 233:21 233:22 241:12 270:23 272:15 273:15,16 308:14 322:5
**address** 77:11 130:13 288:4 288:18 294:3 304:4 326:17
**addresses** 175:2 175:20
**addressing** 303:3
**Administration** 143:20 163:19
**admissible** 216:23
**admitted** 111:1 203:6 283:8 294:22
**admitting** 312:5
**adopted** 218:14 218:19
**adult** 324:18
**adverse** 192:23
**Affairs** 98:11 99:3,6
**affiant** 208:21
**affidavit** 3:10,11 3:12,13 28:6 32:12 34:11 85:15 86:23 87:1 90:4,6,17 91:15,23 92:5 92:6 94:12 105:2,7 107:19 113:16 139:10 207:21 208:7 208:14,22,24 210:2,6,13 315:12 317:12
**affidavits** 43:12
**affirmatively** 100:12
**agency** 1:19
**agenda** 244:13
**Agent** 269:22
**aggressive** 252:24
**ago** 6:13 7:23 11:20 14:4 15:2,23 16:14 16:14 17:6,16 17:22 18:17 19:11 20:19 21:6 26:11 29:19,20 52:5 59:2 62:24 85:16 142:4 149:4,4 154:15 202:1 207:18 317:22 321:21
**agree** 51:9 58:12 76:20 89:22 100:9 102:14 103:1,8 104:2 104:9,14 111:6 125:15,21 153:10,24 163:5 166:11 167:16 168:23 173:2 175:3,22 183:21 184:18 188:23 190:22 201:24 203:4 204:1,13 215:5 215:22 216:1 225:5,8,10 229:2 230:4 231:7 234:19 235:8 242:2 246:24 247:12 249:8 254:14 260:23 275:20 283:11 284:5 295:15 303:15 313:8 322:16
**agreed** 10:11,16 39:12 60:20 61:13 89:17 92:15 102:9,12 111:19 118:21 165:8 200:20 202:20 207:9 208:1,9 212:3 215:20 219:8 221:6 239:19 241:19 242:6,7 242:24 256:12 258:5,20 280:16 294:4
**ahead** 87:6 127:24
**aimed** 57:5,12
**al** 1:5 5:11
**Albert** 83:5
**alert** 209:22 308:4
**allegations** 56:9 56:14,23 57:1 124:7
**alleged** 33:16 54:18 99:6 130:23 189:1 191:1 196:4 202:13,19 204:3 207:24 254:18 255:2 294:2

**allegedly** 195:24
**alleges** 7:1
**allowed** 122:22
**alternative** 303:12
**and/or** 56:10 216:2 222:9 251:10 254:4 269:4 301:10
**Angeline** 2:7 5:17 6:18
**anonymous** 128:7,11 129:19,23 132:3,9,17 133:20 164:11
**Ansel** 2:18 5:23 19:14
**answer** 10:15 18:14 23:19 30:21 36:22 38:15 39:1 40:5,13 41:14 47:19 48:10,12 55:21 56:16 58:16 60:5,22 61:23 64:10 74:17 86:12 93:12 100:14 101:5 113:13 117:13 126:9 127:7,24 128:17 137:15 139:7 145:19 154:2,22 161:2 169:6 177:6,12 182:10 185:20 186:13 196:16 200:15 203:8,9 205:16 206:14 209:15 212:11 215:9 216:7 218:3 219:13 222:15 226:1 231:2,18 234:10 235:1 236:11 240:2 243:6 246:21 247:6 248:2,18 249:17 271:18 272:11 282:19 284:2 295:10 295:19 298:3 300:9 303:19 307:15 322:20
**answered** 23:23 27:23 106:22 110:19 128:18
**answering** 129:13
**answers** 106:18 260:20 326:2
**anticipate** 263:11
**anybody** 15:8 46:14 79:14 128:4 134:1 301:5
**anymore** 273:2
**anyway** 74:18 215:24 249:11
**apologize** 56:20 310:17
**apparent** 321:1
**apparently** 207:4 238:23
**appear** 22:22 30:3 256:20 278:24 279:8
**APPEARAN...** 2:1
**appeared** 164:7 173:12
**appears** 78:8 85:5 146:17 175:12 201:24 228:1 229:2 257:11 273:7 274:9 314:2 321:11 322:4
**appreciate** 48:21
**appropriate** 324:4
**approval** 91:5
**approve** 91:7,7
**approved** 91:1 92:22 94:12 208:8
**approximately** 11:20 26:11 64:6
**approximates** 173:4
**approximations** 20:20
**April** 29:16 89:17,20,24 188:7 190:24 194:21 196:9 197:6 199:18 217:21,22 223:10,12 224:10,18 236:3 241:23 258:20 294:13 294:17
**Arch** 2:3,11 5:8 325:7
**Arlene** 283:20
**arrest** 4:22 23:10 28:8,8 53:1 54:15 88:19 89:21 90:2,24 105:8 112:23 113:1,2 132:14 150:23 192:7 208:8 210:14,21 223:13,17 250:17 274:3,5 314:13 316:15 316:23 317:2,8 317:13,18,23 318:10 319:3 320:11
**arrested** 7:2 22:12 39:4 102:2 109:10 109:13 132:16 135:20 192:15 208:9 209:12 210:1 235:17 258:19 310:12 310:13 319:4,6
**arresting** 316:19
**arrests** 84:8
**arrived** 75:19 76:21
**arrow** 267:7
**art** 198:20,21 276:12
**Arther** 144:7
**articles** 185:5,17 186:1 187:7 207:5
**artistic** 273:20 276:15
**aside** 219:6 323:12
**asked** 24:1 50:22 62:15 63:12 70:24 71:3 86:7 92:23 94:22 95:11 98:10 106:5,22 108:6 121:3 158:20 166:19 177:14 207:17 221:17,24 222:6 237:11 237:15,16,19 250:15 254:4 272:6 283:19 299:7 321:23
**asking** 18:10,12 48:10 52:6,7 67:9 85:21 99:13 106:20 156:11 157:22 243:17 299:13 322:15 324:20
**asks** 282:23 283:23
**aspects** 143:5
**assess** 113:10
**assign** 119:24 324:4
**assigned** 48:17 48:18 49:8,11 50:24 51:7,10 51:15 52:7 69:4 75:10,22 77:24 78:12 79:4,22 80:16 81:9,11 83:3,6 83:8,9,11,18 84:22 85:3,8,9 86:2,13,17 88:5,10,13,21 95:10 96:6 113:17 115:21 116:6 120:13 121:10 130:6 131:1 167:20 176:2 177:14 177:17 179:9 192:2,3 206:6 213:21 259:14 261:12 277:23 277:24 278:6 293:18 295:22 296:8 298:19 300:12 301:5,8 305:18 315:14 315:15
**assignment** 76:9
**assignments** 71:23 72:4,11 74:24 79:15
**assist** 78:23
**assistant** 23:23 91:18 95:10 113:15,17 121:14
**associated** 200:19
**Association** 165:18
**assume** 7:19

9:11 25:13 40:19 61:4 70:22 71:8 75:24 82:23 122:9 140:10 154:13 155:1 158:9 188:15 209:23 211:9 238:16 283:21 291:14 292:7 292:16 297:3 300:17 308:24 318:4
**assumes** 213:14 214:19
**assuming** 218:22 303:21 303:23
**assumption** 101:5 122:10 209:24 216:13 234:5 238:15 242:15 268:5 315:17
**assumptions** 317:7
**Atkinson** 264:14
**attached** 313:23 324:14
**attack** 244:9,12
**attempt** 124:9
**attend** 63:9
**attention** 160:23 181:22 183:19
**attorney** 6:16 68:2,22,23 69:14,15 90:23 92:23 95:10 104:3 113:17 121:14 215:11 230:12,20 231:9 232:19 246:15 247:1,7 249:13,22 250:2 305:17 306:4 319:19 324:20,20
**attorney's** 24:7 27:16 45:16 51:17 62:8 64:6 65:18,23 68:9 74:20 86:1,9 89:4 91:2 100:2 108:20 111:19 112:21,23 132:3 134:21 137:13 150:23 151:22 213:17 215:4 232:5 240:9 301:21 305:4
**attorneys** 23:24 247:10
**authenticating** 53:23
**authored** 289:21
**Authority** 288:12
**authorization** 1:18
**Avenue** 288:14
**aware** 31:9,14 44:18 47:7 48:6 51:6,22 52:1 54:24 55:6 64:5 183:24 204:10 205:24 209:12 223:14 238:24 247:1 278:13 280:5,7 281:10

**B**

**B** 3:7 4:2 91:6
**baby** 276:3
**back** 8:2 9:10 19:21 30:12 33:13 35:8 40:9,19,20,23 42:9 49:16 50:5,8 58:1 63:12 69:14 70:17 71:9 72:7 74:10 75:17 77:18 85:3 88:14 94:24 97:3 100:16 108:15 123:17 137:1 148:4 151:7,13 155:5 164:23 166:5 180:17 188:13 192:21 199:15 200:24 213:16 221:19 221:22 224:17 226:18,21 227:12 233:3 233:14 236:3 236:15 237:4,6 238:18 245:21 250:7 252:20 255:9,24 265:12 266:5 270:17 273:2 277:3 283:5,6 287:11,12 288:3 289:8 309:24 310:2,3
**background** 33:10 70:19 71:4,10 75:1 97:15 131:9 142:12 196:5 200:20
**bad** 23:4 244:21 317:2
**badge** 82:7
**bag** 257:19,20
**bail** 318:6
**ballistics** 272:20 275:13
**bar** 53:5
**Barbara** 52:22 54:12,20
**barely** 153:13
**base** 49:2 176:20 234:20,21 316:3
**based** 59:7,14,18 78:11 113:23 116:14 154:13 163:13,20 170:18 175:6 188:24 204:13 205:13 208:23 210:1 212:5 232:22 246:13 249:11 268:19 283:11 290:9 292:17 295:9 299:20 303:23 312:17 317:21 318:18
**basement** 53:12 143:20
**basic** 22:1 33:21 254:16
**basically** 78:22 93:13 144:17 159:2 162:12
**basics** 48:8
**basing** 206:7,10 207:18
**basis** 262:15
**Bates** 45:2 66:12
**bear** 174:10 194:16
**beat** 53:5 123:7
**beating** 183:11
**beginning** 1:11 63:12 117:24 191:18 221:20 233:9 238:23 270:17 277:16 278:9
**behalf** 5:23 8:1 11:5
**beige** 161:8
**belief** 59:6 136:16 326:4
**believable** 134:20
**believe** 13:3,22 14:22 19:19 27:23 36:19 37:4,7,8,11 38:8,19 54:9 56:3 61:6 67:24 82:11 134:14 137:6 146:20 153:16 266:11,13 267:5,10 303:13
**believed** 36:11 59:3 223:21 231:21 233:15 295:23
**Berry** 8:1 36:16 37:19 38:8,9 51:8 63:17 64:17 66:1,21 75:2 87:9 95:7 114:14 120:17 122:20 134:12 221:22
**best** 12:16 70:23 230:23 306:10 326:3
**better** 8:7 130:6 217:19
**beyond** 24:11 189:9
**bias** 103:17
**biased** 104:2
**big** 216:9 257:17
**Billy** 270:7,8 274:18,22
**binder** 87:10,21 88:7,12,15,18 88:18,22 89:8 90:14,19,20 93:8 95:5,6 117:21,22,23 120:19 122:14 122:15
**births** 175:21
**bit** 22:23 30:2

35:9 92:14 100:10 114:12 158:18 276:14 289:22 310:10
**black** 161:4,13 173:13,14,17 239:5 257:6,16
**blank** 89:9
**block** 170:1,2,9 170:10 265:4
**blow** 183:14 311:9
**blue** 161:11,12
**Bo** 165:17
**board** 93:2
**boarded** 53:8
**Bob** 165:24
**bold** 97:20
**bombing** 195:18 195:19,20
**bottom** 9:11 41:18 45:23 46:17 94:23 96:5 98:17 108:16 120:2 125:1 127:12 127:16 139:16 149:15 160:24 161:2 171:16 172:13 184:22 194:23 196:12 214:4 217:3 245:21 250:14 253:20,23 254:1,2,3 260:16 261:18 268:21 282:16 301:7 308:15 311:6 323:11
**box** 128:23,24 129:3,4,5,6,8 135:8
**boyfriend** 110:14
**boys** 256:3
**Brady** 46:6,19 47:2 216:17,18 216:24 232:21
**break** 10:6,8,9 10:14,16 11:3 77:11,12,14 100:1 151:9,15 151:20 190:15 191:2 226:22 226:23 310:3,5
**Brenda** 3:13 33:18 34:12,21 34:23 39:9
**bricked** 53:9
**briefly** 29:19 122:19
**Brignola** 17:2 180:9,10
**bring** 81:16 96:8 108:8 139:18 148:4 240:18 240:19 263:14 270:5 273:20 274:1,23 299:2 299:11 318:24
**bringing** 237:6 238:17 318:12
**Broad** 1:23
**broaden** 24:11 65:6
**broader** 18:16
**Brooks** 178:22 178:24
**brother** 72:18 74:1,3
**brother-in-law** 274:11
**brought** 6:22 116:4 117:13 154:7,16 187:21 200:24 201:22 224:17 236:15 240:8 240:17 242:15 270:12 318:21
**brown** 161:6
**Bruce** 178:22,24
**BRUSTIN** 2:20
**Building** 2:3,10 143:21 163:19
**Burke** 98:19
**burry** 105:14,17
**bus** 257:18
**Business** 165:18
**busy** 317:17

**C**

**C** 91:6 325:1,1
**C-H-R-I-S-T-...** 315:3
**C-O-M-M** 274:11
**C-R-O-S-S-L-...** 277:11
**caliber** 189:15
**call** 65:7,8 295:16
**called** 65:9 67:1 72:18 97:14 129:23,23 130:8 131:21 164:12 166:13 293:24
**caller** 165:12
**calling** 313:5
**calls** 167:18
**Cancelliere** 1:13 325:3,17
**canvassed** 141:14
**car** 241:2
**care** 109:19 247:8
**career** 7:20 127:3 263:4 306:7
**careful** 201:12
**carefully** 324:1
**case** 7:8,12,17 7:24 8:8 9:15 10:1,3 15:5,13 15:16,19 17:3 17:8,12,18 18:11,13,23 19:2 20:4,12 20:22 21:2,8 21:14 22:2,7 23:15,17 24:5 24:9,15,19 25:6,15,18,22 26:1,14 27:10 27:21 28:2 29:2,12 30:24 31:10 33:19 36:7,15,16 37:15 39:8 48:7,18 49:12 49:14 51:5,8 51:20 52:13,18 52:23 53:2 54:11 55:6 58:2,22 59:1 62:12,18 63:5 63:17,19 66:2 69:9,13 70:9 71:1,8 73:8,15 75:2 78:22 80:10,11,19,21 81:3,8,14 83:7 83:10,20 84:2 85:19 87:4,9 88:9,10 89:12 91:1 92:4,17 93:1,15,16,17 93:19,22 95:1 95:3,5,7 96:5,5 98:7,12 100:5 101:23 103:12 107:17,18 108:4,9 109:1 109:4,5 113:10 113:18,18,19 114:6,14,21 115:3,12 116:2 116:3 117:6,13 117:16,21 119:13 120:14 121:11,13 122:2 123:23 124:8 126:16 126:19 128:8,8 128:22 130:7,9 132:10 137:18 138:4 140:5 141:6 143:5 145:16 150:2 150:24 151:23 152:14,18 154:17 155:10 155:12 157:12 157:24 158:7 158:19 159:4,6 159:8,9 169:4 176:13,21,24 177:2 180:6 185:11,17 187:9 190:15 190:16,23 191:3 192:24 195:6 206:24 207:22 208:15 208:21 210:1 211:15 213:20 218:22 221:22 228:22 230:3 230:13,20 232:15 233:9 234:16,21 235:17 236:19 236:23 238:22 238:24 242:21 243:14,24 245:2,19 246:3 246:7,10 247:8 247:22 250:9 250:11 251:3 251:21 252:4 255:5,19,21 262:20 263:23 271:2 274:6 282:13 284:21 285:21 293:8 293:21 294:2 297:15 298:10 298:13 305:18

310:14 311:3 312:10 315:16 317:5,24 318:11,16 319:9,17
**cases** 27:12 50:21,23 51:14 52:4,6,8,9,15 63:13,24 65:22 69:18 73:3,5 74:19 79:18 80:17,18 99:5 107:24 118:7 124:21 141:20 195:13 213:18 229:4 243:15 243:20 244:9 244:11 245:23 246:12,12,17 247:3,9,14,24 248:5 249:1,15 253:16 255:20 256:22 276:14 302:17 307:1,3
**Cast** 2:3
**Caswell** 1:14 5:2
**caught** 37:1
**cause** 3:10 28:7 85:15 87:1 91:15,23 92:6 92:7 105:7 107:10,11,14 107:20 113:11 113:16 131:15 207:14,22 208:7,15,23 210:2 315:12
**caused** 7:2 38:11 181:5
**causes** 193:13
**center** 201:23 221:4 274:21 286:9
**central** 279:18
**certain** 76:20
**certainly** 81:3 116:21 302:23 308:3
**certainty** 286:21
**certify** 325:5
**certifying** 1:19
**challenge** 148:7 231:15
**challenging** 67:4 162:18
**chance** 7:13 28:21 157:22 160:20 162:6 163:2 199:1
**change** 205:6 285:19 324:5,6 324:8 327:2
**changes** 324:3 324:12
**changing** 299:13
**characterizati...** 148:13 181:2
**characterize** 187:10 244:12
**charge** 124:23 192:15 319:20
**charged** 22:13 135:21 318:4 318:21 319:9
**charges** 103:7 281:8
**charts** 144:15 145:7,22
**check** 131:16 145:20 268:10 275:2,4 320:5
**checked** 259:4,5
**checkers** 161:8
**checking** 260:1
**checks** 261:20 262:7 263:13
**chief** 74:5,9 91:4 91:10,11,14,18 113:15,15
**Christie** 315:3 315:11
**chronological** 172:2,22 197:18
**church** 18:1
**Cimino** 19:6,10 79:2 82:12,13 82:20 85:14 87:3 90:5 92:5 196:22 197:1 210:3 252:24 253:1,14 277:21 278:4 311:18,20 312:13 315:1,5 315:19 316:1,4 317:11
**Cimino's** 314:6
**circumstances** 94:4 110:3 176:20
**cited** 207:23
**Citizen's** 166:1
**city** 1:5 2:9,10 2:13 5:10,19 5:20,21 6:24 53:9 61:12 62:1 97:13 165:3 227:24 254:4 268:8 313:20
**City-177** 198:11
**City-179** 198:11
**City-181** 273:14
**City-186** 165:10
**City-187** 165:16
**City-3** 184:23
**City-5875** 29:5
**civil** 1:4 11:4 36:7 55:1 73:19
**civilian** 29:6
**civilians** 144:1
**claim** 55:1
**claimed** 280:13 283:7
**clarify** 48:24 121:24 254:5 305:20
**clarity** 20:15
**CLARK** 2:15
**classes** 127:14
**classic** 101:23
**cleaned** 53:9
**clear** 21:23 33:24 52:5 93:4 168:21 194:12 207:20 217:20 282:12 289:22 301:11
**clearly** 85:6
**client** 8:1 22:12 31:3 37:18
**Clinton** 166:7
**close** 140:20 142:22 173:23 198:22 279:4 288:20 291:2 291:19 292:9 316:13
**closely** 173:4
**co-counsel** 5:16 6:19
**co-defendant** 37:11,22 38:17
**co-workers** 65:16
**codefendant** 36:24 37:3
**coerce** 122:22
**coercing** 57:5,12
**Coercion** 123:4
**cognizant** 46:7
**coincidental** 16:23
**cold** 78:22 80:10 80:11 81:4 176:24 190:16 190:23
**collaterally** 213:21
**colleagues** 6:17 25:5 26:16 64:14
**collectively** 194:14
**column** 324:4
**come** 9:10 30:12 33:18 35:1 40:19 42:9 49:16 68:12 69:14 100:16 108:15 130:7 136:14 137:1 145:24 193:19 199:14 227:12 238:6 245:21 263:10
**comes** 102:2 119:17 134:10 135:6 183:18 252:5 274:9 277:12
**comfort** 77:12 151:14
**coming** 80:18 129:17
**comment** 249:9
**Commerce** 2:16
**commission** 166:2 325:18 326:22
**commit** 106:10
**committed** 108:19 139:22 189:6 294:14
**committing** 154:3
**common** 240:20 243:12
**Commonwealth** 46:7
**communicate** 65:6 114:19 157:9
**communicated** 319:23
**communicating** 213:3 294:6
**communication**

151:21 320:3
**company** 72:18 311:21
**compare** 269:6 272:19
**compared** 269:10
**comparing** 275:13
**comparison** 269:1,14
**comparisons** 269:16
**competent** 306:21 307:4 324:18
**complainant** 98:2 251:3
**complaint** 10:23 11:2,4,4 21:12 21:14 24:24 25:14 26:4 97:22 98:3 99:14
**completed** 118:20
**complexion** 173:18
**computer** 313:17
**concern** 33:17 125:9 126:12 211:1 219:19
**concerned** 125:22 126:20 186:20
**concerning** 26:19 27:7 43:14 99:10,14 100:19 145:16 167:3 202:19 217:22 250:16 284:19 321:1
**concerns** 125:2 154:2 186:10 191:6 206:10 238:12 283:15
**concise** 3:18 97:14
**concluded** 323:20
**conclusion** 146:13
**conclusions** 146:4
**conclusive** 302:1
**conduct** 57:18 68:10 183:21 322:5
**conducted** 13:16 24:6 30:3 35:8 127:17 153:11 156:6 157:13 199:23 200:6 202:24 227:6 262:8 268:19 272:16 288:23 320:16 321:11
**confess** 57:6,13 237:21 239:19
**confessed** 154:3 189:5 278:12 280:13,15 294:14,18
**confession** 53:2 53:3,4,14 56:2 56:11 58:13 59:8,15 60:1 60:18 189:1 190:3,4,9 191:1 202:13 202:19 204:4 208:1 254:18 255:2
**confessions** 56:24
**confirm** 9:18 10:5 69:17 99:9 116:12 125:4 151:23 173:21 286:5
**confirmed** 17:24 19:22 228:13 312:12
**conflict** 109:8
**confront** 193:11
**confrontation** 148:8
**confused** 254:8
**connected** 272:21 275:14
**connection** 43:11 138:4 197:10 250:16 252:3 257:23 260:11 264:11 309:9 312:10
**cons** 101:14
**conscience** 205:3
**consequence** 192:23
**consider** 271:15
**considered** 254:23
**consistent** 162:12 169:1 189:16,20 190:8 267:20
**consolidating** 175:13
**constant** 73:4
**constitute** 216:24
**consult** 7:13
**consulted** 284:20
**contact** 69:16 73:16 119:3 130:13,14 258:8
**contacted** 109:14 118:23 287:24
**contacts** 119:7
**contain** 90:15 325:12
**contains** 174:24
**contemporane...** 290:10
**context** 12:3 39:7 40:10 42:22 58:13 70:6 79:3 100:15 152:23 153:15 195:8 233:11,21 267:9 274:4
**continuation** 313:7
**continued** 115:4
**continues** 210:15
**control** 214:5 325:11
**convenience** 22:8
**conversation** 33:15 196:4,9 239:9 322:17 323:3
**conversations** 15:7,15 25:9 29:23 94:16,16 228:16 234:23 299:8 321:24
**convict** 31:15 211:10
**convicted** 7:3 43:1 55:2 169:13 170:16 211:8
**conviction** 23:21 24:6 27:20 43:3,4,6,15,24 45:13,17,19 50:24 51:6,11 51:16,24 52:10 59:18 61:9 138:24
**convictions** 50:21 64:4 65:19 67:4
**copies** 26:18 88:23 89:1 116:9 214:2
**copy** 83:18 89:4 92:3 159:14 227:7 252:17 323:22
**corner** 155:16 170:4 256:4 288:6
**correct** 7:21,22 8:14 9:21 11:9 13:4,16 16:10 18:14,15 26:4 26:22 27:4 29:8 31:4,7 37:21 39:19 41:3,4,8,23 42:7 44:12 49:9,10 51:22 53:20,21 54:1 54:22 57:23 58:5,10,11 59:4,9,15,21 60:2,15 61:9 62:13 63:17,18 63:20,21 64:21 67:5 68:7 69:22 70:3 71:6,14,19 72:13,20 73:17 74:7,13 75:12 75:20,21 76:3 76:4,5,6 80:5,6 81:5,21 82:10 82:24 85:17 87:2,4,14,15 87:19,24 88:1 88:7 89:18 90:6 91:2,3,16 92:1,18 95:12 95:14,15 100:7 102:5 103:18 103:19 106:14 106:15 107:4 107:21 108:2 108:21 111:10

113:4,11
114:10 115:1,2
115:6,16
116:16 117:1,2
117:8 118:10
118:11,12
119:1 120:12
120:19 121:4
122:12,23
123:14,15
127:13 128:3
130:1 134:16
134:22 135:13
135:24,24
136:4,18 137:7
138:7,15 139:4
139:19,23
140:19 141:16
144:13 146:11
147:19,22
149:18 150:16
150:19 152:3,7
152:11,12,15
154:20 157:10
158:15,16
162:14 163:8
163:11,16,24
164:8,24
165:13,21
166:23 168:5
168:16,18
169:15,18
170:7,11,16
171:1,20,23
172:16,19,24
173:24 176:5
177:19 179:9
179:10,12,13
179:16 180:3
187:4,12,18
189:7,11,24
190:5,10
191:17 192:20
193:2,14,17
195:10 198:14
200:16,21
202:2,3,14
203:17,23
205:9,14 206:1
207:6,7,10,16
210:3,6,12
213:6,23
214:10,11,15
214:16,22
216:14 217:1,6
218:1 219:1,4
219:11,21,23
220:3,6 222:1
222:6 223:5
224:18,22
225:3,7 227:7
227:10 231:16
232:24 234:17
236:3,6 237:22
238:3,13,14
239:6 240:6,7
240:10,11
246:3,8 249:24
250:3 251:4,19
255:15,22,23
257:13 259:7
260:2 261:24
262:6,17,21
263:1,5,6,15
265:5,10,19
266:12 267:2,7
268:20 269:8
270:9 271:6,16
272:22,23
273:12 274:6
275:7 276:11
278:13 280:2,3
280:6,14 285:2
285:7,14
287:22 289:6
290:7 291:20
292:3,19,20
293:13,16
294:8,9,11,12
294:15,19,22
295:3,7 296:21
297:5,15,16,20
299:4,9 301:12
302:4,12 303:7
303:17 304:8
304:16 305:1,2
305:4,9,12
306:21 307:8
307:22 309:2
309:10,15
312:15,20
314:3,4 316:23
317:5 318:2,13
319:9 320:1
321:6 322:2,6
322:11 325:12
326:3
**corrected** 233:4
**correctly** 19:7
25:11 64:17
86:3
**corresponded**
14:12
**corresponding**
178:11
**corroborate**
41:2 61:2
111:14 139:22
147:24 237:7
242:16 255:14
255:16,17
**corroborated**
61:3 187:6
**counsel** 5:12
11:8 15:8
26:16 209:11
215:6 216:2
217:24 231:14
231:21 232:24
247:12,15,21
248:9,11,12,22
302:23 305:11
308:4,9 323:21
**count** 175:19
241:12
**counter** 263:23
**couple** 21:2
23:16 25:24
26:18 45:10
48:7,19 65:12
109:11 146:3
169:11 195:13
239:3 245:14
252:4 267:18
**course** 7:19 8:16
39:24 71:21
77:13 109:23
116:23 124:13
127:3 147:6
151:15 200:10
222:20 306:6
**court** 1:1,13 5:5
7:20 21:15
23:22 38:17
45:13,14,16
51:16 206:18
216:24 282:22
323:21 324:21
325:3
**courtroom** 9:21
**courts** 27:21
147:5
**cousin** 230:2
265:15,18
**cover** 9:23 87:7
317:15
**covered** 192:6
**covering** 161:9
**create** 103:17
**created** 27:2
145:8
**credibility** 36:1
39:22 47:9
103:10 136:3
147:15 186:10
187:12 190:9
191:7 193:14
201:1 204:16
206:16 207:15
219:20 225:12
230:6 231:15
231:22,24
236:9 238:11
255:13 285:14
296:21 297:19
302:11
**credible** 131:23
134:9,14
136:13,16
255:8 258:24
**crime** 7:6 22:13
101:20 166:1
189:2,6 190:5
237:21 263:21
278:12
**criminal** 192:24
193:2 204:20
204:23 205:2
213:18 218:18
245:20 249:12
**critical** 298:12
**critique** 60:19
**Crosland** 1:2
5:10 6:16,21
6:22 7:1,6 11:5
20:5 22:12
23:22 31:3,16
33:13,15,16
43:1,12 45:12
46:8,11 47:10
66:12 70:9
89:16 90:11,16
154:3 189:5
200:21 202:11
202:14 203:6
203:22 204:4
207:23 208:9
210:1 211:15
213:4 215:10
215:14,18
216:2 217:5,24
221:3 225:1
230:2 236:3
237:21 239:19
241:15 242:4
254:18 261:23
267:1 269:9
272:2,8 277:12
278:12 279:18
280:10,13,24

281:1,7,24 282:14 283:16 284:1,8 294:14 294:18,21 310:12 312:1,4 312:10 317:4 317:24 318:1 318:24 320:11
**Crosland's** 23:10 25:22 28:8 43:14 46:13 51:20,24 189:1 196:3 202:19 210:20 212:7 214:17 215:6 252:4 269:7 319:23
**cross** 231:10
**Crosslan** 277:10
**Curtis** 1:2 5:10 6:16,21 25:21 31:3 90:16 154:3 189:1,5 202:11,14 203:22 204:4 225:1 230:2 237:21 238:3 239:19 269:10 272:2 276:8 277:11 278:12 279:18 282:14 284:1,8 312:1 312:4,10 320:10
**custody** 183:10 184:1 262:16 262:18 312:1 317:5 318:1,8 319:17
**customary** 261:4
**cut** 77:1 78:8

**D**

**D** 3:2 203:1
**D.A** 92:24 93:14 94:22 95:13 100:4 107:16 108:3,4,11 121:10 122:9 135:16 274:3,5 306:16,17 307:10,11 322:15 323:9
**D.A.'s** 46:10 67:24 68:1 74:6,15 86:18 87:22 89:24 91:11,12,14,24 92:21 93:6 94:6,17,21 95:9 96:8 100:13 104:19 105:12,23 106:24 107:8 108:2 109:15 113:3,7,9,22 113:24 120:23 121:3,3 133:3 135:13 138:2,6 139:13 205:12 205:19 213:24 214:10,12 241:3 303:16 305:9 306:1,6 306:9,10 307:3 307:4 315:2 322:13 323:9
**D.A.s** 96:6
**D/C** 274:19
**Daleann** 98:2 99:10
**dark** 161:12
**data** 145:2,22
**date** 5:6 21:22 78:8 98:1 153:16 167:24 172:18,21 279:7 324:9
**dated** 278:24
**dates** 175:21
**dating** 224:16
**daughter** 53:11 53:16
**David** 322:9
**Davis** 3:21 161:22 270:19
**day** 8:7 50:4 52:23,23 127:8 188:7 194:14 197:7 231:10 263:4 291:11
**day-to-day** 83:19,21 84:13
**days** 64:20 81:12 88:17 168:4 224:10 324:22
**de** 80:1 315:15
**deal** 103:5 128:11 166:20 193:11 230:24 231:5,9 285:7
**dealer** 257:17
**death** 253:19
**debriefed** 158:24
**deceased** 19:2,4 65:16 274:20 316:1
**decedent** 27:2 164:4,8 293:11
**December** 7:4 22:8,14 23:10 23:14 34:7 80:22 84:4 89:12,21 163:16 166:12 167:12 176:22 180:19 190:23 318:9 319:1
**deception** 146:4 146:13 147:13 148:12 202:22 203:15,23 220:24
**decide** 133:19 148:2 249:23
**decided** 62:9
**decision** 61:8 96:6 134:18 139:2 142:10 298:21 303:6
**decisions** 64:14 65:18 232:22 301:9
**declined** 225:23
**deeper** 193:14
**defendant** 7:8 21:9 25:15 282:13 283:1 312:2,4
**defendants** 1:6 5:20 15:12 69:18 109:11
**defense** 47:11 87:24 104:3 209:11 212:23 213:4,22 214:3 214:14,18,18 216:16,21 217:6 219:7 230:12,20 231:9,14,21 232:18,24 247:12,15,20 248:9,11,12 249:13 305:11 308:4,9
**define** 101:15
**defined** 80:10
**definite** 209:18
**definitely** 38:9 198:12,24 199:2 261:17 296:15
**definition** 101:11
**Delores** 3:12 31:18 33:11 34:20 39:12,19 123:23 193:20 195:23 196:2 211:17
**delve** 131:16 213:12
**denied** 241:22
**denies** 225:5
**department** 2:9 5:21 24:13 26:17 44:20 64:20 71:5 97:14,17 100:3 100:19 133:10 183:20 213:15 214:6,9,21 216:5 227:24 313:20
**depending** 99:17
**depends** 92:4 93:17 131:20 157:20
**deponent** 5:11 5:19
**deposed** 9:24 55:3 62:19
**deposing** 324:20
**deposition** 1:10 5:4,8 6:14,20 7:9,24 8:2,3,5 8:13,16,18,24 10:22 12:4 15:9 16:10 35:7 36:16 49:21 50:7,12 50:15,21 55:4 62:20 63:2,10 63:13,14,23 64:17 66:1,8 66:21 67:16 70:17 98:10 106:4 114:14 120:17 122:20 134:13 153:19 154:1 221:21 270:18 278:9 307:2 323:20 324:1,2,10,14 324:23 326:1
**depositions** 8:19 9:5 63:5

**DEPUTY** 2:10
**derive** 315:4
**DeROSE** 2:15 5:22,22 323:24
**Descher** 17:17 17:21 18:9,11 18:17 78:15 80:7 81:21,22
**describe** 14:10 289:11
**described** 34:19 53:4 110:17 254:17 263:12 303:13
**describes** 167:17
**describing** 53:14 191:1
**description** 3:9 4:4 34:21 72:5 160:24 161:18 163:22 172:5 173:3,23 184:23 197:6
**descriptive** 161:24 163:6 163:21
**designated** 278:6
**desk** 53:2 128:16 128:23 129:6,7 129:16 130:4 135:7
**detail** 58:14 162:13 221:24 255:1
**details** 13:7 14:10 15:5 25:2 28:1,10 29:1,12 30:8 31:14 33:19 34:8 41:2,5 48:22 56:11 77:23 97:15 116:24 123:23 153:1,22 167:1 172:4 179:7 184:15 189:10 190:4 201:19 202:6 233:11
**detective** 3:16 6:11 13:16,17 13:19 15:18,22 16:7,13,18 17:2,7,15 19:10,12,16 25:10,14 26:9 29:16 30:6,16 30:21 35:17 36:21 38:14 39:1 40:13 41:19 44:8 47:19 48:15,17 49:9,11 50:24 51:15 52:7 54:3 55:14,21 56:16 57:2,4 57:11,19 58:16 60:4,22 61:23 64:9,18,23 65:17,21 68:2 70:11,15 75:23 77:10 80:8,12 80:17 81:11 83:4 84:2,12 85:4,9,11,14 86:14,17 87:3 88:5,13,21 90:8,8 93:8,11 93:24 94:5,9 94:15,19 96:17 98:19 99:21 100:20,22 104:6,22 110:5 113:13,24 117:10 118:20 119:17,24 121:11 124:18 125:12,23 126:8 128:13 128:14 130:4,5 130:6 131:1 132:20 133:12 133:16,18,23 135:8,10 136:20 137:15 139:6 140:15 142:2 143:23 147:9 150:2,9 151:13 154:22 155:7 156:8 157:13 158:3 158:17,23 159:17 167:20 169:6 173:8 176:7 177:6,14 177:17,18 178:24 179:20 185:13,20 186:13 191:9 197:12,16 203:8 204:6,18 205:16 206:14 208:18 209:15 210:3 211:3 212:10,19 213:8,20 215:9 216:7 217:8 218:3 219:13 220:5 221:8 222:15 223:9 226:21 227:6 228:2,13,17 230:8 231:2,18 231:23 232:7 234:9,15,23 235:1,7,12 236:11 237:10 238:9,17,20,22 242:11 245:5,8 246:19 248:2 248:18 249:17 249:20 250:1 251:13 253:14 253:14 254:21 256:14 259:6 261:8 266:2,16 267:11,14 269:4,18 271:8 271:18 272:10 273:23 275:24 276:13 280:9 284:15 286:10 286:24 287:3 287:16 288:22 289:18,24 290:13 291:8 292:12 293:2 293:18 295:9 295:19 296:13 296:23 297:7 297:22 298:16 299:21,24 300:9 301:3,8 303:19 305:15 307:14 308:7 308:16 309:4 310:2 315:1,4 315:8 316:2,4 316:6 317:3 318:18 321:12 322:4,16,20 323:1,13,16
**detective's** 53:11 53:16 86:2 115:11 128:22 143:2
**detectives** 6:23 7:2 13:18,19 14:8 15:12 18:19 19:1,4 20:3 41:11,15 53:7 56:1,5,6 56:10 58:14,24 62:16 63:9 78:24 88:4 100:10 114:15 114:20 115:7 124:9,15 127:15 128:18 142:17,17 158:1 169:12 184:19 195:21 196:10,21,22 200:23 207:5 208:14 219:10 220:8 222:8 223:20 224:20 243:19 248:24 265:23 290:1 290:20 293:7 300:5 305:24 311:18,20,21
**detector** 204:21
**detention** 201:23 221:4 274:21
**determinations** 232:21
**determine** 220:19
**determined** 67:21 110:22 113:15
**develop** 10:2 136:15 160:1
**developed** 300:17
**development** 288:13,20
**Devlin** 56:3,10 57:2,5,19 59:7 59:18,24 60:11 62:17 63:1
**DI** 202:22 203:23 220:24
**Dickinson** 256:5
**difference** 87:9
**different** 12:17 20:6 23:21 26:18 29:6 45:10 62:7 69:6 70:16 71:23 72:7,11 87:13 93:14,17 95:13 109:21 110:18 118:15 123:5,21 131:13 132:12 134:23 135:5 140:22 143:5

143:18 144:5 146:3 155:18 157:19 164:10 165:8,16,24 175:3,12,13,20 179:6 186:8 194:14 195:13 197:16 198:5,6 200:18 212:2 219:18,19 223:23 243:7 243:15 244:8 244:11,16,24 245:22 246:2,7 246:12,17 247:3,24 248:14,15 249:15 256:22 263:10 276:14 280:14,15 282:13 294:10 295:7 297:14 311:2,3 318:10
**differently** 62:12
**dig** 127:11
**digit** 194:24
**direct** 45:10 46:16 160:23 184:21 195:7
**direction** 42:6 163:7,23 170:5 170:24 325:11
**directly** 261:21
**disabilities** 123:19
**disagree** 61:11
**disagreed** 61:7
**disbelieve** 242:22
**discharged** 281:9
**discharging** 98:13
**disclosed** 49:7 86:8 232:18,23 233:2 305:3
**disclosure** 87:23 114:4,9 219:6
**discovery** 94:24 95:2 212:20,20 213:1,18 214:14 218:5 218:11,14,19 218:23
**discrepancy** 302:17
**discuss** 6:12 111:18 152:24 185:2 243:20
**discussed** 11:13 46:13 76:7 106:3 108:18 114:12 134:12 207:2 243:4 253:18 268:19 274:19 320:24
**discusses** 250:9
**discussing** 8:8 67:17 151:20
**discussion** 29:15 77:7 171:13 190:14 204:14 239:22 241:2 243:6,14 245:13 250:13 251:9 295:17 315:1,4 323:14
**discussions** 253:13
**displeased** 61:12 61:18
**disposal** 307:12
**dispute** 75:6 181:1 287:13 288:16
**disregard** 123:21
**distributed** 116:10
**district** 1:1,1 5:5 5:6 23:23 24:7 27:16 45:16 51:17 62:8 64:5 65:18,22 68:9 69:13,15 74:20 86:1,9 89:3 90:22 91:2 92:23 95:10 100:2 108:20 111:19 112:20,22 113:17 121:14 132:3 134:21 137:13 150:22 151:22 213:17 215:4 232:4,19 240:8 246:14 247:1,7,10 249:22 250:2 301:21 305:3 305:17 306:3
**dive** 138:11
**division** 14:9 18:4 27:1 68:7 71:15 75:23 85:24 93:23 98:12 128:6 149:5 181:22 190:14 201:22 299:3 300:15 300:19 306:17 307:5 315:6 319:4,5,7
**doctor** 124:23 124:23 125:4 125:10
**document** 28:11 28:22 29:4 32:22 34:6 43:20,21 44:24 45:1,3,9,15,21 77:4,19 78:11 97:12,17 99:21 114:16 115:15 140:24 168:1 171:17 174:11 174:23 177:22 181:8 183:13 192:12 194:9 204:11 227:4,8 228:6,14,17 232:3 260:19 268:8 278:24 293:24 296:6 307:19 310:16 313:14,23 314:2 316:16 317:23 319:13 321:16,18
**documentation** 221:14 222:12 320:2
**documented** 92:14 96:16,21 118:9 119:4 304:7,21
**documents** 12:7 12:13,19,22 14:17,17 15:4 21:24 22:20 23:6,9 24:2 25:1 26:1 31:23 33:10 66:9 99:13 141:20 145:17 153:18 170:19 175:8,11 191:21 233:22 234:6,14 235:20 240:21 244:17 266:5 269:15 284:4 291:18 302:24 304:1,24 314:9 314:22
**Doe** 90:16 132:9 132:13,18
**doer** 138:23 166:7 271:21 281:5
**doing** 22:2 36:4 69:13 72:21 108:13,14 110:11 111:1 142:19 149:22 191:22 194:18 207:21 224:7 230:23 246:5 287:18 317:17
**dollars** 61:14
**Dominic** 13:22 79:10,13 244:1
**doodler** 276:15
**doorstep** 298:7
**double** 66:10 295:13
**Double-sided** 277:6
**doubt** 39:22 40:2 105:2 111:7 114:3 131:23 190:6
**doubts** 35:24 36:3 38:11 111:17,18 112:7,18,20 138:5 147:21 147:21 201:1
**downstairs** 143:19
**dozens** 33:24
**draw** 268:5
**drawings** 199:4
**drawn** 198:23 276:5
**drive** 110:17 288:24
**driver** 257:18
**driving** 241:3
**drop** 121:11
**dropped** 109:17
**drug** 157:6 257:17
**duly** 6:2
**Dunn** 53:13 54:5 54:8,21
**Durbin** 3:22 162:17 270:19
**duty** 216:20 308:8

**E**

**E** 3:2,7 4:2 325:1,1
**e-mail** 65:6
**e-mailed** 99:12
**earlier** 6:11 10:10 35:15 49:19 50:6 61:1 124:1 169:15
**early** 177:18 180:13 210:23 257:22
**easier** 148:13
**east** 170:10 288:14
**Eastern** 1:1 5:5
**easy** 255:4
**Ed** 1:14 5:2
**Edward** 1:10 3:4 5:11,19 6:1,10 17:10 79:2 325:6 326:8
**effect** 85:8
**efficient** 260:21
**efforts** 140:23 141:1 167:17 176:4 178:24 179:2 180:21 224:16
**eight** 168:4
**Eighth** 2:21
**either** 58:24 116:1 125:16 137:10 142:14 147:24 234:19 234:22 247:7 250:22 264:10 292:18 298:6 299:17 321:5
**electronic** 313:13
**elements** 308:14
**else's** 290:19
**EMMA** 2:21
**emma@nsbci...** 2:23
**encounter** 197:9
**encountered** 36:9
**ended** 110:13 251:20
**English** 109:11 157:5
**ensuing** 27:3
**entire** 47:1 84:1 87:16 93:15 95:5 108:4 117:21 122:16 194:11 311:14
**envelope** 118:2,4 121:1 301:22
**envelopes** 90:15 90:17
**equipment** 144:15
**errata** 324:5,7,9 324:13,19 327:1
**error** 296:11,15 296:15
**errors** 116:22
**especially** 242:14,21 250:10
**ESQUIRE** 2:2,6 2:9,15,21
**essentially** 53:22 261:1
**estates** 18:24
**estimate** 21:16
**et** 1:5 5:11
**Etienne** 2:7 5:17 6:18
**Eugene** 245:14 255:24 322:9
**event** 91:22 173:2,21 193:10 296:18 320:9
**Everett** 3:11,19 4:16,17 13:23 29:17,21,23 30:4 32:12,18 39:12,18 46:20 47:2,10 70:8 92:11 93:21 94:7 153:12 181:20,21 182:1 183:7,10 183:23 187:20 188:16 189:5,6 192:9 194:20 197:5 199:17 200:10,24 201:21 203:4 203:16 204:3 205:4 207:1,3 208:16 211:11 211:16 215:15 215:17 219:11 221:2 223:11 224:21,24 227:7 228:1 229:3 230:5,23 235:9 237:6 238:18 239:9 240:5,23 241:10 242:5 242:15,21 243:7 250:7,9 251:3,10,17 254:15 255:10 256:1,20 258:2 258:18,24 260:2 261:2,22 264:22 265:3,4 265:7,8,9,13 265:24 266:16 266:20 267:12 267:21 270:9 273:11 275:22 278:10 280:12 280:24 282:9 282:24 283:7 283:12,19 284:5,19 292:24 293:6 293:24 294:7 294:10,13,17 294:21 295:2,6 295:12,17 297:2,14 299:8 299:12 301:11 301:19 302:3 303:3 304:18 307:21 308:5 309:13 320:16 321:6,13,24 322:6,17 323:2 323:14
**Everett's** 4:10 154:2 188:6,24 191:6 192:7 197:10 201:2 207:15,24 208:23 210:22 211:23 212:8 219:20 223:21 224:11 225:13 231:15 254:8 257:10 282:11 296:21 297:5 297:19 302:11
**everybody** 116:13
**evidence** 31:9 40:23,24 42:5 46:5,19 47:2 85:23 86:8 101:8,9,18,18 101:24 102:11 102:12,14,19 102:21 103:2,8 104:1,9,12 105:21 107:20 138:23 146:10 147:17 207:23 211:10,14 216:23 217:1 254:16 272:20 275:13 295:5 301:18,24 302:2,9,10 304:1
**evidentiary** 216:13
**exact** 12:10 75:5 76:18 149:14 288:17 319:3
**exactly** 9:1 15:23 65:11 178:9 262:2
**exam** 146:17 203:1,11 225:24
**examination** 6:5 144:14,16 145:10 146:1 264:7
**examinations** 144:11 145:8
**examine** 231:10
**examined** 6:2
**examiner** 145:22 145:24 148:19 148:23 149:24
**examining** 247:22
**example** 25:8 36:14 103:5 110:8,10 111:4 111:21 115:3 119:10 157:2 178:22 229:7
**examples** 67:20 68:13
**exchange** 35:1
**exculpatory** 100:11 101:8,9 101:17,23 102:5,11,15 104:10,14,17 216:20
**excuse** 12:8 66:16 164:22
**exhibit** 3:9 4:4 28:12,14 32:5 32:8 33:1,3 34:11,15 42:17

45:5 49:24 77:20 78:2 97:6,6,8 153:6 159:16 160:12 160:16 161:20 161:21 162:2 162:18,22 164:18 167:6 171:6 172:7 174:15 182:4,8 184:4,6 188:2 194:4,11 197:22,24 199:20 201:7 202:1 217:11 217:16,23 224:2 227:4,15 227:16,18 233:5 260:9 266:6,8 278:17 278:19 281:15 281:17 285:22 285:24 305:7 310:18,20 314:17 320:13 320:17,19 321:10
**Exhibit-10** 153:4
**Exhibit-15** 167:11
**Exhibit-16** 171:10
**Exhibit-17** 172:5
**exhibits** 30:10 197:17
**exist** 145:18
**exonerated** 64:6
**exonerations** 74:20
**expect** 14:16 41:10 49:8 83:15 92:17 94:4,14 113:24 121:13 145:17 152:5 158:23 169:2 178:10 208:13 218:24 220:8 221:13 232:3,17,23 259:5 262:2 287:22 290:8 291:1,5 299:6 299:19,21 300:5,24 301:20 304:7 304:21,24 305:8,22,23 306:23 307:3 307:18 308:3 313:22 316:2 319:22
**expectation** 58:2 121:15 213:2 214:17 217:4
**expectations** 213:3 217:20 231:13
**expected** 290:20 321:4
**expedite** 175:7 252:12 282:18
**experience** 113:23 232:22 249:12 299:20
**experienced** 41:19
**expert** 264:6
**experts** 145:4
**expires** 325:18 326:22
**explain** 23:20 42:22 81:7,10 124:19 171:11 195:8 248:23 254:5
**explained** 308:7
**explanation** 83:24 181:16 254:8
**explore** 147:22 150:18 187:17 242:18 314:7
**explored** 140:6
**expressed** 33:16
**extent** 251:13 290:13 295:20 305:15 307:14 309:4
**eyes** 60:8 161:9
**eyewitness** 138:19 139:9 139:11
**eyewitnesses** 138:15 174:3 180:20 271:6 271:13

**F**

**F** 325:1
**F-A-M-I-L-I-...** 264:2
**fabricated** 66:4
**fabricating** 56:10
**face** 161:7,9 191:5
**face-to-face** 14:24
**facing** 192:16,22 220:1 235:23
**fact** 7:6 58:4 61:6,12 98:16 117:1 134:11 143:13 178:8 181:9,19 187:22 192:14 206:18 207:4,8 212:6 215:3 222:11 223:14 225:8,23 232:13 257:7 263:3 278:10 284:20 287:13 291:5 293:10 297:17 308:4 309:13 314:5 318:23 319:8
**facto** 80:1 315:15
**factor** 193:13
**factors** 41:2 200:20 285:12
**facts** 41:6,20 89:11 101:13 109:21 112:13 157:20 189:23 190:7 238:24 284:10 315:18
**failed** 146:8 148:10,17,17 149:17,17 150:14,22 203:4,16,20 204:3 206:8,12 206:19 207:9 207:19 208:16 209:1,13 210:22 212:8 215:6 216:3 219:23 220:15 221:18 236:5 242:24 284:23
**failing** 205:18
**fails** 205:7
**failure** 222:4
**fair** 41:18 100:24 121:24 137:1 148:13 178:20 193:10 213:14 217:3 234:4 236:8 308:13 309:19 313:5
**fairly** 30:3
**false** 56:18,22,23 56:24 67:21 193:17 220:3
**falsely** 7:2 55:2
**Familiagetti** 263:24 264:1
**familiar** 13:11 13:24 14:1,3 26:21 31:19,20 34:7 42:14 45:18 98:5 131:3 143:14 144:24 181:9 181:11 195:15 288:9
**familiarity** 100:23 144:4 188:16
**familiarize** 117:6
**famous** 245:20 257:3
**far** 22:4 63:16 89:16 149:12 214:13 279:22 295:1
**fascia** 107:17
**February** 8:2 9:4 35:8 37:16 50:8,16 51:13 70:18,23 71:9 221:22 279:3
**fed** 58:14
**federal** 21:14 27:20 45:14,15 311:24
**feel** 62:7,12 126:21 208:24 209:10
**feeling** 126:24
**feelings** 48:1
**Feinberg** 2:2,2 3:5 5:14,15 6:7 6:15 20:16 23:3 26:12 28:17 30:18 31:1,8 32:11 33:6 34:18 35:21 37:6 38:20 39:6 40:17 41:17 42:20 45:8 47:22 48:11,20 50:3 54:7

55:16 56:19
57:10,17 58:19
59:12 60:9
61:5,19 62:2
64:12 70:14
77:9 78:5
84:18 85:13
93:18 94:13
96:24 97:5,11
99:20 103:21
104:8 105:5,18
110:9 112:12
113:20 117:11
121:8,23 123:3
124:24 126:11
128:2 132:24
133:17 134:2
135:3 136:8,24
137:22 139:15
142:8 147:1,11
150:10 151:3
151:12 153:9
154:24 155:14
156:10 160:15
162:5 163:1
164:21 166:18
167:9 169:9
170:20 171:9
172:10 173:10
174:8,18
176:10 177:10
180:1 182:7
184:9 185:15
185:23 186:6
186:15 187:16
188:5,22
189:18 190:21
191:12 192:13
193:9 194:7
197:15 198:3
201:10 203:12
204:9,22
205:21 206:4
206:20 208:6
208:20 209:5
209:20 210:10
211:6,22
212:13 213:13
215:2,13
216:11 217:14
218:6,12 219:5
219:16 220:7
220:14 221:12
222:19 224:5
225:17 226:14
226:20 227:21
230:11,17
231:6,20
232:10 234:12
235:5,16
236:14 237:14
239:1 242:13
243:3 244:4
245:11 246:23
247:11,19
248:7,21 249:7
249:21 250:6
251:16 254:13
254:24 256:17
257:1 259:11
260:6 263:19
266:4 267:17
269:20 271:11
271:24 272:14
274:2 276:7
278:22 280:20
281:20 284:18
285:6,11,18
286:3 287:5,19
290:16 291:10
292:14 293:5
295:14,24
296:16 297:1
297:10 298:1
298:23 300:3
300:13 301:6
301:15 302:8
302:20 303:11
303:22 304:12
305:21 306:14
307:17 308:2
308:12 309:7
309:20 310:1
310:23 314:20
315:13 316:8
318:22 320:22
321:9 322:22
323:10,16
**fellow** 7:1
**felony** 306:17
**felt** 127:21 128:4
**female** 13:6
110:12,13
**females** 251:1
**Ferry** 288:14
**fictitious** 279:16
**fight** 281:1
**figure** 49:2
178:7 197:21
220:18 238:7
257:3 279:19
307:7,21
**figuring** 79:4
**file** 26:19,20
27:2,6,17
44:19,20 48:9
84:1 87:10,16
87:16 90:14,18
93:15,16 95:1
95:3,5,6,8 96:9
96:10,13,13,14
96:16,17,18
100:6 108:4,4
108:5,9 113:6
113:18,19
116:2,7 117:21
118:3,7 120:18
120:24 121:12
122:15 131:6
145:9,12 149:2
154:19 155:5
158:15 165:3
174:3,12,24
177:13,22
179:12 180:23
205:19 213:24
216:5 227:23
232:15,16
233:1,6 246:8
255:19,21
296:7 305:1
311:2 312:23
**filed** 11:5 21:15
23:22 43:7,12
43:23 45:2,13
54:24
**files** 27:10,13
96:3 131:4
255:5 258:22
**filing** 45:12
46:17 324:14
324:22
**fill** 33:8
**final** 34:10
162:16 277:8
320:13
**finally** 224:17
**find** 50:18 77:4
125:6 138:14
139:12,16
141:15 167:17
177:11 178:15
178:24 179:1
237:7 238:12
242:15 260:15
260:18 262:13
287:6
**finding** 140:12
**fingerprint**
264:5 268:22
**fingerprints**
263:22
**finish** 40:4
142:21 148:5
150:2 184:12
241:5 307:2
**finished** 28:20
32:15 66:15,17
89:1 160:19
162:20 165:5
182:20 183:2
184:12 188:10
196:13 200:1
201:13 224:13
228:11 253:6
260:22 279:7
279:11
**fire** 195:18,19
195:20
**fired** 189:16
**firm's** 5:17
**first** 6:2 9:24
11:14,15 12:23
16:15 19:5,6
19:21 20:8
21:7,18 23:14
24:18 26:3
32:3,21 44:4,4
51:9 66:10
75:14 76:16
82:2,12 90:22
90:22 93:16
97:20 101:7
102:8 112:19
117:23 129:2
133:18 138:13
142:5 152:2
153:24 154:1
155:15 156:2
156:16,19,22
160:16 165:7
165:10 181:24
182:11 187:23
189:3 198:10
200:7,13 201:2
201:19 223:12
237:19 239:16
243:5,5 250:14
260:24 261:19
264:3,18,23
265:12 266:10
266:19 271:15
273:3,4,8,19
278:2,15
279:14 280:21
281:23 293:12
293:13 294:24
295:5 297:23
311:17 314:10
316:20,21

317:9
**Fisk** 283:21,21 283:23
**fit** 255:6
**five** 17:22 18:17 169:14 242:4 245:22 246:11 248:5,13
**flag** 41:8 187:11 193:16 204:16
**flight** 163:7,23
**flip** 252:20 275:17 316:14
**Floor** 2:21
**focus** 22:22 78:18 311:15 312:4
**focuses** 322:8
**follow** 23:20 40:18 99:19 112:3,16 120:9 130:21 197:4 205:8 269:6 283:9 299:1
**follow-up** 12:24 111:12 149:20 201:20 286:16 295:17 303:2,7 321:4
**following** 43:4 210:21 260:7 260:10 324:7
**follows** 6:3 279:15
**footnote** 45:22
**force** 143:8 268:2
**forced** 253:2
**foregoing** 325:6 325:9,12 326:1
**forever** 83:9
**forget** 54:11 209:24
**forgot** 220:22 290:3
**form** 20:15 23:2 26:9 30:16 35:17 36:21 38:14 40:13 41:13 47:19 54:3 55:14 56:16 57:9 58:16 59:11 60:4,22 64:9 70:11 84:16 85:11 93:11 94:9 98:17 104:22 105:16 110:5 112:10 113:13 117:10 118:9,13,18 119:1 121:7,22 123:2 124:18 126:8 127:24 128:13 132:20 135:2 136:7 137:15 139:6 142:2 146:23 150:9 154:22 156:8 166:16 169:6 170:18 173:8 174:6 176:7 177:6 179:20 185:13 187:14 188:19 189:13 190:20 191:9 193:4 197:12 203:8 204:6,18 205:16 206:14 208:3,18 210:9 211:3,21 212:10 213:8 215:1,9 216:7 217:8 218:3 219:13 220:5 220:12 221:8 222:15,17 225:15 226:9 230:8 232:7 234:9 235:12 236:11 237:10 238:20 240:4 242:11 243:23 245:8 246:19 250:5 251:13 254:10,21 256:14 260:5 263:18 266:2 267:14 269:18 271:8 273:23 275:24 277:2,4 280:18 284:15 285:5,9,16 286:24 287:16 290:13 292:12 293:2,10 295:9 295:19 296:13 296:23 297:7 297:22 298:16 299:24 300:9 301:3 302:7 303:19 304:10 305:15 306:13 307:14 309:4 315:8 316:6 318:18 322:20 324:3,6
**formal** 85:2 118:19 298:2 299:3
**formatting** 159:22
**former** 25:4 64:13,20 288:12
**forms** 123:5 276:23
**formulate** 143:3
**forth** 72:7
**forward** 33:18 35:1 118:19 199:6
**forwarded** 87:22 92:20
**forwarding** 94:20
**fought** 276:8
**found** 44:19 88:21 131:20 212:16,18,19 257:18,19 258:17 263:22 263:22 272:20
**four** 66:11 112:1 112:7 132:12 169:14 194:24 241:12 245:22 248:15
**fourth** 169:19 254:2,3 299:12 300:23 320:15
**Frank** 123:22 241:18 242:4 245:15 251:24 252:1 253:9 269:10,12 273:6 282:2,14 283:1,13 284:6 284:8 294:1,8 295:2 301:19 304:20 309:2,9 309:14,14,17 309:18 310:13 312:7
**Fraternal** 16:20
**frequently** 141:21 252:5
**fresh** 291:23
**FREUDENBE...** 2:21
**friend** 36:6
**friendly** 56:7
**front** 28:18 37:9 43:17,20 66:2 104:4 159:14 195:4,12 211:8 227:9 260:9 316:14 324:15
**fugitive** 72:1 82:18 127:10 257:7
**full** 113:9 114:4 114:9 140:6 195:10
**full-fledged** 118:24
**full-time** 72:24
**fuller** 83:24
**fully** 191:22
**funerals** 16:4
**further** 14:18 42:1 131:16 139:21 225:12 229:18 283:6 287:12 303:1 323:17
**future** 131:7

G

**G-A-R-W-O-...** 241:14
**G-E-I-Z-E-L** 275:6
**G-R-U-C-K-I-N** 264:12
**gain** 105:8
**gained** 116:14
**gangs** 109:6
**gaps** 33:8
**Garwood** 241:13 242:3 266:21 267:6 270:6 273:21 274:4
**gathered** 176:23
**Geizel** 275:6
**general** 51:1 64:4 67:22 86:16 125:19 133:8 138:10 213:8 237:23 239:17 240:12 243:18 272:10 291:16 292:5
**generalize** 305:17
**generalizing** 292:4
**generally** 110:5

112:10,11
121:22 132:21
133:13 136:21
137:16 139:6,8
142:3 147:9
166:20 176:7
185:13 204:18
205:16 209:16
217:8 230:8
246:19 248:19
271:8,19
272:13 290:14
290:15
**genesis** 289:8
**geography**
169:21
**getting** 58:1
104:17 136:9
140:15 144:18
231:4 251:8
252:13 293:7
298:18 318:11
**gharris@krla...**
2:5
**Giant** 257:14,15
**Gilhold** 269:23
269:24
**Gino** 264:3
**girl** 52:21 53:6
53:13 137:18
150:4
**girlfriend**
183:11 192:8
235:18 297:2
308:6,17
**girlfriend's**
183:14
**give** 10:19 36:14
55:4 69:15
77:23 83:23
100:12,15
110:10 112:7
117:23 119:22
142:11 144:20
150:14 155:17
157:2 163:15
186:1,9 192:24
194:17 201:12
214:3 229:12
249:20 258:7
258:11 259:1
262:15,19
266:7 281:21
281:22 282:21
285:13 320:14
**given** 31:12
33:22 35:14
37:12 39:3
46:4 50:15
63:14 64:1
100:21 143:15
207:3 236:2
242:14,22
285:1 326:2
**gives** 111:22
147:14,17
200:17 237:3
246:11
**giving** 98:14
113:5 136:11
197:19 231:8
252:23 255:10
255:11 298:6
298:19
**glaring** 304:6
**glass** 263:23
**go** 9:15 14:16,17
19:21 21:24
25:24 27:12
31:22 34:13
37:9 40:20
45:1 66:11
68:4 75:17
79:18 80:14
81:14 89:1,3
91:3 93:16
96:9,24 101:2
105:23 106:19
108:5 110:24
113:6,19 116:8
117:22 119:11
119:18,24
120:18,24
123:13 127:24
128:24 129:3,3
129:11 131:4
131:18 139:11
142:17 143:4
145:8 151:3
152:22 158:20
166:5 178:3,18
179:7 182:1
186:18 195:1
197:18 199:6
205:18,19
213:22 220:18
220:19 226:14
232:16 233:3
235:6 237:4
240:19 243:19
244:15 245:1
247:9 250:7,8
252:17 255:13
262:15 263:14
264:17 265:12
266:5 273:2,14
278:2,4 283:5
287:20 301:1
301:10 309:20
317:12,14
319:19
**goal** 126:1
**goes** 61:18,20
80:12 83:10,12
93:14 102:23
132:13 139:13
176:24 213:24
238:5 253:24
255:9,24
**going** 9:15 12:9
19:3 21:24
32:24 40:6
41:22 42:1
49:22 50:18
71:14 81:12
86:22 114:7
118:19 120:9,9
122:14,15
123:13 132:7
136:17 138:9
139:18 141:15
147:22 148:11
150:11 151:5
160:5 161:20
171:16 173:18
176:3,19,19
177:16 190:2
191:23 193:18
194:10 197:1
199:14,19
201:19 204:7
226:16 227:15
231:9 234:16
238:6,8 249:4
249:13 250:8
252:12,16
257:18 258:3,7
259:1 262:24
263:8 264:24
268:2,3 271:4
281:13 285:19
292:21 301:10
307:7,22
309:22 310:16
313:16 314:9
314:13 317:15
320:7,14
**good** 79:9,21,22
100:16 115:3
157:22 169:22
175:18 212:15
306:15 316:11
**Goodman** 270:7
270:8 274:18
274:22
**gotten** 281:1
**Grace** 2:6 5:16
6:18
**Grand** 4:11
194:9 195:3,4
195:12 252:14
**grandchildren**
17:24
**Graterford**
235:15 240:6
**Grays** 288:14
**Green** 257:14,15
**Gregory** 182:24
**Gruckin** 264:12
**guess** 48:16 92:2
103:4 156:11
159:18 248:20
254:22 295:21
302:21 320:6
**guidance** 134:6
**guiding** 135:23
**guilty** 31:3
55:18,19 59:3
59:6,13 61:7
62:6 101:20
205:3
**gun** 161:13
183:15 189:15
250:24 258:17
259:1 267:7
274:3,5
**guy** 102:1
109:13,13,15
150:4 245:16
275:2 300:21
**guys** 79:17
257:24

**H**

**H** 3:7 4:2
**H&B** 185:3
200:15
**half** 6:13 82:22
84:7,13
**halfway** 279:14
308:15
**hand** 28:11 32:4
160:7 182:13
197:16 278:23
314:9,12,13
321:10
**hand-picked**
73:3,5
**handed** 97:12
282:11

**handing** 160:16 164:22 171:11 174:11 182:9 194:8 199:21 213:22
**handle** 73:17
**handled** 53:10 79:16 81:1 315:22
**handles** 213:17
**handling** 298:20
**hands** 112:23
**handwriting** 162:19 174:19 176:15 179:24 198:6,8,9 199:7 266:11 267:20 275:18 276:2,4,10 277:13
**handwritten** 3:23 4:7,12,17 129:22 165:2 175:1 198:5 266:7 267:4,6 267:10 277:9
**happen** 119:21 243:17 262:3 289:10 299:17 299:21 301:17 303:15,21 304:3,5 305:7 317:11
**happened** 14:4 34:24 47:14,17 58:21 59:8,20 96:15,22 111:5 111:24 121:20 158:6 167:2 172:3 180:19 180:24 189:10 191:21 228:24 233:16 239:10 240:3 260:7 272:24 277:19 278:2 291:2 292:10 305:20 317:8 318:15 320:4
**happening** 304:2
**happens** 115:10 119:19 142:14 145:7 214:4
**happy** 33:11
**hard** 236:12
**hardest** 140:14
**Harris** 2:6 5:16 6:18
**hat** 161:10,11
**head** 16:20 120:4 191:24 238:8,9 244:17 257:20 268:3
**heading** 46:18 97:21 118:16 163:10
**heads** 113:22 238:1
**health** 125:3,3 316:11
**hear** 126:6,14 144:23 316:10
**heard** 6:17 21:17 23:15 24:18 46:9 56:9 102:18 144:7 148:6 185:8 237:21 238:3 239:19 251:18 267:1
**hearing** 21:17 47:8 94:18 107:17 164:11 196:24 281:9 283:3,24
**hearsay** 295:13
**heavily** 85:6 259:16
**height** 172:12,16 173:4,22
**held** 5:8 77:7 231:5
**help** 48:23 77:4 79:3 103:14 127:11 229:3,8 229:9,11
**helped** 48:18
**helpful** 31:22 141:9 265:21 311:7
**Heo** 7:5 26:19 27:7 30:14 33:14 42:11 43:1 44:21 74:24 75:17 145:17 154:4 155:3 164:4 172:24 176:21 197:2 203:6 243:4 254:17 255:11,12 280:21 282:13 284:21 293:7 293:12 294:2 296:7,7,7,8 297:15,20 298:13 299:14 304:20 310:8 311:3 322:1 323:3
**Heo's** 185:4
**hesitate** 109:14
**hey** 148:17
**hide** 105:19,20
**highly** 41:19
**HILL** 2:15
**history** 3:18 70:20,20 97:15
**hit** 80:14
**hold** 49:15 281:21
**holding** 217:15
**hole** 115:22 116:6 129:12
**Homes** 288:7,9 288:11 294:3
**homicide** 14:9 18:4,19 26:18 26:20 27:1,6,9 27:13 40:10 44:16,20 48:9 57:21 68:7 71:15,22 75:19 76:5,21 84:1 85:24 87:10,10 87:16,18,21 88:6,12,20 90:14,18 91:1 91:4,10,11,14 93:16,23 95:8 96:3,12,17 100:6,20,22 114:23 117:21 117:22 118:7 120:18,19,24 122:17 127:3 128:6,15 140:15,16 141:24 142:5 145:11 149:2,5 165:3 170:16 174:12,24 180:22 181:22 185:3 190:14 196:10 201:22 216:5 227:23 236:19 246:8 253:16,18 265:23 293:15 299:3,20 300:19 302:17 305:1 306:6,9 306:17 307:4 311:2 315:6 317:16 318:13 319:4,5,7
**homicides** 300:15
**honest** 114:1 221:3
**hope** 126:19
**Horn** 52:22 54:12,20,20
**hospital** 124:8 124:22 142:18 196:21
**hours** 73:2 163:15,17 303:24
**house** 53:8,8,12 183:15 251:20 258:5,18
**Housing** 288:12
**Hudson** 2:21
**Hughes** 17:7,9 17:10,15 79:2 79:2,5 82:9,19 90:9 184:19 199:23 200:23 220:9 222:9 223:20 224:20 277:20
**hypothesize** 240:2
**hypothesizing** 222:5 306:3
**hypothetical** 103:23 132:8 176:19 246:10 249:3 272:7
**hypothetically** 272:1
**hypotheticals** 103:22

**I**

**ID** 271:14 272:4
**ID'ing** 90:11
**idea** 30:17,19,24 55:5 70:12 98:7 117:23 124:20 143:3 151:24 176:14 177:9 189:19 189:21 191:14 201:3 222:8,10 222:23 223:17 223:22 239:24 243:11 246:22

266:3 267:16 271:1 279:9 299:18 322:23
**ideal** 271:10
**identifiable** 263:21
**identification** 28:15 32:9 33:4 34:16 42:18 45:6 50:1 78:3 97:9 153:7 160:13 162:3,23 164:19 167:7 171:7 172:8 174:16 182:5 184:7 188:3 194:5 198:1 201:8 217:12 224:3 227:19 271:5 278:20 281:18 286:1 310:21 314:18 320:20
**identified** 89:16 165:12 179:6 295:2,6 299:1 301:19
**identifier** 264:5
**identifies** 304:19
**identify** 69:5,8 122:22 123:10 123:13 287:9
**identifying** 44:20 164:14 166:13,21
**Il** 7:5 30:14 145:16 155:3 293:11 304:20
**immediately** 105:13 109:16
**immunity** 37:12 39:3
**impeachment** 102:18,21 103:1 105:11
**implicates** 256:1
**implicating** 236:2
**important** 119:7 314:5
**incarcerated** 7:3 240:5
**incarceration** 210:20
**incentives** 220:2
**inches** 97:21
**incident** 98:23 99:1 192:7 254:5
**included** 222:23
**includes** 87:17 282:11
**including** 84:6
**incomplete** 77:16 151:17 227:1,9 310:6 314:3
**inconsistency** 297:4 298:12 303:3,16 304:6 304:19 307:5 307:19
**inconsistent** 102:12 302:1,2 302:9 308:5
**incorrect** 77:15 151:16 226:24 310:6
**incorrectly** 228:2
**inculpatory** 58:4 284:7 312:5 314:1
**independent** 28:2 186:18 187:6 192:12
**indicate** 289:20
**indicated** 146:5 146:14 147:14 148:12 202:22 203:15,23 220:24 279:3
**indication** 164:6
**individual** 133:16
**individually** 133:19
**influence** 157:5
**inform** 104:19 148:10
**information** 29:7 40:10 43:13 46:6 47:5,9 49:6 60:15 61:1 69:15 88:16 89:6,11,15 91:22 93:7 94:20 100:11 102:7 104:17 105:8 107:3,7 107:9,11,12,14 108:1 112:6,24 113:1 114:2,5 114:20 116:14 116:18 119:12 120:10 122:11 125:18,24 126:18 128:20 128:23 129:17 129:19,24 130:15,18,20 132:2 134:13 134:19 135:6,8 135:14,15 136:12,16 137:4,9 138:3 140:2,7 141:12 150:21 151:21 151:24 152:10 152:23 154:10 158:13 159:10 161:24 163:6 163:13,20,21 165:19 166:6 167:17 169:10 169:11 175:7 176:1,23 178:17 179:7 183:4 185:3,18 186:1,11,22 187:2 191:11 191:15,16 193:1,7,8,12 193:17 195:24 200:9,11,17 205:11,18,24 214:9,14 216:3 216:21 219:7 220:3 229:4 231:4,8 234:20 234:21 237:3 238:10,22 239:11 241:7 241:12 242:6 242:17 244:1,2 244:8,16,23 246:11,14,15 247:3,14,23 248:5,12,13,24 249:15,20 250:2 254:14 255:2,3,12 256:11,21 257:11 258:24 260:1 261:11 261:11 265:2 265:10,18 266:24 267:19 273:11 275:21 278:1,3 280:5 284:7 285:2 293:7 296:20 298:5,11,19 301:20 303:15 307:12 308:16 308:21 316:4
**informational** 110:15
**informing** 319:8
**initial** 80:11 83:3 117:24 149:22 156:23 157:3 180:5
**initiated** 243:18
**injury** 104:4
**innocence** 46:14 66:4 67:3
**innocent** 7:6 31:4 46:8
**inside** 109:10 142:19 319:5,6
**insofar** 202:16
**instances** 244:6
**institutional** 115:11
**instructions** 9:16
**insuring** 125:23
**integrity** 24:6 27:20 45:18,19
**intellectual** 123:19
**intending** 113:21
**intent** 238:16,17
**interaction** 118:8 193:21 308:6 321:1
**interactions** 100:1 124:5 126:22 320:10
**interfere** 292:2
**Internal** 98:11 99:3,6
**interpretation** 147:3 231:7
**interpreting** 145:1
**interrogation** 59:20
**interrogations** 127:15 182:16
**intervenes** 282:23
**interview** 3:19 3:20,21,22 4:15,23 12:21 13:2,3,5,8,13

13:14,15 14:5
14:11,13,20
29:15 30:4,5
40:15 81:16
90:16,16 92:3
92:11,13,14,20
106:4 108:17
109:23 110:11
110:16 116:4
118:9,13,18,19
118:24 119:19
127:17,19
137:11 138:17
138:19 139:19
142:21,22,23
148:2,5,7,8,8
149:21,23
150:3 153:11
154:7,11
155:20,23
156:3,12,17,19
157:13,19
158:2,14,22
159:1,12
160:17 162:17
175:17 176:4
177:4 178:12
178:18 182:11
182:17,23
184:10 192:4
197:5,10
199:14,22
200:3,5 201:2
201:24 221:5
221:14,23
222:17 223:1,3
223:10,11
224:8,9,11
225:20 227:5
233:4,8,24
234:16 236:16
236:21 237:2
239:6,10 240:9
240:14 241:10
244:10,24
245:1,3,6,23
246:1 255:24
260:8,11,12
261:2,5 263:1
263:8 266:15
267:12 268:16
268:17,20
272:6 273:9
275:22 276:19
276:23,23
277:4 280:8,12
292:24 298:2,3
298:7,22 299:3
299:12,13
300:24 301:8
301:10,16
303:2 304:7,15
304:21,23
319:14,22
320:15 321:5
321:11 322:5,8
323:8,11
**interviewed**
60:11 68:14
69:21 93:22
108:24 110:15
139:13 174:4
176:12 178:8
178:16 181:20
188:8,17
199:17 224:21
241:21 300:22
304:5,18
**interviewing**
109:22 145:23
243:13
**interviews** 48:7
57:19 68:10
94:1 118:1
127:2,8,9,13
127:14,20
139:21 141:22
142:19 156:6
178:3,5,6
179:12 180:13
180:20 182:16
213:22 236:18
237:1 246:2
263:4,15
270:23 272:16
277:5 303:1,7
303:14
**introduce** 5:13
49:19
**introduced**
77:19
**investigate** 67:1
133:6 166:23
205:9
**investigated**
27:1,12 99:6
105:4
**investigating**
212:16 219:10
**investigation**
22:22 24:5
27:3 31:23
40:11,24 42:11
48:23 72:22
73:16 75:1,3
76:1 77:22
78:19 79:1
80:12 82:21
83:12 84:13,23
85:7 87:18
114:16 115:16
116:15 117:5
119:8 131:8,21
132:13 138:11
138:13 142:16
142:24 145:16
147:7 152:18
153:15 155:2
167:2,3 168:24
174:7 176:3
180:6,18 181:6
187:9 190:22
191:19,24
193:2 197:18
199:17 210:15
210:15 220:10
229:19 233:17
237:2 259:17
264:11 277:17
277:18 289:12
295:1 299:22
300:6 309:9
310:9,11
312:18 315:5
321:22
**investigations**
72:19 78:20,21
80:15 98:11
99:3 114:23
134:7 206:6
315:22
**investigative**
80:23 86:18
89:20 224:16
238:12 268:18
269:5 290:11
**investigator**
43:22 68:23
72:17 74:6
209:9 213:11
214:18
**investigators**
24:12
**involve** 124:21
**involved** 20:4
23:10 31:24
51:19 52:8,9
79:1 84:12
85:7 95:16,24
97:22 98:13,22
100:5 114:21
136:13 152:22
166:14 176:2
192:4 195:13
195:17 213:21
233:12,24
253:3 259:16
277:21,22,23
300:6 316:23
**involvement**
22:4,21 23:16
76:1,7 81:8
83:11,14,16
154:17 155:2
280:15 285:20
322:10
**involves** 253:19
**involving** 235:18
**Iron** 2:3
**ironed** 302:18
**issue** 22:7 46:6
77:11 91:16
99:17,23 247:2
**issued** 93:5
94:11 318:10
**issues** 35:11 51:2
**item** 54:18
272:19 273:19
**items** 273:3,16
**IV** 5:2

**J**

**jacket** 161:11,12
**jail** 36:7 37:11
123:13
**James** 16:15
75:16 264:14
**January** 32:13
84:4 172:18
180:24 321:13
322:6
**jderose@clar...**
2:18
**Jean** 52:22
54:12,20
**Jeannine** 1:12
325:3,17
**Jennings** 322:9
**Jerry** 74:3
**job** 72:24,24
85:3 212:15
214:2 277:12
306:15
**Joel** 20:9 95:17
121:13
**John** 2:15 5:22
90:16 101:24
102:1 132:9,13
132:17 245:16
253:19 276:8

280:23 281:1,4 281:7,14 282:1 282:7 283:8 310:10 311:2
**Johnny** 8:1 36:16 37:19 38:8,9 51:8 63:17 66:1 75:2 87:8 95:7 221:22
**join** 6:19
**joined** 5:16 6:17 76:5 280:9
**Jojo** 245:16 257:2
**Jolly** 257:14,15
**Jolly's** 257:20
**Jon** 6:15 174:6
**Jonathan** 2:2 5:15
**Joseph** 195:14 195:16,22
**judge** 9:18 20:22 20:23 21:4 37:9 122:8 152:11 190:2 205:23 307:18
**judgement** 134:19 209:21 306:20
**July** 22:23 30:4 76:8 78:9,13 98:1 153:12 181:20 188:17 199:14 227:5 233:17 235:8 260:10,11 261:2 266:15 267:22 273:9 280:8,11 287:14,21 294:21
**jumped** 307:6
**jumping** 87:6 256:10
**jumps** 239:18
**June** 21:15,20 51:21 52:1 184:24
**Junior** 273:6
**jury** 4:11 9:19 194:10 195:3,5 195:12 211:9,9 212:2 248:23 252:14
**justice** 80:19 249:12
**justify** 114:17
**juvenile** 110:20 181:15

**K**

**K-A-P-U-S-T-A** 183:1
**K-O-T-Z-P-A...** 166:1
**KAIRYS** 2:2
**KAPLAN** 1:22
**Kapusta** 183:1
**Karen** 5:23
**keep** 15:24 64:19 194:21 196:14
**kept** 129:16
**Kevin** 274:9,11 274:16,17
**key** 32:1 93:21 211:23
**killed** 52:21 53:11,12 110:13 137:19
**killing** 58:9 203:6 282:7
**kind** 16:4 28:9 80:1 112:14 137:2 158:24 161:12 315:15
**kinds** 36:5
**knew** 36:24 56:7 56:7 110:19 143:4 159:10 160:10 235:7,8 238:10 244:18
**know** 9:1,3,6,7 10:6 13:6,12 15:23 20:9,23 21:10,22 23:12 26:9 28:20 30:16,22 31:20 32:14 38:9,9 38:15 40:2,6,8 40:14 42:14 44:1,4 47:3,13 48:5,8,9,12,15 49:11,13 54:3 54:11,12 56:5 56:6 58:21 60:4,13 62:15 63:16 64:9,11 65:11 66:14 69:3 70:11 73:7,8 74:1,9 74:10,17 75:5 76:18 77:3 78:14 79:8,8 79:14 81:19,23 81:24 82:17 85:11,12 87:3 94:9,24 95:19 96:20 101:4,8 104:6,22 106:6 116:11 120:7 120:12 121:19 122:1 123:6,16 124:21 126:8 128:13 133:18 133:24 134:1,3 141:11 143:13 144:17 145:9 149:3,7,9 152:6,9 154:12 155:8,13 159:7 160:18 162:19 165:5 167:1,13 170:3,4 174:19 175:4,15 176:11,21,22 177:8,15,16 179:20 180:9 181:17,21 182:1,20 183:2 184:11 188:9 192:5 193:18 196:13 197:4,8 197:12,13 199:24 200:5,7 200:23 201:12 202:5 203:1 208:7,19 209:24 212:23 213:24 214:1 215:6,9 216:18 217:2 220:1 221:9 223:2,20 224:12 228:10 229:22 232:7 234:14 235:12 235:14 236:15 237:10,16,17 238:4,20,21 239:8,21,21,24 240:4 241:6 242:11 243:21 245:9 247:13 247:15,21 249:14,19 250:10,12,18 251:9,13 253:5 255:7 257:23 258:16,17,23 259:3,3,15 260:22 264:7,9 264:21 266:2 267:15 269:3 270:2,10,11,13 270:22,24 271:13,21,22 271:23 272:15 272:18,24 273:1 274:15 276:1,15 277:13 279:7 280:12 282:17 283:21 286:8 288:8 289:7 291:9 292:12 292:13,15,21 293:2,4 295:20 296:13,23 297:7 298:13 298:16 300:9 300:14 305:15 308:8,20 313:3 316:6,11,12 317:9,21,24 318:23 320:3,9 322:4 323:1,12
**knowing** 56:18 56:21 159:4 187:9
**knowledge** 49:2 120:21 155:10 157:21 181:4 186:18,19 187:3 191:16 213:9 234:20 241:22 326:3
**known** 55:23 58:8 148:20 160:2 164:8 189:23 200:8 235:9 253:9 265:3,7 272:2
**knows** 120:11 238:13 309:17
**Korean** 165:18
**Kotzpaner** 165:24 166:3,6

**L**

**lab** 268:23
**label** 314:11,14
**labeled** 29:5 165:10,15 184:22 268:8
**Lamb** 245:16 253:20 254:15 276:8 280:23 281:2,4,8,15 282:1,7 283:9

310:10 311:2 317:24
**Lance** 195:17
**language** 157:5
**Lanzelotti** 19:19 20:1 167:23 168:7
**larger** 106:23
**late** 31:12 55:9 81:4 177:18 210:21
**law** 2:9 5:21 26:17 97:13 227:24 313:20
**lawsuit** 6:22,24 24:20 38:10
**lawyer** 47:11 212:7,15 213:4 214:18 216:16 217:6 319:24 320:5,6
**lawyers** 24:12 43:11 45:17 73:9,12,21 212:23 213:23 306:20
**lead** 74:19 152:24 192:19 233:11
**leading** 50:11 107:12,23 153:18 156:3 156:14 233:17 245:6,24 321:22
**leads** 84:22 237:19
**LEAMAN** 1:22
**learn** 47:16 138:19 149:17 205:7 262:4 272:1
**learned** 14:11 24:19,22 51:14 52:4,10 109:2 169:13,17 210:22 212:7
**learning** 164:13 187:20 278:16 284:10
**leave** 83:17 89:8 108:9 130:15 131:22 134:8 313:24
**leaves** 216:4
**leaving** 120:14 163:7,23
**left** 130:12,19,22 165:11 258:4 268:22
**legal** 229:8 232:21
**legally** 46:1
**lend** 190:9
**length** 37:15 224:9 255:10 282:10 310:8
**lengthy** 30:3 38:18 182:9
**Lester** 241:14 242:3 269:10 275:5,10 312:7
**let's** 9:4 12:22 19:21 31:21 37:14 39:7,9 42:9,15 45:1 57:3 70:15 74:23 75:17 89:11 96:24 105:6 109:20 114:11 132:7 137:2 148:18 151:3 153:2 160:4 180:17 182:1 187:23 199:6 201:4 209:23 213:16 215:23 226:14 228:9 233:3 234:3 235:6 241:9 242:2 246:10 248:11 250:7 260:7 264:17 266:5 266:16 268:1 272:1 273:2,14 277:8 288:3 289:8 290:17 292:15 297:3 304:4 309:20 311:11,13
**letter** 4:16 228:1 229:1 230:6,13 230:18,22
**letters** 293:12
**level** 213:17 285:1
**Levi** 3:21 161:22 270:19
**library** 185:5 191:11
**license** 74:1,2
**lie** 103:3 114:7 204:20 284:2
**lied** 37:10 39:3
**lieutenant** 19:19 19:20 78:17 89:2 142:15
**life** 37:3,11,20
**light** 61:6 161:6 173:13 313:15
**Lim** 165:17
**limited** 49:3 102:11 152:21 160:3 190:13 235:3
**LIN** 2:2
**Linda** 5:23
**line** 9:11 41:18 71:24 72:6,7 78:23 79:19 80:8 94:23 96:5 108:16 117:14 120:2 125:1 127:12 127:16 139:16 149:15 214:4 217:3 245:21 265:14 274:8 276:5 279:8 282:16,22 283:19 301:7 323:11 327:2
**lined** 277:6
**lis** 259:7
**list** 4:7 12:22 15:13 18:22 19:3 175:14 177:3 179:8 268:17 272:19 273:15,16,19 275:9 314:8
**listed** 178:2,23 245:22
**listening** 267:11
**lists** 175:2 273:3
**litany** 9:16
**literally** 87:17 281:13 311:12 319:7
**litigation** 23:24 43:3 73:19
**little** 22:23 30:2 35:9 52:21 53:6 85:16 92:14 100:10 114:12 131:16 142:11 152:20 158:18 161:4 162:18 282:19 289:22 310:10 310:17 321:21
**lived** 133:7
**lives** 141:14 170:23 274:16 288:5
**living** 15:14 18:23 169:17 298:8
**Lloyd** 37:24 38:3,12,16
**Lloyd's** 38:23
**LLP** 2:20
**locate** 140:11,23 141:8 180:21 263:14 266:8 309:1,2,6,14 309:16
**located** 171:22 288:18,21
**locating** 140:17
**location** 12:10 12:11 143:18 286:11 288:23 288:24 319:3
**locations** 45:10 230:3
**logistically** 115:19
**logistics** 12:11
**long** 11:21 45:9 78:6 149:3 154:15 161:13 184:10 194:8 250:24 260:19 272:3 315:20
**look** 11:1 14:14 14:23 25:1 26:6,7 27:6,16 27:19 28:6 41:1 42:5,23 50:4 66:8 92:13 119:17 129:8 130:22 131:18 153:3 159:23 167:24 171:20 172:12 178:3,5,6,14 179:11,14 180:23 186:18 188:9 193:13 201:4 241:9 245:12 250:8 255:4 267:9 277:8 279:6 290:2 318:15
**looked** 14:19 15:4 84:1 141:12 154:18 155:5,12

158:15 189:23 202:1 268:23 303:1 314:21
**looking** 12:20 117:7,16 118:6 156:12 159:15 255:21 296:2 303:24
**lookout** 166:8
**looks** 67:11 97:18 175:17 180:12 181:9 198:6,9,19 228:6 241:10 251:17 254:2 256:10 258:7 260:14 261:20 269:24 273:9 275:21 308:23 313:6,10 320:15 322:8
**lose** 115:10
**lost** 86:4
**lot** 9:23 10:1 43:2 70:18 141:19 189:9 235:9,13 255:1 260:3 292:4 306:6 313:7 317:16
**Louise** 13:10 182:17 183:11 235:18 264:19 264:24 265:2 265:17,22 287:14,21 289:5 292:18 292:23 293:23 294:7 297:4,24 298:6 299:2 301:10,18 303:2 304:5 321:2,5 322:1 322:18 323:3 323:14
**Louise's** 251:20
**lower** 36:6 258:5
**lunch** 226:22
**lying** 41:7 209:19

**M**

**M-A-R-S-D-E...** 274:14
**M-A-S-S-E-Y** 181:11
**machine** 311:9
**macro** 213:16
**Madison** 3:20 160:17 162:13 173:6,11,24 270:18 272:2
**Madison's** 164:2
**Mafia** 257:6,16
**Magioni** 228:3
**mail** 21:11,12
**mailbox** 115:24
**main** 128:19 307:20
**maintained** 221:2
**majors** 306:16
**making** 122:10 216:12 232:21 238:15 242:14 267:10 268:17 301:9 303:6 315:17 324:6
**male** 110:12 274:24
**males** 262:8,11
**Malone** 73:14 73:15,19,22
**man** 7:5 30:14 130:4 135:7 145:16 155:3 173:13 195:14 195:22 198:21 251:23 253:15 293:11 304:20
**man's** 129:7
**Mangoni** 13:22 15:18,22 25:10 25:14 29:17 30:6 64:18,23 65:17,22 79:1 79:5,10,13 82:9,19 90:8 93:24 94:5,15 94:19 155:9,16 157:20 158:17 158:24 159:17 159:18 184:19 199:23 200:24 220:8 222:9 223:21 224:21 227:6 228:2,17 231:23 234:15 234:23 235:7 238:17,22 239:16 244:2 245:5 251:10 254:4 259:6,16 259:19,22 266:16 269:4 276:14 277:20 280:9 300:21 317:3 321:12 322:4,16 323:2 323:13
**Mangoni's** 85:5 238:9 267:12
**March** 180:24 250:17 258:19
**mark** 30:10 97:5 194:11 227:15 320:16
**marked** 28:12 28:15 32:5,9 33:4 34:11,16 42:18 43:18 45:6 50:1 77:20 78:3 97:8 153:7 159:11,13 160:13 162:3 162:23 164:19 167:7,11 171:7 172:8 174:16 182:5 184:7 188:3 194:4,14 197:22 198:1 201:8 217:12 217:23 224:3 227:4,19 254:4 260:9,18 266:6 273:14 278:20 281:18 286:1 310:21 314:18 320:20
**Market** 2:16 200:15
**marking** 174:13
**marry** 309:12
**Marsden** 274:12 274:13
**Martin** 56:3
**Massey** 4:9 181:11 184:3 185:2 188:8 258:9 259:2
**match** 261:21
**matched** 254:16
**material** 29:21 49:7 87:22
**materiality** 46:24
**materials** 10:1 25:2 86:18 89:20,23
**matter** 5:9 143:13 150:3 240:12 271:12 291:16 318:11 320:6
**Maureen** 53:13 54:5,8
**Maurice** 3:22 162:17 270:19
**McNesby** 16:7 16:13,15,19,19 79:2 82:13,20 196:22 197:1 253:1,14 277:21 278:4 311:18,21 312:14 315:19 316:3 317:11 318:23
**McNesby's** 314:6
**mean** 14:2 38:16 61:21 62:5,8 72:9 73:6 93:4 95:4 101:9 102:21 106:6 156:2 209:7 216:18 244:13 266:18 274:19 304:3
**meaning** 204:2 221:1 277:20 288:24
**meaningless** 135:11 209:8
**means** 9:12,16 90:5 146:16 179:8 203:15 240:12 262:10 270:3 274:21 319:4
**medical** 125:2
**medication** 125:13,16
**meet** 8:6 11:11 11:15
**meeting** 11:14 11:17,19,21 12:3 14:24 15:1 29:10 270:1 315:1
**meetings** 11:14 14:23 94:6
**meets** 315:10
**member** 257:6 257:16
**members** 49:16 179:23 315:2 317:18

**Memo** 3:14 263:23
**memorable** 8:12
**memorandum** 44:10
**memory** 115:11 190:13 268:2 279:16 291:22
**Men's** 165:18
**mental** 125:3
**mention** 87:7 135:12 208:15 208:24 250:15 250:19,21
**mentioned** 7:23 14:7 15:11,17 18:21 22:17 25:8 26:3 34:20 42:24 49:5 82:9 83:24 85:22 95:21 98:16 133:20 141:21 152:17 173:5 173:11 184:3 241:11 250:24 257:2 261:22 263:3 265:9 266:20 270:9
**mentioning** 124:1
**mentions** 241:18 257:14
**messages** 129:9
**MESSING** 2:2
**met** 6:11,13
**method** 114:15 115:15 144:8
**methods** 144:5
**Michael** 4:15 42:12 44:11,21 164:14 165:12 165:19 167:18 224:8 229:20 229:22 230:1 241:14,19 242:3 265:3,7 265:13 269:10
**mid** 31:12 123:18
**middle** 46:19 168:1 251:22 282:23
**Mike** 166:8
**million** 36:8 61:14 240:16
**mind** 106:19 191:13 194:22 207:12,14 232:14
**mine** 198:12,17 198:19
**minimal** 285:1
**minimum** 296:19 301:24
**minutes** 10:9 11:22 227:13
**Miranda** 143:16
**mirror** 144:22 144:22
**mis-** 213:2
**miscellaneous** 131:6
**misspelled** 277:11
**misspoke** 172:21 279:8
**ML** 268:21
**moment** 7:23 28:19 29:19 39:10 43:18 44:1 47:3 52:5 59:2 90:1 160:18 167:13 193:8 199:24 202:1 224:6 228:9 238:7 286:15 314:11 320:14
**moments** 29:20 48:22
**Mona** 3:20 160:17 173:5 270:18 272:2
**money** 33:20 62:1
**Monk** 257:23
**month** 15:23 26:11
**months** 21:2 30:5 62:24 65:12 114:24 117:5,14 172:23 223:13
**morgue** 142:18
**morning** 6:12 52:24
**motive** 103:13 103:17
**move** 70:16 115:7,8 195:19 219:17 220:22 236:22
**moved** 141:6 180:15
**moves** 88:10
**moving** 20:3 223:23
**multiple** 109:9 127:9 131:13 244:8 246:17 247:3,14,23 249:15 263:3
**murder** 7:5 22:7 26:19,24 27:7 33:14 37:1 42:11 43:1 52:20 53:6,10 53:15,18,24 54:5,19,20,22 55:23 58:3,8 60:7 74:24 75:17 80:21 84:4 89:12 111:2,2 117:15 127:9 128:8 138:12 139:23 140:21 142:14 154:4 155:3 167:22 168:4 169:14 176:21 189:11 195:14 196:1 197:2 200:15 225:2 243:4 245:16 251:19 254:16 254:17 255:11 255:12 256:2,3 256:8 280:21 280:23 281:8 281:15 282:1 283:9 294:14 294:15,18,22 296:8 297:20 299:15 310:9 310:10 318:5 322:1,9 323:4
**murdered** 54:8 54:13 109:7 195:23 202:7
**murders** 202:4 243:7,8,9 244:17,19,24 245:14,15 248:14,15 255:4,5 280:14 280:16
**Myers** 98:2,4 99:10,14
**Myrick** 245:14 250:13 256:1 256:12 272:22 275:14
**Myrick's** 322:10

**N**

**N** 3:2
**name** 5:2 6:8,15 13:6,10,12,23 16:15,24 22:21 23:7 25:14 29:21 31:18 37:24 42:12 44:7 53:13 69:5,20 75:14 77:2 82:2 84:3 85:5,8 98:4 109:16 128:22 130:12,12,20 131:5,10,22 132:15,23 133:5 134:9 136:5 155:15 156:2 166:2 181:10 195:15 198:22 229:22 230:2 251:23 252:5,8 257:23 264:3 266:21 266:22 277:10 286:11 289:17 289:19,24 290:6 293:13 296:3 316:19 316:21 324:9
**named** 7:7 8:1 18:22 21:8 24:24 25:15 33:17 43:22 90:1 98:21 165:20 166:7 195:14 245:16 253:15 279:18 308:17
**names** 19:1 37:14 42:10 69:18 82:20 132:8 133:20 175:12,20 180:8 200:18 202:6 261:20 261:22 262:4 264:10 269:9
**naming** 169:2 297:14
**Napa** 265:4 288:5,19
**narcotic** 157:6
**nature** 46:6
**NCIC** 262:7

**near** 160:24
**necessarily** 69:12 90:18 271:10
**necessary** 81:17 92:24 265:21
**need** 7:16 10:2,5 10:9,15 33:10 43:18 70:21 114:8 135:12 182:10 209:21 236:22 241:6 269:2 272:4 282:20 324:17
**needed** 81:13 138:6 300:23 306:15
**needs** 73:15 107:16 113:9 120:7
**negative** 262:8
**neglected** 49:18
**neighborhood** 133:7 141:14 202:5 289:2
**nephew** 74:12 74:14
**Nespoli** 19:12 80:8 83:4,5 84:5,12 88:9 88:14 168:9,13 177:17 277:9 277:10,17,21 278:3 293:18
**Nespoli's** 84:3
**NEUFELD** 2:20
**never** 34:24,24 58:23 68:22 106:13,17 126:24 127:1 128:4 129:11 201:17 210:21 212:7 221:23 228:14 258:15 271:13 279:9 280:1 286:11 287:8 300:14 312:11,11 320:9
**new** 2:22,22 20:23,23 21:5 80:18 95:22 122:8 127:15 152:11 192:15 205:23 227:15 307:19 318:9 319:9,20
**news** 55:9 279:17
**newspaper** 185:4,17 186:1 187:3 207:4
**newspapers** 219:21 242:23 279:17 284:21
**nickname** 164:4 199:1 251:24 275:6 282:3
**night** 53:8
**nine** 46:19
**non-stop** 129:14
**normally** 10:8
**north** 163:10 170:6,10
**northeast** 170:4
**notary** 1:13 324:17 325:4 325:18
**note** 99:12,15 119:11 128:21 129:22 130:7 135:7 165:24 171:13 199:22 222:21 224:7 227:3 262:7 263:20 268:9 270:5,14 277:9 277:9 279:1 293:6 311:19 313:10 319:15 321:10
**noted** 85:1 99:18 151:1 222:17 324:7
**notes** 3:23 4:12 128:20 165:2,8 165:16,17 175:1,13 198:5 199:13 224:16 245:12 264:19 266:7,10,18 267:4,5,6,11 267:20 268:6,9 273:10 276:18 276:22 278:8 314:4
**notice** 1:11 21:7 24:23
**notified** 67:23
**notify** 16:6 135:16 308:8
**November** 1:7 5:7 318:2 325:8
**number** 1:4 9:2 14:20,21 15:11 18:24 23:21 27:9 71:23,24 71:24 82:7 111:22 112:1,2 112:8 118:12 118:16 128:22 130:11,12,22 131:22 136:11 140:17,18 164:24 170:15 170:23 175:11 179:8,11,14 198:4 203:18 211:16,16 235:15 236:18 260:13 268:21 268:22 287:1 293:16 296:7
**numbers** 175:21
**numerous** 116:9

**O**

**o'clock** 52:24
**Oakford** 22:9 163:11 170:4 277:13
**oath** 7:20 9:13 9:17 37:10 284:6
**Object** 20:14 23:1 26:8 35:16 38:13 47:18 54:2 55:13 57:8 58:15 60:3,21 64:8 70:10 84:15 85:10 93:10 94:8 104:21 105:15 110:4 112:9 113:12 117:9 121:6,21 123:1 124:17 126:7 127:23 128:12 132:19 135:1 136:6 137:14 139:5 142:1 146:22 150:8 154:21 156:7 166:15 169:5 170:17 173:7 174:5 176:6 177:5 179:19 185:12 187:13 188:18 189:12 190:19 191:8 193:3 197:11 203:7 204:5,17 205:15 206:13 208:2,17 212:9 213:7 214:24 217:7 218:2 219:12 220:4 220:11 221:7 222:14 225:14 226:8 230:7 232:6 234:8 235:11 236:10 237:9 238:19 242:10 243:22 245:7 246:18 250:4 254:9 260:4 263:17 266:1 269:17 271:7 273:22 275:23 285:8 285:15 287:15 290:12 292:11 295:8 296:22 297:6,21 302:6 304:9 305:14 315:7 316:5 318:17 322:19
**objection** 30:15 30:21 31:6 36:20 39:1 40:12 41:12 48:4,15 55:21 56:15 57:16 59:10 61:16,23 103:20 104:6 133:12,23 136:20 147:9 155:7 171:3 185:20 186:4 186:13 206:3 209:3,15 210:8 211:2,20 215:8 216:6 218:9 219:3 230:15 231:2,18 235:1 243:1 247:5,18 248:2,18 249:6 249:17 251:12 254:20 256:13 256:23 259:9 267:13 271:18 272:10 280:17 284:14 285:4 286:23 291:7 293:1 295:18 296:12 298:15 299:23 300:8 301:2,14

302:14 303:10 303:18 306:12 307:13 308:1 308:11 309:3 321:8 323:6
**obligated** 208:24 209:10
**obligation** 100:12 111:9 111:11,18 113:3 132:16 133:3 134:15 137:12,21 208:11
**observe** 6:20
**observed** 307:5
**obtained** 275:21 318:24
**obtaining** 185:2
**obvious** 116:12 215:23 239:15
**obviously** 51:19 63:7 135:22 136:12 141:10 183:18 224:17 229:1 258:15 317:19
**occasion** 92:2
**occurred** 15:2
**occurrence** 240:20 243:12
**occurs** 168:5
**October** 34:12 98:18 325:19
**offer** 49:6 122:4
**offered** 67:2
**offhand** 126:15
**office** 24:7,8 27:17 45:16 46:10 51:17 62:9 64:6 65:19,23 67:24 68:1,9 74:6,15 74:21 86:1,9 86:18 87:23 89:4,24 91:2 91:11,12,14,24 92:21 93:6 94:6,17,21 95:9 100:2,13 104:20 105:12 105:24 106:24 107:8 108:2,21 109:15 111:19 112:21 113:3,7 113:9,23 120:23 121:3 132:4 133:3 134:21 135:13 137:13 138:2,6 139:14 150:23 151:22 205:12 205:19 213:17 214:1,10,12 215:4 232:5 240:9 241:3 269:22 301:21 303:17 305:4,9 306:1,10 315:2 322:13 323:9
**officer** 3:18 97:14,22 104:18 143:22 143:23 181:15 182:24 203:1 258:8 316:19
**officer's** 289:12
**officers** 196:20
**officially** 278:6
**Ogrod** 52:14,15 52:17 53:20 54:11,19,24 55:6,19 56:2 58:1,4,21 59:3 59:6,13 60:10 60:14 61:7,13 62:9,17,19 63:5,8,19 64:5
**Ogrod's** 61:9 63:2
**oh** 82:8 119:17
**ok'd** 124:22
**okay** 10:6 19:5 44:3 66:19 67:14 86:24 89:10 135:18 165:6 167:15 171:18 182:21 183:3 188:11 192:4 201:14 212:3 217:3 218:21 224:14 228:12 252:19 253:7 258:12 258:14 259:24 265:15,15 287:9 314:15
**old** 53:13 82:23 288:6 316:11 316:12
**older** 316:10
**omitted** 72:4
**once** 11:16 20:6 20:6 32:14 80:17 83:6,12 109:10 110:22 112:23 126:24 132:8 189:16 210:13 236:21 236:24 262:3 275:12,20 277:20 284:19 300:22
**one-page** 281:13
**one-way** 144:22
**ones** 90:9 142:19 289:24 300:7 317:4
**ongoing** 23:24
**open-ended** 8:22
**operator** 1:14 5:1 97:2 151:5 226:16 309:22 323:19
**opinion** 35:13 35:20 55:11,17 59:14 62:3 236:13
**opportunity** 121:16 256:11 262:19
**order** 16:20 72:10 91:16 103:14 113:10 172:2,22 197:19,20 216:24 306:16 309:1
**organizational** 246:6
**orient** 198:4
**original** 88:24 138:1 202:10 202:12 203:21 324:19
**originally** 83:8
**outgoing** 16:20
**outline** 22:1 244:13
**outlined** 168:24 179:2
**outlines** 33:22
**outset** 76:8 241:13
**outside** 12:2 214:4,21
**overheard** 33:14 196:4
**overly** 261:14
**overtime** 114:17
**overturned** 50:22

**P**

**P-1** 3:10 28:12 28:14 92:8
**P-10** 3:19 153:6 227:5 233:5
**P-11** 3:20 160:12,16,21
**P-12** 3:21 161:21 162:2
**P-13** 3:22 162:18,22 164:22
**P-14** 3:23 164:18,22
**P-15** 3:24 167:6
**P-16** 4:5 171:6
**P-17** 4:6 172:7
**P-18** 4:7 174:13 174:15
**P-19** 4:8 182:4,8
**P-2** 3:11 32:6,8 39:17
**P-20** 4:9 184:6
**P-21** 4:10 187:24 188:2
**P-22** 4:11 194:4 194:11,15
**P-23** 4:12 197:22,24 266:8
**P-24** 4:13 199:20 201:7 202:1
**P-25** 4:14 201:5 217:11,16,23
**P-26** 4:15 223:24 224:2
**P-27** 4:16 227:16,18
**P-28** 4:17 278:17,19
**P-29** 4:18 281:15,17
**P-3** 3:12 33:1,3 34:6 39:18
**P-30** 4:19 285:22,24 305:7
**P-31** 4:20 310:18,20 317:22
**P-32** 4:21 314:11,17,24 318:23
**P-33** 4:22 314:14,17
**P-34** 4:23

320:17,19
321:10
**P-4** 3:13 34:11
34:15
**P-5** 3:14 42:15
42:17 43:18
**P-6** 3:15 45:3,5
49:21
**P-7** 3:16 49:22
49:24
**P-8** 3:17 77:20
78:2 159:13,16
260:9,14,16
**P-9** 3:18 97:6,8
**P-A-R-I-S** 43:22
**PA** 2:17
**PAB** 319:3
**pad** 128:21
276:20
**page** 3:4,9 4:4
29:4,14 44:1
45:21,23 46:17
46:19,22,23
50:18 67:12
78:6 92:8,10
101:12,16
104:1 118:15
150:13 160:24
162:8 165:7,10
165:11,15,23
182:12,24
184:21 194:17
194:22,23,24
195:7,9 196:8
196:13 198:6,7
198:10,10,12
198:13 200:13
200:18 249:11
250:14 251:23
252:18,21
253:5,21,24
254:3,4 261:19
264:17,19
265:13 266:10
268:7,9,12,14
269:21 273:3,4
273:8,14 277:8
279:14,20
281:22 282:15
282:16 313:7
327:2
**pages** 34:1 66:11
66:12,13,18
67:13 118:16
174:24 198:5
252:16 275:17
281:14 302:24
325:12
**palm** 263:22
**pan** 248:14
**panned** 132:5
**pans** 135:15
**paper** 87:17
106:11 108:19
141:16 225:19
257:19 276:20
276:21 277:6
277:15 313:22
**papers** 276:24
277:1
**paperwork**
10:24 11:3,7,7
77:2 82:21
84:3 85:5
109:18 252:9
317:1,19
**paragraph** 92:9
169:19 182:15
201:20 252:21
261:18 264:18
311:6,15,17
**paragraphs**
171:17 260:24
**paralegal** 5:17
**paraphrasing**
33:24
**pardon** 19:18
27:24 41:5
49:22 122:15
196:21 254:3
**parent** 110:24
**Paris** 3:14 43:22
44:5,11
**Parkway** 2:10
**parole** 192:9,14
192:16,19
220:2 235:23
269:22
**part** 8:7 36:7
46:3,16 60:6
60:17,20 72:16
73:1 118:5
120:5 140:14
145:11,14,15
148:6,14 149:2
180:10 189:3
232:15 239:22
263:12 297:5
305:1 312:14
**part-time** 72:24
**partially** 79:14
**participate** 94:5
158:14
**participated**
93:24 149:16
**participates**
180:13
**participating**
94:15
**participation**
312:6,18
**particular** 13:20
50:22 54:17
81:13 99:16
113:18 137:18
156:5,21
217:17 247:22
**parties** 27:11
**partner** 79:11
79:24 80:5
**partners** 57:22
79:6,9,17
82:13 315:20
**partnership**
79:15
**parts** 153:15
**pass** 80:19 116:5
116:18 132:16
133:19 134:15
136:17,23
137:12,21
**passes** 16:2
**passing** 132:2
**Patton** 276:3
288:24
**Paul** 3:14 43:22
44:4 56:3
**pay** 61:13
**PCIC** 262:7
**PCRA** 67:24
**pending** 10:15
**Pennsylvania**
1:1,24 2:4,11
5:6 218:15,18
325:5,8
**people** 18:22,24
64:3,7 67:3
68:13 70:1
73:7 91:19
119:12,19
123:18 131:21
135:16 144:3
147:4 157:21
166:13 176:12
177:3 178:2,7
178:16 200:22
211:14 237:20
238:2 239:11
239:18 241:11
242:8 261:12
261:22 263:1,7
265:8,16
270:11
**percent** 8:21
54:10 68:19,24
69:1
**perform** 86:23
**period** 21:5
22:22 75:10
76:10 79:12
80:4 149:12
234:7 284:11
**periodic** 25:9
**periodically**
128:6
**peripherally**
51:20
**perjury** 39:4
**permission**
125:6
**perpetrator**
130:20,23,24
161:1 162:9
163:7 169:3
170:5,15,24
189:24 211:15
272:8
**perpetrators**
128:7 196:1
**person** 8:6 9:24
11:17 40:15
58:7,9 64:19
68:5,21 69:6
84:22 88:5
90:3,5 91:8
98:21 103:2
105:2 106:18
109:7 111:15
120:8,11,15
124:21 125:7
125:11 128:15
129:23 130:11
131:14,19
132:15 135:20
136:2,11
141:13 143:4
143:14 144:19
146:7,16
147:13 148:10
148:16 150:5
150:13 157:9
157:14,16,17
165:20 166:22
173:12 177:15
177:21 185:24
186:17 193:6
202:24 209:12
210:14 214:1
240:19 251:22
262:16 270:8

289:5,21 292:18 297:14
**person's** 131:9 187:12 205:13 209:19 289:17
**personal** 70:20 129:4 187:2 191:15 234:22
**personally** 36:9 41:9,10 104:24 106:1
**persons** 202:7
**pertinent** 106:18 106:21 132:6 216:10 223:3,5 223:7 261:10
**petition** 3:15 43:24 45:13
**petitions** 23:22 43:6 45:14
**Philadelphia** 1:5 1:24 2:4,9,11 2:13,17 5:9,10 5:19,21 6:24 22:10 44:8,19 52:20 61:13 71:5 76:2 97:16 100:3,18 109:6 133:10 183:19 213:15 214:5 216:4 245:20 257:3 257:17 288:12 318:12 325:5,8
**Philly** 169:21 274:13 288:13
**phone** 2:4,12,17 2:22 12:9 65:7 129:13 130:12 130:21 131:22 175:21 287:24 288:2 292:19 298:6
**phones** 128:17 128:18
**photo** 53:17 172:23 173:14 173:15,17
**photograph** 53:23 54:21
**photos** 4:6 172:11
**phrase** 102:18 106:7 248:12 270:2
**physical** 125:3 172:4
**pick** 136:15 158:21 180:17 240:23 305:24
**picked** 177:2,7
**picks** 117:4
**picture** 53:15
**piece** 87:17 169:10 266:17 313:22
**pieces** 169:11
**pigeon** 115:22 116:6 129:12
**pin** 137:3
**place** 11:19 22:8 29:16 62:21 75:3,18 76:2 80:22,23 89:12 117:15 144:11 170:3 176:22 197:5 218:20 221:6 224:10
**places** 267:18
**plain** 276:20 277:1
**plainest** 204:1
**plaintiff** 1:3 2:5 2:23 5:15
**plan** 229:16 243:19 244:9
**planned** 197:9
**platoon** 49:13 49:17
**played** 312:7
**please** 40:4 46:21 153:3 194:22 199:19 224:12 282:15 323:23
**plenty** 255:16
**plus** 16:6 78:6
**point** 10:5 18:4 33:14 37:18 38:22 42:6 45:22 47:8 50:11,15 51:5 58:1 82:22 84:6 93:5 112:22 121:24 125:12 130:10 134:11 139:2 149:8 164:11 170:13 176:24 180:3 236:8 255:9 259:17 265:22 283:20 284:11 288:15 291:22 300:5 313:5 315:6
**pointing** 131:14 168:12 211:14
**police** 4:6 6:23 16:21 24:13 44:8,20 64:20 71:5 97:16,23 98:3 100:3,18 104:18 133:10 143:20,23 163:18 164:6 172:11 182:24 183:19 186:2 213:15 214:5,8 214:21 216:5 224:16 258:13
**policies** 100:19
**polygraph** 4:14 142:7 143:6,9 143:12,16,18 143:24 144:5 144:10,14,20 144:23 145:4 145:14,22,24 146:8 148:3,4 148:11,17,18 148:19,23 149:16,24 150:14,22 151:2 202:16 202:24 203:5 203:11,16 204:3 205:7 206:8,12,16 207:9,20 208:16 209:1 209:13 210:5 210:22 212:8 215:7,12,14 216:3 217:17 217:22 219:8 219:23 220:15 221:18 222:4 225:24 236:5 242:24 284:23
**polygraphed** 142:6,7 144:18 202:10 203:21 212:22
**polygraphs** 141:19,21,23 145:15,23 146:20 149:6 204:14
**polygraphy** 143:15 150:3
**popped** 131:5
**popping** 82:20
**pops** 230:2
**portion** 98:17 153:24 174:23 182:22 313:1
**portions** 196:18
**position** 74:8 125:17 126:3
**possession** 100:11 104:18 107:7 154:10
**possibilities** 158:10,12 298:24 299:1
**possibility** 58:12 125:20 299:11
**possible** 58:18 59:23 116:19 120:10 139:24 155:11,12 159:5 169:3 197:19 282:19 291:19
**possibly** 38:8 76:11 261:23
**post** 23:21 43:3 43:6,24 45:13
**potential** 138:14 139:17 140:7 176:1 193:16 193:17 252:6,6 262:3,14 265:18 285:12 298:11 322:10
**potentially** 183:21 191:2 266:24
**pounds** 173:22
**powerful** 46:6
**PPD** 118:12
**practically** 253:2
**practice** 95:19 106:16 128:10 133:15 138:18 244:6,21 245:4 246:1 261:7 290:17 292:6
**practices** 95:13 96:2 100:19 133:10 141:23 300:18
**pre-** 218:10
**pre-discovery** 218:13
**pre-interview** 239:4 251:9
**precautions** 123:17 124:14

**preceded** 239:23
**preinterview** 106:6
**preliminary** 94:18 107:17 281:9 283:3,24
**preparation** 12:3
**prepare** 10:21 15:9 88:22 116:4 286:7
**prepared** 26:1 43:21 44:11 85:14 89:20 91:9 108:17 115:20 119:1 144:15 178:11 208:14 210:2 263:23 279:3 286:6,13,19 289:11 316:16
**prepares** 315:11
**preparing** 88:6 88:12 92:5 116:17 120:3 208:22
**prepping** 108:8
**present** 1:15 2:6 11:23 14:18 60:10 63:4 68:2 237:13
**presented** 312:24
**president** 165:17
**presumably** 98:4
**pretty** 169:21 183:20 259:16 288:20 289:16 291:2 296:10
**previous** 77:15 88:3 112:14 151:16 154:13 154:17 155:2 204:13 224:24 226:24 227:8 250:22 308:6 310:5,5
**previously** 159:11 227:4
**prima** 107:17
**principle** 135:23
**print** 263:22
**prints** 264:8 268:11 269:1,7 269:7 275:2,4
**prior** 8:20 35:10 49:20 154:19 154:19 205:19 306:1 308:16
**prison** 37:20 103:7 192:20 195:21 235:10 235:14 240:13 240:17,19,22 294:1
**prisons** 318:12
**private** 68:2 72:17,21
**probable** 3:10 28:7 85:15 87:1 91:15,23 92:6,7 105:7 107:10,11,14 107:20 113:11 113:16 207:21 208:7,15,22 210:2 315:11
**probably** 16:14 26:10 65:13 76:18 94:18 111:5 131:12 131:15 196:5 197:17 257:22 287:8 316:17 323:9
**probation** 181:15 258:8
**probationers** 181:16
**probe** 42:1
**problem** 210:11 212:6,14 222:11
**problems** 204:20 205:1
**procedure** 149:4 218:18 268:24 271:5
**proceed** 234:3,4
**proceeds** 185:2
**process** 287:10
**produce** 93:9
**produced** 31:10 66:4 87:18 152:1
**professional** 1:23 70:20
**progress** 114:16
**prohibited** 1:18
**Project** 66:4 67:3
**Projects** 288:7
**promoted** 306:16
**promptly** 324:21
**pronounce** 19:6
**Pros** 101:14
**prosecute** 95:11 114:6,7
**prosecuted** 7:3 246:13 281:7 282:1,2
**prosecution** 31:15 43:14 86:19 87:23 96:7 103:6,14 205:13 206:7 206:11 207:18 210:18 211:24 218:20
**prosecution's** 93:21
**prosecutions** 95:17,24
**prosecutor** 20:9 20:21 152:2 283:20
**provide** 23:20 33:11,18 105:11 114:4,9 117:1 120:10 125:17 126:17 152:22,23 185:17 195:10 214:13 216:20 220:3 246:14 256:11,21
**provided** 12:6 12:13 26:17 29:7 95:8 96:17 97:13 107:8 108:1,20 115:20 121:2 134:19 138:4 152:10,14 165:3 214:20 215:4 217:24 218:24 227:24 233:20 247:2 247:23 249:14 259:22 265:2 273:11 301:20 303:16 313:20 324:11,16
**provides** 225:11 229:5 296:19
**providing** 187:1 193:1,12 247:13 258:24 298:10
**proximity** 140:21
**public** 1:13 45:3 324:17 325:4 325:18
**puffy** 161:12
**pull** 25:1 27:12 92:6 185:16,24 240:21 252:17 255:5 313:13
**pull-down** 53:4
**pulled** 174:12,23 177:22 227:23 311:1
**pulling** 185:4 255:19
**purpose** 106:23 114:18,19 116:11 153:2 160:9 199:18 237:6
**purposes** 6:14 14:18 246:6
**pursuant** 1:11
**pursue** 205:12 321:23
**put** 30:11 37:10 37:14 39:7,9 70:15 99:21 111:3 116:1,6 128:21 129:12 141:15 199:11 206:15 278:8 289:19 290:6 296:3 311:9 314:8 316:21
**puts** 135:7 261:8
**putting** 219:6 289:17 323:11

**Q**

**qualifier** 10:13
**question** 8:23 10:14,15 18:16 23:4,13 24:11 27:24 35:17 36:21 38:14 49:4 85:22 86:6,13 101:7 103:10 105:22 106:18,21 110:19 123:20 136:10 147:14 150:11 154:1 156:11 158:4 166:5 174:9 185:22 186:8 189:3 196:8,15

196:23 200:7 203:5,14,19 206:22,23 207:14,17 217:19 219:15 221:18 226:1 232:13 237:12 237:16,19 239:15,16,17 241:1,5,6 243:5 249:8,9 250:15 256:16 282:20,24 283:6 285:13 292:6 297:18 298:2 312:8 317:2
**questionable** 236:9
**questioned** 202:4
**questioning** 155:23 158:1
**questions** 7:17 12:24 18:12 24:14 25:5 33:7 48:10,13 50:20 62:15 70:19,24 101:6 110:7 111:12 141:18 143:3 156:15,21,24 157:3,8,23 182:11 201:20 203:19 206:21 207:1,2,18 219:9 222:5 225:12 239:4 255:13 260:20 262:20 286:16 288:1 296:20 299:7 319:14 321:17 323:17 324:21
**quick** 76:24
**quickly** 165:4
250:8
**quieter** 253:1
**quite** 257:7 276:14
**quote** 106:5 222:12 229:7
**quoting** 264:20

**R**

**R** 325:1
**R-A-T-H-A-N...** 98:22
**R-H-O-A-N** 245:17
**R-O-C-K-S** 6:10
**raise** 41:7 206:21,22 219:9
**raised** 204:15 207:1,3
**raises** 296:20
**raising** 319:12
**Ralph** 265:3,8
**Ransome** 4:15 42:12 44:11,15 44:21 164:14 165:13,19 166:8,14 167:3 167:18 169:3 169:13 171:12 171:20 172:4 172:11 173:3 180:21,21 224:8,15 225:2 225:2,5,23 241:19,21 242:2
**Ransome's** 225:11 241:23
**Rathana** 98:21
**Ray** 269:12
**Raymond** 241:15 242:4
**re-interview** 68:5,21 156:17 222:13 270:14
275:2 297:24 298:22
**re-interviewed** 201:23 221:2
**reach** 24:8,14 25:4,17 73:9
**reaches** 228:21
**reaction** 321:3
**read** 10:23,23 14:13,14 26:13 28:19 32:14 42:21 44:1 46:3,18,21 47:1 53:3,14 143:1,2 157:4 160:18 161:14 162:19 167:13 171:15 182:14 182:15,18,19 182:23 183:1 184:11 187:7 196:12 199:24 201:12,19 212:2,21 224:6 224:11 228:4,9 234:14 253:4 255:6 258:21 260:21 273:7 274:8 283:5 286:14,15,17 286:18 311:7 311:13,14 314:12 321:15 324:1,2 326:1
**reading** 66:17 67:7 145:21 156:12 191:5 196:14 200:2 237:1 273:8 279:11,17
**reads** 279:15 305:18
**real** 161:13 252:24 303:14
**realize** 77:14 109:24 151:14
226:23 310:4
**realized** 220:21
**really** 21:10 49:1 156:4,9 171:16 191:21 233:10 238:4 251:8 265:22 268:1 306:15
**reason** 10:18 22:2 36:4 37:13 39:22 58:20 70:5,7 75:6 85:4 103:3 111:6 115:14 119:15 125:10 134:20 147:14 179:2 181:1 192:24 209:18 219:9 237:5 239:14 246:5 247:20 285:13 288:16 297:18 322:12 324:4,8 327:2
**reasonable** 231:23
**reasons** 36:5,8 38:21 85:21 141:5 150:15 207:11,13 219:19 230:21 242:22 315:10
**rebuts** 102:8
**recall** 8:3,9,24 12:20,23 13:7 19:5,9 21:17 23:16 24:1 29:10 34:19 35:11 44:7 47:8 51:1 52:9 65:24 66:20,22 67:20 69:9 86:7 87:11 95:16,23 96:2 98:14 99:4 108:23 127:19
154:6 164:2,10 164:13 174:2 183:6 187:20 188:12 190:13 192:8 196:24 200:2 206:5,9 228:16,23,24 239:21 241:1 243:8 244:2 250:21 266:21 278:16 280:4 284:10 287:16 287:18 288:17 292:16 310:14 312:9 320:10
**recant** 35:10,14 68:15 70:1
**recantation** 36:1 38:12,23 39:17 39:18 68:3
**recantations** 36:10,12,18 39:14,23 66:5 67:2,21 70:2,7
**recanted** 31:11 37:5,8 38:3 69:10 278:10 284:7
**recanting** 283:12
**receive** 21:7 107:1 128:7 129:18 324:22
**received** 21:10 21:12 24:23 38:18 107:1 131:13 165:18 166:6 167:19
**receiving** 229:11
**recess** 151:14
**recognize** 199:3 264:10
**recollection** 12:17 14:3 15:15 25:18 28:3 29:1,20

29:22 32:17 44:14 63:24 71:22 76:23 86:11 93:20 152:20 158:5 184:16 192:12 194:2 233:23 234:3
**record** 5:2,4 6:9 6:14 77:7,19 92:15 97:1,3 99:15 131:16 141:7 145:20 151:4,6 168:21 194:12 211:21 212:10 215:1 217:20 226:9 226:15,17,18 226:22 227:3 239:6 261:19 304:15 309:21 309:23 310:3,4 321:2
**recorded** 137:10 223:6,7 239:5
**recording** 221:24 290:19
**records** 185:5
**red** 41:8 187:11 193:16 204:15
**reduced** 103:7,7 325:10
**refer** 73:7 97:20 115:21
**reference** 8:5 44:10 50:6 58:3 98:2,18 162:9 174:3 175:11 194:17 196:9 198:21 210:5 219:21 241:16 252:11 261:19 266:19 274:15,18 275:1,5,12 281:23 282:3 293:11,15 296:8 311:5 312:2,13 319:13
**references** 29:5 194:24 195:1 198:13 253:8 311:18
**referred** 148:7 164:3
**referring** 18:8 250:19 311:20
**refers** 92:10
**refresh** 32:17 44:14
**refreshes** 15:14
**regarding** 27:2 27:21 47:9 55:1 67:16 98:3 99:3,14 100:1 123:18 141:23 155:3 171:12 172:3 192:7 218:19 246:2 275:10 317:23 323:13
**regardless** 301:7
**Registered** 1:23
**regular** 88:20
**regularly** 16:1
**rehash** 261:4
**Reilly** 203:1,2
**related** 27:10,13 49:4
**Relating** 46:20 47:2
**relation** 16:18
**relationship** 18:8 80:1
**released** 109:16 318:5
**relevance** 309:8
**relevant** 178:21 230:6 231:22 231:24 247:1 248:16 302:10 311:16
**reliability** 111:7 186:21
**reliable** 125:18 125:23 146:21 206:17,17,18
**remain** 121:12
**remains** 69:24
**remember** 8:10 8:10,13 9:8,9 15:5 22:3 28:1 30:7,23 36:18 38:4 42:12 66:5 69:17,20 78:16 80:4 81:20 82:1,7 91:19 99:9 108:13,14 109:4 124:1,6 126:15 145:13 153:21 154:9 161:10,17 166:2 175:24 188:21 190:12 193:21 233:10 235:3 239:12 239:12 240:1 241:4,8 244:1 244:6 245:10 245:19 251:15 252:1,7,10,13 253:12,13 254:12 256:7 257:5 264:23 267:24 270:19 317:10
**remembered** 99:2
**remind** 25:2 320:23
**reminder** 50:5
**remove** 242:2
**renovated** 288:15
**reopen** 99:16
**reopened** 190:16
**reopening** 181:5
**repeat** 51:23 56:20 70:21 86:4 185:21 256:19 261:1
**repeated** 253:8
**repeating** 27:24
**repetitive** 261:14
**replaced** 227:7
**report** 4:8,22 182:10 192:6 290:10 292:8 292:17 314:13 316:15 317:3 318:19 319:16
**reported** 261:21 287:20 294:7
**Reporter** 1:13 323:21 325:4
**Reporters** 1:23
**reports** 190:4 291:17
**represent** 5:13 6:21 20:4 21:13 30:1 45:11 50:19 51:4 78:7 153:14 169:24 174:22 175:6 175:10 180:22 181:14 196:17 210:19 211:13 211:24 218:17 223:9,16 227:22 230:1 252:3 279:1 281:6 302:22 310:24 312:23
**representation** 21:16 33:9 94:2 195:11 211:1,18 212:5 253:11 281:12 288:21 303:4
**representations** 59:7 202:18
**represented** 7:12 43:12 209:11 281:24 319:18,20
**Representing** 2:5,13,18,23
**reproduction** 1:17
**request** 269:13 319:21,22
**requested** 323:9
**requests** 319:14
**require** 324:21
**required** 132:1 218:23
**resembled** 272:8
**reserve** 99:16
**reset** 166:11
**resolved** 55:7
**responds** 102:8
**response** 3:15 50:20 77:20
**responsibilities** 128:16 129:15
**responsibility** 86:2,16,21,22 90:12 94:20 104:19 128:19 214:8,12
**responsible** 88:6 88:11 299:14
**rest** 317:13
**result** 144:13 147:13 219:8
**results** 146:1 148:3 203:10
**retain** 73:10
**retained** 5:3 89:4
**retirement** 71:19 72:16
**retrial** 62:6
**return** 33:19 229:4 231:8 324:19

**returned** 221:4
**reverse** 290:18
**revert** 88:14
**review** 12:14 14:5,6 24:1 27:14 28:22 78:11 85:16 91:24 117:16 121:16 160:8 160:21 161:23 162:6 163:2 165:4 170:14 219:17 234:22 242:23 280:11 282:20
**reviewed** 14:12 34:5 39:8,10 39:16 50:10,14 70:6 122:2 141:19 153:18 153:21 154:19 180:18 192:6 194:20 207:4 220:23 234:6,7 235:21 241:23 250:23 252:14 266:14 280:7 295:9
**reviewing** 28:24 77:21 184:13 188:12 286:4
**revisit** 151:19
**reward** 33:19 35:2
**Rhoan** 245:17 245:18 250:11 257:2
**Richard** 102:3 132:14
**rifle** 250:16,22 250:24 251:1 251:11,18 258:4,11 272:21 275:14
**right** 8:18 16:16 21:21 22:24 30:12 37:2 38:1 39:5 42:3 43:5 49:1 62:14 63:7,8 72:2 75:4,7 76:21 77:18 79:17 81:8,10 86:14 87:5 89:13,14 90:7 95:23 96:7,12 99:10,16 101:21 103:10 103:15,16 105:12,14,19 105:24 107:22 108:3,6 110:24 111:12 112:8 112:16 114:21 115:5,8,9,12 115:13,17,22 116:19,22 117:23 119:5,8 119:13,20 120:4,13 121:20 123:5,7 123:10 125:12 126:6 128:3 129:5,11,15,20 132:10,11 135:14 140:3,8 140:13 143:9 143:24 145:2,5 146:1,5,14,18 147:15 149:21 150:1,7 152:8 155:16 157:11 158:7,19,20 159:1,4 165:23 167:22 168:2 168:11 177:20 177:23 178:4,8 183:16 187:5 192:17 193:7,7 193:18 194:23 202:12 210:7 210:13 213:18 214:6 215:15 216:21 219:22 219:24 229:17 229:21 230:24 231:11,19 232:1,14 233:13 235:4 235:24 236:23 238:1,2,4,7 239:18,20 241:22 242:9 242:19 245:6 246:9 248:16 249:2,5,23 251:2 255:14 255:18 256:6 258:15 262:16 262:20 263:9 263:16 270:7 272:4,5 273:21 274:17,22,23 274:24 275:15 280:5,22 281:5 282:4 284:21 284:22,23,24 288:5 289:2 290:23,24 291:3,6,12,23 292:1,3,6 293:8,19,21 296:9 298:3,8 298:9,14 300:7 300:15 301:21 304:22 305:13 305:22 306:7 306:10,18 313:19 315:20 319:1,2 324:2
**right-hand** 286:9 290:1
**rights** 11:4 55:1 144:20
**risk** 306:2
**rival** 109:6
**robbery** 7:5 37:1
**Robert** 165:21
**Robins** 20:23,23 122:8 152:11 205:23 307:18
**Robinson** 21:5
**Rock** 198:21
**Rockman** 273:20
**Rocks** 1:11 3:4 3:16 5:11,19 6:1,10,11 72:18 74:3 77:10 151:13 155:16 223:9 226:21 228:13 286:10 287:3 288:22 308:16 310:2 325:6 326:8
**Rodney** 3:11,19 13:23 29:17,21 32:12,18 39:11 39:18 47:10 92:11 93:21 153:11 181:20 181:21 182:1 183:23 197:5 197:10 201:21 204:2 207:15 207:23 211:16 211:23 264:21 265:9,24 282:9 292:24 295:17 297:18 299:8 299:11 301:11 302:3,10 303:3 304:18 307:20 320:16 321:5 321:24 322:5
**Rodney's** 265:18
**role** 48:24 52:17 52:19 85:19
**roles** 312:6
**roof** 183:15
**room** 77:12 298:8 319:3
**Rosen** 20:9,9,12 20:18 95:17 108:13 121:14 122:1 152:1,7 315:2,10
**Rosen's** 205:22
**roughly** 24:4
**Rowe** 102:3 132:14
**RUDOVSKY** 2:2
**rules** 216:13,17 218:14,18,23 324:21
**running** 142:24 171:1 315:5
**runs** 142:15
**Rutland** 52:20

**S**

**s** 3:7 4:2 273:11
**sat** 62:20
**satisfy** 150:6
**save** 279:13
**saw** 23:7 25:13 25:13 44:10 55:9 60:8 111:23 177:3 212:21 235:20 279:9 289:24 307:19 312:11
**saying** 34:24 65:5 105:22 109:12 111:15 112:3 121:17 125:8 146:7 148:12 150:16 194:1 203:13 203:19 205:13 218:7 237:8,17 241:6 242:17 245:24 267:6 278:1 286:21 287:12 295:4 295:12,16 296:5 297:3,8 313:24

**says** 46:1,4,19 46:24 67:23 97:22 101:24 102:3 119:17 155:16 165:11 168:1,11 189:5 191:11 196:19 200:10,12 203:24 220:24 229:7,11,16 238:4 241:10 242:5 252:21 255:15 268:10 270:14 274:24 275:8 277:10 286:10 287:18 287:23 297:4 297:19 312:4 319:2
**scarf** 161:8
**scenario** 272:7 303:12,14
**scene** 29:7 52:19 53:16,24 54:5 60:8 71:13 112:3 117:24 142:17 160:7 163:20,24 189:17,20 190:9 263:20 265:16 268:11 269:8 272:21 275:4
**SCHECK** 2:20
**screen** 313:17
**search** 262:24
**second** 20:22 29:4 32:24 49:15 76:12,13 102:4 148:6 160:24 161:1 162:8 165:15 174:10 178:23 182:24 194:17 196:8 200:5 213:16 221:5 223:11 224:11 251:23 253:21 253:23 261:18 264:19 265:13 268:8 279:8 280:23
**seconds** 281:21
**section** 46:24 47:1 67:15 68:1 182:19 220:24
**see** 15:14 16:4 29:17 34:23 41:5,6,20 42:1 42:15 45:23 46:23 57:2,4 57:11 61:2 64:23,24 65:5 67:6,12 77:1 82:19,20 92:9 97:23 98:19,23 100:6 101:16 111:14 119:22 121:3 129:9 130:11 131:3,4 137:3 138:6,7 144:24 153:13 156:23 160:4 161:7 162:8 166:8 169:19 171:19 172:13 172:14 179:23 180:9 181:8 184:24 185:6 187:5 194:1,23 196:7,15 197:20 198:8 200:12 203:10 210:11 218:13 222:11 225:24 228:4 230:9,13 230:18,19,21 231:14 241:15 249:4 250:11 253:8,20 255:6 255:14,21 258:9 262:4 265:13 266:17 267:4 268:4 270:15 273:2,3 273:5 278:16 279:19,23 283:6 284:2 287:21,23 288:3 290:3 304:1 308:18 311:13 313:2 313:14 319:12
**seeing** 12:23 29:21 32:22 161:1 164:2 174:2 183:5,6 183:9 192:8 250:21 253:13 279:17 312:9 319:10
**seek** 306:4
**seen** 22:20 26:2 26:3 35:4 36:10 47:4 67:15,19 89:15 97:17 121:9 144:10 146:3 170:24 183:5 185:10 201:15 201:17 228:6 228:14,19 252:9 269:15 280:1 282:3 295:1 302:24 306:5 312:17 313:10 320:2 321:18
**sees** 93:6
**send** 142:20
**Senior** 74:3
**sense** 243:18
**sent** 89:24 91:24 110:14 300:11
**sentence** 36:6 38:18 45:24 46:4 204:2 287:3 311:12 311:16 312:3
**sentenced** 37:20 39:5 135:21
**sentences** 221:1 261:10
**separate** 27:2 93:23 245:1,2 245:2 282:12
**sergeant** 17:17 17:21 19:17,18 74:10 75:11,14 78:15 81:21,24 89:2 142:15 237:1
**series** 89:19 165:1 174:24 299:7
**serious** 183:20 204:15,19 206:23 235:17
**serve** 115:15
**served** 38:4
**set** 28:9 31:22 53:5 71:13 107:24 109:21 130:5 156:23 171:20 194:18 265:16 281:23
**settled** 62:1,5
**settlement** 55:12
**share** 49:20 112:20 113:3 150:21 160:6 161:20 205:11 250:1
**shared** 232:4,9
**shed** 313:14
**sheet** 3:17,24 4:5 4:13,19,20,21 13:4 14:7,10 14:12,21 48:8 66:11 67:7 77:22 78:7 83:17,22 116:5 116:18 117:7 119:4,10,21 120:3,5 137:11 141:3 151:2 159:12,16 167:12,16 169:1 171:12 171:14 175:2 175:12 178:11 178:18,23 179:3 201:4,11 201:15 212:21 212:24 213:5 214:19,20 215:3 216:4 217:18,21 220:16,23 222:13,18,24 223:8 260:10 260:24 261:5 261:16 263:13 264:18 265:11 268:9 269:3 286:5 287:7 289:9,11,15,20 289:21,23 290:6,9,21 294:6 296:4,19 301:17 304:13 304:22 305:7 308:14,24 311:1,6 312:22 313:1,4,6 314:11,24 317:22 320:24 324:5,7,9,13 324:19 327:1
**sheets** 114:11 115:14,19 117:17 118:3,4 120:17,22 121:1,16 122:2 122:14 154:20 178:4,15,21 179:15 245:2 276:21 290:3 291:18 301:23

313:7 317:22
**Shelley** 20:22 21:5 95:22 307:18
**Shepherd** 270:1
**shift** 129:2 291:6 291:11
**shipped** 317:16
**shooter** 130:9 132:9 163:22 164:3,7,15 165:13,20 166:7 173:12 294:2,8 295:3 295:7 297:15 304:20
**shooter's** 163:23
**shooting** 29:8 44:22 76:1 98:23 102:1,4 110:17 111:23 128:8 163:15 163:17 166:14 170:3 172:24 256:2 284:1
**short** 77:10 100:1 118:14 151:9,14 226:22 310:3
**shorthand** 325:10
**shot** 30:14 110:13 281:4
**show** 23:9 28:6 31:24 32:24 34:10 41:6 44:24 67:11 101:19 102:15 102:16 103:2,9 152:21 159:14 162:16 175:8 179:22 181:8 181:24 184:2 191:20 193:24 196:6 199:19 252:11,16 266:11,20 267:18 268:3 269:15 278:15 281:13 282:18 283:15 310:16 313:17 320:13
**showed** 39:13,17 204:11 233:21 266:6 270:17
**showing** 22:21 167:10
**shown** 54:20 172:3 187:22 196:19 233:15 284:4
**shows** 298:11
**SIC** 201:5 311:22,22 312:13
**side** 39:10 70:15 99:22 109:7,9 165:11,23 199:11 278:8 286:10 290:2
**sided** 66:10
**sides** 277:5
**sign** 91:15,18 240:19 324:8 324:10,15,16
**signature** 324:18 326:13
**signed** 34:6 89:3
**significance** 233:16
**significant** 190:15 191:2 296:10
**signing** 324:12
**similar** 64:3
**single** 69:6,9 127:16,18 138:19 176:4 221:24
**sir** 6:8 7:10 8:3 9:10,23 10:18 12:18 20:5 21:8,13 22:10 22:15,24 23:5 23:13 28:12,21 30:1,10,13 32:5,13 33:8 34:13 35:7 41:18 42:21 44:1,18 45:9 45:11,22 46:18 47:5 48:21 49:16,21 50:7 64:3 66:13,18 67:5 70:16 75:4 77:5 78:9 97:12,18,23 100:17,24 108:16,23 109:20 114:11 122:19 138:9 141:19 152:19 153:10,17 159:14 160:5 160:20 161:15 162:6 163:3 164:10 166:9 167:10 168:18 169:22 172:12 172:14 174:2 174:11,20 182:8 184:22 188:13 191:22 193:24 194:9 194:16 195:11 196:14 198:14 198:23 199:11 199:22 200:6 201:11,15 223:14,24 224:6 227:22 233:4 251:8 252:13 260:14 260:19 264:11 266:5 278:23 279:13 282:17 283:17 286:4 296:5 304:4 306:11 310:24 313:16 314:7 314:10,22 320:9,15 321:19
**sister's** 183:15
**sit** 143:1 159:7
**sitting** 30:13 38:22 39:21 68:12 106:9 155:19,22 159:3 161:17 181:4 267:11 268:15
**situated** 281:22
**situation** 108:23 124:16 135:22 176:18 209:24 290:18
**SIU** 71:24 72:6,8 76:11,14,24 78:15,18,19 79:20 81:1,8 81:14,15,18,22 81:23 82:10,17 82:24 83:7,10 83:12 84:21 85:20 88:11 127:10 168:15 168:16 180:15 311:23 312:13 312:19
**six** 195:20 260:24
**skeptical** 70:2,7 150:15
**Skim** 66:13
**skin** 161:6 173:13,19
**skinny** 161:6 173:23
**slipped** 305:23
**small** 9:2 45:24 310:17 311:8 317:23
**Smith** 101:24 102:1
**solely** 321:12
**SOLICITOR** 2:10
**solve** 52:22
**somebody** 40:22 79:20 85:3 88:20 143:7 177:24 237:3,4 250:24 263:13 271:22 276:5 290:3
**son** 74:5
**sorry** 306:4
**sought** 223:13 223:18
**sound** 8:18 13:10,23 22:24 31:18 37:24 67:5 72:1 75:4 75:12 98:4 101:21 115:22 146:14 181:11 195:15
**sounded** 131:3
**sounds** 12:6 14:1,2 31:20 42:14 60:19 64:18 69:24 106:23 150:12 158:9 178:20 179:5 186:20 187:10 189:22 205:5 217:4 218:7 221:5,10 223:4 252:7 257:10 263:11 276:13 287:11 298:5,24 309:8
**source** 191:17 196:24
**sources** 148:1 179:6 279:2
**South** 1:23 2:3 22:9 76:2 109:6 169:18

169:20,21 170:1,9 265:4 274:13 288:5 288:13
**space** 324:11,16
**spare** 212:1
**spark** 28:24 29:22
**sparked** 63:23 233:22
**sparks** 194:2
**speak** 7:16 12:8 15:18 16:9 17:3,7,12,18 41:15 109:11 112:10 124:10 125:11 132:20 133:12 136:20 142:2 176:7 183:13 196:20 197:1 229:1 264:24 274:5 287:13 288:2 292:23 321:2
**speaking** 19:5 19:10 41:16 127:22 265:17
**speaks** 186:2
**special** 78:19,20 78:21 80:15 123:17 124:14
**specific** 12:19 38:21 67:20 68:13,20 73:12 74:23 80:5 122:11 134:6 152:18 243:20 257:12 322:12 323:8
**specifically** 45:17 67:22 230:22
**spectrum** 144:2
**speculate** 292:22 292:22
**speculation** 60:19,24
**spelled** 228:2
**spent** 8:7 235:9 303:24
**spoke** 15:21 16:12 17:5,14 17:20,22 18:13 18:17 20:17 21:4 58:24 69:10 168:20 207:5 279:5 289:5 292:17
**spoken** 15:8 18:3 19:22 20:11 21:1 25:20 62:16 64:13 65:21 74:14,18 228:20 261:23 264:20,21 265:23 283:24
**sprawling** 114:23
**spread** 260:3
**spring** 177:1
**squad** 48:17,17 57:21 71:24 72:1,6,8 75:10 76:8 77:3 78:19,23 79:19 80:8,9 82:15 82:18 115:7,8 119:16 127:10 168:10,11 178:1 179:23 180:2,3,5,10 180:14 261:13 317:13,14,18
**Square** 2:16
**Squirt** 251:24 253:2,9,15 273:5 282:3 283:1,3,8
**Squirt's** 276:3
**stack** 92:8
**staff** 79:16
**stage** 28:9 31:22 130:5 166:11 191:24 281:23
**stamped** 45:2 66:12
**stand** 184:15 237:5
**standard** 271:12 276:19
**standing** 256:4
**start** 21:22 28:5 86:6 117:7,15 117:19 148:2 158:10 280:10
**started** 21:14 72:16 81:3 115:4 157:8 159:1
**starting** 24:4 228:5
**starts** 138:13 184:24 253:23 287:3
**state** 6:8 45:13 185:13 192:20 240:13 252:22
**stated** 190:8 283:23 293:24
**statement** 4:9,10 4:17 10:24 13:20 35:4 40:23 41:3 68:3 92:3 102:4,8 106:20 107:1,2 110:24 111:22 137:11 143:2 148:22 149:1 152:21 152:24 154:2 161:22 164:3 184:3,18,22 187:23 188:6 188:12 191:5 194:19 202:11 202:13,17 203:22 207:24 225:11 236:2 239:23 241:23 245:13 246:6 250:7 252:23 253:19 258:3 259:22 261:15 279:2,15 280:2 280:8 301:18 302:3,9 312:5 312:9 314:1 319:11 320:7
**statements** 32:1 35:10 39:9,11 90:10 148:21 154:19 160:6 163:14 225:1 230:5 246:16 250:22 270:18 278:11
**States** 1:1 5:5
**stating** 215:23 273:20
**stay** 144:19
**stayed** 83:6 144:21
**staying** 294:2
**stays** 83:8
**steno** 276:20
**step** 199:16 220:9 238:12 257:19
**Stephen** 264:12
**stick** 305:19
**stop** 149:5 202:12 311:22
**stopped** 110:23 149:4,7,12
**stopping** 262:23
**storage** 145:20
**store** 22:9 163:8 163:19 185:4 270:15 272:17 275:2
**story** 41:21 138:1 140:22
**straighten** 299:16
**straightened** 210:17 302:16
**street** 1:23 2:3 2:11,16,21 5:8 52:20 88:21 110:12 137:19 141:13 163:10 169:18 256:5 257:19 263:8 265:5 274:12 311:24 325:7
**Streets** 22:9
**strike** 24:22 47:7 54:17 83:2 90:23 93:19 113:7 127:17 138:17 154:14 155:17 164:12 187:21 205:4 207:1,12 208:11 209:22 213:15 225:9 234:3 259:19 271:1 287:10 291:15 296:17 322:24
**stuck** 137:24 189:15
**stuff** 129:12
**style** 106:4 156:5
**subject** 171:15 224:15 231:7 245:23 324:12
**submissions** 27:19
**submit** 105:1 268:24
**submitted** 45:15 105:6 208:8
**subset** 87:21
**substance** 66:24 159:22 188:24 228:22 241:9 266:14 292:15 324:3,6

**substantive** 207:22
**successful** 140:12
**sudden** 271:4
**sue** 36:8
**sued** 15:12 37:12 38:6 61:24
**Suffice** 21:20
**suggest** 41:20 72:9 80:24 123:9 156:1 168:23 289:1,4 307:11
**suggested** 172:21 274:4 278:11
**suggesting** 275:10 301:18 313:21
**suggestion** 77:21 145:19
**suggests** 136:2 192:16 230:22 245:5 288:22 312:18 317:3
**suicide** 124:9
**suit** 55:1
**Suite** 1:23 2:3 2:16 5:9
**sum** 66:24 188:23
**summarize** 261:1
**summary** 116:20 178:19 189:4 202:8 261:9
**supervised** 81:20
**supervision** 75:11
**supervisor** 77:3 81:14,15,18 89:2 90:4 91:4 91:9,9 119:22 120:7,15 142:6 142:24 259:23 259:23 300:11 300:14
**supervisors** 80:7 116:8 142:9 144:2 167:21 168:8 220:17 259:13 298:20
**supervisory** 79:16
**supplied** 11:7 43:13 254:15
**support** 28:7 67:3 86:19 103:6,13 105:7
**supported** 91:22
**supposed** 85:23 213:11
**sure** 5:14 8:21 35:22 40:21 48:21 54:10 76:20 82:16 87:12 89:23 95:18 103:24 106:24 108:18 109:19 110:2 112:15,19 116:13,24 117:12 119:23 120:9 125:13 125:19 126:1 138:6 140:5 142:13 144:12 156:18 157:9 158:3 159:10 168:21 183:24 190:3 198:13 209:10 211:19 230:16 231:12 256:20 259:4 276:2 286:15 288:8
**surface** 255:1 285:1
**surprise** 47:16 47:21
**surprises** 284:17
**surprising** 84:11 284:13
**surveillance** 171:19 288:23
**suspect** 44:15,21 57:6,13 88:19 89:7,17 90:1 122:22 129:24 144:18 252:6 253:15 271:3,4 271:14 272:7
**sworn** 6:2 9:20
**system** 249:13

**T**

**T** 3:7 4:2 325:1 325:1
**T-A-L-M-A-D...** 241:13
**T-A-U-H-E-E...** 37:24
**T-H-A-N** 98:22
**tab** 28:6 42:15 45:1 153:3 182:1 184:4 187:24 199:19 285:21
**table** 194:19
**tabs** 32:4
**tactics** 229:19
**take** 8:8 10:8,16 11:19 12:13 18:14 26:20 28:5,19 32:13 32:21 34:5 43:24 47:2 51:21 61:1,7 61:11 62:21 66:8 96:12 100:21 116:17 122:7 123:4 124:4,15 128:19,20 138:12 142:23 143:12,17 144:10,11 145:21 148:3 148:20,21 153:2 158:5 160:17 163:15 164:23 167:12 188:9 193:21 199:23 201:4 224:6 225:24 226:7,11,13 228:9 240:2 262:15,18 276:22 279:6 286:15 306:5 314:11
**taken** 1:11 53:24 109:19 123:17 145:14,15 151:10 163:14 165:2 172:23 184:19 194:20 199:13 269:7 318:1 325:7,9
**takes** 89:12 117:15 170:3 176:22 224:9
**talk** 12:2 18:6,7 18:10,17 24:9 63:1 65:14,17 71:14 74:23 100:9,18 109:20 111:24 114:11 119:11 140:18,20 148:18 152:17 161:23 199:15 228:21 233:3 237:20 238:2 242:8 244:5 246:20 260:7 274:3 289:8 292:15 307:1 309:17
**talked** 29:19 35:9 37:15 60:24 62:17 63:22 75:2 87:9 114:13 120:16 122:13 122:19 123:24 139:3 141:5 166:19 175:24 181:19 193:20 219:19 224:8 233:8 239:3 251:21,22 267:21 278:9 282:9 284:20 310:8,12 311:19
**talking** 13:15 29:11 38:7 67:8,10 69:2 86:5,24 99:24 101:3 106:9 107:9 118:18 121:22 122:21 134:23 135:4,6 157:14,16 159:21 170:18 172:13 174:6 180:2 229:18 229:20 248:9 255:18 269:5 293:21 296:6 297:2
**talks** 258:2
**taller** 161:5
**Talmadge** 241:13 266:21 267:6 270:5 273:21,21 274:1
**Tasker** 288:6,9 288:11 294:3
**tasks** 268:18 269:5
**taught** 127:14
**Tauheed** 37:23
**team** 79:20

**tech** 77:11
**technically** 90:21 315:14
**tell** 6:15 9:20 10:4,10 14:19 30:14 36:17 65:2 78:12 85:18 88:3 99:2 101:4,11 101:15 109:5 110:7 123:12 126:5 127:7 133:3 134:20 135:4 136:9 137:20,24 140:1 141:22 145:24 147:19 148:16 149:11 152:13 155:19 155:22 156:13 159:15 173:14 173:18 176:15 187:1 196:15 197:17 198:7 200:14 202:17 221:8 226:3 239:8,17 240:21 243:9 244:22 248:24 273:23 274:9 275:9,24 276:10 282:21 283:1,4,16 286:13,18 287:2 290:21 291:1 302:23 309:4,16 315:8 316:16 318:18 319:2
**telling** 38:19 40:7,8,15,22 41:21,21 42:2 59:19 104:13 105:3,10 109:3 110:23 111:8 126:13 137:19 146:11,17 147:18 148:1 150:6 191:14 205:1 219:11 221:19 255:7 265:22 297:9 297:13,17 309:13
**tells** 105:9 150:5 225:22
**ten** 153:3 175:2 175:19
**tended** 80:2 306:9,20
**tends** 101:18 102:15
**Tens** 127:6
**term** 26:20 148:11
**terms** 28:2 96:3 104:1 115:18 128:10 132:2 167:2 173:3 205:6 259:24 266:15 297:19
**test** 148:21
**testified** 6:3 7:20 8:17,19 9:5 33:12 34:3 37:2,22 38:17 39:3 50:6,20 53:17,19 63:16 63:19 70:22 137:17 195:12 196:3 205:17 282:8 283:2 284:5
**testify** 9:12,17 58:23 103:13 211:14 229:9
**testifying** 8:13 8:24 35:11 66:5 252:23
**testimony** 4:18 7:24 10:19 31:11 34:1,20 35:14 51:2 53:22 55:4 63:2,14,23 64:1,16 66:20 67:16 68:15 69:11 70:1 71:9 77:15 86:12 87:8,11 88:3 98:14 122:4 151:16 187:11 188:24 194:10 195:4 206:7,11 207:15,19 208:23 211:23 223:21 225:13 226:24 242:22 252:14 255:11 281:14 282:11 283:12,13 310:6 314:5,6 314:6 324:11 325:6,9,13
**text** 45:24 65:6,7 65:8 279:14 310:17 311:8 317:23
**texted** 65:10
**Thank** 168:12 175:9,19 319:12 324:23
**theory** 139:22
**they'd** 96:9 143:11
**thing** 16:5 60:24 73:4 80:1 88:4 88:24 108:11 125:9 127:8 129:2 155:4 156:1 172:1 178:3 179:22 181:24 184:11 191:13 193:24 203:14 216:9 226:3 239:13 258:2 271:10 273:5 297:23 305:19
**things** 11:15 32:18 44:4 50:5,5 72:10 87:13 90:22 91:5 100:24 106:3,10 110:18,18 120:6 122:16 125:21 134:24 135:5 138:13 157:6 172:3 180:18 189:14 210:16 239:2 252:12 268:4 268:14 271:15 272:5 273:4,15 273:16 292:2,8 299:17 300:19 314:8 317:17
**think** 6:12 21:11 31:21 52:16 56:13 57:20 59:23 70:21 83:24 84:19 85:22 86:11 88:2,11 96:23 101:17 106:20 109:24 110:8 122:13 125:8 126:5 127:2 134:11,14 137:5 147:17 150:12 175:19 182:10 199:12 203:13 212:15 219:7 223:2 231:24 233:9 247:8 249:19 258:21 260:20 268:18 285:20 296:2
**thinking** 195:16 276:24
**thinks** 261:9
**third** 29:14 92:8 92:10 184:21 198:12 236:16 254:1,3 268:7 268:9
**Thomas** 82:4,5
**Thompson** 78:17 80:6 82:1,5
**Thompson's** 82:2
**thought** 49:15 66:3 78:14 92:24 126:13 126:16 127:20 128:4 244:7
**thousands** 127:4 127:6,12,20
**threatened** 126:21,21 127:21 128:5
**threatens** 183:14
**three** 22:13 29:6 39:8 45:21,22 66:18 71:23 72:1,10 84:7 84:14 88:23 93:22,24 97:21 112:1,7 119:12 119:19 132:12 135:16 136:1 166:13 179:6 179:14 194:13 194:13 220:1 224:10 245:22 256:3 300:22
**throw** 37:16 158:3
**throws** 183:15
**Tilghman** 3:12 31:18 33:12 34:2,6 39:12 39:19 70:8 123:23 193:20 194:10 195:11

195:23 196:2 196:19 197:6,9 211:17 252:22
**Tilghman's** 34:20 195:4 252:14
**time** 5:7 7:16 15:21 16:12 17:5,14,20 18:1,4,16 19:4 19:9 20:17 21:4,18 22:22 24:18 25:21 26:24 32:2,5 32:19,21 35:15 37:5,23 38:4 40:9 51:13 57:3 65:2,9 68:19,24 71:21 72:12,17 73:1 74:24 75:9,17 76:9,12 77:22 77:24 79:6,11 80:4,19 81:22 81:24 82:16 84:3,6 85:20 94:10,11 103:7 109:22 149:12 151:10 156:22 160:3,10 180:9 180:14 189:10 192:20,21,22 192:23 193:10 193:19 194:18 200:3 201:16 212:1 223:18 226:11,17 234:7 235:10 235:13 237:13 240:5 257:8 259:13 269:4 272:3 273:8 278:15 279:13 282:21 284:11 288:10 291:2 291:14,19 292:9 294:24 300:17 309:23 314:10 315:20
**timeframe** 23:6 311:3 312:19
**timeline** 22:1
**times** 7:21 8:23 11:15 24:19 39:11 48:19 53:19 69:1 72:7 84:2 93:23 111:5 239:3 240:16 252:24 300:23 317:16
**tip** 129:19
**tips** 44:18 128:7 128:11 131:14 132:3,9,12,17 133:21 136:1,3 164:12,14 166:20,21 169:2 170:13 170:14 180:20
**today** 7:8,14 8:20,23 9:23 10:19 14:18 30:13 38:22 39:21 63:13 64:18 68:12 71:14 76:8 153:19 161:17 181:5 282:10
**today's** 5:6 10:21
**token** 40:4 104:12 152:9 306:2
**told** 8:17 30:8 43:2 51:5 59:2 66:3,24 72:15 75:1,9 88:2,4 95:7 98:12 106:13 109:1 110:18 112:8 112:15,19 120:17 122:13 134:14 137:5 152:20 154:15 155:11 158:18 202:11 203:22 215:11 221:3 221:20,21 225:1 226:10 233:9,14 234:13,15 235:19 239:2 250:10 266:16 283:2 294:1 303:5 310:11 321:21
**Tom** 73:14
**ton** 163:5
**tons** 111:5
**Tony** 164:4 165:13
**tool** 209:8
**top** 78:8 92:10 155:16 162:8 168:1,11 171:14 175:16 196:7 233:6 240:4 254:1 264:19 265:12 269:21 276:2 293:10
**topic** 64:3 67:16 70:16 87:6 104:16 122:19 123:21 137:2 151:19 164:10 219:18 223:23
**topics** 101:2 138:10,10 285:19
**touch** 15:24 64:19 269:21
**touched** 310:9
**track** 141:7 263:9
**transcript** 1:17 3:16 49:20 50:7,11,14 66:2,9,11 67:12 194:9,11 196:18 282:10 323:22 324:19
**transcription** 325:13
**transcripts** 4:11 26:14 194:13 195:3 212:2
**transferred** 119:16
**transition** 100:17 219:18
**transmit** 86:17
**transmitted** 85:24 120:22 305:8
**transparent** 191:22
**transport** 240:14
**travel** 170:5
**trial** 4:18 20:8 26:13 32:2,19 33:13 34:3 37:23 62:11 68:15 107:12 107:23 108:7,8 121:10 122:3 140:22 152:2 193:19 196:3 205:20 216:14 282:6,8,12,13 282:17,23 284:6 305:20 306:1 307:20
**trials** 20:6 53:17 212:3
**tried** 20:5,21 22:17 53:20 124:9 307:6 310:13
**tries** 248:24
**Trina** 276:3 308:17 309:1,6 309:16
**Trina's** 309:8
**triple** 256:2
**true** 38:23 93:1 122:7 137:6 192:18 248:6 282:24 287:22 325:12 326:2
**truth** 9:20 38:19 40:3,7,9,16,22 41:22 42:2 59:19 104:13 105:3,10,20 109:3 110:7,23 126:2 135:19 136:14 137:20 137:20,24 146:11,17 147:18 150:6 205:2 219:11 221:19 255:7 297:3,9,13,17 302:18,19
**truthful** 10:19 60:7,18 61:3,4 68:16 70:24 71:3,10 102:16 110:1,20 114:1 114:8 126:17 202:18
**try** 10:8 50:18 62:9 100:15 107:20 110:6 131:18 138:17 140:10,11 141:8 176:20 203:14 215:23 220:3 291:18 307:21 309:14
**trying** 49:1 147:24 175:7 193:11 197:17 229:3 238:7 247:8 256:21 263:9 282:18 292:5 309:1,5

**Tucker** 75:11
**Tucker's** 75:14
**turn** 29:14 30:11 45:21 46:23 76:13 92:8 165:15 194:22 220:16 232:17 258:13 268:7 282:15 305:11 313:16
**turned** 248:5
**Turner** 3:13 33:18 34:12,21 34:23 39:9 229:20,22 230:1 241:14 241:14,18 242:4 245:15 251:24 252:1 252:12 253:9 254:19 269:11 269:12 273:6 282:2,6,14 283:1,8,13 284:6,8 294:1 294:8 295:2 301:19 304:20 308:17 309:2 309:10,14,15 309:17,18 310:13 312:3,7
**Turner's** 252:5
**turns** 76:24 249:1
**twice** 236:24 300:22
**two** 2:16 8:19 11:20 14:21 15:2 18:12 20:5 25:21 39:22 57:22 71:24 76:17,23 79:17 82:22 84:7,13 87:13 88:24 97:21 109:6 112:1,6 134:23 135:4 138:9 140:18 147:4 157:24 158:10,12 163:18 165:7 165:16 170:23 171:17 179:11 189:14 200:18 207:13 211:13 211:17 212:2 219:19,23 221:1 261:10 263:21 275:17 279:4,5 280:13 280:15 281:14 293:12 298:24 299:1 311:18 314:9 315:2,10 315:18 317:22
**two-thirds** 268:10
**type** 83:14 124:15 157:6 276:19 317:18 320:3
**typed** 155:20 156:13 159:17 159:17,20 298:18 316:24 317:19
**types** 144:5
**typical** 156:23 300:18
**typically** 57:22 91:23 157:12 236:21 315:22 317:10 319:15
**typing** 157:17 157:23 159:9 287:2 325:11
**typo** 296:3,5 311:23

**U**

**uh-huh** 19:20 22:6 43:8 229:13 251:5
**Ultimately** 205:22
**unclear** 256:3
**underlying** 99:13 175:8
**undermine** 101:19 112:14
**underneath** 273:19
**understand** 7:9 9:12,19 20:21 22:5,10,15,18 23:5,19 25:10 33:21 35:18 83:23 84:8 86:3 93:11 94:1 103:22 104:23 107:19 123:20 124:11 124:18 130:19 152:19 156:18 157:4 160:3,9 183:9 190:12 191:23 194:1 214:13 216:12 219:15 232:20 234:2 238:15 249:11 253:11 254:21 268:2 295:15
**understanding** 10:3 14:8 34:2 64:16 74:5 91:13 100:4 113:8,9 114:13 115:18 118:6 133:9 160:2 216:17 259:21 288:11,19 300:18
**understood** 34:3 43:7,15 53:7 78:9 191:20 192:1 195:22 233:18 268:1
**unidentified** 165:12
**unit** 24:6,8,13 27:20 45:18,19 78:20,21 91:5 143:16,24 312:14
**United** 1:1 5:5
**universe** 140:6
**unnecessary** 46:1 196:5
**unquote** 106:6 222:13 229:8
**unsuccessful** 140:24
**untruthful** 60:1 193:1
**unusual** 69:3 185:16,24 186:7 236:18 322:14
**upper** 290:1
**upside** 30:11
**usable** 249:2
**use** 26:19 87:23 89:11 104:4 106:7 111:21 118:14 132:7 132:15 141:23 148:11 193:8 206:17 248:8 248:11 286:11
**useful** 103:8 147:6,12
**useless** 271:23
**usually** 65:15 73:9 143:6 276:22 277:2

**V**

**vacate** 61:8 65:19
**vacated** 51:1,7 51:11,16,21 52:1,11 64:4 65:22
**vacation** 81:12
**vaguely** 36:23
**validity** 36:11 38:11 59:14,17 111:7 190:2
**various** 31:11 45:14 100:18 253:16
**vast** 249:12 299:20
**veer** 243:14
**veered** 137:2
**verbal** 221:10
**versa** 157:18
**version** 233:5 313:13
**versus** 5:10
**vice** 157:17
**video** 5:4
**videographer** 5:3
**videotape** 1:14 5:1 97:2 151:5 226:16 309:22 323:19
**Videotaped** 1:10
**view** 59:17,18 69:24 205:6 223:4,6 242:23
**viewing** 96:3
**violation** 192:17 192:19 220:2 235:23
**violent** 183:21
**Virginia** 257:12
**volumes** 194:13
**volunteered** 60:14
**VS** 1:4
**vulnerable** 125:11,14,16 126:4 127:22 128:5

**W**

**waiting** 193:7

**waiver** 306:17
**walking** 110:12
**wall** 80:14
**Walter** 52:14,17 54:19 60:10 63:8,19 64:5
**want** 5:12 9:17 15:13 22:3 49:19 91:6 100:17 104:4 107:6 113:24 116:19,21,22 116:24 125:4 126:5 134:8 135:19,20 136:12,13 138:14 140:5 141:18 147:22 150:18,21 151:19 152:17 152:19 160:1 160:23 166:23 176:3 178:17 182:15,18 184:2 187:17 190:3 196:6,15 207:20 230:13 230:18,19,21 231:14 242:8 242:18 247:13 247:21 248:6,8 249:14,19 250:11 269:1 271:5 274:23 292:6 298:13 309:14,16 311:5,11 312:3 320:13
**wanted** 87:6 100:6 106:24 126:14 168:20 177:11 183:23 248:4 274:5 285:7 321:23
**wants** 140:16 141:7 229:16 247:15 261:11 319:10
**warnings** 143:16 226:12
**warrant** 28:8 90:24 91:16 92:21 93:5 94:11 107:15 107:21 139:10 208:8 223:13 223:17 262:14 317:12 318:10
**warrants** 109:9 262:11,23
**wasn't** 8:12 48:18 54:15 60:16 68:14 69:3,12 85:8 109:13 110:20 110:23 112:2 127:10 128:17 137:19 238:24 300:2
**waste** 225:19
**watched** 144:22
**watching** 268:16
**way** 9:4 12:17 31:2 32:18 41:11 44:15 46:22 47:13,24 48:1 57:5,12 57:18 58:20 60:13 61:18,20 62:3 65:5 69:7 70:13 75:15 78:6 79:3 80:13 81:7 82:3 91:8 93:6 110:19 117:12 118:1 121:19 122:1,5 143:8 146:7 147:12 152:6,18 155:15,18 156:6,13 158:6 159:11,20 163:14 166:3 172:1 176:11 180:8 183:4 190:24 192:5 207:17 215:5 215:22 216:2 217:5 220:21 226:3 229:23 234:19 240:4 241:2 250:14 252:22 253:24 258:23 268:10 282:17 289:16 290:17 300:19 301:16 312:12 315:19 322:23 323:12
**ways** 93:14
**we'll** 6:12 10:10 40:18 49:16 92:13 97:5 100:9 132:14 197:20 227:12 245:21 314:7 314:14
**we're** 5:1 71:14 97:3 101:11,16 103:24 107:9 121:22 125:8 134:23 150:12 151:13 170:18 180:2 199:14 209:23 213:2 215:23 223:23 226:18,21 238:15 242:14 248:9 249:10 250:8 257:2 293:21 296:6 297:8 310:2,3
**we've** 63:22 114:12 141:5 181:19 206:24 207:2 227:7 266:14 282:9 311:19 312:17
**weakness** 46:5
**weapon** 37:2 53:6,15,18 54:19 55:23 58:3,8 60:7 98:13 111:3
**wearing** 229:19
**week** 11:20 15:2 55:9 73:2 80:17 231:11 240:18
**weight** 53:5 172:12,16 173:4,22
**welcome** 171:15 196:14
**went** 53:7 69:9 70:18 77:18 83:7 91:8 109:9 138:2 142:5 143:15 158:15 195:21 212:20 240:22 282:6 286:10 287:13,20,23 288:3,22 289:4 311:24
**weren't** 86:13 145:21 282:17
**West** 75:23
**Westerman** 2:18 5:23 19:16,21 167:23 168:7
**Westminster** 269:22
**whatsoever** 120:21
**white** 173:14,17 239:5 256:3 274:24 276:21 277:1
**Wilkerson** 195:14,17,17 195:22
**William** 181:10
**willing** 126:5 143:12 229:12
**wire** 229:19
**withdrawal** 150:11 174:9
**withheld** 47:10 49:7 86:8
**witness** 4:7 26:10 30:17,22 31:7 33:12 35:19 36:23,24 38:16 39:2 40:14 41:6,14 41:21 42:2 47:20 48:5,16 54:4 55:15,22 56:17 57:12 58:17 60:6,23 61:2,17,24 64:11 68:3 69:10 70:12 84:17 85:12 93:13,22 94:10 101:24 102:2,7 102:16 103:5,9 103:12 104:2,7 104:13,24 105:9,17,22 106:10 107:3 108:17,19,24 108:24 109:2 109:22,24 110:6,15,16 111:12,22 112:2,8,11,15 112:19 113:14 118:8,21 119:3 119:11 122:21 123:7,9,12 124:20 125:24 126:3,9,13 127:21 128:1 128:14 132:22 133:14,24 134:19 136:22 137:10,17 139:8 140:2,12

140:16,23
141:7,9,11
142:4 143:9,11
145:23 146:24
147:10 149:15
150:15 152:13
154:23 155:8
156:9 166:17
169:7 171:4
173:5,9 176:8
176:23 177:7
179:21 185:14
185:16,18,21
186:2,2,5,14
187:1,15
188:20 189:14
191:1,10
192:22 193:5
193:11 197:2
197:13 203:9
204:7,16,19
205:7,17
206:15 208:4
208:19 209:4
209:17 211:4
212:12 213:10
215:10,17
216:8 217:9
218:4,10 219:4
219:14 220:6
220:13 221:9
222:16 225:16
226:10 228:20
230:9,16 231:3
231:19 232:8
234:10 235:2
235:13 236:9
236:19,21
237:11 238:11
238:11,21
242:12 243:2
243:13,19,24
244:7,18 245:9
246:11,16,21
247:2,6,13,21
248:3,13,19
249:14,18
251:14 252:6
254:11,22
256:15,24
259:10 262:14
263:4 266:3
267:15 269:19
271:9,20
272:12 273:24
274:22 276:1
280:19 283:3
284:16 285:10
285:17 287:1
287:17 290:15
291:9 292:13
293:3 295:11
295:21 296:14
296:24 297:8
297:23 298:12
298:17 300:1
300:10 301:4
302:11,15
303:20 304:11
305:16 307:15
307:20 309:5
315:9 316:7
318:20 322:21
323:7 324:15
324:16,17,18
325:14 326:13
**witness'** 103:10
186:10,21
246:13
**witnessed** 225:3
**witnesses** 27:11
29:6,11 31:11
32:2 35:10,14
43:13 69:21
90:10 111:24
112:6,14
118:23 123:24
126:17,20
137:5 139:3,17
140:7,11,15,17
142:5,20
144:18 160:7
170:6 175:1,3
175:4 176:1,9
237:7 242:5,16
242:18 255:18
255:22 262:3,5
263:14 270:15
270:23 272:16
282:8
**WOLFE** 1:22
**woman** 33:17
**Woods** 13:10
182:17 183:11
235:18 251:2
264:20,24
265:2,17,23
287:14,21
288:4 289:5
292:18,24
293:23 294:7
297:4,24 298:6
299:2 301:10
303:2 304:5
309:13 321:2,5
322:1,18 323:3
323:14
**Woods'** 258:18
301:18
**word** 175:15
**words** 41:1 58:7
106:9 107:6
139:1 147:12
159:22 173:17
179:5 186:24
190:7 262:13
314:2
**work** 18:18
52:23,24 56:21
72:22 73:13,21
74:2,15 78:15
79:18,21 80:2
83:19,21
100:20 115:11
115:19 118:1
129:2 130:7
135:23 154:16
159:24 198:20
198:21 229:8
229:16 260:3
273:20 276:12
**worked** 19:1
57:20 79:5,9
81:23 129:17
276:13 300:19
306:5
**workers** 16:2
**working** 71:4
72:16 73:2
78:16 82:1,23
97:16 100:22
116:3 120:14
181:15
**works** 104:1
311:13
**Worrell** 56:4,10
57:11,19 59:8
59:19,24 60:11
62:17 63:1
**worry** 130:17
**wouldn't** 105:1
106:20 107:6
130:17 134:1
139:1 150:6
159:3 177:8,13
186:24 218:11
226:13 244:12
295:15 296:11
318:5
**wrap** 99:23
305:6
**write** 14:9 157:4
164:23 277:3
289:14
**writing** 198:19
228:21 290:5
290:21
**written** 133:15
221:10 222:4
237:18 277:16
**wrong** 135:20
136:9 140:3
296:3 302:22
**wrongdoing**
99:7
**wrote** 287:6
290:8 291:17
292:8

X

**X** 3:2,7 4:2

Y

**yeah** 16:6 51:24
93:13 101:22
112:1 120:5
127:5,14 128:4
170:2 182:19
212:4 213:10
216:19 223:6
226:11 285:3
292:4 296:14
297:12
**year** 6:13 54:12
75:5 81:23
140:21
**years** 7:4 14:4
16:14,14 17:6
17:16,22 18:17
19:11,23 20:19
21:6 22:13
23:16 25:21
37:4 43:3
52:22 54:6,15
64:24 71:16
76:17,19 82:22
84:7,14 100:23
114:24 117:5
117:14 122:17
127:13 142:4
149:4 169:14
210:20 271:3
278:3 279:4,5
**Yep** 135:9
**York** 2:22,22
**young** 33:17
110:11

Z

**Zoom** 2:21 6:20
8:6,11 50:8

244:5
**Zurbriggen** 2:9 5:18,20 7:13 11:8,11,24 12:2 20:14 23:1 26:8 30:15,20 31:5 35:16 36:20 38:13,24 40:12 41:12 47:18 48:3,14 54:2 55:13,20 56:15 57:8,15 58:15 59:10 60:3,21 61:15,22 64:8 70:10 84:15 85:10 93:10 94:8 99:18 103:20 104:5 104:21 105:15 110:4 112:9 113:12 117:9 121:6,21 123:1 124:17 126:7 127:23 128:12 132:19 133:11 133:22 135:1 136:6,19 137:14 139:5 142:1 146:22 147:8 150:8 154:21 155:6 156:7 166:15 169:5 170:17 171:2 173:7 174:5 176:6 177:5 179:19 185:12,19 186:3,12 187:13 188:18 189:12 190:19 191:8 192:11 193:3 197:11 203:7 204:5,17 205:15 206:2 206:13 208:2 208:17 209:2 209:14 210:8 211:2,20 212:9 213:7 214:24 215:8 216:6 217:7 218:2,8 219:2,12 220:4 220:11 221:7 222:14 225:14 226:8 230:7,14 231:1,17 232:6 234:8,24 235:11 236:10 236:12 237:9 238:19 242:10 243:1,22 245:7 246:18 247:4 247:17 248:1 248:17 249:6 249:16 250:4 251:12 254:9 254:20 256:13 256:23 259:8 260:4 263:17 266:1 267:13 269:17 271:7 271:17 272:9 273:22 275:23 280:17 284:14 285:4,8,15 286:23 287:15 290:12 291:7 292:11 293:1 295:8,18 296:12,22 297:6,21 298:15 299:23 300:8 301:2,14 302:6,13 303:9 303:18 304:9 305:14 306:12 307:13,24 308:10 309:3 315:7 316:5 318:17 321:8 322:19 323:5 323:18,23

**0**

**1**

**1** 75:10
**1:35** 226:17
**10** 11:22
**100** 8:21 54:10
**10013** 2:22
**104** 319:3
**10th** 22:14 318:9 319:1
**11** 172:23
**11/3/87** 311:20
**11:09** 97:3
**11:13** 97:3
**11:58** 151:6
**1147** 169:18,20 169:24 170:9
**11th** 50:8
**12** 67:12
**12,000** 302:24
**12/13/84** 168:1
**12:13** 151:7
**125** 172:16 173:22
**13** 325:19
**13,200** 66:13
**1303** 1:23
**13th** 167:12
**14** 283:19
**15** 11:22 37:4
**1500** 265:4
**1515** 2:11
**153** 3:19
**1533** 288:5,19
**15th** 29:16 188:7 194:21 197:6 223:12 294:13
**16-year** 53:13
**160** 3:20
**162** 3:21
**163** 3:22
**165** 3:23
**167** 3:24
**16th** 196:9
**171** 4:5
**172** 4:6
**175** 4:7
**177** 198:14
**179** 198:14 268:8
**180** 198:17
**1804-C** 288:24
**181** 198:16,18
**182** 4:8
**183** 199:6
**184** 4:9
**185** 199:9
**188** 4:10
**19** 282:16,22
**19102** 1:24 2:11
**19103** 2:17
**19106** 2:4
**194** 4:11
**198** 4:12
**1980s** 31:12 123:18 141:21
**1983** 195:23
**1984** 7:4 22:8 75:18 80:22 81:4 166:12 167:12 172:18 176:21,22 224:17
**1985** 71:18 76:5 180:24
**1986** 184:24
**1987** 22:14,23 23:11,14 29:16 30:5 76:8 79:7 80:23 81:4,18 82:19 85:6 88:11 89:17 91:20 98:1 153:12 177:1 181:1,21 188:7 188:13 194:21 196:9 200:3 210:21 224:10 227:5 280:12 287:14,21 294:13
**1988** 321:13 322:6
**1989** 20:6 22:18 31:16 33:13 279:4
**1991** 20:7,22 22:18 31:16 43:2
**1994** 75:3
**1995** 75:3
**1996** 43:7
**19th** 166:12
**1st** 279:4

**2**

**2** 45:1
**2:13** 226:19
**2:22-CV-0241...** 1:4
**20** 16:14 19:11 19:22 20:19 184:4 281:21
**2001** 2:16
**2005** 98:18
**201** 4:13
**2013** 71:19 72:16 149:11
**2018** 64:7
**2019** 34:7
**2020** 24:5 32:13 34:12 210:23
**2021** 8:2 9:5 35:9 37:16 50:9,16 51:13 51:21 52:1 70:18,23 71:10 221:22
**2022** 21:15
**2023** 1:7 5:7 325:9
**2027** 325:19
**20th** 98:1
**212** 2:22
**215** 2:4,12,17

**217** 4:14
**21st** 199:18 217:22 223:10 294:17
**22** 21:21
**224** 4:15
**227** 4:16
**22nd** 217:21
**230** 1:23
**24** 163:15
**2414** 311:24
**24th** 224:10
**25** 16:14 17:16 182:2
**25th** 287:14,21
**26** 184:4
**2620** 2:16
**26th** 169:18,20 170:1,9 321:13
**27** 187:24
**278** 4:17
**27th** 22:9 98:18 163:10 170:4,6 256:4 277:12
**28** 3:10 71:16 100:22 122:17 127:13 254:4
**281** 4:18
**285** 4:19
**28th** 256:4

**3**

**3** 32:4
**3:33** 309:23
**3:46** 309:24
**30** 17:6,16 19:11 19:23 21:6 88:16,17 324:22
**30th** 172:18
**31** 199:19
**310** 4:20
**314** 4:21,22
**32** 3:11
**320** 4:23
**33** 3:12 316:14
**34** 3:13 7:4 210:20
**35** 64:7
**37** 285:21
**3rd** 318:2

**4**

**4** 32:4 49:13 80:9 168:11 180:3,10,14
**4/15/87** 92:11
**4/21/87** 201:21
**4:03** 323:20
**42** 3:14
**45** 3:15 66:12,14 66:16 67:8,13
**47** 66:12,14,16 67:13
**483** 118:14

**5**

**5** 32:4 172:16
**5'1** 161:5
**5'5** 161:4 173:23
**5'6** 162:10 173:22
**5'7** 162:10
**50** 3:16
**501** 2:3 5:9
**52nd** 269:22
**5876** 29:14
**5th** 7:4 22:8 163:16

**6**

**6** 1:7 3:5 172:16 325:8
**60** 88:17
**640-8420** 2:17
**683-5448** 2:12
**6th** 5:7

**7**

**7** 42:15
**70s** 257:22,22
**718** 2:3 5:8 325:7
**75483** 118:12
**7549** 4:8 182:9
**77** 3:17
**79** 169:16
**7th** 30:4 78:9 153:12 188:17 199:14 227:5 233:17 235:8 260:10,11 261:2 266:15 267:22 273:9 280:8,11 294:21

**8**

**8** 52:24
**80** 316:13
**84** 75:22 84:4 88:10 89:13 115:4 163:16 177:18 180:19 190:24
**84-275** 293:16
**8425** 282:15
**8429** 283:16
**85** 54:9 76:21 84:5 149:10,11 177:18
**86** 54:9 76:18
**87** 76:18 78:9,13 84:7 89:21,21 89:24 115:4 177:3 188:17 190:24 217:21 217:22 224:18 236:3 241:24 250:17 258:19 258:20 280:8 294:17 318:2,9
**8995** 195:1,9

**9**

**9** 28:6 46:17
**9,000** 252:16,20
**9,001** 252:17
**9.1** 61:13
**9:30** 1:12
**9:33** 5:7
**90** 10:9 88:17
**9001** 252:18
**90s** 288:15
**925-4400** 2:4
**95** 68:19,24 69:1
**965-9081** 2:22
**97** 3:18
**99** 2:21
**9th** 318:9