IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA
- - -
CURTIS CROSLAND :
Plaintiff :
:
VS. : CIVIL ACTION NUMBER
: 2:22-CV-02416-AB
CITY OF PHILADELPHIA,:
et al. :
Defendants :
- - -

November 21, 2023

- - -

Videotaped deposition of DOMINIC MANGONI, was taken pursuant to notice beginning at or about 9:30 a.m. before Jeannine Cancelliere, Court Reporter and Notary Public and Ed Caren Trimby, videotape operator, there being present.

Any reproduction of this transcript is prohibited without authorization by the certifying agency.

KAPLAN, LEAMAN AND WOLFE
Registered Professional Reporters
230 South Broad Street, Suite 1303
Philadelphia, Pennsylvania 19102



APPEARANCES:

KAIRYS, RUDOVSKY, MESSING, FEINBERG & LIN
BY: JONATHAN FEINBERG, ESQUIRE
The Cast Iron Building
718 Arch Street, Suite 501 South
Philadelphia, Pennsylvania 19106
PHONE: (215) 925-4400
gharris@krlawphila.com
Representing the Plaintiff
Also Present:
GRACE HARRIS, ESQUIRE
ANGELINE ETIENNE

CITY OF PHILADELPHIA LAW DEPARTMENT
BY: ADAM ZURBRIGGEN, ESQUIRE
DEPUTY CITY SOLICITOR
One Parkway Building
1515 Arch Street
Philadelphia, Pennsylvania 19102
PHONE: (215) 683-5448
adam.zurbriggen@phila.gov
Representing the City of Philadelphia

CLARK HILL
BY: MIKAILA JOHN, ESQUIRE
Two Commerce Square
2001 Market Street, Suite 2620
Philadelphia, PA. 19103
PHONE: (215) 640-8420
mjohn@clarkhill.com
Representing Westerman and Ansel

NEUFELD, SCHECK & BRUSTIN, LLP
BY: EMMA FREUDENBERGER, ESQUIRE (Via Zoom)
99 Hudson Street, Eighth Floor
New York, New York 10013
PHONE: (212) 965-9081
emma@nsbcivilrights.com
Representing the Plaintiff



- - -

INDEX

- - -


| DOMINIC MANGONI | PAGE |
|---|---|
| BY MR. FEINBERG | 6 |


- - -

EXHIBITS

- - -


| EXHIBIT NO. | DESCRIPTION | PAGE |
|---|---|---|
| P-35 | PAC Document | 54 |
| P-36 | 8/7/20 Article | 61 |
| P-37 | Handwritten statement | 90 |
| P-38 | Article | 111 |
| P-39 | Protect Our Police Document | 114 |
| P-40 | Concise Officer History | 136 |
| P-41 | Firearm ID Unit Document | 199 |
| P-42 | Newspaper Articles | 259 |
| P-43 | Activity Sheet | 347 |
| P-44 | Conviction Integrity Unit Document | 386 |
| P-45 | Homicide File Note | 395 |
| P-46 | Note | 396 |
| P-47 | Oscar Brown Interview | 398 |
| P-48 | Handwritten Note | 399 |




- - -

EXHIBITS

- - -


| EXHIBIT NO. | DESCRIPTION | PAGE |
|---|---|---|
| P-49 | Homicide File Note | 400 |
| P-50 | David Brown Criminal Extract | 405 |
| P-51 | Handwritten Note | 444 |
| P-52 | Handwritten Statement | 473 |
| P-53 | Newspaper Article | 478 |

Page 5

VIDEOTAPE OPERATOR: We are now on the record. My name is Caren Trimby and I am a videographer retained by On the Record. This is a video deposition for the United States District Court for the Eastern District of Pennsylvania. Today's date is November 21st and the video time is 9:35 a.m. This deposition is being held at 718 Arch Street, Suite 501, Philadelphia, Pennsylvania 19106 in the matter of Curtis Crosland versus City of Philadelphia, John Della Rocca. The deponent is Dominic Mangoni. Would all counsel please identify themselves for the record?

MR. FEINBERG: Jonathan Feinberg for the plaintiff, Mr. Crosland. I am joined here today by Grace Harris and Angeline Etienne. I'll also note that we may be joined later in the day, on Zoom some of my co-counsel from the firm of Neufeld, Scheck & Brustin.

MR. ZURBRIGGEN: Adam Zurbriggen from the City of Philadelphia Law Department for the deponent and for the City of

Page 6

Philadelphia and the City defendants.

MS. JOHN: Mikaila John, I'm here for Clark Hill on behalf of the City defendants.

VIDEOTAPE OPERATOR: The court reporter is Jeannine Cancelliere and will now swear in the witness.

- - -

DOMINIC MANGONI, after having been first duly sworn, was examined and testified as follows:

- - -

BY MR. FEINBERG:

Q. Mr. Mangoni, good morning. Sir, we met briefly off the record. I'm going to introduce myself formally now. My name is John Feinberg. I'm an attorney for Curtis Crosland and I am joined here today by my colleagues, Grace Harris and my law firm's paralegal, Angeline Etienne. We represent Curtis Crosland.

He has brought a lawsuit against you and several other Philadelphia police detectives and the City of

Page 7

Philadelphia. In the lawsuit, Mr. Crosland alleges that you and your fellow detectives in the homicide division caused him to be falsely arrested, prosecuted, convicted and incarcerated for more than 34 years for the December 5th, 1984 robbery and murder of Il Man Heo, when Mr. Crosland was, in fact, innocent of that crime.

You have been named as a defendant in the case and you're here today for your deposition. Do you understand that, sir?

A. Yes, sir.

Q. You're represented in this case and today by Mr. Zurbriggen. Have you had a chance to consult with him before we begin today?

A. Yes, I have.

Q. Do you need any more time to speak with him?

A. No, sir.

Q. I assume that over your career you've testified under oath in court many times; is that correct, sir?

Page 8

A. Yes, sir.

Q. Have you ever testified in a deposition like this?

A. Yes, sir.

Q. How many times?

A. Two or three.

Q. When was the last deposition?

A. I cannot recall the last one. The last one took place at the Sears Building. I just can't remember the day or time. It was several years ago, a couple years ago.

Q. Suffice it to say, sir, you are familiar with what a deposition is; is that correct?

A. Yes, somewhat, yes.

Q. To confirm, even though we are not in a court and there is no judge or jury here, you're testifying under the same oath that you would have taken if you were appearing in court. Do you understand that?

A. Yes, sir.

Q. Based on your background, I assume that I don't need to explain to you what it means to testify under oath. Would that be a fair assumption?

Page 9

A. Yes, sir.
Q. I want to give just a couple of brief introductory points, given our setup today. As you may have heard me mention to your counsel before we began, I have a lot to cover in this deposition. So we will be here for a while. If at any time though you need a break, you should let me know and we will be happy to accommodate that so long as there's no question pending. In that case, you give an answer and we'll take the break then. Understood, sir?
A. Yes, sir.
Q. Let me also note, just while we're on the record the nature of the conversation I had with your counsel. Up until about 5 o'clock last night, I had made the assumption that your fellow detective, Mr. Hughes would be able to come in and testify about this case. My understanding from review of the documents in this case is that you and Detective Hughes worked many aspects of this investigation together. So for that reason, I had planned to divide my questioning between

Page 10

you and Detective Hughes. I have now learned that Detective Hughes is deceased, so for that reason I may have to take several of the topics that I had planned to cover with Detective Hughes and ask you about them.
A. That's fine.
Q. Under the Federal rules there is a presumptive limit that we have seven hours for each day of deposition. In these circumstances, I may be asking your counsel if you agree or I may be asking the Court to allow us to continue this deposition over another day, in light of this development that we just learned about last night. Do you understand that, sir?
A. Yeah, hopefully we'll see where this takes us.
Q. To be clear, I'm not asking you personally to agree. I just want to make sure that you're operating --
A. I understand.
Q. One thing, let me note you have testified at length -- for the benefit of our court reporter, please be sure to make sure --

Page 11

pardon me, please be sure to let me finish my question before you give an answer. Agreed?
A. Yes, sir.
Q. I'll do the same. I'll try to do the same, wait until you finish your answer before I ask a question. If I interrupt you at any point, tell me and I will stop talking and let you finish. Agreed?
A. Yes, sir.
Q. Is there any reason why you cannot give truthful and accurate testimony today?
A. No.
Q. What did you do to prepare for today's deposition?
A. I read over the complaint that was mailed to me and I spoke to Mr. Zurbriggen on Friday, this past Friday, three days ago.
Q. Had you ever spoken to counsel before Friday of last week?
A. Yes.
Q. Was that -- let me ask it this way, did you ever speak to counsel to prepare for this deposition before Friday of last week?
A. Not really, no.

Page 12

Q. Was that the only conversation you had with your counsel in which you addressed the topic of a deposition?
A. Yes.
Q. Was that conversation in person or by phone?
A. That was in person.
Q. How long was that meeting?
A. Maybe an hour and a half to two hours.
Q. Was anybody else present for that meeting?
A. No.
Q. Do I understand correctly that that is the only meeting you had with your counsel to prepare for the deposition?
A. Yes, sir.
Q. You mentioned reading the complaint, are you referring to the civil rights complaint that Mr. Crosland filed in Federal court?
A. Yes, the one of numerous pages, yes.
Q. It probably would have been between 35 and 40 pages. Does that sound right to you?
A. Yes.
Q. Did you read any other documents?

Page 13

A. Yes.
Q. What other documents did you look at?
A. Interviews that we took, myself and Detective Hughes and myself and Detective Rocks, notes of testimony from the second trial and activity sheets. I believe that was it.
Q. Let me make sure I understand. Interviews that you and Hughes took and you and Rocks took --
A. Yes.
Q. -- of Mr. Everett; is that correct?
A. Mr. Everett.
Q. Were there other interviews that you looked at?
A. Yes.
Q. What other interviews did you look at?
A. Michael Ransome interview, Mr. William Massey and I don't recall if there was another one in there.
Q. Going back to Everett, there were at least four different interviews that I have seen that you conducted with Everett. Did you look at four different statements from

Page 14

Everett?
A. I can't remember the number but I did look at different statements, yes.
Q. You recall looking at these multiple statements, right?
A. Yes.
Q. You looked at a statement from Mr. Ransome, correct?
A. Yes.
Q. You looked at a statement from Mr. Massey, just one of them; is that correct?
A. Yes.
Q. Massey, M-A-S-S-E-Y, correct?
A. Yes.
Q. Now that we have reviewed those, are there any other interviews that you looked at?
A. I don't believe so.
Q. You mentioned the notes of testimony from the 1991 trial of Mr. Crosland; is that correct?
A. Yes.
Q. What portion -- strike that.
Did you read the entire trial transcript?

Page 15

A. No.
Q. What portion of the testimony did you look at?
A. The portion where I testified.
Q. You mentioned activities sheets, which ones did you look at?
A. I think there were four, maybe three or four.
Q. Can you tell me which ones?
A. Offhand, the interview conducted by Mr. Massey I believe; the interview conducted by -- of Mr. Massey, the interview of Michael Ransome, the interview of Rodney Everett.
I believe that was -- and there was an interview that I read -- there was an activity sheet that I read which consisted of Detective Rocks doing some work but I wasn't there that particular day. I wasn't with him that day.
Q. So the interviews -- strike that.
The activity sheets that you recall seeing were activity sheets regarding the same interviews that we discussed?
A. Yes, sir.

Page 16

Q. Plus the one concerning some work that Detective Rocks did where you were not present?
A. In July of '87, yes, sir.
Q. We discussed interviews that you conducted, notes of testimony, activity sheets. Any other documents that you reviewed?
A. Not that I can recall.
Q. Did you speak with anybody, other than counsel, to prepare for this deposition?
A. Not to prepare for it. I spoke with Detective Rocks. He told me that he had come down here and gave a deposition that was very lengthy and pretty much that was about the extent of our conversation.
Q. When did you speak to Detective Rocks?
A. Maybe last Thursday, Wednesday or Thursday.
Q. So a little less than a week ago; is that correct?
A. Yes.
Q. Who initiated -- strike that.
Was that in person or by

Page 17

phone?
A. No, in person.
Q. Where did you see him?
A. At a diner, we had a cup of coffee together.
Q. Did he reach out to you to arrange that or was it coincidental?
A. It was kind of coincidental. We meet every once in awhile. We were partners for years.
Q. What did he tell you about the deposition?
A. Pretty much just what I stated to you before, that it was lengthy, that there were a lot of questions that he didn't remember and that there were a lot of policy questions and generalities discussed.
Q. Other than that discussion at the deposition, did you talk about the case?
A. Not really, I didn't remember that much about the case. I didn't remember that much about the case until I actually saw the paperwork three days ago.
Q. When Mr. Rocks described -- strike that.

Page 18

It sounds like from your answer, now that you've reviewed paperwork about the case, you do have some recollection of your involvement?
A. Some, yes.
Q. Did Detective Rocks remind you of any of the details of the case or the investigation when you got together?
A. Just the fact that we had interviewed a couple people. He didn't remember the specifics of how we got to interview those people and that was basically it.
Q. Where did you meet, by the way?
A. Tiffany's Diner on Roosevelt Boulevard.
Q. You mentioned that you meet with him periodically?
A. Periodically, we talk on the phone quite often.
Q. How often?
A. At least once a month.
Q. You were partners going back several years; is that right?
A. We were partners at West Detectives for a little while and then we were partners in

Page 19

homicide for a while.
Q. Before that meeting or that discussion with Detective Rocks about a week ago, had you spoken to him at any time previously about this case concerning Mr. Crosland or Il Man Heo?
A. No, sir, not really, no.
Q. To summarize, if I can, you see Rocks periodically, the only time you talked, to your recollection, about this case was when you got together about a week ago; is that correct?
A. Yes, and to the fact that he had also told me that he was coming down here before that, for a deposition. I can't tell you when that was, that conversation took place.
Q. So the last time you had spoken with Rocks prior to this most recent get together, he told you that he was coming to testify?
A. That he was going to have to come down for a deposition also.
Q. At that time did he remember any details of the case?
A. I don't remember the specifics of that

Page 20

conversation, other than the fact that he was coming here or he had to come here.
Q. Let me ask you about -- before I get there, we got on this topic about you meeting with Detective Rocks because I asked you whether you spoke with anyone else about this deposition.
Let me re-ask that. Besides your counsel, besides Mr. Rocks, have you talked to anybody else about the deposition?
A. No.
Q. Let me broaden that question then to talk about your communications with others of your former colleagues? I'm going to give you a couple names, my question -- let's start with, when was the last time you saw them.
First one is James McNesby?
A. I haven't seen Jimmy in about -- probably seven, eight, nine years.
Q. How about Brignola?
A. Joe, I haven't seen Joe Brignola in probably 15 to 20 years.
Q. Let me broaden that, I assume the answer will be the same. Have you seen or

Page 21

communicated either by phone or by text message or anything, I take it your answer remains the same for McNesby and Brignola?
A. That's correct.
Q. How about Descher?
A. Joe Descher I saw at a funeral maybe a year, year and a half ago. Other than that, that's about it.
Q. We started talking about Edward Hughes, who I just learned yesterday died back in September.
A. Yes.
Q. Were you aware of his death?
A. Yes.
Q. When did you learn about his death?
A. I knew he was sick. He was diagnosed in April with pancreatic cancer. As a matter of fact, I was on the phone with him numerous times. He lived in North Cape May. So I was on the phone with him and his family numerous times. As a matter of fact, I just told Mr. Zurbriggen I called him the day that he passed away. There was no answer. And then his son called me back a couple hours later and let me

Page 22

know that he had passed.
Q. How frequently had you spoken with him before his death?
A. Occasionally, maybe once every two months, something like that.
Q. The complaint in this case would have been filed or was filed, pardon me, back in 2022. I assume it would have been provided to you around that time period.
A. I can't recall.
Q. I am just providing that as a general time marker.
A. Okay.
Q. At any time after you got notice of the civil rights complaint and that you had been named as a defendant and that Mr. Hughes had also been named as a defendant, did you talk with him on the phone about the case at all?
A. No, sir, because neither of us remembered anything about this case.
Q. How do you know that you didn't remember anything --
A. He let me know that he was a defendant in this case also. We didn't talk about it,

Page 23

he just let me know that he got notified that he was a defendant in this case, along with several other detectives who had passed away who are more his age than mine, that had passed away since then.
Q. Is Hughes older than you?
A. Yes.
Q. How much older?
A. Ten years maybe, nine or ten years.
Q. Let me ask about some of those other folks who I think you're speaking about who are deceased. My questions now will be the last time you spoke with them before they died. John Cimino?
A. Years, at least 15 to 20.
Q. Albert Nespoli?
A. Longer than that.
Q. Francis Ansel?
A. I spoke to him about two days prior to his death, which was several years ago.
Q. Frederick Westerman?
A. I haven't seen Freddy for over 30 years.
Q. John Lanzelotti?
A. The same.

Page 24

Q. I assume that you did not have occasion to speak about Curtis Crosland or Il Man Heo?
A. No, not at all, never.
Q. There were two trials in this case, one in 1989 and one in 1991. The first one was tried by an assistant district attorney named Joel Rosen; the second by, now Judge Shelley Robins New.
Let me first ask you about Mr. Rosen. Have you spoken with Mr. Rosen at any time in the past few years?
A. No, sir.
Q. How about Judge Robins New?
A. No, sir.
Q. Do you recall when you first received notice about this lawsuit?
A. When I received the complaint in the mail which was -- I can't remember how long ago it was, maybe a year and a half ago. I don't remember when I got it. I still have it. It's on my dining room table, as a matter of fact.
Q. Let's put a timeframe together, sir. Do you recall that the murder occurred on

Page 25

December 5th, 1984, right?
A. Yes.
Q. It looks like your involvement -- strike that. Let me first put out the details. The murder took place at a convenience store at 27th and Oakford Streets in South Philadelphia, right?
A. Yes.
Q. Mr. Crosland was arrested on this case on December 10th, 1987, agreed?
A. Yes.
Q. We already talked about the two trials in '89 and '91, correct?
A. Yes.
Q. Between the trial in 1991 and when you first received notice about this lawsuit within the past year and a half or so, did you have any involvement whatsoever with the case?
A. Not after the second court case, no.
Q. By court case, you mean the second trial?
A. Second trial, right.
Q. There were -- I'll just represent to you, there were a number of different appeals,

Page 26

there was post conviction litigation. Did anybody come ask you questions about your involvement in the case, during those proceedings?
A. Not that I can recall.
Q. There also was a reinvestigation of the case by the conviction integrity unit in the District Attorney's Office sometime around 2020, 2021. Were you aware of that at all, sir?
A. No, sir.
Q. Did anyone come ask you questions about the case?
A. No, sir.
Q. There was also some news reported about Mr. Crosland's release from prison and the fact that his conviction had been vacated and that would have been in June of 2021. Do you recall learning about that information?
A. Not really, no.
Q. You don't recall reading any news about it?
A. No, not really.
Q. Is it accurate to say then that between

Page 27

the trial in 1991 and when you first heard about this lawsuit, you had nothing to do with the case?
A. As far as I can remember, yes.
Q. One more question about documents that you reviewed. You told me about interviews, notes of testimony and activity sheets. Are you familiar with the homicide file?
A. Yes, sir.
Q. I assume over the course of your career you have looked in hundreds of different homicide files?
A. 27 years worth.
Q. How many years?
A. 27.
Q. As I -- strike that.
At any point in your preparation for this deposition over the past several months, have you gone through the entirety of the homicide file?
A. I have not seen that file.
Q. If I understand correctly, the documents that you looked at to prepare for this deposition were pulled out or excerpted from

Page 28

the homicide file; is that correct?
A. They were supplied to me by Mr. Zurbriggen?
Q. By the same token, have you looked at any materials from the District Attorney's Office file in this case?
A. No.
Q. Sir, who shot Il Man Heo?
MR. ZURBRIGGEN: Object to form. Detective, you can answer.
THE WITNESS: Curtis Crosland.
BY MR. FEINBERG:
Q. You're certain of that?
A. Yes, sir.
MR. ZURBRIGGEN: Same objection.
BY MR. FEINBERG:
Q. Why do you say that?
A. The evidence pointed to him. All of the evidence that we had -- that I had to deal with.
Q. What evidence did you have?
A. We had evidence of -- an I told you so

Page 29

from Mr. Massey and Mr. Everett.
Q. You said I told you so, are you referring to your prior testimony to me?
A. No, the fact that Curtis Crosland had told Everett that he had committed the shootings. -
Q. When you say, "I told you so", you're describing the alleged interaction between Mr. Crosland and Mr. Everett; is that right?
A. Yes.
Q. First piece of evidence you had was Rodney Everett's say so that Curtis Crosland had confessed to him; is that correct?
A. Yeah, but just to be clear, I'm not sure of every specific piece of evidence that was there or was not there. The actions that I took, that were taken with Eddie Rocks and with Eddie Hughes, which are depicted and denoted in the paperwork that you have. If there were other papers that were in the file that I'm not sure of or maybe that you did not present to me, I don't know. I don't know if there are other papers in there that I don't know about. I haven't looked at the binder.

Page 30

I don't even know if there is a binder on this case. I didn't look at the binder. I didn't look at the file. So as I said, there may be other points of evidence.
I had a limited amount of interaction in this case. I was not the assigned. And I can only answer to what I can remember and to what I did at that case. I can't tell you what happened to the material that I was involved in after I gave it to the detectives or put it in the case file.
BY MR. FEINBERG:
Q. Let me ask you a few follow-up questions. First, let's confirm that when I asked you the question two or three minutes ago: Who shot Il Man Heo, you told me Curtis Crosland, right?
A. Yes.
Q. And you seemed certain about that, right?
A. That's what the evidence depicts to me, yes.
Q. Based on the information that you had and that you recall obtaining in 1987, you

Page 31

believed Curtis Crosland is guilty, correct?
A. Yes.
Q. First things first, do you recall any testimony or evidence from a person named Delores Tilghman?
A. I do not.
Q. To attempt to refresh your recollection, Ms. Tilghman was spoken to by two detectives, John Cimino and James McNesby. Do you recall speaking with them about their involvement with Ms. Tilghman?
A. Have I spoken to them, no.
Q. No, I'm not talking about recently. In fact, we know Cimino has been deceased.
A. I can't tell you if I remember speaking to them about that particular conversation with her back then.
Q. You mentioned just a moment ago that your role in this case was, I think I'm understanding you correctly, was limited; is that correct?
A. Yes.
Q. Would you agree that Rodney Everett was the prosecution's main witness in this case?

Page 32

MR. ZURBRIGGEN: Object to the form. Detective, to the extent you know, you can answer.
THE WITNESS: To the extent I know and to the extent of the information that I have, yes.
BY MR. FEINBERG:
Q. In fact -- by the way, in preparing for this deposition, did you review the affidavit of probable cause that was used to support Mr. Crosland's arrest?
A. I did not see that, no.
Q. Let me show you that. I think that will help us with this discussion.
You have in front of you a white three-ring binder which has tabs containing all of the exhibits that have been previously marked in this case. So I'll be referring you to some of those exhibits during your testimony today.
Let me refer you first to Exhibit-1, which is right behind tab number one. I will note for you that this is the affidavit of probable cause that I just

Page 33

mentioned.
Let me ask you to take a moment and read through that affidavit of probable cause. It's three pages. Let me know when you're finished and I'll probably ask you a question about it.
A. Okay.
Q. Would you agree with me, sir, that the only evidence cited in the affidavit of probable cause connecting Mr. Crosland to this case is from the statement of Rodney Everett on April 15th of '87.
MR. ZURBRIGGEN: Object to the form. Detective, you can answer.
THE WITNESS: That's the only statement that's in this affidavit, yes. I don't know if there's other evidence.
BY MR. FEINBERG:
Q. To be clear, all of the other evidence that is cited is generic evidence from the scene that does not specifically implicate Mr. Crosland, correct?
A. Can you reiterate that, I'm sorry. I was pulling the wire.

Page 34

Q. Sure. Any other evidence that is cited in the affidavit of probable cause does not implicate Mr. Crosland, correct?
MR. ZURBRIGGEN: Object to the form. Detective, you can answer.
THE WITNESS: I really can't answer that because I don't know what other evidence there is. As far as her corroborating the evidence that is in here, this may corroborate other evidence that exists that I don't know of.
BY MR. FEINBERG:
Q. Let go back to the point that we described before. April 15th of '87, that's when you took the statement of Rodney Everett.
A. That's correct.
Q. In that statement, which we'll get to later today, Rodney Everett claimed that Curtis Crosland confessed to shooting Il Man Heo, correct?
A. Correct.
Q. That statement is the only statement that references Curtis Crosland as cited in this affidavit of probable cause, correct?

Page 35

A. In this affidavit, yes.
Q. Going back to your role in the investigation, you spoke to Everett a total of four times; is that correct?
A. I can't recall. I can't recall but there -- at least three, I know there. I don't know if there's a fourth. If there's a fourth, I don't remember.
Q. Let's stick with the three. In each of those three statements, Mr. Everett told you that Crosland had confessed to the shooting; is that correct?
A. Yes.
Q. Do you know of any other detective who spoke to Mr. Everett about these matters?
A. No, I don't. No, I don't.
Q. Is it fair to say then that based on your understanding, all of the evidence in the case file concerning Mr. Everett's claims about Curtis Crosland's confession came from interviews that you produced?
MR. ZURBRIGGEN: Object to the form. But detective, if you can say, based on what you know.

Page 36

THE WITNESS: Yeah, based on what I know -- I don't know what else is in that file, that's what I'm telling you.
BY MR. FEINBERG:
Q. Just to confirm that we're on the same page, you have not seen any other documents showing that anybody else interviewed Mr. Everett, correct?
A. That's correct.
Q. Can we agree then that as far as you know, sitting here today, that you were the detective who was responsible for producing Rodney Everett's evidence alleging that Crosland was the shooter?
MR. ZURBRIGGEN: Object to the form. Detective, you can answer.
THE WITNESS: I was the detective that took Mr. Everett's statement, yes.
BY MR. FEINBERG:
Q. We talked about the evidence from Delores Tilghman and you told me you had no knowledge of that; is that correct?
A. Yes.

Q. Of course there's no mention of Ms. Tilghman anywhere in this affidavit of probable cause, correct?
A. There isn't, no.
Q. And you've already agreed with me that Mr. Everett's alleged -- pardon me. That Mr. Everett's contention that Crosland confessed to him was cited to support the arrest; is that correct?
A. Yes.
Q. You mentioned to me before that you handed it off to other detectives, what other detectives?
MR. ZURBRIGGEN: Object to the form. Detective, if you understand.
THE WITNESS: At the time I was in SIU. As a matter of fact, I spoke to Mr. Zurbriggen about this, when I first went homicide, I was still a police officer. I wasn't a detective yet. I spoke Spanish. I went down for this particular reason.
BY MR. FEINBERG:
Q. Can you speak up a little bit, sir?
A. Sure. What would you like to know?



(Speaking Spanish.)
Q. I'm sorry.
A. What would you like to me? Tell me.
Q. You were reverting to Spanish. You gave an answer, I asked you to speak up and I couldn't hear you.
A. Oh, I'm sorry. I have a cold. Just to let you know.
Q. I'll ask you to be conscious, whenever the heat is on, the vent gets a little bit louder. It's a little hard to hear, especially down this side of the table.
A. Okay.
Q. The question that I asked you before sir was, we got on that topic, who did you give the information to once you took Everett's statement?
A. I would imagine that it went back it into the file. I am not sure if Detective Cimino or McNesby were assigned this case back in SIU. I don't know if they were. I still don't know if they were.
Q. We'll come back to that in a little bit. Let's confirm what you're telling me.



You do not -- let me ask you, do you know who was the assigned detective at the time that Mr. Crosland was arrested?
A. No.
Q. At the time of the initial investigation, right around when Mr. Heo was shot, Detective Nespoli was the assigned investigator --
A. That's correct. He was a 4 squad member. It was a 4 squad case.
Q. Then the case became an SIU case; is that correct?
A. Yes.
Q. Is that because it was a cold case?
A. Probably, yes.
Q. And once a case gets transferred to SIU because it's a cold case, how does the assignment process work?
A. Sometimes it doesn't necessarily go because it's dormant, sometimes it just goes from SIU because there's nothing there and then somebody comes in and gives information on the case and they'll give it to SIU at that particular time because the detectives in line



squad are constantly working on cases as they occur.
So a lot of times the cases go to SIU. That particular day -- it may have been dormant and then someone calls and says, I have information on that job. If the line squad detectives are busy handling current jobs, so the case may be -- not assigned but just given to those guys to -- whoever is around to conduct that amount of work that was done.
Once that work is accomplished, that doesn't necessarily mean the job is going back to SIU. It could have went back to line squad. I don't know. I can't tell you if this job went to Detectives McNesby or Cimino after we took our interviews.
Q. Would there be some notation on the file or a document in the file which describe that a new detective had been assigned?
A. No, not really.
Q. Cimino is the one who prepared the affidavit of probable cause, does that tell

Page 41

you anything --
A. That makes me think but again, that's not necessarily true. I have done many affidavits where I wasn't the assigned on the case. Homicide is, you work as a team. It's not like the divisional detectives where you're pretty much stuck working it by yourself.
Q. Given the fact that you're the one who took multiple statements from Rodney Everett over the course of your work in the case, you were an important part of that team; is that correct?
MR. ZURBRIGGEN: Object to the form. Detective, you can answer.
THE WITNESS: I was. Well, I was in this part, that particular day. And then I did a follow up and that would be reasonable because I did the initial interview. After that, I really didn't do anything. After those two or three days, I wasn't involved in this case at all after that.
BY MR. FEINBERG:

Page 42

Q. But then you testified at trial about your interview with Mr. Everett's?
A. About that one interview, yes.
Q. It was not just one interview, it was multiple interviews, right?
A. No, I testified just to Mr. Everett's initial interview with Mr. Massey present.
Q. Do you recall testifying at trial that you had had multiple encounters with Mr. Everett over a three-year period?
A. I do remember, yes.
Q. Was that, in fact, true that you had multiple encounters with Mr. Everett?
A. I spoke to him several times.
Q. Was Mr. Everett someone who continued to provide you with information?
MR. ZURBRIGGEN: Object to the form. Detective, if you understand.
THE WITNESS: No, no. You know what, I think there's an interview in there that we took where he talked about other jobs, other cases and we took that interview.
BY MR. FEINBERG:
Q. So you had a continuing relationship

Page 43

with him; is that correct?
A. For a short period of time, yes.
Q. Well, it was just a short period of time, it was over three years?
A. Yes, but I didn't see him for years between the time this occurred and the time the trial came. As a matter of fact, like I said, I wasn't involved in the first trial.
Q. We'll come back to that. Bottom line, sir, getting back to the original point about who shot Il Man Heo and your view that it was Curtis Crosland, sounds like you, sitting here today, believe that you conducted an appropriate investigation; is that correct?
MR. ZURBRIGGEN: Object to form. Detective, you can answer.
THE WITNESS: I conducted a part of this investigation. As I stated before and I will reiterate again, I have no idea what else was done on this case.
BY MR. FEINBERG:
Q. With regard to your performance regarding your interviews with Mr. Everett, do you have any concerns that you didn't do your

Page 44

job well?
MR. ZURBRIGGEN: Same objection. Detective, you can answer.
THE WITNESS: No, I don't.
BY MR. FEINBERG:
Q. In fact, you think you did your job exceptionally well; is that right?
MR. ZURBRIGGEN: Same objection. Detective, you can answer.
THE WITNESS: As far as this set up, this wasn't my case.
BY MR. FEINBERG:
Q. As a bottom line, sir, I assume given your 27 years in homicide, you took a lot of pride in your work in homicide?
A. Most definitely.
Q. Thought you did your job exceptionally well; is that correct?
MR. ZURBRIGGEN: Same objection.
THE WITNESS: I did my job well and fair.
BY MR. FEINBERG:
Q. And you were an excellent detective,

Page 45

weren't you?
MR. ZURBRIGGEN: Same objection.
THE WITNESS: I was a detective.
BY MR. FEINBERG:
Q. Do you recall, sitting here today, any case where you did a bad job?
MR. ZURBRIGGEN: Same objection. But go ahead, detective, you can answer.
THE WITNESS: There are cases where I'm sure I could have done a better job. It's not easy to bring an arrest warrant for someone for murder.
BY MR. FEINBERG:
Q. In this case though, this is one where you believe that you did the best possible job you could; is that correct?
A. As far as I was assigned to do whatever I had to do in my part in the case.
Q. You believe that the evidence that was produced as a result of your interviews with Rodney Everett was iron clad evidence, right?

Page 46

MR. ZURBRIGGEN: Same objection. Detective, you can answer.
THE WITNESS: There was evidence that was corroborated by Mr. Massey. It wasn't the type of case where I went and found the witness or located a witness. The witness came to me.
BY MR. FEINBERG:
Q. You believe that evidence to be true; is that correct?
A. Yes.
Q. You're aware and, in fact, we talked about this just a moment ago, the case was investigated by the conviction f.
Integrity unit of the District Attorney's Office?
A. I understand that.
Q. Are you aware that the conviction integrity unit informed a Federal court that Mr. Crosland may very well be actually innocent?
A. I'm sure they did.
Q. Why do you say that?
A. That's why we're going through this.

Page 47

Q. In fact, look in your binder, sir, if you turn to Exhibit-6. I will represent to you that this is a document filed by the conviction integrity unit in Federal court. I will ask you to turn to page 3. Look at the bottom of page 3, you see a footnote number 3?
A. Yes.
Q. I am going to read to you from the second line down. Do you see where it says: Given the weakness? Do you see that? Further down, sir.
A. Second line from the bottom?
Q. Yes.
A. Yes, I see it.
Q. Given the weakness of the evidence against him and the powerful nature of the Brady information at issue here, the Commonwealth is cognizant that Crosland may very well be actually innocent. First of all, had you seen that before?
A. No.
Q. Do you know what Brady information is?
A. I know what the Brady rule is.
Q. Tell me what your understanding of the

Page 48

Brady rule is?
A. It talks about consistent statements given, you know, to whoever takes the statement and to be able to either make a decision to be utilized in court or not utilized in court, which is usually a judge's decision, in the experience that I have had. There were many cases where Brady rule came into play.
Q. You might be taking about state court Brady rule which refers to the introduction of a statement.
A. Yes, the other one I don't know about.
Q. Do you understand the concept of exculpatory evidence?
A. Yes.
Q. And you're aware that as a detective, you have an obligation to make sure that exculpatory evidence is produced to the prosecutor, right?
MR. ZURBRIGGEN: Object to the form. Detective, you can answer.
THE WITNESS: At a time, yes, at a certain time, yes.

Page 49

BY MR. FEINBERG:
Q. We'll come back to that.
Were you aware of any exculpatory information that was withheld from Mr. Crosland in this case?
A. No.
Q. Were you aware of any exculpatory information that was withheld from the prosecution in this case?
A. No.
Q. I take it, given your previous testimony, you disagree with the conclusion that Crosland may very well be actually innocent; is that correct?
MR. ZURBRIGGEN: Object to the form of the question. Detective, you can answer this again.
THE WITNESS: Based on the information that I have in front of me, the statements that I took, based on my participation in this case, I disagree, yeah.
BY MR. FEINBERG:
Q. I will represent to you, sir, that a Federal judge accepted the conclusions of the

Page 50

conviction integrity unit lawyers and vacated the conviction. You're aware of that, right?
A. I understand that.
Q. When is the first time that you learned about Mr. Crosland's conviction being vacated?
A. I can't remember a specific time. Probably notified by the D.A.'s office, I don't remember. I just don't remember.
Q. What was your reaction when you learned?
MR. ZURBRIGGEN: Object to the form. Detective --
THE WITNESS: I didn't really have a particular reaction.
BY MR. FEINBERG:
Q. So you weren't surprised or upset or anything like that?
A. Was I upset, probably a little bit upset, sure.
Q. Why were you upset?
A. Because based on what I had and based on what I know, I felt that he was guilty at the time and was incarcerated for the right reasons.
Q. And that he should have remained

Page 51

incarcerated?
A. Yes.
Q. Did you talk with anybody about that reaction?
A. No, sir.
Q. You're aware that the District Attorney's Office has, since the election of Larry Krasner in 2017, exonerated somewhere between 35 and 40 people?
MR. ZURBRIGGEN: Object to the form of the question. Detective, to the extent you know.
THE WITNESS: I don't know the number but I do know that numerous people have been exonerated.
BY MR. FEINBERG:
Q. As a result -- strike that.
That many of those exonerations have arisen out of investigations that were conducted during the time that you were a homicide detective; is that right?
A. Yes.
Q. In fact, besides you in this case, many of your colleagues were involved in those

Page 52

investigations; is that correct?
A. Yes.
Q. Have you and any of your colleagues, former colleagues gotten together and talked about these exonerations?
A. Not really.
Q. Do you have any opinion on the Krasner District Attorney's Office?
MR. ZURBRIGGEN: Object to the form of the question. Detective, you can answer.
THE WITNESS: I don't have any opinion on him.
BY MR. FEINBERG:
Q. Have you ever talked to anybody about your feelings on the Krasner District Attorney's Office and how they treat homicide cases from your time there?
MR. ZURBRIGGEN: Object to the form of the question. Detective, you can answer.
THE WITNESS: I may have. I'm sure I have.
BY MR. FEINBERG:

Page 53

Q. Can you tell me who you've spoken to?
A. No, I can't.
Q. Tell me about Protect Our Police.
MR. ZURBRIGGEN: Object to the form of the question. Detective, to the extent you understand the question.
THE WITNESS: Yeah, I don't understand what that question was.
BY MR. FEINBERG:
Q. Do you know what that organization is?
A. No.
Q. Tab 59. You have no knowledge of the organization Protect Our Police, sir?
A. No.
Q. I am going to mark this as an exhibit. This will be P-35. Just to note for the record, what we're doing for exhibits is continuing on with where we left off at the last deposition, which was P-34. I am handwriting the number on the document that will be handed to the witness, which will be then turned over to the court reporter at the conclusion of the deposition. I have copies for counsel.

Page 54

- - -
(Whereupon Exhibit P-35 was marked for identification.)
- - -
BY MR. FEINBERG:
Q. Sir, have you seen this document before?
A. Yes. No, I have not seen this one but now I recall what this is.
Q. What is this?
A. This is Nicholas Gerace, Gerace is his name, not Grace. It's Gerace, G-E-R-A-C-E. He is a friend of my son's. I knew him in high school and he was part of this Protect the Police PAC. He had asked me if he could use my name as a chairperson at one point.
Q. So your name on this document identifies you as a chairperson for this political action committee; is that correct?
A. Yes, I just didn't recall this.
Q. This document -- pardon me.
When did Mr. Gerace speak with you?
A. I haven't spoken to Nicholas in probably -- maybe over the summer at my son's

Page 55

house.
Q. Summer of --
A. This past summer.
Q. -- 2023?
A. Yes.
Q. When did you speak to him -- strike that.
Your recollection is he asked you to be a chairperson of this organization; is that correct?
A. Yes.
Q. When was that?
A. This says 9/23/20, so it had been prior to that, I guess. The start date -- yeah, 9/23. So it had been prior to that. I would imagine '19, somewhere in that area.
Q. In fact, this organization was created-- this organization referring to Protect Our Police was created June 3rd of 2020; is that correct?
A. I don't know.
Q. Fair enough. Let me rephrase that question.
Would you agree that the

Page 56

registration date that appears on this document states June 3rd of 2020 for that registration date?
MR. ZURBRIGGEN: Object to the form of the question. Detective, to the extent you can tell.
THE WITNESS: Is there a date on here that says June 3rd?
BY MR. FEINBERG:
Q. Yeah, maybe it's small text. I'll show you, sir. Look at my copy.
A. Okay.
Q. Does that refresh your recollection as to the time period in which you first spoke to Mr. Gerace?
A. No, it doesn't but I am not saying it isn't.
Q. What did Mr. Gerace tell you?
MR. ZURBRIGGEN: Object to the form. Detective, to the extent you know.
THE WITNESS: Pretty much asked me -- I think it was a political action group or something. And he asked me if he could use my name as to be the chairperson.

Page 57

And specifically I told him, you can use my name, I said but I don't really know anything about this because I have four different jobs right now. So I really didn't get involved in this whatever. But he did use my name. I am not saying he didn't, he did. I am not just saying that because it's written on here, he did. I just didn't remember this. I never got involved in any of this.
Q. When he said, can I use your name, what did you believe that to mean?
MR. ZURBRIGGEN: Object to the form. Detective, you can answer.
THE WITNESS: I think he needed someone in the police department that he could utilize as being like -- as being like not the head of it but as just being someone that he could utilize -- I think he had to have a name from the police department to be in that actual position. And I have known him for years. And I guess he just -- I didn't guess, he asked me and I said sure.
BY MR. FEINBERG:
Q. Were you in the police department at that time?

Page 58

A. No.
Q. So help me understand then why --
A. It doesn't have to be somebody -- Nicholas Gerace has not been in the police department for years. He received disability years ago.
Q. Do you remember when?
A. No, it's got to be at least ten years though.
Q. When did you retire?
A. '12, 2012.
Q. So it sounds like the two of you would have retired around the same time; is that right?
A. Yeah, he was on disability before I retired.
Q. Why again would he come to you to need some connection to the police department?
A. I guess easy access. I mean, I know him, I don't know why. I can't answer why.
Q. You know him through your son; is that right?
A. Yes.

Page 59

Q. What division or unit was he assigned to in the police department while he was there?
A. Who, Nicholas?
Q. Yes.
A. He was in East Division. I think he was in the 26th or the 24th.
Q. While he was working, did you have any connections with him through police work?
A. No, not whatsoever, not unless he brought cases up to our place.
Q. Which you don't recall; is that right?
A. I don't recall specific cases, no.
Q. So your connections with him are exclusively through personal, through your son; is that right?
A. Yes.
Q. Is your son in the Philadelphia Police Department?
A. No, sir. He's an ATF agent.
Q. What is his connection to Mr. Gerace?
A. They're friends. They went to high school together. They've known each other for years.
Q. When Mr. Gerace asked you to use your name, what did you expect would happen?

Page 60

MR. ZURBRIGGEN: Object to the form of the question. Detective --
THE WITNESS: Nothing, really.
BY MR. FEINBERG:
Q. Did you know what the purpose of the organization was?
A. Not really, no.
Q. Did you know that the organization was going to be involved politically in campaigns, including the district attorney's race?
A. I knew it was political but I had no idea what. I never really got involved in it ever. I had nothing -- I never had to do anything or did anything with this whatsoever.
Q. Do you know Robert Walls?
A. I remember Bobby Walls, yes, he was in the police department.
Q. Did you have any connections with him while he was in the police department?
A. No.
Q. When was the last time you spoke with Mr. Walls?

Page 61

A. It's got to be years, years.
Q. And Mr. Gerace, you said you spoke to just this past summer; is that correct?
A. Yeah, Nicky is over my son's house once in a while. They're still friends.
Q. Who is Deborah Mattiacci, M-A-T-T-I-A-C-C-I?
A. I don't know her.
Q. I am going to mark this as Exhibit P-36.
- - -
(Whereupon Exhibit P-36 was marked for identification.)
- - -
BY MR. FEINBERG:
Q. As I do so, I'll represent to you that this is an article that's published in the Philadelphia Inquire on August 7th of 2020. You're welcome to read the whole thing but I am going to direct you to a specific portion of it. The specific portion I'll ask you to read is at the bottom of the second page.
There is a paragraph that reads: A PAC questionnaire. Do you see that, sir?

Page 62

A. Yes.
Q. Read from there onto the top of the next page. Tell me when you're done.
A. Okay.
Q. So there is a statement at the top of page three which reads: While the group has a national mission, Gerace said Let 'Em Go Larry is very much on our radar for next year.
First of all, have you ever heard that phrase, Let 'Em Go Larry?
MR. ZURBRIGGEN: Object to the form of the question. Detective, you can answer.
THE WITNESS: No.
BY MR. FEINBERG:
Q. Have you ever talked with any other Philadelphia Police Department members or retirees about calling Larry Krasner Let 'Em Go Larry?
MR. ZURBRIGGEN: Same objection.
THE WITNESS: No.
BY MR. FEINBERG:
Q. Do you believe that that's an

Page 63

appropriate nickname for Larry Krasner?
MR. ZURBRIGGEN: Same objection.
THE WITNESS: You know what, I went against Larry Krasner many times in court over the years. I really don't get involved in this stuff at all. The answer is no.
BY MR. FEINBERG:
Q. So you were aware, sir, that Mr. Gerace was representing you as a chairman of this organization that was out there saying things about Larry Krasner.
MR. ZURBRIGGEN: Object to the form of the question. Detective, you can answer.
THE WITNESS: I do now. I never saw this before.
BY MR. FEINBERG:
Q. Do you have any concerns about the fact that Mr. Gerace was doing that?
MR. ZURBRIGGEN: Object to the form of the question. Detective, you can answer.

Page 64

THE WITNESS: It's kind of a moot point because I don't think -- I don't think I did this or was involved in this or my name was involved in this for a long period of time.
As a matter of fact, it looks like it was there for like three months. My name was utilized for three months.
BY MR. FEINBERG:
Q. Do you recall receiving any other inquiries from other people, whether they be in the media or anybody else about your involvement with the Protect Our Police PAC?
A. I don't recall that, no.
Q. Did you ever make any statements to anybody attempting to disassociate yourself from this group?
MR. ZURBRIGGEN: Object to the form of the question. Detective, you can answer.
THE WITNESS: No, I never did.
BY MR. FEINBERG:
Q. Sitting here today, you don't have any

particular concerns about your name being associated with this group?

MR. ZURBRIGGEN: Same objection. Detective, you can answer.

THE WITNESS: Not for the time -- I really didn't do anything with this.

BY MR. FEINBERG:

Q. Do you recall any conversations with Mr. Gerace about the things that he was saying in public about this political action committee?

A. I saw him on the news.

Q. You saw Mr. Gerace on the news?

A. Yeah, he was on the news numerous times.

Q. Talking about this political action committee; is that correct?

A. Talking about Krasner and politics, not particularly about this committee but just talking about...

Q. How many times did you see him on the news?

A. I don't know, maybe half a dozen times, maybe.

Q. This was, I assume, after he had asked to use your name as part of the political



action committee; is that right?

A. This was over a long period of time.

Q. So is it possible that -- strike that.

Are you saying that you remember seeing him on the news talking about politics before he asked you to use your name?

A. I don't remember that. I don't remember if he did or he didn't. I know he was very involved in politics. I know that. But I have nothing to do with -- I don't belong to any groups. I don't have Facebook. I don't do any of that stuff.

Q. When he came to you though and asked you if he could use your name as part of this group, do you remember having any concerns that here was a guy who was out in public talking about politics?

MR. ZURBRIGGEN: Object to the form of the question. Detective, you can answer.

THE WITNESS: No, not really. He made it sound to me like he needed a name to have somebody in place there. And I told him that I couldn't do any work. There was no



work that I could do. Whatever was involved, I just couldn't do it. I would imagine that's why I was there for such a short period of time.

Q. You were fine having your name used by him for that purpose; is that correct?

MR. ZURBRIGGEN: Object to the form. Detective, you can answer.

THE WITNESS: Yeah, as far as I knew about it yes.

BY MR. FEINBERG:

Q. Obviously you didn't tell him no, right?

A. No, I didn't.

Q. You don't recall at any point having reached out to him and saying, hey, what'd you get me wrapped up in, take me off of this or anything like that?

A. No, not really because I really didn't even pay attention to it.

Q. Do you recall any discussions with any of your fellow detectives about any of the publicized exonerations from the Krasner District Attorney's Office?

MR. ZURBRIGGEN: Object to



the form of the question. Detective, you can answer.

THE WITNESS: I'm sure I have.

BY MR. FEINBERG:

Q. Which ones do you recall talking about?

A. I said I'm sure I have. I can't give you specifics or generalities. There has been a plethora of them so I really don't know.

Q. I understand, sir. I'm not -- let me ask it this way. Are there any names that you can recall talking about, any particular cases where you went and spoke to detectives about those cases?

A. Not specifically, no.

Q. Are you aware about the current prosecution of Detectives Santiago, Jastrzembski and Devlin?

A. Yes, I am.

Q. Have you spoken to any of those gentlemen about that prosecution?

A. About which prosecution?

Q. The fact that they're being prosecuted for perjury?

Page 69

A. Certainly, they were in my group.
Q. So you have talked to them about it?
A. Yeah, I talked to them about that, yes.
Q. What have your conversations been like?
MR. ZURBRIGGEN: Object to the form. Detective, you can generalize.
THE WITNESS: What they're going through. The fact that they're 77, 75, 74 and still going through this. They've all had exemplary careers in law enforcement and afterwards, and all went to law enforcement careers afterwards and just what they're going through at their age.
BY MR. FEINBERG:
Q. Are you familiar with the Anthony Wright case?
A. I am. Well, I am by name. I remember the name.
Q. Were you involved?
A. I don't think I was involved in it, no.
Q. And you're aware that the prosecution of those detectives who I just mentioned arises out of testimony that they gave in the retrial of Mr. Wright?

Page 70

A. I really don't know what the evidence is against them because they haven't provided any evidence, from what I understand. It was a Grand Jury investigation.
Q. Sure. Let me restate the question.
You're aware that they're facing charges of perjury; is that correct?
A. Yes.
Q. Are you aware that they have been accused of perjuring themselves at a trial for Anthony Wright?
A. Yes, through Grand Jury indictment.
Q. And that trial where they're accused of providing perjured testimony was a second trial for Mr. Wright; is that correct?
A. Yes.
Q. That second trial came about because of DNA evidence that was examined and was used to vacate Mr. Wright's conviction; is that correct?
A. That's what I understand, yes.
Q. You're aware that the District Attorney's Office elected to re-prosecute Mr. Wright or stated otherwise, try him a second

Page 71

time; is that correct?
A. Yes.
Q. Do you have any views on that investigation?
MR. ZURBRIGGEN: Object to the form of the question. Detective, you can answer.
THE WITNESS: I would like to have the view -- I would probably have some views if I saw the evidence that was utilized against them, yes.
BY MR. FEINBERG:
Q. Are you aware that the City of Philadelphia settled a civil rights settlement with Mr. Wright for just shy of ten million dollars?
A. I don't know what the matter was but I know they did settle.
MR. ZURBRIGGEN: And an objection for the record.
BY MR. FEINBERG:
Q. Did you have any reaction to when you first learned about that settlement?
MR. ZURBRIGGEN: Same

Page 72

objection. Detective, you can answer.
THE WITNESS: Yeah, I probably didn't like it. I probably didn't think -- those guys were my friends. We were co-workers together.
BY MR. FEINBERG:
Q. Those guys referring to the detectives?
A. The three detectives, yes.
Q. Have you followed news about any other settlements in cases involving wrongful convictions?
MR. ZURBRIGGEN: Object to the form of the question. Detective, if you can generalize.
THE WITNESS: If I can generalize, there were other cases -- there was a case that just came out, the Ogrod case where he got a settlement there on the Barbara Jean Horn case. That was a pretty big settlement. That was newsworthy.
BY MR. FEINBERG:
Q. Were you involved in any way in Mr. Ogrod's prosecution?
A. I don't think I tried. I don't remember

Page 73

if I worked on the case specifically.
Q. Did you talk to any of the detectives who were involved in that investigation?
A. Not for a while, I mean years ago, of course, not now.
Q. When you learned about that settlement from Mr. Ogrod, which was in excess of 9 million dollars, did you talk to anybody about that settlement?
MR. ZURBRIGGEN: Object to the form. Detective, you can answer.
THE WITNESS: Probably Eddie Rocks.
BY MR. FEINBERG:
Q. When you got together with him?
A. Yeah, I think Eddie was part of that investigation.
Q. What did you discuss with Mr. Rocks?
MR. ZURBRIGGEN: Same objection. Detective, you can answer.
THE WITNESS: That he was going to make a settlement. He told me he had been deposed concerning the matter.
BY MR. FEINBERG:

Page 74

Q. In the Ogrod matter?
A. In the Ogrod matter.
Q. Did Mr. Rocks have any reaction to the settlement?
MR. ZURBRIGGEN: Object to the form. Detective, you can answer.
THE WITNESS: I'm sure he didn't agree. He didn't agree.
BY MR. FEINBERG:
Q. It sounds like you didn't agree either; is that right?
MR. ZURBRIGGEN: Same objection.
THE WITNESS: Yes, as far as I know. I don't know all of the evidence or non evidence that was given or utilized. I just don't know.
BY MR. FEINBERG:
Q. Fair to say, sir, that your view was the city was unnecessarily paying money to these people when they were, in fact, guilty of the crime?
MR. ZURBRIGGEN: Object to the form of the question. Detective, you can

Page 75

answer.
THE WITNESS: I don't have an answer for that question.
BY MR. FEINBERG:
Q. Why can't you answer that question?
A. No, I didn't say I don't -- I can't, I said I just don't have one right now.
Q. Let's go back to Mr. Crosland's case. You've maintained before that Mr. Crosland is, in fact, guilty of the Heo murder; is that correct?
MR. ZURBRIGGEN: Object to the form.
THE WITNESS: Based on what I know.
BY MR. FEINBERG:
Q. Let me show you some of the evidence that was used at the time of Mr. Crosland's recent post conviction litigation.
In your exhibit binder please turn to Exhibit P-2.
A. P, number 2?
Q. Disregard the P.
A. Just number two?

Page 76

Q. Yes. You have it right there. It's the paper behind tab two. First, I will ask you, sir -- I'll wait to you have it in front of you.
A. Okay.
Q. Have you seen this document before?
A. No.
Q. Take a moment to read through it and let me know when you're finished.
A. Okay.
Q. This is your first time seeing this document, sir?
A. Yes, sir.
Q. Mr. Everett says here that he informed the police and the prosecutor that Curtis was not guilty and did not want to testify. Do you recall hearing that from Mr. Everett back at the time of Mr. Crosland's trial?
A. The second trial? I wasn't at the first trial.
Q. I'll ask you whatever you remember.
A. I don't remember specifically but I am sure he did. Many witnesses do.
Q. You don't have any specific recollection

Page 77

of Mr. Everett though; is that what you're saying?
A. No, I don't. I know I spoke to him shortly before the second trial.
Q. Did you ever threaten to charge him with perjury?
A. Did I?
Q. Yes.
A. No.
Q. Were you ever present for any discussions where Mr. Everett was threatened to be charged with perjury?
A. Not that I can recall, no.
Q. You see Mr. Everett says that the truth is, this is at the bottom of paragraph 2: Curtis never admitted to me that he committed that murder. Do you see that?
A. I see that.
Q. That obviously is inconsistent with the -- what he told you in your statements taken in 1987; is that correct?
A. Well, at the time of the statement, his statement was that the truth is that Mr. Crosland did tell him he tell the statement,

Page 78

yes.
Q. And it sounds like what you're saying is that what he told you in '87 was the truth; is that correct?
A. That's what he told me.
Q. What is your view as to what the truth is?
MR. ZURBRIGGEN: Object to the form of the question. Detective, you can answer.
THE WITNESS: Based on experience, there are many witnesses, numerous, a plethora of witnesses who give statements and then either recant at a later time or say that what they told is not the truth, for a myriad of reasons.
BY MR. FEINBERG:
Q. I'm not sure you answered my question. It sounds like what you're saying, if I can confirm, is that you believed in '87 that Everett was telling the truth; is that correct?
A. Yes.
Q. And you believed that his statement in

Page 79

2020 is not true; is that correct?
MR. ZURBRIGGEN: Object to the form.
THE WITNESS: I'm not saying that. I'm just saying that many times -- there are many times when people recant for the same -- for a lot of different reasons, retaliation, fear, location, family members, knowing the people, not knowing the people, things of that nature.
BY MR. FEINBERG:
Q. Detective, when you conduct an investigation -- strike that.
Would you agree that a critical tool of your work as a detective is to evaluate the credibility of a witness?
A. Yes.
Q. You're making when you work as a detective, credibility judgements all the time, right?
A. Many times, yes.
Q. You might encounter a witness on the street and you think to yourself, no way is this person telling the truth, right?

Page 80

A. Sometimes, sure.
Q. Because what they tell you is inconsistent with other evidence that you know to be true; is that correct?
A. If I know, if I know what the evidence is.
Q. Can I assume then that given your extensive experience as a detective, you are familiar with making judgements about the credibility of a witness' statement?
MR. ZURBRIGGEN: Object to the form. Detective, you can answer.
THE WITNESS: Somewhat. I cannot read somebody's mind. Somewhat, sure.
BY MR. FEINBERG:
Q. Is there any reason -- strike that.
I think what you're saying is that Everett's statement of 2020 is false; is that correct?
MR. ZURBRIGGEN: Object to the form. Detective, you can answer.
THE WITNESS: No, I didn't say that.
BY MR. FEINBERG:

Q. Why can't you say that?
A. I said I can't say -- I did not say that.
Q. Why is it that you can't say?
A. Because I don't really know what he -- what his reasons were for telling the truth in the beginning or not telling the truth later on down the road. I don't know. The witnesses do different things, different times, many different ways. And then things occur from the time a person gives an interview and let's face it, at trial sometimes there's two, three, four, five, six years later, a lot of things occur and a lot of things are incurred by that witness over that period of time. Some good, some bad, some to his benefit, her benefit, some to his or some not to their benefit. And sometimes things happen to them that cause them to recant their testimony, other than simply the fact that it not being truthful. There's a lot of reasons.
Q. Sitting here today, do you believe that Curtis Crosland told Rodney Everett that he,



Curtis Crosland, shot Il Man Heo?
MR. ZURBRIGGEN: Object to the form of the question. Detective, you can answer.
THE WITNESS: Yeah, I do.
BY MR. FEINBERG:
Q. When you believe that, whatever it says here in Exhibit-2, is inconsistent with your belief; is that correct?
MR. ZURBRIGGEN: Same objection.
THE WITNESS: Do I believe -- I can't say that. All I can tell you is I don't know what happened in between the time that I interviewed him and four years later when the trial occurred in 1991. I can't talk about the 1989 trial.
BY MR. FEINBERG:
Q. I'm doing my best to --
A. And I'm doing my best.
Q. I appreciate that, sir. There are two polar opposite statements. One, Everett says: Curtis told me he committed the crime. Two, he says Curtis never told me he committed the



crime. Right? Would you agree that those are polar opposites?
A. Yes.
Q. You told me that the first, Curtis told me he comitted the crime, you believed to be true; is that correct?
A. Yes.
Q. Can we agree then that the second, Curtis never told me he committed the crime, in your view, is untrue?
MR. ZURBRIGGEN: Object to the form of the question and asked and answered. Go ahead, detective, you can answer.
THE WITNESS: No, I can't say that.
BY MR. FEINBERG:
Q. Why?
A. Because I don't know what his motivations are to say that that was not truthful.
Q. Turn to Exhibit-3, sir. You mentioned before that you don't recall details about Delores Tilghman. I understand that but not



withstanding that, I'm going to ask you to take a moment to read Exhibit-3, which is an affidavit from Delores Tilghman to yourself. And let me know when you're finished.
A. Okay.
Q. Does reading this refresh your recollection in any way about Delores Tilghman's testimony at the time of Mr. Crosland's trial?
A. No, I don't.
Q. Were you aware, sir, that the only two witnesses who provided information about Curtis Crosland's alleged involvement in this murder were Rodney Everett and Delores Tilghman?
A. I did not know that, no.
Q. Do you have any reason to disagree with that characterization?
A. No, I don't. I can't answer that because I don't know what else is available.
Q. Sir, I want to be clear, I'm not trying to hide the ball or anything. What I'm telling you is that we've got something like 13 or 14,000 pages of documents in this case.

Page 85

So rather than asking you to read every single page, I'm making representations to you about what the evidence shows.
A. That's fine.
Q. What I'll ask you just to confirm is, you haven't seen anything that would cause you to dispute the characterization that I've made; is that correct?
A. No.
Q. Based on what we have looked at, the affidavits of Rodney Everett at Exhibit-2 and the affidavits of Delores Tilghman at Exhibit-3, would you agree that both of those witnesses whose testimony supported the prosecution at trial, have recanted their testimony?
A. Mostly definitely. That's why we're here.
Q. It sounds like, sir, that sitting here today you do not believe their testimony, their current testimony or their testimony from 2020 to be truthful?
MR. ZURBRIGGEN: Object to the form of the question. Detective, if you

Page 86

can answer.
THE WITNESS: I can't answer that.
BY MR. FEINBERG:
Q. You do not agree, you deny that Mr. Crosland is innocent; is that correct?
MR. ZURBRIGGEN: Same objection.
THE WITNESS: Based on what I did concerning Mr. Everett.
BY MR. FEINBERG:
Q. I realize that you said you don't remember any involvement with Ms. Tilghman. I am going to ask you to look at one more document to see if it refreshes your recollection. That's Exhibit-4.
As you're doing that, I will note that this is a statement from Brenda Turner from 2019. I apologize. I have been referring to Everett and Tilghman's statements as from 2020. I want to correct myself and note that they were both from 2019. Pardon me, that Tilghman's was from 2019, Everett's was from 2020. With that correction, let me

Page 87

now ask you to look at Brenda Turner's statement and tell me when you're done.
A. Okay.
Q. Does this refresh your recollection in any way about Delores Tilghman's testimony or Brenda Turner's involvement in this case?
A. No, it doesn't. Again, I don't recall having any dealings -- now, I may have, I just don't remember. I just don't remember dealing with Delores Tilghman at all. Now, you may have an interview in here that I did with her. I don't remember doing an interview with her or having any contact with her.
Again, you may have something but I don't remember from 30 or 40 years ago.
Q. You can put that aside. There might be some other information which helps refresh your recollection. We'll come back to it later, once we're more into the details of this case.
Let me ask you this, sir, you mentioned the name Michael Ransome. You did an interview with him; is that correct?
A. Yes.

Page 88

Q. Do you recall seeing information at the time of your involvement in this case that Ransome was a suspect in this murder?
MR. ZURBRIGGEN: Object to the form. Detective, if you know.
THE WITNESS: I would have to read it over. I'd have to look it over again or if you can show me that, then maybe I'll remember.
BY MR. FEINBERG:
Q. Before we do that, let's talk about more recent information. I will ask you to look at Exhibit P-5, tab 5. There's a memorandum there from -- before you start reading, sir, let me tell you what this is or make representations to you about what this is. While Mr. Crosland's case was being litigated at the post conviction stage, his attorney, a man named Dan Rendine --
A. I know Dan.
Q. You know him from many court cases?
A. Yes.
Q. Had an investigator named Paul Paris look at the case. Do you know Mr. Paris?

A. No.
Q. Mr. Paris then sent Mr. Rendine this memorandum from May 31st, 1996. With that explanation, please read the narrative section and let me know when you're finished.
A. Okay.
Q. I take it this is the first time you're seeing this, sir?
A. Yes.
Q. All right. You see here that Mr. Paris has apparently spoken to two witnesses who say that Michael Ransome is one of the people involved in the shooting, correct?
A. That's what this statement says, yes.
Q. And they also identify Mr. Everett as being involved in the shooting; is that correct?
A. That's what the statement says.
Q. Had you ever seen that information before?
A. No, not that I remember.
Q. With that as background, do you recall -- does this refresh your recollection, in any way, about learning that Mr. Ransome was a



suspect in this case?
MR. ZURBRIGGEN: Object to the form. Detective, if it refreshes your memory.
THE WITNESS: I do remember Mr. Ransome's name coming up and I do remember doing an interview with him. And I would imagine that I knew his name, that's why I went and picked him up. This specific -- Paulette Phillips and Pearly Mae, I didn't know nothing about them. Were they available at the time of the murder?
BY MR. FEINBERG:
Q. Sir, we'll come back to that. Let me show you one other document. This will be P-36.

- - -

(Whereupon Exhibit P-37 was marked for identification.)

- - -

BY MR. FEINBERG:
Q. First of all, sir, have you seen this document before?
A. No, sir.



Q. I'll represent to you that this is a handwritten statement that Mr. Paris, who we were just talking about, prepared with Ms. Phillips and Ms. Scott. I will also note that this handwriting is kind of difficult to read. Since I have reviewed it a number of times, I want to read to you the relevant portion. That's at the bottom of the second page, which is labeled City-9416.
First of all, you're welcomed to read through the entire document if you feel like you need to.
A. I've been reading a little bit.
Q. Take a moment to finish reading, if you're able to read it. Let me know when you're finished.
A. I can read most of it. The second page is a little tough. I can read a lot of it. There is some that I can't understand.
Q. Would you agree that, without going through the details, this statement indicates that both Ms. Scott and Ms. Phillips witnessed from outside the H&B Market the events before and after the shooting?



MR. ZURBRIGGEN: Object to the form. Detective, to the extent you can tell from the document.
THE WITNESS: Can I tell that they were there when it happened?
BY MR. FEINBERG:
Q. Yes.
A. According to this, yes.
Q. The point I want to reference to you is at the bottom of the second page. There's a question which reads -- it's about one-third of the way up from the bottom: Do you know a person known as Curtis Crosland? Do you see that?
A. I see that, yes.
Q. The answer is, yes.
A. I can read that.
Q. I will read this into the record since the text is a little challenging. Next question is: How long have you known him? Answer: Over 20 years. Question: Was either of these two black males who entered the store carrying guns Curtis Crosland? And the answer was, no. Agreed?

Page 93

A. Yes.
Q. Would you agree that in summary this statement from Ms. Scott and Ms. Phillips suggest that these two witnesses were present at or near the scene, they still have the shooters and they exonerate Curtis Crosland as being one of the perpetrators?
MR. ZURBRIGGEN: Objection to the form of the question. Detective, to the extent you can clean glean that information from this document.
THE WITNESS: Can I ask you a question? When was this statement taken?
BY MR. FEINBERG:
Q. Sir, we've talked about May 31st of 1996. I will represent to you that that's my belief.
A. So 12 years after the murder?
Q. My question for you, sir is: Would you agree that that's what this statement says?
MR. ZURBRIGGEN: Same objection. Again, detective, to the extent you can tell what the statement say, you can answer the question.

Page 94

THE WITNESS: The statement speaks for itself.
BY MR. FEINBERG:
Q. Did you ever speak with Ms. Phillips or Ms. Scott?
A. No.
Q. Do you have any idea who they are?
A. No.
Q. When we look at their information and Mr. Paris' memo, would you agree that Mr. Crosland has produced evidence showing that Michael Ransome -- strike that.
Would you agree that this evidence collectively, if believed, exculpates Mr. Crosland?
MR. ZURBRIGGEN: Object to the form.
THE WITNESS: If believed, yes.
BY MR. FEINBERG:
Q. It also points to Mr. Ransome as the actual perpetrator.
A. Again, yeah, if believed, yes.
Q. You were aware of Mr. Ransome's name

Page 95

from the time of the investigation --
A. I believe so, yes.
Q. You're also aware after we've reviewed, that Mr. Everett and Ms. Tilghman recanted their trial testimony; is that correct?
A. You showed me that, yes.
Q. Does any of this evidence that we've reviewed change your belief that Mr. Crosland was the person who shot Il Man Heo?
MR. ZURBRIGGEN: Object to the form. Detective, to the extent you've reviewed, you can answer, based on your review.
THE WITNESS: No, my response is, I can't tell you that, no. Because I have no idea -- again, when was this interview taken, in '96?
BY MR. FEINBERG:
Q. My question, sir is, whether anything that you've seen changes your view?
A. I would have to answer that question with a question, if this interview was taken in '96, my answer is no.
Q. Could you hand that document back to me,

Page 96

sir. I think I may have misnumbered it.
Let me note, I inadvertently named two exhibits P-36. This is actually P-37. This refers to the statement from Ms. Phillips and Ms. Scott, City 9415 through 9417. Let's go off the record.
VIDEOTAPE OPERATOR: We are going off the record, the time is 10:56.
We are going back on the record, the time is 11:11 a.m.
BY MR. FEINBERG:
Q. Mr. Mangoni, we're back on the record after a short break. Did you realize during the break that any of your previous testimony was incorrect or incomplete?
A. No, sir.
Q. I want to switch topics now and ask you some background questions about yourself. What is your highest level of education?
A. College graduate.
Q. When did you graduate from college?
A. I have a couple degrees. 1973, 1978.
Q. Was that before you started with the Philadelphia Police Department?

Page 97

A. I started with the police department in '77.
Q. What are your degrees in?
A. Philosophy, criminal justice. One is from Niagra University and one is from LaSalle College. And I have half of Master's in theology.
Q. Half of master's?
A. Yeah, I never -- I was in the priesthood before I became a cop.
Q. Where did you go for the half Master's?
A. Mary Immaculate Seminary -- Province. It's Roman Catholic.
Q. Is that in Philly?
A. No.
Q. Where is that?
A. It's in White Hall, Pennsylvania. Well, it no longer exists. It's a major seminary, it no longer exists.
Q. You joined the PPD in '77?
A. October '77, yes.
Q. Why did you decide to leave the priesthood and become a cop?
A. It's a long story. It's a long story.

Page 98

It was a missionary order and I was -- I went to paramedic school. They sent me to paramedic school and I was working a mission down in Panama. To make a long story short, Panama at the time -- there was a revolution going on down there. There was a guy by the name of Torrijos was in power. And he -- three of our priests were killed. So they stopped sending priests down there. So I got sent to another assignment.
I grew up in Philly and my uncle was a cop that was killed in the line of duty. To make a long story short, I didn't make my decision for three years, from the time I started, because we dealt a lot with the police department, with gangs and stuff like that, the parish was an inner city parish where I was. So I finally made my decision three years later and I left. And I worked in a hospital for a little while and then I joined the police department.
Q. Which hospital did you work at?
A. Germantown.
Q. Did you leave the priesthood in '74?

Page 99

A. Yeah, about '74.
Q. And then took three years to decide to go to the police department?
A. No, no, no. I wanted to be a cop before I left the seminary. It took a couple of years to get on because you have to wait for civil service tests and things of that nature.
Q. Got it. And it was '77 when you started; is that right?
A. Yes.
Q. Did you have any other employment, other than being in the priesthood and starting at the PPD?
A. With the hospital, I worked in the hospital. I worked there and at the time it was St. Luke's Hospital, then it was Giuffre. It's no longer there. But I was only there for a short time, six months. And then I got called by the police department.
Q. You mentioned you had training as a paramedic; is that right?
A. Yes.
Q. Were you working as a paramedic at the hospital?

Page 100

A. Yes, I worked in the OR and I worked in the ER. I did IV tech work. But then I did -- I mostly went into teaching. I do that now. I teach advanced cardiac life support and pediatric advanced life support for first responders in Bucks County and at Jefferson Hospital.
Q. I'm going to ask you, that's a job that you --
A. That's current.
Q. Since your retirement from the police department?
A. Yes, I did that while I was working also. I did that. I also taught while I was on the police department.
Q. We'll come back to that then. Take me through from 1977 -- strike that. You started in the PPD in '97; is that right, or '77?
A. '77.
Q. Your retirement was 2012?
A. Yes.
Q. So all tolled, 35 years --
A. Just about, yes, a little short of 35.
Q. Can you take me through, in summary, the

Page 101

ranks and assignments you had?
A. Yeah, I was a patrol officer for a few years.
Q. What district?
A. 22, 1st and then the 3rd. 22nd was mainly a training type of thing. The 3rd, and then from where I went to -- I think I went to the gang unit. It was part of the juvenile aide division. I worked there for a couple of years. Then I went to West Detectives as a cop, which was at 55th and Pine. Now it's called Southwest Detectives. I worked there as a cop but I worked with the detective. We were assigned -- we handled juveniles for robberies, things of that nature.
After that, I was there until '85 or '86 and then I went to homicide. I was just a cop assigned to homicide, like I said, because I spoke Spanish. And I also handled their juvenile cases, juveniles that were processed for murder and things of that nature.
Then I made detective in '87 or '88. I stayed in homicide and I was there

Page 102

until I retired.
Q. In 2012?
A. Right.
Q. Did you become a detective at some time during your involvement in the Heo investigation?
A. I think I made detective -- no, I couldn't have because it says on there police officer on the interview. I probably made detective just after that. '87 or '88, end of '87, beginning of '88. Something like that.
Q. When you were working as the rank of a police officer in West Detectives or homicide division, did you have any different responsibilities from line detectives?
A. I had a little bit less responsibilities, line squad detectives. I had a detective that I was partnered with in West Detectives. Like I said, we tried to bring in cases like multiple burglaries, multiple robberies, things of that nature.
Q. How about homicide, any different responsibilities?
A. When I first went there, just to handle

Page 103

the juvenile matters, most of them were certified as adults when they got locked up. Most of them were, not all. And then processing, things of that nature. And I was utilized for my Spanish speaking.
Q. I take it if you had the rank of a police officer, any investigation you were involved with, you had to be partnered with a detective?
A. Yeah, I could not be assigned a job, right.
Q. Were you -- strike that.
Was Detective Hughes one of your partners in that timeframe?
A. He was my first partner in homicide.
Q. How long were you partners?
A. I don't know because Eddie went on to another unit. And then Eddie Rocks was in line squad and then I teamed up with him. And I went to line squad in 1988. I was in line squad for a little while and then I was on a detail for a police officer that got killed. I was on that detail for six months.
Q. Let's actually come back to your time at

Page 104

homicide just a little bit. If I understand correctly though, just in terms of your rank, you were a police officer until sometime '87 or '88. You then attained the rank of detective --
A. And stayed there.
Q. Until retirement; is that correct?
A. Until retirement, yes.
Q. Other than responsibilities -- were you in uniform?
A. No --
Q. Plain clothes?
A. Plain clothes, yes.
Q. Was there any particular event that lead you to retire in 2012?
A. No.
Q. You mentioned to us when we were off the record that you have four different jobs now; is that correct?
A. Yes.
Q. Tell me how you're spending your time now that you've retired from the police department?
A. I coach a high school team, Archbishop

Ryan High School.
Q. Is that soccer?
A. Soccer, yes. I coach at Penn State Abington College, mens soccer. I teach for the National Institute of Emergency Care. I do the ACLS and PALS, which is soon to be part of Bensalem EMS. And I work at Thomas Jefferson University Hospital's ER as a medic.
Q. When you say a medic, are you out on ambulances or --
A. No, I work in the ER itself doing EKGs, things of that nature.
Q. How many hours a week are you doing each of those things?
A. It varies -- oh, teaching, maybe twice a week.
Q. I assume your coaching responsibilities are now winding down at the end of the season?
A. Yes, sir.
Q. Which, does that allow you to spend more time teaching and also at Jefferson?
A. Yeah, but Jefferson I usually work every other Saturday and two nights every other week.



Q. How much time do you spend teaching?
A. Two days a week usually, sometimes three.
Q. At Penn State Abington do you have any office season recruiting responsibilities?
A. Yeah, you know, we do go to -- sure, yes.
Q. Are you the head coach?
A. No, I'm an assistant.
Q. By the way, Archbishop Ryan is --
A. It's a high school. Boys also, yes. I have been there for nine years. I coached at Temple before I went there.
Q. I have a soccer playing daughter.
A. That's off the record.
Q. Since your retirement in 2012, have you ever been involved in any other law enforcement activities?
A. No, I worked the papal detail in '15. I did it because I spoke Italian. The police department contacted me. I was assigned with the Vatican guard because they are all Italian. I spent time near the pope, up at the seminary where he resided at the time he



was here.
Q. Any other law enforcement work since then?
A. No.
Q. How old are you, sir?
A. 70.
Q. What is your date of birth?
A. [redacted]
Q. Do you live in the City of Philadelphia?
A. Yes.
Q. Do you own or rent your personal property, your primary residence?
A. Own.
Q. Are you single or married?
A. Married.
Q. Do you own that property with your spouse or on your own?
A. Yes.
Q. Do you own any other real property?
A. No.
Q. Besides your primary residence?
A. No.
Q. By the way, there was an address on this document we looked at before 8858 --



A. Manchester.
Q. Is that your current address, sir?
A. Yes.
Q. Children, you mentioned you have a son. Do you have any other children?
A. Yeah, I have two daughters. My son is an ATF agent. My two daughters are nurses.
Q. Your son is at ATF in law enforcement obviously, right?
A. Yes.
Q. Do you have any other family members who are in law enforcement?
A. No.
Q. You mentioned before that you don't use any social media or anything like that?
A. No, none at all.
Q. This case, sir, we made clear Mr. Crosland is suing you for damages. You're aware of that, right?
A. I understand.
Q. He is seeking compensation for the time that he claims he spent in prison unlawfully; is that right?
A. I understand that.

Page 109

Q. Do you have any understanding as to what will happen if a judge or jury says that you have to pay him damages?
MR. ZURBRIGGEN: Object to the form of the question. Detective, you can answer, based on --
THE WITNESS: No, I don't.
BY MR. FEINBERG:
Q. Do you have any knowledge as to whether the City of Philadelphia would pay that for you?
MR. ZURBRIGGEN: Same objection. Detective, you can answer.
THE WITNESS: I would hope they do.
BY MR. FEINBERG:
Q. Have you been provided any information on that issue, one way or the other?
MR. ZURBRIGGEN: Same objection. Please, don't disclose any confidential information that we've talked about. But apart from that, if you have an understanding, you can answer.
BY MR. FEINBERG:

Page 110

Q. Let me re-ask the question.
Other than conversations with your counsel, sir, do you have any understanding, based on -- strike that.
Are you familiar with the word indemnify or indemnification?
A. Yes.
Q. Have you had any conversations with anyone besides your counsel about the city indemnifying you for this case?
A. No.
Q. You don't know one way or the other whether that would happen; is that right?
A. Correct, yes, correct.
Q. I am going to come back to a topic we discussed before, Mr. Gerace and that Protect Our Police organization. I will show you one other document, sir.
- - -
(Whereupon Exhibit P-38 was marked for identification.)
- - -
BY MR. FEINBERG:
Q. I am marking this as P-38. It's a long

Page 111

article from a publication called The Forward. As I've said before, you're welcomed to read the whole thing but there is one portion I want to show you in particular. Look at page 6. Halfway down page there is reference to you there. Do you see that?
A. Yes.
Q. Read that paragraph to yourself. Let me know when you're finished.
A. I'm good.
Q. First of all, I didn't give you the opportunity to read the beginning of this article. Let me know that -- it makes references to what's described as a controversial billboard connecting George Soros to a candidate for District Attorney in Georgia.
With that as background, I will note that this publication, according to this article, contacted you with questions about the participation of Protect Our Police in that campaign.
Do you recall any contact from this publication to you, sir?

Page 112

A. No. I have never been called by this group.
Q. Do you recall referring questions about Protect Our Police to Mr. Gerace?
A. Do I -- can you ask that again?
Q. Sure. Do you remember referring anybody to Mr. Gerace when they called you with questions about Protect Our Police?
A. No. I don't remember getting a call from this group. As a matter of fact, I could be wrong, but I don't remember getting a call from any group in regards to this. Again, I just don't remember it. That thing about the salary, that's also a fallacy.
Q. We'll come back to that. The article concerns these allegations -- strike that.
The article references George Soros' name being used in this political campaign. Do you recall anyone reaching out to you to ask you about that?
A. No.
Q. Were you aware of that happening at all?
A. No.
Q. Did you ever talk to Mr. Gerace about

Page 113

that?
A. Not really, no.
Q. Do you use e-mail, by the way?
A. Yes.
Q. Do you remember e-mailing Mr. Gerace?
A. Probably, I probably did.
Q. My question was, in general, you have e-mailed Mr. Gerace?
A. Yes.
Q. Do you remember e-mailing him in particular about Protect Our Police?
A. Maybe to the fact of something when he was asking me to do this for him.
Q. At any point did -- bottom line, what you're telling me today is that you don't recall any discussions with Mr. Gerace about this call from a journalist with The Forward?
A. I don't, I don't.
Q. The name by the way of the reporter is Michael Janofsky, J-A-N-O-F-S-K-Y. You don't remember -- does that name ring a bell to you?
A. Again, I can tell you right now if you have evidence of that, that's fine. But I just don't remember it.

Page 114

Q. I will show you one more document. This will be Exhibit P-39.
- - -
(Whereupon Exhibit P-39 was marked for identification.)
- - -
BY MR. FEINBERG:
Q. So this is another document that was issued that was published by Protect Our Police. First, have you ever seen this before, sir?
A. No.
Q. There is a statement in the middle of the page -- strike that. Further back, my understanding from what I've seen publicized about this is that this was an e-mail that was sent out to potential supporters of the Protect Our Police Political Actions Committee. There's a statement in the middle of the first page that says: Let's get one thing clear, George Floyd -- I take it by the way, you're familiar with the George Floyd case?
A. Yes, sir.

Page 115

Q. Tested positive for Covid-19 and was high on a lethal dose of Fentanyl when he died May 25th, 2020. But the main stream media doesn't want you to know that. Have you ever seen this before?
A. No, I never saw this.
Q. Ever heard any statements like that?
MR. ZURBRIGGEN: Object to the form of the question. Detective, you can answer.
THE WITNESS: It may have been on the news. I don't know. Other than that, no. Or maybe Gerace sent me a copy of this but I don't remember seeing this. I don't know if he did or he didn't. I don't know.
BY MR. FEINBERG:
Q. Do you have any opinion one way or the other as to whether George Floyd had Covid-19 and was high on a lethal dose of Fentanyl?
MR. ZURBRIGGEN: Object to the form of the question. Detective, you can answer.
THE WITNESS: No, I don't.

Page 116

BY MR. FEINBERG:
Q. Does it concern you that this organization, which had a connection to your name, was publicizing information --
MR. ZURBRIGGEN: Same objection. Detective, you can answer the question.
THE WITNESS: No, I don't.
BY MR. FEINBERG:
Q. No, you don't have any concerns about that?
A. No, I don't.
Q. Why not?
MR. ZURBRIGGEN: Same objection. Detective, you can answer.
THE WITNESS: I just don't because this was a short thing and I didn't know about any of this until you told me.
Again, let me reiterate and let me tell you, I don't know if he sent me e-mails about this. If he did, then that's fine. I just don't remember. I never got involved in this. That's the easiest way I can say this. I never got involved in it. He

Page 117

asked me if he could use my name because he needed a name for the top of that. I said he could and then it was a matter of -- I couldn't do anything for him. And he says, well -- he said that would be fine and then apparently he went and got -- I didn't even know, to be honest with you, I didn't even know I was off of this. I guess, no, he did tell me that he was taking me off of this and he was going to get somebody else or somebody else had volunteered. That's what it was. And I would imagine that's that Deborah Mattiacci, I guess.
Q. Let's go back and talk about your time in the homicide division. How many different squads did you work on?
A. I worked in SIU and I worked in 2 squad most of the time and line squad. And I worked in the fugitive squad for a short amount of time.
Q. Is the 2 squad part of line squad?
A. Yes, back then there was four squads, worked around the clock.
Q. So the line squad consisted of four

Page 118

different squads?
A. Four different platoons.
Q. Numbered 1 through 4; is that right?
A. Yes.
Q. Do you recall the order in which you worked on each of those squads?
A. When I first went there, I was in assigned cases. I worked in SIU. That's when this happened, this case that we're talking about, the Heo case. In '88, I went to line squad, I went to 2 squad. And then I was on the detail. We had a police officer murdered and we didn't lock anybody up for about four months. I was on that detail. It was Officer Chalie Knox down in South Philadelphia. And another officer was shot who survived, Anthony -- I can't remember Anthony's last name, but he just passed away of natural causes, just recently.
Q. These are the officers who were shot?
A. Yes.
Q. And your detail was for the specific --
A. For that specific case. It was a robbery murder. It was a robbery at Roy

Page 119

Rogers at Broad and Snyder.
Q. That was 1989?
A. No, that was maybe '90. It was Labor Day weekend, I remember that. I am not sure what year.
Q. How long were you on that detail?
A. Four to six months. I think we made the arrest I think in January. It happened Labor Day. I think the arrest was made in January.
Q. So Labor Day of '90?
A. I think it was '90.
Q. So then you're there until early '91 and you come back to homicide?
A. No, I was in homicide. Nothing changed, just talking about squads, there was a detail that was in the office. It was like we had rooms set aside because we interviewed about 600 people -- no, about 1,000 people.
Q. So then you go back to the line squad; is that right?
A. I go back to line squad. I believe it was '92.
Q. How long were you there?
A. I was in line squad again until 2011 and

Page 120

then I worked SIU for about six months to a year before I retired.
Q. You mentioned the fugitive squad. Do you remember when you were there?
A. No, that was only six months. I just filled in for someone that had retired or got sick.
Q. You mentioned that you were partnered up with Detective Rocks at some point; is that right?
A. Yes, that was in SIU. Eddie was in 1 squad. When I went back to line squad in 1002, Eddie stayed in SIU.
Q. There are two Eds. There is Ed Hughes and Ed Rocks.
A. Eddie Rocks. Ed Hughes had been transferred out by then.
Q. So your partnership with Ed Hughes ended --
A. Probably '87 or '88.
Q. Shortly after your involvement in the Heo murder investigation?
A. Yeah, somewhere around there. I can't remember when Eddie was transferred out.

Q. How many cases would you say you were working on at any given time when you were in homicide?
A. Back then if you were in line squad, you averaged being assigned about 14 to 15 cases a year, back then. As the assigned.
Q. We're talking about the late 80s, early 90s, right?
A. Yeah. '90 was the highest number we ever had, up until a couple years ago. We had 525 murders that year.
Q. That period when you would be assigned to 14 or 15 cases per year, roughly one or more per month?
A. Per month, yeah.
Q. So you would work the case where you were the assigned, right?
A. Right.
Q. But you would also work out and help out your fellow detectives --
A. Whenever a case came in, you had a lot of help when a case first happens, first night, second night, third night whatever. But of course nine times out of ten back then, cases came in pretty much like every other day.



Q. Was there a certain time period that would pass before a case got transferred to SIU from the line squad?
A. Not really. If there was a certain case, there are cases and then there's cases. If there were certain cases that were like newsworthy like they were on the news a lot, things of that nature, sometimes they got passed on to SIU to keep working on them so nothing would get dormant. When you're in line squad, you might be the assigned on the job, but unless you're specifically to work nothing else but that job, then you're helping everybody else when jobs come in.
Q. We know that in the Heo murder investigation, the shooting takes place in '84 and then after January of '85 nothing really happens until April of '87.
A. Yeah, I wasn't even in homicide in '84.
Q. Got it. So would it be the case that if evidence came to the attention of the homicide unit for a case that had been dormant, someone in homicide would say, oh, the SIU should look at this now?



A. Yeah or whoever. You know, like sometimes it comes through a phone call. You know, like you get a phone call. I got a guy here that has information or we have somebody at the prison that has information or whatever the case may be. And then you let your boss know. And then the boss -- if it's something that's really old, they'll coordinate it with the SIU sergeant or lieutenant, maybe they'll handle it.
Q. What shifts were you working in the 1987 time period?
A. We rotated, every week we changed. When you're in line squad, 8 to 4, 4 to 12 and 12 to 8.
Q. How about SIU?
A. SIU were two shifts, 8 to 4 and 4 to 12.
Q. And you would rotate each week?
A. Yeah, every other week you rotated, right.
Q. I take it each of the detectives who I mentioned at the beginning of the deposition who you knew, you worked with them before?



A. Those guys were in line squad. They were in 4 squad, Joe Brignola, Frankie Ansel, Al Nespoli. Eddie Hughes was in that squad too. I just don't remember when Eddie came in SIU, if he was there with SIU already when I got there. John Lanzelotti and Sergeant Westerman were the lieutenant and sergeant of 4 squad. They eventually went back to SIU.
Q. Cimino and McNesby were in SIU?
A. They were in SIU, yes.
Q. I take it though, the bottom line is that you worked with all of those guys over the course of your career; is that right?
A. Yes.
Q. You generally had good relationships with them all?
A. Yeah, a lot of those guys, they were older than I was. So a lot had retired way before I did.
Q. But you trusted the work that they did?
MR. ZURBRIGGEN: Object to the form. Detective, you can answer generally.

Page 125

THE WITNESS: Yes.
BY MR. FEINBERG:
Q. Were able to rely on them to do good police work?
A. Yes.
Q. Did you ever have any problems or concerns about the work quality of any of those detectives?
MR. ZURBRIGGEN: Same objection. Detective, you can answer.
THE WITNESS: No.
BY MR. FEINBERG:
Q. In particular, if you were the assigned on a case, would you trust them to keep you informed about any developments they learned of for one of your cases?
A. Yes.
Q. Can you say how many cases -- let me restate that. Over your time in homicide, which was 27 --
A. 27 years almost.
Q. Can you say how many cases you were the assigned on?
A. No, I can't because some years were

Page 126

heavier than others. Some years I might handle 14, 15, and other years I may handle 10 or 11.
Q. Suffice it to say, several hundred?
A. I would imagine so, yes.
Q. Are you aware of any cases where you were the assigned where, other than this one -- strike that. I know you said you weren't the assigned.
Let me ask it in a broader way. Are you aware of any other cases besides this one where you were involved in any respect, where a judge vacated a person's conviction?
A. Yes, the last deposition I was at but I just can't remember what the case was.
Q. You said you don't remember the timeframe for that.
A. I don't remember the timeframe for that.
Q. Was it within the past five years?
A. I remember the job, I just don't remember what year it happened. It was 7th and Sedgley, a grocery store. I'm sorry, a businessman was robbed and murdered at 7th and

Page 127

Sedgley. It was a 60-some year old man. He had a payroll and he was robbed of that. There were four individuals arrested but the arrest didn't come until a couple years later.
I believe there were four arrested. I think two plead out guilty and testified against the other two. And I think, if I remember right, the two that pled guilty did their time because back then third degree was 10 to 20. I'm not sure if the other two or one of the two got life. But I can't remember their name.
Q. What you're recalling is that one or more had their conviction vacated and brought a lawsuit?
A. Yes, one, because he was sitting across from me, yes. I just can't remember his name.
Q. Sitting across from you at the deposition?
A. Yes.
Q. Do you remember the lawyer who asked you questions about the case?
A. I do. He was an ex police officer but I don't remember his last name. His name was

Page 128

Jim.
Q. Jim Figorski?
A. That's it. There was a narcotics cop that worked next door to our office back then.
Q. I'll see if I can pinpoint that name to you because I know Jim, as well. We got on that topic because we were talking about cases where judges vacated convictions.
Are there any others that you can remember, besides Mr. Crosland and this other case that you don't remember the name?
A. Not offhand.
Q. Are you aware of any cases where a judge granted a motion to suppress because of something that you did or didn't do?
A. I don't know, I mean there probably was. There were many cases where there were motions to suppress, many cases. I remember our evidentiary, you would be on the stand sometimes for a day and a half for a motion to suppress. Back then, not so more now. But back then you were on the stand for, like I said, a day, day and a half sometimes, just on a motion. But there were other cases to

answer when or where, I can't...
Q. So it sounds like you were talking about cases where motions were heard. What I am asking is about is granted, where a judge made a finding that you did something wrong?
A. That I personally did something wrong?
Q. Yeah.
A. There may have been one or two but I can't recall any. If you showed me one, then I may say to you, yeah, I remember this. I just don't remember offhand.
Q. Are you aware of any case where a judge or an appellate judge dismissed charges because of allegations that you engaged in misconduct?
MR. ZURBRIGGEN: Object to the form of the question. Detective, if you understand and recall.
THE WITNESS: Yeah, I do remember one. I wasn't the assigned. The assigned detective died very young. His name was Billy Sholl. There was a gentleman arrested for a murder out in West Philadelphia. And we found out like within a



couple of days that it was not him. And he was out of jail within like a week. He was out of jail before a preliminary hearing.
Q. That's not something a judge did, that's something the police --
A. Right, you're exactly right.
Q. I am asking about --
A. No, not that I can recall. Again, I am not telling you that there aren't, I just don't recall any. So if you gave me one and I said, now I remember this, it's not a surprise. I just don't remember any.
Q. To make sure my question was clear because I think we both spoke over one another.
A. Sorry.
Q. No problem. What you're saying is that you don't remember any cases off the top of your head where a judge dismissed charges because of allegations of misconduct, correct?
A. Where I was assigned?
Q. Yes.
A. No. Again, let me preface that by saying I don't remember. There may be but I



just don't remember.
Q. The case that we were talking about before where Mr. Figorski took your deposition, was it a case involving Shaurn Thomas? Shaurn was spelled S-H-A-U-R-N?
A. I don't know. I don't remember.
Q. Mr. Thomas also had a brother, just throwing out additional names to test your recollection, named Mustaffa, M-U-S-T-A-F-F-A.
A. I believe the assigned was Detective Devlin on the case. I don't remember their names.
Q. Do you recall ever going to court to testify in that case?
A. Did I go to court?
Q. Yes.
A. I may have, I don't remember. It was in the 90s. I believe it was in the 90s.
Q. The original murder investigation?
A. Yeah, I believe so. I believe so.
Q. But the deposition was much more recent; is that right?
A. Yeah, that was in the last several years.



Q. If it was the Shaurn Thomas case, if, which I understand you don't know, that would have been sometime between 2017 and 2019 for your deposition?
A. Yeah, maybe.
Q. Sir, I showed you -- one of the exhibits we looked at there was reference to you being the highest paid employee --
A. That's a fallacy.
Q. What is the story behind that?
MR. ZURBRIGGEN: Object to the form. Detective, you can answer.
THE WITNESS: That was the DROP money that everybody gets now. And that was -- the DROP money now is, people retire with like half a million dollars. The higher rank you go, the more money. That was all of the vacation time, holiday time I had saved that was converted, which I ended up using for medical leave. The DROP money is included in that also. That's money that you receive four years prior to the end of your service, but it's not attached to your time of service.
In other words, if you do

Page 133

35 years, 31 years is your pension. And the four years is money that is saved for you, set aside, that you get in a lump sum when you retire.
BY MR. FEINBERG:
Q. Which was in 2012 for you; is that right?
A. Yes.
Q. How much money -- there's a reference to 310,000. How much of that would have been from DROP?
A. About 210.
Q. Do you remember that being publicized, that you were the highest paid employee in the police department?
A. Yeah, I think it was on -- somebody told me it was on -- I did. I looked at it. It was on the internet or something.
Q. Did you ever call anyone to correct it?
A. No, I didn't even bother because I knew what it was. It was DROP money. You can go to anyone's retirement right now and their DROP money -- if I'm a chief inspector and I have four years of DROP in there, my salary is

Page 134

probably over a half of million dollars.
Q. Sir, are you familiar with the Philadelphia Police Department's Internal Affair's process?
A. Somewhat, yes.
Q. Were you ever the target of an Internal Affairs investigation?
A. I may have been like inclusive, I don't think I was -- I don't remember. I think maybe one or two times but I don't remember and I don't remember receiving any kind of disciplinary action from it if it was, whatever it was.
Q. Do you recall being ever interviewed by Internal Affairs?
A. I probably was, I just don't recall specifics.
Q. Do you recall receiving any -- I think you already answered this but let's confirm. Do you recall any discipline of any kind issued --
A. I never -- I may have gotten a written reprimand or something, but I never lost any time or had to take any days off or anything

Page 135

like that.
Q. Were you ever directed to participate in any training over and above the annual training, required by state law?
A. I don't know, sometimes -- I may have been. I'm not sure. I just don't remember. Again, if there is one or two there, it won't surprise me. I just don't recall.
Q. Other than this case, have you ever been sued in relation to your work as a Philadelphia police officer?
A. I think that last case that we just talked about.
Q. The one where you were deposed by Mr. Figorski?
A. Yes. I don't know what the outcome of that was. I never heard anything back.
Q. I will show you an exhibit that we're marking as Exhibit P-40.
- - -
(Whereupon Exhibit P-40 was marked for identification.)
- - -
BY MR. FEINBERG:

Page 136

Q. I will represent to you, sir, that this is something that was provided to us by the City Law Department. It's called a Concise Officer History. Have you ever seen a document that looks like this before?
A. No, it's the first time I saw this also.
Q. Does the information that references you, does it look correct?
MR. ZURBRIGGEN: Object to the form. To the best of your ability to tell that this is accurate --
THE WITNESS: I don't remember what this was specifically, other than the fact that it happened in '95.
BY MR. FEINBERG:
Q. I was asking a question about your payroll number and whether that was correct. But I see it's redacted. So disregard that I'll withdrawal that question.
Let's come back to the details. There's reference to a complaint against police from March of 1995 concerning a Sedrick Davis. Does that name sound familiar at all?

Page 137

A. No, I don't recall.
Q. There is also an abbreviation that says PA struck on face. Do you have any idea what that means?
A. I would imagine -- I'm gleaning that he made a statement that I struck him in the face, I guess.
Q. Assigned investigator was Patricia Deveraux, does that name -- Sergeant Patricia Deveraux, does that name sound familiar?
A. No, I don't remember her.
MR. FEINBERG: Let me note for the record, Adam, I think we made a request for the underlying documents from this case. I note that that's still outstanding and we'll reserve the right to revisit this.
BY MR. FEINBERG:
Q. Bottom line, sir, you don't recall any details about this at all; is that what you're saying?
A. No, I don't.
Q. What's the blue wall of silence?
MR. ZURBRIGGEN: Object to the form of the question. Detective, if you

Page 138

know anything about that, you can answer.
THE WITNESS: I guess it's a term that's out there, I think -- not I think. It's a term out there about I guess cops keeping amongst themselves basically. The blue wall.
BY MR. FEINBERG:
Q. Is there a blue wall of silence or a code of silence in the Philadelphia Police Department?
MR. ZURBRIGGEN: Object to the form of the question. Detective, if you can opine --
THE WITNESS: I am sure there is but I wouldn't call it something that's generic or something that's out there for everyone. I am sure there are individuals that have that belief. But I don't think it's something that permeates the entire police department.
BY MR. FEINBERG:
Q. You were in the police department, what, 35 years?
A. Yes, sir.

Page 139

Q. Over the course of that time, I take it you became fully familiar with all of the various rules that govern police practice, right?
A. Pretty much, yes. We have directives and policies to go by.
Q. Sure. Directives which told you what you could do and what you couldn't do, right?
A. Yes.
Q. You were also aware, based on your training, about constitutional rules, right?
A. About the constitution?
Q. Yes.
A. Yes.
Q. So you were aware of, you can't use excessive force, right?
A. Yes.
Q. You're aware that you can only stop or detain someone -- strike that.
You were aware that you could only detain someone based on reasonable suspicion. I take it that's a familiar concept, right?
A. Yes.

Page 140

Q. In your career, did you ever see a Philadelphia police officer, of whatever rank, engage in what you believed to be misconduct?
MR. ZURBRIGGEN: Object to the form of the question. Detective, you can answer, generalize --
THE WITNESS: No.
BY MR. FEINBERG:
Q. Not a single time over 37 years?
A. No.
Q. If you had observed anyone engage in misconduct, what would you do about it?
MR. ZURBRIGGEN: Same objection. Detective, you can generalize.
THE WITNESS: It depended on the contact, I guess, upon the conduct, the severity of it and what it was.
BY MR. FEINBERG:
Q. It sounds like this is a hypothetical though since it never happened, right?
A. Right.
Q. If you saw an officer use excessive force and punch someone without justification, what do you do in that circumstance?

Page 141

MR. ZURBRIGGEN: Same objection. Detective, you can answer.
THE WITNESS: It depends upon the circumstances. It depends upon the situation. It depends what I observed, when I observed it. Did I come in during whatever happened? Did I see what prefaced that? I can't answer that. I can't. I can't answer a hypothetical like that.
BY MR. FEINBERG:
Q. It is hypothetical because you never saw anything that you believed to be misconduct, correct?
A. Exactly.
Q. I want to ask you, sir, about some of the homicide division policies and practices. It sounds like my questions on this may have been forecasted for you by Detective Rocks, in terms of policy-related issues.
I take it that over your 27 years in homicide, you knew how homicide investigations were supposed to be conducted, right?
A. Yes.

Page 142

Q. Have you ever heard the concept or the phrase tunnel investigation?
MR. ZURBRIGGEN: Object to the form of the question. Detective, if you have, you can answer.
THE WITNESS: I have heard it.
BY MR. FEINBERG:
Q. What does that mean to you, in connection with a homicide investigation?
A. As it does in any other thing, the same with patients in healthcare, do you diagnose someone and you specifically look at that and sometimes you just don't look at anything else, same thing. You know, you focus on one thing and sometimes you stay focused on that one thing. Again, that's not something that's permeating, that's something based on each individual person.
Q. It sounds like though, that's something that you would try to avoid in a homicide investigation, right?
MR. ZURBRIGGEN: Object to the form. Detective, you can answer.

Page 143

THE WITNESS: Yes.
BY MR. FEINBERG:
Q. In other words, if you had information about a suspect and you're focused on that suspect but you receive contradictory information, you're not going to just disregard that contradictory information, right?
MR. ZURBRIGGEN: Object to the form. Detective, you can answer.
THE WITNESS: Generally, no.
BY MR. FEINBERG:
Q. You're going to consider that seriously as part of the investigation, right?
A. Sometimes you make that determination, if that information is frivolous or if you know right up from jump street that it's not true, it depends.
Q. At a minimum, you're going to stop and think about it, right?
A. Yes.
Q. You don't just disregard it, right?
A. Yes.
Q. We talked before about exculpatory

Page 144

evidence. I don't know that we defined the term. Let's make sure we're on the same page. When I say exculpatory evidence, what does that mean to you?
A. Evidence which constitutes something that you, yourself -- I don't want to use the word as not germane to the investigation but maybe something that contradicts what you're focused on or whatever part of your investigation you're working on.
Q. Would you agree that exculpatory evidence is any evidence which tends to undermine or rebut the theory of someone's guilt?
A. Incumbent upon how that evidence -- how that exculpatory evidence comes about. It's incumbent upon that. It's just not the evidence in and of itself. It's the motivation behind that evidence.
Q. So motivation is also important and can be exculpatory, right?
A. Sure.
Q. For example, if you have evidence that a person is biased against a particular suspect,

Page 145

that's relevant, right?
MR. ZURBRIGGEN: Object to the form of the question. Detective, you can answer.
THE WITNESS: Biased in which way?
BY MR. FEINBERG:
Q. Let's do it this way, I realize that's not clear.
You would deal with people who were looking for deals all of the time, witnesses that is, right?
A. Yes.
Q. And witnesses who were looking for deals from the prosecution might have reasons to testify falsely, right?
MR. ZURBRIGGEN: Object to the form. Detective, you can answer.
THE WITNESS: That's feasible.
BY MR. FEINBERG:
Q. Because they might believe that they need to tell a detective or a prosecutor something in order to help themselves, right?

Page 146

A. Yes.
Q. So facts about that person seeking a deal are -- can be exculpatory, right?
A. Yes.
Q. It can show that the person has a reason to lie, correct?
A. Yes.
Q. By the same token, if you get information that is inconsistent or provides an inconsistency with other information from the witness, that's exculpatory, right?
MR. ZURBRIGGEN: Same objection. Detective --
THE WITNESS: That's incumbent upon where the evidence originates and where it emanates from. I mean a lot of that evidence could be inconsistent but that doesn't necessarily mean that it's true or that it's not true.
BY MR. FEINBERG:
Q. We'll come back to that. If a witness says John Smith is the guy who did this shooting and another witness comes in and says, no, it was actually Richard Rowe who did

Page 147

the shooting; would you agree that that second statement is exculpatory as to John Smith?
MR. ZURBRIGGEN: Object to the form of the question. Detective, again, you can answer.
THE WITNESS: I wouldn't say it's exculpatory. I would says it's inconsistent with what that first person said.
BY MR. FEINBERG:
Q. Isn't inconsistency exculpatory?
MR. ZURBRIGGEN: Object to the form of the question. Detective, again --
THE WITNESS: I don't believe it is, no. No, not until it's investigated.
BY MR. FEINBERG:
Q. In other words, if you don't believe it, it might not be exculpatory, right?
MR. ZURBRIGGEN: Same objection.
THE WITNESS: It's not a matter of belief. You try to corroborate one way or the other.
BY MR. FEINBERG:
Q. If you determine that it's not true,

Page 148

then it may not be exculpatory; is that right?
A. You're talking if you corroborate it or not corroborate it?
Q. Yes.
A. Yes.
Q. Yes, it's not true. Let me say it like this: When you receive exculpatory information as a detective, do you have to inform a prosecutor about it if the case later gets prosecuted?
MR. ZURBRIGGEN: Object to the form. Detective, if you know, you can answer.
THE WITNESS: Yes.
BY MR. FEINBERG:
Q. In that situation, let's do this as a hypothetical. John Smith is your target of the investigation. You've got a witness identifying John Smith. But another witness comes in and says, it was Richard Rowe who did the shooting. But if you don't believe that statement about Richard Rowe, what do you do with it?
MR. ZURBRIGGEN: Object to

the form. Detective, if you can speak generally to that hypothetical, go for it.

THE WITNESS: Try to corroborate it either way, to either strengthen that or diminish it, whatever the case may be.

BY MR. FEINBERG:

Q. You would have to provide that information to the prosecutor?

A. Yes.

Q. So even if you don't believe that that statement to be true or you can't corroborate it, you still got to tell the prosecutor about it, right?

A. Yes.

Q. Because even if you make the determination that that second statement is not true, the defense attorney who represents John Smith might want that information, right?

A. Yes, that usually is a matter of trial facts. I mean usually what we discuss with the D.A.'s when we go to confer over getting a warrant for someone, that information is usually given to them that way they know the



pitfalls that they may incur or if there are not any pitfalls. It's incumbent upon who is at the time the head of the office at the D.A.'s office. Like at this particular time, it was Barbara Christy. Before that it was Arnie Gordon. Then it was Dave Lamb. I mean it's just incumbent upon that.

The onus is on the detective to tell them, you know, these are the strong points of the case and if there are any weak points, then there's weak points. And nine times out of ten or maybe mostly ten times out of ten, the D.A.'s that I've dealt with, they told you, this is what I want done prior to me giving you a warrant.

Q. Even after the warrant though, you have these conversations, right?

MR. ZURBRIGGEN: Object to the form.

THE WITNESS: If something comes up that shows yes, afterwards, yes.

BY MR. FEINBERG:

Q. Bottom line and I think we're on the same page here, bottom line, you've got to



make sure that the prosecutor is fully aware of all of the information you have even if -- if it points to guilt or if it points to innocence, right?

A. Without a doubt.

Q. Related topic, if you have -- if there's a suspect and you have evidence supporting guilt of that suspect but you have reasons, you start to doubt the validity of that information, you've got to do something about that, right?

MR. ZURBRIGGEN: Object to the form. Detective, you can answer.

THE WITNESS: Sure, you can -- either the D.A. that's handling the case if it's already at trial time or it's at the time when you're trying to get an affidavit for a warrant, of course.

BY MR. FEINBERG:

Q. Would it be fair to say that you cannot rely on information that you believe to be false?

MR. ZURBRIGGEN: Object to the form of the question. Detective, again,



you can answer.

THE WITNESS: Again, I have to, myself, I have to know where that information came from. What was the reason for that information? Was it, like the case I told you about before where the guy got locked up, the person was arrested and a day or two later we found out it wasn't him and we got him out of jail right away. It was something we found out afterwards, after the investigation.

BY MR. FEINBERG:

Q. So to use an example, witness number one is telling you that John Smith is the perpetrator. But then you talk to witnesses two, three and four and they say, no, that's not true, you can't rely on witness one because you have reason to doubt witness one, right?

MR. ZURBRIGGEN: Object to the form. Generally, again Detective, you can answer the hypothetical, to the extent you can with the information you have.

THE WITNESS: Yeah, but

Page 153

incumbent upon where that information comes from, when it came from, like that interview that you showed me. That occurred 12 years after the murder. Those two people who said that it wasn't them, that it was these other two people, they could have very well said that day, that night, they lived right on that block, that it was so and so and so and so that did the murder. They didn't come forward until 12 years later. Many people recant years after, years after. The case is over.

As you know, as you well know, you're an attorney, people recant numerous times after they give their initial interviews.

Q. Let's focus specifically on information that you gather during an ongoing investigation. If you get information that causes you to doubt other information that you had been relying on up until that point, you have a responsibility to do something about that, right?

MR. ZURBRIGGEN: Same objection.

Page 154

THE WITNESS: Yes, of course.

BY MR. FEINBERG:

Q. We talked about activity sheets. What was the purpose of activity sheets back in the 80s and 90s?

A. To keep whoever -- mainly what they were for, they were to give to sergeants and the lieutenants, to keep them abreast of each investigation as they were going on.

Q. My understanding, in fact you demonstrated this with your description of your assignments, is that detectives would move in and out of different squads, right?

A. Right.

Q. By virtue of that, those detectives would move in and out of different investigations; is that right?

A. Yes.

Q. So if you're the assigned detective, there may be half a dozen different detectives working on your case, right?

A. I mean you'd be aware of it. I mean you would be aware of it but if someone said to me, Dom, your job is being picked up by SIU,

Page 155

okay, thanks, you know.

Q. In fact -- let's go back to a different topic. We know in this case the Heo murder, you had nothing to do with it until April of '87, right?

A. Right.

Q. So at that point the investigation has been around since December of '84, and all of a sudden you're thrown into the case, right?

A. Right, on that particular case, yes.

Q. To familiarize yourself with what had happened up to that point, would you go back and look at the activity sheets?

A. Of course.

Q. So would you agree then that the activity sheets were an important part of documenting what happened over the course of the investigation?

MR. ZURBRIGGEN: Object to the form of the question. Detective, you can answer.

THE WITNESS: Yes.

BY MR. FEINBERG:

Q. With you working in the medical field, I

Page 156

take it you look at medical records all of the time, right?

A. Yes.

Q. If you're going to have an interaction with a patient, the first thing you're going to do is pull up a chart, right?

A. Yes.

Q. See what has happened leading up to your encounter, right?

A. Yes.

Q. Were activity sheets basically serving --

A. Basically the same thing.

Q. It's the running record of the investigation?

A. Right.

Q. And I take it --

A. To the extent that the detective that's preparing that activity sheet -- I might prepare an activity sheet in a total different manner than someone else or I may word things differently or they are just different. The essential information is usually still there but it may be worded totally different.

Page 157

Q. Same thing in the medical field, people fill out their charts a different way, right?
A. Yeah, pretty much. Now it's a lot -- it's a lot more stringent now.
Q. Bottom line, all of the detectives who we've talked about so far, seems like you trusted them as being reliable investigators, right?
A. Yes.
Q. You would expect them to provide detailed and accurate reports in their activity sheets, right?
MR. ZURBRIGGEN: Object to the form. Detective, you can answer.
THE WITNESS: Yes.
BY MR. FEINBERG:
Q. I take it that when you prepared an activity sheet about an investigation, you did your best to provide accurate and detailed information?
MR. ZURBRIGGEN: Same objection.
THE WITNESS: Yes.
BY MR. FEINBERG:

Page 158

Q. Can I assume that you typed up hundreds or even thousands of activity sheets in your career?
A. A lot, yes, numerous, yes.
Q. Everything that we just talked about, being accurate and detailed, you would do that every time, right?
A. Yes.
Q. I have taken testimony from a number of your colleagues recently including Detective Rocks, Detective Santiago and others, I am explaining this to you to avoid a long conversation I'll ask you whether you agree or disagree. What they told me is that those activity sheets were placed in the homicide file. Does that sound right?
A. Yes.
Q. I also understand that there's a difference between homicide files and homicide binders; does that sound correct?
A. Yes.
Q. The binder is a collection of documents that was prepared from the District Attorney's Office at the time -- leading up to a trial; is that correct?

Page 159

A. The binders back then, back then there were kind of like rules, like if it was an unsolved case you had a binder with a certain amount of time. If it was a solved case, you had a longer period of time. They don't even do binders anymore right now.
Q. So your understanding though was that the binder took a smaller collection of information from the file, put it into literally a binder with a two prong clip?
A. Everything was in order. There was a section for property receipts and evidence. There was a section for crime scene photos and crime scene notes. There was a section for police interviews. There was a section for civilian interviews. There was a section for records and information. There was a section for miscellaneous. And then what you did was, you gleaned those papers and you put them in a binder.
It made it -- just like this is, instead of you coming in and giving me 37 different interviews or 100 different

Page 160

interviews, you put it in a nice compact -- so when the D.A.'s office gets it, all he has to do is lift it up and it's in front of him or her.
Q. To confirm, going back to the activity sheets, activity sheets were not included in the homicide binder provided to the D.A.'s office; is that correct?
A. No, they were included a lot of times.
Q. Do you recall a change in practice on activity sheets being provided versus not being provided?
A. There was so much practice -- I mean activity sheets were incorporated a lot. Sometimes they weren't but they were always in an envelope marked activity sheets that was inside the folder.
Q. Was that inside the homicide file or the homicide binder?
A. The homicide file. But there were also guys -- I did it many of times, where my activity sheets -- because it was a good referral for me, because I always tried to put mine in chronological order. That way, when I

Page 161

went to court or I went to prepare for court, such and such date -- three days later, I can just go right to it.
Q. My understanding is that activity sheets were not provided to defense lawyers in Philadelphia until sometimes in the mid 1990s. Does that sound right?
MR. ZURBRIGGEN: Object to the form of the question. Detective, to the extent you know.
THE WITNESS: I don't know that. I don't know if they got it through discovery, I have no idea.
BY MR. FEINBERG:
Q. Bear with me one second. I'm going to mention a case name to you and see if it stands out.
Do you have any familiarity with the name of Ronald Alonzo?
A. I'm sorry, it doesn't ring a bell.
Q. Do you recall any hearings regarding the Ronald Alonzo case before Judge Michael Stiles?
A. I remember Judge Stiles. I don't

Page 162

remember the case.
Q. Just to be clear, my question is: Do you know anything about a hearing concerning Mr. Alonzo in front of Judge Stiles regarding the availability of activity sheets?
A. No.
Q. I will tell you why I'm asking this question and then we'll come back to it when we look at some of the activity sheets in this case.
My understanding from Detective Rocks and Santiago is that at one point, up until the mid 1990s, activity sheets were kept in the homicide file, not placed in the binder and not provided to the D.A.'s office. Do you know whether that's true one way or the other?
A. I would imagine there are cases where the activity sheets weren't included in binders.
Q. Did you have any individual practice yourself?
A. I may have -- maybe not put some activity sheets in some binders and some I

Page 163

did. I just can't recall -- I just can't recall. There was a point in time where we didn't even do binders after a while.
Q. This case, which was --
A. No, this case there was binders. There's supposed to be binders.
Q. Just to be clear, why you know that with certainty, is given that the investigation took place in '87 and was lead to an arrest in December of '87, that's the time period where binders were being used; is that correct?
A. Yes.
Q. In every case?
A. Supposed to be, yes.
Q. So that's why you're drawing the assumption that there would be a binder in this case, correct?
A. Yes.
Q. Do you know who would have been responsibile, in this case, for providing activity sheets, this case meaning the Heo murder -- let me start that over.
Do you know who, within the Philadelphia Police Department homicide

Page 164

division would be responsible for providing activity sheets to the D.A.'s office?
A. Probably the assigned detective.
Q. Who in this case -- it was Nespoli at one point?
A. It was Al at one point.
Q. You're not sure whether it was Cimino or McNesby later?
A. I don't know that for sure.
Q. Did you disclose or can you tell me one way or the other, about whether you disclosed the activity sheets to the D.A.'s office in connection with this investigation?
A. I don't believe so.
Q. A couple more policy related questions, sir, and then we'll move on.
Can I assume that you have interviewed literally thousands of witnesses during your time in homicide?
A. Numerous, yes.
Q. In that time period, you knew you were not allowed to coerce a witness to make a statement, right?
A. Yes.

Page 165

Q. You couldn't beat them up, right?
A. Yes.
Q. You couldn't threaten them, right?
A. Yes.
Q. You couldn't tell them that they were going to be charged with a crime in order to get them to testify?
A. Yes.
Q. Could you feed a witness information?
MR. ZURBRIGGEN: Object to the form of the question. Detective, you can answer.
THE WITNESS: Could I or could anyone?
BY MR. FEINBERG:
Q. Would it be appropriate for you, in the course of an interview, to feed information to a witness to get them to provide information?
MR. ZURBRIGGEN: Same objection.
THE WITNESS: No.
BY MR. FEINBERG:
Q. Were there any special rules for dealing with witnesses who are particularly vulnerable

Page 166

because of mental illness or sickness or anything like that?
MR. ZURBRIGGEN: Object to the form. Detective, if you know.
THE WITNESS: I don't think -- I think it was a case by case basis. I don't think there was any special conditions that were met or set for that. I mean a lot of times if there were people like that, I think you could make accommodations where someone that was close to that person was maybe in interview with you to make them feel at ease, things of that nature. But I don't really believe there was any set conditions for that.
BY MR. FEINBERG:
Q. Did you ever conduct interviews when someone was hospitalized, in the hospital?
A. Yes.
Q. Were there any special rules for that process?
A. No, not really. No, a lot of times when you went to -- a lot of times, of course, the person that was in the hospital were victims,

Page 167

not in a homicide of course or witnesses maybe that incurred some type of injury or whatever the case may be, or sick. You may go there, take very brief interviews or cursory interviews, cursory notes or you may take a formal interview and a lot of times it was for identification purposes.
Q. Would you have to get doctor's approval to meet with a witness who was hospitalized?
A. It's all incumbent upon the patients -- the severity of their injuries or how they were. Not necessarily, no. Could I go into a hospital and go to a patients room?
Q. Yeah, that's my question.
A. Yeah, I could, sure. But if that person couldn't have visitors or whatever the case may be, if the hospital allowed you to do it, then that's fine.
Q. Can I assume, sir, over the course of your career you would receive anonymous tips about murder investigations?
A. Certainly.
Q. What were your obligations regarding the investigation of anonymous tips?

Page 168

MR. ZURBRIGGEN: Objection to form but Detective, if you can generalize.
THE WITNESS: If you took a tip like from a phone call?
BY MR. FEINBERG:
Q. Yes.
A. Well then you would take the tip, jot it down and give it to whoever the assigned of the case was. Or if it was just general information about something you knew nothing about, then you would try to find out what that person was talking about even existed.
Q. I realize from the way I asked my question that it was logical that you would answer that way. You were talking about what would happen if you, yourself, received a tip on the phone, right?
A. Right.
Q. Let's take that a step further. If you're the assigned in a case and you receive information about an anonymous tip, what types of investigation are you supposed to do with that information?
MR. ZURBRIGGEN: Same

Page 169

objection. Detective, you can answer, generally.

THE WITNESS: Again, you try to see -- try to find out where it came from, number one. And then if you can't find that out, you try to search out and see if there's any reliability to that tip whatsoever. Sometimes when you get tips on jobs, there are things that have already been taken care of and the tips are -- how would I put this, the tips are redundant sometimes, you know. So you may not -- it was already taken care of.

BY MR. FEINBERG:

Q. If you had information about anonymous tips and then later arrested a different person that was not identified in those anonymous tips, would you provide information about those anonymous tips to the District Attorney's office?

MR. ZURBRIGGEN: Objection to the form. Detective, you can answer generally.

THE WITNESS: Usually you would and you would tell them what you did to

Page 170

either corroborate it or show that it wasn't true at all, whatever the case may be.

BY MR. FEINBERG:

Q. I take it your process there is -- or your thinking there is that the defense attorney might use those anonymous tips to try to undermine the prosecution's case, right?

A. My thinking there would be, I want to find out the truth. It's not easy to put somebody away for murder. And it's not easy to put somebody away for the rest of their life. So of course, you're going to do what you have to do to try to, you know, if someone needs to be exonerated, you're going to try to exonerate them, bottom line.

Q. The phrase you used before, I think you called it either the pitfalls or the weaknesses in the prosecution case, right? You talked about, you want to talk to the prosecutor about the strengths and the weaknesses of the case.

A. Yeah, sure.

Q. I think that was your testimony a little while ago. It sounds like you're saying that

Page 171

information or anonymous tips could be viewed as a weakness in the prosecution's case, right?

A. Again, I'm sorry.

Q. Yeah, I'm not doing this right. Let me start over.

Let's consider this hypothetical situation.

A. You do a lot of hypotheticals.

Q. Let me ask you about this, sir. When you do training in the police academy, you answer multiple choice questions all of the time, right?

A. Yes.

Q. Those multiple choice questions have to do with hypothetical cases, right?

A. Sometimes, yes.

Q. So in your training, you're familiar with dealing with hypotheticals all of the time, right?

A. Okay.

Q. Let me present you with this hypothetical. If you arrest one suspect but you had anonymous tips about this different

Page 172

suspect, that's a potential weakness, right, because someone else is out there saying some other person did it, right?

MR. ZURBRIGGEN: Objection to the form. Detective, you can answer.

THE WITNESS: It can be.

BY MR. FEINBERG:

Q. And you would want to talk to the prosecutor about that, right?

MR. ZURBRIGGEN: Same objection.

THE WITNESS: Yes.

BY MR. FEINBERG:

Q. Provide the prosecutor with information about those tips, right?

A. Yes.

Q. When you are in a situation -- strike that.

My understanding from taking testimony from homicide detectives is that usually within the first couple of days of an investigation, that's when you're going to get information about the most potential eyewitnesses, right?

Page 173

MR. ZURBRIGGEN: Object to the form. Detective, you can answer, generally.
THE WITNESS: Yeah, a lot of the times, yes.
BY MR. FEINBERG:
Q. You're going to do neighborhood surveys, right?
A. Right.
Q. When you arrive at the scene, you'll receive information about who might have been there, right?
A. Right.
Q. In some cases you'll get long lists of people who may have seen the crime or been there for the immediate aftermath, right?
A. Right.
Q. Is it fair to assume that you'll want to talk to every single one of those potential witnesses?
MR. ZURBRIGGEN: Object to the form of the question. Detective, you can answer, generally.
THE WITNESS: If you can, if

Page 174

it's feasible.
BY MR. FEINBERG:
Q. Would there ever be a reason to just rule it out and not to talk to people who were on the scene?
MR. ZURBRIGGEN: Same objection. Detective --
THE WITNESS: I guess if you have an abundance of evidence against someone and you feel that this other person, you know, a lot of times you don't know until you actually talk to the person.
BY MR. FEINBERG:
Q. In a case, if you got 20 people -- to just use a crazy number, 20 people are telling you that this guy did the shooting, it might not be necessary for you to go out and talk to other witnesses to try to corroborate that testimony, right?
A. Not necessarily, it works both ways. There are people that commit crimes and witnesses come and tell you that these people committed those crimes. And then six months later, that same witness may be down at court

Page 175

and that witness will say, how come so and so is not in jail yet, we saw him do this? Apparently there wasn't enough evidence to the D.A.'s Office to bring those charges forward. So it works both ways.
Q. Let me switch that up and just ask it a different way. If you have a witness who maybe you have concerns about credibility, you told me before that you will try to corroborate that witness' testimony, right?
A. You would try, sure.
Q. One of the ways that you could do that is go speak to other witnesses who you think might have information, right?
A. Yes, if you can find them and if they make them accessible to you and if they speak to you. Many of these witnesses will not speak to you, quote, witnesses, so called witnesses.
Q. Got it. Can I assume, going back to relate this topic to our discussion previously with activity sheets, if you make an effort to talk to a witness and the witness refuses to talk to you, you'll document that in an

Page 176

activity sheet?
A. You should, I mean yeah, you would denote that.
Q. If another detective came in later, that detective might want to know whether they're going to waste their time going to see this witness, right?
A. You would denote that.
Q. Or alternatively, they might say, you know what, let's go give this witness another try and see if they're willing to talk to us now?
A. Yes.
Q. You would assume that if witnesses were -- if detectives made efforts to speak to witnesses, that it would be noted in the file?
MR. ZURBRIGGEN: Objection to the form. Detective, if you can generalize.
THE WITNESS: I mean you would hope so.
BY MR. FEINBERG:
Q. Final policy issue here, sir. I have seen a lot in the various files in this case concerning polygraphs and use of polygraphs

Page 177

with witnesses. Let's talk specifically about the time period, '87 '88. How often were polygraphs used with witnesses?
A. Not that often. In conjunction with the amount of cases that you had, that we incurred, not that often, every once in awhile. At that time the polygraph room was downstairs in the basement of the round house. And the polygraphists were pretty much -- they did a lot of other things. They did background checks on police recruits and stuff of that nature. They were utilized and you could call -- if there was one available there, later on down the road it became where they weren't available to you 24/7, you had to call people in from home. A lot of the times the witnesses would say, I'm not waiting or whatever the case may be and just leave.
Q. Did you have any familiarity -- first of all, have you ever -- you're not a trained polygrapher I take it, right?
A. No, not at all.
Q. Do you have any understanding as to what method the polygraphers used?

Page 178

A. I don't know the specific method, no. No, I don't.
Q. There's a method that was frequently used in that time period called the Arther Method. A-R-T-H-E-R, have you ever heard of that before?
A. No, I'm not familiar with it.
Q. Would the decision to polygraph a witness be a decision in the detective's discretion?
MR. ZURBRIGGEN: Object to the form. Detective, you can answer, generally.
THE WITNESS: Yes and sometimes talked it over with a supervisor.
BY MR. FEINBERG:
Q. So in other words, if you're the detective, you're conducting a statement, you might say, you know what, let's polygraph this witness.
A. Exactly, yes.
Q. What factors would you consider to lead you to conduct a polygraph?
A. To try to confirm -- a lot of it depends

Page 179

on your belief in the polygraph exam. You know, like is it a true factor that, you know, is it because someone passes or doesn't pass; does that give you a true measure of what that person is saying is truthful or not. Sometimes -- you know, a lot of guys do not think it is. There are cases where sometimes you may and sometimes you don't. A lot of it has to do with the particular polygraphist that is conducting the examination. Some polygraphists have a record of finding people either NDI or DI. So a lot of it's attributed to that also. It's not black and white, like these interviews are.
Q. DI, deception indicated, NDI --
A. No deception indicated or inconclusive, which was a lot of times.
Q. What was your belief about the use of polygraphs?
MR. ZURBRIGGEN: Object to the form.
BY MR. FEINBERG:
Q. Let's talk specifically about, if you can get in that head space, '87 '88.

Page 180

MR. ZURBRIGGEN: Same objection.
THE WITNESS: If there was something there that I maybe thought was not credible, based on other information that I had, then I may want to use it. I'd talk it over with a couple other detectives, talk it over with my boss. I'd say, what do you think, you know. And nine times out of ten, they would agree. And then you made the arrangements to get somebody polygraphed.
BY MR. FEINBERG:
Q. To make sure I understand, if you had doubts about the credibility of what the witness was telling you, that's when you might decide to use the polygraph; is that correct?
A. Yeah, unless I had information otherwise that corroborated or not corroborated what that witness was saying.
Q. It sounds like it was something that you would use sparingly; is that accurate?
A. Yeah, I didn't use it a lot. I mean I did use it, but I didn't use it a lot. In conjunction with the number of cases we had,

Page 181

yeah, the ratio was not a lot of times.
Q. Just in terms of efficiency, it seems like it's kind of an inconvenience for the witness, right?
MR. ZURBRIGGEN: Object to the form. Detective, if you know and you can generalize.
THE WITNESS: Yes and no, but there's also been times where the polygraphs have been conducted. And during the course of the polygraph, the person -- if it's a person that's under suspicion or if it's a person that's a possible doer, than there has been numerous times where the person who has been polygraphed has actually said to the polygraphist, all right, this is true. Or when they come back upstairs, you know, they're faced with the fact, well, maybe you didn't tell the truth and they'll say, okay.
BY MR. FEINBERG:
Q. In other words, the mere use of the polygraph can itself be an investigative tool?
A. Exactly.
Q. Once -- getting back to your decision to

Page 182

use the polygraph, I think we've established that if you had reasons to doubt, you were looking for corroboration, that's when you would ask the witness to take the polygraph, right?
A. If I had reasons to doubt or I had other evidence to show maybe this guy wasn't telling the truth, guy or girl, whatever the case may be, then I may think about using it, yes.
Q. When you did that -- strike that.
The witness would have to agree to participate in the polygraph, right?
A. Yes.
Q. You can't force somebody to take a polygraph?
A. No.
Q. If you got evidence that someone -- strike that. If you got a finding -- let me back up even further.
I take it you send the person downstairs, it was in the basement?
A. It was downstairs. You would call, try to make arrangements for a time when they would come down. You would take that person

Page 183

downstairs, talk to the polygraphist and say, this is what we're doing, this is what we're conducting, this is the interview that he gave and would you polygraph him on this matter. And then we leave.
We don't stay there and then we leave, for the most part. For the most part. I guess maybe once or twice somebody can stay there, you don't have to stay with the polygraphist. And then you can go upstairs and then when the polygraphist is done, they'll call you. Then when you go back down, they'll tell you what the results are.
Now, there are cases when you're down there, you're down there the entire time. But usually you're in a room adjacent to the polygraphist's room. You're not in that polygraph room while the polygraph is being conducted.
Q. I think and I might be misremembering but I believe Detective Rocks told me and the transcript will prove me wrong if so, that there's a one-way mirror which would allow you to watch the polygraph examination. Do you

Page 184

remember that?
A. I don't even remember that. It well may be, I just don't remember.
Q. Bottom line is, you don't recall watching any polygraph exam take place; is that correct?
A. No, no, I don't.
Q. So your recollection is that if you sent a witness to be polygraphed, then --
A. A lot of times I would go back upstairs.
Q. And then you'd wait for the --
A. -- the polygrapher would call me and say, Dom, we're done. Then I would go downstairs. And I'd bring the person back up again to see or he would tell me what their results are.
Q. The polygrapher would tell you --
A. Maybe if they hit, what they called hit or miss on certain questions out of the interview.
Q. Would you then use the polygraph -- strike that. If you had a case of deception indicated, would you then use that to conduct an additional interview or challenge the

Page 185

witness?
A. Sure, you could.
Q. Say to the witness, hey, the polygraph examiner tells me you're not telling the truth, let's talk more about it.
A. Yeah, sure.
Q. Have you ever heard that called a challenge interview or a confrontation interview?
A. I don't know what it's called but it's done.
Q. Putting the label aside, this is consistent with what we talked about before, that the polygraph is another investigative tool?
A. Right.
Q. It allows you to then confront the witness with potential untruthful statements; is that correct?
A. Right.
Q. When you had results of a polygraph, was that something you would share with the prosecutor if the case later got prosecuted?
MR. ZURBRIGGEN: Object to

Page 186

the form. Detective, you can answer.
THE WITNESS: Nine times out of ten, most of the times it's indicated on the interview. So when you give the D.A.'s the interviews, the interview in and of itself, it denotes that the polygraph was taken.
So a lot of times it's placed on the activity sheet, that the person was taken for a polygraph and the results are on there. Sometimes it's not placed on the activity sheet, incumbent upon who does the activity sheet because it's denoted right on the interview, in and of itself.
BY MR. FEINBERG:
Q. Would there be any reason not to note it in the text of the interview?
MR. ZURBRIGGEN: Object to the form. Detective, if you know.
THE WITNESS: No.
BY MR. FEINBERG:
Q. In most cases, if you're going to polygraph someone -- strike that.
It sounds like what you're

Page 187

describing is that you're interviewing a witness and then you make a decision that a polygraph might be called for, you would then ask the witness, are you willing to take a polygraph, right?
A. Yeah, pretty much after you conducted the interview.
Q. And that would be reflected in the interview; is that right?
A. That you asked them to take a polygraph test?
Q. Yes.
A. Yes, yeah, a lot of times. A lot of times maybe that certain detective didn't put it on there. But the fact that they were taken down there and all is usually denoted either on the interview or in an activity sheet, either or, or both.
Q. We'll ask about witness statements in a little bit. Let me tell you, Detective Rocks told me that when he was in an interview room with a subject or a witness, every word that was said in that interview room would be recorded in the interview that he recorded?

Page 188

A. Yeah, pretty much.
Q. That was your practice as well?
A. Yes. They were verbatim interviews.
Q. If the topic of a polygraph is raised during the course of an interview, you would expect it to be included in the interview report; is that correct?
A. I would put conversation was had between the person -- either the suspect or the witness about conducting an interview. Then it would be -- it could be denoted, it depends on the detective. It could be denoted on the interview itself, you know, so and so agreed to take a polygraph test. Or they didn't put it down there at all and then at the end of the interview or after the interview was conducted, it was denoted to the fact that as part of the interview that the person reads and signs, that he did take a polygraph test. And it would be denoted that way.
Q. That's how -- the fact that it was within the body of the interview is how the fact of the polygraph would be communicated to the District Attorney's office; is that

correct?

MR. ZURBRIGGEN: Object to the form.

THE WITNESS: Yes, I mean, yes. Either there or through an activity sheet or both, depending upon the detective.

BY MR. FEINBERG:

Q. Including in the activity sheet, of course, presumes that the activity sheet was in fact provided to the D.A.'s office; is that correct?

MR. ZURBRIGGEN: Object to the form of the question.

THE WITNESS: I guess so, yes.

BY MR. FEINBERG:

Q. You told me before that some detectives might not include activity sheets in the binder; is that right?

MR. ZURBRIGGEN: Object to the form.

THE WITNESS: Yes.

MR. FEINBERG: I'm about to change topics. Are you doing okay?



COURT REPORTER: Yes, I'm okay.

MR. FEINBERG: Does anybody need a break before I change topics?

THE WITNESS: Do not take a break because of me. If you got to take a break, just take a break.

MR. FEINBERG: While we're on, I know Detective Mangoni, you have insisted that you don't want to eat lunch. But I know other people might disagree.

THE WITNESS: That's fine. I'm at your disposal. I'm just trying to see if we can get this done in one day.

MR. FEINBERG: We're going to go another 20, 30 minutes or so and then take a break for lunch.

BY MR. FEINBERG:

Q. I want to talk more specifically about your involvement in the Heo murder investigation. We discussed that -- and right now I'm just trying to save time instead of showing you documents from '84 and '85 because I want to get to '87.



The murder takes place December 5th '84, right?

A. Right.

Q. There's some investigative activity into early January of '85 and then it seems like not much happens; does that sound right to you?

A. As far as I can glean from, just reading -- I wasn't in homicide then.

Q. Got it. That confirms, you certainly have no knowledge of anything before '87 --

A. Not concerning this murder, no.

Q. Your name appears for the first time in April of '87 with an interview with Rodney Everett. Does that sound right to you?

A. Yes.

Q. How did you get involved? In other words, how was it that you came to be the detective that interviewed Rodney Everett?

A. I took the interview along with Detective Hughes, am I correct? I would imagine that we were working and I would imagine one of the bosses, somebody was contacted by Mr. Massey in the police



department, our unit, and said he had someone that had information concerning the murder. And I would imagine that Eddie and I happened to be there and one of the bosses said, Dom, Eddie, take care of this guy when he comes in.

Then we interviewed Mr. Everett and then we followed it up with an interview with Mr. Massey who was present during the interview with Mr. Everett.

Q. This was, as I think we've already discussed, you were getting involved in an investigation that had already been in existence for two and a half years, give or take, right?

A. Right.

Q. So I take it before you did that interview, you'd want to familiarize yourself with the basic facts of the case, right?

A. I looked it over as best as I could and as quickly as I could. I would tend to think that Eddie probably had a little more knowledge of the job because Eddie was in 4 squad. I believe he was in 4 squad at the time of the murder. I'm not sure of that

Page 193

though. I'm not sure when Eddie went to SIU.
Q. You have raised a point, let me ask you about it now. Sir, turn to Exhibit P-13. I am not going to ask you to read the whole thing. I just want to show you Hughes' name. Do you see at the top right, this is an interview --
A. Okay, yes.
Q. -- with Maurice Durbin who was a witness at the scene. The name Hughes is up at the top right as the interviewer. First of all, does that look like Ed Hughes' handwriting?
A. Yes.
Q. Were there any other Hughes in homicide division at that time?
A. I don't believe so, no.
Q. We see this took place within -- actually the same day of the murder, the date of this interview is 12/5/84, right?
A. Yes, the day of the murder.
Q. So our purpose in establishing this is that Hughes, whether he had recollection or not, had had some previous involvement in this investigation; is that correct?
A. Yes.

Page 194

Q. Bottom line though, in order for you to get involved in the investigation, you got to familiarize yourself with the basic facts of the case, right?
MR. ZURBRIGGEN: Object to the form. Detective, you can answer.
THE WITNESS: Yeah, as best as I could quickly. And then again, if Eddie knew about the case, of course he knew more about it than I did because I knew absolutely nothing about it, then most of the questions I'm sure were asked by Eddie. If I looked at the typewritten statement, I believe I probably typed it. I probably familiarized myself with it a little bit. To what extent, I don't know. I don't even remember how much there was, other than the initial interviews from that night.
BY MR. FEINBERG:
Q. Those initial interviews would tell you the name of the decedent, the victim, right?
A. Right.
Q. They would tell you who the potential eyewitnesses were, right?

Page 195

MR. ZURBRIGGEN: Object to the form.
THE WITNESS: Some, I guess, yes. The eyewitnesses that were brought to the homicide division were interviewed that night.
BY MR. FEINBERG:
Q. So you would have read those to know their description of the perpetrator?
A. Yes.
Q. Assuming that information was available?
A. Yes.
Q. Let's take a tangent for just a moment, sir, to ask you about some of the information that was available at the time that you got involved. How much do you know about guns and firearms?
MR. ZURBRIGGEN: Object to form.
THE WITNESS: Not much. I mean -- not much.
BY MR. FEINBERG:
Q. Would you deal with firearms evidence in the context of homicide investigations?

Page 196

A. We deal with them as far as like -- not ourselves, we don't collect the evidence ourselves. It's collected by the crime scene unit, nine times out of ten, and it's sent to ballistics. There were no DNA things or types of that things with firearms or ballistics back then, that I was aware of. Cartridges, they were pretty much taken up by the crime scene unit and sent to ballistics and placed on a property receipt and sent to ballistics.
Q. Did you have a police department issued firearm?
A. I did.
Q. Do you remember what type of firearm you had?
A. I had a 38, which most patrolmen had. All patrolmen had when you were a patrolmen. And then I carried a smaller 38 when I made detective.
Q. In the 80s then, you had been carrying a 38 for, at that point, more than ten years, right?
A. Oh, yeah.
Q. Do you know how long the barrel was on

Page 197

the 38?
A. Yeah, the service revolvers were four inches. My detective's revolver was two inches.
Q. Do you know the difference between a 38 and 357, if you saw them?
A. A 357 is a little bit larger.
Q. Longer barrel?
A. Some of them have two inch barrels, some have two and a half inch barrels, the smaller ones. Some have four inches, some have six inches.
Q. Did you ever see a 38 with a long barrel?
A. A four inch barrel. You know what, I did see a 38 with a six inch barrel years ago. It was by a patrolmen who worked center city. Back in the 50s they bought their own guns. So that guy was still carrying his own gun.
Q. If you saw a gun with a longer barrel, would you agree that it's more likely to be a 357 than a 38?
MR. ZURBRIGGEN: Objection to the form. Detective, if you know.

Page 198

THE WITNESS: No, not necessarily.
BY MR. FEINBERG:
Q. Do you know one way or the other? It sounds like -- you told me before you don't know a ton about this.
A. No, I don't know a ton about that. But the question you asked me, no, not necessarily. You can have a short barrel or a long barrel with a 357. I have a 357, which is two and a half inches long.
Q. You mentioned that some 357s will have a six inch barrel?
A. No, I'm not sure about that but there are four inch barrel ones.
Q. Do you remember any discussion when you got involved in this investigation about a description of the firearm used to shoot Mr. Heo?
A. I don't remember specifically.
Q. Do you remember any discussion about the number of shots that were fired?
A. I probably did but I can't recall that specifically.

Page 199

Q. Let me show you one document and let's see if this refreshes your recollection.
A. What is it?
Q. I am just asking Angeline to hand me a document which they have neatly organized here.

\- - -

(Whereupon Exhibit P-41 was marked for identification.)

\- - -

BY MR. FEINBERG:
Q. Handing you a document which was produced by your counsel, we marked it as Exhibit P-41. It's from -- it appears to be from the Philadelphia Police Department homicide file in this case.
A. Okay.
Q. There is a heading at the top which says: Firearms Identification Unit, right?
A. Yes.
Q. Do you see the reference to -- let me explain the background of this before I ask you this question.
I will represent to you that

Page 200

a couple of days after the shooting, the documents show us that a detective from your unit went to the site of Mr. Heo's murder, looked at the scene and pulled a bullet fragment out of a piece of plywood behind the location where Mr. Heo was shot. Do you understand that?
A. Yes.
Q. When matched up with the fact that the medical examiner found a single entry wound near Mr. Heo's eye and an exit wound in his neck, the conclusion was drawn by the detectives that there was one shot fired and that the fragment that was found was from the projectile that was fired. Understand?
A. Yes, through and through, yes.
Q. You see reference here to the FIU findings an exhibit that the caliber was 38/357?
A. Yes.
Q. Do you interpret that as the firearms investigator could not determine the specific caliber?
MR. ZURBRIGGEN: Object to

Page 201

the form. Detective, to the extent you know.
THE WITNESS: I'm sorry, I can't answer for him but you can fire a 38 from a 357.
BY MR. FEINBERG:
Q. The reverse though is not true; is that right? You cannot fire a 357 from a 38?
A. I don't think so but I'm not sure.
Q. So it sounds like what this examiner -- I understand you're not the expert and I understand this is not your report, but in terms of your interpretation, it sounds like the investigator is saying he, Mr. Carlin, can't tell whether this bullet is a 38 or a 357?
A. I agree with you there.
Q. It's one or the other, right?
A. Right.
MR. ZURBRIGGEN: Same objection for the record.
BY MR. FEINBERG:
Q. Which means that the bullet could have been fired from a 38, could have been fired from a 357; is that correct?

Page 202

A. Yes.
Q. We talked a little bit about Rodney Everett at the beginning of the deposition. My understanding is that between April of '87 and January of '88 you conducted four separate interviews with him. Does that sound right to you?
A. Again, I don't remember. You'd have to show them to me. If you show them to me, I'll bring it.
Q. We'll do that as we go --
A. I know I interviewed him and I think I interviewed him at least twice. I don't know about four times. I don't know.
Q. I want to show you the portion of your trial testimony where you discuss your conversations with Mr. Everett. I am going to hand you this binder which has transcripts from the trials and the preliminary hearings in this matter.
For counsel's benefit, I am showing Mr. Mangoni the trial testimony from January 25th of '91 and the Bate's stamp is Crosland 8438.

Page 203

By the way, Detective, I take it you recall testifying at the trial of Mr. Crosland?
A. Yes, I do, in regards to taking the interview from Mr. Everett.
Q. Rather than me handing you this binder, I am just going to hand you this sheet of paper. If you need more, you're welcomed to it.
Do you see that you're asked the question, now after this statement in relationship to this matter was taken -- do you see where I am?
A. Yes.
Q. Have you continued to have contact with Mr. Rodney Everett? You then say: I have had contact off and on with him and his wife over the last three years. Did I read that correctly?
A. Yes.
Q. Do you remember his wife's name?
A. No, I don't.
Q. Does the name Louise Woods sound familiar to you?

Page 204

A. I remember seeing that but I don't know if that's her name or not. If you're telling me that's her name, then that's her name.
Q. The next question is, did you have occasion to speak with Mr. Everett approximately a week ago in regards to this case? And your answer was: Yes, I did. Is that right?
A. Yes.
Q. So that indicates that you spoke to Mr. Everett some point earlier in January of '91; is that right?
A. Yes.
Q. We have agreed that your interviews with Mr. Everett took place throughout '87 and then in early 1988; is that correct?
A. Yes, I guess, yes.
Q. Do you remember what you were talking about with him in '91, before this trial?
A. Probably reminding him that court was coming up soon. Apparently I say in one of my responses, I spoke with Mr. Everett one day last week. And then there was an objection by the defense attorney and I couldn't say

anything any longer.
Q. Sitting here today, do you remember what you would have said had there been no objection?
A. No, but I'm surmising that I was telling him about court.
Q. Do you remember talking with Mr. Everett about the substance of his testimony?
A. I could have. I don't remember. I don't know, I can't answer. I just don't recall the specific conversation I had with him.
Q. Fair to say that based on this testimony, you and Mr. Everett had -- were in touch from '87 all of the way through 1991; is that right?
MR. ZURBRIGGEN: Objection.
THE WITNESS: I guess off and on. How many times, I don't know.
BY MR. FEINBERG:
Q. Do you recall the first time you met Mr. Everett?
A. Inside the office on the 15th of April.
Q. It would have been in connection with



his interview, right?
A. With Mr. Massey, yes.
Q. When Mr. Everett first came to your attention, were you aware of -- strike that.
When Mr. Everett came to your attention, he was in custody, wasn't he?
A. Yes.
Q. Do you recall being aware of what caused him to be in custody?
A. Back then I probably did. I don't know if he was in for a gun case or a robbery case, I'm not sure.
Q. I will show you the document. It's actually Exhibit-19.
A. You're talking about the 49?
Q. Yeah, this is the 7549 or the investigation report concerning Mr. Everett's arrest. It's quite a long document. I think if you read just item two: Interviews and interrogations, that will tell you enough to answer my questions. Why don't you read that to yourself and let me know when you're finished.
A. Okay.



Q. Now that you read these facts, sir, does that refresh your recollection about why Mr. Everett was in custody?
MR. ZURBRIGGEN: Object to form. Detective, to the extent you know from this document.
THE WITNESS: No, not really. I mean I understand but I don't -- I don't.
BY MR. FEINBERG:
Q. So just to review a few of the facts, you could tell from this that Mr. Everett had committed a homicide before; is that right?
MR. ZURBRIGGEN: Object to the form. Detective, to the extent that you know from this document.
THE WITNESS: I didn't know that.
BY MR. FEINBERG:
Q. I will represent to you that records show Mr. Everett did time in custody for a shooting of a young girl that occurred in 1973. Would you assume that if you were interviewing him, you would have been aware of his criminal history?



MR. ZURBRIGGEN: Object to the form. Detective, if you know.
THE WITNESS: I would imagine if we had his record at the time.
BY MR. FEINBERG:
Q. Typically before you interview a witness, you pull their criminal extract, right?
A. Yes.
Q. And their extract is going to have a record of their prior arrests and convictions, right?
A. Yes.
Q. In any event, I understand you don't have a recollection but there's evidence that Mr. Everett had committed a homicide, agreed?
A. According to this, yes.
Q. And that Ms. Woods, the complainant in this case, had been beaten in the past by Mr. Everett; is that correct?
A. Yes.
Q. This report also indicates that prior to his arrest, the incident given rise to his arrest, Mr. Everett put a bullet in a shotgun

Page 209

and went looking for Michael, who was a relative of Ms. Woods; is that correct?
A. According to this again, yes.
Q. And later on Mr. Everett called Ms. Woods' sister and said he was going to blow up the house, right?
A. Yes.
Q. There's also evidence that Mr. Everett had choked Ms. Woods; is that right?
A. Yes, according to her statement, yes.
Q. I neglected to show you one other fact. Flip over to the second page. It's double sided. There's a statement or summary of an interview with Officer Gregory Kapusta. K-A-P-U-S-T-A.
A. I see it here.
Q. Second to last sentence in that summary: While the male was running, do you see that?
A. Yes.
Q. While the male was running over the 3105 block, the officer saw him throwing a shiny object, which is omitted, onto a roof in that block. He caught the male as he was climbing over a fence and as other officers had

Page 210

arrived, he told one of them that the male may have thrown a gun onto the roof top. Do you see that, sir?
A. Yes.
Q. If you look down at the last three lines of the page, do you see that an officer found a 25 caliber Raven semiautomatic pistol?
A. I see that, yes.
Q. Suffice it to say, Mr. Everett has, number one, given rise to his arrest, beaten up his girlfriend, right?
MR. ZURBRIGGEN: Object to the form of the question. Detective, again, to the extent you can relay that, from this document.
THE WITNESS: Exactly.
BY MR. FEINBERG:
Q. According to this report, Mr. Everett has, number one, beaten up his girlfriend; number two, gone chasing after one of her family members with a gun; number three, threatened to blow up a house and number four, throwing that gun on the roof while fleeing from police, agreed?

Page 211

A. Yes.
Q. I take it you learned that Mr. Everett was on parole at the time; is that right?
A. I don't remember -- specifically recall but I may have. I'm sure I did.
Q. Consistent with normal practice, you would know the person's custody status, right?
A. Yes.
Q. In light of these charges which are outlined in Exhibit-19 and the fact that he was on parole, suffice it to say that Mr. Everett is facing potential jail time?
A. Yes.
Q. Potentially significant jail time?
A. Yes.
Q. When a witness comes to your attention, by the way, one other factor: This is a witness who is facing significant jail time who has already served time on a homicide, right?
MR. ZURBRIGGEN: Object to the form.
THE WITNESS: Yes.
BY MR. FEINBERG:

Page 212

Q. You would expect you would have learned that based on the criminal extract, right?
A. I may have known that then, yes.
Q. When a witness comes to you in that situation and wants to provide you with information, would you agree that it's important to be skeptical about the information they're providing?
MR. ZURBRIGGEN: Objection to the form. Detective, if you can answer that generally.
THE WITNESS: Not just simply based on that because many of our witnesses had long prior criminal history records.
BY MR. FEINBERG:
Q. But you knew that there was a risk that he would want to try to get on your good side, right?
MR. ZURBRIGGEN: Same objection.
THE WITNESS: We knew what he was there for.
BY MR. FEINBERG:
Q. He wanted to provide information to help

Page 213

you with the investigation, right?
A. Yeah, and I'm sure he wanted to help himself.
Q. That's right, by helping you he wants to help himself; is that correct?
A. Sure, yes.
Q. When a witness is in that situation, he might have information in his head that he thinks you want to hear, right?
MR. ZURBRIGGEN: Objection to the form. Detective, again, to the extent you know, you can generalize.
THE WITNESS: If he knows it. I mean if he knows the information.
BY MR. FEINBERG:
Q. Bottom line in those situations, you're going to be on the lookout for someone who is telling you something that they think you want to hear?
MR. ZURBRIGGEN: Same objection.
THE WITNESS: Again, that's up to the detective. That's why you asked me -- prior to this you asked me about would I

Page 214

get someone information about a murder while talking to them and my response to that, of course, is no. Because then that's exactly what that's going to lead to, him telling me what I want to hear. So I don't do that. I've never done that. I just don't do that.
BY MR. FEINBERG:
Q. Whenever you're speaking to a witness in this situation, who has everything to lose and everything to gain, you're going to be on the lookout for information which may suggest he is telling you false information, correct?
MR. ZURBRIGGEN: Same objection.
THE WITNESS: Yes, you always look at it, sure.
MR. FEINBERG: We're about to change topics. So why don't we take a break. VIDEOTAPE OPERATOR: We're going off the record, the time is 12:56 p.m.
(Lunch break taken at this time.)
VIDEOTAPE OPERATOR: We are going back on the record. The time is 1:26 p.m.

Page 215

BY MR. FEINBERG:
Q. Mr. Mangoni, we are back on the record after a short lunch recess. Did you realize during that break that any of your previous testimony was incorrect or incomplete?
A. No, sir.
Q. I want to go back now into the meat of your involvement in this case with your interview on April 15th of '87, both of Mr. Massey and of Mr. Everett. Mr. Massey's interview is at Exhibit-20. I will ask you to take a look at that real quick.
First of all, can you confirm is that your interview with Mr. Massey?
A. Yes.
Q. And then your interview with Mr. Everett is at Exhibit-21. Can you confirm that?
A. Yes.
Q. In terms of timing, you have Mr. Everett's statement, it looks like that started at 3:35 p.m.; is that right?
A. Correct.
Q. Mr. Massey's statement was started right after at 5 p.m.?

Page 216

A. 5 p.m., yes.
Q. I am going to take those in reverse order and ask you about Mr. Massey first.
A. Okay.
Q. The reason I am doing that is because it sounds like your first contact or the first contact about Mr. Everett actually came from Mr. Massey; is that right?
A. Correct.
Q. What's your understanding -- let me ask it this way, to your knowledge who did Mr. Massey reach out to?
A. I don't know. Initially, I don't know.
Q. Did you have any previous encounters with Mr. Massey?
A. No, never.
Q. Never had met him before, right. Had you ever had anything like that happen before, where a probation officer reached out to you and contacted you about a probationer?
A. Yeah, but I don't remember specific cases but...
Q. Do you recall having any specific concerns about the reliability of the

Page 217

information that was coming from Mr. Everett, based on what Mr. Massey reported?
MR. ZURBRIGGEN: Object to form. Detective, you can answer.
THE WITNESS: No, because as I said, that particular day it was kind of like -- it wasn't something that I was assigned or something -- it's not my case or something I knew about a lot. This call came in and apparently it got to one of the supervisors who got Eddie and I to do this interview. The answer is, no, as far as I can recall.
Q. So to confirm that I got the timeline right, Massey reaches out to someone in homicide, you don't know who, right?
A. Right.
Q. Someone in homicide either passes that information along to a supervisor or that supervisor then contacts you and says, go interview Everett and Massey?
A. Mr. Everett is coming in, along with this guy, and interview them, see what they know.

Page 218

Q. You and Hughes were partnered together were the ones who were asked to do it; is that correct?
A. Correct.
Q. Mr. Everett's interview takes place first, right?
A. Yes.
Q. Massey sits in on that interview; is that right?
A. Yes.
Q. Why?
MR. ZURBRIGGEN: Object to form. Detective, to the extent you can recall.
THE WITNESS: I guess we allowed him to do it because specifically he had spoken to him. I guess we wanted to make sure what he had told him is what he's telling us, of if there is any discrepancies between what Mr. Massey said and what he said, or if Mr. Massey maybe was filtering it through Mr. Massey and it became wrong or something. So we just felt it was a lot easier to do that. I probably -- he probably also wanted Mr.

Page 219

Massey present when the interview took place.
BY MR. FEINBERG:
Q. At that point Mr. Massey was a retired probation officer, does that sound right?
A. I don't remember that. I don't know.
Q. I just happen to have his statement right in front of me here. It said I was a probation officer --
A. Okay.
Q. I retired March 10 of '87.
A. Okay, yes, then the answer is, yes. So he retired a month before.
Q. At that point he's essentially a civilian witness; is that right?
A. Yes.
Q. Were there any rules or practices regarding the presence of a civilian witness during another witness' interview?
MR. ZURBRIGGEN: Object to form. Detective, you can answer.
THE WITNESS: No, not necessarily, no.
BY MR. FEINBERG:
Q. Did you have any concerns about having

Page 220

another witness present during a witness' interview?
MR. ZURBRIGGEN: Same objection.
THE WITNESS: No it was probably something that we wanted to happen, because otherwise we would have told Mr. Massey we will interview you afterwards or whatever the case may be.
BY MR. FEINBERG:
Q. Would you agree that Mr. Massey was himself a witness?
MR. ZURBRIGGEN: Object to the form. Detective --
THE WITNESS: Yeah, an I told you so witness, sure.
BY MR. FEINBERG:
Q. Because he is a witness to the evidence --
A. To Mr. Everett telling him what he told him.
Q. Right, so he's either a corroborating witness or perhaps even a witness who could underline Mr. Everett, if Everett tells

something inconsistent; is that correct?
A. Yes.
Q. In light of the fact that Everett and Massey are both witnesses, did you have any concerns about them aligning their stories?
MR. ZURBRIGGEN: Object to the form. Detective, you can answer.
THE WITNESS: We didn't see any reason why Mr. Massey would do that. So the answer would be no.
BY MR. FEINBERG:
Q. When you have two witnesses regarding the same set of facts, do you typically separate them?
MR. ZURBRIGGEN: Object to the form. You can answer generally, Detective.
THE WITNESS: Typically, yes.
BY MR. FEINBERG:
Q. The reason being that you don't want one account to influence the other, right?
A. Yes.
Q. You also would eliminate a check for yourself by having those witnesses interviewed



together?
A. Yes.
Q. If one witness tells you one thing, the second witness can correct something that that other witness said, right?
A. Yes.
Q. But if that second witness decides to align their testimony with the first witness, you've lost the ability to do that; is that right?
A. Yes.
Q. Mr. Massey has in the circumstances of this case, he heard what Mr. Everett said to you, right?
A. Yes.
Q. If Mr. Massey wanted to align himself with Mr. Everett, he could do that based on what he heard; is that right?
MR. ZURBRIGGEN: Object to the form. Detective, again --
THE WITNESS: Mr. Massey initiated this. So I don't see a problem there.
BY MR. FEINBERG:



Q. You had no concerns about that at all?
A. These weren't two witnesses that didn't know they were there together. These were not two witnesses that they would expect different answers from. There were not two witnesses that we had to find and locate and were hard to find. These were two people that came in on their own. Understanding what the motivation may be for Mr. Everett, we could not find anything that was diluted about Mr. Massey's expectations.
Q. Do you have Mr. Massey's interview in front of you?
A. This is Everett's. You want Massey's, right?
Q. Yes, I do. Go to page three of Mr. Massey's statement.
A. I'm trying not to rip your folder here.
Q. On page three, the second line of text, you see here, Mr. Massey is saying -- by the way, before I ask you that, I assume you've looked at all of these documents recently, as of last Friday?
A. Just on Friday, yeah.



Q. I think we're going to do this in a way that I won't need to have you read more. But if you ever get to a point that you need to read more to answer one of my questions, just tell me and I'll give you that time.
Right here at the top of page 3, Mr. Massey says: Then he went on to tell me basically the same information in the report he just gave you, right?
A. Right.
Q. Massey is telling you, after having sat in on Everett's interview, yeah, he told me the same thing, right?
A. Right.
Q. How reliable was that, what Massey told you?
MR. ZURBRIGGEN: Object to form. Detective, if you can opine on that.
THE WITNESS: He was confirming what Mr. Crosland said. We were under the impression that he had told Mr. Massey basically everything he had told us already.
BY MR. FEINBERG:

Page 225

Q. You had -- what you're saying is no concerns about the accuracy of Massey's statement there evaluating Everett; is that correct?
A. I had no concerns and Eddie had no concerns, I'm sure, about Mr. Massey and what his motivation was for this, other than to bring this guy in.
Q. Let's talk more specifically about your interview with Mr. Massey. Can you tell who was doing -- strike that.
Did you and Mr. Hughes, given that you were partners for a long time, have a set routine about how you would conduct interviews together?
A. No, I would imagine -- I think this is my typing. I think I typed this. To the best of my recollection, I think I did this because I can pretty much -- Eddie used handwritten notes, handwriting a lot. I typed my stuff for the most part whenever I could because my handwriting is terrible.
So I would tend to think that Mr. Massey's interview was pretty generic

Page 226

because he had already pretty much explained to whoever he called, that this guy had some information and he may have told him some of it already. I think Eddie would have probably lead the questions on Mr. Everett because Eddie knew more about the case than I did.
Q. By the way if you just flip over to see Everett's statement, that is also typed?
A. That's also typed. I probably typed this, also.
Q. Got it. Can you tell -- if one of you, in this case, as you've said, if you were typing, would one of you have been asking the questions or would you have alternated or mixed it up --
A. Mixed it up, a combination of both.
Q. So if you're typing, it doesn't mean that you're just sitting there as a silent typist?
A. No, not at all.
Q. You're an active participant in the interview?
A. Yes.
Q. Before you go into the interview, I

Page 227

assume that you and Detective Hughes would talk about your interview strategy?
A. Not really strategy. There wasn't much strategy here. This gentleman came in here giving information about a murder that happened two years earlier. There wasn't much of a strategy. It wasn't like he was a witness that was combative or a witness that didn't want to articulate what he had to say. He just pretty much came in there and said it.
Q. I want to ask you some detailed questions about what Mr. Massey tells you. First question, we should be able to do this in order of the statement, starting at page one. Do you see the third question and answer down, there is a handwritten yes. Do you have any idea why that's there?
A. No, I probably forgot to type in yes so then he wrote it in.
Q. If you look at the last question on the bottom of page one, the question that is asked is when and where did this discussion take place. You're asking about -- you and Hughes collectively are asking about a discussion

Page 228

between Mr. Massey and Mr. Everett; is that correct?
A. Correct.
Q. And then Mr. Massey says, it took place April 3rd of '87 at -- help me with the pronunciation --
A. Giuffre.
Q. Giuffre.
A. It used to be St. Luke's Hospital, then it became Giuffre Medical Center.
Q. G-U-I-F-F-R-E. If you go to the top of the next page, Massey notes that the interview took place from 10:08 to 11:40 a.m. on April 3rd of '87. Do you see that?
A. Yes.
Q. So he has a specific timeline, correct?
A. Yes.
Q. Did he have notes from that interview?
A. Not that I recall.
Q. Do you have any idea how he was able to tell you that I spoke to him from 10:08 until 11:40?
A. No, I don't know. Like I said, he may have had notes, I just don't remember.

Page 229

Q. If he had notes, would you have asked him for those notes?
A. Probably.
Q. I assume if you had asked him for those notes --
A. They would have been in the box or in the file.
Q. The file you're referring to, the homicide file; is that right?
A. Right, exactly.
Q. Did you ever ask him how he was able to recall that specific timeframe?
A. No. No.
Q. Mr. Massey then goes on to tell you about a first conversation with Mr. Everett which took place on March 27th of '87, agree?
A. Yes.
Q. I think I jumbled my words. Let me just get that clear for the record.
There is a phone conversation on March 27, 1987, correct?
A. Yes.
Q. How did that call come about, do you know?

Page 230

A. No, I don't, I have no idea. It says here, in the office of Mr. Hughie Colihan, who was also a homicide D.A. So it must have went right to Hughie's office.
Q. That's Hugh, H-U-G-H --
A. Colihan.
Q. Middle initial, Colihan, C-O-L-I-H-A-N?
A. Yes.
Q. Does Mr. Colihan go by the name Hughie?
A. Yeah.
Q. Do you have any idea why Mr. Massey was in Mr. Colihan's office?
A. He said that he called him. He didn't say he was there, unless I am reading something wrong.
Q. So Mr. Massey says on Friday, March 27, 1987, Mr. Everett was at the Giuffre Medical Center and I called him there from 1801 Vine Street.
A. Oh, okay.
Q. Do you have any idea --
A. No, no, I don't.
Q. So you have no idea how it came to be that Massey --

Page 231

A. Was at Hughie's office, no.
Q. Different question. How is it that Massey came to call Everett? Why did he call Everett?
A. I don't know.
Q. So you don't know that. You don't know why he was in Hugh Colihan's office; is that right?
A. Yes. I may have known at the time I just don't remember now.
Q. There also, again, is a specific reference to 4:55 p.m., right?
A. That's what he says.
Q. Once again, do you have any idea whether he had notes about that?
A. No, I don't recall any notes. Again, let me reiterate, I have no idea if he had them but I don't recall any.
Q. The next sentence after 4:55 p.m. says: Mr. Everett said he wanted to reveal pertinent information about the H&B Market murder case. Do you see that?
A. Yes.
Q. Why did he want to give that information

Page 232

to Massey?
MR. ZURBRIGGEN: Object to the form. Detective, if you know.
THE WITNESS: I can only glean from what Mr. Massey said later on in his interview, that he had a relationship with Mr. Everett and Mr. Meredith. He apparently trusted him.
Q. Do you have any idea why Massey didn't immediately get a homicide detective involved?
MR. ZURBRIGGEN: Same objection.
THE WITNESS: Maybe he went to somebody -- I can't answer that. I can't answer that.
BY MR. FEINBERG:
Q. Let's go down further. There is a long narrative about Mr. Massey's conversations with Mr. Everett. I'm going to ask you to look down at the bottom of the second page, which starts: He wrote the names down, Curtis Crosland; do you see where I am?
A. Down the bottom.
Q. Yeah.

Page 233

A. Yes, I see.
Q. Read along with me.
A. He wrote the names down, Curtis Crosland, Lester Turner and Michael Ransome, Frank Turner, Junior, who is also known as Squirt. He said these males are involved in drug sales and robberies and shootings at the present time but it wasn't pertinent to this case. Then he also mentioned ADA Joe McGillen or Barbara Christy.
Q. After the word case, there's a reference to H&B murders; is that correct?
A. Right.
Q. Mr. Massey is saying that his information about Crosland, Lester Turner, Ransome and Frank Turner wasn't pertinent to the H&B murder; is that right?
MR. ZURBRIGGEN: Objection. To the extent you can tell from this document.
THE WITNESS: I glean from that, that he has got information about drug sales and robberies that those guys were involved in but it wasn't pertinent to the specific case that he said.

Page 234

BY MR. FEINBERG:
Q. Why --
A. I can't tell you why. I'm just going by the paper. And the answer that I have is what I just gave you.
Q. I understand that but let me finish my question, please. Why -- let me ask it a different way. Is there -- do you recall raising any questions about inconsistencies with Massey saying that Crosland wasn't pertinent to H&B, but then a later statement, that Crosland allegedly confessed to the H&B murder?
MR. ZURBRIGGEN: Object to the form. Detective, to the extent you recall.
THE WITNESS: No -- again, I stated -- I didn't take it the same way you did. I didn't infer it the same way that you did or whoever works with you did. I inferred it as he knew about other cases that those guys were involved in, but that he didn't want to talk about that because of this case. That's the way I inferred it.

Page 235

BY MR. FEINBERG:
Q. Top of the next page, Mr. Massey says, and according to Everett, he would be willing to take a lie detector test, regarding this information. Do you see that?
A. Yes.
Q. Was that of importance to you?
A. He was willing to take one.
Q. That suggested a willingness to try to prove he was telling the truth, right?
A. Right.
Q. You discussed with Mr. Massey about why Mr. Everett wanted to reveal this information; is that correct?
A. Yes.
Q. In fact, the next question on page 3 is, did he say why he decided to reveal this information?
A. Yes.
Q. According to Mr. Massey, Mr. Everett made clear that he wanted to get out of jail, right?
A. Right.
Q. Which I think you have agreed before,

Page 236

raises some potential concerns that someone might tell you what they think you want to hear, right?
A. And that's indicative of the fact that if I wanted to hide that reason, that I would have not put that down there and I would have put something else or nothing at all there. But I didn't, I put down what he said.
Q. The next clause after that, is that Mr. Massey says that he, referring to Mr. Everett, mentioned it some time ago when he first got out of Graterford, that it was on his conscience that this guy Curtis Crosland should be off the street but he, Everett, was afraid of what would happen to his son.
When he first got out of Graterford, he did mention a murder at the H&B Market. He said he would let me know when he found about it.
A. Where are you at?
Q. Page 3.
A. I got it. I'm sorry.
Q. So let me -- this might be a little confusing so I want to read it along with you

Page 237

again.
The second line of the answer about why he decided to reveal this information, I'm repeating it --
A. That's okay, go ahead.
Q. He mentioned it some time ago when he first got out of Graterford, that it was on his conscience that this guy, Curtis Crosland should be off the street but he, Everett, was afraid of what would happen to his son. When he first got out of Graterford, he did mention a murder at the H&B Market. He said he would let me know when he found out about it. I read that correctly?
A. Yes.
Q. This -- so would you agree, sir, that Mr. Massey has known that Mr. Everett may have information about Crosland and the H&B Market since the time he got out of Graterford?
MR. ZURBRIGGEN: Objection to the form. Detective, to the extent you can glean that from this document.
THE WITNESS: It could be.
BY MR. FEINBERG:

Page 238

Q. Piecing that together, you have to flip back to page 1 --
A. Of Everett's interview?
Q. Of Massey.
A. Okay.
Q. The second question and answer, the second answer. I know him and I have known him since he was discharged him from Graterford Prison in February of 1985.
A. So he knew him for two years.
Q. Let me go back to the answer that we had just reviewed, it sounds like you were under the impression that Everett told Massey about Crosland and the H&B Market in and around February of 1985, correct?
MR. ZURBRIGGEN: Objection to the form of the question. Detective, to the extent you can glean that --
THE WITNESS: If I read correctly, I thought he said something about he knew something about the murder and when he found out more, he would get back to him. I don't know how long a period -- what that means getting back to him, how long a period

Page 239

that time is.
Q. Massey is saying that Everett wanted Crosland off the street, right?
MR. ZURBRIGGEN: Same objection.
THE WITNESS: That's what he said.
BY MR. FEINBERG:
Q. And he wanted Crosland off the street in connection with the murder at the H&B Market, right?
MR. ZURBRIGGEN: Same objection.
THE WITNESS: Yeah, he wants him off the street. But it doesn't specifically say that, not just because of the H&B murder, something about his son.
BY MR. FEINBERG:
Q. Why else would --
A. I can't answer why else.
Q. His son -- we will get to this later with Mr. Everett. Is it your recollection that Rodney Everett's son was a family member of Curtis Crosland's?

Page 240

A. I didn't know that at the time.
Q. It's actually in Everett's statement.
A. I just don't remember that specific point.
Q. I will represent to you that the mother of Rodney Everett's child is a sister of Mr. Crosland. In other words Mr. Crosland is Rodney --
A. Uncle.
Q. That's correct, is Rodney Everett's son's uncle, right?
A. Right.
Q. When you piece these two sentences together, Everett wants Crosland off the street and Everett knows something about H&B. And a third point, he's telling Massey about that back in February of '85, right?
MR. ZURBRIGGEN: Objection to the form. Again Detective, to the extent you can tell any of that from this.
THE WITNESS: If that denotes that, then yeah.
BY MR. FEINBERG:
Q. So would you agree that it sounds like

Page 241

Everett has got information about Crosland being involved in the H&B murder in February of '85?

MR. ZURBRIGGEN: Same objection.

THE WITNESS: Yes, and he said he would get back to him. What that means by getting back to him, I have no idea.

BY MR. FEINBERG:

Q. On that exact topic, the next paragraph down, it says: Then in June of '86, do you see where I am?

A. Yes.

Q. I'll read it: Then in June of 1986, before I retired, he asked me if I had found out anything. Do you know what that means?

MR. ZURBRIGGEN: Same objection. Again, Detective --

THE WITNESS: No.

BY MR. FEINBERG:

Q. What was Massey supposed to find out?

MR. ZURBRIGGEN: Same objection.

THE WITNESS: I don't know.

Page 242

I can't answer for Mr. Massey. Did you ask Mr. Massey?

BY MR. FEINBERG:

Q. We'll see. Not yet, sir. We'll get to him. We'll hear what your recollection is.

The next sentence is: At that time I had not done so. After talking to Everett at Giuffre, I did find out information about the murder at H&B by going to the Free Library of Philadelphia, public information newspapers and records, and I obtained all of the information on a computer printout.

A. I see that.

Q. Did Mr. Massey have that print out for you?

A. I don't think so. I don't remember.

Q. If you had it --

A. I probably would have kept it, sure.

Q. You would have put it in the file, right?

A. I'm sure.

Q. Then according to Massey, I had personal meetings with Rodney Everett on 4/3/87 and at that time he told me the information listed

Page 243

above regarding H&B robbery murder, right? Is that correct?

A. That's what it says.

Q. Let's put together a timeline now that we've reviewed the statement. We know that Massey and Everett had a phone call on March 27th of '87 when Massey was in Colihan's office, correct?

MR. ZURBRIGGEN: Object to form. Detective, to the extent you can glean that from this document.

BY MR. FEINBERG:

Q. To be clear, to address counsel's objections, when I say you know, I am not asking whether you know that that specifically happened. I'm asking that that's the information that you had based on Massey's statement?

A. That's the information that Mr. Massey gave us, yes.

Q. I'll change my question to account for that. Mr. Massey told you that he had a phone call on March 27th of '87, right?

A. Yes.

Page 244

Q. They had some conversation about the H&B murder; is that correct?

A. Yes.

Q. Mr. Everett then goes to the library and looks at newspaper articles about the H&B murder; is that correct?

A. Yes.

Q. He then goes and he talks to Everett about what he found in those newspaper articles; is that correct?

A. Yes.

Q. That must have raised some concerns for you?

MR. ZURBRIGGEN: Object to the form of the question, based on the representation. Detective, you can answer.

THE WITNESS: I had no sense that Mr. Massey had some kind of alternative motivation for this, other than bringing a guy in to give us information. To answer your question, no, it did not raise any concerns at that time, no.

BY MR. FEINBERG:

Q. Did it raise concerns at any time?

Page 245

A. No.
Q. Have you ever spoken to another witness or any witness in any other investigation where that witness got information about a case from newspapers?
A. I'm sure I have.
Q. Did you ever have reasons for concern about witnesses getting information from newspapers?
MR. ZURBRIGGEN: Object to the form. Detective, you can answer.
THE WITNESS: If the person said to me that they were a direct witness, then maybe I would. Not something like this that was an I told you so. That this guy generated it, he generated it -- as far as we know, he generated it because of his profession and that he had a longstanding relationship with this guy.
I didn't know Mr. Massey from a can of paint when this started. I didn't know Mr. Crosland from a can of paint. I didn't know any of them. So I have no -- just as Mr. Dan Rendine's investigator didn't know

Page 246

Paulette Phillips during that scenario or when this interview was taken. I guess I could have actually, in my light, I could have actually said, hey, 12 years later, they know the family, they know the people, maybe I could have maybe put her on a polygraph. Was that done?
BY MR. FEINBERG:
Q. Sir, my question for you is about --
A. My response is the same, I don't know.
Q. I haven't finished my question. My question for you is whether you had concerns about the credibility of Mr. Everett's information, if he read newspaper articles about the case?
MR. ZURBRIGGEN: Objection to form, for the record.
BY MR. FEINBERG:
Q. Let's zoom out. General matter, if a witness has information that they've gotten from public sources and they come talk to you, do you have any way of knowing whether they got their information from a public source or from their own personal knowledge?

Page 247

MR. ZURBRIGGEN: Objection to form, for the record.
THE WITNESS: I don't know. I don't know. I mean, you can go and you can see if there are stories on that and how much actual information was actually given. I don't know. I don't know if the caliber of gun was in there, I don't know what was in there. I never saw that, whatever point of information he got, the printout that he saw. I didn't see it.
BY MR. FEINBERG:
Q. So what you're saying is you were aware that Mr. Massey went to the library to look at newspapers, correct?
A. As he has told us, yes.
Q. But you are not aware of the content of those newspaper articles; is that correct?
A. That's correct.
Q. It sounds like you didn't think to ask for those articles; is that correct?
MR. ZURBRIGGEN: Object to the form.
THE WITNESS: I did not but

Page 248

the detectives -- we had our own cases we were working on. So we did this and then we left it for the detectives. I just can't tell you right now that that was Cimino, McNesby or other detectives.
BY MR. FEINBERG:
Q. Who would have been responsible for looking at newspaper articles?
A. Who would have been responsible, well if it was detectives -- if it was John or Jimmy, then I would imagine they could have gone and looked or maybe a supervisor could have said to them, go and see what's in this printout or whatever.
Q. John and Jimmy --
A. McNesby and Cimino.
Q. I will ask you to use last names.
A. Sure, I understand.
Q. Would you agree though that -- strike that.
It sounds like what you're telling me though is someone ought to have gone and looked at those newspaper articles to see whether Everett was getting information of

Page 249

his own personal knowledge or information that he could have gotten from another source?
MR. ZURBRIGGEN: Object to the form. Detective, again, to the extent you know.
THE WITNESS: I guess it would have come down to whoever interviewed Mr. Everett -- I mean Mr. Massey and felt that he was maybe in some way not telling the truth or were they taking what he said at face value.
BY MR. FEINBERG:
Q. Mr. Massey is not a witness with direct evidence about Mr. Crosland's alleged confession, right?
A. Correct.
Q. So Massey is repeating to you what Everett said; is that correct?
A. Correct.
Q. Everett is the one with direct evidence or alleged evidence about Crosland's confession?
A. Correct.
Q. What you didn't know at the time is

Page 250

whether Everett's information came from public sources or his own personal knowledge, correct?
MR. ZURBRIGGEN: Object to the form of the question. Detective, again, to the extent you know.
THE WITNESS: The question you're asking me is about Mr. Massey?
BY MR. FEINBERG:
Q. No, about Mr. Everett. Let me explain what I am doing, sir. I'm not trying to be --
A. That's okay. Just go ahead.
Q. I have shown you Massey's statement to confirm for you that Massey reviewed newspaper articles with Rodney Everett before Rodney Everett's interview. My question for you is, do you have any reason to dispute that that happened?
MR. ZURBRIGGEN: Objection to the representation of the record. Again Detective, you can answer to the extent you can glean from the record.
THE WITNESS: I can't glean that from this and I also can tell you that

Page 251

speaking to Mr. Massey that day, there was no indications that he was lying. That's the best way I can put it to you.
BY MR. FEINBERG:
Q. That Massey was lying or that Everett was lying?
A. That Massey was lying.
Q. Did you have any indications that Everett was lying?
A. No.
Q. So you took Massey at his word that he showed newspaper articles to Everett, right?
A. I would imagine.
MR. ZURBRIGGEN: Objection to form, for the record, based on the representation of this document.
THE WITNESS: I would imagine if Mr. Massey didn't want me to know that he looked at papers and he was quote, unquote in cahoots with Mr. Everett, then he would have never told me that. He was pretty honest, as far as I could see.
BY MR. FEINBERG:
Q. To be clear, sir, I am not challenging

Page 252

Mr. Massey's credibility at all. I want more information from you that you took Massey at his word.
A. I can confirm that, yes.
Q. When you took Massey at his word, when Massey said I obtained all of the information on a computer printout and then I had meetings with Mr. Everett, you believed that to be true, right?
A. Yes.
Q. It sounds like from that representation from Mr. Massey, you would conclude that those newspapers articles were discussed with Mr. Everett?
A. I would imagine so, sure.
Q. Let's look carefully at Mr. Everett's statement, which is Exhibit P-21. The same questions regarding the set up. You and Hughes are there together, you're doing the typing; is that correct?
A. Yes.
Q. You're asking questions, Hughes is asking questions; is that correct?
A. Yes.

Page 253

Q. Can you tell. When you look through the questions, who wrote -- who asked which question?
A. No, not at all.
Q. Is everything that's said during that interview being typed into this interview form?
A. Yes.
Q. So in other words, there's no off the record conversation that's not being included; is that correct?
A. No, this was a pretty straight forward interview.
Q. So literally every word that's said when Everett is in the room with you, Hughes and Massey should appear on this document; is that correct?
A. It should. I'm sure there were words that were said. I'm sure there were things that were said maybe that aren't on paper. But most of them, anything that's pertinent, yes.
Q. Sure. Anything of substance relevant to the case is going to be in here; is that

Page 254

correct?
A. Yes, negative or positive.
Q. You might have greetings, good afternoon, how are you doing, that kind of thing that's not going to be on here, right?
A. Yes.
Q. Once you get into the case, it's all recorded for the record; is that correct?
A. Yes.
Q. Massey -- we talked for several of the past minutes about Massey's review of newspaper articles and I take it you didn't have those articles with you; is that correct?
A. I don't remember having them, no.
Q. Were you aware of what had been reported in the news about the Heo murder?
A. No, I didn't.
Q. You've already told me that to your knowledge -- you don't recall ever going back and looking at newspaper articles; is that right?
A. No, I don't.
Q. If anyone would have done that, it would have been some of the other detectives

Page 255

involved in the investigation; is that correct?
A. Guys that are initially involved, yes.
MR. ZURBRIGGEN: Object to the form.
BY MR. FEINBERG:
Q. Would you expect that's something that they should have done?
MR. ZURBRIGGEN: Same objection.
THE WITNESS: Should have done what?
BY MR. FEINBERG:
Q. Should they have gone back and looked at newspaper articles to find out what Everett had from those articles?
A. It's something that they could have done. Maybe it was done, I don't know. Do you have any evidence of that?
Q. We're going to get to this in a second, sir. Have you dealt with the media in cases where you're the assigned detective?
A. I mean we knew the reporters and all because we saw them every day. But as far as

Page 256

having conversations or going on camera, no.
Q. Was that typically handled by -- was there a public information officer?
A. Yeah, or sometimes the boss at the scene or the captain of homicide or lieutenant.
Q. Wasn't it typically the case that police talking to the media would not want to give all of the facts of the investigation?
MR. ZURBRIGGEN: Objection to the form. Detective, you can answer that.
THE WITNESS: I just can't answer that.
BY MR. FEINBERG:
Q. Have you ever heard of the concept of holding back facts that might be key to the investigation so you can judge the reliability of a confession later on down the road?
MR. ZURBRIGGEN: Same objection. Detective --
THE WITNESS: Sure. You're not going to tell everybody everything. You know that every case that happens hardly anybody gets all of the information.
BY MR. FEINBERG:

Page 257

Q. Sure. One of the reasons that that's done is if someone comes in and confesses to a crime, you expect that there are going to be facts that are only known by the perpetrator, right?
A. Sometimes, yes. But when you're doing the interview, nine times out of ten, you're trying to glean that one piece of information that wasn't in the newspaper. And if you do that, are you able to do that, then that helps corroborate the interview.
Q. Exactly --
A. I know I'm not supposed to ask questions, you're the questioner. My question is, was there anything there that you have or that you have read that was presented to you by someone else or from another deposition that shows that he wasn't telling the truth? I don't know.
Q. We're going to come back to that, sir. Bottom line is, you're familiar with the fact that any information released to the media about a murder investigation is going to be pretty generic, just basic details, right?

Page 258

MR. ZURBRIGGEN: Object to the form.
THE WITNESS: Usually, yes.
BY MR. FEINBERG:
Q. When you interviewed Mr. Everett on April 15th in this six-page statement, right?
A. Yes, five and a half.
Q. You -- it seems like you focused on information about the specific facts that Curtis Crosland allegedly confessed to, correct?
A. As much as I could. Like I said before, I didn't know that much about the case as much as Eddie Hughes knew.
Q. Bottom line is, you wanted to get as much detail as you could about the crime; is that correct?
A. Yes.
Q. Because a detailed confession from Curtis Crosland would make that alleged confession more reliable; is that correct?
A. Sure.
Q. One example, let's do this, what I want to do, sir, is measure or evaluate some of the

Page 259

facts that are reported in this statement from Mr. Everett against information that was publicly reported in the news and see if there's similarities or not, in your judgement.
What I'll do now is introduce -- sir, these are a series of newspaper articles that appeared in the District Attorney's Office file which was given to us by your counsel. I am marking this as Exhibit P-42.
- - -
(Whereupon Exhibit P-42 was marked for identification.)
- - -
BY MR. FEINBERG:
Q. Take a look and page through these.
A. Page three?
Q. No, page through. If you flip through them, I want to explain what you're looking at before we go too much further.
You will see there are Bates stamps on the bottom right corner of each page.

Page 260

A. It says P-42.
Q. That's my handwriting.
A. City-005769.
Q. Yeah, you see it goes 5769 through 5774. What I know, based on what you your counsel has told me, is that these documents were part of the District Attorney's Office file in this case.
Specifically what happened, so far as I can tell, and this is my representation, is that when the District Attorney's Office looked into this case recently, it wanted to know whether Mr. Everett got facts about this case from the newspaper or from his personal knowledge.
So they pulled up articles from this time period to look and see what was reported in the news.
The first page here 5769. It looks like it was probably taken from microfilm from a local newspaper. And then there are a series of typewritten report. Do you see where I am, 5770. I believe that these were taken from a news database which

collects news articles from that time period and just stores them so that you can go back and look at them however many years later. Do you understand what I'm saying?
A. Yes.
Q. Are you familiar with the LexisNexis database?
A. No, not really.
Q. I'll represent to you, that's an electronic database that has records of newspapers, periodicals going back decades. And that's likely where these articles were obtained. Understood?
A. Okay.
Q. I will represent to you that each of these articles or each of these documents are copies of news articles that were published in and around the time of --
A. -- Mr. Heo's murder.
Q. Exactly. Keep Mr. Everett's statement in front of you as we go through this.
The first fact I want to ask you about is the fact that this was a robbery. If you look at the second page of Mr.



Everett's statement, page City-18, do you see Mr. Everett reports that Mr. Crosland confessed to him that, in the middle of page 18, he said he went to rob the guy and the guy somehow flinched or something. Do you see that?
A. Okay.
Q. So Everett is reporting that it was a robbery. Look now at the news articles that you have, 5769. In the very top, left column, this is an obituary about Mr. Heo. The headline is IM HEO holdup victim.
First, hold up suggests that it was a robbery, right?
A. Yes.
Q. In fact, if you go down right below the heading that says deaths, do you see the phrase, demanded money?
A. Yes.
Q. So we see reported in the news at the time of the murder that it was a robbery; is that correct?
A. Yes.
Q. One more on that same topic. If you



flip forward to 5772. I show you here with my pen down towards the bottom of the page, under the headline: Grocer is shot by holdup man in South Philadelphia. Do you see that?
A. Yes.
Q. The sentence reads: The owner of H&B Food Market in South Philadelphia was critically wounded by a gunshot during a holdup attempt. Do you see that?
A. Yes.
Q. We see that it was an attempted robbery; is that correct?
A. Yes.
Q. Which suggests that it was not a successful robbery and that anything was taken; is that correct?
MR. ZURBRIGGEN: Object to the form. Detective, to the extent you can glean that from this document.
THE WITNESS: I'm just going by what it says. This says attempted robbery, the other one said robbery.
BY MR. FEINBERG:
Q. We'll come back to that point about



whether -- sitting here today, do you recall whether the perpetrator of the Heo shooting made off with any money?
A. I don't recall. I thought he did not. I don't know, but I don't recall.
Q. We'll come back to it. Let's go back -- I appreciate you bearing with me, sir. We're going to be going back and forth between the statement.
If you look back at the Everett statement, right back where we left off where I read, he said he went to rob the guy; do you see that?
A. Uh-huh.
Q. The next sentence: He said -- this is Everett reporting what Crosland said, Everett claims Crosland said he shot the man in the face. Do you see that?
A. Yes.
Q. Let's look back at the articles. Go back to 5769, the first page. The second paragraph of that article, the text is small but it reads: Heo, 46, was shot in the face.
A. Okay.

Page 265

Q. Agreed that that fact is reported in the press as well?
MR. ZURBRIGGEN: Object to the form. Again, Detective, to the extent you can glean that from this document.
THE WITNESS: By what you're showing me, yes. I concur. I'm not disagreeing with any of this.
BY MR. FEINBERG:
Q. The next fact I will ask you about sir is, the description of what Crosland was allegedly dressed like at the time of the robbery that he allegedly confessed to.
If you go to page 3, bottom of the page. Page 3 of Everett's statement, pardon me, which is marked City-19. Do you see the question: Do you know how he was dressed when he committed this murder?
A. Yes.
Q. Everett now once again reporting what Crosland allegedly said to him. He had a scarf pulled down around his face. Do you see that?
A. Yes.

Page 266

Q. So that's what Everett claims Crosland says. Now if we go back to the articles, 5770.
A. Okay.
Q. I got the text highlighted.
A. I see it right there.
Q. You see he says: This article from -- this appears to be from December 12th of '84. The article says: The gunman who wore a scarf over the lower portion of his face, right?
A. Uh-huh.
Q. Once again, what Everett says in this statement is also reported in the press from the time of the murder; is that correct?
MR. ZURBRIGGEN: Same objection. Again, to the extent you can tell.
THE WITNESS: If that's what it denotes.
BY MR. FEINBERG:
Q. Back to Everett's statement, bottom of page 3.
A. Okay.
Q. Question: Did he tell you how many shots he fired at the male? Once again,

Page 267

asking Everett what Crosland said? According to Everett, Crosland said, quote, once.
A. Right.
Q. We go back to the news articles. Go to City-5774, towards the back. It's actually the last page of that document.
A. Okay.
Q. The bottom paragraph of this article which is from December 6th of '84, one employee ran out of the store and the other dropped to the floor. Heo was shot once, correct?
A. Yes.
Q. So the fact that he was shot once was also reported in the press, correct?
MR. ZURBRIGGEN: Objection. Again, to the extent you can tell, Detective.
THE WITNESS: Yes.
BY MR. FEINBERG:
Q. The next part I'll ask you about is the location of where Mr. Heo was at the time of the shooting. If you flip over to Everett's statement, page 4, bottom of the page. The question that is asked: Did Curtis Crosland

Page 268

tell you where he was when he shot the male or say how many people were in the store when it happened? Answer, he said -- this is again Everett reporting what Crosland allegedly said. He said he was at the cash register in the front part of the store. He didn't say how many people were in the store.
Let's talk about the cash register. If we go to 5772. Once again -- tell me when you're there.
A. Okay.
Q. Do you see my text that's highlighted here, sir, bottom of the page, one employee ran outside. Do you see where I'm reading?
A. 72.
Q. 5772. It's --
A. Thursday, December 6th, is that the one?
Q. Yes. Read down to the fourth or fifth paragraph.
A. I see.
Q. One employee ran outside, the other dropped to the floor. A shot rang out and Heo collapsed behind the counter. Do you see that?

A. Right.
Q. The cash register is not used but it sounds like similar to what's reported in the press to what's in the statement that Heo was behind the cash register when he was shot, correct?
MR. ZURBRIGGEN: Objection to the representation of the record. Again Detective, to the extent you can tell from this document.
THE WITNESS: Again, if it's denoted there, I agree. I'm not disagreeing. These are points you're making, I agree with you.
BY MR. FEINBERG:
Q. On the topic by the way of how -- whether the perpetrator fled with any money, go back to 5769, the first page.
A. Okay.
Q. Right below that heading that says deaths.
A. Okay.
Q. After shooting Heo, the gunman fled empty handed; is that correct?



A. Yes.
Q. Remember before I asked you about the fact that it was an attempted robbery, which suggests that the robber didn't recover any money?
A. Yes.
Q. And how according to Mr. Everett, during the attempt there was a flinch and that's what lead to the shooting; do you remember seeing that?
A. Yes.
Q. So again, the fact that the attempted robbery, fleeing empty handed is reported in the press; is that correct?
MR. ZURBRIGGEN: Objection to the form of the question.
THE WITNESS: Yes.
BY MR. FEINBERG:
Q. One final question about the description of the perpetrator. Everett's statement -- I'm sorry, I'll come back to that.
Mr. Mangoni, let me just review some of what we just did. Hopefully this will still be fresh in your recollection



since we just did it. If you need to --
A. No, I'm fine.
Q. Would you agree that the following facts that were included in Everett's March 19th -- let me start over.
Would you agree that the following facts that were included in Everett's April 15th, 1987 statement were available in the press from December '84 or thereabouts: One, it was a robbery?
MR. ZURBRIGGEN: Objection to the form of the question. Again, to the extent you can glean, based on the documents that counsel has shown you, Detective, you can answer.
THE WITNESS: That's exactly what I'm going by, your documents that you produced.
BY MR. FEINBERG:
Q. Two, that the perpetrator shot Heo in the face?
MR. ZURBRIGGEN: Same objection, for the record.
THE WITNESS: Same answer.



BY MR. FEINBERG:
Q. Three, that the perpetrator wore a scarf?
MR. ZURBRIGGEN: Same objection, for the record.
THE WITNESS: Same answer.
BY MR. FEINBERG:
Q. Same answer, that you're agreeing that the press --
A. That it was in the press, yes.
Q. Four, that the perpetrator shot once?
MR. ZURBRIGGEN: Same objection.
THE WITNESS: Yes.
BY MR. FEINBERG:
Q. Five, that Heo fell behind the counter at the cash register?
MR. ZURBRIGGEN: Same objection.
THE WITNESS: Yes.
BY MR. FEINBERG:
Q. Six, that the perpetrator didn't get any money, which suggests that the shooting was accidental?

MR. ZURBRIGGEN: Same objection.
THE WITNESS: Yes.
BY MR. FEINBERG:
Q. Would you agree that Everett's entire account to you reported facts that were based on publicly available information?
MR. ZURBRIGGEN: Objection. Detective, again, to the extent that you can glean from documents and your own statement here.
THE WITNESS: Yeah, whatever was in the paper. I agree with -- they were -- that was for everyone and their mother that read that paper and read those articles, they all knew the same thing.
BY MR. FEINBERG:
Q. So in other words, what Everett told you about the account -- pardon me.
What Everett told you about Crosland's confession reported the same facts that were available in the press and available to anyone; is that correct?
MR. ZURBRIGGEN: Objection to



the form of the question. Again Detective, based on what you've been shown by counsel.
THE WITNESS: Except for the one question where he answered that the guy flinched. I didn't see that anywhere, unless you have that in here somewhere.
BY MR. FEINBERG:
Q. With that one exception, all of the facts that we just reviewed were recorded in the press, based on what we've looked at; is that correct?
A. Except for that one exception, yes.
Q. Does that give you any concerns about whether Everett's information to you was based on his personal knowledge from Mr. Crosland?
A. None whatsoever, no.
Q. Why not?
A. It just doesn't. That was available to many people, to a lot of people. And these other people could have done the same thing. They could have just said, I don't like so and so and I'm going to bring that in and bring that up. Here, I read that. No, the answer is no. You asked me a question, the answer is



no.
Q. Did Everett tell you anything that wasn't reported in the press?
MR. ZURBRIGGEN: Objection, it's asked and answered. Detective, you can answer again.
THE WITNESS: If it's not denoted in this interview, I would say no.
BY MR. FEINBERG:
Q. Let me ask you about some other issues regarding Everett's testimony. Do you remember how we talked about that Everett and Massey first had a conversation about Curtis Crosland's alleged involvement at the H&B murder at the time that Everett got out of Graterford in early 1985?
A. I remember that.
Q. We established that Everett appears to have been telling people about Crosland being involved in the H&B murder as early as 1985; is that correct?
MR. ZURBRIGGEN: Objection to the form. Again Detective, based on your own statement here, your own interview, you can



answer.
THE WITNESS: I don't know how many people he told but he told Mr. Massey that.
BY MR. FEINBERG:
Q. To your understanding, Everett's only knowledge about the H&B murder came from what he learned from Mr. Crosland; is that correct?
MR. ZURBRIGGEN: Same objection.
BY MR. FEINBERG:
Q. That's what Everett told you, right?
A. That's what Everett told us, yes.
Q. Do you remember what Everett told you about when he first heard Mr. Crosland's so called confession?
A. You'll have to point it out to me.
Q. You have Everett's statement in front you?
A. Yes.
Q. Look at page 2.
A. Okay.
Q. Four questions from the bottom, the question is: About how long after the murder

Page 277

did Curtis Crosland tell you this information? The answer is, from Mr. Everett: The best I can say is before Christmas of 1986. Do you see that?
A. Yes.
Q. So Everett is telling you that Crosland told him about the H&B murder sometime in late 1986; is that right?
MR. ZURBRIGGEN: Objection. Detective, if you can -- what you can glean from the statement.
THE WITNESS: The question, about how long after the murder did Curtis Crosland tell you this information? The best I can remember is before Christmas of '86. Sometime in '86.
BY MR. FEINBERG:
Q. By the way, this statement is taken in April of '87, right?
A. Right.
Q. I'm not asking you to get inside Everett's head, but it sounds like Everett is thinking, well, I don't know when but it was within the past six months or so, agreed?

Page 278

MR. ZURBRIGGEN: Objection to the form. To the extent you can tell, Detective.
THE WITNESS: I can't tell what he meant or what he was thinking.
BY MR. FEINBERG:
Q. But Massey, however, tells you that Everett is talking to him about Crosland's alleged involvement, all the way back in early '85, right?
A. He says he knew something about the murder back in '85.
Q. Some two years earlier, right?
A. Year and a half, yeah. Yeah, year and half.
Q. You're talking to him in April of '87.
A. That's two years.
Q. Two plus years. 26 months, right?
A. Yes.
Q. By the way, I know I'm repeating myself here but we just discussed that Everett's only alleged knowledge about the murder came from Crosland's allege confession; is that correct?
MR. ZURBRIGGEN: Objection.

Page 279

It's asked and answered. Detective, you can answer again, to the extent you can tell from your interview record.
THE WITNESS: From that interview, yes.
BY MR. FEINBERG:
Q. Would you agree that we have an inconsistency here?
MR. ZURBRIGGEN: Same objection. Again Detective, you can answer.
THE WITNESS: An inconsistency?
BY MR. FEINBERG:
Q. Massey's telling you that Everett mentioned Crosland to him all the way back in February of '85. Everett is saying, he didn't even know about Crosland's alleged confession until late 1986.
MR. ZURBRIGGEN: Objection to the representation of the record. Detective, again, from the extent you can glean a precise date from the interview record here.
THE WITNESS: I don't know. You're talking like sometime before '86. I

Page 280

don't know what that means. I have no idea what he means.
BY MR. FEINBERG:
Q. Would you agree that February of '85 is more than just sometime before December of '86?
MR. ZURBRIGGEN: Objection, form.
THE WITNESS: Again, I have no idea what he told or what he knew about it when he told Mr. Massey back in '85. I don't know.
BY MR. FEINBERG:
Q. Is this something that would have -- first of all, do you recall addressing this potential inconsistency when you interview Mr. Everett?
A. No, if I did, it would be on there.
Q. Maybe you've already answered this question but let me ask anyway. Do recall having any concerns about the credibility of Everett's testimony, in light of these different accounts on timing?
MR. ZURBRIGGEN: Objection,

Page 281

it's asked and answered. Go ahead, Detective.
THE WITNESS: No.
BY MR. FEINBERG:
Q. Do you recall what the description of the perpetrator at the scene was?
A. I would have to look at the 48.
Q. Let me show you. I jumbled that question, let me ask it a different way to make sure the record is clear.
Do you recall seeing any information about witness descriptions of the perpetrator?
A. I probably did at the time but I don't remember.
Q. Let me direct you to a statement from a witness named Mona Madison. It's at Exhibit-11. While you're doing that --
A. I see it. I have it here.
Q. Ms. Madison was an employee at Mr. Heo's store?
A. Right.
Q. And was interviewed about her observations of the shooting. If you look at the second page of the statement labeled

Page 282

City-15, this interview was conducted by --
A. Detective Brignola.
Q. Sure, who we already discussed. If you go -- the second question from the bottom of page 2, can you describe the guy who came into the store tonight with the gun? She says: He was black, 5 feet 5, he was just a little taller than me and I'm 5'1. He was like a light brown skin, he was skinny. Do you see that?
A. Yes.
Q. Let's put a pin in that for the moment and look at Everett's description of Mr. Crosland. We're not going to need Ms. Madison's statement at least for a little bit. So you can go back to Mr. Everett's statement at Exhibit-21.
A. I have the exhibit. What page?
Q. Page 5.
A. Okay.
Q. Do you see --
A. Describe Curtis Crosland, size, weight and complexion?
Q. Right. 5'5, 140 pounds, brown skin,

Page 283

stocky build. Do you see that?
A. Okay.
Q. Did you have any concerns about the difference between a stocky build and a skinny person who was described --
A. No, not at all.
MR. ZURBRIGGEN: Objection to form.
THE WITNESS: Not at all. BY MR. FEINBERG:
Q. Why not?
A. Why not? Because if you have done criminal law for a long time, you'll know that witnesses at the scenes have different descriptions and can be off three, four, five, six inches, can be off 30, 40, 50 pounds -- no, the answer is no. Because other witnesses also described the male as being short, 5'5, 5'6.
Q. After you spoke with Everett, did you believe that he was providing credible information?
MR. ZURBRIGGEN: Object to the form. Detective, you can answer.

Page 284

THE WITNESS: Yes.
BY MR. FEINBERG:
Q. So that was a significant break in the case, right?
MR. ZURBRIGGEN: Same objection. Detective, you can answer.
THE WITNESS: Yes.
BY MR. FEINBERG:
Q. Although you weren't involved early on, the shooting had taken place in 1984 and there had been no arrests made; is that correct?
A. Correct.
Q. So when you have -- I think what you referred to as an I told you so statement, that's a big deal, right?
MR. ZURBRIGGEN: Objection to form. Detective, you can answer.
THE WITNESS: It was the first one that I knew of that had something to do with this case.
BY MR. FEINBERG:
Q. When you have a break like that in the case, there's going to be some additional investigation needed, right?

MR. ZURBRIGGEN: Objection to the form of the question. Detective, you can answer, generally.
THE WITNESS: Yes.
BY MR. FEINBERG:
Q. Bottom line, to your knowledge, no one had identified Curtis Crosland as a suspect in the Heo murder at any time before April 15th of '87; is that correct?
A. Not that I know of, no.
Q. I want to be clear about my question, no one had identified to the Philadelphia Police Department Curtis Crosland; is that correct?
A. Yes, sir, as far as I know.
Q. Immediately at that point Curtis Crosland becomes a suspect in the Heo murder; is that correct?
MR. ZURBRIGGEN: Objection to the form. Detective, if you know.
THE WITNESS: I'm not going to say suspect I would say a person of interest at that time, he's the first name that came up.
BY MR. FEINBERG:



Q. You're going to want to find out more; is that correct?
A. Yes.
Q. There's additional investigative steps that you would expect to take; is that correct?
A. Yes.
MR. ZURBRIGGEN: Objection to form.
BY MR. FEINBERG:
Q. One thing that you would want to do is find other witnesses who might be able to corroborate what Mr. Everett told you, right?
A. If it's feasible, sure.
Q. You could have also tried to interview Mr. Crosland too, right?
MR. ZURBRIGGEN: Objection to the form. Detective, you can answer.
THE WITNESS: Could have.
BY MR. FEINBERG:
Q. Do you recall whether there was any discussion about interviewing Mr. Crosland?
A. I don't think so. Usually you don't want to go and grab somebody up before you try



to do a little bit more to corroborate against someone.
Q. So in other words, one witness statement reporting a so called confession is not enough to bring someone into custody, right?
MR. ZURBRIGGEN: Objection to the form. Detective --
BY MR. FEINBERG:
Q. Generally.
A. That's a tough question to answer.
Q. Let's go back to the main point that I started on, is that you could seek out other witnesses to corroborate Mr. Everett, correct?
A. Yes.
Q. One of the facts that you knew -- by the way -- let me ask you, do you recall seeing information that the shooter appeared to know Mr. Heo?
A. If that's in the interview -- is that in the interview?
Q. It's in -- let me see if I can find it for you.
A. Is it another person's interview?
Q. Bear with me for just one moment, sir, I



will read it to you. It's also Ms. Madison's statement, the same one who was the employee of the store. I'll just read it to you from the bottom of page 1, which is City-14, Exhibit-11.
Ms. Madison says that the perpetrator came in and said: It's a holdup, Tony, it's a stick up, Tony, give me your money. And he told the rest of us not to move.
So do you see there, whoever the perpetrator is, is referring to Mr. Heo by the name Tony?
A. Right.
Q. I will represent to you there's other investigative information which says that Tony was Il Man Heo's nickname.
A. Okay.
Q. And that people in the neighborhood who came to the store knew him as Tony; is that correct?
A. By what you're telling me, yes.
Q. Based on that, at least the police department or the homicide division was under

Page 289

the impression that the perpetrator was someone who had some familiarity with Tony; is that correct?

MR. ZURBRIGGEN: Objection. Again, to the extent you can generalize.

THE WITNESS: I wouldn't know that specifically. I mean there are people in there that maybe don't know the guy but knew that they called him Tony. I mean it's a neighborhood and that guy was in the neighborhood for years, from what I understand.

BY MR. FEINBERG:

Q. At least there's an inference that you can draw that the perpetrator has been in the store before, right?

MR. ZURBRIGGEN: Same objection.

THE WITNESS: It's an inference, yeah.

BY MR. FEINBERG:

Q. It's not definitely true but that's --

A. It's an inference, it's not an assumption. It's an inference.

Page 290

Q. If someone has been in the store, then you would think that other people in the store might be familiar with the perpetrator; is that correct?

MR. ZURBRIGGEN: Same objection.

THE WITNESS: Could be.

BY MR. FEINBERG:

Q. So for that reason, if you had the name of a suspect, you might want to go ask people who were in the store about their knowledge of Mr. Crosland, right?

MR. ZURBRIGGEN: Same objection.

THE WITNESS: Certainly.

BY MR. FEINBERG:

Q. For example, ask them questions, hey, Curtis Crosland ever come in this store before, right? You could ask that question of witnesses?

A. Yes.

Q. You could ask them or you could show a photo of Mr. Crosland and ask whether they recognized him?

Page 291

A. I could show him a single photo and ask them if they recognize him, not for that particular -- if they just knew him from the neighborhood --

Q. Sure.

A. Or if the guy had ever been in the store before but I could never ask him, as far as identifying him --

Q. Sure, the appropriate investigative technique would be to show --

A. -- a photo, right. Sure.

Q. To someone -- a single photo --

A. Who is a witness.

Q. We're speaking over each other, sir. Let me slow down. If you wanted to pursue this lead about Mr. Crosland allegedly knowing Il Man Heo by the name Tony, the people who were in the store, you could have shown them a single photo of Mr. Crosland and said, have you ever seen this guy come in the store before, right?

A. Okay.

Q. We also know that the perpetrator said something, he spoke to Mr. Heo; is that

Page 292

correct?

MR. ZURBRIGGEN: Objection to the form. Again Detective, if you can glean that --

THE WITNESS: Going by Mona Madison's interview. Was she the only one to see him?

BY MR. FEINBERG:

Q. There is another statement concerning Mr. Davis which we'll come back to, sir. But just based on that allegation alone, you could ask people whether they recognize Curtis Crosland's voice, right?

MR. ZURBRIGGEN: Objection to the form. Detective --

THE WITNESS: You could.

BY MR. FEINBERG:

Q. By the way, was there any thought of getting a search warrant for Mr. Crosland's home?

MR. ZURBRIGGEN: Objection to the form. Detective, if you know.

THE WITNESS: Not that I know of. I don't know, there could have been but

Page 293

there wasn't by us. If you see this, I mean for the most part, myself, Detective Hughes and Ed Rocks covered a four-day period. And then I don't think I ever worked on this case again. I know Eddie Rocks went in July and interviewed somebody. But it was about other crimes or something like that.

So we're covering a four-day period. My answer is, no, I don't know if a search warrant was discussed but not the four days while I was there.

BY MR. FEINBERG:

Q. By the way, you're talking four days.

A. The interview that I took on the 21st, the interview I took on the 27th and the interview I took on the 22nd, those interviews I believe were the ones that --

Q. I have interviews, and we're going to go through them, April 15th we just looked at, right?

A. Right.

Q. April 21st we're going to look at in moment.

A. Right.

Page 294

Q. July 7th, right?

A. I don't think I was -- July 7th?

Q. Yes. With Detective Rocks.

A. Okay, and then there was another one on the 25th that Detective Rocks did by himself.

Q. Rocks went on the 25th, right?

A. Right.

Q. So it's not just a four-day period, it's a three-month period that you're looking at this case; is that correct?

A. Well, Detective Rocks did that. I don't know if I was still with Eddie there or not, I don't know. Probably. Probably, yes.

Q. And then we know that you interviewed Mr. Everett in January of 1988, correct?

MR. ZURBRIGGEN: Object to the form. Detective, if you know.

THE WITNESS: No, I don't remember. I don't have that interview. I never saw that interview.

BY MR. FEINBERG:

Q. We also know that as of January of 1991, you were still in touch with Mr. Everett, speaking to him about the case; is that

Page 295

correct?

A. Yes.

Q. So this was not just a three or four day involvement in the investigation; is that correct?

MR. ZURBRIGGEN: Objection to the form. Detective, you can answer.

THE WITNESS: I worked on other cases besides this. And what I'm saying is that I worked specifically on this case for a four or five-day period and then didn't work on it again for a while. Maybe I did something in June or July, whatever the case may be, but I didn't work on this case -- this was not my case. So I wouldn't work on this every day. The other detectives would.

BY MR. FEINBERG:

Q. We'll go through this by review of the remainder of these statements. The next one we have is your interview on April 15th -- pardon me, April 21st of '87. And that's Exhibit-24.

So here we are, you and Hughes are interviewing Mr. Everett again on

Page 296

April 21st, '97 at 9:00 a.m. or p.m.?

A. It looks like p.m. Eddie wrote this. This is Eddie Hughes' writing.

Q. Hughes' writing but the same practice as before, you and he are both asking questions; is that right?

A. Right.

Q. So now here we are, six days later after Mr. Everett has given you a statement; is that correct?

A. Yes.

Q. And then that previous statement, as we've already discussed, the information he gave to you was generic information which had been recorded in the press from December of '84; is that correct?

A. Yes.

Q. Can I assume that between April 15th of '87 and April 21st of '87, you did not go out and interview any witnesses at the store?

A. I did not -- well, I don't recall doing that.

Q. You did not go out and interview any witnesses from the neighborhood?

Page 297

A. I don't recall if I did or didn't.
Q. You did not seek a search warrant for Mr. Crosland's home?
A. I did not, no, I don't think I did.
Q. The relevance of a search warrant, let's make this clear, is that you had some evidence which we looked at before about the caliber of the bullet that was used at the shooting, right?
A. Yes.
Q. So if Mr. Crosland, in fact, had a gun that matched that caliber in his house, that might be relevant evidence; is that correct?
A. Yes.
Q. So a search warrant is something that could have been done to try to corroborate Mr. Crosland's involvement in the crime; is that correct?
A. It could have been done, but the timing of it could have been much later. In other words, they could have discussed that much later. You don't want to serve a search warrant right away sometimes. If I serve a search warrant in somebody's house and he's

Page 298

present and I bring him in, he tells me to go pound sand, then it's a moot point.
Q. Do you know whether there was ever a search warrant executed --
A. I don't know.
Q. In any event, those things that we discussed interviewing witnesses from the store, interviewing witnesses in the neighborhood and the search warrant, to your knowledge, none of that happened between April 15th and April 21st; is that correct?
A. It's not really to my knowledge, I just don't recall if we did any of that or not.
Q. I'll represent to you that I have not seen any indication in the 12- or 13,000 pages.
A. Okay, then the answer is no.
Q. Why did you bring Mr. Everett back?
A. It seems like we brought him back to show him photographs of people that he knew and we wanted to get them identified by him.
Q. The first question you ask, you and Hughes collectively ask, is there anything additional that you can tell us about the

Page 299

murder at the H&B Market. Why did you start with that question?
A. To find out if there was anything else that he knew.
Q. Were you doubting the substance of what he told you before?
A. No, not at all.
Q. Before as we discussed, the only facts he gave you were generic facts available to everyone; is that correct?
MR. ZURBRIGGEN: Objection to the form of the question.
THE WITNESS: I didn't say that, you said that. I never said that.
BY MR. FEINBERG:
Q. Well, you didn't disagree with my characterization.
A. No, no, no, I never said that.
Q. Your next several questions -- by the way, I assume you've read this --
A. I read it on Friday.
Q. Your next several questions kind of challenge Mr. Everett on the premise of what he told you, would you agree?

Page 300

A. I don't know if the word is challenge.
Q. Well, he tells you, he being Everett, tells you that Curtis Crosland confessed to the crime, right?
A. Yes.
Q. And then you ask a series of questions about whether that's really true; is that right?
MR. ZURBRIGGEN: Objection to the characterization. Detective, you can answer.
THE WITNESS: No, absolutely not. That's your inference. The question reads: Is there anything additional that you can add? Not if you told the truth initially, if you did tell the truth. Absolutely not.
BY MR. FEINBERG:
Q. Your second question is: Did Curtis tell you about the murder or did Michael Ransome tell you about the murder?
A. So we asked him another question, if anybody else said anything to him.
Q. You say --
A. I just want to make clear that these

Page 301

inferences are your inferences, not mine. I want that clear, just so you know.
Q. Your question was: Did Curtis tell you about the murder or did Michael Ransome tell you Curtis did it, right?
A. Right.
Q. You're trying to figure out whether Everett got his information from Curtis or from Michael, correct?
A. Yes, we're trying to find out if somebody told him something else about the murder, at that time.
Q. You didn't say Curtis and Michael, you said --
A. -- or.
Q. -- Curtis or Michael, right?
A. Yes.
Q. And he says, no. Well, he didn't say no, he says, Curtis told me face to face, right?
A. Yes.
Q. He is sticking with his story, right?
A. Yes.
Q. That Curtis Crosland confessed, right?

Page 302

A. Yes. Let me ask this question, is there another interview that states something different between the 15th and the 21st? Because if there is, then maybe that's why we asked the question. I don't have any recollection of that or I haven't seen anything.
Q. My question for you, sir, is whether you recall any reason as to why you disbelieved Mr. Everett and brought him back to ask these questions?
MR. ZURBRIGGEN: Objection to the form of the question. Again Detective, you can answer.
THE WITNESS: My answer is that we brought the guy down for identification purposes and that's why I asked the question, if there was any other interview. I'm not going to answer a question if there's something there that indicates that I had to ask this question at this particular time. If there is, let me know. If there isn't, let me know and then I can answer you exactly.

Page 303

BY MR. FEINBERG:
Q. Sir, one thing I will promise you is that I am going to be very thorough and show you literally every --
A. You can be as transparent as you want, Jon. It doesn't make any difference to me. I am not going to answer questions if I don't know -- you're a lawyer. You don't like to ask questions when you don't like the answers. Well, I don't like to answer questions when I have no idea what you're asking.
Q. Mr. Mangoni, you have an attorney here and your attorney is welcome to correct the record and ask you questions after we conclude your questioning and show you any information that I have omitted. So right now what we're going to do is continue to do what we've been doing. I'm going to show you documents and ask you questions.
A. Fine.
Q. The next question that I have for you, was Louise present when Curtis told you about the shooting?
A. And the response was she was upstairs,

Page 304

which he said in this first statement.
Q. Louise was Mr. Woods -- pardon me. Louise Woods was Mr. Everett's girlfriend who he allegedly beat up back in March; is that correct?
A. I don't know what the circumstances were about beating up, but yes. Yes, yes, according to that 49, yes.
Q. The reason why you were asking about Louise is, if another witness was present that can corroborate what he's saying, right?
A. Yes.
Q. Same thing with the next question, did you tell Louise what Curtis told you, if Everett has reported that to Louise, that corroborates what Everett says, right?
A. Right.
Q. He says no, right?
A. Right.
Q. Go down -- skip to the next page. The next several questions are providing identifying information about Curtis and Mike Ransome and other people; is that correct?
A. Correct.

Q. If you go to the next page, page 3. All the way down at the bottom of page 3: Did you discuss the case with Michael Ransome? Answer, no. You're asking that for the same reason, right, if he has talked to Mike Ransome, it corroborates whatever it's saying, right?
A. Yes.
Q. He says no; is that correct?
A. Yes.
Q. And then the next question, did you discuss the case with Squirt? We know from elsewhere, Squirt refers to Frank Turner. His answer is no, correct?
A. Correct.
Q. You asked that question for the same exact reason, you wanted to know whether there was another witness who could corroborate what Rodney Everett was telling you; is that right?
A. Yes.
Q. So you've asked him just to review whether Louise heard -- whether Louise was told, whether Michael was told and whether Frank was told; is that correct?



A. Correct.
Q. Everett says no, as to all of them; is that correct?
A. Correct.
Q. So with regard to this interview, your efforts to find other witnesses who could corroborate what Everett was saying were not successful; is that correct?
MR. ZURBRIGGEN: Objection to the form. Detective, you can answer.
THE WITNESS: Yes, his responses were negative to all of them. So yes.
BY MR. FEINBERG:
Q. Why did you polygraph him?
A. To ensure us that maybe he was telling the truth or not telling the truth. That was an occasion to have someone polygraphed.
Q. How did the topic of a polygraph come up?
A. If I remember right, I don't recall the specifics of that conversation but if I remember right, did he not tell Mr. Massey he would be willing to tell the truth or willing



to take a polygraph? And then I guess it came up from there, would you be willing to take a polygraph.
Q. Why isn't it mentioned in the interview?
A. I don't know that.
Q. You told me before that when you conduct -- when you use a polygraph as part of an interview, it will, as a matter of course, be included in the interview since that's a topic of conversation in the room; is that correct?
A. No, I didn't state that. I stated that sometimes it's not indicated on the interview but it is indicated on an activity sheet. Is there one indicating that there is one on the activity sheet.
Q. First of all, would you agree with me, sir, that this interview does not include reference to the polygraph?
A. Yes, they do.
Q. So obviously the topic of a polygraph came up; is that correct?
A. Yes, it did.
Q. And Mr. Everett was taken for a polygraph examination; is that correct?



A. I believe so, yes.
Q. Take a look -- actually before we get there, back earlier today when we were talking about polygraph examinations, you agreed that sometimes you will use them to see whether a witness really is telling the truth?
A. Right.
Q. So in this case, you had concerns about Mr. Everett telling you the truth; is that right?
MR. ZURBRIGGEN: Objection to the form. Detective, you can answer.
THE WITNESS: It could have been concerns. It could have been maybe a boss might have said, why don't we polygraph him.
BY MR. FEINBERG:
Q. Because you had no corroborating evidence from any of the witnesses who we just discussed; is that correct?
MR. ZURBRIGGEN: Same objection.
THE WITNESS: At that particular time, yes.

Page 309

BY MR. FEINBERG:
Q. Do you remember, now that we've talked at length about the generic information provided by Mr. Everett being reported in the press, did that come up in connection with the polygraph?
MR. ZURBRIGGEN: Same objection. Detective --
THE WITNESS: I don't know. I don't know what took place with the polygraph.
BY MR. FEINBERG:
Q. You can take a look at Exhibit P-25. Sir, have you reviewed this activity sheet?
A. Yes.
Q. Is this an activity sheet that you reviewed in preparation for today's deposition?
A. I saw this on Friday.
Q. Let me take it line by line, before we even get to the polygraph. On 4/21/87 -- before I even do that, can you tell who typed this activity sheet?
A. I can't. It may have been me, I don't

Page 310

know. I don't know.
Q. You said Hughes wasn't much of a typist.
A. No -- again, the answer is -- you asked a question and the answer is, it may have been me.
Q. I understand that you don't like the way I asked that question.
A. It's not a matter of liking it, sir. You asked it and I answered it.
Q. Let me ask it this way, did Hughes ever type activity sheets?
A. I'm sure he did.
Q. If the two of you were working together, was it usually the case that you would type the activity sheet?
A. I was the younger guy, so I'm sure I typed a lot of them.
Q. Given that relationship, what I am doing is I want to make sure I understand the basis for your answer. It seems more likely than not that you were the guy who typed this; is that correct?
A. I probably did this. But my answer again is, I may have. I may have not. I

Page 311

can't answer you specifically. I don't remember who typed up an activity sheet 35 years ago.
Q. On 4/21/87, Rodney Everett was brought to the homicide division from the Detention Center and was re-interviewed. We've established that.
Next line, he was questioned about other murders in the neighborhood and did not seem to know the details of any, except the names of the persons murdered.
Is there any reference to other murders in the statement that we just looked at, Exhibit-24?
A. No.
MR. ZURBRIGGEN: Objection to the form of the question. Based on what is in the document, from what you can glean, Detective.
BY MR. FEINBERG:
Q. Is it correct then to say that there was a discussion about other cases that's not included in the interview from April 21st?
MR. ZURBRIGGEN: Same

Page 312

objection.
THE WITNESS: Yes. Can I ask you a question? When was the third interview taken of Mr. Everett?
BY MR. FEINBERG:
Q. Sir, we're going to get to that. I'll represent to you that the next interview takes place all the way in July, July 7th.
A. Okay.
Q. Why do you ask me that question?
A. I asked you that question because we did interview him about other murders. I just don't remember what date that was.
Q. You saved me a question later. I was going to ask you why there was a discussion of other murders on July 7th. We will come back to that when we get there.
My question remains, why is there no questions or answers reported in the interview form about the other murders?
A. I don't know. The only thing I can say is that we may have talked about the other ones, but he didn't really get into it. So we never put it down. We never did the interview

Page 313

concerning those other cases. And then the rest of the activity sheet is based on his interview that we took.
Q. You told me before that in an interview statement, the typical practice was to include literally every question and every answer of pertinence that took place in the room, other than the greetings and the pleasantries at the beginning or end of the interview; is that correct?
A. Yes.
Q. Would you agree that this is information of substance?
A. Apparently that wasn't done.
MR. ZURBRIGGEN: Objection to the form of the question.
BY MR. FEINBERG:
Q. You have no explanation for why it wasn't done; is that correct?
A. Not at that time, no.
Q. The next sentence is: He was polygraphed on his original statement about being told by Curtis Crosland and was DI, deception indicated; is that correct?

Page 314

A. Correct.
Q. Police Officer D. Reilly; is that the polygrapher?
A. Yes. Polygraphist, yes.
Q. So POL stands for --
A. She was an officer. She retired now.
Q. What is Reilly's first name?
A. Deborah.
Q. Do you know whether Deborah Reilly -- was Deborah Reilly a sworn officer or civilian?
A. She was a police officer but she was assigned to the polygraph testing.
Q. I didn't ask you before about polygraphs, do you know whether there were charts or documents that were produced as part of the polygraph exam?
A. Charts? I don't think we ever got charts. We just got results -- if I remember right. There may have been. There may be some specific cases where there were. But I don't remember that as a general practice. Usually if there was -- anyway to make a long story short, I don't recall any charts being

Page 315

given to us or anything like that.
Q. Got it. To your knowledge, Ms. Reilly would not have given you anything on paper about the polygraph; is that correct?
A. Probably not, other than the fact that she told us that deception was indicated.
Q. Do you know, putting aside whether she gave you anything; do you know whether she stored documents somewhere in her office?
A. I can't answer that, sir. I just don't know. I think each polygraphist had their own, you know, idiosyncrasies, I guess.
Q. Bottom line, based on what's reported in the activity sheet, you know that Ms. Reilly told you that Rodney Everett had deception indicated regarding his allegation that Crosland confessed to the Heo murder; is that correct?
In other words, stated otherwise, there was a test that showed Mr. Everett was not being truthful; is that correct?
A. Yes.
Q. And that's the conclusion that you

Page 316

reached as a result of that polygraph; is that correct?
MR. ZURBRIGGEN: Objection to the form. Detective, go ahead.
THE WITNESS: That's not the conclusion we reached. Just because it said deception indicated, doesn't mean deception indicated. As we spoke before, a lot depends on the polygraphist. A lot depends on interpretation of the polygraphist who doesn't spend that much time with that person. You're talking an hour or two.
BY MR. FEINBERG:
Q. Did you trust Ms. Reilly?
A. Did I trust her?
Q. Yeah.
A. Yeah, I had no reason not to trust her.
Q. So you believed that the examination was appropriate; is that correct?
MR. ZURBRIGGEN: Objection to the form. Detective, again, to the extent you can say.
BY MR. FEINBERG:
Q. Let me withdrawal that question. In

Page 317

other words, you had no reasons to doubt Ms. Reilly's conclusions that there was deception indicated; is that correct?
A. No, I didn't have any objections to what she felt, no.
Q. You then, after you got those results from Ms. Reilly, re-interviewed Mr. Everett; is that correct?
A. I believe so, yes.
Q. That's what the activity sheet says; is that correct?
A. Right.
Q. Let me read out the sentence so we're on the same page. He, meaning Everett, was re-interviewed and maintained he was being honest and was told by Crosland. He was then returned to the Detention Center.
A. Right.
Q. Do you recall when we talked about polygraphs before, I think I used the phrase a challenge interview or a confrontation interview where you confront the person with the results of the polygraph?
A. Yes.

Page 318

Q. That's what you did, right?
A. Yes.
Q. And Everett said, I swear I'm telling the truth, right?
A. Yes.
Q. He maintained everything that he said before, right?
A. Yes.
Q. He said that Crosland told me he committed the murder; is that correct?
A. Yes.
Q. Where is all of that in the interview statement?
MR. ZURBRIGGEN: Objection to the form.
THE WITNESS: It's not in there.
BY MR. FEINBERG:
Q. Why not?
A. It just isn't.
Q. Is the only record of it in this activity sheet?
A. Yes, that I know of.
Q. Do you know whether this activity sheet

Page 319

was ever sent to anyone outside of the Philadelphia Police Department?
A. That, I don't know.
Q. Who would have been responsible for that?
MR. ZURBRIGGEN: Same objection to the form. Detective, if you know.
THE WITNESS: I don't know. It was either Detective Cimino, McNesby or it could have been Al Nespoli. I don't know.
BY MR. FEINBERG:
Q. Would you agree that the results of the polygraph are exculpatory information?
MR. ZURBRIGGEN: Objection to the form. Detective, you can answer.
THE WITNESS: It can be, sure.
BY MR. FEINBERG:
Q. At this point of the investigation, the only evidence pointing to Curtis Crosland as the perpetrator is Everett's contention that Crosland confessed to the crime, correct?
A. So far as I know.
Q. Everett's statement about Mr. Crosland

Page 320

was not corroborated by any other witnesses, right?
MR. ZURBRIGGEN: Objection. Again Detective, to the extent you know.
THE WITNESS: I don't know what was done with this investigation after -- I don't know what happened to it from the time I did it until the time the warrant was obtained.
BY MR. FEINBERG:
Q. That's a good point. I'm going to restate my question to make sure we're in the proper timeframe.
As of April 21st of '87 when you conduct this polygraph, as far as you knew, there was no other evidence out there to corroborate whatever it was saying; is that correct?
A. Not that I can recall.
Q. In fact, when you asked Everett on April 21st about other witnesses who could have corroborated it, he denied that they knew anything; is that correct?
A. Yes.

Page 321

Q. To emphasize, Everett is literally the only evidence you got against Crosland; is that correct?
MR. ZURBRIGGEN: Objection to the form. Again Detective, based on what you know.
THE WITNESS: That I can recall and that I know of at that time, yes.
BY MR. FEINBERG:
Q. You've already told me, polygraphs are an important part of a police investigation, right?
MR. ZURBRIGGEN: Objection. Detective, you can answer.
BY MR. FEINBERG:
Q. It can be.
A. It can be.
Q. You can use them to assess credibility; is that right?
A. You can.
Q. You can use them, as we discussed, as a tool to further probe things with a witness who you believe might not be truthful; is that correct?

Page 322

A. Yes.
Q. When you, as a detective, have questions about a witness' credibility, that's something that's absolutely important to be communicated to the District Attorney's Office; is that correct?
MR. ZURBRIGGEN: Objection to the form of the question. Detective, you can answer.
THE WITNESS: Yes.
BY MR. FEINBERG:
Q. In addition to the failed polygraph, there's no reference anywhere to the re-interview with Mr. Everett; is that correct?
MR. ZURBRIGGEN: Objection to the form of the question.
BY MR. FEINBERG:
Q. I'll withdrawal that.
Other than this activity sheet, there's no discussion of the re-interview with Mr. Everett; is that correct?
MR. ZURBRIGGEN: Same

Page 323

objection. Detective, from what you can glean from this.
THE WITNESS: Not that I know of.
BY MR. FEINBERG:
Q. Let me summarize the status of the investigation and we're going to change topics. But I think we'll take a break before we change topics.
As of April 21st of '87, Mr. Everett has given information which as we've established was just generic information about the crime; is that correct?
A. Yes.
Q. As we reviewed, that generic information was equivalent to what was reported in the press, agreed?
MR. ZURBRIGGEN: Objection to the form of the question. Detective again, if you can tell based on the documents that counsel showed you.
THE WITNESS: For the most part, not all of it.
BY MR. FEINBERG:

Page 324

Q. He wants a deal, Everett, right?
A. Yes.
Q. You bring Everett in for a second interview on April 21st and he can't add any additional facts; is that correct?
MR. ZURBRIGGEN: Objection to the form of the question. Detective, if you understand, you can answer.
THE WITNESS: Reading that interview, yes.
BY MR. FEINBERG:
Q. And then he failed the polygraph; is that correct?
A. Yes.
Q. So at this point, there's no way that he can support prosecution; is that right?
MR. ZURBRIGGEN: Objection to the form of the question. Detective, to the extent you can say, I know you're not a lawyer.
THE WITNESS: I don't know.
BY MR. FEINBERG:
Q. You didn't go ask for an arrest warrant at that point; is that right?

Page 325

A. No.
Q. You didn't go ask for a search warrant; is that right?
A. Not that I can remember.
Q. You didn't conduct any interviews with other witnesses from the scene, did you?
A. No.
MR. FEINBERG: Let's go off the record.
VIDEOTAPE OPERATOR: We are going off the record, the time is 2:57 p.m.
We are going back on the record. The time is 3:14 p.m.
BY MR. FEINBERG:
Q. Mr. Mangoni, we're back on the record after a break. Did you realize during the break that any of your previous testimony was incorrect or incomplete?
A. No, sir.
Q. I want to review just two factors that we discussed or two issues that we discussed before, real quickly to tie them up.
Do you know how we discussed in your April 21st interview with Mr. Everett,

Page 326

there was no discussion of a polygraph and no discussion of the re-interview and also no discussion about other murders in the neighborhood?
MR. ZURBRIGGEN: Objection to the form. Detective, you can answer.
THE WITNESS: As denoted, yes.
BY MR. FEINBERG:
Q. Can you think of any reason, any valid policing reason why those were not included in the text of the interview that Detective Hughes wrote on Exhibit-24?
MR. ZURBRIGGEN: Same objection.
THE WITNESS: No.
BY MR. FEINBERG:
Q. I also want to ask you about your methods in one follow up, on your methods with conducting interviews with Detective Hughes. You confirmed for me that even though one of you was doing the writing, in Detective Hughes case or the typing in your case, you would both ask questions, right?

Page 327

A. Yes.
Q. Would there ever be a time when you would step out of the room and discuss what your next question or next set of questions would be?
A. Maybe.
Q. At the end of the interview, would you ever step out and say, are we all done, confer with each other, are we all done, is there anything else that we need to do?
A. Maybe, yeah.
Q. Do you recall doing that with Mr. Everett?
A. I don't recall that, no. I'm not saying it didn't happen. I just don't recall it.
Q. So regardless of your specifics -- let me say that again.
Regardless of the specifics that occurred with Mr. Everett, your typical practice with Mr. Hughes would involve this collaborative process where you discussed your strategy with the witness; is that correct?
MR. ZURBRIGGEN: Object to the form. Detective, you can answer.

Page 328

THE WITNESS: Yeah, I don't know if you would call it strategy. We'd call it like, did we miss anything? Is there something else that we should ask, things of that nature, that you didn't want to speak in front of the witness.
BY MR. FEINBERG:
Q. Perfect. So in other words, despite the fact that Detective Hughes was senior to you, he would never have ended an interview without consulting with you; is that correct?
A. No, that's not true, no. For lack of a better term, there is probably times where I didn't know any better or would say, you know, Ed, I have an additional question, should we ask this question, something like that. But it's not a normal practice, no.
Q. The normal practice rather was for you to consult together; is that together?
A. Together when we interview someone?
Q. Yes.
A. Yeah, that would be with anyone.
Q. Okay, got it.
A. If I'm doing an interview with another

Page 329

detective.
Q. Let's change topics. We have been talking about Mr. Everett for a while here. I want to take one tangent to talk about the other witness who we referenced at the beginning of the deposition. That was Delores Tilghman.
I will represent to you that Ms. Tilghman after interviews with Detective Cimino and Detective McNesby, testified in a Grand Jury. We have a transcript of the Grand Jury proceedings here in Exhibit-22. Let me ask you to take a look at it.
As I do that, I know that you've told me you don't remember speaking to her. My purpose in showing you these documents is to refresh your recollection and see what, if anything, you might remember. So if you're -- all of the way back at the beginning of Tab 22.
Before I do that, let me explain -- I will represent to you who Delores Tilghman was. Mr. Crosland had a number of cousins who were investigated by the police.

Page 330

We've already talked about Frank Turner and Lester Turner. Do you remember those names?
A. Yes.
Q. Another cousin from the Turner family was Michael Turner. Do you remember hearing that name at all?
A. Yes.
Q. Michael Turner is someone who's in that South Philadelphia neighborhood and is connected by family to these other people we've discussed. The mother of Michael Turner's children was Delores Tilghman. Do you understand the background I've outlined?
A. The mother of who?
Q. Of Michael Turner's children?
A. Oh, okay.
Q. So Michael and Delores had been in a relationship, had children and so on.
Delores then testifies in several days of Grand Jury testimony, which we have, which we have the transcripts of right here. I am going to ask you to refer to, if you look at the bottom right corner of the pages, 8995, which is from a portion of

Page 331

testimony from February 26th of '88.
A. Got it.
Q. Just read that entire page, 8995 to yourself and let me know when you're finished.
A. Okay.
Q. I want to confirm for you that the detectives referenced here are Detective Cimino -- I can get these page references for you later. I'll ask you to accept my representation that the interview which is discussed in this testimony took place with Detective Cimino and McNesby.
A. Okay.
Q. You see that the interview that is referenced took place on April 16th of 1987; is that correct?
A. Yes.
Q. The interview took place while Ms. Tilghman was at Jefferson Hospital because she attempted suicide, agreed?
A. Yes.
Q. April 16th of '87 when that interview takes place is one day after you and Detective Hughes spoke to Mr. Everett about his alleged

Page 332

conversations with Curtis Crosland; is that correct?
A. Yes.
Q. Seeing those dates together, do you recall any conversations with Detective Cimino and McNesby about their efforts to get information from Ms. Tilghman?
A. I can't recall. Is there an interview with Delores Tilghman?
Q. This is all we have, sir, that I'm showing you now. I don't have any interviews. In fact, I'll answer that question and tell you that there was never any interview produced at the time of trial. All we have is Grand Jury testimony.
A. No, I can't recall that either, as far as asking him about Mrs. Tilghman. Is Mrs. Tilghman referenced in any of the interviews that I took?
Q. Why don't you hold onto that question and then we'll, as I look at the other interviews you took, we'll go through them.
A. I just don't remember.
Q. My question for you then is -- by the

Page 333

way, Cimino and McNesby are in SIU; is that correct?
A. Yes.
Q. You and Hughes are in SIU; is that correct?
A. Yes.
Q. If you get information in SIU on April 15th about Mr. Crosland being a suspect in the Heo murder, you're going to discuss that with other members of SIU; is that correct?
MR. ZURBRIGGEN: Objection to the form. Detective, you can answer generally.
THE WITNESS: Yes, either through us or maybe gave the information to a boss and the boss directed the information.
BY MR. FEINBERG:
Q. So at that point you would expect, and I know you don't have a specific recollection of this, but you would expect that other members of the SIU would be aware of the fact that Mr. Crosland was a suspect in the Heo murder?
MR. ZURBRIGGEN: Objection to

Page 334

the form. Detective, if you know, you can say.
THE WITNESS: I would tend to think so but it doesn't necessarily have to be that very next day. It could be a week later, I don't know.
BY MR. FEINBERG:
Q. But the bottom line, just to be fair about this, is that you don't know one way or the other whether Cimino and McNesby were acting based on information you got from Everett; is that correct?
A. Correct.
Q. You can put that Grand Jury testimony to the side. I'm going to ask you to flip back go back to Exhibit-14.
Sir, there are two front and back pages of handwritten notes that were taken from the homicide file regarding the Heo murder. And my understanding is that these were on smaller slips of paper that were copied, two pieces of paper per sheet. Do you understand what I've said there?
A. Yes.

Page 335

Q. So on these two pages, it looks like we've got four different handwritten notes, agreed?
A. Yes.
Q. Let's go through each one and see if you recall seeing them.
The first one which is on the first page, which is City 186, there is a note -- it looks like a message to Detective Nespoli, who was the assigned at the outset of the investigation, an unidentified called says that the man who shot Tony was Michael Ransome; is that correct?
A. Yes.
Q. Do you remember seeing this document in the file?
A. No.
Q. Do you remember hearing about Michael Ransome being identified as the shooter?
A. No, I was -- no, I don't.
Q. I'm sorry, you say I was --
A. No, no, I don't recall this. I don't recall seeing that, no. I wasn't in homicide then but I don't recall seeing it afterwards

Page 336

either.
Q. I think you told me before that when you would have gotten brought in to conduct Rodney Everett's interview in April of '87, you would have gone back and looked at portions of the homicide file; is that right?
A. Yes.
Q. Do you know whether you saw any information --
A. I can't recall if I specifically saw these four items.
Q. Is there a portion of the file where messages or handwritten notes go?
A. Yes, sometimes they're put in a file that's usually stated miscellaneous. That's where I put mine in.
Q. Is there a file that's specifically marked for tips?
A. On big cases there are, where there's a lot of tips.
Q. But accepting that situation, tips would typically go in the miscellaneous portion?
A. Yeah, a lot of them are miscellaneous.
Q. That's in the homicide file, not the

Page 337

binder; is that correct?
A. It should be in the file. It should be in an envelope. In big cases you would have sometimes marked tips, like when a police officer got shot, we did over 600 tips.
Q. Go to the second page. The first note, I'm going to go left to right. The first note from 12/19, 3:45 p.m., also a note to Detective Nespoli about a call from Bo Lim, B-O L-I-M, who's from the Korean Businessmen's Association.
A. Yes, I see it.
Q. It said he received info from a caller, the shooter was Michael Ransome and a second actor was a person named Robert from 2600 Manton M-A-N-T-O-N Street, correct?
A. Yeah, it's right down the block from there.
Q. So that's a tip that was received and in the file; is that correct?
A. Yeah, if you're showing me, yes. I'm taking your word for it.
Q. The next note, also 12/19, 2:00 p.m., message to Detective Nespoli. There's a

Page 338

report from Bob Kotzpaner, K-O-T-Z-P-A-N-E-R, Citizen's Crime Commission, that the doer was Clinton and the number two lookout was Mike Ransome, correct?
MR. ZURBRIGGEN: Objection to the form. Detective again, based on what you see here.
THE WITNESS: Based on this piece of paper, yes.
BY MR. FEINBERG:
Q. Agreed that what we've looked at, there are three separate calls who identify Mike Ransome as one of the perpetrators or the perpetrator at the outset of the investigation; is that correct?
MR. ZURBRIGGEN: Objection to the form. Detective, you can answer.
THE WITNESS: According to this paper, yes.
BY MR. FEINBERG:
Q. Do you recall learning about any efforts to locate Mike Ransome early on in the investigation?
A. I don't know of any. I don't recall

Page 339

any.
Q. You mentioned to me at the very beginning of the deposition today, that you reviewed your interview with Mike Ransome; is that correct?
A. Yes.
Q. Do you recall what it was that caused you to bring Mike Ransome in for an interview?
A. Was that the 24th? What date is his interview? I would have to find out. I probably took an interview where his name was mentioned and then we went out and picked him up.
Q. Fair question, sir. I'll withdrawal my question and come back to it in a time that will probably make more sense.
For now I just want to understand, what, if anything, you knew about Ransome once you got involved in this case in '87?
A. If I have paperwork with his name on it and why, then I might be able to answer. I can't --
Q. Let me show you the next thing we have

Page 340

which is Exhibit-15, the next exhibit over. It's an activity sheet. Why don't you read -- first things first: Did you look at this activity sheet prior to today's deposition?
A. No, this is the first time I saw this one.
Q. Take a moment to read this sheet from December 13th of '84 and let me know when you're finished.
First things first, we see that after the tips came in about Michael Ransome's involvement, Detectives Brignola and Ansel looked for records about Michael Ransome; is that correct?
MR. ZURBRIGGEN: Objection to form. Detective, if you can say --
THE WITNESS: According to this activity sheet.
BY MR. FEINBERG:
Q. By the way, when detectives prepare an activity sheet, you trust the reliability of what they say; is that correct?
MR. ZURBRIGGEN: Same objection. Detective, you can answer.

Page 341

THE WITNESS: Yes.
BY MR. FEINBERG:
Q. What they found is that Mr. Ransome had been prosecuted and convicted for a murder; is that correct?
A. According to this, yes.
Q. And that Ransome was, in fact, on parole at the time of the investigation; is that correct?
A. According to this, according to -- they looked into it apparently, yes.
Q. They also found an address for him at 1147 South 26th Street; is that right?
A. I concur. I don't disagree with you. I'm going by what's on this.
Q. How is your South Philly geography, sir? Do you know where that location is?
A. The 1100 block is between Washington and Federal, Federal and Reed.
Q. Would you agree that the shooting takes place at 27th and Oakford, the 1100 block is going to be a block or two --
A. A block or two north of it, maybe three blocks.

Page 342

Q. So Mr. Ransome then lives in the same neighborhood as the store, agreed?
A. Yes.
Q. On that topic, do you remember seeing that the shooter had fled north from the location of the store?
A. I don't remember if that's what the witnesses say.
Q. Yeah, I will represent to you to save some time, sir, that Maurice Durbin, D-U-R-B-I-N, who lived on the 2700 block of Oakford Street, told police on December 5th of '84, a couple hours after the shooting, this is at Exhibit-13, that he saw the shooter flee and run north on 27th Street. Will you accept that?
A. Yes.
Q. When we piece those two things together, the shooter is running in the direction of Mr. Ransome's reported address; is that correct?
MR. ZURBRIGGEN: Objection to the form. Detective, to the extent you can say --
THE WITNESS: According to

Page 343

this, he's running north. Right, north.
BY MR. FEINBERG:
Q. And Ransome's home was north of the store; is that correct --
MR. ZURBRIGGEN: Same objection.
THE WITNESS: Yes, it is.
BY MR. FEINBERG:
Q. Turn to the next activity sheet which is Exhibit-16. I assume you have not seen this one either.
A. No.
Q. You're welcomed to read the entire thing but let me just note for you that the only relevant portion is the last two paragraphs. Feel free to read those and let me know when you're done.
A. Okay.
Q. So you see that --
A. There is -- George Porter may have information.
Q. Before we even get there -- in fact, that's a good point. Have you seen any interview with Mr. Porter?

Page 344

A. No.
Q. The next paragraph down concerning Mr. Ransome, do you see that there were efforts to locate Mr. Ransome but he could not be located?
A. Yes.
Q. Do you recall detectives seeing any information about Mr. Ransome's physical description?
A. I don't.
Q. If look, you see I'm looking at photos that say Exhibit-17. Do you see these police photos from Mr. Ransome taken January 30th of '84, show him 5'6, 125 pounds?
A. Yes.
Q. And you recall the description of the shooter as being 5'5 and skinny?
MR. ZURBRIGGEN: Objection to the form. Detective, you can answer.
THE WITNESS: Yes.
BY MR. FEINBERG:
Q. So everything I have shown you over the past four or five minutes is information that was about Ransome from the very early stages

Page 345

of the investigation December '84, January '85, agreed?
A. Yes.
Q. In other words, police had anonymous tips about him -- not anonymous, they had tips from three people including Bo Lin and Bob Kotzpaner; is that correct.
MR. ZURBRIGGEN: Objection to the form of the question. Again Detective, from what you can glean from the notes that you've been shown by counsel?
THE WITNESS: I agree with you.
BY MR. FEINBERG:
Q. You had a physical description of him, right?
MR. ZURBRIGGEN: Same objections.
THE WITNESS: Yes.
BY MR. FEINBERG:
Q. And you had an address which was consistent with the direction of flight from the perpetrator; is that correct?
MR. ZURBRIGGEN: Same

Page 346

objections.
THE WITNESS: Yes.
BY MR. FEINBERG:
Q. I will represent to you that there's no interview with Mr. Ransome that takes place until you bring him in in April of '87, specifically April 24th of '87. For that purpose, let me show you Exhibit-25. I apologize, Exhibit-26.
A. Okay.
Q. Everett has mentioned him twice to you at this point, right? Both in your April 15th and April 21st interview; is that correct?
A. Yes.
Q. At the risk of repeating myself, there was information in the file going back to '84 and '85; is that correct?
A. That I just realized, yeah. I just saw now.
Q. Let me show you one other document which we don't have marked. This will be Exhibit P-43, sir.
\- - -
(Whereupon Exhibit P-43 was

Page 347

marked for identification.)
\- - -
BY MR. FEINBERG:
Q. Take a moment to read that to yourself.
A. Okay.
Q. This activity sheet is linked up, for lack of a better word, with your interview of Mr. Ransome on April 24th?
A. Yes.
Q. You note -- first of all, did you type this activity sheet or did Mr. Hughes?
A. I probably typed it, yes.
Q. The last phrase is: He was released and transported home. Was Mr. Ransome in custody for purposes of this interview?
A. No.
Q. What does that mean, released?
A. He was let go. We took him home. Semantics.
Q. Let's go back to your interview which is at Exhibit-26. This interview is typed so I am guessing based on what you told me before, you're the one who typed it?
A. I'm not saying I'm certain of it but I

Page 348

probably did.
Q. Same process as before, you and Hughes did the interview together, would collaborate and ask questions, both of you; is that correct?
A. Right.
Q. I want to ask you some questions about the details of the interview. Have you looked at this recently enough --
A. I saw this Friday for the first time in 40 years, I guess.
Q. Let's do this, I'm going to direct you to a couple of lines that I have specific questions about. If you need to take more time to read it to answer my questions, you'll tell me and I will give you that time.
First thing I want to ask you about is, before we get there. You introduce, you and Hughes introduce the topic of the interview by talking about the shooting at H&B at 27th and Oakford on 12/5/84, correct?
A. Yes, sir.
Q. You ask him, bottom of the page: Where were you when this shooting took place?

Page 349

A. Yes.
Q. He tells you he was in his house with his brother Gary and sister-in-law Delores; is that correct?
A. Yes.
Q. He's basically providing an alibi -- not basically, he is providing an alibi; is that correct?
MR. ZURBRIGGEN: Objection to the form. Detective, if you can say.
THE WITNESS: Yes.
BY MR. FEINBERG:
Q. Ransome had been a suspect in 1984 and here he was telling you that there were two witnesses who could corroborate his non-involvement; is that correct?
MR. ZURBRIGGEN: Objection again to the form. Detective, you can answer.
THE WITNESS: It speaks for itself, yeah.
BY MR. FEINBERG:
Q. Did you go interview Gary or Delores?
A. Not that I can recall.
Q. Do you know if anyone else did?

Page 350

A. I don't know.
Q. Can you think of any reason why they were not interviewed?
A. No.
Q. You would expect that these were logical interviews to conduct, to either rule out Mr. Ransome as a suspect or suggest that maybe he was lying to you; is that correct?
MR. ZURBRIGGEN: Objection to form. Detective, you can answer.
THE WITNESS: Yeah, well that's true and I can also say that maybe somebody did go out there to talk to them and they didn't want to talk. I don't know. I can't answer for what happened after I did this interview.
BY MR. FEINBERG:
Q. If that happened, that would have been documented in the file; is that correct?
A. It may have been, yeah, I'm sure.
Q. I think we talked before about if detectives go out and speak to a witness and the witness doesn't want to talk to you --
A. Yeah, but you're talking about policies.

Page 351

I'm not talking about the specifics detectives do. I don't know what they did. I can't answer that. You asked me about policy, you asked me about generalities. I give you the responses to that. I cannot give you responses to what a detectives does or didn't do 40 years ago. I can't do that.
Q. Would you expect that the detectives who you trust and relied on would act incompliant with Philadelphia Police Department homicide division practices?
MR. ZURBRIGGEN: Same objection. Again Detective, you can answer generally.
THE WITNESS: I can't tell you that. I can't say yes or no. Maybe they have a reason why they didn't want to go at a certain time. I don't know.
BY MR. FEINBERG:
Q. Can you think of any reason why someone would not document an effort to go interview Gary and Delores about Michael Ransome's involvement in this crime?
MR. ZURBRIGGEN: Same

Page 352

objection. Again Detective, you can answer, based on what you know.
THE WITNESS: Maybe at the time they didn't want them to think that maybe they were looking at him a little bit harder. I don't know. I can't answer for another detective.
BY MR. FEINBERG:
Q. So I think we may be speaking past each other. You said you can't -- you said you're not sure whether anyone went out and actually spoke to them. My response was, just to play this back, if anyone did go out and talk to them, you would expect that to be documented, right?
A. Yes.
MR. ZURBRIGGEN: Same objection.
THE WITNESS: Yes.
BY MR. FEINBERG:
Q. We're on the same page about that. Next topic I'll ask you concerning Mr. Ransome's interview, flip to the second page. Do you see the question: Who told you about the

Page 353

shooting?
A. Yes.
Q. The answer is: I heard from a girl by the name of Sharon. She lives around 25th and Federal Streets. She was about 14 or 15 years old. Correct?
A. Yes.
Q. Another witness who can corroborate or undermine what Mr. Ransome is saying; is that correct?
MR. ZURBRIGGEN: Object to form. Detective, if to the extent you can tell.
THE WITNESS: According to this interview, yes.
BY MR. FEINBERG:
Q. Same thing, that's a witness who could be interviewed to provide relevant information about Mr. Ransome; is that correct?
MR. ZURBRIGGEN: Same objection.
THE WITNESS: Could be.
BY MR. FEINBERG:
Q. And you don't know one way or the other

Page 354

whether anyone interviewed Sharon; is that correct?
A. I don't know if this girl even exists. I don't know. I can't answer that.
Q. You would expect that if someone did make an effort to, number one, locate and number two, interview Sharon, that that would be documented in the file.
MR. ZURBRIGGEN: Same objection. Again Detective --
THE WITNESS: Yes.
BY MR. FEINBERG:
Q. Next question down: Were you ever in the store before? Do you see that?
A. Yes.
Q. Answer: Yes, I used to buy cheeseburgers and fries there; is that correct?
A. Yes.
Q. Mr. Ransome acknowledges having been in the store; is that correct?
A. Yes.
Q. We talked before about how, according to the witness Mona Madison, the person who did

Page 355

the shooting referred to Mr. Heo by the name Tony; is that correct?
A. Yes.
Q. Which at least raised the inference that the perpetrator was someone who number one, knew Mr. Heo, correct?
A. Yes.
MR. ZURBRIGGEN: Objection to form.
BY MR. FEINBERG:
Q. And number two, had been in the store before, correct?
MR. ZURBRIGGEN: Object to the form. Detective, you can answer based on --
THE WITNESS: According to this, yes.
BY MR. FEINBERG:
Q. Let me ask you, do you recall the questions I asked you about whether you went or anybody else went and showed Mr. Crosland's photo to the witnesses from the store. Do you remember those questions and answers?
A. Yes.

Page 356

Q. Do you know whether anyone went, based on this acknowledgement by Mr. Ransome that he was in the store, do you know whether anyone went and showed his photo to the witnesses who were in the store at the time of the shooting?
A. I have no idea.
Q. If that happened, you would expect it to be documented in the file?
MR. ZURBRIGGEN: Objection to the form. Detective, you can answer if you know.
THE WITNESS: Yes.
BY MR. FEINBERG:
Q. Mr. Ransome said, I'm on page 3 now, second question from the bottom: Do you own a gun? Answer, no, I never owned a gun. Right?
A. Yes.
Q. That's a lie, right?
MR. ZURBRIGGEN: Objection to the form. Detective, if you know.
THE WITNESS: I don't know.
BY MR. FEINBERG:
Q. He was convicted of shooting David Wilson from the 19 --

Page 357

A. I don't -- so that's self explanatory I guess, yes.
Q. Do you recall talking with Detective Hughes about confronting or not confronting Mr. Ransome about that fact?
A. I don't recall. I didn't even remember it now until you just told me.
Q. Can I assume -- we talked before that before you interview a witness, you typically will look at their criminal extract to find out their record?
A. Yes.
Q. That will tell you a lot of things about the person but namely about how credible they are; is that correct?
A. Yes.
Q. So you assume that you would have known about Mr. Ransome's history when you talked to him; is that correct?
MR. ZURBRIGGEN: Objection to the form. Detective, you can answer.
THE WITNESS: I probably did, I don't remember that specific part. I just don't remember. Did I look at his record,

Page 358

probably.
BY MR. FEINBERG:
Q. The next question: Would you take a lie detector's test on what you have told us tonight? And his answer was, no. So he didn't want to take a test, right?
A. Right.
Q. That was included in this statement from Mr. Ransome obviously, correct?
A. Yes.
Q. It speaks for itself, right. Which is different from the practice that you and Detective Hughes used when talking to Mr. Everett; is that correct?
MR. ZURBRIGGEN: Objection to the form. But again Detective, to the extent you know, you can say.
THE WITNESS: Again, it's not a practice. Sometimes it was mentioned in the activity sheet and the interview. Sometimes it's just denoted on the interview. Sometimes it's just denoted on the activity sheet. It's all incumbent upon who typed up the activity sheet.

Page 359

BY MR. FEINBERG:
Q. Did the fact that he did not want to take a polygraph cause you to think one way or another about him? In other words, was it relevant to you?
A. Yeah, it was relevant.
Q. Relevant how?
A. Relevant that he may be lying.
Q. Do you know whether after Mr. Ransome was interviewed in April of 1997 -- pardon me, 1987, anyone from the Philadelphia Police Department went and spoke to him again?
A. That, I don't know. I would imagine other detectives spoke to him, like during the time -- close to the trial time and things of that nature.
Q. It sounds like you haven't seen any information, one way or the other?
A. No, I don't know.
Q. Once again, if there were efforts to speak with Mr. Ransome or further investigate it, you would expect it to be documented in the file; is that correct?
A. Yes.

Page 360

Q. The next time you spoke with Mr. Everett after April 15th and April 21st was July 7th, correct?
A. Yes, I believe so.
Q. If you want to confirm that I'm right about that, go look at Exhibit P-8. Apologies, P-10.
A. Okay.
Q. P-10 is your interview statement -- pardon me, the report of your interview with Mr. Everett on July 7th; is that correct?
A. Yes.
Q. If you just flip back to P-8, that looks like your activity sheet regarding that same interview and relevant follow-up investigation; is that correct? You've got it right there. That's the back of it. If you flip the page, you'll see the front.
A. Yes.
Q. So both P-8 -- Exhibit-8 and Exhibit-10 refer to your investigative activities on July 7th; is that correct?
A. Yes.
Q. Before we get into what happened on

July 7th, I'll represent to you, sir, that having gone through the entire file, I don't see records of any investigative activities that take place between your interview of Mr. Ransome on April 24th and that July 7th interview. So a period of -- maybe just shy of two and a half months. Do you understand that representation?
A. Yes.
Q. Do you have any reason to disagree with that?
A. No.
Q. It sounds like the investigation is in the same place, right?
The investigation is at the same status, in that Mr. Everett is the only witness who has provided information about Mr. Crosland; is that correct?
MR. ZURBRIGGEN: Objection to the form of the question. Detective, based on documents that have been shown to you, you can answer.
THE WITNESS: Based on what you just told me, yes.



BY MR. FEINBERG:
Q. We already reviewed how despite your efforts on April 21st to find out about witnesses who could corroborate what Mr. Everett was saying, he told you that no, he hadn't told Ransome, he hadn't told Frank Turner, he hadn't told Louise Woods, correct?
MR. ZURBRIGGEN: Objection to form. Detective, again you can answer --
THE WITNESS: Based on the interview, yes.
BY MR. FEINBERG:
Q. That was all you had to go on still, as of July 7th; is that correct?
MR. ZURBRIGGEN: Same objection.
BY MR. FEINBERG:
Q. Meaning Mr. Everett?
A. That I can recall, yes.
BY MR. FEINBERG:
Q. So when you brought him back on July 7th, it sounds like your purpose was to see if there was anybody else who could corroborate what was telling you; is that



correct?
MR. ZURBRIGGEN: Objection to the form. Detective, if you know, you can say.
THE WITNESS: Going by this, there was really on only one question we asked about that, and the response was, he really didn't know anything. I have a funny feeling that the boss is probably saying, bring him down to see what he knows about these other cases.
BY MR. FEINBERG:
Q. When you say you have a funny feeling, what do you mean by that?
A. I'm just going by what the interview says. We asked him one question concerning the 27th and Oakford job, and he said he didn't know anything anymore. So the rest of the interview was pretty much about these other cases.
Q. Well, it's not that he doesn't know anything, he also tells you other people who Curtis may have told; is that correct?
A. I didn't read the whole interview. But



if that's in there, I take your word for it.
Q. Let's do this to set the stage for that question and a couple of follow ups. First, let's confirm the background. This interview is conducted by you and Detective Rocks; is that correct?
A. Right.
Q. How is it that Detective Rocks has now joined up with you for this one, instead of Detective Hughes?
A. I think Detective Hughes might have gotten transferred out of homicide by then. I'm not 100 percent sure. Could have been Eddie was off sick that day. I don't know. I don't recall that.
Q. So at that point Rocks knows basically nothing about the case; is that right?
MR. ZURBRIGGEN: Objection to the form. Detective, to the extent you know --
THE WITNESS: As far as I know, basically.
BY MR. FEINBERG:
Q. Whereas you at that point had conducted

Page 365

two interviews with Mr. Everett; is that correct?
A. Right.
Q. You could never get an interview with Mr. Ransome; is that correct?
A. Right.
Q. You also prepared a couple of activity sheets about your interview with Mr. Ransome; is that correct?
A. Yes.
Q. And your polygraph of Mr. Everett; is that correct?
A. Yes.
Q. So between the two of you, you've got the knowledge base about the case; is that right?
MR. ZURBRIGGEN: Objection to the form. Detective, you can answer.
THE WITNESS: Yes.
BY MR. FEINBERG:
Q. And you referred to him as Eddie Rocks, it sounds like you're deeply familiar with him; is that right?
A. I have known Eddie since 1985.

Page 366

Q. I assume then that the two of you had a rapport working in an interview together; is that right?
A. Yes.
Q. Would you have told Detective Rocks the background about the case and why you were bringing Everett in for an interview?
A. I'm sure I did. I'm sure the boss knew. I'm sure the boss also explained to Eddie. But I just don't remember what boss we had at that time.
Q. That was my -- can you tell who the boss is?
A. It's got to be I guess either Lieutenant Thompson or Sergeant Descher.
Q. What's Lieutenant Thompson's first name?
A. Thomas.
Q. Thomas Thompson, right?
A. Yes.
Q. Descher is Joseph; is that correct?
A. Yes.
Q. They were squad 4 supervisors; is that right?
A. I don't remember if they came back to

Page 367

SIU in the meantime and Freddie -- Sergeant Westerman and Lieutenant Lanzelotti had left. I just don't know. I don't remember how it happened.
Q. You may have told me this at the beginning and I'm sorry if I'm misremembering, your supervisors in SIU would have been -- was it anybody else besides Descher, Thompson, Westerman or Lanzelotti?
A. I had other supervisors but at a later time.
Q. But in '87, it was one of those four -- two of those four, you always had a sergeant and a lieutenant above you; is that correct?
A. Yes.
Q. So it was either Thompson and Descher or Lanzelotti and Westerman who were your supervisors?
A. Right. Just so you know, Lieutenant Lanzelotti and Sergeant Westerman were also 4 squad supervisors prior to that.
Q. So getting back to our point about July 7th, you don't know who initiated the process of bringing Mr. Everett back, it could

Page 368

have been your decision, could have been one of the bosses; is that correct?
A. It was probably one of our bosses. Like I said, we had other cases we were working. We weren't specifically working on this case.
Q. Let's go to the first question that you ask. Actually, one more threshold question. I take it you and Rocks did things the same way as you and Hughes, where one of you would be typing but both of you would be asking questions?
MR. ZURBRIGGEN: Objection to the form. You can answer generally.
THE WITNESS: Yeah, pretty much so. Eddie was very detailed. Eddie Rocks was very detailed.
BY MR. FEINBERG:
Q. The same thing as with Hughes, that you might occasionally step out of the room and talk about whether you missed anything, whether there was a different question to ask and so on?
A. Sure.
Q. The first question you ask is: Rodney,

Page 369

referring to Mr. Everett, you have been interviewed in the past by homicide detectives concerning the murder of a grocer at 27th and Oakford Streets. Is there anything else that you can add at the present time? The first thing he says is: I really do not know anything else. But then he proceeds to talk about other people who may have been told about Curtis Crosland's involvement; is that correct?
A. Yes.
Q. Do you recall any preliminary conversation where you told Mr. Everett, hey, we need to know who else heard from Curtis?
A. No, I mean the question is pretty self explanatory. We just ask him there if he knew anything else more since the last time we talked to him, which I guess was what, three months prior.
Q. And then he proceeds to go right into other people who may have information; is that correct?
A. Right.
Q. Do you recall when talking with your

Page 370

supervisors or with Detective Rocks, that the one thing that you could get from Mr. Everett about the Heo murder was other people who could corroborate what Everett was telling you?
A. I didn't know what he was going to answer but that was the outcome of that question, yes.
Q. That was certainly information that you would have been hoping for at that point; is that correct?
MR. ZURBRIGGEN: Objection to the form. Detective, you can answer.
THE WITNESS: Yes, of course.
BY MR. FEINBERG:
Q. Because up to that point, you had no one else to corroborate what Mr. Everett was telling you about Mr. Crosland's alleged confession; is that correct?
MR. ZURBRIGGEN: Objection to form.
THE WITNESS: Not that I recall.
BY MR. FEINBERG:

Page 371

Q. So then in this answer, Mr. Everett mentions -- it looks like six possible people, Talmadge Garwood, Lester Turner, Michael Turner, Raymond Crosland, Frank Turner and Michael Ransome, agreed?
A. Yes.
Q. Based on our previous questions and answers, I assume that these are people that you would want to speak to in an effort to corroborate Mr. Everett's testimony; is that correct?
A. Yes.
MR. ZURBRIGGEN: Objection to form. Detective, you can answer.
THE WITNESS: Yes.
BY MR. FEINBERG:
Q. You've already talked to Mr. Michael Ransome, right?
A. Yes.
Q. He has told you -- he essentially disputed everything Mr. Everett said, right?
MR. ZURBRIGGEN: Objection to the form.
THE WITNESS: He told us

Page 372

nothing, right.
BY MR. FEINBERG:
Q. So that leaves you with five people; is that correct?
A. Yes.
Q. Do you know whether any of those people were spoken to about Mr. Everett's -- strike that. Do you know whether any of those people were interviewed period?
A. I have no idea, sir.
Q. You would expect that -- strike that.
These are people that if you continued with this investigation, you would want to interview; is that correct?
MR. ZURBRIGGEN: Objection to the form. Again Detective, if you can say.
THE WITNESS: At least make an attempt to interview, yes.
BY MR. FEINBERG:
Q. And if there were any efforts to interview them, you would expect that to be documented in the file; is that correct?
MR. ZURBRIGGEN: Same objection. Detective, you can answer.

Page 373

THE WITNESS: Yes.
BY MR. FEINBERG:
Q. After you discussed the Heo murder with Mr. Everett on July 7th, he then proceeds, as you mentioned, to talk about a number of other different murders; is that right?
A. Different shootings, yes.
Q. In fact, going back -- remember I said we would come back to this, on April 21st the activity sheet noted that there was a discussion of several other murders and that Everett appeared not to know much about them, other than the names of people who were killed; is that right?
MR. ZURBRIGGEN: Objection to the form. Detective, if you can glean that.
THE WITNESS: I believe so, yes.
BY MR. FEINBERG:
Q. Let me ask you -- actually before we get there, if a witness provides information about multiple murders to you -- let me ask it this way: We know Curtis Crosland was ultimately prosecuted for the Heo murder; is that

Page 374

correct?
A. Yes.
Q. Would you agree that the fact that Everett provided information about multiple different murders is relevant to the prosecution in the Heo case?
MR. ZURBRIGGEN: Object to form. Detective, if you know or can say.
BY MR. FEINBERG:
Q. Yes, all of my questions are what you know.
A. Yeah, I mean, are you talking about like going to trial?
Q. Let me ask it generically. If someone is an informant to law enforcement on a number of different cases, that's relevant information for the prosecution to be aware of, right?
MR. ZURBRIGGEN: Objection again, to the form. Again, to the extent you know, Detective, based on your personal knowledge.
THE WITNESS: Yeah, based on my knowledge, sure.

Page 375

BY MR. FEINBERG:
Q. Because if someone is an informant on multiple cases, a defense attorney can cross examine that person about their efforts to help themselves on multiple different cases, right?
MR. ZURBRIGGEN: Same objection.
THE WITNESS: Yes.
BY MR. FEINBERG:
Q. It also shows if they're immersed in multiple different aspects of criminal activity, that's relevant to undermine their credibility, right?
MR. ZURBRIGGEN: Same objection.
THE WITNESS: It can be, sure.
BY MR. FEINBERG:
Q. So for example, if Everett -- if everyone Everett associates with is a murderer or someone who is doing shootings, that's relevant to his credibility; is that correct?
MR. ZURBRIGGEN: Same

Page 376

objection.
THE WITNESS: It can be, sure.
BY MR. FEINBERG:
Q. So the fact that Everett is in this case giving information on five or six different murders, that's relevant information for the prosecution to be aware of; is that correct?
MR. ZURBRIGGEN: Same objection. Detective, you can answer.
THE WITNESS: Yes.
BY MR. FEINBERG:
Q. Just a couple of questions about the specifics that were discussed. The bottom of the first page, there is -- the first question from the bottom, you made a mention concerning the rifle; do you see that?
A. Yes.
Q. In connection with your arrest in March of '87, what did you mean by that? Where did that mention take place? Was that in a conversation that's not recorded here?
A. Maybe.
Q. Do you have any idea why that's not

Page 377

recorded?
A. No.
Q. Go to the next page, please, page 2. Do you see reference to Squirt or Frank Turner?
A. Yes.
Q. Were you aware of any other investigative interest from other homicide detectives about Mr. Turner's involvement in South Philly murders?
A. Not at the time, I don't believe so. We do -- there was a group of guys doing jobs down there, doing robberies and stuff down there. I didn't know about murders or anything like that.
Q. When you say doing jobs, you're referring to Frank Turner; is that right?
A. Yeah.
Q. Jobs is a homicide division lingo for crimes; is that right?
A. Yes, exactly. Sorry.
Q. That's all right. The next murder that's talked about or the next suspect that's talked about -- strike that.
Frank Turner is talked about

Page 378

in connection with the killing of John Lamb, do you see that, those questions and answer?
A. Yes.
Q. Would you agree that Mr. Everett's information about the John Lamb murder is similar in nature to what he told you about the Heo murder?
MR. ZURBRIGGEN: Objection to the form of that question. If you understand it, Detective, you can answer.
BY MR. FEINBERG:
Q. I agree, that's not a great question.
Backing up, Everett told you that Crosland confessed to the Heo murder; is that correct?
A. That's correct.
Q. Here Everett is telling you that Frank Turner confessed to the Lamb murder; is that correct?
A. Yes.
Q. He's also telling you that Curtis Crosland talked about the motive for the Lamb murder; is that correct?
A. Yes.

Page 379

Q. Does he give you any other information about the details of the murder?
MR. ZURBRIGGEN: Objection to the form. Detective, you can answer.
THE WITNESS: According to this, it was something about a fight that Squirt had.
BY MR. FEINBERG:
Q. Now that I've laid that foundation, would you agree that the nature of the information provided is similar to the information that Everett provided about the Heo murder?
MR. ZURBRIGGEN: Same objection. Detective, you can answer.
THE WITNESS: Yes.
BY MR. FEINBERG:
Q. There's more discussion of Eugene Myrick on page 4. Do you know who Myrick was accused of killing?
A. I don't know off hand, no.
Q. This is something we're going to come to later. I'm going to take it out of my binder to save you the trouble. We marked this as

Page 380

Exhibit-34. This is your interview with Rodney Everett from January of '88.
Look at the first page of that. Specifically what I want to know is, do you see reference to the murder of David Jennings. I see you're reading the entire interview, sir, which you're welcome to do.
A. Yeah, I don't really recall this too much or what lead up to me doing this interview.
Q. Let's do this, to expedite things --
A. I was still in SIU at the time, I can tell you that.
Q. I'm not going to ask any questions about the details of that interview right now. I may come back to it later. Let me take it back from you now. Really, I think you've told me that you don't remember the details of that particular homicide.
A. I don't remember the circumstances. All I remember, I can tell you I was still in SIU because I was still a police officer.
Q. We will come back to the timeframe of this later so it will make more sense.

Page 381

Final question or set of questions about the July 7th interview. Do you still have page 5 in front of you?
A. Yes.
Q. There's questions about the rifle that was used by Myrick. And Mr. Everett says, I got the rifle to give it to my contact, Mr. Massey, and he would turn it over to the police. I knew it was the murder weapon.
Tell me if this sounds right to you, Mr. Everett is saying, yeah, the rifle was in my house because I was going to give it to Mr. Massey.
MR. ZURBRIGGEN: Objection to the form. Detective, to the extent you know from this.
BY MR. FEINBERG:
Q. There are other documents on that, sir. I'm just trying to save you the time. Do you know whether that's the case?
A. Can you ask that question again?
Q. Sure, do you know whether Mr. Everett was planning to give that rifle that was found in his house to Mr. Massey?

Page 382

A. Going by this, the answer is yes.
MR. ZURBRIGGEN: Objection, for the record.
BY MR. FEINBERG:
Q. Did you believe him?
A. I don't remember. I probably did, I just don't remember because I didn't know much about this case when I interviewed him. I don't remember the circumstances, how I came about to interview this guy, him, on this particular case.
Q. Once again, sir, after this interview on July 7th with Mr. Everett, you still don't have any specific information about Mr. Crosland's alleged confession from anyone other than Mr. Everett; is that correct?
MR. ZURBRIGGEN: Object to the form. Detective again, you can answer.
THE WITNESS: Yeah, I did not know.
BY MR. FEINBERG:
Q. In terms of what you did with it, let's look at your activity sheet from Exhibit-8. Go back two exhibits.

Page 383

Would you agree -- by the way, this is one of the activity sheets you reviewed to prepare?
A. Yes, I believe -- yes.
Q. It looks like the first six paragraphs of this activity sheet report information summarizing the interview that you conducted with Mr. Everett's; is that correct?
A. Yes. Can I ask you a question? Do you have at the top, do you have a date on this? I can't read the date on this activity sheet.
Q. I'll tell you, sir, that this activity sheet was provided in this fashion from your counsel. But for reference, I will point you to the first sentence which says: On this date Detective Rocks and Police Officer Mangoni did obtain --
A. I would imagine it was 7/7, the date of the interview.
Q. When you look at the first six paragraphs which corresponded to the interview from that same date, you would assume that this activity sheet relates to that interview, correct?

Page 384

A. Yes.
Q. Procedurally, is there a reason why you would summarize information in an activity sheet that was also reflected in an interview statement?
A. Yes.
Q. Why is that?
A. That's what the activity sheet was a summary of, what the interview stated.
Q. Down to the second paragraph from the bottom --
A. Record checks.
Q. Looks like you performed record checks on Mr. Crosland, Mr. Goodman, Mr. Garwood, Lester Turner, Frank Turner, Raymond Crosland and Ralph Turner; is that correct?
A. Yes.
Q. Those were all people who were mentioned during Mr. Everett's interview with you on July 7th; is that correct?
A. Yes.
Q. Pulling those records is the first step to try to go locate those people; is that correct?

Page 385

MR. ZURBRIGGEN: Object to the form. Detective --
THE WITNESS: Well, it's something we would do right away, sure.
BY MR. FEINBERG:
Q. To figure out whether they are in custody; right? Is that correct?
A. Yes.
Q. If someone is in custody, that's an obvious target of someone you want to interview; is that correct? They are, for lack of a better word, a captive audience; is that right?
A. Yes.
Q. You also did a warrant check on all of them?
A. Right.
Q. The reason you'd want to know about warrants is, if there was in fact a warrant for one of them, you could take them into custody and interview them while they are in custody; is that correct?
A. Correct.
Q. You also got photos for all of them; is

Page 386

that right?
A. They were ordered, I don't know if we got them that particular night. Everything had to be done by hand then.
Q. Fair point. As we have said a number of times now, if there was any effort to seek out interviews with these people, that would be documented in an activity sheet; is that correct?
MR. ZURBRIGGEN: Objection to the form. Detective, if you can say.
THE WITNESS: I would imagine so, yes.
BY MR. FEINBERG:
Q. There's reference at the bottom of this page to fingerprints. Do you know whether there are any findings on those fingerprints?
A. I don't know.
- - -
(Whereupon Exhibit P-44 was marked for identification.)
- - -
BY MR. FEINBERG:
Q. Sir, I'm showing you -- I am assuming

Page 387

that you've never seen this before. This will be marked as Exhibit P-44. I will represent to you, sir, that this is a document that was in the conviction integrity unit's file from their investigation of Mr. Crosland's conviction. And there were discussions about fingerprint evidence. I will ask you to turn to the second page.
A. Okay.
Q. There are two names in the middle of the page of this report from the latent print unit laboratory report. Do you see the names Steven Gruckin and James Atkinson?
A. Yes, I do.
Q. Do you have any idea who they are?
A. No.
Q. Never heard those names before in connection with this case?
A. No. This is dated 7/1/2020?
Q. Yes.
You still have the activity sheet in front of you? Mr. Mangoni, do you still have the activity sheet in front of you?
A. Yes, same one, yes.

Page 388

Q. I only wanted to ask you about those two names. I don't intend to come back to that.
If you saw anything in there that you want to call to my attention --
A. No, I'm reading it.
Q. Flip to the back of your activity sheet there. Page City-217.
A. Okay.
Q. There's reference to an interview that was conducted with Louise Woods to quote, let her know that we had spoken to Rodney Everett?
A. Okay.
Q. Why didn't you want to tell Louise Woods that you spoke to Rodney Everett?
A. I don't recall. I don't know why.
Q. She also mentioned that Michael Everett and Ralph, who was also known as Ralph Everett, was in the neighborhood at the time; is that correct?
A. Yeah, that he's in the neighborhood.
Q. And that was Rodney Everett's cousin who made, according to Rodney Everett, have had information about the Heo murder; is that correct?

Page 389

MR. ZURBRIGGEN: Object to the form. Again Detective, if you can tell based on what you've seen.

THE WITNESS: Indicated on that paper, yes. I didn't even know it was his cousin, but yes.

BY MR. FEINBERG:

Q. Do you have any idea whether anyone interviewed Michael Everett?

A. No, I do not.

Q. Sir, after July 7th of '87, just to confirm, now that we've looked at the interview and the activity sheet, Rodney Everett is your only witness identifying Mr. Crosland as the perpetrator; is that correct?

MR. ZURBRIGGEN: Objection to the form of the question. Again Detective, based on what you know.

THE WITNESS: Yes, as far as I know.

BY MR. FEINBERG:

Q. You have concerns about his credibility; is that correct?

MR. ZURBRIGGEN: Same

Page 390

objection. Detective again, based on what you recall.

THE WITNESS: Did I have concerns about his credibility?

BY MR. FEINBERG:

Q. Yeah.

A. I thought I answered that.

Q. Well, he failed a polygraph, right?

A. Yeah, but that's not answering the question you asked me. The answer I said is no.

Q. Let me ask it this way, you had no corroborating information, right?

MR. ZURBRIGGEN: Objection to the form of the question.

THE WITNESS: Yes.

BY MR. FEINBERG:

Q. He failed a polygraph, right?

A. Yes.

Q. You've already agreed that that was exculpatory, correct?

MR. ZURBRIGGEN: Objection to the form of the question. Again Detective, based on how you understand that.

Page 391

THE WITNESS: Could be, sure.

BY MR. FEINBERG:

Q. Also Mr. -- strike that.

As we have discussed, Mr. Everett had provided information that was generic and available to the public; is that correct?

MR. ZURBRIGGEN: Objection to the form of the question. Again Detective, you can answer based on what you've seen.

THE WITNESS: Except for the part about flinching.

BY MR. FEINBERG:

Q. After -- strike that.

To your knowledge, were there any further interviews conducted in an effort to corroborate what Mr. Everett had been telling you?

MR. ZURBRIGGEN: Object to form.

THE WITNESS: Not to my knowledge.

BY MR. FEINBERG:

Q. In this time period, there was no arrest

Page 392

warrant obtained for Mr. Crosland; is that correct?

A. No, sir, not that I know of.

Q. I want to talk to you about the other witnesses who were available to be consulted with at this stage of the investigation because they were known at the outset of the investigation.

For this purpose, we're going to look at Exhibits 11, 12 and 13, which were the three statements taken from eyewitnesses at the time of the murder. What I'm going to do, sir, to make this go as quickly as possible is to direct you to the portion of each statement referencing witnesses. I extend the invitation, as I have throughout, that if you need to read more, tell me and we will take the time.

A. Okay.

Q. First with Exhibit-11, that's Ms. Madison.

A. I have it.

Q. Look at pages 114. The bottom of page 114.

Page 393

A. Okay.
Q. Do you see reference to four teenage boys were standing inside the store by the doorway?
A. Yes.
Q. So that's four people who were present at the scene of the crime; is that correct?
A. According to her, yes.
Q. If you flip over to page 116, she is able to name two of them; is that correct, at the bottom of the page?
A. Yes.
Q. She has got identifying information. One has a nickname Peanut, who lives in the 2700-block of Oakford; is that correct?
A. Yes.
Q. The other has the last name Fredricks and lives on 28th between Oakford and Wharton; is that correct?
A. Yes.
Q. According to Ms. Madison -- based on Ms. Madison's information, you've got two other witnesses, Peanut and Fredricks who have information about the case; is that correct?

Page 394

MR. ZURBRIGGEN: Objection to form. Detective again, based --
THE WITNESS: According to this interview, yes.
BY MR. FEINBERG:
Q. Let's go to Exhibit-13 which is the statement of Maurice Durbin. Durbin mentions, if you look -- answer, page City-119, the handwriting is a little tough so I'll read it.
I was standing outside my house, me, Eugene Fredrick, 28th Street; John Erby had left. I heard a shot. And then we continue on and then there's -- let me stop there.
Would you agree we've got reference now to a Eugene Fredrick and John Erby?
A. Yes.
Q. Go to Exhibit-20. I apologize, tab. This is Exhibit -- Adam, all of these documents that I'm about to show Detective Mangoni are things that I was planning to do with Hughes. When I mentioned that this has to be more time consuming than planned, this

Page 395

is what I'm talking about here.
This will be marked as Exhibit P-45.
- - -
(Whereupon Exhibit P-45 was marked for identification.)
- - -
BY MR. FEINBERG:
Q. Sir, this is a note that was in the homicide file. Do you see someone here has written out Peanut, Fredricks, John Erby and also Oscar Brown?
A. I see that.
Q. This presumably was a note written at the early stages of the investigation, agreed?
MR. ZURBRIGGEN: Objection to the form. Detective, if you know.
THE WITNESS: I have no idea when this was written.
BY MR. FEINBERG:
Q. Sir, I am going to hand you another activity sheet from the early stages of the investigation, actually the day of the shooting. This will be marked as Exhibit

Page 396

P-46.
- - -
(Whereupon Exhibit P-46 was marked for identification.)
- - -
BY MR. FEINBERG:
Q. Look at the second page which is on the back, the second paragraph on the bottom, there are some names of juvenile witnesses that were taken by the uniformed police officers. These names will be checked and these witnesses will be talked to tomorrow. Do you see that?
A. Yes.
Q. Do you have any idea whether that was done?
A. I have no idea, sir.
Q. Now back to your binder, Exhibit-18. This I reviewed with Detective Rocks. These are handwritten notes found in the homicide file, presumably from the early stage of the investigation which lists Ronald Skinner, Bruce Brooks --
A. I can read these, just to save time.

Page 397

Q. Would you agree that there are ten witnesses listed in these handwritten nose?
A. Yes. I don't -- let me say this, I don't know if they're witnesses, I don't know what the correlation is. But there are ten names here.
Q. These are people who were believed, to potentially have information about the Heo murder; is that right?
MR. ZURBRIGGEN: Objection to form. Detective, if you know.
THE WITNESS: If you're telling me, yeah.
BY MR. FEINBERG:
Q. I am actually asking you.
A. I don't know.
Q. Look at the top of the page, it says --
A. It says, to interview.
Q. Presumably one of your fellow detectives -- you weren't in homicide then. A detective in homicide made the determination that these ten people should be interviewed; is that correct?
A. Yes.

Page 398

Q. I will represent to you that the only name that I see an interview for is Oscar Brown, which is Tab 23.
- - -
(Whereupon Exhibit P-47 was marked for identification.)
- - -
BY MR. FEINBERG:
Q. This is P-47. As you're looking at that, I'll note that this is an interview of Oscar Brown. We can probably dispense with the relevance of this from the second question, which is: Did you see the person who did the shooting? And the answer was: No, I wish I did. Do you see that?
A. Yes.
Q. Mr. Brown was interviewed and it turns out he wasn't able to provide relevant information about the shooter; is that correct?
MR. ZURBRIGGEN: Objection to the form. If you can tell, Detective.
THE WITNESS: According to this interview, yes.

Page 399

MR. FEINBERG: This will be P-48.
- - -
(Whereupon Exhibit P-48 was marked for identification.)
- - -
BY MR. FEINBERG:
Q. Sir, once again, these are handwritten notes from the homicide file. There's reference to four witnesses here: Michael Johnson, Harvey Mitchell, William Smalls and Albert Fredrick.
Michael Johnson is repeated from what we were looking at before Exhibit P-18; is that correct?
A. Yes.
Q. Harvey Mitchell is, as well; is that correct?
A. Yes.
Q. So is William Smalls; is that correct?
A. Yes.
Q. Albert Fredricks looks like he is not on our list from P-18; is that correct?
A. Yes.

Page 400

Q. So now we have a total of 11 unique witnesses who are referenced in the homicide file; is that correct?
MR. ZURBRIGGEN: Objection to the form. Again Detective, if you want to answer based on the documents you have been shown, you can.
THE WITNESS: Based on the information that you gave me, yes.
BY MR. FEINBERG:
Q. One more on this set of witness names. We're up to P-49.
- - -
(Whereupon Exhibit P-49 was marked for identification.)
- - -
BY MR. FEINBERG:
Q. These are also notes from the homicide file, sir, which refer to Hodrick and Wood.
A. They are on the same list.
Q. These are written on copies of 7548 forms; is that right?
A. Yes.
Q. Which are often carried by uniformed

Page 401

officers?
A. Yes.
Q. Do you have any idea why they are on these?
A. I don't know. I have no idea if officers wrote these down and gave them to the detectives. I don't know.
Q. Do you remember the activity sheet we saw which referenced that juvenile witnesses were identified by uniformed officers and that they would be interviewed?
A. Yes.
Q. Is this, these 7548s, this is typically paperwork that's carried by a uniformed officer; is that right?
A. Yes.
Q. I know you can't say for sure, but can you draw the inference that Hodrick and Wood were two of the juveniles who were identified by the uniformed officers at the scene?
MR. ZURBRIGGEN: Objection to the form. Detective, if you know.
THE WITNESS: I can't tell you. I can't even tell who wrote these 48s.

Page 402

Usually police officers put their names down at the bottom when they give information, which makes me think that maybe this wasn't even given to him by the police.
BY MR. FEINBERG:
Q. Bottom line, given the papers that we've just gone through over the past ten minutes or so, would you agree that we got a list of more than ten people who the homicide division had identified as witnesses with potential information about the Heo shooting?
MR. ZURBRIGGEN: Objection to the form. Detective -- -
THE WITNESS: Based on that information, the witnesses or potential witnesses or whatever the case maybe.
BY MR. FEINBERG:
Q. Go to Exhibit-23 in your binder, please. I will represent -- have you looked at these documents in connection with this in your preparation for this deposition?
A. I don't believe I saw this one.
Q. To save you some time, I'll tell you that Detective Rocks told me that -- I'm going

Page 403

to characterize, most of the handwriting on these notes is his.
A. I agree.
Q. I will represent to you that what Detective Rocks and I pieced together through his deposition is that he was likely making notes while sitting through the July 7th interview with Mr. Everett.
A. That's probably true.
Q. Let me also ask you, if you turn to the fifth page of the document which is labeled City-181?
A. Okay.
Q. Detective Rocks noted that the Rock Man drawing there was not his. Do you have any idea whose it is?
A. No, I don't at all.
Q. Does that look like a doodle -- is that something you would do?
A. No. No.
Q. Let me ask you a couple of questions about the things that Detective Rocks wrote. If you go back to the first page, City-177. Go back to the Rock Man page, 181.

Page 404

A. Okay.
Q. There is a statement here, handwritten notes which say bring Talmadge. Do you see that?
A. Yes.
Q. Talmadge Garwood was one of the people that Mr. Everett identified as having information; is that correct?
A. I believe so, yeah, if I remember right.
Q. Go back to page 179. Up at the top of the page Detective Rocks writes: Bring down Talmadge Garwood, which is similar to what we just reviewed; is that correct?
A. Right.
Q. Then there's the next couple lines down, re-interview witnesses in the store; do you see that?
A. Yes.
Q. Do you know whether any of those things happened?
A. I don't.
Q. You would expect that it would be documented in the file if those things did happen?

Page 405

MR. ZURBRIGGEN: Object to the form. Detective, you can answer.
THE WITNESS: In general, yes.
BY MR. FEINBERG:
Q. Flip to page 185. Do you recognize this handwriting?
A. No, not at all.
Q. Let me show you one more thing and then I think we ought to take a short break.
- - -
(Whereupon Exhibit P-50 was marked for identification.)
- - -
BY MR. FEINBERG:
Q. We're going out of order chronologically, sir. I have been taking you through your involvement from April of '87 through July of '87. We just looked at Detective Rocks' notes referencing follow-up interviews. So this is out of order.
Do you notice that the top left of Exhibit-50 on the first page, there's a date, 4/17/87?

Page 406

A. Yes.
Q. Is that the date -- strike that.
This is an old style extracted criminal record?
A. Yes.
Q. Does that date mean when the document was pulled or when it was last updated?
A. Probably last updated. I mean when they went to criminal records where you would get them off the computer with pictures, then of course at the bottom of that, the date was on there when it was uplifted. As far as this, I don't think -- again, I can't be sure. I'm just surmising.
Q. Go to the third page, please. Before you do that let's just confirm, this is an extract for the criminal record of David Brown; is that correct?
A. Yes.
Q. If you go to the last page of this exhibit, City-136, this is an investigation interview record of David Brown. The interviewers are noted as Hughes and Mangoni but there's no questions and answers here.

Page 407

A. I saw this on Friday. I don't remember any of this but I'm thinking that he came in or was brought in and he didn't want to talk to us. That's the only thing I can think of.
Q. Would you typically have noted that on an activity sheet?
A. Probably, yes, but if there isn't one there then it wasn't noted.
Q. You can put that one aside. Bottom line, to summarize everything that we have talked about for the last 10, 15 minutes or so; do you have any recollection of interviews with a single person who could corroborate what Rodney Everett was telling you?
MR. ZURBRIGGEN: Objection to the form. Detective, if you know, based on what you've seen.
THE WITNESS: No. Based on this information, no.
MR. FEINBERG: Let's go off the record.
VIDEOTAPE OPERATOR: We are going off the record, the time is 4:33 p.m.
We are back on, the time is

Page 408

4:47 p.m.
BY MR. FEINBERG:
Q. Mr. Mangoni, we're back on the record after a short break. Did you realize during that break that any of your previous testimony was incorrect or incomplete?
A. No, sir.
Q. Please turn to Exhibit-27 in your binder.
A. Okay.
Q. It might be the wrong one. It's a yellow piece of paper.
A. All right.
Q. Have you seen this document before, sir?
A. I saw this for the first time on Friday.
Q. You saw this for the first time ever on Friday?
A. Yeah, ever. I don't ever remember seeing this before. I didn't even know this existed.
Q. This appears to be a letter from Mr. Everett; is that correct?
A. Yes.
Q. It says: Greetings Magioni, (SIC) which

Page 409

can we assume that that is sent to you?
A. Yes, yes.
Q. We've already established that you and Mr. Everett had a continuing relationship from '87 through '91 talking periodically; is that correct?
A. Yes. I would imagine it was closer to '91 when I talked to him again, as trial got closer.
Q. As we discussed, you interviewed him four separate times, right?
A. Right.
Q. And then you talked to him in connection with the trial; is that right?
A. Yes.
Q. I assume you got to the point where you were familiar with one another?
MR. ZURBRIGGEN: Objection to the form. Detective, you can answer.
THE WITNESS: Yes.
BY MR. FEINBERG:
Q. This letter I will represent to you was found in the homicide file -- not in the homicide binder and not in the D.A.'s file.

Page 410

Are you familiar with that, sir?
A. With the homicide file?
Q. Yes.
A. Yeah, with the envelope, the folder. The big folder.
Q. In the Philadelphia --
A. But not in the binder.
Q. Correct. In other words, in the Philadelphia Police Department file but not in the District Attorney's file?
A. Right, I understand.
Q. Do you have any idea how this got into the homicide file?
A. No.
Q. I assume you read this when you looked at it last Friday?
A. Yes.
Q. What was your reaction when you saw it?
MR. ZURBRIGGEN: Objection to the form. If you can answer, Detective.
THE WITNESS: Other than the fact that I never saw it before and I didn't know what it was -- well, I knew what it was as soon as I saw it but I don't remember

Page 411

anything about this at all. I never remember seeing this when the job happened, after the job happened, during the trial. I just don't remember ever seeing this.
BY MR. FEINBERG:
Q. Would you agree that in the letter Mr. Everett is asking you for assistance for his criminal cases in return for his cooperation?
A. Without a doubt, yes.
Q. He says, for example, he wants Mr. Rosen to quote, view his legal work; is that correct?
A. If it's indicated on here, I didn't read it completely.
Q. He also says, Mr. Everett: I am receiving no help but I am willing to give it. That's in the middle of the page.
A. Yes.
Q. He wants to work out a plan, agreed?
A. Yes.
Q. Would you agree that Mr. Everett's written communication to a Philadelphia Police Department homicide division detective asking for help in his criminal cases is exculpatory

Page 412

information?
MR. ZURBRIGGEN: Objection to the form. Detective, you can answer based on your understanding.
THE WITNESS: If the detective is trying to hide that fact, but I don't see it being exculpatory if I or another detective admits to it, yes. When I say admitting to it, I don't mean admitting to it. I mean by stating the fact that, yes, he asked me for help and there has been cases where, yes, we have helped people.
BY MR. FEINBERG:
Q. Just to confirm, sir, are you saying that you never received this letter?
A. I am saying that I never saw this letter. Is there a date on this that I don't know about? This is it, my answer is, no, I never saw this before. Does it surprise me, no.
Q. Because Mr. Everett was someone who wanted help in return for the information he was providing; is that correct?
A. Yes.

Page 413

Q. You just said to me a moment ago that it would be exculpatory if a detective was hiding it?
A. Yes, exactly.
Q. I will represent to you, sir, that there is no information in the 39-year history of this case -- let's call it 36-year history of this case, that suggests that this letter was ever shared with anyone representing Mr. Crosland. Do you have any evidence to the contrary?
A. No.
MR. ZURBRIGGEN: Objection just for the record.
BY MR. FEINBERG:
Q. Do you know why the letter was not shared with anyone representing Mr. Crosland?
MR. ZURBRIGGEN: Objection to the form of that question.
THE WITNESS: I didn't even know the letter existed.
BY MR. FEINBERG:
Q. Would you agree -- let me ask you, I will ask this as a hypothetical. If, in fact,

Page 414

you recalled receiving this letter and if you did this letter, this is something you would have shared with the District Attorney's office, right?
MR. ZURBRIGGEN: Objection to form.
THE WITNESS: Of course.
BY MR. FEINBERG:
Q. Because it's a communication between you and the key witness in the investigation; is that correct?
MR. ZURBRIGGEN: Same objection. Detective, you can answer.
THE WITNESS: Yes.
BY MR. FEINBERG:
Q. And the substance of the information that's communicated in this letter is highly relevant to Mr. Everett's credibility as a witness, right?
MR. ZURBRIGGEN: Same objection. Detective, you can answer.
THE WITNESS: It's relevant to the fact that he wanted help. That was a known fact. That was from back in the 21st of

Page 415

April in 1987 he indicated that.
BY MR. FEINBERG:
Q. Was it a known fact that he wanted to wear a wire and have a conversation with Michael Turner?
A. Apparently he added that. I didn't know about that, no.
Q. He is making an offer to wear a wire to try to get information about Mr. Crosland; is that right?
MR. ZURBRIGGEN: Objection to the form. Go ahead and answer.
THE WITNESS: According to this letter. Like I said, I don't know -- I have no idea when this letter was submitted. I don't know how it got to the homicide unit. I don't know if it was mailed, if it was in an envelope. I don't know if it was dropped off at the D.A.'s office. I have no idea.
BY MR. FEINBERG:
Q. Suffice it to say, sir, that there's no question in your mind that, number one, this letter is exculpatory information; is that correct?

Page 416

MR. ZURBRIGGEN: Objection to the form. Objection, it's asked and answered. Go ahead, Detective.
THE WITNESS: I didn't answer that that way.
BY MR. FEINBERG:
Q. Let me do it this way, there's no question that this should have been shared with the District Attorney's Office; is that correct?
MR. ZURBRIGGEN: Object to form.
THE WITNESS: Should have or shouldn't have.
MR. ZURBRIGGEN: Same set of objections. Go ahead, Detective.
THE WITNESS: Sure.
BY MR. FEINBERG:
Q. You would expect, I understand you're not a District Attorney, but you're familiar with District Attorney's Office practices from having been a homicide detective for 27 years, correct?
A. Yes.

Page 417

MR. ZURBRIGGEN: Same objections.
BY MR. FEINBERG:
Q. And your expectation is that once this information gets sent to the District Attorney's Office, it's going to be provided to a defense attorney; is that correct?
MR. ZURBRIGGEN: Same objection. Go ahead, Detective.
THE WITNESS: I would imagine so.
BY MR. FEINBERG:
Q. You would expect that defense counsel in this case at trial was Benjamin Paul. Do you remember Mr. Paul?
A. I do.
Q. Mr. Paul was a pretty aggressive defense lawyer; isn't that right?
A. Yes.
Q. Would stand up and yell at witnesses all of the time?
A. Not as offensive as a lot of other attorneys are, yes. I don't mean the word offensive, aggressive.

Page 418

Q. You can expect that a defense attorney who had this document would stand up in front of Mr. Everett and wave it all over the place in impeaching him in his testimony at trial; is that correct?
MR. ZURBRIGGEN: Objection to the form of the question. Detective, if you know based on --
THE WITNESS: I am sure some attorneys would and some attorneys wouldn't.
BY MR. FEINBERG:
Q. You can expect for sure that attorneys who have this information in their possession would argue to a jury that Mr. Everett was begging for a deal in this letter?
MR. ZURBRIGGEN: Objection to the form. Detective again, if you know based on your knowledge --
THE WITNESS: I'm sure that would be part of their case from jump street.
BY MR. FEINBERG:
Q. Do you know what happened to Mr. Everett's charges regarding the Louise Woods incident?

Page 419

A. No, I don't.
Q. Were you part of any conversations about that ever?
A. I don't think so.
Q. Just to confirm, the first time that you recall hearing about this letter recently was when you looked at this Friday; is that correct?
A. That's what I can recall. If you have something that says I saw this before, that may be -- but I don't ever remember seeing this. My first words to Mr. Zurbriggen on Friday were --
MR. ZURBRIGGEN: Don't disclose any confidential information. You can answer based on your understanding of the letter.
THE WITNESS: No, I never saw this before. I can't recall ever seeing this before.
BY MR. FEINBERG:
Q. What was your reaction, putting aside what you may have said to Mr. Zurbriggen, what was your reaction when you saw this letter?

Page 420

A. I didn't really have a reaction, other than the fact that I never saw it before. It doesn't surprise me, if that's what you're looking for.
Q. The letter doesn't surprise you because of what you knew about Mr. Everett; is that correct?
A. It doesn't surprise me about a witness writing -- many times witnesses write letters to detectives or to whatever.
Q. When that happens, those documents are for sure shared with the District Attorney's Office?
MR. ZURBRIGGEN: Objection to the form. Detective --
THE WITNESS: I would imagine so, yes.
BY MR. FEINBERG:
Q. In fact, in your experience that's what you would expect; is that right?
MR. ZURBRIGGEN: Same objection.
THE WITNESS: Yes.
BY MR. FEINBERG:

Page 421

Q. Let's look at Exhibit-30, please. As you're turning to it, I will note for you, sir, that this is the activity sheet regarding Detective Rocks which we talked about preliminarily.
A. Okay.
Q. You have reviewed this recently I take it; is that correct?
A. Yes.
Q. Do you know who typed this activity sheet?
A. No, I don't.
Q. I will just represent to you Detective Rocks told me he does not believe he typed it and the best he could tell me is that it didn't look like his style of typing. And in particular, he said he would not refer to himself in the third person. Do you have any idea one way or the other?
A. I don't know. Could I have possibly done it? Possibly, but if I conducted this with Detective Rocks, my name would be on there with him.
Q. Let's review the substance. According

Page 422

to this activity sheet, Detective Rocks spoke to Louise Woods on the phone; is that correct?
A. Yes.
Q. Actually --
A. I don't know if it says -- does it say that, I don't know.
Q. I want to correct myself. It doesn't say that. Do you know whether this was an in-person encounter or a telephone encounter?
A. No, I don't know.
Q. There's a discussion between Ms. Woods and Detective Rocks about Everett calling her; is that correct?
A. Yes.
Q. And Everett telling her that Frank Turner, the alleged shooter in the Heo case was staying in the Tasker homes; is that correct?
A. That's what it says, yes.
Q. Would you agree that this appears to be an inconsistent statement by Mr. Everett about who killed Il Man Heo?
MR. ZURBRIGGEN: Objection to form. Detective again, if you can tell based

Page 423

on this activity sheet, you can answer.
THE WITNESS: It's indicated on this paper, I can't tell. But it is on the paper. I am not disagreeing with that at all.
BY MR. FEINBERG:
Q. So just to review, this is July 25th of '87. Prior to that, Everett has told you on April 15th that Crosland allegedly confessed to shooting Heo, correct?
A. Yes.
Q. On April 21st, Everett told you that Crosland allegedly confessed to killing Heo, correct?
A. Yes.
Q. July 7th, Everett tells you that Crosland allegedly confessed to killing Heo; is that correct?
A. Yes.
Q. And now according to this activity sheet, Everett is telling Louise Woods, Frank Turner is the killer of Il Man Heo; is that correct?
MR. ZURBRIGGEN: Objection to the form. Again Detective, to the extent you

Page 424

can glean that from what you're reviewing currently, you can answer.
THE WITNESS: According to this form, yes.
BY MR. FEINBERG:
Q. I questioned Detective Rocks about this activity sheet at length a little less than two weeks ago. And Detective Rocks told me that after receiving this information, he would want to, first, conduct a formal interview with Louise Woods; do you agree with that statement?
MR. ZURBRIGGEN: Objection to the form. Detective, you can answer.
THE WITNESS: Do I know what he would do; is that what you're asking me?
BY MR. FEINBERG:
Q. That's a fair criticism of my question. Do you agree that that is an appropriate investigative step?
A. Yes.
Q. In fact, you would expect that investigative step?
MR. ZURBRIGGEN: Objection

Page 425

to the form. Detective, you can answer.
THE WITNESS: Yes.
BY MR. FEINBERG:
Q. Detective Rocks said, number two, that he would want to do a follow-up interview with Rodney Everett. Do you agree that that is an appropriate investigative step?
MR. ZURBRIGGEN: Objection to the form of the question. Detective, you can answer.
THE WITNESS: Yes.
BY MR. FEINBERG:
Q. In fact, that's exactly what you would do, you would conduct a follow-up interview with Mr. Everett's; is that correct?
MR. ZURBRIGGEN: Same objection.
THE WITNESS: Yes.
BY MR. FEINBERG:
Q. Because I think you -- just to confirm, you've already agreed that at this point there is now a significant inconsistency in Mr. Everett's account about who committed this murder; is that correct?

Page 426

MR. ZURBRIGGEN: Objection to the characterization. Detective, you can answer again --
THE WITNESS: Based on this activity sheet.
BY MR. FEINBERG:
Q. Up to this point, Everett is the only witness -- the only witness who has identified Mr. Crosland as the perpetrator of the Heo murder; is that correct?
MR. ZURBRIGGEN: Same set of objections.
THE WITNESS: Yeah, as far as I know.
BY MR. FEINBERG:
Q. And now Mr. Everett is, according to this activity sheet, providing inconsistent information; is that correct?
MR. ZURBRIGGEN: Same objection.
THE WITNESS: According to this activity sheet, yes.
BY MR. FEINBERG:
Q. Do you know whether those follow-up

Page 427

investigative steps, interview of Louise Woods, interview of Rodney Everett were taken?
A. I don't know.
Q. Do you know -- I'll represent to you that there's no documentation anywhere in the homicide file, District Attorney's Office file anywhere about follow-up investigation after this conversation with Ms. Woods?
MR. ZURBRIGGEN: Object --
THE WITNESS: I understand and the answer is I don't know.
BY MR. FEINBERG:
Q. Do you have any explanation for why that didn't happen?
A. No, sir. I don't know -- like I said, I don't know if it did or didn't happen. I'm going you told me it didn't happen. I'm taking your word for it. So my answer is I don't know.
Q. Do you know whether -- strike that.
Detective Rocks also told me that in the event that Mr. Crosland would be prosecuted for this offense, which he was, that he would expect this discussion with Ms.

Page 428

Woods to be discussed with the Assistant District Attorney prosecuting the case; do you agree?
MR. ZURBRIGGEN: Objection to the form.
THE WITNESS: I don't know.
BY MR. FEINBERG:
Q. You told me before that weaknesses in the case have to be discussed with the D.A.; is that correct?
MR. ZURBRIGGEN: Same objection.
THE WITNESS: Yes.
BY MR. FEINBERG:
Q. If a witness, in fact, the only witness in the case is providing apparently inconsistent information, that's a weakness in the case; is that correct?
MR. ZURBRIGGEN: Same objection.
THE WITNESS: Yes.
BY MR. FEINBERG:
Q. Do you have any idea whether this inconsistency was ever discussed with either

Page 429

of the trial prosecutors in this case?
A. I have no idea.
Q. Who would have been responsible for discussing this inconsistency with the trial prosecutors?
MR. ZURBRIGGEN: Objection, asked and answered. Detective, you can answer.
THE WITNESS: I am not sure. I mean as far as the affidavit of probable cause for arrest was concerned, Cimino, McNesby got the warrant so they would have had to confer with -- at that time Barbara Christy.
BY MR. FEINBERG:
Q. We'll come back to that.
Once again, sir, I'll represent to you and again I tried to be as fair as possible in going through the entire chronology, as far as I can tell, there's nothing that happens in this investigation between July 25th, which we just looked at and November 3rd of 1987. Do you understand what I've represented?

Page 430

A. Yes.
Q. The next step in November of '87 is that Mr. Crosland gets arrested for the murder of John Lamb, not Il Man Heo, John Lamb. You will see a record of that in Exhibit-31.
I will represent to you that this is an activity sheet that was pulled out of the homicide file concerning the murder of John Lamb.
For reference, Mr. Lamb was killed in 1982. So two plus years before Mr. Heo. Have you looked at this document before today?
A. No.
Q. Take a moment to read it and let me know when you're finished.
A. Okay.
Q. Sir, does this refresh your recollection about anything concerning or any involvement in the Lamb murder investigation?
A. No, I didn't even remember that there was an arrest made in the Lamb murder. I can see here it came through a Grand Jury.
Q. There is reference here to Mr. Crosland

Page 431

making an inculpatory statement, do you see that?
A. Yes.
Q. Have you ever seen that statement?
A. No.
Q. Are you aware that Mr. -- that charges against Mr. Crosland for the Lamb murder were dismissed?
A. No.
Q. Take a look at Exhibit-32, please.
A. Okay.
Q. Have you reviewed this document before today?
A. No, I never saw this. I will look at it now.
Q. Please.
A. Okay.
Q. So this shows that Detective Cimino met with Mr. Rosen and Ms. Christy about seeking an arrest warrant for Mr. Crosland on December 9th; is that correct?
A. Correct.
Q. Do you have any idea what precipitated the decision to arrest Mr. Crosland on this

Page 432

date?
A. No, I don't know why they went to that day.
Q. Do you recall when we reviewed the affidavit of probable cause this morning, that the only reference -- let me say that a different way.
First, do you recall any discussions with Detective Cimino about the decision to arrest Mr. Crosland on the Heo murder?
A. No. He may have told me that they got a warrant or they obtained a warrant for his arrest. He probably did.
Q. He told you after he had the warrant?
A. I don't know, either before or he was going to or he may have told me that they were going over to see if they could get a warrant for him.
Q. In terms of him talking to you before the warrant, you at that point were the only person in the homicide division who had spoken to Everett all three times he was interviewed, right?

Page 433

MR. ZURBRIGGEN: Objection to the form. Detective, if you know.
THE WITNESS: According to the paperwork that we have, yes.
BY MR. FEINBERG:
Q. Would it be fair to say that of anyone in the homicide division, you were the one with the most knowledge about Everett's information?
MR. ZURBRIGGEN: Same objection. Detective, you can answer if you know.
THE WITNESS: About Everett?
BY MR. FEINBERG:
Q. Yes.
A. Not anything else that was involved in the murder.
Q. What I'm getting at is that each time these interviews happen, you sit across the table from the person, right, and you talk to them for sometimes lengthy time periods; is that correct?
A. Correct.
Q. So you had three periods of face time

Page 434

with Mr. Everett; is that correct?
A. Correct.
Q. You got to assess his credibility; is that correct?
A. Correct.
Q. And the statement that was used to seek the arrest of Mr. Crosland was the 4/15/87 statement, correct?
A. That was one. I don't know if there was any other evidence that they used.
Q. Do you recall the affidavit of probable cause we reviewed which referenced only that April 15th, '87 statement?
A. Yes.
Q. So in other words, the only evidence that was used to support the arrest of Mr. Crosland was evidence that was obtained from your interview with Mr. Everett?
MR. ZURBRIGGEN: Objection to the form of the question. Again Detective, if you know.
THE WITNESS: According to the affidavit, yes.
BY MR. FEINBERG:

Page 435

Q. By the way, you have no reason to dispute the integrity of that affidavit?
A. No.
Q. With that as background, do you recall Detective Cimino coming and asking you whether you thought Everett was a credible witness?
A. No.
Q. Do you recall Detective Cimino coming and asking you, is there anything else we have to corroborate whatever is said?
A. No.
Q. Would you agree, let me ask a more general question about affidavits of probable cause, you probably typed up hundreds if not thousands of them; is that correct?
A. Many of them, yes.
Q. If you had information that was inconsistent with the subject's guilt, would you ever include that in the affidavit?
A. Probably not.
Q. Why not?
A. It wasn't our practice to do that. It was our practice -- if it was an affidavit of probable cause, things of that nature were

Page 436

usually either preliminary hearings once they got to discovery or matters of fact at trial. No, we would not, you know, normally.
Q. So when you say practice, that was an established practice of the Philadelphia Police Department homicide division, not to include exculpatory information in an affidavit of probable cause?
MR. ZURBRIGGEN: Objection to the form of the question. Again Detective, to the extent you can speak to whether it was an established practice.
THE WITNESS: I wouldn't say it's an established practice, no. I would say it was something where it was a case by case. I'm sure there were times where you went and conferred with an ADA who would tell you, maybe it's a good idea to put that in an affidavit, to put something in an affidavit.
For the most part, we really pit minimal things in the affidavit of probable cause.
BY MR. FEINBERG:
Q. Meaning that you would not include any

Page 437

information which undermined this subject's guilt; is that correct?

MR. ZURBRIGGEN: Same objection as previously. Again Detective, you can answer.

THE WITNESS: For the most part, yes.

BY MR. FEINBERG:

Q. I am going to hand you my copy, just to save you the time of flipping back and forth in the binder, of Exhibit-1, which is the affidavit of probable cause.

I think you will be able to answer my questions without reviewing it again. If you need to --

A. No, I read this a couple times.

Q. Let's just confirm, there is no mention in the affidavit of probable cause that Mr. Everett's information was consistent -- let me say that again.

There's no information in the affidavit about the fact that Mr. Everett's generic description matched what was reported in the media?

Page 438

MR. ZURBRIGGEN: Objection to the form. Detective, based on the documents you have been provided by counsel, you can answer if you can.

THE WITNESS: No.

BY MR. FEINBERG:

Q. There's no mention in the affidavit about the fact that Mr. Everett failed the polygraph?

MR. ZURBRIGGEN: Same objection. Detective, you can answer.

THE WITNESS: No.

BY MR. FEINBERG:

Q. There's no mention of the fact that Mr. Ransome provided information that undermined Everett's statement?

MR. ZURBRIGGEN: Objection to the form of the question.

THE WITNESS: No.

BY MR. FEINBERG:

Q. There's no mention in the affidavit that Mr. Everett was begging for a deal with a letter addressed to you?

MR. ZURBRIGGEN: Objection to

Page 439

the form of the question, the characterization. Detective, you can answer.

THE WITNESS: No.

BY MR. FEINBERG:

Q. There's no mention in the affidavit that Louise Woods reported that Everett identified Frank Turner in the Heo murder?

MR. ZURBRIGGEN: Same objection. Detective, you can answer.

THE WITNESS: No.

BY MR. FEINBERG:

Q. All of what was not included in the affidavit that I just outlined, the omission of that information was consistent with your understanding of PPD practice?

MR. ZURBRIGGEN: Objection to the form of the question. Again Detective, to the extent you know.

THE WITNESS: Again, let me reiterate, it wasn't a practice, it was a case by case scenario.

BY MR. FEINBERG:

Q. So the omission of that information there doesn't surprise you; is that correct?

Page 440

A. No.

MR. ZURBRIGGEN: Objection to the form of the question. Detective, you can answer.

BY MR. FEINBERG:

Q. Do you believe, I know you're not a prosecutor, you're not a magistrate, but if all of that information was included, would you have believed that there was probable cause for Mr. Crosland's arrest?

MR. ZURBRIGGEN: Objection to form. Again Detective, you can answer.

THE WITNESS: Yes.

BY MR. FEINBERG:

Q. Why? Everett's statement?

A. Yes.

Q. I will take that back from you.

By the way, sir, each of those topics that I just outlined, the news media reports, the failed polygraph, Ransome statement -- I'll withdrawal that question.

You have Exhibit-32 in front of you, right?

A. Yes.

Page 441

Q. Flip to Exhibit-33. This is a report of Mr. Crosland's arrest on December 10th of '87, right?
A. Yes.
Q. We have already established that Mr. Crosland was in custody, having been arrested in November of '87 on the Lamb murder; is that correct?
A. That's correct.
Q. So in that situation when he's in custody, he's brought down to the homicide division and he's provided with notice of the charges; is that right?
A. Correct.
Q. And this report shows that you and Detective Rocks were the ones who encountered Mr. Crosland for that purpose; is that right?
A. Yes, sir.
Q. Do you remember any conversations with Mr. Crosland?
A. No, not really. I believe all we did was processed him. This is strictly process paperwork.
Q. Did you even have him in front of you?

Page 442

Did you see him?
A. Yes.
Q. Did you tell him about the charges on the Heo murder?
A. Yes.
Q. How did he react?
MR. ZURBRIGGEN: Objection to the form.
THE WITNESS: I don't recall. I don't think he had much of a reaction at all but I don't recall.
BY MR. FEINBERG:
Q. By the way, sir, let me go back to -- we just talked a moment ago, I listed the various things that were omitted from the affidavit of probable cause, correct? And you told me that you still believed that there was probable cause because of Everett's statement; is that correct?
A. Yes.
Q. In your judgement, Everett's statement to you outweighed all of the factors that I just outlined; is that correct?
MR. ZURBRIGGEN: Objection to

Page 443

the form of the question. Detective, you can answer based on your understanding.
THE WITNESS: I can't answer totally on that because I don't have all of the information that the other detectives had, I don't know. I know what you're telling me but I don't know.
BY MR. FEINBERG:
Q. So I'm not asking about all of the information that's out there. I am asking based on the information that I have shown you here today. We talked about facts that are in the file but were omitted from the affidavit of probable cause, correct?
A. I understand.
MR. ZURBRIGGEN: Objection.
BY MR. FEINBERG:
Q. And then I asked you if those facts had been included in the affidavit, would you still believe there was probable cause for the arrest and you said yes; is that correct?
A. Yes, sir.
Q. It sounds like your conclusion is that in your judgement, the credibility of

Page 444

Everett's statement was enough to justify the arrest of Mr. Crosland?
MR. ZURBRIGGEN: Object to the form of the question but you can answer.
THE WITNESS: Based on my interaction with him, yes.
BY MR. FEINBERG:
Q. Because you believed that Everett's statement was credible; is that correct?
A. Yes.
Q. Not withstanding everything else that we've discussed?
MR. ZURBRIGGEN: Objection to form.
THE WITNESS: Yes.
BY MR. FEINBERG:
Q. There is one more document from Everett I want to show you. This is Exhibit P-51.
- - -
(Whereupon Exhibit P-51 was marked for identification.)
- - -
BY MR. FEINBERG:
Q. You probably haven't seen this, sir, but

Page 445

tell me if it looks familiar to you?
A. That's my handwriting.
Q. That's your handwriting?
A. Yes, sir.
Q. I'm having a hard time making it out. Can you read it to me?
A. That's why I type everything. Rodney Everett stated -- I can't make out -- told him that Jerime Davis, J5, which I have no idea what is, is going to change his testimony. I don't know what this is about in regards to. I don't recognize the name Davis.
Q. It sounds like this is a record of a conversation that you had with Mr. Everett on December 18th of '87; is that correct?
A. Yes.
Q. 9:30 a.m.?
A. That's what it seems like, yes.
Q. In the homicide division; is that correct?
A. Yes, via phone.
Q. So you had a phone call with Mr. Everett; is that correct?
A. Yes.

Page 446

Q. He would have been in custody; is that right?
A. Yeah, I guess, yes. I don't know what J5 is.
Q. Would that be in reference to a housing area maybe at the Holmesburg Prison.
MR. ZURBRIGGEN: Objection to the form.
THE WITNESS: I don't know. I just don't know.
BY MR. FEINBERG:
Q. Any idea what this is in reference to?
A. I have no idea what changing his testimony, in regards to what, I don't know. But this is my handwriting.
Q. So it sounds like, I suppose the relevance of this is that you're having continued conversations with Mr. Everett now into December of '87; is that correct?
A. Yes.
Q. On that same topic, go to Exhibit-34 which is in your binder. We already looked at this statement. This is an interview that you conducted with Mr. Everett in January of '88;

Page 447

is that correct?
A. Yes.
Q. I will represent to you that Mr. Everett testified in two different preliminary hearings for Mr. Crosland on January 21st of '88. One for the Lamb murder and the other for the Heo murder. Do you recall being present in court for those?
A. No.
Q. In any event, I will ask you to accept that time line and just note that now we're five days later where you're interviewing him, it looks like in the District Attorney's Office about the shooting death of David Jennings; do you see that?
MR. ZURBRIGGEN: Objection to form.
THE WITNESS: Yes. This is a copy of the interview.
BY MR. FEINBERG:
Q. You've looked at some of this before. My only question for you in reference to the Heo murder is, why is it that you did not ask Mr. Everett at this point about Louise Woods'

Page 448

statement concerning Frank Turner?
MR. ZURBRIGGEN: Objection to the characterization. Detective, if you know, based on what counsel has represented.
BY MR. FEINBERG:
Q. Let me set that up a little bit more, sir. July 25th of '87, Louise Woods talks to Rocks, gives him information about Everett mentioning Frank Turner as the shooter of Mr. Heo, correct?
MR. ZURBRIGGEN: Objection to the characterization. Detective again, you can answer.
THE WITNESS: I go by what you represented to me.
BY MR. FEINBERG:
Q. Detective Rocks told me, and you agreed, that you would want to conduct follow-up investigation, either through interviewing Ms. Woods or interviewing Mr. Everett; is that correct?
MR. ZURBRIGGEN: Same objection. Detective, you can answer.
BY MR. FEINBERG:

Page 449

Q. Am I correct.
A. I am reading this statement, I'll let you know in a second.
Q. Sure.
A. Okay, I'm sorry, that question was?
Q. So the foundational question was, you had told me that you agreed with Detective Rocks that following that July 25th of '87 encounter, you would want to interview either Louise Woods or Rodney Everett about this inconsistency; is that correct?
MR. ZURBRIGGEN: Objection to the representation again. Detective, you can answer.
THE WITNESS: That's what I told you, yes.
BY MR. FEINBERG:
Q. You're here interviewing Mr. Everett again in January of 1988, correct?
A. Yes.
Q. And you don't ask him about that inconsistency; is that correct?
MR. ZURBRIGGEN: Objection to the form of the question. Again Detective,

Page 450

you can answer.
THE WITNESS: No, apparently I didn't.
BY MR. FEINBERG:
Q. Do you have any idea why you didn't?
A. No, I don't. I took this in the D.A.'s office. I don't know what that's about. I don't remember doing that.
Q. Sir, I am going to make some representations to you about what information was and was not provided to the District Attorney's Office. I understand these may be disputes. Where I'm getting this from is from investigation conducted by the conviction integrity unit.
A. Okay.
Q. And what they specifically looked at by isolating the homicide file on the one hand and the District Attorney's Office file on the other. Do you understand what I've said?
A. Yes.
Q. Their findings were that the following items were in the homicide file but not in the District Attorney's Office files, okay.

Page 451

Number one, the tips about Mr. Ransome's involvement in the crime, understand?
A. Yes.
Q. Number two, the activity sheet regarding the failed polygraph by Mr. Everett, understood?
A. Yes.
Q. Number three, the activity sheet referencing Mr. Rock -- Detective Rocks' conversation with Ms. Woods, understood?
A. Yes.
Q. And number four, the letter that was addressed to you, identifying you as Detective Mangoni, understood?
A. Yes.
Q. Do you know one way or the other whether this information was provided to the District Attorney's Office?
A. I have no idea.
Q. Would you agree that this information absolutely should have been provided to the District Attorney's Office?
MR. ZURBRIGGEN: Blanket

Page 452

objection to all the representations and to the form. Detective, you can answer based on what counsel is representing.
THE WITNESS: Yes.
BY MR. FEINBERG:
Q. That someone in the Philadelphia Police Department had an absolute obligation to introduce -- to provide this information to the District Attorney's Office, correct?
MR. ZURBRIGGEN: Same set of objections. Detective, you can answer.
THE WITNESS: Yes, and hopefully it was acted upon and maybe it wasn't denoted.
BY MR. FEINBERG:
Q. All of this information was relevant to the credibility of Rodney Everett as a witness; is that correct?
MR. ZURBRIGGEN: Same set of objections.
THE WITNESS: Yes.
BY MR. FEINBERG:
Q. Rodney Everett was the only witness whose information directly implicated Mr.

Crosland in this offense; is that correct?
MR. ZURBRIGGEN: Objection to the form of the question and same set of objections.
THE WITNESS: Only that I know of. I have no idea what Mr. Rosen and Barbara Christy were confronted with.
BY MR. FEINBERG:
Q. Just in terms of the relevance of this information. It -- specifically the tips about Mr. Ransome, pointed to another suspect as the shooter; is that correct?
MR. ZURBRIGGEN: Objection to form. Again Detective, if you can answer --
THE WITNESS: Yes, according to what you showed me today.
BY MR. FEINBERG:
Q. That's relevant exculpatory information; is that correct?
MR. ZURBRIGGEN: Same set of objections.
THE WITNESS: Yes, according to what you said.



BY MR. FEINBERG:
Q. It addressed, and this is repeating, I acknowledge -- it addressed questions -- let me restate that.
This evidence was relevant to undermine Mr. Everett's credibility, correct?
MR. ZURBRIGGEN: Same set of objections. Detective, you can answer.
THE WITNESS: What you showed me, I have no idea what the mindset was.
BY MR. FEINBERG:
Q. You agree that the evidence was relevant for that purpose; is that correct?
MR. ZURBRIGGEN: Objection to form.
THE WITNESS: Yes.
BY MR. FEINBERG:
Q. And that evidence showed that you had reason to believe that Mr. Everett's testimony was not truthful; is that correct?
MR. ZURBRIGGEN: Objection to the form of that question. Detective, you can answer.
THE WITNESS: Not strictly



based on that, no.
BY MR. FEINBERG:
Q. Well, I mean he failed a polygraph, right?
MR. ZURBRIGGEN: Same objection. Detective --
THE WITNESS: I certainly don't go by that, John. I don't know your last name, sorry. I certainly don't go by that. Many people fail the polygraph. And many people pass a polygraph that are still lying. That's why a polygraph is not admissible.
BY MR. FEINBERG:
Q. Maybe we're re-treading over territory we already addressed. You told me before that a failed polygraph is absolutely exculpatory, it has got to be disclosed to the District Attorney's Office, right?
MR. ZURBRIGGEN: Again, objection to that form. Detective -- and asked and answered. Go ahead, Detective.
THE WITNESS: You can read the record back. I didn't say it was



exculpatory. I said it could be.
BY MR. FEINBERG:
Q. It's got to be disclosed to the District Attorney's Office, right?
MR. ZURBRIGGEN: Same set of objections.
THE WITNESS: It should be, yes.
BY MR. FEINBERG:
Q. Someone is absolutely obligated to provide this to the District Attorney's Office; is that correct?
MR. ZURBRIGGEN: Same set of objections.
THE WITNESS: It should be, yes.
BY MR. FEINBERG:
Q. It shows -- this evidence that we've reviewed showed that even after having reason to believe he was lying, Everett identified a different shooter, Frank Turner, right?
MR. ZURBRIGGEN: Objection to the form. Again Detective, to the extent you

Page 457

know that, you can answer.
THE WITNESS: Indicated on his interview, yes.
BY MR. FEINBERG:
Q. That goes to his credibility; is that correct?
MR. ZURBRIGGEN: Same objection.
THE WITNESS: Yes.
BY MR. FEINBERG:
Q. In your view, this information absolutely should have been provided to the District Attorney's Office, correct?
MR. ZURBRIGGEN: Objection, it's asked and answered multiple times. Detective, you can answer again.
THE WITNESS: Yes.
BY MR. FEINBERG:
Q. Were you aware, sir, of practices back in the 1980 where detectives were given discretion to decide what to produce to the District Attorney's Office?
MR. ZURBRIGGEN: Objection to the form. Detective, if you know.

Page 458

THE WITNESS: No, there wasn't any.
BY MR. FEINBERG:
Q. Was there any specific policy which told you what you had to provide to the D.A.'s office?
A. No, not really.
Q. In other words, it was up to you as the detective when you were the assigned to decide what to provide to the D.A.'s office?
MR. ZURBRIGGEN: Objection to the form.
THE WITNESS: Detectives pretty much gave them the folder, gave them the binder. They gleaned from it whatever they wanted, whatever they needed, whatever was necessary.
BY MR. FEINBERG:
Q. So when the detectives prepared the binder to hand off to the District Attorney's Office, detectives made a decision about what to include in that binder; is that correct?
MR. ZURBRIGGEN: Objection to the form of that question. Again Detective,

Page 459

to the extent you can speak to what everyone --
THE WITNESS: They could.
BY MR. FEINBERG:
Q. In fact, I think you told me before that on the topic of activity sheets, some detectives might provide them, other detectives might not; is that correct?
MR. ZURBRIGGEN: Same set of objections.
THE WITNESS: Not so much provide them, sometimes they're in a binder. Sometimes they're not in a binder, an envelope is in the folder.
BY MR. FEINBERG:
Q. And the detectives had the discretion to decide what to include; is that correct?
MR. ZURBRIGGEN: Same objection and asked and answered. Detective, you can answer again.
THE WITNESS: I would imagine -- I can't answer that. The bottom line is some detectives did, some detectives didn't.
BY MR. FEINBERG:

Page 460

Q. Did any supervisor ever come around and tell you or other detective, hey detective, this is the information you have to provide to the District Attorney's Office?
MR. ZURBRIGGEN: Objection to the form. Detective, you can answer.
THE WITNESS: I'm sure there has been, yes.
BY MR. FEINBERG:
Q. Do you remember in that timeframe?
A. Yeah, I'm sure.
Q. Do you remember any trainings on your obligations under the case Brady versus Maryland?
MR. ZURBRIGGEN: Objection to the form of the question. Detective, if you understand.
THE WITNESS: Federal law or are you talking state law?
BY MR. FEINBERG:
Q. Federal law?
A. I can't answer that. I don't know.
Q. In fact, at the beginning when I asked you about Brady, you talked about a

Page 461

Pennsylvania State Supreme Court Case, right?
A. Yes.
Q. And that case concerned the admissibility of a statement at a preliminary hearing or at a trial; is that correct?
A. Or inconsistency, yes.
Q. Which is different from the concept of disclosing exculpatory information; is that correct?
A. You're explaining that to me, yes.
Q. In fact, me explaining that to you, is that the first time that you're hearing about the Brady rule?
A. Well, as far as Federal laws are concerned, yes.
Q. You don't recall any supervisors or training officers from the police department coming around and telling you about those obligations; is that correct?
MR. ZURBRIGGEN: Objection, asked and answered. Go ahead, Detective.
THE WITNESS: No, I don't think most would even know about the Federal law.

Page 462

BY MR. FEINBERG:
Q. Sir, final topic I want to ask you about is when Mr. Everett's story changed. We have talked about the statements that he gave to you in April of '87, July of '87, January of '88 and then his preliminary hearing testimony in January of '88. Do you recall all of our testimony on that issue?
A. Yes.
Q. Were you present at the first trial in December of '88?
A. I don't think so.
Q. Do you recall ever hearing that Mr. Everett, on the advice of his counsel, asserted a 5th Amendment privilege and declined to testify?
A. I heard about it probably back then, I'm sure I did, but I heard about it again.
Q. And your recollection or what you heard is that Mr. Everett believed that testifying would violate his 5th Amendment rights because he would acknowledge that he perjured himself at the preliminary hearing?
MR. ZURBRIGGEN: Objection to

Page 463

the form. Detective, if you know.
THE WITNESS: I don't recall why but I know that he did.
BY MR. FEINBERG:
Q. In other words, what he told the court is, I don't want to take the stand and admit that my previous testimony at the preliminary hearing where I implicated Curtis Crosland in this case, was false?
MR. ZURBRIGGEN: Same objection.
THE WITNESS: Yes.
BY MR. FEINBERG:
Q. So you're aware, at some point you learned, that as of December 1988, Everett was denying that Curtis Crosland confessed to the crime; is that correct?
MR. ZURBRIGGEN: Objection.
THE WITNESS: Yes.
BY MR. FEINBERG:
Q. Are you aware that from December '88 on, Mr. Everett made multiple statements asserting that his previous statements implicating Mr. Crosland were false?

Page 464

MR. ZURBRIGGEN: Objection to form. Are we talking about now aware or aware at that time?
BY MR. FEINBERG:
Q. That's a good question. Let me ask no, are you aware?
A. Now I am, yes.
Q. I want to show them to you quickly to see whether you recall hearing any of these details. For this, sir, I am going to hand you this binder of trial testimony.
I'm sorry, go to Exhibit-29. As you're doing that, let me explain that Mr. Everett testified, not just at the Heo trial but at the trial concerning the John Lamb murder; do you recall learning about that?
A. No, I don't.
Q. I'll represent to you that the one person who was prosecuted for the John Lamb murder was Frank Turner, who has a nickname Squirt. Exhibit-29, you should have copies of testimony from Mr. Everett. I'm going to refer you to page 8479.
By the way, this testimony is

Page 465

on January 27th of '89, so a month after Mr. Everett asserted the 5th Amendment at Mr. Crosland's trial.
A. A month after Mr. Crosland's trial in '91 or '88?
Q. This is -- first Crosland trial is December of '88. We're now in January of '89.
A. So it's after the first trial.
Q. Correct. So if you look at 8479, read lines 11 to 19 to yourself.
A. Okay.
Q. So here Mr. Everett is being asked about his statement implicating Mr. Crosland in the John Lamb murder, correct?
A. Yes.
Q. Mr. Everett is saying, no, that statement wasn't truthful, agreed?
A. Yes.
Q. Go back to page 8423, okay. Line ten on that page, read from there onto the next page to line five and tell me when you're done.
It says: Do you remember his questions for the record? Would you tell us again how you know him.

Page 466

A. Who is him? Who is he referring to?
Q. You're on --
A. 8422 you said?
Q. 8423.
A. 23, I'm sorry. What line was that?
Q. Line ten. Once again, this is asking Mr. Everett about his July 7th, '87 statement.
A. Okay.
Q. Do you see on the top of page 8424 Mr. Everett says -- collectively Mr. Everett says, his testimony wasn't true and he was just reading the statement that was in front of him?
A. Yes.
Q. And he was told by the officer to do that; is that correct?
A. That's what it says, yes. That's what he said.
Q. Do you know which officer he was talking about?
MR. ZURBRIGGEN: Objection to form.
THE WITNESS: I have no idea.
BY MR. FEINBERG:

Page 467

Q. Do you recall any conversations with Mr. Everett where you told him just to stick to his statement?
A. I had conversations with him, what exactly they were over --
Q. Do you know?
A. I don't recall that specific, no.
Q. Did you ever tell Mr. Everett that he had to testify consistent with his previous statements?
A. That he had to?
Q. Yes.
A. I told him to testify, tell the truth.
Q. Did you ever tell him that he would be prosecuted for perjury if he testified inconsistent with the statements?
A. I may have.
Q. That's because you believed that his initial statement to you, in April of '87, was the truth; is that correct?
A. I probably told him that in many cases people, which you're certainly familiar with and your office is certainly familiar with, a lot of people do recant. And when they

Page 468

recant, they're granted immunity and then they -- the person gets out of jail. It happens a lot. People recant all of the time, in a lot of cases, in more cases than not but they are not granted immunity a lot of times, incumbent upon who the judges are.
Q. Did you talk about immunity with him?
A. No, not at all.
Q. Sitting here today, all you can say is that you may have told him that he could be prosecuted for perjury if he testified inconsistent with his statement; is that correct?
MR. ZURBRIGGEN: Objection to the form of that question. Detective, again, based on what you -- you can testify based on what you recall.
BY MR. FEINBERG:
Q. That's what I'm asking.
A. Yes.
Q. Turn to page 8425. Read lines 13 to 18. Do you see Mr. Everett there says, he was under a lot of stress when he was being questioned?

Page 469

A. Yes.
Q. And he was being questioned about other actions?
A. Yes.
Q. Meaning his criminal offenses; is that correct?
A. Probably, I have no idea what he meant by that. I would imagine so.
Q. He was worried about himself, that's what he says, right?
A. Yes.
Q. You knew that, right?
A. Of course.
Q. That was absolutely true, right?
A. Of course.
Q. And he then says, anything that they said, referring to the police, he was going along with them. Do you see that?
A. Yes.
Q. Do you believe that to be true?
MR. ZURBRIGGEN: Objection to the form. Detective, you can answer based on what you know.
THE WITNESS: No.

Page 470

BY MR. FEINBERG:
Q. Because you believed that his statement from April 15th of '87 was the truth; is that correct?
A. Yes.
Q. Go back to Exhibit 28. As you're doing that, I will set the timetable for you. We've just reviewed testimony where Mr. Everett recants and says that his statements about Mr. Crosland were false. That was on January 27th of '89. What you have in front of you now is a handwritten statement from Mr. Everett dated 2/1/89. So five days, give or take, after that testimony. Have you seen this before, sir?
A. No, sir.
Q. Once again, you're welcomed to read the entire thing but I'll refer you to the relevant part, which is just slightly more than halfway down the page. The statement which I made, do you see where I'm reading?
A. Yes.
Q. The statement which I made was fictitious and made from memory from reading

Page 471

the newspapers and seeing on the news, and I named Curtis Crosland as the central figure. After lengthy hours of questioning, I was taken back to DC, meaning the Detention Center. On numerous of occasions I was given the polygraph and failed.
First, it's accurate that he was given a polygraph and failed, correct?
A. Yes.
Q. Do you see the reference to the newspapers and seeing things on the news?
A. Yes.
Q. We have already reviewed that based on what I showed you, facts that were reported in the news were consistent with the facts that Mr. Everett asserted in his statement; is that correct?
MR. ZURBRIGGEN: Objection to the form of the question. Again Detective, if you can answer based on what you've been shown by counsel.
THE WITNESS: According to the paperwork, yes.
BY MR. FEINBERG:

Page 472

Q. Here Mr. Everett is providing in writing a statement exonerating Mr. Crosland and acknowledging that he, Mr. Everett, lied; agreed?
A. According to this paperwork -- according to this, yes.
Q. You do not believe this to be true; is that correct?
A. Can I ask you who took this interview?
Q. Sir, you're welcomed to ask -- I'm just showing you a document that was provided to me in the District Attorney's Office file.
A. So you don't know who took this interview?
Q. Sir, I'm telling you that this is a statement from Mr. Everett. My question for you is this --
A. This is the first time I saw this. Can I ask you this, was this gentleman ever asked if he wanted to take a lie detector test concerning his statement?
Q. Sir, I'm going to give you the classic lawyer answer and say that my job is to ask the questions.

Page 473

A. Classic lawyer answer, okay, thanks.
Q. My job. Bottom line, when Mr. Everett says that this statement was fictitious, you don't believe that; is that correct?
MR. ZURBRIGGEN: Objection to the form of the question. Detective, you can answer based on documents you have been shown and your own knowledge.
THE WITNESS: No, I don't.
BY MR. FEINBERG:
Q. Because you believe the April 15th, '87 statement is true; is that correct?
A. That's correct.
- - -
(Whereupon Exhibit P-52 was marked for identification.)
- - -
BY MR. FEINBERG:
Q. So this is Exhibit-52. This is in the same handwriting that we had a hard time with earlier. I'll represent to you sir, that as with the previous document, this was found in the District Attorney's Office file. It is a statement that is signed by Mr. Everett on

Page 474

May 8th of 1996. Do you understand that representation, sir?
A. I can see it denoted here, yes.
Q. I'm going to -- the bottom of the first page, do you see the question why?
A. Yes.
Q. Above that, is the --
A. I don't see why.
Q. The question before that is, is the information you gave true and correct, the answer was, no. And the next question is why. Are you with me on that?
A. Yes.
Q. Because I had the benefit of studying this for a good 20 minutes to make out the text, I'm going to read to you my interpretation of what the text says and ask you to read along with me.
For one reason I was protecting myself. I was concerned for my safety. I felt that I was going to get railroaded by the police. They did try. There's an illegible word there that I can't make out. Right before the hearing I told

Page 475

Detective Dougherty -- do you know a Detective Dougherty, by the way?
A. Jim Dougherty, yes. There was also Ray Dougherty. There were two Doughertys back then.
Q. Both in homicide?
A. Yes.
Q. Continuing. I told Detective Dougherty that Curtis didn't do it. They didn't want to hear anything else. They said, this is the statement you deal with. The bottom line is they want to win.
If you continue on the next page, there is a question -- knowing you were going to give at the hearing, why did you testify? The answer is, I told you they intimidated me. The threat of -- illegible word, I had a case over my head. Let's just say the bottom line is that the man didn't do it. Curtis never told me that he did it. I lied because I was afraid, confused and I didn't want to be convicted of something I wasn't guilty of. I felt threatened, that's why I testified and gave that statement.

Page 476

Did you read along with me, sir, as I read that?
A. Yes.
Q. Do you believe Mr. Everett's statement of May 8th, 1996 is true?
MR. ZURBRIGGEN: Same objection as before. But Detective, you can answer, based on what you know and you've been shown.
THE WITNESS: I would like to know who took this interview, who it was, what part of it was? What's 11/9/56, what does that indicate? And then there's a Social Security number, do you know what that indicates.
BY MR. FEINBERG:
Q. I don't. Although we can presume --
A. My answer is no.
Q. No, you don't believe this statement; is that correct?
A. Yes.
Q. Because you believe what Mr. Everett told you on April 15th, April 21st and July

Page 477

7th of '87; is that correct?
A. If you could give me a little bit more information on this statement, maybe I could answer you a little bit better. But with what you give me, my answer is yes. Yes, I do believe Mr. Crosland's statement -- Mr. Everett's initial statement.
Q. Going forward in time, we have just reviewed a statement from '96; we previously reviewed a statement of '89. Do you remember all the way back at the beginning of the deposition, we reviewed a statement from January 7th of 2020.
MR. ZURBRIGGEN: From whom? From Mr. Everett?
BY MR. FEINBERG:
Q. Yes, Exhibit-2.
A. Yeah, I do. I remember.
Q. You told me then, you don't believe that statement; is that correct? That was a recantation -- it's Exhibit-2?
A. Right, you're exactly right, right.
Q. You didn't believe that one to be true; is that correct?

Page 478

MR. ZURBRIGGEN: Same objection.
THE WITNESS: Right.
BY MR. FEINBERG:
Q. Because once again, you believe that the statements from April 15th, April 21st and July 7th of 1987 were true; is that correct?
A. Yes.
Q. The final thing I will show you, this is Tab 58 which we'll mark as Exhibit P-53.

- - -

(Whereupon Exhibit P-53 was marked for identification.)

- - -

BY MR. FEINBERG:
Q. So this is an article from the Philadelphia Inquire dated June 25th, 2021. It reports on Mr. Crosland's release from prison. You see a photo there of Mr. Crosland. Do you recognize him at all?
A. No, not really.
Q. I will direct you -- if you go to the fifth page. I will read the text to you at page five. In interviews Thursday, both

Page 479

witnesses, and it's referring to the time period of June of 2021. Both witnesses said they felt coerced into giving false statements. I'll continue. Quote: It was just very brutal. They threaten you, they will use your family and they will tell you what they will do to your family, taking your kids, said Everett, who testified at Crosland's preliminary hearing but said he repeatedly tried to recant. Quote, when you tell the truth, they don't care. They'll accept the lies but they won't accept the truth. Do you see that, sir?
A. Yes.
Q. Do you believe that statement to be true?
A. No. This is said by a lot of people who recant.
Q. Because once again you believe --
A. The original statement, yes.
Q. -- that Mr. Everett said in April and July of '87 was true; is that correct?
A. Yes.
MR. FEINBERG: Let's go off

Page 480

the record.
VIDEOTAPE OPERATOR: Going off the record, the time is 5:49 p.m.
We are going back on the record, the time is 5:53 p.m.
BY MR. FEINBERG:
Q. Mr. Mangoni, after having reviewed all of the documents that I have shown you and gone through all of the testimony, I take it your conclusion that Mr. Crosland is guilty of the Heo murder remains the same; is that correct?
MR. ZURBRIGGEN: Objection to form. Detective, you can answer.
THE WITNESS: According to what you gave me, yes.
BY MR. FEINBERG:
Q. My final question is, do you have any regrets about anything concerning your involvement in this investigation?
MR. ZURBRIGGEN: Object to form. Detective, you can answer.
THE WITNESS: No. No. Is there more that could have been done? I would

Page 481

say yes. But I just don't -- I don't have any regrets or recantations, no. The answer is no.

MR. FEINBERG: That concludes my questioning, sir. I defer to defense counsel.

MR. ZURBRIGGEN: I have no questions. Thank you, Detective.

MS. JOHN: No questions on this end.

MR. FEINBERG: In that case, your deposition is concluded, sir. Thank you for sticking with me through these questions.

THE WITNESS: Okay, thanks a lot. Nice meeting all of you.

VIDEOTAPE OPERATOR: We are going off the record, the time is 5:54 p.m.

COURT REPORTER: Counsel, would you like a copy of the transcript?

MR. ZURBRIGGEN: Yes.

MS. JOHN: Yes.

Page 482

Read your deposition over carefully. It is your right to read your deposition and make changes in form or substance. You should assign a reason in the appropriate column on the errata sheet for any change made. After making any change in form or substance which has been noted on the following errata sheet along with the reason for any change, sign your name on the errata sheet and date it. Then sign your deposition at the end of your testimony in the space provided. You are signing it subject to the changes you have made in the errata sheet, which will be attached to the deposition before filing. You must sign it in front of a witness. Have the witness sign in the space provided. The witness need not be a notary public. Any competent adult may witness your signature. Return the original errata sheet & transcript to deposing attorney, (attorney asking questions) promptly. Court rules require filing within 30 days after you receive the deposition. Thank you.

Page 483

C E R T I F I C A T E

\- - -

I, Jeannine Cancelliere, Court Reporter and Notary Public and for Philadelphia, Pennsylvania, do hereby certify that the foregoing testimony of DOMINIC MANGONI, was taken before me at 718 Arch Street, Philadelphia, Pennsylvania on November 21, 2023; that the foregoing testimony was taken by me in shorthand by myself and reduced to typing under my direction and control, that the foregoing pages contain a true and correct transcription of all of the testimony of said witness.

.............

JEANNINE CANCELLIERE

Notary Public

My commission expires

October 13, 2023

Page 484

I have read the foregoing deposition and the answers given by me are true and correct, to the best of my knowledge and belief.

............................

DOMINIC MANGONI

Witness to signature

Address

My Commission expires

.............

ERRATA SHEET

PAGE LINE # CHANGE REASON THEREFORE

**A**

**A-R-T-H-E-R** 178:5
**a.m** 1:12 5:7 96:10 228:13 296:1 445:17
**abbreviation** 137:2
**ability** 136:10 222:9
**Abington** 105:4 106:4
**able** 9:19 48:4 91:15 125:3 227:13 228:20 229:11 257:10 286:12 339:22 393:10 398:18 437:13
**abreast** 154:8
**absolute** 452:7
**absolutely** 194:10 300:12 300:16 322:4 451:22 455:17 456:10 457:12 469:14
**abundance** 174:9
**academy** 171:11
**accept** 331:9 342:15 447:10 479:12,12
**accepted** 49:24
**accepting** 336:21
**access** 58:20
**accessible** 175:16
**accidental** 272:24
**accommodate** 9:9
**accommodati...** 166:10
**accomplished** 40:13
**account** 221:21 243:21 273:6 273:19 425:23
**accounts** 280:23
**accuracy** 225:2
**accurate** 11:11 26:24 136:11 157:11,19 158:6 180:21 471:7
**accused** 70:10 70:13 379:19
**acknowledge** 454:3 462:22
**acknowledge...** 356:2
**acknowledges** 354:20
**acknowledging** 472:3
**ACLS** 105:6
**act** 351:9
**acted** 452:13
**acting** 334:11
**action** 1:4 54:17 56:22 65:10,14 66:1 134:12
**actions** 29:16 114:18 469:3
**active** 226:21
**activities** 15:5 106:18 360:21 361:3
**activity** 3:18 13:6 15:16,21 15:22 16:6 27:7 154:3,4 155:13,16 156:11,19,20 157:12,18 158:2,15 160:5 160:6,11,14,16 160:22 161:4 162:5,9,13,19 162:24 163:21 164:2,12 175:22 176:1 186:9,12,13 187:17 189:5,8 189:9,18 191:4 307:13,15 309:14,16,23 310:11,15 311:2 313:2 315:14 317:10 318:22,24 322:20 340:2,4 340:18,21 343:9 347:6,11 358:20,22,23 360:14 365:7 373:10 375:13 382:23 383:2,6 383:11,12,23 384:3,8 386:8 387:21,23 388:6 389:13 395:22 401:8 407:6 421:3,10 422:1 423:1,19 424:7 426:5,17 426:22 430:7 451:5,9 459:6
**actor** 337:15
**actual** 57:20 94:22 247:6
**ADA** 233:9 436:17
**Adam** 2:9 5:22 137:13 394:20
**adam.zurbrig...** 2:12
**add** 300:15 324:4 369:5
**added** 415:6
**addition** 322:12
**additional** 131:8 184:24 284:23 286:4 298:24 300:14 324:5 328:15
**address** 107:23 108:2 243:13 341:12 342:20 345:21 484:17
**addressed** 12:2 438:23 451:14 454:2,3 455:16
**addressing** 280:15
**adjacent** 183:17
**admissibility** 461:4
**admissible** 455:13
**admit** 463:6
**admits** 412:8
**admitted** 77:16
**admitting** 412:9 412:9
**adult** 482:18
**adults** 103:2
**advanced** 100:4 100:5
**advice** 462:14
**Affair's** 134:4
**Affairs** 134:7,15
**affidavit** 32:9,24 33:3,9,16 34:2 34:24 35:1 37:2 40:24 84:3 151:17 429:10 432:5 434:11,23 435:2,19,23 436:8,19,19,21 437:12,18,22 438:7,21 439:5 439:13 442:15 443:13,19
**affidavits** 41:4 85:11,12 435:13
**afraid** 236:15 237:10 475:21
**aftermath** 173:16
**afternoon** 254:4
**age** 23:4 69:13
**agency** 1:19
**agent** 59:19 108:7
**aggressive** 417:17,24
**ago** 8:11,11 11:17 16:20 17:23 19:3,11 21:7 23:20 24:19,19 30:16 31:18 46:13 58:7 73:4 87:15 121:10 170:24 197:16 204:6 236:11 237:6 311:3 351:7 413:1 424:8 442:14
**agree** 10:11,19 31:23 33:8 36:10 55:24 74:8,8,10 79:14 83:1,8 85:13 86:5 91:20 93:2,20 94:10,13 144:11 147:1 155:15 158:13 180:10 182:12 197:21 201:16 212:6 220:11 229:16 237:16 240:24 248:19 269:12,13 271:3,6 273:5 273:13 279:7 280:4 299:24 307:16 313:12 319:13 341:20 345:12 374:3 378:4,12 379:10 383:1 394:15 397:1 402:8 403:3

411:6,21
413:23 422:20
424:11,19
425:6 428:3
435:12 451:21
454:12
**agreed** 11:2,8
25:10 37:5
92:24 188:13
204:14 208:16
210:24 235:24
265:1 277:24
308:4 323:17
331:20 335:3
338:11 342:2
345:2 371:5
390:20 395:15
411:19 425:21
448:17 449:7
465:17 472:4
**agreeing** 272:8
**ahead** 45:10
83:13 237:5
250:12 281:1
316:4 415:12
416:3,16 417:9
455:22 461:21
**aide** 101:9
**al** 1:5 124:4
164:6 319:11
**Albert** 23:16
399:12,22
**alibi** 349:6,7
**align** 222:8,16
**aligning** 221:5
**allegation**
292:11 315:16
**allegations**
112:16 129:14
130:20
**allege** 278:23
**alleged** 29:8
37:6 84:13
249:14,21
258:20 275:14
278:9,22
279:17 331:24
370:18 382:15
422:16
**allegedly** 234:12
258:10 265:12
265:13,21
268:4 291:16
304:4 423:8,12
423:16
**alleges** 7:2
**alleging** 36:13
**allow** 10:12
105:20 183:23
**allowed** 164:22
167:17 218:16
**allows** 185:17
**Alonzo** 161:19
161:22 162:4
**alternated**
226:14
**alternative**
244:18
**alternatively**
176:9
**ambulances**
105:10
**Amendment**
462:15,21
465:2
**amount** 30:5
40:10 117:19
159:5 177:5
**Angeline** 2:7
5:17 6:20
199:4
**annual** 135:3
**anonymous**
167:20,24
168:21 169:14
169:17,18
170:6 171:1,24
345:4,5
**Ansel** 2:18 23:18
124:3 340:13
**answer** 9:11
11:2,5 18:2
20:23 21:2,23
28:10 30:7
32:3 33:14
34:5,7 36:16
38:5 41:15
43:16 44:3,9
45:11 46:2
48:22 49:17
52:11,21 57:13
58:21 62:13
63:7,16,24
64:20 65:4
66:20 67:8
68:2 71:7 72:1
73:11,20 74:6
75:1,3,5 78:10
80:12,21 82:4
83:14 84:19
86:1,2 92:16
92:21,23 93:24
95:12,21,23
109:6,13,23
115:10,23
116:6,15
124:23 125:10
129:1 132:12
138:1 140:6
141:2,8,8
142:5,24
143:10 145:4
145:18 147:5
148:13 151:13
152:1,22
155:21 157:14
165:12 168:15
169:1,21
171:12 172:5
173:2,23
178:12 186:1
194:6 201:3
204:7 205:10
206:21 212:10
217:4,12
219:11,20
221:7,10,16
224:4 227:15
232:14,15
234:4 237:2
238:6,7,11
239:20 242:1
244:16,20
245:11 250:21
256:10,12
268:3 271:15
271:24 272:6,8
274:23,24
275:6 276:1
277:2 279:2,10
283:17,24
284:6,17 285:3
286:18 287:10
293:9 295:7
298:17 300:11
302:14,15,19
302:23 303:7
303:10 305:4
305:14 306:10
308:12 310:3,4
310:20,23
311:1 313:6
315:10 319:16
321:14 322:9
324:8 326:6
327:24 332:12
333:13 338:17
339:22 340:24
344:19 348:15
349:18 350:10
350:15 351:3
351:13 352:1,6
353:3 354:4,16
355:14 356:10
356:16 357:21
358:5 361:22
362:9 365:18
368:13 370:7
370:13 371:1
371:14 372:24
376:10 378:2
378:10 379:4
379:15 382:1
382:18 390:10
391:10 394:8
398:14 400:6
405:2 409:19
410:20 412:3
412:18 414:13
414:21 415:12
416:4 419:16
423:1 424:2,14
425:1,10 426:3
427:11,18
429:8 433:11
437:5,14 438:4
438:11 439:2,9
440:4,12 443:2
443:3 444:4
448:13,23
449:14 450:1
452:2,11
453:14 454:8
454:23 457:1
457:16 459:20
459:22 460:6
460:22 469:22
471:20 472:23
473:1,7 474:11
475:16 476:9
476:19 477:4,5
480:14,22
481:2
**answered** 78:18
83:13 134:19
274:4 275:5
279:1 280:19
281:1 310:9
390:7 416:2
429:7 455:22
457:15 459:19
461:21
**answering** 390:9
**answers** 223:5
303:9 312:19
355:23 371:8
406:24 484:2
**Anthony** 69:15
70:11 118:16
**Anthony's**

118:17
**anybody** 12:10 16:10 20:10 26:2 36:7 51:3 52:15 64:12,16 73:8 112:6 118:13 190:3 256:23 300:22 355:21 362:23 367:8
**anymore** 159:7 363:18
**anyone's** 133:22
**anyway** 280:20 314:23
**apart** 109:22
**Apologies** 360:7
**apologize** 86:19 346:9 394:19
**apparently** 89:11 117:6 175:3 204:21 217:10 232:7 313:14 341:11 415:6 428:16 450:2
**appeals** 25:24
**appear** 253:16
**APPEARAN...** 2:1
**appeared** 259:8 287:17 373:12
**appearing** 8:18
**appears** 56:1 191:13 199:14 266:8 275:18 408:21 422:20
**appellate** 129:13
**appreciate** 82:21 264:7
**appropriate** 43:14 63:1 165:16 291:9 316:19 424:19 425:7 482:4
**approval** 167:8
**approximately** 204:6
**April** 21:17 33:12 34:14 122:20 155:4 191:14 202:4 205:23 215:9 228:5,13 258:6 271:8 277:19 278:16 285:8 293:19,22 295:20,21 296:1,18,19 298:11,11 311:23 320:14 320:20 323:10 324:4 325:24 331:15,22 333:8 336:4 346:6,7,12,13 347:8 359:10 360:2,2 361:5 362:3 373:9 405:18 415:1 423:8,11 434:13 462:5 467:19 470:3 473:11 476:24 476:24 478:6,6 479:21
**Arch** 2:3,11 5:8 483:7
**Archbishop** 104:24 106:10
**area** 55:16 446:6
**argue** 418:14
**arisen** 51:19
**arises** 69:22
**Arnie** 150:6
**arrange** 17:6
**arrangements** 180:11 182:23
**arrest** 32:11 37:8 45:14 119:8,9 127:4 163:9 171:23 206:18 208:23 208:24 210:10 324:23 376:19 391:24 429:11 430:22 431:20 431:24 432:10 432:14 434:7 434:16 440:10 441:2 443:21 444:2
**arrested** 7:4 25:9 39:3 127:3,6 129:23 152:7 169:15 430:3 441:6
**arrests** 208:11 284:11
**arrive** 173:10
**arrived** 210:1
**Arther** 178:4
**article** 3:11,13 4:9 61:16 111:1,13,20 112:15,17 264:22 266:7,9 267:8 478:16
**articles** 3:17 244:5,10 246:14 247:18 247:21 248:8 248:23 250:15 251:12 252:13 254:12,13,20 255:15,16 259:8 260:16 261:1,12,16,17 262:9 264:20 266:2 267:4 273:15
**articulate** 227:9
**aside** 87:16 119:17 133:3 185:12 315:7 407:9 419:22
**asked** 20:5 30:15 38:5,14 54:14 55:8 56:22,23 57:22 59:24 65:23 66:6,13 83:12 117:1 127:21 168:13 187:10 194:12 198:8 203:10 213:23,24 218:2 227:21 229:1,4 241:15 253:2 267:24 270:2 274:24 275:5 279:1 281:1 300:21 302:5,17 305:16,21 310:3,7,9 312:11 320:20 351:3,4 355:20 363:6,16 390:10 412:10 416:2 429:7 443:18 455:22 457:15 459:19 460:23 461:21 465:12 472:19
**asking** 10:10,11 10:18 85:1 113:13 129:4 130:7 136:16 162:7 199:4 226:13 227:23 227:24 243:15 243:16 250:8 252:22,23 267:1 277:21 296:5 303:11 304:9 305:4 332:17 368:10 397:15 411:7 411:23 424:16 435:5,9 443:9 443:10 466:6 468:19 482:20
**aspects** 9:22 375:12
**asserted** 462:15 465:2 471:16
**asserting** 463:22
**assess** 321:18 434:3
**assign** 482:4
**assigned** 30:7 38:20 39:2,7 40:8,21 41:4 45:20 59:1 101:14,18 103:10 106:21 118:8 121:5,6 121:12,17 122:13 125:13 125:23 126:7,9 129:20,21 130:21 131:10 137:8 154:19 164:3 168:8,20 217:8 255:22 314:13 335:10 458:9
**assignment** 39:18 98:10
**assignments** 101:1 154:12
**assistance** 411:7
**assistant** 24:6 106:9 428:1
**associated** 65:2
**associates** 375:21
**Association** 337:11
**assume** 7:22 8:21 20:23 22:8 24:1 27:10 44:13 65:23 80:7 105:17 158:1 164:17 167:19 173:18 175:20 176:14 207:22 223:21 227:1 229:4 296:18

299:20 343:10 357:8,17 366:1 371:8 383:22 409:1,16 410:15
**assuming** 195:11 386:24
**assumption** 8:24 9:18 163:16 289:24
**ATF** 59:19 108:7,8
**Atkinson** 387:13
**attached** 132:23 482:14
**attained** 104:4
**attempt** 31:7 263:9 270:8 372:18
**attempted** 263:11,21 270:3,12 331:20
**attempting** 64:16
**attention** 67:19 122:23 206:4,6 211:16 388:4
**attorney** 6:17 24:6 88:18 111:16 149:18 153:13 170:6 204:24 303:12 303:13 375:3 416:20 417:7 418:1 428:2 482:20,20
**attorney's** 26:8 28:5 46:16 51:7 52:8,17 60:12 67:23 70:23 158:23 169:19 188:24 259:9 260:7,12 322:5 410:10 414:3 416:9,21 417:6 420:12 427:6 447:13 450:12,19,24 451:19,23 452:9 455:19 456:4,11 457:13,22 458:20 460:4 472:12 473:23
**attorneys** 417:23 418:10 418:10,12
**attributed** 179:12
**audience** 385:12
**August** 61:17
**authorization** 1:18
**availability** 162:5
**available** 84:20 90:11 177:13 177:15 195:11 195:15 271:9 273:7,22,22 274:18 299:9 391:6 392:5
**averaged** 121:5
**avoid** 142:21 158:12
**aware** 21:13 26:9 46:12,18 48:17 49:3,7 50:2 51:6 63:10 68:16 69:21 70:6,9 70:22 71:13 84:11 94:24 95:3 108:19 112:22 126:6 126:11 128:13 129:12 139:10 139:15,18,20 151:1 154:22 154:23 196:7 206:4,8 207:23 247:13,17 254:15 333:22 374:17 376:8 377:6 431:6 457:19 463:14 463:21 464:2,2 464:6
**awhile** 17:9 177:7

**B**

**B** 3:7 4:2
**B-O** 337:10
**back** 13:21 18:21 21:10,24 22:7 31:17 34:13 35:2 38:18,20,23 40:14,15 43:9 43:10 49:2 75:8 76:17 87:18 90:14 95:24 96:9,12 100:16 103:24 110:15 112:15 114:14 117:14 117:22 119:13 119:19,21 120:12 121:4,6 121:24 124:9 127:9 128:4,21 128:22 135:17 136:20 146:21 154:4 155:2,12 159:2,2 160:5 162:8 175:20 181:17,24 182:19 183:12 184:10,14 196:7 197:18 206:10 214:23 215:2,7 238:2 238:11,22,24 240:17 241:7,8 254:19 255:14 256:15 257:20 261:2,11 263:24 264:6,6 264:8,10,11,20 264:21 266:2 266:20 267:4,5 269:18 270:21 278:9,12 279:15 280:11 282:16 287:11 292:10 298:18 298:19 302:10 304:4 308:3 312:16 325:12 325:15 329:19 334:15,16,18 336:5 339:15 346:16 347:20 352:13 360:13 360:17 362:21 366:24 367:22 367:24 373:8,9 380:16,17,23 382:24 388:2,6 396:8,18 403:23,24 404:10 407:24 408:3 414:24 429:16 437:10 440:17 442:13 455:24 457:19 462:17 465:19 470:6 471:4 475:4 477:11 480:4
**background** 8:21 89:22 96:18 111:18 177:11 199:22 330:13 364:4 366:6 435:4
**Backing** 378:13
**bad** 45:8 81:16
**ball** 84:22
**ballistics** 196:5,6 196:9,10
**Barbara** 72:18 150:5 233:10 429:13 453:7
**barrel** 196:24 197:8,14,15,16 197:20 198:9 198:10,13,15
**barrels** 197:9,10
**base** 365:15
**based** 8:21 30:23 35:17,24 36:1 49:18,20 50:20,20 75:14 78:11 85:10 86:9 95:12 109:6 110:4 139:10,21 142:18 180:5 205:13 212:2 212:13 217:2 222:17 243:17 244:15 251:15 260:5 271:13 273:6 274:2,10 274:14 275:23 288:23 292:11 311:17 313:2 315:13 321:5 323:20 334:11 338:6,8 347:22 352:2 355:14 356:1 361:20 361:23 362:10 371:7 374:21 374:23 389:3 389:18 390:1 390:24 391:10 393:21 394:2 400:6,8 402:14 407:16,18 412:3 418:8,17 419:16 422:24 426:4 438:2 443:2,11 444:5 448:4 452:2 455:1 468:16 468:16 469:22

471:13,20
473:7 476:9
**basement** 177:8
182:21
**basic** 192:18
194:3 257:24
**basically** 18:12
138:5 156:11
156:13 224:8
224:22 349:6,7
364:16,22
**basis** 166:6
310:19
**Bate's** 202:23
**Bates** 259:22
**Bear** 161:15
287:24
**bearing** 264:7
**beat** 165:1 304:4
**beaten** 208:19
210:10,19
**beating** 304:7
**began** 9:5
**begging** 418:15
438:22
**beginning** 1:12
81:7 102:11
111:12 123:24
202:3 313:9
329:6,20 339:3
367:6 460:23
477:11
**behalf** 6:3
**belief** 82:9 93:17
95:8 138:18
147:21 179:1
179:18 484:4
**believe** 13:6
14:17 15:11,14
43:13 45:18,22
46:9 57:11
62:24 81:23
82:7,12 85:20
95:2 119:21
127:5 131:10
131:18,20,20
145:22 147:13
147:16 148:21
149:11 151:21
164:14 166:14
183:21 192:23
193:15 194:13
260:23 283:21
293:17 308:1
317:9 321:23
360:4 373:17
377:10 382:5
383:4 402:22
404:9 421:14
440:6 441:21
443:20 454:19
456:21 469:20
472:7 473:4,11
476:4,20,23
477:6,19,23
478:5 479:15
479:19
**believed** 31:1
78:20,24 83:5
94:14,18,23
140:3 141:12
252:8 316:18
397:7 440:9
442:17 444:8
462:20 467:18
470:2
**bell** 113:21
161:20
**belong** 66:10
**benefit** 10:23
81:17,17,18
202:21 474:14
**Benjamin**
417:14
**Bensalem** 105:7
**best** 45:18 82:19
82:20 136:10
157:19 192:19
194:7 225:17
251:3 277:2,14
421:15 484:3
**better** 45:13
328:13,14
347:7 385:12
477:4
**biased** 144:24
145:5
**big** 72:19 284:15
336:19 337:3
410:5
**billboard** 111:15
**Billy** 129:22
**binder** 29:24
30:1,2 32:16
47:1 75:20
158:22 159:4,9
159:11,21
160:7,19
162:15 163:16
189:19 202:18
203:6 337:1
379:23 396:18
402:18 408:9
409:24 410:7
437:11 446:22
458:15,20,22
459:12,13
464:11
**binders** 158:20
159:2,7 162:20
162:24 163:3,5
163:6,11
**birth** 107:7
**bit** 37:23 38:10
38:23 50:17
91:13 102:16
104:1 187:20
194:15 197:7
202:2 282:15
287:1 352:5
448:6 477:2,4
**black** 92:22
179:13 282:7
**Blanket** 451:24
**block** 153:8
209:21,23
337:17 341:18
341:21,22,23
342:11
**blocks** 341:24
**blow** 209:5
210:22
**blue** 137:22
138:6,8
**Bo** 337:9 345:6
**Bob** 338:1 345:6
**Bobby** 60:18
**body** 188:22
**boss** 123:8,9
180:8 256:4
308:15 333:17
333:17 363:9
366:8,9,10,12
**bosses** 191:23
192:4 368:2,3
**bother** 133:20
**bottom** 43:9
44:13 47:6,12
61:21 77:15
91:8 92:10,12
113:14 124:12
137:18 150:23
150:24 157:5
170:15 184:4
194:1 213:16
227:21 232:20
232:23 257:21
258:15 259:23
263:2 265:14
266:20 267:8
267:23 268:13
276:23 282:4
285:6 288:4
305:2 315:13
330:23 334:8
348:23 356:15
376:14,16
384:11 386:15
392:23 393:11
396:8 402:2,6
406:11 407:9
459:22 473:2
474:4 475:11
475:19
**bought** 197:18
**Boulevard** 18:14
**box** 229:6
**boys** 106:11
393:3
**Brady** 47:17,22
47:23 48:1,8
48:11 460:13
460:24 461:13
**break** 9:8,11
96:13,14 190:4
190:6,7,7,17
214:19,21
215:4 284:3,22
323:8 325:16
325:17 405:10
408:4,5
**Brenda** 86:18
87:1,6
**brief** 9:2 167:4
**briefly** 6:15
**Brignola** 20:20
20:21 21:3
124:3 282:2
340:12
**bring** 45:14
102:20 175:4
184:14 202:10
225:8 274:22
274:22 287:5
298:1,18 324:3
339:8 346:6
363:9 404:3,11
**bringing** 244:19
366:7 367:24
**Broad** 1:23
119:1
**broaden** 20:12
20:23
**broader** 126:10
**Brooks** 396:23
**brother** 131:7
349:3
**brought** 6:22
59:10 127:14
195:4 298:19

302:10,16 311:4 336:3 362:21 407:3 441:11
**brown** 3:23 4:6 282:9,24 395:12 398:3 398:11,17 406:18,22
**Bruce** 396:23
**Brustin** 2:20 5:21
**brutal** 479:5
**Bucks** 100:6
**build** 283:1,4
**Building** 2:3,10 8:9
**bullet** 200:4 201:14,22 208:24 297:8
**burglaries** 102:20
**businessman** 126:24
**Businessmen's** 337:10
**busy** 40:7
**buy** 354:16

C

**C** 483:1,1
**C-O-L-I-H-A-N** 230:7
**cahoots** 251:20
**caliber** 200:18 200:23 210:7 247:7 297:7,12
**call** 112:9,11 113:17 123:4,5 133:19 138:15 168:4 177:13 177:16 182:22 183:12 184:12 217:9 229:23 231:3,3 243:6 243:23 328:2,2 337:9 388:4 413:7 445:22
**called** 21:22,24 99:19 101:12 111:1 112:1,7 136:3 170:17 175:18 178:4 184:18 185:7 185:10 187:3 209:4 226:2 230:13,18 276:16 287:4 289:9 335:11
**caller** 337:13
**calling** 62:18 422:12
**calls** 40:5 338:12
**camera** 256:1
**campaign** 111:22 112:19
**campaigns** 60:11
**Cancelliere** 1:13 6:6 483:3,17
**cancer** 21:17
**candidate** 111:16
**Cape** 21:19
**captain** 256:5
**captive** 385:12
**cardiac** 100:4
**care** 105:5 169:9 169:12 192:5 479:11
**career** 7:22 27:10 124:14 140:1 158:3 167:20
**careers** 69:10,12
**carefully** 252:16 482:1
**Caren** 1:14 5:2
**Carlin** 201:13
**carried** 196:18 400:24 401:14
**carrying** 92:23 196:20 197:19
**Cartridges** 196:7
**case** 7:10,14 9:10,20,21 17:19,21,22 18:3,7 19:5,10 19:23 22:6,18 22:20,24 23:2 24:4 25:9,18 25:19,20 26:3 26:7,13 27:3 28:6 30:2,6,8 30:11 31:19,24 32:18 33:11 35:19 38:20 39:10,11,11,14 39:16,17,23 40:8 41:5,11 41:22 43:20 44:11 45:8,17 45:21 46:5,13 49:5,9,21 51:23 69:16 72:17,17,19 73:1 75:8 84:24 87:6,20 88:2,17,24 90:1 108:17 110:10 114:23 118:9,10,23 121:16,21,22 122:4,7,22,24 123:8 125:14 126:16 127:22 128:11 129:12 131:2,4,11,14 132:1 135:9,12 137:15 148:9 149:6 150:10 151:15 152:5 153:11 154:21 155:3,9,10 159:4,6 161:16 161:22 162:1 162:10 163:4,5 163:13,17,20 163:21 164:4 166:6,6 167:3 167:16 168:9 168:20 170:2,7 170:18,21 171:2 174:14 176:23 177:18 182:8 184:22 185:23 192:18 194:4,9 199:16 204:7 206:11 206:11 208:19 215:8 217:8 220:9 222:13 226:6,12 231:21 233:9 233:11,24 234:23 245:5 246:15 253:24 254:7 256:6,22 258:13 260:8 260:12,14 284:4,20,23 293:4 294:10 294:24 295:10 295:13,14,15 305:3,12 308:8 310:14 326:23 326:23 339:19 364:17 365:15 366:6 368:5 374:6 376:5 381:20 382:8 382:11 387:18 393:24 402:16 413:7,8 417:14 418:20 422:16 428:2,9,16,18 429:1 436:15 436:15 439:20 439:21 460:13 461:1,3 463:9 475:18 481:11
**cases** 40:1,3 42:22 45:12 48:8 52:18 59:10,12 68:12 68:14 72:10,16 88:21 101:20 102:20 118:8 121:1,5,13 122:1,7,7,8 125:16,18,22 126:6,11 128:7 128:13,17,18 128:24 129:3 130:18 162:18 171:16 173:14 177:5 179:7 180:24 183:14 186:22 216:22 234:21 248:1 255:21 295:9 311:22 313:1 314:21 336:19 337:3 363:11 363:20 368:4 374:16 375:3,5 411:8,24 412:11 467:21 468:4,4
**cash** 268:5,8 269:2,5 272:17
**Cast** 2:3
**Catholic** 97:13
**caught** 209:23
**cause** 32:10,24 33:4,10 34:2 34:24 37:3 40:24 81:19 85:6 359:3 429:11 432:5 434:12 435:14 435:24 436:8 436:22 437:12 437:18 440:10 442:16,18 443:14,20
**caused** 7:3 206:8 339:7
**causes** 118:18

153:19
**center** 197:17 228:10 230:18 311:6 317:17 471:5
**central** 471:2
**certain** 28:14 30:19 48:24 122:3,6,8 159:5 184:19 187:14 347:24 351:18
**certainly** 69:1 167:22 191:10 290:15 370:9 455:7,9 467:22 467:23
**certainty** 163:8
**certified** 103:2
**certify** 483:5
**certifying** 1:19
**chairman** 63:11
**chairperson** 54:15,17 55:9 56:24
**Chalie** 118:15
**challenge** 184:24 185:8 299:23 300:1 317:21
**challenging** 92:19 251:24
**chance** 7:16
**change** 95:8 160:10 189:24 190:4 214:18 243:21 323:7,9 329:2 445:10 482:5,6,8 485:2
**changed** 119:14 123:15 462:3
**changes** 95:20 482:3,12
**changing** 446:13
**characterizati...** 84:18 85:7 299:17 300:10 426:2 439:2 448:3,12
**characterize** 403:1
**charge** 77:5
**charged** 77:12 165:6
**charges** 70:7 129:13 130:19 175:4 211:9 418:23 431:6 441:13 442:3
**chart** 156:6
**charts** 157:2 314:16,18,19 314:24
**chasing** 210:20
**check** 221:23 385:15
**checked** 396:11
**checks** 177:11 384:12,13
**cheeseburgers** 354:17
**chief** 133:23
**child** 240:6
**children** 108:4,5 330:12,15,18
**choice** 171:12,15
**choked** 209:9
**Christmas** 277:3 277:15
**Christy** 150:5 233:10 429:14 431:19 453:7
**chronological** 160:24
**chronologically** 405:17
**chronology** 429:20
**Cimino** 23:14 31:9,14 38:20 40:17,23 124:10 164:7 248:4,16 319:10 329:10 331:8,12 332:5 333:1 334:10 429:11 431:18 432:9 435:5,8
**circumstance** 140:24
**circumstances** 10:10 141:4 222:12 304:6 380:20 382:9
**cited** 33:9,20 34:1,23 37:8
**Citizen's** 338:2
**city** 1:5 2:9,10 2:13 5:11,23 5:24 6:1,3,24 71:13 74:20 96:5 98:17 107:9 109:10 110:9 136:3 197:17 335:8
**City-005769** 260:3
**City-119** 394:8
**City-136** 406:21
**City-14** 288:4
**City-15** 282:1
**City-177** 403:23
**City-18** 262:1
**City-181** 403:12
**City-19** 265:16
**City-217** 388:7
**City-5774** 267:5
**City-9416** 91:9
**civil** 1:4 12:18 22:15 71:14 99:7
**civilian** 159:17 219:14,17 314:11
**clad** 45:24
**claimed** 34:18
**claims** 35:19 108:22 264:17 266:1
**Clark** 2:15 6:3
**classic** 472:22 473:1
**clause** 236:9
**clean** 93:10
**clear** 10:18 29:14 33:19 84:21 108:17 114:21 130:13 145:9 162:2 163:7 229:19 235:21 243:13 251:24 281:9 285:11 297:6 300:24 301:2
**climbing** 209:23
**Clinton** 338:3
**clip** 159:11
**clock** 117:23
**close** 166:11 359:15
**closer** 409:7,9
**clothes** 104:12 104:13
**co-counsel** 5:20
**co-workers** 72:5
**coach** 104:24 105:3 106:8
**coached** 106:12
**coaching** 105:17
**code** 138:9
**coerce** 164:22
**coerced** 479:3
**coffee** 17:4
**cognizant** 47:18
**coincidental** 17:7,8
**cold** 38:7 39:14 39:17
**Colihan** 230:2,6 230:7,9
**Colihan's** 230:12 231:7 243:7
**collaborate** 348:3
**collaborative** 327:21
**collapsed** 268:23
**colleagues** 6:19 20:14 51:24 52:3,4 158:10
**collect** 196:2
**collected** 196:3
**collection** 158:22 159:9
**collectively** 94:14 227:24 298:23 466:10
**collects** 261:1
**college** 96:20,21 97:6 105:4
**column** 262:10 482:4
**combative** 227:8
**combination** 226:16
**come** 9:19 16:13 19:20 20:2 26:2,12 38:23 43:9 49:2 58:18 87:18 90:14 100:16 103:24 110:15 112:15 119:13 122:16 127:4 136:20 141:6 146:21 153:9 162:8 174:22 175:1 181:17 182:24 229:23 246:21 249:7 257:20 263:24 264:6 270:21 290:18 291:20 292:10 306:19 309:5 312:16 339:15 373:9 379:22 380:16 380:23 388:2 429:16 460:1

**comes** 39:22 123:4 144:16 146:23 148:20 150:21 153:1 192:5 211:16 212:4 257:2
**coming** 19:14,19 20:2 90:6 159:23 204:21 217:1,22 435:5 435:8 461:18
**comitted** 83:5
**Commerce** 2:16
**commission** 338:2 483:18 484:22
**commit** 174:21
**committed** 29:5 77:16 82:23,24 83:9 174:23 207:12 208:16 265:18 318:10 425:23
**committee** 54:18 65:10,15,17 66:1 114:19
**Commonwealth** 47:18
**communicated** 21:1 188:23 322:4 414:17
**communication** 411:22 414:9
**communicatio...** 20:13
**compact** 160:1
**compensation** 108:21
**competent** 482:18
**complainant** 208:18
**complaint** 11:15 12:17,18 22:6 22:15 24:17 136:21
**completely** 411:14
**complexion** 282:23
**computer** 242:12 252:7 406:10
**concept** 48:14 139:23 142:1 256:14 461:7
**concern** 116:2 245:7
**concerned** 429:11 461:3 461:15 474:20
**concerning** 16:1 19:5 35:19 73:23 86:10 136:22 162:3 176:24 191:12 192:2 206:17 292:9 313:1 344:2 352:22 363:16 369:3 376:16 430:8 430:19 448:1 464:15 472:21 480:19
**concerns** 43:24 63:20 65:1 66:15 112:16 116:10 125:7 175:8 216:24 219:24 221:5 223:1 225:2,5 225:6 236:1 244:12,21,24 246:12 274:13 280:21 283:3 308:8,14 389:22 390:4
**Concise** 3:15 136:3
**conclude** 252:12 303:14
**concluded** 481:12
**concludes** 481:4
**conclusion** 49:12 53:23 200:12 315:24 316:6 443:23 480:10
**conclusions** 49:24 317:2
**concur** 265:7 341:14
**conditions** 166:7 166:14
**conduct** 40:10 79:12 140:16 166:17 178:23 184:23 225:14 307:6 320:15 325:5 336:3 350:6 424:10 425:14 448:18
**conducted** 13:23 15:10,11 16:6 43:13,17 51:20 141:22 181:10 183:19 187:6 188:17 202:5 282:1 364:5,24 383:7 388:10 391:16 421:21 446:24 450:14
**conducting** 178:18 179:10 183:3 188:10 326:20
**confer** 149:22 327:8 429:13
**conferred** 436:17
**confessed** 29:13 34:19 35:11 37:7 234:12 258:10 262:3 265:13 300:3 301:24 315:17 319:22 378:14 378:18 423:8 423:12,16 463:16
**confesses** 257:2
**confession** 35:20 249:15,22 256:17 258:19 258:21 273:21 276:16 278:23 279:17 287:4 370:19 382:15
**confidential** 109:21 419:15
**confirm** 8:15 30:14 36:5 38:24 78:20 85:5 134:19 160:5 178:24 215:13,17 217:14 250:14 252:4 331:6 360:5 364:4 389:12 406:16 412:14 419:5 425:20 437:17
**confirmed** 326:21
**confirming** 224:20
**confirms** 191:10
**confront** 185:17 317:22
**confrontation** 185:8 317:21
**confronted** 453:7
**confronting** 357:4,4
**confused** 475:21
**confusing** 236:24
**conjunction** 177:4 180:24
**connected** 330:10
**connecting** 33:10 111:15
**connection** 58:19 59:20 116:3 142:10 164:13 205:24 239:10 309:5 376:19 378:1 387:18 402:20 409:13
**connections** 59:8,13 60:20
**conscience** 236:13 237:8
**conscious** 38:9
**consider** 143:13 171:7 178:22
**consisted** 15:17 117:24
**consistent** 48:2 185:13 211:6 345:22 437:19 439:14 467:9 471:15
**constantly** 40:1
**constitutes** 144:5
**constitution** 139:12
**constitutional** 139:11
**consult** 7:16 328:19
**consulted** 392:5
**consulting** 328:11
**consuming** 394:24
**contact** 87:13 111:23 140:16 203:15,17 216:6,7 381:7
**contacted** 106:21 111:20 191:24 216:20
**contacts** 217:20
**contain** 483:12

**containing** 32:17
**content** 247:17
**contention** 37:7 319:21
**context** 195:24
**continue** 10:12 303:17 394:13 475:13 479:4
**continued** 42:15 203:15 372:13 446:18
**continuing** 42:24 53:18 409:4 475:8
**contradictory** 143:5,7
**contradicts** 144:8
**contrary** 413:11
**control** 483:11
**controversial** 111:15
**convenience** 25:5
**conversation** 9:15 12:1,5 16:16 19:16 20:1 31:16 158:13 188:8 205:11 229:15 229:20 244:1 253:10 275:13 306:22 307:10 369:13 376:22 415:4 427:8 445:14 451:11
**conversations** 65:8 69:4 110:2,8 150:17 202:17 232:18 256:1 332:1,5 419:2 441:19 446:18 467:1,4
**converted** 132:19
**convicted** 7:4 341:4 356:23 475:22
**conviction** 3:19 26:1,7,17 46:14,18 47:4 50:1,2,5 70:19 75:19 88:18 126:14 127:14 387:4,6 450:14
**convictions** 72:11 128:8 208:11
**cooperation** 411:8
**coordinate** 123:10
**cop** 97:10,23 98:12 99:4 101:11,13,18 128:3
**copied** 334:22
**copies** 53:23 261:17 400:21 464:21
**cops** 138:5
**copy** 56:11 115:13 437:9 447:19 481:19
**corner** 259:23 330:23
**correct** 7:24 8:13 13:12 14:8,11,13,20 16:21 19:12 21:4 25:13 28:1 29:13 31:1,21 33:22 34:3,16,20,21 34:24 35:4,12 36:8,9,23 37:3 37:9 39:9,12 41:13 43:1,14 44:18 45:19 46:10 49:14 52:1 54:18 55:10,20 61:3 65:15 67:6 70:7,15,20 71:1 75:11 77:21 78:4,22 79:1 80:4,19 82:9 83:6 85:8 86:6,21 87:23 89:13,17 95:5 104:7,19 110:14,14 130:20 133:19 136:8,17 141:13 146:6 158:20 159:1 160:8 163:11 163:17 180:16 184:6 185:19 188:7 189:1,11 191:21 193:23 201:24 204:16 208:20 209:2 213:5 214:12 215:22 216:9 218:3,4 221:1 222:4 225:4 228:2,3,16 229:21 233:12 235:14 238:15 240:10 243:2,8 244:2,6,10 247:15,18,19 247:21 249:16 249:18,19,23 250:3 252:20 252:23 253:11 253:17 254:1,8 254:13 255:2 258:11,17,21 262:22 263:12 263:16 266:14 267:12,15 269:6,24 270:14 273:23 274:11 275:21 276:8 278:23 284:11,12 285:9,13,17 286:2,6 287:13 288:21 289:3 290:4 292:1 294:10,15 295:1,5 296:10 296:16 297:13 297:18 298:11 299:10 301:9 303:13 304:5 304:23,24 305:9,14,15,24 306:1,3,4,8 307:10,21,24 308:20 310:22 311:21 313:10 313:19,24 314:1 315:4,18 315:22 316:2 316:19 317:3,8 317:11 318:10 319:22 320:18 320:23 321:3 321:24 322:6 322:15,23 323:13 324:5 324:13 327:22 328:11 331:16 332:2 333:2,5 333:11 334:12 334:13 335:13 337:1,16,20 338:4,15 339:5 340:14,22 341:5,9 342:20 343:4 345:7,23 346:13,17 348:5,21 349:4 349:8,16 350:8 350:19 353:6 353:10,19 354:2,18,21 355:2,6,12 357:15,19 358:9,14 359:23 360:3 360:11,16,22 361:18 362:7 362:14 363:1 363:23 364:6 365:2,5,9,12 366:20 367:14 368:2 369:10 369:22 370:11 370:19 371:11 372:4,14,22 374:1 375:23 376:8 378:15 378:16,19,23 382:16 383:8 383:24 384:16 384:20,24 385:7,11,22,23 386:9 388:19 388:24 389:15 389:23 390:21 391:7 392:2 393:7,10,15,19 393:24 397:23 398:20 399:15 399:18,20,23 400:3 404:8,13 406:18 408:22 409:6 410:8 411:12 412:23 414:11 415:24 416:10,23 417:7 418:5 419:8 420:7 421:8 422:2,7 422:13,18 423:9,13,17,22 425:15,24 426:10,18 428:10,18 431:21,22 433:22,23 434:1,2,4,5,8 435:15 437:2 439:24 441:8,9 441:14 442:16

442:19,23 443:14,21 444:9 445:15 445:20,23 446:19 447:1 448:10,21 449:1,11,19,22 452:9,18 453:1 453:12,19 454:6,13,20 456:12 457:6 457:13 458:22 459:8,17 461:5 461:9,19 463:17 465:9 465:14 466:16 467:20 468:13 469:6 470:4 471:8,17 472:8 473:4,12,13 474:10 476:21 477:1,20,24 478:7 479:22 480:12 483:12 484:3
**correction** 86:24
**correctly** 12:13 27:22 31:20 104:2 203:19 237:14 238:20
**correlation** 397:5
**corresponded** 383:21
**corroborate** 34:10 147:21 148:2,3 149:4 149:12 170:1 174:18 175:10 257:11 286:13 287:1,13 297:16 304:11 305:18 306:7 320:17 349:15 353:8 362:4,24 370:4,17 371:10 391:17 407:13 435:10
**corroborated** 46:4 180:18,18 320:1,22
**corroborates** 304:16 305:6
**corroborating** 34:9 220:22 308:18 390:13
**corroboration** 182:3
**counsel** 5:13 9:5 9:16 10:10 11:18,22 12:2 12:14 16:11 20:9 53:24 110:3,9 199:13 259:10 260:5 271:14 274:2 323:21 345:11 383:14 417:13 438:3 448:4 452:3 462:14 471:21 481:6 481:18
**counsel's** 202:21 243:13
**counter** 268:23 272:16
**County** 100:6
**couple** 8:11 9:2 18:10 20:15 21:24 96:22 99:5 101:9 121:10 127:4 130:1 164:15 172:21 180:7 200:1 342:13 348:13 364:3 365:7 376:13 403:21 404:15 437:16
**course** 27:10 37:1 41:11 73:5 121:24 124:14 139:1 151:18 154:1 155:14,17 165:17 166:23 167:1,19 170:12 181:10 188:5 189:9 194:9 214:3 307:8 370:14 406:11 414:7 469:13,15
**court** 1:1,13 5:5 6:5 7:23 8:16 8:19 10:11,24 12:19 25:19,20 46:19 47:4 48:5,6,10 53:22 63:6 88:21 131:13 131:15 161:1,1 174:24 190:1 204:20 205:6 447:8 461:1 463:5 481:18 482:21 483:3
**cousin** 330:4 388:21 389:6
**cousins** 329:24
**cover** 9:5 10:4
**covered** 293:3
**covering** 293:8
**Covid-19** 115:1 115:19
**crazy** 174:15
**created** 55:19
**created--** 55:17
**credibility** 79:16 79:19 80:10 175:8 180:14 246:13 252:1 280:21 321:18 322:3 375:14 375:23 389:22 390:4 414:18 434:3 443:24 452:17 454:6 457:5
**credible** 180:5 283:21 357:14 435:6 444:9
**crime** 7:8 74:22 82:23 83:1,5,9 159:14,15 165:6 173:15 196:3,8 257:3 258:16 297:17 300:4 319:22 323:13 338:2 351:23 393:7 451:2 463:17
**crimes** 174:21 174:23 293:7 377:19
**criminal** 4:6 97:4 207:24 208:7 212:2,14 283:13 357:10 375:12 406:4,9 406:17 411:8 411:24 469:5
**critical** 79:15
**critically** 263:8
**criticism** 424:18
**Crosland** 1:2 5:10,16 6:18 6:21 7:1,7 12:19 14:19 19:5 24:2 25:9 28:12 29:4,9 29:12 30:17 31:1 33:10,22 34:3,19,23 35:11 36:14 37:7 39:3 43:12 46:20 47:18 49:5,13 75:9 77:24 81:24 82:1 86:6 92:13,23 93:6 94:11,15 95:8 108:18 128:10 202:24 203:3 224:20 232:22 233:4 233:15 234:10 234:12 236:13 237:8,18 238:14 239:3,9 240:7,7,14 241:1 245:22 258:10,20 262:2 264:16 264:17 265:11 265:21 266:1 267:1,2,24 268:4 274:15 275:19 276:8 277:1,6,14 279:15 282:14 282:22 285:7 285:13,16 286:16,22 290:12,18,23 291:16,19 297:11 300:3 301:24 313:23 315:17 317:16 318:9 319:20 319:22,24 321:2 329:23 332:1 333:8,23 361:18 371:4 373:23 378:14 378:22 384:14 384:15 389:15 392:1 413:10 413:17 415:9 423:8,12,16 426:9 427:22 430:3,24 431:7 431:20,24 432:10 434:7 434:17 441:6 441:17,20 444:2 447:5 453:1 463:8,16 463:24 465:6 465:13 470:10

471:2 472:2 478:20 480:10
**Crosland's** 26:16 32:11 35:20 50:5 75:8,18 76:18 84:9,13 88:17 239:24 249:14 249:21 273:21 275:14 276:15 278:8,23 279:17 292:13 292:19 297:3 297:17 355:21 369:9 370:18 382:15 387:5 440:10 441:2 465:3,4 477:6 478:18 479:9
**cross** 375:3
**cup** 17:4
**current** 40:7 68:16 85:21 100:10 108:2
**currently** 424:2
**cursory** 167:4,5
**Curtis** 1:2 5:10 6:17,21 24:2 28:11 29:4,12 30:16 31:1 34:19,23 35:20 43:12 76:15 77:16 81:24 82:1,23,24 83:4,9 84:13 92:13,23 93:6 232:21 233:3 236:13 237:8 239:24 258:10 258:20 267:24 275:13 277:1 277:13 282:22 285:7,13,15 290:18 292:12 300:3,18 301:3 301:5,8,13,16 301:19,24 303:22 304:14 304:22 313:23 319:20 332:1 363:23 369:9 369:14 373:23 378:21 463:8 463:16 471:2 475:9,20
**custody** 206:6,9 207:3,20 211:7 287:5 347:14 385:7,9,21,22 441:6,11 446:1

**D**

**D** 3:2 314:2
**D-U-R-B-I-N** 342:11
**D.A** 151:15 230:3 428:9
**D.A.'s** 50:7 149:22 150:4 150:13 160:2,7 162:15 164:2 164:12 175:4 186:4 189:10 409:24 415:19 450:6 458:5,10
**damages** 108:18 109:3
**Dan** 88:19,20 245:24
**database** 260:24 261:7,10
**date** 5:6 55:14 56:1,3,7 107:7 161:2 193:17 279:22 312:13 339:9 383:10 383:11,16,18 383:22 405:24 406:2,6,11 412:17 432:1 482:9
**dated** 387:19 470:12 478:17
**dates** 332:4
**daughter** 106:14
**daughters** 108:6 108:7
**Dave** 150:6
**David** 4:6 356:23 380:5 406:17,22 447:14
**Davis** 136:23 292:10 445:9 445:12
**day** 5:19 8:10 10:9,13 15:18 15:19 21:22 40:4 41:17 119:4,9,10 122:2 128:20 128:23,23 152:7 153:7 190:14 193:17 193:19 204:22 217:6 251:1 255:24 295:3 295:16 331:23 334:5 364:14 395:23 432:3
**days** 11:17 17:23 23:19 41:21 106:2 130:1 134:24 161:2 172:21 200:1 293:11 293:13 296:8 330:20 447:12 470:13 482:22
**DC** 471:4
**deal** 28:21 145:10 146:3 195:23 196:1 284:15 324:1 418:15 438:22 475:11
**dealing** 87:9 165:23 171:19
**dealings** 87:8
**deals** 145:11,14
**dealt** 98:15 150:13 255:21
**death** 21:13,15 22:3 23:20 447:14
**deaths** 262:17 269:21
**Deborah** 61:6 117:12 314:8,9 314:10
**decades** 261:11
**deceased** 10:2 23:12 31:14
**decedent** 194:21
**December** 7:6 25:1,10 155:8 163:10 191:2 266:8 267:9 268:17 271:9 280:5 296:15 340:8 342:12 345:1 431:21 441:2 445:15 446:19 462:11 463:15,21 465:7
**deception** 179:15,16 184:22 313:24 315:6,15 316:7 316:7 317:2
**decide** 97:22 99:2 180:16 457:21 458:9 459:17
**decided** 235:17 237:3
**decides** 222:7
**decision** 48:5,7 98:14,18 178:8 178:9 181:24 187:2 368:1 431:24 432:10 458:21
**declined** 462:16
**deeply** 365:22
**defendant** 7:10 22:16,17,23 23:2
**defendants** 1:6 6:1,4
**defense** 149:18 161:5 170:5 204:24 375:3 417:7,13,17 418:1 481:5
**defer** 481:5
**defined** 144:1
**definitely** 44:16 85:17 289:22
**degree** 127:9
**degrees** 96:22 97:3
**Della** 5:11
**Delores** 31:5 36:22 83:24 84:3,7,14 85:12 87:5,10 329:6,22 330:12,17,19 332:9 349:3,22 351:22
**demanded** 262:18
**demonstrated** 154:11
**denied** 320:22
**denote** 176:3,8
**denoted** 29:19 186:13 187:16 188:11,12,17 188:20 269:12 275:8 326:7 358:21,22 452:14 474:3
**denotes** 186:6 240:21 266:18
**deny** 86:5
**denying** 463:16
**department** 2:9

5:23 57:15,19 57:24 58:6,19 59:2,18 60:19 60:21 62:17 96:24 97:1 98:16,21 99:3 99:19 100:12 100:15 104:23 106:21 133:15 136:3 138:10 138:20,22 163:24 192:1 196:11 199:15 285:13 288:24 319:2 351:10 359:12 410:9 411:23 436:6 452:7 461:17
**Department's** 134:3
**depended** 140:15
**depending** 189:6
**depends** 141:3,4 141:5 143:18 178:24 188:11 316:8,9
**depicted** 29:18
**depicts** 30:21
**deponent** 5:12 5:24
**deposed** 73:23 135:14
**deposing** 482:20
**deposition** 1:10 5:4,8 7:11 8:2 8:7,13 9:6 10:9 10:12 11:14,23 12:3,15 16:11 16:14 17:12,19 19:15,21 20:7 20:10 27:18,24 32:9 53:19,23 123:24 126:15 127:19 131:4 131:21 132:4 202:3 257:17 309:18 329:6 339:3 340:4 402:21 403:6 477:12 481:12 482:1,2,10,14 482:23 484:1
**DEPUTY** 2:10
**Descher** 21:5,6 366:15,20 367:8,16
**describe** 40:20 282:5,22
**described** 17:24 34:14 111:14 283:5,18
**describing** 29:8 187:1
**description** 3:9 4:4 154:11 195:9 198:18 265:11 270:19 281:4 282:13 344:9,16 345:15 437:23
**descriptions** 281:11 283:15
**despite** 328:8 362:2
**detail** 103:22,23 106:19 118:12 118:14,22 119:6,15 258:16
**detailed** 157:11 157:19 158:6 227:11 258:19 368:15,16
**details** 18:7 19:22 25:4 83:23 87:19 91:21 136:21 137:19 257:24 311:10 348:8 379:2 380:15 380:18 464:10
**detain** 139:19,21
**detective** 9:18 9:22 10:1,2,5 13:4,4 15:17 16:2,13,17 18:6 19:3 20:5 28:10 32:2 33:14 34:5 35:14,23 36:12 36:16,18 37:15 37:20 38:19 39:2,7 40:21 41:15 42:18 43:16 44:3,9 44:24 45:5,10 46:2 48:17,22 49:16 50:11 51:11,21 52:10 52:20 53:5 56:5,20 57:13 60:3 62:12 63:15,23 64:19 65:4 66:19 67:8 68:1 69:6 71:6 72:1,13 73:11,20 74:6 74:24 78:9 79:12,15,19 80:8,12,21 82:3 83:13 85:24 88:5 90:3 92:2 93:9 93:22 95:11 101:13,23 102:4,7,10,18 103:9,13 104:5 109:5,13 115:9 115:22 116:6 116:15 120:9 124:23 125:10 129:17,21 131:10 132:12 137:24 138:12 140:5,14 141:2 141:18 142:4 142:24 143:10 145:3,18,23 146:13 147:4 147:12 148:8 148:12 149:1 150:8 151:13 151:24 152:21 154:19 155:20 156:18 157:14 158:10,11 161:9 162:12 164:3 165:11 166:4 168:2 169:1,21 172:5 173:2,22 174:7 176:4,5,18 178:12,18 181:6 183:21 186:1,19 187:14,20 188:12 189:6 190:9 191:19 191:21 194:6 196:19 197:24 200:2 201:1 203:1 207:5,14 208:2 210:13 212:10 213:11 213:23 217:4 218:13 219:20 220:14 221:7 221:17 222:20 224:18 227:1 232:3,10 234:15 237:21 238:17 240:19 241:18 243:10 244:16 245:11 249:4 250:5,21 255:22 256:10 256:19 263:18 265:4 267:17 269:9 271:14 273:9 274:1 275:5,23 277:10 278:3 279:1,10,20 281:1 282:2 283:24 284:6 284:17 285:2 285:19 286:18 287:7 292:3,15 292:22 293:2 294:3,5,11,17 295:7 300:10 302:13 306:10 308:12 309:8 311:19 316:4 316:21 319:7 319:10,16 320:4 321:5,14 322:2,8 323:1 323:19 324:7 324:18 326:6 326:12,20,22 327:24 328:9 329:1,9,10 331:7,12,23 332:5 333:13 334:1 335:9 337:9,24 338:6 338:17 340:16 340:24 342:22 344:19 345:9 349:10,18 350:10 351:13 352:1,7 353:12 354:10 355:14 356:10,20 357:3,21 358:13,16 361:20 362:9 363:3 364:5,8 364:10,11,19 365:18 366:5 370:1,13 371:14 372:16 372:24 373:16 374:8,21 376:10 378:10 379:4,15 381:15 382:18 383:16 385:2

386:11 389:2
389:17 390:1
390:23 391:9
394:2,21
395:17 396:19
397:11,20
398:22 400:5
401:22 402:13
402:24 403:5
403:14,22
404:11 405:2
405:20 407:16
409:19 410:20
411:23 412:3,6
412:8 413:2
414:13,21
416:3,16,22
417:9 418:7,17
420:15 421:4
421:13,22
422:1,12,24
423:24 424:6,8
424:14 425:1,4
425:9 426:2
427:21 429:7
431:18 432:9
433:2,11
434:20 435:5,8
436:10 437:4
438:2,11 439:2
439:9,17 440:3
440:12 441:16
443:1 448:3,12
448:17,23
449:7,13,24
451:10,14
452:2,11
453:14 454:8
454:22 455:6
455:21,22
456:24 457:16
457:24 458:9
458:24 459:19
460:2,2,6,16
461:21 463:1
468:15 469:22
471:19 473:6
475:1,1,8
476:8 480:14
480:22 481:8
**detective's** 178:9 197:3
**detectives** 6:24 7:2 18:23 23:3 30:11 31:8 37:12,13 39:24 40:7,16 41:6 67:21 68:13,17 69:22 72:7,8 73:2 101:10,12 102:13,15,17 102:19 121:20 123:23 125:8 154:12,15,20 157:5 172:20 176:15 180:7 189:17 200:13 248:1,3,5,10 254:24 295:16 331:7 340:12 340:20 344:7 350:22 351:1,6 351:8 359:14 369:2 377:8 397:19 401:7 420:10 443:5 457:20 458:13 458:19,21 459:7,8,16,23 459:23
**detector** 235:4 472:20
**detector's** 358:4
**Detention** 311:5 317:17 471:4
**determination** 143:15 149:17 397:21
**determine** 147:24 200:22
**development** 10:13
**developments** 125:15
**Deveraux** 137:9 137:10
**Devlin** 68:18 131:11
**DI** 179:12,15 313:23
**diagnose** 142:12
**diagnosed** 21:16
**died** 21:10 23:14 115:2 129:21
**difference** 158:19 197:5 283:4 303:6
**different** 13:22 13:24 14:3 25:24 27:11 57:3 79:7 81:9 81:9,10 102:14 102:22 104:18 117:15 118:1,2 154:13,16,20 155:2 156:20 156:22,24 157:2 159:24 159:24 169:15 171:24 175:7 223:4 231:2 234:8 280:23 281:8 283:14 302:3 335:2 358:12 368:21 373:6,7 374:5 374:16 375:5 375:12 376:6 432:7 447:4 456:22 461:7
**differently** 156:22
**difficult** 91:5
**diluted** 223:10
**diminish** 149:5
**diner** 17:4 18:14
**dining** 24:21
**direct** 61:19 245:13 249:13 249:20 281:15 348:12 392:14 478:22
**directed** 135:2 333:17
**direction** 342:19 345:22 483:11
**directives** 139:5 139:7
**directly** 452:24
**disability** 58:6 58:16
**disagree** 49:12 49:21 84:17 158:14 190:11 299:16 341:14 361:10
**disagreeing** 265:8 269:12 423:4
**disassociate** 64:16
**disbelieved** 302:9
**discharged** 238:8
**disciplinary** 134:12
**discipline** 134:20
**disclose** 109:20 164:10 419:15
**disclosed** 164:11 455:18 456:3
**disclosing** 461:8
**discovery** 161:13 436:2
**discrepancies** 218:19
**discretion** 178:10 457:21 459:16
**discuss** 73:18 149:21 202:16 305:3,12 327:3 333:9
**discussed** 15:23 16:5 17:17 110:16 190:21 192:11 235:12 252:13 278:21 282:3 293:10 296:13 297:21 298:7 299:8 308:20 321:21 325:21,21,23 327:21 330:11 331:11 373:3 376:14 391:4 409:10 428:1,9 428:24 444:12
**discussing** 429:4
**discussion** 17:18 19:2 32:14 175:21 198:16 198:21 227:22 227:24 286:22 311:22 312:15 322:21 326:1,2 326:3 373:11 379:18 422:11 427:24
**discussions** 67:20 77:11 113:16 387:6 432:9
**dismissed** 129:13 130:19 431:8
**dispense** 398:11
**disposal** 190:13
**dispute** 85:7 250:17 435:2
**disputed** 371:21
**disputes** 450:13
**disregard** 75:23 136:18 143:7 143:22
**district** 1:1,1 5:5 5:5 24:6 26:8 28:5 46:16

51:6 52:8,16 60:12 67:23 70:22 101:4 111:16 158:23 169:18 188:24 259:8 260:7,11 322:5 410:10 414:3 416:9,20 416:21 417:5 420:12 427:6 428:2 447:13 450:11,19,24 451:18,23 452:9 455:18 456:3,11 457:13,22 458:20 460:4 472:12 473:23
**divide** 9:24
**division** 7:3 59:1 59:5 101:9 102:14 117:15 141:16 164:1 193:14 195:5 288:24 311:5 351:11 377:18 402:9 411:23 432:22 433:7 436:6 441:12 445:19
**divisional** 41:6
**DNA** 70:18 196:5
**doctor's** 167:8
**document** 3:10 3:14,16,20 40:20 47:3 53:20 54:6,16 54:20 56:2 76:6,12 86:15 90:15,23 91:11 92:3 93:11 95:24 107:24 110:18 114:1,8 136:5 175:24 199:1,5,12 206:13,18 207:6,15 210:15 233:19 237:22 243:11 251:16 253:16 263:19 265:5 267:6 269:10 311:18 335:15 346:20 351:21 387:3 403:11 406:6 408:14 418:2 430:12 431:12 444:17 472:11 473:22
**documentation** 427:5
**documented** 350:19 352:14 354:8 356:8 359:22 372:22 386:8 404:23
**documenting** 155:17
**documents** 9:21 12:24 13:2 16:7 27:5,22 36:6 84:24 137:14 158:22 190:23 200:2 223:22 260:6 261:16 271:13 271:17 273:10 303:18 314:16 315:9 323:20 329:17 361:21 381:18 394:21 400:6 402:20 420:11 438:2 473:7 480:8
**doer** 181:13 338:2
**doing** 15:17 53:17 63:21 82:19,20 86:17 87:12 90:7 105:11,13 171:5 183:2 189:24 216:5 225:11 250:11 252:19 254:4 257:6 281:17 296:21 303:18 310:18 326:22 327:12 328:24 375:22 377:11 377:12,15 380:9 450:8 464:13 470:6
**dollars** 71:16 73:8 132:16 134:1
**Dom** 154:24 184:13 192:4
**Dominic** 1:10 3:4 5:12 6:9 483:6 484:8
**doodle** 403:18
**door** 128:4
**doorway** 393:4
**dormant** 39:20 40:5 122:12,24
**dose** 115:2,20
**double** 209:12
**doubt** 151:5,9 152:18 153:19 182:2,6 317:1 411:9
**doubting** 299:5
**doubts** 180:14
**Dougherty** 475:1,2,3,4,8
**Doughertys** 475:4
**downstairs** 177:8 182:21 182:22 183:1 184:14
**dozen** 65:21 154:20
**draw** 289:15 401:18
**drawing** 163:15 403:15
**drawn** 200:12
**dressed** 265:12 265:18
**DROP** 132:14 132:15,20 133:11,21,23 133:24
**dropped** 267:11 268:22 415:18
**drug** 233:7,21
**duly** 6:10
**Durbin** 193:8 342:10 394:7,7
**duty** 98:13

**E**

**E** 3:2,7 4:2 483:1,1
**e-mail** 113:3 114:16
**e-mailed** 113:8
**e-mailing** 113:5 113:10
**e-mails** 116:21
**earlier** 204:11 227:6 278:13 308:3 473:21
**early** 119:12 121:7 191:5 204:16 275:16 275:20 278:9 284:9 338:22 344:24 395:15 395:22 396:21
**ease** 166:13
**easier** 218:23
**easiest** 116:23
**East** 59:5
**Eastern** 1:1 5:5
**easy** 45:14 58:20 170:9,10
**eat** 190:10
**Ed** 1:14 120:14 120:15,16,18 193:11 293:3 328:15
**Eddie** 29:17,18 73:12,16 103:17,18 120:11,13,16 120:24 124:4,5 192:3,5,21,22 193:1 194:8,12 217:11 225:5 225:19 226:4,6 258:14 293:5 294:12 296:2,3 364:14 365:21 365:24 366:9 368:15,15
**Eds** 120:14
**education** 96:19
**Edward** 21:9
**efficiency** 181:2
**effort** 175:22 351:21 354:6 371:9 386:6 391:16
**efforts** 176:15 306:6 332:6 338:21 344:3 359:20 362:3 372:20 375:4
**eight** 20:19
**Eighth** 2:21
**either** 21:1 48:4 74:10 78:14 92:21 149:4,4 151:15 170:1 170:17 179:12 187:17,18 188:9 189:5 217:18 220:22 319:10 332:16 333:15 336:1 343:11 350:6 366:14 367:16 428:24 432:16 436:1 448:19 449:9
**EKGs** 105:11

**elected** 70:23
**election** 51:7
**electronic** 261:10
**eliminate** 221:23
**Em** 62:7,10,18
**emanates** 146:16
**Emergency** 105:5
**EMMA** 2:21
**emma@nsbci...** 2:23
**emphasize** 321:1
**employee** 132:8 133:14 267:10 268:13,21 281:19 288:2
**employment** 99:11
**empty** 269:24 270:13
**EMS** 105:7
**encounter** 79:22 156:9 422:9,9 449:9
**encountered** 441:16
**encounters** 42:9 42:13 216:14
**ended** 120:19 132:19 328:10
**enforcement** 69:10,11 106:18 107:2 108:8,12 374:15
**engage** 140:3,11
**engaged** 129:14
**ensure** 306:16
**entered** 92:22
**entire** 14:23 91:11 138:19 183:16 273:5 331:3 343:13 361:2 380:6 429:19 470:18
**entirety** 27:20
**entry** 200:10
**envelope** 160:16 337:3 410:4 415:18 459:13
**equivalent** 323:16
**ER** 100:2 105:8 105:11
**Erby** 394:12,17 395:11
**errata** 482:5,7,9 482:13,19 485:1
**especially** 38:12
**ESQUIRE** 2:2,6 2:9,15,21
**essential** 156:23
**essentially** 219:13 371:20
**established** 182:1 275:18 311:7 323:12 409:3 436:5,12 436:14 441:5
**establishing** 193:20
**et** 1:5
**Etienne** 2:7 5:18 6:20
**Eugene** 379:18 394:11,16
**evaluate** 79:16 258:24
**evaluating** 225:3
**event** 104:14 208:14 298:6 427:22 447:10
**events** 91:23
**eventually** 124:9
**Everett** 13:12,13 13:21,23 14:1 15:13 29:1,5,9 31:23 33:11 34:15,18 35:3 35:10,15 36:8 41:10 42:10,13 42:15 43:23 45:24 76:14,17 77:1,11,14 78:21 81:24 82:22 84:14 85:11 86:10,20 89:15 95:4 191:15,19 192:7,9 202:3 202:17 203:5 203:16 204:5 204:11,15,22 205:7,14,22 206:3,5 207:3 207:11,20 208:16,20,24 209:4,8 210:9 210:18 211:2 211:12 215:10 215:16 216:7 217:1,21,22 220:20,24,24 221:3 222:13 222:17 223:9 225:3 226:5 228:1 229:15 230:17 231:3,4 231:20 232:7 232:19 235:3 235:13,20 236:10,14 237:9,17 238:13 239:2 239:22 240:14 240:15 241:1 242:8,23 243:6 244:4,8 248:24 249:8,18,20 250:10,15 251:5,9,12,20 252:8,14 253:15 255:15 258:5 259:2 260:14 262:2,8 264:11,16,16 265:20 266:1 266:12 267:1,2 268:4 270:7 273:18,20 275:2,12,15,18 276:12,13,14 277:2,6,22 278:8 279:14 279:16 280:17 283:20 286:13 287:13 294:15 294:23 295:24 296:9 298:18 299:23 300:2 301:8 302:10 304:15,16 305:19 306:2,7 307:23 308:9 309:4 311:4 312:4 315:15 315:21 317:7 317:14 318:3 320:20 321:1 322:14,22 323:11 324:1,3 325:24 327:13 327:19 329:3 331:24 334:12 346:11 358:14 360:1,11 361:16 362:5 362:18 365:1 365:11 366:7 367:24 369:1 369:13 370:2,4 370:17 371:1 371:21 373:4 373:12 374:4 375:20,21 376:5 378:13 378:17 379:12 380:2 381:6,11 381:22 382:13 382:16 388:11 388:14,16,18 388:22 389:9 389:14 391:5 391:17 403:8 404:7 407:14 408:22 409:4 411:7,15 412:21 418:3 418:14 420:6 422:12,15,21 423:7,11,15,20 425:6 426:7,16 427:2 432:23 433:13 434:1 434:18 435:6 438:8,22 439:6 444:17 445:8 445:14,23 446:18,24 447:3,24 448:8 448:20 449:10 449:18 451:6 452:17,23 456:21 462:14 462:20 463:15 463:22 464:14 464:22 465:2 465:12,16 466:7,10,10 467:2,8 468:22 470:8,12 471:16 472:1,3 472:16 473:2 473:24 476:23 477:15 479:8 479:21
**Everett's** 29:12 35:19 36:13,18 37:6,7 38:16 42:2,6 80:18 86:23 206:17 215:20 218:5 223:14 224:12 226:8 238:3 239:23 240:2,6 240:10 246:13 250:1,16

252:16 261:20 262:1 265:15 266:20 267:22 270:20 271:4,8 273:5 274:14 275:11 276:6 276:18 277:22 278:21 280:22 282:13,16 304:3 319:21 319:24 336:4 371:10 372:7 378:4 383:8 384:19 388:21 411:21 414:18 418:23 425:15 425:23 433:8 437:19,22 438:16 440:15 442:18,21 444:1,8 454:6 454:19 462:3 476:4 477:7
**everybody** 122:16 132:14 256:21
**evidence** 28:20 28:21,23,24 29:11,15 30:4 30:21 31:4 33:9,17,19,20 34:1,8,9,10 35:18 36:13,21 45:22,24 46:4 46:9 47:15 48:15,19 70:1 70:3,18 71:10 74:15,16 75:17 80:3,5 85:3 94:11,14 95:7 113:23 122:23 144:1,3,5,12 144:12,15,16 144:18,19,23 146:15,17 151:7 159:13 174:9 175:3 182:7,17 195:23 196:2 208:15 209:8 220:18 249:14 249:20,21 255:19 297:6 297:13 308:19 319:20 320:16 321:2 387:7 413:10 434:10 434:15,17 454:5,12,18 456:19
**evidentiary** 128:19
**ex** 127:23
**exact** 241:10 305:17
**exactly** 130:6 141:14 178:21 181:23 210:16 214:3 229:10 257:12 261:20 271:16 302:24 377:20 413:4 425:13 467:5 477:22
**exam** 179:1 184:5 314:17
**examination** 179:10 183:24 307:24 316:18
**examinations** 308:4
**examine** 375:4
**examined** 6:10 70:18
**examiner** 185:4 200:10 201:9
**example** 144:23 152:13 258:23 290:17 375:20 411:10
**excellent** 44:24
**exception** 274:8 274:12
**exceptionally** 44:7,17
**excerpted** 27:24
**excess** 73:7
**excessive** 139:16 140:22
**exclusively** 59:14
**exculpates** 94:14
**exculpatory** 48:15,19 49:4 49:7 143:24 144:3,11,16,21 146:3,11 147:2 147:7,10,17 148:1,7 319:14 390:21 411:24 412:7 413:2 415:23 436:7 453:18 455:17 456:1 461:8
**executed** 298:4
**exemplary** 69:10
**exhibit** 3:9 4:4 53:15 54:2 61:9,11 75:20 75:21 88:13 90:18 110:20 114:2,4 135:18 135:19,21 193:3 199:8,14 200:18 252:17 259:10,13 282:18 309:13 340:1 346:21 346:24 360:6 386:20 387:2 394:20 395:3,5 395:24 396:3 398:5 399:4,14 400:14 405:12 406:21 444:18 444:20 470:6 473:15 478:10 478:12
**Exhibit-1** 32:22 437:11
**Exhibit-10** 360:20
**Exhibit-11** 281:17 288:5 392:20
**Exhibit-13** 342:14 394:6
**Exhibit-14** 334:16
**Exhibit-15** 340:1
**Exhibit-16** 343:10
**Exhibit-17** 344:12
**Exhibit-18** 396:18
**Exhibit-19** 206:14 211:10
**Exhibit-2** 82:8 85:11 477:17 477:21
**Exhibit-20** 215:11 394:19
**Exhibit-21** 215:17 282:17
**Exhibit-22** 329:12
**Exhibit-23** 402:18
**Exhibit-24** 295:22 311:14 326:13
**Exhibit-25** 346:8
**Exhibit-26** 346:9 347:21
**Exhibit-27** 408:8
**Exhibit-29** 464:12,21
**Exhibit-3** 83:22 84:2 85:13
**Exhibit-30** 421:1
**Exhibit-31** 430:5
**Exhibit-32** 431:10 440:22
**Exhibit-33** 441:1
**Exhibit-34** 380:1 446:21
**Exhibit-4** 86:16
**Exhibit-50** 405:23
**Exhibit-52** 473:19
**Exhibit-6** 47:2
**Exhibit-8** 360:20 382:23
**exhibits** 32:17 32:19 53:17 96:3 132:6 382:24 392:10
**existed** 168:12 408:20 413:21
**existence** 192:13
**exists** 34:11 97:18,19 354:3
**exit** 200:11
**exonerate** 93:6 170:15
**exonerated** 51:8 51:15 170:14
**exonerating** 472:2
**exonerations** 51:19 52:5 67:22
**expect** 60:1 157:10 188:6 212:1 223:4 255:7 257:3 286:5 333:19 333:21 350:5 351:8 352:14 354:5 356:7 359:22 372:11 372:21 404:22

416:19 417:13 418:1,12 420:20 424:22 427:24
**expectation** 417:4
**expectations** 223:11
**expedite** 380:11
**experience** 48:7 78:12 80:8 420:19
**expert** 201:10
**expires** 483:18 484:22
**explain** 8:22 199:22 250:10 259:20 329:22 464:13
**explained** 226:1 366:9
**explaining** 158:12 461:10 461:11
**explanation** 89:4 313:18 427:13
**explanatory** 357:1 369:16
**extend** 392:16
**extensive** 80:8
**extent** 16:16 32:2,4,5 51:12 53:6 56:6,20 92:2 93:10,22 95:11 152:22 156:18 161:10 194:15 201:1 207:5,14 210:14 213:11 218:13 233:19 234:15 237:21 238:18 240:19 243:10 249:4 250:6,21 263:18 265:4 266:16 267:17 269:9 271:13 273:9 278:2 279:2,21 289:5 316:21 320:4 324:19 342:22 353:12 358:16 364:19 374:20 381:15 423:24 436:11 439:18 456:24 459:1
**extract** 4:6 208:7,10 212:2 357:10 406:17
**extracted** 406:4
**eye** 200:11
**eyewitnesses** 172:24 194:24 195:4 392:11

**F**

**f** 46:14 483:1
**face** 81:12 137:3 137:7 249:10 264:18,23 265:22 266:10 271:21 301:19 301:19 433:24
**Facebook** 66:11
**faced** 181:18
**facing** 70:7 211:12,18
**fact** 7:7 18:9 19:13 20:1 21:18,21 24:22 26:17 29:4 31:14 32:8 37:17 41:9 42:12 43:7 44:6 46:12 47:1 51:23 55:17 63:20 64:6 68:23 69:8 74:21 75:10 81:21 112:10 113:12 136:14 154:10 155:2 181:18 187:15 188:17 188:21,23 189:10 200:9 209:11 211:10 221:3 235:16 236:4 257:21 261:22,23 262:16 265:1 265:10 267:14 270:3,12 297:11 315:5 320:20 328:9 332:12 333:22 341:7 343:22 357:5 359:2 373:8 374:3 376:5 385:19 410:22 412:6 412:10 413:24 414:23,24 415:3 420:2,19 424:22 425:13 428:15 436:2 437:22 438:8 438:14 459:5 460:23 461:11
**factor** 179:2 211:17
**factors** 178:22 325:20 442:22
**facts** 146:2 149:21 192:18 194:3 207:1,10 221:13 256:8 256:15 257:4 258:9 259:1 260:14 271:3,7 273:6,21 274:9 287:15 299:8,9 324:5 443:12 443:18 471:14 471:15
**fail** 455:10
**failed** 322:12 324:12 390:8 390:18 438:8 440:20 451:6 455:3,17 471:6 471:8
**fair** 8:23 35:17 44:22 55:22 74:19 151:20 173:18 205:13 334:8 339:14 386:5 424:18 429:19 433:6
**fallacy** 112:14 132:9
**false** 80:18 151:22 214:12 463:9,24 470:10 479:3
**falsely** 7:3 145:16
**familiar** 8:12 27:8 69:15 80:9 110:5 114:22 134:2 136:23 137:10 139:2,22 171:18 178:7 203:24 257:21 261:6 290:3 365:22 409:17 410:1 416:20 445:1 467:22 467:23
**familiarity** 161:18 177:19 289:2
**familiarize** 155:11 192:17 194:3
**familiarized** 194:14
**family** 21:20 79:8 108:11 210:21 239:23 246:5 330:4,10 479:6,7
**far** 27:4 34:8 36:10 44:10 45:20 67:9 74:14 157:6 191:8 196:1 217:12 245:16 251:22 255:24 260:10 285:14 291:7 319:23 320:15 332:16 364:21 389:19 406:12 426:13 429:10,20 461:14
**fashion** 383:13
**fear** 79:8
**feasible** 145:20 174:1 286:14
**February** 238:9 238:15 240:17 241:2 279:16 280:4 331:1
**Federal** 10:7 12:19 46:19 47:4 49:24 341:19,19 353:5 460:18 460:21 461:14 461:23
**feed** 165:9,17
**feel** 91:12 166:12 174:10 343:16
**feeling** 363:8,13
**feelings** 52:16
**feet** 282:7
**Feinberg** 2:2,2 3:5 5:15,15 6:13,17 28:13 28:18 30:12 32:7 33:18 34:12 36:4,20 37:22 41:24 42:23 43:21 44:5,12,23 45:6,16 46:8

49:1,22 50:14
51:16 52:14,24
53:9 54:5 56:9
57:23 60:6
61:14 62:15,23
63:9,19 64:9
64:23 65:7
67:11 68:5
69:14 71:12,21
72:6,21 73:14
73:24 74:9,18
75:4,16 78:17
79:11 80:15,24
82:6,18 83:17
86:4,11 88:10
90:13,21 92:6
93:14 94:3,20
95:18 96:11
109:8,16,24
110:23 114:7
115:17 116:1,9
125:2,12 133:5
135:24 136:15
137:12,17
138:7,21 140:8
140:18 141:10
142:8 143:2,12
145:7,21
146:20 147:9
147:15,23
148:15 149:7
150:22 151:19
152:12 154:2
155:23 157:16
157:24 161:14
165:15,22
166:16 168:5
169:13 170:3
172:7,13 173:6
174:2,13
176:21 178:16
179:22 180:12
181:20 186:15
186:21 189:7
189:16,23
190:3,8,15,18
194:19 195:7
195:22 198:3
199:11 201:5
201:21 205:20
207:9,18 208:5
210:17 211:24
212:15,23
213:15 214:7
214:17 215:1
219:2,23
220:10,17
221:11,19
222:24 224:24
232:16 234:1
235:1 237:24
239:8,18
240:23 241:9
241:20 242:3
243:12 244:23
246:8,18
247:12 248:6
249:12 250:9
251:4,23 255:6
255:13 256:13
256:24 258:4
259:16 263:23
265:9 266:19
267:19 269:15
270:18 271:19
272:1,7,15,21
273:4,17 274:7
275:9 276:5,11
277:17 278:6
279:6,13 280:3
280:13 281:3
283:10 284:2,8
284:21 285:5
285:24 286:10
286:20 287:8
289:13,21
290:8,16 292:8
292:17 293:12
294:21 295:17
299:15 300:17
303:1 306:14
308:17 309:1
309:12 311:20
312:5 313:17
316:13,23
318:18 319:12
319:18 320:10
321:9,15
322:11,18
323:5,24
324:11,22
325:8,14 326:9
326:17 328:7
333:18 334:7
338:10,20
340:19 341:2
343:2,8 344:21
345:14,20
346:3 347:3
349:12,21
350:17 351:19
352:8,20
353:16,23
354:12 355:10
355:18 356:13
356:22 358:2
359:1 362:1,12
362:17,20
363:12 364:23
365:20 368:17
370:15,24
371:16 372:2
372:19 373:2
373:19 374:9
375:1,10,19
376:4,12
378:11 379:8
379:17 381:17
382:4,21 385:5
386:14,23
389:7,21 390:5
390:17 391:2
391:13,23
394:5 395:8,20
396:6 397:14
398:8 399:1,7
400:10,17
402:5,17 405:5
405:15 407:20
408:2 409:21
411:5 412:13
413:15,22
414:8,15 415:2
415:20 416:6
416:18 417:3
417:12 418:11
418:21 419:21
420:18,24
423:5 424:5,17
425:3,12,19
426:6,15,23
427:12 428:7
428:14,22
429:15 433:5
433:14 434:24
436:23 437:8
438:6,13,20
439:4,11,22
440:5,14
442:12 443:8
443:17 444:7
444:16,23
446:11 447:20
448:5,16,24
449:17 450:4
452:5,15,22
453:8,17 454:1
454:11,17
455:2,14 456:2
456:9,18 457:4
457:10,18
458:3,18 459:4
459:15,24
460:9,20 462:1
463:4,13,20
464:4 466:24
468:18 470:1
471:24 473:10
473:18 476:17
477:16 478:4
478:15 479:24
480:6,17 481:4
481:11
**fell** 272:16
**fellow** 7:2 9:18
67:21 121:20
397:19
**felt** 50:21 218:23
249:8 317:5
474:21 475:23
479:3
**fence** 209:24
**Fentanyl** 115:2
115:20
**fictitious** 470:24
473:3
**field** 155:24
157:1
**fifth** 268:18
403:11 478:23
**fight** 379:6
**Figorski** 128:2
131:3 135:15
**figure** 301:7
385:6 471:2
**file** 3:21 4:5 27:8
27:20,21 28:1
28:6 29:20
30:3,11 35:19
36:3 38:19
40:19,20
158:16 159:10
160:18,20
162:14 176:16
199:16 229:7,8
229:9 242:19
259:9 260:7
334:19 335:16
336:6,12,14,17
336:24 337:2
337:20 346:16
350:19 354:8
356:8 359:23
361:2 372:22
387:4 395:10
396:21 399:9
400:3,19
404:23 409:23
409:24 410:2,9
410:10,13

427:6,6 430:8
443:13 450:18
450:19,23
472:12 473:23
**filed** 12:19 22:7
22:7 47:3
**files** 27:12
158:19 176:23
450:24
**filing** 482:14,22
**fill** 157:2
**filled** 120:6
**filtering** 218:21
**final** 176:22
270:19 381:1
462:2 478:9
480:18
**finally** 98:18
**find** 168:11
169:4,5 170:9
175:15 223:6,7
223:10 241:21
242:8 255:15
286:1,12
287:21 299:3
301:10 306:6
339:10 357:10
362:3
**finding** 129:5
179:11 182:18
**findings** 200:18
386:17 450:22
**fine** 10:6 67:5
85:4 113:23
116:22 117:5
167:18 190:12
271:2 303:20
**fingerprint**
387:7
**fingerprints**
386:16,17
**finish** 11:1,5,8
91:14 234:6
**finished** 33:5
76:9 84:4 89:5
91:16 111:9
206:23 246:11
331:4 340:9
430:16
**fire** 201:3,7
**firearm** 3:16
196:12,14
198:18
**firearms** 195:17
195:23 196:6
199:19 200:21
**fired** 198:22
200:13,15
201:23,23
266:24
**firm** 5:20
**firm's** 6:19
**first** 6:10 20:17
24:5,9,15 25:4
25:16 27:1
29:11 30:14
31:3,3 32:21
37:18 43:8
47:19 50:4
56:14 62:9
71:23 76:2,11
76:19 83:4
89:7 90:22
91:10 100:5
102:24 103:15
111:11 114:10
114:20 118:7
121:22,22
136:6 147:8
156:5 172:21
177:19 191:13
193:10 205:21
206:3 215:13
216:3,6,6
218:6 222:8
227:13 229:15
236:11,16
237:7,11
260:19 261:22
262:13 264:21
269:18 275:13
276:15 280:15
284:19 285:22
298:22 304:1
307:16 314:7
335:7,8 337:6
337:7 340:3,3
340:5,10,10
347:10 348:10
348:17 364:3
366:16 368:6
368:24 369:5
376:15,15
380:3 383:5,15
383:20 384:22
392:20 403:23
405:23 408:15
408:16 419:5
419:12 424:10
432:8 461:12
462:10 465:6,8
471:7 472:18
474:4
**FIU** 200:17
**five** 81:13
126:20 258:7
272:16 283:15
344:23 372:3
376:6 447:12
465:21 470:13
478:24
**five-day** 295:11
**fled** 269:17,23
342:5
**flee** 342:14
**fleeing** 210:23
270:13
**flight** 345:22
**flinch** 270:8
**flinched** 262:5
274:5
**flinching** 391:12
**flip** 209:12 226:7
238:1 259:19
263:1 267:22
334:15 352:23
360:13,18
388:6 393:9
405:6 441:1
**flipping** 437:10
**floor** 2:21
267:11 268:22
**Floyd** 114:21,22
115:19
**focus** 142:15
153:16
**focused** 142:16
143:4 144:9
258:8
**folder** 160:17
223:18 410:4,5
458:14 459:14
**folks** 23:11
**follow** 41:18
326:19 364:3
**follow-up** 30:13
360:15 405:20
425:5,14
426:24 427:7
448:18
**followed** 72:9
192:7
**following** 271:3
271:7 449:8
450:22 482:7
**follows** 6:11
**Food** 263:7
**footnote** 47:6
**force** 139:16
140:23 182:14
**forecasted**
141:18
**foregoing** 483:6
483:9,12 484:1
**forgot** 227:18
**form** 28:10 32:2
33:14 34:5
35:23 36:16
37:15 41:15
42:18 43:16
48:22 49:16
50:11 51:11
52:10,20 53:5
56:5,20 57:13
60:3 62:12
63:15,23 64:19
66:19 67:8
68:1 69:6 71:6
72:13 73:11
74:6,24 75:13
78:9 79:3
80:12,21 82:3
83:12 85:24
88:5 90:3 92:2
93:9 94:17
95:11 109:5
115:9,22
124:23 129:17
132:12 136:10
137:24 138:12
140:5 142:4,24
143:10 145:3
145:18 147:4
147:12 148:12
149:1 150:19
151:13,24
152:21 155:20
157:14 161:9
165:11 166:4
168:2 169:21
172:5 173:2,22
176:18 178:12
179:21 181:6
186:1,19 189:3
189:13,21
194:6 195:2,19
197:24 201:1
207:5,14 208:2
210:13 211:22
212:10 213:11
217:4 218:13
219:20 220:14
221:7,16
222:20 224:18
232:3 234:15
237:21 238:17
240:19 243:10
244:15 245:11
246:17 247:2
247:23 249:4

250:5 251:15
253:7 255:5
256:10 258:2
263:18 265:4
270:16 271:12
274:1 275:23
278:2 280:8
283:8,24
284:17 285:2
285:19 286:9
286:18 287:7
292:3,15,22
294:17 295:7
299:12 302:13
306:10 308:12
311:17 312:20
313:16 316:4
316:21 318:15
319:7,16 321:5
322:8,17
323:19 324:7
324:18 326:6
327:24 333:13
334:1 338:6,17
340:16 342:22
344:19 345:9
349:10,18
350:10 353:12
355:9,14
356:10,20
357:21 358:16
361:20 362:9
363:3 364:19
365:18 368:13
370:13,21
371:14,23
372:16 373:16
374:8,20 378:9
379:4 381:15
382:18 385:2
386:11 389:2
389:17 390:15
390:23 391:9
391:20 394:2
395:17 397:11
398:22 400:5
401:22 402:13
405:2 407:16
409:19 410:20
412:3 413:19
414:6 415:12
416:2,12 418:7
418:17 420:15
422:24 423:24
424:4,14 425:1
425:9 428:5
433:2 434:20
436:10 438:2
438:18 439:1
439:17 440:3
440:12 442:8
443:1 444:4,14
446:8 447:17
449:24 452:2
453:3,14
454:15,22
455:21 456:24
457:24 458:12
458:24 460:6
460:16 463:1
464:2 466:22
468:15 469:22
471:19 473:6
480:14,22
482:3,6
**formal** 167:6
424:10
**formally** 6:16
**former** 20:14
52:4
**forms** 400:22
**forth** 264:8
437:10
**forward** 111:1
113:17 153:9
175:4 253:12
263:1 477:8
**found** 46:6
129:24 152:8
152:10 200:10
200:14 210:6
236:19 237:13
238:22 241:15
244:9 341:3,12
381:23 396:20
409:23 473:22
**foundation**
379:9
**foundational**
449:6
**four** 13:22,24
15:7,8 35:4
57:3 81:13
82:15 104:18
117:22,24
118:2,13 119:7
127:3,5 132:21
133:2,24
152:16 197:2
197:11,15
198:15 202:5
202:14 210:22
272:11 276:23
283:15 293:10
293:13 295:3
295:11 335:2
336:11 344:23
367:12,13
393:2,6 399:10
409:11 451:13
**four-day** 293:3,8
294:8
**fourth** 35:7,8
268:18
**fragment** 200:5
200:14
**Francis** 23:18
**Frank** 233:5,16
305:13,24
330:1 362:6
371:4 377:4,16
377:24 378:17
384:15 422:15
423:20 439:7
448:1,9 456:22
464:20
**Frankie** 124:3
**Freddie** 367:1
**Freddy** 23:22
**Frederick** 23:21
**Fredrick** 394:11
394:16 399:12
**Fredricks**
393:17,23
395:11 399:22
**free** 242:9
343:16
**frequently** 22:2
178:3
**fresh** 270:24
**FREUDENBE...**
2:21
**Friday** 11:17,17
11:19,23
223:23,24
230:16 299:21
309:19 348:10
407:1 408:15
408:17 410:16
419:7,13
**friend** 54:12
**friends** 59:21
61:5 72:4
**fries** 354:17
**frivolous** 143:16
**front** 32:15
49:19 76:3
160:3 162:4
219:7 223:13
261:21 268:6
276:18 328:6
334:17 360:18
381:3 387:22
387:23 418:2
440:22 441:24
466:12 470:11
482:15
**fugitive** 117:19
120:3
**fully** 139:2 151:1
**funeral** 21:6
**funny** 363:8,13
**further** 47:10
114:14 168:19
182:19 232:17
259:21 321:22
359:21 391:16

**G**

**G-E-R-A-C-E**
54:11
**G-U-I-F-F-R-E**
228:11
**gain** 214:10
**gang** 101:8
**gangs** 98:16
**Garwood** 371:3
384:14 404:6
404:12
**Gary** 349:3,22
351:22
**gather** 153:17
**general** 22:11
113:7 168:9
246:19 314:22
405:3 435:13
**generalities**
17:17 68:8
351:4
**generalize** 69:6
72:14,16 140:6
140:14 168:2
176:18 181:7
213:12 289:5
**generally** 124:16
124:24 143:11
149:2 152:21
169:2,22 173:3
173:23 178:13
212:11 221:16
285:3 287:9
333:14 351:14
368:13
**generated**
245:16,16,17
**generic** 33:20
138:16 225:24
257:24 296:14
299:9 309:3
323:12,15

391:6 437:23
**generically** 374:14
**gentleman** 129:22 227:4 472:19
**gentlemen** 68:21
**geography** 341:16
**George** 111:15 112:17 114:21 114:22 115:19 343:20
**Georgia** 111:17
**Gerace** 54:10,10 54:11,21 56:15 56:18 58:5 59:20,24 61:2 62:7 63:10,21 65:9,12 110:16 112:4,7,24 113:5,8,16 115:13
**germane** 144:7
**Germantown** 98:23
**getting** 43:10 112:9,11 149:22 181:24 192:11 238:24 241:8 245:8 248:24 292:19 367:22 433:18 450:13
**gharris@krla...** 2:5
**girl** 182:8 207:21 353:3 354:3
**girlfriend** 210:11,19 304:3
**Giuffre** 99:16 228:7,8,10 230:17 242:8
**give** 9:2,10 11:2 11:10 20:14 38:15 39:23 68:7 78:13 111:11 153:14 154:7 168:8 176:10 179:4 186:4 192:13 224:5 231:24 244:20 256:7 274:13 288:8 348:16 351:4,5 379:1 381:7,12 381:23 402:2 411:16 470:13 472:22 475:15 477:2,5
**given** 9:3 40:9 41:9 44:13 47:10,15 48:3 49:11 74:16 80:7 121:2 149:24 163:8 208:23 210:10 225:12 247:6 259:9 296:9 310:18 315:1,3 323:11 402:4,6 457:20 471:5,8 484:2
**gives** 39:22 81:11 448:8
**giving** 150:15 159:23 227:5 376:6 479:3
**glean** 93:10 191:8 232:5 233:20 237:22 238:18 243:10 250:22,23 257:8 263:19 265:5 271:13 273:10 277:10 279:21 292:3 311:18 323:1 345:10 373:16 424:1
**gleaned** 159:20 458:15
**gleaning** 137:5
**go** 34:13 39:19 40:4 45:10 62:7,10,19 75:8 83:13 96:6 97:11 99:3 106:6 117:14 119:19 119:21 131:15 132:17 133:21 139:6 149:2,22 155:2,12 161:3 167:3,12,13 174:17 175:13 176:10 183:10 183:12 184:10 184:13 190:16 202:11 215:7 217:20 223:16 226:24 228:11 230:9 232:17 237:5 238:11 247:4 248:13 250:12 259:21 261:2,21 262:16 264:6 264:20 265:14 266:2 267:4,4 268:9 269:18 281:1 282:4,16 286:24 287:11 290:10 293:18 295:18 296:19 296:23 298:1 304:20 305:1 316:4 324:23 325:2,8 332:22 334:16 335:5 336:13,22 337:6,7 347:18 347:20 349:22 350:13,22 351:17,21 352:13 360:6 362:13 368:6 369:20 377:3 382:24 384:23 392:13 394:6 394:19 402:18 403:23,24 404:10 406:15 406:20 407:20 415:12 416:3 416:16 417:9 442:13 446:21 448:14 455:8,9 455:22 461:21 464:12 465:19 470:6 478:22 479:24
**goes** 39:20 229:14 244:4,8 260:4 457:5
**going** 6:15 13:21 18:21 19:20 20:14 35:2 40:14 46:24 47:8 53:15 60:11 61:9,19 69:8,9,12 73:22 84:1 86:14 91:20 96:8,9 98:6 100:8 110:15 117:10 131:13 143:6,13,19 154:9 156:4,5 160:5 161:15 165:6 170:12 170:14 172:22 173:7 175:20 176:6,6 186:22 190:15 193:4 202:17 203:7 208:10 209:5 213:17 214:4 214:10,20,23 216:2 224:1 232:19 234:3 242:9 253:24 254:5,19 255:20 256:1 256:21 257:3 257:20,23 261:11 263:20 264:8,8 271:17 274:22 282:14 284:23 285:20 286:1 292:5 293:18,22 302:19 303:3,7 303:17,18 312:6,15 320:11 323:7 325:11,12 330:22 333:9 334:15 337:7 341:15,22 346:16 348:12 363:5,15 370:6 373:8 374:13 379:22,23 380:14 381:12 382:1 392:9,12 395:21 402:24 405:16 407:23 417:6 427:17 429:19 432:17 432:18 437:9 445:10 450:9 464:10,22 469:17 472:22 474:4,16,21 475:15 477:8 480:2,4 481:17
**good** 6:14 81:16 111:10 124:16 125:3 160:22 212:17 254:3 320:11 343:23 436:18 464:5 474:15
**Goodman** 384:14
**Gordon** 150:6
**gotten** 52:4

134:22 246:20 249:2 336:3 364:12
**govern** 139:3
**grab** 286:24
**Grace** 2:6 5:17 6:19 54:11
**graduate** 96:20 96:21
**Grand** 70:4,12 329:11,11 330:20 332:15 334:14 430:23
**granted** 128:14 129:4 468:1,5
**Graterford** 236:12,17 237:7,11,19 238:9 275:16
**great** 378:12
**greetings** 254:3 313:8 408:24
**Gregory** 209:14
**grew** 98:11
**grocer** 263:3 369:3
**grocery** 126:23
**group** 56:23 62:6 64:17 65:2 66:15 69:1 112:2,10 112:12 377:11
**groups** 66:11
**Gruckin** 387:13
**guard** 106:22
**guess** 55:14 57:21,22 58:20 117:8,13 137:7 138:2,4 140:16 174:8 183:8 189:14 195:3 204:17 205:18 218:15,17 246:2 249:6 307:1 315:12 348:11 357:2
366:14 369:18 446:3
**guessing** 347:22
**guilt** 144:14 151:3,8 435:18 437:2
**guilty** 31:1 50:21 74:21 75:10 76:16 127:6,8 475:23 480:10
**gun** 197:19,20 206:11 210:2 210:21,23 247:8 282:6 297:11 356:16 356:16
**gunman** 266:9 269:23
**guns** 92:23 195:16 197:18
**gunshot** 263:8
**guy** 66:16 98:6 123:5 146:22 152:6 174:16 182:7,8 192:5 197:19 217:23 225:8 226:2 236:13 237:8 244:19 245:15 245:19 262:4,5 264:13 274:4 282:5 289:8,10 291:6,20 302:16 310:16 310:21 382:10
**guys** 40:9 72:4,7 124:2,13,18 160:21 179:6 233:22 234:22 255:3 377:11

**H**

**H** 3:7 4:2
**H-U-G-H** 230:5
**H&B** 91:23
231:21 233:12 233:17 234:11 234:12 236:17 237:12,18 238:14 239:10 239:17 240:15 241:2 242:9 243:1 244:1,5 263:6 275:14 275:20 276:7 277:7 299:1 348:20
**half** 12:9 21:7 24:19 25:17 65:21 97:6,8 97:11 128:20 128:23 132:16 134:1 154:20 192:13 197:10 198:11 258:7 278:14,15 361:7
**halfway** 111:5 470:20
**Hall** 97:17
**hand** 95:24 199:4 202:18 203:7 379:21 386:4 395:21 437:9 450:18 458:20 464:10
**handed** 37:12 53:21 269:24 270:13
**handing** 199:12 203:6
**handle** 102:24 123:12 126:2,2
**handled** 101:14 101:19 256:2
**handling** 40:7 151:15
**handwriting** 53:20 91:5 193:11 225:20 225:22 260:2
394:9 403:1 405:7 445:2,3 446:15 473:20
**handwritten** 3:12,24 4:7,8 91:2 225:19 227:16 334:18 335:2 336:13 396:20 397:2 399:8 404:2 470:12
**happen** 60:1 81:19 109:2 110:13 168:16 216:18 219:6 220:6 236:15 237:10 327:15 404:24 427:14 427:16,17 433:19
**happened** 30:9 82:14 92:5 118:9 119:8 126:22 136:14 140:20 141:7 155:12,17 156:8 192:3 227:6 243:16 250:18 260:9 268:3 298:10 320:7 350:15 350:18 356:7 360:24 367:4 404:20 411:2,3 418:22
**happening** 112:22
**happens** 121:22 122:20 191:6 256:22 420:11 429:21 468:2
**happy** 9:9
**hard** 38:11 223:6 445:5 473:20
**harder** 352:5
**Harris** 2:6 5:17 6:19
**Harvey** 399:11 399:17
**head** 57:17 106:8 130:19 150:3 179:24 213:8 277:22 475:18
**heading** 199:18 262:17 269:20
**headline** 262:12 263:3
**healthcare** 142:12
**hear** 38:6,11 213:9,19 214:5 236:3 242:5 475:10
**heard** 9:4 27:1 62:10 115:7 129:3 135:17 142:1,6 178:5 185:7 222:13 222:18 256:14 276:15 305:22 353:3 369:14 387:17 394:12 462:17,18,19
**hearing** 76:17 130:3 162:3 330:5 335:18 419:6 461:5,12 462:6,13,23 463:8 464:9 474:24 475:15 479:9
**hearings** 161:21 202:19 436:1 447:5
**heat** 38:10
**heavier** 126:1
**held** 5:8
**help** 32:14 58:3 121:19,22 145:24 212:24

213:2,5 228:5 375:5 411:16 411:24 412:11 412:22 414:23
**helped** 412:12
**helping** 122:15 213:4
**helps** 87:17 257:10
**Heo** 7:7 19:6 24:2 28:8 30:16 34:20 39:6 43:11 75:10 82:1 95:9 102:5 118:10 120:22 122:17 155:3 163:21 190:20 198:19 200:6 254:16 262:11 262:12 264:2 264:23 267:11 267:21 268:22 269:4,23 271:20 272:16 285:8,16 287:18 288:12 291:17,24 315:17 333:9 333:23 334:19 355:1,6 370:3 373:3,24 374:6 378:7,14 379:13 388:23 397:8 402:11 422:16,22 423:9,12,16,21 426:9 430:4,12 432:10 439:7 442:4 447:7,23 448:10 464:14 480:11
**Heo's** 200:3,11 261:19 281:19 288:17
**hey** 67:15 185:3 246:4 290:17 369:13 460:2
**hide** 84:22 236:5 412:6
**hiding** 413:2
**high** 54:13 59:21 104:24 105:1 106:11 115:2 115:20
**higher** 132:16
**highest** 96:19 121:9 132:8 133:14
**highlighted** 266:5 268:12
**highly** 414:17
**Hill** 2:15 6:3
**history** 3:15 136:4 207:24 212:14 357:18 413:6,7
**hit** 184:18,18
**Hodrick** 400:19 401:18
**hold** 262:13 332:20
**holding** 256:15
**holdup** 262:12 263:3,9 288:7
**holiday** 132:18
**Holmesburg** 446:6
**home** 177:16 292:20 297:3 343:3 347:14 347:18
**homes** 422:17
**homicide** 3:21 4:5 7:3 19:1 27:8,12,20 28:1 37:19 41:5 44:14,15 51:21 52:17 101:17,18,24 102:13,22 103:15 104:1 117:15 119:13 119:14 121:3 122:21,23 123:1 125:19 141:16,21,21 142:10,21 158:15,19,19 160:7,18,19,20 162:14 163:24 164:19 167:1 172:20 191:9 193:13 195:5 195:24 199:16 207:12 208:16 211:19 217:16 217:18 229:9 230:3 232:10 256:5 288:24 311:5 334:19 335:23 336:6 336:24 351:10 364:12 369:2 377:7,18 380:19 395:10 396:20 397:20 397:21 399:9 400:2,18 402:9 409:23,24 410:2,13 411:23 415:16 416:22 427:6 430:8 432:22 433:7 436:6 441:11 445:19 450:18,23 475:6
**honest** 117:7 251:21 317:16
**hope** 109:14 176:20
**hopefully** 10:16 270:23 452:13
**hoping** 370:10
**Horn** 72:19
**hospital** 98:20 98:22 99:14,15 99:16,24 100:7 166:18,24 167:13,17 228:9 331:19
**Hospital's** 105:8
**hospitalized** 166:18 167:9
**hour** 12:9 316:12
**hours** 10:8 12:9 21:24 105:13 342:13 471:3
**house** 55:1 61:4 177:8 209:6 210:22 297:12 297:24 349:2 381:12,24 394:11
**housing** 446:5
**Hudson** 2:21
**Hugh** 230:5 231:7
**Hughes** 9:19,22 10:1,2,5 13:4,9 21:9 22:16 23:6 29:18 103:13 120:14 120:16,18 124:4 191:21 193:9,13,21 218:1 225:12 227:1,23 252:19,22 253:15 258:14 293:2 295:24 298:23 310:2 310:10 326:13 326:20,22 327:20 328:9 331:24 333:4 347:11 348:2 348:19 357:4 358:13 364:10 364:11 368:9 368:18 394:23 406:23
**Hughes'** 193:5 193:11 296:3,4
**Hughie** 230:2,9
**Hughie's** 230:4 231:1
**hundred** 126:4
**hundreds** 27:11 158:1 435:14
**hypothetical** 140:19 141:9 141:11 148:17 149:2 152:22 171:8,16,23 413:24
**hypotheticals** 171:9,19

**I**

**ID** 3:16
**idea** 43:20 60:14 94:7 95:16 137:3 161:13 227:17 228:20 230:1,11,21,23 231:14,17 232:9 241:8 280:1,10 303:11 356:6 372:10 376:24 387:15 389:8 395:18 396:15 396:17 401:3,5 403:16 410:12 415:15,19 421:19 428:23 429:2 431:23 436:18 445:9 446:12,13 450:5 451:20 453:6 454:10 466:23 469:7
**identification** 54:3 61:12 90:19 110:21 114:5 135:22 167:7 199:9,19

259:14 302:17 347:1 386:21 395:6 396:4 398:6 399:5 400:15 405:13 444:21 473:16 478:13
**identified** 169:16 285:7 285:12 298:21 335:19 401:10 401:19 402:10 404:7 426:8 439:6 456:21
**identifies** 54:16
**identify** 5:13 89:15 338:12
**identifying** 148:19 291:8 304:22 389:14 393:13 451:14
**idiosyncrasies** 315:12
**Il** 7:6 19:5 24:2 28:8 30:16 34:19 43:11 82:1 95:9 288:17 291:17 422:22 423:21 430:4
**illegible** 474:23 475:17
**illness** 166:1
**IM** 262:12
**imagine** 38:18 55:16 67:2 90:8 117:12 126:5 137:5 162:18 191:22 191:23 192:3 208:3 225:16 248:11 251:13 251:17 252:15 359:13 383:18 386:12 409:7 417:10 420:16 459:21 469:8
**Immaculate** 97:12
**immediate** 173:16
**immediately** 232:10 285:15
**immersed** 375:11
**immunity** 468:1 468:5,7
**impeaching** 418:4
**implicate** 33:21 34:3
**implicated** 452:24 463:8
**implicating** 463:23 465:13
**importance** 235:7
**important** 41:12 144:20 155:16 212:7 321:11 322:4
**impression** 224:21 238:13 289:1
**in-person** 422:9
**inadvertently** 96:2
**incarcerated** 7:5 50:22 51:1
**inch** 197:9,10,15 197:16 198:13 198:15
**inches** 197:3,4 197:11,12 198:11 283:16
**incident** 208:23 418:24
**include** 189:18 307:17 313:5 435:19 436:7 436:24 458:22 459:17
**included** 132:20 160:6,9 162:19 188:6 253:10 271:4,7 307:9 311:23 326:11 358:8 439:12 440:8 443:19
**including** 60:12 158:10 189:8 345:6
**inclusive** 134:8
**incomplete** 96:15 215:5 325:18 408:6
**incompliant** 351:9
**inconclusive** 179:16
**inconsistencies** 234:9
**inconsistency** 146:10 147:10 279:8,12 280:16 425:22 428:24 429:4 449:11,22 461:6
**inconsistent** 77:19 80:3 82:8 146:9,17 147:8 221:1 422:21 426:17 428:17 435:18 467:16 468:12
**inconvenience** 181:3
**incorporated** 160:14
**incorrect** 96:15 215:5 325:18 408:6
**inculpatory** 431:1
**incumbent** 144:15,17 146:15 150:2,7 153:1 167:10 186:12 358:23 468:5
**incur** 150:1
**incurred** 81:15 167:2 177:6
**indemnification** 110:6
**indemnify** 110:6
**indemnifying** 110:10
**indicate** 476:14
**indicated** 179:15 179:16 184:23 186:3 307:12 307:13 313:24 315:6,16 316:7 316:8 317:3 389:4 411:13 415:1 423:2 457:2
**indicates** 91:21 204:10 208:22 302:20 476:16
**indicating** 307:14
**indication** 298:15
**indications** 251:2,8
**indicative** 236:4
**indictment** 70:12
**individual** 142:19 162:21
**individuals** 127:3 138:17
**infer** 234:19
**inference** 289:14 289:20,23,24 300:13 355:4 401:18
**inferences** 301:1 301:1
**inferred** 234:20 234:24
**influence** 221:21
**info** 337:13
**inform** 148:9
**informant** 374:15 375:2
**information** 26:19 30:23 32:5 38:16 39:22 40:6 42:16 47:17,22 49:4,8,19 84:12 87:17 88:1,12 89:19 93:10 94:9 109:17,21 116:4 123:6,7 136:7 143:3,6 143:7,16 146:9 146:10 148:8 149:9,19,23 151:2,10,21 152:4,5,23 153:1,16,18,19 156:23 157:20 159:10,18 165:9,17,18 168:10,21,23 169:14,17 171:1 172:14 172:23 173:11 175:14 180:5 180:17 192:2 195:11,14 212:6,8,24 213:8,14 214:1 214:11,12 217:1,19 224:8 226:3 227:5 231:21,24 233:15,21 235:5,13,18 237:4,18 241:1 242:8,10,12,24 243:17,19 244:20 245:4,8 246:14,20,23

247:6,10
248:24 249:1
250:1 252:2,6
256:3,23 257:8
257:22 258:9
259:2 273:7
274:14 277:1
277:14 281:11
283:22 287:17
288:16 296:13
296:14 301:8
303:15 304:22
309:3 313:12
319:14 323:11
323:12,15
332:7 333:7,16
333:17 334:11
336:9 343:21
344:8,23
346:16 353:18
359:18 361:17
369:21 370:9
373:21 374:4
374:17 376:6,7
378:5 379:1,11
379:12 382:14
383:6 384:3
388:23 390:13
391:5 393:13
393:22,24
397:8 398:19
400:9 402:2,11
402:15 404:8
407:19 412:1
412:22 413:6
414:16 415:9
415:23 417:5
418:13 419:15
424:9 426:18
428:17 433:9
435:17 436:7
437:1,19,21
438:15 439:14
439:23 440:8
443:5,10,11
448:8 450:10
451:18,21
452:8,16,24
453:10,18
457:11 460:3
461:8 474:10
477:3
**informed** 46:19
76:14 125:15
**initial** 39:5
41:19 42:7
153:14 194:17
194:20 230:7
467:19 477:7
**initially** 216:13
255:3 300:15
**initiated** 16:23
222:22 367:23
**injuries** 167:11
**injury** 167:2
**inner** 98:17
**innocence** 151:4
**innocent** 7:8
46:21 47:19
49:14 86:6
**Inquire** 61:17
478:17
**inquiries** 64:11
**inside** 160:17,18
205:23 277:21
393:3
**insisted** 190:10
**inspector** 133:23
**Institute** 105:5
**integrity** 3:19
26:7 46:15,19
47:4 50:1
387:4 435:2
450:15
**intend** 388:2
**interaction** 29:8
30:6 156:4
444:6
**interest** 285:22
377:7
**Internal** 134:3,6
134:15
**internet** 133:18
**interpret** 200:21
**interpretation**
201:12 316:10
474:17
**interrogations**
206:20
**interrupt** 11:6
**interview** 3:23
13:18 15:10,11
15:12,13,15
18:11 41:20
42:2,3,4,7,20
42:22 81:12
87:11,12,23
90:7 95:16,22
102:9 153:2
165:17 166:12
167:6 183:3
184:20,24
185:8,9 186:4
186:5,14,17
187:7,9,17,21
187:23,24
188:5,6,10,13
188:16,16,18
188:22 191:14
191:20 192:8,9
192:17 193:6
193:18 203:5
206:1 208:6
209:14 215:9
215:11,14,16
217:12,21,23
218:5,8 219:1
219:18 220:2,8
223:12 224:12
225:10,24
226:22,24
227:2 228:12
228:18 232:6
238:3 246:2
250:16 253:6,6
253:13 257:7
257:11 275:8
275:24 279:3,5
279:22 280:16
282:1 286:15
287:19,20,23
292:6 293:14
293:15,16
294:19,20
295:20 296:20
296:23 302:2
302:19 306:5
307:4,8,9,12
307:17 311:23
312:3,7,12,20
312:24 313:3,4
313:9 317:21
317:22 318:12
324:4,10
325:24 326:12
327:7 328:10
328:20,24
331:10,14,18
331:22 332:8
332:13 336:4
339:4,8,10,11
343:24 346:5
346:13 347:7
347:15,20,21
348:3,8,20
349:22 350:16
351:21 352:23
353:15 354:7
357:9 358:20
358:21 360:9
360:10,15
361:4,6 362:11
363:15,19,24
364:4 365:4,8
366:2,7 372:14
372:18,21
380:1,7,10,15
381:2 382:10
382:12 383:7
383:19,21,23
384:4,9,19
385:11,21
388:9 389:13
394:4 397:18
398:2,10,24
403:8 406:22
424:11 425:5
425:14 427:1,2
434:18 446:23
447:19 449:9
457:3 472:9,14
476:12
**interviewed**
18:9 36:7
82:15 119:17
134:14 164:18
191:19 192:6
195:5 202:12
202:13 221:24
249:7 258:5
281:22 293:6
294:14 350:3
353:18 354:1
359:10 369:2
372:9 382:8
389:9 397:22
398:17 401:11
409:10 432:23
**interviewer**
193:10
**interviewers**
406:23
**interviewing**
187:1 207:23
286:22 295:24
298:7,8 447:12
448:19,20
449:18
**interviews** 13:3
13:9,14,17,22
14:16 15:20,23
16:5 27:6
35:21 40:18
42:5 43:23
45:23 153:15
159:16,17,24
160:1 166:17
167:4,5 179:14
186:5 188:3
194:17,20

202:6 204:14 206:19 225:15 293:16,18 325:5 326:20 329:9 332:11 332:18,22 350:6 365:1 386:7 391:16 405:21 407:12 433:19 478:24
**intimidated** 475:17
**introduce** 6:16 259:6 348:18 348:19 452:8
**introduction** 48:11
**introductory** 9:3
**investigate** 359:21
**investigated** 46:14 147:14 329:24
**investigation** 9:23 18:7 35:3 39:6 43:14,18 70:4 71:4 73:3 73:17 79:13 95:1 102:6 103:7 120:22 122:18 131:19 134:7 142:2,10 142:22 143:14 144:7,10 148:18 152:11 153:18 154:9 155:7,18 156:15 157:18 163:8 164:13 167:24 168:22 172:22 190:21 192:12 193:23 194:2 198:17 206:17 213:1 245:3 255:1 256:8,16 257:23 284:24 295:4 319:19 320:6 321:11 323:7 335:11 338:15,23 341:8 345:1 360:16 361:13 361:15 372:13 387:5 392:6,8 395:15,23 396:22 406:21 414:10 427:7 429:21 430:20 448:19 450:14 480:20
**investigations** 51:19 52:1 141:22 154:17 167:21 195:24
**investigative** 181:22 185:14 191:4 286:4 288:16 291:9 360:21 361:3 377:7 424:20 424:23 425:7 427:1
**investigator** 39:8 88:23 137:8 200:22 201:13 245:24
**investigators** 157:7
**invitation** 392:16
**involve** 327:20
**involved** 30:10 41:22 43:8 51:24 57:4,9 60:11,14 63:7 64:3,4 66:9 67:1 69:19,20 72:22 73:3 89:13,16 103:8 106:17 116:23 116:24 126:12 191:17 192:11 194:2 195:16 198:17 232:10 233:6,23 234:22 241:2 255:1,3 275:20 284:9 339:19 433:16
**involvement** 18:4 25:3,18 26:3 31:10 64:13 84:13 86:13 87:6 88:2 102:5 120:21 190:20 193:22 215:8 275:14 278:9 295:4 297:17 340:12 349:16 351:23 369:9 377:8 405:18 430:19 451:2 480:20
**involving** 72:10 131:4
**iron** 2:3 45:24
**isolating** 450:18
**issue** 47:17 109:18 176:22 462:8
**issued** 114:9 134:21 196:11
**issues** 141:19 275:10 325:21
**Italian** 106:20 106:23
**item** 206:19
**items** 336:11 450:23
**IV** 100:2

**J**

**J-A-N-O-F-S-...** 113:20
**J5** 445:9 446:4
**jail** 130:2,3 152:9 175:2 211:12,14,18 235:21 468:2
**James** 20:17 31:9 387:13
**Janofsky** 113:20
**January** 119:8,9 122:19 191:5 202:5,23 204:11 294:15 294:22 344:13 345:1 380:2 446:24 447:5 449:19 462:5,7 465:1,7 470:10 477:13
**Jastrzembski** 68:18
**Jean** 72:19
**Jeannine** 1:13 6:6 483:3,17
**Jefferson** 100:6 105:8,21,22 331:19
**Jennings** 380:6 447:15
**Jerime** 445:9
**Jim** 128:1,2,6 475:3
**Jimmy** 20:18 248:10,15
**job** 40:6,14,16 44:1,6,17,21 45:8,13,18 100:8 103:10 122:14,15 126:21 154:24 192:22 363:17 411:2,3 472:23 473:2
**jobs** 40:8 42:22 57:3 104:18 122:16 169:8 377:11,15,18
**Joe** 20:21,21 21:6 124:3 233:9
**Joel** 24:7
**John** 2:15 5:11 6:2,2,17 23:14 23:23 31:9 124:7 146:22 147:2 148:17 148:19 149:19 152:14 248:10 248:15 378:1,5 394:11,16 395:11 430:4,4 430:9 455:8 464:15,19 465:14 481:9 481:21
**Johnson** 399:11 399:13
**joined** 5:16,18 6:18 97:20 98:21 364:9
**Jon** 303:6
**Jonathan** 2:2 5:15
**Joseph** 366:20
**jot** 168:7
**journalist** 113:17
**judge** 8:16 24:7 24:13 49:24 109:2 126:13 128:13 129:4 129:12,13 130:4,19 161:22,24 162:4 256:16
**judge's** 48:6
**judgement** 259:5 442:21 443:24
**judgements** 79:19 80:9
**judges** 128:8 468:6
**July** 16:4 293:5 294:1,2 295:13

312:8,8,16 360:2,11,22 361:1,5 362:14 362:22 367:23 373:4 381:2 382:13 384:20 389:11 403:7 405:19 423:6 423:15 429:22 448:7 449:8 462:5 466:7 476:24 478:7 479:22
**jumbled** 229:18 281:7
**jump** 143:17 418:20
**June** 26:18 55:19 56:2,8 241:11,14 295:13 478:17 479:2
**Junior** 233:5
**jury** 8:16 70:4 70:12 109:2 329:11,12 330:20 332:15 334:14 418:14 430:23
**justice** 97:4
**justification** 140:23
**justify** 444:1
**juvenile** 101:8 101:20 103:1 396:9 401:9
**juveniles** 101:14 101:20 401:19

**K**

**K-A-P-U-S-T-A** 209:15
**K-O-T-Z-P-A...** 338:1
**KAIRYS** 2:2
**KAPLAN** 1:22
**Kapusta** 209:14
**keep** 122:11 125:14 154:6,8 261:20
**keeping** 138:5
**kept** 162:14 242:18
**key** 256:15 414:10
**kids** 479:8
**killed** 98:8,12 103:22 373:14 422:22 430:11
**killer** 423:21
**killing** 378:1 379:20 423:12 423:16
**kind** 17:8 64:1 91:5 134:11,20 159:3 181:3 217:6 244:18 254:4 299:22
**knew** 21:16 54:12 60:13 67:10 90:8 124:1 133:20 141:21 164:21 168:10 194:9,9 194:10 212:16 212:21 217:9 226:6 234:21 238:10,21 255:23 258:14 273:16 278:11 280:10 284:19 287:15 288:20 289:8 291:3 298:20 299:4 320:16,22 339:18 355:6 366:8 369:16 381:9 410:23 420:6 469:12
**know** 9:8 22:1 22:21,23 23:1 29:22,22,24 30:1 31:14 32:2,5 33:5,17 34:7,11 35:6,7 35:14,24 36:2 36:2,11 37:24 38:8,21,22 39:2 40:15 42:20 47:22,23 48:3,13 50:21 51:12,13,14 53:10 55:21 56:20 57:2 58:20,21,22 60:7,10,17 61:8 63:4 65:21 66:8,9 68:9 70:1 71:17,18 74:15 74:15,17 75:15 76:9 77:3 80:3 80:5,5 81:5,8 82:14 83:19 84:4,16,20 88:5,20,21,24 89:5 90:11 91:15 92:12 103:17 106:6 110:12 111:9 111:13 115:4 115:12,15,16 116:18,20 117:7,8 122:17 123:3,5,9 126:8 128:6,16 131:6 132:2 135:5,16 138:1 142:15 143:17 144:1 148:12 149:24 150:9 152:3 153:12 153:13 155:1,3 161:10,11,12 162:3,16 163:7 163:19,23 164:9 166:4 169:11 170:13 174:10,11 176:5,10 178:1 178:19 179:2,2 179:6 180:9 181:6,17 185:10 186:19 188:13 190:9 190:11 194:16 195:8,16 196:24 197:5 197:15,24 198:4,6,7 201:1 202:12 202:13,14 204:1 205:10 205:19 206:10 206:22 207:5 207:15,16 208:2 211:7 213:12 216:13 216:13 217:16 217:24 219:5 223:3 228:23 229:24 231:5,6 231:6 232:3 236:18 237:13 238:7,23 240:1 241:16,24 243:5,14,15 245:17,20,22 245:23,24 246:4,5,10 247:3,4,7,7,8 249:5,24 250:6 251:18 255:18 256:22 257:13 257:19 258:13 260:5,13 264:5 265:17 276:2 277:23 278:20 279:17,23 280:1,12 283:13 285:10 285:14,19 287:17 289:6,8 291:23 292:22 292:23,24 293:5,9 294:12 294:13,14,17 294:22 298:3,5 300:1 301:2 302:22,23 303:8 304:6 305:12,17 307:5 309:9,10 310:1,1 311:10 312:21 314:9 314:15 315:7,8 315:11,12,14 318:23,24 319:3,8,9,11 319:23 320:4,5 320:7 321:6,8 323:3 324:19 324:21 325:23 328:2,14,14 329:14 331:4 333:20 334:1,6 334:9 336:8 338:24 340:8 341:17 343:16 349:24 350:1 350:14 351:2 351:18 352:2,6 353:24 354:3,4 356:1,3,11,20 356:21 358:17 359:9,13,19 363:3,8,18,21 364:14,20,22 367:3,19,23 369:6,14 370:6 372:6,8 373:12 373:23 374:8 374:11,21 377:13 379:19 379:21 380:4 381:15,20,22 382:7,20 385:18 386:2 386:16,18 388:11,15

389:5,18,20
392:3 395:17
397:4,4,11,16
401:5,7,17,22
404:19 407:16
408:19 410:23
412:18 413:16
413:21 415:6
415:14,16,17
415:18 418:8
418:17,22
421:10,20
422:5,6,8,10
424:15 426:14
426:24 427:3,4
427:11,15,16
427:19,20
428:6 430:15
432:2,16 433:2
433:12 434:9
434:21 436:3
439:18 440:6
443:6,6,7
445:11 446:3,9
446:10,14
448:3 449:3
450:7 451:17
453:6 455:8
457:1,24
460:22 461:23
463:1,3 465:24
466:19 467:6
469:23 472:13
475:1 476:9,12
476:15
**knowing** 79:9,9
246:22 291:16
475:14
**knowledge**
36:23 53:12
109:9 191:11
192:22 216:11
246:24 249:1
250:2 254:19
260:15 274:15
276:7 278:22
285:6 290:11
298:10,12
315:2 365:15
374:22,24
391:15,22
418:18 433:8
473:8 484:3
**known** 57:21
59:22 92:13,20
212:3 231:9
233:5 237:17
238:7 257:4
357:17 365:24
388:17 392:7
414:24 415:3
**knows** 213:13,14
240:15 363:10
364:16
**Knox** 118:15
**Korean** 337:10
**Kotzpaner**
338:1 345:7
**Krasner** 51:8
52:7,16 62:18
63:1,5,13
65:16 67:22

**L**

**L-I-M** 337:10
**label** 185:12
**labeled** 91:9
281:24 403:11
**Labor** 119:3,8
119:10
**laboratory**
387:12
**lack** 328:12
347:7 385:12
**laid** 379:9
**Lamb** 150:6
378:1,5,18,22
430:4,4,9,10
430:20,22
431:7 441:7
447:6 464:15
464:19 465:14
**Lanzelotti** 23:23
124:7 367:2,9
367:17,20
**larger** 197:7
**Larry** 51:8 62:7
62:10,18,19
63:1,5,13
**LaSalle** 97:5
**late** 121:7 277:7
279:18
**latent** 387:11
**law** 2:9 5:23
6:19 69:10,11
106:17 107:2
108:8,12 135:4
136:3 283:13
374:15 460:18
460:19,21
461:24
**laws** 461:14
**lawsuit** 6:22 7:1
24:16 25:16
27:2 127:15
**lawyer** 127:21
303:8 324:20
417:18 472:23
473:1
**lawyers** 50:1
161:5
**lead** 104:14
163:9 178:22
214:4 226:5
270:9 291:16
380:9
**leading** 156:8
158:24
**LEAMAN** 1:22
**learn** 21:15
**learned** 10:1,14
21:10 50:4,9
71:23 73:6
125:15 211:2
212:1 276:8
463:15
**learning** 26:19
89:24 338:21
464:16
**leave** 97:22
98:24 132:20
177:18 183:5,7
**leaves** 372:3
**left** 53:18 98:19
99:5 248:2
262:10 264:11
337:7 367:2
394:12 405:23
**legal** 411:11
**length** 10:23
309:3 424:7
**lengthy** 16:15
17:14 433:21
471:3
**Lester** 233:4,15
330:2 371:3
384:15
**let's** 20:15 24:23
30:14 35:9
38:24 75:8
81:12 88:11
96:6 103:24
114:20 117:14
134:19 136:20
144:2 145:8
148:16 153:16
155:2 168:19
171:7 176:10
177:1 178:19
179:23 185:5
195:13 199:1
225:9 232:17
243:4 246:19
252:16 258:23
264:6,20 268:8
282:12 287:11
297:5 325:8
329:2 335:5
347:20 348:12
364:2,4 368:6
380:11 382:22
394:6 406:16
407:20 413:7
421:1,24
437:17 475:18
479:24
**lethal** 115:2,20
**letter** 408:21
409:22 411:6
412:15,17
413:8,16,21
414:1,2,17
415:14,15,23
418:15 419:6
419:17,24
420:5 438:23
451:13
**letters** 420:9
**level** 96:19
**LexisNexis**
261:6
**library** 242:10
244:4 247:14
**lie** 146:6 235:4
356:18 358:3
472:20
**lied** 472:3
475:21
**lies** 479:12
**lieutenant**
123:11 124:8
256:5 366:14
366:16 367:2
367:14,19
**lieutenants**
154:8
**life** 100:4,5
127:11 170:12
**lift** 160:3
**light** 10:13
211:9 221:3
246:3 280:22
282:9
**liking** 310:8
**Lim** 337:9
**limit** 10:8
**limited** 30:5
31:20
**Lin** 2:2 345:6
**line** 39:24 40:6

40:15 43:9 44:13 47:9,12 98:12 102:15 102:17 103:19 103:20,20 113:14 117:18 117:21,24 118:10 119:19 119:21,24 120:12 121:4 122:5,13 123:16 124:2 124:12 137:18 150:23,24 157:5 170:15 184:4 194:1 213:16 223:19 237:2 257:21 258:15 285:6 309:20,20 311:8 315:13 334:8 402:6 407:10 447:11 459:22 465:19 465:21 466:5,6 473:2 475:11 475:19 485:2
**lines** 210:5 348:13 404:15 465:10 468:21
**lingo** 377:18
**linked** 347:6
**list** 399:23 400:20 402:8
**listed** 242:24 397:2 442:14
**lists** 173:14 396:22
**literally** 159:11 164:18 253:14 303:4 313:6 321:1
**litigated** 88:17
**litigation** 26:1 75:19
**little** 16:20 18:24 37:23 38:10,11 38:23 50:17 91:13,18 92:19 98:20 100:23 102:16 103:21 104:1 170:23 187:20 192:21 194:15 197:7 202:2 236:23 282:7,15 287:1 352:5 394:9 424:7 448:6 477:2,4
**live** 107:9
**lived** 21:19 153:7 342:11
**lives** 342:1 353:4 393:14,18
**LLP** 2:20
**local** 260:21
**locate** 223:6 338:22 344:4 354:6 384:23
**located** 46:6 344:5
**location** 79:8 200:6 267:21 341:17 342:6
**lock** 118:13
**locked** 103:2 152:6
**logical** 168:14 350:5
**long** 9:9 12:8 24:18 64:4 66:2 92:20 97:24,24 98:4 98:13 103:16 110:24 119:6 119:23 158:12 173:14 196:24 197:13 198:10 198:11 206:18 212:14 225:13 232:17 238:23 238:24 276:24 277:13 283:13 314:23
**longer** 23:17 97:18,19 99:17 159:6 197:8,20 205:1
**longstanding** 245:18
**look** 13:2,17,24 14:3 15:3,6 30:2,3 47:1,5 56:11 86:14 87:1 88:7,12 88:24 94:9 111:4 123:1 136:8 142:13 142:14 155:13 156:1 162:9 193:11 210:5 214:16 215:12 227:20 232:20 247:14 252:16 253:1 259:17 260:17 261:3 261:24 262:9 264:10,20 276:21 281:6 281:23 282:13 293:22 308:2 309:13 329:13 330:23 332:21 340:3 344:11 357:10,24 360:6 380:3 382:23 383:20 392:10,23 394:8 396:7 397:17 403:18 421:1,16 431:10,14 465:9
**looked** 13:15 14:7,10,16 27:11,23 28:4 29:24 85:10 107:24 132:7 133:17 192:19 194:12 200:4 223:22 248:12 248:23 251:19 255:14 260:12 274:10 293:19 297:7 311:14 336:5 338:11 340:13 341:11 348:8 389:12 402:19 405:19 410:15 419:7 429:22 430:12 446:22 447:21 450:17
**looking** 14:4 145:11,14 182:3 209:1 248:8 254:20 259:20 294:9 344:11 352:5 398:9 399:14 420:4
**lookout** 213:17 214:11 338:3
**looks** 25:3 64:6 136:5 215:20 244:5 260:20 296:2 335:1,9 360:13 371:2 383:5 384:13 399:22 445:1 447:13
**lose** 214:9
**lost** 134:23 222:9
**lot** 9:5 17:15,16 40:3 44:14 79:7 81:14,14 81:22 91:18 98:15 121:21 122:9 124:18 124:19 146:16 157:3,4 158:4 160:9,14 166:8 166:22,23 167:6 171:9 173:4 174:11 176:23 177:10 177:16 178:24 179:6,8,12,17 180:22,23 181:1 184:10 186:8 187:13 187:13 217:9 218:23 225:20 274:19 310:17 316:8,9 336:20 336:23 357:13 417:22 467:24 468:3,3,5,23 479:17 481:15
**louder** 38:11
**Louise** 203:23 303:22 304:2,3 304:10,14,15 305:22,22 362:7 388:10 388:13 418:23 422:2 423:20 424:11 427:1 439:6 447:24 448:7 449:10
**lower** 266:10
**Luke's** 99:16 228:9
**lump** 133:3
**lunch** 190:10,17 214:21 215:3
**lying** 251:2,5,6,7 251:9 350:8 359:8 455:12 456:21

**M**

**M-A-N-T-O-N** 337:16
**M-A-S-S-E-Y** 14:13
**M-A-T-T-I-A-...** 61:7
**M-U-S-T-A-F...**

131:9
**Madison** 281:16 281:19 288:6 354:24 392:21 393:21
**Madison's** 282:15 288:1 292:6 393:22
**Mae** 90:10
**Magioni** 408:24
**magistrate** 440:7
**mail** 24:18
**mailed** 11:16 415:17
**main** 31:24 115:3 287:11
**maintained** 75:9 317:15 318:6
**major** 97:18
**making** 79:18 80:9 85:2 269:13 403:6 415:8 431:1 445:5 482:6
**male** 209:18,20 209:23 210:1 266:24 268:1 283:18
**males** 92:22 233:6
**man** 7:7 19:5 24:2 28:8 30:16 34:19 43:11 82:1 88:19 95:9 127:1 263:3 264:17 288:17 291:17 335:12 403:14,24 422:22 423:21 430:4 475:19
**Manchester** 108:1
**Mangoni** 1:11 3:4 5:12 6:9,14 96:12 190:9 202:22 215:2 270:22 303:12 325:15 383:17 387:22 394:22 406:23 408:3 451:15 480:7 483:7 484:8
**manner** 156:21
**Manton** 337:16
**March** 136:22 219:10 229:16 229:21 230:16 243:7,23 271:4 304:4 376:19
**mark** 53:15 61:9 478:10
**marked** 32:18 54:3 61:12 90:19 110:21 114:5 135:22 160:16 199:9 199:13 259:14 265:16 336:18 337:4 346:21 347:1 379:24 386:21 387:2 395:2,6,24 396:4 398:6 399:5 400:15 405:13 444:21 473:16 478:13
**marker** 22:12
**Market** 2:16 91:23 231:21 236:18 237:12 237:18 238:14 239:10 263:7 299:1
**marking** 110:24 135:19 259:10
**married** 107:14 107:15
**Mary** 97:12
**Maryland** 460:14
**Massey** 13:19 14:11,13 15:11 15:12 29:1 42:7 46:4 191:24 192:8 206:2 215:10 215:14 216:3,8 216:12,15 217:2,15,21 218:8,20,21,22 219:1,3 220:8 220:11 221:4,9 222:12,16,21 223:20 224:7 224:11,15,22 225:6,10 227:12 228:1,4 228:12 229:14 230:11,16,24 231:3 232:1,5 232:9 233:14 234:10 235:2 235:12,20 236:10 237:17 238:4,13 239:2 240:16 241:21 242:1,2,14,22 243:6,7,19,22 244:18 245:20 247:14 249:8 249:13,17 250:8,14 251:1 251:5,7,11,18 252:2,5,6,12 253:16 254:10 275:13 276:3 278:7 280:11 306:23 381:8 381:13,24
**Massey's** 215:10 215:23 223:11 223:12,14,17 225:2,24 232:18 243:17 250:13 252:1 254:11 279:14
**master's** 97:6,8 97:11
**matched** 200:9 297:12 437:23
**material** 30:9
**materials** 28:5
**matter** 5:10 21:17,21 24:21 37:17 43:7 64:6 71:17 73:23 74:1,2 112:10 117:3 147:21 149:20 183:4 202:20 203:12 246:19 307:8 310:8
**matters** 35:15 103:1 436:2
**Mattiacci** 61:6 117:13
**Maurice** 193:8 342:10 394:7
**McGillen** 233:9
**McNesby** 20:17 21:3 31:9 38:20 40:17 124:10 164:8 248:4,16 319:10 329:10 331:12 332:6 333:1 334:10 429:12
**mean** 25:20 40:13 57:11 58:20 73:4 128:16 142:9 144:4 146:16 146:18 149:21 150:6 154:22 154:22 160:13 166:8 176:2,19 180:22 189:4 195:21 207:8 213:14 226:17 247:4 249:8 255:23 289:7,9 293:1 316:7 347:17 363:14 369:15 374:12 376:20 406:6,8 412:9,10 417:23 429:10 455:3
**meaning** 163:21 317:14 362:18 436:24 469:5 471:4
**means** 8:22 137:4 201:22 238:24 241:8 241:16 280:1,2
**meant** 278:5 469:7
**measure** 179:4 258:24
**meat** 215:7
**media** 64:12 108:15 115:3 255:21 256:7 257:22 437:24 440:20
**medic** 105:8,9
**medical** 132:20 155:24 156:1 157:1 200:10 228:10 230:17
**meet** 17:8 18:13 18:15 167:9
**meeting** 12:8,11 12:14 19:2 20:4 481:15
**meetings** 242:23 252:7
**member** 39:10 239:23
**members** 62:17 79:8 108:11 210:21 333:10 333:21
**memo** 94:10
**memorandum** 88:13 89:3

470:24
**mens** 105:4
**mental** 166:1
**mention** 9:4 37:1 161:16 236:17 237:11 376:16,21 437:17 438:7 438:14,21 439:5
**mentioned** 12:17 14:18 15:5 18:15 31:18 33:1 37:11 69:22 83:22 87:22 99:20 104:17 108:4,14 120:3 120:8 123:24 198:12 233:9 236:11 237:6 279:15 307:4 339:2,12 346:11 358:19 373:5 384:18 388:16 394:23
**mentioning** 448:9
**mentions** 371:2 394:7
**mere** 181:21
**Meredith** 232:7
**message** 21:2 335:9 337:24
**messages** 336:13
**MESSING** 2:2
**met** 6:14 166:8 205:21 216:17 431:18
**method** 177:24 178:1,3,5
**methods** 326:19 326:19
**Michael** 13:18 15:12 87:22 89:12 94:12 113:20 161:22 209:1 233:4 300:19 301:4,9 301:13,16 305:3,23 330:5 330:8,11,15,17 335:12,18 337:14 340:11 340:13 351:22 371:3,5,17 388:16 389:9 399:10,13 415:5
**microfilm** 260:21
**mid** 161:6 162:13
**middle** 114:13 114:19 230:7 262:3 387:10 411:17
**Mikaila** 2:15 6:2
**Mike** 304:22 305:5 338:3,12 338:22 339:4,8
**million** 71:15 73:8 132:16 134:1
**mind** 80:14 415:22
**mindset** 454:10
**mine** 23:4 160:24 301:1 336:16
**minimal** 436:21
**minimum** 143:19
**minutes** 30:15 190:16 254:11 344:23 402:7 407:11 474:15
**mirror** 183:23
**miscellaneous** 159:19 336:15 336:22,23
**misconduct** 129:15 130:20 140:3,12 141:12
**misnumbered** 96:1
**misrememberi...** 183:20 367:6
**missed** 368:20
**mission** 62:7 98:3
**missionary** 98:1
**Mitchell** 399:11 399:17
**mixed** 226:15,16
**mjohn@clark...** 2:18
**moment** 31:18 33:3 46:13 76:8 84:2 91:14 195:13 282:12 287:24 293:23 340:7 347:4 413:1 430:15 442:14
**Mona** 281:16 292:5 354:24
**money** 74:20 132:14,15,17 132:20,21 133:2,9,21,23 262:18 264:3 269:17 270:5 272:23 288:9
**month** 18:20 121:14,15 219:12 465:1,4
**months** 22:5 27:19 64:7,8 99:18 103:23 118:14 119:7 120:1,5 174:23 277:24 278:18 361:7 369:19
**moot** 64:2 298:2
**morning** 6:14 432:5
**mother** 240:5 273:14 330:11 330:14
**motion** 128:14 128:20,24
**motions** 128:17 129:3
**motivation** 144:19,20 223:9 225:7 244:19
**motivations** 83:20
**motive** 378:22
**move** 154:13,16 164:16 288:10
**multiple** 14:4 41:10 42:5,9 42:13 102:20 102:21 171:12 171:15 373:22 374:4 375:3,5 375:12 457:15 463:22
**murder** 7:6 24:24 25:5 45:15 75:10 77:17 84:14 88:3 90:12 93:18 101:21 118:24 120:22 122:17 129:23 131:19 153:4,9 155:3 163:22 167:21 170:10 190:20 191:1 191:12 192:2 192:24 193:17 193:19 200:3 214:1 227:5 231:21 233:17 234:13 236:17 237:12 238:21 239:10,17 241:2 242:9 243:1 244:2,6 254:16 257:23 261:19 262:21 265:18 266:14 275:15,20 276:7,24 277:7 277:13 278:12 278:22 285:8 285:16 299:1 300:19,20 301:4,12 315:17 318:10 333:9,23 334:20 341:4 369:3 370:3 373:3,24 377:21 378:5,7 378:14,18,23 379:2,13 380:5 381:9 388:23 392:12 397:9 425:24 426:10 430:3,8,20,22 431:7 432:11 433:17 439:7 441:7 442:4 447:6,7,23 464:16,20 465:14 480:11
**murdered** 118:12 126:24 311:11
**murderer** 375:21
**murders** 121:11 233:12 311:9 311:13 312:12 312:16,20 326:3 373:6,11 373:22 374:5 376:7 377:9,13
**Mustaffa** 131:9
**myriad** 78:16
**Myrick** 379:18 379:19 381:6

**N**

**N** 3:2
**name** 5:2 6:16 54:11,15,16 56:24 57:2,5 57:10,19 60:1 64:4,8 65:1,24 66:6,14,22 67:5 69:17,18 87:22 90:6,8 94:24 98:7 112:18 113:19 113:21 116:4 117:1,2 118:17 127:12,17,24 127:24 128:5 128:11 129:21 136:23 137:9 137:10 161:16 161:19 191:13 193:5,9 194:21 203:21,23 204:2,3,3 230:9 285:22 288:13 290:9 291:17 314:7 330:6 339:11 339:21 353:4 355:1 366:16 393:10,17 398:2 421:22 445:12 455:9 482:9
**named** 7:9 22:16 22:17 24:6 31:4 88:19,23 96:3 131:9 281:16 337:15 471:2
**names** 20:15 68:11 131:8,12 232:21 233:3 248:17 311:11 330:2 373:13 387:10,12,17 388:2 396:9,11 397:6 400:11 402:1
**narcotics** 128:3
**narrative** 89:4 232:18
**national** 62:7 105:5
**natural** 118:18
**nature** 9:15 47:16 79:10 99:7 101:15,22 102:21 103:4 105:12 122:10 166:13 177:12 328:5 359:16 378:6 379:10 435:24
**NDI** 179:12,15
**near** 93:5 106:23 200:11
**neatly** 199:5
**necessarily** 39:19 40:13 41:3 146:18 167:12 174:20 198:2,9 219:22 334:4
**necessary** 174:17 458:17
**neck** 200:12
**need** 7:19 8:22 9:7 58:18 91:12 145:23 190:4 203:8 224:2,3 271:1 282:14 327:10 348:14 369:14 392:17 437:15 482:17
**needed** 57:15 66:22 117:2 284:24 458:16
**needs** 170:14
**negative** 254:2 306:12
**neglected** 209:11
**neighborhood** 173:7 288:19 289:10,11 291:4 296:24 298:9 311:9 326:4 330:9 342:2 388:18 388:20
**neither** 22:19
**Nespoli** 23:16 39:7 124:4 164:4 319:11 335:10 337:9 337:24
**Neufeld** 2:20 5:20
**never** 24:3 57:8 60:14,15 63:18 64:21 77:16 82:24 83:9 97:9 112:1 115:6 116:22 116:24 134:22 134:23 135:17 140:20 141:11 214:6 216:16 216:17 247:9 251:21 291:7 294:20 299:14 299:18 312:24 312:24 328:10 332:13 356:16 365:4 387:1,17 410:22 411:1 412:15,16,19 419:18 420:2 431:14 475:20
**new** 2:22,22 24:8,13 40:21
**news** 26:15,21 65:11,12,13,20 66:5 72:9 115:12 122:9 254:16 259:3 260:18,24 261:1,17 262:9 262:20 267:4 440:19 471:1 471:11,15
**newspaper** 3:17 4:9 244:5,9 246:14 247:18 248:8,23 250:14 251:12 254:12,20 255:15 257:9 259:7 260:15 260:21
**newspapers** 242:11 245:5,9 247:15 252:13 261:11 471:1 471:11
**newsworthy** 72:20 122:9
**Niagra** 97:5
**nice** 160:1 481:15
**Nicholas** 54:10 54:23 58:5 59:3
**nickname** 63:1 288:17 393:14 464:20
**Nicky** 61:4
**night** 9:17 10:14 121:23,23,23 153:7 194:18 195:6 386:3
**nights** 105:23
**nine** 20:19 23:9 106:12 121:24 150:11 180:9 186:2 196:4 257:7
**non** 74:16
**non-** 349:15
**normal** 211:6 328:17,18
**normally** 436:3
**north** 21:19 341:23 342:5 342:15 343:1,1 343:3
**nose** 397:2
**notary** 1:14 482:17 483:4 483:18
**notation** 40:19
**note** 3:21,22,24 4:5,7 5:18 9:14 10:22 32:23 53:16 86:18,22 91:4 96:2 111:19 137:12 137:15 186:16 335:9 337:6,7 337:8,23 343:14 347:10 395:9,14 398:10 421:2 447:11
**noted** 176:16 373:10 403:14 406:23 407:5,8 482:7
**notes** 13:5 14:18 16:6 27:7 159:15 167:5 225:20 228:12 228:18,24 229:1,2,5 231:15,16 334:18 335:2 336:13 345:10 396:20 399:9 400:18 403:2,7 404:3 405:20
**notice** 1:11 22:14 24:16 25:16 405:22 441:12
**notified** 23:1 50:7
**November** 1:7 5:7 429:23 430:2 441:7 483:8

**number** 1:4 14:2 25:24 32:22 47:6 51:14 53:20 75:22,24 91:6 121:9 136:17 152:13 158:9 169:5 174:15 180:24 198:22 210:10 210:19,20,21 210:22 329:23 338:3 354:6,7 355:5,11 373:5 374:15 386:5 415:22 425:4 451:1,5,9,13 476:15
**Numbered** 118:3
**numerous** 12:20 21:18,20 51:14 65:13 78:13 153:14 158:4 164:20 181:14 471:5
**nurses** 108:7

**O**

**o'clock** 9:17
**Oakford** 25:6 341:21 342:12 348:21 363:17 369:4 393:15 393:18
**oath** 7:23 8:17 8:23
**obituary** 262:11
**object** 28:9 32:1 33:13 34:4 35:22 36:15 37:14 41:14 42:17 43:15 48:21 49:15 50:10 51:10 52:9,19 53:4 56:4,19 57:12 60:2 62:11 63:14,22 64:18 66:18 67:7,24 69:5 71:5 72:12 73:10 74:5,23 75:12 78:8 79:2 80:11,20 82:2 83:11 85:23 88:4 90:2 92:1 94:16 95:10 109:4 115:8,21 124:22 129:16 132:11 136:9 137:23 138:11 140:4 142:3,23 143:9 145:2,17 147:3,11 148:11,24 150:18 151:12 151:23 152:20 155:19 157:13 161:8 165:10 166:3 173:1,21 178:11 179:20 181:5 185:24 186:18 189:2 189:12,20 194:5 195:1,18 200:24 207:4 207:13 208:1 209:22 210:12 211:21 217:3 218:12 219:19 220:13 221:6 221:15 222:19 224:17 232:2 234:14 243:9 244:14 245:10 247:22 249:3 250:4 255:4 258:1 263:17 265:3 283:23 294:16 327:23 353:11 355:13 374:7 382:17 385:1 389:1 391:19 405:1 416:11 427:9 444:3 480:21
**objection** 28:17 44:3,9,20 45:3 45:10 46:2 62:21 63:3 65:4 71:20 72:1 73:20 74:13 82:11 86:8 93:8,22 109:13,20 116:6,15 125:10 140:14 141:2 146:13 147:19 153:24 157:22 165:20 168:1 169:1,20 172:4,11 174:7 176:17 180:2 197:23 201:20 204:23 205:4 205:17 212:9 212:20 213:10 213:21 214:14 220:4 232:12 233:18 237:20 238:16 239:5 239:13 240:18 241:5,18,23 246:16 247:1 250:19 251:14 255:10 256:9 256:19 266:16 267:16 269:7 270:15 271:11 271:23 272:5 272:13,19 273:2,8,24 275:4,22 276:10 277:9 278:1,24 279:10,19 280:7,24 283:7 284:6,16 285:1 285:18 286:8 286:17 287:6 289:4,18 290:6 290:14 292:2 292:14,21 295:6 299:11 300:9 302:12 306:9 308:11 308:22 309:8 311:16 312:1 313:15 316:3 316:20 318:14 319:7,15 320:3 321:4,13 322:7 322:16 323:1 323:18 324:6 324:17 326:5 326:15 333:12 333:24 338:5 338:16 340:15 340:24 342:21 343:6 344:18 345:8 349:9,17 350:9 351:13 352:1,18 353:21 354:10 355:8 356:9,19 357:20 358:15 361:19 362:8 362:16 363:2 364:18 365:17 368:12 370:12 370:20 371:13 371:22 372:15 372:24 373:15 374:19 375:8 375:16 376:1 376:10 378:8 379:3,15 381:14 382:2 386:10 389:16 390:1,14,22 391:8 394:1 395:16 397:10 398:21 400:4 401:21 402:12 407:15 409:18 410:19 412:2 413:13,18 414:5,13,21 415:11 416:1,2 417:9 418:6,16 420:14,22 422:23 423:23 424:13,24 425:8,17 426:1 426:20 428:4 428:12,20 429:6 433:1,11 434:19 436:9 437:4 438:1,11 438:17,24 439:9,16 440:2 440:11 442:7 442:24 443:16 444:13 446:7 447:16 448:2 448:11,23 449:12,23 452:1 453:2,13 454:14,21 455:6,21 456:23 457:8 457:14,23 458:11,23 459:19 460:5 460:15 461:20 462:24 463:11 463:18 464:1 466:21 468:14 469:21 471:18 473:5 476:8 478:2 480:13
**objections** 243:14 317:4 345:18 346:1 416:16 417:2 426:12 452:11 452:20 453:4 453:22 454:8 456:6,15 459:10

**obligated** 456:10
**obligation** 48:18 452:7
**obligations** 167:23 460:13 461:19
**observations** 281:23
**observed** 140:11 141:5,6
**obtain** 383:17
**obtained** 242:11 252:6 261:13 320:9 392:1 432:13 434:17
**obtaining** 30:24
**obvious** 385:10
**obviously** 67:12 77:19 108:9 307:20 358:9
**occasion** 24:1 204:5 306:18
**occasionally** 22:4 368:19
**occasions** 471:5
**occur** 40:2 81:11 81:14
**occurred** 24:24 43:6 82:16 153:3 207:21 327:19
**October** 97:21 483:19
**offense** 427:23 453:1
**offenses** 469:5
**offensive** 417:22 417:24
**offer** 415:8
**offhand** 15:10 128:12 129:11
**office** 26:8 28:6 46:16 50:7 51:7 52:8,17 67:23 70:23 106:5 119:16 128:4 150:3,4 158:24 160:2,8 162:16 164:2 164:12 169:19 175:4 188:24 189:10 205:23 230:2,4,12 231:1,7 243:8 259:9 260:7,12 315:9 322:5 414:4 415:19 416:9,21 417:6 420:13 427:6 447:14 450:7 450:12,19,24 451:19,23 452:9 455:19 456:4,12 457:13,22 458:6,10,21 460:4 467:23 472:12 473:23
**officer** 3:15 37:19 101:2 102:9,13 103:7 103:22 104:3 118:12,14,16 127:23 135:11 136:4 140:2,22 209:14,21 210:6 216:19 219:4,8 256:3 314:2,6,10,12 337:5 380:22 383:16 401:15 466:15,19
**officers** 118:20 209:24 396:11 401:1,6,10,20 402:1 461:17
**Ogrod** 72:17 73:7 74:1,2
**Ogrod's** 72:23
**oh** 38:7 105:15 123:1 196:23 230:20 330:16
**okay** 22:13 33:7 38:13 56:12 62:4 76:5,10 84:5 87:3 89:6 155:1 171:21 181:19 189:24 190:2 193:7 199:17 206:24 216:4 219:9,11 230:20 237:5 238:5 250:12 261:14 262:7 264:24 266:4 266:22 267:7 268:11 269:19 269:22 276:22 282:20 283:2 288:18 291:22 294:4 298:17 312:9 328:23 330:16 331:5 331:13 343:18 346:10 347:5 360:8 387:9 388:8,12 392:19 393:1 403:13 404:1 408:10 421:6 430:17 431:11 431:17 449:5 450:16,24 465:11,19 466:8 473:1 481:14
**old** 107:5 123:10 127:1 353:6 406:3
**older** 23:6,8 124:19
**omission** 439:13 439:23
**omitted** 209:22 303:16 442:15 443:13
**once** 17:9 18:20 22:4 38:16 39:16 40:12 61:4 87:19 177:6 181:24 183:8 231:14 254:7 265:20 266:12,24 267:2,11,14 268:9 272:11 339:19 359:20 382:12 399:8 417:4 429:17 436:1 466:6 470:17 478:5 479:19
**one-third** 92:11
**one-way** 183:23
**ones** 15:6,9 68:6 197:11 198:15 218:2 293:17 312:23 441:16
**ongoing** 153:17
**onus** 150:8
**operating** 10:20
**operator** 1:15 5:1 6:5 96:7 214:19,22 325:10 407:22 480:2 481:16
**opine** 138:13 224:18
**opinion** 52:7,13 115:18
**opportunity** 111:12
**opposite** 82:22
**opposites** 83:2
**order** 98:1 118:5 145:24 159:12 160:24 165:6 194:1 216:3 227:14 405:16 405:21
**ordered** 386:2
**organization** 53:10,13 55:9 55:17,18 60:8 60:10 63:12 110:17 116:3
**organized** 199:5
**original** 43:10 131:19 313:22 479:20 482:19
**originates** 146:15
**Oscar** 3:23 395:12 398:2 398:11
**ought** 248:22 405:10
**outcome** 135:16 370:7
**outlined** 211:10 330:13 439:13 440:19 442:23
**outset** 335:10 338:14 392:7
**outside** 91:23 268:14,21 319:1 394:10
**outstanding** 137:15
**outweighed** 442:22
**owned** 356:16
**owner** 263:6

**P**

**P** 75:22,23
**P-10** 360:7,9
**P-13** 193:3
**P-18** 399:15,23
**P-2** 75:21
**P-21** 252:17
**P-25** 309:13
**P-34** 53:19
**P-35** 3:10 53:16 54:2
**P-36** 3:11 61:9 61:11 90:16 96:3
**P-37** 3:12 90:18 96:4

**P-38** 3:13 110:20,24
**P-39** 3:14 114:2 114:4
**P-40** 3:15 135:19,21
**P-41** 3:16 199:8 199:14
**P-42** 3:17 259:11,13 260:1
**P-43** 3:18 346:22,24
**P-44** 3:19 386:20 387:2
**P-45** 3:21 395:3 395:5
**P-46** 3:22 396:1 396:3
**P-47** 3:23 398:5 398:9
**P-48** 3:24 399:2 399:4
**P-49** 4:5 400:12 400:14
**P-5** 88:13
**P-50** 4:6 405:12
**P-51** 4:7 444:18 444:20
**P-52** 4:8 473:15
**P-53** 4:9 478:10 478:12
**P-8** 360:6,13,20
**p.m** 214:20,24 215:21,24 216:1 231:12 231:19 296:1,2 325:11,13 337:8,23 407:23 408:1 480:3,5 481:17
**PA** 2:17 137:3
**PAC** 3:10 54:14 61:23 64:13
**page** 3:4,9 4:4 36:6 47:5,6 61:21 62:3,6 85:2 91:8,17 92:10 111:5,5 114:14,20 144:2 150:24 209:12 210:6 223:16,19 224:6 227:14 227:21 228:12 232:20 235:2 235:16 236:21 238:2 259:17 259:18,19,24 260:19 261:24 262:1,4 263:2 264:21 265:14 265:15,15 266:21 267:6 267:23,23 268:13 269:18 276:21 281:24 282:5,18,19 288:4 304:20 305:1,1,2 317:14 331:3,8 335:8 337:6 348:23 352:21 352:23 356:14 360:18 376:15 377:3,3 379:19 380:3 381:3 386:16 387:8 387:11 388:7 392:24 393:9 393:11 394:8 396:7 397:17 403:11,23,24 404:10,11 405:6,23 406:15,20 411:17 464:23 465:19,20,20 466:9 468:21 470:20 474:5 475:14 478:23 478:24 485:2
**pages** 12:20,22 33:4 84:24 298:16 330:24 334:18 335:1 392:23 483:12
**paid** 132:8 133:14
**paint** 245:21,22
**PALS** 105:6
**Panama** 98:4,5
**pancreatic** 21:17
**papal** 106:19
**paper** 76:2 203:8 234:4 253:20 273:13 273:15 315:3 334:21,22 338:9,19 389:5 408:12 423:3,4
**papers** 29:20,23 159:20 251:19 402:6
**paperwork** 17:23 18:2 29:19 339:21 401:14 433:4 441:23 471:23 472:5
**paragraph** 61:22 77:15 111:8 241:10 264:22 267:8 268:19 344:2 384:10 396:8
**paragraphs** 343:15 383:5 383:21
**paralegal** 6:20
**paramedic** 98:2 98:3 99:21,23
**pardon** 11:1 22:7 37:6 54:20 86:22 265:16 273:19 295:21 304:2 359:10 360:10
**Paris** 88:23,24 89:2,10 91:2
**Paris'** 94:10
**parish** 98:17,17
**Parkway** 2:10
**parole** 211:3,11 341:7
**part** 41:12,17 43:18 45:21 54:13 65:24 66:14 73:16 101:8 105:6 117:21 143:14 144:9 155:16 183:7,8 188:18 225:21 260:6 267:20 268:6 293:2 307:7 314:16 321:11 323:23 357:23 391:12 418:20 419:2 436:20 437:7 470:19 476:13
**participant** 226:21
**participate** 135:2 182:12
**participation** 49:21 111:21
**particular** 15:18 31:16 37:21 39:24 40:4 41:17 50:13 65:1 68:12 104:14 111:4 113:11 125:13 144:24 150:4 155:10 179:9 217:6 291:3 302:21 308:24 380:19 382:11 386:3 421:17
**particularly** 65:17 165:24
**partner** 103:15
**partnered** 102:18 103:8 120:8 218:1
**partners** 17:9 18:21,23,24 103:14,16 225:13
**partnership** 120:18
**pass** 122:4 179:3 455:11
**passed** 21:22 22:1 23:3,5 118:18 122:11
**passes** 179:3 217:18
**patient** 156:5
**patients** 142:12 167:10,13
**Patricia** 137:8,9
**patrol** 101:2
**patrolmen** 196:16,17,17 197:17
**Paul** 88:23 417:14,15,17
**Paulette** 90:10 246:1
**pay** 67:19 109:3 109:10
**paying** 74:20
**payroll** 127:2 136:17
**Peanut** 393:14 393:23 395:11
**Pearly** 90:10
**pediatric** 100:5
**pen** 263:2
**pending** 9:10
**Penn** 105:3 106:4
**Pennsylvania** 1:1,24 2:4,11 5:6,9 97:17 461:1 483:5,8

**pension** 133:1
**people** 18:10,12 51:9,14 64:11 74:21 79:6,9,9 89:12 119:18 119:18 132:15 145:10 153:4,6 153:10,13 157:1 166:9 173:15 174:4 174:14,15,21 174:22 177:16 179:11 190:11 223:7 246:5 268:2,7 274:19 274:19,20 275:19 276:3 288:19 289:7 290:2,10 291:17 292:12 298:20 304:23 330:10 345:6 363:22 369:8 369:21 370:3 371:2,8 372:3 372:6,8,12 373:13 384:18 384:23 386:7 393:6 397:7,22 402:9 404:6 412:12 455:10 455:11 467:22 467:24 468:3 479:17
**percent** 364:13
**Perfect** 328:8
**performance** 43:22
**performed** 384:13
**period** 22:9 42:10 43:2,3 56:14 64:4 66:2 67:3 81:16 121:12 122:3 123:14 159:6 163:10 164:21 177:2 178:4 238:23 238:24 260:17 261:1 293:3,9 294:8,9 295:11 361:6 372:9 391:24 479:2
**periodically** 18:16,17 19:9 409:5
**periodicals** 261:11
**periods** 433:21 433:24
**perjured** 70:14 462:22
**perjuring** 70:10
**perjury** 68:24 70:7 77:6,12 467:15 468:11
**permeates** 138:19
**permeating** 142:18
**perpetrator** 94:22 152:15 195:9 257:4 264:2 269:17 270:20 271:20 272:2,11,22 281:5,12 288:7 288:12 289:1 289:15 290:3 291:23 319:21 338:14 345:23 355:5 389:15 426:9
**perpetrators** 93:7 338:13
**person** 12:5,7 16:24 17:2 31:4 79:24 81:11 92:13 95:9 142:19 144:24 146:2,5 147:8 152:7 166:11,24 167:15 168:12 169:16 172:3 174:10,12 179:5 181:11 181:11,12,14 182:20,24 184:14 186:9 188:9,18 245:12 283:5 285:21 316:11 317:22 337:15 354:24 357:14 375:4 398:13 407:13 421:18 432:22 433:20 464:19 468:2
**person's** 126:13 211:7 287:23
**personal** 59:14 107:11 242:22 246:24 249:1 250:2 260:15 274:15 374:21
**personally** 10:19 129:6
**persons** 311:11
**pertinence** 313:7
**pertinent** 231:20 233:8,16,23 234:11 253:21
**Philadelphia** 1:5 1:24 2:4,9,11 2:13,17 5:9,11 5:23 6:1,23 7:1 25:7 59:17 61:17 62:17 71:14 96:24 107:9 109:10 118:15 129:24 134:3 135:11 138:9 140:2 161:6 163:24 199:15 242:10 263:4,7 285:12 319:2 330:9 351:10 359:11 410:6,9 411:22 436:5 452:6 478:17 483:5,8
**Phillips** 90:10 91:4,22 93:3 94:4 96:5 246:1
**Philly** 97:14 98:11 341:16 377:9
**Philosophy** 97:4
**phone** 2:4,12,17 2:22 12:6 17:1 18:17 21:1,18 21:20 22:18 123:4,5 168:4 168:17 229:20 243:6,22 422:2 445:21,22
**photo** 290:23 291:1,11,12,19 355:22 356:4 478:19
**photographs** 298:20
**photos** 159:14 344:11,13 385:24
**phrase** 62:10 142:2 170:16 262:18 317:20 347:13
**physical** 344:8 345:15
**picked** 90:9 154:24 339:12
**pictures** 406:10
**piece** 29:11,15 200:5 240:13 257:8 338:9 342:18 408:12
**pieced** 403:5
**pieces** 334:22
**Piecing** 238:1
**pin** 282:12
**Pine** 101:11
**pinpoint** 128:5
**pistol** 210:7
**pit** 436:21
**pitfalls** 150:1,2 170:17
**place** 8:9 19:16 25:5 59:10 66:23 122:18 163:9 184:5 191:1 193:16 204:15 218:5 219:1 227:23 228:4,13 229:16 284:10 309:10 312:8 313:7 331:11 331:15,18,23 341:21 346:5 348:24 361:4 361:14 376:21 418:3
**placed** 158:15 162:14 186:8 186:11 196:9
**Plain** 104:12,13
**plaintiff** 1:3 2:5 2:23 5:16
**plan** 411:19
**planned** 9:24 10:4 394:24
**planning** 381:23 394:22
**platoons** 118:2
**play** 48:9 352:12
**playing** 106:14
**plead** 127:6
**pleasantries** 313:8
**please** 5:13 10:24 11:1 75:20 89:4 109:20 234:7 377:3 402:18

406:15 408:8 421:1 431:10 431:16
**pled** 127:8
**plethora** 68:9 78:13
**plus** 16:1 278:18 430:11
**plywood** 200:5
**point** 11:7 27:17 34:13 43:10 54:15 64:2 67:14 92:9 113:14 120:9 153:20 155:7 155:12 162:13 163:2 164:5,6 193:2 196:21 204:11 219:3 219:13 224:3 240:4,16 247:9 263:24 276:17 285:15 287:11 298:2 319:19 320:11 324:15 324:24 333:19 343:23 346:12 364:16,24 367:22 370:10 370:16 383:14 386:5 409:16 425:21 426:7 432:21 447:24 463:14
**pointed** 28:20 453:11
**pointing** 319:20
**points** 9:3 30:4 94:21 150:10 150:11,11 151:3,3 269:13
**POL** 314:5
**polar** 82:22 83:2
**police** 3:14 6:24 37:19 53:3,13 54:14 55:19 57:15,19,24 58:5,19 59:2,8 59:17 60:19,21 62:17 64:13 76:15 96:24 97:1 98:16,21 99:3,19 100:11 100:15 102:8 102:13 103:7 103:22 104:3 104:22 106:20 110:17 111:21 112:4,8 113:11 114:10,18 118:12 125:4 127:23 130:5 133:15 134:3 135:11 136:22 138:9,19,22 139:3 140:2 159:16 163:24 171:11 177:11 191:24 196:11 199:15 210:24 256:6 285:12 288:23 314:2 314:12 319:2 321:11 329:24 337:4 342:12 344:12 345:4 351:10 359:11 380:22 381:9 383:16 396:10 402:1,4 410:9 411:22 436:6 452:6 461:17 469:17 474:22
**policies** 139:6 141:16 350:24
**policing** 326:11
**policy** 17:16 164:15 176:22 351:3 458:4
**policy-related** 141:19
**political** 54:17 56:22 60:13 65:10,14,24 112:18 114:18
**politically** 60:11
**politics** 65:16 66:6,9,17
**polygraph** 177:7 178:8,19,23 179:1 180:16 181:11,22 182:1,4,12,15 183:4,18,18,24 184:5,21 185:3 185:14,21 186:6,10,23 187:3,5,10 188:4,14,19,23 246:6 306:15 306:19 307:1,3 307:7,18,20,24 308:4,15 309:6 309:11,21 314:13,17 315:4 316:1 317:23 319:14 320:15 322:12 324:12 326:1 359:3 365:11 390:8,18 438:9 440:20 451:6 455:3,10,11,12 455:17 471:6,8
**polygraphed** 180:11 181:15 184:9 306:18 313:22
**polygrapher** 177:21 184:12 184:17 314:3
**polygraphers** 177:24
**polygraphist** 179:9 181:16 183:1,10,11 314:4 315:11 316:9,10
**polygraphist's** 183:17
**polygraphists** 177:9 179:11
**polygraphs** 176:24,24 177:3 179:19 181:9 314:15 317:20 321:10
**pope** 106:23
**Porter** 343:20 343:24
**portion** 14:22 15:2,4 61:19 61:20 91:7 111:3 202:15 266:10 330:24 336:12,22 343:15 392:14
**portions** 336:5
**position** 57:20
**positive** 115:1 254:2
**possession** 418:13
**possible** 45:18 66:3 181:13 371:2 392:14 429:19
**possibly** 421:20 421:21
**post** 26:1 75:19 88:18
**potential** 114:17 172:1,23 173:19 185:18 194:23 211:12 236:1 280:16 402:10,15
**potentially** 211:14 397:8
**pound** 298:2
**pounds** 282:24 283:16 344:14
**power** 98:7
**powerful** 47:16
**PPD** 97:20 99:13 100:18 439:15
**practice** 139:3 160:10,13 162:21 188:2 211:6 296:4 313:5 314:22 327:20 328:17 328:18 358:12 358:19 435:22 435:23 436:4,5 436:12,14 439:15,20
**practices** 141:16 219:16 351:11 416:21 457:19
**precipitated** 431:23
**precise** 279:21
**preface** 130:23
**prefaced** 141:7
**preliminarily** 421:5
**preliminary** 130:3 202:19 369:12 436:1 447:4 461:4 462:6,23 463:7 479:9
**premise** 299:23
**preparation** 27:18 309:17 402:21
**prepare** 11:13 11:22 12:15 16:11,12 27:23 156:20 161:1 340:20 383:3
**prepared** 40:23 91:3 157:17 158:23 365:7 458:19
**preparing** 32:8 156:19
**presence** 219:17
**present** 1:15 2:6

12:10 16:3 29:22 42:7 77:10 93:4 171:22 192:8 219:1 220:1 233:8 298:1 303:22 304:10 369:5 393:6 447:8 462:10
**presented** 257:16
**press** 265:2 266:13 267:15 269:4 270:14 271:9 272:9,10 273:22 274:10 275:3 296:15 309:5 323:17
**presumably** 395:14 396:21 397:19
**presume** 476:18
**presumes** 189:9
**presumptive** 10:8
**pretty** 16:15 17:13 41:7 56:21 72:19 122:1 139:5 157:3 177:9 187:6 188:1 196:8 225:19 225:24 226:1 227:10 251:21 253:12 257:24 363:19 368:14 369:15 417:17 458:14
**previous** 49:11 96:14 193:22 215:4 216:14 296:12 325:17 371:7 408:5 463:7,23 467:9 473:22
**previously** 19:4 32:18 175:21 437:4 477:9
**pride** 44:15
**priesthood** 97:9 97:23 98:24 99:12
**priests** 98:8,9
**primary** 107:12 107:21
**print** 242:14 387:11
**printout** 242:12 247:10 248:13 252:7
**prior** 19:18 23:19 29:3 55:13,15 132:22 150:14 208:11,22 212:14 213:24 340:4 367:21 369:19 423:7
**prison** 26:16 108:22 123:7 238:9 446:6 478:19
**privilege** 462:15
**probable** 32:10 32:24 33:4,10 34:2,24 37:3 40:24 429:10 432:5 434:11 435:13,24 436:8,22 437:12,18 440:9 442:16 442:17 443:14 443:20
**probably** 12:21 20:19,22 33:5 39:15 50:7,17 54:24 71:9 72:3,3 73:12 102:9 113:6,6 120:20 128:16 134:1,16 164:3 192:21 194:14 194:14 198:23 204:20 206:10 218:24,24 220:6 226:4,9 227:18 229:3 242:18 260:20 281:13 294:13 294:13 310:23 315:5 328:13 339:11,16 347:12 348:1 357:22 358:1 363:9 368:3 382:6 398:11 403:9 406:8 407:7 432:14 435:14,20 444:24 462:17 467:21 469:7
**probation** 216:19 219:4,8
**probationer** 216:20
**probe** 321:22
**problem** 130:17 222:22
**problems** 125:6
**Procedurally** 384:2
**proceedings** 26:4 329:12
**proceeds** 369:7 369:20 373:4
**process** 39:18 134:4 166:21 170:4 327:21 348:2 367:24 441:22
**processed** 101:21 441:22
**processing** 103:4
**produce** 457:21
**produced** 35:21 45:23 48:19 94:11 199:13 271:18 314:16 332:14
**producing** 36:12
**profession** 245:18
**Professional** 1:23
**prohibited** 1:18
**projectile** 200:15
**promise** 303:2
**promptly** 482:21
**prong** 159:11
**pronunciation** 228:6
**proper** 320:13
**property** 107:12 107:16,19 159:13 196:10
**prosecuted** 7:4 68:23 148:10 185:23 341:4 373:24 427:23 464:19 467:15 468:11
**prosecuting** 428:2
**prosecution** 49:9 68:17,21 68:22 69:21 72:23 85:15 145:15 170:18 324:16 374:6 374:17 376:8
**prosecution's** 31:24 170:7 171:2
**prosecutor** 48:20 76:15 145:23 148:9 149:9,13 151:1 170:20 172:9 172:14 185:23 440:7
**prosecutors** 429:1,5
**Protect** 3:14 53:3,13 54:13 55:18 64:13 110:16 111:21 112:4,8 113:11 114:9,18
**protecting** 474:20
**prove** 183:22 235:10
**provide** 42:16 149:8 157:10 157:19 165:18 169:17 172:14 212:5,24 353:18 398:18 452:8 456:11 458:5,10 459:7 459:12 460:3
**provided** 22:8 70:2 84:12 109:17 136:2 160:7,11,12 161:5 162:15 189:10 309:4 361:17 374:4 379:11,12 383:13 391:5 417:6 438:3,15 441:12 450:11 451:18,22 457:12 472:11 482:11,16
**provides** 146:9 373:21
**providing** 22:11 70:14 163:20 164:1 212:8 283:21 304:21 349:6,7 412:23 426:17 428:16 472:1
**Province** 97:12
**public** 1:14 65:10 66:16 242:10 246:21

246:23 250:1 256:3 391:6 482:17 483:4 483:18
**publication** 111:1,19,24
**publicized** 67:22 114:15 133:13
**publicizing** 116:4
**publicly** 259:3 273:7
**published** 61:16 114:9 261:17
**pull** 156:6 208:7
**pulled** 27:24 200:4 260:16 265:22 406:7 430:7
**pulling** 33:24 384:22
**punch** 140:23
**purpose** 60:7 67:6 154:4 193:20 329:16 346:8 362:22 392:9 441:17 454:13
**purposes** 167:7 302:17 347:15
**pursuant** 1:11
**pursue** 291:15
**put** 24:23 25:4 30:11 87:16 159:10,20 160:1,23 162:23 169:10 170:9,11 187:14 188:8 188:14 208:24 236:6,7,8 242:19 243:4 246:6 251:3 282:12 312:24 334:14 336:14 336:16 402:1 407:9 436:18 436:19
**putting** 185:12 315:7 419:22

**Q**

**quality** 125:7
**question** 9:10 11:2,6 20:12 20:15 27:5 30:15 33:6 38:14 49:16 51:11 52:10,20 53:5,6,8 55:23 56:5 60:3 62:12 63:15,23 64:19 66:19 68:1 70:5 71:6 72:13 74:24 75:3,5 78:9,18 82:3 83:12 85:24 92:11,20 92:21 93:9,13 93:19,24 95:19 95:21,22 109:5 110:1 113:7 115:9,22 116:7 129:17 130:13 136:16,19 137:24 138:12 140:5 142:4 145:3 147:4,12 151:24 155:20 161:9 162:2,8 165:11 167:14 168:14 173:22 189:13 198:8 199:23 203:11 204:4 210:13 227:13,15,20 227:21 231:2 234:7 235:16 238:6,17 243:21 244:15 244:21 246:9 246:11,12 250:5,7,16 253:3 257:14 265:17 266:23 267:24 270:16 270:19 271:12 274:1,4,24 276:24 277:12 280:20 281:8 282:4 285:2,11 287:10 290:19 298:22 299:2 299:12 300:13 300:18,21 301:3 302:1,5 302:8,13,18,19 302:21 303:21 304:13 305:11 305:16 310:4,7 311:17 312:3 312:10,11,14 312:18 313:6 313:16 316:24 320:12 322:8 322:17 323:19 324:7,18 327:4 328:15,16 332:12,20,24 339:14,15 345:9 352:24 354:13 356:15 358:3 361:20 363:6,16 364:3 368:6,7,21,24 369:15 370:8 376:15 378:9 378:12 381:1 381:21 383:9 389:17 390:10 390:15,23 391:9 398:13 413:19 415:22 416:8 418:7 424:18 425:9 434:20 435:13 436:10 438:18 439:1,17 440:3 440:21 443:1 444:4 447:22 449:5,6,24 453:3 454:22 458:24 460:16 464:5 468:15 471:19 472:16 473:6 474:5,9 474:11 475:14 480:18
**questioned** 311:8 424:6 468:24 469:2
**questioner** 257:14
**questioning** 9:24 303:15 471:3 481:5
**questionnaire** 61:23
**questions** 17:15 17:16 23:12 26:2,12 30:14 96:18 111:20 112:3,8 127:22 141:17 164:15 171:12,15 184:19 194:11 206:21 224:4 226:5,14 227:12 234:9 252:18,22,23 253:2 257:14 276:23 290:17 296:5 299:19 299:22 300:6 302:11 303:7,9 303:10,14,19 304:21 312:19 322:2 326:24 327:4 348:4,7 348:14,15 355:20,23 368:11 371:7 374:10 376:13 378:2 380:14 381:2,5 403:21 406:24 437:14 454:3 465:23 472:24 481:8,9 481:13 482:21
**quick** 215:12
**quickly** 192:20 194:8 325:22 392:13 464:8
**quite** 18:17 206:18
**quote** 175:18 251:19 267:2 388:10 411:11 479:4,10

**R**

**R** 483:1
**race** 60:12
**radar** 62:8
**railroaded** 474:22
**raise** 244:21,24
**raised** 188:4 193:2 244:12 355:4
**raises** 236:1
**raising** 234:9
**Ralph** 384:16 388:17,17
**ran** 267:10 268:14,21
**rang** 268:22
**rank** 102:12 103:6 104:2,4 132:17 140:2
**ranks** 101:1
**Ransome** 13:18 14:8 15:13 87:22 88:3 89:12,24 94:12 94:21 233:4,16 300:20 301:4 304:23 305:3,6 335:13,19 337:14 338:4

338:13,22 339:4,8,19 340:14 341:3,7 342:1 344:3,4 344:13,24 346:5 347:8,14 349:13 350:7 353:9,19 354:20 356:2 356:14 357:5 358:9 359:9,21 361:5 362:6 365:5,8 371:5 371:18 438:15 440:20 453:11
**Ransome's** 90:6 94:24 340:12 342:20 343:3 344:8 351:22 352:22 357:18 451:2
**rapport** 366:2
**ratio** 181:1
**Raven** 210:7
**Ray** 475:3
**Raymond** 371:4 384:15
**re-ask** 20:8 110:1
**re-interview** 322:14,22 326:2 404:16
**re-interviewed** 311:6 317:7,15
**re-prosecute** 70:23
**re-treading** 455:15
**reach** 17:6 216:12
**reached** 67:15 216:19 316:1,6
**reaches** 217:15
**reaching** 112:19
**react** 442:6
**reaction** 50:9,13 51:4 71:22 74:3 410:18 419:22,24 420:1 442:10
**read** 11:15 12:24 14:23 15:15,16 33:3 47:8 61:18,21 62:2 76:8 80:14 84:2 85:1 88:7 89:4 91:5,7,11 91:15,17,18 92:17,18 111:2 111:8,12 193:4 195:8 203:18 206:19,21 207:1 224:2,4 233:2 236:24 237:14 238:19 241:14 246:14 257:16 264:12 268:18 273:15 273:15 274:23 288:1,3 299:20 299:21 317:13 331:3 340:2,7 343:13,16 347:4 348:15 363:24 383:11 392:17 394:9 396:24 410:15 411:13 430:15 437:16 445:6 455:23 465:9 465:20 468:21 470:17 474:16 474:18 476:1,2 478:23 482:1,2 484:1
**reading** 12:17 26:21 84:6 88:14 91:13,14 191:8 230:14 268:14 324:9 380:6 388:5 449:2 466:12 470:21,24
**reads** 61:23 62:6 92:11 188:18 263:6 264:23 300:14
**real** 107:19 215:12 325:22
**realize** 86:12 96:13 145:8 168:13 215:3 325:16 408:4
**realized** 346:18
**really** 11:24 17:20 19:7 26:20,23 34:6 40:22 41:20 50:12 52:6 57:2,4 60:5,9 60:14 63:6 65:6 66:21 67:18,18 68:9 70:1 81:5 113:2 122:6,19 123:10 166:14 166:22 207:7 227:3 261:8 298:12 300:7 308:6 312:23 363:6,7 369:6 380:8,17 420:1 436:20 441:21 458:7 478:21
**reason** 9:23 10:3 11:10 37:21 80:16 84:17 146:5 152:4,18 174:3 186:16 216:5 221:9,20 236:5 250:17 290:9 302:9 304:9 305:5,17 316:17 326:10 326:11 350:2 351:17,20 361:10 384:2 385:18 435:1 454:19 456:20 474:19 482:4,8 485:2
**reasonable** 41:19 139:21
**reasons** 50:23 78:16 79:7 81:6,22 145:15 151:8 182:2,6 245:7 257:1 317:1
**rebut** 144:13
**recall** 8:8 13:19 14:4 15:22 16:9 22:10 24:15,24 26:5 26:19,21 30:24 31:3,9 35:5,5 42:8 45:7 54:8 54:19 59:11,12 64:10,14 65:8 67:14,20 68:6 68:12 76:17 77:13 83:23 87:7 88:1 89:22 111:23 112:3,19 113:16 118:5 129:9,18 130:8 130:10 131:13 134:14,16,18 134:20 135:8 137:1,18 160:10 161:21 163:1,2 184:4 198:23 203:2 205:11,21 206:8 211:4 216:23 217:13 218:14 228:19 229:12 231:16 231:18 234:8 234:16 254:19 264:1,4,5 280:15,20 281:4,10 286:21 287:16 296:21 297:1 298:13 302:9 306:21 314:24 317:19 320:19 321:8 327:12 327:14,15 332:5,8,16 335:6,22,23,24 336:10 338:21 338:24 339:7 344:7,16 349:23 355:19 357:3,6 362:19 364:15 369:12 369:24 370:23 380:8 388:15 390:2 419:6,9 419:19 432:4,8 434:11 435:4,8 442:9,11 447:7 461:16 462:7 462:13 463:2 464:9,16 467:1 467:7 468:17
**recalled** 414:1
**recalling** 127:13
**recant** 78:14 79:6 81:20 153:10,13 467:24 468:1,3 479:10,18
**recantation** 477:21
**recantations** 481:2
**recanted** 85:15 95:4
**recants** 470:9
**receipt** 196:10
**receipts** 159:13
**receive** 132:21 143:5 148:7 167:20 168:20 173:11 482:22
**received** 24:15

24:17 25:16
58:6 168:16
337:13,19
412:15
**receiving** 64:10
134:11,18
411:16 414:1
424:9
**recess** 215:3
**recognize** 291:2
292:12 405:6
445:12 478:20
**recognized**
290:24
**recollection** 18:3
19:10 31:7
55:8 56:13
76:24 84:7
86:16 87:4,18
89:23 131:9
184:8 193:21
199:2 207:2
208:15 225:18
239:22 242:5
270:24 302:6
329:17 333:20
407:12 430:18
462:19
**record** 5:2,3,14
6:15 9:15
53:17 71:20
92:18 96:6,8
96:10,12
104:18 106:15
137:13 156:14
179:11 201:20
208:4,11
214:20,23
215:2 229:19
246:17 247:2
250:20,22
251:15 253:10
254:8 269:8
271:23 272:5
279:3,20,22
281:9 303:14
318:21 325:9
325:11,13,15
357:11,24
382:3 384:12
384:13 406:4
406:17,22
407:21,23
408:3 413:14
430:5 445:13
455:24 465:23
480:1,3,5
481:17
**recorded** 187:24
187:24 254:8
274:9 296:15
376:22 377:1
**records** 156:1
159:18 207:19
212:14 242:11
261:10 340:13
361:3 384:22
406:9
**recover** 270:4
**recruiting** 106:5
**recruits** 177:11
**redacted** 136:18
**reduced** 483:10
**redundant**
169:11
**Reed** 341:19
**refer** 32:21
330:22 360:21
400:19 421:17
464:23 470:18
**reference** 92:9
111:5 132:7
133:9 136:21
199:21 200:17
231:12 233:11
307:18 311:12
322:13 377:4
380:5 383:14
386:15 388:9
393:2 394:16
399:10 430:10
430:24 432:6
446:5,12
447:22 471:10
**referenced**
329:5 331:7,15
332:18 400:2
401:9 434:12
**references** 34:23
111:14 112:17
136:7 331:8
**referencing**
392:15 405:20
451:10
**referral** 160:23
**referred** 284:14
355:1 365:21
**referring** 12:18
29:3 32:19
55:18 72:7
86:20 112:3,6
229:8 236:10
288:12 369:1
377:16 466:1
469:17 479:1
**refers** 48:11 96:4
305:13
**reflected** 187:8
384:4
**refresh** 31:7
56:13 84:6
87:4,17 89:23
207:2 329:17
430:18
**refreshes** 86:15
90:3 199:2
**refuses** 175:23
**regard** 43:22
306:5
**regarding** 15:22
43:23 161:21
162:4 167:23
219:17 221:12
235:4 243:1
252:18 275:11
315:16 334:19
360:14 418:23
421:3 451:5
**regardless**
327:16,18
**regards** 112:12
203:4 204:6
445:11 446:14
**register** 268:5,9
269:2,5 272:17
**Registered** 1:23
**registration** 56:1
56:3
**regrets** 480:19
481:2
**Reilly** 314:2,9
314:10 315:2
315:14 316:14
317:7
**Reilly's** 314:7
317:2
**reinvestigation**
26:6
**reiterate** 33:23
43:19 116:19
231:17 439:20
**relate** 175:21
**related** 151:6
164:15
**relates** 383:23
**relation** 135:10
**relationship**
42:24 203:12
232:6 245:19
310:18 330:18
409:4
**relationships**
124:16
**relative** 209:2
**relay** 210:14
**release** 26:16
478:18
**released** 257:22
347:13,17
**relevance** 297:5
398:12 446:17
453:9
**relevant** 91:7
145:1 253:23
297:13 343:15
353:18 359:5,6
359:7,8 360:15
374:5,16
375:13,23
376:7 398:18
414:18,22
452:16 453:18
454:5,12
470:19
**reliability** 169:7
216:24 256:16
340:21
**reliable** 157:7
224:15 258:21
**relied** 351:9
**rely** 125:3
151:21 152:17
**relying** 153:20
**remainder**
295:19
**remained** 50:24
**remains** 21:3
312:18 480:11
**remember** 8:10
14:2 17:15,20
17:21 18:10
19:22,24 22:21
24:18,20 27:4
30:8 31:15
35:8 42:11
50:6,8,8 57:8
58:8 60:18
66:5,7,7,15
69:17 72:24
76:21,22 86:13
87:9,9,12,15
88:9 89:21
90:5,6 112:6,9
112:11,13
113:5,10,21,24
115:14 116:22
118:17 119:4
120:4,24 124:5
126:16,17,19
126:21,22

127:8,12,17,21 127:24 128:10 128:11,18 129:10,11,20 130:11,12,18 130:24 131:1,6 131:11,17 133:13 134:9 134:10,11 135:6 136:13 137:11 161:24 162:1 184:1,2 184:3 194:16 196:14 198:16 198:20,21 202:8 203:21 204:1,18 205:2 205:7,9 211:4 216:21 219:5 228:24 231:10 240:3 242:16 254:14 270:2,9 275:12,17 276:14 277:15 281:14 294:19 306:21,23 309:2 311:2 312:13 314:19 314:22 325:4 329:15,18 330:2,5 332:23 335:15,18 342:4,7 355:23 357:6,23,24 366:10,24 367:3 373:8 380:18,20,21 382:6,7,9 401:8 404:9 407:1 408:18 410:24 411:1,4 417:15 419:11 430:21 441:19 450:8 460:10 460:12 465:22 477:10,18
**remembered** 22:20
**remind** 18:6
**reminding** 204:20
**Rendine** 88:19 89:2
**Rendine's** 245:24
**rent** 107:11
**repeated** 399:13
**repeatedly** 479:10
**repeating** 237:4 249:17 278:20 346:15 454:2
**rephrase** 55:22
**report** 188:7 201:11 206:17 208:22 210:18 224:9 260:22 338:1 360:10 383:6 387:11 387:12 441:1 441:15
**reported** 26:15 217:2 254:15 259:1,3 260:18 262:20 265:1 266:13 267:15 269:3 270:13 273:6,21 275:3 304:15 309:4 312:19 315:13 323:16 342:20 437:23 439:6 471:14
**reporter** 1:13 6:6 10:24 53:22 113:19 190:1 481:18 483:4
**reporters** 1:23 255:23
**reporting** 262:8 264:16 265:20 268:4 287:4
**reports** 157:11 262:2 440:20 478:18
**represent** 6:20 25:23 47:2 49:23 61:15 91:1 93:16 136:1 199:24 207:19 240:5 261:9,15 288:15 298:14 312:7 329:8,22 342:9 346:4 361:1 387:2 398:1 402:19 403:4 409:22 413:5 421:13 427:4 429:18 430:6 447:3 464:18 473:21
**representation** 244:16 250:20 251:16 252:11 260:11 269:8 279:20 331:10 361:8 449:13 474:2
**representations** 85:2 88:16 450:10 452:1
**represented** 7:14 429:24 448:4,15
**representing** 2:5 2:13,18,23 63:11 413:9,17 452:3
**represents** 149:18
**reprimand** 134:23
**reproduction** 1:17
**request** 137:14
**require** 482:21
**required** 135:4
**reserve** 137:16
**resided** 106:24
**residence** 107:12 107:21
**respect** 126:13
**responders** 100:6
**response** 95:14 214:2 246:10 303:24 352:12 363:7
**responses** 204:22 306:12 351:5,6
**responsibile** 163:20
**responsibilities** 102:15,17,23 104:9 105:17 106:5
**responsibility** 153:21
**responsible** 36:12 164:1 248:7,9 319:4 429:3
**rest** 170:11 288:9 313:2 363:18
**restate** 70:5 125:19 320:12 454:4
**result** 45:23 51:17 316:1
**results** 183:13 184:16 185:21 186:10 314:19 317:6,23 319:13
**retained** 5:3
**retaliation** 79:8
**retire** 58:11 104:15 132:15 133:4
**retired** 58:14,17 102:1 104:22 120:2,6 124:19 219:3,10,12 241:15 314:6
**retirees** 62:18
**retirement** 100:11,20 104:7,8 106:16 133:22
**retrial** 69:23
**return** 411:8 412:22 482:19
**returned** 317:17
**reveal** 231:20 235:13,17 237:3
**reverse** 201:6 216:2
**reverting** 38:4
**review** 9:20 32:9 95:13 207:10 254:11 270:23 295:18 305:21 325:20 421:24 423:6
**reviewed** 14:15 16:8 18:2 27:6 91:6 95:3,8,12 238:12 243:5 250:14 274:9 309:14,17 323:15 339:4 362:2 383:3 396:19 404:13 421:7 431:12 432:4 434:12 456:20 470:8 471:13 477:9 477:10,12 480:7
**reviewing** 424:1 437:14
**revisit** 137:16
**revolution** 98:5
**revolver** 197:3
**revolvers** 197:2

**Richard** 146:24 148:20,22
**rifle** 376:17 381:5,7,11,23
**right** 12:22 14:5 18:22 25:1,7 25:22 29:9 30:17,20 32:22 39:6 42:5 44:7 45:24 48:20 50:2,22 51:21 57:4 58:15,23 59:11,15 66:1 67:12 74:11 75:7 76:1 79:20,24 83:1 89:10 99:9,21 100:18 102:3 103:11 108:9 108:19,23 110:13 113:22 118:3 119:20 120:10 121:8 121:17,18 123:22 124:14 127:8 130:6,6 131:22 133:7 133:22 137:16 139:4,8,11,16 139:23 140:20 140:21 141:23 142:22 143:8 143:14,17,20 143:22 144:21 145:1,12,16,24 146:3,11 147:17 148:1 149:14,19 150:17 151:4 151:11 152:9 152:19 153:7 153:22 154:13 154:14,17,21 155:5,6,9,10 156:2,6,9,16 157:2,8,12 158:7,16 159:7 161:3,7 164:23 165:1,3 168:17 168:18 170:7 170:18 171:3,5 171:13,16,20 172:1,3,9,15 172:24 173:8,9 173:12,13,16 173:17 174:19 175:10,14 176:7 177:21 181:4,16 182:5 182:12 185:16 185:20 186:13 187:5,9 189:19 190:21 191:2,3 191:6,15 192:14,15,18 193:6,10,18 194:4,21,22,24 196:22 199:19 201:7,17,18 202:6 204:8,12 205:16 206:1 207:12 208:8 208:12 209:6,9 210:11 211:3,7 211:20 212:2 212:18 213:1,4 213:9 215:21 215:23 216:8 216:17 217:15 217:16,17 218:6,9 219:4 219:7,14 220:22 221:21 222:5,10,14,18 223:15 224:6,9 224:10,13,14 229:9,10 230:4 231:8,12 233:13,17 235:10,11,22 235:23 236:3 239:3,11 240:11,12,17 242:20 243:1 243:23 248:4 249:15 251:12 252:9 254:5,21 257:5,24 258:6 259:23 262:14 262:16 264:11 266:6,10 267:3 269:1,20 276:12 277:8 277:19,20 278:10,13,18 281:21 282:24 284:4,15,24 286:13,16 287:5 288:14 289:16 290:12 290:19 291:11 291:21 292:13 293:20,21,24 294:1,6,7 296:6,7 297:9 297:23 300:4,8 301:5,6,16,20 301:22,24 303:16 304:11 304:16,17,18 304:19 305:5,7 305:19 306:21 306:23 308:7 308:10 314:20 317:12,18 318:1,4,7 320:2 321:12 321:19 324:1 324:16,24 325:3 326:24 330:21,23 336:6 337:7,17 341:13 343:1 345:16 346:12 348:6 352:15 356:16,18 358:6,7,11 360:5,17 361:14 364:7 364:17 365:3,6 365:16,23 366:3,18,23 367:19 369:20 369:23 371:18 371:21 372:1 373:6,14 374:18 375:6 375:14 377:16 377:19,21 380:15 381:10 385:4,7,13,17 386:1 390:8,13 390:18 397:9 400:22 401:15 404:9,14 408:13 409:11 409:12,14 410:11 414:4 414:19 415:10 417:18 420:20 432:24 433:20 440:23 441:3 441:13,17 446:2 455:4,19 456:4,22 461:1 469:10,12,14 474:24 477:22 477:22,22 478:3 482:2
**rights** 12:18 22:15 71:14 462:21
**ring** 113:21 161:20
**rip** 223:18
**rise** 208:23 210:10
**risk** 212:16 346:15
**road** 81:8 177:14 256:17
**rob** 262:4 264:12
**robbed** 126:24 127:2
**robber** 270:4
**robberies** 101:15 102:21 233:7,22 377:12
**robbery** 7:6 118:24,24 206:11 243:1 261:23 262:9 262:14,21 263:11,15,21 263:22 265:13 270:3,13 271:10
**Robert** 60:17 337:15
**Robins** 24:8,13
**Rocca** 5:11
**Rock** 403:14,24 451:10
**Rocks** 13:5,10 15:17 16:2,13 16:17 17:24 18:6 19:3,8,18 20:5,9 29:17 73:13,18 74:3 103:18 120:9 120:15,16 141:18 158:11 162:12 183:21 187:20 293:3,5 294:3,5,6,11 364:5,8,16 365:21 366:5 368:8,16 370:1 383:16 396:19 402:24 403:5 403:14,22 404:11 421:4 421:14,22 422:1,12 424:6 424:8 425:4 427:21 441:16 448:8,17 449:8
**Rocks'** 405:20

451:10
**Rodney** 15:13 29:12 31:23 33:11 34:15,18 36:13 41:10 45:24 81:24 84:14 85:11 191:14,19 202:2 203:16 239:23 240:6,8 240:10 242:23 250:15,15 305:19 311:4 315:15 336:3 368:24 380:2 388:11,14,21 388:22 389:13 407:14 425:6 427:2 445:7 449:10 452:17 452:23
**Rogers** 119:1
**role** 31:19 35:2
**Roman** 97:13
**Ronald** 161:19 161:22 396:22
**roof** 209:22 210:2,23
**room** 24:21 167:13 177:7 183:16,17,18 187:21,23 253:15 307:10 313:7 327:3 368:19
**rooms** 119:17
**Roosevelt** 18:14
**Rosen** 24:7,10 24:10 411:10 431:19 453:6
**rotate** 123:20
**rotated** 123:15 123:21
**roughly** 121:13
**round** 177:8
**routine** 225:14
**Rowe** 146:24 148:20,22
**Roy** 118:24
**RUDOVSKY** 2:2
**rule** 47:23 48:1 48:8,11 174:4 350:6 461:13
**rules** 10:7 139:3 139:11 159:3 165:23 166:20 219:16 482:21
**run** 342:15
**running** 156:14 209:18,20 342:19 343:1
**Ryan** 105:1 106:10

**S**

**S** 3:7 4:2
**S-H-A-U-R-N** 131:5
**safety** 474:21
**salary** 112:14 133:24
**sales** 233:7,22
**sand** 298:2
**Santiago** 68:17 158:11 162:12
**sat** 224:11
**Saturday** 105:23
**save** 190:22 342:9 379:24 381:19 396:24 402:23 437:10
**saved** 132:18 133:2 312:14
**saw** 17:22 20:16 21:6 63:18 65:11,12 71:10 115:6 136:6 140:22 141:11 175:2 197:6,20 209:21 247:9 247:10 255:24 294:20 309:19 336:8,10 340:5 342:14 346:18 348:10 388:3 401:9 402:22 407:1 408:15 408:16 410:18 410:22,24 412:16,19 419:10,18,24 420:2 431:14 472:18
**saying** 56:16 57:6,7 63:12 65:9 66:4 67:15 77:2 78:2,19 79:4,5 80:17 130:17 130:24 137:20 170:24 172:2 179:5 180:19 201:13 223:20 225:1 233:14 234:10 239:2 247:13 261:4 279:16 295:9 304:11 305:6 306:7 320:17 327:14 347:24 353:9 362:5 363:9 381:11 412:14,16 465:16
**says** 40:5 47:9 55:13 56:8 76:14 77:14 82:7,22,24 89:14,18 93:20 102:8 109:2 114:20 117:4 137:2 146:22 146:24 147:7 148:20 199:19 217:20 224:7 228:4 230:1,16 231:13,19 235:2 236:10 241:11 243:3 260:1 262:17 263:21,21 266:2,7,9,12 269:20 278:11 282:6 288:6,16 301:18,19 304:16,18 305:9 306:2 317:10 335:11 363:16 369:6 381:6 383:15 397:17,18 408:24 411:10 411:15 419:10 422:5,19 465:22 466:10 466:10,17 468:22 469:10 469:16 470:9 473:3 474:17
**scarf** 265:22 266:9 272:3
**scenario** 246:1 439:21
**scene** 33:21 93:5 159:14,15 173:10 174:5 193:9 196:3,9 200:4 256:4 281:5 325:6 393:7 401:20
**scenes** 283:14
**Scheck** 2:20 5:20
**school** 54:13 59:22 98:2,3 104:24 105:1 106:11
**Scott** 91:4,22 93:3 94:5 96:5
**search** 169:6 292:19 293:10 297:2,5,15,22 297:24 298:4,9 325:2
**Sears** 8:9
**season** 105:18 106:5
**second** 13:5 24:7 25:19,20,22 47:9,12 61:21 70:14,17,24 76:19 77:4 83:8 91:8,17 92:10 121:23 147:1 149:17 161:15 209:12 209:17 222:4,7 223:19 232:20 237:2 238:6,7 255:20 261:24 264:21 281:24 282:4 300:18 324:3 337:6,14 352:23 356:15 384:10 387:8 396:7,8 398:12 449:3
**section** 89:4 159:13,14,15 159:16,17,18
**Security** 476:15
**Sedgley** 126:23 127:1
**Sedrick** 136:23
**see** 10:16 17:3 19:8 32:12 43:5 47:6,9,10 47:14 61:23 65:19 77:14,17 77:18 86:15 89:10 92:13,15 111:6 128:5 136:18 140:1 141:7 156:8 161:16 169:4,6 176:6,11 184:15 190:13 193:6,16 197:13,16

199:2,21
200:17 203:10
203:13 209:16
209:18 210:3,6
210:8 217:23
221:8 222:22
223:20 226:7
227:15 228:14
231:22 232:22
233:1 235:5
241:12 242:4
242:13 247:5
247:11 248:13
248:24 251:22
259:3,22 260:4
260:17,23
262:1,6,17,20
263:4,9,11
264:13,18
265:17,22
266:6,7 268:12
268:14,20,23
274:5 277:4
281:18 282:9
282:21 283:1
287:21 288:11
292:7 293:1
308:5 329:18
331:14 335:5
337:12 338:7
340:10 343:19
344:3,11,12
352:24 354:14
360:18 361:3
362:23 363:10
376:17 377:4
378:2 380:5,6
387:12 393:2
395:10,13
396:13 398:2
398:13,15
404:3,17 412:7
430:5,23 431:1
432:18 442:1
447:15 464:9
466:9 468:22
469:18 470:21
471:10 474:3,5
474:8 478:19
479:13
**seeing** 15:22
66:5 76:11
88:1 89:8
115:14 204:1
270:9 281:10
287:16 332:4
335:6,15,23,24
342:4 344:7
408:19 411:2,4
419:11,19
471:1,11
**seek** 287:12
297:2 386:6
434:6
**seeking** 108:21
146:2 431:19
**seen** 13:23 20:18
20:21,24 23:22
27:21 36:6
47:20 54:6,7
76:6 85:6
89:19 90:22
95:20 114:10
114:15 115:5
136:4 173:15
176:23 291:20
298:15 302:6
343:10,23
359:17 387:1
389:3 391:10
407:17 408:14
431:4 444:24
470:14
**self** 357:1 369:15
**Semantics**
347:19
**semiautomatic**
210:7
**seminary** 97:12
97:18 99:5
106:24
**send** 182:20
**sending** 98:9
**senior** 328:9
**sense** 244:17
339:16 380:24
**sent** 89:2 98:2
98:10 114:17
115:13 116:20
184:8 196:4,9
196:10 319:1
409:1 417:5
**sentence** 209:17
231:19 242:6
263:6 264:15
313:21 317:13
383:15
**sentences**
240:13
**separate** 202:5
221:14 338:12
409:11
**September**
21:11
**sergeant** 123:11
124:7,8 137:9
366:15 367:1
367:13,20
**sergeants** 154:7
**series** 259:7
260:22 300:6
**seriously** 143:13
**serve** 297:22,23
**served** 211:19
**service** 99:7
132:22,23
197:2
**serving** 156:11
**set** 44:11 119:17
133:2 166:8,14
221:13 225:14
252:18 327:4
364:2 381:1
400:11 416:15
426:11 448:6
452:10,19
453:3,21 454:7
456:5,14 459:9
470:7
**settle** 71:18
**settled** 71:14
**settlement** 71:14
71:23 72:18,20
73:6,9,22 74:4
**settlements**
72:10
**setup** 9:3
**seven** 10:8 20:19
**severity** 140:17
167:11
**share** 185:22
**shared** 413:9,17
414:3 416:8
420:12
**Sharon** 353:4
354:1,7
**Shaurn** 131:4,5
132:1
**sheet** 3:18 15:16
156:19,20
157:18 176:1
186:9,12,13
187:18 189:6,8
189:9 203:7
307:13,15
309:14,16,23
310:15 311:2
313:2 315:14
317:10 318:22
318:24 322:21
334:22 340:2,4
340:7,18,21
343:9 347:6,11
358:20,22,24
360:14 373:10
382:23 383:6
383:11,13,23
384:4,8 386:8
387:22,23
388:6 389:13
395:22 401:8
407:6 421:3,11
422:1 423:1,20
424:7 426:5,17
426:22 430:7
451:5,9 482:5
482:7,9,13,19
485:1
**sheets** 13:6 15:5
15:21,22 16:7
27:7 154:3,4
155:13,16
156:11 157:12
158:2,15 160:6
160:6,11,14,16
160:22 161:4
162:5,9,13,19
162:24 163:21
164:2,12
175:22 189:18
310:11 365:8
383:2 459:6
**Shelley** 24:7
**shifts** 123:13,19
**shiny** 209:21
**Sholl** 129:22
**shoot** 198:18
**shooter** 36:14
287:17 335:19
337:14 342:5
342:14,19
344:17 398:19
422:16 448:9
453:12 456:22
**shooters** 93:6
**shooting** 34:19
35:11 89:13,16
91:24 122:18
146:23 147:1
148:21 174:16
200:1 207:21
264:2 267:22
269:23 270:9
272:23 281:23
284:10 297:8
303:23 341:20
342:13 348:20
348:24 353:1
355:1 356:5,23
395:24 398:14

402:11 423:9 447:14
**shootings** 29:6 233:7 373:7 375:22
**short** 43:2,3 67:3 96:13 98:4,13 99:18 100:23 116:17 117:19 198:9 215:3 283:18 314:24 405:10 408:4
**shorthand** 483:10
**shortly** 77:4 120:21
**shot** 28:8 30:16 39:7 43:11 82:1 95:9 118:16,20 200:6,13 263:3 264:17,23 267:11,14 268:1,22 269:5 271:20 272:11 335:12 337:5 394:12
**shotgun** 208:24
**shots** 198:22 266:24
**show** 32:13 56:10 75:17 88:8 90:15 110:17 111:4 114:1 135:18 146:5 170:1 182:7 193:5 199:1 200:2 202:9,9,15 206:13 207:20 209:11 263:1 281:7 290:22 291:1,10 298:20 303:3 303:15,18 339:24 344:14 346:8,20 394:21 405:9 444:18 464:8 478:9
**showed** 95:6 129:9 132:6 153:3 251:12 315:20 323:21 355:21 356:4 453:16 454:9 454:18 456:20 471:14
**showing** 36:7 94:11 190:23 202:22 265:7 329:16 332:11 337:21 386:24 472:11
**shown** 250:13 271:14 274:2 291:18 344:22 345:11 361:21 400:7 443:11 471:20 473:7 476:10 480:8
**shows** 85:3 150:21 257:18 375:11 431:18 441:15 456:19
**shy** 71:15 361:6
**SIC** 408:24
**sick** 21:16 120:7 167:3 364:14
**sickness** 166:1
**side** 38:12 212:17 334:15
**sided** 209:13
**sign** 482:8,10,15 482:16
**signature** 482:18 484:13
**signed** 473:24
**significant** 211:14,18 284:3 425:22
**signing** 482:12
**signs** 188:19
**silence** 137:22 138:8,9
**silent** 226:18
**similar** 269:3 378:6 379:11 404:12
**similarities** 259:4
**simply** 81:20 212:12
**single** 85:1 107:14 140:9 173:19 200:10 291:1,12,19 407:13
**sir** 6:14 7:12,13 7:21,24 8:1,4 8:12,20 9:1,12 9:13 10:15 11:3,9 12:16 15:24 16:4 19:7 22:19 24:12,14,23 26:10,11,14 27:9 28:8,15 33:8 37:23 38:14 43:10 44:13 47:1,11 49:23 51:5 53:13 54:6 56:11 59:19 61:24 63:10 68:10 74:19 76:3,12,13 82:21 83:22 84:11,21 85:19 87:21 88:14 89:8 90:14,22 90:24 93:15,19 95:19 96:1,16 105:19 107:5 108:2,17 110:3 110:18 111:24 114:11,24 132:6 134:2 136:1 137:18 138:24 141:15 164:16 167:19 171:10 176:22 193:3 195:14 207:1 210:3 215:6 237:16 242:4 246:9 250:11 251:24 255:21 257:20 258:24 259:7 264:7 265:10 268:13 285:14 287:24 291:14 292:10 302:8 303:2 307:17 309:14 310:8 312:6 315:10 325:19 332:10 334:17 339:14 341:16 342:10 346:22 348:22 361:1 372:10 380:7 381:18 382:12 383:12 386:24 387:3 389:11 392:3 392:13 395:9 395:21 396:17 399:8 400:19 405:17 408:7 408:14 410:1 412:14 413:5 415:21 421:3 427:15 429:17 430:18 440:18 441:18 442:13 443:22 444:24 445:4 448:7 450:9 457:19 462:2 464:10 470:15,16 472:10,15,22 473:21 474:2 476:2 479:13 481:5,12
**sister** 209:5 240:6
**sister-in-law** 349:3
**sit** 433:19
**site** 200:3
**sits** 218:8
**sitting** 36:11 43:12 45:7 64:24 81:23 85:19 127:16 127:18 205:2 226:18 264:1 403:7 468:9
**situation** 141:5 148:16 171:8 172:17 212:5 213:7 214:9 336:21 441:10
**situations** 213:16
**SIU** 37:17 38:21 39:11,16,21,23 40:4,14 117:17 118:8 120:1,11 120:13 122:5 122:11 123:1 123:11,18,19 124:6,6,9,10 124:11 154:24 193:1 333:1,4 333:7,10,22 367:1,7 380:12 380:21
**six** 81:13 99:18 103:23 119:7 120:1,5 174:23 197:11,16 198:13 272:22 277:24 283:16 296:8 371:2 376:6 383:5,20
**six-page** 258:6
**size** 282:22
**skeptical** 212:7

**skin** 282:9,24
**Skinner** 396:22
**skinny** 282:9 283:4 344:17
**skip** 304:20
**slightly** 470:19
**slips** 334:21
**slow** 291:15
**small** 56:10 264:22
**smaller** 159:9 196:18 197:10 334:21
**Smalls** 399:11 399:20
**Smith** 146:22 147:2 148:17 148:19 149:19 152:14
**Snyder** 119:1
**soccer** 105:2,3,4 106:14
**social** 108:15 476:14
**SOLICITOR** 2:10
**solved** 159:5
**somebody** 39:22 58:4 66:23 117:10,10 123:6 133:16 170:10,11 180:11 182:14 183:8 191:23 232:14 286:24 293:6 301:11 350:13
**somebody's** 80:14 297:24
**someone's** 144:13
**somewhat** 8:14 80:13,14 134:5
**son** 21:23 58:22 59:15,17 108:4 108:6,8 236:15 237:10 239:17 239:21,23
**son's** 54:12,24 61:4 240:11
**soon** 105:6 204:21 410:24
**Soros** 111:16
**Soros'** 112:18
**sorry** 33:23 38:2 38:7 126:23 130:16 161:20 171:4 201:2 236:22 270:21 335:21 367:6 377:20 449:5 455:9 464:12 466:5
**sound** 12:22 66:22 136:23 137:10 158:16 158:20 161:7 191:6,15 202:6 203:23 219:4
**sounds** 18:1 43:12 58:13 74:10 78:2,19 85:19 129:2 140:19 141:17 142:20 170:24 180:20 186:24 198:5 201:9,12 216:6 238:12 240:24 247:20 248:21 252:11 269:3 277:22 359:17 361:13 362:22 365:22 381:10 443:23 445:13 446:16
**source** 246:23 249:2
**sources** 246:21 250:2
**South** 1:23 2:3 25:6 118:15 263:4,7 330:9 341:13,16 377:9
**Southwest** 101:12
**space** 179:24 482:11,16
**Spanish** 37:20 38:1,4 101:19 103:5
**sparingly** 180:21
**speak** 7:19 11:22 16:10,17 24:2 37:23 38:5 54:21 55:6 94:4 149:1 175:13,16,18 176:15 204:5 328:5 350:22 359:21 371:9 436:11 459:1
**speaking** 23:11 31:10,15 38:1 103:5 214:8 251:1 291:14 294:24 329:15 352:9
**speaks** 94:2 349:19 358:11
**special** 165:23 166:7,20
**specific** 29:15 50:6 59:12 61:19,20 76:24 90:9 118:22,23 178:1 200:22 205:11 216:21 216:23 228:16 229:12 231:11 233:24 240:3 258:9 314:21 333:20 348:13 357:23 382:14 458:4 467:7
**specifically** 33:21 57:1 68:15 73:1 76:22 122:14 136:13 142:13 153:16 177:1 179:23 190:19 198:20,24 211:4 218:16 225:9 239:16 243:15 260:9 289:7 295:10 311:1 336:10 336:17 346:7 368:5 380:4 450:17 453:10
**specifics** 18:11 19:24 68:8 134:17 306:22 327:16,18 351:1 376:14
**spelled** 131:5
**spend** 105:20 106:1 316:11
**spending** 104:21
**spent** 106:23 108:22
**spoke** 11:16 16:12 20:6 23:13,19 35:3 35:15 37:17,20 42:14 56:14 60:23 61:2 68:13 77:3 101:19 106:20 130:14 204:10 204:22 228:21 283:20 291:24 316:8 331:24 352:12 359:12 359:14 360:1 388:14 422:1
**spoken** 11:18 19:4,17 22:2 24:10 31:8,12 53:1 54:23 68:20 89:11 218:17 245:2 372:7 388:11 432:22
**spouse** 107:17
**squad** 39:9,10 40:1,7,15 102:17 103:19 103:20,21 117:17,18,19 117:21,21,24 118:11,11 119:19,21,24 120:3,12,12 121:4 122:5,13 123:16 124:2,3 124:4,9 192:23 192:23 366:22 367:21
**squads** 117:16 117:22 118:1,6 119:15 154:13
**Square** 2:16
**Squirt** 233:6 305:12,13 377:4 379:7 464:21
**St** 99:16 228:9
**stage** 88:18 364:2 392:6 396:21
**stages** 344:24 395:15,22
**stamp** 202:23
**stamps** 259:23
**stand** 128:19,22 417:20 418:2 463:6
**standing** 393:3 394:10
**stands** 161:17 314:5
**start** 20:15 55:14 88:14 151:9 163:22 171:6 271:5 299:1
**started** 21:9 96:23 97:1

98:15 99:9 100:17 215:21 215:23 245:21 287:12
**starting** 99:12 227:14
**starts** 232:21
**state** 48:10 105:3 106:4 135:4 307:11 460:19 461:1
**stated** 17:13 43:18 70:24 234:18 307:11 315:19 336:15 384:9 445:8
**statement** 3:12 4:8 14:7,10 33:11,16 34:15 34:17,22,22 36:18 38:17 48:4,12 62:5 77:22,23,24 78:24 80:10,18 86:18 87:2 89:14,18 91:2 91:21 93:3,13 93:20,23 94:1 96:4 114:13,19 137:6 147:2 148:22 149:12 149:17 164:23 178:18 194:13 203:11 209:10 209:13 215:20 215:23 219:6 223:17 225:3 226:8 227:14 234:11 240:2 243:5,18 250:13 252:17 258:6 259:1 261:20 262:1 264:9,11 265:15 266:13 266:20 267:23 269:4 270:20 271:8 273:10 275:24 276:18 277:11,18 281:15,24 282:15,16 284:14 287:3 288:2 292:9 296:9,12 304:1 311:13 313:5 313:22 318:13 319:24 358:8 360:9 384:5 392:15 394:7 404:2 422:21 424:12 431:1,4 434:6,8,13 438:16 440:15 440:21 442:18 442:21 444:1,9 446:23 448:1 449:2 461:4 465:13,17 466:7,12 467:3 467:19 468:12 470:2,12,20,23 471:16 472:2 472:16,21 473:3,12,24 475:11,24 476:4,20 477:3 477:6,7,9,10 477:12,20 479:15,20
**statements** 13:24 14:3,5 35:10 41:10 48:2 49:20 64:15 77:20 78:14 82:22 86:20 115:7 185:18 187:19 295:19 392:11 462:4 463:22 463:23 467:10 467:16 470:9 478:6 479:4
**states** 1:1 5:5 56:2 302:2
**stating** 412:10
**status** 211:7 323:6 361:16
**stay** 142:16 183:6,9,9
**stayed** 101:24 104:6 120:13
**staying** 422:17
**step** 168:19 327:3,8 368:19 384:22 424:20 424:23 425:7 430:2
**steps** 286:4 427:1
**Steven** 387:13
**stick** 35:9 288:8 467:2
**sticking** 301:22 481:13
**Stiles** 161:23,24 162:4
**stocky** 283:1,4
**stop** 11:7 139:18 143:19 394:13
**stopped** 98:9
**store** 25:5 92:22 126:23 267:10 268:2,6,7 281:20 282:6 288:3,20 289:16 290:1,2 290:11,18 291:6,18,20 296:20 298:8 342:2,6 343:4 354:14,21 355:11,22 356:3,5 393:3 404:16
**stored** 315:9
**stores** 261:2
**stories** 221:5 247:5
**story** 97:24,24 98:4,13 132:10 301:22 314:24 462:3
**straight** 253:12
**strategy** 227:2,3 227:4,7 327:22 328:2
**stream** 115:3
**street** 1:23 2:3 2:11,16,21 5:9 79:23 143:17 230:19 236:14 237:9 239:3,9 239:15 240:15 337:16 341:13 342:12,15 394:11 418:20 483:8
**Streets** 25:6 353:5 369:4
**strengthen** 149:5
**strengths** 170:20
**stress** 468:23
**strictly** 441:22 454:24
**strike** 14:22 15:20 16:23 17:24 25:3 27:16 51:17 55:6 66:3 79:13 80:16 94:12 100:17 103:12 110:4 112:16 114:14 126:8 139:19 172:17 182:10 182:18 184:22 186:23 206:4 225:11 248:19 372:7,11 377:23 391:3 391:14 406:2 427:20
**stringent** 157:4
**strong** 150:9
**struck** 137:3,6
**stuck** 41:7
**studying** 474:14
**stuff** 63:7 66:12 98:16 177:11 225:20 377:12
**style** 406:3 421:16
**subject** 187:22 482:12
**subject's** 435:18 437:1
**submitted** 415:15
**substance** 205:8 253:23 299:5 313:13 414:16 421:24 482:3,6
**successful** 263:15 306:8
**sudden** 155:9
**sued** 135:10
**suffice** 8:12 126:4 210:9 211:11 415:21
**suggest** 93:4 214:11 350:7
**suggested** 235:9
**suggests** 262:13 263:14 270:4 272:23 413:8
**suicide** 331:20
**suing** 108:18
**Suite** 1:23 2:3 2:16 5:9
**sum** 133:3
**summarize** 19:8 323:6 384:3 407:10
**summarizing** 383:7
**summary** 93:2 100:24 209:13 209:17 384:9

**summer** 54:24 55:2,3 61:3
**supervisor** 178:15 217:19 217:20 248:12 460:1
**supervisors** 217:11 366:22 367:7,10,18,21 370:1 461:16
**supplied** 28:2
**support** 32:10 37:8 100:4,5 324:16 434:16
**supported** 85:14
**supporters** 114:17
**supporting** 151:7
**suppose** 446:16
**supposed** 141:22 163:6,14 168:22 241:21 257:13
**suppress** 128:14 128:18,21
**Supreme** 461:1
**sure** 10:19,24,24 11:1 13:8 29:14,21 34:1 37:24 38:19 45:13 46:22 48:18 50:18 52:23 57:22 68:3,7 70:5 74:7 76:23 78:18 80:1,14 106:6 112:6 119:4 127:10 130:13 135:6 138:14,17 139:7 144:2,22 151:1,14 164:7 164:9 167:15 170:22 175:11 180:13 185:2,6 192:24 193:1 194:12 198:14 201:8 206:12 211:5 213:2,6 214:16 218:18 220:16 225:6 242:18,21 245:6 248:18 252:15 253:18 253:19,23 256:20 257:1 258:22 281:9 282:3 286:14 291:5,9,11 310:12,16,19 319:17 320:12 350:20 352:11 364:13 366:8,8 366:9 368:23 374:24 375:18 376:3 381:22 385:4 391:1 401:17 406:13 416:17 418:9 418:12,19 420:12 429:9 436:16 449:4 460:7,11 462:18
**surmising** 205:5 406:14
**surprise** 130:12 135:8 412:19 420:3,5,8 439:24
**surprised** 50:15
**surveys** 173:7
**survived** 118:16
**suspect** 88:3 90:1 143:4,5 144:24 151:7,8 171:23 172:1 188:9 285:7,16 285:21 290:10 333:8,23 349:13 350:7 377:22 453:11
**suspicion** 139:22 181:12
**swear** 6:7 318:3
**switch** 96:17 175:6
**sworn** 6:10 314:10

**T**

**T** 3:7 4:2 483:1 483:1
**tab** 32:22 53:12 76:2 88:13 329:20 394:19 398:3 478:10
**table** 24:21 38:12 433:20
**tabs** 32:16
**take** 9:11 10:3 21:2 33:2 49:11 67:16 76:8 84:2 89:7 91:14 100:16 100:24 103:6 114:21 123:23 124:12 134:24 139:1,22 141:20 156:1 156:17 157:17 167:4,5 168:7 168:19 170:4 177:21 182:4 182:14,20,24 184:5 187:4,10 188:14,19 190:5,6,7,16 192:5,14,16 195:13 203:1 211:2 214:18 215:12 216:2 227:22 234:18 235:4,8 254:12 259:17 286:5 307:1,2 308:2 309:13,20 323:8 329:4,13 340:7 347:4 348:14 358:3,6 359:3 361:4 364:1 368:8 376:21 379:23 380:16 385:20 392:18 405:10 421:7 430:15 431:10 440:17 463:6 470:13 472:20 480:9
**taken** 1:11 8:18 29:17 77:20 93:13 95:17,22 158:9 169:9,12 186:7,10 187:16 196:8 203:12 214:21 246:2 260:20 260:24 263:16 277:18 284:10 307:23 312:4 334:19 344:13 392:11 396:10 427:2 471:4 483:7,10
**takes** 10:17 48:3 122:18 191:1 218:5 312:7 331:23 341:20 346:5
**talk** 17:19 18:17 20:13 22:17,24 51:3 73:2,8 82:16 88:11 112:24 117:14 152:15 170:19 172:8 173:19 174:4,12,17 175:23,24 176:11 177:1 179:23 180:6,7 183:1 185:5 190:19 225:9 227:2 234:23 246:21 268:8 329:4 350:13 350:14,23 352:13 368:20 369:7 373:5 392:4 407:3 433:20 468:7
**talked** 19:9 20:10 25:12 36:21 42:21 46:12 52:4,15 62:16 69:2,3 93:15 109:21 135:13 143:24 154:3 157:6 158:5 170:19 178:15 185:13 202:2 254:10 275:12 305:5 309:2 312:22 317:19 330:1 350:21 354:23 357:8,18 369:18 371:17 377:22,23,24 378:22 396:12 407:11 409:8 409:13 421:4 442:14 443:12 460:24 462:4
**talking** 11:7 21:9 31:13 65:14,16,18 66:5,17 68:6 68:12 91:3 118:9 119:15 121:7 128:7 129:2 131:2 148:2 168:12 168:15 204:18 205:7 206:15 214:2 242:7 256:7 278:8,16 279:24 293:13 308:3 316:12 329:3 348:20

350:24 351:1
357:3 358:13
369:24 374:12
395:1 409:5
432:20 460:19
464:2 466:19
**talks** 48:2 244:8
448:7
**taller** 282:8
**Talmadge** 371:3
404:3,6,12
**tangent** 195:13
329:4
**target** 134:6
148:17 385:10
**Tasker** 422:17
**taught** 100:14
**teach** 100:4
105:4
**teaching** 100:3
105:15,21
106:1
**team** 41:5,12
104:24
**teamed** 103:19
**tech** 100:2
**technique**
291:10
**teenage** 393:2
**telephone** 422:9
**tell** 11:7 15:9
17:11 19:15
30:9 31:15
38:3 40:16,24
47:24 53:1,3
56:6,18 62:3
67:12 77:24,24
80:2 82:13
87:2 88:15
92:3,4 93:23
95:15 104:21
113:22 116:20
117:9 136:10
145:23 149:13
150:9 162:7
164:10 165:5
169:24 174:22
181:19 183:13
184:15,17
187:20 194:20
194:23 201:14
206:20 207:11
224:5,7 225:10
226:11 228:21
229:14 233:19
234:3 236:2
240:20 248:3
250:24 253:1
256:21 260:10
266:16,23
267:17 268:1
268:10 269:9
275:2 277:1,14
278:2,4 279:2
298:24 300:16
300:19,20
301:3,4 304:14
306:23,24
309:22 323:20
332:12 348:16
351:15 353:13
357:13 366:12
380:13,21
381:10 383:12
388:13 389:2
392:17 398:22
401:23,24
402:23 421:15
422:24 423:3
429:20 436:17
442:3 445:1
460:2 465:21
465:23 467:8
467:13,14
479:6,11
**telling** 36:3
38:24 78:21
79:24 81:6,7
84:23 113:15
130:9 152:14
174:15 180:15
182:7 185:4
204:2 205:5
213:18 214:4
214:12 218:18
220:20 224:11
235:10 240:16
248:22 249:9
257:18 275:19
277:6 279:14
288:22 305:19
306:16,17
308:6,9 318:3
349:14 362:24
370:4,18
378:17,21
391:18 397:13
407:14 422:15
423:20 443:6
461:18 472:15
**tells** 185:4
220:24 222:3
227:12 278:7
298:1 300:2,3
349:2 363:22
423:15
**Temple** 106:13
**ten** 23:9,9 58:9
71:15 121:24
150:12,12,13
180:9 186:3
196:4,21 257:7
397:1,5,22
402:7,9 465:19
466:6
**tend** 192:20
225:23 334:3
**tends** 144:12
**term** 138:3,4
144:2 328:13
**terms** 104:2
141:19 181:2
201:12 215:19
382:22 432:20
453:9
**terrible** 225:22
**territory** 455:15
**test** 131:8
187:11 188:14
188:19 235:4
315:20 358:4,6
472:20
**Tested** 115:1
**testified** 6:11
7:23 8:2 10:23
15:4 42:1,6
127:7 329:10
447:4 464:14
467:15 468:11
475:24 479:8
**testifies** 330:19
**testify** 8:23 9:19
19:19 76:16
131:14 145:16
165:7 462:16
467:9,13
468:16 475:16
**testifying** 8:17
42:8 203:2
462:20
**testimony** 11:11
13:5 14:18
15:2 16:6 27:7
29:3 31:4
32:20 49:12
69:23 70:14
81:20 84:8
85:14,16,20,21
85:21 87:5
95:5 96:14
158:9 170:23
172:20 174:19
175:10 202:16
202:22 205:8
205:14 215:5
222:8 275:11
280:22 325:17
330:20 331:1
331:11 332:15
334:14 371:10
408:5 418:4
445:10 446:14
454:19 462:6,8
463:7 464:11
464:22,24
466:11 470:8
470:14 480:9
482:11 483:6,9
483:13
**testing** 314:13
**tests** 99:7
**text** 21:1 56:10
92:19 186:17
223:19 264:22
266:5 268:12
326:12 474:16
474:17 478:23
**Thank** 481:8,12
482:23
**thanks** 155:1
473:1 481:14
**theology** 97:7
**theory** 144:13
**thereabouts**
271:10
**thing** 10:22
61:18 101:6
111:3 112:13
114:21 116:17
142:11,15,16
142:17 156:5
156:13 157:1
193:4 222:3
224:13 254:5
273:16 274:20
286:11 303:2
304:13 312:21
339:24 343:13
348:17 353:17
368:18 369:6
370:2 405:9
407:4 470:18
478:9
**things** 31:3
63:12 65:9
79:10 81:9,10
81:14,15,19
99:7 101:15,21
102:21 103:4
105:12,14

122:10 156:21 166:13 169:9 177:10 196:5,6 253:19 298:6 321:22 328:4 340:3,10 342:18 357:13 359:15 368:8 380:11 394:22 403:22 404:19 404:23 435:24 436:21 442:15 471:11
**think** 15:7 23:11 31:19 32:13 41:2 42:20 44:6 56:22 57:14,18 59:5 64:2,3 69:20 72:4,24 73:16 79:23 80:17 96:1 101:7 102:7 119:7,8 119:9,11 127:6 127:7 130:14 133:16 134:9,9 134:18 135:12 137:13 138:3,4 138:18 143:20 150:23 166:5,6 166:7,10 170:16,23 175:13 179:7 180:9 182:1,9 183:20 192:10 192:20 201:8 202:12 206:18 213:18 224:1 225:16,17,18 225:23 226:4 229:18 235:24 236:2 242:16 247:20 284:13 286:23 290:2 293:4 294:2 297:4 314:18 315:11 317:20 323:8 326:10 334:4 336:2 350:2,21 351:20 352:4,9 359:3 364:11 380:17 402:3 405:10 406:13 407:4 419:4 425:20 437:13 442:10 459:5 461:23 462:12
**thinking** 170:5,8 277:23 278:5 407:2
**thinks** 213:9
**third** 121:23 127:9 227:15 240:16 312:3 406:15 421:18
**Thomas** 105:7 131:5,7 132:1 366:17,18
**Thompson** 366:15,18 367:8,16
**Thompson's** 366:16
**thorough** 303:3
**thought** 44:17 180:4 238:20 264:4 292:18 390:7 435:6
**thousands** 158:2 164:18 435:15
**threat** 475:17
**threaten** 77:5 165:3 479:5
**threatened** 77:11 210:22 475:23
**three** 8:6 11:17 15:7 17:23 30:15 33:4 35:6,9,10 41:21 43:4 62:6 64:7,8 72:8 81:13 98:8,14,19 99:2 106:3 152:16 161:2 203:18 210:5 210:21 223:16 223:19 259:18 272:2 283:15 295:3 338:12 341:23 345:6 369:18 392:11 432:23 433:24 451:9
**three-month** 294:9
**three-ring** 32:16
**three-year** 42:10
**threshold** 368:7
**throwing** 131:8 209:21 210:23
**thrown** 155:9 210:2
**Thursday** 16:18 16:19 268:17 478:24
**tie** 325:22
**Tiffany's** 18:14
**Tilghman** 31:5,8 31:11 36:22 37:2 83:24 84:3,15 85:12 86:13 87:10 95:4 329:7,9 329:23 330:12 331:19 332:7,9 332:17,18
**Tilghman's** 84:8 86:20,23 87:5
**time** 5:7 7:19 8:10 9:7 19:4,9 19:17,22 20:16 22:9,12,14 23:13 24:11 37:16 39:3,5 39:24 43:2,4,6 43:6 48:23,24 50:4,6,22 51:20 52:18 56:14 58:1,14 60:23 64:5 65:6 66:2 67:4 71:1 75:18 76:11,18 77:22 78:15 79:20 81:11,16 82:14 84:8 88:2 89:7 90:12 95:1 96:8,10 98:5 98:15 99:15,18 102:4 103:24 104:21 105:21 106:1,23,24 108:21 117:14 117:18,20 121:2 122:3 123:14 125:19 127:9 132:18 132:18,23 134:24 136:6 139:1 140:9 145:11 150:3,4 151:16,16 156:2 158:7,24 159:5,6 163:2 163:10 164:19 164:21 171:13 171:20 176:6 177:2,7 178:4 182:23 183:16 190:22 191:13 192:24 193:14 195:15 205:21 207:20 208:4 211:3,12,14,18 211:19 214:20 214:21,23 224:5 225:13 231:9 233:8 236:11 237:6 237:19 239:1 240:1 242:7,24 244:22,24 249:24 260:17 261:1,18 262:21 265:12 266:14 267:21 275:15 281:13 283:13 285:8 285:22 301:12 302:22 308:24 313:20 316:11 320:7,8 321:8 325:11,13 327:2 332:14 339:15 340:5 341:8 342:10 348:10,15,16 351:18 352:4 356:5 359:15 359:15 360:1 366:11 367:11 369:5,17 377:10 380:12 381:19 388:18 391:24 392:12 392:18 394:24 396:24 402:23 407:23,24 408:15,16 417:21 419:5 429:13 433:18 433:21,24 437:10 445:5 447:11 461:12 464:3 468:3 472:18 473:20 477:8 479:1 480:3,5 481:17
**timeframe** 24:23 103:14 126:18 126:19 229:12 320:13 380:23 460:10
**timeline** 217:14 228:16 243:4
**times** 7:23 8:5 21:19,21 35:4

40:3 42:14
63:5 65:13,19
65:21 79:5,6
79:21 81:10
91:6 121:24
134:10 150:12
150:12 153:14
160:9,21 166:9
166:22,23
167:6 173:5
174:11 177:16
179:17 180:9
181:1,9,14
184:10 186:2,3
186:8 187:13
187:14 196:4
202:14 205:19
257:7 328:13
386:6 409:11
420:9 432:23
436:16 437:16
457:15 468:5
**timetable** 470:7
**timing** 215:19
280:23 297:19
**tip** 168:4,7,16,21
169:7 337:19
**tips** 167:20,24
169:8,10,11,15
169:17,18
170:6 171:1,24
172:15 336:18
336:20,21
337:4,5 340:11
345:5,5 451:1
453:10
**today** 5:17 6:18
7:10,15,17 9:3
11:11 32:20
34:18 36:11
43:13 45:7
64:24 81:23
85:20 113:15
205:2 264:1
308:3 339:3
430:13 431:13
443:12 453:16
468:9
**today's** 5:6
11:13 309:17
340:4
**token** 28:4 146:8
**told** 16:13 19:14
19:19 21:21
27:6 28:24
29:2,5,7 30:16
35:10 36:22
57:1 66:23
73:22 77:20
78:3,5,15
81:24 82:23,24
83:4,4,9
116:18 133:16
139:7 150:14
152:6 158:14
175:9 183:21
187:21 189:17
198:5 210:1
218:18 220:7
220:15,20
224:12,15,21
224:22 226:3
238:13 242:24
243:22 245:15
247:16 251:21
254:18 260:6
273:18,20
276:3,3,12,13
276:14 277:7
280:10,11
284:14 286:13
288:9 299:6,24
300:15 301:11
301:19 303:22
304:14 305:23
305:23,24
307:6 313:4,23
315:6,15
317:16 318:9
321:10 329:15
336:2 342:12
347:22 352:24
357:7 358:4
361:24 362:5,6
362:6,7 363:23
366:5 367:5
369:8,13
371:20,24
378:6,13
380:18 402:24
421:14 423:7
423:11 424:8
427:17,21
428:8 432:12
432:15,17
442:16 445:8
448:17 449:7
449:16 455:16
458:4 459:5
463:5 466:15
467:2,13,21
468:10 474:24
475:8,16,20
476:24 477:19
**tolled** 100:22
**tomorrow**
396:12
**ton** 198:6,7
**tonight** 282:6
358:5
**Tony** 288:8,8,13
288:16,20
289:2,9 291:17
335:12 355:2
**tool** 79:15
181:22 185:15
321:22
**top** 62:2,5 117:2
130:18 193:6
193:10 199:18
210:2 224:6
228:11 235:2
262:10 383:10
397:17 404:10
405:22 466:9
**topic** 12:3 20:4
38:15 110:15
128:7 151:6
155:3 175:21
188:4 241:10
262:24 269:16
306:19 307:9
307:20 342:4
348:19 352:22
446:21 459:6
462:2
**topics** 10:4
96:17 189:24
190:4 214:18
323:8,9 329:2
440:19
**Torrijos** 98:7
**total** 35:3
156:20 400:1
**totally** 156:24
443:4
**touch** 205:15
294:23
**tough** 91:18
287:10 394:9
**trained** 177:20
**training** 99:20
101:6 135:3,4
139:11 171:11
171:18 461:17
**trainings** 460:12
**transcript** 1:17
14:24 183:22
329:11 481:19
482:19
**transcription**
483:13
**transcripts**
202:18 330:21
**transferred**
39:16 120:17
120:24 122:4
364:12
**transparent**
303:5
**transported**
347:14
**treat** 52:17
**trial** 13:6 14:19
14:23 25:15,21
25:22 27:1
42:1,8 43:7,8
70:10,13,15,17
76:18,19,20
77:4 81:12
82:16,17 84:9
85:15 95:5
149:20 151:16
158:24 202:16
202:22 203:2
204:19 332:14
359:15 374:13
409:8,14 411:3
417:14 418:4
429:1,4 436:2
461:5 462:10
464:11,14,15
465:3,4,6,8
**trials** 24:4 25:12
202:19
**tried** 24:6 72:24
102:19 160:23
286:15 429:18
479:10
**Trimby** 1:14 5:2
**trouble** 379:24
**true** 41:3 42:12
46:9 79:1 80:4
83:6 143:18
146:18,19
147:24 148:6
149:12,18
152:17 162:16
170:2 179:2,4
181:16 201:6
252:9 289:22
300:7 328:12
350:12 403:9
466:11 469:14
469:20 472:7
473:12 474:10
476:5 477:23
478:7 479:16
479:22 483:12
484:2

**trust** 125:14 316:14,15,17 340:21 351:9
**trusted** 124:21 157:7 232:8
**truth** 77:14,23 78:3,6,16,21 79:24 81:6,7 170:9 181:19 182:8 185:5 235:10 249:9 257:18 300:15 300:16 306:17 306:17,24 308:6,9 318:4 467:13,20 470:3 479:11 479:13
**truthful** 11:11 81:21 83:21 85:22 179:5 315:21 321:23 454:20 465:17
**try** 11:4 70:24 142:21 147:21 149:3 168:11 169:3,4,6 170:6,13,14 174:18 175:9 175:11 176:11 178:24 182:22 212:17 235:9 286:24 297:16 384:23 415:9 474:22
**trying** 84:21 151:17 190:13 190:22 223:18 250:11 257:8 301:7,10 381:19 412:6
**tunnel** 142:2
**turn** 47:2,5 75:21 83:22 193:3 343:9 381:8 387:7 403:10 408:8 468:21
**turned** 53:22
**Turner** 86:19 233:4,5,15,16 305:13 330:1,2 330:4,5,8 362:7 371:3,4 371:4 377:4,16 377:24 378:18 384:15,15,16 415:5 422:16 423:21 439:7 448:1,9 456:22 464:20
**Turner's** 87:1,6 330:12,15 377:8
**turning** 421:2
**turns** 398:17
**twice** 105:15 183:8 202:13 346:11
**two** 2:16 8:6 12:9 22:4 23:19 24:4 25:12 30:15 31:8 41:21 58:13 75:24 76:2 81:13 82:21,23 84:11 89:11 92:22 93:4 96:3 105:23 106:2 108:6,7 120:14 123:19 127:6,7 127:8,10,11 129:8 134:10 135:7 152:7,16 153:4,6 159:11 192:13 197:3,9 197:10 198:11 206:19 210:20 221:12 223:2,4 223:5,7 227:6 238:10 240:13 271:20 278:13 278:17,18 310:13 316:12 325:20,21 334:17,22 335:1 338:3 341:22,23 342:18 343:15 349:14 354:7 355:11 361:7 365:1,14 366:1 367:13 382:24 387:10 388:1 393:10,22 401:19 424:8 425:4 430:11 447:4 451:5 475:4
**type** 46:5 101:6 167:2 196:14 227:18 310:11 310:14 347:10 445:7
**typed** 158:1 194:14 225:17 225:20 226:8,9 226:9 253:6 309:22 310:17 310:21 311:2 347:12,21,23 358:23 421:10 421:14 435:14
**types** 168:21 196:5
**typewritten** 194:13 260:22
**typical** 313:5 327:19
**typically** 208:6 221:13,18 256:2,6 336:22 357:9 401:13 407:5
**typing** 225:17 226:13,17 252:20 326:23 368:10 421:16 483:11
**typist** 226:19 310:2

**U**

**Uh-huh** 264:14 266:11
**ultimately** 373:23
**uncle** 98:12 240:9,11
**underline** 220:24
**underlying** 137:14
**undermine** 144:13 170:7 353:9 375:13 454:6
**undermined** 437:1 438:15
**understand** 7:11 8:19 10:15,21 12:13 13:8 27:22 37:15 42:18 46:17 48:14 50:3 53:6,8 58:3 68:10 70:3,21 83:24 91:19 104:1 108:20 108:24 129:18 132:2 158:18 180:13 200:7 200:15 201:10 201:11 207:8 208:14 234:6 248:18 261:4 289:12 310:6 310:19 324:8 330:13 334:23 339:18 361:7 378:9 390:24 410:11 416:19 427:10 429:23 443:15 450:12 450:20 451:3 460:17 474:1
**understanding** 9:20 31:20 35:18 47:24 109:1,23 110:4 114:15 154:10 159:8 161:4 162:11 172:19 177:23 202:4 216:10 223:8 276:6 334:20 412:4 419:16 439:15 443:2
**understood** 9:12 261:13 451:7 451:11,15
**unidentified** 335:11
**uniform** 104:10
**uniformed** 396:10 400:24 401:10,14,20
**unique** 400:1
**unit** 3:16,20 26:7 46:15,19 47:4 50:1 59:1 101:8 103:18 122:24 192:1 196:4,9 199:19 200:3 387:11 415:16 450:15
**unit's** 387:4
**United** 1:1 5:4
**University** 97:5 105:8
**unlawfully** 108:22
**unnecessarily** 74:20
**unquote** 251:19
**unsolved** 159:4
**untrue** 83:10
**untruthful** 185:18

**updated** 406:7,8
**uplifted** 406:12
**ups** 364:3
**upset** 50:15,17 50:18,19
**upstairs** 181:17 183:11 184:10 303:24
**use** 54:15 56:24 57:1,5,10 59:24 65:24 66:6,14 108:14 113:3 117:1 139:15 140:22 144:6 152:13 170:6 174:15 176:24 179:18 180:6,16,21,22 180:23,23 181:21 182:1 184:21,23 248:17 307:7 308:5 321:18 321:21 479:6
**usually** 48:6 105:22 106:2 149:20,21,24 156:23 169:23 172:21 183:16 187:16 258:3 286:23 310:14 314:23 336:15 402:1 436:1
**utilize** 57:16,18
**utilized** 48:5,6 64:8 71:10 74:16 103:5 177:12

**V**

**vacate** 70:19
**vacated** 26:17 50:1,5 126:13 127:14 128:8
**vacation** 132:18
**valid** 326:10
**validity** 151:9
**value** 249:11
**varies** 105:15
**various** 139:3 176:23 442:14
**Vatican** 106:22
**vent** 38:10
**verbatim** 188:3
**versus** 5:10 160:11 460:13
**victim** 194:21 262:12
**victims** 166:24
**video** 5:4,7
**videographer** 5:3
**videotape** 1:14 5:1 6:5 96:7 214:19,22 325:10 407:22 480:2 481:16
**Videotaped** 1:10
**view** 43:11 71:9 74:19 78:6 83:10 95:20 411:11 457:11
**viewed** 171:1
**views** 71:3,10
**Vine** 230:18
**violate** 462:21
**virtue** 154:15
**visitors** 167:16
**voice** 292:13
**volunteered** 117:11
**VS** 1:4
**vulnerable** 165:24

**W**

**wait** 11:5 76:3 99:6 184:11
**waiting** 177:17
**wall** 137:22 138:6,8
**Walls** 60:17,18 60:24
**want** 9:2 10:19 76:16 84:21 86:21 91:7 92:9 96:17 111:4 115:4 141:15 144:6 149:19 150:14 170:8,19 172:8 173:18 176:5 180:6 190:10 190:19,24 192:17 193:5 202:15 212:17 213:9,18 214:5 215:7 221:20 223:14 227:9 227:11 231:24 234:22 236:2 236:24 251:18 252:1 256:7 258:23 259:20 261:22 285:11 286:1,11,24 290:10 297:22 300:24 301:2 303:5 310:19 325:20 326:18 328:5 329:4 331:6 339:17 348:7,17 350:14,23 351:17 352:4 358:6 359:2 360:5 371:9 372:14 380:4 385:10,18 388:4,13 392:4 400:5 407:3 422:7 424:10 425:5 444:18 448:18 449:9 462:2 463:6 464:8 475:9,12 475:22
**wanted** 99:4 212:24 213:2 218:17,24 220:6 222:16 231:20 235:13 235:21 236:5 239:2,9 258:15 260:13 291:15 298:21 305:17 388:1 412:22 414:23 415:3 458:16 472:20
**wants** 212:5 213:4 239:14 240:14 324:1 411:10,19
**warrant** 45:14 149:23 150:15 150:16 151:18 292:19 293:10 297:2,5,15,23 297:24 298:4,9 320:8 324:23 325:2 385:15 385:19 392:1 429:12 431:20 432:13,13,15 432:18,21
**warrants** 385:19
**Washington** 341:18
**wasn't** 15:18,19 37:20 41:4,22 43:8 44:11 46:5 76:19 122:21 129:20 152:8 153:5 170:1 175:3 182:7 191:9 206:6 217:7 227:3,6,7 233:8,16,23 234:10 256:6 257:9,18 275:3 293:1 310:2 313:14,19 335:23 398:18 402:3 407:8 435:22 439:20 452:14 458:2 465:17 466:11 475:23
**waste** 176:6
**watch** 183:24
**watching** 184:5
**wave** 418:3
**way** 11:21 18:13 32:8 68:11 72:22 79:23 84:7 87:5 89:24 92:12 106:10 107:23 109:18 110:12 113:3,19 114:22 115:18 116:23 124:19 126:11 145:6,8 147:22 149:4 149:24 157:2 160:24 162:17 164:11 168:13 168:15 175:7 188:20 198:4 203:1 205:15 211:17 216:11 223:21 224:1 226:7 234:8,18 234:19,24 246:22 249:9 251:3 269:16 277:18 278:9 278:20 279:15 281:8 287:16 292:18 293:13 299:20 305:2 310:6,10 312:8 324:15 329:19 333:1 334:9 340:20 353:24 359:3,18 368:9 373:23 383:2 390:12 416:5,7 421:19 432:7

435:1 440:18 442:13 451:17 464:24 475:2 477:11
**ways** 81:10 174:20 175:5 175:12
**we'll** 9:11 10:16 34:17 38:23 43:9 49:2 87:18 90:14 100:16 112:15 137:16 146:21 162:8 164:16 187:19 202:11 242:4,4,5 263:24 264:6 292:10 295:18 323:8 332:21 332:22 429:16 478:10
**we're** 9:14 36:5 46:24 53:17 85:17 87:19 96:12 118:9 121:7 135:18 144:2 150:23 183:2,2 184:13 190:8,15 214:17,19 224:1 255:20 257:20 264:7 282:14 291:14 293:8,18,22 301:10 303:16 312:6 317:13 320:12 323:7 325:15 352:21 379:22 392:9 400:12 405:16 408:3 447:11 455:15 465:7
**we've** 84:23 93:15 95:3,7 109:21 157:6 182:1 192:10 243:5 274:10 296:13 303:17 309:2 311:6 323:11 330:1 330:11 335:2 338:11 389:12 394:15 402:6 409:3 444:12 456:19 470:7
**weak** 150:10,11
**weakness** 47:10 47:15 171:2 172:1 428:17
**weaknesses** 170:18,21 428:8
**weapon** 381:9
**wear** 415:4,8
**Wednesday** 16:18
**week** 11:19,23 16:20 19:3,11 105:13,16,24 106:2 123:15 123:20,21 130:2 204:6,23 334:5
**weekend** 119:4
**weeks** 424:8
**weight** 282:22
**welcome** 61:18 303:13 380:7
**welcomed** 91:10 111:2 203:8 343:13 470:17 472:10
**went** 37:18,21 38:18 40:15,16 46:5 59:21 63:5 68:13 69:11 90:9 98:1 100:3 101:7,7,10,17 102:24 103:17 103:20 106:13 117:6 118:7,10 118:11 120:12 124:9 161:1,1 166:23 193:1 200:3 209:1 224:7 230:3 232:13 247:14 262:4 264:12 293:5 294:6 339:12 352:11 355:20,21 356:1,4 359:12 406:9 432:2 436:16
**weren't** 45:1 50:15 126:9 160:15 162:19 177:15 223:2 284:9 368:5 397:20
**West** 18:23 101:10 102:13 102:19 129:23
**Westerman** 2:18 23:21 124:8 367:2,9,17,20
**Wharton** 393:18
**what'd** 67:15
**whatsoever** 25:18 59:9 60:16 169:7 274:16
**white** 32:16 97:17 179:13
**wife** 203:17
**wife's** 203:21
**William** 13:18 399:11,20
**willing** 176:11 187:4 235:3,8 306:24,24 307:2 411:16
**willingness** 235:9
**Wilson** 356:24
**win** 475:12
**winding** 105:18
**wire** 33:24 415:4 415:8
**wish** 398:15
**withdrawal** 136:19 316:24 322:19 339:14 440:21
**withheld** 49:4,8
**withstanding** 84:1 444:11
**witness** 6:7 28:11 31:24 32:4 33:15 34:6 36:1,17 37:16 41:16 42:19 43:17 44:4,10,21 45:4,12 46:3,6 46:6,7 48:23 49:18 50:12 51:13 52:12,22 53:7,21 56:7 56:21 57:14 60:4 62:14,22 63:4,17 64:1 64:21 65:5 66:21 67:9 68:3 69:7 71:8 72:2,15 73:12 73:21 74:7,14 75:2,14 78:11 79:4,16,22 80:13,22 81:15 82:5,12 83:15 86:2,9 88:6 90:5 92:4 93:12 94:1,18 95:14 109:7,14 115:11,24 116:8,16 125:1 125:11 129:19 132:13 136:12 138:2,14 140:7 140:15 141:3 142:6 143:1,11 145:5,19 146:11,14,21 146:23 147:6 147:13,20 148:14,18,19 149:3 150:20 151:14 152:2 152:13,17,18 152:24 154:1 155:22 157:15 157:23 161:11 164:22 165:9 165:13,18,21 166:5 167:9 168:3 169:3,23 172:6,12 173:4 173:24 174:8 174:24 175:1,7 175:23,23 176:7,10,19 178:9,14,20 180:3,15,19 181:4,8 182:4 182:11 184:9 185:1,3,18 186:2,20 187:2 187:4,19,22 188:10 189:4 189:14,22 190:5,12 193:8 194:7 195:3,20 198:1 201:2 205:18 207:7 207:16 208:3,7 210:16 211:16 211:18,23 212:4,12,21 213:7,13,22 214:8,15 217:5 218:15 219:14 219:17,21 220:1,5,12,15 220:16,18,23 220:23 221:8 221:18 222:3,4 222:5,7,8,21 224:19 227:8,8

232:4,13
233:20 234:17
237:23 238:19
239:6,14
240:21 241:6
241:19,24
244:17 245:2,3
245:4,12,13
246:20 247:3
247:24 249:6
249:13 250:7
250:23 251:17
255:11 256:11
256:20 258:3
263:20 265:6
266:17 267:18
269:11 270:17
271:16,24
272:6,14,20
273:3,12 274:3
275:7 276:2
277:12 278:4
279:4,11,23
280:9 281:2,11
281:16 283:9
284:1,7,18
285:4,20
286:19 287:3
289:6,19 290:7
290:15 291:13
292:5,16,23
294:18 295:8
299:13 300:12
302:15 304:10
305:18 306:11
308:6,13,23
309:9 312:2
316:5 318:16
319:9,17 320:5
321:7,22
322:10 323:3
323:22 324:9
324:21 326:7
326:16 327:22
328:1,6 329:5
333:15 334:3
338:8,18
340:17 341:1
342:24 343:7
344:20 345:12
345:19 346:2
349:11,19
350:11,22,23
351:15 352:3
352:19 353:8
353:14,17,22
354:11,24
355:16 356:12
356:21 357:9
357:22 358:18
361:17,23
362:10 363:5
364:21 365:19
368:14 370:14
370:22 371:15
371:24 372:17
373:1,17,21
374:23 375:9
375:17 376:2
376:11 379:5
379:16 382:19
385:3 386:12
389:4,14,19
390:3,16 391:1
391:11,21
394:3 395:18
397:12 398:23
400:8,11
401:23 402:14
405:3 407:18
409:20 410:21
412:5 413:20
414:7,10,14,19
414:22 415:13
416:4,13,17
417:10 418:9
418:19 419:18
420:8,16,23
423:2 424:3,15
425:2,11,18
426:4,8,8,13
426:21 427:10
428:6,13,15,15
428:21 429:9
433:3,13
434:22 435:6
436:13 437:6
438:5,12,19
439:3,10,19
440:13 442:9
443:3 444:5,15
446:9 447:18
448:14 449:15
450:2 452:4,12
452:18,21,23
453:5,15,23
454:9,16,24
455:7,23 456:7
456:16 457:2,9
457:17 458:1
458:13 459:3
459:11,21
460:7,18
461:22 463:2
463:12,19
466:23 469:24
471:22 473:9
476:11 478:3
480:15,23
481:14 482:15
482:16,17,18
483:14 484:13
**witness'** 80:10
175:10 219:18
220:1 322:3
**witnessed** 91:22
**witnesses** 76:23
78:12,13 81:9
84:12 85:14
89:11 93:4
145:12,14
152:15 164:18
165:24 167:1
173:20 174:18
174:22 175:13
175:17,18,19
176:14,16
177:1,3,17
212:13 221:4
221:12,24
223:2,4,5
245:8 283:14
283:17 286:12
287:13 290:20
296:20,24
298:7,8 306:6
308:19 320:1
320:21 325:6
342:8 349:15
355:22 356:4
362:4 392:5,15
393:23 396:9
396:12 397:2,4
399:10 400:2
401:9 402:10
402:15,16
404:16 417:20
420:9 479:1,2
**WOLFE** 1:22
**Wood** 400:19
401:18
**Woods** 203:23
208:18 209:2,9
304:2,3 362:7
388:10,13
418:23 422:2
422:11 423:20
424:11 427:2,8
428:1 439:6
448:7,20
449:10 451:11
**Woods'** 209:5
447:24
**word** 110:6
144:7 156:21
187:22 233:11
251:11 252:3,5
253:14 300:1
337:22 347:7
364:1 385:12
417:23 427:18
474:23 475:18
**worded** 156:24
**words** 132:24
143:3 147:16
178:17 181:21
191:18 229:18
240:7 253:9,18
273:18 287:3
297:21 315:19
317:1 328:8
345:4 359:4
410:8 419:12
434:15 458:8
463:5
**wore** 266:9
272:2
**work** 15:17 16:1
39:18 40:10,12
41:5,11 44:15
59:8 66:24
67:1 79:15,18
98:22 100:2
105:7,11,22
107:2 117:16
121:16,19
122:14 124:21
125:4,7 135:10
295:11,14,15
411:11,19
**worked** 9:22
73:1 98:19
99:14,15 100:1
100:1 101:9,12
101:13 106:19
117:17,17,18
117:23 118:6,8
120:1 124:1,13
128:4 197:17
293:4 295:8,10
**working** 40:1
41:7 59:7 98:3
99:23 100:13
102:12 121:2
122:11 123:13
144:10 154:21
155:24 191:22
248:2 310:13
366:2 368:4,5
**works** 174:20

175:5 234:20
**worried** 469:9
**worth** 27:13
**wouldn't** 138:15 147:6 289:6 295:15 418:10 436:13
**wound** 200:10 200:11
**wounded** 263:8
**wrapped** 67:16
**Wright** 69:15,24 70:11,15,24 71:15
**Wright's** 70:19
**write** 420:9
**writes** 404:11
**writing** 296:3,4 326:22 420:9 472:1
**written** 57:7 134:22 395:11 395:14,19 400:21 411:22
**wrong** 112:11 129:5,6 183:22 218:22 230:15 408:11
**wrongful** 72:10
**wrote** 227:19 232:21 233:3 253:2 296:2 326:13 401:6 401:24 403:22

**X**

**X** 3:2,7 4:2

**Y**

**yeah** 10:16 29:14 36:1 49:21 53:7 55:14 56:10 58:16 61:4 65:13 67:9 69:3 72:2 73:16 82:5 94:23 97:9 99:1 101:2 103:10 105:22 106:6 108:6 120:23 121:9 121:15 122:21 123:3,21 124:18 129:7 129:10,19 131:20,23 132:5 133:16 152:24 157:3 167:14,15 170:22 171:5 173:4 176:2 180:17,22 181:1 185:6 187:6,13 188:1 194:7 196:23 197:2 206:16 213:2 216:21 220:15 223:24 224:12 230:10 232:24 239:14 240:22 256:4 260:4 273:12 278:14,14 289:20 316:16 316:17 327:11 328:1,22 336:23 337:17 337:21 342:9 346:18 349:20 350:11,20,24 359:6 368:14 374:12,23 377:17 380:8 381:11 382:19 388:20 390:6,9 397:13 404:9 408:18 410:4 426:13 446:3 460:11 477:18
**year** 21:7,7 24:19 25:17 62:8 119:5 120:2 121:6,11 121:13 126:22 127:1 278:14 278:14
**years** 7:5 8:11 8:11 17:10 18:22 20:19,22 23:9,9,15,20 23:22 24:11 27:13,14 43:4 43:5 44:14 57:21 58:6,7,9 59:23 61:1,1 63:6 73:4 81:14 82:15 87:15 92:21 93:18 98:14,19 99:2,6 100:22 101:3,10 106:12 121:10 125:21,24 126:1,2,20 127:4 131:24 132:22 133:1,1 133:2,24 138:23 140:9 141:21 153:3 153:10,11,11 192:13 196:21 197:16 203:18 227:6 238:10 246:4 261:3 278:13,17,18 289:11 311:3 348:11 351:7 353:5 416:22 430:11
**yell** 417:20
**yellow** 408:12
**yesterday** 21:10
**York** 2:22,22
**young** 129:21 207:21
**younger** 310:16

**Z**

**zoom** 2:21 5:19 246:19
**Zurbriggen** 2:9 5:22,22 7:15 11:16 21:22 28:3,9,16 32:1 33:13 34:4 35:22 36:15 37:14,18 41:14 42:17 43:15 44:2,8,19 45:2 45:9 46:1 48:21 49:15 50:10 51:10 52:9,19 53:4 56:4,19 57:12 60:2 62:11,20 63:2,14,22 64:18 65:3 66:18 67:7,24 69:5 71:5,19 71:24 72:12 73:10,19 74:5 74:12,23 75:12 78:8 79:2 80:11,20 82:2 82:10 83:11 85:23 86:7 88:4 90:2 92:1 93:8,21 94:16 95:10 109:4,12 109:19 115:8 115:21 116:5 116:14 124:22 125:9 129:16 132:11 136:9 137:23 138:11 140:4,13 141:1 142:3,23 143:9 145:2,17 146:12 147:3 147:11,18 148:11,24 150:18 151:12 151:23 152:20 153:23 155:19 157:13,21 161:8 165:10 165:19 166:3 168:1,24 169:20 172:4 172:10 173:1 173:21 174:6 176:17 178:11 179:20 180:1 181:5 185:24 186:18 189:2 189:12,20 194:5 195:1,18 197:23 200:24 201:19 205:17 207:4,13 208:1 210:12 211:21 212:9,19 213:10,20 214:13 217:3 218:12 219:19 220:3,13 221:6 221:15 222:19 224:17 232:2 232:11 233:18 234:14 237:20 238:16 239:4 239:12 240:18 241:4,17,22 243:9 244:14 245:10 246:16 247:1,22 249:3 250:4,19 251:14 255:4,9 256:9,18 258:1 263:17 265:3 266:15 267:16 269:7 270:15 271:11,22 272:4,12,18 273:1,8,24 275:4,22 276:9 277:9 278:1,24 279:9,19 280:7 280:24 283:7

283:23 284:5
284:16 285:1
285:18 286:8
286:17 287:6
289:4,17 290:5
290:13 292:2
292:14,21
294:16 295:6
299:11 300:9
302:12 306:9
308:11,21
309:7 311:16
311:24 313:15
316:3,20
318:14 319:6
319:15 320:3
321:4,13 322:7
322:16,24
323:18 324:6
324:17 326:5
326:14 327:23
333:12,24
338:5,16
340:15,23
342:21 343:5
344:18 345:8
345:17,24
349:9,17 350:9
351:12,24
352:17 353:11
353:20 354:9
355:8,13 356:9
356:19 357:20
358:15 361:19
362:8,15 363:2
364:18 365:17
368:12 370:12
370:20 371:13
371:22 372:15
372:23 373:15
374:7,19 375:7
375:15,24
376:9 378:8
379:3,14
381:14 382:2
382:17 385:1
386:10 389:1
389:16,24
390:14,22
391:8,19 394:1
395:16 397:10
398:21 400:4
401:21 402:12
405:1 407:15
409:18 410:19
412:2 413:13
413:18 414:5
414:12,20
415:11 416:1
416:11,15
417:1,8 418:6
418:16 419:12
419:14,23
420:14,21
422:23 423:23
424:13,24
425:8,16 426:1
426:11,19
427:9 428:4,11
428:19 429:6
433:1,10
434:19 436:9
437:3 438:1,10
438:17,24
439:8,16 440:2
440:11 442:7
442:24 443:16
444:3,13 446:7
447:16 448:2
448:11,22
449:12,23
451:24 452:10
452:19 453:2
453:13,21
454:7,14,21
455:5,20 456:5
456:14,23
457:7,14,23
458:11,23
459:9,18 460:5
460:15 461:20
462:24 463:10
463:18 464:1
466:21 468:14
469:21 471:18
473:5 476:7
477:14 478:1
480:13,21
481:7,20

**0**

**1**

**1** 118:3 120:11 238:2 288:4
**1,000** 119:18
**1:26** 214:23
**10** 126:2 127:10 219:10 407:11
**10:08** 228:13,21
**10:56** 96:8
**100** 159:24 364:13
**10013** 2:22
**1002** 120:13
**10th** 25:10 441:2
**11** 126:3 392:10 400:1 465:10
**11/9/56** 476:13
**11:11** 96:10
**11:40** 228:13,22
**1100** 341:18,21
**111** 3:13
**114** 3:14 392:23 392:24
**1147** 341:13
**116** 393:9
**12** 58:12 93:18 123:16,16,19 153:3,10 246:4 392:10
**12-** 298:15
**12/19** 337:8,23
**12/23/52** 107:8
**12/5/84** 193:18 348:21
**12:56** 214:20
**125** 344:14
**12th** 266:8
**13** 84:24 392:10 468:21 483:19
**13,000** 298:16
**1303** 1:23
**136** 3:15
**13th** 340:8
**14** 121:5,13 126:2 353:5
**14,000** 84:24
**140** 282:24
**15** 20:22 23:15 106:19 121:5 121:13 126:2 353:5 407:11
**1515** 2:11
**15th** 33:12 34:14 205:23 215:9 258:6 271:8 285:8 293:19 295:20 296:18 298:11 302:3 333:8 346:12 360:2 423:8 434:13 470:3 473:11 476:24 478:6
**16th** 331:15,22
**179** 404:10
**18** 262:4 468:21
**1801** 230:18
**181** 403:24
**185** 405:6
**186** 335:8
**18th** 445:15
**19** 55:16 356:24 465:10
**19102** 1:24 2:11
**19103** 2:17
**19106** 2:4 5:10
**1973** 96:22 207:22
**1977** 100:17
**1978** 96:22
**1980** 457:20
**1982** 430:11
**1984** 7:6 25:1 284:10 349:13
**1985** 238:9,15 275:16,20 365:24
**1986** 241:14 277:3,8 279:18
**1987** 25:10 30:24 77:21 123:13 229:21 230:17 271:8 331:15 359:11 415:1 429:23 478:7
**1988** 103:20 204:16 294:15 449:19 463:15
**1989** 24:5 82:17 119:2
**199** 3:16
**1990s** 161:6 162:13
**1991** 14:19 24:5 25:15 27:1 82:16 205:15 294:22
**1995** 136:22
**1996** 89:3 93:16 474:1 476:5
**1997** 359:10
**19th** 271:4
**1st** 101:5

**2**

**2** 75:22 77:15 117:17,21 118:11 276:21 282:5 377:3
**2/1/89** 470:13
**2:00** 337:23
**2:22-CV-0241...** 1:4
**2:57** 325:11
**20** 20:22 23:15 92:21 127:10 174:14,15

190:16 474:15
**2001** 2:16
**2011** 119:24
**2012** 58:12 100:20 102:2 104:15 106:16 133:6
**2017** 51:8 132:3
**2019** 86:19,22 86:23 132:3
**2020** 26:9 55:19 56:2 61:17 79:1 80:18 85:22 86:21,24 115:3 477:13
**2021** 26:9,18 478:17 479:2
**2022** 22:8
**2023** 1:7 55:4 483:9,19
**21** 1:7 483:9
**210** 133:12
**212** 2:22
**215** 2:4,12,17
**21st** 5:7 293:14 293:22 295:21 296:1,19 298:11 302:3 311:23 320:14 320:21 323:10 324:4 325:24 346:13 360:2 362:3 373:9 414:24 423:11 447:5 476:24 478:6
**22** 101:5 329:20
**22nd** 101:5 293:16
**23** 398:3 466:5
**230** 1:23
**24/7** 177:15
**24th** 59:6 339:9 346:7 347:8 361:5
**25** 210:7
**259** 3:17
**25th** 115:3 202:23 294:5,6 353:4 423:6 429:22 448:7 449:8 478:17
**26** 278:18
**2600** 337:15
**2620** 2:16
**26th** 59:6 331:1 341:13
**27** 27:13,15 44:14 125:20 125:21 141:20 229:21 230:16 416:22
**2700** 342:11
**2700-block** 393:15
**27th** 25:6 229:16 243:7,23 293:15 341:21 342:15 348:21 363:17 369:3 465:1 470:10
**28** 470:6
**28th** 393:18 394:11

**3**

**3** 47:5,6,6 224:7 235:16 236:21 265:14,15 266:21 305:1,2 356:14
**3:14** 325:13
**3:35** 215:21
**3:45** 337:8
**30** 23:22 87:15 190:16 283:16 482:22
**30th** 344:13
**31** 133:1
**310,000** 133:10
**3105** 209:20
**31st** 89:3 93:15
**34** 7:5
**347** 3:18
**35** 12:21 51:9 100:22,23 133:1 138:23 311:2
**357** 197:6,7,22 198:10,10 200:19 201:4,7 201:15,24
**357s** 198:12
**36-year** 413:7
**37** 140:9 159:23
**38** 196:16,18,21 197:1,5,13,16 197:22 201:3,7 201:14,23
**38/** 200:18
**386** 3:19
**39-year** 413:6
**395** 3:21
**396** 3:22
**398** 3:23
**399** 3:24
**3rd** 55:19 56:2,8 101:5,6 228:5 228:14 429:23

**4**

**4** 39:9,10 118:3 123:16,16,19 123:19 124:3,9 192:22,23 267:23 366:22 367:20 379:19
**4/15/87** 434:7
**4/17/87** 405:24
**4/21/87** 309:21 311:4
**4/3/87** 242:23
**4:33** 407:23
**4:47** 408:1
**4:55** 231:12,19
**40** 12:22 51:9 87:15 283:16 348:11 351:7
**400** 4:5
**405** 4:6
**444** 4:7
**46** 264:23
**473** 4:8
**478** 4:9
**48** 281:6
**48s** 401:24
**49** 206:15 304:8

**5**

**5** 9:17 88:13 215:24 216:1 282:7,7,19 381:3
**5'1** 282:8
**5'5** 282:24 283:18 344:17
**5'6** 283:19 344:14
**5:49** 480:3
**5:53** 480:5
**5:54** 481:17
**50** 283:16
**501** 2:3 5:9
**50s** 197:18
**525** 121:11
**54** 3:10
**55th** 101:11
**5769** 260:4,19 262:10 264:21 269:18
**5770** 260:23 266:3
**5772** 263:1 268:9,16
**5774** 260:4
**58** 478:10
**59** 53:12
**5th** 7:6 25:1 191:2 342:12 462:15,21 465:2

**6**

**6** 3:5 111:5
**60-some** 127:1
**600** 119:18 337:5
**61** 3:11
**640-8420** 2:17
**683-5448** 2:12
**6th** 267:9 268:17

**7**

**7/1/2020** 387:19
**7/7** 383:18
**70** 107:6
**718** 2:3 5:8 483:7
**72** 268:15
**74** 69:9 98:24 99:1
**75** 69:8
**7548** 400:21
**7548s** 401:13
**7549** 206:16
**77** 69:8 97:2,20 97:21 99:8 100:18,19
**7th** 61:17 126:22 126:24 294:1,2 312:8,16 360:2 360:11,22 361:1,5 362:14 362:22 367:23 373:4 381:2 382:13 384:20 389:11 403:7 423:15 466:7 477:1,13 478:7

**8**

**8** 123:16,17,19
**8/7/20** 3:11
**80s** 121:7 154:5 196:20
**84** 122:18,21 155:8 190:23 191:2 266:8 267:9 271:9 296:16 340:8

342:13 344:14 345:1 346:16
**8422** 466:3
**8423** 465:19 466:4
**8424** 466:9
**8425** 468:21
**8438** 202:24
**8479** 464:23 465:9
**85** 101:17 122:19 190:23 191:5 240:17 241:3 278:10 278:12 279:16 280:4,11 345:2 346:17
**86** 101:17 241:11 277:15 277:16 279:24 280:6
**87** 16:4 33:12 34:14 78:3,20 101:23 102:10 102:11 104:3 120:20 122:20 155:5 163:9,10 177:2 179:24 190:24 191:11 191:14 202:4 204:15 205:15 215:9 219:10 228:5,14 229:16 243:7 243:23 277:19 278:16 285:9 295:21 296:19 296:19 320:14 323:10 331:22 336:4 339:20 346:6,7 367:12 376:20 389:11 405:18,19 409:5 423:7 430:2 434:13 441:2,7 445:15 446:19 448:7 449:8 462:5,5 466:7 467:19 470:3 473:11 477:1 479:22
**88** 101:24 102:10,11 104:4 118:10 120:20 177:2 179:24 202:5 331:1 380:2 446:24 447:6 462:6,7,11 463:21 465:5,7
**8858** 107:24
**89** 25:13 465:1,7 470:11 477:10
**8995** 330:24 331:3
**8th** 474:1 476:5

**9**

**9** 73:8
**9/23** 55:15
**9/23/20** 55:13
**9:00** 296:1
**9:30** 1:12 445:17
**9:35** 5:7
**90** 3:12 119:3,10 119:11 121:9
**90s** 121:8 131:18 131:18 154:5
**91** 25:13 119:12 202:23 204:11 204:19 409:5,8 465:5
**92** 119:22
**925-4400** 2:4
**9415** 96:5
**9417** 96:6
**95** 136:14
**96** 95:17,23 477:9
**965-9081** 2:22
**97** 100:18 296:1
**99** 2:21
**9th** 431:21