Page 1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

CURTIS CROSLAND )
)
Plaintiff, )
)
VS. ) NO. 2:22-cv-02416-AB
)
CITY OF PHILADELPHIA, JOHN DELLA )
ROCCA, as personal representative)
of the Estates of JOHN CIMINO and)
ALBERT NESPOLI; DOMINICK MANGONI;)
JAMES McNESBY; JOSEPH BRIGNOLA; )
KAREN ANSEL as personal )
representative of the Estate of )
FRANCIS ANSEL; EDWARD HUGHES; )
EDWARD ROCKS; LINDA WESTERMAN as )
personal representative of the )
Estate of FREDERICK WESTERMAN; )
LUIS A. SILVA as personal )
representative of the Estate of )
JOHN LANZELOTTI; JOSEPH DESCHER; )
and LIEUTENANT THOMPSON )
)
Defendants. )
______________________________)

---
THURSDAY, FEBRUARY 22, 2024
---

Videotaped deposition of JAMES McNESBY, taken at the law offices of KAIRYS, RUDOVSKY, MESSING, FEINBERG & LIN, LLP, 718 Arch Street, Suite 501 South, Philadelphia, Pennsylvania, beginning at approximately 9:33 a.m., on the above date, before Carol L. Shearer, Registered Professional Reporter and Notary Public.

Page 2

A P P E A R A N C E S:

KAIRYS, RUDOVSKY, MESSING, FEINBERG & LIN, LLP
BY: JONATHAN H. FEINBERG, ESQUIRE
GRACE HARRIS, ESQUIRE
718 Arch Street, Suite 501 South
The Cast Iron Building
Philadelphia, Pennsylvnia 19106
(215) 925-4400
jfeinberg@krlawphila.com

-- Representing the Plaintiff

CITY OF PHILADELPHIA
BY: ADAM R. ZURBRIGGEN, ESQUIRE
DANIEL CERONE, ESQUIRE
One Parkway Building, 14th Floor
1515 Arch Street
Philadelphia, Pennsylvania 19102
(215) 683-5000
adam.zurbriggen@phila.gov

-- Representing the Defendants City of Philadelphia, Dominick Mangoni, James McNesby, Joseph Brignola, Edward Hughes, Edward Rocks and Joseph Descher

Page 3

A P P E A R A N C E S (continued):

CLARK HILL
BY: JOHN A. DeROSE, ESQUIRE
Two Commerce Square - Suite 2620
2001 Market Street
Philadelphia, Pennsylvania 19103
(215) 640-8240
jderose@clarkhill.com
-- Representing the Defendants John Della Rocca, as Personal Representative of the Estates of John Cimino and Albert Nespoli, Karen Ansel as Personal Representative of the Estate of Francis Ansel, Linda Westerman, as Personal Representative of The Estate of Frederick Westerman, and Luis A. Silva, as Personal Representative of the Estate of John Lanzelotti

ALSO PRESENT: Ed Caswell, Videographer
Angeline Etienne

Page 4

I N D E X


| | Page |
|---|---|
| Examination by Mr. Feinberg | 7 |
| Examination by Mr. Zurbriggen | 267 |
| Court Reporter's Certificate | 270 |


E X H I B I T S


| | | |
|---|---|---|
| Exhibit 54 | Document Re: John Lamb | 113 |
| Exhibit 55 | Activity Sheet | 114 |
| Exhibit 56 | Activity Sheet | 116 |
| Exhibit 57 | Search Warrant/Affidavit | 117 |
| Exhibit 58 | Handwritten Notes | 120 |
| Exhibit 59 | Arrest Warrant | 121 |
| Exhibit 60 | Activity Sheet | 130 |
| Exhibit 61 | Affidavit of Probable Cause | 142 |
| Exhibit 62 | Handwritten Notes | 146 |
| Exhibit 63 | Statement | 153 |
| Exhibit 64 | Activity Sheet | 208 |
| Exhibit 65 | Arrest Warrant | 212 |
| Exhibit 66 | Activity Sheet | 224 |
| Exhibit 67 | Arrest Warrant | 226 |
| Exhibit 31A | Activity Sheet | 228 |
| Exhibit 67A | Chronology | 240 |


(Exhibits were not provided to Court Reporter for

Page 5

VIDEOGRAPHER: We are now on the Record. My name is Ed Caswell the 4th. I'm your videographer retained by On the Record. This is a video deposition for United States District Court for the Eastern District of Pennsylvania. Today's date is February 22nd, 2024, and the time is 9:33. This deposition is being held at 718 Arch Street in Philly in the matter of Curtis Crosland versus City of Philadelphia, et al. The deponent is James McNesby.

Counsel, if you want to introduce yourselves and who you represent.

MR. FEINBERG: Sure. This is Jon Feinberg. I represent the Plaintiff, Curtis Crosland. I'm joined here today by my colleague, Grace Harris, and our paralegal, Angeline Etienne.

MR. ZURBRIGGEN: My name is Adam Zurbriggen from the City of Philadelphia Law Department. I'm joined here by my colleague, Daniel Cerone, from the City of Philadelphia Law Department. We represent the Department, James McNesby, City of Philadelphia and the other City Defendants.

MR. DeROSE: Good morning. This is John DeRose from Clark Hill. I'm here on behalf of

Page 6

Karen Ansel and Linda Westerman.

VIDEOGRAPHER: The witness will now be sworn in.

JAMES McNESBY,

the Witness herein, having been first duly sworn, was examined and testified as follows:

VIDEOGRAPHER: Proceed.

MR. FEINBERG: Sir, before I begin, I just need to put something on the Record that the attorneys have discussed. There are a number of Estate Defendants in this case who remain unrepresented. Some of the decedents who are represented by those Estates which do not have counsel may be discussed during today's deposition.

I've discussed with Adam and John that we will proceed with this deposition and agree that, if new counsel should enter on behalf of any of those Estates in the future, to the extent any issues that are addressed in this deposition need further exploration, we will not object to any further questioning of this witness.

Does that accurately summarize where we stand?

MR. ZURBRIGGEN: Agreed.

MR. DeROSE: Agreed.

Page 7

EXAMINATION

BY MR. FEINBERG:

Q. Sir, thank you for waiting while we put that on the Record.

First, introductions, I introduced myself before we went on the Record. Let me now do it formally. My name is Jon Feinberg. I'm joined here today by Grace Harris and Angeline Etienne. Our law firm and our co-counsel, who are based in New York, represent Curtis Crosland.

Mr. Crosland has brought a lawsuit against you, several other Philadelphia Police Department detectives and the City of Philadelphia. In the lawsuit, Mr. Crosland alleges that you and your fellow detectives caused him to be falsely arrested, prosecuted, convicted and incarcerated for more than 34 years for the December 5th, 1984, robbery and murder of Il Man Heo, when Mr. Crosland was in fact innocent of that crime. As I've mentioned, you've been named as a Defendant, and you're here today for your deposition.

Do you understand all that, sir?

A. Yes.

Q. You're represented in this case by Mr. Zurbriggen and Mr. Cerone. Have you had a chance to consult with them before we begin?

Page 8

A. Yes.

Q. Do you need any more time to speak with them?

A. No.

Q. Can I assume that, over your career as a Philadelphia police officer and detective, you testified under oath in court many times?

A. Yes.

Q. Have you ever testified in a deposition before, in a setting like this?

A. No.

Q. I'll just note for you, sir, in terms of instructions, even though there's no judge or jury here -- we are not in a courtroom -- you're testifying under oath as if you were in court in front of a judge or jury. Do you understand that, sir?

A. Yes.

Q. Okay. With that out of the way, I will not go through the litany of instructions that I would give to a civilian witness. Let me just mention two things.

First -- the first I already mentioned. The second is that your counsel may object for the Record, but unlike a court proceeding, when there's an objection, you don't have to stop talking. You can answer the question unless your counsel instructs you otherwise. So objections

Page 9

are just for the purpose of preserving things for the Record for a judge to address later.
Do you understand that, sir?
A. Yes.
Q. Okay. We have a lot to cover today, and I know this investigation took place many years ago. So it may take some time for you to review and understand. I get that. The point I want to drive home, though, is that this is not a marathon. We're not here to tire you out. If at any point you need a break, you should tell me, and I'll be happy to accommodate that.
Understood?
A. Yes.
Q. Okay. Two qualifiers. One is that, if you ask for a break and there's a question pending, then you should go ahead and answer the question before you take a break.
Understood?
A. Yes.
Q. The second is, I'll try to break myself. I typically, especially for the comfort of our court reporter, will try and break every hour and 15 to hour and 30 minutes. Okay?
A. Yes.
Q. All right. Is there any reason why you cannot

Page 10

give truthful and accurate testimony today?
A. No.
Q. What did you do to prepare for today's deposition?
A. I read over the Complaint that I received. That's about it.
Q. The Complaint meaning the Complaint filed in federal court --
A. Yes.
Q. -- by Mr. Crosland?
A. Yes.
Q. Did you meet with your counsel?
A. This morning, yes.
Q. Okay. Had you ever met with your counsel before this morning?
A. No.
Q. How long was your meeting this morning?
A. Half hour.
Q. Was anyone else present with you in that meeting --
A. No.
Q. -- with your counsel?
Okay. And is today the first time you've seen your counsel in person?
A. Yes.

Page 11

Q. Have you ever had any meetings with your counsel by Zoom or any other videoconference?
A. No.
Q. Have you ever spoken to your counsel on the phone before this morning?
A. Yes.
Q. In those phone calls, without asking the content of what was discussed, were any of those phone calls for purposes of preparing for this deposition?
A. Yes.
Q. Okay. How long was your -- how many phone calls did you have to discuss the deposition?
A. Basically, it was phone calls, when was I going to be available for this deposition. That was many the topics of conversations.
Q. Got it. Okay. What I was asking about was whether there were any calls where you had an opportunity to prepare for the deposition with your counsel?
A. No.
Q. It sounds like that's not the case; is that correct?
A. Right.
Q. All right. Have you spoken to anybody else besides your counsel about the deposition?

Page 12

A. No.
Q. There are a number of detectives who have been named as Defendants in this case, several of whom are deceased.
A. Right.
Q. Let me first ask you about the living detectives to ask whether you've spoken to them about this case or your deposition.
First is Detective Rocks, Edward Rocks.
A. No.
Q. Detective Rocks gave deposition testimony on November 6th of last year in this case. Have you ever spoken to him about that deposition?
A. No.
Q. When was the last time you spoke to Detective Rocks at all?
A. About three or four years ago.
Q. Did you happen to read a transcript of Detective Rocks' deposition?
A. No.
Q. Detective Mangoni, Dominick Mangoni, testified in a deposition on November 22nd of last year. Have you spoken to him about that deposition?
A. No.

Page 13

Q. When was the last time you spoke to Detective Mangoni?
A. Maybe two years ago.
Q. There's a Detective Brignola who was named as a Defendant. When was the last time you spoke to Detective Brignola?
A. Maybe 30 years ago.
Q. Okay. How about Sergeant Descher, when was the last time you spoke to him?
A. I haven't spoken to him 30 years, also.
Q. Let me ask you then about last conversations with some of the deceased Defendants. One is Detective John Cimino. I understand he's been deceased for quite some time?
A. Yes.
Q. Do you remember when you last spoke to him?
A. Seven, eight years ago.
Q. In that conversation or any recent conversations, did you happen to speak to him about this case involving Curtis Crosland?
A. No. No.
Q. Detective Edward Hughes, I understand he just died last year. When was the last time you spoke with him?
A. Right before he passed away.

Page 14

Q. Did you happen to speak with him about this case at all?
A. No.
Q. Detective Nespoli, when was the last time you spoke with him?
A. Maybe 40 years ago.
Q. Detective Ansel, when was the last time you spoke with him?
A. When he was on his deathbed. Maybe five years ago.
Q. Did you happen to speak to him about this case or any part --
A. No. No.
Q. Sergeant Westerman, when was the last time you spoke with him?
A. I really never spoke to him.
Q. How about John's Lanzelotti, who I believe was a lieutenant?
A. Same thing. I never spoke to him.
Q. There were two prosecutors who tried the case against Mr. Crosland, because there were two different trials. The first was Joel Rosen. Do you know Mr. Rosen?
A. Yes.
Q. When was the last time you spoke with Mr. Rosen?

Page 15

A. I guess right around the time of the -- I don't know.
Q. So the first trial in the case was in 1989.
A. I think Joel had another case I was involved with.
Q. When was that?
A. I don't know.
Q. Have you spoken with him at all --
A. No.
Q. Let me finish my question, sir.
Have you spoken with him at all since that last trial?
A. No.
Q. I misspoke before. The first trial was in December of 1988. In any event, I take it your answer stands that you haven't spoken with him since the late '80s or early '90s; is that right?
A. Yes.
Q. The second trial was prosecuted by Shelley Robins New. When was the last time you spoke with Now- Judge Robins New?
A. Like I said, time of trial, maybe.
Q. My understanding is -- first, can you tell me, when did you retire from the Philadelphia Police Department?

Page 16

A. 1991, January 3rd.
Q. Okay. The second trial in this case started January 24th of 1991. So I understand you would not have been on the force at that time?
A. Right.
Q. Do you remember being brought in after your retirement to testify in any cases in that time period?
A. (No audible response.)
Q. Sir, you mentioned that you read the Complaint that was filed in federal court. When did you read it?
A. I read it when I first got it, like December of last year, maybe.
Q. Okay.
A. And I also reviewed it a few days ago.
Q. Okay. So you understand the time frame. I know you've read the Complaint. Let me just put a couple of dates in your mind so it's clear what we're talking about.
I take it you're aware that the case involves a murder that occurred on December 25th, 1984; is that right?
A. I never worked on that -- I never worked on that investigation.
Q. Okay. Well, did you work on the investigation at a later date?
A. No.

Q. Okay. We'll come back to that.
Before I ask you about your involvement, will you just confirm for me your understanding of the dates based on your review of the Complaint. That's my goal here. First, do you understand that the murder that Mr. Crosland was prosecuted for took place on December 4th of '84.
A. No.
Q. You don't remember seeing that in the Complaint?
A. I'm sorry. Yes.
Q. And you understand that that murder was alleged to have -- that murder took place at 27th and Oakford Streets in South Philadelphia?
A. Like I said, I never had -- I was just at the very end when I went to the hospital to see the witness at the request of the DA. And then the day of the trial, I guess the second trial, I guess, we picked up the witness, because she didn't have any money to come to court.
Q. The witness you're referring to is Delores Tilghman; is that correct?
A. Yes.
Q. Okay. And you recall speaking to Ms. Tilghman about this case?
A. No.
Q. Okay. We'll come back to that. You're aware that



Mr. Crosland was arrested and charged with this crime in December of 1987; is that correct?
A. No.
Q. Didn't know that at all?
A. No.
Q. The dates that I'm going through are dates that are cited in the Complaint. What I'm attempting to do with these questions is refresh your recollection based on the Complaint, based on what you've seen in the Complaint.
Do you have any reason to disagree with the recommendations that I've made about these various dates?
A. No.
Q. Okay. To be clear, your involvement in anything connected to this case occurred in 1987 when you conducted an interview with Delores Tilghman; is that correct?
A. Yes.
Q. After Mr. Crosland was convicted, do you recall having any involvement in the case at all?
A. No.
Q. Did you look at any other documents before today besides the Complaint?
A. No.
Q. There are two other -- pardon me. There were two other homicides that we have documents showing your



involvement in investigations. One was for the murder of John Lamb. Do you remember that name?
A. No.
Q. The other was for the murder of Joseph Wilkerson. Do you remember that name?
A. No.
Q. Okay. What I'll do as we go forward today is show you some of the documents from those cases.
Did you look at any materials from the homicide file from the Il Man Heo murder in order to prepare for today's deposition?
A. No.
Q. Let's do this, sir. I think what might be helpful to get ourselves on the same page is let me start by showing you some documents --
A. Sure.
Q. -- related to this case and also related to your interactions with Ms. Tilghman.
A. Okay.
Q. As I mentioned to you before we went on the Record, you have a binder in front of you which has tabs numbered 1 through 53. When I reference a tab, the document that I'm asking you to look at is behind each tab.
So the first is Exhibit 1. What I'll explain to



you first, before you start reading, is Exhibit 1 is the Affidavit of Probable Cause that was prepared for the arrest of Curtis Crosland in connection with the Il Man Heo murder. Why don't you take a look through that Affidavit of Probable Cause. I'll note that it's front and back of the page. It's a three-page document in total. So take your time to read it and let me know when you're finished and I'll ask you some questions.
A. Okay.
Q. Have you read all three pages, sir?
A. Yes.
Q. Okay. Did reading that refresh your recollection of any of your involvement in this case?
A. No.
Q. Now, would you agree with me that, although the signature is a little tough to read, that this affidavit was prepared by John Cimino?
A. Yes.
Q. Was Detective Cimino your partner in 1987?
A. Yes.
Q. Okay. Do you recall, now that we've discussed the fact that he was your partner, hearing about any of his involvement in this prosecution?
A. No.

Page 21

Q. The second document I'll ask you to take a look at is Exhibit 22. So if you turn all the way to Exhibit 22, and before I direct to you a specific page, let me explain to you -- take your time there to make that work.
Exhibit 22 is a transcript of several days of deposition testimony that were given by Delores Tilghman. To make things easy, I'm going to refer to the page numbers that appear on the bottom right corner of each page. So I'll ask you to turn to page 9000. About two-thirds of the way through the packet.
A. You said 2000?
Q. 9000. It's going to be the back of one of the pages. All right, sir. So before you start reading, let me just set the scene for you so you understand.
By the way, I'm going to show you a number of documents throughout the day. To expedite things, I will direct you to the part of the document that is most relevant for my questions. You don't need to accept my representations. If you need to look at other portions of the document before you answer my questions, you just tell me, and we'll give you time to do that.
With that said, let me note that what is described here in this transcript is an interview and a statement that was taken by you and Detective Cimino of Delores

Page 22

Tilghman on April 16th of 1987. So if you read from the top of page 9000 and you go to the bottom of page 90006, that will give you the details of Ms. Tilghman's testimony. Take your time to do that and let me know when you're finished.
Did you finish going through page 9006, sir?
A. Yes.
Q. Okay. Thank you. Did review of that testimony refresh your recollection at all about your interactions with Delores Tilghman?
A. A little bit.
Q. Okay. So you recall being present for an interview in a hospital with Delores Tilghman; is that right?
A. Well, there really was no interview. It was just going through, checking her well-being.
Q. Okay. You see that Ms. Tilghman testifies that a statement was taken, and then that statement is read back in this testimony. Did you see that, sir?
A. Yeah, I saw that, but I'm not aware of it.
Q. Okay. In other words, you don't recall that specific statement?
A. Right.
Q. Okay. Let me also represent to you that the

Page 23

reason I'm showing you this testimony is that I have not seen the written statement that is described in this testimony in any of the thousands of pages that we've received from the City Law Department.
A. Right.
Q. It sounds like you don't recall taking a statement; is that correct?
A. I wouldn't take one in a hospital, anyway.
Q. You would not take one in a hospital; is that right?
A. Right.
Q. Okay. We'll come back to that in just a moment.
Let me ask you this. Do you recall -- let me ask a different question.
Do you dispute the fact in any way that there was a statement taken as described in this testimony?
MR. ZURBRIGGEN: Object to the form, but Detective, you can answer.
THE WITNESS: Like I said, we didn't take statements at the hospital.
BY MR. FEINBERG:
Q. If Mr. Rosen read a statement into the Record in this grand jury testimony, would you agree that there must have been a statement at some point?

Page 24

MR. ZURBRIGGEN: Same objection, but Detective, you can answer.
THE WITNESS: No.
BY MR. FEINBERG:
Q. No, you don't?
A. No.
Q. So what you're saying is that there's -- let me ask you this.
Do you have any explanation for why there's a description of the statement in this grand jury testimony?
A. No.
MR. ZURBRIGGEN: Object to the form. Detective, you can answer.
THE WITNESS: No.
BY MR. FEINBERG:
Q. You have no idea?
A. Right.
Q. Let's go on. Sir, sitting here today, do you have any idea whether Curtis Crosland is guilty or innocent of the shooting of Il Man Heo?
A. He's guilty.
Q. Why do you say that?
A. Well, he was tried -- two different trials, and he

Page 25

-- both jury trials, and the jurors found him guilty.
Q. Do you have any understanding of the evidence that was used to convict Mr. Crosland of the murders -- of the murder, singular?
A. No.
Q. So is there anything other than the fact that a jury found him guilty that you're relying on in order to tell me that he's guilty?
A. Well, I mean, it was probable cause to arrest him, and he went to trial and was found guilty.
Q. Okay. Which I understood that. What I'm asking you, my question was, do you know whether he's guilty or innocent. You said he's guilty because a jury found him guilty.
A. Twice.
Q. My question for you is, do you have any other information or any other evidence that you're relying on to support your belief that he's guilty?
A. No.
Q. Okay. So it's the mere fact of the jury verdict; is that correct?
A. Yes.
Q. Are you aware that Mr. Crosland's conviction has been vacated or eliminated by federal court?

Page 26

A. Yes.
Q. And are you aware that that happened after lawyers in the District Attorney's Office conducted a reinvestigation of the case?
A. Yes.
Q. Are you aware that those lawyers in the District Attorney's Office submitted papers to a federal court stating that Mr. Crosland may very well be innocent of the crime?
A. No.
Q. Let me show you that, actually. If you go back to Exhibit 6.
A. I have it here.
Q. No, no. Tab 6, right here, sir. If you see --
A. I'm sorry.
Q. Not the page number; the tab number. You have to go all the way back.
Let me do this. Let me make it easy for you. Sir, you can stop. That testimony that's in front of you, I may ask you to look at that a number of times.
Sir, I'm going to show you from my exhibit binder a portion of Exhibit 6. This is a portion of a brief that was submitted by the District Attorney's Office to a federal court. I have some text highlighted down at the

Page 27

very bottom of page 6. Take a moment to read that.
Sir, did you see what I've highlighted here that the Commonwealth, meaning the District Attorney's Office is cognizant that Crosland may very be actually innocent?
A. Right.
Q. Do you have -- well, first, do you agree or disagree with that statement?
MR. ZURBRIGGEN: Object to the form. Detective, you can answer.
THE WITNESS: Yes.
BY MR. FEINBERG:
Q. Yes, you agree?
A. Disagree.
Q. You --
A. Disagree with it.
Q. Why do you disagree?
A. Because he was found guilty by two different juries of his peers.
Q. Okay. You're aware that a federal judge, judge Anita Brody, accepted the conclusions of the lawyers with the District Attorney's Office and vacated the conviction?
A. No, I'm not aware of that.
Q. Okay. And it sounds like you disagree with that conclusion; is that correct?

Page 28

A. Yes.
MR. ZURBRIGGEN: Object to the form.
THE WITNESS: Sorry.
BY MR. FEINBERG:
Q. You disagree because of the fact that a jury found him guilty; is that correct?
A. Yes.
Q. When was the first time you learned about the fact that Mr. Crosland's conviction had been vacated?
A. I guess when I received the Notice.
Q. The Complaint?
A. The Complaint, yeah.
Q. Did you have any reaction to learning that fact?
A. No.
Q. I hear what you're saying, but I'm asking just to follow up. Were you upset? Disappointed? Anything like that?
A. No.
MR. ZURBRIGGEN: Object to the form.
THE WITNESS: I'm sorry.
MR. ZURBRIGGEN: That's okay, Detective.
BY MR. FEINBERG:
Q. Are you aware that the District Attorney's Office has, since 2018, agreed to the vacatur or the elimination

Page 29

of convictions in 40 cases?
MR. ZURBRIGGEN: Object to the form.
Detective, you can answer if you can.
THE WITNESS: No.
BY MR. FEINBERG:
Q. Are you aware that many of the cases which have resulted in vacating of a conviction or exonerations have been cases that arose out of investigations by the Philadelphia Police Department homicide unit?
MR. ZURBRIGGEN: Same objection, but go ahead, Detective.
THE WITNESS: No.
BY MR. FEINBERG:
Q. How often do you connect with and see any of your former colleagues from the homicide division these days?
A. Maybe every couple weeks.
Q. Who do you see?
A. I see Art Mee. I saw Ed Hughes one time before he passed away. I see Paul Worrel. I see Frank Yastremski.
Q. Who else?
A. That's it.
Q. Okay. The first one, Art, I missed the last name.
A. Mee.
Q. How do you spell that?

Page 30

A. M-E-E.
Q. Sir, you mentioned Mr. Mee, Mr. Hughes, who I understand is now deceased, Mr. Worrel and Mr. Yastremski. When you see them, do you ever talk about any of your work in the homicide division, any of your old investigations, anything like that?
A. Sometimes.
Q. Have you ever had discussions with them about the way the District Attorney's Office is handling current cases?
MR. ZURBRIGGEN: Object to the form.
THE WITNESS: Yes.
BY MR. FEINBERG:
Q. Tell me about those conversations.
MR. ZURBRIGGEN: Same objection, but go ahead, Detective.
THE WITNESS: Well, we just see a pattern of how these cases are being overturned. Many years after they're convicted, the witnesses that testified against them now rebut their original testimony.
BY MR. FEINBERG:
Q. What else have you discussed with them?
MR. ZURBRIGGEN: Same objection.

Page 31

THE WITNESS: (No audible response.)
BY MR. FEINBERG:
Q. When you say that the witnesses rebut their testimony, are you suggesting that, with the passage of time, witnesses decide to change their stories?
A. Yes.
Q. Have you discussed whether there has been -- sorry. Let me restate that.
Have you ever discussed with those other detectives, maybe we got something wrong?
A. No.
Q. Has any of those detectives ever acknowledged that they may have made errors in the investigation of cases which have later been vacated?
A. No.
Q. Has any of them ever acknowledged that they engaged in misconduct in any of those cases?
A. No.
Q. Do you believe that they ever engaged in any misconduct?
MR. ZURBRIGGEN: Object to the form.
Detective, you can answer.
THE WITNESS: No, I don't think so.
BY MR. FEINBERG:

Page 32

Q. I take it you're aware that Mr. Yastremski in particular is facing a prosecution for perjury?
A. Yes.
Q. Have you ever discussed that with him?
A. No.
Q. My understanding is that Detective Worrell and Detective Yastremski were both involved in the prosecution of a man named Anthony Wright. Do you know Mr. Wright?
A. No.
Q. I should say that differently. Do you know anything about the case involving Mr. Wright?
A. I read about it in the paper a couple times.
Q. Let's make sure we're talking about the same case. Mr. Wright, his conviction was vacated --
A. Right.
Q. -- after DNA testing. The District Attorney's Office decided to prosecute him again and he was found not guilty. Are you aware of all that?
A. I believe so, yeah.
Q. And you're aware he then brought a civil rights lawsuit?
A. Yes.
Q. And that the city settled that civil rights lawsuit for close to $10 million?

Page 33

A. Yes.
Q. Have you ever discussed that topic, anything having to do with what I just asked you about --
A. No.
Q. -- let me finish my questioning -- with Detective Yastremski or Detective Worrell?
A. No.
Q. When you talked with these other detectives, do you -- has there been discussion about the way the District Attorney's Office has handled these cases in particular?
MR. ZURBRIGGEN: Object to the form. Detective, you can answer.
THE WITNESS: Repeat that.
BY MR. FEINBERG:
Q. Sure. Have you ever discussed with these other detectives the manner in which the District Attorney's Office has handled these cases?
MR. ZURBRIGGEN: Same objection, but Detective, you can answer.
THE WITNESS: The current DA's Office?
BY MR. FEINBERG:
Q. Right.
A. Yes.
Q. What's been the nature of that conversation?

Page 34

MR. ZURBRIGGEN: Same objection.
THE WITNESS: The way the cases resurface and witnesses have now changed their original testimony. So we kind of see a pattern here.
BY MR. FEINBERG:
Q. Do you believe the DA's Office should be doing something different?
MR. ZURBRIGGEN: Object to the form. Detective, you can answer.
THE WITNESS: Yes.
BY MR. FEINBERG:
Q. What should they be doing different?
MR. ZURBRIGGEN: Same objection. Detective.
THE WITNESS: Prosecuting defendants.
BY MR. FEINBERG:
Q. So, by the same token, in a situation like Mr. Crosland's case where the District Attorney's Office agreed that his conviction should be vacated, it sounds like you believe they should not have done that; is that right?
A. Correct.
Q. And once again you -- strike that.
Other than these detectives who we talked about -- Detective Mee, Detective Hughes, Detective Worrell, Detective Yastremski -- have you ever had conversations of

Page 35

the nature we've just been discussing with anybody else?
A. Detective Joe Walls.
Q. Spell that last name for me.
A. Walls, W-A-L-L-S.
Q. Was he a homicide detective?
A. Yes.
Q. Who else besides the four we were discussing and Detective Walls?
A. None -- none that I recall.
Q. Okay. Sir, on the topic of witnesses providing different stories after the passage of time, I want to show you some of the documents about the witnesses against Mr. Crosland. And for that purpose, I'll ask you to turn all the way back to the front of your binder. Actually, let's go to tab 2. Adam, maybe you can help him get to tab 2.
What I'm going to do now, sir, is show you three documents to orient you to the circumstances that led to Mr. Crosland's release from prison. The first exhibit, 2, is an affidavit of Rodney Everett. Do you see that, sir?
A. Yes.
Q. Okay. So before you start reading that, let me just remind you a short while ago I asked you to look at Exhibit 1, which was the Affidavit of Probable Cause for the arrest of Mr. Crosland. Do you remember reading that?

Page 36

A. Right.
Q. And do you remember seeing that affidavit in reference to a statement given by Rodney Everett?
A. Yes.
Q. Okay. So now I'll ask you to read this affidavit of Rodney Everett which was signed on July -- pardon me -- January 7th of 2020. Read it to yourself. Tell me when you're finished.
A. Okay.
Q. You finished reading that, sir?
A. Yes.
Q. All right. Now let's turn to tab 3. This is the affidavit of Delores Tilghman, who now uses the name Tilghman Washington. It's signed December 20th, 2019. Before I ask you to read that, just confirm, Ms. Tilghman, you recall seeing her in the hospital; is that correct --
A. Right.
Q. -- back in 1987?
A. Yeah.
Q. Okay. So take a moment to read this affidavit to yourself and let me know when you're finished.
A. Okay.
Q. You finished reading Exhibit 3?
A. Right.

Page 37

Q. Now turn to one more exhibit, please, Exhibit 4, and this is the affidavit of Brenda Turner. And let me note that Brenda Turner's name is not mentioned in any of the previous affidavits, but you'll see there's reference to testimony that Delores Tilghman gave about Brenda Turner. Do you understand what I've said?
A. Um-hum.
Q. Okay. Is that a yes?
A. Yes.
Q. Okay. Take a moment then to read this affidavit and let me know when you're finished.
A. Okay.
Q. Do you see there's a description of Delores Tilghman's trial testimony referencing Brenda?
A. Yeah.
Q. And then Brenda says in this affidavit that what's described in that testimony never happened?
A. Um-hum.
Q. Do you see that?
A. Yeah.
Q. Is that a yes?
A. Yes.
Q. Okay. I'm sorry to keep doing that, sir. For our court reporter's purposes, I want to make sure that you're

Page 38

saying --
A. Okay. I'm sorry.
Q. -- yes or no.
So sir, have you ever seen these affidavits before I asked you to read them?
A. No.
Q. Now, you and I were just talking a short while ago about witnesses providing different stories or different testimony as years have passed since people were convicted --
A. Right.
Q. -- is that correct?
A. Yes.
Q. Is that a yes?
A. Yes.
Q. All right. What's your reaction to seeing these affidavits about the Curtis Crosland case?
MR. ZURBRIGGEN: Objection to form. Detective, you can answer.
THE WITNESS: I don't really have a reaction.
BY MR. FEINBERG:
Q. Okay. Do these affidavits from witnesses whose testimony or whose information that was used to prosecute and convict Mr. Crosland cause you to have any doubts about

Page 39

the validity of Mr. Crosland's conviction?
A. No.
MR. ZURBRIGGEN: Same objection.
THE WITNESS: Never.
BY MR. FEINBERG:
Q. Is that because you believe that the jury got it right after finding -- after hearing the trial and finding Mr. Crosland guilty?
A. Yes.
Q. One other document I'll show you. Just keep going to the next tab. It's Exhibit 5. This is a document, sir, prepared by a private investigator named Paul Paris. The document I'm showing you is the cover page to the transmission of witness statements. The reason I'm showing you this typed document is because the handwritten documents that are described are very hard to read and will take us a long time. So to save us some time, I'm just going to ask you to read the summary that pairs with this exhibit and tell me when you're finished.
A. Okay.
Q. Do you see reference to the name Michael Ransome?
A. Yes.
Q. Do you recall that name at all in connection with the Curtis Crosland case?

Page 40

A. No.
Q. There's also a reference to Rodney Everett being at the scene of the crime. Do you see that, sir?
A. Right.
Q. Do you recall hearing at any point that there were a number of tips called into the homicide division after Il Man Heo was shot and killed identifying Michael Ransome as the suspect, or as the perpetrator?
A. No.
Q. Does anything that you see here change your views about whether Curtis Crosland was in fact guilty of the shooting of Il Man Heo?
MR. ZURBRIGGEN: Object to the form, but go ahead, Detective.
THE WITNESS: No.
BY MR. FEINBERG:
Q. Have you seen any statements that identify Mr. Ransome as the perpetrator?
MR. ZURBRIGGEN: Same objection. Detective, you can answer.
(Court Reporter clarification.)
BY MR. FEINBERG:
Q. Have you seen any statements that identify Mr. Ransome as the perpetrator, other than what I've just

Page 41

shown you?
A. When I read the Complaint that I received in the mail, I think I saw Michael Ransome's name involved there.
Q. Okay. So you saw reference in the Complaint to the fact that Michael Ransome had been identified --
A. Right.
Q. -- as a perpetrator? Is that a yes?
A. Yes.
Q. But my question was, do you recall seeing any of the other underlying documents from the police investigation file?
A. No.
Q. Do you remember discussing Michael Ransome with any of your fellow detectives back in that time frame?
A. No.
Q. All right, sir. I'm going to ask you some background questions now that we've covered some introductory information about the case. What's your highest level of education?
A. Master's degree in public safety.
Q. When did you obtain that master's degree?
A. 1993.
Q. Were you already working -- yes, you already were working for the Philadelphia Police Department at that

Page 42

point?
A. No. I was working at St. Joseph's University.
Q. Got it. You retired from the police department in '91?
A. Yes.
Q. Before you started working for the Philadelphia Police Department, what was your highest level of education?
A. High school.
Q. Okay. Then I take it you went to college while you were working in the police department?
A. Yes.
Q. Just walk me through your educational history then.
A. Graduated high school in 1962, North Catholic High School. Associate's degree from Philadelphia Community College, criminology, sociology. Then LaSalle University, sociology, another associate's degree. And then St. Joseph's University, master's degree in public safety.
Q. So the master's was in '93; is that correct?
A. Yes.
Q. When did you obtain the associate's degree?
A. '75, I believe.
Q. And when did you obtain the bachelor's?

Page 43

A. '81.
Q. I apologize if I already asked you, but when did you start with the police department?
A. March 20th, 1967.
Q. Did you do any work between your graduation from high school in '62 and starting with the department in '67?
A. I was in the United States Marine Corps.
Q. All five years?
A. Four years.
Q. Active duty?
A. Yes.
Q. What was the nature of your discharge?
A. It was honorable.
Q. When were you discharged?
A. 1967, February 4th.
Q. So right before you started with the police department?
A. Yes.
Q. Can you walk me through then your career in the Philadelphia Police Department in terms of your ranks and your assignments.
A. After the police academy, I was assigned to the unit called the task force. That was disbanded, and I was assigned to the 19th District at 61st and Thompson Street.

Page 44

I was there a little less than a year. Then I went to Highway Patrol. I spent five years in Highway Patrol. Then I was detailed to the DEA for four years. In 1979, promoted to detective and assigned to homicide.
Q. Did you remain there throughout your -- until your retirement?
A. Yes.
Q. You started off by mentioning the task force. What was the duty of the task force?
A. That we were -- back then, there was a lot of gang shootings at different high schools. So they had us patrolling around two schools looking for -- being available for any kind of gang fighting or whatever.
Q. Do you recall which schools?
A. William Penn High School. It was mostly all -- mostly all public schools.
Q. When was William Penn -- let me ask you this way. Was there a specific section of the city you were assigned to?
A. Covered the whole city.
Q. 19th District, that's Southwest Philly; is that right?
A. No. Well, it's above Market Street, but it's West Philly, yeah.

Page 45

Q. I misspoke. So West Philly north of Market; is that right?
A. Yeah.
Q. Highway Patrol, you covered the whole city; is that correct?
A. Yes.
Q. All right. And once you were promoted to detective in '79, you went right to homicide; is that right?
A. Yes.
Q. And you retired in '91; is that correct?
A. Yes.
Q. Where did you go after you retired?
A. St. Joe's University. I was head of security.
Q. How long did you stay there?
A. 14 years. I then went to Gwynedd Mercy University.
Q. So '91 to '05, give or take a couple years?
A. '04.
Q. Then you went to Gwynedd Mercy, also head of security?
A. Yes.
Q. How long did you stay at Gwynedd Mercy?
A. 13 years.

Page 46

Q. To 2017; is that right?
A. Yes.
Q. And did you retire from Gwynedd Mercy in 2017?
A. Yes.
Q. Have you done any -- have you had any employment since 2017?
A. No.
Q. Have you ever been fired from a job in your life?
A. No.
Q. At any point since you left the Philadelphia Police Department, have you ever been called back to give information about old investigations or anything like that?
A. Yes.
Q. How many times did that happen?
A. About once.
Q. When did that happen?
A. I really don't know. It was Santiago. He murdered a police officer.
Q. The case, the Defendant's name was Wilfredo Santiago?
A. Yes.
Q. Were you involved in the original investigation of that case?
A. Yes.

Page 47

Q. Describe to me what happened that brought you back to work with the police department after your retirement in connection with that case.
A. I don't recall.
Q. Do you recall who you spoke to?
A. No.
Q. Do you recall who reached out to you?
A. No.
Q. Would it have been close in time to your retirement in '91?
A. No.
Q. It could be any time; is that what you're saying?
A. Right.
Q. How old are you, sir?
A. 79.
Q. What's your date of birth?
A. [redacted]
Q. Where do you live, sir?
A. Well, my wife passed away last year. So I've been living with my daughter up in Upper Dublin. I also have a house down in North Wildwood, New Jersey. So I go back and forth.
Q. Where were you living before your wife passed away?

Page 48

A. I was with my daughter. We moved up there, but before that we lived in Northeast Philadelphia.
Q. Do you still own the house in Northeast Philadelphia?
A. No.
Q. Did you sell that recently?
A. Yes.
Q. Okay. You mentioned that you own a house in North Wildwood; is that correct?
A. Yes.
Q. Do you own it with anybody else, or is it exclusively in your name?
A. Just my name. My children's, too.
Q. I'm sorry?
A. My children, too.
Q. Do you own any other real property besides that house in North Wildwood?
A. I own a lot up in Eagle Rock. It's above the Poconos. Just a wooded lot.
Q. Eagle Rock, was that the name?
A. Yeah.
Q. There's no real property on the lot?
A. No.
Q. Is there any other real property besides North

Wildwood and Eagle Rock?
A. No.
Q. You mentioned that you live now with your daughter; is that right?
A. Yes.
Q. Are there any other people who live in the home with you and your daughter?
A. Yeah. Her husband, my son-in-law, and they have three daughters.
Q. How many children do you have -- you've already mentioned one daughter. Other than that daughter who you're living with, do you have any other children?
A. Seven.
Q. Seven children total?
A. Yeah.
Q. Can you give me their age ranges, just from oldest to youngest.
A. 52 to 40.
Q. The daughter who you're living with now, where does she fall in the birth order?
A. Fourth.
Q. Do you have any family members who work in law enforcement?
A. No.



Q. You probably get asked all the time. Are you related in any way to John McNesby?
A. No.
Q. You know who I'm talking about; the former head of the Fraternal Order of Police?
A. Yeah. We're friends.
Q. Friends but no relation?
A. We couldn't establish one.
Q. Do you ever use any social media, sir?
A. What's that now?
Q. You've answered my question. Do you ever use any social Internet services like Facebook --
A. No.
Q. -- or Instagram?
A. No.
Q. Do you have any grandchildren?
A. Yes, 14.
Q. Your grandchildren haven't gotten you into social media at all?
A. No. I stay out of it. I hear it from other people.
Q. That may be a good move on your part then.
Sir, you're aware that Mr. Crosland has brought a lawsuit against you and is suing you for damages; is that



correct?
A. Yes.
Q. Do you have any understanding as to who would be responsible for making payment in the event a court were to say that you owed Mr. Crosland money?
MR. ZURBRIGGEN: Object to the form, but Detective, you can answer.
THE WITNESS: I guess it would be me.
BY MR. FEINBERG:
Q. Have you ever been informed the City of Philadelphia will be required to pay on your behalf?
MR. ZURBRIGGEN: Same objection, but Detective, you can answer if you know.
THE WITNESS: Yes.
BY MR. FEINBERG:
Q. Yes, you have?
A. Yeah.
Q. Is that your understanding, that the City would cover an award of damages?
MR. ZURBRIGGEN: Same objection.
THE WITNESS: Yes.
BY MR. FEINBERG:
Q. Okay. Let me ask more specifically now about your work in the homicide division, which was from 1979 to '91;



is that correct?
A. Yes.
Q. All right. I understand from taking testimony from a number of other detectives that the division was divided into different squads; is that correct?
A. Yes.
Q. Can you tell me what squads you worked on through your time.
A. Well, I was 1 squad for two years. And then I was assigned SIU, Special Investigations Unit, for ten years.
Q. So roughly '81 to '91?
A. Yes.
Q. What was the -- what were the job responsibilities of the SIU?
A. Well, basically, we would review old cases and see if we could identify different ways to interview additional witnesses to solve these unsolved crimes. But also, sometimes a high priority -- high priority homicide, you know, they put us on there.
Q. Essentially it was the cold case unit; is that correct?
A. Yeah.
Q. With the exception that sometimes the higher profile, higher priority cases might be tasked to the unit;

Page 53

is that correct?
A. Yes.
Q. We already discussed that you were partners with John Cimino; is that correct?
A. Correct.
Q. For how long were you partners with Detective Cimino?
A. Ten years.
Q. The entire time in the SIU?
A. Maybe nine years.
Q. So the overwhelming majority of your time in SIU you were partnered with Detective Cimino?
A. Right.
Q. Can I assume that you got to know Detective Cimino pretty well over that time frame?
A. Yes.
Q. Did you have kind of a working relationship developed in how you would conduct your investigations?
MR. ZURBRIGGEN: Object to the form, but Detective, you can answer.
THE WITNESS: Well, I kind of knew streets. I knew the area. So I was basically directing John where to go to interview people. And then he was an excellent typist. So we -- you know, we would

Page 54

interview somebody.
If somebody was going to be a witness, during the interview I might run over to our photo lab and get a photo ID. If I had to put a spread together or something like that for getting somebody identified.
It was basically -- so he was the typist and main interviewer. Where I was kind of the go-to guy. Like, a lot of times people say, well, I don't know the address, but it's right next to the house with the yellow door or something like that there. So I would go over to voter registration. I'd see who lived on that block. Whatever we needed to follow through on investigations.
BY MR. FEINBERG:
Q. Okay. So it sounds like Cimino is the guy who would be doing the interviews, interacting with witnesses; is that correct?
A. Basically, yeah.
Q. You mentioned that he was a typist, or good typist. When he typed out a question and answer interview, would he also be the one asking the questions?
A. Yes.
Q. Were there ever any interviews where you would ask

Page 55

the questions of the witness?
A. Yes. Sometimes -- I was a slow typist. So I would do it handwriting, handwritten statements out, stuff like that there.
Q. Okay. Was it typically your role that whoever was asking the questions was also the person who was recording, either in handwriting or typing?
A. Yes.
Q. So would it ever be the situation where one of you would ask the questions and the other one would be there typing or handwriting?
A. Yes.
Q. You have a mix of things; is that correct?
A. Yeah, yeah.
Q. Okay. Did you generally trust Detective Cimino?
A. Yes.
Q. Thought he was a good Detective?
A. Yes.
Q. And did you generally have an idea of what each other was doing?
A. Yes.
Q. So if Cimino got pulled in to work on a case, you would expect that you would do work on the case as well?
A. Right.

Page 56

Q. Would there ever be situations where Detective Cimino would do something on a case and you would have no idea what was going on?
A. Yes.
Q. How often did that happen?
A. Well, it happened with the affidavit that I read here.
Q. Okay.
A. He was the affiant on the probable cause, and I don't recall that.
Q. Okay. So when you say you don't recall that, are you saying that you had no idea at that time, or just sitting here today you just don't know?
MR. ZURBRIGGEN: Object to the form. Detective, you can answer.
THE WITNESS: No recollection now.
BY MR. FEINBERG:
Q. Okay. As a general matter, it sounds like you would know what he was doing when you showed up at work; right?
A. Yes.
Q. And you would expect that he would know what you were doing; is that right?
A. Yes.

Page 57

Q. Especially in 1987, you'd been partners at that point for six or seven years?
A. Yes.
Q. Did either of you -- strike that.
Did he have a particular style in the way he conducted interviews?
MR. ZURBRIGGEN: Object to the form, but Detective if you understand, you can answer.
THE WITNESS: Well, not really, no.
BY MR. FEINBERG:
Q. Let me ask you this way. Did you ever know him to be aggressive in interviews?
A. No.
Q. Did you ever know him to yell at a witness?
A. No.
Q. Did you ever know him to threaten a witness?
A. No.
Q. Did you ever know him to raise his voice at all?
A. No.
Q. Did you ever know him to say to a witness that, if they didn't cooperate, they would be prosecuted?
A. No.
Q. Would you ever do those things?
A. No.

Page 58

Q. Is it possible for you to tell me on average over your time at homicide how many cases you would be working on at any given time?
A. Maybe two or three.
Q. And are those cases where you were the assigned detective?
A. No. When you're in SIU, the assigned detective was in the line squad. We would just support the line squad.
Q. Got it. Okay. So when new cases came in, if there was a murder and they were called into the homicide division, no one in your unit would be identified as the assigned detective to run that investigation; is that correct?
A. Right.
Q. So your job was to provide support to the line squad?
A. Right. And look at all unsolved homicides.
Q. Okay. And I take it then that, when you say two or three, you would have two or three files that you were actively working on at any given time; is that correct?
A. Right. Right.
Q. Did you work a particular shift when you were in the SIU?

Page 59

A. Well, we had Sundays and Mondays off. I think we were day shift, and then 4 to 12 shift.
Q. And was that Tuesday through Saturday?
A. Yeah.
Q. Was there a squad within the SIU that divided you into smaller groups?
A. Well, there was eight of us, and we all had a partner.
Q. So let's focus specifically on 1987, if you can. We know that you and Cimino were two of the eight. Can you tell me who the other six were.
A. (No audible response.)
Q. Let me help you out. I know from the documents in this case that Mangoni and Hughes would have been in SIU at this time. Does that sound right to you?
A. They were in a different SIU.
Q. What was that SIU?
A. Well, we worked for different lieutenants. I had Bill Shelton was our lieutenant.
Q. Shelton?
A. Then we had Tom Smith, who had another SIU unit. Then they established a fugitive unit. Maybe that's where Ed and Mangoni were out of. I don't know.
Q. When you say Ed, are you referring to Ed Hughes

Page 60

or --
A. Ed Hughes. I didn't even know that him and Mangoni were partners.
Q. Okay. So your lieutenant was Shelton; is that correct?
A. Bill Shelton, yeah.
Q. I apologize. Go ahead.
A. He passed away.
Q. Was there a sergeant also assigned to your SIU?
A. No.
Q. So the lieutenants supervised eight detectives?
A. Yeah.
Q. Before I tried to help you, but it turns out I failed by mentioning two people that are not in your unit.
Can you remember the other six now sitting here today from that time frame in '87?
A. Ernie Bethea, Roy Wicher. Sometimes it would change. So I can't think of them.
Q. Despite the fact that you were in different units, can I assume that you encountered the detectives who I mentioned at the beginning of this deposition -- Mangoni, Hughes, Nespoli -- you would run into them?
A. No.
Q. Okay. So tell me what I got wrong there.

Page 61

A. Well, Nespoli, he was apparently the assigned detective on this Crosland case. When it occurred, we never got involved until it was unsolved or whatever it is.
Q. Okay. My question was -- I intended to aim that question in a different place.
Would you ever work with Detective Nespoli in that time frame?
A. No.
Q. Would you ever work --
A. He was in the line squad.
Q. Would you ever work with Detective Mangoni and Hughes in that time frame?
A. Not really, but we come across each other, you know.
Q. How about Detective Rocks, would you work with him in that time frame?
A. No.
Q. Despite the fact that you may have had limited exposure to them, did you ever have reasons to be concerned about their work and believe they weren't doing a good job?
A. No.
Q. Generally, your belief was that detectives in the homicide division did good work; is that correct?

Page 62

A. Yeah.
Q. They could be trusted?
A. Yes.
Q. All right, sir. Are you aware of any case that you were involved in where a judge granted a motion to suppress based on allegations of misconduct by you?
MR. ZURBRIGGEN: Object to the form, but Detective, if you know, you can answer.
THE WITNESS: Yes.
BY MR. FEINBERG:
Q. How many times did that happen?
A. Twice maybe.
Q. Do you remember any of the particulars?
A. Well, one, when I was Highway Patrol, and I pulled over a car and in the back seat was a box of marijuana. I could see it. And Judge Teddy Smith, you know, he just thought I was making up the story.
Q. So that judge granted the motion to suppress the evidence of the marijuana?
A. Yeah.
Q. Okay.
A. And then there was a homicide at A and Champlost I was assigned to, and I worked -- I kind of worked it myself and identified the doer and brought him in. It was New

Page 63

Year's Eve the murder occurred. And the witnesses were all teenagers and had been drinking. So they weren't reliable-type witnesses you want for a trial. But they did testify eventually, but in the meantime, I got the doer in. And anyway, then I asked him if he wanted to take a polygraph. He did, and he failed it. So just talking to him, you know, I got him to give me a confession.
Well, we went to court, the judge suppressed it because they said I -- he said that I coerced him. That's not my style, but I just would talk to him and talk to him, and I guess wore him down a little bit or whatever. But that was thrown out, and then he was eventually found not guilty.
Q. Do you remember the name of that person?
A. No.
Q. How long ago was that, or what year was it, if you can estimate?
A. Well, I was in the line quad, 1 squad at the time. So it had to be, like, 10 years ago.
Q. Well, not 10 years, but at the very beginning of your time in homicide?
A. Yes.
Q. So the early 1980s; is that correct?
A. Yes. Might have been '81.

Page 64

Q. Are there any other cases that you can recall where a motion to suppress was granted?
A. No.
Q. Are you aware of any other cases where a judge or appellate court dismissed charges because of allegations that you engaged in misconduct?
MR. ZURBRIGGEN: Object to the form.
THE WITNESS: I'm sorry.
MR. ZURBRIGGEN: No, that's okay, Detective.
BY MR. FEINBERG:
Q. We have the Curtis Crosland case, obviously you were -- the allegation is that you were involved in the allegation. You're aware of this case; is that right?
A. Yeah.
Q. Do you recall the names Bruce Murray and Gregory Holden?
A. No.
Q. Do you recall the name Edward Randall or Edward Randolph?
A. No.
Q. Going back to Murray or Holden, do you recall seeing any or hearing about any orders of a judge vacating the convictions for Mr. Murray or Mr. Holden?
A. No.

Page 65

Q. We've been going for a while. Do you need a break, sir, or are you okay to keep going?
A. I'm good.
Q. Let's go another five or ten minutes and then we'll take a break.
A. Up to you.
Q. Sir, are you familiar with the Philadelphia Police Department Internal Affairs process?
A. Internal Affairs?
Q. Yes.
A. What?
Q. Are you familiar with that process?
A. Internal Affairs unit?
Q. Yes.
A. Yeah.
Q. Were you ever the target of an investigation by Internal Affairs?
A. No.
Q. Were you ever interviewed by Internal Affairs?
A. Yes.
Q. How many times?
A. Once.
Q. How long ago?
A. Well, I was in the 19th District. So it happened

Page 66

in 1968, I guess.
Q. Do you remember what the interview was about?
A. What's that?
Q. Do you remember what the interview was about?
A. Yeah. It was a -- it was in North Philadelphia. There was a bar that police officers would hang out, and somebody came in and caused problems or whatever, and I think shots were fired or whatever. So I was called in -- I happened to be there, but I didn't see anything.
Q. So shots were fired at a bar where Philadelphia police personnel were hanging out and --
A. Yes.
Q. Okay. Do you recall any other interviews by Internal Affairs?
A. No.
Q. Are you aware of any disciplinary complaint against you ever being sustained?
A. No.
Q. Did you ever receive discipline of any kind while you were working in the Philadelphia Police Department?
A. No.
Q. Were you ever directed to participate in training over and above the annual training that you would have been required to receive?

Page 67

A. Yes.
Q. So on an annual basis you had to do specific training; right?
A. Right.
Q. Did anyone ever say to you, Detective McNesby, we're seeing this issue with you, you've to go do training on something different?
A. No.
Q. Other than this case, sir, do you recall ever being sued in connection to your work as a Philadelphia police officer or detective?
A. Right.
Q. Other than this case, any other case?
A. No.
Q. All right. Sir, given your long time in the Philadelphia Police Department, I assume that you're familiar with the various rules that govern what you can and can't do as a police officer?
A. Yes.
Q. You understood that there were legal rules that told you what you could and couldn't do; right?
A. Yes.
Q. And were you familiar with various directives issued by the commissioner or the top brass in the

Page 68

department?
A. Yes.
Q. Over your career in the police department, did you ever see anyone violate one of those rules; a legal rule or a directive or anything like that?
MR. ZURBRIGGEN: Object to the form, but Detective, you can answer if you recall.
THE WITNESS: No.
BY MR. FEINBERG:
Q. Not a single time?
A. No.
Q. Just as an example, did you ever see a fellow officer use force that you thought was unjustified in the circumstances?
A. No.
Q. Did you ever see an officer stop someone without probable cause or the required legal cause?
A. Yeah.
Q. Yes, you did?
A. Yeah.
Q. Okay. Tell me about that.
A. Car stops, you know. You're working in the neighborhoods where there's a lot of high crime areas, you know. You get out of the police car and young men on the

Page 69

corner or whatever, and we just stop and see what they're up to and maybe pat them down or whatever, you know.
Q. Was that against the rules of the police department?
A. Not really, not then. It's called stop and frisk. But...
Q. Were you allowed to do that?
A. No.
Q. How many times did you see that happen?
A. Well, working high crime areas, it would be every night.
Q. Is that while you were working as a district officer?
A. Highway Patrol.
Q. And you had, was it four years --
A. Five years. Five years.
Q. So those five years of Highway Patrol, what you're saying is that routinely, every day, you would stop people and frisk them; is that correct?
MR. ZURBRIGGEN: Object to the form.
Detective, you can answer.
THE WITNESS: Sorry. Yes.
BY MR. FEINBERG:
Q. And you would do that even though there was no

Page 70

sufficient legal cause to stop them and frisk them; is that correct?
A. Yes.
Q. And you knew that was against the rules at the time?
A. Not really.
Q. What do you mean by "not really?"
A. We were out there to stop crimes, you know.
Q. Did the police department ever tell you, you can go stop and frisk everyone you want?
A. No.
Q. So you knew that there was -- well, first, have you ever heard of a case called Terry versus Ohio?
A. Yes.
Q. What was your understanding -- and I'm not asking for a legal opinion, but what was your understanding as a police officer about what Terry versus Ohio said?
MR. ZURBRIGGEN: Object to the form.
Detective, you can answer to the extent you know.
THE WITNESS: Well, that was stop and frisk, you know.
BY MR. FEINBERG:
Q. Do you recall that under Terry you needed reasonable suspicion --

Page 71

A. Yes. Probable cause, yeah. You're right, reasonable suspicion.
Q. And you also, in order to frisk someone, needed reasonable suspicion to believe that the person may have a weapon; is that correct?
A. Yes.
Q. What you're saying is, when you were at the Highway Patrol or working with the Highway Patrol, that didn't matter; you would stop people no matter what?
MR. ZURBRIGGEN: Objection to the form.
Detective, you can answer.
THE WITNESS: Sometimes.
BY MR. FEINBERG:
Q. I think you said that would happen every night in the high crime areas; is that correct?
A. Yeah.
Q. Were you ever -- you told me before that you were never disciplined; is that correct?
A. Right.
Q. Did you ever -- well, strike that.
Did you understand what your responsibility was to report a fellow officer for engaging in misconduct?
MR. ZURBRIGGEN: Object to the form.
Detective, you can answer.

Page 72

THE WITNESS: No. No.
BY MR. FEINBERG:
Q. If you saw an officer beat up someone on the street with no legal basis, did you know what you were supposed to do?
A. Yeah.
Q. What were you supposed to do?
A. Report it to the supervisor.
Q. Did you ever report anyone to the supervisor?
A. No.
Q. All right. You mentioned to me that it sounds like you saw for five years unlawful stops and frisks of people literally every shift; is that correct?
A. Well, there's a lot of crimes going on. You report a robbery and they give you a little description or whatever. So you might see an individual that matched that clothing or something like that there. So...
Q. I understand that. Let me ask it this way.
Given what you told me about how you knew that people were stopping people without reasonable suspicion and frisking people without reasonable suspicion, did you ever report to a supervisor that your fellow officers were doing that?
A. No.

Page 73

Q. Did you ever report to a supervisor that you yourself were doing that?
A. No. No.
Q. Different topic about potential misconduct. Are you aware that there were certain rules that applied to police when they conducted interrogations of suspects?
A. Yes.
Q. For example, a detective is not allowed to use physical force during an interrogation; is that correct?
A. Right.
Q. And detective is not permitted to use coercion and threats with a suspect; is that correct?
A. Right.
Q. Same rules apply to witnesses, not just suspects; is that correct?
A. Right.
Q. Did you ever, in your years as a detective, see any other detective violate those rules?
A. No.
Q. And I don't want to limit it just to those rules, but did you see any detective violate any rules or expectations for how they should conduct themselves in interviewing a witness or a suspect?
MR. ZURBRIGGEN: Object to the form.

Page 74

Detective, you can answer.
THE WITNESS: No.
BY MR. FEINBERG:
Q. Now, you told me -- we talked before about your observations of officers making stops without reasonable suspicion and frisking people without reasonable suspicion. Did you ever see any other types of conduct by officers in violation of legal rules or police directives?
MR. FEINBERG: Object to the form. Detective.
THE WITNESS: No.
BY MR. FEINBERG:
Q. Have you ever heard the phrase blue wall of silence?
A. No.
Q. How about code of silence, have you heard that before?
A. Yeah.
Q. What's that mean to you?
A. You don't -- you don't report someone.
Q. Was there a code of silence when you were working with the Philadelphia Police Department?
A. No.
MR. FEINBERG: Let's go off the Record.
VIDEOGRAPHER: Going off Record. 10:50.

Page 75

(Brief recess taken.)
VIDEOGRAPHER: We're back on 11:04.
BY MR. FEINBERG:
Q. All right, sir. We're back on the Record after a break of about 15 minutes or so. Did you realize during the break that any of your prior testimony was incomplete or incorrect in any way?
A. No.
Q. I'm going to ask you a few follow-up questions about a concept we discussed. You told me that you believe Mr. Crosland was guilty because the jury found him guilty. Do you remember that testimony?
A. Yes.
Q. Have you ever in your time in law enforcement seen a case where you felt that the jury got it wrong?
A. No.
Q. Have you ever seen a case where police officers engaged in misconduct which then caused the jury to find someone guilty?
A. No.
MR. ZURBRIGGEN: Object to the form. Go ahead, Detective.
BY MR. FEINBERG:
Q. Have you ever heard the phrase wrongful

Page 76

conviction?
A. Yes.
Q. Have you ever seen a case that you thought was a wrongful conviction?
A. No.
Q. Never?
A. No.
Q. So in summary then, any time the jury reaches a conviction, you believe that that is a just and appropriate result?
A. Yes.
MR. ZURBRIGGEN: Object to the form.
THE WITNESS: Sorry.
MR. ZURBRIGGEN: That's all right.
BY MR. FEINBERG:
Q. All right, sir. I want to ask you about a couple of concepts that applied to the way you conducted your work as a detective in the homicide division.
When I say exculpatory evidence, what does that phrase mean to you?
A. Evidence that supports the Defendant's concerns.
Q. Might show innocence?
A. Yes.
Q. It might give reasons to undermine the prosecution

witnesses?
A. Yes.
Q. Would you agree that, if you as a detective came into possession of exculpatory evidence, you had an obligation to do something with that evidence?
A. Yes.
Q. What would you have to do with that evidence?
A. Well, if the person was arrested, you have to bring attention to the district attorney.
Q. How about before a person is arrested, do you have any obligation?
A. Well, pursue that lead.
Q. How do you mean?
A. Well, if somebody calls in with a name of somebody that they're accusing of committing the crime, you want to kind of verify it.
Q. And if you verified -- well, strike that.
That means that you would investigate the lead and see whether it panned out; right?
A. Yes.
Q. Would you have an obligation to tell the prosecutor about that lead?
A. Yes.
Q. So if you're investigating a case and you decide



to prosecute suspect 1, but you have information there was a lead about suspect 2, you'd have to tell the DA, hey, we think it's suspect 1, but we also got information about suspect 2; is that correct?
A. Yes.
Q. So in other words, when you sit down with the DA before there's an arrest approved, you've got to reveal all of that exculpatory information; is that correct?
A. Yes.
Q. Would you have to provide documentation about that exculpatory information?
A. Yes.
Q. So all the information that you had which might be used to undermine the prosecution theory has to be shared with the DA; is that correct?
A. Yes.
Q. All right. I assume, sir, that you prepared affidavits of probable cause when you were working as a detective?
A. Yes.
Q. Probably hundreds, would that be accurate?
A. Yes.
Q. When you prepared an Affidavit of Probable Cause, would you have any obligation to list or describe



exculpatory evidence in that affidavit?
A. No.
Q. So the affidavit would only include information that pointed to the specific suspect for whom you were seeking the arrest; is that correct?
A. Yes.
Q. Was that something that you were told by your supervisors or your superiors in the police department?
A. No.
Q. Did anyone from the police department ever say to you, Detective, you have to include exculpatory evidence in the affidavit?
A. No.
Q. Is that something you've ever heard of before?
A. Yes.
Q. In what context have you heard about the need to include exculpatory evidence in the Affidavit of Probable Cause?
A. I'm sorry. Include it in the affidavit?
Q. Yes.
A. I didn't think -- I thought we were just putting evidence out there to support the arrest.
Q. Okay. And that's -- maybe you misunderstood my question.



As of the late 1980s up through the time of your retirement, you understood that the practice was only include evidence in the affidavit that supports the theory that the person you seek to arrest is guilty; is that correct.
A. Yes.
Q. So if you had information in your possession, you would not -- which undermined that prosecution theory, you would not include it in the affidavit; is that correct?
A. Yes.
Q. And that's something that was an established practice; is that correct?
A. Yes.
MR. ZURBRIGGEN: Objection to the form.
Detective, you can answer.
THE WITNESS: Yes.
BY MR. FEINBERG:
Q. No one ever told you to do anything to the contrary; is that correct?
A. That's correct.
Q. Would you also agree, sir, on a slightly different topic, that, if a witness gives you information and you just don't believe it, you can't still run with that information and prosecute the person who was identified by

Page 81

that witness?
A. Right.
Q. I'll give you a crazy example. If a witness says suspect 1 is the guy who did this shooting --
A. Right.
Q. -- but then 10 other people come in and say suspect 1 wasn't even in the country when this shooting happened, you can't run with what that witness is saying about suspect 1; is that correct?
A. Yeah.
MR. ZURBRIGGEN: Object to the form.
THE WITNESS: Yeah.
BY MR. FEINBERG:
Q. So in other words, if you have reason to doubt the validity and reliability of information that you're provided, then you have an obligation to pass those doubts along; is that correct?
A. Yes.
Q. You have an obligation not to initiate a prosecution based on information which is not valid and reliable; is that correct?
A. Right.
Q. So if you had any belief or concerns about the validity or reliability, then you have an obligation not to

Page 82

pursue that prosecution; was that correct?
A. Yes.
Q. Are you familiar with Philadelphia Police Department activity sheets?
A. Yes.
Q. What was your understanding of the use and purpose of activity sheets back when you worked in the homicide division?
A. Well, we first started using them on high profile cases that we would -- it's little synopsis of somebody that we interviewed just to -- it might take a couple months to solve a crime. This way you can look back, did you pursue this part of it, did you pursue that part of it. So it was just a tool that we had internally to, you know, keep the investigation active and just record things that --
Q. A running log of the investigation?
A. Yes, yeah.
Q. Kind of like a medical chart for someone who's hospitalized?
A. Yes.
Q. And I take it during that time detectives would be working on multiple investigations at a time; right?
A. Yes.

Page 83

Q. So you might conduct an interview in a case and then not do anything with that case for weeks or months; is that right?
A. Yeah.
Q. So once you picked that case back up, you'd read the activity sheet to figure out what --
A. Yeah.
Q. To remind yourself what happened; is that correct?
A. Yes.
Q. And can I assume then that, given the purpose of activity sheets, if you prepared them, you did your best to be accurate and complete in what you wrote in the activity sheet?
A. Yes.
Q. Once you prepare an activity sheet, when you're in the special investigations unit, what did you do with them?
A. Just you kept a running log in the typewriter.
Q. Oh, no. I understand that. Once you completed it and you pulled it out of the typewriter and you had it in your hands, where did you put it?
A. Just put it in the file.
Q. In the homicide file; is that correct?
A. Yes. Yeah.
Q. Sometimes referred to as the H file; is that

Page 84

correct?
A. Yeah.
Q. Do you have any idea whether activity sheets were provided to the District Attorney's Office?
A. I don't -- I don't think so.
Q. Okay. So in your time, at least prior to 1991 when you retired, the activity sheets stayed in the homicide file; is that correct?
A. Yes.
Q. Now, my understanding, from talking to other detectives from the same time period, is that there were two different things. One was the homicide file, and the other was the homicide binder. Do those phrases make sense to you?
A. Yes.
Q. Tell me if you agree with this then. The homicide file was something that always stayed in the homicide division headquarters; is that correct?
A. Yes.
Q. The homicide binder was what was sent to the District Attorney's Office in support of a prosecution; is that correct?
A. Yes.
Q. The binder would be prepared by the assigned

Page 85

detective; is that correct?
A. Yes. Yes.
Q. And the assigned detective could pick and choose what portions of the file to place in the binder; is that correct?
A. Yes.
Q. There would be some information that the Detective could choose to keep only in the file and not share with the District Attorney's Office?
A. Right.
Q. Okay. And your understanding is that activity sheets in that time frame, or at least up until your retirement in 1991, were typically kept in the file and not placed in the binder; is that correct?
A. Yes.
Q. Different topic, sir. We've already touched on this a little bit. I want to ask you about the concept of coercing a witness to identify someone. Let's make sure we're on the same page in terms of language.
When I say coercion, what do you understand that to mean?
MR. ZURBRIGGEN: Object to the form.
Detective, you can answer.
THE WITNESS: That you use force to try to

Page 86

obtain information.
BY MR. FEINBERG:
Q. Can it be more than force? Can it also be threats?
A. Yes.
Q. So -- and I take it you can't do either of those things; is that right?
A. Correct.
Q. So in other words, if a witness -- if you think a witness knows something about a crime, you can't try to get the witness to give that information by threatening them; is that right?
A. Correct.
Q. For example, if you said, you're going to be prosecuted if you don't give me the information you have, that would be inappropriate?
A. Correct.
Q. And would you never do that; is that right?
A. Right.
Q. None of the detectives you know would ever do that as well; is that right?
MR. ZURBRIGGEN: Object to the form.
THE WITNESS: Right.
BY MR. FEINBERG:

Page 87

Q. And if that ever did happen, that would be completely inappropriate; is that correct?
A. Yes.
Q. It would violate police department rules; right?
A. Yes.
Q. And it would be unlawful; is that correct?
A. Yes.
Q. In terms of -- well, slightly different topic.
Based on the witness who was in front of you -- actually, before I ask this, can you estimate for me how many witnesses interviews you conducted while working in homicide?
A. Hundreds.
Q. Maybe even thousands?
A. Maybe.
Q. Okay. Were there specific types of witnesses or conditions that people may have had which may have made them more vulnerable to coercion?
A. Probably.
Q. Any examples come to mind for you?
A. No.
Q. All right. If someone had an intellectual disability, that would be one situation; right?
A. Right.

Page 88

Q. So can I assume that, in that situation, you would take specific special precautions to make sure that you were not coercing a person with an intellectual disability?
A. Yes.
Q. We also talked about -- a little earlier about people who were hospitalized. Was there any specific rule for conducting witness interviews with people who were hospitalized?
A. No.
Q. So there was no rule, or no, you couldn't conduct the interview?
A. No rule.
Q. What's that?
A. No rule.
Q. No rule?
A. Right.
Q. Okay. What was your practice regarding conducting an interview in a hospital?
A. I really didn't do it.
Q. Okay. Why not?
A. Well, wait for the person to get discharged if you need a statement from them.
Q. Okay. Is that -- I'm trying to understand your

Page 89

reasons for that. So let me just ask you. Why? Why would you typically wait for someone to be discharged before you took a statement?
A. Well, I didn't think it was appropriate to conduct interviews in a hospital, especially witnesses.
Q. And I'm sorry if I'm asking questions where the answers might seem obvious --
A. Yes.
Q. -- but I want to make sure we're on the same page. Why would it not be appropriate?
A. Well, they might be vulnerable.
Q. Okay. So what you're saying then, to make sure I understand, is that, if a witness is hospitalized and you go to interview them, they could be especially vulnerable to be coerced to give information; is that correct?
A. Yes.
Q. And if a witness is coerced to give information, there's a risk that they could give false information; is that correct?
A. Right.
Q. We should have said that before. The reason why you don't coerce a witness is, if a witness thinks that you want them to tell you something, they're going to tell you whatever they think you want to hear; right?

Page 90

A. Sometimes.
Q. And that means that the information could be false; is that correct?
A. Sure.
Q. Which means that, if that false information is given, you might be focusing the investigation on someone who is not actually guilty of the crime; is that correct?
A. Correct.
Q. So going back full circle, the reason why you would not want to interview someone who is hospitalized is because there's a risk that you could cause them to give information that was incorrect or false; is that correct?
A. Yes.
Q. Now, you said that as a rule, you would not personally conduct interviews in a hospital. Do you know whether Detective Cimino ever conducted interviews in a hospital?
A. He did not.
Q. Do you remember ever, a single occasion ever, visiting -- or conducting an interview in a hospital?
A. Well, I recall going out to see Delores Tilghman at the hospital, but we were going out there to check her well-being, because she was -- the case was coming up. The DA wanted to know if she was going to be available.

Page 91

Q. So that was not an interview; that was just to check on her, is that right?
A. Yes.
Q. Okay. So you do not recall -- well, I'll come back to Delores Tilghman in just a moment.
Putting aside Delores Tilghman, do you recall ever a single instance of conducting an interview of a witness in a hospital?
A. No.
Q. Back to Delores Tilghman now. Your recollection is that your interaction in the hospital -- with her in the hospital was not for the purpose of any interview; is that correct?
A. That's correct.
Q. Do you recall any guidance, a police directive or anything about this which related to conducting an interview in a hospital?
A. No.
Q. All right, sir. A short while ago you told me about an instance where you gave a suspect a polygraph. Do you recall that testimony?
A. Yes.
Q. I've seen a lot of documents in particular in this case involving Mr. Crosland about detectives using

Page 92

polygraphs during or after interviews. How often did you give polygraphs to people?
A. I did not. We had a polygraph examiner.
Q. I'm sorry. I misspoke. I did not mean to suggest that you were conducting the polygraph. What I mean to say is, how often did you ask a polygraph examiner to conduct a polygraph on a witness or a suspect who you were interviewing?
A. It wasn't that many times.
Q. What reasons would cause you to ask for a polygraph exam?
A. If I believed the person might be guilty or holding information back. Or the witness holding information back.
Q. And what was the purpose of asking for a polygraph in those circumstances?
A. Well, ask the individual if they agreed to take a polygraph, and once they waived the waiver, we take them down to the polygraph unit, tell the polygrapher what was involved, and a set of questions to give the witness or suspect.
Q. If a person said they did not want to take a polygraph, you couldn't force them to do it; right?
A. Yeah.

Page 93

Q. You needed their consent; is that correct?
A. Yes.
Q. Were there any rules or directives which told you when you could and could not ask for a polygraph?
A. I don't recall seeing any.
Q. So to your recollection then, that was strictly up to each detective's discretion; is that correct?
A. Yes.
Q. You could make the decision during the course of an interview, let's do a polygraph; right?
A. Yes.
Q. And it sounds like you conducted a lot of interviews or participated in a lot of interviews with Detective Cimino; is that correct?
A. Yes.
Q. Can I assume that, if you and Detective Cimino were in an interview together, that you would discuss whether a polygraph might be appropriate?
A. Yes.
Q. Do you recall how many instances when you were conducting interviews with Cimino, Detective Cimino, where you would ask for a polygraph?
A. No.
Q. Describe the process to me. Just think of an

Page 94

example case. You're sitting down talking to a witness. You think the witness is holding back information. So you say to the witness, are you willing to take a polygraph? They say, yes. What happens next?
A. We have them sign a waiver, and then take them to the polygraph -- polygrapher.
Q. Was the polygrapher stationed in the police administration building?
A. Yes.
Q. Homicide division is at 8th and Race. What floor?
A. First floor. Basement.
Q. The polygrapher is in the basement?
A. Yeah.
Q. So you take the suspect down there -- suspect or witness down; is that correct?
A. Yes. Yes.
Q. Would you observe the polygraph examination?
A. No.
Q. So you would let the polygraph examiner take the witness or the suspect; is that correct?
A. Yes.
Q. You go off and do your own thing; is that correct?
A. Yes.
Q. And then wait to hear from the polygraph examiner?

Page 95

A. I think we wait there.
Q. Okay. Were there -- how many different polygraph examiners were there in the late 1980s?
A. Maybe three or four.
Q. Was there any particular one that you tended to work with, or just whoever was there?
A. No. Whoever's there.
Q. Did you tend to trust all of them?
A. Yes.
Q. Once they completed the polygraph examination -- strike that.
I know you're not a polygraph examiner; is that correct?
A. Right.
Q. Do you have any familiarity with how polygraph exams work?
A. Yes.
Q. So you recall seeing that charts would be prepared --
A. Yeah.
Q. -- that were the result of monitoring equipment?
A. Yes.
Q. Was anything supposed to happen -- strike that.
Do you know what the polygraph examiners did with

Page 96

those charts after the examination was completed?
A. No.
Q. Would the polygraph examiner -- strike that.
Let's go back.
So you have no idea what would happen to those charts?
A. Right.
Q. Could have been thrown out, could have been placed in a file; you have no idea?
A. I have none.
Q. Do you recall them ever being handed to you as the homicide Detective to be put in the homicide file?
A. No.
Q. Would the polygraph examiner ever write up a report of the examination?
A. No.
Q. So how would the results of the examination be reflected in the file, if at all?
A. Probably not at all.
Q. Sometimes not at all; is that correct?
A. Yeah.
Q. Would you ever put the results of the examination on an activity sheet?
A. Maybe.

Q. Would you ever put the results of the polygraph examination in the witness' or suspect's interview statement?
A. Sometimes.
Q. Can you tell me why you would do that.
A. Just to record the information that they took the polygraph and read the results.
Q. If someone failed the polygraph -- when I say "failed the polygraph," usually the result would be deception indicated; is that correct?
A. Yes.
Q. If there was no deception indicated, that's the same as passing the polygraph; is that right?
A. Yes.
Q. All right. So if there was deception indicated, meaning a polygraph failure, would you then use that in your interview and say to the person you're not being truthful, what's going on?
A. Yes.
Q. So that would become a -- kind of part of your tactics in your interview; is that correct?
A. Yes.
Q. Okay. And again, I think I asked you before, and I apologize if I'm repeating the question, can you tell me



over the course of your time in homicide how many polygraphs you would have asked for?
A. No.
Q. If a witness failed a polygraph and then that witness was used to seek an arrest, would you have an obligation to tell the district attorney about it?
A. Yes.
MR. ZURBRIGGEN: Object to the form.
BY MR. FEINBERG:
Q. So if a witness' -- strike that.
If the witness fails the polygraph but that witness' testimony was later used, at some point you're going to tell the DA, this person failed the polygraph; is that correct?
A. Yes.
Q. Why is that?
A. Just so the district attorney has that information.
Q. Would that be considered exculpatory information?
A. Yes.
Q. Because that polygraph failure would show that the witness, who is identifying a suspect, might not be giving truthful information; is that correct?
A. Right.



Q. In fact, would you expect that -- strike that.
Would you expect that a district attorney would very much want to see that information?
MR. ZURBRIGGEN: Object to the form.
Detective, you can say if you know.
THE WITNESS: Yes.
BY MR. FEINBERG:
Q. And by the way, when I ask that question, I'm not asking you to get inside the head of a prosecutor, but I assume you've spoken to prosecutors, in your time as a detective, hundreds of times; is that correct?
A. Yes.
Q. And through those hundreds of conversations, you had an idea of what prosecutors generally expected from their detectives; is that correct?
A. Yes.
Q. And if a detective was aware of a polygraph failure, the detective -- in your experience, a district attorney would want to hear about that; is that correct?
A. Yeah.
Q. Do you recall any cases that you were involved with where you discussed a polygraph failure with a prosecutor?
A. No.



Q. So Mr. McNesby, I'm going to hand you -- you've already looked at the grand jury testimony from Delores Tilghman, which has been previously marked as Exhibit 22. I realize it's kind of aggravating to move that back and forth in the binder. So we've printed another copy for you. That's the same copy of what you've already looked at, Exhibit 22. I want to refer back to that now. We're going to start to get into the details of the investigation.
So let's go back. Turn to page 8,995. 8,995.
Q. Do you have that in front of you, sir?
A. 8,995.
Q. Yes.
A. Yes.
Q. The second line says "And basically all the things they asked you and what you told them is here." Do you see that?
A. Yes.
Q. Let me do this. First, let me explain this. This page will set up a discussion of what you've already read before. So take a moment to read this page to yourself, and then I'll ask some follow-up questions.
Did you finish reading that page, sir?
A. Yeah.

Page 101

Q. Okay. So do you see reference to the fact that, on April 16th of 1987, Ms. Tilghman was in Jefferson Hospital because of an attempted suicide; is that correct?
A. Yes.
Q. And her attempted suicide was by an attempted overdose of medication; is that correct?
A. Yes.
Q. All right. Now, we've got the date. We've got the location. If you go forward to page 9000, so a few pages over -- and as you're doing it, I'll note I'm asking you to skip pages for the purposes of expediency. If you need to read those pages between them, you can certainly take the time.
You're at page 9000. Do you see a few lines down there's a question, "This is the statement that you gave to Detective McNesby?" Do you see that?
A. Um-hum.
Q. Is that a yes? Is that yes, sir?
A. What?
Q. You said um-hum. I'm confirming --
A. Yes.
Q. -- yes, you see your name; is that correct?
A. Yes.
Q. And then the answer is "McNesby, but I gave it to someone else." I'm going to keep reading.

Page 102

Question: "There were two white detectives?"
Answer: "Detective Cimino."
Question: "Was he the shorter or taller one?
Answer: "The taller and the more aggressive one."
First of all, was Detective Cimino taller than you?
A. Yes.
Q. Okay. So would you agree that Ms. Tilghman is stating here that she gave a statement to you and to Detective Cimino?
A. Yes.
Q. And if we connect that back to what I asked you to read a moment ago, would you agree that, according to this testimony, the statement took place in the hospital, Jefferson Hospital, on April 16th of 1987?
MR. ZURBRIGGEN: Object to the form, but Detective, if you understand.
THE WITNESS: No.
BY MR. FEINBERG:
Q. Why is that?
A. First of all, I thought she was in Einstein Hospital. Okay? But we didn't take a statement from her there. I think there was only one in existence.

Page 103

Q. So I think you answered a different question than I was asking, but it's helpful to have your answer. Let me try that question again.
Would you agree that Ms. Tilghman is saying, according to this testimony, that she gave you a statement? I'm not asking whether it's true.
A. Yes.
Q. I'm just asking. That's her testimony; right?
A. Yes.
MR. ZURBRIGGEN: Objection, for the Record.
BY MR. FEINBERG:
Q. She's saying that you and Detective Cimino came to the hospital where she was for an attempted suicide and took a statement from her April 16th, '87. Agreed?
A. Yes, she says that.
Q. Okay. You're saying that didn't happen; is that correct?
A. That's correct.
Q. And you're saying that didn't happen because you would never take a statement from someone in the hospital; is that right?
A. Yeah.
Q. And you would never take a statement from someone in the hospital because they're in a vulnerable position; is that right?

Page 104

A. Sure.
Q. And if they're in a vulnerable position, they could give you false or misleading testimony; is that correct?
A. I don't know about that.
Q. Well, I'm just repeating what we said before.
A. Yeah.
Q. The reason why you don't try to -- strike that.
The reason why you would not want to interview someone in the hospital when they may be in a vulnerable position is because there's a risk that you'll receive false or misleading information. Agreed?
A. I don't know if -- I don't know if I agree with that.
Q. Okay. Well, I think you told me -- well, let me go back to what you said before.
What's your reason for why you would never conduct an interview in a hospital?
A. Well, I just didn't think it was appropriate.
Q. Why is it not appropriate?
A. They were in a hospital setting and this person, you know, I don't know her status as far as what's -- you know, what she's in there for.

Page 105

Q. I think you told me before that there's a risk that a person in the hospital could be in a vulnerable position; is that correct?
A. Yes.
Q. Okay. And would you agree you also told me before that, when you interview a vulnerable person, they may be more susceptible to coercion?
MR. ZURBRIGGEN: Object to the form. Detective, you can answer.
THE WITNESS: I guess so.
BY MR. FEINBERG:
Q. Okay. All right. Are you still on page 9000 there, sir?
A. Yes.
Q. Okay. Bear with me for one second. Turn to page 9002.
A. Okay.
Q. And by the way, had you seen this testimony at all before today?
A. No.
Q. You mentioned before that you know Joel Rosen, who, in the late 1980s, was an assistant district attorney; is that correct?
A. Yes.

Page 106

Q. You had at least two cases with him; is that right?
A. Yes.
Q. I'll represent to you -- in fact, I'll show you -- you can just keep that page there.
I'm showing you the first page of the grand jury testimony, so the first page of Exhibit 22, City 8957. Do you see at the top, it says in the Common Pleas Court of Philadelphia, in and for Philadelphia County, First Judicial Circuit of Pennsylvania; do you see that?
A. Yes.
Q. And do you see In Re: County Investigating Grand Jury?
A. Um-hum.
Q. Is that a yes?
A. Yeah.
Q. And do you see Joel Rosen is the prosecutor?
A. Yes.
Q. And do you see that the testimony of Delores Tilghman is referenced there?
A. Right.
Q. So you understand that this is Mr. Rosen who is presenting Ms. Tilghman's testimony to the grand jury; is that correct?

Page 107

A. Yes.
Q. By the way, did you ever testify in front of a grand jury while you were a detective?
A. I don't think so.
Q. Did you have familiarity with how they worked?
A. Yes.
Q. And I assume that you would occasionally -- a prosecutor would ask you, bring this witness to the grand jury so they can testify; is that correct?
A. Right.
Q. And the purpose of the grand jury would be to produce information which could be used to issue recommendations about charging; is that correct?
A. Yeah.
Q. Would you sometimes use investigating grand juries to issue subpoenas -- strike that.
I'm guessing the prosecutors were the ones making decisions about this; is that right?
A. Yeah.
Q. All right. So are you on page 9002?
A. Yeah.
Q. I'm going to read to you just a portion of the testimony here. This is Ms. Tilghman testifying. About one third of the way down, do you see the question that

Page 108

Mr. Rosen asks: "In fact, everything that is in here in terms of questions and answers is what you told Detective Cimino; is that right?"
Do you see that? It's probably about a third of the way. Do you see the question I just read?
A. Read it again.
Q. "In fact, everything that is in here" --
A. Okay. I see it.
Q. So that's Mr. Rosen's question.
A. Okay.
Q. And then the answer is "Yes." Do you see that?
A. Yeah.
Q. Then the next question is, "All right. Let me read the statement to you." Do you see what I've read?
A. Yes.
Q. I assume you've seen testimony like this in court where a prosecutor or defense attorney will read a statement into the Record. Have you seen that happen before, sir?
MR. ZURBRIGGEN: Object to the form, but Detective, you can answer.
THE WITNESS: I believe so, yes.
BY MR. FEINBERG:
Q. And in fact, I'm sure that you as a detective

Page 109

probably would be called to testify, where you would read a witness' statement into the Record; is that right?
A. Yes.
Q. Okay. So this is not unfamiliar to you that a statement could be read into the Record?
A. Right.
Q. Okay. Now, the next question is, after -- let me read this statement. Mr. Rosen says, reading the statement, "Delores, my name is Detective McNesby and my partner's name is John Cimino. We have previously interviewed you concerning the shooting death of Joseph Wilkerson in which you implicated Michael Martin as having participated in his murder, and we understand that you have further information. Is that correct?"
Answer: "Yes."
Did you follow along as I've read that, sir?
A. Yes.
Q. Would you agree that, based on this testimony, Mr. Rosen appears to have in his hand -- I'm not asking whether this is true, but he appears from this transcript that to have in his hands a copy of an interview that you conducted with Delores Tilghman.
A. Yes.
MR. ZURBRIGGEN: Object to the form.

Page 110

Detective, you can answer if you can.
THE WITNESS: Yes.
BY MR. FEINBERG:
Q. Okay. Do you recall one way or the other whether that statement -- taking that statement?
A. No.
Q. Do you know where that statement took place?
A. No.
Q. Okay. After -- strike that.
You told me just a moment ago or a few moments ago with certainty that you did not take a statement from Delores Tilghman in the hospital on April 16th, '87. Did I understand you correctly?
A. Yes.
Q. Do you maintain that that is correct?
A. Yes.
Q. Does this refresh your recollection in any way about the fact that you conducted an interview with Delores Tilghman on April 16th of 1987?
A. No.
Q. And to confirm, you -- your testimony today is that that never happened; is that correct?
A. Yes.
Q. Let me ask you this some of the details of Delores

Page 111

Tilghman's information.
You're aware that she gave information regarding the father of her children, Michael Turner; does that sound right to you?
A. Just reading this over, yeah.
Q. Okay. Tell me, now that you've read this, do you have any idea where the information came from that Mr. Rosen is reading to Ms. Tilghman?
A. No.
MR. ZURBRIGGEN: Object to the form.
Detective, if you know, you can answer.
THE WITNESS: No.
BY MR. FEINBERG:
Q. No idea, okay. But you're aware that, in some way, that Delores Tilghman gave information about Mr. -- the father of her children, Michael Turner; is that correct?
A. Yeah.
MR. ZURBRIGGEN: Object to the form.
Detective, again, if you know --
THE WITNESS: Yes.
BY MR. FEINBERG:
Q. And you recall that that information had to do with the shooting of someone named Joseph Wilkerson?

Page 112

MR. ZURBRIGGEN: Same objection. Detective, if you know, you can answer say.
THE WITNESS: I don't know.
BY MR. FEINBERG:
Q. Okay. I'll show you some documents about that to refresh your recollection in just a moment.
Do you recall speaking to Ms. Tilghman about Curtis Crosland's involvement in the murder of Il Man Heo?
A. No.
Q. We'll come back to that. All right, sir.
What I want to do now is, especially given that you told me that you don't recall Delores Tilghman's testimony, suffice it to say you do remember speaking to Delores Tilghman; is that correct?
A. Yes.
Q. Okay. What I'm going to do now -- and I want to acknowledge this is going to be a little cumbersome because I'm going to have to show you a number of documents from different cases. What I'd like to do now is refresh your recollection about what information you and your fellow detectives had at the time that you were interacting with Delores Tilghman in 1987. Do you understand what I've said, sir?
A. Um-hum. Yes.

Page 113

Q. And in particular, I want to show you that, at the time Delores Tilghman came to your attention in the spring of 1987, there were at least three different homicides that I think the police department wanted to have Delores Tilghman testify about. Okay? I'm not telling you that's what the truth is. I'm just telling you that I want to try to gain an understanding and show you information to that effect. Do you understand?
A. Yes.
MR. FEINBERG: Okay. So let's start now -- Angeline, let's go to tab 66, please. This will be marked -- our last Exhibit Number was 53, so this will become 54.
(Exhibit 54 was marked for identification by the Court Reporter.)
(Discussion held off the Record.)
BY MR. FEINBERG:
Q. Sir, that's Exhibit 54. Sir, I'll tell you, sir, that this is a document that was pulled out of the homicide file regarding the murder of John Lamb. Let me just ask you, read the first two pages to yourself and let me know when you finish. Are you finished reading that, sir?
A. Yes.
Q. Okay. Would you agree with me that Mr. Lamb was

Page 114

murdered on or around September 26th of 1982? Do you see that date up at the top?
A. Yes.
Q. And his body was found in the Tasker project area, 1804-B Patton Drive. Do you see that? That's on the second page actually.
A. Yes.
Q. Okay. The Tasker Homes, are you familiar with that neighborhood?
A. Yes.
Q. Was that a housing project in South Philadelphia?
A. Yes.
Q. No longer there; is that right?
A. Right.
Q. You can put that aside. We might refer to it later. The next document I'm going to show you, this will be Exhibit 55.
(Exhibit 55 was marked for identification by the Court Reporter.)
BY MR. FEINBERG:
Q. Sir, this is a two-page activity sheet regarding the death of John Lamb. Why don't you read both pages. I'll note for you the second page, the text is a little blurred. Do your best. Read these two pages, and let me

Page 115

know when you're finished.
A. Okay.
Q. Finished, sir? First things first, do you see reference to a man with the nickname Squirt?
A. Yeah.
Q. And did you also see a reference to the fact that Squirt's real name was Frank Turner?
A. Yes.
Q. Okay. Going to the second page in the third paragraph, do you see that police had information as of the date of this activity sheet, October 5th, '82, that the rumor on the street was that Squirt, Frank Turner, is the one who shot Mr. Lamb?
A. That's what it says.
Q. Okay. So you understand that that was the information police had; is that correct?
A. Not really. I was unaware of this.
Q. I get that. What I'm doing is showing you what information was available to police back in the 1980s.
Would you agree that that's the information police had at that time; is that right?
A. Yeah.
MR. ZURBRIGGEN: Object to the form. Detective, if you can answer.

Page 116

THE WITNESS: Yes.
BY MR. FEINBERG:
Q. Okay. And police also had information that the shooting was over an incident or was -- the motive of the shooting had to do with an incident where John Lamb assaulted or otherwise beat up Curtis Crosland?
A. Yes.
MR. ZURBRIGGEN: Same objection, for the Record.
BY MR. FEINBERG:
Q. So as of October '82, and the John Lamb murder, police are working on investigating a situation where John Lamb is shot because he beat up Curtis Crosland and Frank Turner is the suspect. Would you agree?
A. Yes.
MR. ZURBRIGGEN: And objection for the Record.
BY MR. FEINBERG:
Q. You can put that document aside, sir. We'll go one more document on the same case. This is Exhibit 56.
(Exhibit 56 was marked for identification by the Court Reporter.)
BY MR. FEINBERG:
Q. There you go, sir. I'll note this is another activity sheet. It's October 14th, 1982, so nine days

after the one we just looked at. Take a moment to read this to yourself and let me know when you're finished. You can actually stop, sir, after the second paragraph.
A. Okay.
Q. Would you agree that the second paragraph, this witness, Debra Lorenzano, L-O-R-E-N-Z-A-N-O, repeats that the rumor is that Frank Turner, known as Squirt, is the shooter of Mr. Lamb?
A. Yes.
Q. Okay. So once again, confirmed as of October '82, police are working with the theory that Mr. Turner -- Mr. Frank Turner is the shooter of John Lamb; correct?
MR. ZURBRIGGEN: Object to the form. Detective, if you know, you can say.
THE WITNESS: Yes.
BY MR. FEINBERG:
Q. Okay. That was the John Lamb murder. The next murder that I'm going to ask you about -- again, we're working up to 1987 to show what was in your possession -- is the murder of Joseph Wilkerson. For that we'll start with tab 69. I'm sorry. This will be Exhibit 57. We have our own numbering system which I'll do my best not to duplicate.
(Exhibit 57 was marked for identification by



the Court Reporter.)
BY MR. FEINBERG:
Q. So, sir, Exhibit 57 that I've just put in front of you is a search warrant and Affidavit of Probable Cause which provides some of the background regarding the murder of Joseph Wilkerson. Take a moment to read this two-page document and let me know when you're finished.
A. Okay.
Q. Okay, sir. So would you agree that Mr. Wilkerson was found dead near the 1600 block of Latona Street, L-A-T-O-N-A, on August 29th of 1983?
MR. ZURBRIGGEN: Object to the form. Again, Detective, if you can tell from what you see here.
THE WITNESS: Like I said, I never saw these documents before.
BY MR. FEINBERG:
Q. Let me restate the question. To be clear, as I'm showing you all these documents, I acknowledge that you may not have been involved.
A. Yeah.
Q. But I'm showing you what your fellow detectives in the homicide division were aware of in that time frame.
A. Yeah.



Q. So with that qualifier, would you agree that, according to this document --
A. Yeah.
Q. -- it appears --
A. Right.
Q. -- that Mr. Wilkerson was found dead --
A. Right.
Q. -- August 29th, 1983, in the 1600 block of Latona Street?
A. Yes.
Q. Okay. On second page of the affidavit, did you see reference to Patricia Turner?
A. Yeah.
Q. And do you see that the affiant in this case, who was Igor Alfinow, A-L-F-I-N-O-W, that Detective Alfinow included an allegation that Patricia Turner lived at 1621 Latona Street. Did you see that?
A. Um-hum.
Q. Is that a yes?
A. Yes.
Q. And there was an allegation that Mr. Wilkerson, the person found dead, was alleged to have raped Patricia Turner; is that correct?
A. Yes.



Q. And that the killing of Mr. Wilkerson was in retaliation for that rape. Did you see that?
A. Yes.
Q. Okay. Let me show you another document on the same case. This will be Exhibit 58.
(Exhibit 58 was marked for identification by the Court Reporter.)
BY MR. FEINBERG:
Q. Here you go, sir. These are some handwritten notes that were pulled out of the homicide file for the death of Mr. Wilkerson.
By the way, sir, just so you know, any time I reference a homicide file that I've pulled documents from, those homicide files were provided to me by your lawyers on my request. So these are documents that the City has produced to us.
So take a moment just to quickly skim those notes, and I'll ask you some questions. Were you able to finish reading those notes, sir?
A. Yeah.
Q. Okay. So once again, this is about the Wilkerson murder.
A. Yeah.
Q. We see reference or a note dated September 2nd,

Page 121

'83, "Doer is Squirt." Did you see that?
A. Um-hum.
Q. Is that a yes?
A. Yes.
Q. Squirt is the same person who we talked about a short time ago whose real name was Frank Turner; is that correct?
A. Yes.
Q. Or at least that's what the documents say; is that correct?
A. Yes. Yeah.
Q. And then on the second page we see a note that Patricia Turner -- strike that.
We see essentially just a restatement of the fact that Mr. Wilkerson, the decedent, was alleged to have raped Patricia Turner; is that correct?
A. Yes.
Q. Okay. You can put that to the side. I'll show you one more document -- actually two more documents on this case. The first is tab 71, Angeline. This will be Exhibit 59.
(Exhibit 59 was marked for identification by the Court Reporter.)
BY MR. FEINBERG:

Page 122

Q. Sir, that's a larger stack of documents. If you give me a moment, I'll direct you to the page I'd like you to read. Actually, bear with me for just one moment. Okay.
First things first, sir. Would you agree that, on the first page, there's an arrest warrant here that's issued to you?
A. Yes.
Q. And the warrant was for the arrest of Pat Turner; is that correct?
A. Yes.
Q. And you would agree, based on what we've read before, Patricia Turner is the woman who was -- according to the documents, was allegedly raped by Mr. Wilkerson, the person who was the decedent; is that correct?
A. Yes.
Q. Now, showing you these documents, do you recall anything about the arrest of Patricia Turner?
A. No.
Q. Give me just a moment, sir. Actually, go to the third page of the document. It's marked City 12685. There's a long narrative description here about an interview with Juanita Mays. Do you see the reference to Juanita Mays? It's on the page where you're at.

Page 123

A. I see it.
Q. Detectives from the homicide unit interviewed Juanita Mays?
A. Robby Mays.
Q. Can you hand that document back to me, sir. Okay. You were looking at -- I sent you to the wrong page. That's Juanita Mays.
A. Okay.
Q. In fact, let me -- hand it back to me one moment, sir. I don't want you to have to take the time to read this entire document. Okay. I've put a blue line about a third of the way down, just a little dash there. Just read that text from the top to that line.
A. Okay.
Q. Okay. Would you agree, sir, that, according to this document, the information provided by Juanita Mays shows that the allegation was that Patricia Turner was raped by Joseph Wilkerson?
A. Yes.
Q. And that Patricia Turner spoke to her nephew, Squirt, Frank Turner, about that rape; is that correct?
A. Yes.
Q. And once again, we know from the notes that we read before at Exhibit 58 that the allegation was that

Page 124

Squirt was the person who shot Mr. Wilkerson; is that correct?
A. Yes.
Q. Okay. So you can hand that document back to me just to keep it out of your way. Let's do this. I want to show you some documents now about Mr. Crosland, which are already in the binder. Let me help you to do that. Bear with me for one second. I'm going to turn you to Exhibit 46.
A. 46 is here. 46; right?
Q. Yes. Now, before you read that -- are you there, sir?
A. Yeah.
Q. I'll take these documents back from you. Just to set the scene, we've reviewed two different murders, or some of the facts about two different murders: One, the murder of John Lamb in 1982; two, the murder of Joseph Wilkerson in 1983?
A. Right.
Q. Agreed?
A. Yeah.
Q. Now, we're moving a year into the future from '83, and we're in December of '84. And this activity sheet that I've put in front of you from Exhibit 46 concerns the

Page 125

murder of Il Man Heo on December 5th, '84. So please read this activity sheet to yourself and let me know when you're finished.
Okay, sir. So you've finished reading that now?
A. Yeah.
Q. So you see the details of this case involve the shooting on December 5th of '84; is that correct?
A. Yeah.
Q. Detective Nespoli is the assigned detective?
A. Yes.
Q. And the shooting is -- the murder victim was the owner of a grocery store at 27th and Oakford Streets; is that correct?
A. Yeah.
Q. Is that a yes?
A. Yes.
Q. Okay. I take it, I assume the information that you saw about the three eyewitnesses -- Mona Madison, Levi Davis and Maurice Durbin -- you recall seeing that in the Affidavit of Probable Cause that Detective Cimino prepared that I had you review?
A. Yes.
Q. Okay. So once again, this -- not once again.
This murder takes place in South Philadelphia; is

Page 126

that correct?
A. Yes.
Q. The murder of Mr. Wilkerson, 1600 Latona, that's South Philadelphia; is that correct?
A. Yes.
Q. The murder of John Lamb, Tasker Homes, that's South Philadelphia; is that correct?
A. Yes.
Q. Okay. So we've got three murders, '82, '83, '84, all taking place in South Philadelphia; correct?
A. Yes.
Q. All right. Before I move on, let me just show you just some information about the suspects. You'll have to turn back to Exhibit 15.
A. Where?
Q. Exhibit 15 in that binder. Take your time. There's a lot of paper in there. I can actually help you. There we go.
Exhibit 15 is an activity sheet pulled from the homicide file for the murder of Il Man Heo. It's dated December 13th of '84. So just a little over a week after Mr. Heo's murder. Take a moment to read through that and let me know when you're finished.
A. Okay.

Page 127

Q. Actually, go ahead and read the next exhibit, which is Exhibit 16. That's an activity sheet from January 7th of 1985, same case involving Mr. Heo.
A. Okay.
Q. Would you agree, sir, that, in combination, these two exhibits show that Michael Ransome was identified as a potential suspect in the Heo murder?
A. Yes.
Q. And that police tried to locate him, but they could not?
A. Yes.
Q. And that was as of January 7th of '85; is that correct?
A. Right.
Q. I'll represent to you, sir, that, based on a lengthy deposition that we conducted with Detective Mangoni and Detective Rocks on previous occasions, we've established that the Heo case essentially went cold after January 7th of '85 and wasn't picked up again until sometime in '87.
A. Right.
Q. Will you just accept that representation?
A. Yes.
Q. All right. So let's -- before I move on I just

Page 128

want to summarize what we've reviewed with regard to the three murders of John Lamb, Joseph Wilkerson and Il Man Heo, all in South Philadelphia. Okay?
A. Um-hum.
Q. First, would you agree that, based on the documents that you've seen, Lamb was murdered in September of '82. Agreed?
A. Yes.
Q. And police, according to the documents, believed that Frank Turner is a suspect; is that correct?
A. Yes.
Q. And police also believe that Mr. Crosland was at least involved because a fight with him is what precipitated the murder?
A. Yes.
Q. Okay. Would you also agree, sir, that we have evidence Joseph Wilkerson was murdered in August of '83?
A. Yes.
Q. And police believe that Frank Turner and Patricia Turner were involved; is that correct?
A. Yes.
Q. And we see that Heo was murdered December of '85; is that correct?
A. Yes.

Page 129

Q. All right. As of the spring of 1987, which we were talking about earlier, I'll represent to you that there have been no arrests made in any of those three cases. Do you understand that representation?
A. Yes.
Q. So as of March of '87, the Lamb case is four and a half years old, from September of '82. Agreed?
A. Yes.
Q. The Wilkerson case is three and a half years old, from August of '83. Agreed?
A. Yes.
Q. And the Heo case is two and a half years old, from December of '85. Agreed?
A. Yes.
Q. All right. Now, let's move forward and talk about what happens in March and April of '87 once Delores Tilghman comes to the attention of Philadelphia Police detectives.
First, do you recall seeing in any of the documents you've reviewed that Delores Tilghman called the police out of the blue to speak about her boyfriend, Michael Turner?
A. No.
Q. Let me show you a document then. Let's go to tab

Page 130

74. This will be Exhibit 60.
(Exhibit 60 was marked for identification by the Court Reporter.)
BY MR. FEINBERG:
Q. Sir, as I hand you this -- -- before you start reading Exhibit 60, sir, let me tell you that this is an activity sheet that is prepared by Detective Lubiejewski, L-U-B-I-E-J-E-W-S-K-I. Do you know that Detective?
A. Yes.
Q. Did I pronounce his name correctly?
A. Lubiejewski.
Q. Lubiejewski, okay. So this activity sheet is prepared by Detective Lubiejewski and it concerns a statement that was given by Ms. Tilghman. I've been unable to locate that specific statement, but my understanding is that this activity sheet communicates what was in that statement plus additional investigative work.
So with that background, take your -- take some time to review the activity sheet and let me know when you're finished.
A. Okay.
Q. Are you finished reading it, sir? Are you finished reading?
A. Yes. Yes.

Page 131

Q. Okay. Did anything that you read here refresh your recollection about your involvement with Ms. Tilghman?
A. No.
Q. Let's just review some of the things that are in the document which will, I think, help us deal with questions that I've got for you later.
So according to this activity sheet, Ms. Tilghman is interviewed by Detective McGuoirk; is that correct?
A. Yes.
Q. McGuoirk, M-C-G-U-I-R-K; is that correct?
A. Yes.
Q. Upon reading this, sir, do you have any questions or concerns about the credibility of Ms. Tilghman's statement?
MR. ZURBRIGGEN: Object to the form.
Detective, if you can answer, you can answer.
THE WITNESS: No.
BY MR. FEINBERG:
Q. Would you agree that, according to this activity sheet, Ms. Tilghman has called police out of the blue three and a half years after the murder took place?
A. Yes.
Q. And she has said that Michael has assaulted her or, you know, otherwise threatened her; is that correct?

Page 132

A. Yes.
Q. Would you agree that at that moment she's got a motive or a bias against him?
A. Yes.
MR. ZURBRIGGEN: Objection to the form.
Detective?
THE WITNESS: Yes.
BY MR. FEINBERG:
Q. Because according to her, he's just beaten her up; is that correct?
A. Yes.
Q. In a circumstance like this, would you kind of pay careful attention to the credibility of her statement?
MR. ZURBRIGGEN: Object to the form.
Detective, you can answer.
THE WITNESS: Yes.
BY MR. FEINBERG:
Q. Because, if she's got an ax to grind with the person who she is identifying in the statement, she may have reasons to not be truthful; is that correct?
A. Yes.
Q. Okay. One immediate issue that kind of is addressed here is whether she told anybody else about what Michael had allegedly admitted in August of 1983; is that

Page 133

correct?
A. Yes.
Q. And by the way, for background -- and the document will speak for itself, but according to this document, what Ms. Tilghman says is that Michael admitted to being involved with the murder of Joey Wilkerson the same day it happened; is that correct?
A. Yes.
Q. And that she's coming forward and, according to this document, saying something about it four and a half years later; is that correct?
A. Yes.
Q. Three and a half years later; is that correct?
A. Yes.
Q. Okay. So in a situation like that -- forget this case -- if someone comes to you and says I've got information about an old case, would you typically ask them, did you ever tell anybody else about this?
A. Yes.
Q. Because if they did, that will help to corroborate --
A. Corroborate.
Q. -- their statement; is that correct?
A. Yes.

Page 134

Q. All right. Do you see a reference to a Mary Jackson in this statement? It was her aunt. I'll help you find it if you can't locate it. It's the middle paragraph on the first page, the second-to-last sentence, "She did tell her aunt, Mary Jackson, and her friend Tracey Singleton." Did you see that?
A. Yes.
Q. If you got information like that, it sounds like, from what you're saying, you'd want to interview Mary Jackson and Tracey Singleton; is that right?
A. Yes.
MR. ZURBRIGGEN: Object to the form.
Detective, you can answer.
THE WITNESS: Yes.
BY MR. FEINBERG:
Q. Okay. There's reference to a Tracey Singleton interview the next paragraph down, but before we get there, do you have any -- I realize when I'm asking this question that -- let me just ask it.
Do you have any idea whether Mary Jackson was interviewed?
A. No.
Q. If Mary Jackson was interviewed, would you expect that the file would contain some indication of that in an

Page 135

activity sheet or an interview statement?
A. Yes.
Q. I think you told me before that the practice in homicide in the 1980s was to keep a running log of the investigation?
A. Right.
Q. If there is no reference to -- in the file to any interview with Mary Jackson, does that lead you to assume that no such interview was conducted?
MR. ZURBRIGGEN: Object to the form.
Detective, you can answer.
THE WITNESS: Yes.
BY MR. FEINBERG:
Q. Okay. Regarding Tracey Singleton, I mentioned just a moment ago that there was a reference to an interview with Tracey Singleton. I'm going to read this out loud and we'll see if we can parse this together.
"Detective Clark interviewed" -- do you see where I am?
A. Yes.
Q. "Detective Clark interviewed Tracey Singleton who stated that Delores had told her about the killing back some time after it happened. Delores told her before the guy was killed that Michael was going to get with the guy

Page 136

who raped his mother. Delores also told her on 3/22/87 that Michael had killed the guy in 1983 at the 1600 block of Latona."
Did you follow along with what I've read?
A. Yes.
Q. Okay. So would you agree with me -- and again, I know you didn't write this.
A. Yeah.
Q. But according to this document, it appears that Tracey Singleton only learned about Michael Turner's alleged admission on March 22nd of '87.
A. Yes.
Q. Which is the same day that Delores Tilghman called the police; is that correct?
A. Yes.
Q. Okay. So if Delores Tilghman told two people about Michael Turner's alleged admission -- Mary Jackson and Tracey Singleton -- you would expect -- your practice would be to interview them; is that correct?
A. Yes.
MR. ZURBRIGGEN: Object to the form.
BY MR. FEINBERG:
Q. We've already established -- not established, but we've agreed that, if there's no reference to an interview

with Mary Jackson, you assume it didn't happen; is that correct?
MR. ZURBRIGGEN: Objection to the form.
Detective, you can answer.
THE WITNESS: Yeah.
BY MR. FEINBERG:
Q. With regard to Tracey Singleton, her interview is only telling you that Delores Tilghman attributes a confession to Michael Turner on the very same date that she called police; agreed?
MR. ZURBRIGGEN: Object to the form.
THE WITNESS: Yes.
BY MR. FEINBERG:
Q. And I think that you've told me on that date, when Delores Tilghman has been beaten up by her boyfriend Michael Turner, you've got reasons to view -- to be suspicious about her statement; is that correct?
MR. ZURBRIGGEN: Object to the form.
Detective, you can answer.
THE WITNESS: Yes.
BY MR. FEINBERG:
Q. May not be credible because she has a potential ax to grind against Michael Turner; is that correct?
A. Yes.



Q. Okay. Once again, sir -- and this may be an issue of the fact that we are dealing with cases that are decades old -- I do not have a copy of Delores Tilghman's statement to Detective McGuoirk. But that statement was read into the Record during her grand jury testimony, which is why I've just picked up Exhibit 22, the copy of the grand jury testimony, and I'm going to show that to you now.
So again, I'm in Exhibit 22, and I'm turning to page 8,978. I'll hand that back to you. I'll ask you to bear with me for just a moment while I get myself to that page. Just read page 8,978 to yourself, and that'll help set the scene.
A. Okay.
Q. Would you agree, sir, that once again we're in the grand jury testimony with questioning by Mr. Rosen; is that correct?
A. Yes.
Q. And Mr. Rosen, it appears from what you've just read, he's provided a -- not a handwritten, a written statement given by Ms. Tilghman. He's given her an opportunity to review the statement. Agreed?
A. Yes.
Q. If you go over to the next page, so 8,979. If you



look, Mr. Rosen says, "I'm going to read this for the ladies and gentlemen," he's referring to the statement. And then there's a couple lines down, he says, "These questions are by Detective McGuoirk.
Do you see what I've read there?
A. Yes.
Q. From the context there, can we agree that Mr. Rosen is reading into the Record -- or it appears that Mr. Rosen is reading into the Record the statement that Ms. Tilghman gave to Detective McGuoirk on March 22nd of '87?
MR. ZURBRIGGEN: Object to the form.
Detective, you can tell.
THE WITNESS: Yes.
BY MR. FEINBERG:
Q. In fact, just so you have more context, one of the first questions that Mr. Rosen reads is, reading from the statement is, "Today at approximately 6 in the morning, you called Detective Lubiejewski here at homicide and stated that your boyfriend, Michael Martin, had killed a man in August of 1983, drug his body into a lot around 16th and Latona," and the answer was "Yes."
Did you see what I've read, sir?
A. Yes.
Q. So when we put all that context together, it



appears that Mr. Rosen is reading that statement into the Record. Agreed?
A. Yes.
Q. All right. Go forward to page 8,986.
And by the way, this statement is taking place March 22nd of '87, so a couple of weeks before you recall having some interaction with Ms. Tilghman; correct?
A. Yeah.
Q. Okay. The statement that's being read into the Record of the grand jury testimony, to be clear. Understood?
A. Yes.
Q. Do you see about one third to one halfway down the page there's a question, reading the statement, saying "Are you willing to take a lie detector test?" Do you see that?
A. Yes.
Q. And the answer was "Sure. Why not?" Do you see that?
A. Yes.
Q. Do you have any idea whether there was a polygraph exam given to Delores Tilghman?
A. No.
Q. All right. In your practice, if you asked a

Page 141

witness whether they wanted to take a polygraph test or whether they'd be willing to take a polygraph test and they said yes, would you typically give it to them?
A. Yes.
Q. Would there ever be a reason why you would say, do you want to take a polygraph, and the witness said yes where you decided not to give a polygraph?
A. Yes.
Q. Why would that happen?
A. If the person is credible and there was other corroborating evidence.
Q. Okay. But then if that were the case, why would you ask about the polygraph?
A. I don't know.
Q. Okay. Based on your practice, what -- I think what you told me is that, if you had doubts about what the person was saying or you thought the person was holding information back, you'd say, why don't you take a polygraph; right?
A. Yes.
Q. And I'm paraphrasing, but that's essentially what you've told me; right?
A. Sure.
Q. So if you had a situation where you said to a

Page 142

witness, why don't you take a polygraph, and the answer was yes, your practice would be to give the polygraph; is that correct?
A. Yes.
Q. Or at least set the polygraph up with an examiner; is that correct?
A. Yes.
Q. All right. And I understand sitting here today you have no idea whether that polygraph was conducted; is that correct?
A. Correct.
Q. All right. Let's go forward to one other item I'm going to show you in this testimony. You have to go several pages later in the grand jury testimony to page 9013. Bear with me for one moment, sir. You know what, I'm going to disregard that, sir. We'll come back to that.
You can actually put that testimony to the side, sir. I'm going to mark Exhibit 61.
(Exhibit 61 was marked for identification by the Court Reporter.)
BY MR. FEINBERG:
Q. Here you go, sir. Before you read it, let me direct you to the relevant portions. First -- in fact, we can just do this. I'll point you to just a couple of quick

Page 143

specific references here. This appears to be an Affidavit of Probable Cause prepared by Detective Frank McGuoirk; is that correct?
A. Yes.
Q. The same one we referenced who took the statement from Ms. Tilghman on March 22nd of '87; is that correct?
A. Yes.
Q. The date on this is that same day, March 22nd of '87; is that correct?
A. Yes.
Q. And would you agree, if you turn to the second page -- by the way, I forget if I mentioned, this is an affidavit seeking the arrest of Michael Turner; is that correct?
A. Yes.
Q. For the murder of Joseph Wilkerson; is that correct?
A. Yes.
Q. And if you just look at the second page, you don't have to read the entire thing, but do you see there that a large portion of this affidavit covers or relates information that was provided by Delores Tilghman?
A. Yes.
Q. Okay. So would you agree, based on that -- and by

Page 144

the way, tell me if you need to take time to read this to answer this question -- that the information provided by Delores Tilghman to homicide detectives on March 22nd, 1987, essentially was the final -- or the sole factor that caused the arrest of Michael Turner for that murder; is that correct?
MR. ZURBRIGGEN: Object to the form. Detective, if you can tell from this, you can answer.
BY MR. FEINBERG:
Q. I'm going to restate that question, because it was too many questions in one.
Would you agree that Delores Tilghman's information was critical to the arrest of Michael Turner?
MR. ZURBRIGGEN: Same objection. Detective, you can answer.
THE WITNESS: It looks that way.
BY MR. FEINBERG:
Q. Okay. You should have Exhibit 60, you have in front of you; right?
A. Yeah.
Q. And you've already read this, so maybe it's fresh in your mind.
Would you agree that Mr. Turner, Michael Turner,

was arrested that same day, March 22nd of '87?
A. Yes.
Q. So if you recall correctly -- tell me if you agree -- a while back we established that there were three murders in South Philadelphia; Lamb, Wilkerson and Heo; correct?
A. Yes.
Q. All of them were cold cases from '82, '83 and '84, all the way to '87; is that correct?
A. Yeah.
MR. ZURBRIGGEN: Object to the form.
BY MR. FEINBERG:
Q. Once Delores Tilghman comes in on March 22nd, '87, police detectives act immediately, and Michael Turner is in custody later that day. Agreed?
A. Yes.
Q. So that's been a significant break in one of these cases that has been a cold case for quite some time; agreed?
A. Yes.
MR. ZURBRIGGEN: Object to the form.
BY MR. FEINBERG:
Q. Okay. Have you observed situations like this where a witness comes in -- strike that.



Have you ever observed cases where a witness will provide information to detectives and detectives believe that the witness will have information on multiple cases?
A. I've seen that happen.
Q. For example, a witness comes in and says, I know about this murder, and then detectives start asking that witness questions about multiple different cases?
A. Yeah.
Q. What I want to ask you now is whether that -- not what I'm going to ask you now, but what I want to go through now is whether Delores Tilghman became a witness like that who provided information about a lot of different suspects and murders. Okay? That's what I'm going to do over the next few minutes here.
First I'm going to show you tab 75, which this will be marked, pardon me, as Exhibit 62.
(Exhibit 62 was marked for identification by the Court Reporter.)
BY MR. FEINBERG:
Q. Take a moment to read this handwritten note to the extent that you can.
A. Okay.
Q. Are you finished reading?
A. Yeah.



Q. First, let me make a representation to you -- and your counsel can confirm this just by virtue of the page numbers -- there's a stamp there that says City 11622. Do you see that?
A. Yes.
Q. That's the page range is a document that means it comes from the John Lamb homicide file. Do you understand what I've said?
A. Yeah.
Q. Remember we've talked about three cases: Lamb, Wilkerson, Heo. Correct?
A. Yes.
Q. Okay. When you read this note, "Mike came home and said," do you see the first part I've read there?
A. Yeah.
Q. Then there's text that says "Clothes bloody, had gun, washed clothes." Do you see that?
A. Yes.
Q. And then "ran into Joey on Latona." Do you see that?
A. Yes.
Q. Based on that handwriting, would you agree that this note appears to reference, number one, the Wilkerson murder; agree with that?



MR. ZURBRIGGEN: Object to the form.
Detective, if you can tell.
THE WITNESS: I can't tell.
BY MR. FEINBERG:
Q. Okay. Now, remember we just reviewed a whole bunch of documents about the Wilkerson murder. Wilkerson's first name was Joey; is that correct?
A. Yeah.
Q. Wilkerson was, according to the documents, found dead on the 1600 block of Latona; is that correct?
A. Yeah.
Q. Delores Tilghman told police, according to what you've seen, that she washed Michael Turner's clothes after the murder; correct?
A. Yes.
Q. And Turner's first name was Mike, Michael; is that correct?
A. Yes.
Q. So based on what we've just reviewed, would it stand to reason that this note is in reference to information provided by Delores Tilghman about the Joey Wilkerson murder?
MR. ZURBRIGGEN: Object to the form. Again, Detective, if you can tell.

Page 149

THE WITNESS: Yes.
BY MR. FEINBERG:
Q. Okay. So piece together the two things I said, that this is -- I'll ask you to assume --
A. Yeah.
Q. -- that this document is about the Joey Wilkerson murder, and it's found in the John Lamb file. Do you follow what I'm saying?
A. Yes.
Q. Does that make sense to you that, once Delores Tilghman comes in and gives information, detectives would have pulled files from old unsolved murders to see if they could use Delores Tilghman's information in those other cases?
MR. ZURBRIGGEN: Object to the form. Detective, if you know.
THE WITNESS: Yes.
BY MR. FEINBERG:
Q. And that's something that you told me you've seen done before; right?
A. Yes.
Q. And do you recall that, with regard to the Lamb murder -- remember Frank Turner, Squirt, was the suspect?
A. Yeah.

Page 150

Q. And with regard to the Wilkerson murder, Frank Turner and Pat Turner were the suspects; right?
A. Yes.
Q. And then Mike Turner gets added to that in light of Tilghman's information; is that correct?
A. Yes.
MR. ZURBRIGGEN: Objection to the whole line of questioning, for the Record.
MR. FEINBERG: Do you need a break at all, sir?
THE WITNESS: No.
MR. FEINBERG: Five to ten minutes from now would be a good time for a break.
BY MR. FEINBERG:
Q. Just to set the scene again, Delores Tilghman has come in to talk to police in March of '87. Agreed?
A. Yeah.
Q. Detectives have open cases for Lamb, Wilkerson and Heo; correct?
A. Yeah.
Q. And then it look like police, from this document we just looked at, Exhibit 62, that the police are starting to pull the file from Lamb and Wilkerson. Agreed?
A. Yes.

Page 151

Q. Okay. Did you become aware at any point that Delores Tilghman attempted to retract or take back the testimony or the information that she gave to police?
A. No.
Q. Do you still have -- here's the grand jury testimony. I'd like to direct you to a page here. Go to page 8,995. Take a moment to read, sir, 8,995 and 8,996.
A. Okay.
Q. All right, sir. So I neglected before to put on the Record the date of Ms. Tilghman's grand jury testimony. There are a couple of different dates. The date that we're reading from right now is February 4th of '88. So Delores Tilghman on February 4th of '88, is talking about things that happened back in March and April of '87. Agreed?
A. Yes.
Q. Would you agree, from the testimony that Ms. Tilghman just read, she's testifying about her previous statements to police concerning Michael Turner. Agreed?
A. Yes.
Q. She told the grand jury that she attempted suicide; is that correct?
A. Yes.
Q. She told the grand jury that she attempted suicide because, quote, it had a lot to do with this case here. Do you see that?
A. Yes.

Page 152

Q. And what she told the grand jury is that the statement that she gave to the police was not true. Do you see that?
A. Yes.
Q. And she told police that she wanted to retract, or take back, her statement. Agreed?
A. Yes.
Q. And the police told her, no, she can't do that, because everything she said about Michael Turner seemed to be true. Did you see that?
A. Yes.
Q. Okay. Does that refresh your recollection about any of your interactions with Delores Tilghman?
A. No.
Q. That said, you agree that, according to this testimony, Delores Tilghman tried to kill herself because of the statement that she gave and she tried to take it back. Is that right?
A. Yes.
Q. And the police told her, no, you can't. Is that right?
A. Yes.

MR. ZURBRIGGEN: Object to the form.
BY MR. FEINBERG:
Q. Let me show you one more document on that same document. This will be Exhibit 63.
(Exhibit 63 was marked for identification by the Court Reporter.)
BY MR. FEINBERG:
Q. Okay, sir. This is a long document. First, let me make some representations to you about what this is. This is a statement -- in fact, if you read along with me on the first page, the date is April 27th of '87. Do you see that?
A. Yes.
Q. Okay. So just piecing thing together again, remember, Delores Tilghman talks to Detective McGuoirk -- strike that.
Detective -- pardon me.
Delores Tilghman calls Detective Lubiejewski and gives a statement to Detective McGuoirk on March 22nd, '87. Agreed?
A. Um-hum.
Q. Is that a yes?
A. Yes.
Q. Then April 16th of '87, she's in the hospital,



according to the grand jury testimony. Agreed?
A. Yes.
Q. And then April 27th of '87, 11 days later, she's giving this statement, according to this document. Agreed?
A. Yes.
Q. Okay. And if you just read the first question, it says "Delores Tilghman. My name is Daniel Paul Alva, Esquire. I'm the court appointed attorney for Michael Martin" -- later we find out that's an also-known for Michael Turner -- "who has been arrested on the charge of homicide," and then the statement continues.
So do you see, sir, that this is an interview conducted by Mr. Alva with Delores Tilghman about Michael Turner? Do you see that?
A. Yes.
Q. By the way, do you know Mr. Alva?
A. Yeah.
Q. Long-time defense attorney; I'm sure he cross-examined you many times?
A. Yeah.
Q. Do you have an opinion of Mr. Alva about --
A. No.
MR. ZURBRIGGEN: Object to the form.
BY MR. FEINBERG:



Q. Go to page 8 -- pardon me -- 693 on this document. It says page 5 of the document, and the stamp at the bottom is 693. Okay. Bear with me for just a moment. All right.
Why don't you read page 693, page 694, down to the bottom of page 695.
A. Okay.
Q. Actually, sir, just continue on to the top of page 690 --
A. 690?
Q. Bear with me for one second. You've read to the bottom of page 696; right?
A. Yeah.
Q. Would you agree with me that Ms. Tilghman says that she tried to retract her statement?
A. It says it here.
Q. And according to this document, she spoke to -- she remembered specifically you, Detective McNesby; is that correct?
A. Yes.
Q. Although the name is spelled wrong, it's pretty clear that they're referring to Detective Cimino; is that correct?
A. Yes.
Q. By the way, have I been pronouncing that name



correctly?
A. Yes.
Q. And there's a reference to interactions with you and Detective Cimino about her request or her wishes to retract her statement. Agreed?
A. Yes.
Q. She also says that the detectives she spoke to, meaning you and Cimino, wouldn't let her retract her statement; is that correct?
A. That's what she says, yeah.
Q. And then she also says that she tried to commit suicide because of the way she felt about her statement. Agreed?
A. That's what it says here.
Q. Okay. Do you remember any of that happening?
A. No.
Q. Did she ever tell you that she wanted to retract her statement?
A. No.
Q. Did you ever tell her that she could not retract her statement?
A. No.
Q. Do you remember any discussions at any time with Delores Tilghman about retracting statements that she gave

Page 157

to police?
A. No.
MR. FEINBERG: Let's go off the Record.
VIDEOGRAPHER: Going off Record. 12:47.
(Brief recess taken.)
VIDEOGRAPHER: We're back on. 1:21.
BY MR. FEINBERG:
Q. Okay, Mr. McNesby. Good afternoon once again. We took a break that went a little bit longer than expected. We were off for about 25, 30 minutes or so.
Did you realize during the break that any of your previous testimony was incorrect or incomplete?
A. No.
Q. Just to pick up with where we were before, we had talked about how Delores Tilghman came in in March of '87 and spoke to police. Do you recall that?
A. No.
Q. Do you recall that we spoke about it?
A. Yes.
Q. Okay. And do you recall that we spoke about the fact that, in March of '87, there were three South Philly murders that had been unsolved up to that time?
A. Yes.
Q. Okay. Let me mention -- well, we talked about the

Page 158

Wilkerson and the Lamb murder. Let me now bring you up to speed in '87 with the Heo murder. Turn, please, to Exhibit 21 in your binder.
Do you have in front of you a statement of Rodney Everett dated April 15th of '87?
A. Yes.
Q. Now, I assume you would have some familiarity with the statement because I asked you to review the Affidavit of Probable Cause prepared by your partner, Detective Cimino; is that correct?
A. Yes.
Q. And Detective Cimino's affidavit related information supplied by Mr. Everett on April 15th of '87; is that correct?
A. Yes.
Q. All right. So now I'm showing you that underlying document. It's a lengthy statement. I'll ask you just to read the first and second page, and let me know when you're finished.
A. Go ahead.
Q. All right. Now, Mr. Everett says that Curtis Crosland is the man who shot Il Man Heo; correct?
A. Yes.
Q. And he says that Curtis Crosland confessed to

Page 159

shooting Il Man Heo; is that correct?
A. Yes.
Q. The homicide division, based on documents you've seen, already knew Mr. Crosland's name from the John Lamb case; agreed?
MR. ZURBRIGGEN: Object to the form of the question. Detective, if you can tell from --
THE WITNESS: I don't know.
BY MR. FEINBERG:
Q. Do you remember seeing documents earlier today which showed that Frank Turner was rumored to be the shooter in the John Lamb case and that Frank Turner shot John Lamb because John Lamb beat up Curtis Crosland?
A. Yes.
Q. And do you remember seeing documents showing that Frank Turner and Curtis Crosland were cousins?
A. Yes.
Q. Okay. So in light of that, if you assume that those documents were available at that time, would you agree that it appears that the homicide division had information about Curtis Crosland at that time?
A. Yes.
MR. ZURBRIGGEN: Object to the form.
THE WITNESS: Sorry.

Page 160

MR. ZURBRIGGEN: It's all right.
BY MR. FEINBERG:
Q. So then, of course, if someone comes in and gives a statement like this -- Mr. Everett, that is -- that makes Curtis Crosland a suspect in the case; is that right?
A. Yes.
Q. Of course assuming the truth of the statement; is that right?
A. Yes.
Q. Okay. The statement also references Squirt. Did you see that?
A. Yes.
Q. Because it shows that Squirt allegedly has information about the Il Man Heo murder; is that correct?
A. Yes.
Q. And in fact, if you go on to the third page, City 19 -- actually the top of this page right here, "Who is Squirt"?
A. Right.
Q. The correct name is Frank Turner; right?
A. Yes.
Q. So Frank Turner's name is now popping up in this case; is that correct?
A. Yes.

Page 161

Q. It had previously come up in the Wilkerson case; right?
A. Yes.
Q. It had previously come up in the Lamb case; is that correct?
A. Yes.
Q. Okay. So this information, would you agree based on what you've seen in this document, was available to the Philadelphia Police Department homicide division as of April 15th of 1987?
MR. ZURBRIGGEN: Object to the form. Detective, you can answer.
THE WITNESS: Yes.
BY MR. FEINBERG:
Q. Do you remember learning about that information?
A. No.
Q. Now, you've seen reference in the grand jury testimony from Ms. Tilghman that she recalls police coming to see her in the hospital on April 16th of 1987. Do you remember seeing that?
A. Yes.
Q. Okay. Were you there on April 16th, 1987, seeing Ms. Tilghman in the hospital?
A. I do recall going to the hospital and to see a

Page 162

female.
Q. Do you have any reason to dispute the date, that that's the date you went to see her?
A. No reason to dispute it right now.
Q. Okay. Now, you're aware, based on everything you've seen, that Ms. Tilghman had given information about the Turner family?
A. Yes.
Q. She gave information about the father of her children, Michael Turner; is that correct?
A. Yes.
Q. She mentioned that Patricia Turner and Michael Turner were involved in the Wilkerson case; is that right?
A. Yes.
Q. That was something that, based on the documents that you've seen, happened on March 22nd; is that correct?
A. Yes.
Q. We also know, based on what you've seen, that Frank Turner was connected to the Wilkerson case from the very beginning; is that right?
MR. ZURBRIGGEN: Object to the form. Detective, you can answer if you can tell.
THE WITNESS: According to the documents, yes.
BY MR. FEINBERG:

Page 163

Q. Okay. So at that point, as of March of '87, based on Delores Tilghman's information, police have information on Frank Turner, Michael Turner, Patricia Turner; correct?
A. Yes.
MR. ZURBRIGGEN: Object to the form.
THE WITNESS: Yes.
BY MR. FEINBERG:
Q. And that's for the Wilkerson case and the Lamb case; is that correct?
A. Yes.
Q. Then Curtis Crosland's name comes up in connection with the Heo case; is that right?
A. Yes.
Q. And Curtis Crosland's name was also connected to the Lamb case; is that right?
A. Yes.
Q. So would you agree with me, without repeating all of that, that the police -- the homicide division, as of April 15th of '87, have information about Crosland and the Turners in connection with Lamb, Wilkerson and Heo?
MR. ZURBRIGGEN: Object to the form. Detective, you can answer.
THE WITNESS: Yes.

Page 164

BY MR. FEINBERG:
Q. Okay. Would you expect that, in those situations, or in that situation, that police would want to speak to Delores Tilghman about knowledge of other cases?
MR. FEINBERG: Object to the form. Detective, you can answer.
THE WITNESS: Sure.
BY MR. FEINBERG:
Q. In fact, you told me before, sometimes a witness comes in, they give you information on one cold case, you ask them questions about lots of cold cases from the same time period or same geographical area; is that right?
A. Yes.
Q. And what we've been talking about for the past -- well, the hour or so before the break, were three cold cases from the same time period and the same geographical area; is that correct?
A. Yes.
Q. So Delores Tilghman, given the information that she presents to the police naturally would be a witness who would be asked about other cases; is that correct?
MR. ZURBRIGGEN: Object to the form. Detective, you can answer.
THE WITNESS: Yes.

Page 165

BY MR. FEINBERG:
Q. Okay. So when detectives went to speak to Delores Tilghman on April 16th, the day after Curtis Crosland is identified as a suspect in the Heo murder -- are you with me on timeline?
A. No.
Q. Let me start again. Let's just repeat the dates. April 15th --
A. I got that.
Q. -- Rodney Everett says Crosland is the guy who did Heo. Right?
A. Yes.
Q. April 16th, police, according to the grand jury testimony, are talking to Delores Tilghman. Agreed?
A. Yes.
Q. Okay. You would expect then that Delores Tilghman would be asked about her knowledge of Curtis Crosland; agreed?
MR. ZURBRIGGEN: Object to the form of the question. Detective, you can answer if you know.
THE WITNESS: I don't know.
BY MR. FEINBERG:
Q. If you were a detective in that -- well, you were a detective in that time frame; right?

Page 166

A. Yeah.
Q. You know Delores Tilghman has got information or says she has information about Michael Turner committing the Wilkerson case; right?
A. Yes.
Q. She's got information about Patricia Turner being involved in the Wilkerson case; right?
A. I was only involved in the Heo event.
Q. You were only involved in the --
A. The --
Q. -- Heo case; right?
A. For trial, yes.
Q. Before we get there, I'm talking about what happened to Delores Tilghman in April of '87.
A. Yes.
Q. Not what happened, but what she was asked about. Okay?
A. Yes. Yes.
Q. All right. So if you're a detective in that time period and you know that information about the Turners has come up in connection with Lamb, Wilkerson and now Heo, you would expect that you'd want -- not you would expect. You would ask her about her knowledge of Curtis Crosland; right?

Page 167

MR. ZURBRIGGEN: Object to the form. Detective, you can answer.
THE WITNESS: I don't know.
BY MR. FEINBERG:
Q. That's what a good Detective would do; right?
MR. ZURBRIGGEN: Same objection. Detective?
THE WITNESS: I hope so, yeah.
BY MR. FEINBERG:
Q. And I assume you considered yourself a good detective; right?
A. Yes.
Q. You considered your partner, Detective Cimino, a good detective; right?
A. Partner, yeah.
Q. So at that point, if detectives have information on multiple cases and Delores Tilghman might have information on other cases beyond what she's already talked about you'd want to ask her about it; right?
A. I don't know.
Q. Okay. You don't know, but -- I think maybe we're talking over one another. You told me you don't remember whether you asked her questions about Curtis Crosland; is that correct?
A. Right.

Page 168

Q. Well, let me ask it in an open-ended fashion.
Do you remember asking Delores Tilghman about Curtis Crosland?
A. No.
Q. Do you remember asking Delores Tilghman about the Il Man Heo murder?
A. No. I -- no.
Q. Okay. You don't remember?
A. No.
Q. But I'm asking a different set of questions now. I'm asking based on your practices, based on your expectations, based on your knowledge that you would be a good homicide Detective, I'm asking you what you expect that you would do in that situation. Okay?
A. Yes.
Q. Given everything that we've just described, do you expect that you would ask Delores Tilghman about Curtis Crosland and the Il Man Heo case?
MR. ZURBRIGGEN: Object to the form. Detective, you may --
THE WITNESS: I might ask, do you have any information about any other homicide?
BY MR. FEINBERG:
Q. Okay. All right. And in particular, if Rodney

Everett has come in to talk about Curtis Crosland, would ask her whether she knew Rodney Everett?
A. No.
Q. Would you ask her whether she knew Curtis Crosland?
A. No.
Q. Why not?
A. Because he's in talking about -- it's Everett, right?
Q. Yes.
A. He's giving us information he knows.
Q. But he's giving you information about Frank Turner and Curtis Crosland; is that right?
A. Yeah.
Q. Delores Tilghman is giving information about Frank Turner and Michael Turner and Patricia Turner; right?
A. Right.
Q. So given those connections --
A. Well, they weren't connected, though.
Q. I'm sorry?
A. They weren't connected.
Q. Which wasn't connected?
A. What I'm saying is, the detectives were interviewing Everett, but they didn't connect them to the



other homicides, whatever it was saying.
Q. How do you know?
A. I'm just assuming, because otherwise, I think they would have followed up with these other investigations.
Q. Well, we haven't gotten to what happened later. Okay?
My question for you is -- first of all, Detective -- this interview with Rodney Everett is conducted by Detective Hughes and Mangoni; agreed?
A. Yes.
Q. They were in the SIU; is that correct?
A. I believe so, yes.
Q. A different SIU?
A. Yeah.
Q. So this becomes a cold case investigation; is that right?
A. Yes.
Q. You were part of cold case investigations at that time; is that correct?
A. Yes.
Q. So is it natural that, if anyone is going to do a cold case investigation, it's going to come to SIU detectives?
MR. ZURBRIGGEN: Object to the form.



Detective, you can answer.
THE WITNESS: No.
BY MR. FEINBERG:
Q. Okay. Why is it that you think that you -- strike that.
Why were you the one who went to visit Delores Tilghman in the hospital?
A. I believe it was the district attorney heard about it, that she was in the hospital, and he just wanted to verify it and see what her well-being was. We never took any statements or anything.
Q. In connection with the Heo case?
A. Any case.
Q. Well, what case was the district attorney involved in?
A. I don't recall.
Q. Okay. Now, I'll represent to you that no one was arrested for the Heo murder until December of 1987.
A. Um-hum.
Q. Are you with me?
A. Yes. Yes.
Q. Delores Tilghman was in the hospital in April of '87.
A. Okay.



Q. Can we agree that, if Mr. Crosland hadn't been arrested, no DA would be involved in his case?
A. No. Yes.
Q. Okay. And typical practice is, police investigate the case. Once they're ready to make an arrest, you consult with the DA; is that correct?
A. Yes.
Q. And then at that point the DA will be involved in preparing the case for trial. Agreed?
A. Yes.
Q. Okay. So if Ms. Tilghman is in the hospital some eight months before Mr. Crosland is ever arrested, can you agree there would be -- can you think of any reason why a DA would be involved at that point?
MR. ZURBRIGGEN: Objection to the form, but Detective if you know, you can say.
THE WITNESS: I don't know.
BY MR. FEINBERG:
Q. Okay. Knowing that time frame now, does that refresh your recollection in any way about whether -- what came up in the interview with Delores Tilghman in April of '87?
A. We were just asked by the district attorney to go visit the hospital to check on the well-being of

Page 173

Ms. Delores Tilghman.
Q. Let me do this. Let me just ask you to tell me everything you remember. Which district attorney asked you?
A. I don't know.
Q. An assistant district attorney asked you to go to the hospital; is that correct?
A. Yes.
Q. Why -- to your understanding -- did you have any understanding as to why the assistant district attorney was concerned about Delores Tilghman?
A. That she was a witness for a homicide case that he was --
MR. ZURBRIGGEN: Last question (phonetic).
THE WITNESS: That he was dealing with.
BY MR. FEINBERG:
Q. Which homicide case?
A. I don't know.
Q. Okay. You mentioned that you only dealt with Delores Tilghman in the Heo case; is that correct?
A. Yes.
Q. So can we assume --
A. Well, that's the one that was on trial, I believe.
Q. Okay. So can we assume then that, if your memory

Page 174

is you spoke to Delores Tilghman, or you dealt with Delores Tilghman about the Heo case, that any visit to her in the hospital would have been in connection with that case?
MR. ZURBRIGGEN: Object to the form. Detective --
THE WITNESS: I would think so.
(Court reporter clarification)
BY MR. FEINBERG:
Q. But we've already established that -- I think, that Delores Tilghman -- pardon me -- that Curtis Crosland was not arrested for the Heo murder until December of '87. Is that correct?
A. Yes.
Q. So I realize we're kind of going around in circles, but let me try to ask a different question.
Can you think of any reason how that would have come to pass, that a DA said to you, go talk to Tilghman, I need to make sure she's okay as a witness?
MR. ZURBRIGGEN: Object to the form. Detective, if you know, you can say.
THE WITNESS: That's the only reason I would think I went there. That's it.
BY MR. FEINBERG:
Q. What specifically did the DA ask you to do?

Page 175

A. Well, he subpoenaed us to come in and I guess -- I don't know what case he was working on, but for some reason he wanted us to interview this -- maybe she was a witness to another case or something. I don't know.
Q. Interview or do --
A. Just visit.
Q. Okay. What did you do next?
A. Well, once we got the subpoena, we went up to -- I thought it was Einstein Hospital, but apparently it's Jefferson -- to visit her. That's about all we did.
Q. You say a subpoena. Who was the subpoena for?
A. I don't recall.
Q. Okay. Did the DA want you to subpoena Delores Tilghman to come to court to testify?
A. No. No.
Q. Okay. Then what was your -- I don't understand what your reference to a subpoena -- I'm sorry. Let me ask that as a question.
Can you tell me why you referred to a subpoena before.
A. The DA wanted us to come in on a court day and go up to the hospital and visit --
Q. I see. Okay. Now I think I understand. If a DA wants to talk to you, the DA issues a subpoena to you;

Page 176

right?
A. Yeah.
Q. Through the court attendance office?
A. Court -- yeah.
Q. So you got a notice from court attendance --
A. Yes.
Q. -- that you had to show up and talk to the DA?
A. Yes.
Q. You go and talk to the DA -- when I say "the DA," I mean whichever assistant district attorney we're talking about; right?
A. Yes.
Q. Do you remember whether it was a male or a female?
A. Male.
Q. Do you remember the race of the attorney?
A. Caucasian.
Q. Okay. Was it Joel Rosen who was involved in the Crosland case?
A. Possibly.
Q. Okay. Whoever it was, can you give me every detail you remember about the request that was made of you.
MR. ZURBRIGGEN: Object to the form, but Detective, to the extent you can remember.
THE WITNESS: I don't recall.

Page 177

BY MR. FEINBERG:
Q. All you know is that, as a result of that meeting with the assistant district attorney, you ended up going to the hospital?
A. Yes.
Q. Okay. What happened when you got to the hospital?
A. We got to her bedside. The doctor said, you know, you really shouldn't be talking to her, so we left.
Q. Okay. How long were you there?
A. Not long at all.
Q. Can you give me an estimate.
A. Two minutes.
Q. Okay. Did you speak to her at all?
A. Yeah.
Q. What did you say?
A. See how she was doing. She was -- like you said, she tried to overdose. So we were concerned about you know, intimidating her. So we left.
Q. Was she able to respond to your questions?
A. I don't recall.
Q. So if I -- to make sure I understand, your recollection is you walked into the hospital. Was she even awake or --

Page 178

A. Yes.
Q. -- conscious?
A. Yeah.
Q. Okay. You see her.
A. Um-hum.
Q. Did you say anything?
A. Just we were concerned about her well-being.
Q. A doctor comes in?
A. Yes.
Q. Less than two minutes later?
A. Yes.
Q. The doctor says you shouldn't be here; right?
A. Yes.
Q. And you leave?
A. Yeah.
Q. Did Ms. Tilghman say anything in that time frame?
A. No.
Q. If your purpose was to check on her -- is that correct?
A. Yes.
Q. Were you able to even check on her on that short interaction?
A. Yes.
Q. What were you able to determine from that

Page 179

interaction?
A. That she was alert and she seemed to be okay.
Q. She wasn't dead, obviously?
A. Right, yeah.
Q. What did you do with that information?
A. I gave it back to the district attorney who request we went up there.
Q. That's it?
A. Yeah.
Q. Did you ever put any of that in writing?
A. No.
Q. Why not?
A. I wasn't asked to.
Q. And your recollection is that the assistant district attorney was concerned about Delores Tilghman as a witness in the --
A. A case. I don't know which one.
Q. Okay. But before you told me it was the Heo murder.
A. I did say that, but I think I misspoke there.
Q. Okay. Do you have any idea which case it was about?
A. No, I don't.
Q. Okay. Is that anything -- is that something you

Page 180

had ever done before?
A. What's that?
Q. Let me be more specific. What you've described to me is -- let's call it a wellness check. Does that sound accurate?
A. Yes.
Q. The assistant district attorney involved in the case asked you to conduct a wellness check on Delores Tilghman; is that right?
A. Yes.
Q. Had you ever done that before?
A. I believe so, yeah.
Q. In what circumstances?
A. I don't know.
Q. How many times have you done that --
A. Oh, I don't know.
Q. -- in total?
A. I don't recall.
Q. A lot?
A. No.
Q. Less than five?
A. Yeah. Yeah.
Q. And was the purpose always the same, just to check on the witness?

Page 181

A. Yeah.
Q. Is there any reason why the assistant district attorney wouldn't pick up the phone and call the witness at the hospital?
MR. ZURBRIGGEN: Object to the form, but Detective, if you know.
THE WITNESS: No.
BY MR. FEINBERG:
Q. The doctor told you that you shouldn't be here; is that right?
A. Yes.
Q. Was that surprising to you at all?
A. No.
Q. In the other wellness checks that you conducted, did doctors ever tell you to go away?
A. I don't recall.
Q. By the way, when you were working as a detective, I take it you were not in police uniform; is that correct?
A. Right.
Q. Plain clothes?
A. Yes.
Q. But I assume you carried a badge?
A. Yes.

Page 182

Q. And you made it obvious that you were a detective with the Philadelphia Police Department; is that right?
A. Yes.
Q. Okay. Do you remember anything about the doctor who told you that you should go?
A. No.
Q. You don't remember the race, sex, anything like that?
A. No.
Q. Okay. And putting together the dates -- strike that.
You saw the grand jury testimony where it was established that Ms. Tilghman was hospitalized and had an encounter with detectives on April 16th of '87; is that correct?
A. Yes.
Q. Do you believe that that was the date that you went to see Delores Tilghman?
A. I would think so, yeah.
Q. Did you ever learn of any other hospitalization for Ms. Tilghman?
A. No.
Q. I also showed you evidence earlier today -- not evidence. I showed you the transcript which appeared to

Page 183

show that you and Detective Cimino took a statement from Ms. Tilghman on that date. Do you remember seeing that testimony?
A. Yes.
Q. But your testimony is that never happened; is that correct?
A. That's correct.
Q. Do you have any idea why Joel -- let me ask that a different way.
Do you have any explanation for the fact that the transcript shows Joel Rosen reading into the Record a statement that was attributed to you and Detective Cimino if you say that never happened?
MR. ZURBRIGGEN: Object to the form, but Detective, if you know.
THE WITNESS: I don't know.
BY MR. FEINBERG:
Q. No idea whatsoever?
A. Right.
Q. Do you think the statement was completely made up?
MR. ZURBRIGGEN: Same objection. Detective, if you know.
THE WITNESS: I have no idea.
BY MR. FEINBERG:

Page 184

Q. Do you know if the statement was completely fabricated?
A. I don't know.
MR. ZURBRIGGEN: Same objection.
BY MR. FEINBERG:
Q. Do you recall anything, ever in your career, where you -- say that again.
Did you ever conduct an interview with a witness or a suspect in a hospital?
A. No.
Q. Never once in 10 years in the homicide division?
A. No.
Q. All right. Let's talk about some of the specifics about what the transcript shows Ms. Tilghman talks to police about. Do you still have -- it's right here.
I'm going back to the grand jury transcript which was previously marked as Exhibit 22. By necessity, sir, to ask some of my questions, I'm going to have to repeat some of the things I've already shown you. Start at page 8,995.
A. Okay.
Q. All right. Actually, we just read this right before the break, so we'll just do it quickly.
Do you recall seeing here the testimony from Ms. Tilghman that she was hospitalized because she attempted

Page 185

suicide?
A. Yes.
Q. Okay. Now, let's go forward -- actually go to 9000.
A. Okay.
Q. She says at 9000 she being Ms. Tilghman -- that while she was in the hospital after attempting suicide, she sees you and Detective Cimino; is that correct?
A. Yes.
Q. I had you read pages 9000 through 9002 earlier today. I'm going to ask you a few questions about them. If you need to re-read, you just tell me.
Would you agree that this transcript shows that, number one, Ms. Tilghman said that she spoke to you and Cimino on April 16th of '87?
A. It says that, but I gave it to someone else.
Q. Okay. So let's read together. "That is the statement that you gave to Detective McNesby?" That's the question.
Answer: "McNesby, but I gave it to someone else."
A. Yes.
Q. Question: "There were two white detectives?"
Answer: "Detective Cimino."
Question: "Was he the shorter or the taller one?"

Page 186

Answer: "The taller one and the more aggressive one."
Question: "Did you give this statement to them," referring back to Cimino and McNesby?
Answer: "Yes, I did."
Agreed?
MR. ZURBRIGGEN: Object to the form. Detective, if you can tell.
THE WITNESS: She's saying there's other -- there were two other detectives.
BY MR. FEINBERG:
Q. Flip forward to page 9002. I already read this to you, but let's repeat it. Halfway down the page, remember we reviewed this appears that Mr. Rosen is reading into the record --
A. Yes.
Q. -- a statement given by Delores Tilghman, but you say -- I understand you say that never happened. But the statement says, "Delores, my name is Detective McNesby and my partner's name is John Cimino." Do you see that?
A. Yes.
Q. "We have previously interviewed you concerning the shooting death of Joseph Wilkerson in which you implicated Michael Martin," and it continues on. Agreed?

Page 187

A. Yes.
Q. So can we agree that, based on the context of that statement that's read by Mr. Rosen and the testimony from Ms. Tilghman, she's saying that you and Cimino were there on April 16th of '87 when she's in the hospital after attempting suicide. Agreed?
A. Yes.
Q. Okay. Would you agree that she also had testified that Cimino got aggressive with her?
MR. ZURBRIGGEN: Object to the form. Detective, if you can tell.
THE WITNESS: Well, I can tell you that didn't happen.
BY MR. FEINBERG:
Q. Okay. Before I follow up on that, I'll go back to page 9000. I'll read it to you.
Her answer: "And let me also state, in giving that statement to them, several times Cimino got really aggressive because McNesby was quieter."
Do you remember -- do you see that?
A. Yes.
Q. Okay. So can we agree that Cimino -- pardon me -- that Tilghman testified that Cimino got aggressive?
A. That's what it says, yeah.

Page 188

Q. Okay. And can we also agree, the next sentence, that according to Tilghman, "Cimino practically forced me to say that Squirt was involved." Do you see that?
A. Yeah. That's not true.
Q. Squirt, by the way, is Frank Turner; is that correct?
A. Yes.
Q. So Ms. Tilghman's recollection -- or what Ms. Tilghman's testimony is, is that she's talking to you and Cimino; correct?
A. Yes.
Q. She's in the hospital; correct?
A. Yes.
Q. She's just attempted suicide; correct?
A. Yes.
Q. And that while she's in the hospital after attempting suicide, Cimino is getting aggressive with her trying to get her to identify Squirt as being involved in the Wilkerson murder. Agreed?
A. Not true, though.
Q. That's what she's testifying to, though?
A. I understand.
Q. Okay. You say that's not true?
A. Yes.

Page 189

Q. You say that with certainty?
A. Yes.
Q. Why is that not true?
A. Because I worked with him for ten years. I know his professionalism, how he interacted with people.
Q. He would never get aggressive with anyone?
A. No.
Q. He would never pressure someone to identify a suspect?
A. No.
Q. He would never threaten anybody?
A. No.
Q. Never saw that?
A. Right.
Q. And don't believe that for a second; is that correct?
A. Right.
Q. Now, you read -- if you go back to page 9002, once again -- I asked you to read this this morning. You're welcome to re-read it now if you need to to answer this question. I don't think you will.
Would you agree that the statement, which again you say never happened, but the statement that is reflected here in this testimony appears to focus on the involvement

Page 190

of Squirt -- that is, Frank Turner -- in the Wilkerson murder?
MR. ZURBRIGGEN: Object to the form. Detective, again to the extent you can tell.
THE WITNESS: I don't know.
BY MR. FEINBERG:
Q. Okay. Look at page 9003. Actually, page 9002.
A. 2?
Q. Yes. At the bottom there's an answer attributed to Ms. Tilghman which says, "I wanted to add that after Michael and Squirt killed Joseph Wilkerson, they came to my house." Do you see that?
A. Yes.
Q. So would you agree that, according to this statement that's reflected in the transcript, Squirt, Frank Turner, is involved in the Joey Wilkerson murder?
A. Yes.
Q. Okay. Do you recall -- and I'll represent to you -- you can re-read this if you want, but I'll represent to you that Squirt is named throughout the rest of what's reflected in this testimony. Do you accept that representation?
A. Yeah.
Q. With that foundation, do you recall ever talking

Page 191

to Ms. Tilghman about the involvement of Frank Turner, Squirt, in a homicide?
A. No.
Q. Never happened?
A. No.
MR. ZURBRIGGEN: Object to the form of the last question.
(Court reporter clarification)
BY MR. FEINBERG:
Q. Okay. Let me ask you to read a different portion on this same topic. Flip to page 9006.
Why don't you read 9006 through 9008 and tell me when you're finished.
A. That's not true.
Q. Which part's not true, sir?
A. The whole thing.
Q. So let's just review some of what she said, and then I'll go back and ask you some follow-ups. Right now I'm going to review what she said to make sure our summary is accurate.
Ms. Tilghman said that Detective Cimino asked questions and you were writing; is that correct?
A. Yes.
Q. Ms. Tilghman said that she tried to take her

Page 192

statement back, but that Cimino said there was no turning back; is that correct?
A. No, that's not correct. That's what it says, but --
Q. Yeah. She says that; right?
A. Yeah, yeah.
Q. She also says that Cimino told her she was going to jail if she tried to take her statement back; correct?
A. She said that, yeah.
Q. She also said that there was no way that she could retract her statement regarding Squirt or Michael. Isn't that what she said?
A. Yes.
Q. She also said that, once again, that they -- meaning you and Cimino -- said there was no turning back. Is that correct?
A. Yes.
Q. She says that Cimino kept harassing her to put Squirt into the case. Is that what she says?
A. Yes.
Q. She says that she never mentioned Squirt's name but Cimino was the one who did that. That's what she says; right?
A. Yes.

Page 193

Q. She says that the doctor told Cimino and you to stay away from the hospital. That's what she says; right?
A. No. That's what she says.
Q. She said that you kept coming to the hospital while she was recovering. You kept bothering her?
A. She said that, but that's not true.
Q. Okay. But she says you came to the hospital several times; right?
A. Yes. That's what she says, yeah.
Q. Now, you said none of that was true; is that right?
A. That's right.
Q. All right. So the fact that Cimino --
A. She said we even called.
Q. I'm sorry?
A. She said we used to call the hospital. I don't know why we would do that.
Q. She said that Cimino led her on about Frank Turner trying to insert his name into the case; is that correct? Well, okay. Let me start again.
You're saying that Cimino never led her on about Frank Turner and tried to get her to put him into the case; is that correct?
A. Correct.

Page 194

Q. If that did happen, that would have been completely inappropriate; right?
A. Yep.
Q. And that's why you say it never happened?
A. Yes.
MR. ZURBRIGGEN: Object to the form, but...
BY MR. FEINBERG:
Q. If -- you also say that it's not true that Cimino told her that it was either her, Ms. Tilghman, or them. That never happened; right?
A. Correct.
Q. If that -- that communicates to her that she's going to get locked up if she doesn't cooperate; right?
A. Right.
Q. But that didn't happen; right?
A. Correct.
Q. If it did, that would have been completely inappropriate?
A. Absolutely.
Q. Okay. I'm sorry. I didn't --
A. Absolutely. I'm sorry.
Q. She said that the doctor told you to stay away from the hospital, but you kept coming back, and you said that's not true. Is that right?

Page 195

A. Right.
Q. And that's because she's a vulnerable person, not in a good place to talk; right?
A. Right.
Q. So it didn't happen; right?
A. Yes.
Q. If it did happen, that would have been completely inappropriate?
A. Yes.
Q. Now, you also say that you never spoke to her about Curtis Crosland's involvement in the Heo murder in this encounter; is that correct?
A. I believe so, yes.
Q. What you said is the encounter lasted less than two minutes before the doctor asked you to leave?
A. At the hospital, yeah.
Q. Told you to leave; right?
A. Yeah.
Q. Let's go back -- I'm going to make it easier for you. Let's have you go back. Go back to Exhibit 3, please.
A. 3?
Q. Yes. It's in your binder, sir. Tab 3.
A. I'm sorry. Go ahead.

Page 196

Q. So this is Delores Tilghman's statement from December of 2019. Agreed?
A. Yeah.
Q. Paragraph 3 of that statement says, "Previously I had given the police information that my partner, Michael Turner, had committed a murder." I'll stop there.
A. Yes.
Q. The documents you've seen support that; right? She gave a statement to Detective McGuoirk in March of '87 --
A. Yeah.
Q. -- about Michael Turner; right?
A. Yes.
Q. Okay. Let's continue. "And also that his cousin, Curtis Crosland, was involved in a different murder."
We haven't gotten there yet, but do you have any reason to dispute that she gave information about Curtis Crosland?
A. No.
Q. "After I told the police this, I retracted it for both Michael and Curtis. I even went to Michael's lawyer to give a statement."
Do you recall the statement she gave to his attorney, Mr. Alva?

Page 197

A. Yes.
Q. So you see everything that Ms. Tilghman says?
A. Yes.
Q. Do you know one way or the other whether she tried to retract her statement to police?
MR. ZURBRIGGEN: Objection to the form. Detective, if you know.
THE WITNESS: No.
BY MR. FEINBERG:
Q. DO you -- I'll represent to you, sir, that I don't see any documentation in any of the files we've been discussing -- the Lamb file, the Wilkerson file or the Heo file -- about any interviews with Delores Tilghman. Do you understand what I've said?
A. Yes.
Q. The only conversation I see documentation of is what's in this grand jury testimony where she describes an interview taken on April 16th of '87.
A. Yes.
Q. And the only documentation I see of police involvement with Ms. Tilghman, other than her initial statement in March of '87 to Detective McGuoirk, is you and Cimino; is that correct?
A. Yes.

Page 198

MR. ZURBRIGGEN: Object to the form.
BY MR. FEINBERG:
Q. But you say that never happened; right?
A. Yes.
MR. ZURBRIGGEN: Objection to the form.
BY MR. FEINBERG:
Q. You say you never took a statement from Delores Tilghman in the hospital on April 16th of '87; is that correct?
A. That's correct.
Q. And you don't have any explanation for how Mr. Rosen appeared to have something in his hands that he read to the grand jury?
MR. ZURBRIGGEN: Same objection. Detective, you can answer if you know.
THE WITNESS: Yes.
BY MR. FEINBERG:
Q. All right. Let's go back to the grand jury testimony that you have there. I want to show you what Ms. Tilghman said about Curtis Crosland in the grand jury.
You'll go to page 8968. Do you see down toward the bottom of the page there's a question that says, "Do you know Curtis Crosland or Curtis Turner?"
A. Yes.

Page 199

Q. Okay. Now, from the bottom of that page to page 8974, that's Ms. Tilghman's testimony about what she knows concerning Curtis Crosland, or what she claims to know about Curtis Crosland in this grand jury testimony. I'd ask you to read through that, and then I'll ask you some questions. So start at the bottom of 8968, and go through the middle of 8974.
A. Okay.
Q. Are you finished reading that, sir?
A. Yeah.
Q. So you see that Delores Tilghman is giving information to the grand jury about a conversation that she overheard involving Curtis Crosland; is that right?
A. Yes.
Q. And the other people involved in the conversation were Michael Turner; is that right?
A. Yes.
Q. Michael Turner, who was the father of Delores Tilghman's children; is that right?
A. Yes.
Q. And there's also somebody named Geizel (phonetic), or Geizel, who she identified as Lester Turner. Do you recall seeing that?
A. Yes.

Page 200

Q. So in Delores Tilghman's testimony, conversation -- there's a conversation with Curtis, Michael and Lester; is that correct?
A. Yes.
Q. And in that conversation, there's a discussion of the Heo murder at a Korean grocery store; is that correct?
A. Yes.
Q. And according to Ms. Tilghman, Curtis expresses concern that someone will talk about the case in order for the reward money?
A. Yeah.
Q. Is that correct?
A. Yes.
Q. And the person who is specifically referenced is Brenda --
A. Yes.
Q. -- who is the sister of Frank Turner; is that correct?
A. Yes.
Q. So would you agree, based on all the names that we've gone through, these are all the same people that we've been talking about for the past couple of hours now; right?

A. Yes.
Q. Frank Turner's name came up in connection with the Lamb murder, the Wilkerson murder and the Heo murder; is that correct?
A. Yes.
Q. Michael Turner's name came up in connection with the Wilkerson murder; is that correct?
A. Yes.
Q. Lester Turner's name is a new one here; right?
A. Yeah.
Q. Brenda Turner is the sister of Frank Turner, whose name came up in all these murders; is that correct?
A. Right.
Q. And Curtis Crosland is a cousin of the Turners; is that correct?
A. Yes.
Q. So this information that you just reviewed with Delores Tilghman about the Turner family, would you imagine, would have been part of conversations with Delores Tilghman when she first came to talk to police?
MR. ZURBRIGGEN: Objection to form.
Detective, if you know, you can answer.
THE WITNESS: I don't know.
BY MR. FEINBERG:



Q. I know you don't know, but we've talked before about how you're a good detective; right?
A. Yeah.
Q. And a good detectives, when they get a lead on one case, may try to exploit it for use in other cases; is that correct?
A. Yes.
Q. I don't mean use it improperly, but you may try to derive all that you can out of a witness' information; is that correct?
A. Yes.
Q. If a witness has got information on one case, why not see if they have information on other cases; is that correct?
A. Yes.
Q. So in light of that, in light of what you would expect from good police work, wouldn't you assume that detectives would have spoken to Delores Tilghman about all of the different players who are mentioned in this testimony?
MR. ZURBRIGGEN: Objection to form.
Detective, if you know, you can say.
THE WITNESS: I don't know.
BY MR. FEINBERG:



Q. You wouldn't be surprised if that happened, let's say it that way.
A. Yes.
Q. Because that's -- in many investigations, that's how things go; is that correct?
A. Yes.
Q. Okay. I assume, based on your previous testimony, you don't know whether that was discussed with Delores Tilghman; is that correct?
A. Right.
Q. You don't know whether -- strike that.
You don't recall discussing this information with Delores Tilghman on April 16th of 1987; is that correct?
A. Right.
Q. In fact, you told me you were there with her for less than two minutes; right?
A. Yep.
Q. Okay. And even though Curtis Crosland's name was first placed into this case, into the Heo investigation, literally the day before Delores Tilghman claims she was interviewed, you don't know whether there was any questioning of Delores Tilghman about Curtis Crosland?
MR. ZURBRIGGEN: Objection to the form of the question. Detective, if you know, you can



answer.
THE WITNESS: I don't.
BY MR. FEINBERG:
Q. That was a jumbled question. I understand your answer. I want to make sure the Record is clear.
You agree April 15th, '87, Rodney Everett puts Curtis Crosland's name into the mix for the Heo murder; is that correct?
MR. ZURBRIGGEN: Objection to form.
THE WITNESS: Yes.
BY MR. FEINBERG:
Q. Curtis Crosland becomes a suspect on that day; is that correct?
MR. ZURBRIGGEN: Objection to the form.
Detective, if you know, you can say.
THE WITNESS: Yes.
BY MR. FEINBERG:
Q. You've seen testimony that Delores Tilghman was interviewed on April 16th, '87, less than 24 hours later; agreed?
A. Yes.
Q. You're saying that you don't know whether anyone addressed Curtis Crosland with Ms. Tilghman that day; is that correct?

A. Correct.
Q. But you wouldn't be surprised if there was a discussion with her about Curtis Crosland given that timing; correct?
A. I don't know.
Q. I'm not asking whether you know. I asked a very different question. You wouldn't be surprised; right?
MR. ZURBRIGGEN: Objection to the form. Detective, you can answer.
THE WITNESS: I'd be surprised.
BY MR. FEINBERG:
Q. I'm sorry.
A. I'd be surprised.
Q. Why would you be surprised?
A. I would think they'd follow up.
Q. With who?
A. I'm sorry. Let's go back. What was your question again?
Q. Yeah. Let's repeat the time frame. April 15th --
A. Yeah.
Q. -- curtis Crosland becomes a suspect because of Rodney Everett's testimony; is that correct?
A. Yeah.
Q. The police -- the homicide division knows Crosland



is connected to Frank Turner, Michael Turner, Patricia Turner; agreed?
MR. ZURBRIGGEN: Objection to the form.
THE WITNESS: I don't know.
BY MR. FEINBERG:
Q. Okay. Well, do you have any reason -- can we agree that the 12 different documents -- that's an exaggeration. Can we agree that the very many documents I've shown you this morning established a connection between the Turners and Mr. Crosland?
A. Yes.
Q. And can we agree that those documents established a connection between Frank Turner, Michael Turner and three unsolved murders?
A. Yes.
Q. Okay. So in light of the connection between the Turners and various murders and the connection between the Turners and Mr. Crosland, that the homicide division would want to know from Delores Tilghman what she knew about Curtis Crosland?
MR. ZURBRIGGEN: Objection to the form of the question. Detective, if you know, you can say.
THE WITNESS: I would think so, yeah.
BY MR. FEINBERG:



Q. Okay. And you would expect that detectives would want to jump on that information as quickly as possible; is that correct?
MR. ZURBRIGGEN: Same objection.
THE WITNESS: Yes.
BY MR. FEINBERG:
Q. In fact, when we go back to March 22nd of '87, do you remember the document which showed that Delores Tilghman came in that morning and spoke about Michael Turner?
A. Yes.
Q. And literally by that evening Michael Turner was in custody; is that correct?
A. I don't know.
Q. Well, we looked at the --
A. Yeah.
Q. You saw a document that showed that; right?
A. Yes. Yes.
Q. Okay. So once police get information about cold cases, typically you'd want to jump on them as quickly as possible; right?
A. Yeah.
Q. So Rodney Everett -- if there's a witness who comes in and identifies Curtis Crosland as a suspect on



April 15th, you'd expect that homicide detectives would want to jump on that as quickly as possible; is that correct?
MR. ZURBRIGGEN: Objection to the form. Detective, if you know.
THE WITNESS: Yes.
BY MR. FEINBERG:
Q. I wasn't -- yes. My question was whether you would expect that to happen.
A. Yeah, yeah.
Q. And you say yes; right?
A. Yeah.
Q. Okay. That said -- strike that.
Okay. Let me show you one activity sheet from that time frame. It's tab 76. This will be Exhibit 64, sir.
(Exhibit 64 was marked for identification by the Court Reporter.)
BY MR. FEINBERG:
Q. Here you go. This is a document, sir, that was -- an activity sheet that was pulled out of the Joseph Wilkerson homicide file. Take a moment to read it to yourself and let me know when you're done.
Are you finished?

Page 209

A. Yes.
Q. Do you see the date of April 20th of '87?
A. Yes.
Q. So that's four days after Delores Tilghman says she was interviewed in the hospital; is that correct?
A. Yes.
Q. And do you see that there's reference to Detective Cimino discussing help for Delores Tilghman, who was presently in Jefferson Hospital?
A. Yes.
Q. Now, your name is not mentioned in connection with any of Detective Cimino's actions here; is that correct?
A. Right.
Q. I think you told me before that you and Cimino would typically handle all of your work together; is that right?
A. Yes.
Q. Do you have any idea why you're not mentioned in connection with any of these activities?
A. Apparently I wasn't there.
Q. Okay. Do you know who Mary Achilles' is?
A. Yes.
Q. Who is she?
A. She worked with the DA's Office, witness support

Page 210

group or something like that.
Q. Do you remember any discussions with Ms. Achilles' about any case?
A. No.
Q. Do you remember -- well, okay.
A. I went to school with her brother.
Q. I'm sorry?
A. I went to school with her brother.
Q. What's her brother's name?
A. I don't know.
Q. You don't know?
A. No.
Q. Okay. Now, did you see -- so -- strike that.
Does anything you saw here refresh your recollection about any discussions with Delores Tilghman in connection with this case?
A. No.
Q. Now, you see the bottom two paragraphs reference Detective Cimino's investigative activities to locate Frank Turner and Patricia Turner?
A. Um-hum.
Q. Is that a yes?
A. Yes.
Q. Okay. And this is four days after, according to

Page 211

the grand jury testimony, Ms. Tilghman spoke to you and Detective Cimino about Frank Turner's involvement in the Wilkerson murder. Agreed?
A. I don't see it.
Q. Okay. Well, we've reviewed the grand jury testimony --
A. Yeah.
Q. -- which shows, according to the testimony, that you and Cimino interviewed her on April 16th, '87, about Frank Turner's involvement in the Wilkerson murder. Do you recall seeing that testimony?
A. Yes.
Q. Okay. And now we see an activity sheet which shows that Detective Cimino is looking for Frank Turner. Agreed?
A. Yeah.
Q. Okay. Does that refresh your recollection in any way --
A. No.
Q. Let me finish the question. About -- does that refresh your recollection in any way about your involvement in questioning Delores Tilghman about the Turner family?
A. No.
Q. Would you expect that, if you and your partner,

Page 212

Detective Cimino, learned from a witness about Frank Turner that the next step in the investigation would be to try and find him?
A. Yes.
Q. And would you agree that this activity sheet indicates that that's exactly what Detective Cimino is doing?
A. Yes.
Q. I'm going to put two documents in front of you. One is a document that we've already marked as Exhibit 59. Take that. I'll take Exhibit 22 back from you. I'm also marking a new exhibit. This is Exhibit 65.
(Exhibit 65 was marked for identification by the Court Reporter.)
BY MR. FEINBERG:
Q. So you'll have Exhibits 59 and 65 in front of you.
First, take a look at Exhibit 65. This is a warrant that's issued to Detective Cimino for the arrest of Frank Turner. Agreed?
A. Yes.
Q. And it's issued on April 22nd of 1987 is that right?
A. Yes.
Q. So just two days after the activity sheet that we

Page 213

looked at from April 20th; is that correct?
A. Yes.
Q. And six days after the grand jury's -- six days after the interview that's described in the grand jury's testimony; is that correct?
A. Yes.
Q. If you look at the Affidavit of Probable Cause in support of this arrest warrant, if you flip all the way to the second-to-last page, do you see, second paragraph, there's a reference to Delores Tilghman's interview?
A. Yeah.
Q. Okay. Now, I also asked you to have Exhibit 59 in front of you.
A. Yes.
Q. Do you still have that there?
A. Yes.
Q. Exhibit 59 was a warrant that was issued to you; right?
A. Yeah.
Q. For Pat Turner; is that right?
A. Yes.
Q. Go to the second-to-last page -- actually, let's do this. The Affidavit of Probable Cause is five pages. I'd like you to take a look, compare it to the 59 and 65,

Page 214

and tell me whether it appears that the Affidavit of Probable Cause that you prepared for Pat Turner looks to be the same as the Affidavit of Probable Cause that Detective Cimino prepared for Frank Turner.
MR. ZURBRIGGEN: Objection to the form, but Detective, to the extent you can tell from this document, go for it.
THE WITNESS: Yes.
BY MR. FEINBERG:
Q. Okay. Can you tell sitting here today whether -- who prepared this Affidavit of Probable Cause?
A. I would think Detective Cimino.
Q. Why do you say that?
A. Because he was the typist.
Q. Okay. So the fact it was typed suggests that it was him, not you?
A. Yeah. We didn't have -- we didn't have word processors at the time, you know.
Q. Let's look at -- keep Exhibit 59 in front of you, because that's the one that's issued to you; right?
A. Yeah.
Q. For the arrest of Pat Turner; is that correct?
A. Yeah.
Q. You obviously -- you signed that Affidavit of

Page 215

Probable Cause; right?
A. Yes.
Q. So you were swearing that the information that was contained in it was true; is that right?
A. Yes.
Q. So even though Detective Cimino prepared it, you would never have signed it without reviewing it; is that correct?
A. Yeah.
Q. Your signature endorses the truth of what's communicated in the affidavit; is that correct?
A. Yes.
Q. And it does so under oath; is that correct?
A. Yes.
Q. Okay. Now, read the section that just refers to Delores Tilghman. So it's on the second-to-last page, the second paragraph on that page, do you see that?
A. Yes.
Q. Just read that paragraph to yourself and let me know when you're finished.
A. Okay.
Q. Do you see that the Affidavit of Probable Cause that you signed includes references to both Michael Turner and Frank Turner?

Page 216

A. Yes.
Q. Okay. Do you recall that the first mention of Frank Turner in connection with the Wilkerson murder didn't come up until the interview that is described in the grand jury testimony?
A. Um-hum.
Q. Is that a yes?
A. Yeah.
Q. When I showed you the interview -- or the activity sheet about Detective McGuoirk's interview with Ms. Tilghman -- that was Exhibit 60, by the way -- there was no reference to Frank Turner; is that right?
A. Yes.
Q. Frank Turner doesn't come into play until what we've seen in the grand jury testimony; is that correct?
A. Yes.
Q. Okay. So given that you signed an Affidavit of Probable Cause referencing Delores Tilghman's testimony about, number one, Michael Turner, and number two, Frank Turner, can we assume that you had information on April 22nd of '87 about Delores Tilghman's allegations regarding Frank Turner?
A. Yes.
MR. ZURBRIGGEN: Object to the form of the

Page 217

question.
BY MR. FEINBERG:
Q. Do you know where you got that information?
A. No.
Q. Does that refresh your recollection in any way about your encounter with Delores Tilghman at the hospital?
A. No.
Q. You still maintain that you never interviewed Delores Tilghman at the hospital; is that correct?
A. Yes.
Q. Never discussed Frank Turner with her?
A. No.
Q. Never discussed Curtis Crosland with her?
A. No.
Q. Never discussed any of the Turners with her at all?
A. Right.
Q. But you have no idea where you got that information about Frank Turner's alleged involvement in the Wilkerson shooting; is that correct?
A. Yes.
Q. Now, I want to just remind you of the time frame that we're in. Delores Tilghman's first interview, we know, is March 22nd of '87; right? That's with Detective

Page 218

McGuoirk.
A. Right.
Q. We know that Rodney Everett gives a statement about Mr. Crosland on April 15th; right?
A. Yes.
Q. We have information, although you dispute it, that Delores Tilghman had an encounter with police April 16th; is that right?
A. Right.
Q. We know that you're seeking Pat Turner's arrest on April 22nd; is that correct?
A. Yes.
Q. And then five days after that, April 27th, Ms. Tilghman is in Danny Alva's office giving a statement that she wants to take back what she told police. Do you recall seeing that?
A. Yes.
Q. So this all happens in just over a month; is that correct?
A. Yes.
Q. Do you recall -- the reason I say that is I want to ask you this question.
Do you recall ever hearing about Delores Tilghman going to Michael Turner's lawyer, Mr. Alva, and taking back

Page 219

her statement?
A. No.
Q. Would you agree that -- put aside the statement to Mr. Alva.
Based on what you've seen so far, Delores Tilghman, between March 22nd and a few weeks later, has given information regarding the Joseph Wilkerson murder?
A. Yes.
Q. It appears that she's given information about the Il Man Heo murder?
A. Yes.
Q. She's given information -- not information about the Lamb murder, but she's given information about the Turner family; is that correct?
A. Yes.
Q. And she's given information about Mr. Crosland, who is connected to the Turner family; is that correct?
A. Yes.
Q. But as of April 27th, all that information that she's given is falling apart based on her statement to Mr. Alva; agreed?
MR. ZURBRIGGEN: Objection to the form of the question. Detective, if you know, you can say.
THE WITNESS: I think so, yeah. Yes.

Page 220

BY MR. FEINBERG:
Q. All right. Do you remember having any questions about the credibility of Delores Tilghman?
A. No.
Q. Do you recall seeing that -- do you recall seeing Ms. Tilghman's grand jury testimony, the reference to Brenda?
A. Yes.
Q. And the particular concern being that Brenda would give information in order to obtain a reward; is that right?
A. Yeah.
MR. ZURBRIGGEN: Objection to the form of the question.
THE WITNESS: Yes.
BY MR. FEINBERG:
Q. Do you know whether Brenda was ever interviewed?
A. No.
Q. Putting aside what you know, would you expect that, if Delores Tilghman says Brenda might have information about this murder, that detectives would go interview her?
A. Yes.
MR. ZURBRIGGEN: Objection to the form.

Page 221

BY MR. FEINBERG:
Q. And fact, if you were leading the investigation in this case, you would go interview her; is that right?
A. Yes.
Q. Why do you say that?
A. To corroborate Delores' testimony.
Q. So if Delores is saying Brenda might have information, you want to find out whether she does; right?
A. Yeah.
Q. If Brenda does not have information, what might that tell you?
MR. ZURBRIGGEN: Objection to the form.
Detective, if you can say.
BY MR. FEINBERG:
Q. Yeah. And I'm not asking you to speculate. I want to be clear about my question.
You answered immediately that you would certainly want to go interview her; correct?
A. Yes.
Q. And it seems like there are two possibilities for her testimony, her information; either she knew about the murder or she didn't know about the murder. Right?
A. Yes.
Q. If she didn't know about the murder, would that

Page 222

raise any concerns for you about others' testimony?
A. Yes.
MR. ZURBRIGGEN: Objection to the form.
BY MR. FEINBERG:
Q. How so?
A. Well, I want her testimony to be corroborated.
Q. Okay. Is what you're saying that, if Brenda says, I know nothing about this murder, then you have questions about what Delores Tilghman is saying?
A. Yeah.
Q. Okay. Delores Tilghman, who at that point has told her -- told Michael Turner's lawyer that all of her testimony was false anyway; right?
MR. ZURBRIGGEN: Objection to the form.
THE WITNESS: I don't know.
BY MR. FEINBERG:
Q. Okay. Bottom line, though, your expectation would be that Brenda Turner would be interviewed; is that correct?
MR. ZURBRIGGEN: Objection to the form.
Detective, again, if you can say.
THE WITNESS: I would think so, at some point.
BY MR. FEINBERG:

Page 223

Q. So Brenda Turner at that point was 16 years old. Would that have had any influence on whether she was interviewed or not?
A. Maybe.
Q. Would you have gone to ask a parent for permission to interview her?
A. Maybe.
Q. By the way, did you ever interview juvenile witnesses?
A. Yes.
Q. What was your practice for interviewing juvenile witnesses?
MR. ZURBRIGGEN: Objection to the form.
Detective, you can say --
BY MR. FEINBERG:
Q. If any -- let me be clear. It's a fair objection.
Did you have any practice for juvenile witnesses that was different from interviews of witnesses over the age of 18?
A. No.
Q. So it sounds like then that you would have -- that there would be -- the fact that she was a juvenile would not influence you one way or the other?
A. Right.

Page 224

Q. And in light of that then, your previous answer, that you would expect that she would be interviewed stands; is that correct?
A. I would think so.
MR. FEINBERG: Let's go off the Record.
VIDEOGRAPHER: Going off record. 2:34.
(Brief recess taken.)
VIDEOGRAPHER: We are back on. 2:48.
BY MR. FEINBERG:
Q. Mr. McNesby, we're back on the Record after a short recess. Did you realize that any of your previous testimony was incorrect or incomplete?
A. No.
Q. We cut off the timeline that we were discussing involving Delores Tilghman's testimony in the case or information in the case, March through April of '87. Do you recall where we left off there?
A. Yeah.
Q. I'm going to fast forward ahead now to November of '87, and for that purpose I'm going to show you a document, sir, that will be marked as Exhibit 66.
(Exhibit 66 was marked for identification by the Court Reporter.)
BY MR. FEINBERG:

Page 225

Q. Take a moment to read that, sir.
A. Okay.
Q. Okay, sir. Do you see this activity sheet that's dated November 2nd of '87?
A. Yes.
Q. There's a reference to you and Detective Cimino. Do you see that?
A. Yes.
Q. And you agree that you and Detective Cimino received arrest warrants in connection with the John Lamb case?
A. Yes.
Q. That's the first case we talked about from 1982; correct?
A. Yes.
Q. Do you recall, looking at this document, being involved in any of the arrests -- strike that.
Do you recall anything in connection with seeking the arrest warrants for Frank Turner or Curtis Crosland or Lester Turner?
A. No.
Q. By the way, the facts of this case, if you recall, this was the shooting of Mr. Lamb allegedly in retaliation for his beating up Mr. Crosland. Agreed?

Page 226

A. Yes.
Q. I'm going to show you -- this is tab -- pardon me -- Exhibit 67 now.
(Exhibit 67 was marked for identification by the Court Reporter.)
THE WITNESS: Okay.
BY MR. FEINBERG:
Q. Would you agree that this is an arrest warrant that was issued to you, sir?
A. Yes.
Q. For the arrest of Frank Turner; is that correct?
A. Yes.
Q. The arrest warrant references a grand jury presentment that's attached. Do you see that?
A. Yes.
Q. First of all, do you recall anything about a grand jury proceeding involving Frank Turner?
A. No.
Q. Is this something that would happen periodically, that the grand jury would make findings and then you would get an arrest warrant as a result of the grand jury findings?
A. Yes.
Q. How often would that happen?

Page 227

A. Not often.
Q. Sitting here today, do you remember anything about grand jury proceedings regarding Frank Turner?
A. No.
Q. Do you have any reason to dispute the fact that you were the one who obtained the warrant for Frank Turner?
A. No.
Q. Do you know why -- do you know why you were the person who sought the arrest warrant for Frank Turner?
A. No.
Q. Given everything that we've seen where you got an arrest warrant for Pat Turner for the Joseph Wilkerson murder -- do you remember that?
A. Right.
Q. You got an arrest warrant for Frank Turner for the John Lamb case; correct?
A. Yes.
Q. Does that now confirm for you that you were involved in the investigations with respect to all three murders?
MR. ZURBRIGGEN: Objection to the form, but go ahead, Detective.
THE WITNESS: A little involvement. I mean,

Page 228

just the arrest warrants and going to the hospital. That's about it.
BY MR. FEINBERG:
Q. Anything else besides that?
A. No.
Q. And when you say going to the hospital, it was just for that two-minute wellness check before you were kicked out by a doctor; right?
A. Right.
Q. Not for the interview that was described in the grand jury testimony?
A. Right.
Q. That didn't happen as far as you're concerned; right?
A. Right.
Q. Sir, I'm going to show you an exhibit. For counsel's benefit, this was already marked as Exhibit P-31, but this is a better copy. So we're going to call this P-31A.
(Exhibit P-31A was marked for identification by the Court Reporter.)
BY MR. FEINBERG:
Q. Take a moment to read that, sir. By the way, sir, just to interrupt you for one moment while you're reading

Page 229

it, this document was pulled from the John Lamb homicide files. So this concerns arrests for the John Lamb homicide file like the documents that we were just looking at.
A. Okay.
Q. Okay?
A. Yep.
Q. You've had a chance to review that, sir?
A. Yes.
Q. And would you agree that you obtained arrest warrants for Frank Turner, Curtis Crosland and Lester Turner?
A. Yes.
Q. The activity sheet -- by the way, we can't tell from the top, but is this an activity sheet?
A. Yeah, I think so.
Q. The first line says, "This case was ultimately taken to the grand jury by Detectives J. Cimino and J. McNesby through ADA Rosen."
What does that mean to take -- for you as a detective to take the case to the grand jury?
A. Well, you have difficulty with witnesses, so you want to bring witnesses in front of a grand jury to try and put together a case.
Q. What's the advantage of putting the witnesses --

Page 230

what's the advantage, if any, of putting witnesses in front of the grand jury?
A. Well, it's a quiet -- it's just -- it's -- you know, it's not broadcast out in the neighborhoods and stuff like that there.
Q. My question is, why would you put a witness in front of a grand jury as opposed to bringing them in for an interview?
A. If you feel they might have information based on a case.
Q. I guess my question is, why wouldn't you just bring them in for an interview in the homicide division?
A. Because maybe they're reluctant to come in and talk to us.
Q. As a grand jury you can issue a subpoena, which requires them to be present?
A. Yeah.
Q. Okay. So in some cases that would be the route that you as a detective would decide to take; is that correct?
A. Yes.
Q. And you'll --
A. Well, you have to get the cooperation of the DA.
Q. Okay. And it sounds like then in this case there

Page 231

was -- someone determined that -- whether it was you or someone else, that a grand jury investigation concerning Frank Turner, Curtis Crosland and Lester Turner would be helpful; is that correct?
A. Right.
Q. The second paragraph says, same detectives -- this is on November 3rd of '87 -- in company with other detectives from SIC. What is SIC, do you know?
A. Hum-um.
Q. Okay. Could that be a typo for SIU?
A. Probably.
Q. Went to 2414 Federal Street and took Curtis Crosland into custody.
Would you agree that this appears to indicate that you were present for Curtis Crosland's arrest --
A. Right.
Q. -- on November 3rd of '87?
A. Yes.
Q. Do you remember anything about that?
A. No.
Q. The last line, or the last sentence of this activity sheet says, "Defendant Curtis Crosland did make an inculpatory statement admitting not only his participation but also the roles played by both Frank and Lester Turner."

Page 232

Do you have any idea what that means?
A. No.
Q. If someone gives an inculpatory statement, would you typically document that?
A. Yeah.
Q. Let me say it differently. Does the phrase inculpatory statement suggest to you that someone gave a signed and written statement?
A. Yes.
Q. Do you know where the signed, written statement for Curtis Crosland is --
A. No.
Q. Strike that. Do you know if there is in fact a signed, written statement for Curtis Crosland?
A. No.
Q. Do you -- I assume you don't know, but I'll represent to you that the charges against Mr. Crosland in relation to the John Lamb murder were thrown out at the preliminary hearing. Have you ever heard that before?
A. No.
Q. Do you have any idea why that happened?
A. No.
Q. Have you ever seen a case thrown out at the preliminary hearing when someone has given an apparently

Page 233

inculpatory statement?
MR. ZURBRIGGEN: Objection to the form.
Detective, if you know.
THE WITNESS: I've seen -- I've seen cases not being -- cases produced for preliminary hearing but the suspect was let go.
BY MR. FEINBERG:
Q. Okay. I'm asking about a much more specific situation.
Have you ever seen cases where the Defendant has given an inculpatory statement or a confession where they've been let go?
MR. ZURBRIGGEN: Objection to the form again.
Detective, you can answer.
THE WITNESS: I don't know.
BY MR. FEINBERG:
Q. All right. Let me just, in terms of setting the time frame, we know Mr. Crosland was taken into custody in connection with the Lamb murder in November of '87. Agreed?
A. Right.
Q. We just looked at that document. You're aware that Mr. -- pardon me -- that Detective Cimino prepared an affidavit for the arrest of Mr. Crosland in the Heo murder;

Page 234

is that correct?
A. Yes.
Q. You looked at that right at the beginning of our deposition today. That was Exhibit 1.
A. Yeah.
Q. You don't have to look at it. I'll just show you the date. It was December 9th, 1987. Do you understand that?
A. Yes.
Q. That's just a little over a month after Mr. Crosland is taken into custody on the Lamb murder. Agreed?
A. Um-hum. Yes.
Q. Do you have any idea why there was a month period between the arrest of Mr. Crosland on the Lamb murder and the arrest on the Crosland murder?
A. No.
Q. You mentioned that Detective Cimino prepared the Affidavit of Probable Cause without your knowledge; is that correct?
A. No.
Q. Well, okay. Let me ask it a different way. Do you remember Detective Cimino preparing that Affidavit of Probable Cause?
A. Yes.

Page 235

Q. What do you remember about it?
A. Well, we were given the okay to get arrest warrants. So like I said, he was the typist. So he typed them up, and we served them.
Q. Who gave you the okay for Detective Cimino to get the arrest warrant for Mr. Crosland on the Heo murder?
A. I don't know.
Q. Okay. Now, let me ask you just a question about the way the homicide division operates. You told me before that the SIU, you typically wouldn't have assigned -- you wouldn't be the assigned detectives in cases?
A. Right.
Q. I want to show you that -- Detective Cimino's testimony from January 25th of 1991. Hang on one second. And just so you're aware, sir, this is after -- right after your retirement from the Philadelphia Police Department?
A. Yes.
Q. That's Mr. Crosland's second trial. Understood?
A. Yes.
Q. I'm going to show you -- in fact, I'll just put this whole binder in front of you -- pages 37 and 38 from January 25th of 1991. The Bates Stamps are NSB Crosland 8460 and 8461. Take a look. Read from line 20 on the first page down to line 8 on the next page. Let me know

Page 236

when you're finished.
You probably have gone far enough, sir, because I just want to ask you about Detective Cimino's testimony that he was the assigned detective.
A. Okay.
Q. Did you see that?
A. Yeah.
Q. Before I ask you that, let me just explain what this is.
In the second trial for Mr. Crosland, the prosecution claimed that Delores Tilghman could not be located to be served a subpoena for her testimony.
Do you understand what I've said?
A. Yes.
Q. So Detective Cimino testified outside the presence of the jury to demonstrate her unavailability. Have you seen anything like that happen before?
A. Yes.
Q. I'm sure you've ever testified about your efforts to locate a witness?
A. Yes.
Q. And in such circumstances, the prosecutor can, under the rules of evidence, admit their prior testimony?
A. Right.

Page 237

Q. So you're aware of that phenomenon?
A. Yes.
Q. All right. So you see Detective Cimino, when he's giving testimony about Delores Tilghman's unavailability, he identifies himself as one of two assigned detectives in the case. Is that right?
A. I read that, yes.
Q. Is that, to your mind, an accurate description of Detective Cimino's role?
A. No.
Q. Why not?
A. He wasn't the assigned detective.
Q. So why would he say that, if you know?
A. I don't know why.
Q. How was it -- we know Detective Cimino was the affiant, the person who sought the arrest warrant for Mr. Crosland in December of 1987. Correct?
A. Yes.
Q. How was it that he became the person to seek the --
A. SIU took over the case.
Q. Okay. If SIU takes over the case, is there --
A. It's not a new assigned detective. The assigned detectives, when the job happened, and you're up in the

Page 238

wheel. It's your turn.
Q. Got it.
A. You become the assigned detective.
Q. And maybe --
A. Everything else gets put in the file. Other people are conducting interviews and things of that nature, but your job is to put the binder together.
Q. Perhaps I'm getting confused about the terminology then. Once a case gets assigned to SIU, is there a specific detective or detectives who take on the responsibility for leading the investigation?
A. Yes.
Q. Is that what Detective Cimino was saying?
MR. ZURBRIGGEN: Object to the form, but you can answer.
BY MR. FEINBERG:
Q. In terms of your interpretation.
A. No.
(Court Reporter clarification)
Q. What was he saying?
A. I'm sorry?
Q. What was he saying?
A. Well, SIU, we follow up on all their homicides, read through them and see if there's one we can bring in

Page 239

more information to enable an arrest. I was kind of the guy who went through all of the open homicides and said, look, I think we can do something with this one, this -- but I wouldn't be the assigned. We would -- in the SIU, we have the jurisdiction over that new case or whatever.
Q. Would it be fair to characterize Detective Cimino's role as the lead detective at that time?
A. Probably, yeah.
Q. What's that?
A. Probably, yeah.
Q. Okay. Because he's the one who's in interviews leading up to Mr. Crosland's arrest?
A. Yes.
Q. And he's the one who prepares the Affidavit of Probable Cause; right?
A. Yes.
Q. And when he says that there are two assigned -- put aside the word assigned -- what he's talking about are two lead detectives; right?
A. More likely.
Q. My understanding is that, once you retired in '91, Detective Cimino then gets partnered with Detective Ansel. Does that sound right?
A. Yes.

Page 240

Q. Okay. And prior to '91 when you were his -- strike that.
If Detective Cimino was, prior to your retirement, the lead detective and he's one of two lead detectives, that would have made you the other lead detective on the Crosland investigation; is that correct?
MR. ZURBRIGGEN: Object to the form. Detective, if you know.
THE WITNESS: Not necessarily.
BY MR. FEINBERG:
Q. Who would he have been talking about?
A. I don't know.
Q. You were involved -- strike that.
Let me show you now -- this is Exhibit 67.
(Exhibit 67A was marked for identification by the Court Reporter.)
BY MR. FEINBERG:
Q. Here you go, sir. Do you see your name on this document, sir?
A. Yes.
Q. What is this document?
A. It's a chronology of events dealing with the suspect.
Q. Does it -- it looks like my interpretation is it

Page 241

shows -- strike that.
Because all the locations refer to room 104. Is that the homicide division?
A. Yes.
Q. So you keep a record of everything that happens with the suspect --
A. Yes.
Q. -- while they're in the homicide division; is that correct?
A. Yes. We only had six hours to interview people.
Q. Got it. Six hours to interview someone, and if an interview took place after six hours, you'd have a legal problem with the interview?
A. Yes.
Q. Right?
A. Right.
Q. So this chart was to satisfy your obligation with the six-hour rule; is that correct?
A. Yes.
Q. Now, is all the handwriting on this form yours?
A. Yes.
Q. So we see references to you being the recorder. What does that mean? The extreme right-hand column --
A. Yeah.

Page 242

Q. -- the title is Recorder; is that correct?
A. Yes.
Q. And then there's --
A. Recording the event.
Q. So each time something happens, you were the one making the note; is that correct?
A. Yes.
Q. So if you go down to the bottom of the page, 3:05 p.m., bathroom and water. That means -- and you're identified as the "by whom". That means that you took Mr. Crosland to the bathroom and got him water; is that correct?
A. Yeah.
Q. And then at 3:10, you allowed him some phone calls; is that correct?
A. It says bathroom and water.
Q. 3:10, next line down.
A. 3:10.
Q. You allowed phone calls; right?
A. No.
Q. Do you see the reference at 3:10 p.m., sir?
A. Yep. That's 3:25.
Q. Okay. So 3:10 -- okay. I see what you were doing. I missed that.

Page 243

From 3:05 to 3:10, you took him to the bathroom; right?
A. Yeah.
Q. And then from 3:10 to 3:25, you allowed him phone calls; is that correct?
A. Yes.
Q. Okay. Does that refresh your recollection about any interactions with Mr. Crosland?
A. No.
Q. Looks like you and Detective Mangoni are doing most of the interacting with Mr. Crosland; is that correct?
MR. ZURBRIGGEN: Object to the form, but Detective, if you can tell.
THE WITNESS: Yeah, it looks like it. Yeah.
BY MR. FEINBERG:
Q. Do you recall any interactions with Detective Mangoni in connection with this case?
A. No.
Q. Now, can we assume, sir, that given -- well, strike that.
Do you have any reason to dispute that you had these interactions with Mr. Crosland?
A. No.
Q. Can we assume then that you were -- because you

Page 244

were there with Mr. Crosland when he was brought into custody, you had some involvement in this case?
A. Yeah.
Q. And in fact, I think you told me a moment ago that, now that you've gone through all of these documents, you recall being aware of Detective Cimino seeking the warrant for Mr. Crosland's arrest for the Heo murder; is that correct?
A. Yes.
Q. And the Affidavit of Probable Cause that we looked at way back at the beginning of the day, Exhibit 1, is something that you would have been aware of in that time frame; is that right?
A. Yeah.
Q. Okay. Now, I want to ask you about what was included and what was not included in that Affidavit of Probable Cause. Okay?
A. Um-hum. Yes.
Q. In fact, for this -- do you still -- flip back to tab 1 in the binder. Do you recall looking at this earlier today, sir?
A. Yes.
Q. I know you read it before, but let's just confirm. Would you agree that the first and second page, there's no

Page 245

mention of Mr. Crosland at all. It's just a description of what eyewitnesses saw at the time of the shooting; is that right?
A. Yeah.
Q. So would you agree then that the only information that actually inculpates Mr. Crosland is attributed to Rodney Everett's April 15th, '87, statement?
MR. ZURBRIGGEN: Object to the form.
Detective, you can answer.
THE WITNESS: Yes.
BY MR. FEINBERG:
Q. Okay. And so you're aware that -- strike that.
So that's what Detective Cimino concluded -- included in this affidavit when he sought Mr. Crosland's arrest; is that correct?
A. Yes.
Q. Were you aware that Mr. Everett was interviewed two more times by detectives in connection with the Heo murder?
A. No.
Q. And just for reference on the dates, April 21st of '87 and July 7th of '87. Did you have any knowledge about those interviews?
A. No.

Page 246

Q. Do you have any idea why Detective Cimino would not include information about those interviews?
A. No.
Q. I'm going to ask you a series of questions now, sir, about information that was available to police concerning Mr. Crosland. Most of the information that I'm going to discuss with you now was the subject of a day-long deposition with Detective Mangoni. I'm going to try to short-circuit that and not show you all the documents that I spent seven hours showing to Detective Mangoni. But if at any point you want to see the documents I'm talking about, you tell me, and I'll point them out to you.
A. Okay.
Q. Okay. First, did you ever have any knowledge about the fact that Mr. Everett was provided with newspaper articles about the Heo murder before he spoke to detectives?
A. No.
Q. Is that something you've ever done before?
A. No.
Q. When I say -- strike that.
Have you ever interviewed a witness who read newspaper articles about a case before he gave you information?

Page 247

A. No.
Q. Would that raise concerns with you about the credibility?
A. Yes.
Q. Why?
A. Well, you want information that can be corroborated and not the -- I don't know.
Q. It sounds like what you're saying is that, if someone reads newspaper articles about a case --
A. It might take their information.
Q. -- They're providing information they got from another source as opposed to their personal knowledge?
A. Right.
Q. Which means you can't trust that information?
A. Right.
Q. Okay. Did you ever learn that Mr. Everett's statements to police were similar in most if not all respects to what was reported in the news about the case?
A. No.
MR. ZURBRIGGEN: Objection to the form of the question.
THE WITNESS: Sorry.
MR. ZURBRIGGEN: It's just a standing objection to the line of questioning.

Page 248

MR. FEINBERG: Sure. I get it. I'm trying to avoid duplicating seven hours.
MR. ZURBRIGGEN: Exactly.
BY MR. FEINBERG:
Q. Detective McNesby, if you were aware that that happened and Mr. Everett gave information which was parroting what was in the newspapers, you would have concerns about the credibility; is that correct?
A. Yes.
Q. Did you ever learn that Mr. Everett was facing a parole violation at the time he gave a statement to Detective Mangoni?
A. No.
Q. Did you ever learn that Mr. Everett sent a letter to Detective Mangoni pleading for a deal on his parole violation?
A. No.
Q. Would those factors, sir, give you reasons to have concerns about Mr. Everett's credibility?
A. Yes.
Q. Why?
A. Well, he's not giving you firsthand information.
Q. Well, if he has a parole violation and he's pleading for a deal --

Page 249

A. Yeah.
Q. -- does that suggest, sir, that he has an interest in telling detectives what he thinks they want to hear?
A. Yes.
Q. Which means that you may have reasons to question his credibility?
A. Yes.
Q. Did you ever learn that Everett failed a polygraph examination on the question of whether Mr. Crosland in fact confessed to the Heo murder?
A. No.
Q. If you heard about that, would that give you reasons to question Mr. Everett's credibility?
A. No.
Q. Sir, I think you told me before that, if you were concerned that a witness was not providing accurate information, you would sometimes seek a polygraph; right?
A. Yes.
Q. And if the person failed the polygraph, that would give you even more reason to question their credibility?
A. Yeah.
MR. ZURBRIGGEN: Objection to the form.
BY MR. FEINBERG:
Q. Is that correct?

Page 250

A. Yes, sir.
Q. So if Everett failed the polygraph, would that give you reasons to question his credibility?
MR. ZURBRIGGEN: Objection to the form. Go ahead, Detective.
THE WITNESS: Yes.
BY MR. FEINBERG:
Q. Would you expect that information about that failed polygraph would be provided to the District Attorney's Office?
MR. ZURBRIGGEN: Objection to the form. Detective, you can answer.
THE WITNESS: I would expect.
BY MR. FEINBERG:
Q. I know we talked about it before, but do you recall in that time frame, 1987, learning that there were multiple tips pointing to another suspect in the Heo murder, Michael Ransome?
A. No.
Q. Do you recall learning that Michael Ransome was interviewed by detectives and denied any involvement in the case?
A. No.
Q. Do you recall learning that Ransome, in his

Page 251

statement to police, gave alibi information that was never investigated?
A. No.
Q. By the way, if a suspect in a case gives you alibi information in their statement, if they say, for example, I didn't do this murder, I was with my mom or with my girlfriend at that time, would you typically go interview those people?
A. Yes.
Q. Because, if the alibi is not corroborated --
A. Right.
Q. -- that might give you a reason to doubt the credibility of the person's statement; is that correct?
A. Yes.
Q. Okay. So if Michael Ransome, the suspect who was identified in multiple tips, gave police an alibi and it wasn't investigated -- the alibi that is -- would that give you concerns about the credibility of the investigation?
MR. ZURBRIGGEN: Objection to the form. Again, may I get a standing objection?
MR. FEINBERG: Sure.
THE WITNESS: I don't know.
BY MR. FEINBERG:
Q. Well, sir, if you're a detective, you're the

Page 252

assigned detective, and I take it you were on the line squad at some point before you became an SIU detective; right?
A. Yes.
Q. So you were well experienced in how to conduct investigations; right?
A. Yes.
Q. If you interviewed a suspect and a suspect gave you alibi information, I think you just told me, you'd go interview the alibi witnesses?
A. Yes.
Q. And if the alibi witnesses told you, no, that's not true, you'd have reasons to be concerned; correct?
A. Yes.
Q. So by the same token, if detectives don't interview alibi witnesses, that would be inconsistent with your practice; right?
A. Yes.
Q. So you would expect that those witnesses -- that interviews would take place; is that correct?
A. Yes.
Q. Specifically interviews of the alibi witnesses; correct?
A. Yes.

Page 253

Q. Do you recall ever hearing, sir, that Detective Rocks got a phone call or spoke to Rodney Everett's girlfriend and that the girlfriend reported that Everett identified Frank Turner as the shooter in the Heo case? Did you ever learn that?
A. No.
Q. That was a complicated question. I want to break it up. You remember Rodney Everett says Crosland committed to the crime; right?
A. Yes.
Q. Rodney Everett had a girlfriend. Her name was Louise Woods. Understand?
A. Yes.
Q. Louise Woods calls Detective Rocks. Understand?
A. Yes.
Q. And Louise Woods tells Detective Rocks that Everett says Frank Turner did the shooting. Do you understand everything I've said?
A. Yes.
Q. You didn't learn that before; is that correct?
A. Right.
Q. Would that give you reasons to be concerned about Everett's credibility in identifying Crosland as the shooter?

Page 254

A. Yes.
Q. Would you agree that everything that we've talked about for the past several minutes is exculpatory information to Curtis Crosland?
A. Yes.
Q. And I'll represent to you that all of this information appears to have been in the homicide file and available to you and Detective Cimino before Detective Cimino sought the Affidavit -- or prepared the Affidavit of Probable Cause in December of 1987. Do you understand my representation?
MR. ZURBRIGGEN: Objection, but go ahead, Detective.
THE WITNESS: Yes, but I don't know if we received the stuff.
BY MR. FEINBERG:
Q. Okay. Now, I'll come back to that in just a moment. My question for you is this, sir.
Would you agree -- the document speaks for itself, but none of the information I just outlined for you is in the Affidavit of Probable Cause for Mr. Crosland's arrest?
A. Right.
Q. On -- okay. Let's go back to the point you just made where you said you don't know whether this information

Page 255

was available.
When you were an SIU Detective, most of the cases that you got assigned were cases that had been around for a while; is that correct?
A. Yes.
Q. And I think you told me that you were the guy who was -- what you were known for was looking through the file and seeking out information to look for other suspects; right?
A. Yes, yes.
Q. To look for other witnesses who may have information; right?
A. Yes.
Q. That was your specialty; right?
A. Yeah.
Q. So your specialty then would be to literally comb through the entire homicide file and know the case cold; is that correct?
A. That's true.
MR. ZURBRIGGEN: Objection to the form.
BY MR. FEINBERG:
Q. So if -- when I say "cold," I realize we're talking about cold cases. Let me state it again.
Your job -- your role was to know the case as well

Page 256

as possible?
A. Yes.
Q. By looking through every single piece of paper in the homicide file; is that correct?
A. Yes.
Q. So can you expect that, if you and Cimino were working up the Heo murder at the end of 1987 -- strike that.
Would you agree that the papers that we're looking at show us that you and Cimino were working up the Heo homicide in December of '87?
A. I don't think -- we got on board at the later -- later.
Q. Sure. But what you've told me is, no matter when you get involved, your job as an excellent detective was to look through every single piece of paper in the homicide file; right?
A. Yes.
Q. And you expect you would have done that in this case; right?
A. Yes.
Q. So if this information that I've just reviewed with you -- the failed polygraph, the reference to the newspaper articles, the interview with Michael Ransome, et

Page 257

cetera -- if that was all in the homicide file, you would have seen it; is that correct?
A. Yes.
Q. Can you think of any reason today why none of that information was included in the Affidavit of Probable Cause?
MR. ZURBRIGGEN: Objection. Particularly, it's asked and answered. Go ahead, Detective.
(Court Reporter clarification).
THE WITNESS: No. I don't know why.
BY MR. FEINBERG:
Q. Do you know one way or the other whether that information was communicated to the District Attorney's Office?
A. I don't know.
Q. Given everything -- I'm not asking you for a legal conclusion. I'm asking you for your experience working with detectives in the Philadelphia District Attorney's office -- pardon me -- working with prosecutors in the Philadelphia District Attorney's Office, if all of this information that we've reviewed was communicated to a prosecutor, would you expect a prosecutor to approve the arrest of Mr. Crosland?
MR. ZURBRIGGEN: Objection to the form of the question. Detective, if you can answer that, you can.
THE WITNESS: I can't answer that.
BY MR. FEINBERG:
Q. Why can't you answer?
MR. ZURBRIGGEN: And my standing objection noted.
BY MR. FEINBERG:
Q. You can tell me.
A. Well, I think the district attorney should be aware of it, of course.
Q. That you should provide that information to the district attorney?
A. Yeah.
Q. Because the district attorney doesn't have access to all the information in the homicide file; right?
A. Right.
MR. ZURBRIGGEN: Objection to the form.
BY MR. FEINBERG:
Q. The district attorney only has access -- strike that.
The district attorney only receives the information that you provide; right?
A. Yes.

Page 259

MR. ZURBRIGGEN: Objection to the form.
BY MR. FEINBERG:
Q. Do you know one way or the other whether information was withheld from the district attorney by homicide detectives?
A. No.
Q. Would you agree that, if information was withheld, that would be highly inappropriate?
A. No.
Q. No? Why not?
A. If it was withheld from the DA?
Q. Yes.
A. I don't think that's -- that's not fair.
Q. It shouldn't be withheld; is that correct?
A. Yeah.
Q. In other words, you should tell the DA about this information; is that correct?
A. Yeah.
Q. But you don't know, sitting here today, whether in fact the information was provided to the DA; is that correct?
A. Right.
Q. One other question about Delores Tilghman's grand jury testimony. I'm going to show you -- first of all, do you recall reading where Delores Tilghman told the grand jury that she made up information about Michael Turner?
A. Yes.
Q. I'm showing you, in Exhibit 22 page 9028 -- just read that text that's on that page.
A. Okay.
Q. Would you agree that that testimony shows that the grand jury was asked to approve charges for Ms. Tilghman for false reporting to law enforcement?
A. Yes.
Q. Do you recall anything about that?
A. No.
Q. Do you have any idea -- do you have any idea what gave rise to those charges?
A. No.
Q. You mentioned -- strike that.
The first trial for Mr. Crosland was in December of 1988. You were still in the homicide division then; right?
A. Yes.
Q. Do you know how Ms. Tilghman got to court to testify?
A. I believe we drove her.
Q. Okay. Tell me what you remember about getting her

Page 261

to court.
A. Well, she said she didn't have money for car fare. So myself and Detective Cimino went and picked her up and brought her to the courthouse.
Q. Who asked you to do that?
A. Probably district attorney.
Q. Would that be Mr. Rosen as the trial prosecutor?
A. Yeah.
Q. Tell me everything you remember about that ride.
A. Just normal ride. Not really much conversation.
Q. When you went to her house, was she ready and waiting for you?
A. Yeah.
Q. Do you remember where you went to pick her up?
A. I'm sorry?
Q. Do you remember where you went to pick her up?
A. West Philly somewhere.
Q. Do you recall reading Ms. Tilghman's affidavit in which she said -- this is from December of 2019, Exhibit 3, paragraph 4 -- "On the day I testified at Curtis' trial, the police came into my house without permission. They told me I had to get up and testify against Curtis or I would be charged with making false statements. I was scared and did what they wanted me to do. To this day I've

Page 262

regretted and felt terrible about giving false testimony against Curtis."
First of all, did you go into her house without permission?
A. No.
Q. Did they tell you -- did you ever tell her that she had to testify against Curtis or that she would be charged with making false statements?
A. No.
Q. Your recollection instead is that she was there waiting for you, ready to get in the car, and she went with you?
A. Yeah.
Q. Didn't complain?
A. No.
Q. Didn't make any -- didn't express any concern?
A. No.
Q. Voluntarily went with you; is that correct?
A. Yeah.
Q. Did you bring her home after her testimony?
A. I believe so, yeah.
Q. Did she express any concern in that ride home?
A. I don't recall.
Q. Make any complaints?

Page 263

A. I don't -- no.
Q. So it sounds like, sir, in total you've described three encounters with Delores Tilghman. Let's review them.
One was in the hospital April 16th, 1987, for less than two minutes until a doctor asked you to leave; is that correct?
A. Right.
Q. Two, picking her up to testify in December 1988; is that correct?
A. Yes.
Q. Three, bringing her home from her testimony --
A. Yes.
Q. -- in December '88; is that correct?
A. Yes.
Q. That's all you remember with her; is that correct?
A. Yes.
Q. You never took a statement from her?
A. No.
Q. You never interviewed her about the Il Man Heo murder; is that correct?
A. Not that I'm aware of, no.
Q. I'm sorry?
A. Not that I'm aware of, no.
Q. Didn't interview her about the John Lamb murder?

Page 264

A. No.
Q. Didn't interview her about the Joseph Wilkerson murder; is that correct?
A. Right.
MR. FEINBERG: Let's go off the Record.
VIDEOGRAPHER: Going off Record. 3:31.
(Brief recess taken.)
VIDEOGRAPHER: We are back on. 3:38.
BY MR. FEINBERG:
Q. All right. Detective McNesby, just two or three very brief questions to finish up.
First, at the beginning of the deposition, you told me, when I asked you about your views on Curtis Crosland, whether he was guilty or not guilty, you told me that you thought that there was probable cause to arrest him; is that correct?
A. Yes.
Q. Has anything we've reviewed, including the various pieces of exculpatory information regarding Curtis Crosland, changed your view on that?
MR. ZURBRIGGEN: Objection form. Detective, you can answer.
THE WITNESS: I can answer?
MR. ZURBRIGGEN: Yes, you can.

THE WITNESS: Somewhat.
BY MR. FEINBERG:
Q. How has your view changed?
A. Well, they kept changing their testimony, changing their statements.
Q. So sitting here today, do you believe that there was in fact probable cause to support Mr. Crosland's arrest in December of 1987?
MR. ZURBRIGGEN: Objection to the form. Detective, you can answer.
THE WITNESS: Yes.
BY MR. FEINBERG:
Q. So nothing that you've reviewed has changed your conclusion about that; is that correct?
A. Right.
Q. You also told me you believed he was guilty because a jury found him guilty twice; is that correct?
A. Yes.
Q. Has anything we've reviewed changed your conclusion on that issue?
MR. ZURBRIGGEN: Same objection, but Detective, you can answer.
THE WITNESS: No.
BY MR. FEINBERG:



Q. You did say that something has changed.
A. Yeah.
Q. Tell me what has changed for you.
A. Well, it's just all the witnesses lying on each other, it looks like, you know.
Q. Well, has anything about your view of the case changed?
A. Possibly.
Q. Okay. And tell me what. Tell me what is different for you now than it was six hours ago.
A. Well, the false information seemed like you guys uncovered.
Q. What conclusion does that lead you to draw?
MR. ZURBRIGGEN: Objection to the form. Go ahead, Detective.
THE WITNESS: Possibly not guilty.
BY MR. FEINBERG:
Q. Okay. So are you saying now that you have concerns -- strike that -- that you are less certain about Mr. Crosland's guilt in light of what you've seen since -- over the last six hours; is that correct?
MR. ZURBRIGGEN: Same objection, but go ahead Detective. You can answer.
THE WITNESS: Yes.



BY MR. FEINBERG:
Q. Do you know one way or the other -- well, strike that.
Has anything else changed for you based upon what you've seen over the past six hours?
MR. ZURBRIGGEN: Objection to the form. Go ahead, Detective.
THE WITNESS: No.
MR. FEINBERG: Thank you, sir. I have no further questions for you.
THE WITNESS: Thank you.
EXAMINATION
BY MR. ZURBRIGGEN:
Q. Detective, good afternoon. I'll be very brief. I have just a few questions for you.
Earlier Mr. Feinberg asked you the distinction between a homicide file and a homicide binder. Do you recall those questions?
A. Yes.
Q. Can you just explain briefly again what's the difference, as you understand.
A. Well, the binder is put together by the assigned detective, put in all pertinent interviews and any tests or search warrants or whatever; whereas, the file, that's



where they keep all the original copies and stuff like that there.
Q. So am I correct in saying that, after the homicide binder is created, the homicide file still contains copies of what's contained in the homicide binder separate --
A. Yes.
Q. -- in addition to some additional materials?
A. Yes.
Q. While you were in homicide, were you ever asked by anyone at the District Attorney's Office for a homicide file, the whole file, in a particular case?
A. Not really, no.
Q. Okay. Not in your experience?
A. Yeah.
Q. If an assistant district attorney or anybody else from the District Attorney's Office had said, we'd like the entire homicide file, would you have provided it?
A. Yes.
Q. Did anyone come to you in relation to the Curtis Crosland case from the District Attorney's Office and ask you for the complete homicide file?
A. No.
Q. But if they had, you would have provided it?
A. Yes.

MR. FEINBERG: Objection to the form.
MR. ZURBRIGGEN: That's all I have.
MR. DeROSE: I have nothing.
MR. FEINBERG: I have no further questions based on that.
VIDEOGRAPHER: The dep is concluded. 3:42.
COURT REPORTER: Adam, do you want a copy?
MR. ZURBRIGGEN: Yes, please.
COURT REPORTER: John, do you want a copy?
MR. DeROSE: I would love a copy. Thank you.
(Whereupon, the deposition was concluded at 3:42 p.m.)



C E R T I F I C A T I O N.

I hereby certify that the proceedings, evidence and objections noted are contained fully and accurately in the notes taken by me in the hearing of the foregoing matter, and that this is a true and correct transcript of the same.

______________________________________

CAROL L. SHEARER, RPR
Stenographic Court Reporter
Notary Public.

(THE FOREGOING CERTIFICATION OF THIS TRANSCRIPT DOES NOT APPLY TO ANY REPRODUCTION OF THE SAME BY ANY MEANS, UNLESS UNDER THE DIRECT CONTROL AND/OR SUPERVISION OF THE CERTIFYING REPORTER.)

**A**

**A-L-F-I-N-O-W** 119:15
**a.m** 1:21
**able** 120:18 177:20 178:21 178:24
**Absolutely** 194:19,21
**academy** 43:22
**accept** 21:18 127:22 190:21
**accepted** 27:20
**access** 258:15,20
**accommodate** 9:11
**accurate** 10:1 78:21 83:12 180:5 191:20 237:8 249:16
**accurately** 6:22 270:4
**accusing** 77:15
**Achilles'** 209:21 210:2
**acknowledge** 112:17 118:19
**acknowledged** 31:12,16
**act** 145:14
**actions** 209:12
**active** 43:10 82:15
**actively** 58:21
**activities** 209:19 210:19
**activity** 4:9,10 4:14,18,20,22 82:4,7 83:6,11 83:12,15 84:3 84:7 85:11 96:23 114:21 115:11 116:24 124:23 125:2 126:19 127:2 130:7,12,16,19 131:7,19 135:1 208:14,21 211:13 212:5 212:24 216:9 225:3 229:13 229:14 231:22
**ADA** 229:18
**Adam** 2:11 5:17 6:15 35:15 269:7
**adam.zurbrig...** 2:14
**add** 190:10
**added** 150:4
**addition** 268:7
**additional** 52:16 130:17 268:7
**address** 9:2 54:10
**addressed** 6:19 132:23 204:23
**administration** 94:8
**admission** 136:11,17
**admit** 236:23
**admitted** 132:24 133:5
**admitting** 231:23
**advantage** 229:24 230:1
**Affairs** 65:8,9,13 65:17,19 66:14
**affiant** 56:9 119:14 237:16
**affidavit** 4:15 20:2,4,16 35:19,23 36:2 36:5,13,20 37:2,10,16 56:6 78:23 79:1,3,12,17 79:19 80:3,9 118:4 119:11 125:20 143:1 143:13,21 158:8,12 213:7 213:23 214:1,3 214:11,24 215:11,22 216:17 233:24 234:18,22 239:14 244:10 244:16 245:14 254:9,9,21 257:5 261:18
**affidavits** 37:4 38:4,17,22 78:18
**afternoon** 157:8 267:14
**age** 49:16 223:19
**aggravating** 100:4
**aggressive** 57:12 102:5 186:1 187:9,19,23 188:17 189:6
**ago** 9:6 12:17 13:3,7,17 14:6 14:10 16:14 35:22 38:7 63:16,19 65:23 91:19 102:14 110:10,10 121:6 135:15 244:4 266:10
**agree** 6:16 20:15 23:23 27:6,12 77:3 80:21 84:16 102:9,14 103:4 104:14 105:5 109:18 113:24 115:20 116:14 117:5 118:9 119:1 122:5,12 123:15 127:5 128:5,16 131:19 132:2 136:6 138:15 139:7 143:11 143:24 144:13 144:24 145:4 147:22,24 151:16 152:17 155:13 159:20 161:7 163:18 172:1,13 185:13 187:2,8 187:22 188:1 189:22 190:14 200:21 204:6 206:7,8,12 212:5 219:3 225:9 226:8 229:9 231:14 244:24 245:5 254:2,19 256:9 259:7 260:7
**agreed** 6:23,24 28:24 34:17 92:17 103:14 104:13 124:20 128:7 129:7,10 129:13 136:24 137:10 138:22 140:2 145:15 145:19 150:16 150:23 151:14 151:18 152:8 153:20 154:1,4 156:5,13 159:5 165:14,18 170:9 172:9 186:6,24 187:6 188:19 196:2 204:20 206:2 211:3,15 212:19 219:21 225:24 233:20 234:11
**ahead** 9:16 29:10 30:15 40:14 60:7 75:22 127:1 158:20 195:24 224:19 227:23 250:5 254:12 257:8 266:15 266:22 267:7
**aim** 61:4
**al** 5:9
**Albert** 1:7 3:9
**alert** 179:2
**Alfinow** 119:15 119:15
**alibi** 251:1,4,10 251:16,17 252:9,10,12,16 252:22
**allegation** 64:12 64:13 119:16 119:21 123:17 123:24
**allegations** 62:6 64:5 216:21
**alleged** 17:10 119:22 121:15 136:11,17 217:19
**allegedly** 122:14 132:24 160:13 225:23
**alleges** 7:13
**allowed** 69:7 73:8 242:14,19 243:4
**also-known** 154:9
**Alva** 154:7,13 154:16,21 196:24 218:24 219:4,21
**Alva's** 218:14
**AND/OR** 270:23
**Angeline** 3:15 5:16 7:8 113:11 121:20
**Anita** 27:20
**annual** 66:23 67:2

**Ansel** 1:8,9 3:9 3:10 6:1 14:7 239:22
**answer** 8:23 9:16 15:14 21:20 23:18 24:2,14 27:9 29:3 31:22 33:12,19 34:9 38:19 40:20 51:7,13 53:20 54:21 56:15 57:8 62:8 68:7 69:21 70:19 71:11,24 74:1 80:15 85:23 101:24 102:3,5 103:2 105:9 108:11,21 109:15 110:1 111:11 112:2 115:24 131:16 131:16 132:15 134:13 135:11 137:4,19 139:21 140:18 142:1 144:2,9 144:16 161:12 162:22 163:23 164:6,23 165:20 167:2 171:1 185:20 185:23 186:1,5 187:17 189:20 190:9 198:15 201:22 204:1,5 205:9 224:1 233:14 238:15 245:9 250:12 258:1,3,5 264:22,23 265:10,22 266:23
**answered** 50:11 103:1 221:17 257:8
**answers** 89:7 108:2
**Anthony** 32:8
**anybody** 11:23 35:1 48:11 132:23 133:18 189:11 268:15
**anyway** 23:8 63:5 222:13
**apart** 219:20
**apologize** 43:2 60:7 97:24
**apparently** 61:1 175:9 209:20 232:24
**appear** 21:8
**appeared** 182:24 198:12
**appears** 109:19 109:20 119:4 136:9 138:19 139:8 140:1 143:1 147:23 159:20 186:14 189:24 214:1 219:9 231:14 254:7
**appellate** 64:5
**applied** 73:5 76:17
**apply** 73:14 270:22
**appointed** 154:8
**appropriate** 76:9 89:4,10 93:18 104:20 104:21
**approve** 257:22 260:8
**approved** 78:7
**approximately** 1:20 139:17
**April** 22:1 101:2 102:16 103:14 110:12,19 129:16 151:14 153:11,24 154:3 158:5,13 161:10,19,22 163:20 165:3,8 165:13 166:14 171:22 172:21 182:14 185:15 187:5 197:18 198:8 203:13 204:6,19 205:19 208:1 209:2 211:9 212:21 213:1 216:20 218:4,7 218:11,13 219:19 224:16 245:7,21 263:4
**Arch** 1:20 2:5,13 5:7
**area** 53:22 114:4 164:12,17
**areas** 68:23 69:10 71:15
**arose** 29:8
**arrest** 4:13,19 4:21 20:3 25:9 35:24 78:7 79:5,22 80:4 98:5 122:6,9 122:18 143:13 144:5,14 172:5 212:18 213:8 214:22 218:10 225:10,19 226:8,11,13,21 227:10,13,16 228:1 229:9 231:15 233:24 234:14,15 235:2,6 237:16 239:1,12 244:7 245:15 254:21 257:23 264:15 265:7
**arrested** 7:14 18:1 77:8,10 145:1 154:10 171:18 172:2 172:12 174:11
**arrests** 129:3 225:17 229:2
**Art** 29:18,22
**articles** 246:16 246:23 247:9 256:24
**aside** 91:6 114:15 116:18 219:3 220:19 239:18
**asked** 33:3 35:22 38:5 43:2 50:1 63:5 97:23 98:2 100:16 102:13 140:24 158:8 164:21 165:17 166:16 167:22 172:23 173:3,6 179:13 180:8 189:19 191:21 195:15 205:6 213:12 257:8 260:8 261:5 263:5 264:13 267:16 268:9
**asking** 11:7,16 19:23 25:11 28:15 54:22 55:6 70:15 89:6 92:15 99:9 101:10 103:2,6,8 109:19 134:18 146:6 168:2,5 168:10,11,13 205:6 221:15 233:8 257:16 257:17
**asks** 108:1
**assaulted** 116:6 131:23
**assigned** 43:22 43:24 44:4,18 52:10 58:5,7 58:13 60:9 61:1 62:23 84:24 85:3 125:9 235:10 235:11 236:4 237:5,12,23,23 238:3,9 239:4 239:17,18 252:1 255:3 267:22
**assignments** 43:21
**assistant** 105:22 173:6,10 176:10 177:3 179:14 180:7 181:2 268:15
**associate's** 42:16 42:18,22
**assume** 8:4 53:14 60:20 67:16 78:17 83:10 88:1 93:16 99:10 107:7 108:16 125:17 135:8 137:1 149:4 158:7 159:18 167:9 173:22 173:24 181:23 202:17 203:7 216:20 232:16 243:19,24
**assuming** 160:7 170:3
**attached** 226:14
**attempted** 101:3 101:5,5 103:13 151:2,20,23 184:24 188:14
**attempting** 18:7 185:7 187:6 188:17
**attendance**

176:3,5
**attention** 77:9 113:2 129:17 132:13
**attorney** 77:9 98:6,17 99:2 99:19 105:22 108:17 154:8 154:18 171:8 171:14 172:23 173:3,6,10 176:10,15 177:3 179:6,15 180:7 181:3 196:24 258:10 258:13,15,20 258:22 259:4 261:6 268:15
**Attorney's** 26:3 26:7,23 27:3 27:21 28:23 30:9 32:16 33:10,16 34:17 84:4,21 85:9 250:10 257:13 257:18,20 268:10,16,20
**attorneys** 6:10
**attributed** 183:12 190:9 245:6
**attributes** 137:8
**audible** 16:8 31:1 59:12
**August** 118:11 119:8 128:17 129:10 132:24 139:20
**aunt** 134:2,5
**available** 11:14 44:13 90:24 115:19 159:19 161:8 246:5 254:8 255:1
**average** 58:1
**avoid** 248:2
**awake** 177:24
**award** 51:19
**aware** 16:18 17:24 22:20 25:23 26:2,6 27:19,22 28:23 29:6 32:1,18 32:20 50:23 62:4 64:4,13 66:16 73:5 99:17 111:2,14 118:23 151:1 162:5 233:22 235:15 237:1 244:6,12 245:12,17 248:5 258:11 263:21,23
**ax** 132:18 137:22

**B**

**B** 4:7
**bachelor's** 42:24
**back** 17:1,24 20:5 21:12 22:18 23:12 26:11,17 35:14 36:18 41:14 44:10 46:11 47:1,21 62:15 64:21 75:2,4 82:7,12 83:5 90:9 91:5,10 92:13,14 94:2 96:4 100:4,7 100:10 102:13 104:17 112:10 115:19 123:5,9 124:4,14 126:14 135:22 138:10 141:18 142:16 145:4 151:2,14 152:8 152:20 157:6 179:6 184:16 186:4 187:15 189:18 191:18 192:1,2,8,15 194:23 195:19 195:20,20 198:18 205:17 207:7 212:11 218:15,24 224:8,10 244:11,19 254:17,23 264:8
**background** 41:17 118:5 130:18 133:3
**badge** 181:23
**bar** 66:6,10
**based** 7:9 17:3 18:8,9 62:6 81:20 87:9 109:18 122:12 127:15 128:5 141:15 143:24 147:22 148:19 159:3 161:7 162:5,15,18 163:1 168:11 168:11,12 187:2 200:21 203:7 219:5,20 230:9 267:4 269:5
**basement** 94:11 94:12
**basically** 11:13 52:15 53:22 54:7,19 100:15
**basis** 67:2 72:4
**Bates** 235:22
**bathroom** 242:9 242:11,16 243:1
**bear** 105:15 122:3 124:7 138:11 142:15 155:3,10
**beat** 72:3 116:6 116:13 159:13
**beaten** 132:9 137:15
**beating** 225:24
**bedside** 177:8
**beginning** 1:20 60:21 63:20 162:20 234:3 244:11 264:12
**behalf** 5:24 6:17 51:11
**belief** 25:18 61:23 81:23
**believe** 14:17 31:19 32:19 34:6,19 39:6 42:23 61:20 71:4 75:10 76:9 80:23 108:22 128:12 128:19 146:2 170:12 171:8 173:23 180:12 182:17 189:15 195:13 260:23 262:21 265:6
**believed** 92:12 128:9 265:16
**benefit** 228:17
**best** 83:11 114:24 117:22
**Bethea** 60:17
**better** 228:18
**beyond** 167:17
**bias** 132:3
**Bill** 59:19 60:6
**binder** 19:21 26:21 35:14 84:13,20,24 85:4,14 100:5 124:7 126:16 158:3 195:23 235:21 238:7 244:20 267:17 267:22 268:4,5
**birth** 47:16 49:20
**bit** 22:11 63:11 85:17 157:9
**block** 54:13 118:10 119:8 136:2 148:10
**bloody** 147:16
**blue** 74:12 123:11 129:21 131:20
**blurred** 114:24
**board** 256:12
**body** 114:4 139:20
**bothering** 193:5
**bottom** 21:8 22:2 27:1 155:2,5,11 190:9 198:22 199:1,6 210:18 222:17 242:8
**box** 62:15
**boyfriend** 129:21 137:15 139:19
**brass** 67:24
**break** 9:10,15 9:16,19,21 65:2,5 75:5,6 145:17 150:9 150:13 157:9 157:11 164:15 184:22 253:7
**Brenda** 37:2,3,5 37:14,16 200:16 201:11 220:7,9,17,20 221:7,10 222:7 222:18 223:1
**brief** 26:22 75:1 157:5 224:7 264:7,11 267:14
**briefly** 267:20
**Brignola** 1:8

**bring** 77:9 107:8 158:1 229:22 230:12 238:24 262:20
**bringing** 230:7 263:11
**broadcast** 230:4
**Brody** 27:20
**brother** 210:6,8
**brother's** 210:9
**brought** 7:10 16:6 32:20 47:1 50:23 62:24 244:1 261:4
**Bruce** 64:15
**building** 2:6,12 94:8
**bunch** 148:6

**C**

**C** 2:1 3:1 270:1 270:1
**call** 180:4 181:3 193:16 228:18 253:2
**called** 40:6 43:23 46:11 58:11 66:8 69:5 70:13 109:1 129:20 131:20 136:13 137:10 139:18 193:14
**calls** 11:7,8,11 11:13,17 77:14 153:18 242:15 242:19 243:5 253:14
**car** 62:15 68:22 68:24 261:2 262:11
**career** 8:4 43:19 68:3 184:6
**careful** 132:13
**Carol** 1:21
270:17
**carried** 181:23
**case** 6:11 7:22 11:20 12:3,7 12:12 13:19 14:1,11,20 15:3,4 16:2,18 17:22 18:14,18 19:17 20:13 26:4 32:11,13 34:17 38:17 39:24 41:18 46:19,23 47:3 52:20 55:22,23 56:2 59:14 61:2 62:4 64:11,13 67:9 67:13,13 70:13 75:15,17 76:3 77:24 83:1,2,5 90:23 91:24 94:1 116:19 119:14 120:5 121:20 125:6 127:3,18 129:6 129:9,12 133:16,17 141:12 145:18 151:24 159:5 159:12 160:5 160:23 161:1,4 162:13,19 163:9,10,13,16 164:10 166:4,7 166:11 168:18 170:15,18,22 171:12,13,14 172:2,5,9 173:12,17,20 174:2,3 175:2 175:4 176:18 179:17,21 180:8 192:19 193:19,22 200:10 202:5 202:12 203:19 210:3,16 221:3 224:15,16 225:11,13,22 227:17 229:16 229:20,23 230:10,24 232:23 237:6 237:21,22 238:9 239:5 243:17 244:2 246:23 247:9 247:18 250:22 251:4 253:4 255:17,24 256:20 266:6 268:11,20
**cases** 16:7 19:8 29:1,6,8 30:10 30:18 31:13,17 33:10,17 34:2 52:15,24 58:2 58:5,10 64:1,4 82:10 99:21 106:1 112:19 129:4 138:2 145:8,18 146:1 146:3,7 147:10 149:14 150:18 164:4,11,16,21 167:16,17 202:5,13 207:20 230:18 233:4,5,10 235:11 255:2,3 255:23
**Cast** 2:6
**Caswell** 3:15 5:2
**Catholic** 42:15
**Caucasian** 176:16
**cause** 4:15 20:2 20:5 25:9 35:23 38:24 56:9 68:17,17 70:1 71:1 78:18,23 79:18 90:11 92:10 118:4 125:20 143:2 158:9 213:7,23 214:2 214:3,11 215:1 215:22 216:18 234:18,23 239:15 244:10 244:17 254:10 254:21 257:6 264:15 265:7
**caused** 7:13 66:7 75:18 144:5
**Cerone** 2:12 5:19 7:23
**certain** 73:5 266:19
**certainly** 101:12 221:17
**certainty** 110:11 189:1
**Certificate** 4:5
**CERTIFICA...** 270:21
**certify** 270:2
**CERTIFYING** 270:24
**cetera** 257:1
**Champlost** 62:22
**chance** 7:23 229:7
**change** 31:5 40:10 60:18
**changed** 34:3 264:20 265:3 265:13,19 266:1,3,7 267:4
**changing** 265:4 265:4
**characterize** 239:6
**charge** 154:10
**charged** 18:1 261:23 262:8
**charges** 64:5 232:17 260:8 260:14
**charging** 107:13
**chart** 82:19 241:17
**charts** 95:18 96:1,6
**check** 90:22 91:2 172:24 178:18 178:21 180:4,8 180:23 228:7
**checking** 22:16
**checks** 181:14
**children** 48:15 49:10,12,14 111:3,16 162:10 199:19
**children's** 48:13
**choose** 85:3,8
**chronology** 4:23 240:22
**Cimino** 1:7 3:9 13:13 20:17,19 21:24 53:4,7 53:12,14 54:16 55:15,22 56:2 59:10 90:16 93:14,16,21,21 102:3,6,11 103:12 108:3 109:10 125:20 155:21 156:4,8 158:10 167:12 183:1,12 185:8 185:15,23 186:4,20 187:4 187:9,18,22,23 188:2,10,17 191:21 192:1,7 192:15,18,22 193:1,13,18,21 194:8 197:23 209:8,14 211:2 211:9,14 212:1 212:6,18 214:4

214:12 215:6 225:6,9 229:17 233:23 234:17 234:22 235:5 236:15 237:3 237:15 238:13 239:22 240:3 244:6 245:13 246:1 254:8,9 256:6,10 261:3
**Cimino's** 158:12 209:12 210:19 235:13 236:3 237:9 239:7
**circle** 90:9
**circles** 174:15
**Circuit** 106:10
**circumstance** 132:12
**circumstances** 35:17 68:14 92:16 180:13 236:22
**cited** 18:7
**city** 1:6 2:11,16 5:8,18,20,21 5:22 7:12 23:4 32:23 44:18,20 45:4 51:10,18 106:7 120:15 122:21 147:3 160:16
**civil** 32:20,23
**civilian** 8:19
**claimed** 236:11
**claims** 199:3 203:20
**clarification** 40:21 174:7 191:8 238:19 257:9
**Clark** 3:4 5:24 135:18,21
**clear** 16:17 18:13 118:18 140:10 155:21 204:5 221:16 223:16
**close** 32:24 47:9
**clothes** 147:16 147:17 148:13 181:21
**clothing** 72:17
**co-counsel** 7:8
**code** 74:15,20
**coerce** 89:22
**coerced** 63:9 89:15,17
**coercing** 85:18 88:3
**coercion** 73:11 85:20 87:18 105:7
**cognizant** 27:4
**cold** 52:20 127:18 145:8 145:18 164:10 164:11,15 170:15,18,22 207:19 255:17 255:22,23
**colleague** 5:15 5:19
**colleagues** 29:15
**college** 42:10,17
**column** 241:23
**comb** 255:16
**combination** 127:5
**come** 17:1,17,24 23:12 61:13 81:6 87:20 91:4 112:10 142:16 150:16 161:1,4 166:21 169:1 170:22 174:17 175:1 175:14,21 216:4,14 230:13 254:17 268:19
**comes** 129:17 133:16 145:13 145:24 146:5 147:7 149:11 160:3 163:12 164:10 178:8 207:24
**comfort** 9:20
**coming** 90:23 133:9 161:18 193:4 194:23
**Commerce** 3:5
**commissioner** 67:24
**commit** 156:11
**committed** 196:6 253:8
**committing** 77:15 166:3
**Common** 106:8
**Commonwealth** 27:3
**communicated** 215:11 257:13 257:21
**communicates** 130:16 194:12
**Community** 42:16
**company** 231:7
**compare** 213:24
**complain** 262:14
**complaint** 10:4 10:6,6 16:9,16 17:4,8 18:7,9,9 18:21 28:11,12 41:2,4 66:16
**complaints** 262:24
**complete** 83:12 268:21
**completed** 83:18 95:10 96:1
**completely** 87:2 183:20 184:1 194:2,17 195:7
**complicated** 253:7
**concept** 75:10 85:17
**concepts** 76:17
**concern** 200:10 220:9 262:16 262:22
**concerned** 61:19 173:11 177:18 178:7 179:15 228:13 249:16 252:13 253:22
**concerning** 109:11 151:18 186:22 199:3 231:2 246:6
**concerns** 76:21 81:23 124:24 130:13 131:13 222:1 229:2 247:2 248:8,19 251:18 266:19
**concluded** 245:13 269:6 269:11
**conclusion** 27:24 257:17 265:14,20 266:13
**conclusions** 27:20
**conditions** 87:17
**conduct** 53:18 73:22 74:7 83:1 88:11 89:4 90:15 92:6 104:18 180:8 184:8 252:5
**conducted** 18:14 26:3 57:6 73:6 76:17 87:11 90:16 93:12 109:22 110:18 127:16 135:9 142:9 154:13 170:9 181:14
**conducting** 88:8 88:18 90:20 91:7,16 92:5 93:21 238:6
**confessed** 158:24 249:10
**confession** 63:7 137:9 233:11
**confirm** 17:3 36:15 110:21 147:2 227:19 244:23
**confirmed** 117:10
**confirming** 101:20
**confused** 238:8
**connect** 29:14 102:13 169:24
**connected** 18:14 162:19 163:15 169:19,21,22 206:1 219:17
**connection** 20:3 39:23 47:3 67:10 163:12 163:21 166:21 171:12 174:3 201:2,6 206:9 206:13,16,17 209:11,19 210:16 216:3 225:10,18 233:19 243:17 245:18
**connections** 169:18
**conscious** 178:2
**consent** 93:1
**considered** 98:19 167:9,12
**consult** 7:23 172:6
**contain** 134:24
**contained** 215:4

268:5 270:3
**contains** 268:4
**content** 11:7
**context** 79:16 139:7,15,24 187:2
**continue** 155:7 196:14
**continued** 3:1
**continues** 154:11 186:24
**contrary** 80:19
**CONTROL** 270:23
**conversation** 13:18 33:24 197:16 199:12 199:15 200:1,2 200:5 261:10
**conversations** 11:15 13:11,18 30:14 34:24 99:13 201:19
**convict** 25:3 38:24
**convicted** 7:14 18:17 30:19 38:10
**conviction** 25:23 27:21 28:9 29:7 32:14 34:18 39:1 76:1,4,9
**convictions** 29:1 64:23
**cooperate** 57:21 194:13
**cooperation** 230:23
**copies** 268:1,4
**copy** 100:5,6 109:21 138:3,6 228:18 269:7,9 269:10
**corner** 21:8 69:1
**Corps** 43:7
**correct** 11:21 17:19 18:2,15 23:7 25:21 27:24 28:6 34:20 36:16 38:12 42:20 45:5,11 48:9 51:1 52:1,5,21 53:1,4,5 54:18 55:13 58:14,21 60:5 61:24 63:23 69:19 70:2 71:5,15 71:18 72:13 73:9,12,15 78:4,8,15 79:5 80:5,9,12,19 80:20 81:9,17 81:21 82:1 83:8,22 84:1,8 84:18,22 85:1 85:5,14 86:8 86:13,17 87:2 87:6 89:15,19 90:3,7,8,12 91:13,14 93:1 93:7,14 94:15 94:20,22 95:13 96:20 97:10,21 98:14,23 99:11 99:15,19 101:3 101:6,22 103:17,18 104:5 105:3,23 106:24 107:9 107:13 109:14 110:15,22 111:17 112:14 115:16 117:12 119:23 121:7 121:10,16 122:10,15 123:21 124:2 125:7,13 126:1 126:4,7,10 127:13 128:10 128:20,23 131:8,10,24 132:10,20 133:1,7,11,13 133:23 136:14 136:19 137:2 137:17,23 138:17 140:7 142:3,6,10,11 143:3,6,9,14 143:17 144:6 145:6,9 147:11 148:7,10,14,17 150:5,19 151:21 155:18 155:22 156:9 158:10,14,22 159:1 160:14 160:20,23 161:5 162:10 162:16 163:4 163:10 164:17 164:21 167:23 170:11,19 172:6 173:7,20 174:12 178:19 181:19 182:15 183:6,7 185:8 188:6,10,12,14 189:16 191:22 192:2,3,8,16 193:19,23,24 194:11,16 195:12 197:23 198:9,10 200:3 200:7,13,19 201:4,7,12,15 202:6,10,14 203:5,9,13 204:8,13,24 205:1,4,22 207:3,13 208:3 209:5,12 213:1 213:5 214:22 215:8,11,13 216:15 217:9 217:20 218:11 218:19 219:14 219:17 221:18 222:19 224:3 225:14 226:11 227:17 230:20 231:4 234:1,19 237:17 240:6 241:9,18 242:1 242:6,12,15 243:5,11 244:8 245:15 248:8 249:24 251:13 252:13,20,23 253:20 255:4 255:18 256:4 257:2 259:14 259:17,21 262:18 263:6,9 263:13,15,20 264:3,16 265:14,17 266:21 268:3 270:6
**correctly** 110:13 130:10 145:3 156:1
**corroborate** 133:21,22 221:6
**corroborated** 222:6 247:7 251:10
**corroborating** 141:11
**counsel** 5:11 6:14,17 8:21 8:24 10:11,13 10:21,23 11:1 11:4,18,24 147:2
**counsel's** 228:17
**country** 81:7
**County** 106:9,12
**couple** 16:16 29:16 32:12 45:18 76:16 82:11 139:3 140:6 142:24 151:11 200:23
**course** 93:9 98:1 160:3,7 258:11
**court** 1:1 4:5,24 5:4 8:6,14,22 9:20 10:7 16:10 17:17 25:24 26:7,24 37:24 40:21 51:4 63:8 64:5 106:8 108:16 113:15 114:19 116:21 118:1 120:7 121:23 130:3 142:20 146:18 153:6 154:8 174:7 175:14,21 176:3,4,5 191:8 208:18 212:14 224:23 226:5 228:21 238:19 240:16 257:9 260:21 261:1 269:7,9 270:18
**courthouse** 261:4
**courtroom** 8:13
**cousin** 196:14 201:14
**cousins** 159:16
**cover** 9:5 39:13 51:19
**covered** 41:17 44:20 45:4
**covers** 143:21
**crazy** 81:3
**created** 268:4
**credibility** 131:13 132:13 220:3 247:3 248:8,19 249:6

249:13,20 250:3 251:13 251:18 253:23
**credible** 137:22 141:10
**crime** 7:17 18:1 26:9 40:3 68:23 69:10 71:15 77:15 82:12 86:10 90:7 253:9
**crimes** 52:17 70:8 72:14
**criminology** 42:17
**critical** 144:14
**Crosland** 1:3 5:8 5:14 7:9,10,12 7:16 10:9 13:20 14:21 17:5 18:1,17 20:3 24:20 25:3 26:8 27:4 35:13,24 38:17 38:24 39:8,24 40:11 50:23 51:5 61:2 64:11 75:11 91:24 116:6,13 124:6 128:12 158:22,24 159:13,16,21 160:5 163:20 165:3,10,17 166:23 167:22 168:3,18 169:1 169:5,13 172:1 172:12 174:10 176:18 196:15 196:18 198:20 198:23 199:3,4 199:13 201:14 203:22 204:12 204:23 205:3 205:21,24 206:10,18,20 207:24 217:13 218:4 219:16 225:19,24 229:10 231:3 231:13,22 232:11,14,17 233:18,24 234:11,14,15 235:6,22 236:10 237:17 240:6 242:11 243:8,11,22 244:1 245:1,6 246:6 249:9 253:8,23 254:4 257:23 260:17 264:14,20 268:20
**Crosland's** 25:23 28:9 34:17 35:18 39:1 112:8 159:4 163:12 163:15 195:11 203:18 204:7 231:15 235:18 239:12 244:7 245:14 254:21 265:7 266:20
**cross-examined** 154:19
**cumbersome** 112:17
**current** 30:9 33:20
**curtis** 1:3 5:8,14 7:9 13:20 20:3 24:20 38:17 39:24 40:11 64:11 112:8 116:6,13 158:21,24 159:13,16,21 160:5 163:12 163:15 165:3 165:17 166:23 167:22 168:3 168:17 169:1,4 169:13 174:10 195:11 196:15 196:17,21 198:20,23,23 199:3,4,13 200:2,9 201:14 203:18,22 204:7,12,23 205:3,21 206:20 207:24 217:13 225:19 229:10 231:3 231:12,15,22 232:11,14 254:4 261:22 262:2,7 264:13 264:19 268:19
**Curtis'** 261:20
**custody** 145:15 207:13 231:13 233:18 234:11 244:2
**cut** 224:14

**D**

**D** 4:1
**DA** 17:15 78:2,6 78:15 90:24 98:13 172:2,6 172:8,14 174:17,24 175:13,21,23 175:24 176:7,9 176:9 230:23 259:11,16,20
**DA's** 33:20 34:6 209:24
**damages** 50:24 51:19
**Daniel** 2:12 5:19 154:7
**Danny** 218:14
**dash** 123:12
**date** 1:21 5:5 16:23 47:16 101:8 114:2 115:11 137:9 137:14 143:8 151:10,11 153:11 162:2,3 182:17 183:2 209:2 234:7
**dated** 120:24 126:20 158:5 225:4
**dates** 16:17 17:3 18:6,6,11 151:11 165:7 182:10 245:21
**daughter** 47:20 48:1 49:4,7,11 49:11,19
**daughters** 49:9
**Davis** 125:19
**day** 17:15 21:16 59:2 69:18 133:6 136:13 143:8 145:1,15 165:3 175:21 203:20 204:12 204:23 244:11 261:20,24
**day-long** 246:7
**days** 16:14 21:5 29:15 116:24 154:3 209:4 210:24 212:24 213:3,3 218:13
**DEA** 44:3
**dead** 118:10 119:6,22 148:10 179:3
**deal** 131:5 248:15,24
**dealing** 138:2 173:15 240:22
**dealt** 173:19 174:1
**death** 109:11 114:22 120:11 186:23
**deathbed** 14:9
**Debra** 117:6
**decades** 138:3
**deceased** 12:4 13:12,13 30:3
**decedent** 121:15 122:15
**decedents** 6:12
**December** 7:15 15:14 16:11,19 17:6 18:2 36:14 124:23 125:1,7 126:21 128:22 129:13 171:18 174:11 196:2 234:7 237:17 254:10 256:11 260:17 261:19 263:8 263:13 265:8
**deception** 97:10 97:12,15
**decide** 31:5 77:24 230:19
**decided** 32:17 141:7
**decision** 93:9
**decisions** 107:18
**Defendant** 7:18 13:5 231:22 233:10
**Defendant's** 46:19 76:21
**defendants** 1:14 2:16 3:8 5:22 6:11 12:3 13:12 34:14
**defense** 108:17 154:18
**degree** 41:20,21 42:16,18,19,22
**Della** 1:6 3:8
**Delores** 17:18 18:15 21:6,24 22:10,13 36:13

37:5,13 90:21
91:5,6,10
100:2 106:19
109:9,22
110:12,18,24
111:15 112:12
112:14,22
113:2,4 129:16
129:20 135:22
135:23 136:1
136:13,16
137:8,15 138:3
140:22 143:22
144:3,13
145:13 146:11
148:12,21
149:10,13
150:15 151:2
151:12 152:15
152:18 153:15
153:18 154:7
154:13 156:24
157:15 163:2
164:4,19 165:2
165:14,16
166:2,14
167:16 168:2,5
168:17 169:15
171:6,22
172:21 173:1
173:11,20
174:1,1,10
175:13 179:15
180:8 182:18
186:17,19
196:1 197:13
198:7 199:11
199:18 200:1
201:18,19
202:18 203:8
203:13,20,22
204:18 206:19
207:8 209:4,8
210:15 211:22
213:10 215:16
216:18,21
217:6,9,23
218:7,23 219:5
220:3,20 221:7
222:9,11
224:15 236:11
237:4 259:23
260:1 263:3
**Delores'** 221:6
**demonstrate**
236:16
**denied** 250:21
**dep** 269:6
**department**
5:18,20,21
7:11 15:24
23:4 29:9
41:24 42:3,7
42:11 43:3,6
43:17,20 46:11
47:2 65:8
66:20 67:16
68:1,3 69:4
70:9 74:21
79:8,10 82:4
87:4 113:4
161:9 182:2
235:16
**deponent** 5:9
**deposition** 1:19
5:4,7 6:14,16
6:19 7:19 8:8
10:3 11:9,12
11:14,18,24
12:8,11,13,19
12:22,23 19:11
21:6 60:21
127:16 234:4
246:8 264:12
269:11
**derive** 202:9
**DeROSE** 3:4
5:23,24 6:24
269:3,10
**Descher** 1:12
2:17 13:8
**describe** 47:1
78:24 93:24
**described** 21:22
23:2,16 37:17
39:16 168:16
180:3 213:4
216:4 228:10
263:2
**describes** 197:17
**description**
24:10 37:13
72:15 122:22
237:8 245:1
**Despite** 60:19
61:18
**detail** 176:21
**detailed** 44:3
**details** 22:3
100:8 110:24
125:6
**detective** 8:5
12:9,11,15,18
12:21 13:1,4,5
13:12,22 14:4
14:7 20:19
21:24 23:18
24:2,14 27:9
28:21 29:3,11
30:16 31:22
32:6,7 33:5,6
33:12,19 34:9
34:13,23,23,23
34:24 35:2,5,8
38:18 40:14,19
44:4 45:8 51:7
51:13 53:6,12
53:14,20 55:15
55:17 56:1,15
57:8 58:6,7,13
61:2,6,11,15
62:8 64:9 67:5
67:11 68:7
69:21 70:19
71:11,24 73:8
73:11,17,18,21
74:1,9 75:22
76:18 77:3
78:19 79:11
80:15 85:1,3,7
85:23 90:16
93:14,16,21
96:12 99:5,11
99:17,18
101:16 102:3,6
102:11,18
103:12 105:9
107:3 108:2,21
108:24 109:9
110:1 111:11
111:20 112:1
115:24 117:14
118:13 119:15
125:9,9,20
127:16,17
130:7,8,13
131:8,16 132:6
132:15 134:13
135:11,18,21
137:4,19 138:4
139:4,10,12,18
143:2 144:8,15
148:2,24
149:16 153:15
153:17,18,19
155:17,21
156:4 158:9,12
159:7 161:12
162:22 163:23
164:5,23
165:20,23,24
166:19 167:2,5
167:6,10,12,13
168:13,20
170:8,9 171:1
172:16 174:5
174:20 176:23
181:6,17 182:1
183:1,12,15,21
185:8,18,23
186:8,19
187:11 190:4
191:21 196:9
197:7,22
198:14 201:22
202:2,22
203:24 204:15
205:9 206:22
208:5 209:7,12
210:19 211:2
211:14 212:1,6
212:18 214:3,6
214:12 215:6
216:10 217:24
219:23 221:13
222:21 223:14
225:6,9 227:23
229:20 230:19
233:3,14,23
234:17,22
235:5,13 236:3
236:4,15 237:3
237:9,12,15,23
238:3,10,13
239:6,7,22,22
240:3,4,5,8
243:10,13,16
244:6 245:9,13
246:1,8,10
248:5,12,15
250:5,12
251:24 252:1,2
253:1,14,16
254:8,8,13
255:2 256:15
257:8 258:1
261:3 264:10
264:21 265:10
265:22 266:15
266:23 267:7
267:14,23
**detective's** 93:7
**detectives** 7:11
7:13 12:2,6
31:10,12 33:8
33:16 34:22
41:14 52:4
60:11,20 61:23
82:22 84:11
86:20 91:24

99:15 102:2 112:21 118:22 123:2 129:18 144:3 145:14 146:2,2,6 149:11 150:18 156:7 165:2 167:15 169:23 170:23 182:14 185:22 186:10 202:4,18 207:1 208:1 220:21 229:17 231:6,8 235:11 237:5 237:24 238:10 239:19 240:4 245:18 246:17 249:3 250:21 252:15 257:18 259:5
**detector** 140:15
**determine** 178:24
**determined** 231:1
**developed** 53:18
**died** 13:22
**difference** 267:21
**different** 14:21 23:14 24:24 27:17 34:7,12 35:11 38:8,8 44:11 52:5,16 59:16,18 60:19 61:5 67:7 73:4 80:21 84:12 85:16 87:8 95:2 103:1 112:19 113:3 124:15,16 146:7,12 151:11 168:10 170:13 174:15 183:9 191:10 196:15 202:19 205:7 206:7 223:18 234:21 266:10
**differently** 32:10 232:6
**difficulty** 229:21
**direct** 21:3,17 122:2 142:23 151:6 270:23
**directed** 66:22
**directing** 53:22
**directive** 68:5 91:15
**directives** 67:23 74:8 93:3
**disability** 87:23 88:4
**disagree** 18:10 27:7,13,15,16 27:23 28:5
**Disappointed** 28:16
**disbanded** 43:23
**discharge** 43:12
**discharged** 43:14 88:22 89:2
**disciplinary** 66:16
**discipline** 66:19
**disciplined** 71:18
**discretion** 93:7
**discuss** 11:12 93:17 246:7
**discussed** 6:10 6:14,15 11:8 20:21 30:23 31:7,9 32:4 33:2,15 53:3 75:10 99:22 203:8 217:11 217:13,15
**discussing** 35:1 35:7 41:13 197:12 203:12 209:8 224:14
**discussion** 33:9 100:20 113:16 200:5 205:3
**discussions** 30:8 156:23 210:2 210:15
**dismissed** 64:5
**dispute** 23:15 162:2,4 196:17 218:6 227:5 243:21
**disregard** 142:16
**distinction** 267:16
**district** 1:1,1 5:4 5:5 26:3,6,23 27:3,21 28:23 30:9 32:16 33:9,16 34:17 43:24 44:21 65:24 69:12 77:9 84:4,21 85:9 98:6,17 99:2,18 105:22 171:8,14 172:23 173:3,6 173:10 176:10 177:3 179:6,15 180:7 181:2 250:9 257:13 257:18,20 258:10,13,15 258:20,22 259:4 261:6 268:10,15,16 268:20
**divided** 52:5 59:5
**division** 29:15 30:5 40:6 51:24 52:4 58:12 61:24 76:18 82:8 84:18 94:10 118:23 159:3 159:20 161:9 163:19 184:11 205:24 206:18 230:12 235:9 241:3,8 260:18
**DNA** 32:16
**doctor** 177:8 178:8,12 181:9 182:4 193:1 194:22 195:15 228:8 263:5
**doctors** 181:15
**document** 4:8 19:23 20:6 21:1,17,20 39:10,11,13,15 113:19 114:16 116:18,19 118:7 119:2 120:4 121:19 122:21 123:5 123:11,16 124:4 129:24 131:5 133:3,4 133:10 136:9 147:6 149:6 150:21 153:3,4 153:8 154:4 155:1,2,16 158:17 161:8 207:8,17 208:20 212:10 214:7 224:21 225:16 229:1 232:4 233:22 240:19,21 254:19
**documentation** 78:10 197:11 197:16,20
**documents** 18:20,24 19:8 19:15 21:16 35:12,17 39:16 41:10 59:13 91:23 112:5,18 118:16,19 120:13,15 121:9,19 122:1 122:14,17 124:6,14 128:6 128:9 129:20 148:6,9 159:3 159:10,15,19 162:15,23 196:8 206:7,8 206:12 212:9 229:3 244:5 246:9,11
**doer** 62:24 63:4 121:1
**doing** 34:6,12 37:23 54:17 55:20 56:19,23 61:20 72:23 73:2 101:10 115:18 177:17 212:7 242:24 243:10
**Dominick** 1:7 2:16 12:21
**door** 54:11
**doubt** 81:14 251:12
**doubts** 38:24 81:16 141:16
**draw** 266:13
**drinking** 63:2
**drive** 9:8 114:5
**drove** 260:23
**drug** 139:20
**Dublin** 47:20
**duly** 6:5
**duplicate** 117:23
**duplicating** 248:2
**Durbin** 125:19
**duty** 43:10 44:9

**E**

**E** 2:1,1 3:1,1 4:1

4:7 270:1
**Eagle** 48:18,20 49:1
**earlier** 88:6 129:2 159:10 182:23 185:10 244:20 267:16
**early** 15:16 63:23
**easier** 195:19
**Eastern** 1:1 5:5
**easy** 21:7 26:18
**Ed** 3:15 5:2 29:18 59:23,24 59:24 60:2
**education** 41:19 42:8
**educational** 42:13
**Edward** 1:9,10 2:17,17 12:9 13:22 64:18,18
**effect** 113:8
**efforts** 236:19
**eight** 13:17 59:7 59:10 60:11 172:12
**Einstein** 102:22 175:9
**either** 55:7 57:4 86:6 194:9 221:21
**eliminated** 25:24
**elimination** 28:24
**employment** 46:5
**enable** 239:1
**encounter** 182:14 195:12 195:14 217:6 218:7
**encountered** 60:20
**encounters** 263:3
**ended** 177:3
**endorses** 215:10
**enforcement** 49:23 75:14 260:9
**engaged** 31:17 31:19 64:6 75:18
**engaging** 71:22
**enter** 6:17
**entire** 53:9 123:11 143:20 255:17 268:17
**equipment** 95:21
**Ernie** 60:17
**errors** 31:13
**especially** 9:20 57:1 89:5,14 112:11
**Esquire** 2:4,5,11 2:12 3:4 154:8
**essentially** 52:20 121:14 127:18 141:21 144:4
**establish** 50:8
**established** 59:22 80:11 127:18 136:23 136:23 145:4 174:9 182:13 206:9,12
**Estate** 1:9,11,12 3:10,11,12 6:11
**Estates** 1:7 3:9 6:13,18
**estimate** 63:17 87:10 177:12
**et** 5:9 256:24
**Etienne** 3:15 5:16 7:8
**Eve** 63:1
**evening** 207:12
**event** 15:14 51:4 166:8 242:4
**events** 240:22
**eventually** 63:4 63:12
**Everett** 35:19 36:3,6 40:2 158:5,13,21 160:4 165:10 169:1,2,8,24 170:8 204:6 207:23 218:3 245:17 246:15 248:6,10,14 249:8 250:2 253:3,8,11,17
**Everett's** 205:22 245:7 247:16 248:19 249:13 253:2,23
**evidence** 25:2,17 62:19 76:19,21 77:4,5,7 79:1 79:11,17,22 80:3 128:17 141:11 182:23 182:24 236:23 270:3
**exactly** 212:6 248:3
**exaggeration** 206:8
**exam** 92:11 140:22
**examination** 4:3 4:4 7:1 94:17 95:10 96:1,15 96:17,22 97:2 249:9 267:12
**examined** 6:6
**examiner** 92:3,6 94:19,24 95:12 96:3,14 142:5
**examiners** 95:3 95:24
**example** 68:12 73:8 81:3 86:14 94:1 146:5 251:5
**examples** 87:20
**exams** 95:16
**excellent** 53:24 256:15
**exception** 52:23
**exclusively** 48:12
**exculpatory** 76:19 77:4 78:8,11 79:1 79:11,17 98:19 254:3 264:19
**exhibit** 4:8,9,10 4:11,12,13,14 4:15,16,17,18 4:19,20,21,22 4:23 19:24 20:1 21:2,2,5 26:12,21,22 35:18,23 36:23 37:1,1 39:11 39:19 100:3,7 106:7 113:12 113:14,18 114:17,18 116:19,20 117:21,24 118:3 120:5,6 121:21,22 123:24 124:8 124:24 126:14 126:16,19 127:1,2 130:1 130:2,6 138:6 138:9 142:18 142:19 144:19 146:16,17 150:22 153:4,5 158:2 184:17 195:20 208:15 208:17 212:10 212:11,12,12 212:13,17 213:12,17 214:19 216:11 224:21,22 226:3,4 228:16 228:17,20 234:4 240:14 240:15 244:11 260:4 261:19
**exhibits** 4:24 127:6 212:16
**existence** 102:24
**exonerations** 29:7
**expect** 55:23 56:22 99:1,2 134:23 136:18 164:2 165:16 166:22,22 168:13,17 202:17 207:1 208:1,9 211:24 220:19 224:2 250:8,13 252:19 256:6 256:19 257:22
**expectation** 222:17
**expectations** 73:22 168:12
**expected** 99:14 157:9
**expediency** 101:11
**expedite** 21:16
**experience** 99:18 257:17 268:13
**experienced** 252:5
**explain** 19:24 21:3 100:19 236:8 267:20
**explanation** 24:9 183:10 198:11
**exploit** 202:5
**exploration** 6:20

**exposure** 61:19
**express** 262:16 262:22
**expresses** 200:9
**extent** 6:18 70:19 146:21 176:23 190:4 214:6
**extreme** 241:23
**eyewitnesses** 125:18 245:2

**F**

**F** 270:1
**fabricated** 184:2
**Facebook** 50:12
**facing** 32:2 248:10
**fact** 7:16 20:22 23:15 25:6,20 28:5,8,13 40:11 41:5 60:19 61:18 99:1 101:1 106:4 108:1,7 108:24 110:18 115:6 121:14 123:9 138:2 139:15 142:23 153:10 157:21 160:16 164:9 183:10 193:13 203:15 207:7 214:15 221:2 223:22 227:5 232:13 235:20 244:4,19 246:15 249:9 259:20 265:7
**factor** 144:4
**factors** 248:18
**facts** 124:16 225:22
**failed** 60:14 63:6 97:8,9 98:4,13 249:8,19 250:2 250:9 256:23
**fails** 98:11
**failure** 97:16 98:21 99:18,22
**fair** 223:16 239:6 259:13
**fall** 49:20
**falling** 219:20
**false** 89:18 90:3 90:5,12 104:4 104:13 222:13 260:9 261:23 262:1,8 266:11
**falsely** 7:14
**familiar** 65:7,12 67:17,23 82:3 114:8
**familiarity** 95:15 107:5 158:7
**family** 49:22 162:7 201:18 211:22 219:14 219:17
**far** 104:23 219:5 228:13 236:2
**fare** 261:2
**fashion** 168:1
**fast** 224:19
**father** 111:3,16 162:9 199:18
**February** 1:17 5:6 43:15 151:12,13
**federal** 10:7 16:10 25:24 26:7,24 27:19 231:12
**feel** 230:9
**Feinberg** 1:20 2:4,4 4:3 5:13 5:13 6:8 7:2,7 23:21 24:4,16 27:11 28:4,22 29:5,13 30:13 30:22 31:2,24 33:14,21 34:5 34:11,15 38:21 39:5 40:16,22 51:9,15,22 54:15 56:17 57:10 62:10 64:10 68:9 69:23 70:22 71:13 72:2 74:3,9,11,23 75:3,23 76:15 80:17 81:13 86:2,24 98:9 99:7 102:20 103:11 105:11 108:23 110:3 111:13,22 112:4 113:10 113:17 114:20 116:2,10,17,22 117:16 118:2 118:17 120:8 121:24 130:4 131:18 132:8 132:17 134:15 135:13 136:22 137:6,13,21 139:14 142:21 144:10,18 145:12,22 146:19 148:4 149:2,18 150:9 150:12,14 153:2,7 154:24 157:3,7 159:9 160:2 161:14 162:24 163:8 164:1,5,8 165:1,22 167:4 167:8 168:23 171:3 172:18 173:16 174:8 174:23 177:1 181:8 183:17 183:24 184:5 186:11 187:14 190:6 191:9 194:7 197:9 198:2,6,17 201:24 202:24 204:3,11,17 205:11 206:5 206:24 207:6 208:7,19 212:15 214:9 217:2 220:1,16 221:1,14 222:4 222:16,24 223:15 224:5,9 224:24 226:7 228:3,22 233:7 233:16 238:16 240:10,17 243:15 245:11 248:1,4 249:23 250:7,14 251:21,23 254:16 255:21 257:11 258:4,8 258:19 259:2 264:5,9 265:2 265:12,24 266:17 267:1,9 267:16 269:1,4
**fellow** 7:13 41:14 68:12 71:22 72:22 112:20 118:22
**felt** 75:15 156:12 262:1
**female** 162:1 176:13
**fight** 128:13
**fighting** 44:13
**figure** 83:6
**file** 19:10 41:11 83:21,22,24 84:8,12,17 85:4,8,13 96:9 96:12,18 113:20 120:10 120:13 126:20 134:24 135:7 147:7 149:7 150:23 197:12 197:12,13 208:22 229:3 238:5 254:7 255:7,17 256:4 256:17 257:1 258:16 267:17 267:24 268:4 268:11,11,17 268:21
**filed** 10:6 16:10
**files** 58:20 120:14 149:12 197:11 229:2
**final** 144:4
**find** 75:18 134:3 154:9 212:3 221:8
**finding** 39:7,7
**findings** 226:20 226:22
**finish** 15:9 22:6 33:5 100:23 113:22 120:18 211:20 264:11
**finished** 20:7 22:5 36:8,10 36:21,23 37:11 39:19 113:22 115:1,3 117:2 118:7 125:3,4 126:23 130:20 130:22,23 146:23 158:19 191:13 199:9 208:24 215:20 236:1
**fired** 46:8 66:8 66:10
**firm** 7:8
**first** 6:5 7:5 8:20 8:20 10:22 12:6,9 14:22 15:3,13,22

16:11 17:5 19:24 20:1 27:6 28:8 29:22 35:18 70:12 82:9 94:11 100:19 102:6,22 106:6 106:7,9 113:21 115:3,3 121:20 122:5,5,6 128:5 129:19 134:4 139:16 142:23 146:15 147:1,14 148:7 148:16 153:8 153:11 154:6 158:18 170:7 201:20 203:19 212:17 216:2 217:23 225:13 226:16 229:16 235:24 244:24 246:14 259:24 260:17 262:3 264:12
**firsthand** 248:22
**five** 14:9 43:8 44:2 65:4 69:16,16,17 72:12 150:12 180:21 213:23 218:13
**flip** 186:12 191:11 213:8 244:19
**floor** 2:12 94:10 94:11
**focus** 59:9 189:24
**focusing** 90:6
**follow** 28:16 54:14 109:16 136:4 149:8 187:15 205:15 238:23
**follow-up** 75:9 100:22
**follow-ups** 191:18
**followed** 170:4
**follows** 6:6
**force** 16:4 43:23 44:8,9 68:13 73:9 85:24 86:3 92:23
**forced** 188:2
**foregoing** 270:5 270:21
**forget** 133:15 143:12
**form** 23:17 24:13 27:8 28:2,19 29:2 30:11 31:21 33:11 34:8 38:18 40:13 51:6 53:19 56:14 57:7 62:7 64:7 68:6 69:20 70:18 71:10,23 73:24 74:9 75:21 76:12 80:14 81:11 85:22 86:22 98:8 99:4 102:17 105:8 108:20 109:24 111:10 111:19 115:23 117:13 118:12 131:15 132:5 132:14 134:12 135:10 136:21 137:3,11,18 139:11 144:7 145:11,21 148:1,23 149:15 153:1 154:23 159:6 159:23 161:11 162:21 163:6 163:22 164:5 164:22 165:19 167:1 168:19 170:24 172:15 174:4,19 176:22 181:5 183:14 186:7 187:10 190:3 191:6 194:6 197:6 198:1,5 201:21 202:21 203:23 204:9 204:14 205:8 206:3,21 208:4 214:5 216:24 219:22 220:13 220:24 221:12 222:3,14,20 223:13 227:22 233:2,13 238:14 240:7 241:20 243:12 245:8 247:20 249:22 250:4 250:11 251:19 255:20 257:24 258:18 259:1 264:21 265:9 266:14 267:6 269:1
**formally** 7:6
**former** 29:15 50:4
**forth** 47:22 100:5
**forward** 19:7 101:9 129:15 133:9 140:4 142:12 185:3 186:12 224:19
**found** 25:1,7,10 25:13 27:17 28:5 32:17 63:12 75:11 114:4 118:10 119:6,22 148:9 149:7 265:17
**foundation** 190:24
**four** 12:17 35:7 43:9 44:3 69:15 95:4 129:6 133:10 209:4 210:24
**Fourth** 49:21
**frame** 16:15 41:14 53:15 60:16 61:7,12 61:16 85:12 118:23 165:24 172:19 178:16 205:19 208:15 217:22 233:18 244:13 250:16
**Francis** 1:9 3:10
**Frank** 29:19 115:7,12 116:13 117:7 117:12 121:6 123:21 128:10 128:19 143:2 149:23 150:1 159:11,12,16 160:20,22 162:19 163:3 169:12,15 188:5 190:1,15 191:1 193:18 193:22 200:18 201:2,11 206:1 206:13 210:19 211:2,10,14 212:1,19 214:4 215:24 216:3 216:12,14,19 216:22 217:11 217:19 225:19 226:11,17 227:3,6,10,16 229:10 231:3 231:24 253:4 253:17
**Fraternal** 50:5
**Frederick** 1:11 3:11
**fresh** 144:22
**friend** 134:5
**friends** 50:6,7
**frisk** 69:5,19 70:1,10,20 71:3
**frisking** 72:21 74:6
**frisks** 72:12
**front** 8:14 19:21 20:5 26:19 35:14 87:9 100:11 107:2 118:3 124:24 144:20 158:4 212:9,16 213:13 214:19 229:22 230:1,7 235:21
**fugitive** 59:22
**full** 90:9
**fully** 270:4
**further** 6:19,20 109:14 267:10 269:4
**future** 6:18 124:22

**G**

**gain** 113:7
**gang** 44:10,13
**Geizel** 199:21,22
**general** 56:18
**generally** 55:15 55:19 61:23 99:14
**gentlemen** 139:2
**geographical** 164:12,16
**getting** 54:5 188:17 238:8 260:24
**girlfriend** 251:7 253:3,3,11

**give** 8:18 10:1 21:21 22:3 45:18 46:11 49:16 63:7 72:15 76:24 81:3 86:11,15 89:15,17,18 90:11 92:2,20 104:4 122:2,20 141:3,7 142:2 164:10 176:20 177:12 186:3 196:22 220:10 248:18 249:12 249:20 250:3 251:12,17 253:22
**given** 21:6 36:3 58:3,21 67:15 72:19 83:10 90:6 112:11 130:14 138:21 138:21 140:22 162:6 164:19 168:16 169:18 186:17 196:5 205:3 216:17 219:7,9,12,13 219:16,20 227:12 232:24 233:11 235:2 243:19 257:16
**gives** 80:22 149:11 153:19 160:3 218:3 232:3 251:4
**giving** 98:22 154:4 169:11 169:12,15 187:17 199:11 218:14 237:4 248:22 262:1
**go** 8:17 9:16 19:7 22:2 24:19 26:11,17 29:10 30:15 35:15 40:13 45:13 47:21 53:23 54:12 60:7 65:4 67:6 70:10 74:23 75:21 89:14 94:22 96:4 100:10 101:9 104:17 113:11 116:18,23 120:9 122:20 126:18 127:1 129:24 138:24 140:4 142:12 142:13,22 146:10 151:6 155:1 157:3 158:20 160:16 172:23 173:6 174:17 175:21 176:9 181:15 182:5 185:3,3 187:15 189:18 191:18 195:19 195:20,20,24 198:18,21 199:6 203:5 205:17 207:7 208:20 213:22 214:7 220:21 221:3,18 224:5 227:22 233:6 233:12 240:18 242:8 250:4 251:7 252:9 254:12,23 257:8 262:3 264:5 266:14 266:22 267:6
**go-to** 54:8
**goal** 17:4
**going** 11:13 18:6 21:7,12,15 22:6,16 26:21 35:16 39:10,18 41:16 54:2 56:3 64:21 65:1,2 72:14 74:24 75:9 86:14 89:23 90:9,21,22,24 97:18 98:13 100:1,8 102:1 107:22 112:16 112:17,18 114:16 115:9 117:18 124:8 135:16,24 138:7 139:1 142:13,16,18 144:11 146:10 146:13,15 157:4 161:24 170:21,22 174:14 177:3 184:16,18 185:11 191:19 192:7 194:13 195:19 212:9 218:24 224:6 224:19,20 226:2 228:1,6 228:16,18 235:20 246:4,7 246:8 259:24 264:6
**good** 5:23 50:22 54:20 55:17 61:20,24 65:3 150:13 157:8 167:5,9,13 168:13 195:3 202:2,4,17 267:14
**gotten** 50:18 170:5 196:16
**govern** 67:17
**Grace** 2:5 5:15 7:7
**Graduated** 42:15
**graduation** 43:5
**grand** 23:23 24:10 100:2 106:6,12,23 107:3,8,11,15 138:5,7,16 140:10 142:14 151:5,10,20,23 152:3 154:1 161:17 165:13 182:12 184:16 197:17 198:13 198:18,20 199:4,12 211:1 211:5 213:3,4 216:4,15 220:6 226:13,16,20 226:21 227:3 228:11 229:17 229:20,22 230:2,7,15 231:2 259:23 260:1,8
**grandchildren** 50:16,18
**granted** 62:5,18 64:2
**Gregory** 64:15
**grind** 132:18 137:23
**grocery** 125:12 200:6
**group** 210:1
**groups** 59:6
**guess** 15:1 17:15 17:16 28:10 51:8 63:11 66:1 105:10 175:1 230:11
**guessing** 107:17
**guidance** 91:15
**guilt** 266:20
**guilty** 24:20,22 25:1,7,8,10,12 25:13,14,18 27:17 28:6 32:18 39:8 40:11 63:13 75:11,11,19 80:4 90:7 92:12 264:14 264:14 265:16 265:17 266:16
**gun** 147:17
**guy** 54:9,16 81:4 135:24,24 136:2 165:10 239:2 255:6
**guys** 266:11
**Gwynedd** 45:16 45:20,23 46:3

**H**

**H** 2:4 4:7 83:24
**half** 10:17 129:7 129:9,12 131:21 133:10 133:13
**halfway** 140:13 186:13
**hand** 100:1 109:19 123:5,9 124:4 130:5 138:10
**handed** 96:11
**handle** 209:15
**handled** 33:10 33:17
**handling** 30:9
**hands** 83:20 109:21 198:12
**handwriting** 55:3,7,11 147:22 241:20
**handwritten** 4:12,16 39:15 55:3 120:9 138:20 146:20
**hang** 66:6 235:14
**hanging** 66:11
**happen** 12:18 13:19 14:1,11

46:14,16 56:5 62:11 69:9 71:14 87:1 95:23 96:5 103:16,19 108:18 137:1 141:9 146:4 187:13 194:1 194:15 195:5,7 208:9 226:19 226:24 228:13 236:17
**happened** 26:2 37:17 47:1 56:6 65:24 66:9 81:8 83:8 110:22 133:7 135:23 151:14 162:16 166:14 166:16 170:5 177:6 183:5,13 186:18 189:23 191:4 194:4,10 198:3 203:1 232:21 237:24 248:6
**happening** 156:15
**happens** 94:4 129:16 218:18 241:5 242:5
**happy** 9:11
**harassing** 192:18
**hard** 39:16
**Harris** 2:5 5:15 7:7
**head** 45:14,20 50:4 99:9
**headquarters** 84:18
**hear** 28:15 50:20 89:24 94:24 99:19 249:3
**heard** 70:13 74:12,15 75:24 79:14,16 171:8 232:19 249:12
**hearing** 20:22 39:7 40:5 64:22 218:23 232:19,24 233:5 253:1 270:5
**held** 5:7 113:16
**help** 35:15 59:13 60:13 124:7 126:17 131:5 133:20 134:2 138:12 209:8
**helpful** 19:13 103:2 231:4
**Heo** 7:16 19:10 20:3 24:21 40:7,12 112:8 125:1 126:20 127:3,7,18 128:3,22 129:12 145:5 147:11 150:19 158:2,22 159:1 160:14 163:13 163:21 165:4 165:11 166:8 166:11,21 168:6,18 171:12,18 173:20 174:2 174:11 179:18 195:11 197:12 200:6 201:3 203:19 204:7 219:10 233:24 235:6 244:7 245:18 246:16 249:10 250:17 253:4 256:7,10 263:19
**Heo's** 126:22
**hey** 78:2
**high** 42:9,15,15 43:6 44:11,15 52:18,18 68:23 69:10 71:15 82:9
**higher** 52:23,24
**highest** 41:19 42:7
**highlighted** 26:24 27:2
**highly** 259:8
**Highway** 44:2,2 45:4 62:14 69:14,17 71:8 71:8
**Hill** 3:4 5:24
**history** 42:13
**Holden** 64:16,21 64:23
**holding** 92:13 92:13 94:2 141:17
**home** 9:8 49:6 147:13 262:20 262:22 263:11
**Homes** 114:8 126:6
**homicide** 19:9 29:9,15 30:5 35:5 40:6 44:4 45:8 51:24 52:18 58:2,11 61:24 62:22 63:21 76:18 82:7 83:22 84:8,12,13,16 84:17,20 87:12 94:10 96:12,12 98:1 113:19 118:23 120:10 120:13,14 123:2 126:20 135:4 139:18 144:3 147:7 154:11 159:3 159:20 161:9 163:19 168:13 168:22 173:12 173:17 184:11 191:2 205:24 206:18 208:1 208:22 229:1,2 230:12 235:9 241:3,8 254:7 255:17 256:4 256:11,16 257:1 258:16 259:5 260:18 267:17,17 268:3,4,5,9,10 268:17,21
**homicides** 18:24 58:18 113:3 170:1 238:23 239:2
**honorable** 43:13
**hope** 167:7
**hospital** 17:14 22:13 23:8,9 23:20 36:16 88:19 89:5 90:15,17,20,22 91:8,11,12,17 101:3 102:15 102:16,23 103:13,20,24 104:11,19,22 105:2 110:12 153:24 161:19 161:23,24 171:7,9,22 172:11,24 173:7 174:3 175:9,22 177:4 177:7,23 181:4 184:9 185:7 187:5 188:12 188:16 193:2,4 193:7,16 194:23 195:16 198:8 209:5,9 217:6,9 228:1 228:6 263:4
**hospitalization** 182:20
**hospitalized** 82:20 88:7,9 89:13 90:10 182:13 184:24
**hour** 9:21,21 10:17 164:15
**hours** 200:23 204:19 241:10 241:11,12 246:10 248:2 266:10,21 267:5
**house** 47:21 48:3,8,17 54:11 190:12 261:11,21 262:3
**housing** 114:11
**Hughes** 1:9 2:17 13:22 29:18 30:2 34:23 59:14,24 60:2 60:22 61:12 170:9
**Hum-um** 231:9
**hundreds** 78:21 87:13 99:11,13
**husband** 49:8

**I**

**ID** 54:4
**idea** 24:17,20 55:19 56:3,12 84:3 96:5,9 99:14 111:7,14 134:20 140:21 142:9 179:21 183:8,18,23 209:18 217:18 232:1,21 234:13 246:1 260:13,13
**identification** 113:14 114:18 116:20 117:24

120:6 121:22 130:2 142:19 146:17 153:5 208:17 212:13 224:22 226:4 228:20 240:15
**identified** 41:5 54:6 58:12 62:24 80:24 127:6 165:4 199:22 242:10 251:16 253:4
**identifies** 207:24 237:5
**identify** 40:17 40:23 52:16 85:18 188:18 189:8
**identifying** 40:7 98:22 132:19 253:23
**Igor** 119:15
**Il** 7:16 19:10 20:3 24:21 40:6,12 112:8 125:1 126:20 128:2 158:22 159:1 160:14 168:6,18 219:10 263:19
**imagine** 201:19
**immediate** 132:22
**immediately** 145:14 221:17
**implicated** 109:12 186:23
**improperly** 202:8
**inappropriate** 86:16 87:2 194:2,18 195:8 259:8
**incarcerated** 7:14
**incident** 116:4,5
**include** 79:3,11 79:17,19 80:3 80:9 246:2
**included** 119:16 244:16,16 245:14 257:5
**includes** 215:23
**including** 264:18
**incomplete** 75:6 157:12 224:12
**inconsistent** 252:16
**incorrect** 75:7 90:12 157:12 224:12
**inculpates** 245:6
**inculpatory** 231:23 232:3,7 233:1,11
**indicate** 231:14
**indicated** 97:10 97:12,15
**indicates** 212:6
**indication** 134:24
**individual** 72:16 92:17
**influence** 223:2 223:23
**information** 25:17 38:23 41:18 46:12 78:1,3,8,11,13 79:3 80:7,22 80:24 81:15,20 85:7 86:1,11 86:15 89:15,17 89:18 90:2,5 90:12 92:13,14 94:2 97:6 98:18,19,23 99:3 104:13 107:12 109:14 111:1,2,7,15 111:23 112:20 113:7 115:10 115:16,19,20 116:3 123:16 125:17 126:13 133:17 134:8 141:18 143:22 144:2,14 146:2 146:3,12 148:21 149:11 149:13 150:5 151:3 158:13 159:21 160:14 161:7,15 162:6 162:9 163:2,2 163:20 164:10 164:19 166:2,3 166:6,20 167:15,17 168:22 169:11 169:12,15 179:5 196:5,17 199:12 201:17 202:9,12,13 203:12 207:2 207:19 215:3 216:20 217:3 217:19 218:6 219:7,9,12,12 219:13,16,19 220:10,21 221:8,10,21 224:16 230:9 239:1 245:5 246:2,5,6,24 247:6,10,11,14 248:6,22 249:17 250:8 251:1,5 252:9 254:4,7,20,24 255:8,12 256:22 257:5 257:13,21 258:12,16,23 259:4,7,17,20 260:2 264:19 266:11
**informed** 51:10
**initial** 197:21
**initiate** 81:19
**innocence** 76:22
**innocent** 7:17 24:20 25:13 26:8 27:4
**insert** 193:19
**inside** 99:9
**Instagram** 50:14
**instance** 91:7,20
**instances** 93:20
**instructions** 8:12,18
**instructs** 8:24
**intellectual** 87:22 88:3
**intended** 61:4
**interacted** 189:5
**interacting** 54:17 112:21 243:11
**interaction** 91:11 140:7 178:22 179:1
**interactions** 19:18 22:9 152:15 156:3 243:8,16,22
**interest** 249:2
**Internal** 65:8,9 65:13,17,19 66:14
**internally** 82:14
**Internet** 50:12
**interpretation** 238:17 240:24
**interrogation** 73:9
**interrogations** 73:6
**interrupt** 228:24
**interview** 18:15 21:23 22:13,15 52:16 53:23 54:1,3,21 66:2 66:4 83:1 88:12,19 89:14 90:10,20 91:1 91:7,12,17 93:10,17 97:2 97:17,21 104:10,19 105:6 109:21 110:18 122:23 134:9,17 135:1 135:8,9,16 136:19,24 137:7 154:12 170:8 172:21 175:3,5 184:8 197:18 213:4 213:10 216:4,9 216:10 217:23 220:22 221:3 221:18 223:6,8 228:10 230:8 230:12 241:10 241:11,12,13 251:7 252:10 252:16 256:24 263:24 264:2
**interviewed** 65:19 82:11 109:11 123:2 131:8 134:21 134:23 135:18 135:21 186:22 203:21 204:19 209:5 211:9 217:8 220:17 222:18 223:3 224:2 245:17 246:22 250:21 252:8 263:19
**interviewer** 54:8
**interviewing** 73:23 92:8 169:24 223:11
**interviews** 54:17 54:24 57:6,12 66:13 87:11

88:8 89:5 90:15,16 92:1 93:13,13,21 197:13 223:18 238:6 239:11 245:23 246:2 252:20,22 267:23
**intimidating** 177:19
**introduce** 5:11
**introduced** 7:5
**introductions** 7:5
**introductory** 41:18
**investigate** 77:18 172:4
**investigated** 251:2,17
**investigating** 77:24 106:12 107:15 116:12
**investigation** 9:6 16:21,22 31:13 41:11 46:22 58:13 65:16 82:15,17 90:6 100:9 135:5 170:15,22 203:19 212:2 221:2 231:2 238:11 240:6 251:18
**investigations** 19:1 29:8 30:5 46:12 52:10 53:18 54:14 82:23 83:16 170:4,18 203:4 227:20 252:6
**investigative** 130:17 210:19
**investigator** 39:12
**involve** 125:6
**involved** 15:4 32:7 41:3 46:22 61:3 62:5 64:12 92:20 99:21 118:20 128:13 128:20 133:6 162:13 166:7,8 166:9 171:14 172:2,8,14 176:17 180:7 188:3,18 190:16 196:15 199:15 225:17 227:20 240:13 256:15
**involvement** 17:2 18:13,18 19:1 20:13,23 112:8 131:2 189:24 191:1 195:11 197:21 211:2,10,21 217:19 227:24 244:2 250:21
**involves** 16:18
**involving** 13:19 32:11 91:24 127:3 199:13 224:15 226:17
**Iron** 2:6
**issue** 67:6 107:12,16 132:22 138:2 230:15 265:20
**issued** 67:24 122:7 212:18 212:21 213:17 214:20 226:9
**issues** 6:18 175:24
**item** 142:12

**J**

**J** 229:17,17
**Jackson** 134:2,5 134:10,20,23 135:8 136:17 137:1
**jail** 192:8
**James** 1:8,19 2:16 5:9,21 6:4
**January** 16:1,3 36:7 127:2,12 127:19 235:14 235:22
**jderose@clar...** 3:7
**Jefferson** 101:2 102:16 175:10 209:9
**Jersey** 47:21
**jfeinberg@krl...** 2:7
**job** 46:8 52:13 58:16 61:21 237:24 238:7 255:24 256:15
**Joe** 35:2
**Joe's** 45:14
**Joel** 14:22 15:4 105:21 106:17 176:17 183:8 183:11
**Joey** 133:6 147:19 148:7 148:21 149:6 190:16
**John** 1:6,7,12 3:4,8,9,12 4:8 5:23 6:15 13:12 19:2 20:17 50:2 53:4,22 109:10 113:20 114:22 116:5,11,12 117:12,17 124:17 126:6 128:2 147:7 149:7 159:4,12 159:13,13 186:20 225:10 227:17 229:1,2 232:18 263:24 269:9
**John's** 14:17
**joined** 5:15,19 7:7
**Jon** 5:13 7:7
**JONATHAN** 2:4
**Joseph** 1:8,12 2:17,17 19:4 109:11 111:24 117:20 118:6 123:18 124:17 128:2,17 143:16 186:23 190:11 208:21 219:7 227:13 264:2
**Joseph's** 42:2,19
**Juanita** 122:23 122:24 123:3,7 123:16
**judge** 8:12,14 9:2 15:19 27:19,19 62:5 62:16,18 63:8 64:4,22
**Judicial** 106:10
**July** 36:6 245:22
**jumbled** 204:4
**jump** 207:2,20 208:2
**juries** 27:18 107:15
**jurisdiction** 239:5
**jurors** 25:1
**jury** 8:12,14 23:23 24:10 25:1,7,13,20 28:5 39:6 75:11,15,18 76:8 100:2 106:6,13,23 107:3,9,11 138:5,7,16 140:10 142:14 151:5,10,20,23 152:3 154:1 161:17 165:13 182:12 184:16 197:17 198:13 198:18,20 199:4,12 211:1 211:5 216:5,15 220:6 226:13 226:17,20,21 227:3 228:11 229:17,20,22 230:2,7,15 231:2 236:16 259:24 260:2,8 265:17
**jury's** 213:3,4
**juvenile** 223:8 223:11,17,22

**K**

**KAIRYS** 1:19 2:4
**Karen** 1:8 3:9 6:1
**keep** 37:23 39:10 65:2 82:15 85:8 102:1 106:5 124:5 135:4 214:19 241:5 268:1
**kept** 83:17 85:13 192:18 193:4,5 194:23 265:4
**kicked** 228:8
**kill** 152:18
**killed** 40:7 135:24 136:2 139:19 190:11
**killing** 120:1 135:22
**kind** 34:4 44:13 53:17,21 54:8

62:23 66:19 77:16 82:19 97:20 100:4 132:12,22 174:14 239:1
**knew** 53:21,22 70:4,12 72:19 159:4 169:2,4 206:19 221:21
**know** 9:5 14:22 15:2,6 16:15 18:4 20:7 22:4 25:12 32:8,10 36:21 37:11 46:17 50:4 51:13 52:19 53:14,24 54:10 56:13,19,22 57:11,14,16,18 57:20 59:10,13 59:23 60:2 61:14 62:8,16 63:7 68:22,24 69:2 70:8,19 70:21 72:4 82:14 86:20 90:15,24 95:12 95:24 99:5 104:6,14,14,23 104:23,24 105:21 110:7 111:11,20 112:2,3 113:21 115:1 117:2,14 118:7 120:12 123:23 125:2 126:23 130:8 130:19 131:24 136:7 141:14 142:15 146:5 149:16 154:16 158:18 159:8 162:18 165:20 165:21 166:2 166:20 167:3 167:19,20 170:2 172:16 172:17 173:5 173:18 174:20 175:2,4 177:2 177:8,19 179:17 180:14 180:16 181:6 183:15,16,22 184:1,3 189:4 190:5 193:17 197:4,7 198:15 198:23 199:3 201:22,23 202:1,1,22,23 203:8,11,21,24 204:15,22 205:5,6 206:4 206:19,22 207:14 208:5 208:23 209:21 210:10,11 214:18 215:20 217:3,24 218:3 218:10 219:23 220:17,19 221:22,24 222:8,15 227:9 227:9 230:4 231:8 232:10 232:13,16 233:3,15,18 235:7,24 237:13,14,15 240:8,12 244:23 247:7 250:15 251:22 254:14,24 255:17,24 257:10,12,15 259:3,19 260:21 266:5 267:2
**Knowing** 172:19
**knowledge** 164:4 165:17 166:23 168:12 234:18 245:22 246:14 247:12
**known** 117:7 255:7
**knows** 86:10 169:11 199:2 205:24
**Korean** 200:6

**L**

**L** 1:21 270:17
**L-A-T-O-N-A** 118:11
**L-O-R-E-N-Z...** 117:6
**L-U-B-I-E-J-...** 130:8
**lab** 54:3
**ladies** 139:2
**Lamb** 4:8 19:2 113:20,24 114:22 115:13 116:5,11,13 117:8,12,17 124:17 126:6 128:2,6 129:6 145:5 147:7,10 149:7,22 150:18,23 158:1 159:4,12 159:13,13 161:4 163:9,16 163:21 166:21 197:12 201:3 219:13 225:10 225:23 227:17 229:1,2 232:18 233:19 234:11 234:14 263:24
**language** 85:19
**Lanzelotti** 1:12 3:12 14:17
**large** 143:21
**larger** 122:1
**LaSalle** 42:17
**lasted** 195:14
**late** 15:15 80:1 95:3 105:22
**Latona** 118:10 119:8,17 126:3 136:3 139:21 147:19 148:10
**law** 1:19 5:18,20 7:8 23:4 49:22 75:14 260:9
**lawsuit** 7:10,12 32:21,24 50:24
**lawyer** 196:21 218:24 222:12
**lawyers** 26:2,6 27:20 120:14
**lead** 77:12,18,22 78:2 135:8 202:4 239:7,19 240:4,4,5 266:13
**leading** 221:2 238:11 239:12
**learn** 182:20 247:16 248:10 248:14 249:8 253:5,20
**learned** 28:8 136:10 212:1
**learning** 28:13 161:15 250:16 250:20,24
**leave** 178:14 195:15,17 263:5
**led** 35:17 193:18 193:21
**left** 46:10 177:9 177:19 224:17
**legal** 67:20 68:4 68:17 70:1,16 72:4 74:8 241:12 257:16
**lengthy** 127:16 158:17
**Lester** 199:22 200:2 201:9 225:20 229:10 231:3,24
**let's** 19:13 24:19 32:13 35:14 36:12 59:9 65:4 74:23 85:18 93:10 96:4 100:10 113:10,11 124:5 127:24 129:15,24 131:4 142:12 157:3 165:7 180:4 184:13 185:3,17 186:13 191:17 195:19,20 196:14 198:18 203:1 205:17 205:19 213:22 214:19 224:5 244:23 254:23 263:3 264:5
**letter** 248:14
**level** 41:19 42:7
**Levi** 125:18
**lie** 140:15
**lieutenant** 1:13 14:18 59:19 60:4
**lieutenants** 59:18 60:11
**life** 46:8
**light** 150:4 159:18 202:16 202:16 206:16 224:1 266:20
**limit** 73:20
**limited** 61:18
**LIN** 1:20 2:4
**Linda** 1:10 3:10 6:1
**line** 58:8,8,16 61:10 63:18 100:15 123:11 123:13 150:7

222:17 229:16 231:21 235:23 235:24 242:17 247:24 252:1
**lines** 101:14 139:3
**list** 78:24
**litany** 8:18
**literally** 72:13 203:20 207:12 255:16
**little** 20:16 22:11 44:1 63:11 72:15 82:10 85:17 88:6 112:17 114:23 123:12 126:21 157:9 227:24 234:10
**live** 47:18 49:3,6
**lived** 48:2 54:13 119:16
**living** 12:6 47:20 47:23 49:12,19
**LLP** 1:20 2:4
**locate** 127:9 130:15 134:3 210:19 236:20
**located** 236:12
**location** 101:9
**locations** 241:2
**locked** 194:13
**log** 82:17 83:17 135:4
**long** 10:16 11:11 39:17 45:15,23 53:6 63:16 65:23 67:15 122:22 153:8 177:10,11
**Long-time** 154:18
**longer** 114:13 157:9
**look** 18:20 19:9 19:23 20:4 21:1,19 26:20 35:22 58:18 82:12 139:1 143:19 150:21 190:7 212:17 213:7,24 214:19 234:6 235:23 239:3 255:8,11 256:16
**looked** 100:2,6 117:1 150:22 207:15 213:1 233:22 234:3 244:10
**looking** 44:12 123:6 211:14 225:16 229:3 244:20 255:7 256:3,9
**looks** 144:17 214:2 240:24 243:10,14 266:5
**Lorenzano** 117:6
**lot** 9:5 44:10 48:18,19,22 54:9 68:23 72:14 91:23 93:12,13 126:17 139:20 146:12 151:24 180:19
**lots** 164:11
**loud** 135:17
**Louise** 253:12 253:14,16
**love** 269:10
**Lubiejewski** 130:7,11,12,13 139:18 153:18
**Luis** 1:11 3:11
**lying** 266:4

**M**

**M-C-G-U-I-R...** 131:10
**M-E-E** 30:1
**Madison** 125:18
**mail** 41:3
**main** 54:8
**maintain** 110:15 217:8
**majority** 53:11
**making** 51:4 62:17 74:5 107:17 242:6 261:23 262:8
**male** 176:13,14
**man** 7:16 19:10 20:3 24:21 32:8 40:7,12 112:8 115:4 125:1 126:20 128:2 139:19 158:22,22 159:1 160:14 168:6,18 219:10 263:19
**Mangoni** 1:7 2:16 12:21,21 13:2 59:14,23 60:3,21 61:11 127:16 170:9 243:10,17 246:8,10 248:12,15
**manner** 33:16
**marathon** 9:9
**March** 43:4 129:6,16 136:11 139:10 140:6 143:6,8 144:3 145:1,13 150:16 151:14 153:19 157:15 157:21 162:16 163:1 196:9 197:22 207:7 217:24 219:6 224:16
**marijuana** 62:15,19
**Marine** 43:7
**mark** 142:18
**marked** 100:3 113:12,14 114:18 116:20 117:24 120:6 121:22 122:21 130:2 142:19 146:16,17 153:5 184:17 208:17 212:10 212:13 224:21 224:22 226:4 228:17,20 240:15
**Market** 3:5 44:23 45:1
**marking** 212:12
**Martin** 109:12 139:19 154:9 186:24
**Mary** 134:1,5,9 134:20,23 135:8 136:17 137:1 209:21
**master's** 41:20 41:21 42:19,20
**matched** 72:16
**materials** 19:9 268:7
**matter** 5:8 56:18 71:9,9 256:14 270:5
**Maurice** 125:19
**Mays** 122:23,24 123:3,4,7,16
**McGuoirk** 131:8,10 138:4 139:4,10 143:2 153:15,19 196:9 197:22 218:1
**McGuoirk's** 216:10
**McNESBY** 1:8 1:19 2:17 5:10 5:21 6:4 50:2 67:5 100:1 101:16,24 109:9 155:17 157:8 185:18 185:20 186:4 186:19 187:19 224:10 229:18 248:5 264:10
**mean** 25:9 70:7 74:18 76:20 77:13 85:21 92:4,5 176:10 202:8 227:24 229:19 241:23
**meaning** 10:6 27:3 97:16 156:8 192:15
**means** 77:18 90:2,5 147:6 232:1 242:9,10 247:14 249:5 270:23
**media** 50:9,19
**medical** 82:19
**medication** 101:6
**Mee** 29:18,23 30:2 34:23
**meet** 10:11
**meeting** 10:16 10:19 177:2
**meetings** 11:1
**members** 49:22
**memory** 173:24
**men** 68:24
**mention** 8:19 157:24 216:2 245:1
**mentioned** 7:17 8:20 16:9 19:20 30:2 37:3 48:8 49:3 49:11 54:20

60:21 72:11 105:21 135:14 143:12 162:12 173:19 192:21 202:19 209:11 209:18 234:17 260:16
**mentioning** 44:8 60:14
**Mercy** 45:16,20 45:23 46:3
**mere** 25:20
**MESSING** 1:19 2:4
**met** 10:13
**Michael** 39:21 40:7 41:3,5,13 109:12 111:3 111:16 127:6 129:22 131:23 132:24 133:5 135:24 136:2 136:10,17 137:9,16,23 139:19 143:13 144:5,14,24 145:14 148:13 148:16 151:18 152:11 154:8 154:10,13 162:10,12 163:3 166:3 169:16 186:24 190:11 192:11 196:5,12,21 199:16,18 200:2 201:6 206:1,13 207:9 207:12 215:23 216:19 218:24 222:12 250:18 250:20 251:15 256:24 260:2
**Michael's** 196:21
**middle** 134:3 199:7
**Mike** 147:13 148:16 150:4
**million** 32:24
**mind** 16:17 87:20 144:23 237:8
**minutes** 9:22 65:4 75:5 146:14 150:12 157:10 177:13 178:10 195:15 203:16 254:3 263:5
**misconduct** 31:17,20 62:6 64:6 71:22 73:4 75:18
**misleading** 104:4,13
**missed** 29:22 242:24
**misspoke** 15:13 45:1 92:4 179:20
**misunderstood** 79:23
**mix** 55:13 204:7
**mom** 251:6
**moment** 23:12 27:1 36:20 37:10 91:5 100:21 102:14 110:10 112:6 117:1 118:6 120:17 122:2,3 122:20 123:9 126:22 132:2 135:15 138:11 142:15 146:20 151:7 155:3 208:22 225:1 228:23,24 244:4 254:18
**moments** 110:10
**Mona** 125:18
**Mondays** 59:1
**money** 17:17 51:5 200:11 261:2
**monitoring** 95:21
**month** 218:18 234:10,13
**months** 82:12 83:2 172:12
**morning** 5:23 10:12,14,16 11:5 139:17 189:19 206:9 207:9
**mother** 136:1
**motion** 62:5,18 64:2
**motive** 116:4 132:3
**move** 50:22 100:4 126:12 127:24 129:15
**moved** 48:1
**moving** 124:22
**multiple** 82:23 146:3,7 167:16 250:17 251:16
**murder** 7:16 16:19 17:5,10 17:11 19:1,4 19:10 20:4 25:4 58:11 63:1 109:13 112:8 113:20 116:11 117:17 117:18,20 118:5 120:22 124:17,17 125:1,11,24 126:3,6,20,22 127:7 128:14 131:21 133:6 143:16 144:5 146:6 147:24 148:6,14,22 149:7,23 150:1 158:1,2 160:14 165:4 168:6 171:18 174:11 179:19 188:19 190:2,16 195:11 196:6 196:15 200:6 201:3,3,3,7 204:7 211:3,10 216:3 219:7,10 219:13 220:21 221:22,22,24 222:8 227:14 232:18 233:19 233:24 234:11 234:14,15 235:6 244:7 245:19 246:16 249:10 250:18 251:6 256:7 263:20,24 264:3
**murdered** 46:18 114:1 128:6,17 128:22
**murders** 25:3 124:15,16 126:9 128:2 145:5 146:13 149:12 157:22 201:12 206:14 206:17 227:21
**Murray** 64:15 64:21,23

**N**

**N** 2:1 3:1 4:1 270:1
**name** 5:2,17 7:6 19:2,5 29:22 35:3 36:13 37:3 39:21,23 41:3 46:19 48:12,13,20 63:14 64:18 77:14 101:22 109:9,10 115:7 121:6 130:10 148:7,16 154:7 155:20,24 159:4 160:20 160:22 163:12 163:15 186:19 186:20 192:21 193:19 201:2,6 201:9,12 203:18 204:7 209:11 210:9 240:18 253:11
**named** 7:18 12:3 13:4 32:8 39:12 111:24 190:20 199:21
**names** 64:15 200:21
**narrative** 122:22
**natural** 170:21
**naturally** 164:20
**nature** 33:24 35:1 43:12 238:6
**near** 118:10
**necessarily** 240:9
**necessity** 184:17
**need** 6:9,19 8:2 9:10 21:18,19 65:1 79:16 88:23 101:12 144:1 150:9 174:18 185:12 189:20
**needed** 54:14 70:23 71:3 93:1
**neglected** 151:9
**neighborhood** 114:9
**neighborhoods** 68:23 230:4
**nephew** 123:20

**Nespoli** 1:7 3:9 14:4 60:22 61:1,6 125:9
**never** 14:16,19 16:20,20 17:13 37:17 39:4 61:3 71:18 76:6 86:18 103:20,23 104:18 110:22 118:15 171:10 183:5,13 184:11 186:18 189:6,8,11,13 189:23 191:4 192:21 193:21 194:4,10 195:10 198:3,7 215:7 217:8,11 217:13,15 251:1 263:17 263:19
**new** 6:16 7:9 15:19,20 47:21 58:10 62:24 201:9 212:12 237:23 239:5
**news** 247:18
**newspaper** 246:15,23 247:9 256:24
**newspapers** 248:7
**nickname** 115:4
**night** 69:11 71:14
**nine** 53:10 116:24
**normal** 261:10
**north** 42:15 45:1 47:21 48:8,17 48:24 66:5
**Northeast** 48:2,3
**Notary** 1:21 270:19
**note** 8:11 20:5 21:22 37:3 101:10 114:23 116:23 120:24 121:12 146:20 147:13,23 148:20 242:6
**noted** 258:7 270:3
**notes** 4:12,16 120:10,17,19 123:23 270:4
**notice** 28:10 176:5
**November** 12:12 12:22 224:19 225:4 231:7,17 233:19
**Now-** 15:19
**NSB** 235:22
**number** 6:10 12:2 21:15 26:16,16,20 40:6 52:4 112:18 113:12 147:23 185:14 216:19,19
**numbered** 19:22
**numbering** 117:22
**numbers** 21:7 147:3

**O**

**O** 270:1
**Oakford** 17:11 125:12
**oath** 8:6,13 215:13
**object** 6:20 8:21 23:17 24:13 27:8 28:2,19 29:2 30:11 31:21 33:11 34:8 40:13 51:6 53:19 56:14 57:7 62:7 64:7 68:6 69:20 70:18 71:23 73:24 74:9 75:21 76:12 81:11 85:22 86:22 98:8 99:4 102:17 105:8 108:20 109:24 111:10,19 115:23 117:13 118:12 131:15 132:14 134:12 135:10 136:21 137:11,18 139:11 144:7 145:11,21 148:1,23 149:15 153:1 154:23 159:6 159:23 161:11 162:21 163:6 163:22 164:5 164:22 165:19 167:1 168:19 170:24 174:4 174:19 176:22 181:5 183:14 186:7 187:10 190:3 191:6 194:6 198:1 216:24 238:14 240:7 243:12 245:8
**objection** 8:22 24:1 29:10 30:15,24 33:18 34:1,13 38:18 39:3 40:19 51:12,20 71:10 80:14 103:10 112:1 116:8,16 132:5 137:3 144:15 150:7 167:6 172:15 183:21 184:4 197:6 198:5,14 201:21 202:21 203:23 204:9 204:14 205:8 206:3,21 207:4 208:4 214:5 219:22 220:13 220:24 221:12 222:3,14,20 223:13,16 227:22 233:2 233:13 247:20 247:24 249:22 250:4,11 251:19,20 254:12 255:20 257:7,24 258:6 258:18 259:1 264:21 265:9 265:21 266:14 266:22 267:6 269:1
**objections** 8:24 270:3
**obligation** 77:5 77:11,21 78:24 81:16,19,24 98:6 241:17
**observations** 74:5
**observe** 94:17
**observed** 145:23 146:1
**obtain** 41:21 42:22,24 86:1 220:10
**obtained** 227:6 229:9
**obvious** 89:7 182:1
**obviously** 64:11 179:3 214:24
**occasion** 90:19
**occasionally** 107:7
**occasions** 127:17
**occurred** 16:19 18:14 61:2 63:1
**October** 115:11 116:11,24 117:10
**office** 26:3,7,23 27:3,21 28:23 30:9 32:17 33:10,17,20 34:6,17 84:4 84:21 85:9 176:3 209:24 218:14 250:10 257:14,19,20 268:10,16,20
**officer** 8:5 46:18 67:11,18 68:13 68:16 69:13 70:17 71:22 72:3
**officers** 66:6 72:22 74:5,7 75:17
**offices** 1:19
**Oh** 83:18 180:16
**Ohio** 70:13,17
**okay** 8:17 9:5,14 9:22 10:13,22 11:11,16 13:8 16:2,13,15,22 17:1,21,24 18:13 19:7,19 20:9,12,21 22:8,12,17,21 22:24 23:12 25:11,20 27:19 27:23 28:21 29:22 35:10,21 36:5,9,20,22 37:8,10,12,23 38:2,22 39:20 41:4 42:10 48:8 51:23 54:16 55:5,15

56:8,11,18
58:10,19 60:4
60:24 61:4
62:21 64:9
65:2 66:13
68:21 79:23
84:6 85:11
87:16 88:18,21
88:24 89:12
91:4 95:2
97:23 101:1
102:9,23
103:16 104:16
105:5,12,15,17
108:8,10 109:4
109:7 110:4,9
111:6,14 112:5
112:16 113:5
113:10,24
114:8 115:2,9
115:15 116:3
117:4,10,17
118:8,9 119:11
120:4,21
121:18 122:4
123:5,8,11,14
123:15 124:4
125:4,17,23
126:9,24 127:4
128:3,16
130:12,21
131:1 132:22
133:15 134:16
135:14 136:6
136:16 138:1
138:14 140:9
141:12,15
143:24 144:19
145:23 146:13
146:22 147:13
148:5 149:3
151:1,8 152:14
153:8,14 154:6
155:3,6 156:15
157:8,20,24
159:18 160:10
161:7,22 162:5
163:1 164:2
165:2,16
166:17 167:20
168:8,14,24
170:6 171:4,17
171:24 172:4
172:11,19
173:19,24
174:18 175:7
175:13,16,23
176:17,20
177:6,10,14
178:4 179:2,18
179:21,24
182:4,10
184:20 185:3,5
185:17 187:8
187:15,22
188:1,23 190:7
190:18 191:10
193:7,20
194:20 196:14
199:1,8 203:7
203:18 206:6
206:16 207:1
207:19 208:13
208:14 209:21
210:5,13,24
211:5,13,17
213:12 214:10
214:15 215:15
215:21 216:2
216:17 222:7
222:11,17
225:2,3 226:6
229:4,5 230:18
230:24 231:10
233:8 234:21
235:2,5,8
236:5 237:22
239:11 240:1
242:23,23
243:7 244:15
244:17 245:12
246:13,14
247:16 251:15
254:17,23
260:6,24 266:9
266:18 268:13
**old** 30:5 46:12
47:14 52:15
129:7,9,12
133:17 138:3
149:12 223:1
**oldest** 49:16
**once** 34:21 45:7
46:15 65:22
83:5,15,18
92:18 95:10
117:10 120:21
123:23 125:23
125:23 129:16
138:1,15
145:13 149:10
157:8 172:5
175:8 184:11
189:18 192:14
207:19 238:9
239:21
**ones** 107:17
**open** 150:18
239:2
**open-ended**
168:1
**operates** 235:9
**opinion** 70:16
154:21
**opportunity**
11:17 138:22
**opposed** 230:7
247:12
**order** 19:10 25:7
49:20 50:5
71:3 200:10
220:10
**orders** 64:22
**orient** 35:17
**original** 30:20
34:3 46:22
268:1
**others'** 222:1
**outlined** 254:20
**outside** 236:15
**overdose** 101:6
177:18
**overheard**
199:13
**overturned**
30:18
**overwhelming**
53:11
**owed** 51:5
**owner** 125:12

**P**

**P** 2:1,1 3:1,1
**P-31** 228:17
**P-31A** 228:19,20
**p.m** 242:9,21
269:12
**packet** 21:10
**page** 4:2 19:14
20:6 21:3,7,8,9
22:2,2,6 26:16
27:1 39:13
85:19 89:9
100:10,20,21
100:23 101:9
101:14 105:12
105:15 106:5,6
106:7 107:20
114:6,23 115:9
119:11 121:12
122:2,6,21,24
123:6 134:4
138:10,12,12
138:24 140:4
140:14 142:14
143:12,19
147:2,6 151:6
151:7 153:11
155:1,2,4,4,5,7
155:11 158:18
160:16,17
184:19 186:12
186:13 187:16
189:18 190:7,7
191:11 198:21
198:22 199:1,1
213:9,22
215:16,17
235:24,24
242:8 244:24
260:4,5
**pages** 20:10
21:13 23:3
101:10,11,12
113:21 114:22
114:24 142:14
185:10 213:23
235:21
**pairs** 39:18
**panned** 77:19
**paper** 32:12
126:17 256:3
256:16
**papers** 26:7
256:9
**paragraph**
115:10 117:3,5
134:3,17 196:4
213:9 215:17
215:19 231:6
261:20
**paragraphs**
210:18
**paralegal** 5:16
**paraphrasing**
141:21
**pardon** 18:23
36:6 146:16
153:17 155:1
174:10 187:22
226:2 233:23
257:19
**parent** 223:5
**Paris** 39:12
**Parkway** 2:12
**parole** 248:11,15
248:23
**parroting** 248:7
**parse** 135:17
**part** 14:12 21:17

50:22 82:13,13 97:20 147:14 170:18 201:19
**part's** 191:15
**participate** 66:22
**participated** 93:13 109:13
**participation** 231:23
**particular** 32:2 33:10 57:5 58:23 91:23 95:5 113:1 168:24 220:9 268:11
**Particularly** 257:7
**particulars** 62:13
**partner** 20:19 20:22 59:8 158:9 167:12 167:14 196:5 211:24
**partner's** 109:10 186:20
**partnered** 53:12 239:22
**partners** 53:3,6 57:1 60:3
**pass** 81:16 174:17
**passage** 31:4 35:11
**passed** 13:24 29:19 38:9 47:19,23 60:8
**passing** 97:13
**pat** 69:2 122:9 150:2 213:20 214:2,22 218:10 227:13
**Patricia** 119:12 119:16,22 121:13,16
122:13,18 123:17,20 128:19 162:12 163:3 166:6 169:16 206:1 210:20
**Patrol** 44:2,2 45:4 62:14 69:14,17 71:8 71:8
**patrolling** 44:12
**pattern** 30:17 34:4
**Patton** 114:5
**Paul** 29:19 39:12 154:7
**pay** 51:11 132:12
**payment** 51:4
**peers** 27:18
**pending** 9:15
**Penn** 44:15,17
**Pennsylvania** 1:1,20 2:13 3:6 5:5 106:10
**Pennsylvnia** 2:6
**people** 38:9 49:6 50:21 53:23 54:9 60:14 69:18 71:9 72:13,20,20,21 74:6 81:6 87:17 88:7,8 92:2 136:16 189:5 199:15 200:22 238:6 241:10 251:8
**period** 16:7 84:11 164:12 164:16 166:20 234:13
**periodically** 226:19
**perjury** 32:2
**permission** 223:5 261:21
262:4
**permitted** 73:11
**perpetrator** 40:8 40:18,24 41:7
**person** 10:23 55:6 63:14 71:4 77:8,10 80:4,24 88:3 88:22 92:12,22 97:17 98:13 104:22 105:2,6 119:22 121:5 122:15 124:1 132:19 141:10 141:17,17 195:2 200:15 227:10 237:16 237:19 249:19
**person's** 251:13
**personal** 1:6,8 1:10,11 3:8,9 3:10,11 247:12
**personally** 90:15
**personnel** 66:11
**pertinent** 267:23
**phenomenon** 237:1
**Philadelphia** 1:6 1:20 2:6,11,13 2:16 3:6 5:9,18 5:20,22 7:11 7:12 8:5 15:23 17:12 29:9 41:24 42:6,16 43:20 46:10 48:2,4 51:11 65:7 66:5,10 66:20 67:10,16 74:21 82:3 106:9,9 114:11 125:24 126:4,7 126:10 128:3 129:17 145:5 161:9 182:2 235:16 257:18 257:20
**Philly** 5:8 44:21 44:24 45:1 157:21 261:17
**phone** 11:4,7,8 11:11,13 181:3 242:14,19 243:4 253:2
**phonetic** 173:14 199:21
**photo** 54:3,4
**phrase** 74:12 75:24 76:20 232:6
**phrases** 84:13
**physical** 73:9
**pick** 85:3 157:14 181:3 261:14 261:16
**picked** 17:16 83:5 127:19 138:6 261:3
**picking** 263:8
**piece** 149:3 256:3,16
**pieces** 264:19
**piecing** 153:14
**place** 9:6 17:6 17:11 61:5 85:4 102:15 110:7 125:24 126:10 131:21 140:5 195:3 241:12 252:20
**placed** 85:14 96:8 203:19
**Plain** 181:21
**Plaintiff** 1:4 2:9 5:14
**play** 216:14
**played** 231:24
**players** 202:19
**pleading** 248:15 248:24
**Pleas** 106:8
**please** 37:1 113:11 125:1
158:2 195:21 269:8
**plus** 130:17
**Poconos** 48:19
**point** 9:8,10 23:24 40:5 42:1 46:10 57:2 98:12 142:24 151:1 163:1 167:15 172:8,14 222:11,23 223:1 246:11 246:12 252:2 254:23
**pointed** 79:4
**pointing** 250:17
**police** 7:11 8:5 15:23 29:9 41:10,24 42:3 42:7,11 43:3 43:16,20,22 46:11,18 47:2 50:5 65:7 66:6 66:11,20 67:11 67:16,18 68:3 68:24 69:3 70:9,17 73:6 74:8,21 75:17 79:8,10 82:3 87:4 91:15 94:7 113:4 115:10,16,19 115:20 116:3 116:12 117:11 127:9 128:9,12 128:19 129:17 129:21 131:20 136:14 137:10 145:14 148:12 150:16,21,22 151:3,18 152:4 152:7,10,22 157:1,16 161:9 161:18 163:2 163:19 164:3

164:20 165:13 172:4 181:18 182:2 184:15 196:5,20 197:5 197:20 201:20 202:17 205:24 207:19 218:7 218:15 235:16 246:5 247:17 251:1,16 261:21
**polygraph** 63:6 91:20 92:3,5,6 92:7,11,15,18 92:19,23 93:4 93:10,18,22 94:3,6,17,19 94:24 95:2,10 95:12,15,24 96:3,14 97:1,7 97:8,9,13,16 98:4,11,13,21 99:17,22 140:21 141:1,2 141:6,7,13,19 142:1,2,5,9 249:8,17,19 250:2,9 256:23
**polygrapher** 92:19 94:6,7 94:12
**polygraphs** 92:1 92:2 98:2
**popping** 160:22
**portion** 26:22,22 107:22 143:21 191:10
**portions** 21:19 85:4 142:23
**position** 103:24 104:3,12 105:3
**possession** 77:4 80:7 117:19
**possibilities** 221:20
**possible** 58:1 207:2,21 208:2 256:1
**Possibly** 176:19 266:8,16
**potential** 73:4 127:7 137:22
**practically** 188:2
**practice** 80:2,12 88:18 135:3 136:18 140:24 141:15 142:2 172:4 223:11 223:17 252:17
**practices** 168:11
**precautions** 88:2
**precipitated** 128:14
**preliminary** 232:19,24 233:5
**prepare** 10:3 11:18 19:10 83:15
**prepared** 20:2 20:17 39:12 78:17,23 83:11 84:24 95:19 125:20 130:7 130:13 143:2 158:9 214:2,4 214:11 215:6 233:23 234:17 254:9
**prepares** 239:14
**preparing** 11:9 172:9 234:22
**presence** 236:15
**present** 3:15 10:18 22:12 230:16 231:15
**presenting** 106:23
**presently** 209:9
**presentment** 226:14
**presents** 164:20
**preserving** 9:1
**pressure** 189:8
**pretty** 53:15 155:20
**previous** 37:4 127:17 151:17 157:12 203:7 224:1,11
**previously** 100:3 109:10 161:1,4 184:17 186:22 196:4
**printed** 100:5
**prior** 75:6 84:6 236:23 240:1,3
**priority** 52:18 52:18,24
**prison** 35:18
**private** 39:12
**probable** 4:15 20:2,5 25:9 35:23 56:9 68:17 71:1 78:18,23 79:17 118:4 125:20 143:2 158:9 213:7,23 214:2 214:3,11 215:1 215:22 216:18 234:18,23 239:15 244:10 244:17 254:10 254:21 257:5 264:15 265:7
**probably** 50:1 78:21 87:19 96:19 108:4 109:1 231:11 236:2 239:8,10 261:6
**problem** 241:13
**problems** 66:7
**proceed** 6:7,16
**proceeding** 8:22 226:17
**proceedings** 227:3 270:3
**process** 65:8,12 93:24
**processors** 214:18
**produce** 107:12
**produced** 120:16 233:5
**Professional** 1:21
**professionalism** 189:5
**profile** 52:24 82:9
**project** 114:4,11
**promoted** 44:4 45:7
**pronounce** 130:10
**pronouncing** 155:24
**property** 48:16 48:22,24
**prosecute** 32:17 38:23 78:1 80:24
**prosecuted** 7:14 15:18 17:6 57:21 86:15
**Prosecuting** 34:14
**prosecution** 20:23 32:2,7 76:24 78:14 80:8 81:20 82:1 84:21 236:11
**prosecutor** 77:22 99:9,23 106:17 107:8 108:17 236:22 257:22,22 261:7
**prosecutors** 14:20 99:10,14 107:17 257:19
**provide** 58:16 78:10 146:2 258:12,23
**provided** 4:24 81:16 84:4 120:14 123:16 138:20 143:22 144:2 146:12 148:21 246:15 250:9 259:20 268:17,23
**provides** 118:5
**providing** 35:10 38:8 247:11 249:16
**public** 1:21 41:20 42:19 44:16 270:19
**pull** 150:23
**pulled** 55:22 62:14 83:19 113:19 120:10 120:13 126:19 149:12 208:21 229:1
**purpose** 9:1 35:13 82:6 83:10 91:12 92:15 107:11 178:18 180:23 224:20
**purposes** 11:9 37:24 101:11
**pursue** 77:12 82:1,13,13
**put** 6:9 7:3 16:16 52:19 54:4 83:20,21 96:12,22 97:1 114:15 116:18 118:3 121:18 123:11 124:24 139:24 142:17 151:9 179:10

192:18 193:22 212:9 219:3 229:23 230:6 235:20 238:5,7 239:18 267:22 267:23
**puts** 204:6
**putting** 79:21 91:6 182:10 220:19 229:24 230:1

## Q

**quad** 63:18
**qualifier** 119:1
**qualifiers** 9:14
**question** 8:23 9:15,16 15:9 23:14 25:12,16 41:9 50:11 54:21 61:4,5 79:24 97:24 99:8 101:15 102:2,4 103:1 103:3 107:24 108:5,9,13 109:7 118:18 134:19 140:14 144:2,11 154:6 159:7 165:20 170:7 173:14 174:15 175:18 185:19,22,24 186:3 189:21 191:7 198:22 203:24 204:4 205:7,17 206:22 208:8 211:20 217:1 218:22 219:23 220:14 221:16 230:6,11 235:8 247:21 249:5,9 249:13,20 250:3 253:7 254:18 258:1 259:23
**questioning** 6:21 33:5 138:16 150:8 203:22 211:22 247:24
**questions** 18:8 20:8 21:18,20 41:17 54:22 55:1,6,10 75:9 89:6 92:20 100:22 108:2 120:18 131:6 131:12 139:3 139:16 144:12 146:7 164:11 167:22 168:10 177:20 184:18 185:11 191:22 199:6 220:2 222:8 246:4 264:11 267:10 267:15,18 269:4
**quick** 142:24
**quickly** 120:17 184:22 207:2 207:20 208:2
**quiet** 230:3
**quieter** 187:19
**quite** 13:13 145:18
**quote** 151:24

## R

**R** 2:1,11 3:1 270:1
**race** 94:10 176:15 182:7
**raise** 57:18 222:1 247:2
**ran** 147:19
**Randall** 64:18
**Randolph** 64:19
**range** 147:6
**ranges** 49:16
**ranks** 43:20
**Ransome** 39:21 40:7,18,24 41:5,13 127:6 250:18,20,24 251:15 256:24
**Ransome's** 41:3
**rape** 120:2 123:21
**raped** 119:22 121:15 122:14 123:18 136:1
**re-read** 185:12 189:20 190:19
**reached** 47:7
**reaches** 76:8
**reaction** 28:13 38:16,20
**read** 10:4 12:18 16:9,10,11,16 20:7,10,16 22:1,18 23:22 27:1 32:12 36:5,7,15,20 37:10 38:5 39:16,18 41:2 56:6 83:5 97:7 100:20,21 101:12 102:14 107:22 108:5,6 108:14,14,17 109:1,5,8,16 111:6 113:21 114:22,24 117:1 118:6 122:3,12 123:10,12,24 124:11 125:1 126:22 127:1 131:1 135:16 136:4 138:5,12 138:20 139:1,5 139:22 140:9 142:22 143:20 144:1,22 146:20 147:13 147:14 151:7 151:17 153:10 154:6 155:4,10 158:18 184:21 185:10,17 186:12 187:3 187:16 189:18 189:19 191:10 191:12 198:13 199:5 208:22 215:15,19 225:1 228:23 235:23 237:7 238:24 244:23 246:22 260:5
**reading** 20:1,12 21:13 35:21,24 36:10,23 100:23 102:1 109:8 111:5,8 113:22 120:19 125:4 130:6,22 130:23 131:12 139:8,9,16 140:1,14 146:23 151:12 183:11 186:14 199:9 228:24 260:1 261:18
**reads** 139:16 247:9
**ready** 172:5 261:11 262:11
**real** 48:16,22,24 115:7 121:6
**realize** 75:5 100:4 134:18 157:11 174:14 224:11 255:22
**really** 14:16 22:15 38:20 46:17 57:9 61:13 69:5 70:6,7 88:20 115:17 177:9 187:18 261:10 268:12
**reason** 9:24 18:10 23:1 39:14 81:14 89:21 90:9 104:9,10,18 141:5 148:20 162:2,4 172:13 174:16,21 175:2 181:2 196:17 206:6 218:21 227:5 243:21 249:20 251:12 257:4
**reasonable** 70:24 71:2,4 72:20,21 74:5 74:6
**reasons** 61:19 76:24 89:1 92:10 132:20 137:16 248:18 249:5,13 250:3 252:13 253:22
**rebut** 30:20 31:3
**recall** 17:21 18:17 20:21 22:12,21 23:6 23:13 35:9 36:16 39:23 40:5 41:9 44:14 47:4,5,7 56:10,11 64:1 64:15,18,21 66:13 67:9 68:7 70:23 90:21 91:4,6 91:15,21 93:5 93:20 95:18 96:11 99:21 110:4 111:23 112:7,12 122:17 125:19 129:19 140:6 145:3 149:22 157:16,18,20 161:24 171:16

175:12 176:24 177:21 180:18 181:16 184:6 184:23 190:18 190:24 196:23 199:23 203:12 211:11 216:2 218:15,21,23 220:5,5 224:17 225:16,18,22 226:16 243:16 244:6,20 250:16,20,24 253:1 260:1,11 261:18 262:23 267:18
**recalls** 161:18
**receive** 66:19,24 104:12
**received** 10:4 23:4 28:10 41:2 225:10 254:15
**receives** 258:22
**recess** 75:1 157:5 224:7,11 264:7
**recollection** 18:8 20:12 22:9 56:16 91:10 93:6 110:17 112:6,20 131:2 152:14 172:20 177:23 179:14 188:8 210:15 211:17,21 217:5 243:7 262:10
**recommendati...** 18:11 107:13
**record** 5:1,3 6:9 7:4,6 8:21 9:2 19:21 23:22 74:23,24 75:4 82:15 97:6 103:10 108:18 109:2,5 113:16 116:9,16 138:5 139:8,9 140:2 140:10 150:8 151:10 157:3,4 183:11 186:15 204:5 224:5,6 224:10 241:5 264:5,6
**recorder** 241:22 242:1
**recording** 55:6 242:4
**recovering** 193:5
**refer** 21:7 100:7 114:15 241:2
**reference** 19:22 36:3 37:4 39:21 40:2 41:4 101:1 115:4,6 119:12 120:13,24 122:23 134:1 134:16 135:7 135:15 136:24 147:23 148:20 156:3 161:17 175:17 209:7 210:18 213:10 216:12 220:6 225:6 242:21 245:21 256:23
**referenced** 106:20 143:5 200:15
**references** 143:1 160:10 215:23 226:13 241:22
**referencing** 37:14 216:18
**referred** 83:24 175:19
**referring** 17:18 59:24 139:2 155:21 186:4
**refers** 215:15
**reflected** 96:18 189:23 190:15 190:21
**refresh** 18:8 20:12 22:9 110:17 112:6 112:19 131:1 152:14 172:20 210:14 211:17 211:21 217:5 243:7
**regard** 128:1 137:7 149:22 150:1
**regarding** 88:18 111:2 113:20 114:21 118:5 135:14 192:11 216:21 219:7 227:3 264:19
**Registered** 1:21
**registration** 54:12
**regretted** 262:1
**reinvestigation** 26:4
**related** 19:17,17 50:2 91:16 158:12
**relates** 143:21
**relation** 50:7 232:18 268:19
**relationship** 53:17
**release** 35:18
**relevant** 21:18 142:23
**reliability** 81:15 81:24
**reliable** 81:21
**reliable-type** 63:3
**reluctant** 230:13
**relying** 25:7,17
**remain** 6:11 44:5
**remember** 13:16 16:6 17:8 19:2 19:5 35:24 36:2 41:13 60:15 62:13 63:14 66:2,4 75:12 90:19 112:13 147:10 148:5 149:23 153:15 156:15 156:23 159:10 159:15 161:15 161:20 167:21 168:2,5,8 173:3 176:13 176:15,21,23 182:4,7 183:2 186:13 187:20 207:8 210:2,5 220:2 227:2,14 231:19 234:22 235:1 253:8 260:24 261:9 261:14,16 263:15
**remembered** 155:17
**remind** 35:22 83:8 217:22
**repeat** 33:13 165:7 184:18 186:13 205:19
**repeating** 97:24 104:7 163:18
**repeats** 117:6
**report** 71:22 72:8,9,15,22 73:1 74:19 96:15
**reported** 247:18 253:3
**reporter** 1:21 4:24 9:21 40:21 113:15 114:19 116:21 118:1 120:7 121:23 130:3 142:20 146:18 153:6 174:7 191:8 208:18 212:14 224:23 226:5 228:21 238:19 240:16 257:9 269:7,9 270:18,24
**reporter's** 4:5 37:24
**reporting** 260:9
**represent** 5:12 5:14,21 7:9 22:24 106:4 127:15 129:2 171:17 190:18 190:19 197:10 232:17 254:6
**representation** 127:22 129:4 147:1 190:22 254:11
**representations** 21:19 153:9
**representative** 1:6,9,10,12 3:8 3:9,10,11
**represented** 6:13 7:22
**Representing** 2:9,16 3:8
**REPRODUC...** 270:22
**request** 17:15 120:15 156:4 176:21 179:7
**required** 51:11 66:24 68:17
**requires** 230:16
**respect** 227:20
**respects** 247:18
**respond** 177:20
**response** 16:8 31:1 59:12

**responsibilities** 52:13
**responsibility** 71:21 238:11
**responsible** 51:4
**rest** 190:20
**restate** 31:8 118:18 144:11
**restatement** 121:14
**result** 76:10 95:21 97:9 177:2 226:21
**resulted** 29:7
**results** 96:17,22 97:1,7
**resurface** 34:2
**retained** 5:3
**retaliation** 120:2 225:23
**retire** 15:23 46:3
**retired** 42:3 45:11,13 84:7 239:21
**retirement** 16:7 44:6 47:2,10 80:2 85:13 235:16 240:3
**retract** 151:2 152:7 155:14 156:5,8,17,20 192:11 197:5
**retracted** 196:20
**retracting** 156:24
**reveal** 78:7
**review** 9:7 17:4 22:8 52:15 125:21 130:19 131:4 138:22 158:8 191:17 191:19 229:7 263:3
**reviewed** 16:14 124:15 128:1 129:20 148:5 148:19 186:14 201:17 211:5 256:22 257:21 264:18 265:13 265:19
**reviewing** 215:7
**reward** 200:11 220:10
**ride** 261:9,10 262:22
**right** 9:24 11:22 11:23 12:5 13:24 15:1,16 16:5,19 21:8 21:13 22:14,23 23:5,10,11 24:18 26:14 27:5 32:15 33:22 34:19 36:1,12,17,24 38:11,16 39:7 40:4 41:6,16 43:16 44:22 45:2,7,8,9 46:1 47:13 49:4 52:3 53:13 54:10 55:24 56:20,23 58:15 58:18,22,22 59:15 62:4 64:13 67:3,4 67:12,15,21 71:1,19 72:11 73:10,13,16 75:4 76:14,16 77:19 78:17 81:2,5,22 82:23 83:3 85:10 86:7,12 86:18,19,21,23 87:4,22,23,24 88:17 89:20,24 91:2,19 92:23 93:10 95:14 96:7 97:13,15 98:24 101:8 103:8,21 104:1 105:12 106:2 106:21 107:10 107:18,20 108:3,13 109:2 109:6 111:4 112:10 114:13 114:14 115:21 119:5,7 124:10 124:19 126:12 127:14,21,24 129:1,15 134:1 134:10 135:6 140:4,24 141:19,22 142:8,12 144:20 149:20 150:2 151:9,12 152:20,23 155:3,11 158:16,21 160:1,5,8,17 160:19,20 161:2 162:4,13 162:20 163:13 163:16 164:12 165:11,24 166:4,7,11,19 166:24 167:5 167:10,13,18 167:24 168:24 169:9,13,16,17 170:16 176:1 176:11 178:12 179:4 180:9 181:10,20 182:2 183:19 184:13,15,21 184:21 189:14 189:17 191:18 192:5,23 193:2 193:8,11,12,13 194:2,10,13,14 194:15,24 195:1,3,4,5,17 196:8,12 198:3 198:18 199:13 199:16,19 200:24 201:9 201:13 202:2 203:10,14,16 205:7 207:17 207:21 208:11 209:13,16 212:22 213:18 213:20 214:20 215:1,4 216:12 217:17,24 218:2,4,8,9 220:2,11 221:3 221:8,22 222:13 223:24 227:15 228:8,9 228:12,14,15 231:5,16 233:17,21 234:3 235:12 235:15 236:24 237:3,6 239:15 239:19,23 241:15,16 242:19 243:2 244:13 245:3 247:13,15 249:17 251:11 252:3,6,17 253:9,21 254:22 255:9 255:12,14 256:17,20 258:16,17,23 259:22 260:19 263:7 264:4,10 265:15
**right-hand** 241:23
**rights** 32:20,23
**rise** 260:14
**risk** 89:18 90:11 104:12 105:1
**robbery** 7:15 72:15
**Robby** 123:4
**Robins** 15:18,20
**Rocca** 1:6 3:8
**Rock** 48:18,20 49:1
**Rocks** 1:10 2:17 12:9,9,11,16 61:15 127:17 253:2,14,16
**Rocks'** 12:19
**Rodney** 35:19 36:3,6 40:2 158:4 165:10 168:24 169:2 170:8 204:6 205:22 207:23 218:3 245:7 253:2,8,11
**role** 55:5 237:9 239:7 255:24
**roles** 231:24
**room** 241:2
**Rosen** 14:22,22 14:24 23:22 105:21 106:17 106:22 108:1 109:8,19 111:8 138:16,19 139:1,8,9,16 140:1 176:17 183:11 186:14 187:3 198:12 229:18 261:7
**Rosen's** 108:9
**roughly** 52:11
**route** 230:18
**routinely** 69:18
**Roy** 60:17
**RPR** 270:17
**RUDOVSKY** 1:19 2:4
**rule** 68:4 88:7 88:11,13,15,16 90:14 241:18
**rules** 67:17,20 68:4 69:3 70:4

73:5,14,18,20 73:21 74:8 87:4 93:3 236:23
**rumor** 115:12 117:7
**rumored** 159:11
**run** 54:3 58:13 60:22 80:23 81:8
**running** 82:17 83:17 135:4

S

**S** 2:1 3:1 4:7
**safety** 41:20 42:19
**Santiago** 46:17 46:20
**satisfy** 241:17
**Saturday** 59:3
**save** 39:17
**saw** 22:20 29:18 41:3,4 72:3,12 118:15 125:18 182:12 189:13 207:17 210:14 245:2
**saying** 24:7 28:15 38:1 47:12 56:12 69:18 71:7 81:8 89:12 103:4,12,16,19 133:10 134:9 140:14 141:17 149:8 169:23 170:1 186:9 187:4 193:21 204:22 221:7 222:7,9 238:13 238:20,22 247:8 266:18 268:3
**says** 37:16 81:3 100:15 103:15 106:8 109:8 115:14 133:5 133:16 139:1,3 146:5 147:3,16 154:7 155:2,13 155:15 156:7 156:10,11,14 158:21,24 165:10 166:3 178:12 185:6 185:16 186:19 187:24 190:10 192:3,5,7,18 192:19,21,22 193:1,2,3,7,9 196:4 197:2 198:22 209:4 220:20 222:7 229:16 231:6 231:22 239:17 242:16 253:8 253:17
**scared** 261:24
**scene** 21:14 40:3 124:15 138:13 150:15
**school** 42:9,15 42:16 43:6 44:15 210:6,8
**schools** 44:11,12 44:14,16
**search** 4:11 118:4 267:24
**seat** 62:15
**second** 8:21 9:19 15:18 16:2 17:16 21:1 100:15 105:15 114:6,23 115:9 117:3,5 119:11 121:12 124:8 143:11,19 155:10 158:18 189:15 213:9 215:17 231:6 235:14,18 236:10 244:24
**second-to-last** 134:4 213:9,22 215:16
**section** 44:18 215:15
**security** 45:14 45:21
**see** 17:14 22:17 22:19 26:14 27:2 29:14,17 29:18,19,19 30:4,17 34:4 35:19 37:4,13 37:19 39:21 40:3,10 52:15 54:13 62:16 66:9 68:4,12 68:16 69:1,9 72:16 73:17,21 74:7 77:19 90:21 99:3 100:16 101:1 101:14,16,22 106:8,10,12,17 106:19 107:24 108:4,5,8,11 108:14 114:1,5 115:3,6,10 118:13 119:12 119:14,17 120:2,24 121:1 121:12,14 122:23 123:1 125:6 128:22 134:1,6 135:17 135:18 139:5 139:22 140:13 140:15,18 143:20 147:4 147:14,17,19 149:12 152:1,5 152:12 153:12 154:12,14 160:11 161:19 161:24 162:3 171:10 175:23 177:17 178:4 182:18 186:20 187:20 188:3 190:12 197:2 197:11,16,20 198:21 199:11 202:13 209:2,7 210:13,18 211:4,13 213:9 215:17,22 225:3,7 226:14 236:6 237:3 238:24 240:18 241:22 242:21 242:23 246:11
**seeing** 17:8 36:2 36:16 38:16 41:9 64:22 67:6 93:5 95:18 125:19 129:19 159:10 159:15 161:20 161:22 183:2 184:23 199:23 211:11 218:16 220:5,5
**seek** 80:4 98:5 237:19 249:17
**seeking** 79:5 143:13 218:10 225:18 244:6 255:8
**seen** 10:22 18:9 23:2 38:4 40:17,23 75:14 75:17 76:3 91:23 105:18 108:16,18 128:6 146:4 148:13 149:19 159:4 161:8,17 162:6,16,18 196:8 204:18 216:15 219:5 227:12 232:23 233:4,4,10 236:17 257:2 266:20 267:5
**sees** 185:8
**sell** 48:6
**sense** 84:13 149:10
**sent** 84:20 123:6 248:14
**sentence** 134:4 188:1 231:21
**separate** 268:5
**September** 114:1 120:24 128:6 129:7
**sergeant** 13:8 14:14 60:9
**series** 246:4
**served** 235:4 236:12
**services** 50:12
**set** 21:14 92:20 100:20 124:15 138:13 142:5 150:15 168:10
**setting** 8:9 104:22 233:17
**settled** 32:23
**seven** 13:17 49:13,14 57:2 246:10 248:2
**sex** 182:7
**share** 85:8
**shared** 78:14
**Shearer** 1:21 270:17
**sheet** 4:9,10,14 4:18,20,22 83:6,13,15 96:23 114:21 115:11 116:24 124:23 125:2 126:19 127:2 130:7,12,16,19 131:7,20 135:1 208:14,21

211:13 212:5 212:24 216:10 225:3 229:13 229:14 231:22
**sheets** 82:4,7 83:11 84:3,7 85:12
**Shelley** 15:18
**Shelton** 59:19 59:20 60:4,6
**shift** 58:23 59:2 59:2 72:13
**shooter** 117:8,12 159:12 253:4 253:24
**shooting** 24:21 40:12 81:4,7 109:11 111:24 116:4,5 125:7 125:11 159:1 186:23 217:20 225:23 245:2 253:17
**shootings** 44:11
**short** 35:22 38:7 91:19 121:6 178:21 224:11
**short-circuit** 246:9
**shorter** 102:4 185:24
**shot** 40:7 115:13 116:13 124:1 158:22 159:12
**shots** 66:8,10
**show** 19:7 21:15 26:11,21 35:11 35:16 39:10 76:22 98:21 106:4 112:5,18 113:1,7 114:16 117:19 120:4 121:18 124:6 126:12 127:6 129:24 138:7 142:13 146:15 153:3 176:7 183:1 198:19 208:14 224:20 226:2 228:16 234:6 235:13 235:20 240:14 246:9 256:10 259:24
**showed** 56:19 159:11 182:23 182:24 207:8 207:17 216:9
**showing** 18:24 19:15 23:1 39:13,14 106:6 115:18 118:19 118:22 122:17 158:16 159:15 246:10 260:4
**shown** 41:1 184:19 206:9
**shows** 123:17 160:13 183:11 184:14 185:13 211:8,14 241:1 260:7
**SIC** 231:8,8
**side** 121:18 142:17
**sign** 94:5
**signature** 20:16 215:10
**signed** 36:6,14 214:24 215:7 215:23 216:17 232:8,10,14
**significant** 145:17
**silence** 74:13,15 74:20
**Silva** 1:11 3:11
**similar** 247:17
**single** 68:10 90:19 91:7 256:3,16
**Singleton** 134:6 134:10,16 135:14,16,21 136:10,18 137:7
**singular** 25:4
**sir** 6:8 7:3,20 8:11,15 9:3 15:9 16:9 19:13 20:10 21:13 22:6,19 24:19 26:14,19 26:21 27:2 30:2 35:10,16 35:19 36:10 37:23 38:4 39:11 40:3 41:16 47:14,18 50:9,23 62:4 65:2,7 67:9,15 75:4 76:16 78:17 80:21 85:16 91:19 100:11,23 101:18 105:13 108:19 109:16 112:10,23 113:18,18,18 113:22 114:21 115:3 116:18 116:23 117:3 118:3,9 120:9 120:12,19 122:1,5,20 123:5,10,15 124:12 125:4 127:5,15 128:16 130:5,6 130:22 131:12 138:1,15 139:22 142:15 142:16,18,22 150:10 151:7,9 153:8 154:12 155:7 184:17 191:15 195:23 197:10 199:9 208:16,20 224:21 225:1,3 226:9 228:16 228:23,23 229:7 235:15 236:2 240:18 240:19 242:21 243:19 244:21 246:5 248:18 249:2,15 250:1 251:24 253:1 254:18 263:2 267:9
**sister** 200:18 201:11
**sit** 78:6
**sitting** 24:19 56:13 60:15 94:1 142:8 214:10 227:2 259:19 265:6
**situation** 34:16 55:9 87:23 88:1 116:12 133:15 141:24 164:3 168:14 233:9
**situations** 56:1 145:23 164:2
**SIU** 52:10,14 53:9,11 58:7 58:24 59:5,14 59:16,17,21 60:9 170:11,13 170:22 231:10 235:10 237:21 237:22 238:9 238:23 239:4 252:2 255:2
**six** 57:2 59:11 60:15 213:3,3 241:10,11,12 266:10,21 267:5
**six-hour** 241:18
**skim** 120:17
**skip** 101:11
**slightly** 80:21 87:8
**slow** 55:2
**smaller** 59:6
**Smith** 59:21 62:16
**social** 50:9,12,18
**sociology** 42:17 42:18
**sole** 144:4
**solve** 52:17 82:12
**somebody** 54:1 54:2,5 66:7 77:14,14 82:10 199:21
**Somewhat** 265:1
**son-in-law** 49:8
**sorry** 17:9 26:15 28:3,20 31:8 37:23 38:2 48:14 64:8 69:22 76:13 79:19 89:6 92:4 117:21 159:24 169:20 175:17 193:15 194:20,21 195:24 205:12 205:17 210:7 238:21 247:22 261:15 263:22
**sought** 227:10 237:16 245:14 254:9
**sound** 59:15 111:3 180:4 239:23
**sounds** 11:20 23:6 27:23 34:18 54:16 56:18 72:11 93:12 134:8 223:21 230:24 247:8 263:2

**source** 247:12
**South** 1:20 2:5 17:12 114:11 125:24 126:4,7 126:10 128:3 145:5 157:21
**Southwest** 44:21
**speak** 8:2 13:19 14:1,11 129:21 133:4 164:3 165:2 177:14
**speaking** 17:21 112:7,13
**speaks** 254:19
**special** 52:10 83:16 88:2
**specialty** 255:14 255:16
**specific** 21:3 22:22 44:18 67:2 79:4 87:16 88:2,7 130:15 143:1 180:3 233:8 238:10
**specifically** 51:23 59:9 155:17 174:24 200:15 252:22
**specifics** 184:13
**speculate** 221:15
**speed** 158:2
**spell** 29:24 35:3
**spelled** 155:20
**spent** 44:2 246:10
**spoke** 12:15 13:1 13:5,9,16,23 14:5,7,15,16 14:19,24 15:19 47:5 123:20 155:16 156:7 157:16,18,20 174:1 185:14 195:10 207:9 211:1 246:16 253:2
**spoken** 11:4,23 12:7,13,23 13:10 15:7,10 15:15 99:10 202:18
**spread** 54:4
**spring** 113:2 129:1
**squad** 52:9 58:8 58:9,17 59:5 61:10 63:18 252:2
**squads** 52:5,7
**Square** 3:5
**Squirt** 115:4,12 117:7 121:1,5 123:21 124:1 149:23 160:10 160:13,18 188:3,5,18 190:1,11,15,20 191:2 192:11 192:19
**Squirt's** 115:7 192:21
**St** 42:2,19 45:14
**stack** 122:1
**stamp** 147:3 155:2
**Stamps** 235:22
**stand** 6:22 148:20
**standing** 247:23 251:20 258:6
**stands** 15:15 224:2
**start** 19:14 20:1 21:13 35:21 43:3 100:8 113:10 117:20 130:5 146:6 165:7 184:19 193:20 199:6
**started** 16:2 42:6 43:16 44:8 82:9
**starting** 43:6 150:22
**state** 187:17 255:23
**stated** 135:22 139:18
**statement** 4:17 21:23 22:18,18 22:22 23:2,7 23:16,22,24 24:10 27:7 36:3 88:23 89:3 97:3 101:15 102:10 102:15,23 103:5,14,20,23 108:14,18 109:2,5,8,9 110:5,5,7,11 130:14,15,17 131:14 132:13 132:19 133:23 134:2 135:1 137:17 138:4,4 138:21,22 139:2,9,17 140:1,5,9,14 143:5 152:4,8 152:19 153:10 153:19 154:4 154:11 155:14 156:5,9,12,18 156:21 158:4,8 158:17 160:4,7 160:10 183:1 183:12,20 184:1 185:18 186:3,17,19 187:3,18 189:22,23 190:15 192:1,8 192:11 196:1,4 196:9,22,23 197:5,22 198:7 218:3,14 219:1 219:3,20 231:23 232:3,7 232:8,10,14 233:1,11 245:7 248:11 251:1,5 251:13 263:17
**statements** 23:20 39:14 40:17,23 55:3 151:18 156:24 171:11 247:17 261:23 262:8 265:5
**States** 1:1 5:4 43:7
**stating** 26:8 102:10
**stationed** 94:7
**status** 104:23
**stay** 45:15,23 50:20 193:2 194:22
**stayed** 84:7,17
**Stenographic** 270:18
**step** 212:2
**stop** 8:23 26:19 68:16 69:1,5 69:18 70:1,8 70:10,20 71:9 117:3 196:6
**stopping** 72:20
**stops** 68:22 72:12 74:5
**store** 125:12 200:6
**stories** 31:5 35:11 38:8
**story** 62:17
**street** 1:20 2:5 2:13 3:5 5:7 43:24 44:23 72:4 115:12 118:10 119:9 119:17 231:12
**streets** 17:11 53:21 125:12
**strictly** 93:6
**strike** 34:21 57:4 71:20 77:17 95:11,23 96:3 98:10 99:1 104:9 107:16 110:9 121:13 145:24 153:16 171:4 182:10 203:11 208:13 210:13 225:17 232:13 240:2 240:13 241:1 243:20 245:12 246:21 256:7 258:20 260:16 266:19 267:2
**stuff** 55:3 230:4 254:15 268:1
**style** 57:5 63:10
**subject** 246:7
**submitted** 26:7 26:23
**subpoena** 175:8 175:11,11,13 175:17,19,24 230:15 236:12
**subpoenaed** 175:1
**subpoenas** 107:16
**sued** 67:10
**suffice** 112:13
**sufficient** 70:1
**suggest** 92:4 232:7 249:2
**suggesting** 31:4
**suggests** 214:15
**suicide** 101:3,5 103:13 151:21 151:23 156:12 185:1,7 187:6 188:14,17
**suing** 50:24
**Suite** 1:20 2:5

3:5
**summarize** 6:22 128:1
**summary** 39:18 76:8 191:19
**Sundays** 59:1
**superiors** 79:8
**supervised** 60:11
**SUPERVISION** 270:24
**supervisor** 72:8 72:9,22 73:1
**supervisors** 79:8
**supplied** 158:13
**support** 25:18 58:8,16 79:22 84:21 196:8 209:24 213:8 265:7
**supports** 76:21 80:3
**supposed** 72:5,7 95:23
**suppress** 62:6,18 64:2
**suppressed** 63:8
**sure** 5:13 19:16 32:13 33:15 37:24 85:18 88:2 89:9,12 90:4 104:2 108:24 140:18 141:23 154:18 164:7 174:18 177:22 191:19 204:5 236:19 248:1 251:21 256:14
**surprised** 203:1 205:2,7,10,13 205:14
**surprising** 181:12
**susceptible** 105:7
**suspect** 40:8 73:12,23 78:1 78:2,3,4 79:4 81:4,7,9 91:20 92:7,21 94:14 94:14,20 98:22 116:14 127:7 128:10 149:23 160:5 165:4 184:9 189:9 204:12 205:21 207:24 233:6 240:23 241:6 250:17 251:4 251:15 252:8,8
**suspect's** 97:2
**suspects** 73:6,14 126:13 146:13 150:2 255:8
**suspicion** 70:24 71:2,4 72:20 72:21 74:6,6
**suspicious** 137:17
**sustained** 66:17
**swearing** 215:3
**sworn** 6:2,5
**synopsis** 82:10
**system** 117:22

**T**

**T** 4:7 270:1,1
**tab** 19:22,23 26:14,16 35:15 35:15 36:12 39:11 113:11 117:21 121:20 129:24 146:15 195:23 208:15 226:2 244:20
**tabs** 19:21
**tactics** 97:21
**take** 9:7,16 15:14 16:18 20:4,6 21:1,4 22:4 23:8,9,19 27:1 32:1 36:20 37:10 39:17 42:10 45:18 58:19 63:5 65:5 82:11,22 86:6 88:2 92:17,18 92:22 94:3,5 94:14,19 100:21 101:13 102:23 103:20 103:23 110:11 117:1 118:6 120:17 123:10 124:14 125:17 126:16,22 130:18,18 140:15 141:1,2 141:6,18 142:1 144:1 146:20 151:2,7 152:8 152:19 181:18 191:24 192:8 208:22 212:11 212:11,17 213:24 218:15 225:1 228:23 229:19,20 230:19 235:23 238:10 247:10 252:1,20
**taken** 1:19 21:24 22:18 23:16 75:1 157:5 197:18 224:7 229:17 233:18 234:11 264:7 270:4
**takes** 125:24 237:22
**talk** 30:4 63:10 63:10 129:15 150:16 169:1 174:17 175:24 176:7,9 184:13 195:3 200:10 201:20 230:14
**talked** 33:8 34:22 74:4 88:6 121:5 147:10 157:15 157:24 167:17 202:1 225:13 250:15 254:2
**talking** 8:23 16:17 32:13 38:7 50:4 63:6 84:10 94:1 129:2 151:13 164:14 165:14 166:13 167:21 169:8 176:10 177:9 188:9 190:24 200:23 239:18 240:11 246:11 255:23
**talks** 153:15 184:14
**taller** 102:4,5,6 185:24 186:1
**target** 65:16
**task** 43:23 44:8 44:9
**tasked** 52:24
**Tasker** 114:4,8 126:6
**Teddy** 62:16
**teenagers** 63:2
**tell** 9:10 15:22 21:20 25:8 30:14 36:7 39:19 52:7 58:1 59:11 60:24 68:21 70:9 77:21 78:2 84:16 89:23,23 92:19 97:5,24 98:6 98:13 111:6 113:18 118:13 130:6 133:18 134:5 139:12 144:1,8 145:3 148:2,3,24 156:17,20 159:7 162:22 173:2 175:19 181:15 185:12 186:8 187:11 187:12 190:4 191:12 214:1,6 214:10 221:11 229:13 243:13 246:12 258:9 259:16 260:24 261:9 262:6,6 266:3,9,9
**telling** 113:5,6 137:8 249:3
**tells** 253:16
**ten** 52:10 53:8 65:4 150:12 189:4
**tend** 95:8
**tended** 95:5
**terminology** 238:8
**terms** 8:11 43:20 85:19 87:8 108:2 233:17 238:17
**terrible** 262:1
**Terry** 70:13,17 70:23
**test** 140:15 141:1,2
**testified** 6:6 8:5 8:8 12:21 30:20 187:8,23 236:15,19 261:20
**testifies** 22:17
**testify** 16:7 63:4 107:2,9 109:1 113:5 175:14 260:22 261:22 262:7 263:8
**testifying** 8:13

107:23 151:17 188:21
**testimony** 10:1 12:11 21:6 22:3,8,19 23:1 23:3,16,23 24:11 26:19 30:21 31:4 34:4 37:5,14 37:17 38:9,23 52:3 75:6,12 91:21 98:12 100:2 102:15 103:5,8 104:4 105:18 106:7 106:19,23 107:23 108:16 109:18 110:21 112:13 138:5,7 138:16 140:10 142:13,14,17 151:3,6,10,16 152:18 154:1 157:12 161:18 165:14 182:12 183:3,5 184:23 187:3 188:9 189:24 190:21 197:17 198:19 199:2,4 200:1 202:20 203:7 204:18 205:22 211:1,6,8,11 213:5 216:5,15 216:18 220:6 221:6,21 222:1 222:6,13 224:12,15 228:11 235:14 236:3,12,23 237:4 259:24 260:7 262:1,20 263:11 265:4
**testing** 32:16
**tests** 267:23
**text** 26:24
114:23 123:13 147:16 260:5
**thank** 7:3 22:8 267:9,11 269:10
**theory** 78:14 80:3,8 117:11
**they'd** 141:2 205:15
**thing** 14:19 94:22 143:20 153:14 191:16
**things** 8:19 9:1 21:7,16 55:13 57:23 82:15 84:12 86:7 100:15 115:3 122:5 131:4 149:3 151:13 184:19 203:5 238:6
**think** 15:4 19:13 31:23 41:3 59:1 60:18 66:8 71:14 78:3 79:21 84:5 86:9 89:4 89:24 93:24 94:2 95:1 97:23 102:24 103:1 104:16 104:20 105:1 107:4 113:4 131:5 135:3 137:14 141:15 167:20 170:3 171:4 172:13 174:6,9,16,22 175:23 179:20 182:19 183:20 189:21 205:15 206:23 209:14 214:12 219:24 222:22 224:4 229:15 239:3 244:4 249:15
252:9 255:6 256:12 257:4 258:10 259:13
**thinks** 89:22 249:3
**third** 107:24 108:4 115:9 122:21 123:12 140:13 160:16
**Thompson** 1:13 43:24
**thought** 55:17 62:17 68:13 76:3 79:21 102:22 141:17 175:9 264:15
**thousands** 23:3 87:14
**threaten** 57:16 189:11
**threatened** 131:24
**threatening** 86:11
**threats** 73:12 86:4
**three** 12:17 20:10 35:16 49:9 58:4,20 58:20 95:4 113:3 125:18 126:9 128:2 129:3,9 131:20 133:13 145:4 147:10 157:21 164:15 206:13 227:20 263:3 263:11 264:10
**three-page** 20:6
**thrown** 63:12 96:8 232:18,23
**THURSDAY** 1:17
**Tilghman** 17:19 17:21 18:15 19:18 21:6 22:1,10,13,17 36:13,14,15 37:5 90:21 91:5,6,10 100:3 101:2 102:9 103:4 106:20 107:23 109:22 110:12 110:19 111:8 111:15 112:7 112:14,22 113:2,5 129:17 129:20 130:14 131:2,7,20 133:5 136:13 136:16 137:8 137:15 138:21 139:10 140:7 140:22 143:6 143:22 144:3 145:13 146:11 148:12,21 149:11 150:15 151:2,13,17 152:15,18 153:15,18 154:7,13 155:13 156:24 157:15 161:18 161:23 162:6 164:4,19 165:3 165:14,16 166:2,14 167:16 168:2,5 168:17 169:15 171:7,22 172:11,21 173:1,11,20 174:1,2,10,17 175:14 178:16 179:15 180:9 182:13,18,21 183:2 184:14 184:24 185:6 185:14 186:17 187:4,23 188:2 190:10 191:1 191:21,24 194:9 197:2,13 197:21 198:8 198:20 199:11 200:9 201:18 201:20 202:18 203:9,13,20,22 204:18,23 206:19 207:9 209:4,8 210:15 211:1,22 215:16 216:11 217:6,9 218:7 218:14,23 219:6 220:3,20 222:9,11 236:11 260:1,8 260:21 263:3
**Tilghman's** 22:3 37:14 106:23 111:1 112:12 131:13 138:3 144:13 149:13 150:5 151:10 163:2 188:8,9 196:1 199:2,19 200:1 213:10 216:18,21 217:23 220:6 224:15 237:4 259:23 261:18
**time** 5:6 8:2 9:7 10:22 12:15 13:1,5,9,14,23 14:4,7,14,24 15:1,19,21 16:4,7,15 20:7 21:4,21 22:4 28:8 29:18 31:5 35:11 39:17,17 41:14 47:9,12 50:1 52:8 53:9,11 53:15 56:12 58:2,3,21

59:15 60:16 61:7,12,16 63:18,21 67:15 68:10 70:5 75:14 76:8 80:1 82:22,23 84:6,11 85:12 98:1 99:10 101:13 112:21 113:2 115:21 118:23 120:12 121:6 123:10 126:16 130:19 135:23 144:1 145:18 150:13 156:23 157:22 159:19,21 164:12,16 165:24 166:19 170:19 172:19 178:16 205:19 208:15 214:18 217:22 233:18 239:7 242:5 244:12 245:2 248:11 250:16 251:7
**timeline** 165:5 224:14
**times** 8:6 26:20 32:12 46:14 54:9 62:11 65:21 69:9 92:9 99:11 154:19 180:15 187:18 193:8 245:18
**timing** 205:4
**tips** 40:6 250:17 251:16
**tire** 9:9
**title** 242:1
**today** 5:15 7:7 7:18 9:5 10:1 10:22 18:20 19:7 24:19 56:13 60:16 105:19 110:21 139:17 142:8 159:10 182:23 185:11 214:10 227:2 234:4 244:21 257:4 259:19 265:6
**today's** 5:5 6:14 10:3 19:11
**token** 34:16 252:15
**told** 67:21 71:17 72:19 74:4 75:10 79:7 80:18 91:19 93:3 100:16 104:16 105:1,5 108:2 110:10 112:12 132:23 135:3,22,23 136:1,16 137:14 141:16 141:22 148:12 149:19 151:20 151:23 152:3,7 152:10,22 164:9 167:21 179:18 181:9 182:5 192:7 193:1 194:9,22 195:17 196:20 203:15 209:14 218:15 222:12 222:12 235:9 244:4 249:15 252:9,12 255:6 256:14 260:1 261:22 264:13 264:14 265:16
**Tom** 59:21
**tool** 82:14
**top** 22:2 67:24 106:8 114:2 123:13 155:7 160:17 229:14
**topic** 33:2 35:10 73:4 80:22 85:16 87:8 191:11
**topics** 11:14
**total** 20:6 49:14 180:17 263:2
**touched** 85:16
**tough** 20:16
**Tracey** 134:5,10 134:16 135:14 135:16,21 136:10,18 137:7
**training** 66:22 66:23 67:3,6
**transcript** 12:18 21:5,23 109:20 182:24 183:11 184:14,16 185:13 190:15 270:6,22
**transmission** 39:14
**trial** 15:3,11,13 15:18,21 16:2 17:15,16 25:10 37:14 39:7 63:3 166:12 172:9 173:23 235:18 236:10 260:17 261:7 261:20
**trials** 14:22 24:24 25:1
**tried** 14:20 24:24 60:13 127:9 152:18 152:19 155:14 156:11 177:18 191:24 192:8 193:22 197:4
**true** 103:6 109:20 152:4 152:12 188:4 188:20,23 189:3 191:14 191:15 193:6 193:10 194:8 194:24 215:4 252:13 255:19 270:5
**trust** 55:15 95:8 247:14
**trusted** 62:2
**truth** 113:6 160:7 215:10
**truthful** 10:1 97:18 98:23 132:20
**try** 9:19,21 85:24 86:10 103:3 104:9 113:6 174:15 202:5,8 212:2 229:22 246:8
**trying** 88:24 188:18 193:19 248:1
**Tuesday** 59:3
**turn** 21:2,9 35:13 36:12 37:1 100:10 105:15 124:8 126:14 143:11 158:2 238:1
**Turner** 37:2,6 111:3,16 115:7 115:12 116:14 117:7,11,12 119:12,16,23 121:6,13,16 122:9,13,18 123:17,20,21 128:10,19,20 129:22 137:9 137:16,23 143:13 144:5 144:14,24,24 145:14 149:23 150:2,2,4 151:18 152:11 154:10,14 159:11,12,16 160:20 162:7 162:10,12,13 162:19 163:3,3 163:3 166:3,6 169:12,16,16 169:16 188:5 190:1,16 191:1 193:18,22 196:6,12 198:23 199:16 199:18,22 200:18 201:11 201:11,18 206:1,1,2,13 206:13 207:10 207:12 210:20 210:20 211:14 211:22 212:1 212:19 213:20 214:2,4,22 215:23,24 216:3,12,14,19 216:20,22 217:11 219:14 219:17 222:18 223:1 225:19 225:20 226:11 226:17 227:3,7 227:10,13,16 229:10,11 231:3,3,24 253:4,17 260:2
**Turner's** 37:3 136:10,17 148:13,16 160:22 201:2,6 201:9 211:2,10 217:19 218:10 218:24 222:12
**Turners** 163:21 166:20 201:14 206:10,17,18 217:15
**turning** 138:9

192:1,15
**turns** 60:13
**twice** 25:15 62:12 265:17
**two** 3:5 8:19 9:14 13:3 14:20,21 18:23 18:23 24:24 27:17 44:12 52:9 58:4,19 58:20 59:10 60:14 84:12 102:2 106:1 113:21 114:24 121:19 124:15 124:16,17 127:6 129:12 136:16 149:3 177:13 178:10 185:22 186:10 195:15 203:16 210:18 212:9 212:24 216:19 221:20 237:5 239:17,19 240:4 245:18 263:5,8 264:10
**two-minute** 228:7
**two-page** 114:21 118:6
**two-thirds** 21:9
**typed** 39:15 54:21 214:15 235:3
**types** 74:7 87:16
**typewriter** 83:17 83:19
**typical** 172:4
**typically** 9:20 55:5 85:13 89:2 133:17 141:3 207:20 209:15 232:4 235:10 251:7
**typing** 55:7,11
**typist** 53:24 54:7 54:20,21 55:2 214:14 235:3
**typo** 231:10

**U**

**ultimately** 229:16
**um-hum** 37:7,18 101:17,20 106:14 112:24 119:18 121:2 128:4 153:21 171:19 178:5 210:21 216:6 234:12 244:18
**unable** 130:14
**unavailability** 236:16 237:4
**unaware** 115:17
**uncovered** 266:12
**underlying** 41:10 158:16
**undermine** 76:24 78:14
**undermined** 80:8
**understand** 7:20 8:15 9:3,7 13:13,22 16:3 16:15 17:5,10 21:14 30:3 37:6 52:3 57:8 71:21 72:18 83:18 85:20 88:24 89:13 102:18 106:22 109:13 110:13 112:22 113:8 115:15 129:4 142:8 147:7 175:16,23 177:22 186:18 188:22 197:14 204:4 234:7 236:13 253:12 253:14,18 254:10 267:21
**understanding** 15:22 17:3 25:2 32:6 51:3 51:18 70:15,16 82:6 84:10 85:11 113:7 130:15 173:9 173:10 239:21
**understood** 9:12 9:17 25:11 67:20 80:2 140:11 235:18
**unfamiliar** 109:4
**uniform** 181:18
**unit** 29:9 43:23 52:10,20,24 58:12 59:21,22 60:14 65:13 83:16 92:19 123:2
**United** 1:1 5:4 43:7
**units** 60:19
**University** 42:2 42:17,19 45:14 45:17
**unjustified** 68:13
**unlawful** 72:12 87:6
**unrepresented** 6:12
**unsolved** 52:17 58:18 61:3 149:12 157:22 206:14
**Upper** 47:20
**upset** 28:16
**use** 50:9,11 68:13 73:8,11 82:6 85:24 97:16 107:15 149:13 202:5,8
**uses** 36:13
**usually** 97:9

**V**

**vacated** 25:24 27:21 28:9 31:14 32:14 34:18
**vacating** 29:7 64:22
**vacatur** 28:24
**valid** 81:20
**validity** 39:1 81:15,24
**various** 18:11 67:17,23 206:17 264:18
**verdict** 25:20
**verified** 77:17
**verify** 77:16 171:10
**versus** 5:8 70:13 70:17
**victim** 125:11
**video** 5:3
**videoconference** 11:2
**videographer** 3:15 5:1,2 6:2 6:7 74:24 75:2 157:4,6 224:6 224:8 264:6,8 269:6
**Videotaped** 1:19
**view** 137:16 264:20 265:3 266:6
**views** 40:10 264:13
**violate** 68:4 73:18,21 87:4
**violation** 74:8 248:11,16,23
**virtue** 147:2
**visit** 171:6 172:24 174:2 175:6,10,22
**visiting** 90:20
**voice** 57:18
**Voluntarily** 262:18
**voter** 54:12
**VS** 1:5
**vulnerable** 87:18 89:11,14 103:24 104:3 104:11 105:2,6 195:2

**W**

**W-A-L-L-S** 35:4
**wait** 88:22 89:2 94:24 95:1
**waiting** 7:3 261:12 262:11
**waived** 92:18
**waiver** 92:18 94:5
**walk** 42:13 43:19
**walked** 177:23
**wall** 74:12
**Walls** 35:2,4,8
**want** 5:11 9:8 35:11 37:24 63:3 70:10 73:20 76:16 77:15 85:17 89:9,23,24 90:10 92:22 99:3,19 100:7 104:10 112:11 112:16 113:1,6 123:10 124:5 128:1 134:9 141:6 146:9,10 164:3 166:22 167:18 175:13 190:19 198:19 204:5 206:19 207:2,20 208:2

217:22 218:21 221:8,16,18 222:6 229:22 235:13 236:3 244:15 246:11 247:6 249:3 253:7 269:7,9
**wanted** 63:5 90:24 113:4 141:1 152:7 156:17 171:9 175:3,21 190:10 261:24
**wants** 175:24 218:15
**warrant** 4:13,19 4:21 118:4 122:6,9 212:18 213:8,17 226:8 226:13,21 227:6,10,13,16 235:6 237:16 244:7
**Warrant/Affi...** 4:11
**warrants** 225:10 225:19 228:1 229:10 235:3 267:24
**washed** 147:17 148:13
**Washington** 36:14
**wasn't** 81:7 92:9 127:19 169:22 179:3,13 208:8 209:20 237:12 251:17
**water** 242:9,11 242:16
**way** 8:17 21:2 21:10,15 23:15 26:17 30:9 33:9 34:2 35:14 44:17 50:2 57:5,11 72:18 75:7 76:17 82:12 99:8 105:18 107:2,24 108:5 110:4,17 111:15 120:12 123:12 124:5 133:3 140:5 143:12 144:1 144:17 145:9 154:16 155:24 156:12 172:20 181:17 183:9 188:5 192:10 197:4 203:2 211:18,21 213:8 216:11 217:5 223:8,23 225:22 228:23 229:13 234:21 235:9 244:11 251:4 257:12 259:3 267:2
**ways** 52:16
**we'll** 17:1,24 21:21 23:12 65:5 112:10 116:18 117:20 135:17 142:16 184:22
**we're** 9:9 16:17 32:13 50:6 67:6 75:2,4 85:19 89:9 100:7 117:18 124:22,23 138:15 151:11 157:6 167:20 174:14 176:10 217:23 224:10 228:18 255:22 256:9
**we've** 20:21 23:3 35:1 41:17 65:1 85:16 100:5 101:8,8 122:12 124:15 126:9 127:17 128:1 136:23 136:24 147:10 148:19 164:14 168:16 174:9 197:11 200:22 200:23 202:1 211:5 212:10 216:15 227:12 254:2 257:21 264:18 265:19
**weapon** 71:5
**week** 126:21
**weeks** 29:16 83:2 140:6 219:6
**welcome** 189:20
**well-being** 22:16 90:23 171:10 172:24 178:7
**wellness** 180:4,8 181:14 228:7
**went** 7:6 17:14 19:20 25:10 42:10 44:1 45:8,16,20 63:8 127:18 157:9 162:3 165:2 171:6 174:22 175:8 179:7 182:18 196:21 210:6,8 231:12 239:2 261:3,11,14,16 262:11,18
**weren't** 61:20 63:2 169:19,21
**West** 44:23 45:1 261:17
**Westerman** 1:10 1:11 3:10,11 6:1 14:14
**whatsoever** 183:18
**wheel** 238:1
**whichever** 176:10
**white** 102:2 185:22
**Whoever's** 95:7
**Wicher** 60:17
**wife** 47:19,23
**Wildwood** 47:21 48:9,17 49:1
**Wilfredo** 46:19
**Wilkerson** 19:4 109:12 111:24 117:20 118:6,9 119:6,21 120:1 120:11,21 121:15 122:14 123:18 124:1 124:18 126:3 128:2,17 129:9 133:6 143:16 145:5 147:11 147:23 148:6,9 148:22 149:6 150:1,18,23 158:1 161:1 162:13,19 163:9,21 166:4 166:7,21 186:23 188:19 190:1,11,16 197:12 201:3,7 208:22 211:3 211:10 216:3 217:20 219:7 227:13 264:2
**Wilkerson's** 148:6
**William** 44:15 44:17
**willing** 94:3 140:15 141:2
**wishes** 156:4
**withheld** 259:4 259:7,11,14
**witness** 6:2,5,21 8:19 17:14,16 17:18 23:19 24:3,15 27:10 28:3,20 29:4 29:12 30:12,17 31:1,23 33:13 33:20 34:2,10 34:14 38:20 39:4,14 40:15 51:8,14,21 53:21 54:2 55:1 56:16 57:9,14,16,20 62:9 64:8 68:8 69:22 70:20 71:12 72:1 73:23 74:2,10 76:13 80:16,22 81:1,3,8,12 85:18,24 86:9 86:10,11,23 87:9 88:8 89:13,17,22,22 91:7 92:7,13 92:20 94:1,2,3 94:15,20 98:4 98:5,11,22 99:6 102:19 105:10 107:8 108:22 110:2 111:12,21 112:3 116:1 117:6,15 118:15 131:17 132:7,16 134:14 135:12 137:5,12,20 139:13 141:1,6 142:1 144:17 145:24 146:1,3 146:5,7,11 148:3 149:1,17 150:11 159:8 159:24 161:13 162:23 163:7 163:24 164:7,9 164:20,24

165:21 167:3,7 168:21 171:2 172:17 173:12 173:15 174:6 174:18,21 175:3 176:24 179:16 180:24 181:3,7 183:16 183:23 184:8 186:9 187:12 190:5 197:8 198:16 201:23 202:12,23 204:2,10,16 205:10 206:4 206:23 207:5 207:23 208:6 209:24 212:1 214:8 219:24 220:15 222:15 222:22 226:6 227:24 230:6 233:4,15 236:20 240:9 243:14 245:10 246:22 247:22 249:16 250:6 250:13 251:22 254:14 257:10 258:3 264:23 265:1,11,23 266:16,24 267:8,11
**witness'** 97:2 98:10,12 109:2 202:9
**witnesses** 30:19 31:3,5 34:3 35:10,12 38:8 38:22 52:17 54:17 63:1,3 73:14 77:1 87:11,16 89:5 223:9,12,17,18 229:21,22,24 230:1 252:10 252:12,16,19 252:22 255:11 266:4
**woman** 122:13
**wooded** 48:19
**Woods** 253:12 253:14,16
**word** 214:17 239:18
**words** 22:21 78:6 81:14 86:9 259:16
**wore** 63:11
**work** 16:22 21:4 30:4 43:5 47:2 49:22 51:24 55:22,23 56:19 58:23 61:6,9 61:11,15,20,24 67:10 76:17 95:6,16 130:17 202:17 209:15
**worked** 16:20,20 52:7 59:18 62:23,23 82:7 107:5 189:4 209:24
**working** 41:23 41:24 42:2,6 42:11 53:17 58:2,21 66:20 68:22 69:10,12 71:8 74:20 78:18 82:23 87:11 116:12 117:11,19 175:2 181:17 256:7,10 257:17,19
**Worrel** 29:19 30:3
**Worrell** 32:6 33:6 34:23
**wouldn't** 23:8 156:8 181:3 202:17 203:1 205:2,7 230:11 235:10,11 239:4
**Wright** 32:8,8 32:11,14
**write** 96:14 136:7
**writing** 179:10 191:22
**written** 23:2 138:20 232:8 232:10,14
**wrong** 31:10 60:24 75:15 123:6 155:20
**wrongful** 75:24 76:4
**wrote** 83:12

**X**

**X** 4:1,7

**Y**

**Yastremski** 29:19 30:3 32:1,7 33:6 34:24
**yeah** 22:20 28:12 32:19 36:19 37:15,20 44:24 45:3 48:21 49:8,15 50:6 51:17 52:22 54:19 55:14,14 59:4 60:6,12 62:1 62:20 64:14 65:15 66:5 68:18,20 71:1 71:16 72:6 74:17 81:10,12 82:18 83:4,7 83:23 84:2 92:24 94:13 95:20 96:21 99:20 100:24 103:22 104:8 106:16 107:14 107:19,21 108:12 111:5 111:18 115:5 115:22 118:21 118:24 119:3 119:13 120:20 120:23 121:11 124:13,21 125:5,8,14 136:8 137:5 140:8 144:21 145:10 146:8 146:24 147:9 147:15 148:8 148:11 149:5 149:24 150:17 150:20 154:17 154:20 155:12 156:10 166:1 167:7,14 169:14 170:14 176:2,4 177:15 178:3,15 179:4 179:9 180:12 180:22,22 181:1 182:19 187:24 188:4 190:23 192:5,6 192:6,9 193:9 195:16,18 196:3,11 199:10 200:12 201:10 202:3 205:19,20,23 206:23 207:16 207:22 208:10 208:10,12 211:7,16 213:11,19 214:17,21,23 215:9 216:8 219:24 220:12 221:9,15 222:10 224:18 229:15 230:17 232:5 234:5 236:7 239:8,10 241:24 242:13 243:3,14,14 244:3,14 245:4 249:1,21 255:15 258:14 259:15,18 261:8,13 262:13,19,21 266:2 268:14
**year** 12:12,22 13:23 16:12 44:1 47:19 63:16 124:22
**Year's** 63:1
**years** 7:15 9:6 12:17 13:3,7 13:10,17 14:6 14:9 30:18 38:9 43:8,9 44:2,3 45:16 45:18,24 52:9 52:10 53:8,10 57:2 63:19,20 69:15,16,16,17 72:12 73:17 129:7,9,12 131:21 133:11 133:13 184:11 189:4 223:1
**yell** 57:14
**yellow** 54:11
**Yep** 194:3 203:17 229:6 242:22
**York** 7:9
**young** 68:24
**youngest** 49:17

**Z**

**Zoom** 11:2
**Zurbriggen** 2:11 4:4 5:17,17 6:23 7:22

23:17 24:1,13
27:8 28:2,19
28:21 29:2,10
30:11,15,24
31:21 33:11,18
34:1,8,13
38:18 39:3
40:13,19 51:6
51:12,20 53:19
56:14 57:7
62:7 64:7,9
68:6 69:20
70:18 71:10,23
73:24 75:21
76:12,14 80:14
81:11 85:22
86:22 98:8
99:4 102:17
103:10 105:8
108:20 109:24
111:10,19
112:1 115:23
116:8,16
117:13 118:12
131:15 132:5
132:14 134:12
135:10 136:21
137:3,11,18
139:11 144:7
144:15 145:11
145:21 148:1
148:23 149:15
150:7 153:1
154:23 159:6
159:23 160:1
161:11 162:21
163:6,22
164:22 165:19
167:1,6 168:19
170:24 172:15
173:14 174:4
174:19 176:22
181:5 183:14
183:21 184:4
186:7 187:10
190:3 191:6
194:6 197:6
198:1,5,14
201:21 202:21
203:23 204:9
204:14 205:8
206:3,21 207:4
208:4 214:5
216:24 219:22
220:13,24
221:12 222:3
222:14,20
223:13 227:22
233:2,13
238:14 240:7
243:12 245:8
247:20,23
248:3 249:22
250:4,11
251:19 254:12
255:20 257:7
257:24 258:6
258:18 259:1
264:21,24
265:9,21
266:14,22
267:6,13 269:2
269:8

**0**

**04** 45:19
**05** 45:18

**1**

**1** 19:22,24 20:1 35:23 52:9 63:18 78:1,3 81:4,7,9 234:4 244:11,20
**1:21** 157:6
**10** 32:24 63:19 63:20 81:6 184:11
**10:50** 74:24
**104** 241:2
**11** 154:3
**11:04** 75:2
**113** 4:8
**114** 4:9
**116** 4:10
**11622** 147:3
**117** 4:11
**12** 59:2 206:7
**12:47** 157:4
**120** 4:12
**121** 4:13
**12685** 122:21
**13** 45:24
**130** 4:14
**13th** 126:21
**14** 45:16 50:17
**142** 4:15
**146** 4:16
**14th** 2:12 116:24
**15** 9:21 75:5 126:14,16,19
**1515** 2:13
**153** 4:17
**15th** 158:5,13 161:10 163:20 165:8 204:6 205:19 208:1 218:4 245:7
**16** 127:2 223:1
**1600** 118:10 119:8 126:3 136:2 148:10
**1621** 119:16
**16th** 22:1 101:2 102:16 103:14 110:12,19 139:20 153:24 161:19,22 165:3,13 182:14 185:15 187:5 197:18 198:8 203:13 204:19 211:9 218:7 263:4
**18** 223:19
**1804-B** 114:5
**19** 160:17
**19102** 2:13
**19103** 3:6
**19106** 2:6
**1962** 42:15
**1967** 43:4,15
**1968** 66:1
**1979** 44:3 51:24
**1980s** 63:23 80:1 95:3 105:22 115:19 135:4
**1982** 114:1 116:24 124:17 225:13
**1983** 118:11 119:8 124:18 132:24 136:2 139:20
**1984** 7:15 16:19
**1985** 127:3
**1987** 18:2,14 20:19 22:1 36:18 57:1 59:9 101:2 102:16 110:19 112:22 113:3 117:19 129:1 144:4 161:10 161:19,22 171:18 203:13 212:21 234:7 237:17 250:16 254:10 256:7 263:4 265:8
**1988** 15:14 260:18 263:8
**1989** 15:3
**1991** 16:1,3 84:6 85:13 235:14 235:22
**1993** 41:22
**19th** 43:24 44:21 65:24

**2**

**2** 35:15,15,18 78:2,4 190:8
**2:22-cv-02416...** 1:5
**2:34** 224:6
**2:48** 224:8
**20** 235:23
**2000** 21:11
**2001** 3:5
**2017** 46:1,3,6
**2018** 28:24
**2019** 36:14 196:2 261:19
**2020** 36:7
**2024** 1:17 5:6
**208** 4:18
**20th** 36:14 43:4 209:2 213:1
**21** 158:3
**212** 4:19
**215** 2:7,14 3:6
**21st** 245:21
**22** 1:17 21:2,2,5 100:3,7 106:7 138:6,9 184:17 212:11 260:4
**224** 4:20
**226** 4:21
**228** 4:22
**22nd** 5:6 12:22 136:11 139:10 140:6 143:6,8 144:3 145:1,13 153:19 162:16 207:7 212:21 216:21 217:24 218:11 219:6
**24** 204:19
**240** 4:23
**2414** 231:12
**24th** 16:3
**25** 157:10
**25th** 16:19 235:14,22
**2620** 3:5
**267** 4:4
**26th** 114:1
**270** 4:5
**27th** 17:11

125:12 153:11 154:3 218:13 219:19
**29th** 118:11 119:8
**2nd** 120:24 225:4

### 3

**3** 36:12,23 195:20,22,23 196:4 261:19
**3/22/87** 136:1
**3:05** 242:8 243:1
**3:10** 242:14,17 242:18,21,23 243:1,4
**3:25** 242:22 243:4
**3:31** 264:6
**3:38** 264:8
**3:42** 269:6,12
**30** 9:22 13:7,10 157:10
**31A** 4:22
**34** 7:15
**37** 235:21
**38** 235:21
**3rd** 16:1 231:7 231:17

### 4

**4** 37:1 59:2 261:20
**40** 14:6 29:1 49:18
**46** 124:9,10,10 124:24
**4th** 5:2 17:6 43:15 151:12 151:13

### 5

**5** 39:11 155:2
**501** 1:20 2:5
**52** 49:18
**53** 19:22 113:12
**54** 4:8 113:13,14 113:18
**55** 4:9 114:17,18
**56** 4:10 116:19 116:20
**57** 4:11 117:21 117:24 118:3
**58** 4:12 120:5,6 123:24
**59** 4:13 121:21 121:22 212:10 212:16 213:12 213:17,24 214:19
**5th** 7:15 115:11 125:1,7

### 6

**6** 26:12,14,22 27:1 139:17
**60** 4:14 130:1,2 130:6 144:19 216:11
**61** 4:15 142:18 142:19
**61st** 43:24
**62** 4:16 43:6 146:16,17 150:22
**63** 4:17 153:4,5
**64** 4:18 208:15 208:17
**640-8240** 3:6
**65** 4:19 212:12 212:13,16,17 213:24
**66** 4:20 113:11 224:21,22
**67** 4:21 43:6 226:3,4 240:14
**67A** 4:23 240:15
**683-5000** 2:14
**69** 117:21
**690** 155:8,9
**693** 155:1,3,4
**694** 155:4
**695** 155:5
**696** 155:11
**6th** 12:12

### 7

**7** 4:3
**7/23/1944** 47:17
**71** 121:20
**718** 1:20 2:5 5:7
**74** 130:1
**75** 42:23 146:15
**76** 208:15
**79** 45:8 47:15
**7th** 36:7 127:3 127:12,19 245:22

### 8

**8** 155:1 235:24
**8,978** 138:10,12
**8,979** 138:24
**8,986** 140:4
**8,995** 100:10,10 100:12 151:7,7 184:19
**8,996** 151:7
**80s** 15:15
**81** 43:1 52:11 63:24
**82** 115:11 116:11 117:10 126:9 128:7 129:7 145:8
**83** 121:1 124:22 126:9 128:17 129:10 145:8
**84** 17:6 124:23 125:1,7 126:9 126:21 145:8
**8460** 235:23
**8461** 235:23
**85** 127:12,19 128:22 129:13
**87** 60:16 103:14 110:12 127:20 129:6,16 136:11 139:10 140:6 143:6,9 145:1,9,14 150:16 151:14 153:11,19,24 154:3 157:15 157:21 158:2,5 158:13 163:1 163:20 166:14 171:23 172:22 174:11 182:14 185:15 187:5 196:10 197:18 197:22 198:8 204:6,19 207:7 209:2 211:9 216:21 217:24 224:16,20 225:4 231:7,17 233:19 245:7 245:22,22 256:11
**88** 151:12,13 263:13
**8957** 106:7
**8968** 198:21 199:6
**8974** 199:2,7
**8th** 94:10

### 9

**9:33** 1:20 5:6
**9000** 21:9,12 22:2 101:9,14 105:12 185:4,6 185:10 187:16
**90006** 22:2
**9002** 105:16 107:20 185:10 186:12 189:18 190:7
**9003** 190:7
**9006** 22:6 191:11,12
**9008** 191:12
**9013** 142:15
**9028** 260:4
**90s** 15:16
**91** 42:4 45:11,18 47:10 51:24 52:11 239:21 240:1
**925-4400** 2:7
**93** 42:20
**9th** 234:7