IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

\- - -

CURTIS CROSLAND :
Plaintiff :
:
VS. : CIVIL ACTION NUMBER
: 2:22-CV-02416-AB
CITY OF PHILADELPHIA,:
et al. :
Defendants :

\- - -

April 8, 2024

\- - -

Videotaped deposition of JOSEPH DESCHER, was taken pursuant to notice at The Cast Iron Building, 718 Arch Street, Suite 501 beginning at or about 9:30 a.m. before Jeannine Cancelliere, Court Reporter and Notary Public and Matt Downing, videotape operator, there being present.

Any reproduction of this transcript is prohibited without authorization by the certifying agency.

KAPLAN, LEAMAN AND WOLFE
Registered Professional Reporters
230 South Broad Street, Suite 1303
Philadelphia, Pennsylvania 19102



APPEARANCES:

KAIRYS, RUDOVSKY, MESSING, FEINBERG & LIN
BY: GRACE HARRIS, ESQUIRE
The Cast Iron Building
718 Arch Street, Suite 501 South
Philadelphia, Pennsylvania 19106
PHONE: (215) 925-4400
gharris@krlawphila.com
Representing the Plaintiff
Also Present:
JONATHAN FEINBERG, ESQUIRE
ANGELINE ETIENNE

CITY OF PHILADELPHIA LAW DEPARTMENT
BY: ADAM ZURBRIGGEN, ESQUIRE
DEPUTY CITY SOLICITOR
One Parkway Building
1515 Arch Street
Philadelphia, Pennsylvania 19102
PHONE: (215) 683-5448
adam.zurbriggen@phila.gov
Representing the City of Philadelphia

CLARK HILL
BY: JOHN DEROSE, ESQUIRE
Two Commerce Square
2001 Market Street, Suite 2620
Philadelphia, PA. 19103
PHONE: (215) 640-8420
jderose@clarkhill.com
Representing Westerman and Ansel



\- - -

I N D E X

\- - -


| JOSEPH DESCHER | PAGE |
| --- | --- |
| BY MS. HARRIS | 5 |


\- - -

E X H I B I T S

\- - -


| EXHIBIT NO. | DESCRIPTION | PAGE |
| --- | --- | --- |
| P-69 | Report | 132 |
| P-70 | Activity Sheet | 280 |
| P-71 | Crosland Statement | 334 |
| P-72 | Crosland Testimony | 334 |




VIDEOTAPE OPERATOR: Good morning. We are now on the record. My name is Matt Downing. I'm a videographer retained by On the Record. This is a videotaped deposition in the United States District Court for the Eastern District of Pennsylvania. Today's date is April 8th, 2024 and our video time is now 9:45 a.m. eastern time.

This deposition is being held today at the Cast Iron Building located at 718 Arch Street, Suite 501 in Philadelphia, Pennsylvania. We are here today in the matter of Curtis Crosland versus City of Philadelphia, et al. Our deponent today is Joseph Descher.

Will all counsel please identify themselves for our record?

MS. HARRIS: Good morning, Grace Harris on behalf of Curtis Crosland.

MR. FEINBERG: Jonathan Feinberg, also on behalf of Curtis Crosland.

MR. ZURBRIGGEN: Good morning, Adam Zurbriggen on behalf of the City of Philadelphia and the other City defendants and

Page 5

the witness, Sergeant Descher.
MR. DEROSE: Good morning, John DeRose on behalf of Karen Ansel and Linda Westerman.
VIDEOTAPE OPERATOR: The court reporter will now swear in the witness.
- - -
JOSEPH DESCHER, after having been first duly sworn, was examined and testified as follows:
- - -
EXAMINATION
- - -
BY MS. HARRIS:
Q. Good morning, Sergeant. I introduced myself briefly before we got started. My name is Grace Harris. I represent Curtis Crosland. I am joined here by my colleagues, Jonathan Feinberg and our law firm's paralegal, Angeline Etienne. As I mentioned, we represent Curtis Crosland who has, as you know, brought a lawsuit against you and several other Philadelphia police officers as well as the City of Philadelphia.

Page 6

In this lawsuit, Mr. Crosland alleges that you and several homicide detectives working under your supervision and some other folks in the homicide department caused him to be falsely arrested, prosecuted, convicted and incarcerated for more than 34 years for the December 5th, 1984 murder and robbery of Il Man Heo when Mr. Crosland was, in fact, innocent of that crime.
You have been named as a defendant in this case and you're here for a deposition. Do you understand all of that?
A. Yes.
Q. You're represented in this case by Mr. Zurbriggen. Have you had a chance to consult with him before we begin today?
A. Yes.
Q. Do you need to speak with him anymore before we get started?
A. No.
Q. I assume that over the course of your career that you've testified under oath many times; is that correct?
A. Yes.

Page 7

Q. Have you ever testified in a deposition before?
A. Yes.
Q. How many times?
A. Many times but not all regarding law enforcement. A lot of them were my second career.
Q. You've testified in many depositions based on your second career, okay.
Can you tell me about the times that you have testified in deposition surrounding law enforcement work?
MR. ZURBRIGGEN: Objection to form.
THE WITNESS: I was deposed in another matter some time ago, I don't even remember when, as far as my law enforcement. One other that I remember.
BY MS. HARRIS:
Q. One other occasion. Was that the Anthony Wright case?
A. Yeah, now that you said it.
Q. Based on that background, I assume you understand what it means to testify under

Page 8

oath?
A. Yes.
Q. So I'm not going to give you further instructions about that, I just want to note a couple of things. There's no judge or jury here but you're under the same oath that you would take in court, of course. Do you understand all of that?
A. Yes.
Q. Your counsel may object for the record but unless he gives you a specific instruction not to answer the question, you have to answer the question anyway.
A. I understand.
Q. Just a couple final introductory things before we get into it, we have a lot to cover today so it's going to take some time. I'm going to take breaks periodically, but if you ever need a break just let me know and we'll be happy to accommodate that as long as there's no question pending at that point. All right?
A. Yes.
Q. Is there any reason why you can't give

Page 9

truthful and accurate testimony today?
A. I am suffering from tinnitus, it's continuous. And I have constant buzzing in my head. It's difficult for me to concentrate but I'll do the best I can.
Q. Will you let me know if there's a question you can't hear or you need me to repeat?
A. Yeah, I have hearing aids in. I'll hear it.
Q. Please let me know if you need a break. All right.
I want to ask you really quick about your preparation for today. Did you meet with your counsel?
A. No.
Q. Did you speak with your counsel at all?
A. Yes.
Q. How many times?
A. I don't know, once on the phone, maybe twice and downstairs.
Q. About how long did those conversations last?
A. Five minutes.

Page 10

Q. Was there anyone else there during those conversations?
A. No. My wife was in the house.
Q. Have you talked to anyone from the Philadelphia Police Department about your deposition today?
A. No.
Q. How about anyone from the D.A.'s office?
A. No.
Q. Have you talked to any of the other detectives or officers who have been sued in this case?
MR. ZURBRIGGEN: Objection to the form --
THE WITNESS: Talked to them in what manner? I've seen them at viewings and stuff like that.
BY MS. HARRIS:
Q. Sure. Let me just go through them one by one, maybe that will help.
When is the last time you talked to Edward Rocks?
A. In church about 20 years ago.
Q. So you haven't talked to Mr. Rocks about

Page 11

this case?
A. No.
Q. How about Dominic Mangoni?
A. I talked to him on the phone a couple times but mostly about viewings I was going to and stuff like that.
Q. When was the last time you talked to Detective Mangoni?
A. I'm not sure.
Q. Have you ever talked to him about this case?
A. Not really.
Q. What do you mean by, not really?
A. No, I did not.
Q. How about James McNesby?
A. I haven't seen Jim in years, no.
Q. So you've never talked to Mr. McNesby about this case?
A. No.
Q. There are several detectives in this case who have unfortunately passed away. I'm just going to go through them and if you can tell me the last time you spoke to that person would be. John Cimino?

Page 12

A. Probably when I was in homicide.
Q. Edward Hughes?
A. Probably the same.
Q. Albert Nespoli?
A. Never probably.
Q. Francis Ansel?
A. 15, 20 years ago, maybe.
Q. Frederick Westerman?
A. Never spoke to him.
Q. John Lanzelotti?
A. Never spoke to him.
Q. Joseph Brignola?
A. 25, 30 years ago maybe, I don't know.
Q. How about the district attorneys who tried this case, Joel Rosen. Do you remember the last time you talked to Joel Rosen, if ever?
A. Probably back -- I don't know if I ever talked to Joel Rosen.
Q. How about Shelley Robins New?
A. I knew Shelley probably 30 years ago, w5 years ago I saw her in a restaurants with her husband.
Q. Did you ever talk to either of those

D.A.'s about this case?
A. No.
Q. Curtis Crosland.
When did you first receive notice of this lawsuit?
A. I don't know. I don't remember.
Q. The complaint was filed in June 2022. Would it have been some time in 2022?
A. I don't know. I don't remember.
Q. When was the last time you had heard anything about this case, about Curtis Crosland or the Il Man Heo murder?
A. When I talked to counsel on the phone.
Q. When was that again?
A. A week ago -- I guess a couple weeks ago. I don't know.
Q. So a couple weeks ago was the first time that you heard about this lawsuit?
MR. ZURBRIGGEN: Objection to the form.
THE WITNESS: I mean I saw it sent to my house, you know.
BY MS. HARRIS:
Q. By it, do you mean the complaint?



A. Yeah, the complaint. I didn't read it.
Q. You did not read it?
A. No.
Q. Have you ever read it?
A. No.
Q. Let me go through the timeline really quick of the case that we're talking about. This was quite a long time ago.
This murder occurred on December 5th, 1984 on around 27th and Oakford in South Philadelphia. Mr. Crosland, our client was arrested on December 10th, 1987, so about three years later. And he had two trials, one in 1988 which was overturned and then one in 1991.
Your main involvement, based on the files that I have reviewed, seems to be about in 1987 when you were a sergeant supervising the investigation. Does that timeline sound right to you?
MR. ZURBRIGGEN: Objection to form. Sergeant, you can answer.
THE WITNESS: I don't even think I was in homicide in '84. I'm not sure.



In '87, yeah, I was there but I don't remember anything about that case at all.
BY MS. HARRIS:
Q. You were a sergeant supervising the homicide squad in 1987?
A. I don't know what squad I was supervising. It sounds like I might have been in 5 squad at the time, I don't know.
Q. We'll get into --
A. '87 I was probably in 5 squad.
Q. I take it you don't recall any details concerning your involvement in this case?
A. No.
Q. Do you recall -- did anyone call you in 2020 when the D.A.'s office was re-investigating this case?
A. No.
Q. Do you remember any further involvement in the case after 1987?
A. No, I don't remember '87, either.
Q. In order to prepare for today's deposition, did you look at any documents?
A. No.
Q. You already mentioned --



A. He sent me a couple activity sheets and I couldn't even read them. They were very small and I'm having difficulty reading. So I did not read them but I saw on the top that my name was on there. I think a Lieutenant Thompson was questionable because I don't think I ever worked with Lieutenant Thompson.
Q. Okay. So you mentioned that you looked at a couple activity sheets?
A. I looked at them, yeah. That's a good description.
Q. I am going to ask you to review some documents today as we go through --
A. I'm going to have difficulty, I'll tell you right now. I drove up from the shore and my head is spinning and I'm going to have difficulty but I'll try.
Q. You're going to have difficulty reading the documents?
A. Yes.
Q. Okay.
A. I got hit in the head with a ladder, an 18-foot ladder August 4th and I've been spinning ever since.

Page 17

Q. My goodness. Okay, we can work through that together as we get there. All right.
Did you look at any other documents from the homicide file, other than these couple activity sheets?
A. No.
Q. Okay. Did you look at anything from the district attorney file?
A. No.
Q. Have you reviewed any deposition transcripts from any of the other detectives that have been deposed in this case?
A. No.
Q. What do you remember about this case?
A. Nothing.
Q. I think that if that's the case we should start with just looking over the affidavit of probable cause. I am going to ask you to read this. Please let me know if you're unable to do so. This is Exhibit-1, the affidavit of probable cause. This has been marked in previous depositions. It should be three pages?
Let me know if you are having

Page 18

trouble reading it.
A. I am having trouble.
Q. What do you think would be the best way to accommodate that? Do you want your attorney to read it to you?
A. No, I mean it's not familiar to me. What I can read -- none of it. Like I said, I don't even think I was in homicide then, you're talking about '84.
Q. If you can read through the whole thing you will get to 1987 at some point.
Were you able to get through that?
A. Yeah, somewhat.
Q. Just maybe to refresh a little bit your role here, do you mind flipping to Tab 32 for me? This might be one of the activity sheets you looked at. This should be an activity sheet from December 9th, 1987. That one might be cut off. That's correct.
Do you see your name there up at the top?
A. Yes.
Q. That means that you were the sergeant

Page 19

supervising this investigation?
A. It doesn't mean it to me. That means my name is up at the top.
Q. What does it mean to you then if your name is on the top of an activity sheet?
A. It means that it's there with Lieutenant Thompson and I don't ever remember working with Lieutenant Thompson, ever. So, I don't know.
Q. What does it mean generally if a sergeant's name is on the top of an activity sheet?
MR. ZURBRIGGEN: Objection to form. Sergeant, to the extent you know, you can say.
THE WITNESS: It means that usually -- that he would have been the supervisor of the person -- of one of the people involved.
BY MS. HARRIS:
Q. Surely the supervisor is doing something related to the investigation, right?
MR. ZURBRIGGEN: Object to the form. Sergeant, go ahead.

Page 20

THE WITNESS: An activity sheet doesn't mean anything to me. It's just somebody's rendition of what they did.
BY MS. HARRIS:
Q. Why is a sergeant's name on the top then?
A. Because somebody typed it there.
Q. Why would a detective type a sergeant's name?
MR. ZURBRIGGEN: Objection to form. Sergeant, you can answer.
THE WITNESS: Normally it would mean that that was his supervisor or her supervisor.
BY MS. HARRIS:
Q. So typically this would mean that you were supervising somebody who was investigating the case in December of 1987?
A. I guess it would indicate that, yeah. That's what it says.
Q. Based on this activity sheet, this is the point in time that the affidavit of probable cause is being drafted; is that right?

MR. ZURBRIGGEN: Objection to form. Sergeant, to the extent you know or you can tell.
THE WITNESS: I don't know.
BY MS. HARRIS:
Q. Could you review it?
A. I am looking at it.
Q. I am seeing here that Detective Cimino is preparing the probable cause affidavit for Curtis Crosland in the Il Man Heo murder. Does that sound right to you?
A. It looks like he reviewed it with Barbara Christy and somebody else.
Q. So is it fair to say that December 1987, Detective Cimino is preparing an affidavit of probably cause for Curtis Crosland?
MR. ZURBRIGGEN: Objection to the form. Sergeant, to the extent you know or you can tell based on this document?
THE WITNESS: I don't know. That's what it says, I don't know.
BY MS. HARRIS:
Q. So that's what the activity sheet with your name on it says, right?



A. That's what it says.
Q. Sitting here today, sir, you can stop reviewing, unless you'd like to finish reading it.
Sitting here today, sir, do you know who shot Il Man Heo in 1984?
A. No.
Q. Do you know whether Curtis Crosland was guilty or innocent of that crime?
A. No, I don't.
Q. Were you aware that there was no physical evidence presented against Mr. Crosland in court in this case?
MR. ZURBRIGGEN: Objection to the form. Sergeant, you can answer based on --
THE WITNESS: I don't know. I don't remember and I was never involved, as far as I know.
BY MS. HARRIS:
Q. Except that your name was on the activity sheet there, right?
A. That's what you're saying.
Q. Well, you agree --



A. Well, you're saying that that means I'm involved. I never said it does.
Q. Sure. Okay. I am just going to review a little bit -- I think this will go a little faster. I'm going to review a little of the evidence that was brought against Mr. Crosland at trial.
As you can see from the affidavit of probable cause that we just went over, a man named Rodney Everett told police that Curtis Crosland had confessed to him. It's on the third page, I believe, if you want to review that.
Before we move on, I just want to clarify. You were supervising John Cimino at some point when he was in homicide; is that right?
A. For a very short period of time, I believe, but I'm not sure.
Q. As you just read, one of the pieces of evidence brought against Curtis Crosland was this man named Rodney Everett told police that Crosland had confessed to him.
I'm just going to represent



to you that the other piece of evidence against Curtis Crosland was a woman named Delores Tilghman told police that she overheard a conversation where Crosland expressed fear that his 16-year old niece Brenda would come forward with information against him for reward money.
Are you aware, sitting here today, of any other evidence against Curtis Crosland?
A. I'm not aware of any of it.
Q. I want to talk a little bit about the exoneration that happened more recently.
Were you aware that this case was investigated by the conviction integrity unit at the D.A.'s office in 2020?
A. No.
Q. Were you aware that that investigation informed a Federal Court that certain evidence had been withheld by police during the investigation?
A. No.
Q. Were you aware that the CIU informed the Federal Court that Mr. Crosland may very well

Page 25

be actually innocent?
A. No.
Q. I would like to just show you something really quick from that filing. Can you go to Tab 6, please. If you could go to page three, this is a document filed by the conviction integrity unit in Federal Court. Go to page three and note three on the bottom there. It starts with: Although it is legally unnecessary.
Do you see there that the District Attorney's Office presented to a Federal Court that Mr. Crosland may very well be actually innocent?
A. I see it.
Q. Were you aware that the Federal judge accepted the conclusions of the CIU lawyers and vacated the conviction?
MR. ZURBRIGGEN: Objection to form.
THE WITNESS: No.

BY MS. HARRIS:
Q. Do you have any basis today to agree or

Page 26

disagree with that conclusion?
A. None at all.
Q. Were you aware of this ruling?
A. No.
Q. Do you have any reaction to this ruling today?
MR. ZURBRIGGEN: Objection to form.
THE WITNESS: No, I don't.
BY MS. HARRIS:
Q. You're not surprised by this?
MR. ZURBRIGGEN: Same objection.
THE WITNESS: I'm not anything.
BY MS. HARRIS:
Q. Are you aware that the District Attorney's Office has since 2017 exonerated 40 people?
MR. ZURBRIGGEN: Objection to the form. Sergeant, if you understand.
THE WITNESS: No.
BY MS. HARRIS:
Q. Were you aware that this involved

Page 27

multiple cases that you supervised?
MR. ZURBRIGGEN: Same objection. Officer, you can respond.
THE WITNESS: No.
BY MS. HARRIS:
Q. You were aware that Anthony Wright had been exonerated?
MR. ZURBRIGGEN: Objection.
THE WITNESS: No, I'm not.
BY MS. HARRIS:
Q. You said earlier today that you were deposed in his lawsuit, right?
A. I was.
Q. You didn't know at that time --
A. I didn't know anything.
Q. Were you aware that a man named Antonio Martinez has been exonerated?
A. No.
Q. Are you aware that was also a case that you supervised?
MR. ZURBRIGGEN: Same objection. Standing objection to all of these.
THE WITNESS: No, I'm not

Page 28

aware of that at all. I never heard the name before.
BY MS. HARRIS:
Q. Are you aware that you had been named in a lawsuit filed by Antonio Martinez under the name Pedro Alicea?
MR. ZURBRIGGEN: Objection to form. Sergeant, I just caution you not to disclose any confidential conversations.
THE WITNESS: I don't know.
BY MS. HARRIS:
Q. Do these exonerations make you at all concerned about the work that your squad was doing during this period?
MR. ZURBRIGGEN: Objection to the form. Sergeant, you can answer?
THE WITNESS: No.
BY MS. HARRIS:
Q. Do you have any concerns about the level of supervision they received at the time?
A. No.
Q. Have you ever discussed any exonerations or actions by the District Attorney's Office with your colleagues?

Page 29

MR. ZURBRIGGEN: Same objection.
THE WITNESS: No.
BY MS. HARRIS:
Q. Have you ever discussed Larry Krasner's District Attorney's Office with your colleagues?
MR. ZURBRIGGEN: Same objection.
THE WITNESS: No.
BY MS. HARRIS:
Q. Have you ever had any conversations about the treatment of homicide cases from the 1980s and the 1990s?
A. No.
Q. Do you have any feelings about Larry Krasner's office?
MR. ZURBRIGGEN: Objection.
THE WITNESS: No.
BY MS. HARRIS:
Q. Just for the court reporter's assistance, if you could wait until the objection before you answer.
MR. ZURBRIGGEN: Please

Page 30

sergeant, if you would just pause for one second while I get my objection on the record.
THE WITNESS: I'm sorry.
MR. ZURBRIGGEN: That's okay.
BY MS. HARRIS:
Q. Let's go through some of the evidence in this case. I understand it's a long time ago. I understand that you don't have an independent recollection of it so we're going to go through some of it together.
Let me know if you're unable to read a document or if you need some extra time.
So we talked about the evidence in this case. The key witnesses were Rodney Everett and Delores Tilghman. Were you aware that those two witnesses have both recanted their trial testimony?
A. No.
Q. I would like you to turn to Tab 2. This is an affidavit from 2020 by Rodney Everett. If you don't mind just reading through that real quick. If you wouldn't mind flipping to the next tab. That was Exhibit-2. This is

Page 31

Exhibit-3. This is a recantation by Delores Tilghman in 2019. Are you finished?
A. Uh-huh.
Q. As I noted, Delores Tilghman's testimony at the time of trial suggested that a teenager named Brenda Turner had some knowledge of the murder. So I would ask you to flip one more to Exhibit-4 and read that statement by Brenda Turner from 2015.
A. I read it.
Q. Have you ever seen any of these three documents before?
A. No.
Q. What do you think?
MR. ZURBRIGGEN: Objection to form. Sergeant, if you have any reaction at all, you can say what it is.
THE WITNESS: I don't think anything.
BY MS. HARRIS:
Q. I will go back to my question I asked before, would you agree that the first two affidavits that you just read, they both discuss attempting to retract statements from

Page 32

police prior to trial?
MR. ZURBRIGGEN: Objection to form. Sergeant, if you can tell from what you just read.
THE WITNESS: From what I read, that sounds like what it said.
BY MS. HARRIS:
Q. Go back to a question I asked earlier, does this give you any concern about the work that was being done by the homicide department back in 1987?
A. No.
MR. ZURBRIGGEN: Objection, asked and answered.
THE WITNESS: I'm sorry. No.
BY MS. HARRIS:
Q. Do you have any concerns about Mr. Crosland's guilt?
MR. ZURBRIGGEN: Objection to the form.
BY MS. HARRIS:
Q. His conviction in this case?
A. No.
Q. We can close this for now. I just want

Page 33

to ask a little bit of background about you.
Can you tell me about your highest level of education?
A. I have an Associate's degree in criminal justice.
Q. What year did you get the Associate's degree?
A. I don't know, I was in my 40s, I think.
Q. Can you estimate for me? A decade?
A. It's hard, probably '87, '88, I don't know.
Q. You obtained this degree during your time in the homicide department?
A. No, before I went to homicide.
Q. But while you were a Philadelphia police officer?
A. Yes.
Q. Did you have any special training in law enforcement, other than the training you received at the Philly police department?
A. No, other than criminal justice, that's it.
Q. Did you work between high school and joining the department?

Page 34

A. I was in the United States Navy mostly but I did work a year.
Q. What years were you in the Navy?
A. '66 to '70.
Q. And then you mentioned another job that you had?
A. Yeah, I don't know, 65 or something like that.
Q. What kind of work did you do?
A. I was in a sheet metal shop and I worked in a glass shop for a few months.
Q. Why did you decide to join the Navy?
A. Just to change the direction of where I was going with my life.
Q. Why did you decide to join the police department?
A. I got out 90 days early from the Navy. Originally my first test and so forth, I found out you got an early out, I took the test.
Q. So you took the test to join the police department as a way to leave the Navy?
A. Yeah, I was leaving anyway.
Q. When did you start in the police department?

Page 35

A. I don't know the date, '70.
Q. 1970?
A. I am having difficulty.
Q. Take your time.
A. '66 to '70 -- 70, I think it was March or something. I'm not sure.
Q. Can you just walk me through sort of your ranks and assignments in the police department, to the degree that you can remember?
A. 1970 to 1980 I was in uniform, in the 22nd District, 17th and Montgomery. I did a year or so in plain clothes in the 9th District. '80 to '85 I was a detective in Northeast Detectives.
Q. In 1985 you were promoted to sergeant?
A. Uh-huh.
Q. As a sergeant, were you always in the homicide division?
A. No, I went to West Detectives after I left homicide.
Q. Did you start off as a sergeant in homicide?
A. Yes.

Page 36

Q. What years was that?
A. I guess '85, '86, I'm not sure. I was on another assignment so there was a time period where -- I was on a plain clothes assignment. It was a time period from when I got promoted to when I went to homicide.
Q. In between you were at a plain clothes assignment you said?
A. Yes.
Q. What was the subject of that assignment?
A. I don't remember.
Q. So then you supervised in West Detectives after homicide?
A. Yes.
Q. Why did you leave homicide?
A. I got transferred.
Q. Did you request the transfer?
A. No.
Q. Do you know why you were transferred?
A. No.
Q. When did you leave the department? When did you retire?
A. '95, I believe. No, that's not right. I guess 1990.

Page 37

Q. Why did you leave?
A. I got a job in the civilian world.
Q. What job did you go to?
A. I was an investigator for an insurance company, a fraud investigator. I did 24 years after that.
Q. You were a fraud investigator for 24 years --
A. No, I went up in rank. I was an assistant vice president when I left the insurance company.
Q. You worked at the insurance company for about -- you said 24 years?
A. I think it was 24 years.
Q. At the same company the whole time?
A. They changed names a few times but they were the same company.
Q. Why did you decide to go from being a sergeant in the police department to working in the insurance company?
A. I mean when you look at it, it was for pension reasons and -- we didn't pay into Social Security. So if I left at that period of time -- with the Windfall Act you have to

Page 38

do I think 25 or 30 years paying into Social Security to collect the full Social Security. So it was an opportunity for me to get back in civilian life and start planning for my future. At least that's what I think I did.
Q. Have you had any other jobs since leaving the police department?
A. No.
Q. You said you started at the insurance company -- what was the name of the insurance company?
A. Infinity.
Q. You said you started off as an investigator, moved through the ranks?
A. Uh-huh.
Q. Have you ever been involved in any sort of other law enforcement activity since leaving the department?
A. No. You go to meetings and task force and stuff like that. I was running the National Fraud Unit so I travel around the country and would go to different meetings with law enforcement, but never that I was involved in anything with them.

Page 39

Q. So in your role as a fraud investigator you had some innerface --
A. Mostly as a manager, in a management position.
Q. So you would still attend law enforcement conferences and things like that?
A. Yeah and oversee investigations my people were doing.
Q. Were you ever called in by the police department to look at old cases that you were a part of?
A. No.
Q. Did any detectives ever call you up and say, hey, we're reopening this case or we're looking at this case again, what do you remember?
A. Not that I recall.
Q. We're going to go back and ask a couple more personal questions before we get back into the case itself.
What is your birth date?
A. [redacted]
Q. Where do you live now?
A. Cape May, New Jersey. North Cape May,

Page 40

New Jersey.
Q. Do you own or rent?
A. I own.
Q. Do you own any other real property, other than your home?
A. No.
Q. Do you have any investment or saving accounts valued at more than $50,000?
A. Yeah.
Q. Can you describe?
A. I have various stock investments, financial accounts, yeah.
Q. Can you estimate the value for me?
A. My total worth value?
Q. Uh-huh.
A. In stock, probably two or three million.
Q. Who do you live with now in Cape May?
A. My wife.
Q. What does your wife do for a living?
A. Paralegal for an insurance company.
Q. Do you have any children?
A. Yes.
Q. How many?
A. Seven, five natural, two stepchildren.

Page 41

Q. Do you have any family members who work in law enforcement?
A. Sure.
Q. How many?
A. Two.
Q. Your children?
A. Yeah.
Q. Do they work in the Philadelphia Police Department?
A. One was and used to be in the Police in Philadelphia, now she's in Horsham.
Q. What are their names?
A. John Descher, he's in Philadelphia.
Q. He is currently a sergeant in the Philly police department?
A. No, he's a lieutenant. I think he's in Internal Affairs.
Q. And your daughter?
A. Yeah, I have a daughter in Horsham. She's a school cop at Horsham High School.
Q. She was previously in the Philly police department?
A. She froze her pension at 20 years.
Q. What was her name?

Page 42

A. Marybeth --
Q. Descher?
A. Novack.
Q. Do you use any social media, sir?
A. Not really. I read sports.
Q. Do you have a Facebook account?
A. No.
Q. Do you have a Twitter account?
A. I don't think so.
Q. How about Instagram?
A. No, I barely read.
Q. Do you ever post on social media about sports or anything?
A. No.
Q. Have you ever been sued before?
A. No, I don't think so.
Q. I found a couple of things and I just want to ask you to the degree you remember. It looks like Officer Brignola and a series of other officers sued you and the city, I think you as a sergeant in the homicide department in about 1988. Do you remember what this was about?
A. No.

Page 43

Q. In 1991 a man named Herbert Springs and his wife, Phyllis Walker their children sued you and the city and Detective Thomas Augustine. Do you remember what that was about?
A. No.
Q. I mentioned earlier that you had been named as a defendant in a lawsuit filed by a man named Pedro Alicea alleging similar things as the lawsuit here. Were you aware of that one?
A. Nope. I mean there's some other notice I got like that on another case but I don't know what it is.
Q. Are you aware of any other pending lawsuits?
A. No.
Q. Have you received any other notices likes you just described?
MR. ZURBRIGGEN: Objection. Just be careful not to disclose anything confidential, communications with attorneys. You can answer.
BY MS. HARRIS:

Page 44

Q. I'm not asking about your communications with your attorneys, sir. I'm just asking if you are aware of any other pending lawsuits?
A. There is another one that I saw come in. I really don't know what it is.
Q. Have you ever filed a lawsuit? Have you ever sued anyone?
A. No.
Q. In this case, Mr. Crosland is suing you for damages. Are you aware of that?
A. Yes.
Q. Do you understand that a jury could find that you have to pay those damages?
A. I guess.
Q. If that happens, what is your understanding as to who would pay those damages?
MR. ZURBRIGGEN: Objection to the form. Sergeant, I would again instruct you not to disclose any confidential communications you've had with your attorneys.
THE WITNESS: I don't know.
BY MS. HARRIS:
Q. Would the city be paying?

Page 45

MR. ZURBRIGGEN: Same objection.
THE WITNESS: I don't know.
BY MS. HARRIS:
Q. Is there any situation where you would have to pay those damages yourself?
MR. ZURBRIGGEN: Same objection. Sergeant, you can answer.
THE WITNESS: I don't know the answer to that.
BY MS. HARRIS:
Q. I want to talk a little bit about the Philly homicide department generally.
Can you tell me a little bit about the role of a supervisor when you were a homicide detective there?
A. Depends whether you were in the line squad or 5 squad situation.
Q. Can you tell me about the line squad and the 5 squad?
A. The line squad, if you were a sergeant, you would be a lieutenant, you would go to the scene, do a scene, come back and you work with the squad. As the job goes on, the job would

Page 46

be assigned to a certain detective and he would handle the specific daily reception of interviews and stuff like that. The supervisor would oversee all of the investigations in that line squad.
Q. So you would have some detectives that were working under your supervision?
A. Yes.
Q. And they would keep you abreast of the investigation?
A. The best you could.
Q. You would provide them with guidance, direction --
A. Yes.
Q. If their investigation was insufficient, you would direct them to do things, right?
A. If you could, yeah.
Q. What do you mean if you could?
A. There was more -- if you were actively involved and working with somebody in particular and you could direct them, yeah, I guess you would.
Q. You would review formal documentation like witness interviews, right?

Page 47

A. At the line squad it's different because all of the interviews are being done. The main interviews are being done all at once. So you're doing your best you can to review as they come in. We question -- you might have an additional question or something. It's been a long time. I left that career and went to another career and left that all behind. That's what I remember.
Q. Understood. But you might review the crime scene analysis, right, if you weren't able to go there yourself?
A. I don't know. I don't remember doing that.
Q. If there was forensic analysis, you might review that with the detective?
A. I don't remember doing any forensic reviews.
Q. Would you review the affidavit of probable cause before it's being shown to the D.A.?
A. Maybe. I guess. I don't remember doing any.
Q. You would review the activity sheets,

Page 48

right, provided by the detectives?
A. No. The activity sheets would be typed up and put in an envelope, in a folder usually.
Q. My understanding is the activity sheets were created for supervisors to know what was happening in the investigation; is that wrong?
A. That's not what I recall.
Q. What do you recall the purpose of them to be?
A. So he has a record of his activity and it's in the file. It's in the folder.
Q. You never used those activity sheets to approve time spent on cases or time spent on specific leads?
A. Most of my time as a line sergeant was reading the interviews, the actual interviews as they were being conducted and trying to level them out and see if they were all the same or if you could find a differential that you might bring to somebody's attention.
Q. So these activity sheets were more just internal documents to note a detective's thoughts?

Page 49

MR. ZURBRIGGEN: Objection to form. Sergeant, you can answer.
THE WITNESS: Whoever was assigned to the case, it was his H number. He carried that folder, it was his.
BY MS. HARRIS:
Q. You mean the assigned detective?
A. The assigned detective. That's how I remember it. I never carried one so I don't know for sure but that's what my belief is.
Q. But you were responsible for supervising assigned detectives, right?
A. Sure.
Q. You would sometimes be present during witness or suspect interviews?
A. I lost your whole question.
Q. I'm sorry. Sometimes you might be present during a witness or suspect interviews, interrogations?
A. Sometimes but not often. Usually if you're a sergeant on a line squad, you're out sitting at a desk and trying to go through the interviews, at least the initials.
Q. When would you supervise one directly?

Page 50

When would you choose to sit in?
A. I have no recollection of that.
Q. You don't recall ever sitting in?
A. I don't recall when I would sit in. I guess -- I just don't have a recollection of that.
Q. Could it depend on which detective was doing the interrogation?
MR. ZURBRIGGEN: Objection to the form. Asked and answered. Sergeant, to the best you can say.
THE WITNESS: I don't know that that would matter.
BY MS. HARRIS:
Q. Were there some detectives that might be more necessary to supervise than others?
MR. ZURBRIGGEN: Same objection.
THE WITNESS: Not that I have a recollection of.
BY MS. HARRIS:
Q. If you didn't get to sit in yourself, how would you know what happened?
A. They come out and show you the

Page 51

interview.
Q. Did you sometimes do a case roundtable so everyone is up-to-date?
A. Sometimes you'd be sitting there going through it, you suggest that he go back in. That's my recollection. It's been a long time.
Q. So ultimately it's the assigned detective's responsibility to move a case forward, right?
A. Sure.
Q. And you trusted them to do that, the ones you supervised?
A. Sure.
Q. I want to Zoom out a little bit just to the Philly police department generally. When you're talking about the homicide department, not all detectives end up working in homicide, right?
A. No, they don't.
Q. These are very serious cases you're working on, right, in homicide?
A. Sure.
Q. This is the cream of the crop of

Page 52

detectives, right?
MR. ZURBRIGGEN: Objection to form. Sergeant, you can answer.
THE WITNESS: I don't have an opinion on that.
BY MS. HARRIS:
Q. You don't think they put good detectives in homicide?
A. I don't have an opinion one way or the other.
Q. But you trusted the detectives that were working for you in homicide, right?
A. Sure.
Q. And you trusted them to do a good investigation?
A. Sure.
Q. How many line squads? You described line squad and 5 squad. How many were there?
A. I'm not really sure. I think it was four.
Q. What is 5 squad?
A. 5 squad had follow-up investigations, special assignment investigations, stuff like that. That's my recollection. But like I

Page 53

said, it has been a long time.
Q. Which squad did you supervise, do you remember?
A. I did line squad and I did 5 squad.
Q. But you don't know when you were doing which one?
A. No, not exactly, no.
Q. Which one did you start with? Were you put on a line squad to start?
A. Line squad in the beginning.
Q. I want to go through some detectives and ask if you remember supervising them. Okay?
A. Sure.
Q. Marty Devlin?
A. Yes.
Q. Frank Jastremski?
A. I'm not sure. Frank I knew from -- I was in uniform with. I'm not sure if he was ever in my squad.
Q. Manny Santiago.
A. I don't think Manny was ever in my squad but I'm not sure.
Q. Marty Devlin was though?
A. Marty Devlin was, yes.

Page 54

Q. Were you aware that Detective Devlin has been charged with perjury for lying under oath?
A. Yes.
Q. Do you have any opinion on that?
MR. ZURBRIGGEN: Objection to form. Sergeant, you can answer.
THE WITNESS: None that I wish to share.
BY MS. HARRIS:
Q. How about one that you don't wish to share?
MR. ZURBRIGGEN: Same objection. Sergeant, you can give your opinion, relevant as it is.
THE WITNESS: Marty is a stand-up guy. That's what I knew.
BY MS. HARRIS:
Q. How about Albert Nespoli, do you remember supervising him?
A. I'm not sure. I remember him, I don't remember whether I supervised him or not.
Q. John Cimino you mentioned you did not remember --

Page 55

A. For a short period of time in 5 squad.
Q. How about Jim McNesby?
A. Short period of time in 5 squad.
Q. Dominic Mangoni?
A. I'm not sure. I worked with Dominic I think in a 5 squad situation. There may be more than one 5 squad. He may have been one and I was in the other. I know I worked with Dom at times. And he was an interpreter. I remember working with him in that regard.
Q. Interpreter for what language?
A. Spanish.
Q. So there could have been multiple 5 squads at the same time?
A. Sure.
Q. How about Joseph Brignola?
A. I did supervise Joseph Brignola.
Q. How about Francis Ansel?
A. Yes.
Q. Edward Hughes?
A. Yes.
Q. And Edward Rocks?
A. Yes.
Q. So you supervised all of these guys in

Page 56

homicide?
A. At some period of time. You had an A and B at some point. At 5 squad, you had a lieutenant, an A sergeant and a B sergeant. He may be in B and I may be in A, I would still supervise him but it wouldn't be his direct. That's my recollection.
Q. Anything stand out about any of these detectives?
MR. ZURBRIGGEN: Object to form. Sergeant, if it does, you can answer.
THE WITNESS: No.
BY MS. HARRIS:
Q. Anyone you particularly trusted to do a good job there?
A. I trusted all of them.
Q. Anyone whose work you would make sure to double check?
A. Not that I recall.
Q. How about some of the other supervisors you might have worked with in homicide. Did you work with -- I'm honestly not sure if it's sergeant or lieutenant Westerman?
A. I'm not sure. I knew who he was. I'm

Page 57

not sure if I ever worked directly with him.
Q. He was another sergeant in homicide?
A. I think he was a lieutenant. I'm not sure.
Q. And Lanzelotti?
A. I think he was a lieutenant too. Again, I'm not sure.
Q. You don't remember working with them directly?
A. No.
Q. You don't remember if they were good supervisors?
A. No.
Q. If you weren't there, would another supervisor take over your squad?
A. Yeah.
Q. You trusted the other supervisors in homicide to look after your squad if you were out?
A. Sure.
Q. How many cases were you working on at any given time?
A. As a sergeant?
Q. Yeah, how many were you supervising?

Page 58

A. I don't know, I don't remember.
Q. Can you give me a ballpark?
A. A lot, I don't remember. You're talking about line or are you talking about 5 squad?
Q. Let's start with line squad?
A. A lot.
Q. More than 20?
A. If you have four or five detectives, sure you had more than 20.
Q. How many cases are each detective working on?
A. I don't know. I don't recall.
Q. How about in line squad, is it more or less?
A. It's more. You may have two in a day.
Q. Two different murders investigations?
A. Yeah, two investigations going on.
Q. How do you keep track of everything?
A. I don't recall.
Q. What kind of shifts were you working? How many hours a week?
A. A lot, I don't remember. A lot of hours.
Q. A lot of hours?

Page 59

A. A lot.
Q. Did you have specific days off every week?
A. Yeah, but you might have court.
Q. So you might have to go to court even on your days off?
A. Yes.
Q. Even as a sergeant you would go to testify in court?
A. Sure.
Q. Do you remember who was supervising your squad when you were off?
A. No. No, I don't.
Q. I want to go through one more section and then we can take a break. Is that all right with you?
A. Yes.
Q. Were you familiar with the Philadelphia Police Department's Internal Affairs process?
A. Yeah.
Q. Had you ever been the target of an investigation?
A. Not that I know of.
Q. Have you ever been interviewed by

Page 60

Internal Affairs?
A. Yeah, as a cop.
Q. You were interviewed about other police officers?
A. No, I was interviewed. I don't remember what it was.
Q. So you were interviews because there was an allegation against you?
MR. ZURBRIGGEN: Objection to form.
THE WITNESS: No, I didn't say that.
MR. ZURBRIGGEN: You can answer.
THE WITNESS: Not that I recall.
BY MS. HARRIS:
Q. But you don't recall it being about somebody else?
A. No.
Q. Do you remember any complaint against you ever being sustained by Internal Affairs?
A. Not that I know of.
Q. Were you ever disciplined by the Philly

Page 61

police department?
A. Not that I know of.
Q. Were you ever directed to participate in extra training?
A. No.
Q. Given that you were -- your work in the Philadelphia Police Department, your supervisory role, can I assume that you're familiar -- or at least back then, you're familiar with the basic rules that govern police practice?
MR. ZURBRIGGEN: Objection to form. Sergeant, you can answer.
THE WITNESS: I don't know.
BY MS. HARRIS:
Q. The constitutional rules like you need probable cause, you can't use unreasonable force?
MR. ZURBRIGGEN: Same objection. Sergeant, you can explain as best you can.
THE WITNESS: I don't recall. I don't recall the rules and I don't recall what you're talking about. I don't really

Page 62

know.
BY MS. HARRIS:
Q. You don't ever recall being trained on the constitutional limits of a police officer's behavior?
MR. ZURBRIGGEN: Same objection.
THE WITNESS: I have no direct recollection of that.
BY MS. HARRIS:
Q. Do you remember any Philadelphia police directives governing how you were allowed to do things?
A. I remember studying directives for promotion tests.
Q. So you were trained on those directives at some point?
A. I remember studying directives for promotion tests.
Q. Presumably you applied those directives in your work, right?
MR. ZURBRIGGEN: Objection to form, Sergeant.
THE WITNESS: I do.

Page 63

BY MS. HARRIS:
Q. You wouldn't just study them for the test and then ignore them when you actually started working, right?
A. No, I believe I followed them, the ones I knew.
Q. It was your responsibility as a sergeant to report violations, right?
A. Yes.
Q. Who would you report those to, to the degree that you ever had to report one?
A. I don't recall ever having to or what the standard procedure was.
Q. Violations that you had a duty to report would include civilian complaints, right?
MR. ZURBRIGGEN: Objection to the form. Sergeant, if you understand.
THE WITNESS: I guess.
BY MS. HARRIS:
Q. Internal complaints, like if one cop said something about another cop, right?
A. If I knew of it, yeah.
Q. Or something that you witnessed personally, right? If you witnessed a

Page 64

detective doing something inappropriate, you would have a duty to report that, right?
A. Yes.
Q. Did you have a responsibility to report any allegation of misconduct or just those that you were able to substantiate?
A. I don't recall. I don't recall what the standard was.
Q. I'm going to list a few things and you tell me if this is something that you would have had to report or that you would have reported or investigated.
If a detective working underneath you was keeping important information from the district attorney, would you report that?
A. If I knew about it.
Q. If you knew that they were keeping information about alternative suspects from the district attorney, that's something that would need to be reported, right?
A. I don't know. I don't know what you're talking about. I don't know the criteria you're proposing to me.

Page 65

Q. Well, if a detective working under your supervision was aware of an alternative suspect in a case and kept that information from the district attorney and you knew about it, you would have to report that, right?
MR. ZURBRIGGEN: Objection. Sergeant, to the extent you can answer that.
THE WITNESS: It makes sense.
BY MS. HARRIS:
Q. It makes sense that you would have to report it?
A. Yeah.
Q. How about if the main witness in a case had serious credibility issues?
MR. ZURBRIGGEN: Same objection.
BY MS. HARRIS:
Q. And the detective didn't tell the district attorney, that's something you would have to report, right?
MR. ZURBRIGGEN: Same objection. Sergeant you can answer the hypothetical the best you can.
THE WITNESS: I would, I

Page 66

guess. I don't know.
BY MS. HARRIS:
Q. What if you were aware that a detective under your supervision was threatening a suspect or a witness with force during interrogation; would you report that.
MR. ZURBRIGGEN: Same objection.
THE WITNESS: Yes.
BY MS. HARRIS:
Q. What if the detective was threatening the suspect or a witness with charges or jail time during interrogation; is that something you'd have to report?
MR. ZURBRIGGEN: Same objection.
THE WITNESS: I would if I knew it. If I knew it, I would stop it.
BY MS. HARRIS:
Q. What about if a detective under your supervision was relying on a single witness in a case and that witness had obvious credibility problems; is that something you would want to follow up with?

Page 67

MR. ZURBRIGGEN: Same objection.
THE WITNESS: I don't know, it's too vague what you're telling me, for me to even respond to.
BY MS. HARRIS:
Q. What part is vague?
A. Your whole question. Your whole presentation was vague.
Q. Fair enough. So if a detective under your supervision is moving an investigation forward based on one witness and this witness -- you have reason to believe that witness is not telling the truth.
A. If I knew about it, it wouldn't happen.
Q. What would you do?
A. Deal with it.
Q. What does deal with it mean?
A. Whatever I had to do to deal with it to make sure it was done directly.
Q. So you would maybe talk to the detective?
A. I don't know, it's too vague.
MR. ZURBRIGGEN: Objection to

Page 68

form.
BY MS. HARRIS:
Q. I'm just trying to understand what you mean by deal with it?
A. I don't know either because I don't know the situation. I knew that if something wrong was being done, I would deal with it.
Q. Is it your responsibility to investigate if a detective like that is working underneath you?
MR. ZURBRIGGEN: Objection to form. Sergeant, do you understand?
BY MS. HARRIS:
Q. If they're doing something inappropriate?
A. No, I don't understand.
Q. If you get reports that a detective working under your supervision is committing misconduct of some kind, is it your responsibility to investigate?
MR. ZURBRIGGEN: Same objection.
THE WITNESS: I would think so.

Page 69

BY MS. HARRIS:
Q. What steps might you take?
A. I don't know. It's been so long, it's another world. I don't even know. I don't even know how I would deal with it then. You're talking about then?
Q. Yes.
A. I don't know.
Q. I know, it's hard to go back this far. Would you potentially, sit in on future interrogations to see how they conduct themselves?
MR. ZURBRIGGEN: Objection to form. Again, Sergeant, you can answer.
THE WITNESS: I don't know.
BY MS. HARRIS:
Q. Did you ever report anyone working beneath you?
A. Not that I recall.
Q. Did you ever informally reprimand or redirect a detective?
A. Not that I recall.
Q. If a detective under your supervision had been reported to Internal Affairs by

Page 70

someone else, would you be informed as one of their supervisors? Would they go and tell all the supervisors?
A. I don't think so but I don't know.
Q. Do you ever remember being informed of a detective's misconduct history?
A. No.
Q. Were you ever told to keep an eye on a particular detective?
A. No.
Q. In your career, did you ever see a fellow Philadelphia Police Department officer of any rank engage in misconduct?
A. Not that I recall.
Q. Not a single time?
A. Not that I recall.
Q. Every detention of a person you ever saw was carried out within the rules?
MR. ZURBRIGGEN: Objection, asked and answered. Sergeant, you can answer again.
THE WITNESS: Not that I recall, no.
BY MS. HARRIS:

Page 71

Q. Every arrest was done properly?
A. I don't know. I don't recall anything occurring like that.
Q. How many years were you in the department again?
A. I guess 25.
Q. So in 25 years, every witness interview you ever supervised, everything you ever sat in on was done correctly?
MR. ZURBRIGGEN: Same objection. Sergeant, you can answer again.
THE WITNESS: As I said, I don't recall.
BY MS. HARRIS:
Q. Given the multiple exonerations we've talked about and the officer we talked about that has been charged with perjury, do you ever worry that you missed something?
MR. ZURBRIGGEN: Objection to the form. Sergeant, you can answer.
THE WITNESS: No, I never worried about it.
BY MS. HARRIS:
Q. Do you ever worry that the detectives

Page 72

under your supervision maybe needed to be supervised more?
MR. ZURBRIGGEN: Objection to the form. Sergeant, you can answer.
THE WITNESS: I have no recollection of that, of having any feelings like that.
BY MS. HARRIS:
Q. Have you ever heard of the blue wall of silence or the code of silence?
MR. ZURBRIGGEN: Objection to the form. Sergeant, you can answer.
THE WITNESS: No.
BY MS. HARRIS:
Q. You never heard about this idea that police officers protect each other?
MR. ZURBRIGGEN: Same objection, Sergeant.
THE WITNESS: No. I think this would be a good time for a quick break.
VIDEOTAPE OPERATOR: The time is 10:45 a.m., off the record.
The time is 10:59 a.m., back on the record.

Page 73

BY MS. HARRIS:
Q. Sergeant Descher, during the break did anything occur to you that you wanted to change about your answers?
A. No.
Q. Because at the beginning you started talking about some issues that you might have in understanding or responding to my questions, can I assume that you understood all of my questions so far and that your answers were truthful?
A. Yes.
Q. Can you please just let me know if at any point today you get to a point where you don't understand my questions or you think a break will be useful?
A. Yes.
Q. Thank you. I want to go back to a couple quick points.
Why didn't you receive the complaint when you received it in the mail?
MR. ZURBRIGGEN: Object to the form. Sergeant, you can answer.
THE WITNESS: I don't know.

Page 74

I mean my wife went over it. We talked about it.
BY MS. HARRIS:
Q. So your wife read it?
A. Yeah.
Q. Did she summarize the allegations for you?
A. I can't remember.
Q. You don't remember any of the allegations against you here?
A. No.
Q. It didn't concern you that someone was making these kinds of allegations?
MR. ZURBRIGGEN: Objection to the form. Sergeant, you can answer.
THE WITNESS: No.
BY MS. HARRIS:
Q. It didn't upset you?
A. No.
MR. ZURBRIGGEN: Same objection.
BY MS. HARRIS:
Q. I want to go back really quickly to your

Page 75

move from homicide to --
A. West Detectives.
Q. You said you don't know why that transfer occurred?
A. No.
Q. But you didn't request it?
A. No.
Q. Do you know if it had anything to do with that lawsuit we talked about, initiated by Officer Brignola?
MR. ZURBRIGGEN: Objection to the form. It's asked and answered, Sergeant.
THE WITNESS: I don't know. I didn't even know there was a lawsuit.
BY MS. HARRIS:
Q. You don't remember Officer Brignola suing you and the city.
A. I didn't know. I don't know.
Q. You weren't informed at the time, as far as you know?
A. No.
Q. So you're not aware if there was a connection between that lawsuit and the

Page 76

transfer?
A. I didn't even know about it.
Q. Do you remember having any feelings about being transferred out of homicide?
MR. ZURBRIGGEN: Objection to the form. Sergeant, you can answer.
THE WITNESS: No, I don't. I don't remember. You asked me did I remember. Is that what you asked me?
BY MS. HARRIS:
Q. Do you remember if you had any feelings about it?
A. I don't remember having any feelings about it.
Q. I want to talk about some policies and practices that were relevant to your work as a homicide sergeant. I want to talk about discovery of exculpatory evidence. Just so we're on the same page, do you know what exculpatory means?
A. No.
Q. I will offer to you that exculpatory means anything that tends to show that someone

Page 77

accused of a crime might not be guilty. Does that sound right to you?
A. Yes.
Q. So any evidence that would be favorable to the suspect or the defendant?
A. Yes.
Q. Does that ring a bell?
A. Yes.
Q. A classic exculpatory evidence might be that a witness says someone else did it, right?
MR. ZURBRIGGEN: Objection to the form. Sergeant, you can answer.
THE WITNESS: I don't know.
BY MS. HARRIS:
Q. Would you agree that that would be exculpatory to a suspect?
MR. ZURBRIGGEN: Objection.
THE WITNESS: I don't know. I don't know because I'm really vague about exculpatory. I don't know.
BY MS. HARRIS:
Q. Let's make sure we're on the same page

Page 78

about it then. You just agreed with me that exculpatory is anything that tends to show someone accused of a crime might be innocent, right?
A. That's what you're telling me, yes.
Q. I thought earlier you said that rang a bell to you.
MR. ZURBRIGGEN: Objection, it's asked and answered. Sergeant, again.
THE WITNESS: It rang a bell.
BY MS. HARRIS:
Q. Would you agree that if there's suspect number one and a witness said, oh, actually it was guy number two, that would be favorable evidence to guy number one, right?
MR. ZURBRIGGEN: Objection to the form. Sergeant, you can answer the hypothetical.
THE WITNESS: I don't know.
BY MS. HARRIS:
Q. You don't know if --
A. I don't know. I really don't. I don't know.

Page 79

Q. If there is one shooter in a case and guy number one is accused of being that shooter and a witness said, no, I saw guy number two shoot him, you don't know whether that would be favorable to guy number one?
MR. ZURBRIGGEN: Objection. Same objection.
THE WITNESS: You don't know what the surrounding information is about number two. Number two could have been 52 blocks away, I don't know. It's very vague and doesn't make sense what you're saying, to me.
BY MS. HARRIS:
Q. What doesn't make sense about it?
MR. ZURBRIGGEN: Same objection.
THE WITNESS: The scenario that you gave me doesn't make sense. Because one person said one thing and another person said another, I don't know whether they were even in the same city at the same time.
BY MS. HARRIS:

Page 80

Q. Let's say we have no other information, right. There's suspect number one and a witness says, it's not suspect number one, it's suspect number two. All I'm trying to get at is, wouldn't you agree that that would be exculpatory evidence to suspect number one?
MR. ZURBRIGGEN: Same objection. Sergeant, you can answer.
THE WITNESS: No, I would believe that that would take some investigating that needed to be done as to what number two and what number one are saying. I would think further investigation would be needed.
BY MS. HARRIS:
Q. Maybe we should clarify. Exculpatory evidence doesn't mean that somebody is completely cleared, right? It just might be favorable evidence to them, right?
MR. ZURBRIGGEN: Objection to the form.
THE WITNESS: I believe it would rise to some more investigation would be needed.

Page 81

BY MS. HARRIS:
Q. Would you agree that that suspect number one might want to know that some other witness said it was somebody else?
MR. ZURBRIGGEN: Objection to the form.
THE WITNESS: That I have no opinion on.
BY MS. HARRIS:
Q. So favorable evidence to suspect number one, you agree that a witness pointing at another suspect would be favorable to suspect number one, right?
MR. ZURBRIGGEN: Same objection.
THE WITNESS: No, it would be different. It would be different information. If one person is saying one thing, another person is saying another, it's different.
BY MS. HARRIS:
Q. Right. But if there's different information, if there's inconsistent information as to whether suspect number one did it, that's favorable information to

Page 82

suspect number one, right?
MR. ZURBRIGGEN: Objection to form.
BY MS. HARRIS:
Q. Even if it doesn't ultimately clear that suspect, it's still favorable information to him, right?
MR. ZURBRIGGEN: Same objection, Sergeant --
THE WITNESS: I don't agree with the word favorable.
BY MS. HARRIS:
Q. What word would you use?
A. I already told you my belief, that you would need to do further investigation. That's my belief.
Q. Right. I'm not talking about whether there's more investigation necessary, I'm talking about classifying the evidence as exculpatory or not exculpatory?
MR. ZURBRIGGEN: Objection if that's a question. Sergeant, you can answer.
THE WITNESS: I'm not comfortable with giving an answer on that. I

Page 83

am just not comfortable with the whole scenario.
BY MS. HARRIS:
Q. You're not comfortable with the concept of exculpatory evidence?
A. I'm not.
Q. So it's not something they taught you in the Philadelphia Police Department, what exculpatory evidence was?
A. I don't remember.
Q. You don't remember being trained on that?
A. No, I don't remember at all.
Q. You said you were in the Philadelphia Police Department for 25 years?
A. 25 years.
Q. And then you went on to work as an investigator, right?
A. Yes.
Q. And then you moved up the ranks of the insurance investigation, right?
A. Yes.
Q. You went to the law enforcement conferences where you spoke with law

Page 84

enforcement agencies and officers?
A. I did.
Q. And you don't know what the concept of exculpatory evidence is?
A. No, I don't.
Q. Will you accept my representation that exculpatory evidence is anything that tends to show someone accused of a crime might not be guilty of that crime?
MR. ZURBRIGGEN: Objection to the form. Sergeant, you can accept counsel's representation.
BY MS. HARRIS:
Q. Do you have any reason to dispute that representation?
A. It would be important to me how reliable that information was.
Q. Why would that be important to you?
A. Because reliability -- you can't chase -- you can't chase things around that aren't reliable, once they're shown that they're not reliable.
Q. Sure. Something does not become exculpatory evidence unless you are able to

Page 85

investigate and determine it's reliable?
MR. ZURBRIGGEN: Objection to the form and to the extent it calls for a legal conclusion. Sergeant, you can answer.
THE WITNESS: I don't know.
BY MS. HARRIS:
Q. How about evidence that might be used to question a witness' truthfulness, right? If you have a witness, this might be the kind of evidence you were just talking about.
You have a witness who says suspect number one. If you learn new evidence about that witness that shows that witness might not be telling the truth when they say that, might not be a reliable witness. That's information that would be important to have, right?
MR. ZURBRIGGEN: Same objection. Sergeant, you can answer.
THE WITNESS: You would have to pursue it.
BY MS. HARRIS:
Q. That's information that might be favorable to that suspect that they're

Page 86

pointing out, right?
MR. ZURBRIGGEN: Same objection.
THE WITNESS: If you pursued it and you determined that it was reliable, then yes. If it's not reliable, no.
BY MS. HARRIS:
Q. If you or one of the detectives has exculpatory information, information that is good for the suspect or defendant, that information has to be given to the District Attorney's Office, right?
A. Yes.
Q. You have to do this when you present the case for prosecution, right?
A. Absolutely, from what I recall.
Q. Is the first contact with the District Attorney's Office when you seek an arrest warrant, when you need that approval of the affidavit of probable cause?
A. No, when you're doing an investigation, if you wanted a search warrant at 3 o'clock in the morning, we would have to wake Barbara Christy up and get permission.

Page 87

Q. Permission to what?
A. To get the warrant.
Q. So when you have that conversation where you go over the evidence for the warrant, you have to tell them of all the exculpatory information you've uncovered as well, right? All the information that might be favorable to that suspect?
MR. ZURBRIGGEN: Objection to the form.
THE WITNESS: That wouldn't fit that scenario.
BY MS. HARRIS:
Q. What do you mean?
A. If you're calling for a warrant, you have certain information, you know, probable cause and reason to want to pursue that. That's what you would give them, and they would determine from that information. If you had something that said it wasn't true, you wouldn't be giving it to them.
Q. If you have something that goes against that theory, right, goes against saying we have reasonable suspicion for the suspect --

Page 88

we have probable cause to arrest the suspect, then you're not going to tell the D.A. that?
A. I'm not going to pursue it.
Q. You're not going to pursue what?
A. I'm not going to move to get a warrant. I'm not pursuing it if I know that something is not true.
Q. Okay but what if it's a little more ambiguous than that, right? You have some evidence -- you have a lot of evidence against him, you think you have enough for a warrant but then there's a couple of contradictory things, a couple inconsistencies; do you give that information to the D.A. so they have every -- they have the whole picture of the investigation?
MR. ZURBRIGGEN: Objection to the form. Sergeant, you can answer the hypothetical.
THE WITNESS: I don't know. I don't know. I don't know.
BY MS. HARRIS:
Q. You don't remember whether you would give any inconsistent or exculpatory

Page 89

information to the D.A.'s office?
MR. ZURBRIGGEN: Same objection.
THE WITNESS: Once again, it would depend on the information, I guess.
BY MS. HARRIS:
Q. In what way would it depend on the information?
MR. ZURBRIGGEN: Same objection.
THE WITNESS: If I knew it was true, I would tell them. If I knew it was questionable, I wouldn't.
BY MS. HARRIS:
Q. So if you weren't sure that it was true, you wouldn't give it to them?
A. No.
MR. ZURBRIGGEN: Same objection.
BY MS. HARRIS:
Q. So were you aware that a defendant has a -- I'm sorry, can we clarify that? If you were -- if you're not sure if evidence is true or not true, then you're not going to give it

Page 90

to the D.A.'s office?
A. Not until I investigate it and find out whether it's true. If I investigate it and pursue it and find out it's true, I will give it to them. If I find out it's not true, I will pursue that.
MR. ZURBRIGGEN: Objection to form, for th record.
BY MS. HARRIS:
Q. What if you investigate, you do your best, you send out your guys, you talk to the witness again and it's still a little ambiguous, you're still not quite sure whether it's true or not; do you give it to the D.A. in that situation?
MR. ZURBRIGGEN: Object to the form. Sergeant, you can answer.
THE WITNESS: I don't know.
BY MS. HARRIS:
Q. You have evidence that cuts against probable cause, evidence that's favorable to the suspect and you're just not quite sure if it's reliable, what do you do with that evidence?

Page 91

MR. ZURBRIGGEN: Same objection.
THE WITNESS: I would investigate it.
BY MS. HARRIS:
Q. What if you've investigated it as much as you can and you're still not sure?
MR. ZURBRIGGEN: Same objection.
THE WITNESS: I wouldn't use it probably.
BY MS. HARRIS:
Q. By use it, you mean you wouldn't give it to the D.A.'s office?
MR. ZURBRIGGEN: Same objection.
THE WITNESS: I don't know -- you're somewhere where I'm not. You're giving me situations in a scenario and I don't know where you're at. I don't know what position you're putting me in to ask me about when I would do something, it depended on what the situation was. It's like sitting on a cloud here.

Page 92

BY MS. HARRIS:
Q. I would love to get on the same page. I'm just trying to understand --
A. I'm not going to answer if I don't know what you're asking me. It doesn't make sense. I don't know, I don't know. That's what I'm telling you, I don't know.
Q. I appreciate that. I'm happy to rephrase so that you can understand my question better. I'm trying to understand how you would provide the information that you learned in your investigation to the District Attorney's Office in that process where you're getting an affidavit of probable cause.
So you need the D.A.'s office to approve an affidavit of probable cause, right, for an arrest warrant?
A. Yes.
Q. To do that, you're going to have to give them information about the investigation, right?
A. I'm going to give them everything we have and we're going to discuss it and they're going to make a decision. It's their

Page 93

decision.
Q. You're going to give them even the evidence that cuts against guilt, right?
A. Everything.
Q. So you can't bury information that cuts against guilt just because?
MR. ZURBRIGGEN: Objection to form. Sergeant, you can answer the hypothetical.
THE WITNESS: You said you can't?
BY MS. HARRIS:
Q. You cannot, right?
A. I wouldn't.
Q. That's something that you knew in 1987, right?
A. I don't know. I don't know what I knew in 1987. I probably didn't know a lot of things in 1987. I don't know.
Q. I assume you would know how to conduct a homicide investigation in 1987, right?
A. I'm sure I did.
Q. And you knew then as part of conducting a homicide investigation that you can't bury

Page 94

evidence that cuts against your theory, right?
A. Right.
MR. ZURBRIGGEN: Objection to the form.
THE WITNESS: Sorry.
MR. ZURBRIGGEN: That's all right, Sergeant.
BY MS. HARRIS:
Q. Can you repeat your answer? I think you said right.
A. I don't know. I don't know what I said.
Q. Are you aware that a defendant in a criminal case has as a constitutional right to be able to challenge the credibility of witnesses against them?
MR. ZURBRIGGEN: Objection to the form. Sergeant, you can answer.
THE WITNESS: No, I'm not aware.
BY MS. HARRIS:
Q. You're not aware of a defendant's constitutional rights to challenge their own conviction?
MR. ZURBRIGGEN: Same

Page 95

objection.
THE WITNESS: No, I'm not.
BY MS. HARRIS:
Q. You're not aware at all that a defendant has a right to challenge a case against them?
MR. ZURBRIGGEN: Objection.
THE WITNESS: I guess to they do. I don't know what you're talking about.
MR. ZURBRIGGEN: And an objection for the record.
BY MS. HARRIS:
Q. I'm talking about a defendant's constitutional right to challenge a conviction?
MR. ZURBRIGGEN: Objection, it was asked and answered three times. Sergeant, answer it again.
THE WITNESS: I don't know.
BY MS. HARRIS:
Q. So you understand that you would do an investigation in homicide, right?
A. Yes.
Q. And that then that investigation would potentially lead to an arrest, right?

Page 96

A. Sometimes.
Q. And that arrest might lead to a trial, right?
A. Sometimes.
Q. And at trial a defendant might try to argue that they're innocent, right?
A. Yes.
Q. And they're entitled to certain evidence so that they can make that argument, right?
MR. ZURBRIGGEN: Objection to the form. Sergeant, you can answer.
THE WITNESS: I don't know.
BY MS. HARRIS:
Q. Well, you've testified in trials before, right?
A. Yes.
Q. And there's a defendant there, right?
A. Yes.
Q. And the defendant has a lawyer?
A. Yes.
Q. And the lawyer is making arguments?
A. Yes.
Q. And the lawyer is using evidence to make those arguments?

Page 97

A. I don't know.
Q. If you have information that cuts against guilt, as a police officer, do you have a responsibility to make sure that gets passed to the defendant?
MR. ZURBRIGGEN: Object to the form. Sergeant, again, you can answer the hypothetical.
THE WITNESS: You would have a duty, in my situation you would have a duty to report it to the district attorney.
BY MS. HARRIS:
Q. And then your assumption is the district attorney then gives it to the defendant if they're legally obligated to?
MR. ZURBRIGGEN: Objection to form. Sergeant, if you know.
THE WITNESS: Yes.
BY MS. HARRIS:
Q. What did you do to ensure that the detectives working under you were complying with this rule to give the district attorney that information?
A. We went into a room sometimes -- most of

Page 98

the time, sometimes the detectives did it themselves, sometimes I would be there. And all of the information we have would be discussed with the district attorney and would be turned over to the district attorney. And at that point they would make a decision.
Q. This includes information that supports your theory of the case, right?
A. It should be all of the information.
Q. Did you review what was passed on to the district attorney in each case?
A. Sometimes I wasn't part of the meetings, sometimes I was. If I was a part of the meeting, I would be there.
Q. If you weren't part of the meeting, then you might not even know what information the detectives passed on to the D.A.?
A. That's correct.
Q. Did you ever have to discipline or remind a detective working under you about this rule to pass information?
A. Not that I recall.
Q. Did you ever have any concern that the detectives working under you were failing to

Page 99

pass information to the D.A.'s office.
MR. ZURBRIGGEN: Objection.
MR. ZURBRIGGEN: Not that I recall, sorry.
MR. ZURBRIGGEN: That's okay, Sergeant.
BY MS. HARRIS
Q. I want to talk a little bit about the process of preparing the affidavit of probable cause.
You're preparing the affidavit at the end of an investigation, right?
A. To be honest with you, I don't remember. I don't remember that process at all.
Q. You don't remember how a case would come to a close?
A. No, I don't remember the process that we used, no. I know that at some point the information was turned over to the district attorney. Depending on the case, it was done in different ways but I just don't remember what they were.
Q. I'll go through some specific questions

Page 100

and maybe that will help.
Did supervisors approve affidavits of probable cause? As a sergeant, did you review it first?
A. Not that I recall.
Q. Would you ever discuss an affidavit of probable cause with the detectives working under you?
A. I don't recall.
Q. Do you ever remember reviewing evidence against a suspect with the detectives?
A. No, I don't recall.
Q. So you never remember reviewing information in a homicide investigation with the detectives?
A. No.
Q. So what were you doing then?
A. I was supervising.
Q. What does supervising look like to you then, if not reviewing evidence?
MR. ZURBRIGGEN: Objection to form. It's asked and answered. Sergeant, go ahead.
THE WITNESS: You review

Page 101

interviews, you discuss cases, whatever it takes. I don't recall that process you're asking me about.
BY MS. HARRIS:
Q. I was asking about whether you reviewed evidence with the detectives and it sounds like you do remember that?
MR. ZURBRIGGEN: Objection to the form. Sergeant, again --
THE WITNESS: I have no recollection.
BY MS. HARRIS:
Q. It sounds like from what you just said that you would review interviews with the detectives working under your supervision, right?
A. Yes.
Q. So I assume as they're preparing the affidavit, you're going to review evidence against the suspect, right?
MR. ZURBRIGGEN: Objection to the form of the question.
THE WITNESS: I don't remember being part of that process.

Page 102

BY MS. HARRIS:
Q. So you don't remember whether you as a supervisor ever supervised as part of the process?
MR. ZURBRIGGEN: Objection to the form.
THE WITNESS: Not that process where they're taking it to the district attorney.
BY MS. HARRIS:
Q. Where they're putting together the investigation into an affidavit of probable cause?
A. Yes, I don't recall.
Q. So the detectives might have done this without supervision completely?
MR. ZURBRIGGEN: Objection to the form and asked and answered. Sergeant.
THE WITNESS: They may have.
BY MS. HARRIS:
Q. Would you expect them to review the evidence against the suspect as part of that process, to go through what they've ave got against the guy?

Page 103

A. Sure.
Q. I assume you would expect them to review anything undermining that evidence too, right, anything that might point to that person being innocent?
MR. ZURBRIGGEN: Objection to the form.
THE WITNESS: Yes.
BY MS. HARRIS:
Q. That would include any credibility issues with the witnesses, right?
MR. ZURBRIGGEN: Same objection.
THE WITNESS: I don't know what it would include because I don't remember the process.
BY MS. HARRIS:
Q. We just talked about that they would have to review any evidence that would point towards innocence, right?
MR. ZURBRIGGEN: Objection to the form.
BY MS. HARRIS:
Q. You would expect them to do that?

Page 104

A. I would expect them to do that.
Q. Evidence pointing towards innocence could include credibility issues of witnesses, right?
MR. ZURBRIGGEN: Same objection. Sergeant, you can answer the hypothetical.
THE WITNESS: I don't know.
BY MS. HARRIS:
Q. You don't know whether if there was a credibility issue with a witness, how it could point towards someone's innocence?
A. I don't know what degree you're talking about.
Q. Any degree?
A. I don't know that they would discuss that with the witness, no.
Q. You don't know that a detective would discuss a credibility issue with the witness?
A. I don't know.
Q. But if the detectives are going through all of the innocence for and against somebody, you would expect them to discuss any credibility issues with witnesses, right?

Page 105

MR. ZURBRIGGEN: Objection to the form.
BY MS. HARRIS:
Q. You would expect them to say, hey, I don't know if that guy was telling the truth. If he's not telling the truth, then that's not very good evidence?
MR. ZURBRIGGEN: Objection to the form and asked and answered. Sergeant, you can answer.
THE WITNESS: I don't know.
BY MS. HARRIS:
Q. How about information about alternative suspects, you would expect them to discuss that, right?
MR. ZURBRIGGEN: Same objection.
THE WITNESS: I don't know.
BY MS. HARRIS:
Q. What don't you know?
A. I don't know each thing they do. Each thing you did in that job was an individual case, a specific case. And you're asking me to generalize and I can't because I don't

Page 106

know.
Q. So there were no generalizable rules or practices?
MR. ZURBRIGGEN: Objection to the form of that question. Sergeant, you can answer.
THE WITNESS: No, not that I know of.
BY MS. HARRIS:
Q. Didn't you say that there were Philadelphia Police Department directives?
A. Sure.
Q. There were no directives about preparing affidavits or probable cause or reviewing evidence?
A. I don't remember.
Q. So each detective for each case was just kind of flying by the seat of their pants doing whatever?
MR. ZURBRIGGEN: Objection to the form.
THE WITNESS: You said that, I didn't.
BY MS. HARRIS:

Page 107

Q. I am trying to get a better sense of how this works.
A. I don't think you are. I already answered that I don't know.
Q. After 25 years in the Philadelphia Police Department, you don't know how an affidavit of probable cause is put together?
MR. ZURBRIGGEN: Objection to the form. It's argumentative and asked and answered. Sergeant, please answer.
THE WITNESS: I believe it's very individual.
BY MS. HARRIS:
Q. We will get into the individual aspects of this case in a bit.
You said a detective might go straight to the district attorney without discussing the case with a supervisor first, right?
A. If the district attorney subpoenaed them or brings them over on a court case, then they would discuss that and I wouldn't be there, probably.
Q. When would you get the update?

Page 108

A. I may not.
MR. ZURBRIGGEN: Object to form.
BY MS. HARRIS:
Q. I want to clarify really quickly, what exactly you need a D.A. to approve. So a police officer can go get an arrest warrant without the district attorney, right?
A. Not when I was there.
Q. You needed the district attorney's permission to get an arrest warrant?
A. Sure.
Q. Every single time?
A. That's my recollection.
Q. I want to turn your attention because we have deposed a couple detectives that were involved in this case. So I want to get your opinion on what they've told us.
I want to say a few months ago we took the deposition of Detective Mangoni who you said that you supervised, at least at one time, right?
A. Yes.
Q. This is a copy of his deposition.

Page 109

Please let me know if you need me to print it in a bigger font. It's sort of a small font. We did the four per page.
I am going to flip to page 435. This is Dominic Mangoni's deposition that was just taken on November 21st of 2023. We asked him about preparing affidavits of probable cause, as well.
Can you take a look at page 435. It should be on the top right there. Look at line 17. Start there, 435 line 17. He's talking about affidavits of probable cause. Read through to the end of his answer on the top of page 436, the page below. Go to the end of the page.
Let me know when you get to line 3 on the page below, page 436.
A. Yes.
Q. Would you agree that when asked whether if you had information that was inconsistent with a subject's guilt, would you ever include that in the affidavit; Detective Mangoni, answered probably not.

Page 110

MR. ZURBRIGGEN: Objection to form. Sergeant, if you can glean that from this.
THE WITNESS: You're asking me -- repeat your question.
BY MS. HARRIS:
Q. I'm just asking you, would you agree with me that when he was asked on line 17 if you had information that was inconsistent with the subject's guilt, would you ever include that in the affidavit and Mangoni says probably not. Would you agree that's what it says?
A. That's what it says.
Q. If you keep reading and the question is why not, Mangoni answers, it wasn't our practice to do that.
Do you agree with Detective Mangoni that it was not the practice to include information that cut against guilt in the affidavit of probable cause?
MR. ZURBRIGGEN: Objection to the form and asked and answered.
THE WITNESS: No, I don't

Page 111

agree with that.
BY MS. HARRIS:
Q. You don't agree with that?
A. No, I don't agree with that.
Q. Why not?
A. Because you would investigate more. If you had information, you would investigate it and you wouldn't -- you would go out and finish your investigation.
Q. So you're saying by the time that you put together an affidavit of probable cause, there shouldn't be any information that cuts against guilt?
MR. ZURBRIGGEN: Objection to the form of the question.
THE WITNESS: It should have been dealt with if there is.
BY MS. HARRIS:
Q. What do you mean, dealt with?
A. It should have been investigated and cleared.
Q. So there shouldn't be any reliable evidence that cuts against guilt by the time you're putting together the affidavit, right?

Page 112

MR. ZURBRIGGEN: Same objection.
THE WITNESS: My recollection back then was, you took that information into the D.A. and you discussed it. And if there was questions, they'd send you back out and get more information. And you wouldn't pursue it until they had probable cause.
BY MS. HARRIS:
Q. You're saying that if there's information -- if there's evidence that cuts against guilt, you might not have probable cause?
MR. ZURBRIGGEN: Objection again.
THE WITNESS: You might not.
BY MS. HARRIS:
Q. Were you aware that the detectives, including Detective Mangoni weren't including exculpatory evidence in the affidavits?
MR. ZURBRIGGEN: Objection to the form.
THE WITNESS: No, I don't

Page 113

believe that's correct. I don't believe that's true.
BY MS. HARRIS:
Q. You think he was being dishonest in his deposition?
MR. ZURBRIGGEN: Objection to the form.
THE WITNESS: No, I didn't say that.
BY MS. HARRIS:
Q. You think he remembered incorrectly?
A. I don't know.
MR. ZURBRIGGEN: Objection.
BY MS. HARRIS:
Q. Did you ever specifically tell the detectives under your supervision that they had to include everything in the affidavit?
A. I don't recall.
Q. Did anyone higher ranking than you ever tell you to direct a detective?
A. My back is killing me.
Q. Would you like to take a break?
A. No. I'm turning because --
Q. I am going to repeat the question if

Page 114

that's okay.
Did anyone higher ranking than you ever tell you to direct your detectives to include more information in the affidavit?
A. The process you're describing is not a process that I recall doing. But I explained to you already that when we had probable cause, we went into the District Attorney's Office -- when I was involved. We sat down and we discussed it. When there was questions, we went out and re-investigated it until the district attorney agreed and we agreed that everything was done directly. I don't know -- the process that's being discussed here is something I don't know about because I didn't do it.
Q. Sure. Based on what you just described, it sounds to me like the district attorney is only going to know in that meeting, only know what the detectives tells them, right?
A. No, that folder that he carries around is going to be on the table and everything is going to be out there.

Page 115

Q. Would you expect the district attorney to have read everything in the folder before that meeting?
MR. ZURBRIGGEN: Object to the form. Sergeant, if you know.
THE WITNESS: My recollection would be yes, that's my recollection, of cases that I did. But like I said, I wasn't always involved.
BY MS. HARRIS:
Q. Would you agree with me that the district attorney's knowledge is going to be based on whatever they received from the detectives?
MR. ZURBRIGGEN: Objection to the form. Sergeant, to the extent you know, you can answer.
THE WITNESS: I don't know. They may have had other information, I don't know.
BY MS. HARRIS:
Q. Typically it's the police department that's in charge of investigating a homicide, right?

Page 116

A. The district attorney -- in a homicide case, the district attorney is very, very, very much involved. Depending on which one you were working with, who was the chief at that time, it was very different rules.
Q. Surely they relied on the police detectives to investigate the case and provide them information, right?
MR. ZURBRIGGEN: Object to form. Sergeant you can answer.
THE WITNESS: My recollection is they oversaw it, the ones that I dealt with.
BY MS. HARRIS:
Q. So the district attorney was acting as a supervisor?
A. No, they were acting as a district attorney on a homicide case.
Q. I would imagine they relied on you, the sergeant, to also be supervising the investigation, right?
MR. ZURBRIGGEN: Object to form.
THE WITNESS: Sometimes I

Page 117

wasn't even there.
BY MS. HARRIS:
Q. You never disciplined a detective under your supervision for failing to provide enough information to the district attorney, did you?
A. No, not that I recall. I don't remember but I don't think so.
Q. You were never disciplined about failing to turn over information to the district attorney by someone higher from than you?
A. No, that I recall.
Q. Okay. I think we have already gone through some of this but let me just take us back a minute.
You can't proceed with an investigation, your squad can't proceed with an investigation if you believe the information to be false, right?
MR. ZURBRIGGEN: Objection to the form. Sergeant, you can answer.
THE WITNESS: No, you shouldn't.
BY MS. HARRIS:
Q. If you have reason to doubt the validity

Page 118

and the reliability of the information you received, you have an obligation to investigate those doubts, right?
MR. ZURBRIGGEN: Same objection.
THE WITNESS: Yes.
BY MS. HARRIS:
Q. I am going to give you an example, I know we haven't done great with the examples so far but we're gonna try.
Witness number one gives a statement that they saw a shooting and your suspect was the shooter. And then three other witnesses also at the scene tell you that witness number one was nowhere near there, couldn't have seen anything.
You're going to have a reason to doubt that witness number one, right?
MR. ZURBRIGGEN: Objection to the form. Sergeant, you can answer the hypothetical.
THE WITNESS: I don't know.
BY MS. HARRIS:

Page 119

Q. You don't know?
A. No.
Q. The word of three people versus the word of one wouldn't cause you to doubt the one?
MR. ZURBRIGGEN: Same objection. Sergeant...
THE WITNESS: You're not giving me totality of the information. I don't know. Three people saying things and then it was investigated and found out they weren't even there or they were in another country, then there would be no reliability in what they said. That's the only thing -- I think it should be looked into.
You're asking me to make a decision on something sitting on a cloud by itself that doesn't exist.
BY MS. HARRIS:
Q. I understand. Hypotheticals are tricky. Let's say you know these three people are at the scene of the crime, right? They're seen at the scene of the crime by your officers who you trust. They all say that the first witness, the one that says, oh yeah, I saw

Page 120

John Smith shoot the guy, they all say that witness number one wasn't there. You're going to have reason to doubt witness number one saying John Smith shot the guy, right?
MR. ZURBRIGGEN: Same objection. Sergeant...
THE WITNESS: I'm going to do further investigation, yes.
BY MS. HARRIS:
Q. You're not going to just run ahead with the case against John Smith just based on what that one witness says, right.
MR. ZURBRIGGEN: Same objection.
BY MS. HARRIS:
Q. When there's three other witnesses saying he wasn't there.
A. Based on my recollection, that's what happens, yes, you do further investigation.
Q. If you do your further investigation and there's more evidence against John Smith and you're like, I can't really explain that first contradiction but there's all of this evidence against John Smith, you're going to go forward

Page 121

with the prosecution, you're still going to tell the district attorney about those three witnesses that said that first witness wasn't there, right?
MR. ZURBRIGGEN: Object to form. Sergeant, and is asked answered. Sergeant, you can answer.
THE WITNESS: I don't know. I believe that's what should happen, yes. But I don't know, I'm not there.
BY MS. HARRIS:
Q. Same thing if your main witness has clearly other motives, right, if this witness says to you, I'll tell you whatever you want to hear as long as you can help me beat my own case, that's going to affect the credibility of the next thing they say, right?
MR. ZURBRIGGEN: Objection to the form. Sergeant, you can answer the hypothetical.
THE WITNESS: I don't know. I really don't know.
BY MS. HARRIS:

Page 122

Q. You don't know if a witness saying, I'll tell you whatever you want to hear will affect their credibility?
A. No, I don't know because I know it wouldn't happen with me.
Q. Why wouldn't it happen with you?
A. Because I wouldn't allow anybody -- I wouldn't take part in anything like that.
Q. Because that would give you concerns about their credibility?
A. I would do further investigation. I would know what's credible and what's not credible.
Q. Why would someone saying that cause you to do further investigation is what I'm trying to get at?
A. I don't know.
Q. Would you have concerns that they were telling the truth?
A. I don't know. If I had doubts about something, I would continue to investigate. That's all I can tell you.
Q. Somebody saying, I will tell you whatever you want to hear, that would give you

Page 123

those doubts, right?
A. Sure.
MR. ZURBRIGGEN: Objection to the form.
BY MS. HARRIS:
Q. This -- somebody saying that to you, those doubts of yours, that's something you would have to pass along, right?
MR. ZURBRIGGEN: Objection to the form. Sergeant, you can answer again.
THE WITNESS: I don't know. You sound like -- you're doing to me what you're describing. You keep coming and it's ridiculous.
BY MS. HARRIS:
Q. I know it's a lot to get through.
A. You want an answer and you're just gonna keep coming and I don't have it for you because I don't remember. You can keep doing it but I don't have the answer. You already know what you want, that's all you're doing.
Q. I'm not trying to get you to say anything particular --
A. Yes, you are.

Page 124

Q. Or remember anything particular.
A. Yes, you are.
Q. Sir, I'm just trying to get a sense of what it was like to investigate these cases.
A. That's okay.
Q. You were there, sir, and I was not.
A. I was not there. I told you I wasn't there.
Q. You were there in the Philadelphia Police Department, right?
A. I was somewhere in the city, I'm sure.
MR. ZURBRIGGEN: Objection to the whole line as argumentative. Counsel, ask your next question.
BY MS. HARRIS:
Q. You were a sergeant in the homicide division of the Philadelphia Police Department, right?
A. I was.
Q. So you had some experiences while you were a police department homicide sergeant, right?
A. I did.
Q. That's all I'm trying to get at.

Page 125

A. But they're not the experiences you're throwing at me. It just makes no sense. You want a particular answer and you keep asking the same question in different ways and I can tell you -- I keep telling you, I don't remember. It's a long, long time ago. I had a further career, I had a further life and I don't recall.
Q. Sir, I'm asking about basic investigative practices.
A. Which I don't even recall all of the basic practices.
Q. That's fine. I'm trying to get at what you can recall about the investigative practices of the Philadelphia homicide --
A. I don't recall.
Q. You continued doing investigative work for many years after your 25 years of service in Philadelphia, right?
MR. ZURBRIGGEN: Objection, all of this is argumentative. Sergeant, you can answer.
THE WITNESS: I did.
BY MS. HARRIS:

Page 126

Q. Let's see how far we can get on what you remember about the investigative practices in the Philadelphia homicide department, okay?
A. I don't remember them, period.
Q. You don't remember anything?
A. I don't remember the practices, no, I don't.
Q. You don't remember anything about the day-to-day of what occurred in the homicide department?
A. Now you're going day-to-day, I don't know what you're asking me.
Q. Let's get into specific questions and see how far we get, okay. We talked about activity sheets, right?
A. Yes.
Q. Do you remember activity sheets?
A. I told you earlier, I do.
Q. Great. So an activity sheet is a document that gives progress about what's happening in an investigation, right?
A. Yes.
Q. Investigations can be sprawling, they can take years, right?

Page 127

A. Yes.
Q. And you might have a lot of different detectives doing a lot of different work, right?
A. Right.
Q. Detectives might leave an assignment and a new detective might come in and take over, right?
A. Yes.
Q. So the department, the homicide division, the squad, they might need information about what happened in previous periods of the investigation, right?
MR. ZURBRIGGEN: Objection to the form. Sergeant, you can answer.
THE WITNESS: My recollection is they didn't -- nobody I ever worked with ever used an activity sheet to review what happened on a case. There was other methodology that you could use but not an activity sheet. Activity sheets could come from anywhere. It could be part of another case.
As far as I remember, and I

Page 128

don't really remember, I never saw anybody use activity sheets as a form of review.
BY MS. HARRIS:
Q. What did they use them for? I'm generally trying to understand.
A. My recollection, like I said, I don't really remember. If somebody got information or did something on a particular case that wasn't theirs, they created an activity sheet and they turned it over to the assigned detective. He would review it and do further investigation. That's how my recollection is but I don't really remember all of the practices.
Q. So your recollection is only if you were working on a case that wasn't your case?
A. No, they did activity sheets on cases that were theirs too. You asked me earlier about did I review every activity sheet that had my name on it? Absolutely not. I didn't use that as a form of review, as far as I remember.
Q. You remember reviewing more like witness interviews?

Page 129

A. And individually talking to the detectives or whoever.
Q. So a detective might do something on an investigation, prepare an activity sheet and just put it in the case folder?
A. Might. The assigned -- he's not going to put it in the case folder without giving it to the assigned. That's my recollection. Again, I'm not sure because I never carried a folder.
Q. Understood. Your recollection of the activity sheets would go to the assigned, the assigned would review them and put them in the folder?
A. Yes.
Q. And you, the supervisor, may or may not review them but you don't remember?
A. He may come to me and discuss something if he wants my opinion or something like that. That's how I recall but I'm not sure.
Q. The activity sheets still need to be accurate, right?
MR. ZURBRIGGEN: Objection to the form.

Page 130

THE WITNESS: I don't know if they have to be accurate or not.
BY MS. HARRIS:
Q. You didn't know detectives to like lie on these activity sheets, right?
A. No, not that I know of. Like I said, I didn't review them so I don't know.
Q. So when you're talking about the folder, are you talking about the homicide file?
A. H folder.
Q. My understanding, based on what other detectives have told me, tell me if I'm wrong, is that there's a difference between a homicide file and a homicide binder. Does that ring true?
A. I kind of remember that but I don't know. I don't know. I don't remember a binder.
Q. Let me show you what Detective McNesby said about it and that might help refresh your recollection. You can just tell me whether you remember something different.
Detective McNesby was also deposed in this case on February 22nd of this

Page 131

year, 2024. I'm going to flip you to page 84. I am going to ask you to just read this bottom one, page 84 and halfway through page 85 on the next page. Read to line 15 or so.
A. It doesn't mean anything to me. I was never an assigned detective. So what he's talking about does nothing for my memory.
Q. Do you have any reason to dispute what Detective McNesby said, that there is the homicide binder is what went to the district attorney's office?
A. I don't recall a homicide binder. I really don't. I can't speak to that because I don't have any recollection of it.
Q. So you don't have any recollection that disputes what Mr. McNesby said?
A. I don't have a reason to.
Q. Detective McNesby did work under your supervision for at least some time, right?
A. Not long, some period of time.
Q. You agree that what Detective McNesby said is that activity sheets didn't really go to the district attorney unless they asked for them, right?

Page 132

MR. ZURBRIGGEN: Objection to the form. Sergeant, you can answer.
THE WITNESS: Based on what I read, that's what it seemed like.
BY MS. HARRIS:
Q. I would like to quickly take Tab 83. We're going to mark this Exhibit-69.
- - -
(Whereupon Exhibit-69 was marked for identification.)
- - -
BY MS. HARRIS:
Q. Sir, this is a report that was put out recently about the Philadelphia District Attorney's Office. I would just like you to take a quick look at one of the things that came out in this report and let me know if you agree or disagree with that.
I'm sorry, this is marked as NSB Crosland-13364 is the first page. This is on the bottom of page seven. I'm going to point you in the right direction. Section on activity sheets, right at the bottom of page seven and then it should continue to the top

of page 8, just a couple short paragraphs.
A. I can't read that.
Q. You can't read it?
A. No.
Q. Would you like me to read it to you.
A. You can.
Q. I'm going to read it to you. This is -- again this is Exhibit-68 and -9. This is Bates stamped NSB Crosland 13372. The section is titled: Not Disclosing Police Activity Sheets. For some unknown period, the office, this would be the District Attorney's Office, used to routinely hold information found in police activity sheets. The Philadelphia Police Department uses police activity sheets to, among other things, document the investigative steps taken in an investigation and the police activity sheets maintain within the H file. The police activity sheets often contained additional details and information that were not always found in other police documents, including formal witness statements or investigative memoranda.

In fact, the police activity



sheets were sometimes the only record of what a witness said because the police did not always formally document a witness' statement.

The Conviction Integrity Unit learned that the District Attorney's Office used to routinely withhold police activity sheets in the discovery process and that when defense counsel learned about this policy and practice and began to make specific requests, both police activity sheets, the District Attorney's Office initially resisted disclosure and sought judicial review to determine if they had to be disclosed. Is there anything you disagree with there?

MR. ZURBRIGGEN: Objection to the form. That's a lot of information. Sergeant, if there is, you can say it.

MR. ZURBRIGGEN: I don't know.

BY MS. HARRIS:
Q. You don't know if activity sheets sometimes documented things that weren't in other police paperwork?

MR. ZURBRIGGEN: Same



objection. I don't know.

BY MS. HARRIS:
Q. You don't know if they were routinely withheld from the District Attorney's Office?
A. I don't know.

MR. ZURBRIGGEN: Objection to the form. Representation -- go ahead Sergeant, answer.

THE WITNESS: I don't know.

BY MS. HARRIS:
Q. You didn't specifically direct your detectives to produce activity sheets?
A. No, I very seldom ever saw an activity sheet.
Q. I want to talk a little bit about witness interrogations generally. Are you doing okay, sir, do you want to take a break?
A. I'm okay. I'm in pain but I'm okay.
Q. I'm sorry to hear that.

When you were a detective under your supervision as talking to a witness, it would be completely unacceptable to coerce that witness into ID'ing somebody, right?



MR. ZURBRIGGEN: Objection to the form. Sergeant, you can answer the hypothetical.

THE WITNESS: Yes.

BY MS. HARRIS:
Q. Coercion can takes lots of different forms, right?

MR. ZURBRIGGEN: Same objection.

THE WITNESS: I don't know.

BY MS. HARRIS:
Q. Would suggesting that a witness ID somebody, would that be coercive?

MR. ZURBRIGGEN: Same objection.

THE WITNESS: I don't know. I don't know.

BY MS. HARRIS:
Q. Would that be bad police work to suggest that your witness ID somebody in particular?

MR. ZURBRIGGEN: Same objection.

THE WITNESS: That doesn't sound right to me but I don't know.

BY MS. HARRIS:
Q. How about threatening a witness to ID somebody?
MR. ZURBRIGGEN: Same objection.
THE WITNESS: It doesn't sound right to me.
BY MS. HARRIS:
Q. Coercion is particularly likely in a situation if you're dealing with a really vulnerable witness, right?
MR. ZURBRIGGEN: Same objection. Sergeant...
THE WITNESS: I don't know what you mean.
BY MS. HARRIS:
Q. Like if a witness has an intellectual disability, if they're experiencing a mental illness episode, they might be in a vulnerable position, right?
A. Yes.
Q. A police detective would need to be careful about how interrogate someone in that situation, if at all, right?



MR. ZURBRIGGEN: Same objection.
THE WITNESS: I imagine.
BY MS. HARRIS:
Q. What about if a witness is in the hospital, what are you supposed to do in that situation?
MR. ZURBRIGGEN: Same objection.
THE WITNESS: Did you say hospital?
BY MS. HARRIS:
Q. Hospital, exactly.
A. I don't know.
Q. Would you need approval from medical staff to interview someone in a hospital?
MR. ZURBRIGGEN: Objection to form.
THE WITNESS: I don't know. I've never done it.
BY MS. HARRIS:
Q. Do you know if any detectives working under your supervision ever did that?
A. Not that I know of.



Q. Would you ever send a detective to go interview someone you knew was in a hospital?
A. I can't remember ever doing that.
Q. Would you agree that there is some potential for coercion or getting unreliable information from someone in that state, right?
MR. ZURBRIGGEN: Objection to the form.
THE WITNESS: I don't know. I don't know.
BY MS. HARRIS:
Q. Okay. It would depend on why they're in the hospital probably?
MR. ZURBRIGGEN: Objection.
THE WITNESS: Yeah.
BY MS. HARRIS:
Q. In this situation, in this hypothetical --
A. I keep turning.
Q. Going off camera.
If you're -- if you have a witness in the hospital and your detectives are interviewing this person, would you want to get permission from the doctor to make sure



it's okay?
MR. ZURBRIGGEN: Objection to the form. Sergeant, you can answer the hypothetical.
THE WITNESS: I don't know.
BY MS. HARRIS:
Q. Are you aware of any specific guidance in the Philly Police Department for dealing with a suspect in that situation?
A. No, I don't know.
Q. I want to talk a little bit about tips, how you get information. So periodically you would get information from anonymous tips, right?
A. I imagine.
Q. Information like that could cut for guilt or could gut against guilt, right? It could go either way?
MR. ZURBRIGGEN: Objection to the form.
THE WITNESS: I don't know, no.
BY MS. HARRIS:
Q. Can you imagine a situation where it was

Page 141

--
A. I can't, I don't know.
Q. Let's say you arrest John Smith but you get a tip from an anonymous source that Jack Jones was the actual shooter. That would go against the likelihood that it was John Smith, right?
MR. ZURBRIGGEN: Objection to the form. Sergeant, you can answer the hypothetical.
THE WITNESS: I don't know. You're not giving me enough information, I don't know.
BY MS. HARRIS:
Q. Well what other information would you need to know?
MR. ZURBRIGGEN: Same objection.
THE WITNESS: You said anonymous, I don't know what that means.
BY MS. HARRIS:
Q. Anonymous means you don't know who is making the tip?
A. I don't know. What's the means they're

Page 142

getting it? There's just too many -- I'm not going to answer the question.
Q. Sure. I will try to fill it out a little bit, that's fair.
So you arrest John Smith for a murder. Somebody, without giving their name, calls the police department and says, I need to talk to the detective who arrested John Smith. You put that detective on the line. This person, who won't give their name says, I saw Jack Jones shoot that guy, it wasn't John Smith, right? That's going to cut against John Smith's guilt, right?
MR. ZURBRIGGEN: Objection to the form. Sergeant, you can answer.
THE WITNESS: I guess.
BY MS. HARRIS:
Q. If you bring John Smith to trial, his lawyer might want to investigate this Jack Jones guy right, this other suspect?
MR. ZURBRIGGEN: Objection to the form and to the extent it calls for a conclusion.

Page 143

THE WITNESS: I don't know. You're asking me things that I just really don't know. I don't remember or I don't have any recollection of anything like that. So I really don't know.
BY MS. HARRIS:
Q. Having information that someone else did it would be crucial to your defense if you're being charged with murder, right?
MR. ZURBRIGGEN: Objection to the form. Again Detective -- I'm sorry, Sergeant.
THE WITNESS: I don't know. I don't know what the situation is, what the scenario is. You're asking me things that I just don't know.
BY MS. HARRIS:
Q. Say that you were charged with murder and your lawyer found information that said somebody else did it, Adam did it. Wouldn't you want that information?
MR. ZURBRIGGEN: Objection to the form.
THE WITNESS: I think

Page 144

somebody should investigate it, that's for damn sure.
BY MS. HARRIS:
Q. And you would want the district attorney in that case to know that information, right?
MR. ZURBRIGGEN: Objection to the form.
THE WITNESS: If I were aware of that information, it would be investigated as much as I could do. And then I would make anybody else aware of it that I could.
BY MS. HARRIS:
Q. You would.
That's something everybody knew back then in the 80s, in 1984 and 1987, right?
MR. ZURBRIGGEN: Objection to the form.
THE WITNESS: I don't know what people knew then.
BY MS. HARRIS:
Q. Is that something you would have expected the detectives working under your supervision to know?

Page 145

A. I don't know what they would know.
Q. You wouldn't expect them to be operating under certain standards?
MR. ZURBRIGGEN: Objection to the form.
THE WITNESS: I don't know what standards they would operate under. There were a lot of people -- I don't know.
BY MS. HARRIS:
Q. Earlier you said that you trusted the detectives in the department to do a good investigation, right?
A. That's not what you asked me. You asked me if I trusted the people that worked for me. That's what I recall you asked me.
Q. Sorry, that's what I'm talking about now, the detectives working for you, you would expect them to investigate any kind of tip that went against their suspect, right?
A. Sure.
Q. Just because a tip is anonymous, just because the person doesn't give their name, doesn't mean it's completely unreliable, right?

Page 146

MR. ZURBRIGGEN: Objection to the form. Sergeant, you can answer the hypothetical.
THE WITNESS: I guess.
BY MS. HARRIS:
Q. Like there might be reasons people wouldn't want to give their name, right, in a murder investigation?
MR. ZURBRIGGEN: Same objection.
THE WITNESS: I guess.
BY MS. HARRIS:
Q. You guys are sometimes dealing with witnesses who are scared of retaliation in the community, right?
MR. ZURBRIGGEN: Same objection. Sergeant, you can answer generally.
THE WITNESS: I imagine.
BY MS. HARRIS:
Q. In some cases you might learn about many potential witnesses to a crime, right? Some crime scenes there's a lot of people around?
A. Yep.

Page 147

Q. In that case you and your detectives would make the effort to interview everybody, right?
A. In cases I worked, yes.
Q. You don't want to let someone go because they might have critical information that someone else didn't see or here, right.
MR. ZURBRIGGEN: Objection to the form.
THE WITNESS: I agree.
BY MS. HARRIS:
Q. You don't know what people know until you talk to them, right?
A. Yes.
Q. You never made the decision that you just didn't want to try to talk to everybody, right?
MR. ZURBRIGGEN: Objection to the form. Sergeant, you can answer.
THE WITNESS: Not that I recall.
BY MS. HARRIS:
Q. That wouldn't be good police work,

Page 148

right?
A. Not that I recall.
Q. So bottom line, you're going to direct the detectives working on a case to the degree they need direction to try to talk to everybody?
A. Everybody they can, yes.
Q. You expect the detectives to document their effort to do so, right?
MR. ZURBRIGGEN: Objection to form.
THE WITNESS: Yes.
BY MS. HARRIS:
Q. So there would be a record that they tried to talk to someone or they couldn't find somebody or that they did talk to somebody, right?
MR. ZURBRIGGEN: Objection to the form.
THE WITNESS: I don't know.
BY MS. HARRIS:
Q. You don't know what they would document?
A. No, I don't.
Q. Would they sometimes just not document

their efforts?
A. I don't know, I don't recall. It has been a long time, I don't recall.
Q. As their supervisor, just sitting here today, you would want them to record what they had done, right?
MR. ZURBRIGGEN: Objection to the form. Sergeant, you can answer.
THE WITNESS: It would depend on the credibility of the information.
BY MS. HARRIS:
Q. So if a detective decides that information isn't credible, then they don't have to document it?
MR. ZURBRIGGEN: Objection to the form.
THE WITNESS: I don't know what you're talking about. I really don't know.
BY MS. HARRIS:
Q. I was just responding to you. You said if it was credible. So I'm trying to understand what you mean by that.
A. I had a thought in my head about



somebody screaming something from across the street and you could barely understand them, I wouldn't be documenting that.
Q. You wouldn't document that?
A. No, not if I couldn't understand what they were saying, they're just screaming something.
Q. If there's someone at a crime scene just screaming, wouldn't you want to go talk to them more?
A. If I could, sometimes you can. Sometimes you can't.
Q. You would expect your detectives to at least try, right?
MR. ZURBRIGGEN: Objection to the form.
THE WITNESS: I don't know.
BY MS. HARRIS:
Q. If you were at the crime scene, there's a lot of witnesses, right? Assuming that the detective has documented some of these witness interactions, you have the names of these people who might have been eyewitnesses, right?



MR. ZURBRIGGEN: Objection to the form. Sergeant, if you understand.
THE WITNESS: I don't understand.
BY MS. HARRIS:
Q. I apologize, that's fair. That was unclear.
If your detectives have done their job and they talked to the witnesses on the crime scene, right, they have information for those eyewitnesses?
MR. ZURBRIGGEN: Objection to the form. Sergeant...
THE WITNESS: I don't know. What you're saying doesn't make sense to me.
BY MS. HARRIS:
Q. It doesn't make sense to you that the detectives would write down the names of the eyewitnesses?
A. You're saying at a crime scene. I don't know what you're talking about. You don't talk to everybody at a crime scene.
Q. Who do you talk to?
A. You transport witnesses that you can



transport into homicide. You probably have three or four people with you at a crime scene and you're trying to do the crime scene.
Q. Regardless of where you talk to these eyewitnesses, you're going to try to talk to the eyewitnesses, right, even if it's at homicide, not on the street?
A. If there's somebody you want to talk to, you normally would have them transported to homicide and either other detectives there or when you got back you would interview them. That's my recollection. It has been, like I said, it's been a really long time.
Q. Of course. You would want records of those conversations so you could go back and talk to those eyewitnesses again later, right?
A. If you brought them in, you would have a record.
Q. That way if you have another witness who gives you information but you have questions about the credibility, you can go confirm some of that information with the eyewitnesses, right?
A. If you have an interview, yes.

Page 153

Q. I'm really not trying to be difficult, I'm just trying to understand how this would work.
You have witnesses, right?
A. Excuse me. Go ahead.
Q. You have witnesses, right? You've brought them in. Yeah?
A. Yeah.
Q. You've written down their information.
A. You do an interview. You have them interviewed. If you brought them in, you have a formal interview.
Q. Right. And you can go and talk to them later, right?
A. If you had to, yes.
Q. So when you develop new information about the case, you can try to corroborate it with those eyewitnesses, right?
A. I guess.
Q. Like if you get another witness later in the case who says --
A. If you were aware of it, yeah.
Q. If another witness comes in later in the case and says it was John Smith, you can take

Page 154

a picture of John Smith and show it to those eyewitnesses and say, is this the guy that you saw? Is this the guy you described to me, right?
MR. ZURBRIGGEN: Objection to the form. Sergeant, you can --
THE WITNESS: No, you can't. You can't go take pictures of one person and take it out and show it to somebody. You know better that that.
BY MS. HARRIS:
Q. Understood. I mean you can do a photo array, you could corroborate the information that you received later?
MR. ZURBRIGGEN: Objection to the form.
THE WITNESS: You lost me way back when. You lost me way back.
BY MS. HARRIS:
Q. All I'm trying to get at is, you might try to corroborate information you obtained later in an investigation with information you received at the beginning of the investigation?

Page 155

A. Yes. If you're aware of it, yes.
Q. That's all I'm trying to get at.
A. Yes.
Q. That information you get at the beginning, those people you talked to at the beginning, they might help you confirm or deny information you get later?
A. If you're aware of it, yes.
Q. If you're aware of what?
A. The information that was taken originally. If it's different, then you would try to confirm it. If you're not aware of it, then you can't.
Q. That's why you do such a thorough job at the beginning of the investigation, right?
A. You try.
MR. ZURBRIGGEN: Objection to the form.
BY MS. HARRIS:
Q. So if a new suspect comes up later, you might want to try to confirm or corroborate that suspect with the folks you talked to at the beginning, right?
A. Only if you have reason to, I would

Page 156

think. I mean you would need a reason to do that. If somebody gave you a reason to follow up on something, you would do it. If you didn't know about it, you wouldn't be able to do it.
Q. Sure. But there are ways in which you try to corroborate different information that you're getting throughout an investigation with other information you've already gotten, right?
MR. ZURBRIGGEN: Objection to the form. Sergeant...
THE WITNESS: I can't answer. You keep repeating -- you're looking for a particular answer and you keep posing it to me in different ways. And I really don't have it because I don't understand your line of questioning. You just keep pounding on the same thing over and over again. You should have been a detective.
BY MS. HARRIS:
Q. All I am trying to get at here, sir, is that you might want to confirm information from later in an investigation with

information you received at the beginning of the investigation?

MR. ZURBRIGGEN: Same objection.

THE WITNESS: If you're aware of it, yes.

BY MS. HARRIS:

Q. Of course you would be aware of it because you have the information?

MR. ZURBRIGGEN: Object as asked and answered and to the form.

THE WITNESS: I can't answer that.

BY MS. HARRIS:

Q. Let's move on. If a suspect comes to light and denies involvement, right, you have a suspect, they say I didn't do it; you're going to expect investigators, detectives to do a little bit more, to investigate that more, right? You don't just take a suspect at their word, that they didn't do it?

MR. ZURBRIGGEN: Objection to the form. Sergeant, again, you can answer.

THE WITNESS: I don't



understand what you're saying.

BY MS. HARRIS:

Q. You have a suspect in the case, right?

A. Yes. You bring the suspect in, you talk to them, they say, I didn't do it. Does it end there?

MR. ZURBRIGGEN: Objection to the form.

THE WITNESS: Normally not.

BY MS. HARRIS:

Q. You would expect the detectives to do some more investigating, right?

A. I would hope -- it depends on the situation. I would hope that they'd have information before they brought somebody in, they'd have a reason to bring them in. And then yes, they would follow up on the investigation.

Q. So if a suspect gives you an alibi, they say, I didn't do it because I was in New Jersey, right?

A. Uh-huh.

Q. You're going to expect detectives to go look into that alibi, right?



MR. ZURBRIGGEN: Objection to the form.

THE WITNESS: I don't know the total circumstances. Each person who is conducting an investigation would have to make those decisions, I think at the time they're doing them, whether they had enough information to follow up on that.

BY MS. HARRIS:

Q. What if someone came to you as their supervisor and said, hey, I talked to -- I feel like all the names I'm giving you are getting confusing. I talked to John Smith, who is the suspect, we had good reason to think he did it. He says he was talking to his wife Jane and he wasn't there, he was with his wife Jane. What would you say to those detectives?

MR. ZURBRIGGEN: Objection to the form. Sergeant, you can answer the hypothetical.

THE WITNESS: I would tell them to go follow up on it.

BY MS. HARRIS:



Q. To go talk to Jane, right?

A. I would tell them to follow up on the investigation.

Q. To follow up on the alibi, right?

A. Follow up on the investigation.

Q. You wouldn't give them anymore guidance than that?

A. I don't think I'd need to.

Q. What would you expect them to do if you said to follow up?

MR. ZURBRIGGEN: Objection to the form.

THE WITNESS: To continue their investigation, follow up on their investigation.

BY MS. HARRIS:

Q. Would that include looking into the alibi?

A. They would be much more aware of the situation. They would be much more aware of the totality of what they're doing and they'd have to make good investigative decisions and follow up on that investigation based on what they know. As a supervisor, I can't step in

Page 161

the middle of an investigation. They know more about it than I. I would have them follow up on their investigation.
Q. Would you expect them to follow up on a suspect's alibi if a suspect gave you an alibi?
MR. ZURBRIGGEN: Objection, it's asked and answered.
THE WITNESS: I don't know depending on the situation.
BY MS. HARRIS:
Q. We'll move on again.
We have seen a lot of documents about the use of polygraph examinations in homicide investigations in the 80s. Can you tell me a little bit about how polygraphs were used?
MR. ZURBRIGGEN: Objection to the form. Sergeant, you can...
THE WITNESS: I don't recall.
BY MS. HARRIS:
Q. Do you remember if every witness got polygraphed or if it was a discretionary choice?

Page 162

A. I don't recall but I don't believe every witness got polygraphed. I don't know.
Q. So someone had to decide then for somebody to get polygraphed. Every witness didn't get polygraphed.
A. Some people would request polygraphs, from my recollection. Other than that, it would have to be requested by a detective or supervisor.
Q. So a detective or a supervisor would have to request a polygraph. It wouldn't be every time?
A. That's how I remember it but I'm not sure. Everyone is different.
Q. Okay. Do you remember ever telling a detective to polygraph a suspect or a witness?
A. Sure.
Q. Do you remember what would cause you to do that?
A. No. I can't remember what I ate for dinner last night.
Q. Is it fair to say that if a witness or a suspect had credibility issues, you weren't sure whether you believed them, a polygraph is

Page 163

a tool you might use?
MR. ZURBRIGGEN: Objection to the form. Asked and answered.
THE WITNESS: I don't think so. I don't think it's that easy to do. It just wasn't that easy to get a polygraph done. It took planning, it took going down there and making sure there was somebody available. You had to have reason.
BY MS. HARRIS:
Q. So you had to have a good reason to do it?
A. I would think so, yeah, based on what I recall. It was a long time ago.
Q. So you would have to have serious issues with someone's credibility to go through all of that effort to get a polygraph?
MR. ZURBRIGGEN: Objection to the form.
THE WITNESS: I don't know on each individual situation. Yeah, it wasn't that easy to get a polygraph done.
BY MS. HARRIS:
Q. This is totally fair if you don't know.

Page 164

Do you know what method that they used to do polygraphs?
A. No.
Q. Have you ever heard of the Arthur Method?
A. I don't know, no.
Q. So you couldn't just polygraph someone yourself, right? You need a trained polygrapher to come in?
A. Yeah.
Q. Is it fair to say there were two main results, deception indicated or no deception indicated?
A. I don't recall.
Q. But someone could fail a polygraph or pass a polygraph, right?
A. I don't know. I really don't know. I don't know anything about it.
Q. If a key witness fails a polygraph, that's going to be important, right?
MR. ZURBRIGGEN: Objection to the form. Sergeant...
THE WITNESS: I don't remember relying on polygraphs a lot. It's

Page 165

been a long time.
BY MS. HARRIS:
Q. Fair enough. That's still something if they fail a polygraph, that's information you have to pass along, right? We're talking about information you have to tell the district attorney?
MR. ZURBRIGGEN: Objection to form.
THE WITNESS: I don't know. I really don't know.
BY MS. HARRIS:
Q. You don't know if a failed polygraph counts as that kind of information?
A. No, I don't know.
Q. I want to get into this investigation itself, which based on what you've told me about how little you remember, it's going to require us to go through some documents.
Would you like to take a break before we get into that?
A. No, I'm all right.
Q. I can tell you right now I have read through the entire homicide file of this case.

Page 166

I know that you haven't done that before today, but based on my review of the homicide file it seems like you were not involved in the initial investigation of Il Man Heo's murder in December of 1984.
Do you have any independent recollection of this murder? The man's name was Il Man Heo, it was a small grocery store. He was the clerk. He owned the store and he was shot.
A. I have no recollection of it at all. I would be very, very shocked if I was involved in it in any way.
Q. As I said, from my review it does not look like you were involved in the initial investigation in December of 1984. It looks to me like some early investigative work took place in December 1984 into January of 1985 and then not much happens.
Did that ever happen? You deal with the crime scene, you don't get a lot of leads and then the case kind of just...
A. I think it happens. There was a ton of murders.

Page 167

Q. Fair enough. The earliest we see your name on paperwork is 1987. Does that sound right to you, that's when you were supervising the homicide?
A. I don't know. I really don't know. Seeing my name is very surprising to me on that activity sheet. And seeing it with Thompson's name is very, very surprising. I don't even know if I was there.
Q. Why did it surprise you to see your name?
A. I didn't work with Thompson, that I recall at all, and I don't have any recollection.
Q. It's the pairing of your name with Lieutenant Thompson that makes it surprising to you?
A. Part of it and who the other detectives were, I had very little to do with. Cimino and McNesby.
Q. You don't remember working with them?
A. I worked with them but not much.
Q. I want to go back to 5 squad. Again, I'm just trying to understand how it all

Page 168

worked. Was it ever referred to as a Special Investigations Unit of the homicide division?
A. I guess it was.
Q. SIU?
A. It was. There was an SIU, yeah. I ran an SIU in West Detectives. There was SIU's in almost every detective bureau. I can't remember whether there was in homicide or not, to be honest with you. I always called it 5 squad, maybe they called it SIU. I don't know.
There was more particular units, I think, in homicide. I think there was a fugitive section. I think there was more than one and you jumped around.
Q. Can you remind me what kind of cases 5 squad handled? Were these older cases?
A. There was a cold case squad. There was guys that handled older cases. But 5 squad, a lot of it was a follow-up squad.
Q. Follow up on cases that maybe weren't so old --
A. They could be old. A lead could come in, that's how I recall it. But like I said,

Page 169

I don't have a great recollection. I recall that if a lead would come in or if there'd be a reason to reopen something or take a look at something -- a lot of it was the captain. A captain would go to a 5 squad supervisor and ask them to look at something sometimes as I recall but I'm not sure.
Q. Who was the captain back then?
A. I don't know.
Q. Okay, no problem.
As I said, the earliest that we see your name on paperwork for this murder that happened in 1984 is 1987. Was it normal to kind of jump into an investigation that's ongoing like that, two and a half years later?
A. I don't know.
Q. Do you ever remember doing that?
A. I mean I don't remember doing it and I don't remember not doing it.
Q. You don't remember having to get caught up on an older investigation?
A. I remember looking into something if we had a reason to or follow up something.
Q. Were cases ever moved between squads in

Page 170

homicide?
A. As I told you earlier, I remember at one time it was an A and B, an A and B sergeant. And sometimes stuff would move back and forth if I didn't have ability to work overtime and he was doing something.
Q. How would you get yourself caught up if you did take over a case from another sergeant or that moved from another squad?
MR. ZURBRIGGEN: Objection to the form. Sergeant, you can answer.
THE WITNESS: I don't recall, I don't remember at all.
BY MS. HARRIS:
Q. Would it be fair to say that you might review documents?
MR. ZURBRIGGEN: Same objection.
THE WITNESS: I don't remember.
BY MS. HARRIS:
Q. But you would want to get caught up?
A. I don't remember if there would be a

Page 171

need. If I was asked to do a particular something for somebody else, I don't remember if there would be a need. I don't remember.
Q. You don't know if there would be a need for you to get caught up?
A. No, I don't remember.
Q. But you would want to be up to date enough to be able to talk about it with the detectives you're supervising, right?
MR. ZURBRIGGEN: Same objection.
THE WITNESS: I don't remember. I don't recall.
BY MS. HARRIS:
Q. Even just sitting here today, is that fair to say that if you were going to take over an assignment, you would want know what's going on?
MR. ZURBRIGGEN: Objection to form.
THE WITNESS: The supervisor wouldn't take over an assignment like that.
BY MS. HARRIS:
Q. What do you mean?

Page 172

A. As a supervisor, I'm not going to take over the assignment. The investigator might be doing some follow up, I'm not going to take over the assignment.
Q. I don't mean take over the assignment like you would become the assigned detective --
A. I wouldn't take over anything. If he had something to follow up on, he would follow up on it. If he wanted my help in some way or there was something I could do, but I wouldn't take over an investigation as a 5 squad. But that's my recollection.
Q. Understood.
A. If somebody else tells you something else, you better believe them.
Q. Fair enough.
If a detective you're supervising has taken over an investigation and they are asking for your help, then you would have to get caught up in some way, right? They would have to tell you about the case?
MR. ZURBRIGGEN: Objection to

Page 173

form.
THE WITNESS: I would say that may be true. If I am interested in that one -- there may be no need for me.
BY MS. HARRIS:
Q. I'm trying to figure out how to ask this.
When would there be a need for you?
A. I don't know, I don't remember.
Q. It would be because a detective has asked for your help or your guidance?
MR. ZURBRIGGEN: Objection to the form.
THE WITNESS: You're going somewhere I'm not going because I don't remember.
BY MS. HARRIS:
Q. Let's just start going through it then. Are you aware at the outset of this investigation there were a number of tips identifying someone named Michael Ransome as the shooter?
MR. ZURBRIGGEN: Objection to

Page 174

the form. Sergeant, you can answer.
THE WITNESS: No.
BY MS. HARRIS:
Q. Let's go to tab -- to Exhibit-14. I will represent to you that these were handwritten notes that were found in the homicide file.
Would you agree that -- take a look at these two pages. Would you agree that there are three separate notes that talk about calls identifying someone named Michael Ransome?
MR. ZURBRIGGEN: Objection to the form. Sergeant, if you can tell.
THE WITNESS: I don't know. I don't even know what they are.
BY MS. HARRIS:
Q. I've told you they're handwritten notes that are found in the H file.
A. I see Sergeant Schneider's name there.
Q. You can see Detective Nespoli's name, right? He's the assigned detective?
A. Yeah.
Q. So these look like they're notes to

Page 175

Nespoli.
MR. ZURBRIGGEN: Objection to the form?
THE WITNESS: I don't know. How am I going to know what that is? I don't know what it is. It looks like somebody left notes, I don't know.
BY MS. HARRIS:
Q. Would you agree that the name Michael Ransome appears in several of these notes?
MR. ZURBRIGGEN: Same objection.
BY MS. HARRIS:
Q. As a potential suspect or identified as the shooter?
A. It looks like it says that but I don't know. I don't know anything about it.
Q. I'm just asking you what it looks like it says?
A. It looks like it says Ransome.
Q. Okay. Now if you turn to Exhibit-15, this is an activity sheet from I believe December 13th, 1984. Does that look right?
MR. ZURBRIGGEN: Objection to

Page 176

the form.
THE WITNESS: This is before me.
BY MS. HARRIS:
Q. You will note that you're not the sergeant on the case at this point. As I said, it looks like you were not involved until '87. Is this fair to say this is an activity sheet dated December 13th of '84?
A. That's what it looks like.
Q. If you just review it real quick, I have a couple of questions.
A. I mean I wasn't even there. I wasn't in homicide at that point.
Q. Understood. I am just showing you some of the early investigation that was done in this case before you got involved.
A. What reference is that to me? I don't know how that has reference to me. In other words, I wasn't there.
Q. I understood that you weren't there. I'm trying to get you to understand what the detectives working on this case were informed of before you were there. Just the one-page.

Page 177

Let me know when you're done.
A. I am done.
Q. I understand that you weren't working on it at this time.
A. I never worked on it.
Q. I understand that's your position. I am going through some of the things that the detectives on this case were aware of. And I also understand what you said, that you may or may not have been brought up to speed on these things when your name started showing up on the activity sheets. I understand that.
Based on this activity sheet from December 13th, 1984, it looks to me -- I'm hoping you will agree or disagree, that this person Michael Ransome who had been identified as a potential suspect, the detectives on this case learned that he had been convicted of a murder four years before that. Do you see that in the activity --
A. That's what you're telling me.
MR. ZURBRIGGEN: Objection to the form.
BY MS. HARRIS:

Page 178

Q. I'm asking if you saw that in the activity sheet?
A. No.
Q. You didn't see the part where it says --
A. No, I told you I'm having much difficulty and I'm not making any sense of it at all.
Q. As I mentioned earlier, if you could let me know if you're having trouble reading something, I would be happy to read it to you.
A. Yeah.
Q. I am going to read from the second paragraph, all right. Actually, let's start with the first paragraph.
Information was received at the homicide division from an unknown source that a Michael Ransome was involved in this job, right? We saw that from the other tips, right?
MR. ZURBRIGGEN: Is the question whether he heard that from your reading it?
BY MS. HARRIS:
Q. Do you accept that that's the first

Page 179

sentence in this activity sheet, that I just read to you?
A. That's what you read to me.
Q. We also saw from the previous handwritten notes --
A. That's what you told me. I don't know what that stuff is. You're asking me to make judgement on things that I wasn't involved with. I wasn't in homicide. I don't know how they did it. I don't know what notes they left, I wasn't there. Now you're asking me to make judgement on things that I can't make judgement on because I wasn't there and I didn't know and I told you I don't know what they did because I wasn't there.
Q. I'm not asking whether they did it or not, I'm asking you to review the documents with me and tell me what they say.
A. You're asking me to make judgement on the process of a process that I wasn't part of or didn't know about.
Q. Sir, I'm simply asking to review the documents with me and tell me whether they say what I'm saying they say.

Page 180

MR. ZURBRIGGEN: I have a standing objection to that. Sergeant, to the extent you can read this document.
THE WITNESS: I can't read it.
BY MS. HARRIS:
Q. That's why I just read it to you, sir.
A. And I said, that's what you said. What you read to me is what you said. As far as those notes, I don't know where they came from. I don't know what they are.
Q. Let's go back to Exhibit-14, the handwritten notes.
Can we assume that there's handwritten notes with the assigned detective's name on them, in the homicide file, that they were put there by a detective working on this case?
MR. ZURBRIGGEN: Objection to the form.
THE WITNESS: I can't assume anything.
BY MS. HARRIS:
Q. Have you ever heard of people just

Page 181

coming into the homicide department and putting notes in the case file that had nothing to do with the case?
A. I don't know where those notes came from or where they were. It doesn't make sense to me. It may be my condition, but it doesn't make sense to me what you're saying.
Q. It doesn't make sense to you that there might be handwritten notes --
A. There may be handwritten notes but I don't know what they are. You're telling me that there's somebody names -- I mean it says that.
Q. You can read that it says Michael Ransome?
A. Yeah, it says that.
Q. The man who shot Tony, Il Man Heo, was Michael Ransome. You agree with me it says that?
A. It says that.
Q. You agree with me if this was found in the homicide file, this handwritten note, that it was likely put there by someone working on the case?

Page 182

MR. ZURBRIGGEN: Objection to the form.
THE WITNESS: I don't know. No, I don't agree with you because I don't know.
BY MS. HARRIS:
Q. How else would it have ended up --
A. I don't know.
MR. ZURBRIGGEN: Objection to the form.
THE WITNESS: I don't know. I don't know.
BY MS. HARRIS:
Q. Were you ever aware of an investigation where there were just random notes unconnected to the investigation found in the homicide file?
MR. ZURBRIGGEN: Objection to the form.
THE WITNESS: To best honest with you, I don't ever know that I ever looked in one of them files.
BY MS. HARRIS:
Q. You never looked at a homicide file?

Page 183

A. I don't even know that I did. Maybe I did, maybe I didn't. I don't remember.
Q. So as a supervisor in the homicide department, you're not aware of any specific time where you reviewed a homicide file?
A. No, inside one of those files, is that what you're talking about, no. One of those H files, I don't ever remember going in them. But actually, I don't know.
Q. But you agree with me that that's what that note said, that someone named Michael Ransome was identified as the shooter in the Il Man Heo murder case?
MR. ZURBRIGGEN: Objection, you can answer.
THE WITNESS: That's what it seems to say.
BY MS. HARRIS:
Q. You'll agree with me that this is an activity sheet?
A. That is an activity sheet.
Q. From December 13th, 1984?
A. Yes.
Q. The decedent -- what does that say?

Page 184

A. I don't know, R something Heo. R. Heo.
Q. You're telling me you're not able to read --
A. I was reading it and as I read it, I lose concentration of it. I am really not able to follow. I explained that to you.
Q. I understand that. I'm trying to make this as easy as possible. But we will have to go through some documents together because as you've said, you don't have any independent recollection?
A. I don't. I wasn't in homicide then. That's why I don't have any recollection.
Q. What do you think would be the best way for us to review this together, in a way that you can understand it?
A. I don't know that there's a better way. I can't remember what I can't remember.
MR. ZURBRIGGEN: Objection to the form.
BY MS. HARRIS:
Q. I am not asking you to remember anything right now. I am asking you to review the document with me --

Page 185

A. You're asking me to make judgements on things that I don't even know what they are.
Q. I'm not asking you to make a judgement.
A. Yes, you are.
Q. I am asking you to review the document together and we can go through what it says. And I might ask you whether you think that would mean that the detective would know what's in this document. If you don't know, that's okay.
MR. ZURBRIGGEN: Objection for the record, form.
BY MS. HARRIS:
Q. Why don't you follow along the first line with me and we can read it together. Do you agree with me that the first sentence says, information was received at the homicide division from an unknown source that a Michael Ransome was involved in this job?
MR. ZURBRIGGEN: A standing objection to all of these. Sergeant, you can read that.
THE WITNESS: I read it.
BY MS. HARRIS:

Page 186

Q. Is that what it says?
A. Yes.
Q. Let's go to the next paragraph. Detectives Brignola and Ansel pulled the records and found the name of Michael Ransome NM DOB 4/1/61 with the address, I don't need to read the address or the PP number. This male lives in the area of the investigation and shows two prior arrests with the last arrest being in 1980 for murder. Okay?
A. Yep.
Q. So it sounds like somebody working on this case, not you, somebody working on this case, learned that Michael Ransome who had previously been identified as a potential suspect, he lived in the area where the murder occurred, right?
A. I don't agree with that because nobody identified him -- from what you just read, it didn't say that. It didn't say what you just said it said.
Q. It says that information was received that he was involved in a job?
A. You said identified, nobody said

Page 187

identified.
Q. Sorry. Information was received that he was involved in a job. I apologize. I will use the more precise language.
A. You can use what it says because that's what it says.
Q. Right. Somebody working on this case learned that he had been identified as someone who's involved in the job?
A. Uh-huh.
Q. That he had been convicted of a murder four years prior in 1980, right?
A. That's what it says.
Q. And that he lived in the area of the investigation, right?
A. Uh-huh.
Q. I want to read the last paragraph together. We can skip the long one in the middle, though you're welcomed to read it if you would like. I'd like to read the last one together.
Info previously received from PO Ash and Jones, 17th District burgulary detail, was that the victim had been a witness

Page 188

in a 1979 murder where someone had been shot five to six times. Ransome's murder arrest is H-79, which my understanding means from 1979, right?
A. Yes.
Q. Decedent, David Wilson, and it occurred on highway at 24th and Federal Streets. File to be ordered from record storage in the a.m., detective will check with Heo's relatives about his being the witness. That's what it says?
A. Yes.
Q. So it seems like there was a theory that the decedent in this case, Il Man Heo, may have been a witness to this prior murder. Did you read that differently than me?
MR. ZURBRIGGEN: Objection to the form. Sergeant, to the extent you can glean that from what you just read.
THE WITNESS: I don't know. I don't know what it means. I don't know what it means. I mean -- it means -- it looks like it needs some investigation, that's all.
BY MS. HARRIS:

Page 189

Q. So if somebody wanted to investigate this prior murder that Ransome was convicted of --
A. Somebody is making, yeah, that accusation.
Q. It looks like someone wants to see if Il Man Heo was a witness in that murder, right?
A. I guess.
Q. Because if Il Man Heo had testified against Ransome in a different murder, that might be motivation for Ransome to shoot him, right?
MR. ZURBRIGGEN: Objection to the form. Again, Sergeant...
MR. ZURBRIGGEN: I don't know. I don't know.
BY MS. HARRIS:
Q. That's something that you might investigate, whether a suspect has a motive to hurt the person who was hurt, right?
A. I guess.
Q. Let's look at the next activity sheet. This is Exhibit-16. This is an activity sheet from -- it looks like January 7th, 1985. So

Page 190

now we're into the next year, right?
A. Yep, Lanzelotti.
Q. And you noted that's Lieutenant Lanzelotti's name on top here, right?
A. Yes.
Q. Are you able to read this one or would you like me to read it with you?
A. I can read it, I guess.
Q. Okay. Just let me know, I'm happy to help. If I can focus you on the last paragraph. That might be quicker.
A. Yeah, I read it.
Q. My reading it says: Anonymous calls have linked Michael Ransome to this murder; is that right?
MR. ZURBRIGGEN: Objection.
THE WITNESS: That's what it says.
BY MS. HARRIS:
Q. And the surveillance was set up around his residence and haunts to hopefully pick him up on the street, right?
MR. ZURBRIGGEN: Same objection.

Page 191

THE WITNESS: That's what it says.
BY MS. HARRIS:
Q. It seems like there's some attempt to bring him in for questioning, right?
MR. ZURBRIGGEN: Same objection.
THE WITNESS: I don't know. I wasn't there.
BY MS. HARRIS:
Q. Sure, but it says a surveillance was set up, right?
MR. ZURBRIGGEN: Same objection.
THE WITNESS: That's what it says.
BY MS. HARRIS:
Q. And it says, hopefully pick him up on the street, right?
A. That's what it says.
Q. I know you weren't there but it looks like, based on this document, somebody was setting up a surveillance and trying to pick him up, right?

Page 192

MR. ZURBRIGGEN: Objection to form.
THE WITNESS: I guess.
BY MS. HARRIS:
Q. If you had been supervising at this time, I know you weren't, if you had been or if you were supervising this right now, they pulled you out of retirement --
A. If I was supervising this right now, you would all be in big ass trouble.
Q. Would you agree, based on just the information that you've seen, I understand there could be other information, just based on this information, Michael Ransome is someone you would want to talk to if you were supervising this early part of the investigation, right?
MR. ZURBRIGGEN: Objection to the form. Sergeant, you can answer the hypothetical based on what --
THE WITNESS: Yeah, I agree.
BY MS. HARRIS:
Q. Even if you were having trouble locating him, would you maybe want to put his photo in

Page 193

a photo array to show to eyewitnesses from the scene?
MR. ZURBRIGGEN: Same objection.
THE WITNESS: I don't know. I don't know.
BY MS. HARRIS:
Q. Would you ever investigate someone in that way, before you're able to bring them in, if you're having trouble finding him?
MR. ZURBRIGGEN: Objection to form.
THE WITNESS: No. Would I go out with a photo array, no. Probably not that early, no.
BY MS. HARRIS:
Q. You always want to talk to the person first?
A. No, I would probably do some more investigating. I'm not going to take a photo array out. Who know? I don't know the situation. You're -- like I said, you're putting me in a situation that I don't have answers for you.

Page 194

Q. Understood. Like I said, I'm just focused on if you had this information about the early calls identifying someone as a shooter; this is someone you would want to investigate. I think you already agreed to that, right?
MR. ZURBRIGGEN: Objection to the form.
THE WITNESS: I don't know. If somebody's name came up that many times, I'd want to talk to them, I guess.
BY MS. HARRIS:
Q. From my review of the H file, it looks like nothing else really happened in this investigation from January '85 to March '87, almost two years. Do you remember any involvement from that time?
A. I wasn't there.
Q. Presumably if any investigation work is done generally in an investigation, you would expect it to be in the H file somewhere, right?
MR. ZURBRIGGEN: Object to the form. Again, Sergeant...

Page 195

THE WITNESS: I don't know.
BY MS. HARRIS:
Q. You don't know --
A. I don't know what they did then.
Q. In terms of how they documented --
A. Since I want there.
Q. In terms of how they documented an investigation?
A. Uh-huh.
Q. Once you were there, you would expect, if there was big investigation work done, it would be documented somewhere, right?
MR. ZURBRIGGEN: Objection to the form.
THE WITNESS: I would hope so.
BY MS. HARRIS:
Q. Are you still okay in terms of a break?
A. Yeah, I guess so. You know, I'd like to take a break.
VIDEOTAPE OPERATOR: The time is 12:38 p.m., off the record.
The time is 12:52 p.m., back on the record.

Page 196

BY MS. HARRIS:
Q. Sergeant Descher, I'm going to ask after every break, is there anything that during the break you realize you didn't understand or you need to clarify your answer?
A. No.
Q. So all of the answers you have given so far have been accurate?
A. Yes.
Q. Once again, please do let me know if there's anything that you need to be able to provide testimony as we continue. Okay?
A. Uh-huh.
Q. I want to get into the next activity sheet but before I do, I have to say there is a fair a number of things that I asked you about today that going into this I would have assumed that you would have been able to confirm that supervisors did in the homicide division.
So I would like to get a better sense of what you were doing in the day-to-day. Can you tell me a little bit more about what the sergeant's job was, other than

Page 197

you said, reviewing interviews?
A. It depends where you were, what unit you were in, what squad you were in then, at that particular time. I told you there's a line squad. So mostly you're doing active jobs. You're doing, two, three, one, two, three murders that happened that day plus whatever they're carrying at that time.
Q. By doing it, you mean you're going to the crime scene?
A. Going to the crime scene -- well, either you or the lieutenant is going to go to the crime scene, one of you is gonna go. The other one is going to oversee interviews that are being done from people they're sending in.
Q. How about in 5 squad or SIU?
A. It's different. A lot of it is follow-up work, depending on which 5 squad you were in. If you were in fugitive squad, you would be going and getting fugitives. It depends, you know, what you were doing. If you were doing follow ups, follow-up investigations usually at the request of another squad.
Q. So 5 squad would be doing follow ups at

Page 198

the request of another squad?
A. Yeah, whoever has the active job or it might be from another supervisor, it might be the captain. It might be anything.
Q. What exactly is a sergeant doing for these follow-ups? Are you going to interview people or call people?
A. On 5 squad situations a sergeant is not doing much of anything, to be honest with you, other than maintaining support.
Q. So you were there to support the detectives --
A. Yeah.
Q. -- and they'll let you know if something comes up?
A. And if they needed something outside the norm, you would be able to help them. You were saying polygraph, you would be able to help set a polygraph up, make a decision on the importance of something. It's very different. Both jobs are very different.
Q. Gotcha. Okay. So they might come to you and say, hey, we need your advice on this thing or who should we talk to next but they

Page 199

might not?
A. They might not.
Q. So like more often than not, they might not --
A. Not in 5 squad. They're usually experienced guys that have had success and they are there for a reason. They are following up on something that they can close. They are looking to close cases. That's how I remember it anyway.
Q. Like you said, these are really experienced detectives?
A. They normally are.
Q. They're given a good amount of deference by the division?
A. By me they were.
Q. Let's go to Exhibit-25. I can tell you this is chronologically the first thing with your name on it in the investigation. Do you see your name up top with Lieutenant Thompson?
A. Yes, with Nespoli which makes no sense.
Q. Why does it make no sense --
A. I don't remember ever supervising Nespoli. Actually he is down there as the

Page 200

assigned. I'm sorry.
Q. Maybe we should clarify that actually. So the assigned detective isn't necessarily the detective who's like going out and doing the stuff on this activity sheet, right?
A. No, absolutely not.
Q. So even though you might not be supervising the assigned detective, you might be supervising one of the detectives doing this follow up?
A. Yeah.
Q. Like I said, from my review of the H file, this is the first -- chronologically the first piece of paper with your name on it, this activity sheet from April 22, 1987.
Was this one of the activity sheets that you reviewed in preparing for the deposition, that you looked at?
MR. ZURBRIGGEN: Objection.
THE WITNESS: I never said I looked at it. All I could see was the headings.
BY MS. HARRIS:
Q. Gotcha. You looked for your name --

A. Yeah, that's pretty much all I looked at.
Q. But it wouldn't have your name on it for no reason, right?
A. I seen things with my name on it when I had left already.
Q. Maybe it was just put in error.
A. Guys used to type in somebody as their supervisor and they continued to type me on as a supervisor. I seen that. I was detailed out one time and they were still typing it in. It doesn't mean you were really there.
Q. Okay. But in April of 1987, were you supervising detectives in the homicide division? This wasn't after you had left the division?
A. I probably was, yeah.
Q. This probably means that a detective working under you was on the case, right?
MR. ZURBRIGGEN: Object to the form.
THE WITNESS: I don't know.
BY MS. HARRIS:
Q. This activity sheet, if you look at the



beginning of the second paragraph is detailing some things done by Detective Hughes and Mangoni. Were they ever under your supervision?
A. I don't remember, no. I don't remember Mangoni -- I believe he was detailed in as an interpreter. That's the way I remember him. And he eventually stayed there. But I remember him coming in as an interpreter. I don't remember him ever reporting to me. He was in 5 squad but not reporting to me, that I recall. Eddie Hughes, maybe early on when I had line squad he may have reported to me but it wouldn't have been then.
Q. So this could have just been that you were a sergeant in 5 squad and these were 5 squad detectives working on this case?
A. That could be.
Q. So would you have reviewed this activity sheet or discussed its contents with the detectives?
A. Probably not if I wasn't there.
Q. Okay. I want to just read the first sentence of this activity sheet out loud. If



you could read along with me, on April 21st, 1987, Rodney Everett was brought to the homicide division from the detention center and was re-interviewed. Okay?
A. It's a bring down, yeah.
Q. So before we continue, this is a stupid question but this implies that someone named Rodney Everett had previously been interviewed about this murder, right.
MR. ZURBRIGGEN: Object to the form.
BY MS. HARRIS:
Q. He was brought in and re-interviewed is what it says.
A. I don't know. I have no idea what it means.
Q. Typically if someone says someone is re-interviewed, does that mean they've been previously interviewed?
A. I don't know.
Q. You don't know what the word re-interviewed means?
A. No, I don't.
Q. Would you expect detectives who are



re-interviewing a suspect to have read the previous interview, if there was a previous interview?
MR. ZURBRIGGEN: Objection to the form. Sergeant, you can answer.
THE WITNESS: I don't know. I mean he was interviewed. That's how I would put it if it was me. I don't see how you could re-interview somebody unless you interviewed them before.
BY MS. HARRIS:
Q. I agree with you. Let's -- why don't we take a look at his first interview then because that might give us some guidance as to why he was re-interviewed. Let's go to Exhibit-19. Feel free to read the whole thing if you would like.
A. Okay.
Q. I just want to give a little background on Rodney Everett that I'm assuming the detectives who were taking his statement would know. You might not have gotten this information, but I assume the detectives would. Please go to Tab 19. Sorry, that's a

Page 205

lot of flipping.
A. It looks like it's upside down or some shit. These numbers are backwards.
Q. Before we get into Everett's statement on April 21st, '87, if you could just take a look at Exhibit-19. Tell me if I'm wrong but I think this is a 7549 form. Is that right?
A. Yeah.
Q. Take a look and read through this. Let me know if there's anything you would want me to read out loud or clarify. You can stop at the end of this paragraph. You don't have to read B.
A. Yeah, I did it.
Q. Would you agree with me that this looks like an investigation report regarding the arrest of Rodney Everett on March 19th, '87? That's really the first sentence under origin and details.
MR. ZURBRIGGEN: Object to form. Sergeant, if you tell.
THE WITNESS: What did you ask me?
BY MS. HARRIS:

Page 206

Q. Would you agree with me that this looks like an investigation report regarding an arrest of Rodney Everett --
A. I wouldn't agree with you on anything, to be honest with you.
Q. From reading it?
A. It seems like that.
Q. And a woman named Louise Woods, his children's mother reported to police that he had beaten her up or had previously beaten her up?
MR. ZURBRIGGEN: Same objection.
THE WITNESS: I don't know. I can't tell.

BY MS. HARRIS:
Q. You can't tell based on this?
A. I don't know. I guess that's what it says.
Q. It also says that she reported that he threatened to blow up her sister's house the day before, right?
MR. ZURBRIGGEN: Same

Page 207

objection.
BY MS. HARRIS:
Q. Is that a yes?
A. Yeah.
Q. And that he was armed with a gun?
MR. ZURBRIGGEN: Same objection.
THE WITNESS: It says something about putting a bullet in -- I saw that.
BY MS. HARRIS:
Q. So she saw him taking what she believed was a shotgun, put a bullet in, leave the house; that's what you meant?
A. That's what it says.
Q. Again, this is a report on his arrest for simple assault and weapons offenses I think it says; is that right?
MR. ZURBRIGGEN: Objection.
THE WITNESS: It said simple assault.
BY MS. HARRIS:
Q. And then under origin of details it says, on weapons charges or for weapons

Page 208

charges?
A. It's classified as a simple assault 801.
Q. So this report is from March 19th, '87, right?
A. That's what it says.
Q. Let's flip to Exhibit-21. Would you agree with me this is an investigation interview record?
A. That's what it looks like.
Q. And the interview is Detective Hughes --
A. And Policeman Mangoni. He was not a detective at the time.
Q. Okay. So why would a policeman --
A. He was there as an interpreter, I told you that. He was detailed.
Q. He's a Spanish interpreter?
A. He was detailed. He was not a detective at that time.
Q. Okay, understood. That's helpful.
So this is an investigation interview record of an interview with Rodney Everett, right?
A. That's what it says.
Q. Taken by Hughes and Mangoni?

A. Mangoni.
Q. I'm sorry, Mangoni. We've heard it both ways throughout this case. I'll take your word for it.
A. I don't know, that's what I always thought it was.
Q. I honestly can't remember which one he said. Hard g, Mangoni, interesting.
So this interview takes place on April 15th, '87, right?
MR. ZURBRIGGEN: Same objection. Sergeant, you can say based --
THE WITNESS: It says on this, yeah, 4/15/87, 5 o'clock p.m.
BY MS. HARRIS:
Q. So this is about a month after his arrest that we just read about in the 7549, right?
MR. ZURBRIGGEN: Same objection.
THE WITNESS: I don't know. I don't know. You're asking me questions that I don't know the answers to.
BY MS. HARRIS:



Q. I'm just trying to build on the questions we've already asked. So you just agreed with me that that arrest was 3/19/87 and this is 4/15/87. So I'm just asking -- it's about a month later, right?
MR. ZURBRIGGEN: Same objection.
THE WITNESS: I don't know. That's what it says but I don't know.
BY MS. HARRIS:
Q. If you can just take a minute and read through this statement, I will have a couple of quick questions about it.
A. Yeah.
Q. So he contacted the police department to provide information about the Il Man Heo murder, right?
MR. ZURBRIGGEN: Objection to form. Again, Sergeant...
THE WITNESS: I don't know, that's what it says.
BY MS. HARRIS:
Q. And you would assume if it says that, that's what happened, right?



MR. ZURBRIGGEN: Objection to form.
THE WITNESS: I don't assume anything. I assumed I was going to be home by now and I was wrong. I don't know. I don't know what it says. I don't know. I'm not speculating.
BY MS. HARRIS:
Q. I have asked you --
A. You asked me what it said. What happened -- it's what it says.
Q. I understand that's all that you can tell me --
A. It makes no sense. This whole thing makes no sense.
Q. This whole investigation makes no sense?
A. No, that I'm reading stuff that has nothing to do with me and you're telling me what I read and what's going on when I had nothing to do with it.
Q. Sir, you understand we represent a man named Curtis Crosland?
A. I understand that.
Q. Curtis Crosland is alleging that he



spent 34 years of his life in prison for a murder he didn't commit. We have gone through the murder file for that case and your name is all over it, sir. So we're trying to understand --
A. My name is all over it?
Q. Yes, your name is on activity sheets --
A. It's on two activity sheets.
Q. It's not. It's on several activity sheets. We will go through them. And they cover a very critical part of the case when he was arrested.
You're telling me that you didn't have anything to do with it, which I understand but you see why we have to go through this for you to tell me who did what.
A. No, I don't. It's harassment.
MR. ZURBRIGGEN: I don't either. For the record --
THE WITNESS: You just keep going over the things and trying to tell me to answer the questions to what you want me to say. You would have been a detective.
MS. HARRIS: Sir, you can

Page 213

answer however you would like --
THE WITNESS: No, you just keep pushing it over and over again.
MR. ZURBRIGGEN: I do object to this line of questioning. It's argumentative. I agree, this was line of questioning was done ad nauseam. Let's move on and continue. Counsel, ask your next question, please.
BY MS. HARRIS:
Q. Sir, would you agree with me that this is an investigation interview record interviewing a man named Rodney Everett who came in to provide information about the Il Man Heo murder?
MR. ZURBRIGGEN: Same objection. Sergeant, you can answer.
THE WITNESS: That's what it appears to be.
BY MS. HARRIS:
Q. This is less than a month after his arrest that we just read about on March 19th, 1987?
A. That, I don't know. I don't know.

Page 214

Q. Would you like to go back and look at the date on the arrest?
A. No, I don't want to. I don't know. That's what you're saying.
Q. No, that's what the documents are saying and I'm asking you to look at them so that we can get on the same page.
A. I don't want to look at it anymore. My head is spinning. I'm not feeling well and I don't want to look at it and I don't want to be harassed.
Q. I'm very sorry that you're not feeling well, sir. We can take breaks whenever you want. If there's anything we can do to make you more comfortable, I'm happy to accommodate. But based on the allegations of our client, we have to go through the murder file.
A. As you said, I wasn't even involved. You've already said that. You just said it five minutes ago.
Q. I said that's what you are alleging and that's fine. We can go through all of this and you can tell me whether you were involved

Page 215

or not.
A. No, you told me earlier that you went through the H sheets and that I was not mentioned in anything other -- you told me that earlier. I was not mentioned in anything except my name on two activity sheets or several activities sheets, whatever you said.
Q. What I told you was I did not see anything showing your involvement for several years --
A. And I explained that to you, how that could happen.
MR. ZURBRIGGEN: This has become argumentative. It's not productive. I suggest we maybe can take a break soon or we continue to -- I know we were going to talk about taking lunch at about 1:20. Otherwise, let's continue with questioning and not argument.
MS. HARRIS: I'm happy to take a break if you or your client would like to take a break. But I do need your client to answer the questions.
MR. ZURBRIGGEN: He has. If

Page 216

you want to continue for the next five or ten minutes or however long until the lunch break we discussed, I'm happy to do that or I'm happy to continue now. But let's do questions and answers and not argument. What do you all want to do?
MS. HARRIS: Let's see if we can get through this investigation record. I only have a couple questions about it.
MR. ZURBRIGGEN: Let's do that.
BY MS. HARRIS:
Q. I'm just trying to get the timeline down for the record. We've looked at the arrest report that was dated March 19th, 1987. You have already agreed with me that that's the date that was on that arrest report. You can look at it again. We've already gone through that.
MR. ZURBRIGGEN: Counsel, why don't you direct the witness to the record that you want him to answer again what the date was.
BY MS. HARRIS:

Page 217

Q. Sure. Exhibit-19, would you agree with me this is an arrest report of Rodney Everett on March 19th, 1987?
A. It appears to be.
Q. Great. Let's go back --
A. Date says 3/21/87.
Q. This first sentence --
A. 3/19 about 3:40 p.m. an arrest was made -- black male later identified -- for weapons charges. Just so you know, the 49 refers to simple assault.
Q. Right. That's totally fine. Let's go to Exhibit-21 again. This is -- is this 21?
A. That's what it says. 22.
Q. Exhibit-21 is Rodney Everett's statement on April 15th, 1987, less than a month after the arrest we just read about.
MR. ZURBRIGGEN: Objection. You can answer, Sergeant.
THE WITNESS: Yes.
BY MS. HARRIS:
Q. This is now about two and a half years after the murder which took place in December of 1984, correct?

Page 218

A. Uh-huh.
Q. How far were you able to read of this interview?
A. I read it through the first page.
Q. Would you mind just reading the second page for me and we should be fine.
A. Yes.
Q. In this interview he comes in two and a half years after the murder, a month after he is arrested and he tells Hughes and Mangoni that Curtis Crosland told him that Crosland killed Il Man Heo; is that fair?
MR. ZURBRIGGEN: Objection to form. Again, Sergeant, to the extent you can glean it from what you read --
THE WITNESS: That's what it seems like what it says, yeah.
BY MS. HARRIS:
Q. Let's go back to the activity sheet with your name on it from a week later, from the 22nd. That's number 25. Perfect.
Do you know why he was re-interviewed a week after this first interview?

Page 219

A. Absolutely not.
Q. Can you tell me why that might happen, just generally?
MR. ZURBRIGGEN: Objection to form. Sergeant, if you --
THE WITNESS: I don't know.
BY MS. HARRIS:
Q. You had said earlier that this was a bring down, right, what does that mean?
A. It means they brought him from prison.
Q. So he was in --
A. They ordered a bring down and he was picked up by uniform and brought down in a wagon.
Q. Gotcha. Okay. So he was incarcerated at the time of the re-interview?
A. That's what it looks like.
Q. Do you mind just reading through that full activity sheet. I don't know if you had a chance to do that earlier?
A. I did.
Q. So he was questioned about other murders also, right?
A. That's what it says.

Page 220

MR. ZURBRIGGEN: Objection.
BY MS. HARRIS:
Q. He was given a polygraph regarding his statement accusing Crosland?
MR. ZURBRIGGEN: Same objection. Sergeant, you can answer based on the document.
THE WITNESS: He was polygraphed on his original statement about being told by Crosland -- that says he was polygraphed.
BY MS. HARRIS:
Q. Do you remember why he was given a polygraph?
A. How would I remember, I wasn't there.
Q. Of course.
Let's look at Mangoni's deposition because he remembers a little bit more about this it seems. Can you go to page 308. If you look at 308, this is again Dominic Mangoni's deposition testimony. State at line 8, page 308 down to 16.
A. 308 what?
Q. 308, line 8 to line 16.

Page 221

A. Yeah.
Q. So Mangoni testified that maybe -- he had concerns about Everett's credibility or maybe his boss had concerns.
A. It doesn't say that.
Q. I'm sorry, it could have been concerns --
A. It could have been concerns. It could have been maybe the boss might have said, why don't you polygraph him.
Q. Okay. Thank you for clarifying. So did you -- were you that boss?
A. No. I don't know if I was or not. I don't believe I was there. I don't believe I ever had any involvement with any of this.
Q. Fair enough. Is that something that you did sometimes, not necessarily this case?
A. I don't know that I did. I don't remember ever setting up a polygraph for anybody in homicide or even suggesting it.
Q. Okay. Either way, it seems like someone maybe had concerns about this witness' credibility, right?
MR. ZURBRIGGEN: Objection to form.

Page 222

THE WITNESS: I don't know. That's what it says in here.
BY MS. HARRIS:
Q. In Mangoni's deposition?
A. It says something about a boss, maybe a boss.
Q. So if you start with just line 8, in this case you had concerns about Mr. Everett telling the truth and he says, it may have been concerns, it might have been a boss who had concerns --
A. Might have been.
Q. And then if you look at line 18, can you read the question and answer there?
A. Yeah.
Q. So Mangoni at least is agreeing that at that particular time, there was no corroborating evidence about this witness --
A. It doesn't say that.
MR. ZURBRIGGEN: Objection to form.
BY MS. HARRIS:
Q. Because you had no corroborating evidence from any other witnesses --

Page 223

A. It could have been concerns, it could have been maybe a boss might have said, why don't you polygraph him, by Mr. Feinberg. Question, because you had no corroboration, that's him saying that. From any of the witnesses who were just -- is that correct. Objection. At the particular time, yes.
Q. So at that particular time, they had no other corroborating evidence against Mr. Crosland?
A. I don't know, I wasn't there.
MR. ZURBRIGGEN: Same objection.
BY MS. HARRIS:
Q. Again, you trusted Police Officer Mangoni at the time, right?
A. What do you mean I trusted him?
Q. No?
A. I don't even know if I knew him at the time.
Q. You trusted his later work as a detective?
A. I didn't work with him as a detective.

Page 224

Q. Do you think there is a risk that he was lying in his deposition?
A. I don't know. I don't know anything.
MR. ZURBRIGGEN: Objection to the form.
BY MS. HARRIS:
Q. It sounds like you may or may not have been consulted as the sergeant or this sergeant who was working on the case, even if it wasn't you, may or may not have been consulted about the decision to polygraph, right?
MR. ZURBRIGGEN: Objection to form and asked and answered.
THE WITNESS: I don't know.
BY MS. HARRIS:
Q. There wasn't a specific guidance to tell --
A. I don't know. I have no way of knowing.
Q. The way you would know is because you were his supervisor?
A. No, I wasn't that supervisor.
Q. Just generally, was the supervisor always informed of a decision to polygraph?

Page 225

A. No, I don't think so. I don't know.
Q. If we go back to the activity sheet, he failed the polygraph, right? That's what deception indicated means?
A. I don't know. I don't know if that's what it means, that he failed. They won't say. I remember that, that they will not say that they failed or passed?
Q. They would say deception indicated or deception not indicated, right?
A. Uh-huh.
MR. ZURBRIGGEN: Objection.
THE WITNESS: I don't remember them ever saying they failed.
BY MS. HARRIS:
Q. But you nodded and said uh-huh when I said, deception indicated versus --
A. I guess. I don't know.
Q. If there is deception indicated, this would increase the doubt about his credibility, right, to the extent there were doubts about his credibility.
MR. ZURBRIGGEN: Objection to the form. If you can answer the hypothetical,

Page 226

Sergeant.
THE WITNESS: I don't know.
BY MS. HARRIS:
Q. Were you going to say something?
A. No.
Q. If you doubted someone's credibility and they failed a polygraph, would it increase your doubts?
MR. ZURBRIGGEN: Same objection.
THE WITNESS: My personal opinion back then, I had no faith in polygraph but that was just me.
BY MS. HARRIS:
Q. Okay, why not?
A. Because I didn't.
Q. Okay. But if they had enough concerns to do the polygraph and then the results of the polygraph is that there was deception indicated, wouldn't it be logical that that would increase --
A. It wouldn't mean anything to me. If you're asking my opinion, it wouldn't mean anything to me.

Page 227

MR. ZURBRIGGEN: Objection for the record.
BY MS. HARRIS:
Q. Would you want to do any other kinds of investigation?
A. I don't know, I wasn't there.
Q. Can you think of any reason why you would conclude that a statement is valid and reliable if the person needed to be polygraphed and then failed the polygraph?
MR. ZURBRIGGEN: Objection to form. Sergeant, you can answer.
THE WITNESS: I don't know.
BY MS. HARRIS:
Q. Would it give you any concerns about the witness or the statement that they made?
MR. ZURBRIGGEN: Objection to form. Sergeant, you can answer.
THE WITNESS: I don't know. It's a big picture. There's not enough information. It wouldn't mean anything to me.
BY MS. HARRIS:
Q. What would give you doubts about a witness' credibility?

Page 228

A. I don't know.
MR. ZURBRIGGEN: Objection to form.
BY MS. HARRIS:
THE WITNESS: There's no one thing.
BY MS. HARRIS:
Q. What are some things?
A. I don't know. I'm not doing that right now so I don't know.
Q. What do you mean you're not doing that?
A. I don't know. I'm not playing the game of knowing what somebody said or what they didn't do when I wasn't there. I can't tell what would have caused somebody to doubt something.
Q. I'm just asking you in your vast experience as an investigator both in the Philadelphia Police Department and after, what would cause you to doubt a witness' credibility?
A. I don't know.
MR. ZURBRIGGEN: Same objection.

THE WITNESS: I don't know.
BY MS. HARRIS:
Q. You can't think of anything?
A. Not one thing, no.
Q. I assume there are several things that would cause you to doubt a witness' credibility, right?
MR. ZURBRIGGEN: Objection, asked and answered.
THE WITNESS: No, it would all be part of the product.
BY MS. HARRIS:
Q. What do you mean the product?
A. The total product.
Q. What do you mean --
A. Whether I believe something or not, there would be a whole lot of things involved and I can't specify.
Q. Well, specifically whether you believe a witness to be credible?
A. I can't answer that because it doesn't make sense.
Q. Are there any factors that you could discuss about a witness' credibility?



MR. ZURBRIGGEN: Same objection.
THE WITNESS: No.
BY MS. HARRIS:
Q. How about their demeanor, would that affect their credibility?
A. No.
Q. How about the outlandishness of the things they were saying, would that affect their credibility?
A. No.
MR. ZURBRIGGEN: Objection to form.
BY MS. HARRIS:
Q. If a witness told you the sky was green, would that affect their credibility?
A. No.
Q. No?
A. Nothing, I mean there's no one thing that would.
Q. I assume there's many factors that would affect a witness' credibility, right?
MR. ZURBRIGGEN: Object to form.



THE WITNESS: I don't know.
BY MS. HARRIS:
Q. It would be a judgement call, right?
A. No, it wouldn't -- I mean, there is no way of telling. You mentioned something earlier about people's mental health.
Q. Uh-huh.
A. I'm not going to judge by any things that you said, it could be mental health, they might have tinnitus and their head is spinning, I don't know.
Q. Because you mentioned the tinnitus that you mentioned earlier, I do have to just ask generally, are you able to give truthful testimony today?
A. I'm as truthful as I can be. What I know, I answered.
Q. So when you answer a question, I can assume that means that you were being truthful and accurate with your testimony?
A. You got it.
Q. I gather what you're trying to say is that these are credibility determinations made by an investigator or detective who has all



kinds of information available to them, right?
MR. ZURBRIGGEN: Objection. Sergeant, if you can answer.
THE WITNESS: I don't know. I do not know.
BY MS. HARRIS:
Q. Is it fair to say that an investigator, a detective or an insurance investigator is going to have to, at some point, make credibility determinations? You're going to have to decide who you believe and who you don't believe, right?
A. I don't think that's necessary. I think you have to further investigate. You take the information you receive, if you think part of it is credible or part of it is not, you investigate to try to support your belief. You don't make decisions based on what somebody says. You go out and further investigate.
Q. Those other things that you investigate, corroboration or lack of corroboration, that's going to tell you whether you believed that person or not, right?

Page 233

A. You're going to go investigate objective information.
Q. Is it fair to say though that a lot of homicide investigations generally are going to come down to what witnesses say or don't say, right?
MR. ZURBRIGGEN: Objection to the form. Sergeant, if you can generalize.
THE WITNESS: I don't know.
BY MS. HARRIS:
Q. You're not going to have objective, forensic physical evidence for every single case, right?
A. No, but I don't know. I really don't. I know that you should investigate if you believe something and you should find out what you can find out.
Q. Philadelphia Police detectives in the homicide unit, they had leeway to make those determinations and to go get out more evidence when they thought they needed to and not get more evidence when they didn't think they needed to, right?
MR. ZURBRIGGEN: Objection to

Page 234

form. Sergeant, you can answer.
THE WITNESS: I don't know. I can only speak for myself, I don't know.
BY MS. HARRIS:
Q. Do you feel like you had that leeway when you were a Philadelphia detective, sergeant?
A. Yes.
Q. Okay, to make credibility determinations --
A. No, not credibility, go out and find out -- that's not what I said. Once again, it's your words, not mine.
Q. I'm trying to understand, sir.
A. I don't know what else to tell you. I would go out and find out more information, possibly objective information, if possible.
Q. What if it wasn't possible?
A. I would continue to investigate.
Q. What if five different people are all saying the same thing and you can't get any objective evidence, do you just throw out the case or do you go with what those five people are saying?

Page 235

A. I would take it to a D.A.
MR. ZURBRIGGEN: Objection to form.
THE WITNESS: If they felt as though it was substantial, then we go from there.
BY MS. HARRIS:
Q. Okay. So there's never a time when a detective is making a credibility determination about a witness?
MR. ZURBRIGGEN: Objection to form.
THE WITNESS: I don't know.
BY MS. HARRIS:
Q. When a polygraph is taken, would you expect there to be a polygraph report in the file? How does that work?
A. I don't know, I don't remember.
Q. Would there be a report from a polygrapher?
A. I don't remember.
Q. This re-interview that's discussed in the activity sheet, do you know if this was ever documented in a formal interview sheet?

Page 236

A. I don't know.
Q. Would you expect it to be?
A. I don't know.
MR. ZURBRIGGEN: Objection.
THE WITNESS: I don't know what the circumstances are.
BY MS. HARRIS:
Q. An interview of a suspect, is that typically recorded on an investigation interview sheet?
A. I don't know. If they take a statement from somebody, is that what you're talking about?
Q. Yeah, if they take a statement from a suspect or a witness in a case, would that be on --
A. If they're taken from a suspect, it should be.
Q. What about from a witness?
A. No.
Q. No? Witness interviews are not put on investigation interview sheets?
A. I don't know. I can't remember.
Q. Have you seen any documentation of this

Page 237

re-interview, other than what I've showed you?
A. I didn't look for it but I didn't see it.
Q. And you're saying that it would not be atypical for an interview of a witness to just be on an activity sheet and not make its way to a --
A. I really don't know. I'm telling you, I don't remember because I don't remember. It was a long time ago.
Q. So you don't have a memory either way as to whether it should be documented in an interview sheet or whether an activity sheet is sufficient?
A. I don't have a memory either way.
Q. Would you agree that the information in this activity sheet would need to go to the D.A. as part of that conversation you just described, about the D.A. making some sort of credibility determination?
MR. ZURBRIGGEN: Objection to form.
THE WITNESS: I don't know. I don't know the circumstances.

Page 238

BY MS. HARRIS:
Q. Say this is the only witness in the case?
A. I don't know. I don't know. I'm not going to answer because I don't know the situation.
Q. Well, I just told you the situation, this is the only witness --
A. You're making something up. I'm not going to answer it because it's made up and I don't know.
Q. Well, we can talk about it in a hypothetical, right?
A. No. I don't want to talk hypothetical.

MR. ZURBRIGGEN: Objection to the form. Sergeant, to the extent you can answer the hypothetical, you can answer it. If you can't, you can't.
THE WITNESS: I can't answer it.
BY MS. HARRIS:
Q. Why not?
A. Because it doesn't make sense to me to

Page 239

answer if it's not objective.
Q. As of your time in the police department, you had to take tests, right, to go up to be a sergeant, to apply for different ranks, right?
A. Yes.
Q. Those tests often had hypotheticals, right?
MR. ZURBRIGGEN: Objection to the form.
THE WITNESS: No, actually they're not hypothetical at all.
BY MS. HARRIS:
Q. There's no hypotheticals in police training?
A. No. They're competitive tests that are based on books that you read and directives. They are really not hypotheticals.
Q. There's no hypothetical situations that they ask you to apply those directives to?
A. Not that I remember.
Q. As an insurance investigator, you never talked about hypotheticals, hypothetical cases of what you were and weren't supposed to do?

Page 240

A. Not that I recall.
Q. Okay. So you have never in your time as an investigator either for the police department or since ever worked through a hypothetical to determine what you can and can't do?

MR. ZURBRIGGEN: Objection to the form of the question. Again...
THE WITNESS: I don't understand what you're asking.
BY MS. HARRIS:
Q. I'm asking about your experience working through hypotheticals.
A. It makes no sense. It's not making any sense to me. I can't answer it because it's not making any sense to me, the question.
Q. My question is, do you have experience working through hypotheticals?
MR. ZURBRIGGEN: Objection.
THE WITNESS: I don't know what you mean.
MR. ZURBRIGGEN: And as asked and answered.

Page 241

BY MS. HARRIS:
Q. We'll move on. If Rodney Everett were to testify against Curtis Crosland at trial, do you believe Curtis Crosland would have a right to this failed polygraph test?
MR. ZURBRIGGEN: Objection to form. Objection to legal conclusion. Sergeant, if you know, you can answer.
THE WITNESS: I don't know.
BY MS. HARRIS:
Q. Did you know at the time?
A. I had nothing to do with it.
Q. At the time, did you know that a defendant is entitled to a witness' failed polygraph exam, one way or the other?
MR. ZURBRIGGEN: Same objection.
MR. ZURBRIGGEN: I don't know. I don't know anything about it.
BY MS. HARRIS:
Q. So that's not something they taught you in the Philly Police Department?
A. Never taught me anything about polygraph when I was in the police department.

Page 242

Q. Okay. Let's look at a couple of other things that might speak to Everett's credibility. Did you need to take your lunch break now?
MR. ZURBRIGGEN: I'm ready to take it when you all want to or we can wait. If you all want to and the sergeant is okay to continue.
Are you okay to continue, Sergeant?
THE WITNESS: I'm fine.
BY MS. HARRIS:
Q. I want to look at a couple of other things that I think might affect this witness' credibility, I want to talk about.
Can we go to Exhibit-20. This should be the investigation interview record of an interview with a man named William Massey. Are we on the same page?
A. Yes.
Q. So this is the statement of William Massey who's a retired probation officer who Everett spoke to about this murder. Do you want to take a read through and then we can

Page 243

talk about it for a second?
A. I think I read this. Didn't you ask me about this earlier?
Q. I did not ask you about this one. Did you read it to prepare for your deposition?
A. No. I didn't read anything to prepare for my deposition.
Q. You can see that Detective Hughes and Police Officer Mangoni took this one as well, right?
MR. ZURBRIGGEN: Objection to form.
THE WITNESS: That's why I was confused. It was a different one you showed me before that used the name Mangoni, is that what you're telling me?
BY MS. HARRIS:
Q. Exactly, that was of the witness himself, Rodney Everett. This is the probation officer.
A. I saw the names and thought it was the same one.
Q. Gotcha, that makes sense. It's a long statement. You can certainly take the time to

Page 244

read the whole thing.
A. I really don't want to.
Q. Let's go to page 3 then. Can you read the first full question and answer on page 3 that starts with, did he say why he decided to reveal this information?
A. He also said -- is that what you're talking about, he also said he would be willing to take a lie detector test regarding the information, this information.
Q. Yes, I wanted to start with this, did he say why. Let me know when you get to the end of that answer?
A. Yeah.
Q. So according to this interview, Everett wanted to get out of jail and that's why he decided part of this info, right?
MR. ZURBRIGGEN: Objection to the form. Sergeant...
THE WITNESS: That's what it says.
BY MS. HARRIS:
Q. He asked his old probation officer, Massey, if Massey was able to find anything

Page 245

about the murder, right?

MR. ZURBRIGGEN: Same objection.

THE WITNESS: That's what it says.

BY MS. HARRIS:

Q. And then Massey went out and found news articles about it and printed them out for him.

MR. ZURBRIGGEN: Same objection.

THE WITNESS: That's what it says.

BY MS. HARRIS:

Q. Would that be concerning to you, the idea that a witness was shown newspaper articles about a murder before giving a statement about it?

MR. ZURBRIGGEN: Objection to the form of the question. Sergeant, you can answer.

THE WITNESS: I don't know. I don't know. I don't have a feeling about it one way or the other.

Page 246

BY MS. HARRIS:

Q. Had you ever seen that happen before in a case?

A. No, not that I remember.

Q. Would you agree with me, and I know you're not inclined to, but would you agree that if someone read public reporting on a case, then there's some risk that they could just be repeating what they read in the reports and not basing it on their own personal knowledge?

MR. ZURBRIGGEN: Objection to the form. Sergeant, you can answer.

THE WITNESS: I don't know.

BY MS. HARRIS:

Q. Can you see why that might be a risk?

MR. ZURBRIGGEN: Objection as asked and answered and to form.

THE WITNESS: I don't know. I have no feeling about it one way or the other.

BY MS. HARRIS:

Q. You have no feeling about a witness being shown newspaper articles?

Page 247

A. No, the whole thing makes no sense to me.

Q. Why not?

A. Because it doesn't. It's not clicking.

Q. What about it is not clicking? I'm just trying to understand.

A. The situation, it doesn't make sense about a probation officer -- I mean I don't know where it's going, where it came from, where it's going. And I don't know anything about it.

Q. Again, even if we put this aside, in the hypothetical, a witness has been shown newspaper reports about a murder and then gives a statement about that murder. Is there any concern that maybe they're repeating things they read in the news instead of telling you something that they know from their observations?

MR. ZURBRIGGEN: Objection to the form of the question. Sergeant, to the extent you can answer that hypothetical.

THE WITNESS: If I'm not there, I can't tell you what it does to a

Page 248

person. I mean I'm not there. I don't know what it would do or what it wouldn't do. I have no way of knowing.

BY MS. HARRIS:

Q. When a witness gives a statement, you want that information to come from their personal knowledge, right?

MR. ZURBRIGGEN: Object to the form. Sergeant, you can answer.

THE WITNESS: I guess.

BY MS. HARRIS:

Q. You don't --

A. It seems like you want me to give an expert opinion on something that I'm not an expert on. I don't have any expertise on these issues that you're throwing at me and I don't know. I don't know what that would mean about a newspaper, not a newspaper. I don't know. I've never been involved in anything like that.

Q. So that's not a typical thing that happens in a homicide investigation?

A. I hope not.

Page 249

Q. You hope not?
A. Yes.
Q. Do you know if Hughes or Mangoni compared these news articles to the statement, to Everett's statement?
A. I told you, I didn't have anything to do with this. I wasn't there. So I wouldn't know.
Q. So you wouldn't know. If they had come to you in this situation, would you have said, hey, go look at the news articles and make sure he's giving new info?
MR. ZURBRIGGEN: Objection to the form.
THE WITNESS: No, I'm sure I wouldn't. I don't know.
BY MS. HARRIS:
Q. You wouldn't do that because you weren't giving that kind of hands-on direction to the detectives?
MR. ZURBRIGGEN: Objection.
THE WITNESS: You're leading me into -- to try to answer something in a way you want me to and I don't even know what the

Page 250

hell you're talking about.
BY MS. HARRIS:
Q. I'm talking about the statement that we just looked at.
A. I don't know. I don't know what you're talking about. I'm sure they wouldn't do it.
Q. You're sure they wouldn't do what?
A. Whatever you're saying they did, that they showed somebody a newspaper. It doesn't make sense to me.
Q. Massey is saying, William Massey, the probation officer is saying in this statement that that's what he did do?
A. He did.
MR. ZURBRIGGEN: Object to the form. Objection, asked and answered.
BY MS. HARRIS:
Q. That he showed it to the witness.
A. If that's what he said, that's what he did. I don't know what a probation officer would do in a situation like this.
Q. Right. I'm not asking you to opine on that. But that's what he's saying he did. So if you're Hughes and Mangoni and you're

Page 251

hearing that, doesn't that strike you as a little odd, that the witness you just talked to has been given news articles about the case?
MR. ZURBRIGGEN: Objection to the form. Again, Sergeant, you can answer the hypothetical.
THE WITNESS: I don't know. I don't have a feeling about it. I don't know.
BY MS. HARRIS:
Q. That's not something that you were trained on, to make sure that your witnesses were speaking to you from their personal knowledge?
A. I don't remember that.
Q. So you don't know, sitting here today, whether Everett gave any information that was not publicly available about the murder?
A. I don't know anything about it. I wasn't there.
Q. Let's look at Exhibit-27. Take a look at this. If you're not able to read any of this, the handwriting is a little odd, let me

Page 252

know.
A. I read it.
Q. Would you agree that this looks like a letter written to Detective Mangoni from Rodney Everett?
MR. ZURBRIGGEN: Objection to form. Sergeant, if you can tell.
THE WITNESS: I have no way of knowing that's what it says.
BY MS. HARRIS:
Q. It says: Greetings Mangoni or Mangoni, and it says Rodney Everett both at the top and the bottom?
A. That's what it says.
Q. In this letter he seems to be asking Mangoni for Mangoni's assistance of some kind. Is that what you read?
MR. ZURBRIGGEN: Objection.
THE WITNESS: I don't know what it says. It's very difficult for me to understand what he's saying.
BY MS. HARRIS:
Q. Why don't we read along together.
A. It's not going to change anything. I

Page 253

read it, I know what it says. It just don't make sense.
Q. What part of it doesn't make sense?
A. None of it. It's a letter.
Q. And do you see the part where -- because it seems I am receiving no help but I am willing to give it, do you see that part? Third paragraph -- fourth paragraph down.
A. Yeah.
Q. It says, I want to work out a plan but I need your help and he says he's happy to wear a wire?
A. It says, as you said to me on the phone.
Q. What you could charge me with, you carry a badge and a gun. I want to work out a plan. Do you see all of that?
A. I see it.
Q. Okay. So fair to say that it sounds like he's asking for some sort of assistance if he's operating as well as an --
A. It's out of context. I don't know what the context of the letter was. It doesn't mean anything to me.
MR. ZURBRIGGEN: Objection to

Page 254

form.
BY MS. HARRIS:
Q. Well, we've looked at some other context.
A. It doesn't matter. I don't know the context that that fits in. It doesn't mean anything.
Q. It doesn't mean anything to you --
A. No, it doesn't mean anything.
Q. Can I finish my question, please? It doesn't mean anything to you when a witness in a homicide case writes to the --
A. Now you're --
Q. Can you let me finish the question please.
MR. ZURBRIGGEN: Let her finish the question and I will object.
BY MS. HARRIS:
Q. It doesn't mean anything to you when a witness in a homicide case writes to the police officer that took his statement and says, I am willing to provide assistance, I need your help, I want your help?
MR. ZURBRIGGEN: Objection

Page 255

to the form of the question. Sergeant, you can answer the hypothetical to the extent --
THE WITNESS: No, it doesn't mean anything to me.
BY MS. HARRIS:
Q. That doesn't mean anything to you?
A. No.
Q. That doesn't give you any concerns about that witness' credibility?
MR. ZURBRIGGEN: Same objection.
THE WITNESS: No. I don't know. I don't know where it fits into in the whole scenario of what you're doing. So it doesn't make any sense to me.
BY MS. HARRIS:
Q. Have you ever heard of a context where a police detective, a police officer helps out a witness who might be facing their own criminal charges in exchange for testimony?
A. No, I haven't.
Q. Would that be inappropriate?
MR. ZURBRIGGEN: Objection to the form and to the legal conclusion.

Page 256

THE WITNESS: No. It doesn't make any sense to me.
BY MS. HARRIS:
Q. No, it doesn't make sense or no, it wouldn't be inappropriate?
MR. ZURBRIGGEN: Same objection.
THE WITNESS: I am not answering the question because I don't know where you're coming from and I'm not going to say something that I don't know what the question is. You're trying to put words in my mouth.
BY MS. HARRIS:
Q. Sir, I'm asking you questions.
A. And the answer is no, I don't know.
Q. The answer to my question which is whether it would be inappropriate for a detective to help out a witness on his own criminal charges in exchange for testimony, you're saying you don't know if that would be inappropriate?
MR. ZURBRIGGEN: Objection to the form.

Page 257

THE WITNESS: What kind of testimony? Honest testimony?
BY MS. HARRIS:
Q. No, false testimony.
A. Then no, I don't think it would be appropriate.
Q. How about honest testimony?
A. If it's honest testimony, I think if he could -- the way he could help him, I guess there's way it could be done, I don't know, within the legal system.
Q. How would the detective know one way or the other whether it's honest testimony or not?
A. I don't know.
MR. ZURBRIGGEN: Objection to the form.
THE WITNESS: That's exactly what I'm saying, you're hitting me with something completely out of context that makes no sense that I can't answer because there's too many -- it doesn't fit into any scenario at all that makes sense to me.
BY MS. HARRIS:

Page 258

Q. I tried to offer you context, right? This is a witness who was arrested for a crime in March of 1987. In April of 1987, he comes into the police department and says, hey, this guy Curtis Crosland told me he committed this murder. Then we hear from his probation officer that the probation officer showed him news articles about that murder. Now he's writing to Detective Mangoni saying, how can you help me out for that testimony I have given you.
That's the context I have provided you.
A. It doesn't mean anything to me.
Q. That combination of things doesn't mean anything to you?
A. No, like I said, it doesn't mean anything to me.
MR. ZURBRIGGEN: Objection to the last question, for the record.
BY MS. HARRIS:
Q. When we looked at the probation officer's interview, he tells Hughes and Mangoni plainly that Everett's motivation is

Page 259

to get out of jail, right? That's why he came forward with the information.
MR. ZURBRIGGEN: Objection to the form. Sergeant, if you recall from what you read, you can answer.
THE WITNESS: I don't know.
BY MS. HARRIS:
Q. Let's go back and look then to Exhibit-20. I want to make sure you're following along.
The middle of page 3 of this interview, this is William Massey. Middle of page 3 he says: He, being Rodney Everett, said the primary reason was that he wanted to get out of jail, right?
A. That's what it says.
MR. ZURBRIGGEN: Objection to the form.
BY MS. HARRIS:
Q. Given what we've seen, you can stop looking at the statement unless you'd like to read it further. Given what we've seen so far in this investigation, early tips identifying someone names Michael Ransome, all of the

Page 260

context related to this witness Rodney Everett, do you think the statement by Everett alone, say there's no other evidence, would be enough to move forward with an arrest warrant across Curtis Crosland?
MR. ZURBRIGGEN: Objection to the form of the question. To the extent that you can answer that hypothetical question, Sergeant.
THE WITNESS: I don't know.
BY MS. HARRIS:
Q. So the statement of a single witness who failed a polygraph and is trying to get out of jail with this testimony, that might be enough for an arrest warrant?
MR. ZURBRIGGEN: Same objection.
THE WITNESS: I don't know.
BY MS. HARRIS:
Q. If the detectives under your supervision came to you with that, you would say, I don't know, go talk to the D.A.?
MR. ZURBRIGGEN: Same objection.

Page 261

THE WITNESS: I don't know. I don't know what I would do. It's then and now. It's two different times. I don't know what I would do.
BY MS. HARRIS:
Q. At this point in the investigation, are you aware of any other evidence pointing to Curtis Crosland as the perpetrator?
MR. ZURBRIGGEN: Objection to the form.
THE WITNESS: I don't know anything about the investigation.
BY MS. HARRIS:
Q. You said earlier that sometimes a detective would come to you or you would make your own determination that more investigation had to happen. Do you think this is a situation where more investigation has to happen around this witness?
MR. ZURBRIGGEN: Objection to the form.
THE WITNESS: I don't know. I wasn't there, I don't know.
BY MS. HARRIS:

Page 262

Q. I mean your name was on the activity sheet, right?
MR. ZURBRIGGEN: Objection.
THE WITNESS: I don't know. It's on there. I was wasn't involved in this, as far as I know. I have no recollection of it.
BY MS. HARRIS:
Q. So someone was putting your name on activity sheets for things that you had nothing to do with?
MR. ZURBRIGGEN: Objection as asked and answered. Again, Sergeant, you can answer.
THE WITNESS: I don't know. I don't know why anybody would put my name on an activity sheet when I wasn't there. I don't know. It could happen.
BY MS. HARRIS:
Q. Can you think of any reason why your name would be on there?
MR. ZURBRIGGEN: Objection to the form. Sergeant, you can answer.
BY MS. HARRIS:

Page 263

Q. Do you want me to show you which one I'm talking about.
A. Just show me the one that you're talking about.
Q. Of course. Let me see, that is 25.
A. I have no idea. Like I said, I never worked with Thompson as my lieutenant. That would normally be -- the situation with the slash would be the lieutenant and the sergeant in the same investigation. So it makes no sense to me why my name is on there.
Q. So you can't think of any reason?
A. No.
Q. We will see when we get through to some of the other ones. This might be a good time to take a lunch break. It's 2:00.
VIDEOTAPE OPERATOR: The time is 1:58 p.m., off the record.
(Lunch break)
The time is 2:33 p.m., back on the record?
BY MS. HARRIS:
Q. Sergeant Descher, I've asked it after every break, anything came up during the break

Page 264

that made you think that you answered something incorrectly or needed something repeated?
A. No.
Q. Are you able to continue giving truthful and honest testimony?
A. Yes.
Q. Before we get into the next activity sheet, because there's another activity sheet I'd like to show you, I just want to really quickly explain where all of these documents come from, just so that it's clear.
As part of this litigation, we asked your attorney and the City of Philadelphia's solicitor's office for the entire homicide file of this investigation, as well as a couple homicide files for related investigations happening at the same time.
These documents were produced to us from the city through the police department. Every time you see something that says city, the number, that's because it's stamped by the city and produced to us. We trust the City of Philadelphia to give us

Page 265

accurate copies of these events.
You laugh, sir, do you think there's a reason not to trust the City of Philadelphia to give us these documents?
A. Absolutely, no, that's all right, you can trust them. You're allowed to trust them.
Q. Do you have any reason to believe that the documents we've received from your attorney's office are inaccurate?
A. It's fine.
Q. So you do not have any reason to believe they're inaccurate?
A. No.
Q. I know you have said several times that you're not involved in this investigation. I think it would be useful just to show you all of the documents so there's nothing I'm hiding away from you, all of the documents that have your name on them so that we can go through this a little bit faster.
Here's the first activity sheet from April 22nd, 1987 that you've already seen. You agree that has your name on it?

Page 266

A. Yes.
Q. Here is another activity sheet from April 24th, 1987 that has your name on it. Do you agree that has your name on the top?
A. Yes, it does.
Q. Here is another activity sheet, this one is undated but we can talk about -- I think I know when it's from. We can talk about that later. It corresponds to an interview that took place on July 7th, '87. You can just barely see it's cut off but your name is on that one as well. Do you see that?
A. It's cut off, yeah.
Q. You will agree that's your name?
A. It looks like it.
Q. Here is another activity sheet from July 25th, 1987 that also has your name on it. Do you see that on the top right?
A. Yep.
Q. Here is another activity sheet with your name on it from December 9th, 1987. Do you agree your name was on that one, as well?
A. Yes.
Q. This is a statement from November 3rd,

Page 267

1987 that you were present for. Do you see that there?
A. Uh-huh.
Q. That's actually a statement taken of my client, Curtis Crosland, the plaintiff in this case. We will go over all of these in more detail. You can hand them back to me, sir.
Just so we're on the same page, I want to be clear that your name is on one, two, three, four -- five activity sheets and an interview that you were present for with my client?
MR. ZURBRIGGEN: Objection to form. Sergeant, if you can say based on what you looked at.
THE WITNESS: Let me see the statement again.
BY MS. HARRIS:
Q. Do you have any reason to doubt the accuracy of these documents?
A. Sure.
Q. We are going to go through that interview in more detail, sir. I just wanted to be clear that you had some involvement in

Page 268

this investigation, would you agree with me?
MR. ZURBRIGGEN: Objection to form. Sergeant, you can answer based on what you reviewed.
THE WITNESS: I don't know. I mean you showed me my name on several activity sheets. I don't have any recollection of any of it. So...
BY MS. HARRIS:
Q. Do you have any explanation as to why your name would be on the activity sheets if you were not, in some way, involved in supervising the investigation?
MR. ZURBRIGGEN: Objection to form.
THE WITNESS: I don't know.
BY MS. HARRIS:
Q. Sir, it's a yes or no question.
A. You said my involvement.
Q. Do you have any explanation as to why your name would be on the activity sheets if you didn't have some involvement with the investigation?
A. The involvement would be that I was

Page 269

their sergeant. That's not the same as being involved with the case. I agree that my name is on there as their sergeant on the activity sheets.
Q. By they you mean the detectives investigating this case. You were --
A. Detectives investigate. I was most probably their Sergeant at that time. As I said, 5 squads jump around from supervisor to supervisor. If you are supervising one person that reports to me, he's going to put my name down.
Q. I just want to clarify something from earlier because both Detective McNesby and then Police Officer Mangoni, they both referred to themselves as being in the SIU Unit of the homicide division. Is that the same as 5 squad?
A. I guess.
MR. ZURBRIGGEN: Objection as asked and answered.
THE WITNESS: Regular detectives they call it 5 squad SIU. I never referred to -- never heard homicide 5 squad

Page 270

being referred to as SIU but I guess they do.
BY MS. HARRIS:
Q. There wasn't a separate SIU within the homicide unit?
A. No, not that I know of.
Q. Let's take a look at one of the activity sheets I just showed you. I think it's Tab 43. So this is the next one chronologically from the one we looked at before. You can see this one has your name on it as well, right?
A. Yes.
Q. So from what you just said, you were probably supervising or you were the supervisor for either Hughes or Mangoni, right?
MR. ZURBRIGGEN: Objection, asked and answered.
THE WITNESS: I was not. I was not the supervisor for Hughes or Mangoni. I never even remember working with them but that's my memory, that I remember.
As far as -- when they put Thompson and Descher together, that confuses

Page 271

me because I don't remember him being in the same unit as I was.
BY MS. HARRIS:
Q. But you agreed that if your name is on several of these activity sheets, you were probably supervising someone who was investigating this case and preparing these activity sheets?
MR. ZURBRIGGEN: Objection to the form.
THE WITNESS: Like I said, I have no memory of that.
BY MS. HARRIS:
Q. But you have no other explanation as to why your --
A. I am not trying to explain, I just said I don't have any memory of it.
Q. I am asking you if you have any explanation other than that?
A. No, not yet.
Q. Feel free to read this one.
Do you remember from earlier we looked at all of those multiple tips at the very beginning of the investigation back in

Page 272

'84, '85 pointing to Michael Ransome?
A. Yes.
Q. It looks like to me -- would you agree that on 4/24/87 they finally picked up Michael Ransome?
MR. ZURBRIGGEN: Objection to form. Sergeant, to the extent you can tell.
THE WITNESS: That's what it says here.
BY MS. HARRIS:
Q. So they brought him into homicide for an interview, right?
A. Yep, looks like Hughes and Mangoni.
Q. And they're asking about a shooting of a male inside the H&B on 27th and Oakford, that's Il Man Heo?
MR. ZURBRIGGEN: Same objection. Sergeant...
THE WITNESS: That's what it says.
BY MS. HARRIS:
Q. He denies any involvement in the crime, right?
A. Uh-huh.

Q. He refused to take a polygraph, right? Bottom of the last paragraph.
A. That's what it says.
Q. This is just the activity sheet. I want to show you the corresponding interview sheet. Again, this is marked April 24th, '87, right?
A. Uh-huh.
Q. Here is an interview. To me this seems like it corresponds to that activity sheet. What do you think?
MR. ZURBRIGGEN: Objection to the form.
THE WITNESS: I don't know. I didn't pay attention to the dates and times. I don't know.
BY MS. HARRIS:
Q. We just said together 4/24/87, that's what this says here as well, right?
A. Uh-huh. It says 8:30 p.m.
Q. Does it say who they are interviewing here?
A. Michael Ransome.
Q. So it's the same suspect or witness on the same date. Can we assume this is the



statement they are talking about in that activity sheet?
MR. ZURBRIGGEN: Objection to form. Sergeant, you can answer.
THE WITNESS: I don't know.
BY MS. HARRIS:
Q. Do you have any reason to believe it's not?
A. No.
Q. Do you remember sitting in on this interview?
A. No, I do not. I don't remember anything from then.
Q. Right, of course. Why don't you read through this statement and we'll talk about it. Let me know when you get to about the middle of that second page.
A. I'm in the middle of the second page.
Q. Would you agree that he's describing an alibi?
MR. ZURBRIGGEN: Objection to the form.
THE WITNESS: I don't know.



BY MS. HARRIS:
Q. He says where he was when the shooting took place, right?
MR. ZURBRIGGEN: Same objection.
BY MS. HARRIS:
Q. He says I was in the house the whole night.
MR. ZURBRIGGEN: Same objection.
BY MS. HARRIS:
Q. Do you agree he is telling the detectives where he was when the shooting took place?
MR. ZURBRIGGEN: Same objection, Sergeant.
THE WITNESS: In the evening around 6, 7:00 p.m., I was in the house the whole night, that's what it says.
BY MS. HARRIS:
Q. The question he is answering was from the previous page, where were you when the shooting took place?
A. Yeah. I was home in my house with my



brother, Gary and my sister, Delores.
Q. So would you agree with me he's describing an alibi?
MR. ZURBRIGGEN: Same objection.
THE WITNESS: It seems like it.
BY MS. HARRIS:
Q. And he gives two witnesses to the alibi, his brother and his sister?
A. Yes, he does.
Q. He does say that he's familiar with the store, right?
A. When is the last time you were in the store before the shooting, I don't know. Who told you about the shooting? Yes, I used to buy cheeseburgers and fries there.
Q. He tells you he's familiar with the store, right? Not you, he tells Hughes and Mangoni he's familiar with the store, right?
A. Uh-huh.
Q. And then if you look at the last page at the very bottom, he is asked if he would take

Page 277

a lie detector test, right?
MR. ZURBRIGGEN: Object to the form. Sergeant, if you can tell.
THE WITNESS: He says no.
BY MS. HARRIS:
Q. But they asked him and he said no, right?
A. Yes.
Q. Let's go back to the activity sheet on Tab 43. What does it say at the very bottom, the last sentence?
A. He was released and transported home.
Q. Yes. He gives a statement, he denies involvement, he gives an alibi and then he's released and transported home, right?
MR. ZURBRIGGEN: Object to the form. Sergeant, from what you see here, you can answer.
THE WITNESS: That's what it says, he was released and transferred home.
BY MS. HARRIS:
Q. Would you expect that given there were a couple tips identifying him early on, that the detectives would do some more investigation

Page 278

after talking to him?
MR. ZURBRIGGEN: Objection to the form. Sergeant, if you can answer the hypothetical.
THE WITNESS: I can't say what they would have done at the time because I don't know what they knew. I don't know what information they had different than what's on here.
BY MS. HARRIS:
Q. What if this is all of the information they had? What if they had no other information?
A. If there's no other information, they should do more.
MR. ZURBRIGGEN: Same objection.
BY MS. HARRIS:
Q. You think they should do more?
A. I guess. I am not in that room so I don't know.
Q. Understood. Would you expect them to at least follow up on the alibi, talk to the witnesses?

Page 279

MR. ZURBRIGGEN: Same objection.
THE WITNESS: I don't have any expectations. This is something I didn't know about and I don't remember.
BY MS. HARRIS:
Q. In general, I know.
A. There really shouldn't be an in general when you're doing this stuff.
Q. In a situation with these facts, you have a person who has been identified early on in the investigation, you look for him for a while and you can't find him. You track him down, you bring him in and he says, oh no, I have an alibi. I was with my sister and my brother.
Would you expect the detectives to go talk to the sister and the brother and see if the alibi checks out?
MR. ZURBRIGGEN: Objection to form. Sergeant, you can answer the hypothetical based on what's been presented.
THE WITNESS: Hypothetically I would have went and talked to the alibi but

Page 280

I don't know the situation.
BY MS. HARRIS:
Q. Do you have any explanation, sitting here today, for why they didn't go talk to the alibi witnesses?
MR. ZURBRIGGEN: Same objection.
BY MS. HARRIS:
Q. It's a yes or no question. If you don't have an explanation --
A. I'm not in a position to make any explanation for anybody when I'm not there. I am not going to try that.
Q. Okay. So you do not have an explanation?
A. I don't, either way.
Q. Let's take a closer look -- can you give me Tab 84, please.
This is marked as City-216, 217. I am going to mark it as Exhibit-70.
\- - -
(Whereupon Exhibit-70 was marked for identification.)
\- - -

Page 281

BY MS. HARRIS:
Q. This is one of the activity sheets I showed you earlier. Your name is just kind of cut off but it seems to me that's what it says, Sergeant Descher, right at the top.
Unfortunately the date of this has been cut off. As I said, I did a review of the file and based on my review I think this activity sheet corresponds to a statement made by Rodney Everett on July 7th, 1987.
Can you read through and just let me know if you think that this is also referring to a statement made by Rodney Everett?
MR. ZURBRIGGEN: Objection to the form. Sergeant, if you can tell.
THE WITNESS: I don't know, I can't tell.
BY MS. HARRIS:
Q. Would you agree that Detective Rocks and Officer Mangoni obtained a bring down for Everett who was at the time incarcerated at

Page 282

Graterford Prison on a parole detainer?
MR. ZURBRIGGEN: Same objection. If you can tell.
THE WITNESS: I don't know that I can tell that either, from what I read so far.
BY MS. HARRIS:
Q. Why don't you read the first sentence for me?
A. Bring down -- yes, they did.
Q. Let's go to Tab 10. This is Exhibit 10. This is Exhibit 10. Would you agree this is an investigation interview record of Rodney Everett?
A. That's what it says.
Q. Under address it says male at present time incarcerated at the Graterford Institution. Do you agree with that?
A. Yes.
Q. It's a little faded. The date is also a little faded but I will represent to you it says 7/7/87.
If you read the first question and answer, would you agree he is

Page 283

being interviewed again about the murder of a grocer at 27th and Oakford Street?
MR. ZURBRIGGEN: Objection to the form. Sergeant, if you can tell from that, you can say.
THE WITNESS: Interviewed in the past, homicide detectives -- Rodney had been interviewed in the past by homicide detectives concerning a murder. Is there anything else --
BY MS. HARRIS:
Q. If you can just read down to the end of that second page.
A. Second page?
Q. Yeah, just read the first and the second page.
A. I read the end of the second page.
Q. So Everett is incarcerated at the time he gives the statement, right?
A. It looks like it.
Q. Graterford is a state prison, do you remember?
A. Graterford is in the City of Philadelphia but I think -- I don't know.

Page 284

Q. Okay, it's a prison?
A. It's a prison. Graterford is outside the city. I don't know what it is.
Q. During this interview, Everett is talking about a couple of other murders as well, right?
A. Yeah.
MR. ZURBRIGGEN: Objection to the form.
BY MS. HARRIS:
Q. Any idea what he's talking about?
A. No.
Q. But he is giving information, right?
MR. ZURBRIGGEN: Same objection.
THE WITNESS: I don't know, that's what it appears.
BY MS. HARRIS:
Q. This kind of supports the idea we were talking about before, that he's hoping that if he gives enough information the detectives are going to help him out, right?
MR. ZURBRIGGEN: Objection to the form. Sergeant, if you can tell.

Page 285

THE WITNESS: I don't know.
BY MS. HARRIS:
Q. He's the same guy that wrote that letter to Mangoni, right?
A. I don't know.
Q. It's his name on that letter?
A. I know but I don't know if one correlates to the other.
Q. In this statement he also lists some other people who Crosland might have told about the Il Man Heo murder, right?
MR. ZURBRIGGEN: Objection to the form.
THE WITNESS: Yeah, I saw that.
BY MS. HARRIS:
Q. Would you say that it's possible the detectives are asking this so they can corroborate what he's saying to them, right?
MR. ZURBRIGGEN: Objection to form.
THE WITNESS: I have no idea.
BY MS. HARRIS:
Q. When a witness is saying someone

Page 286

admitted to them that they committed a crime, did they tell anyone else is a pretty standard question, right?
A. I have no idea what they're doing. I'm not there and I don't have any recollection of that time.
Q. Right. We talked about the need to corroborate evidence generally, right?
MR. ZURBRIGGEN: Objection to the form.
THE WITNESS: Yeah, we did.
BY MS. HARRIS:
Q. So this could be a way that they're trying to corroborate, right?
MR. ZURBRIGGEN: I don't know, not there.
BY MS. HARRIS:
Q. Would you expect the detectives under your supervision to corroborate evidence?
MR. ZURBRIGGEN: Objection to the form.
THE WITNESS: I don't know. I don't know what I expected then.
BY MS. HARRIS:

Page 287

Q. Would you expect that now, thinking back on this?
A. I wouldn't know, I don't know enough about it.
Q. But sitting here today, you expected them to do a good job, right?
MR. ZURBRIGGEN: Objection to the form and as asked and answered. Sergeant, you can answer again.
THE WITNESS: I expected them to do a good job.
BY MS. HARRIS:
Q. Sometimes doing a good job involves corroborating witness statements, right?
A. I don't know. I don't know in that particular situation.
Q. One of the people that they said Curtis might have told or one of the people that Rodney Everett says Curtis might have told was Michael Ransome, right?
MR. ZURBRIGGEN: Objection to the form.
BY MS. HARRIS:
Q. If you look at the first question and

Page 288

answer. It's the first few lines of the answer to that first question.
A. You say Lester Turner, is that what you asked me?
Q. I said Michael Ransome. If you look at that last sentence, he did not tell anyone else besides Squirt, who is Frank Turner and Michael Ransome, as far as I know. Do you see where it says that?
A. No. (Reading document)
Q. So Everett is saying to Rocks and Mangoni that Crosland would have told this information to Michael Ransome?
A. It says he may have told it --
MR. ZURBRIGGEN: Objection, form.
THE WITNESS: I don't know. It's confusing. Yeah, I guess it says that.
BY MS. HARRIS:
Q. But then when they talk to Michael Ransome, Michael Ransome said he didn't tell me anything, right?
MR. ZURBRIGGEN: Objection to the form.

Page 289

THE WITNESS: I don't know, I don't remember.
BY MS. HARRIS:
Q. Let's look at 43 again. This is the activity sheet where they talk about their conversation with Michael Ransome?
MR. ZURBRIGGEN: Objection to form. Sergeant, if you can tell.
THE WITNESS: What did you ask me to look for?
BY MS. HARRIS:
Q. This last full paragraph.
A. He admitted knowing Curtis Crosland and also knowing him at the time of the shooting. He said he never heard Curtis did it.
Q. So Michael Ransome tells them that he has never heard that Curtis has done this, right?
MR. ZURBRIGGEN: Same objection.
THE WITNESS: I guess, that's what it looks like.
BY MS. HARRIS:
Q. So that sort of contradicts what Everett

Page 290

is saying, right?
MR. ZURBRIGGEN: Same objection.
THE WITNESS: I don't know.
BY MS. HARRIS:
Q. We just looked at this part where Everett says Michael Ransome would know. And then Michael Ransome says, I never heard that.
MR. ZURBRIGGEN: Same objection.
THE WITNESS: I don't know. I don't know. That's what it says.
BY MS. HARRIS:
Q. So just based on what it says, that's contradictory, right?
A. I guess, based on what it says.
MR. ZURBRIGGEN: Objection.
BY MS. HARRIS:
Q. Let's flip to one of the other activity sheets I showed you. This is Tab 30 or Exhibit 30, sorry. This one has your name on it as well. It's one of the ones I showed you.
A. Yes, it does.

Page 291

Q. Take a minute and read that one.
A. What was your question?
Q. I hadn't asked one yet. I just asked you to read the activity sheet. But I'm happy to give you one if you want.
A. That's all right. You can hold it. Yes.
Q. So it says here that Louise Woods is Rodney Everett's girlfriend, right?
A. I don't know. I'm not retaining anymore.
MR. ZURBRIGGEN: Objection.
THE WITNESS: I'm trying to read it but I'm not retaining it.
BY MS. HARRIS:
Q. We'll take it step by step. The first sentence if you follow along with me it says: On Saturday July 25th, 1987, Detective Rocks contacted Louise Woods. She was the girlfriend of Rodney Everett. Is that fair to say?
A. That's what it says.
Q. Everett is giving information to detectives in the Heo case. That's the next

Page 292

sentence. Right, so that makes sense. This is the same Rodney Everett that we've been talking about, right?
MR. ZURBRIGGEN: Objection to form.
BY MS. HARRIS:
Q. Do you agree with me?
A. I guess.
Q. They are talking to his girlfriend, Louise Woods, right?
MR. ZURBRIGGEN: Objection to form.
THE WITNESS: That's what it says.
BY MS. HARRIS:
Q. Detective Rocks specifically is talking to his girlfriend, Louise Woods?
MR. ZURBRIGGEN: Objection to form again. Again Sergeant, to the extent you can tell from this document in front of you.
THE WITNESS: That seems what it says, I don't know.
BY MS. HARRIS:
Q. The next sentence says: She stated that

Everett called her from prison and he told her that Frank Turner a/k/a Squirt, the alleged shooter in the Heo case was staying in the Tasker Homes. Do you agree with me that's what it says?
A. That's what it says.
Q. This gives us some new information, right? Everett is now saying that Frank Turner is the shooter in the Heo case.
MR. ZURBRIGGEN: Objection to the form. Sergeant, you can answer based on what's in front of you.
THE WITNESS: That's what it says.
BY MS. HARRIS:
Q. We asked Detective Rocks about this because he's the person that took this statement or made this phone call to Louise Woods. Take a quick second and look at what Detective Rocks says about it. This is page 297 of Detective Rocks' deposition transcript. 297 top left, look at line 13. Read through to page 300.
A. Yes.



Q. So what Rocks says is that if Louise Woods is telling the truth here, she is naming a completely different -- we're talking about a completely different suspect in this murder than we were originally going after, Curtis Crosland, right?
MR. ZURBRIGGEN: Objection to the form. Sergeant, you can answer based on the transcript.
THE WITNESS: Based on what this thing says, it sounds like it.
BY MS. HARRIS:
Q. What Rocks says is that he would want to follow up on this, right?
MR. ZURBRIGGEN: Same objection.
THE WITNESS: Yeah.
BY MS. HARRIS:
Q. He would want to interview her?
A. That's what it says.
Q. Okay. He would want to talk to Louise Woods again and maybe he would want to talk to Rodney Everett again, right?
MR. ZURBRIGGEN: Same



objection.
THE WITNESS: I don't know, he said Louise Woods.
BY MS. HARRIS:
Q. And then later on page 299, it says the other possibility is to bring Rodney Everett in? And he answers, yes, straighten it out.
A. That's what it says.
Q. He says specifically on page 300 that a supervisor would send someone out to go interview them.
A. No, they asked them if he knew -- it would be whoever the supervisor sent out to do it, assigned him to do that.
Q. At the bottom of page 298, look over where your hand is covering.
A. Yeah.
Q. At the bottom it says, just say I typed this up, me getting this information, giving it to the assigned of the supervisors handling it and they would make the decision on what to do, who to re-interview, who to interview?
A. That's what it says.
Q. Do you have any reason to disagree with



that chain of command?
A. Well, that's not what usually happened but whatever.
Q. What usually happened?
A. They followed their investigations up.
Q. So you think that's not necessarily accurate as to how you remember it, that they were --
A. I don't remember it, first of all. You're saying I remember it, but I don't --
Q. I apologize. I thought you had just come to a memory.
A. I have a memory but not about that.
Q. So you don't remember being the supervisor that was given this information?
A. I wasn't given that information, I don't believe. I don't know, it has been a long time ago.
Q. Do you agree with this general approach, that someone should go out and interview these two witnesses?
MR. ZURBRIGGEN: Objection to the form. Sergeant, you can answer.
THE WITNESS: I don't know.

Page 297

I don't know based on that. That's not what I remember but I don't remember that situation. That's not how I remember it being done.
BY MS. HARRIS:
Q. Even based on how you remember it, someone would probably go out, even if it's Rocks, if it's somebody else, someone would probably go and try to iron out this contradiction?
MR. ZURBRIGGEN: Objection to the form.
THE WITNESS: I don't know. I don't know the situation.
BY MS. HARRIS:
Q. Just based on this situation.
A. It's hard to put yourself in a situation time wise and where the investigation was and who was where. You're giving me an impossible situation that I can't answer because I don't remember, I wasn't there.
Q. Even though your name was on the street?
MR. ZURBRIGGEN: Objection, argumentative. Sergeant, if you can answer.
THE WITNESS: I don't

Page 298

remember.
MS. HARRIS: Let's take our brief break to see if we can see the Eclipse.
VIDEOTAPE OPERATOR: The time is 3:10 p.m., off the record.
The time is 3:27 p.m., back on the record.
BY MS. HARRIS:
Q. Sergeant Descher, during that break did you come to determine anything you had said previously was inaccurate or you wanted to follow up on anything?
A. No.
Q. I will just note that we had a conversation with your counsel about whether we should continue today, given that you mentioned that you're getting a little bit tired, this has been difficult. Your counsel represented that things should be fine continuing going on today. Do you feel differently?
A. I can go for a while. I'm not coming back. I am concerned with my health with going back and forth.

Page 299

Q. Do you feel like you are able to truthfully and accurately answer my questions for another couple hours?
A. Yeah, I do.
Q. Before we broke we were talking about this activity sheet about a conversation that Detective Rocks had with a woman named Louise Woods, Rodney Everett's girlfriend, right?
A. Yes.
Q. We looked at what Detective Rocks had to say about this interview, right, in his deposition?
A. Yeah, I remember what you said.
Q. We were talking about the follow up that Detective Rocks suggested should be done after this interview?
A. Yes.
Q. He suggested that he would have wanted to re-interview Louise Woods, right?
MR. ZURBRIGGEN: Objection to form.
THE WITNESS: That's not what he said. That's not what I read.
BY MS. HARRIS:

Page 300

Q. What did he say?
A. He said something about a supervisor would assign somebody or something like that. That's what I read.
Q. Why don't you look at the bottom of 297 of Rocks' testimony, if you could read what he said there.
A. 297?
Q. Uh-huh, the last two lines of that, line 23.
A. Yeah, that's what he said.
Q. That's what he said, that he would have wanted to re-interview Louise Woods?
A. I would do is re-interview, yes.
Q. Is that what you would do if you were in that situation?
MR. ZURBRIGGEN: Objection to the form.
THE WITNESS: I don't know, no. I don't know what I would do, unless I was there.
BY MS. HARRIS:
Q. You don't know what you would do if a witness was giving you contradictory

Page 301

information from what another witness said?
MR. ZURBRIGGEN: Objection to the form.
THE WITNESS: I don't know exactly what I would do, no.
BY MS. HARRIS:
Q. Do you know what you would expect the detectives working under your supervision to do?
A. No, I don't. Each situation is different.
Q. In this situation?
A. Each situation is different. I don't know this situation.
Q. Based on what you read about this situation?
MR. ZURBRIGGEN: Object to form.
THE WITNESS: I don't have an opinion.
BY MS. HARRIS:
Q. Two witnesses giving you contradictory information does not give you enough information to know what you would do?

Page 302

MR. ZURBRIGGEN: Objection to form.
THE WITNESS: No.
BY MS. HARRIS:
Q. Let's fast forward to December of this year. Here we are in July. Let's fast forward to December, I am going to go back to an activity sheet I showed you in the very beginning which is Exhibit-32. So at this point in time, now we're at December 9th, 1987, right, that's the date on there?
A. That's what it says, 1987.
Q. At this point Detective Cimino is preparing an affidavit of probable cause for Mr. Crosland's arrest; is that right, based on the activity sheet in front of you?
A. He met with Rosen and Christy. Yes, that's what it says, charge of murder.
Q. Your name is still on this activity sheet, right?
A. It's there. I wasn't there.
Q. We have now looked at activity sheets from April of '87, July of '87 and now December of '87 that each have your name on

Page 303

it?
A. Yep.
Q. I understand your representation is that doesn't necessarily mean anything to you?
A. It doesn't.
Q. That doesn't necessarily mean that you were involved in the preparation of this affidavit of probable cause?
A. No, if I was, I would have been with Christy and Rosen and I am not.
Q. So if you were involved in supervising this investigation, you would have been in that meeting with the D.A.?
A. I believe I would be, yeah, absolutely.
Q. So Cimino is doing this on his own?
MR. ZURBRIGGEN: Object to the form.
THE WITNESS: I don't know.
BY MS. HARRIS:
Q. But that doesn't list any other supervisors in that room?
A. It doesn't list any supervisor in that room.
Q. Let's go back to the affidavit of

Page 304

probable cause itself that they're talking about in this activity sheet. That's back at all the way at Exhibit-1, the first one we looked at.
A. Number 1 in here?
Q. Yeah.
Okay, so you're at the affidavit of probable cause?
A. No. There it is.
Q. So you can see the preparer of this affidavit is Detective Cimino, right?
A. Yes.
Q. The affidavit is for the arrest of Curtis Crosland?
A. Yeah.
Q. I would like to go through this together but I want to do it as quickly and easily as possible.
This first paragraph, would you agree this is a description of the crime scene of when they found Mr. Heo, who had been shot?
MR. ZURBRIGGEN: Objection to the form. Sergeant, to the extent you can

Page 305

tell.
THE WITNESS: It seems like that's what it is.
BY MS. HARRIS:
Q. The second page describes some eyewitness interviews from the crime scene, right?
A. Yeah, I guess.
Q. Why don't you read --
A. I'm not going to read it. It's too much. Right now I can't read it all.
Q. Let me know if it would help if I read it to you.
A. No. I summarized it a little bit, the best I'm gonna do.
Q. Is it fair to say that Everett's statement on the third page, the third page talks about Rodney Everett coming in and giving a statement, right, back in April?
MR. ZURBRIGGEN: Objection to the form. Sergeant, if you can tell.
THE WITNESS: I can't really.
BY MS. HARRIS:
Q. The first sentence says Rodney Everett

Page 306

was interviewed by Police Officer Mangoni and the homicide unit, right?
A. Uh-huh.
Q. That's that same interview that we looked at before.
MR. ZURBRIGGEN: Objection to the form.
THE WITNESS: Yeah, that seems like it.
BY MS. HARRIS:
Q. So the only evidence against Mr. Crosland in this affidavit of probable cause is this statement by Rodney Everett. Do you see anything else in this affidavit of probable cause that points to Curtis Crosland specifically?
MR. ZURBRIGGEN: Objection to the form. Sergeant, if you can say.
THE WITNESS: It says witness stated... yep, that's what it says.
BY MS. HARRIS:
Q. So all of this information is coming from Everett?
A. That's what it seems like.

Page 307

Q. Everything else in the affidavit is sort of general information about the murder and doesn't name Curtis Crosland specifically, these other witness interviews.
MR. ZURBRIGGEN: Objection to form. Sergeant, if you can tell.
THE WITNESS: I only see it in summary here.
BY MS. HARRIS:
Q. On the third page?
A. Third page.
Q. Can we assume if detectives had other information directly pointing to Crosland, that would have been in the affidavit?
MR. ZURBRIGGEN: Objection to form. Sergeant, if you can answer.
THE WITNESS: In my opinion you can't assume that because there are so many different people involved. I don't know how much Cimino went back, you know.
BY MS. HARRIS:
Q. But the affidavit of probable cause is usually where you put all of your best evidence, right?

Page 308

MR. ZURBRIGGEN: Objection to form.
THE WITNESS: I don't know. I don't know. I don't know what he would do. Best evidence, I guess they felt like this was his best evidence.
BY MS. HARRIS:
Q. The detectives -- let's see. You would expect Detective Cimino in preparing the affidavit to be pretty up on the investigation, right?
MR. ZURBRIGGEN: Objection to form. Sergeant, if you know.
THE WITNESS: I don't know. He's coming in way after.
BY MS. HARRIS:
Q. Maybe this is a good background question, how is it determined who writes the affidavit of probable cause if there's a bunch of detectives working on a case?
A. It's normally the assigned but in the 5 squad situation I don't know. I really don't know what normally would happen. I'm surprised that they were in the D.A.'s office

Page 309

and that Barbara Christy was involved and that it was done this way. But I don't know, it's not the way I remember it.
Q. How do you remember it?
A. I remember if differently. I remember the D.A.'s would be part of it when you went that far with it.
Q. When you're ready to make an arrest.
A. But it's a different time.
Q. Would you expect Cimino or whoever prepared an affidavit of probable cause to have access to the whole homicide file?
MR. ZURBRIGGEN: Objection to the form.
THE WITNESS: I don't know, no idea.
BY MS. HARRIS:
Q. Would you expect them to have read the other interviews in the case?
MR. ZURBRIGGEN: Same objection.
THE WITNESS: I don't know.
BY MS. HARRIS:
Q. Do you think it would be good police

Page 310

work if they hadn't?
MR. ZURBRIGGEN: Same objection.
THE WITNESS: I don't know. I don't know what they did so I can't rate their police work when I don't know what they did.
BY MS. HARRIS:
Q. I am asking you if they hadn't. If they hadn't looked at anything else that happened in this case, would that be good police work?
A. Based -- as many directions as this thing was running, it would have been very difficult to have everything I would say, but I don't know.
MR. ZURBRIGGEN: Objection for the record.
BY MS. HARRIS:
Q. Presumably if he is describing the statement that Everett gives on 4/15/87, he would have read that statement at least, right?
MR. ZURBRIGGEN: Objection to the form.

Page 311

THE WITNESS: He gave it to him?
BY MS. HARRIS:
Q. Yeah.
A. To John, John took the statement?
Q. Even if he gave it to Mangoni or Hughes or Rocks, you would expect Cimino to have read it, right?
MR. ZURBRIGGEN: Same objection.
THE WITNESS: Somebody read it in that D.A.'s meeting.
BY MS. HARRIS:
Q. They would have learned about the statement that the probation officer gave saying that he gave Everett newspaper articles, right?
MR. ZURBRIGGEN: Objection to the form.
THE WITNESS: I don't know. I have no idea about that. I don't even have an opinion about that.
BY MS. HARRIS:
Q. You don't think that whoever prepared

Page 312

this would have known about that other interview?
A. I don't know.
MR. ZURBRIGGEN: Objection to the form.
THE WITNESS: I don't know.
BY MS. HARRIS:
Q. You don't know if they would have read the other interviews in the case?
MR. ZURBRIGGEN: Same objection.
THE WITNESS: It would be an assumption on my part.
BY MS. HARRIS:
Q. Do you think they would have learned that Everett was facing a parole violation and had written that letter to Mangoni?
MR. ZURBRIGGEN: Same objection.
THE WITNESS: I don't know. I don't even know where that letter came in from, where it showed up at. I saw the letter, but...
BY MS. HARRIS:

Page 313

Q. You know that it was provided to us by the city as part of the homicide file?
MR. ZURBRIGGEN: Objection.
THE WITNESS: I don't know. I know that's what you said.
BY MS. HARRIS:
Q. Indeed. How about that Everett failed the polygraph exam, that was part of that same interview, right?
MR. ZURBRIGGEN: Objection to the form.
THE WITNESS: I don't know. I don't think there is such a thing as failing a polygraph in Philadelphia.
BY MS. HARRIS:
Q. Sure. Deception was indicated as part of the polygraph examination. Do you think that whoever prepared this affidavit would know that?
MR. ZURBRIGGEN: Objection.
THE WITNESS: I don't know. I don't know what he knew.
BY MS. HARRIS:
Q. Do you think that Cimino would have

Page 314

known that there were multiple tips pointing to this other guy, Michael Ransome?
MR. ZURBRIGGEN: Objection.
THE WITNESS: I don't know.
BY MS. HARRIS:
Q. How about that Everett said Crosland told Ransome about the crime but Ransome gave a statement and denied that, would they know that?
MR. ZURBRIGGEN: Same objection.
THE WITNESS: I wouldn't know.
BY MS. HARRIS:
Q. How about that Ransome gave that alibi information and it was never followed up on?
MR. ZURBRIGGEN: Same objection.
THE WITNESS: I don't know.
BY MS. HARRIS:
Q. How about that Everett told his girlfriend that it was actually Frank Turner who was the shooter in this case?
MR. ZURBRIGGEN: Objection to

Page 315

the form.
THE WITNESS: I don't know.
BY MS. HARRIS:
Q. How about that police didn't go back and confirm an ID of Crosland with any of these other witnesses from the crime scene?
MR. ZURBRIGGEN: Same objection.
THE WITNESS: I don't know.
BY MS. HARRIS:
Q. You don't know if Cimino would have known any of that?
A. I don't know.
Q. So either -- these are the only two possibilities I could come up with based on how you answered those questions. You let me know if there are others. Either John Cimino knew all of that information and didn't include it in the affidavit or John Cimino prepared an affidavit of probable cause in this case and didn't know any of that information that I just described to you. Can you think of any other explanations?
MR. ZURBRIGGEN: Objection to

Page 316

the form. Sergeant, you can answer.
THE WITNESS: I have no way of knowing. I can't assume.
BY MS. HARRIS:
Q. It's really yes or no, can you come up with any other explanation as to why --
A. Like I said, I have no idea.
Q. So you have no explanation?
A. No. I am not going to assume anything.
Q. Earlier we talked about how it was at least -- you looked at Detective Mangoni's deposition and he said that it was not his practice to include evidence that went against guilt in the affidavit of probable cause.
MR. ZURBRIGGEN: Objection to the form. Sergeant, do you recall that?
BY MS. HARRIS:
Q. Do you recall that?
A. No.
Q. Do you want to take another look?
A. What was Mangoni -- at the particular time was he still detailed as a police officer?
Q. I believe he was a police officer within

Page 317

the homicide department.
A. Then he wouldn't have been making any probable cause, in my opinion, I don't know.
Q. Because that's something that only detectives would be doing?
A. Probably.
Q. Because that's a serious responsibility, right?
MR. ZURBRIGGEN: Objection to the form.
THE WITNESS: It's a detective's responsibility or a D.A.'s responsibility or a group responsibility.
BY MS. HARRIS:
Q. Do you have any theories as to why your name is on all of these activity sheets, including the one related to the affidavit of probable cause if you were not involved?
MR. ZURBRIGGEN: Objection asked and answered, objection to form. Go ahead Sergeant, answer again.
THE WITNESS: No.
BY MS. HARRIS:
Q. Would detectives have just made up that

Page 318

you were involved?
MR. ZURBRIGGEN: Same set of objections.
THE WITNESS: To me, all it means on the activity sheet when you see a supervisor's names, is that that particular detective or that particular person, I'm his supervisor. I doesn't mean that I'm his supervisor on that particular investigation.
So I saw in another deposition where my name was written, you know, and I wasn't even in homicide but I had been that person's supervisor. So sometimes they are making these things up after they work about 13, 14 hours and they're going to put the name of the supervisor that's their supervisor because that's easy so they can go home.
They're not going to particularly think about two or three different sergeants that might have interviewed -- worked with them during that period of time.
BY MS. HARRIS:

Page 319

Q. So they might have just put your name down even when they shouldn't have.
MR. ZURBRIGGEN: Objection to form. I'm sorry, Sergeant, go ahead and answer.
THE WITNESS: I explained to you when we were with line, we had an A and B side. I'm going home at 11, the other sergeant is going to take my guys and his guys and keep running. When they do that activity sheet, the ones that are assigned to him are going to put his name down. The ones that are assigned to me, even though I'm not there, they're going to put my name down. That's my experience.
BY MS. HARRIS:
Q. So we're talking about four or five activity sheets from the same investigation, different detectives working on different activity sheets, some of these are Rocks, some of these are Mangoni, some of these are McNesby, Cimino --
A. Right.
Q. They're all putting your name down and

Page 320

this could all just be a coincidence that you just happened to be supervising one of them but not on this case?
A. I was a 5 quad sergeant at the time.
MR. ZURBRIGGEN: Objection to the form.
BY MS. HARRIS:
Q. These guys are all in 5 squad?
A. They were in 5 squad. Thompson -- I didn't even know he was a 5 squad lieutenant but he may have been.
Q. So they're all putting your name down just because you're one of the supervisors in the unit?
A. They're probably assigned to me.
MR. ZURBRIGGEN: Objection to the form.
BY MS. HARRIS:
Q. The case is assigned to you? The detective is assigned to you or the case?
A. No, the detective.
MR. ZURBRIGGEN: Objection to form. Objection, asked and answered.
THE WITNESS: In my group.

BY MS. HARRIS:
Q. Just because you're the supervisor doesn't mean you're supervising their work?
A. I might not be there when they're working.
Q. So you might not have been there for each of these four or five activity sheets?
A. They got approval to work over on the job for five hours overtime, they ain't giving me five hours overtime.
Q. Whose approval do they need for that?
A. Probably the lieutenants, captain, somebody. I'm not getting approval, that's for damn sure especially if there's another sergeant there. That's -- I was just thinking, that's probably a big part of the reason because they were on overtime when most of the stuff was done. I don't even know, it's a wild guess.
Q. Okay. So these activity sheets might really just be for keeping track of overtime and --
A. Not, that's not true. You're making that up.



Q. I'm really trying to understand, sir.
A. You're making shit up. That's not what I said.
Q. So the activity sheets -- one of the purposes might be to present -- to explain overtime?
A. No, that's who they're assigned to. On the sheets, on the rosters they're assigned to me. If I happen to be the only 5 squad sergeant but three are different squads, unit guys working, they're all going to put my name down whether I'm there or not. That's my guess. I don't know.
Q. Right, because you're still trying to figure out why your name is there?
A. No, I'm not. You assumed what you assumed and I'm assuming what I assumed.
Q. I appreciate you shedding the light.
Based on everything that we have just reviewed, that we've gone through together, it has been a lot, based on what is in the affidavit, do you think there was probable cause to arrest Mr. Crosland for this murder in December of 1987?



MR. ZURBRIGGEN: Objection to form. Objection to the legal conclusion.
THE WITNESS: I have no understanding of that investigation well enough that I would have any opinion on that because I won't assume something like you did.
BY MS. HARRIS:
Q. Understood.
I want to talk about a couple -- I don't have a ton more for you but I do want to talk about a couple other related murder investigations that look like you were also supervising or at least your name is on some activity sheets and some interviews that are happening right around the same time, the same year involving the same people.
A. The same defendants?
Q. Yes.
A. Just being clear.
Q. Yes. Same suspects, generally.
So the first is a victim named John Lamb, do you remember the murder of John Lamb?
A. No.



Q. I want to show you all of the way at the end, Exhibit-66. Do you agree this is another activity sheet with your name on it?
A. My name is there. '87.
Q. So this is that same year, November 2nd, 1987. It's about a month before Detective Cimino got that arrest warrant that we just looked at for Curtis Crosland in the Il Man Heo case.
Is it fair to say that Detective Cimino looks like he is working on this case and the Il Man Heo case at the same time?
MR. ZURBRIGGEN: Objection to the form. Sergeant, if you can tell.
THE WITNESS: I have no idea.
BY MS. HARRIS:
Q. His name is on there as well, right, Detectives Cimino and McNesby received authorization to obtain arrest warrants?
A. That's what it says, it says Cimino and McNesby are authorized to obtain arrest warrants.
Q. He is getting an arrest warrant in this

Page 325

case for the murder of John Lamb and then next month he is getting an arrest warrant in the murder of Il Man Heo?
A. I guess.
Q. Do you see Curtis Crosland's name under B there?
A. Yes.
Q. So it's the same defendant or a defendant in common, at lease?
A. I see Crosland.
Q. Do you remember anything about this case?
A. Lamb, I don't have any idea, no.
Q. This activity sheet describes arrest warrants obtained for Mr. Crosland as well as Frank Turner and Lester Turner; is that right?
MR. ZURBRIGGEN: Objection to form. Sergeant, if you can see that.
THE WITNESS: It says arrest warrant, three different names.
BY MS. HARRIS:
Q. And those are the names, Frank Turner, Lester Turner, Curtis Crosland?
A. Frank Turner, Curtis Crosland and Lester

Page 326

Turner.
Q. Did you discuss these cases with Detective Cimino, McNesby and Rocks, to your recollection?
A. I have no recollection, no knowledge.
Q. I would like you to turn to 31 here. We're flipping back and forth.
This is an activity sheet from the next day, from 11/3/87, documenting Curtis Crosland's arrest on the arrest warrant we just looked at. Can you read that last sentence?
A. On the bottom of the page?
Q. Yes.
A. Defendants Curtis Crosland did make an exculpatory statement admitting not only his participation but also the roles played by both Frank and Lester Turner.
Q. Based on that, it sounds like someone here is reporting that Curtis Crosland made a statement that inculpates himself, right?
MR. ZURBRIGGEN: Objection to form, Sergeant...
THE WITNESS: Inculpatory --

Page 327

I don't know what it means.
BY MS. HARRIS:
Q. You don't know what inculpatory means?
A. I know what the word means.
Q. It means he made a statement that was bad for him, right?
A. I guess that's what it means, inculpatory.
Q. Can I have Tab 85? I want to go back to that statement we looked at before. This is the first thing we seen that says you're actually present. I would like you to take a close look at this one. This is in the John Lamb murder.
A. This is a different case.
Q. This is the John Lamb murder, the one we're talking about now. It says there that he was interrogated by Sergeant Descher and Detective Rocks, right?
A. No, it doesn't say that.
Q. It does not say that? In the presence of -- interrogated by --
A. In the presence of -- interrogated by Sergeant Descher, yeah, it does say that.

Page 328

Q. Someone at least wrote down that you were actually present for this interrogation and that you participated in it somehow?
A. November, 1987.
MR. ZURBRIGGEN: Objection to the form.
BY MS. HARRIS:
Q. Right?
A. That's what it says.
Q. Which aligns with what you told me earlier, which is sometimes you did sit in on interrogations that your detectives were doing, right?
MR. ZURBRIGGEN: Objection to the form. Sergeant, you can answer.
THE WITNESS: Yeah, I've been in statements but I don't recall this.
BY MS. HARRIS:
Q. So you don't recall taking this statement?
A. I wouldn't be taking it. I was present in this statement maybe, if that's what it says.
Q. Fair enough. You don't remember being

present during this statement?
A. Right.
Q. I am going to ask you to just read through it.
A. Yes.
Q. In this statement Curtis explains that -- Curtis Crosland explains that he and Frank and Lester are cousins, right?
MR. ZURBRIGGEN: Objection to form. Sergeant, if you can say based on this document.
THE WITNESS: I don't know. On this document that's what it seems like.
BY MS. HARRIS:
Q. Okay. This is the statement that was described in that activity sheet as an inculpatory statement. Do you agree that this is an inculpatory statement?
MR. ZURBRIGGEN: Objection to the form. Objection, it calls for a conclusion. Sergeant, you can answer.
THE WITNESS: I don't know. I don't know.
BY MS. HARRIS:



Q. Would you agree that Curtis Crosland is admitting guilt in this murder?
MR. ZURBRIGGEN: Same objection.
BY MS. HARRIS:
Q. Within this statement that you just read?
A. It appears that way.
Q. You think so?
A. I don't know. I explained to you several times that I'm having trouble retaining what I'm reading because my head is spinning. I can tell you no, I don't know.
Q. As I said to you and to your counsel --
A. That's this bullshit you keep saying, I can break and all that. I'm explaining to you an issue.
MR. ZURBRIGGEN: Counsel, if you want to direct him to a portion of this document, you're free to do that.
BY MS. HARRIS:
Q. I am really trying to do this in a way that you can understand what's going on --
A. I explained to you the situation.



Q. Okay. I need to ask you about this statement as a whole --
A. Ask me. It looks to me like I was in the statement for the warnings only.
Q. Why do you see that?
A. Because that's the only place I see --
Q. See what?
A. That's what it appears to me, based on my experience, that I went in to observe the warnings.
Q. Why would you go in and just observe the warnings?
A. That's what it appears.
Q. I'm trying to understand, sir. Why does it appears that way?
A. I told you what I believe. You don't have to understand why because I can't explain why. I would have signed it. I would have signed it at the end where Rocks -- in his presence.
Q. So because you didn't sign it at the end --
A. I don't believe I was in there at the end.



Q. You were just there at the beginning?
A. I don't know, I'm just saying, that's what I believe.
Q. Okay. It doesn't specify at the top where it says that you were present, it doesn't specify for what period of time you were present, right?
MR. ZURBRIGGEN: Objection to the form.
THE WITNESS: I don't see it. If it does, it does. I don't see it.
BY MS. HARRIS:
Q. Was that typically your practice, to leave after the warnings?
A. No. I could have got called out, it could have been a lot of things.
Q. Were you able to understand this statement when you read it just now?
A. Not really. I understand that he's talking about getting jumped -- no.
Q. Do you agree that he is admitting to involvement in the murder in this statement?
MR. ZURBRIGGEN: Objection to the form. Sergeant, to the extent you can

tell --
THE WITNESS: It appears to me that he is.
BY MS. HARRIS:
Q. Were you aware that the charges against Mr. Crosland in this murder were dismissed at the preliminary hearing level, after he told the hearing judge the same set of facts?
A. Absolutely not.
Q. Let's fast forward to the trial of Frank Turner for the Lamb murder. I'll represent to you that Frank Turner and Curtis Crosland were both charged with this murder and Curtis' case was dismissed at the preliminary hearing and the trial went ahead against Frank Turner for this murder.
A. Who was dismissed?
Q. The case against Mr. Crosland was dismissed for the John Lamb murder and the case against his cousin, Frank Turner, went to trial.
A. Okay.
Q. Could I have Tab 86.
So at some point during the



trial of Frank Turner for the John Lamb murder, we're going to mark this as Exhibit-71. It is Crosland court file 3287.
- - -
(Whereupon Exhibits-71 and 72 were marked for identification.)
- - -
BY MS. HARRIS:
Q. So at some point during the trial against Frank Turner for the John Lamb murder, Curtis Crosland was asked to testify. My understanding is this was testimony outside of the presence of the jury for the D.A. to determine whether to call him as a witness.
He is being asked about the same murder that he was asked about in the statement that you were present for at least in the beginning.
MR. ZURBRIGGEN: Objection to the form.
BY MS. HARRIS:
Q. I would ask you to flip to 137 on the top right corner?
A. Uh-huh.



Q. Mr. Crosland is describing speaking to a detective about this testimony. Can you read through that, please?
A. Where is it at, on the top?
Q. Yes, if you look at his answer. If you could read through to where Ms. Fisk says, your Honor, I object to any further questioning at this time. It's halfway through 138.
A. 138?
Q. Yeah, about halfway through that page. You can stop there. Actually, read through that whole page.
A. Yeah.
Q. So Crosland testified here that Detective Rocks asked him to testify against Frank Turner.
A. I think that's what it said.
MR. ZURBRIGGEN: Objection to the form.
BY MS. HARRIS:
Q. And Crosland told him that he couldn't because the information would be false, right?
MR. ZURBRIGGEN: Same



objection.
THE WITNESS: I think that's what it said, yes.
BY MS. HARRIS:
Q. Why should I give a statement against someone, a false accusation?
A. Uh-huh, I saw it.
Q. It seems like what he's saying is that Detective Rocks asked him to testify anyway.
MR. ZURBRIGGEN: Objection to the form. Sergeant, if you can tell --
THE WITNESS: I have no way of telling what he said.
BY MS. HARRIS:
Q. Would you believe that about Detective Rocks --
A. No, I wouldn't.
MR. ZURBRIGGEN: Objection to the form.
BY MS. HARRIS:
Q. No?
A. No.
Q. Because if that was true, that would be

Page 337

totally inappropriate, right?
MR. ZURBRIGGEN: Objection to the form.
THE WITNESS: I don't believe it.
BY MS. HARRIS:
Q. Because if it was true, it would be inappropriate, right?
A. It would probably be inappropriate, yeah.
Q. You would never tell a detective under your supervision to do that?
A. No.
Q. If you found out that happened, you would have to do something about it, right?
MR. ZURBRIGGEN: Objection to the form.
THE WITNESS: Probably.
BY MS. HARRIS:
Q. Were you aware at the time -- do you remember being aware at the time of this accusation against Rocks?
A. No.
Q. No one came to you and said, hey, a

Page 338

witness in the Lamb trial testified that Rocks tried to get him to testify to something that isn't true?
A. I don't think I was even there.
Q. Sorry?
A. '89 this was?
Q. Yes.
A. I don't think I was in homicide.
Q. But if someone did say that about someone that was working for you, you would have a duty to investigate it?
MR. ZURBRIGGEN: Objection to the form.
THE WITNESS: Yes.
MS. HARRIS: Let's take a quick break. I am trying to wrap up. Give me five to ten minutes to go over my notes and we'll see where we are.
VIDEOTAPE OPERATOR: The time is 4:10 p.m., off the record.
The time is 4:23 p.m., back on the record.
BY MS. HARRIS:
Q. Per usual, Sergeant Descher, did you

Page 339

remember anything that you wanted to correct or change?
A. No.
Q. Do you have any reason to believe you can't give truthful and honest testimony for the next hopefully hour at most?
A. No.
Q. So in addition to the John Lamb murder that we just talked about, I have one more murder investigation I want you to look at very briefly. This is also occurring right around the same time.
If you look at Exhibit-64 in your binder, right towards the end. This is the investigation into the murder of a man named Joseph Wilkerson. You can see this is an activity sheet that has your name on it again. I promise it's the last one.
Is it fair to say that once again your name is on this activity sheet?
A. It says it.
Q. And as you now clarified for me several times, which I appreciate, this just means that you were supervising a detective that was

Page 340

involved in this investigation, not necessarily that you were supervising the investigation itself?
A. Correct.
Q. Correct?
A. That's what I believe.
Q. So this activity sheet is dated 4/20/87. Right next to your name there.
A. Yeah.
Q. There is right around the same time that we saw that Everett is being interviewed and re-interviewed about the Il Man Heo case, right?
MR. ZURBRIGGEN: Objection to the form.
THE WITNESS: I don't know, if that's what you say.
BY MS. HARRIS:
Q. I will represent to you that the other documents -- we have looked at some other documents from April of '87.
If you just take a look at that first paragraph under the decedent's name --

Page 341

A. Yeah.
Q. They are discussing a person named Delores Tilghman who is presently in Jefferson Hospital. Did I get that right?
A. (Reads document) Yes.
Q. So this is a witness who was hospitalized at the time and the detectives are discussing what to do about that?
MR. ZURBRIGGEN: Objection to the form. Sergeant, you can answer.
THE WITNESS: I don't recall but that's what it says.
BY MS. HARRIS:
Q. Do you remember at the very beginning of the deposition we talked about Delores Tilghman was the only other witness, other than Everett, who testified against Mr. Crosland?
A. No, I don't remember.
Q. Do you remember when we read her recantation affidavit at the very beginning --
A. I remember there was one, I just don't remember.
Q. And if you go down to the second to last

Page 342

paragraph, we see the name Frank Turner again referred to as a principle here.
A. Yeah.
Q. In this context, does principle mean he's a suspect?
MR. ZURBRIGGEN: Object to form. Sergeant, if you know.
THE WITNESS: Principle, I don't know what the hell he means.
BY MS. HARRIS:
Q. I will represent to you that based on other documents we've looked at, Frank Turner was considered a suspect in this murder.
A. I never heard principle used but that's all right.
Q. Fair enough. So between these three murder investigations which, again, your name is on all of them, I hear what you're saying, it doesn't mean that you were involved in all of them, but these are all happening around the same time and involve several of the same people; is that fair to say?
MR. ZURBRIGGEN: Objection to the form.

Page 343

THE WITNESS: What do you mean by several of the same people, defendants?
BY MS. HARRIS:
Q. Yes, suspects, defendants?
A. It sounds like it, yeah.
Q. Witnesses with Delores Tilghman, at least?
A. Uh-huh.
Q. They're all being investigated the same year, 1987. That's probably why your name is on all of them, right?
MR. ZURBRIGGEN: Objection to the form and asked and answered.
THE WITNESS: It looks like it.
BY MS. HARRIS:
Q. I will represent to you, I want to try to skip some of the document review. I'm going to represent some things to you and you don't have to believe me. I am going to tell you.
Delores Tilghman testified against Curtis Crosland at trial and she

Page 344

testified in a Grand Jury testimony in the Joseph Wilkerson case, this case against Frank Turner. She testified about the circumstances in which she was interviewed by detectives Cimino and McNesby. I want to flip you to Exhibit-22.
A. Uh-huh.
Q. Before we get into the testimony itself, I just want to go back to a concept we talked about before, which is that sometimes you have a single witness who has information about multiple murders, right?
MR. ZURBRIGGEN: Objection to the form.
BY MS. HARRIS:
Q. Did that ever happen?
A. I guess.
Q. We saw that with Rodney Everett, right, they're asking about a couple other murders?
A. I saw that they were asking, yeah.
Q. So that's an investigative tool, sometimes you have a guy who knows about a whole neighborhood worth of stuff, right?
A. Uh-huh.

Q. I'll represent to you that seems to be the situation with Ms. Tilghman. They're asking her about a couple of different things.
If you could flip to page 8995. I believe it's the City's Bate stamp on the bottom. 8995.
A. Uh-huh.
Q. Let me just get there. She is asked about speaking with homicide detectives in the hospital in that second question; is that right?
A. I don't know.
Q. Take a second to read it?
A. Page three?
Q. 8995.
A. Yeah, it does.
Q. Take a look at that second question, after that on April 16th. Just read those questions and answers through the bottom of that page.
A. I read it.
Q. What she is describing, I understand that you can't say whether she's telling the truth here or not, of course not. But from



what she is describing, if we take that at face value, she says that she is being interviewed by detectives -- by homicide detectives in the hospital while she is recovering from a suicide attempt.
MR. ZURBRIGGEN: Objection to the form.
THE WITNESS: Yeah.
BY MS. HARRIS:
Q. That's what you read there, right?
A. Yeah.
Q. Let's scroll just a couple pages or flip just a couple pages to 9001, on the bottom there.
A. Uh-huh.
Q. Can you start with just the question in the middle of the page, I think it's the third question that says, was there anything else in the statement that he made you say?
A. He didn't make me say it. He just lead me on. What do you mean?
Q. Read that answer to yourself.
A. He lead me on -- what about Squirt, what about Squirt. I never mentioned Squirt's name



until he brought it up. He kept saying, what about Squirt? And I didn't give him an answer for a long time. And he was telling me what about Squirt? What about Squirt? What about Squirt this and what about Squirt that. And I told him, I don't know anything that Squirt had to do with anything.
Then he came up to the hospital and my doctor told him he couldn't come up there while I was being treated. Then he came back again and she was not there. That is when I gave them that statement.
Q. So I am going to represent to you because I don't want to take the time and make you read the entire Grand Jury testimony, that she's talking about Detectives Cimino and McNesby.
What she has testified to is that her doctor told them to leave and then they came back when the doctor wasn't there, right? That's what she just said?
MR. ZURBRIGGEN: Objection to the form.
THE WITNESS: It appears --



that might be what she's saying. Yeah, it sounds like it.
BY MS. HARRIS:
Q. If we assume that this testimony is accurate -- I know it's a big assumption. But if we assume that her testimony here is accurate, would you agree that she is in a pretty vulnerable situation during this police interview, that she describes?
MR. ZURBRIGGEN: Objection to the form. Sergeant...
THE WITNESS: I don't know, I wasn't there.
BY MS. HARRIS:
Q. If it occurred as she describes it, she's hospitalized on a suicide attempt, her doctor told them to leave.
MR. ZURBRIGGEN: Same objection.
THE WITNESS: I don't know, I wasn't there. I can't assume anything. If I assume my shoelaces are gold, I'd be rich.
BY MS. HARRIS:

Page 349

Q. Sure. If this is accurate, she is in the hospital, she has attempted suicide, she's telling the police what they want her to say isn't true and they are coming to bother her when her doctor has stepped out of the room because the doctor already told them to leave.
Under those circumstances, that would be inappropriate, right?
MR. ZURBRIGGEN: Objection to the form. Sergeant, you can answer.
THE WITNESS: I don't know the whole circumstances. So I'm not going to speculate.
BY MS. HARRIS:
Q. Wouldn't you agree that in that situation -- if someone were in that situation there would be a risk they would just say whatever the detectives wanted to here to make them go away?
MR. ZURBRIGGEN: Same objection.
THE WITNESS: I don't know. I have no way of knowing.
BY MS. HARRIS:

Page 350

Q. But you would never direct --
A. I know I wouldn't admit to any murder I didn't do, if that's what you're asking me.
Q. I don't think that's what happens here. Would you ever interview somebody if they were hospitalized for a suicide attempt and their doctor told you leave?
MR. ZURBRIGGEN: Objection to the form. Sergeant, you can answer.
THE WITNESS: I have never been in that situation but I am sure I wouldn't.
BY MS. HARRIS:
Q. Why not?
A. I don't know. I was in an interview one time when a cop was shot and he was in the emergency room and he started talking and the doctor invited us in. That was the only time I was ever in that and I was a cop, a uniformed cop. No, I don't think I would.
BY MS. HARRIS:
Q. In that situation, you had permission from the doctor to interview this person?
A. We did, we left.

Page 351

Q. And you left because the officer --
A. Because the guy was dying, it wasn't the right time.
Q. But you wouldn't direct detectives to do this knowingly?
A. No.
Q. So you just said something interesting, that you would never admit to a murder that you didn't commit?
A. Right.
Q. Under any circumstances?
A. No.
Q. You don't think there are any circumstances that would put someone in a position where they might?
MR. ZURBRIGGEN: Objection to the form. Sergeant, you can answer.
THE WITNESS: I can only speak for myself.
BY MS. HARRIS:
Q. You think there's no amount of coercion that would cause you to admit to something you didn't do?
MR. ZURBRIGGEN: Same

Page 352

objection. Sergeant, you can answer.
THE WITNESS: No, I don't think I could be coerced and lie like that, no.
BY MS. HARRIS:
Q. If you were threatened with violence?
MR. ZURBRIGGEN: Objection to the form. Sergeant, again you can answer the hypothetical.
THE WITNESS: No. I don't believe -- I don't think violence works in any circumstances of interviewing or statement taking. That's just my belief, my personal belief.
BY MS. HARRIS:
Q. You don't think people ever say something just to make it stop?
A. I don't think it started.
Q. You just don't think that's something that would ever happen?
A. I don't think it would work and I don't see a need for it. It doesn't happen.
Q. I think I am just about done. I do want to just close it out a bit. We have looked at

Page 353

a lot of things. We have looked at a lot of documents from this case. We have looked at documents from multiple cases and you told me about the things that you did and the things that you didn't do as a supervisor.

I want to ask you something I asked early on, do you have any regrets?

MR. ZURBRIGGEN: Objection to the form of the question. Sergeant --

THE WITNESS: Regret for what? What kind of regret are you talking about? Do I regret that I got divorced twice, yeah.

BY MS. HARRIS:

Q. Do you have any regrets about the supervision you provided to the detectives working under you in the homicide department in 1987?

MR. ZURBRIGGEN: Same objection.

THE WITNESS: Absolutely not.

BY MS. HARRIS:

Q. Do you ever feel like you should have

Page 354

done more to supervise them?

MR. ZURBRIGGEN: Same objection.

THE WITNESS: Absolutely not.

BY MS. HARRIS:

Q. When you learned about multiple exonerations of cases that detectives underneath you worked on, multiple men who say that they spent 30, 40 years in prison for murders that they didn't commit, lost years and years with their loved ones with their children, like Mr. Crosland did; does that give you any concerns?

MR. ZURBRIGGEN: Objection to the form of the question, certainly the representations. Sergeant, you can answer.

THE WITNESS: I don't want to see anybody hurt.

BY MS. HARRIS:

Q. But it doesn't make you think about what role you could have played in that hurt?

MR. ZURBRIGGEN: Same objection and objection argumentative and asked and answered. Go ahead Sergeant, answer

Page 355

again.

THE WITNESS: I don't feel I was ever involved in anything like that. I know I wasn't.

BY MS. HARRIS:

Q. You feel confident that the detectives working under you weren't either?

MR. ZURBRIGGEN: Same objection.

THE WITNESS: I do.

MS. HARRIS: I don't have any further questions.

MR. ZURBRIGGEN: I have no questions.

MR. DEROSE: Nothing for me.

VIDEOTAPE OPERATOR: That concludes today's video deposition. The time is 4:38 p.m., off the record.

\- - -

(Whereupon the deposition concluded at 4:38 p.m.)

\- - -

Page 356

Read your deposition over carefully. It is your right to read your deposition and make changes in form or substance. You should assign a reason in the appropriate column on the errata sheet for any change made. After making any change in form or substance which has been noted on the following errata sheet along with the reason for any change, sign your name on the errata sheet and date it. Then sign your deposition at the end of your testimony in the space provided. You are signing it subject to the changes you have made in the errata sheet, which will be attached to the deposition before filing. You must sign it in front of a witness. Have the witness sign in the space provided. The witness need not be a notary public. Any competent adult may witness your signature. Return the original errata sheet & transcript to deposing attorney, (attorney asking questions) promptly. Court rules require filing within 30 days after you receive the deposition. Thank you.

Page 357

CERTIFICATE

---

I, Jeannine Cancelliere, Court Reporter and Notary Public and for Philadelphia, Pennsylvania, do hereby certify that the foregoing testimony of SERGEANT JOSEPH DESCHER, was taken before me at The Cast Iron Building, 718 Arch Street, Suite 501, Philadelphia, Pennsylvania on Monday, April 8, 2024; that the foregoing testimony was taken by me in shorthand by myself and reduced to typing under my direction and control, that the foregoing pages contain a true and correct transcription of all of the testimony of said witness.

.............

JEANNINE CANCELLIERE
Notary Public
My commission expires
October 13, 2027

Page 358

I have read the foregoing deposition and the answers given by me are true and correct, to the best of my knowledge and belief.

............................

SERGEANT JOSEPH DESCHER

Witness to signature

Address

My Commission expires

.............

Page 359

ERRATA SHEET

PAGE LINE # CHANGE REASON THEREFORE

**A**

**a.m** 1:13 4:8 72:22,23 188:8
**a/k/a** 293:2
**ability** 170:5
**able** 18:12 47:12 64:6 84:24 94:14 156:4 171:8 184:2,6 190:6 193:9 196:11,18 198:17,18 218:2 231:14 244:24 251:23 264:5 299:1 332:17
**abreast** 46:9
**absolutely** 86:16 128:20 200:6 219:1 265:5 303:14 333:9 353:22 354:4
**accept** 84:6,11 178:24
**accepted** 25:17
**access** 309:12
**accommodate** 8:20 18:4 214:16
**account** 42:6,8
**accounts** 40:8 40:12
**accuracy** 267:20
**accurate** 9:1 129:22 130:2 196:8 231:20 265:1 296:7 348:5,7 349:1
**accurately** 299:2
**accusation** 189:5 336:6 337:22
**accused** 77:1 78:3 79:2 84:8
**accusing** 220:4
**Act** 37:24
**acting** 116:15,17
**ACTION** 1:4
**actions** 28:23
**active** 197:5 198:2
**actively** 46:19
**activities** 215:7
**activity** 3:11 16:1,9 17:5 18:17,18 19:5 19:11 20:1,21 21:23 22:22 38:17 47:24 48:2,5,11,13 48:22 126:15 126:17,19 127:18,21,21 128:2,9,17,19 129:4,12,21 130:5 131:22 132:23 133:10 133:14,15,18 133:19,24 134:6,10,21 135:12,13 167:7 175:22 176:9 177:12 177:13,20 178:2 179:1 183:20,21 189:22,23 196:14 200:5 200:15,16 201:24 202:19 202:24 212:7,8 212:9 215:6 218:19 219:19 225:2 235:23 237:6,13,17 262:1,10,17 264:8,9 265:21 266:2,6,16,20 267:10 268:7 268:11,21 269:3 270:6 271:5,8 273:4 273:9 274:2 277:9 281:2,9 289:5 290:19 291:4 299:6 302:8,16,19,22 304:2 317:16 318:5 319:10 319:18,20 321:7,20 322:4 323:14 324:3 325:14 326:8 329:16 339:17 339:20 340:7
**actual** 48:17 141:5
**ad** 213:7
**Adam** 2:9 4:23 143:20
**adam.zurbrig...** 2:12
**addition** 339:8
**additional** 47:6 133:20
**address** 186:6,7 282:16 358:17
**admit** 350:2 351:8,22
**admitted** 286:1 289:13
**admitting** 326:16 330:2 332:21
**adult** 356:18
**advice** 198:23
**Affairs** 41:17 59:19 60:1,22 69:24
**affect** 121:16 122:2 230:6,9 230:16,22 242:14
**affidavit** 17:18 17:21 20:22 21:9,15 23:9 30:21 47:19 86:20 92:14,16 99:9,12 100:6 101:19 102:12 107:7 109:23 110:11,21 111:11,24 113:17 114:5 302:14 303:8 303:24 304:8 304:11,13 306:12,14 307:1,14,22 308:10,19 309:11 313:18 315:19,20 316:14 317:17 322:22 341:21
**affidavits** 31:23 100:3 106:14 109:8,13 112:20
**agencies** 84:1
**agency** 1:20
**ago** 7:16 10:23 12:7,13,21,22 13:15,16,17 14:8 30:7 108:20 125:6 163:14 214:21 237:10 296:18
**agree** 22:24 25:24 31:22 77:17 78:12 80:5 81:2,11 82:10 109:20 110:7,12,18 111:1,3,4 115:11 131:21 132:18 139:4 147:10 174:8,9 175:9 177:15 181:18,21 182:4 183:10 183:19 185:16 186:18 192:11 192:21 204:12 205:15 206:1,4 208:7 213:6,11 217:1 237:16 246:5,6 252:3 265:23 266:4 266:14,22 268:1 269:2 272:3 274:19 275:12 276:2 281:22 282:12 282:18,24 292:7 293:4 296:19 304:20 324:2 329:17 330:1 332:21 348:7 349:15
**agreed** 78:1 114:13,14 194:5 210:3 216:16 271:4
**agreeing** 222:17
**ahead** 19:24 100:23 120:10 135:7 153:5 317:21 319:4 333:15 354:24
**aids** 9:9
**ain't** 321:9
**al** 1:5 4:14
**Albert** 12:4 54:19
**alibi** 158:19,24 160:4,18 161:5 161:6 274:20 276:3,10 277:14 278:23 279:15,19,24 280:5 314:15
**Alicea** 28:6 43:9
**aligns** 328:10
**allegation** 60:8 64:5
**allegations** 74:6 74:10,13 214:16
**alleged** 293:2
**alleges** 6:2

**alleging** 43:9 211:24 214:22
**allow** 122:7
**allowed** 62:12 265:6
**alternative** 64:19 65:2 105:13
**ambiguous** 88:9 90:13
**amount** 199:14 351:21
**analysis** 47:11 47:15
**Angeline** 2:7 5:20
**anonymous** 140:13 141:4 141:20,22 145:21 190:13
**Ansel** 2:18 5:3 12:6 55:18 186:4
**answer** 8:12,12 14:22 20:11 22:15 28:16 29:23 43:23 45:8,10 49:2 52:3 54:7 56:11 60:14 61:13 65:7,22 69:14 70:20 71:11,20 72:4 72:12 73:23 74:16 76:7 77:14 78:18 80:8 82:22,24 85:4,19 88:18 90:17 92:4 93:8 94:9,17 95:17 96:11 97:7 104:6 105:10 106:6 107:10 109:15 115:17 116:10 117:20 118:21 121:7,20 123:10,17,20 125:3,22 127:15 132:2 135:8 136:2 140:3 141:9 142:2,15 146:2 146:17 147:20 149:8 156:13 156:15 157:12 157:23 159:20 170:12 174:1 183:15 192:19 196:5 204:5 212:22 213:1 213:17 215:23 216:22 217:19 220:6 222:15 225:24 227:12 227:18 229:21 231:18 232:3 234:1 238:5,10 238:18,18,20 239:1 240:16 241:8 244:4,13 245:21 246:13 247:22 248:10 249:23 251:6 255:2 256:16 256:17 257:21 259:5 260:8 262:14,23 268:3 274:4 277:18 278:3 279:21 282:24 287:9 288:1,2 293:11 294:8 296:23 297:19 297:23 299:2 307:16 316:1 317:21 319:5 328:15 329:21 335:5 341:10 346:22 347:2 349:10 350:9 351:17 352:1,8 354:16,24
**answered** 32:14 50:10 70:20 75:13 78:9 95:16 100:22 102:18 105:9 107:4,10 109:24 110:23 121:6 157:11 161:8 163:3 224:14 229:9 231:17 240:24 246:18 250:16 262:13 264:1 269:21 270:18 287:8 315:16 317:20 320:23 343:14 354:24
**answering** 256:9 275:21
**answers** 73:4,11 110:16 193:24 196:7 209:23 216:5 295:7 345:19 358:2
**Anthony** 7:21 27:6
**Antonio** 27:16 28:5
**anybody** 122:7 128:1 144:11 221:20 262:16 280:12 354:18
**anymore** 6:18 160:6 214:8 291:11
**anyway** 8:13 34:22 199:10 336:9
**apologize** 151:6 187:3 296:11
**APPEARAN...** 2:1
**appears** 175:10 213:19 217:4 284:17 330:8 331:8,13,15 333:2 347:24
**applied** 62:20
**apply** 239:4,20
**appreciate** 92:8 322:18 339:23
**approach** 296:19
**appropriate** 257:6 356:4
**approval** 86:19 138:15 321:8 321:11,13
**approve** 48:14 92:16 100:2 108:6
**April** 1:7 4:7 200:15 201:13 203:1 205:5 209:10 217:16 258:3 265:22 266:3 273:6 302:23 305:19 340:21 345:18 357:10
**Arch** 1:12 2:3,11 4:11 357:8
**area** 186:8,16 187:14
**argue** 96:6
**argument** 96:9 215:19 216:5
**argumentative** 107:9 124:13 125:21 213:6 215:14 297:23 354:23
**arguments** 96:21,24
**armed** 207:5
**array** 154:13 193:1,14,21
**arrest** 71:1 86:18 88:1 92:17 95:24 96:2 108:7,11 141:3 142:5 186:10 188:2 205:17 206:3 207:16 209:17 210:3 213:22 214:2 216:14 216:17 217:2,8 217:17 260:4 260:15 302:15 304:13 309:8 322:23 324:7 324:20,22,24 325:2,14,19 326:10,10
**arrested** 6:5 14:12 142:8 212:12 218:10 258:2
**arrests** 186:9
**Arthur** 164:4
**articles** 245:8,17 246:24 249:4 249:11 251:3 258:8 311:17
**Ash** 187:23
**aside** 247:12
**asked** 31:21 32:8 32:14 50:10 70:20 75:13 76:9,10 78:9 95:16 100:22 102:18 105:9 107:9 109:7,20 110:8,23 121:6 128:18 131:23 145:13,13,15 157:11 161:8 163:3 171:1 173:12 196:16 210:2 211:9,10 224:14 229:9 240:23 244:23 246:18 250:16 262:13 263:23 264:14 269:21 270:18 276:24

277:6 287:8 288:4 291:3,3 293:16 295:12 317:20 320:23 334:11,15,16 335:16 336:9 343:14 345:8 353:7 354:24
**asking** 44:1,2 92:5 101:3,5 105:23 110:4,7 119:15 125:3,9 126:12 143:2 143:15 172:20 175:18 178:1 179:7,11,16,17 179:19,22 184:22,23 185:1,3,5 209:22 210:4 214:6 226:23 228:17 240:11 240:13 250:22 252:15 253:19 256:15 271:18 272:14 285:18 310:9 344:19 344:20 345:3 350:3 356:20
**aspects** 107:14
**ass** 192:10
**assault** 207:17 207:21 208:2 217:11
**assign** 300:3 356:4
**assigned** 46:1 49:4,7,8,12 51:8 128:10 129:6,8,12,13 131:6 172:6 174:22 180:15 200:1,3,8 295:14,20 308:21 319:11 319:13 320:15 320:19,20 322:7,8
**assignment** 36:3 36:5,8,10 52:23 127:6 171:17,22 172:2,4,5
**assignments** 35:8
**assistance** 29:22 252:16 253:19 254:22
**assistant** 37:10
**Associate's** 33:4 33:6
**assume** 6:21 7:23 61:8 73:9 93:20 101:18 103:2 180:14 180:21 204:23 210:23 211:3 229:5 230:21 231:19 273:24 307:12,18 316:3,9 323:6 348:4,6,22,23
**assumed** 196:18 211:4 322:16 322:17,17
**assuming** 150:20 204:20 322:17
**assumption** 97:13 312:13 348:5
**ate** 162:20
**attached** 356:14
**attempt** 191:4 346:5 348:16 350:6
**attempted** 349:2
**attempting** 31:24
**attend** 39:5
**attention** 48:21 108:15 273:14
**attorney** 17:8 18:5 64:15,20 65:4,19 97:11 97:14,22 98:4 98:5,11 99:21 102:9 107:17 107:20 108:8 114:13,19 115:1 116:1,2 116:15,18 117:5,10 121:2 131:23 144:4 165:7 264:14 356:20,20
**attorney's** 25:12 26:18 28:23 29:6 86:12,18 92:13 108:10 114:9 115:12 131:11 132:15 133:12 134:5 134:11 135:4 265:9
**attorneys** 12:14 43:22 44:2,21
**atypical** 237:5
**August** 16:23
**Augustine** 43:4
**authorization** 1:19 324:20
**authorized** 324:22
**available** 163:8 232:1 251:19
**ave** 102:23
**aware** 22:11 24:8,11,14,18 24:23 25:16 26:3,17,24 27:6,16,19 28:1,4 30:17 43:10,15 44:3 44:10 54:1 65:2 66:3 75:23 89:21 94:12,19,21 95:4 112:18 140:7 144:8,11 153:22 155:1,8 155:9,12 157:5 157:8 160:19 160:20 173:20 177:8 182:14 183:4 261:7 333:5 337:20 337:21

**B**

**B** 3:7 56:3,4,5 170:3,3 205:13 319:7 325:6
**back** 12:18 31:21 32:8,11 38:3 39:18,19 45:23 51:5 61:9 69:9 72:23 73:18 74:24 112:4,6 113:21 117:14 144:15 152:11 152:15 154:18 154:18 167:23 169:8 170:4 180:12 195:23 214:1 217:5 218:19 225:2 226:12 259:8 263:20 267:7 271:24 277:9 287:1 298:6,23 298:24 302:7 303:24 304:2 305:19 307:20 315:4 326:7 327:9 338:21 344:9 347:11 347:20
**background** 7:23 33:1 204:19 308:17
**backwards** 205:3
**bad** 136:19 327:6
**badge** 253:15
**ballpark** 58:2
**Barbara** 21:13 86:23 309:1
**barely** 42:11 150:2 266:11
**based** 7:9,23 14:16 20:21 21:19 22:15 67:12 114:18 115:13 120:11 120:18 130:11 132:3 160:23 163:13 165:17 166:2 177:13 191:22 192:11 192:13,20 206:18 209:12 214:16 220:6 232:18 239:17 267:14 268:3 279:22 281:8 290:14,16 293:11 294:8 294:10 297:1,5 297:15 301:15 302:15 310:12 315:15 322:19 322:21 326:19 329:10 331:8 342:11
**basic** 61:10 125:9,12
**basing** 246:10
**basis** 25:24
**Bate** 345:5
**Bates** 133:9
**beat** 121:15
**beaten** 206:10 206:10
**began** 134:9
**beginning** 1:13 53:10 73:6 154:23 155:5,6

155:15,23 157:1 202:1 271:24 302:9 332:1 334:18 341:14,21
**behalf** 4:19,21 4:23 5:3
**behavior** 62:5
**belief** 49:10 82:14,16 232:17 352:13 352:14 358:4
**believe** 23:12,19 36:23 63:5 67:13 80:10,22 107:11 113:1,1 117:17 121:9 162:1 172:16 175:22 202:6 221:14,14 229:16,19 232:11,12 233:16 241:4 265:7,11 274:7 296:17 303:14 316:24 331:16 331:23 332:3 336:16 337:4 339:4 340:6 343:21 345:5 352:11
**believed** 162:24 207:12 232:23
**bell** 77:7 78:7,10
**beneath** 69:18
**best** 9:5 18:3 46:11 47:4 50:11 61:20 65:23 90:11 182:20 184:14 305:15 307:23 308:5,6 358:3
**better** 92:10 107:1 154:10 172:16 184:17 196:22
**big** 192:10 195:11 227:20 321:16 348:5
**bigger** 109:2
**binder** 130:14 130:18 131:10 131:12 339:14
**birth** 39:21
**bit** 18:15 23:4 24:12 33:1 45:12,14 51:15 99:8 107:15 135:15 140:11 142:4 157:19 161:16 196:23 220:18 265:20 298:17 305:14 352:24
**black** 217:9
**blocks** 79:12
**blow** 206:22
**blue** 72:9
**books** 239:17
**boss** 221:4,9,12 222:6,7,11 223:3
**bother** 349:4
**bottom** 25:8 131:2 132:21 132:23 148:3 252:13 273:2 276:24 277:10 295:15,18 300:5 326:13 345:6,19 346:13
**break** 8:19 9:11 59:15 72:20 73:2,16 113:22 135:17 165:21 195:18,20 196:3,4 215:15 215:21,22 216:2 242:4 263:16,19,24 263:24 298:3,9 330:16 338:16
**breaks** 8:18 214:13
**Brenda** 24:6 31:6,8
**brief** 298:3
**briefly** 5:16 339:11
**Brignola** 12:12 42:19 55:16,17 75:10,17 186:4
**bring** 48:21 142:18 158:4 158:16 191:5 193:9 203:5 219:9,12 279:14 281:23 282:10 295:6
**brings** 107:21
**Broad** 1:23
**broke** 299:5
**brother** 276:1 276:11 279:16 279:19
**brought** 5:22 23:6,21 152:17 153:7,11 158:15 177:10 203:2,13 219:10,13 272:11 347:1
**build** 210:1
**Building** 1:12 2:3,10 4:10 357:8
**bullet** 207:9,13
**bullshit** 330:15
**bunch** 308:19
**bureau** 168:7
**burgulary** 187:23
**bury** 93:5,24
**buy** 276:18
**buzzing** 9:3

## C

**C** 357:1,1
**call** 15:14 39:13 198:7 231:3 269:23 293:18 334:14
**called** 39:9 168:9,10 293:1 332:15
**calling** 87:15
**calls** 85:3 142:7 142:23 174:11 190:13 194:3 329:20
**camera** 139:20
**Cancelliere** 1:14 357:3,18
**Cape** 39:24,24 40:17
**captain** 169:4,5 169:8 198:4 321:12
**career** 6:22 7:7,9 47:7,8 70:11 125:7
**careful** 43:21 137:23
**carefully** 356:1
**carried** 49:5,9 70:18 129:9
**carries** 114:22
**carry** 253:14
**carrying** 197:8
**case** 6:11,14 7:21 10:12 11:1,11,18,21 12:15 13:1,11 14:7 15:2,12 15:16,19 17:12 17:14,16 20:18 22:13 24:14 27:19 30:7,15 32:22 39:14,15 39:20 43:13 44:9 49:4 51:2 51:9 65:3,13 66:22 79:1 86:15 94:13 95:5 98:8,11 99:16,21 105:23,23 106:17 107:15 107:18,21 108:17 116:2,7 116:18 120:11 121:16 127:19 127:23 128:8 128:16,16 129:5,7 130:24 144:5 147:1 148:4 153:17 153:21,24 158:3 165:24 166:22 168:18 170:8 172:23 176:6,17,23 177:8,18 180:18 181:2,3 181:24 183:13 186:13,14 187:7 188:14 201:19 202:17 209:3 212:3,11 221:17 222:9 224:9 233:13 234:23 236:15 238:3 246:3,8 251:4 254:12 254:20 267:6 269:2,6 271:7 291:24 293:3,9 308:20 309:19 310:11 312:9 314:23 315:21 320:3,19,20 324:9,12,12 325:1,12 327:15 333:13 333:18,20 340:12 344:2,2 353:2
**cases** 27:1 29:13 39:10 48:14

51:21 57:21 58:10 101:1 115:7 124:4 128:17 146:21 147:4 168:16 168:17,19,21 169:24 199:9 239:23 326:2 353:3 354:7
**Cast** 1:12 2:3 4:10 357:8
**caught** 169:20 170:7,23 171:5 172:21
**cause** 17:18,21 20:23 21:9,16 23:9 47:20 61:17 86:20 87:17 88:1 90:21 92:14,16 99:10 100:3,7 102:13 106:14 107:7 109:8,14 110:21 111:11 112:8,13 114:9 119:4 122:14 162:18 228:20 229:6 302:14 303:8 304:1,8 306:12,15 307:22 308:19 309:11 315:20 316:14 317:3 317:18 322:23 351:22
**caused** 6:5 228:15
**caution** 28:8
**center** 203:3
**certain** 24:19 46:1 87:16 96:8 145:3
**certainly** 243:24 354:15
**certify** 357:5
**certifying** 1:20
**chain** 296:1
**challenge** 94:14 94:22 95:5,13
**chance** 6:15 219:20
**change** 34:13 73:4 252:24 339:2 356:5,6 356:8 359:2
**changed** 37:16
**changes** 356:3 356:12
**charge** 115:23 253:14 302:18
**charged** 54:2 71:17 143:9,18 333:13
**charges** 66:12 207:24 208:1 217:10 255:20 256:20 333:5
**chase** 84:20,20
**check** 56:18 188:9
**checks** 279:19
**cheeseburgers** 276:18
**chief** 116:4
**children** 40:21 41:6 43:2 354:12
**children's** 206:9
**choice** 161:24
**choose** 50:1
**Christy** 21:13 86:24 302:17 303:10 309:1
**chronologically** 199:18 200:13 270:9
**church** 10:23
**Cimino** 11:24 21:8,15 23:16 54:23 167:19 302:13 303:15 304:11 307:20 308:9 309:10 311:7 313:24 315:11,17,19 319:22 324:7 324:11,19,21 326:3 344:5 347:16
**circumstances** 159:4 236:6 237:24 344:3 349:7,12 351:11,14 352:12
**city** 1:5 2:9,10 2:13 4:13,23 4:24 5:24 42:20 43:3 44:24 75:18 79:23 124:11 264:14,20,22 264:23,24 265:3 283:23 284:3 313:2
**City's** 345:5
**City-216** 280:19
**CIU** 24:23 25:17
**CIVIL** 1:4
**civilian** 37:2 38:4 63:15
**clarified** 339:22
**clarify** 23:15 80:16 89:22 108:5 196:5 200:2 205:11 269:13
**clarifying** 221:11
**CLARK** 2:15
**classic** 77:9
**classified** 208:2
**classifying** 82:19
**clear** 82:5 264:12 267:9 267:24 323:19
**cleared** 80:18 111:21
**clearly** 121:13
**clerk** 166:9
**clicking** 247:4,5
**client** 14:12 214:17 215:21 215:22 267:5 267:12
**close** 32:24 99:17 199:8,9 327:13 352:24
**closer** 280:17
**clothes** 35:13 36:4,7
**cloud** 91:23 119:16
**code** 72:10
**coerce** 135:23
**coerced** 352:3
**coercion** 136:6 137:9 139:5 351:21
**coercive** 136:13
**coincidence** 320:1
**cold** 168:18
**colleagues** 5:18 28:24 29:7
**collect** 38:2
**column** 356:4
**combination** 258:15
**come** 24:6 44:4 45:23 47:5 50:24 99:16 127:7,21 129:18 164:9 168:23 169:2 198:22 233:5 248:6 249:9 261:15 264:12 296:12 298:10 315:15 316:5 347:10
**comes** 153:23 155:20 157:15 198:15 218:8 258:3
**comfortable** 82:24 83:1,4 214:15
**coming** 123:13 123:18 181:1 202:9 256:10 298:22 305:18 306:22 308:15 349:4
**command** 296:1
**Commerce** 2:16
**commission** 357:19 358:22
**commit** 212:2 351:9 354:10
**committed** 258:5 286:1
**committing** 68:18
**common** 325:9
**communicatio...** 43:22 44:1,21
**community** 146:15
**company** 37:5 37:11,12,15,17 37:20 38:10,11 40:20
**compared** 249:4
**competent** 356:18
**competitive** 239:16
**complaint** 13:7 13:24 14:1 60:21 73:21
**complaints** 63:15,20
**completely** 80:18 102:16 135:22 145:23 257:20 294:3,4
**complying** 97:21
**concentrate** 9:4
**concentration**

184:5
**concept** 83:4 84:3 344:9
**concern** 32:9 74:12 98:23 247:16
**concerned** 28:13 298:23
**concerning** 15:12 245:15 283:9
**concerns** 28:19 32:17 122:9,18 221:3,4,6,8,22 222:9,11,12 223:2 226:17 227:15 255:8 354:13
**conclude** 227:8
**concluded** 355:21
**concludes** 355:17
**conclusion** 26:1 85:4 142:24 241:7 255:24 323:2 329:21
**conclusions** 25:17
**condition** 181:6
**conduct** 69:11 93:20
**conducted** 48:18
**conducting** 93:23 159:5
**conferences** 39:6 83:24
**confessed** 23:11 23:23
**confident** 355:6
**confidential** 28:9 43:22 44:20
**confirm** 152:21 155:6,12,21 156:23 196:19 315:5
**confused** 243:14
**confuses** 270:24
**confusing** 159:13 288:18
**connection** 75:24
**considered** 342:13
**constant** 9:3
**constitutional** 61:16 62:4 94:13,22 95:13
**consult** 6:15
**consulted** 224:8 224:11
**contact** 86:17
**contacted** 210:15 291:19
**contain** 357:13
**contained** 133:20
**contents** 202:20
**context** 253:21 253:22 254:4,6 255:17 257:20 258:1,12 260:1 342:4
**continue** 122:21 132:24 160:13 196:12 203:6 213:8 215:16 215:18 216:1,4 234:19 242:8,9 264:5 298:16
**continued** 125:17 201:9
**continuing** 298:20
**continuous** 9:3
**contradiction** 120:23 297:9
**contradictory** 88:12 290:15 300:24 301:22
**contradicts** 289:24
**control** 357:13
**conversation** 24:4 87:3 237:18 289:6 298:15 299:6
**conversations** 9:22 10:2 28:9 29:12 152:15
**convicted** 6:6 177:19 187:11 189:2
**conviction** 24:15 25:6,18 32:22 94:23 95:14 134:4
**cop** 41:20 60:2 63:20,21 350:16,19,20
**copies** 265:1
**copy** 108:24
**corner** 334:23
**correct** 6:23 18:20 98:18 113:1 217:24 223:7 339:1 340:4,5 357:14 358:3
**correctly** 71:9
**correlates** 285:8
**corresponding** 273:5
**corresponds** 266:9 273:9 281:9
**corroborate** 153:17 154:13 154:21 155:21 156:7 285:19 286:8,14,19
**corroborating** 222:19,24 223:10 287:14
**corroboration** 223:5 232:22 232:22
**counsel** 4:16 8:10 9:15,17 13:13 124:13 134:8 213:8 216:20 298:15 298:18 330:14 330:18
**counsel's** 84:11
**country** 38:22 119:12
**counts** 165:14
**couple** 8:5,15 11:4 13:15,17 16:1,9 17:5 39:18 42:17 73:19 88:12,13 108:16 133:1 176:12 210:12 216:9 242:1,13 264:17 277:23 284:5 299:3 323:9,11 344:19 345:3 346:12,13
**course** 6:21 8:7 152:14 157:8 220:16 263:5 274:14 345:24
**court** 1:1,14 4:5 5:5 8:7 22:13 24:19,24 25:7 25:13 29:21 59:4,5,9 107:21 334:3 356:21 357:3
**cousin** 333:20
**cousins** 329:8
**cover** 8:16 212:11
**covering** 295:16
**cream** 51:24
**created** 48:6 128:9
**credibility** 65:14 66:23 94:14 103:10 104:3 104:11,19,24 121:16 122:3 122:10 149:10 152:21 162:23 163:16 221:3 221:23 225:21 225:22 226:6 227:24 228:21 229:7,24 230:6 230:10,16,22 231:23 232:10 234:9,11 235:9 237:20 242:3 242:15 255:9
**credible** 122:12 122:13 149:13 149:22 229:20 232:16
**crime** 6:9 22:9 47:11 77:1 78:3 84:8,9 119:21,22 146:22,23 150:8,19 151:10,20,22 152:2,3 166:21 197:10,11,13 258:2 272:22 286:1 304:20 305:6 314:7 315:6
**criminal** 33:4,21 94:13 255:19 256:20
**criteria** 64:23
**critical** 147:6 212:11
**crop** 51:24
**Crosland** 1:2 3:12,13 4:13 4:19,21 5:17 5:21 6:1,8 13:3 13:12 14:11 21:10,16 22:8 22:13 23:6,11 23:21,23 24:2

24:4,10,24
25:13 44:9
133:9 211:22
211:24 218:11
218:11 220:4
220:10 223:11
241:3,4 258:5
260:5 261:8
267:5 285:10
288:12 289:13
294:6 304:14
306:12,15
307:3,13 314:6
315:5 322:23
324:8 325:10
325:15,23,24
326:15,20
329:7 330:1
333:6,12,18
334:3,11 335:1
335:15,22
341:18 343:24
354:12
**Crosland's**
32:18 302:15
325:5 326:10
**Crosland-13364**
132:20
**crucial** 143:8
**currently** 41:14
**Curtis** 1:2 4:13
4:19,21 5:17
5:21 13:3,11
21:10,16 22:8
23:11,21 24:2
24:9 211:22,24
218:11 241:3,4
258:5 260:5
261:8 267:5
287:17,19
289:13,15,17
294:5 304:14
306:15 307:3
324:8 325:5,23
325:24 326:10
326:15,20
329:6,7 330:1
333:12 334:11
343:24
**Curtis'** 333:13
**cut** 18:20 110:20
140:16 142:12
266:11,13
281:4,7
**cuts** 90:20 93:3
93:5 94:1 97:2
111:12,23
112:11

**D**

**D** 3:2
**D.A** 47:21 88:2
88:14 90:14
98:17 108:6
112:5 235:1
237:18,19
260:22 303:13
334:13
**D.A.'s** 10:8 13:1
15:15 24:16
89:1 90:1
91:14 92:15
99:1 308:24
309:6 311:12
317:12
**daily** 46:2
**damages** 44:10
44:13,17 45:6
**damn** 144:2
321:14
**date** 4:7 35:1
39:21 171:7
214:2 216:17
216:23 217:6
273:24 281:6
282:20 302:11
356:9
**dated** 176:9
216:15 340:7
**dates** 273:14
**daughter** 41:18
41:19
**David** 188:6
**day** 58:15 197:7
206:23 326:9
**day-to-day**
126:9,11
196:23
**days** 34:17 59:2
59:6 356:22
**deal** 67:17,18,19
68:4,7 69:5
166:21
**dealing** 137:10
140:8 146:13
**dealt** 111:17,19
116:12
**decade** 33:9
**decedent** 183:24
188:6,14
**decedent's**
340:23
**December** 6:7
14:10,12 18:19
20:18 21:14
166:5,16,18
175:23 176:9
177:14 183:22
217:23 266:21
302:5,7,10,24
322:24
**deception**
164:12,12
225:4,9,10,17
225:19 226:19
313:16
**decide** 34:12,15
37:18 162:3
232:11
**decided** 244:5
244:17
**decides** 149:12
**decision** 92:24
93:1 98:6
119:16 147:15
198:19 224:11
224:24 295:21
**decisions** 159:6
160:22 232:18
**defendant** 6:11
43:8 77:5
86:10 89:21
94:12 95:4
96:5,17,19
97:5,14 241:14
325:8,9
**defendant's**
94:21 95:12
**defendants** 1:6
4:24 323:17
326:15 343:3,5
**defense** 134:8
143:8
**deference**
199:14
**degree** 33:4,7,12
35:9 42:18
63:11 104:13
104:15 148:4
**Delores** 24:3
30:16 31:1,4
276:1 341:3,15
343:7,23
**demeanor** 230:5
**denied** 314:8
**denies** 157:16
272:22 277:13
**deny** 155:6
**department** 2:9
6:4 10:5 32:10
33:13,20,24
34:16,21,24
35:9 36:21
37:19 38:7,18
39:10 41:9,15
41:22 42:21
45:13 51:16,17
61:1,7 70:12
71:5 83:8,15
106:11 107:6
115:22 124:10
124:18,21
126:3,10
127:10 133:15
140:8 142:7
145:11 181:1
183:4 210:15
228:19 239:3
240:4 241:22
241:24 258:4
264:21 317:1
353:18
**Department's**
59:19
**depend** 50:7
89:5,7 139:12
149:9
**depended** 91:22
**depending** 99:21
116:3 161:10
197:18
**depends** 45:17
158:13 197:2
197:20
**deponent** 4:14
**deposed** 7:15
17:12 27:12
108:16 130:24
**deposing** 356:20
**deposition** 1:10
4:5,9 6:12 7:1
7:11 10:6
15:22 17:10
108:20,24
109:6 113:5
200:18 220:18
220:21 222:5
224:2 243:5,7
293:21 299:12
316:12 318:11
341:15 355:17
355:20 356:1,2
356:10,14,23
358:1
**depositions** 7:8
17:22
**DEPUTY** 2:10
**DeRose** 2:15 5:2
5:3 355:15
**Descher** 1:11 3:4

4:15 5:1,8
41:13 42:2
73:2 196:2
263:23 270:24
281:5 298:9
327:18,24
338:24 357:7
358:8
**describe** 40:10
**described** 43:19
52:17 114:18
154:3 237:19
315:22 329:16
**describes** 305:5
325:14 348:9
348:15
**describing** 114:6
123:13 274:19
276:3 310:19
335:1 345:22
346:1
**description** 3:9
16:11 304:20
**desk** 49:22
**detail** 187:24
267:7,23
**detailed** 201:10
202:6 208:15
208:17 316:22
**detailing** 202:1
**details** 15:11
133:20 205:19
207:23
**detainer** 282:1
**detective** 11:8
20:8 21:8,15
35:14 43:3
45:16 46:1
47:16 49:7,8
50:7 54:1
58:10 64:1,13
65:1,18 66:3
66:11,20 67:10
67:22 68:9,17
69:21,23 70:9
98:20 104:18
106:17 107:16
108:20 109:23
110:18 112:19
113:20 117:3
127:7 128:11
129:3 130:19
130:23 131:6,9
131:18,21
135:20 137:22
139:1 142:8,9
143:11 149:12
150:21 156:20
162:8,10,16
168:7 172:6,18
173:11 174:21
174:22 180:17
185:8 188:9
200:3,4,8
201:18 202:2
208:10,12,17
212:23 223:23
223:24 231:24
232:8 234:6
235:9 243:8
252:4 255:18
256:19 257:12
258:9 261:15
269:14 281:22
291:18 292:16
293:16,20,21
299:7,10,15
302:13 304:11
308:9 316:11
318:7 320:20
320:21 324:6
324:11 326:3
327:19 335:2
335:16 336:9
336:16 337:11
339:24
**detective's** 48:23
51:9 70:6
180:16 317:12
**detectives** 6:3
10:11 11:20
17:11 35:15,20
36:13 39:13
46:6 48:1
49:12 50:15
51:18 52:1,7
52:11 53:11
56:9 58:8
71:24 75:2
86:8 97:21
98:1,17,24
100:7,11,15
101:6,15
102:15 104:21
108:16 112:18
113:16 114:4
114:21 115:14
116:7 127:3,6
129:2 130:4,12
135:12 138:22
139:22 144:23
145:11,17
147:1 148:4,8
150:13 151:8
151:18 152:10
157:18 158:11
158:23 159:18
167:18 168:6
171:9 176:23
177:8,18 186:4
198:12 199:12
200:9 201:14
202:17,21
203:24 204:21
204:23 233:18
249:20 260:20
269:5,7,23
275:13 277:24
279:18 283:7,9
284:21 285:18
286:18 291:24
301:8 307:12
308:8,20 317:5
317:24 319:19
324:19 328:12
341:7 344:4
345:9 346:3,4
347:16 349:18
351:4 353:17
354:7 355:6
**detector** 244:9
277:1
**detention** 70:17
203:3
**determination**
235:10 237:20
261:16
**determinations**
231:23 232:10
233:20 234:9
**determine** 85:1
87:19 134:13
240:5 298:10
334:14
**determined** 86:5
308:18
**develop** 153:16
**Devlin** 53:14,23
53:24 54:1
**difference**
130:13
**different** 38:22
47:1 58:16
81:17,17,19,21
99:22 116:5
125:4 127:2,3
130:22 136:6
155:11 156:7
156:16 162:14
189:10 197:17
198:21,21
234:20 239:4
243:14 261:3
278:8 294:3,4
301:11,13
307:19 309:9
318:21 319:19
319:19 322:10
325:20 327:15
345:3
**differential**
48:20
**differently**
188:16 298:21
309:5
**difficult** 9:4
153:1 252:20
298:18 310:14
**difficulty** 16:3
16:14,17,18
35:3 178:6
**dinner** 162:21
**direct** 46:16,21
56:7 62:9
113:20 114:3
135:11 148:3
216:21 330:19
350:1 351:4
**directed** 61:3
**direction** 34:13
46:13 132:22
148:5 249:19
357:12
**directions**
310:12
**directives** 62:12
62:14,16,18,20
106:11,13
239:17,20
**directly** 49:24
57:1,9 67:20
114:14 307:13
**disability** 137:18
**disagree** 26:1
132:18 134:14
177:15 295:24
**discipline** 98:19
**disciplined**
60:24 117:3,8
**disclose** 28:9
43:21 44:20
**disclosed** 134:13
**Disclosing**
133:10
**disclosure**
134:12
**discovery** 76:19
134:7
**discretionary**
161:23

**discuss** 31:24 92:23 100:6 101:1 104:16 104:19,23 105:14 107:22 129:18 229:24 326:2
**discussed** 28:22 29:5 98:4 112:5 114:11 114:16 202:20 216:3 235:22
**discussing** 107:18 341:2,8
**dishonest** 113:4
**dismissed** 333:6 333:14,17,19
**dispute** 84:14 131:8
**disputes** 131:16
**district** 1:1,1 4:5 4:6 12:14 17:8 25:12 26:17 28:23 29:6 35:12,14 64:15 64:20 65:4,19 86:11,17 92:12 97:11,13,22 98:4,5,11 99:20 102:9 107:17,20 108:8,10 114:9 114:13,19 115:1,12 116:1 116:2,15,17 117:5,9 121:2 131:10,23 132:14 133:12 134:5,10 135:4 144:4 165:7 187:23
**division** 35:19 124:17 127:11 168:2 178:16 185:18 196:20 199:15 201:15 201:16 203:3 269:17
**divorced** 353:13
**DOB** 186:6
**doctor** 139:24 347:9,19,20 348:17 349:5,6 350:7,18,23
**document** 21:19 25:6 30:12 126:20 133:16 134:3 148:8,22 148:24 149:14 150:4 180:3 184:24 185:5,9 191:22 220:7 288:10 292:20 329:11,13 330:20 341:5 343:19
**documentation** 46:23 236:24
**documented** 134:22 150:21 195:5,7,12 235:24 237:12
**documenting** 150:3 326:9
**documents** 15:22 16:13,19 17:4 31:12 48:23 133:22 161:14 165:19 170:17 179:17 179:23 184:9 214:5 264:11 264:19 265:4,8 265:17,18 267:20 340:20 340:21 342:12 353:2,3
**doing** 19:21 28:14 39:8 47:4,13,17,22 50:8 53:5 64:1 68:14 86:21 100:17 106:19 114:7 123:12 123:19,21 125:17 127:3 135:17 139:3 159:7 160:21 169:17,18,19 170:6 172:3 196:22 197:5,6 197:9,21,22,24 198:5,9 200:4 200:9 228:9,11 255:14 279:9 286:4 287:13 303:15 317:5 328:13
**Dom** 55:9
**Dominic** 11:3 55:4,5 109:5 220:21
**double** 56:18
**doubt** 117:24 118:19 119:4 120:3 225:20 228:15,20 229:6 267:19
**doubted** 226:6
**doubts** 118:3 122:20 123:1,7 225:22 226:8 227:23
**Downing** 1:15 4:3
**downstairs** 9:21
**drafted** 20:23
**drove** 16:15
**duly** 5:9
**duty** 63:14 64:2 97:10,10 338:11
**dying** 351:2

**E**

**E** 3:2,7 357:1,1
**earlier** 27:11 32:8 43:7 78:6 126:18 128:18 145:10 170:2 178:8 215:2,5 219:8,20 231:6 231:13 243:3 261:14 269:14 271:22 281:3 316:10 328:11
**earliest** 167:1 169:11
**early** 34:17,19 166:17 176:16 192:16 193:15 194:3 202:12 259:23 277:23 279:11 353:7
**easily** 304:17
**eastern** 1:1 4:6,8
**easy** 163:5,6,22 184:8 318:17
**Eclipse** 298:3
**Eddie** 202:12
**education** 33:3
**Edward** 10:22 12:2 55:20,22
**effort** 147:2 148:9 163:17
**efforts** 149:1
**either** 12:24 15:20 68:5 140:18 152:10 197:11 212:19 221:21 237:11 237:15 240:3 270:15 280:16 282:5 315:14 315:17 355:7
**emergency** 350:17
**ended** 182:7
**enforcement** 7:6 7:12,17 33:19 38:17,23 39:6 41:2 83:23 84:1
**engage** 70:13
**ensure** 97:20
**entire** 165:24 264:16 347:15
**entitled** 96:8 241:14
**envelope** 48:3
**episode** 137:19
**errata** 356:5,7,9 356:13,19 359:1
**error** 201:7
**especially** 321:14
**ESQUIRE** 2:2,6 2:9,15
**estimate** 33:9 40:13
**et** 1:5 4:14
**Etienne** 2:7 5:20
**evening** 275:17
**events** 265:1
**eventually** 202:8
**Everett** 23:10,22 30:16,21 203:2 203:8 204:20 205:17 206:3 208:22 213:13 217:2 222:9 241:2 242:23 243:19 244:15 251:18 252:5 252:12 259:13 260:2,2 281:10 281:15,24 282:14 283:18 284:4 287:19 288:11 289:24 290:7 291:20 291:23 292:2 293:1,8 294:23 295:6 305:18 305:24 306:13 306:23 310:20 311:16 312:16 313:7 314:6,21 340:11 341:17

344:18
**Everett's** 205:4 217:15 221:3 242:2 249:5 258:24 291:9 299:8 305:16
**everybody** 144:14 147:2 147:16 148:6,7 151:22
**evidence** 22:12 23:6,21 24:1,9 24:19 30:6,15 76:19 77:4,9 78:15 80:6,17 80:19 81:10 82:19 83:5,9 84:4,7,24 85:7 85:10,12 87:4 88:10,10 89:23 90:20,21,24 93:3 94:1 96:8 96:23 100:10 100:20 101:6 101:19 102:22 103:3,19 104:2 105:7 106:15 111:23 112:11 112:20 120:21 120:23 222:19 223:1,10 233:12,20,22 234:22 260:3 261:7 286:8,19 306:11 307:24 308:5,6 316:13
**exactly** 53:7 108:6 138:13 198:5 243:18 257:18 301:5
**exam** 241:15 313:8
**examination** 5:12 313:17
**examinations** 161:15
**examined** 5:9
**example** 118:9
**examples** 118:10
**exchange** 255:20 256:20
**exculpatory** 76:19,21,23 77:9,18,22 78:2 80:6,16 82:20,20 83:5 83:9 84:4,7,24 86:9 87:5 88:24 112:20 326:16
**Excuse** 153:5
**Exhibit** 3:9 282:11,12 290:21
**Exhibit-1** 17:20 304:3
**Exhibit-14** 174:4 180:12
**Exhibit-15** 175:21
**Exhibit-16** 189:23
**Exhibit-19** 204:16 205:6 217:1
**Exhibit-2** 30:24
**Exhibit-20** 242:16 259:9
**Exhibit-21** 208:6 217:13 217:15
**Exhibit-22** 344:6
**Exhibit-25** 199:17
**Exhibit-27** 251:22
**Exhibit-3** 31:1
**Exhibit-32** 302:9
**Exhibit-4** 31:8
**Exhibit-64** 339:13
**Exhibit-66** 324:2
**Exhibit-68** 133:8
**Exhibit-69** 132:7,9
**Exhibit-70** 280:20,22
**Exhibit-71** 334:3
**Exhibits-71** 334:5
**exist** 119:17
**exonerated** 26:18 27:7,17
**exoneration** 24:13
**exonerations** 28:12,22 71:15 354:7
**expect** 102:21 103:2,24 104:1 104:23 105:4 105:14 115:1 145:2,18 148:8 150:13 157:18 158:11,23 160:9 161:4 194:21 195:10 203:24 235:16 236:2 277:22 278:22 279:17 286:18 287:1 301:7 308:9 309:10,18 311:7
**expectations** 279:4
**expected** 144:23 286:23 287:5 287:10
**experience** 228:18 240:13 240:18 319:15 331:9
**experienced** 199:6,12
**experiences** 124:20 125:1
**experiencing** 137:18
**expert** 248:15,16
**expertise** 248:16
**expires** 357:19 358:22
**explain** 61:20 120:22 264:11 271:16 322:5 331:17
**explained** 114:7 184:6 215:11 319:6 330:10 330:24
**explaining** 330:16
**explains** 329:6,7
**explanation** 268:10,20 271:14,19 280:3,10,12,15 316:6,8
**explanations** 315:23
**expressed** 24:5
**extent** 19:14 21:2,18 65:7 85:3 115:16 142:23 180:3 188:18 218:14 225:21 238:17 247:22 255:2 260:7 272:7 292:19 304:24 332:24
**extra** 30:12 61:4
**eye** 70:8
**eyewitness** 305:6
**eyewitnesses** 150:23 151:11 151:19 152:5,6 152:16,22 153:18 154:2 193:1

**F**

**F** 357:1
**face** 346:2
**Facebook** 42:6
**facing** 255:19 312:16
**fact** 6:9 133:24
**factors** 229:23 230:21
**facts** 279:10 333:8
**faded** 282:20,21
**fail** 164:15 165:4
**failed** 165:13 225:3,6,8,14 226:7 227:10 241:5,14 260:13 313:7
**failing** 98:24 117:4,8 313:13
**fails** 164:19
**fair** 21:14 67:10 142:4 151:6 162:22 163:24 164:11 165:3 167:1 170:16 171:16 172:17 176:8 196:16 218:12 221:16 232:7 233:3 253:18 291:20 305:16 324:10 328:24 339:19 342:16,22
**faith** 226:12
**false** 117:18 257:4 335:23 336:6
**falsely** 6:5
**familiar** 18:6 59:18 61:9,10 276:13,19,21

**family** 41:1
**far** 7:17 22:19 69:9 73:10 75:20 118:11 126:1,14 127:24 128:21 180:9 196:8 218:2 259:22 262:6 270:23 282:6 288:8 309:7
**fast** 302:5,6 333:10
**faster** 23:5 265:20
**favorable** 77:4 78:14 79:5 80:19 81:10,12 81:24 82:6,11 85:24 87:7 90:21
**fear** 24:5
**February** 39:22 130:24
**Federal** 24:19 24:24 25:7,13 25:16 188:7
**feel** 159:12 204:16 234:5 271:21 298:20 299:1 353:24 355:2,6
**feeling** 214:9,12 245:23 246:20 246:23 251:9
**feelings** 29:16 72:6 76:3,12 76:14
**Feinberg** 2:2,6 4:20,21 5:19 223:4
**fellow** 70:12
**felt** 235:4 308:5
**figure** 173:6 322:15
**file** 17:4,8 48:12 130:9,14 133:19 165:24 166:3 174:7,19 180:17 181:2 181:22 182:17 182:24 183:5 188:7 194:13 194:21 200:13 212:3 214:18 235:17 264:16 281:8 309:12 313:2 334:3
**filed** 13:7 25:6 28:5 43:8 44:6
**files** 14:17 182:22 183:6,8 264:17
**filing** 25:4 356:14,22
**fill** 142:3
**final** 8:15
**finally** 272:4
**financial** 40:12
**find** 44:12 48:20 90:2,4,5 148:15 233:16 233:17 234:11 234:16 244:24 279:13
**finding** 193:10
**fine** 125:13 214:23 217:12 218:6 242:11 265:10 298:19
**finish** 22:3 111:9 254:10,14,17
**finished** 31:2
**firm's** 5:19
**first** 5:9 13:4,17 31:22 34:18 86:17 100:4 107:18 119:23 120:22 121:3 132:20 178:14 178:24 185:14 185:16 193:18 199:18 200:13 200:14 202:23 204:13 205:18 217:7 218:4,23 244:4 265:21 282:8,23 283:15 287:24 288:1,2 291:16 296:9 304:3,19 305:24 323:21 327:11 340:23
**Fisk** 335:6
**fit** 87:12 257:22
**fits** 254:6 255:13
**five** 9:24 40:24 58:8 188:2 214:21 216:1 234:20,23 267:10 319:17 321:7,9,10 338:17
**flip** 31:7 109:4 131:1 208:6 290:19 334:22 344:5 345:4 346:12
**flipping** 18:16 30:23 205:1 326:7
**flying** 106:18
**focus** 190:10
**focused** 194:2
**folder** 48:3,12 49:5 114:22 115:2 129:5,7 129:10,14 130:8,10
**folks** 6:4 155:22
**follow** 66:24 156:2 158:17 159:8,23 160:2 160:4,5,10,14 160:23 161:3,4 168:21 169:23 172:3,9,9 184:6 185:14 197:22,24 200:10 278:23 291:17 294:14 298:12 299:14
**follow-** 197:17
**follow-up** 52:22 168:20 197:22
**follow-ups** 198:6
**followed** 63:5 296:5 314:16
**following** 199:8 259:10 356:7
**follows** 5:10
**font** 109:2,2
**force** 38:19 61:18 66:5
**foregoing** 357:6 357:10,13 358:1
**forensic** 47:15 47:17 233:12
**form** 7:14 10:14 13:20 14:22 19:14,24 20:11 21:2,18 22:15 25:20 26:8,21 28:8,16 31:16 32:3,20 44:19 49:2 50:10 52:3 54:7 56:11 60:10 61:13 62:23 63:17 68:1,12 69:14 71:20 72:4,12 73:23 74:16 75:13 76:7 77:14 78:18 80:21 81:6 82:3 84:11 85:3 87:10 88:18 90:8,17 93:8 94:4,17 96:11 97:7,17 100:22 101:9,22 102:6 102:18 103:7 103:22 105:2,9 106:5,21 107:9 108:3 110:2,23 111:15 112:23 113:7 115:5,16 116:10,23 117:20 118:21 121:6,20 123:4 123:10 127:15 128:2,21 129:24 132:2 134:16 135:7 136:2 138:18 139:8 140:3,20 141:9 142:15 142:23 143:11 143:23 144:7 144:18 145:5 146:2 147:9,20 148:11,19 149:8,16 150:16 151:2 151:13 154:6 154:16 155:18 156:12 157:11 157:23 158:8 159:2,20 160:12 161:19 163:3,19 164:22 165:9 170:12 171:20 173:1,14 174:1 174:14 175:3 176:1 177:23 180:20 182:2 182:10,19 184:20 185:12 188:18 189:14 192:2,19 193:12 194:8 194:24 195:14 201:21 203:11 204:5 205:7,21 210:19 211:2 218:14 219:5 222:1,22 224:5

224:14 225:24 227:12,18 228:3 230:13 230:24 233:8 234:1 235:3,12 237:22 238:17 239:10 240:9 241:7 243:12 244:19 245:20 246:13,18 247:21 248:10 249:14 250:16 251:6 252:7 254:1 255:1,24 256:24 257:17 259:4,18 260:7 261:10,21 262:23 267:14 268:3,15 271:10 272:7 273:12 274:4 274:23 277:3 277:17 278:3 279:21 281:18 283:4 284:9,24 285:13,21 286:10,21 287:8,22 288:16,24 289:8 292:5,12 292:19 293:11 294:8 296:23 297:11 299:21 300:18 301:3 301:18 302:2 303:17 304:24 305:21 306:7 306:18 307:6 307:16 308:2 308:13 309:14 310:24 311:19 312:5 313:11 315:1 316:1,16 317:10,20 319:4 320:6,17 320:23 323:2 324:15 325:18 326:23 328:6 328:15 329:10 329:20 332:9 332:24 334:20 335:20 336:12 336:20 337:3 337:17 338:13 340:15 341:10 342:7,24 343:14 344:14 346:7 347:23 348:11 349:10 350:9 351:17 352:8 353:10 354:15 356:3,6

**formal** 46:23 133:22 153:12 235:24

**formally** 134:3

**forms** 136:7

**forth** 34:18 170:4 298:24 326:7

**forward** 24:6 51:10 67:12 120:24 259:2 260:4 302:5,7 333:10

**found** 34:18 42:17 119:10 133:13,21 143:19 174:6 174:19 181:21 182:16 186:5 245:7 304:21 337:14

**four** 52:20 58:8 109:3 152:2 177:19 187:12 267:10 319:17 321:7

**fourth** 253:8

**Francis** 12:6 55:18

**Frank** 53:16,17 288:7 293:2,8 314:22 325:16 325:22,24 326:18 329:7 333:10,12,15 333:20 334:1 334:10 335:17 342:1,12 344:2

**fraud** 37:5,7 38:21 39:1

**Frederick** 12:8

**free** 204:16 271:21 330:20

**fries** 276:18

**front** 292:20 293:12 302:16 356:15

**froze** 41:23

**fugitive** 168:14 197:19

**fugitives** 197:20

**full** 38:2 219:19 244:4 289:12

**further** 8:3 15:18 80:13 82:15 120:8,19 120:20 122:11 122:15 125:7,7 128:11 232:14 232:19 259:22 335:7 355:12

**future** 38:5 69:10

**G**

**g** 209:8

**game** 228:12

**Gary** 276:1

**gather** 231:22

**general** 279:7,8 296:19 307:2

**generalizable** 106:2

**generalize** 105:24 233:8

**generally** 19:10 45:13 51:16 128:5 135:16 146:18 194:20 219:3 224:23 231:14 233:4 286:8 323:20

**getting** 92:14 139:5 142:1 156:8 159:13 197:20 295:19 298:17 321:13 324:24 325:2 332:20

**gharris@krla...** 2:5

**girlfriend** 291:9 291:20 292:9 292:17 299:8 314:22

**give** 8:3,24 32:9 54:14 58:2 87:18 88:13,24 89:16,24 90:4 90:14 91:13 92:19,22 93:2 97:22 118:9 122:9,24 142:10 145:22 146:7 160:6 204:14,19 227:15,23 231:14 248:14 253:7 255:8 264:24 265:4 280:17 291:5 301:23 336:5 338:16 339:5 347:2 354:13

**given** 57:22 61:6 71:15 86:11 196:7 199:14 220:3,13 251:3 258:11 259:20 259:22 277:22 296:15,16 298:16 358:2

**gives** 8:11 97:14 118:12 126:20 152:20 158:19 247:15 248:5 276:10 277:13 277:14 283:19 284:21 293:7 310:20

**giving** 82:24 87:21 91:18 119:8 129:7 141:12 142:6 159:12 245:17 249:12,19 264:5 284:13 291:23 295:19 297:18 300:24 301:22 305:19 321:9

**glass** 34:11

**glean** 110:2 188:19 218:15

**go** 10:19 11:22 14:6 16:13 19:24 23:4 25:4,5,7 30:6 30:10 31:21 32:8 37:3,18 38:19,22 39:18 45:22 47:12 49:22 51:5 53:11 59:5,8 59:14 69:9 70:2 73:18 74:24 87:4 99:24 100:22 102:23 107:16 108:7 109:16 111:8 120:24 129:12 131:22 135:7 139:1 140:18 141:5 147:5 150:9 152:15,21 153:5,13 154:8 158:23 159:23

160:1 163:16 165:19 167:23 169:5 174:4 180:12 184:9 185:6 186:3 193:13 197:12 197:13 199:17 204:15,24 212:10,15 214:1,17,23 217:5,12 218:19 220:19 225:2 232:19 233:1,20 234:11,16,23 235:5 237:17 239:4 242:16 244:3 249:11 259:8 260:22 265:19 267:6 267:22 277:9 279:18 280:4 282:11 295:10 296:20 297:6,8 298:22 302:7 303:24 304:16 315:4 317:20 318:17 319:4 327:9 331:11 338:17 341:24 344:9 349:19 354:24

**goes** 45:24 87:22 87:23

**going** 8:3,17,18 11:5,22 16:12 16:14,16,18 17:18 23:3,5 23:24 30:9 34:14 39:18 51:4 58:17 64:9 88:2,3,4,5 89:24 92:4,19 92:22,23,24 93:2 101:19 104:21 109:4 113:24 114:20 114:23,24 115:12 118:9 118:18 120:2,7 120:10,24 121:1,16 126:11 129:6 131:1,2 132:7 132:21 133:7 139:20 142:2 142:12 148:3 152:5 157:18 158:23 163:7 164:20 165:18 171:16,18 172:1,3 173:15 173:16,19 175:5 177:7 178:12 183:8 193:20 196:2 196:17 197:9 197:11,12,14 197:20 198:6 200:4 211:4,19 212:21 215:16 226:4 231:8 232:9,10,23 233:1,4,11 238:5,10 247:9 247:10 252:24 256:10 267:22 269:11 280:13 280:20 284:22 294:5 298:20 298:24 302:7 305:10 316:9 318:15,19 319:8,9,12,14 322:11 329:3 330:23 334:2 343:20,21 347:13 349:12

**gold** 348:23

**gonna** 118:11 123:17 197:13 305:15

**good** 4:1,18,22 5:2,15 16:10 52:7,14 56:15 57:11 72:20 86:10 105:7 145:11 147:24 159:14 160:22 163:11 199:14 263:15 287:6 287:11,13 308:17 309:24 310:11

**goodness** 17:1

**Gotcha** 198:22 200:24 219:15 243:23

**gotten** 156:9 204:22

**govern** 61:10

**governing** 62:12

**Grace** 2:2 4:18 5:17

**Grand** 344:1 347:15

**Graterford** 282:1,17 283:21,23 284:2

**great** 118:10 126:19 169:1 217:5

**green** 230:15

**Greetings** 252:11

**grocer** 283:2

**grocery** 166:8

**group** 317:13 320:24

**guess** 13:15 20:19 36:2,24 44:14 46:22 47:22 50:5 63:18 66:1 71:6 89:5 95:7 142:16 146:4 146:11 153:19 168:3 189:8,21 190:8 192:3 194:11 195:19 206:19 225:18 248:11 257:9 269:19 270:1 278:20 288:18 289:21 290:16 292:8 305:8 308:5 321:19 322:13 325:4 327:7 344:17

**guidance** 46:12 140:7 160:6 173:12 204:14 224:17

**guilt** 32:18 93:3 93:6 97:3 109:22 110:10 110:20 111:13 111:23 112:12 140:17,17 142:13 316:14 330:2

**guilty** 22:9 77:1 84:9

**gun** 207:5 253:15

**gut** 140:17

**guy** 54:17 78:14 78:15 79:2,3,5 102:24 105:5 120:1,4 142:11 142:20 154:2,3 258:5 285:3 314:2 344:22 351:2

**guys** 55:24 90:11 146:13 168:19 199:6 201:8 319:9,9 320:8 322:11

**H**

**H** 3:7 49:4 130:10 133:19 174:19 183:7 194:13,21 200:12 215:3

**H-79** 188:3

**H&B** 272:15

**half** 169:15 217:22 218:9

**halfway** 131:3 335:8,11

**hand** 267:7 295:16

**handle** 46:2

**handled** 168:17 168:19

**handling** 295:20

**hands-on** 249:19

**handwriting** 251:24

**handwritten** 174:6,18 179:5 180:13,15 181:9,10,22

**happen** 67:15 121:9 122:5,6 166:20 215:12 219:2 246:2 261:17,19 262:18 308:23 322:9 344:16 352:20,22

**happened** 24:13 50:23 127:12 127:19 169:13 194:14 197:7 210:24 211:11 296:2,4 310:10 320:2 337:14

**happening** 48:7 126:21 264:18 323:15 342:20

**happens** 44:15 120:19 166:19 166:23 248:23 350:4

**happy** 8:20 92:8 178:10 190:9

214:15 215:20 216:3,4 253:11 291:4
**harassed** 214:11
**harassment** 212:17
**hard** 33:10 69:9 209:8 297:16
**Harris** 2:2 3:5 4:18,19 5:14 5:17 7:19 10:18 13:23 15:3 19:20 20:4,15 21:5 21:22 22:20 25:23 26:10,16 26:23 27:5,10 28:3,11,18 29:4,11,20 30:5 31:20 32:7,16,21 43:24 44:23 45:4,11 49:6 50:14,21 52:6 54:10,18 56:13 60:17 61:15 62:2,10 63:1 63:19 65:9,17 66:2,10,19 67:6 68:2,13 69:1,16 70:24 71:14,23 72:8 72:14 73:1 74:3,18,23 75:16 76:11 77:16,23 78:11 78:21 79:15,24 80:15 81:1,9 81:20 82:4,12 83:3 84:13 85:6,22 86:7 87:13 88:22 89:6,14,20 90:9,19 91:5 91:12 92:1 93:12 94:8,20 95:3,11,19 96:13 97:12,19 99:7 101:4,12 102:1,10,20 103:9,17,23 104:9 105:3,12 105:19 106:9 106:24 107:13 108:4 110:6 111:2,18 112:9 112:17 113:3 113:10,14 115:10,21 116:14 117:2 117:23 118:8 118:24 119:18 120:9,15 121:11,24 123:5,15 124:15 125:24 128:3 130:3 132:5,12 134:20 135:2 135:10 136:5 136:11,18 137:1,8,16 138:4,12,21 139:11,16 140:6,23 141:14,21 142:17 143:6 143:17 144:3 144:12,21 145:9 146:5,12 146:20 147:11 147:23 148:13 148:21 149:11 149:20 150:18 151:5,16 154:11,19 155:19 156:21 157:7,14 158:2 158:10 159:9 159:24 160:16 161:11,21 163:10,23 165:2,12 170:15,22 171:14,23 173:5,18 174:3 174:17 175:8 175:13 176:4 177:24 178:23 180:6,23 182:6 182:13,23 183:18 184:21 185:13,24 188:24 189:17 190:19 191:3 191:10,17 192:4,22 193:7 193:16 194:12 195:2,17 196:1 200:23 201:23 203:12 204:11 205:24 206:17 207:2,11,22 209:15,24 210:10,22 211:8 212:24 213:10,20 215:20 216:7 216:12,24 217:21 218:18 219:7 220:2,12 222:4,23 223:15 224:6 224:16 225:15 226:3,14 227:3 227:14,22 228:4,7 229:2 229:12 230:4 230:14 231:2 232:6 233:10 234:4 235:7,14 236:7 238:1,22 239:13 240:12 241:1,10,20 242:12 243:17 244:22 245:6 245:14 246:1 246:15,22 248:4,12 249:17 250:2 250:17 251:11 252:10,22 254:2,18 255:5 255:16 256:3 256:14 257:3 257:24 258:21 259:7,19 260:11,19 261:5,13,24 262:8,19,24 263:22 267:18 268:9,17 270:2 271:3,13 272:10,21 273:16 274:6 275:1,6,11,20 276:9 277:5,21 278:10,18 279:6 280:2,8 281:1,21 282:7 283:11 284:10 284:18 285:2 285:16,23 286:12,17,24 287:12,23 288:19 289:3 289:11,23 290:5,13,18 291:15 292:6 292:15,23 293:15 294:12 294:18 295:4 297:4,14 298:2 298:8 299:24 300:22 301:6 301:21 302:4 303:19 305:4 305:23 306:10 306:21 307:9 307:21 308:7 308:16 309:17 309:23 310:8 310:18 311:3 311:13,23 312:7,14,24 313:6,15,23 314:5,14,20 315:3,10 316:4 316:17 317:14 317:23 318:24 319:16 320:7 320:18 321:1 323:7 324:17 325:21 327:2 328:7,18 329:14,24 330:5,21 332:12 333:4 334:8,21 335:21 336:4 336:15,21 337:6,19 338:15,23 340:18 341:13 342:10 343:4 343:17 344:15 346:9 348:3,14 348:24 349:14 349:24 350:13 350:21 351:20 352:5,15 353:15,23 354:5,19 355:5 355:11
**haunts** 190:21
**head** 9:4 16:16 16:22 149:24 214:9 231:10 330:12
**headings** 200:22
**health** 231:6,9 298:23
**hear** 9:7,9 121:15 122:2 122:24 135:19 258:6 342:18
**heard** 13:10,18 28:1 72:9,15 164:4 178:21 180:24 209:2

255:17 269:24 289:15,17 290:8 342:14
**hearing** 9:9 251:1 333:7,8 333:14
**held** 4:9
**hell** 250:1 342:9
**help** 10:20 100:1 121:15 130:20 155:6 172:10 172:20 173:12 190:10 198:17 198:19 253:6 253:11 254:23 254:23 256:19 257:9 258:10 284:22 305:12
**helpful** 208:19
**helps** 255:18
**Heo** 6:8 13:12 21:10 22:6 166:8 181:17 183:13 184:1,1 188:14 189:7,9 210:16 213:15 218:12 272:16 285:11 291:24 293:3,9 304:21 324:9,12 325:3 340:12
**Heo's** 166:4 188:9
**Herbert** 43:1
**hey** 39:14 105:4 159:11 198:23 249:11 258:4 337:24
**hiding** 265:17
**high** 33:23 41:20
**higher** 113:19 114:2 117:10
**highest** 33:3
**highway** 188:7
**HILL** 2:15
**history** 70:6
**hit** 16:22
**hitting** 257:19
**hold** 133:13 291:6
**home** 40:5 211:4 275:24 277:12 277:15,20 318:18 319:8
**Homes** 293:4
**homicide** 6:2,4 12:1 14:24 15:5 17:4 18:8 23:16 29:13 32:10 33:13,14 35:19,21,23 36:6,13,15 42:21 45:13,16 51:17,18,22 52:8,12 56:1 56:21 57:2,18 75:1 76:4,18 93:21,24 95:21 100:14 115:23 116:1,18 124:16,21 125:15 126:3,9 127:10 130:9 130:14,14 131:10,12 152:1,7,10 161:15 165:24 166:2 167:4 168:2,8,13 170:1 174:7 176:14 178:16 179:9 180:16 181:1,22 182:16,24 183:3,5 184:12 185:17 196:19 201:14 203:3 221:20 233:4 233:19 248:23 254:12,20 264:16,17 269:17,24 270:4 272:11 283:7,8 306:2 309:12 313:2 317:1 318:12 338:8 345:9 346:3 353:18
**honest** 99:14 168:9 182:20 198:9 206:5 257:2,7,8,13 264:6 339:5
**honestly** 56:22 209:7
**Honor** 335:7
**hope** 158:13,14 195:15 248:24 249:1
**hopefully** 190:21 191:18 339:6
**hoping** 177:15 284:20
**Horsham** 41:11 41:19,20
**hospital** 138:6 138:11,13,16 139:2,13,22 341:4 345:10 346:4 347:9 349:2
**hospitalized** 341:7 348:16 350:6
**hour** 339:6
**hours** 58:21,23 58:24 299:3 318:15 321:9 321:10
**house** 10:3 13:22 206:22 207:14 275:7 275:18,24
**Hughes** 12:2 55:20 202:2,12 208:10,24 218:10 243:8 249:3 250:24 258:23 270:15 270:20 272:13 276:20 311:6
**hurt** 189:20,20 354:18,21
**husband** 12:23
**hypothetical** 65:23 78:19 88:19 93:9 97:8 104:7 118:22 121:21 136:3 139:17 140:4 141:10 146:3 159:21 192:20 225:24 238:13,14,18 239:12,19,23 240:5 247:13 247:22 251:7 255:2 260:8 278:4 279:22 352:9
**Hypothetically** 279:23
**hypotheticals** 119:19 239:7 239:14,18,23 240:14,19

## I

**ID** 136:12,20 137:2 315:5
**ID'ing** 135:23
**idea** 72:15 203:15 245:16 263:6 284:11 284:19 285:22 286:4 309:16 311:21 316:7 324:16 325:13
**identification** 132:10 280:23 334:6
**identified** 175:14 177:17 183:12 186:15 186:19,24 187:1,8 217:9 279:11
**identify** 4:16
**identifying** 173:22 174:11 194:3 259:23 277:23
**ignore** 63:3
**Il** 6:8 13:12 21:10 22:6 166:4,8 181:17 183:13 188:14 189:6,9 210:16 213:14 218:12 272:16 285:11 324:8,12 325:3 340:12
**illness** 137:19
**imagine** 116:19 138:3 140:15 140:24 146:19
**implies** 203:7
**importance** 198:20
**important** 64:14 84:16,18 85:16 164:20
**impossible** 297:18
**inaccurate** 265:9,12 298:11
**inappropriate** 64:1 68:15 255:22 256:5 256:18,22 337:1,8,9 349:8
**incarcerated** 6:6 219:15 281:24 282:17 283:18
**inclined** 246:6
**include** 63:15 103:10,15 104:3 109:22

110:10,20
113:17 114:4
160:17 315:19
316:13
**includes** 98:7
**including**
112:19,19
133:22 317:17
**inconsistencies**
88:13
**inconsistent**
81:22 88:24
109:21 110:9
**incorrectly**
113:11 264:2
**increase** 225:20
226:7,21
**inculpates**
326:21
**inculpatory**
326:24 327:3,8
329:17,18
**independent**
30:9 166:6
184:10
**indicate** 20:19
**indicated** 164:12
164:13 225:4,9
225:10,17,19
226:20 313:16
**individual**
105:22 107:12
107:14 163:21
**individually**
129:1
**Infinity** 38:12
**info** 187:22
244:17 249:12
**informally** 69:20
**information**
24:6 64:15,19
65:3 79:10
80:1 81:17,22
81:23,24 82:6
84:17 85:16,23
86:9,9,11 87:6
87:7,16,19
88:14 89:1,5,8
92:11,20 93:5
97:2,23 98:3,7
98:9,16,21
99:1,20 100:14
105:13 109:21
110:9,20 111:7
111:12 112:4,7
112:11 114:4
115:19 116:8
117:5,9,18
118:1 119:8
127:12 128:7
133:13,20
134:16 139:6
140:12,13,16
141:12,15
143:7,19,21
144:5,9 147:6
149:10,13
151:10 152:20
152:22 153:9
153:16 154:13
154:21,22
155:4,7,10
156:7,9,23
157:1,9 158:15
159:8 165:4,6
165:14 178:15
185:17 186:22
187:2 192:12
192:13,14
194:2 204:23
210:16 213:14
227:21 232:1
232:15 233:2
234:16,17
237:16 244:6
244:10,10
248:6 251:18
259:2 278:8,11
278:13,14
284:13,21
288:13 291:23
293:7 295:19
296:15,16
301:1,23,24
306:22 307:2
307:13 314:16
315:18,22
335:23 344:11
**informed** 24:19
24:23 70:1,5
75:20 176:23
224:24
**initial** 166:4,15
**initially** 134:11
**initials** 49:23
**initiated** 75:9
**innerface** 39:2
**innocence**
103:20 104:2
104:12,22
**innocent** 6:9
22:9 25:1,14
78:3 96:6
103:5
**inside** 183:6
272:15
**Instagram** 42:10
**Institution**
282:18
**instruct** 44:19
**instruction** 8:11
**instructions** 8:4
**insufficient**
46:15
**insurance** 37:4
37:11,12,20
38:9,10 40:20
83:21 232:8
239:22
**integrity** 24:15
25:7 134:4
**intellectual**
137:17
**interactions**
150:22
**interested** 173:3
**interesting**
209:8 351:7
**internal** 41:17
48:23 59:19
60:1,22 63:20
69:24
**interpreter** 55:9
55:11 202:7,9
208:14,16
**interrogate**
137:23
**interrogated**
327:18,22,23
**interrogation**
50:8 66:6,13
328:2
**interrogations**
49:19 69:11
135:16 328:12
**interview** 51:1
71:7 138:16
139:2 147:2
152:11,24
153:10,12
198:6 204:2,3
204:13 208:8
208:10,21,21
209:9 213:12
218:3,8,24
235:24 236:8
236:10,22
237:5,13
242:17,18
244:15 258:23
259:12 266:9
267:11,23
272:12 273:5,8
274:11 282:13
284:4 294:19
295:11,22
296:20 299:11
299:16 306:4
312:2 313:9
348:9 350:5,15
350:23
**interviewed**
59:24 60:3,5
153:11 203:8
203:19 204:7
204:10 283:1,6
283:8 306:1
318:22 340:11
344:4 346:3
**interviewing**
139:23 213:13
273:20 352:12
**interviews** 46:3
46:24 47:2,3
48:17,17 49:15
49:19,23 60:7
101:1,14
128:24 197:1
197:14 236:21
305:6 307:4
309:19 312:9
323:14
**introduced** 5:15
**introductory**
8:15
**investigate** 68:8
68:20 85:1
90:2,3,10 91:4
111:6,7 116:7
118:3 122:21
124:4 142:19
144:1 145:18
157:19 189:1
189:19 193:8
194:5 232:14
232:17,20,21
233:1,15
234:19 269:7
338:11
**investigated**
24:15 64:12
91:6 111:20
119:10 144:9
343:10
**investigating**
20:18 80:11
115:23 158:12
193:20 269:6
271:7
**investigation**

14:19 19:1,22 24:18,21 46:10 46:15 48:7 52:15 59:22 67:11 80:14,23 82:15,18 83:21 86:21 88:16 92:12,20 93:21 93:24 95:21,23 99:12 100:14 102:12 111:9 116:21 117:16 117:17 120:8 120:19,20 122:11,15 126:21 127:13 128:12 129:4 133:17 145:12 146:8 154:22 154:24 155:15 156:8,24 157:2 158:18 159:5 160:3,5,14,15 160:23 161:1,3 165:16 166:4 166:16 169:14 169:21 172:12 172:19 173:21 176:16 182:14 182:16 186:8 187:15 188:23 192:17 194:15 194:19,20 195:8,11 199:19 205:16 206:2 208:7,20 211:16 213:12 216:8 227:5 236:9,22 242:17 248:23 259:23 261:6 261:12,16,18 263:10 264:16 265:15 268:1 268:13,23 271:24 277:24 279:12 282:13 297:17 303:12 308:11 318:9 319:18 323:4 339:10,15 340:1,3

**investigations** 39:7 46:5 52:22,23 58:16 58:17 126:23 161:15 168:2 197:22 233:4 264:18 296:5 323:12 342:17

**investigative** 125:10,14,17 126:2 133:17 133:23 160:22 166:17 344:21

**investigator** 37:4,5,7 38:14 39:1 83:18 172:2 228:18 231:24 232:7,8 239:22 240:3

**investigators** 157:18

**investment** 40:7

**investments** 40:11

**invited** 350:18

**involve** 342:21

**involved** 19:19 22:18 23:2 26:24 38:16,24 46:20 108:17 114:10 115:9 116:3 166:3,12 166:15 176:7 176:17 178:17 179:8 185:19 186:23 187:3,9 214:19,24 229:17 248:20 262:5 265:15 268:12 269:2 303:7,11 307:19 309:1 317:18 318:1 340:1 342:19 355:3

**involvement** 14:16 15:12,18 157:16 194:17 215:9 221:15 267:24 268:19 268:22,24 272:22 277:14 332:22

**involves** 287:13

**involving** 323:16

**iron** 1:12 2:3 4:10 297:8 357:8

**issue** 104:11,19 330:17

**issues** 65:14 73:7 103:11 104:3 104:24 162:23 163:15 248:17

**J**

**Jack** 141:4 142:11,19

**jail** 66:12 244:16 259:1,15 260:14

**James** 11:15

**Jane** 159:16,17 160:1

**January** 166:18 189:24 194:15

**Jastremski** 53:16

**jderose@clar...** 2:18

**Jeannine** 1:14 357:3,18

**Jefferson** 341:3

**Jersey** 39:24 40:1 158:21

**Jim** 11:16 55:2

**job** 34:5 37:2,3 45:24,24 56:15 105:22 151:9 155:14 178:18 185:19 186:23 187:3,9 196:24 198:2 287:6,11 287:13 321:9

**jobs** 38:6 197:5 198:21

**Joel** 12:15,16,19

**John** 2:15 5:2 11:24 12:10 23:15 41:13 54:23 120:1,4 120:11,21,24 141:3,6 142:5 142:9,12,13,18 153:24 154:1 159:13 311:5,5 315:17,19 323:22,23 325:1 327:13 327:16 333:19 334:1,10 339:8

**join** 34:12,15,20

**joined** 5:18

**joining** 33:24

**Jonathan** 2:6 4:20 5:18

**Jones** 141:5 142:11,20 187:23

**Joseph** 1:10 3:4 4:15 5:8 12:12 55:16,17 339:16 344:2 357:7 358:8

**judge** 8:5 25:16 231:8 333:8

**judgement** 179:8,12,13,19 185:3 231:3

**judgements** 185:1

**judicial** 134:12

**July** 266:10,17 281:10 291:18 302:6,23

**jump** 169:14 269:9

**jumped** 168:15 332:20

**June** 13:7

**jury** 8:5 44:12 334:13 344:1 347:15

**justice** 33:5,21

**K**

**KAIRYS** 2:2

**KAPLAN** 1:22

**Karen** 5:3

**keep** 46:9 58:18 70:8 110:15 123:13,18,19 125:3,5 139:19 156:14,15,18 212:20 213:3 319:10 330:15

**keeping** 64:14 64:18 321:21

**kept** 65:3 347:1

**key** 30:15 164:19

**killed** 218:12

**killing** 113:21

**kind** 34:9 58:20 68:19 85:9 106:18 130:16 145:18 165:14 166:22 168:16 169:14 249:19 252:16 257:1 281:3 284:19 353:12

**kinds** 74:13 227:4 232:1

**knew** 12:21 53:17 54:17 56:24 63:6,22 64:17,18 65:4

68:6 89:11,12 93:15,17,23 139:2 144:15 144:20 223:20 278:7 295:12 313:22 315:18
**know** 5:22 8:19 9:6,11,20 12:13,18 13:6 13:9,16,22 15:6,8 17:19 17:24 19:9,14 21:2,4,18,20 21:21 22:6,8 22:17,19 27:14 27:15 28:10 30:11 33:8,11 34:7 35:1 36:19 43:14 44:5,22 45:3,9 47:13 48:6 49:10 50:12,23 53:5 55:8 58:1 58:12 59:23 60:23 61:2,14 62:1 64:22,22 64:23 66:1 67:3,23 68:5,5 69:3,4,5,8,9,15 70:4 71:2 73:13,24 75:3 75:8,14,15,19 75:19,21 76:2 76:20 77:15,20 77:21,22 78:20 78:22,23,24 79:4,9,12,22 81:3 84:3 85:5 87:16 88:6,20 88:21,21 90:18 91:17,19,20 92:4,6,6,7 93:17,17,18,19 93:20 94:11,11 95:8,18 96:12 97:1,17 98:16 99:19 103:14 104:8,10,13,16 104:18,20 105:5,11,18,20 105:21 106:1,8 107:4,6 109:1 109:17 113:12 114:15,16,20 114:20 115:5 115:16,18,20 118:10,23 119:1,9,20 121:8,10,22,23 122:1,4,4,12 122:17,20 123:11,16,21 126:12 130:1,4 130:6,7,17,17 132:17 134:19 134:21 135:1,3 135:5,9 136:10 136:16,17,24 137:14 138:14 138:19,22,24 139:9,10 140:5 140:10,21 141:2,11,13,16 141:20,22,24 143:1,3,5,13 143:14,16 144:5,19,24 145:1,1,6,8 147:12,12 148:20,22 149:2,17,19 150:17 151:14 151:21 154:9 156:4 159:3 160:24 161:1,9 162:2 163:20 163:24 164:1,6 164:17,17,18 165:10,11,13 165:15 166:1 167:5,5,9 168:11 169:9 169:16 171:4 171:17 173:10 174:15,16 175:4,5,6,7,17 175:17 176:19 177:1 178:9 179:6,9,10,14 179:14,21 180:10,11 181:4,11 182:3 182:5,8,11,12 182:21 183:1,9 184:1,17 185:2 185:8,9 188:20 188:21,21 189:16,16 190:9 191:8,21 192:6 193:5,6 193:21,21 194:9 195:1,3 195:4,19 196:10 197:21 198:14 201:22 203:15,20,21 204:6,22 205:10 206:14 206:19 209:5 209:21,22,23 210:8,9,20 211:5,6,6 213:24,24 214:3 215:16 217:10 218:22 219:6,19 221:13,18 222:2 223:12 223:20 224:3,3 224:15,19,20 225:1,5,5,18 226:2 227:6,13 227:19 228:1,9 228:10,12,22 229:1 231:1,11 231:17 232:4,5 233:9,14,15 234:2,3,15 235:13,18,23 236:1,3,5,11 236:23 237:8 237:23,24 238:4,4,5,11 240:21 241:8,9 241:11,13,19 241:19 244:12 245:22,23 246:5,14,19 247:9,10,18 248:1,18,18,20 249:3,8,9,16 249:24 250:5,5 250:20 251:8 251:10,17,20 252:1,19 253:1 253:21 254:5 255:13,13 256:9,11,16,21 257:10,12,15 259:6 260:10 260:18,22 261:1,2,3,11 261:22,23 262:4,6,15,16 262:18 265:14 266:8 268:5,16 270:5 273:13 273:15 274:5 274:16,24 276:16 278:7,7 278:21 279:5,7 280:1 281:13 281:19 282:4 283:24 284:3 284:16 285:1,5 285:7,7 286:16 286:22,23 287:3,3,15,15 288:8,17 289:1 290:4,7,11,12 291:10 292:22 295:2 296:17 296:24 297:1 297:12,13 300:19,20,23 301:4,7,14,24 303:18 305:12 307:19,20 308:3,4,4,13 308:14,22,23 309:2,15,22 310:4,5,6,15 311:20 312:3,6 312:8,20,21 313:1,4,5,12 313:19,21,22 314:4,8,13,19 315:2,9,11,13 315:17,21 317:3 318:12 320:10 321:18 322:13 327:1,3 327:4 329:12 329:22,23 330:10,13 332:2 340:16 342:7,9 345:12 347:6 348:5,12 348:21 349:11 349:22 350:2 350:15 355:4
**knowing** 224:19 228:13 248:3 252:9 289:13 289:14 316:3 349:23
**knowingly** 351:5
**knowledge** 31:6 115:12 246:11 248:7 251:15 326:5 358:3
**known** 312:1 314:1 315:12
**knows** 344:22
**Krasner's** 29:5 29:17

**L**

**lack** 232:22
**ladder** 16:22,23

**Lamb** 323:22,23 325:1,13 327:14,16 333:11,19 334:1,10 338:1 339:8
**language** 55:11 187:4
**Lanzelotti** 12:10 57:5 190:2
**Lanzelotti's** 190:4
**Larry** 29:5,16
**laugh** 265:2
**law** 2:9 5:19 7:5 7:12,17 33:18 38:17,23 39:5 41:2 83:23,24
**lawsuit** 5:22 6:1 13:5,18 27:12 28:5 43:8,10 44:6 75:9,15 75:24
**lawsuits** 43:16 44:3
**lawyer** 96:19,21 96:23 142:19 143:19
**lawyers** 25:17
**lead** 95:24 96:2 168:23 169:2 346:20,23
**leading** 249:22
**leads** 48:15 166:22
**LEAMAN** 1:22
**learn** 85:12 146:21
**learned** 92:12 134:5,8 177:18 186:14 187:8 311:14 312:15 354:6
**lease** 325:9
**leave** 34:21 36:15,21 37:1 127:6 207:13 332:14 347:19 348:17 349:6 350:7
**leaving** 34:22 38:7,18
**leeway** 233:19 234:5
**left** 35:21 37:10 37:23 47:7,8 175:6 179:11 201:6,15 293:22 350:24 351:1
**legal** 85:4 241:7 255:24 257:11 323:2
**legally** 25:9 97:15
**Lester** 288:3 325:16,23,24 326:18 329:8
**let's** 30:6 58:5 77:24 80:1 119:20 126:1 126:13 141:3 157:15 173:19 174:4 178:13 180:12 186:3 189:22 199:17 204:12,15 208:6 213:7 215:18 216:4,7 216:10 217:5 217:12 218:19 220:17 242:1 244:3 251:22 259:8 270:6 277:9 280:17 282:11 289:4 290:19 298:2 302:5,6 303:24 308:8 333:10 338:15 346:12
**letter** 252:4,15 253:4,22 285:3 285:6 312:17 312:21,23
**level** 28:19 33:3 48:19 333:7
**lie** 130:4 244:9 277:1 352:3
**lieutenant** 16:5 16:7 19:6,8 41:16 45:22 56:4,23 57:3,6 167:16 190:3 197:12 199:20 263:7,9 320:10
**lieutenants** 321:12
**life** 34:14 38:4 125:7 212:1
**light** 157:16 322:18
**likelihood** 141:6
**likes** 43:19
**limits** 62:4
**LIN** 2:2
**Linda** 5:3
**line** 45:17,19,21 46:5 47:1 48:16 49:21 52:17,18 53:4 53:9,10 58:4,5 58:13 109:12 109:13,18 110:8 124:13 131:4 142:10 148:3 156:17 185:15 197:4 202:13 213:5,6 220:22,24,24 222:8,14 293:22 300:9 319:7 359:2
**lines** 288:1 300:9
**linked** 190:14
**list** 64:9 303:20 303:22
**lists** 285:9
**litigation** 264:13
**little** 18:15 23:4 23:4,5 24:12 33:1 45:12,14 51:15 88:8 90:12 99:8 135:15 140:11 142:4 157:19 161:16 165:18 167:19 196:23 204:19 220:18 251:2,24 265:20 282:20 282:21 298:17 305:14
**live** 39:23 40:17
**lived** 186:16 187:14
**lives** 186:8
**living** 40:19
**located** 4:10
**locating** 192:23
**logical** 226:20
**long** 8:20 9:22 14:8 30:7 47:7 51:6 53:1 69:3 121:15 125:6,6 131:20 149:3 152:13 163:14 165:1 187:18 216:2 237:10 243:23 296:17 347:3
**look** 15:22 17:3 17:7 37:21 39:10 57:18 100:19 109:10 109:12 132:16 158:24 166:15 169:3,6 174:9 174:24 175:23 189:22 201:24 204:13 205:6,9 214:1,6,8,10 216:18 220:17 220:20 222:14 237:2 242:1,13 249:11 251:22 251:22 259:8 270:6 276:23 279:12 280:17 287:24 288:5 289:4,10 293:19,22 295:15 300:5 316:20 323:12 327:13 335:5 339:10,13 340:22 345:17
**looked** 16:8,10 18:18 119:14 182:21,24 200:18,21,24 201:1 216:14 250:4 254:3 258:22 267:15 270:9 271:23 290:6 299:10 302:22 304:4 306:5 310:10 316:11 324:8 326:11 327:10 340:20 342:12 352:24 353:1,2
**looking** 17:17 21:7 39:15 156:14 160:17 169:22 199:9 259:21
**looks** 21:12 42:19 166:16 175:6,16,18,20 176:7,10 177:14 188:22 189:6,24 191:21 194:13 205:2,15 206:1 208:9 219:17 252:3 266:15 272:3,13 283:20 289:22 324:11 331:3 343:15

**lose** 184:5
**lost** 49:16 154:17,18 354:10
**lot** 7:6 8:16 58:3 58:6,22,22,24 59:1 88:10 93:18 123:16 127:2,3 134:16 145:8 146:23 150:20 161:13 164:24 166:21 168:20 169:4 197:17 205:1 229:17 233:3 322:21 332:16 353:1,1
**lots** 136:6
**loud** 202:24 205:11
**Louise** 206:8 291:8,19 292:10,17 293:18 294:1 294:21 295:3 299:7,19 300:13
**love** 92:2
**loved** 354:11
**lunch** 215:17 216:2 242:3 263:16,19
**lying** 54:2 224:2

**M**

**mail** 73:21
**main** 14:16 47:3 65:13 121:12 164:11
**maintain** 133:18
**maintaining** 198:10
**making** 74:13 96:21 141:23 163:8 178:6 189:4 235:9 237:19 238:9 240:15,17 317:2 318:14 321:23 322:2 356:6
**male** 186:8 217:9 272:15 282:16
**man** 6:8 13:12 21:10 22:6 23:10,22 27:16 43:1,9 166:4,8 181:17,17 183:13 188:14 189:7,9 210:16 211:21 213:13 213:15 218:12 242:18 272:16 285:11 324:8 324:12 325:3 339:15 340:12
**man's** 166:7
**management** 39:3
**manager** 39:3
**Mangoni** 11:3,8 55:4 108:21 109:23 110:11 110:16,19 112:19 202:3,6 208:11,24 209:1,2,8 218:10 221:2 222:17 223:17 243:9,15 249:3 250:24 252:4 252:11,11,16 258:9,24 269:15 270:15 270:20 272:13 276:21 281:23 285:4 288:12 306:1 311:6 312:17 316:21 319:21
**Mangoni's** 109:5 220:17 220:21 222:5 252:16 316:11
**manner** 10:16
**Manny** 53:20,21
**March** 35:5 194:15 205:17 208:3 213:22 216:15 217:3 258:3
**mark** 132:7 280:20 334:2
**marked** 17:22 132:9,19 273:6 280:19,22 334:6
**Market** 2:16
**Martinez** 27:17 28:5
**Marty** 53:14,23 53:24 54:16
**Marybeth** 42:1
**Massey** 242:19 242:22 244:24 244:24 245:7 250:11,11 259:12
**Matt** 1:15 4:3
**matter** 4:12 7:16 50:13 254:5
**McNesby** 11:15 11:17 55:2 130:19,23 131:9,16,18,21 167:20 269:14 319:22 324:19 324:22 326:3 344:5 347:17
**mean** 11:13 13:21,24 18:6 19:2,4,10 20:2 20:13,16 37:21 43:12 46:18 49:7 67:18 68:4 74:1 80:17 87:14 91:13 111:19 131:5 137:15 145:23 149:23 154:12 156:1 169:18 171:24 172:5 176:13 181:12 185:8 188:22 197:9 201:12 203:18 204:7 219:9 223:18 226:22 226:23 227:21 228:11 229:13 229:15 230:19 231:4 240:22 247:8 248:1,18 253:23 254:6,8 254:9,11,19 255:4,6 258:14 258:15,17 262:1 268:6 269:5 303:4,6 318:8 321:3 342:4,19 343:2 346:21
**means** 7:24 18:24 19:2,6 19:16 23:1 76:21,24 141:20,22,24 188:3,21,22,22 201:18 203:16 203:22 219:10 225:4,6 231:19 318:5 327:1,3 327:4,5,7 339:23 342:9
**meant** 207:14
**media** 42:4,12
**medical** 138:15
**meet** 9:15
**meeting** 98:14 98:15 114:20 115:3 303:13 311:12
**meetings** 38:19 38:22 98:12
**members** 41:1
**memoranda** 133:23
**memory** 131:7 237:11,15 270:22 271:12 271:17 296:12 296:13
**men** 354:8
**mental** 137:18 231:6,9
**mentioned** 5:20 15:24 16:8 34:5 43:7 54:23 178:8 215:4,5 231:5 231:12,13 298:17 346:24
**MESSING** 2:2
**met** 302:17
**metal** 34:10
**method** 164:1,5
**methodology** 127:20
**Michael** 173:22 174:11 175:9 177:16 178:17 181:14,18 183:11 185:18 186:5,14 190:14 192:14 259:24 272:1,4 273:22 287:20 288:5,8,13,20 288:21 289:6 289:16 290:7,8 314:2
**middle** 161:1 187:19 259:11 259:12 274:17 274:18 346:17
**million** 40:16
**mind** 18:16 30:22,23 218:5 219:18

**mine** 234:13
**minute** 117:14 210:11 291:1
**minutes** 9:24 214:21 216:2 338:17
**misconduct** 64:5 68:19 70:6,13
**missed** 71:18
**Monday** 357:9
**money** 24:7
**Montgomery** 35:12
**month** 209:16 210:5 213:21 217:16 218:9 324:6 325:2
**months** 34:11 108:19
**morning** 4:2,18 4:22 5:2,15 86:23
**mother** 206:9
**motivation** 189:11 258:24
**motive** 189:19
**motives** 121:13
**mouth** 256:13
**move** 23:14 51:9 75:1 88:5 157:15 161:12 170:4 213:7 241:2 260:4
**moved** 38:14 83:20 169:24 170:9
**moving** 67:11
**multiple** 27:1 55:13 71:15 271:23 314:1 344:12 353:3 354:6,8
**murder** 6:7 13:12 14:9 21:10 31:7 142:6 143:9,18 146:8 166:5,7 169:12 177:19 183:13 186:10 186:16 187:11 188:1,2,15 189:2,7,10 190:14 203:9 210:17 212:2,3 213:15 214:17 217:23 218:9 242:23 245:1 245:17 247:14 247:15 251:19 258:6,8 283:1 283:9 285:11 294:4 302:18 307:2 322:24 323:12,22 325:1,3 327:14 327:16 330:2 332:22 333:6 333:11,13,16 333:19 334:2 334:10,16 339:8,10,15 342:13,17 350:2 351:8
**murders** 58:16 166:24 197:7 219:22 284:5 344:12,19 354:10

**N**

**N** 3:2
**name** 4:2 5:16 16:5 18:21 19:3,5,11 20:5 20:9 21:24 22:21 28:1,6 38:10 41:24 128:20 142:7 142:10 145:22 146:7 166:7 167:2,6,8,11 167:15 169:12 174:20,21 175:9 177:11 180:16 186:5 190:4 194:10 199:19,20 200:14,24 201:3,5 212:3 212:6,7 215:6 218:20 243:15 262:1,9,16,21 263:11 265:19 265:23 266:3,4 266:11,14,17 266:21,22 267:9 268:6,11 268:21 269:2 269:11 270:10 271:4 281:3 285:6 290:21 297:21 302:19 302:24 307:3 317:16 318:11 318:16 319:1 319:12,14,24 320:12 322:11 322:15 323:13 324:3,4,18 325:5 339:17 339:20 340:8 340:24 342:1 342:17 343:11 346:24 356:9
**named** 6:10 23:10,22 24:2 27:16 28:4 31:6 43:1,8,9 173:22 174:11 183:11 203:7 206:8 211:22 213:13 242:18 299:7 323:22 339:16 341:2
**names** 37:16 41:12 150:22 151:18 159:12 181:12 243:21 259:24 318:6 325:20,22
**naming** 294:2
**National** 38:21
**natural** 40:24
**nauseam** 213:7
**Navy** 34:1,3,12 34:17,21
**near** 118:16
**necessarily** 200:3 221:17 296:6 303:4,6 340:2
**necessary** 50:16 82:18 232:13
**need** 6:18 8:19 9:7,11 30:12 61:16 64:21 82:15 86:19 92:15 108:6 109:1 127:11 129:21 137:22 138:15 141:16 142:8 148:5 156:1 160:8 164:8 171:1,3 171:4 173:4,8 186:6 196:5,11 198:23 215:22 237:17 242:3 253:11 254:23 286:7 321:11 331:1 352:22 356:17
**needed** 72:1 80:11,14,24 108:10 198:16 227:9 233:21 233:23 264:2
**needs** 188:23
**neighborhood** 344:23
**Nespoli** 12:4 54:19 175:1 199:21,24
**Nespoli's** 174:21
**never** 11:17 12:5 12:9,11 22:18 23:2 28:1 38:23 48:13 49:9 71:21 72:15 100:13 117:3,8 128:1 129:9 131:6 138:20 147:15 177:5 182:24 200:20 235:8 239:22 240:2 241:23 248:20 263:6 269:23 269:24 270:21 289:15,17 290:8 314:16 337:11 342:14 346:24 350:1 350:10 351:8
**new** 12:20 39:24 40:1 85:12 127:7 153:16 155:20 158:20 249:12 293:7
**news** 245:7 247:17 249:4 249:11 251:3 258:8
**newspaper** 245:16 246:24 247:14 248:19 248:19 250:9 311:16
**niece** 24:5
**night** 162:21 275:8,19
**NM** 186:6
**nodded** 225:16
**Nope** 43:12
**norm** 198:17
**normal** 169:13
**normally** 20:12 152:9 158:9 199:13 263:8 308:21,23

**North** 39:24
**Northeast** 35:15
**notary** 1:15 356:17 357:4 357:19
**note** 8:4 25:8 48:23 176:5 181:22 183:11 298:14
**noted** 31:4 190:3 356:7
**notes** 174:6,10 174:18,24 175:7,10 179:5 179:10 180:10 180:13,15 181:2,4,9,10 182:15 338:17
**notice** 1:11 13:5 43:12
**notices** 43:18
**Novack** 42:3
**November** 109:7 266:24 324:5 328:4
**NSB** 132:20 133:9
**number** 1:4 49:4 78:13,14,15 79:2,4,5,11,11 80:2,3,4,6,12 80:12 81:2,10 81:13,23 82:1 85:12 118:12 118:16,19 120:2,3 173:21 186:7 196:16 218:21 264:22 304:5
**numbers** 205:3

**O**

**o'clock** 86:22 209:14
**Oakford** 14:10 272:15 283:2
**oath** 6:22 8:1,6 54:3
**object** 8:10 19:23 56:10 73:22 90:16 97:6 108:2 115:4 116:9,22 121:5 157:10 194:23 201:20 203:10 205:20 213:4 230:23 248:9 250:15 254:17 277:2 277:16 301:17 303:16 335:7 342:6
**objection** 7:13 10:13 13:19 14:21 19:13 20:10 21:1,17 22:14 25:19 26:7,13,20 27:3,8,22,22 28:7,15 29:2,9 29:18,23 30:2 31:15 32:2,13 32:19 43:20 44:18 45:2,8 49:1 50:9,18 52:2 54:6,14 60:9 61:12,20 62:7,22 63:16 65:6,16,22 66:8,16 67:2 67:24 68:11,22 69:13 70:19 71:11,19 72:3 72:11,18 74:15 74:22 75:12 76:6 77:13,19 78:8,17 79:7,8 79:18 80:8,20 81:5,15 82:2,9 82:21 84:10 85:2,19 86:3 87:9 88:17 89:3,10,19 90:7 91:2,9,16 93:7 94:3,16 95:1,6,10,15 96:10 97:16 99:2 100:21 101:8,21 102:5 102:17 103:6 103:13,21 104:6 105:1,8 105:17 106:4 106:20 107:8 110:1,22 111:14 112:2 112:14,22 113:6,13 115:15 117:19 118:6,20 119:6 120:6,14 121:19 123:3,9 124:12 125:20 127:14 129:23 132:1 134:15 135:1,6 136:1 136:9,15,22 137:5,13 138:2 138:9,17 139:7 139:14 140:2 140:19 141:8 141:18 142:14 142:22 143:10 143:22 144:6 144:17 145:4 146:1,10,17 147:8,19 148:10,18 149:7,15 150:15 151:1 151:12 154:5 154:15 155:17 156:11 157:4 157:22 158:7 159:1,19 160:11 161:7 161:18 163:2 163:18 164:21 165:8 170:11 170:19 171:11 171:19 172:24 173:13,24 174:13 175:2 175:12,24 177:22 180:2 180:19 182:1,9 182:18 183:14 184:19 185:11 185:21 188:17 189:13 190:16 190:24 191:7 191:14 192:1 192:18 193:4 193:11 194:7 195:13 200:19 204:4 206:13 207:1,7,19 209:12,20 210:7,18 211:1 213:17 217:18 218:13 219:4 220:1,6 221:24 222:21 223:8 223:14 224:4 224:13 225:12 225:23 226:10 227:1,11,17 228:2,24 229:8 230:2,12 232:2 233:7,24 235:2 235:11 236:4 237:21 238:16 239:9 240:8,20 241:6,7,17 243:11 244:18 245:3,11,19 246:12,17 247:20 249:13 249:21 250:16 251:5 252:6,18 253:24 254:24 255:11,23 256:7,23 257:16 258:19 259:3,17 260:6 260:17,24 261:9,20 262:3 262:12,22 267:13 268:2 268:14 269:20 270:17 271:9 272:6,18 273:11 274:3 274:22 275:5 275:10,16 276:6 278:2,17 279:2,20 280:7 281:17 282:3 283:3 284:8,15 284:23 285:12 285:20 286:9 286:20 287:7 287:21 288:15 288:23 289:7 289:20 290:3 290:10,17 291:12 292:4 292:11,18 293:10 294:7 294:16 295:1 296:22 297:10 297:22 299:20 300:17 301:2 302:1 304:23 305:20 306:6 306:17 307:5 307:15 308:1 308:12 309:13 309:21 310:3 310:16,23 311:10,18 312:4,11,19 313:3,10,20 314:3,11,18,24 315:8,24 316:15 317:9 317:19,20 319:3 320:5,16 320:22,23 323:1,2 324:14

325:17 326:22 328:5,14 329:9 329:19,20 330:4 332:8,23 334:19 335:19 336:1,11,19 337:2,16 338:12 340:14 341:9 342:23 343:13 344:13 346:6 347:22 348:10,20 349:9,21 350:8 351:16 352:1,7 353:9,21 354:3 354:14,23,23 355:9
**objections** 318:3
**objective** 233:1 233:11 234:17 234:22 239:1
**obligated** 97:15
**obligation** 118:2
**observations** 247:19
**observe** 331:9 331:11
**obtain** 324:20 324:22
**obtained** 33:12 154:21 281:23 325:15
**obvious** 66:22
**occasion** 7:20
**occur** 73:3
**occurred** 14:9 75:4 126:9 186:17 188:6 348:15
**occurring** 71:3 339:11
**October** 357:20
**odd** 251:2,24
**offenses** 207:17
**offer** 76:23 258:1
**office** 10:8 15:15 24:16 25:12 26:18 28:23 29:6,17 86:12 86:18 89:1 90:1 91:14 92:13,15 99:1 114:10 131:11 132:15 133:11 133:12 134:5 134:11 135:4 264:15 265:9 308:24
**officer** 27:3 33:16 42:19 70:12 71:16 75:10,17 97:3 108:7 223:16 242:22 243:9 243:20 244:23 247:8 250:12 250:20 254:21 255:18 258:7,7 269:15 281:23 306:1 311:15 316:23,24 351:1
**officer's** 62:5 258:23
**officers** 5:23 10:11 42:20 60:4 72:16 84:1 119:22
**oh** 78:13 119:24 279:14
**okay** 7:9 16:8,21 17:1,7 23:3 30:4 53:12 88:8 99:5 114:1 117:12 124:5 126:3,14 135:17,18,18 139:12 140:1 162:15 169:10 175:21 185:10 186:10 190:9 195:18 196:12 198:22 201:13 202:23 203:4 204:18 208:13 208:19 219:15 221:11,21 226:15,17 234:9 235:8 240:2 242:1,7 242:9 253:18 280:14 284:1 294:21 304:7 321:20 329:15 331:1 332:4 333:22
**old** 24:5 39:10 168:22,23 244:23
**older** 168:17,19 169:21
**once** 9:20 47:3 84:21 89:4 195:10 196:10 234:12 339:19
**one-page** 176:24
**ones** 51:13 63:5 116:12 263:15 290:22 319:11 319:12 354:11
**ongoing** 169:15
**operate** 145:7
**operating** 145:2 253:20
**operator** 1:16 4:1 5:5 72:21 195:21 263:17 298:4 338:19 355:16
**opine** 250:22
**opinion** 52:5,9 54:5,15 81:8 108:18 129:19 226:12,23 248:15 301:20 307:17 311:22 317:3 323:5
**opportunity** 38:3
**order** 15:21
**ordered** 188:8 219:12
**origin** 205:18 207:23
**original** 220:9 356:19
**originally** 34:18 155:11 294:5
**outlandishness** 230:8
**outset** 173:20
**outside** 198:16 284:2 334:12
**overheard** 24:4
**oversaw** 116:12
**oversee** 39:7 46:4 197:14
**overtime** 170:5 321:9,10,17,21 322:6
**overturned** 14:14
**owned** 166:9

**P**

**P-69** 3:10
**P-70** 3:11
**P-71** 3:12
**P-72** 3:13
**p.m** 195:22,23 209:14 217:8 263:18,20 273:19 275:18 298:5,6 338:20 338:21 355:18 355:21
**PA** 2:17
**page** 3:4,9 23:12 25:5,7 76:20 77:24 92:2 109:3,5,11,15 109:15,16,18 109:18 131:1,3 131:3,4 132:20 132:21,23 133:1 214:7 218:4,6 220:20 220:22 242:19 244:3,4 259:11 259:13 267:9 274:17,18 275:22 276:23 283:13,14,16 283:17 293:20 293:23 295:5,9 295:15 305:5 305:17,17 307:10,11 326:13 335:11 335:13 345:4 345:14,20 346:17 359:2
**pages** 17:23 174:9 346:12 346:13 357:13
**pain** 135:18
**pairing** 167:15
**pants** 106:18
**paper** 200:14
**paperwork** 134:23 167:2 169:12
**paragraph** 178:13,14 186:3 187:17 190:11 202:1 205:12 253:8,8 273:2 289:12 304:19 340:23 342:1
**paragraphs** 133:1
**paralegal** 5:19 40:20
**Parkway** 2:10
**parole** 282:1 312:16
**part** 39:11 67:7 93:23 98:12,13

98:15 101:24 102:3,22 122:8 127:22 167:18 178:4 179:20 192:16 212:11 229:11 232:15 232:16 237:18 244:17 253:3,5 253:7 264:13 290:6 309:6 312:13 313:2,8 313:16 321:16
**participate** 61:3
**participated** 328:3
**participation** 326:17
**particular** 46:21 70:9 123:23 124:1 125:3 128:8 136:20 156:15 168:12 171:1 197:4 222:18 223:8,9 287:16 316:21 318:6,7,9
**particularly** 56:14 137:9 318:20
**pass** 98:21 99:1 123:8 164:16 165:5
**passed** 11:21 97:5 98:10,17 225:8
**pause** 30:1
**pay** 37:22 44:13 44:16 45:6 273:14
**paying** 38:1 44:24
**Pedro** 28:6 43:9
**pending** 8:21 43:15 44:3
**Pennsylvania** 1:1,24 2:4,11 4:6,12 357:5,9
**pension** 37:22 41:23
**people** 19:19 26:19 39:8 119:3,9,20 144:20 145:8 145:14 146:6 146:23 147:12 150:23 152:2 155:5 162:6 180:24 197:15 198:7,7 234:20 234:23 285:10 287:17,18 307:19 323:16 342:22 343:2 352:16
**people's** 231:6
**Perfect** 218:21
**period** 23:18 28:14 36:4,5 37:23 55:1,3 56:2 126:4 131:20 133:11 318:23 332:6
**periodically** 8:18 140:12
**periods** 127:13
**perjury** 54:2 71:17
**permission** 86:24 87:1 108:11 139:24 350:22
**perpetrator** 261:8
**person** 11:23 19:18 70:17 79:21,21 81:18 81:19 103:4 139:23 142:10 145:22 154:8 159:4 177:16 189:20 193:17 227:9 232:24 248:1 269:10 279:11 293:17 318:7 341:2 350:23
**person's** 318:13
**personal** 39:19 226:11 246:11 248:7 251:14 352:13
**personally** 63:24
**Philadelphia** 1:5 1:24 2:4,9,11 2:13,17 4:11 4:14,24 5:23 5:24 10:5 14:11 33:15 41:8,11,13 59:18 61:7 62:11 70:12 83:8,14 106:11 107:5 124:9,17 125:15,19 126:3 132:14 133:14 228:19 233:18 234:6 264:24 265:4 283:24 313:14 357:5,9
**Philadelphia's** 264:15
**Philly** 33:20 41:14,21 45:13 51:16 60:24 140:8 241:22
**phone** 2:4,12,17 9:20 11:4 13:13 253:13 293:18
**photo** 154:12 192:24 193:1 193:14,20
**Phyllis** 43:2
**physical** 22:12 233:12
**pick** 190:21 191:18,23
**picked** 219:13 272:4
**picture** 88:15 154:1 227:20
**pictures** 154:8
**piece** 24:1 200:14
**pieces** 23:20
**place** 166:18 209:9 217:23 266:10 275:3 275:14,23 331:6
**plain** 35:13 36:4 36:7
**plainly** 258:24
**plaintiff** 1:3 2:5 267:5
**plan** 253:10,15
**planning** 38:4 163:7
**played** 326:17 354:21
**playing** 228:12
**please** 4:16 9:11 17:19 25:5 29:24 73:13 107:10 109:1 196:10 204:24 213:9 254:10 254:15 280:18 335:3
**plus** 197:7
**PO** 187:23
**point** 8:21 18:11 20:22 23:16 56:3 62:17 73:14,14 98:6 99:19 103:4,19 104:12 132:22 176:6,14 232:9 261:6 302:10 302:13 333:24 334:9
**pointing** 81:11 86:1 104:2 261:7 272:1 307:13 314:1
**points** 73:19 306:15
**police** 5:23 10:5 23:10,22 24:3 24:20 32:1 33:15,20 34:15 34:20,23 35:8 37:19 38:7 39:9 41:8,10 41:15,21 51:16 59:19 60:3 61:1,7,11 62:4 62:11 70:12 72:16 83:8,15 97:3 106:11 107:6 108:7 115:22 116:6 124:10,17,21 133:10,14,15 133:15,18,19 133:21,24 134:2,6,10,23 136:19 137:22 140:8 142:7 147:24 206:9 210:15 223:16 228:19 233:18 239:2,14 240:3 241:22,24 243:9 254:21 255:18,18 258:4 264:20 269:15 306:1 309:24 310:6 310:11 315:4 316:22,24 348:8 349:3
**policeman** 208:11,13
**policies** 76:16
**policy** 134:8
**polygraph** 161:14 162:11 162:16,24

163:6,17,22 164:7,15,16,19 165:4,13 198:18,19 220:3,14 221:10,19 223:4 224:11 224:24 225:3 226:7,12,18,19 227:10 235:15 235:16 241:5 241:15,23 260:13 273:1 313:8,14,17
**polygraphed** 161:23 162:2,4 162:5 220:9,11 227:10
**polygrapher** 164:9 235:20
**polygraphs** 161:17 162:6 164:2,24
**portion** 330:19
**posing** 156:15
**position** 39:4 91:20 137:20 177:6 280:11 351:15
**possibilities** 315:15
**possibility** 295:6
**possible** 184:8 234:17,18 285:17 304:18
**possibly** 234:17
**post** 42:12
**potential** 139:5 146:22 175:14 177:17 186:15
**potentially** 69:10 95:24
**pounding** 156:18
**PP** 186:7
**practice** 61:11 110:17,19 134:9 316:13 332:13
**practices** 76:17 106:3 125:10 125:12,15 126:2,6 128:14
**precise** 187:4
**preliminary** 333:7,14
**preparation** 9:14 303:7
**prepare** 15:21 129:4 243:5,6
**prepared** 309:11 311:24 313:18 315:20
**preparer** 304:10
**preparing** 21:9 21:15 99:9,11 101:18 106:13 109:8 200:17 271:7 302:14 308:9
**presence** 327:21 327:23 331:20 334:13
**present** 1:16 2:6 49:14,18 86:14 267:1,11 282:16 322:5 327:12 328:2 328:21 329:1 332:5,7 334:17
**presentation** 67:9
**presented** 22:12 25:12 279:22
**presently** 341:3
**president** 37:10
**Presumably** 62:20 194:19 310:19
**pretty** 201:1 286:2 308:10 348:8
**previous** 17:22 127:12 179:4 204:2,2 275:22
**previously** 41:21 186:15 187:22 203:8,19 206:10 298:11
**primary** 259:14
**principle** 342:2 342:4,8,14
**print** 109:1
**printed** 245:8
**prior** 32:1 186:9 187:12 188:15 189:2
**prison** 212:1 219:10 282:1 283:21 284:1,2 293:1 354:9
**probable** 17:18 17:21 20:23 21:9 23:9 47:20 61:17 86:20 87:16 88:1 90:21 92:14,16 99:9 100:3,7 102:12 106:14 107:7 109:8,14 110:21 111:11 112:8,12 114:8 302:14 303:8 304:1,8 306:12 306:15 307:22 308:19 309:11 315:20 316:14 317:3,18 322:23
**probably** 12:1,3 12:5,18,21 15:10 21:16 33:10 40:16 91:11 93:18 107:23 109:24 110:12 139:13 152:1 193:14 193:19 201:17 201:18 202:22 269:8 270:14 271:6 297:6,8 317:6 320:15 321:12,16 337:9,18 343:11
**probation** 242:22 243:20 244:23 247:8 250:12,20 258:6,7,22 311:15
**problem** 169:10
**problems** 66:23
**procedure** 63:13
**proceed** 117:15 117:16
**process** 59:19 92:13 99:9,15 99:18 101:2,24 102:4,8,23 103:16 114:6,7 114:15 134:7 179:20,20
**produce** 135:12
**produced** 264:19,23
**product** 229:11 229:13,14
**productive** 215:14
**Professional** 1:23
**progress** 126:20
**prohibited** 1:19
**promise** 339:18
**promoted** 35:16 36:6
**promotion** 62:15,19
**promptly** 356:21
**properly** 71:1
**property** 40:4
**proposing** 64:24
**prosecuted** 6:5
**prosecution** 86:15 121:1
**protect** 72:16
**provide** 46:12 92:11 116:7 117:4 196:12 210:16 213:14 254:22
**provided** 48:1 258:13 313:1 353:17 356:11 356:16
**public** 1:15 246:7 356:17 357:4,19
**publicly** 251:19
**pulled** 186:4 192:8
**purpose** 48:9
**purposes** 322:5
**pursuant** 1:11
**pursue** 85:21 87:17 88:3,4 90:4,6 112:7
**pursued** 86:4
**pursuing** 88:6
**pushing** 213:3
**put** 48:3 52:7 53:9 107:7 111:11 129:5,7 129:13 132:13 142:9 180:17 181:23 192:24 201:7 204:8 207:13 236:21 247:12 256:12 262:16 269:11 270:23 297:16 307:23 318:16 319:1,12,14 322:11 351:14
**putting** 91:21 102:11 111:24 181:2 193:23 207:9 262:9

319:24 320:12

**Q**

**quad** 320:4
**question** 8:12,13 8:21 9:7 31:21 32:8 47:5,6 49:16 67:8 82:22 85:8 92:10 101:22 106:5 110:5,15 111:15 113:24 124:14 125:4 142:2 178:21 203:7 213:9 222:15 223:5 231:18 240:9 240:17,18 244:4 245:20 247:21 254:10 254:14,17 255:1 256:9,12 256:17 258:20 260:7,8 268:18 275:21 280:9 282:24 286:3 287:24 288:2 291:2 308:18 345:10,17 346:16,18 353:10 354:15
**questionable** 16:6 89:13
**questioned** 219:22
**questioning** 156:18 191:5 213:5,7 215:18 335:8
**questions** 39:19 73:9,10,15 99:24 112:6 114:12 126:13 152:20 176:12 209:22 210:2 210:13 212:22 215:23 216:4,9 256:15 299:2 315:16 345:19 355:12,14 356:21
**quick** 9:14 14:7 25:4 30:23 72:20 73:19 132:16 176:11 210:13 293:19 338:16
**quicker** 190:11
**quickly** 74:24 108:5 132:6 264:11 304:17
**quite** 14:8 90:13 90:22

**R**

**R** 184:1,1 357:1
**ran** 168:5
**random** 182:15
**rang** 78:6,10
**rank** 37:9 70:13
**ranking** 113:19 114:2
**ranks** 35:8 38:14 83:20 239:5
**Ransome** 173:22 174:12 175:10 175:20 177:16 178:17 181:15 181:18 183:12 185:19 186:5 186:14 189:2 189:10,11 190:14 192:14 259:24 272:1,5 273:22 287:20 288:5,8,13,21 288:21 289:6 289:16 290:7,8 314:2,7,7,15
**Ransome's** 188:2
**rate** 310:5
**re-interview** 204:9 219:16 235:22 237:1 295:22 299:19 300:13,14
**re-interviewed** 203:4,13,18,22 204:15 218:23 340:12
**re-interviewing** 204:1
**re-investigated** 114:12
**re-investigating** 15:16
**reaction** 26:5 31:16
**read** 14:1,2,4 16:2,4 17:19 18:5,7,10 23:20 30:12 31:8,10,23 32:4,6 42:5,11 74:4 109:14 115:2 131:2,4 132:4 133:2,3 133:5,7 165:23 178:10,12 179:2,3 180:3 180:4,7,9 181:14 184:3,4 185:15,22,23 186:7,19 187:17,19,20 188:16,19 190:6,7,8,12 202:23 203:1 204:1,16 205:9 205:11,13 209:17 210:11 211:19 213:22 217:17 218:2,4 218:15 222:15 239:17 242:24 243:2,5,6 244:1,3 246:7 246:9 247:17 251:23 252:2 252:17,23 253:1 259:5,22 271:21 274:14 281:12 282:5,8 282:23 283:12 283:15,17 291:1,4,14 293:22 299:23 300:4,6 301:15 305:9,10,11,12 309:18 310:21 311:7,11 312:8 326:11 329:3 330:7 332:18 335:2,6,12 341:20 345:13 345:18,21 346:10,22 347:15 356:1,2 358:1
**reading** 16:3,18 18:1 22:3 30:22 48:17 110:15 178:9 178:22 184:4 190:13 206:6 211:17 218:5 219:18 288:10 330:12
**Reads** 341:5
**ready** 242:5 309:8
**real** 30:23 40:4 176:11
**realize** 196:4
**really** 9:13 11:12 11:13 14:6 25:4 42:5 44:5 52:19 61:24 74:24 77:21 78:23 108:5 120:22 121:23 128:1,7,13 131:13,22 137:10 143:2,5 149:18 152:13 153:1 156:16 164:17 165:11 167:5 184:5 194:14 199:11 201:12 205:18 233:14 237:8 239:18 244:2 264:10 279:8 305:22 308:22 316:5 321:21 322:1 330:22 332:19
**reason** 8:24 67:13 84:14 87:17 117:24 118:18 120:3 131:8,17 155:24 156:1,2 158:16 159:14 163:9,11 169:3 169:23 199:7 201:4 227:7 259:14 262:20 263:12 265:3,7 265:11 267:19 274:7 295:24 321:17 339:4 356:4,8 359:2
**reasonable** 87:24
**reasons** 37:22 146:6
**recall** 15:11,14 39:17 48:8,9 50:3,4 56:19 58:12,19 60:16 60:18 61:22,23 61:23 62:3 63:12 64:7,7 69:19,22 70:14 70:16,23 71:2 71:13 86:16 98:22 99:4 100:5,9,12

101:2 102:14 113:18 114:7 117:6,11 125:8 125:11,14,16 129:20 131:12 145:15 147:22 148:2 149:2,3 161:20 162:1 163:14 164:14 167:13 168:24 169:1,7 170:13 171:13 202:12 240:1 259:4 316:16,18 328:17,19 341:11
**recantation** 31:1 341:21
**recanted** 30:18
**receive** 13:4 73:20 232:15 356:22
**received** 28:20 33:20 43:18 73:21 115:13 118:2 154:14 154:23 157:1 178:15 185:17 186:22 187:2 187:22 265:8 324:19
**receiving** 253:6
**reception** 46:2
**recollection** 30:9 50:2,5,20 51:6 52:24 56:7 62:9 72:6 101:11 108:14 112:3 115:6,7 116:11 120:18 127:16 128:6 128:12,15 129:8,11 130:21 131:14 131:15 143:4 152:12 162:7 166:7,11 167:14 169:1 172:13 184:11 184:13 262:6 268:8 286:5 326:4,5
**record** 4:2,4,17 8:10 30:2 48:11 72:22,24 90:8 95:10 134:1 148:14 149:5 152:18 185:12 188:8 195:22,24 208:8,21 212:19 213:12 216:8,14,21 227:2 242:18 258:20 263:18 263:21 282:13 298:5,7 310:17 338:20,22 355:18
**recorded** 236:9
**records** 152:14 186:5
**recovering** 346:5
**redirect** 69:21
**reduced** 357:12
**reference** 176:18 176:19
**referred** 168:1 269:16,24 270:1 342:2
**referring** 281:14
**refers** 217:11
**refresh** 18:15 130:20
**refused** 273:1
**regard** 55:10
**regarding** 7:5 205:16 206:2 220:3 244:9
**Regardless** 152:4
**Registered** 1:23
**regret** 353:11,12 353:13
**regrets** 353:7,16
**Regular** 269:22
**related** 19:22 260:1 264:17 317:17 323:11
**relatives** 188:9
**released** 277:12 277:15,20
**relevant** 54:15 76:17
**reliability** 84:19 118:1 119:12
**reliable** 84:16,21 84:22 85:1,15 86:5,6 90:23 111:22 227:9
**relied** 116:6,19
**relying** 66:21 164:24
**remember** 7:17 7:18 12:15 13:6,9 15:1,18 15:20 17:14 19:7 22:18 35:10 36:11 39:16 42:18,22 43:4 47:9,13 47:17,22 49:9 53:3,12 54:20 54:21,22,24 55:10 57:8,11 58:1,3,22 59:11 60:5,21 62:11,14,18 70:5 74:8,9 75:17 76:3,9,9 76:12,14 83:10 83:11,13 88:23 99:14,15,16,18 99:22 100:10 100:13 101:7 101:24 102:2 103:15 106:16 117:6 123:19 124:1 125:6 126:2,4,5,6,8 126:17 127:24 128:1,7,13,22 128:23 129:17 130:16,17,22 139:3 143:3 161:22 162:13 162:15,18,20 164:24 165:18 167:21 168:8 169:17,18,19 169:20,22 170:2,14,21,24 171:2,3,6,13 173:10,17 183:2,8 184:18 184:18,22 194:16 199:10 199:23 202:5,5 202:7,9,10 209:7 220:13 220:15 221:19 225:7,14 235:18,21 236:23 237:9,9 239:21 246:4 251:16 270:21 270:22 271:1 271:22 274:10 274:12 279:5 283:22 289:2 296:7,9,10,14 297:2,2,3,5,20 298:1 299:13 309:3,4,5,5 323:22 325:11 328:24 337:21 339:1 341:14 341:19,20,22 341:23
**remembered** 113:11
**remembers** 220:18
**remind** 98:20 168:16
**rendition** 20:3
**rent** 40:2
**reopen** 169:3
**reopening** 39:14
**repeat** 9:8 94:9 110:5 113:24
**repeated** 264:3
**repeating** 156:14 246:9 247:16
**rephrase** 92:9
**report** 3:10 63:8 63:10,11,14 64:2,4,11,16 65:5,11,20 66:6,14 69:17 97:11 132:13 132:17 205:16 206:2 207:16 208:3 216:15 216:17 217:2 235:16,19
**reported** 64:12 64:21 69:24 202:13 206:9 206:21
**reporter** 1:14 5:6 357:4
**reporter's** 29:21
**Reporters** 1:23
**reporting** 202:10,11 246:7 326:20
**reports** 68:17 246:10 247:14 269:11
**represent** 5:17 5:21 23:24 174:5 211:21 282:21 333:11 340:19 342:11 343:18,20 345:1 347:13
**representation**

84:6,12,15 135:7 303:3
**representations** 354:16
**represented** 6:14 298:19
**Representing** 2:5,13,18
**reprimand** 69:20
**reproduction** 1:18
**request** 36:17 75:6 162:6,11 197:23 198:1
**requested** 162:8
**requests** 134:9
**require** 165:19 356:21
**residence** 190:21
**resisted** 134:11
**respond** 27:3 67:5
**responding** 73:8 149:21
**responsibility** 51:9 63:7 64:4 68:8,20 97:4 317:7,12,13,13
**responsible** 49:11
**restaurants** 12:22
**results** 164:12 226:18
**retained** 4:3
**retaining** 291:10 291:14 330:12
**retaliation** 146:14
**retire** 36:22
**retired** 242:22
**retirement** 192:8
**retract** 31:24
**Return** 356:19
**reveal** 244:6
**review** 16:12 21:6 23:3,5,13 46:23 47:4,10 47:16,19,24 98:10 100:4,24 101:14,19 102:21 103:2 103:19 127:18 128:2,11,19,21 129:13,17 130:7 134:12 166:2,14 170:17 176:11 179:17,22 184:15,23 185:5 194:13 200:12 281:8,8 343:19
**reviewed** 14:17 17:10 21:12 101:5 183:5 200:17 202:19 268:4 322:20
**reviewing** 22:3 100:10,13,20 106:14 128:23 197:1
**reviews** 47:18
**reward** 24:7
**rich** 348:23
**ridiculous** 123:14
**right** 8:22 9:12 14:20 16:15 17:2 19:22 20:24 21:11,24 22:22 23:17 27:12 36:23 46:16,24 47:11 48:1 49:12 51:10,19,22 52:1,12 59:16 62:21 63:4,8 63:15,21,24 64:2,21 65:5 65:20 77:2,11 78:4,15 80:2 80:18,19 81:13 81:21 82:1,7 82:17 83:18,21 85:8,17 86:1 86:12,15 87:6 87:23 88:9 92:17,21 93:3 93:13,16,21 94:1,2,7,10,13 95:5,13,21,24 96:3,6,9,15,17 98:8 99:13 101:16,20 103:3,11,20 104:4,24 105:15 107:19 108:8,22 109:11 111:24 114:21 115:24 116:8,21 117:18 118:3 118:19 119:21 120:4,12 121:4 121:13,17 123:1,8 124:10 124:18,22 125:19 126:15 126:21,24 127:4,5,8,13 129:22 130:5 131:19,24 132:22,23 135:24 136:7 136:24 137:7 137:11,20,24 139:6 140:14 140:17 141:7 142:12,13,20 143:9 144:5,16 145:12,19,24 146:7,15,22 147:3,7,13,17 148:1,9,17 149:6 150:14 150:20,24 151:10 152:6 152:16,23 153:4,6,13,14 153:18 154:4 155:15,23 156:10 157:16 157:20 158:3 158:12,21,24 160:1,4 164:8 164:16,20 165:5,22,23 167:3 171:9 172:22 174:22 175:23 178:13 178:18,19 184:23 186:17 187:7,12,15 188:4 189:7,12 189:20 190:1,4 190:15,22 191:5,12,19,24 192:7,9,17 194:6,22 195:12 200:5 201:4,19 203:9 205:7 206:23 207:18 208:4 208:22 209:10 209:18 210:5 210:17,24 217:12 219:9 219:23 221:23 223:17 224:12 225:3,10,21 228:9 229:7 230:22 231:3 232:1,12,24 233:6,13,23 238:13 239:3,5 239:8 241:5 243:10 244:17 245:1 248:7 250:22 258:1 259:1,15 262:2 265:5 266:18 270:11,16 272:12,23 273:1,6,18 274:14 275:3 276:14,20,21 277:1,7,15 281:5 283:19 284:6,13,22 285:4,11,19 286:3,7,8,14 287:6,14,20 288:22 289:18 290:1,15 291:6 291:9 292:1,3 292:10 293:8 294:6,14,23 299:8,11,19 302:11,15,20 304:11 305:7 305:11,19 306:2 307:24 308:11 310:22 311:8,17 313:9 317:8 319:23 322:14 323:15 324:18 325:16 326:21 327:6 327:19 328:8 328:13 329:2,8 332:7 334:23 335:23 337:1,8 337:15 339:11 339:14 340:8 340:10,13 341:4 342:15 343:12 344:12 344:18,23 345:11 346:10 347:21 349:8 351:3,10 356:2
**rights** 94:22
**ring** 77:7 130:15
**rise** 80:23
**risk** 224:1 246:8 246:16 349:17
**robbery** 6:8

**Rocks** 10:22,24 55:22 281:22 288:11 291:18 292:16 293:16 293:20 294:1 294:13 297:7 299:7,10,15 311:7 319:20 326:3 327:19 331:19 335:16 336:9,17 337:22 338:1
**Rocks'** 293:21 300:6
**Rodney** 23:10 23:22 30:16,21 203:2,8 204:20 205:17 206:3 208:21 213:13 217:2,15 241:2 243:19 252:5 252:12 259:13 260:1 281:10 281:14 282:13 283:7 287:19 291:9,20 292:2 294:23 295:6 299:8 305:18 305:24 306:13 344:18
**role** 18:16 39:1 45:15 61:8 354:21
**roles** 326:17
**room** 97:24 278:20 303:21 303:23 349:5 350:17
**Rosen** 12:15,16 12:19 302:17 303:10
**rosters** 322:8
**roundtable** 51:2
**routinely** 133:13 134:6 135:3
**RUDOVSKY** 2:2
**rule** 97:22 98:21
**rules** 61:10,16 61:23 70:18 106:2 116:5 356:21
**ruling** 26:3,5
**run** 120:10
**running** 38:20 310:13 319:10

**S**

**S** 3:7
**Santiago** 53:20
**sat** 71:8 114:10
**Saturday** 291:18
**saving** 40:7
**saw** 12:22 13:21 16:4 44:4 70:17 79:3 118:13 119:24 128:1 135:13 142:11 154:3 178:1,18 179:4 207:9,12 243:21 285:14 312:22 318:10 336:7 340:11 344:18,20
**saying** 22:23 23:1 79:13 80:13 81:18,19 87:23 111:10 112:10 119:9 120:4,17 122:1 122:14,23 123:6 150:6 151:15,20 158:1 179:24 181:7 198:18 214:4,5 223:6 225:14 230:9 234:21,24 237:4 250:8,11 250:12,23 252:21 256:21 257:19 258:9 285:19,24 288:11 290:1 293:8 296:10 311:16 330:15 332:2 336:8 342:18 347:1 348:1
**says** 20:20 21:21 21:24 22:1 77:10 80:3 85:11 110:11 110:13,14 119:24 120:12 121:14 142:7 142:11 153:21 153:24 159:15 175:16,19,20 178:4 181:12 181:14,16,18 181:20 185:6 185:17 186:1 186:22 187:5,6 187:13 188:11 190:13,18 191:2,11,16,18 191:20 203:14 203:17 206:20 206:21 207:8 207:15,18,24 208:5,23 209:13 210:9 210:21,23 211:6,11 217:6 217:14 218:17 219:24 220:10 222:3,6,10 232:19 244:21 245:5,13 252:9 252:11,12,14 252:20 253:1 253:10,11,13 254:22 258:4 259:13,16 264:22 272:9 272:20 273:3 273:18,19 275:2,7,19 277:4,20 279:14 281:5 282:15,16,22 287:19 288:9 288:14,18 290:7,8,12,14 290:16 291:8 291:17,22 292:14,22,24 293:5,6,14,20 294:1,11,13,20 295:5,8,9,18 295:23 302:12 302:18 305:24 306:19,20 324:21,21 325:19 327:11 327:17 328:9 328:23 332:5 335:6 339:21 341:12 346:2 346:18
**scared** 146:14
**scenario** 79:19 83:2 87:12 91:19 143:15 255:14 257:22
**scene** 45:23,23 47:11 118:15 119:21,22 150:8,19 151:10,20,22 152:2,3 166:21 193:2 197:10 197:11,13 304:21 305:6 315:6
**scenes** 146:23
**Schneider's** 174:20
**school** 33:23 41:20,20
**screaming** 150:1 150:6,9
**scroll** 346:12
**search** 86:22
**seat** 106:18
**second** 7:6,9 30:2 178:12 202:1 218:5 243:1 274:17 274:18 283:13 283:14,15,17 293:19 305:5 341:24 345:10 345:13,17
**section** 59:14 132:22 133:9 168:14
**Security** 37:23 38:2,2
**see** 18:21 23:8 25:11,15 48:19 69:11 70:11 126:1,14 147:7 167:1,10 169:12 174:20 174:21 177:20 178:4 189:6 199:20 200:21 204:8 212:15 215:8 216:7 237:2 243:8 246:16 253:5,7 253:16,17 263:5,14 264:21 266:11 266:12,18 267:1,16 270:10 277:17 279:19 288:8 298:3,3 304:10 306:14 307:7 308:8 318:5 325:5,10,18 331:5,6,7 332:10,11 338:18 339:16 342:1 352:22 354:18

**seeing** 21:8 167:6,7
**seek** 86:18
**seen** 10:16 11:16 31:11 118:17 119:21 161:13 192:12 201:5 201:10 236:24 246:2 259:20 259:22 265:23 327:11
**seldom** 135:13
**send** 90:11 112:6 139:1 295:10
**sending** 197:15
**sense** 65:8,10 79:13,16,20 92:5 107:1 124:3 125:2 151:15,17 178:6 181:5,7 181:8 196:22 199:21,22 211:14,15,16 229:22 238:24 240:15,16,17 243:23 247:1,7 250:10 253:2,3 255:15 256:2,4 257:21,23 263:11 292:1
**sent** 13:22 16:1 295:13
**sentence** 179:1 185:16 202:24 205:18 217:7 277:11 282:8 288:6 291:17 292:1,24 305:24 326:12
**separate** 174:10 270:3
**sergeant** 5:1,15 14:18,22 15:4 18:24 19:14,24 20:11 21:2,18 22:15 26:21 28:8,16 30:1 31:16 32:3 35:16,18,22 37:19 41:14 42:21 44:19 45:8,21 48:16 49:2,21 50:10 52:3 54:7,14 56:4,4,11,23 57:2,23 59:8 61:13,20 62:23 63:7,17 65:7 65:22 68:12 69:14 70:20 71:11,20 72:4 72:12,18 73:2 73:23 74:16 75:13 76:7,18 77:14 78:9,18 80:8 82:9,22 84:11 85:4,19 88:18 90:17 93:8 94:7,17 95:17 96:11 97:7,17 99:6 100:3,22 101:9 102:18 104:6 105:9 106:5 107:10 110:2 115:5,16 116:10,20 117:20 118:21 119:6 120:6 121:6,7,20 123:10 124:16 124:21 125:21 127:15 132:2 134:17 135:8 136:2 137:13 140:3 141:9 142:15 143:12 146:2,17 147:20 149:8 151:2,13 154:6 156:12 157:23 159:20 161:19 164:22 170:3,8 170:12 174:1 174:14,20 176:6 180:2 185:21 188:18 189:14 192:19 194:24 196:2 198:5,8 202:16 204:5 205:21 209:12 210:19 213:17 217:19 218:14 219:5 220:6 224:8,9 226:1 227:12 227:18 232:3 233:8 234:1,7 238:17 239:4 241:8 242:7,10 244:19 245:20 246:13 247:21 248:10 251:6 252:7 255:1 259:4 260:9 262:13,23 263:9,23 267:14 268:3 269:1,3,8 272:7,18 274:4 275:16 277:3 277:17 278:3 279:21 281:5 281:18 283:4 284:24 287:8 289:8 292:19 293:11 294:8 296:23 297:23 298:9 304:24 305:21 306:18 307:6,16 308:13 316:1 316:16 317:21 319:4,9 320:4 321:15 322:10 324:15 325:18 326:23 327:18 327:24 328:15 329:10,21 332:24 336:12 338:24 341:10 342:7 348:11 349:10 350:9 351:17 352:1,8 353:10 354:16 354:24 357:6 358:8
**sergeant's** 19:11 20:5,8 196:24
**sergeants** 318:21
**series** 42:19
**serious** 51:21 65:14 163:15 317:7
**service** 125:18
**set** 190:20 191:11 198:19 318:2 333:8
**setting** 191:23 221:19
**seven** 40:24 132:21,24
**share** 54:9,12
**shedding** 322:18
**sheet** 3:11 18:19 19:5,12 20:2 20:21 21:23 22:22 34:10 126:19 127:18 127:21 128:9 128:19 129:4 135:14 167:7 175:22 176:9 177:13 178:2 179:1 183:20 183:21 189:22 189:23 196:15 200:5,15 201:24 202:20 202:24 218:19 219:19 225:2 235:23,24 236:10 237:6 237:13,13,17 262:2,17 264:9 264:9 265:22 266:2,6,16,20 273:4,5,9 274:2 277:9 281:9 289:5 291:4 299:6 302:8,16,20 304:2 318:5 319:11 324:3 325:14 326:8 329:16 339:17 339:20 340:7 356:5,7,9,13 356:19 359:1
**sheets** 16:1,9 17:5 18:17 47:24 48:2,5 48:13,22 126:15,17 127:21 128:2 128:17 129:12 129:21 130:5 131:22 132:23 133:11,14,15 133:18,19 134:1,7,10,21 135:12 177:12 200:17 212:7,8 212:10 215:3,6 215:7 236:22 262:10 267:10 268:7,11,21 269:4 270:7 271:5,8 281:2 290:20 302:22 317:16 319:18 319:20 321:7 321:20 322:4,8 323:14
**Shelley** 12:20,21
**shifts** 58:20
**shit** 205:3 322:2
**shocked** 166:12

**shoelaces** 348:23
**shoot** 79:4 120:1 142:11 189:11
**shooter** 79:1,3 118:14 141:5 173:23 175:15 183:12 194:4 293:3,9 314:23
**shooting** 118:13 272:14 275:2 275:13,23 276:16,17 289:14
**shop** 34:10,11
**shore** 16:15
**short** 23:18 55:1 55:3 133:1
**shorthand** 357:11
**shot** 22:6 120:4 166:10 181:17 188:1 304:22 350:16
**shotgun** 207:13
**show** 25:3 50:24 76:24 78:2 84:8 130:19 154:1,9 193:1 263:1,3 264:10 265:16 273:5 324:1
**showed** 237:1 243:15 250:9 250:18 258:7 268:6 270:7 281:3 290:20 290:22 302:8 312:22
**showing** 176:15 177:11 215:9
**shown** 47:20 84:21 245:16 246:24 247:13
**shows** 85:13 186:9
**side** 319:8
**sign** 331:21 356:8,10,15,16
**signature** 356:18 358:13
**signed** 331:18 331:19
**signing** 356:12
**silence** 72:10,10
**similar** 43:9
**simple** 207:17 207:20 208:2 217:11
**simply** 179:22
**single** 66:21 70:15 108:13 233:12 260:12 344:11
**sir** 22:2,5 42:4 44:2 124:3,6 125:9 132:13 135:17 156:22 179:22 180:7 211:21 212:4 212:24 213:11 214:13 234:14 256:15 265:2 267:7,23 268:18 322:1 331:14
**sister** 276:1,11 279:15,18
**sister's** 206:22
**sit** 50:1,4,22 69:10 328:11
**sitting** 22:2,5 24:8 49:22 50:3 51:4 91:23 119:16 149:4 171:15 251:17 274:10 280:3 287:5
**situation** 45:5 45:18 55:6 68:6 90:15 91:23 97:10 137:10,24 138:7 139:17 140:9,24 143:14 158:14 160:20 161:10 163:21 193:22 193:23 238:6,7 247:7 249:10 250:21 261:18 263:8 279:10 280:1 287:16 297:2,13,15,16 297:19 300:16 301:10,12,13 301:14,16 308:22 330:24 345:2 348:8 349:16,16 350:11,22
**situations** 91:19 198:8 239:19
**SIU** 168:4,5,6,10 197:16 269:16 269:23 270:1,3
**SIU's** 168:6
**six** 188:2
**skip** 187:18 343:19
**sky** 230:15
**slash** 263:9
**small** 16:3 109:2 166:8
**Smith** 120:1,4 120:11,21,24 141:3,6 142:5 142:9,12,18 153:24 154:1 159:13
**Smith's** 142:13
**social** 37:23 38:1 38:2 42:4,12
**SOLICITOR** 2:10
**solicitor's** 264:15
**somebody** 20:7 20:17 21:13 46:20 60:19 80:17 81:4 104:22 122:23 123:6 128:7 135:23 136:13 136:20 137:3 142:6 143:20 144:1 148:16 148:16 150:1 152:8 154:9 156:2 158:15 162:4 163:8 171:2 172:15 175:6 181:12 186:12,13 187:7 189:1,4 191:22 201:8 204:9 228:13 228:15 232:19 236:12 250:9 297:7 300:3 311:11 321:13 350:5
**somebody's** 20:3 48:21 194:10
**someone's** 104:12 163:16 226:6
**somewhat** 18:14
**soon** 215:15
**sorry** 30:3 32:15 49:17 89:22 94:5 99:4 132:19 135:19 143:11 145:16 187:2 200:1 204:24 209:2 214:12 221:6 290:21 319:4 338:5
**sort** 35:7 38:16 109:2 237:19 253:19 289:24 307:1
**sought** 134:12
**sound** 14:20 21:11 77:2 123:12 136:24 137:7 167:2
**sounds** 15:7 32:6 101:6,13 114:19 186:12 224:7 253:18 294:11 326:19 343:6 348:2
**source** 141:4 178:16 185:18
**South** 1:23 2:3 14:11
**space** 356:11,16
**Spanish** 55:12 208:16
**speak** 6:18 9:17 131:13 234:3 242:2 351:19
**speaking** 251:14 335:1 345:9
**special** 33:18 52:23 168:1
**specific** 8:11 46:2 48:15 59:2 99:24 105:23 126:13 134:9 140:7 183:4 224:17
**specifically** 113:15 135:11 229:19 292:16 295:9 306:16 307:3
**specify** 229:18 332:4,6
**speculate** 349:13
**speculating** 211:7
**speed** 177:10
**spent** 48:14,14 212:1 354:9
**spinning** 16:16 16:24 214:9 231:11 330:13
**spoke** 11:23 12:9

12:11 83:24 242:23
**sports** 42:5,13
**sprawling** 126:23
**Springs** 43:1
**squad** 15:5,6,8 15:10 28:13 45:18,18,19,20 45:21,24 46:5 47:1 49:21 52:18,18,21,22 53:2,4,4,9,10 53:19,21 55:1 55:3,6,7 56:3 57:15,18 58:4 58:5,13 59:12 117:16 127:11 167:23 168:10 168:17,18,19 168:20 169:5 170:9 172:12 197:3,5,16,18 197:19,23,24 198:1,8 199:5 202:11,13,16 202:17 269:18 269:23,24 308:22 320:8,9 320:10 322:9
**squads** 52:17 55:14 169:24 269:9 322:10
**Square** 2:16
**Squirt** 288:7 293:2 346:23 346:24 347:2,4 347:4,5,5,6
**Squirt's** 346:24
**staff** 138:16
**stamp** 345:5
**stamped** 133:9 264:23
**stand** 56:8
**stand-up** 54:17
**standard** 63:13 64:8 286:2
**standards** 145:3 145:7
**standing** 27:22 180:2 185:20
**start** 17:17 34:23 35:22 38:4 53:8,9 58:5 109:12 173:19 178:13 222:8 244:11 346:16
**started** 5:16 6:19 38:9,13 63:4 73:6 177:11 350:17 352:18
**starts** 25:9 244:5
**state** 139:6 220:21 283:21
**stated** 292:24 306:20
**statement** 3:12 31:8 118:13 134:3 204:21 205:4 210:12 217:15 220:4,9 227:8,16 236:11,14 242:21 243:24 245:18 247:15 248:5 249:4,5 250:3,12 254:21 259:21 260:2,12 266:24 267:4 267:17 274:1 274:15 277:13 281:10,14 283:19 285:9 293:18 305:17 305:19 306:13 310:20,21 311:5,15 314:8 326:16,21 327:5,10 328:20,22 329:1,6,15,17 329:18 330:6 331:2,4 332:18 332:22 334:17 336:5 346:19 347:12 352:12
**statements** 31:24 133:22 287:14 328:17
**States** 1:1 4:5 34:1
**stayed** 202:8
**staying** 293:3
**step** 160:24 291:16,16
**stepchildren** 40:24
**stepped** 349:5
**steps** 69:2 133:17
**stock** 40:11,16
**stop** 22:2 66:18 205:11 259:20 335:12 352:17
**storage** 188:8
**store** 166:8,9 276:14,16,20 276:21
**straight** 107:17
**straighten** 295:7
**street** 1:12,23 2:3,11,16 4:11 150:2 152:7 190:22 191:19 283:2 297:21 357:8
**Streets** 188:7
**strike** 251:1
**study** 63:2
**studying** 62:14 62:18
**stuff** 10:17 11:6 38:20 46:3 52:23 170:4 179:7 200:5 211:17 279:9 321:18 344:23
**stupid** 203:6
**subject** 36:10 356:12
**subject's** 109:22 110:10
**subpoenaed** 107:20
**substance** 356:3 356:6
**substantial** 235:5
**substantiate** 64:6
**success** 199:6
**sued** 10:11 42:15,20 43:2 44:7
**suffering** 9:2
**sufficient** 237:14
**suggest** 51:5 136:19 215:15
**suggested** 31:5 299:15,18
**suggesting** 136:12 221:20
**suicide** 346:5 348:16 349:2 350:6
**suing** 44:9 75:18
**Suite** 1:12,23 2:3,16 4:11 357:8
**summarize** 74:6
**summarized** 305:14
**summary** 307:8
**supervise** 49:24 50:16 53:2 55:17 56:6 354:1
**supervised** 27:1 27:20 36:12 51:13 54:22 55:24 71:8 72:2 102:3 108:21
**supervising** 14:19 15:4,7 19:1 20:17 23:15 49:11 53:12 54:20 57:24 59:11 100:18,19 116:20 167:3 171:9 172:19 192:5,7,9,16 199:23 200:8,9 201:14 268:13 269:10 270:14 271:6 303:11 320:2 321:3 323:13 339:24 340:2
**supervision** 6:3 28:20 46:7 65:2 66:4,21 67:11 68:18 69:23 72:1 101:15 102:16 113:16 117:4 131:19 135:21 138:23 144:24 202:4 260:20 286:19 301:8 337:12 353:17
**supervisor** 19:18 19:21 20:13,14 45:15 46:4 57:15 102:3 107:18 116:16 129:16 149:4 159:11 160:24 162:9,10 169:5 171:21 172:1 183:3 198:3 201:9,10 224:21,22,23 269:9,10 270:15,20 295:10,13

296:15 300:2 303:22 318:8,9 318:13,16,17 321:2 353:5
**supervisor's** 318:6
**supervisors** 48:6 56:20 57:12,17 70:2,3 100:2 196:19 295:20 303:21 320:13
**supervisory** 61:8
**support** 198:10 198:11 232:17
**supports** 98:7 284:19
**supposed** 138:6 239:24
**sure** 10:19 11:9 14:24 23:3,19 35:6 36:2 41:3 49:10,13 51:11 51:14,23 52:13 52:16,19 53:13 53:17,18,22 54:21 55:5,15 56:17,22,24 57:1,4,7,20 58:9 59:10 67:20 77:24 84:23 89:15,23 90:13,22 91:7 93:22 97:4 103:1 106:12 108:12 114:18 123:2 124:11 129:9,20 139:24 142:3 144:2 145:20 156:6 162:14 162:17,24 163:8 169:7 191:11 217:1 249:12,15 250:6,7 251:13 259:9 267:21 313:16 321:14 349:1 350:11
**Surely** 19:21 116:6
**surprise** 167:10
**surprised** 26:11 308:24
**surprising** 167:6 167:8,16
**surrounding** 7:12 79:10
**surveillance** 190:20 191:11 191:23
**suspect** 49:15,18 65:3 66:5,12 77:5,18 78:12 80:2,3,4,6 81:2 81:10,12,12,23 82:1,6 85:12 85:24 86:10 87:8,24 88:1 90:22 100:11 101:20 102:22 118:14 140:9 142:20 145:19 155:20,22 157:15,17,20 158:3,4,19 159:14 161:5 162:16,23 175:14 177:17 186:16 189:19 204:1 236:8,15 236:17 273:23 294:4 342:5,13
**suspect's** 161:5
**suspects** 64:19 105:14 323:20 343:5
**suspicion** 87:24
**sustained** 60:22
**swear** 5:6
**sworn** 5:9
**system** 257:11

**T**

**T** 3:7 357:1,1
**tab** 18:16 25:5 30:20,24 132:6 174:4 204:24 270:8 277:10 280:18 282:11 290:20 327:9 333:23
**table** 114:23
**take** 8:7,17,18 15:11 35:4 57:15 59:15 69:2 80:10 109:10 113:22 117:13 122:8 126:24 127:7 132:6,16 135:17 153:24 154:8,9 157:20 165:20 169:3 170:8 171:16 171:22 172:1,3 172:5,8,12 174:8 193:20 195:20 204:13 205:5,9 209:3 210:11 214:13 215:15,21,22 232:14 235:1 236:11,14 239:3 242:3,6 242:24 243:24 244:9 251:22 263:16 270:6 273:1 276:24 280:17 291:1 291:16 293:19 298:2 316:20 319:9 327:12 338:15 340:22 345:13,17 346:1 347:14
**taken** 1:11 109:6 133:17 155:10 172:19 208:24 235:15 236:17 267:4 357:7,11
**takes** 101:2 136:6 209:9
**talk** 12:24 24:12 45:12 67:21 76:16,18 90:11 99:8 135:15 140:11 142:8 147:13,16 148:5,15,16 150:9 151:22 151:23 152:4,5 152:8,16 153:13 158:4 160:1 171:8 174:10 192:15 193:17 194:11 198:24 215:16 238:12,14 242:15 243:1 260:22 266:7,8 274:15 278:23 279:18 280:4 288:20 289:5 294:21,22 323:9,11
**talked** 10:4,10 10:15,22,24 11:4,7,10,17 12:16,19 13:13 30:14 71:16,16 74:1 75:9 103:18 126:14 151:9 155:5,22 159:11,13 239:23 251:2 279:24 286:7 316:10 339:9 341:15 344:9
**talking** 14:7 18:9 51:17 58:3,4 61:24 64:23 69:6 73:7 82:17,19 85:10 95:8,12 104:13 109:13 129:1 130:8,9 131:7 135:21 145:16 149:18 151:21 159:15 165:5 183:7 236:12 244:8 250:1,3,6 263:2,3 274:1 278:1 284:5,11 284:20 292:3,9 292:16 294:3 299:5,14 304:1 319:17 327:17 332:20 347:16 350:17 353:12
**talks** 305:18
**target** 59:21
**task** 38:19
**Tasker** 293:4
**taught** 83:7 241:21,23
**teenager** 31:5
**tell** 7:10 11:23 16:14 21:3,19 32:3 33:2 45:14,19 64:10 65:18 70:2 87:5 88:2 89:12 113:15 113:20 114:3 118:15 121:2 121:14 122:2 122:22,23 125:5 130:12 130:21 159:22 160:2 161:16 165:6,23 172:22 174:14 179:18,23 196:23 199:17 205:6,21 206:15,18 211:13 212:16 212:21 214:24 219:2 224:18

228:14 232:23 234:15 247:24 252:7 272:7 277:3 281:18 281:20 282:3,5 283:4 284:24 286:2 288:6,21 289:8 292:20 305:1,21 307:6 324:15 330:13 333:1 336:12 337:11 343:21
**telling** 67:4,14 78:5 85:14 92:7 105:5,6 122:19 125:5 162:15 177:21 181:11 184:2 211:18 212:13 222:10 231:5 237:8 243:16 247:18 275:12 294:2 336:14 345:23 347:3 349:3
**tells** 114:21 172:15 218:10 258:23 276:19 276:20 289:16
**ten** 216:1 338:17
**tends** 76:24 78:2 84:7
**terms** 195:5,7,18
**test** 34:18,19,20 63:3 241:5 244:9 277:1
**testified** 5:10 6:22 7:1,8,11 96:14 189:9 221:2 335:15 338:1 341:17 343:23 344:1,3 347:18
**testify** 7:24 59:9 241:3 334:11 335:16 336:9 338:2
**testimony** 3:13 9:1 30:18 31:4 196:12 220:21 231:15,20 255:20 256:20 257:2,2,4,7,8 257:13 258:10 260:14 264:6 300:6 334:12 335:2 339:5 344:1,8 347:15 348:4,6 356:11 357:6,10,15
**tests** 62:15,19 239:3,7,16
**th** 90:8
**Thank** 73:18 221:11 356:23
**theirs** 128:9,18
**theories** 317:15
**theory** 87:23 94:1 98:8 188:13
**they'd** 112:6 158:14,16 160:21
**thing** 18:10 79:21 81:18 105:21,22 119:13 121:12 121:17 156:19 198:24 199:18 204:16 211:14 228:6 229:4 230:19 234:21 244:1 247:1 248:22 294:11 310:13 313:13 327:11
**things** 8:5,15 39:6 42:17 43:9 46:16 62:13 64:9 84:20 88:13 93:19 119:9 132:16 133:16 134:22 143:2 143:15 177:7 177:11 179:8 179:12 185:2 196:16 201:5 202:2 212:21 228:8 229:5,17 230:9 231:8 232:21 242:2 242:14 247:17 258:15 262:10 298:19 318:14 332:16 343:20 345:3 353:1,4 353:4
**think** 14:24 16:5 16:7 17:16 18:3,8 23:4 31:14,18 33:8 35:5 37:14 38:1,5 41:16 42:9,16,20 52:7,19 53:21 55:6 57:3,6 68:23 70:4 72:19 73:15 80:13 88:11 94:9 107:3 113:4,11 117:7 117:12 119:14 143:24 156:1 159:6,15 160:8 163:4,5,13 166:23 168:13 168:13,14 184:14 185:7 194:5 205:7 207:18 224:1 225:1 227:7 229:3 232:13 232:13,15 233:22 242:14 243:2 257:5,8 260:2 261:17 262:20 263:12 264:1 265:2,16 266:7 270:7 273:10 278:19 281:9,13 283:24 296:6 309:24 311:24 312:15 313:13 313:17,24 315:23 318:20 322:22 330:9 335:18 336:2 338:4,8 346:17 350:4,20 351:13,21 352:3,11,16,18 352:19,21,23 354:20
**thinking** 287:1 321:16
**third** 23:12 253:8 305:17 305:17 307:10 307:11 346:17
**Thomas** 43:3
**Thompson** 16:6 16:7 19:7,8 167:12,16 199:20 263:7 270:24 320:9
**Thompson's** 167:8
**thorough** 155:14
**thought** 78:6 149:24 209:6 233:21 243:21 296:11
**thoughts** 48:24
**threatened** 206:22 352:6
**threatening** 66:4 66:11 137:2
**three** 14:13 17:23 25:5,8,8 31:11 40:16 95:16 118:14 119:3,9,20 120:16 121:2 152:2 174:10 197:6,6 267:10 318:20 322:10 325:20 342:16 345:14
**throw** 234:22
**throwing** 125:2 248:17
**Tilghman** 24:3 30:16 31:2 341:3,16 343:7 343:23 345:2
**Tilghman's** 31:4
**time** 4:8,8 7:16 8:17 10:21 11:7,23 12:16 13:8,10,17 14:8 15:8 20:22 23:18 27:14 28:20 30:7,13 31:5 33:13 35:4 36:3,5 37:15 37:24 47:7 48:14,14,16 51:7 53:1 55:1 55:3,14 56:2 57:22 66:13 70:15 72:20,21 72:23 75:20 79:23 98:1 108:13,22 111:10,23 116:5 125:6 131:19,20 149:3 152:13 159:6 162:12 163:14 165:1 170:3 177:4 183:5 192:6 194:17 195:21 195:23 197:4,8 201:11 208:12 208:18 219:16 222:18 223:8,9

223:17,21 235:8 237:10 239:2 240:2 241:11,13 243:24 263:15 263:17,20 264:18,21 269:8 276:15 278:6 281:24 282:17 283:18 286:6 289:14 296:18 297:17 298:4,6 302:10 309:9 316:22 318:23 320:4 323:15 324:13 332:6 335:8 337:20,21 338:19,21 339:12 340:10 341:7 342:21 347:3,14 350:16,18 351:3 355:17
**timeline** 14:6,20 216:13
**times** 6:23 7:4,5 7:11 9:19 11:5 37:16 55:9 95:16 188:2 194:10 261:3 265:14 273:14 330:11 339:23
**tinnitus** 9:2 231:10,12
**tip** 141:4,23 145:18,21
**tips** 140:11,13 173:21 178:18 259:23 271:23 277:23 314:1
**tired** 298:18
**titled** 133:10
**today** 4:10,12,14 6:16 8:17 9:1 9:14 10:6 16:13 22:2,5 24:9 25:24 26:6 27:11 73:14 149:5 166:2 171:15 196:17 231:15 251:17 280:4 287:5 298:16 298:20
**today's** 4:7 15:21 355:17
**told** 23:10,22 24:3 70:8 82:14 108:18 124:7 126:18 130:12 165:17 170:2 174:18 178:5 179:6,14 197:4 208:14 215:2,4,8 218:11 220:10 230:15 238:7 249:6 258:5 276:17 285:10 287:18,19 288:12,14 293:1 314:7,21 328:10 331:16 333:7 335:22 347:6,9,19 348:17 349:6 350:7 353:3
**ton** 166:23 323:10
**Tony** 181:17
**tool** 163:1 344:21
**top** 16:4 18:22 19:3,5,11 20:5 109:11,15 132:24 190:4 199:20 252:12 266:4,18 281:5 293:22 332:4 334:23 335:4
**total** 40:14 159:4 229:14
**totality** 119:8 160:21
**totally** 163:24 217:12 337:1
**track** 58:18 279:13 321:21
**trained** 62:3,16 83:11 164:8 251:13
**training** 33:18 33:19 61:4 239:15
**transcript** 1:18 293:21 294:9 356:19
**transcription** 357:14
**transcripts** 17:11
**transfer** 36:17 75:4 76:1
**transferred** 36:16,19 76:4 277:20
**transport** 151:24 152:1
**transported** 152:9 277:12 277:15
**travel** 38:21
**treated** 347:10
**treatment** 29:13
**trial** 23:7 30:18 31:5 32:1 96:2 96:5 142:18 241:3 333:10 333:15,21 334:1,9 338:1 343:24
**trials** 14:14 96:14
**tricky** 119:19
**tried** 12:15 148:15 258:1 338:2
**trouble** 18:1,2 178:9 192:10 192:23 193:10 330:11
**true** 87:20 88:7 89:12,15,23,24 90:3,4,5,14 113:2 130:15 173:3 321:23 336:24 337:7 338:3 349:4 357:14 358:2
**trust** 119:23 264:24 265:3,6 265:6
**trusted** 51:12 52:11,14 56:14 56:16 57:17 145:10,14 223:16,18,22
**truth** 67:14 85:14 105:5,6 122:19 222:10 294:2 345:24
**truthful** 9:1 73:11 231:14 231:16,19 264:5 339:5
**truthfully** 299:2
**truthfulness** 85:8
**try** 16:17 96:5 118:11 142:3 147:16 148:5 150:14 152:5 153:17 154:21 155:12,16,21 156:7 232:17 249:23 280:13 297:8 343:18
**trying** 48:18 49:22 68:3 80:4 92:3,10 107:1 122:15 123:22 124:3 124:24 125:13 128:5 149:22 152:3 153:1,2 154:20 155:2 156:22 167:24 173:6 176:22 184:7 191:23 210:1 212:4,21 216:13 231:22 234:14 247:6 256:12 260:13 271:16 286:14 291:13 322:1 322:14 330:22 331:14 338:16
**turn** 30:20 108:15 117:9 175:21 326:6
**turned** 98:5 99:20 128:10
**Turner** 31:6,9 288:3,7 293:2 293:9 314:22 325:16,16,22 325:23,24 326:1,18 333:11,12,15 333:20 334:1 334:10 335:17 342:1,12 344:3
**turning** 113:23 139:19
**twice** 9:21 353:13
**Twitter** 42:8
**two** 2:16 14:13 30:17 31:22 40:16,24 41:5 58:15,16,17 78:14 79:4,11 79:11 80:4,12 164:11 169:15 174:9 186:9 194:16 197:6,6 212:8 215:6 217:22 218:8 261:3 267:10

276:10 296:21 300:9 301:22 315:14 318:20
**type** 20:8 201:8 201:9
**typed** 20:7 48:2 295:18
**typical** 248:22
**typically** 20:16 115:22 203:17 236:9 332:13
**typing** 201:11 357:12

**U**

**uh-huh** 31:3 35:17 38:15 40:15 158:22 187:10,16 195:9 196:13 218:1 225:11 225:16 231:7 267:3 272:24 273:7,19 276:22 300:9 306:3 334:24 336:7 343:9 344:7,24 345:7 346:15
**ultimately** 51:8 82:5
**unable** 17:20 30:11
**unacceptable** 135:22
**unclear** 151:7
**unconnected** 182:15
**uncovered** 87:6
**undated** 266:7
**undermining** 103:3
**underneath** 64:14 68:9 354:8
**understand** 6:12 7:24 8:8,14 26:21 30:7,8 44:12 63:17 68:3,12,16 73:15 92:3,9 92:10 95:20 119:19 128:5 149:23 150:2,5 151:2,4 153:2 156:17 158:1 167:24 176:22 177:3,6,9,12 184:7,16 192:12 196:4 211:12,21,23 212:5,15 234:14 240:11 247:6 252:21 303:3 322:1 330:23 331:14 331:17 332:17 332:19 345:22
**understanding** 44:16 48:5 73:8 130:11 188:3 323:4 334:12
**understood** 47:10 73:9 129:11 154:12 172:14 176:15 176:21 194:1 208:19 278:22 323:8
**unfortunately** 11:21 281:6
**uniform** 35:11 53:18 219:13
**uniformed** 350:20
**unit** 24:16 25:7 38:21 134:4 168:2 197:2 233:19 269:17 270:4 271:2 306:2 320:14 322:10
**United** 1:1 4:5 34:1
**units** 168:13
**unknown** 133:11 178:16 185:18
**unnecessary** 25:10
**unreasonable** 61:17
**unreliable** 139:5 145:23
**up-to-date** 51:3
**update** 107:24
**ups** 197:22,24
**upset** 74:19
**upside** 205:2
**use** 42:4 61:17 82:13 91:10,13 127:20 128:1,4 128:21 161:14 163:1 187:4,5
**useful** 73:16 265:16
**uses** 133:15
**usual** 338:24
**usually** 19:17 48:4 49:20 197:23 199:5 296:2,4 307:23

**V**

**vacated** 25:18
**vague** 67:4,7,9 67:23 77:21 79:12
**valid** 227:8
**validity** 117:24
**value** 40:13,14 346:2
**valued** 40:8
**various** 40:11
**vast** 228:17
**versus** 4:13 119:3 225:17
**vice** 37:10
**victim** 187:24 323:21
**video** 4:7 355:17
**videographer** 4:3
**videotape** 1:15 4:1 5:5 72:21 195:21 263:17 298:4 338:19 355:16
**videotaped** 1:10 4:4
**viewings** 10:16 11:5
**violation** 312:16
**violations** 63:8 63:14
**violence** 352:6 352:11
**VS** 1:4
**vulnerable** 137:11,19 348:8

**W**

**w5** 12:21
**wagon** 219:14
**wait** 29:22 242:6
**wake** 86:23
**walk** 35:7
**Walker** 43:2
**wall** 72:9
**want** 8:4 9:13 18:4 23:12,15 24:12 32:24 42:18 45:12 51:15 53:11 59:14 66:24 73:18 74:24 76:16,18 81:3 87:17 99:8 108:5,15,17,19 121:14 122:2 122:24 123:17 123:21 125:3 135:15,17 139:23 140:11 142:19 143:21 144:4 146:7 147:5,16 149:5 150:9 152:8,14 155:21 156:23 165:16 167:23 170:23 171:7 171:17 187:17 192:15,24 193:17 194:4 194:11 195:6 196:14 202:23 204:19 205:10 212:22 214:3,8 214:10,10,14 216:1,6,22 227:4 238:14 242:6,7,13,15 242:24 244:2 248:6,14 249:24 253:10 253:15 254:23 259:9 263:1 264:10 267:9 269:13 273:4 291:5 294:13 294:19,21,22 304:17 316:20 323:9,11 324:1 327:9 330:19 339:10 343:18 344:5,9 347:14 349:3 352:23 353:6 354:17
**wanted** 73:3 86:22 172:10 189:1 244:11 244:16 259:14 267:23 298:11 299:18 300:13 339:1 349:18
**wants** 129:19 189:6
**warnings** 331:4

331:10,12 332:14
**warrant** 86:19 86:22 87:2,4 87:15 88:5,11 92:17 108:7,11 260:4,15 324:7 324:24 325:2 325:20 326:10
**warrants** 324:20 324:23 325:15
**wasn't** 87:20 98:12 110:16 115:8 117:1 120:2,17 121:3 124:7 128:9,16 142:12 159:16 163:6,21 176:13,13,20 179:8,9,11,13 179:15,20 184:12 191:9 194:18 201:15 202:22 214:19 220:15 223:12 224:10,17,22 227:6 228:14 234:18 249:7 251:21 261:23 262:5,17 270:3 296:16 297:20 302:21 318:12 347:20 348:13 348:22 351:2 355:4
**way** 18:3 34:21 52:9 89:7 140:18 152:19 154:17,18 166:13 172:10 172:21 184:14 184:15,17 193:9 202:7 221:21 224:19 224:20 231:5 237:6,11,15 241:15 245:24 246:20 248:3 249:23 252:8 257:9,10,12 268:12 280:16 286:13 304:3 308:15 309:2,3 316:2 324:1 330:8,22 331:15 336:13 349:23
**ways** 99:22 125:4 156:6,16 209:3
**we'll** 8:19 15:9 161:12 241:2 274:15 291:16 338:18
**we're** 14:7 30:9 39:14,14,18 76:20 77:24 92:23 118:11 132:7 165:5 190:1 212:4 267:8 294:3 302:10 319:17 326:7 327:17 334:2
**we've** 71:15 209:2 210:2 216:14,18 254:3 259:20 259:22 265:8 292:2 322:20 342:12
**weapons** 207:17 207:24,24 217:10
**wear** 253:11
**week** 13:15 58:21 59:3 218:20,23
**weeks** 13:15,17
**welcomed** 187:19
**went** 23:9 33:14 35:20 36:6 37:9 47:7 74:1 83:17,23 97:24 114:9,12 131:10 145:19 215:2 245:7 279:24 307:20 309:6 316:13 331:9 333:15 333:20
**weren't** 47:11 57:14 75:20 89:15 98:15 112:19 119:11 134:22 162:23 168:21 176:21 177:3 191:21 192:6 239:24 249:18 355:7
**West** 35:20 36:12 75:2 168:6
**Westerman** 2:18 5:4 12:8 56:23
**wife** 10:3 40:18 40:19 43:2 74:1,4 159:16 159:17
**wild** 321:19
**Wilkerson** 339:16 344:2
**William** 242:19 242:21 250:11 259:12
**willing** 244:9 253:7 254:22
**Wilson** 188:6
**Windfall** 37:24
**wire** 253:12
**wise** 297:17
**wish** 54:9,11
**withheld** 24:20 135:4
**withhold** 134:6
**witness** 5:1,6 7:15 10:15 13:21 14:23 19:16 20:1,12 21:4,20 22:17 25:21 26:9,14 26:22 27:4,9 27:24 28:10,17 29:3,10,19 30:3 31:18 32:5,15 44:22 45:3,9 46:24 49:3,15,18 50:12,19 52:4 54:8,16 56:12 60:11,15 61:14 61:22 62:8,24 63:18 65:8,13 65:24 66:5,9 66:12,17,21,22 67:3,12,12,13 68:23 69:15 70:22 71:7,12 71:21 72:5,13 72:19 73:24 74:17 75:14 76:8 77:10,15 77:20 78:10,13 78:20 79:3,9 79:19 80:3,9 80:22 81:3,7 81:11,16 82:10 82:23 85:5,9 85:11,13,13,15 85:20 86:4 87:11 88:20 89:4,11 90:12 90:18 91:3,10 91:17 93:10 94:5,18 95:2,7 95:18 96:12 97:9,18 100:24 101:10,23 102:7,19 103:8 103:14 104:8 104:11,17,19 105:11,18 106:7,22 107:11 110:4 110:24 111:16 112:3,16,24 113:8 115:6,18 116:11,24 117:21 118:7 118:12,16,19 118:23 119:7 119:24 120:2,3 120:7,12 121:3 121:8,12,13,22 122:1 123:11 125:23 127:16 128:23 130:1 132:3 133:22 134:2 135:9,16 135:22,23 136:4,10,12,16 136:20,23 137:2,6,11,14 137:17 138:3,5 138:10,19 139:9,15,22 140:5,21 141:11,19 142:16 143:1 143:13,24 144:8,19 145:6 146:4,11,19 147:10,21 148:12,20 149:9,17 150:17,21 151:3,14 152:19 153:20 153:23 154:7 154:17 156:13 157:5,12,24 158:9 159:3,22 160:13 161:9 161:20,22 162:2,4,16,22 163:4,20 164:19,23 165:10 170:13 170:20 171:12

171:21 173:2
173:15 174:2
174:15 175:4
176:2 180:4,21
182:3,11,20
183:16 185:23
187:24 188:10
188:15,20
189:7 190:17
191:1,8,15
192:3,21 193:5
193:13 194:9
195:1,15
200:20 201:22
204:6 205:22
206:14 207:8
207:20 209:13
209:21 210:8
210:20 211:3
212:20 213:2
213:18 216:21
217:20 218:16
219:6 220:8
222:2,19
224:15 225:13
226:2,11
227:13,16,19
228:5 229:1,10
229:20 230:3
230:15 231:1
232:4 233:9
234:2 235:4,10
235:13 236:5
236:15,19,21
237:5,23 238:2
238:8,20
239:11 240:10
240:21 241:9
242:11 243:13
243:18 244:20
245:4,12,16,22
246:14,19,23
247:13,23
248:5,11
249:15,22
250:18 251:2,8
252:8,19
254:11,20
255:3,12,19
256:1,8,19
257:1,18 258:2
259:6 260:1,10
260:12,18
261:1,11,19,22
262:4,15
267:16 268:5
268:16 269:22
270:19 271:11
272:8,19
273:13,23
274:5,24
275:17 276:7
277:4,19 278:5
279:3,23
281:19 282:4
283:6 284:16
285:1,14,22,24
286:11,22
287:10,14
288:17 289:1,9
289:21 290:4
290:11 291:13
292:13,21
293:13 294:10
294:17 295:2
296:24 297:12
297:24 299:22
300:19,24
301:1,4,19
302:3 303:18
305:2,22 306:8
306:19,19
307:4,7,17
308:3,14
309:15,22
310:4 311:1,11
311:20 312:6
312:12,20
313:4,12,21
314:4,12,19
315:2,9 316:2
317:11,22
318:4 319:6
320:24 323:3
324:16 325:19
326:24 328:16
329:12,22
332:10 333:2
334:14 336:2
336:13 337:4
337:18 338:1
338:14 340:16
341:6,11,16
342:8 343:1,15
344:11 346:8
347:24 348:12
348:21 349:11
349:22 350:10
351:18 352:2
352:10 353:11
353:22 354:4
354:17 355:2
355:10 356:15
356:16,17,18
357:15 358:13
**witness'** 85:8
134:3 221:22
227:24 228:20
229:6,24
230:22 241:14
242:14 255:9
**witnessed** 63:23
63:24
**witnesses** 30:15
30:17 94:15
103:11 104:3
104:24 118:15
120:16 121:3
146:14,22
150:20 151:9
151:24 153:4,6
223:1,7 233:5
251:13 276:10
278:24 280:5
296:21 301:22
315:6 343:7
**WOLFE** 1:22
**woman** 24:2
206:8 299:7
**Woods** 206:8
291:8,19
292:10,17
293:19 294:2
294:22 295:3
299:8,19
300:13
**word** 82:11,13
119:3,3 157:21
203:21 209:4
327:4
**words** 176:20
234:13 256:12
**work** 7:12 17:1
28:13 32:9
33:23 34:2,9
41:1,8 45:23
56:17,22 61:6
62:21 76:17
83:17 125:17
127:3 131:18
136:19 147:24
153:3 166:17
167:12 170:5
194:19 195:11
197:18 223:22
223:24 235:17
253:10,15
310:1,6,11
318:15 321:3,8
352:21
**worked** 16:7
34:10 37:12
55:5,8 56:21
57:1 127:17
145:14 147:4
167:22 168:1
177:5 240:4
263:7 318:22
354:8
**working** 6:3
19:7 37:19
46:7,20 51:18
51:22 52:12
55:10 57:8,21
58:11,20 63:4
64:13 65:1
68:9,18 69:17
97:21 98:20,24
100:7 101:15
116:4 128:16
138:22 144:23
145:17 148:4
167:21 176:23
177:3 180:18
181:23 186:12
186:13 187:7
201:19 202:17
224:9 240:13
240:19 270:21
301:8 308:20
319:19 321:5
322:11 324:11
338:10 353:18
355:7
**works** 107:2
352:11
**world** 37:2 69:4
**worried** 71:22
**worry** 71:18,24
**worth** 40:14
344:23
**wouldn't** 30:23
56:6 63:2
67:15 80:5
87:11,21 89:13
89:16 91:10,13
93:14 107:22
111:8 112:7
119:4 122:5,6
122:7,8 143:20
145:2 146:7
147:24 150:3,4
150:9 156:4
160:6 162:11
171:22 172:8
172:11 201:3
202:14 206:4
226:20,22,23
227:21 231:4
248:2 249:7,9

249:16,18 250:6,7 256:5 287:3 314:12 317:2 328:21 336:18 349:15 350:2,12 351:4
**wrap** 338:16
**Wright** 7:21 27:6
**write** 151:18
**writes** 254:12,20 308:18
**writing** 258:9
**written** 153:9 252:4 312:17 318:11
**wrong** 48:7 68:6 130:12 205:6 211:5
**wrote** 285:3 328:1

X

**X** 3:2,7

Y

**yeah** 7:22 9:9 14:1 15:1 16:10 18:14 20:19 34:7,22 39:7 40:9,12 41:7,19 46:17 46:21 57:16,24 58:17 59:4,20 60:2 63:22 65:12 74:5 119:24 139:15 153:7,8,22 163:13,21 164:10 168:5 174:23 178:11 181:16 189:4 190:12 192:21 195:19 198:2 198:13 200:11 201:1,17 203:5 205:8,14 207:4 209:14 210:14 218:17 221:1 222:16 236:14 244:14 253:9 266:13 275:24 283:15 284:7 285:14 286:11 288:18 294:17 295:17 299:4 299:13 300:11 303:14 304:6 304:15 305:8 306:8 311:4 327:24 328:16 335:11,14 337:10 340:9 341:1 342:3 343:6 344:20 345:16 346:8 346:11 348:1 353:14
**year** 33:6 34:2 35:13 131:1 190:1 302:6 323:16 324:5 343:11
**years** 6:7 10:23 11:16 12:7,13 12:21,22 14:13 34:3 36:1 37:5 37:8,13,14 38:1 41:23 71:4,7 83:15 83:16 107:5 125:18,18 126:24 169:15 177:19 187:12 194:16 212:1 215:10 217:22 218:9 354:9,10 354:11
**yep** 146:24 186:11 190:2 266:19 272:13 303:2 306:20

Z

**Zoom** 51:15
**Zurbriggen** 2:9 4:22,23 6:15 7:13 10:13 13:19 14:21 19:13,23 20:10 21:1,17 22:14 25:19 26:7,12 26:20 27:2,8 27:21 28:7,15 29:1,8,18,24 30:4 31:15 32:2,13,19 43:20 44:18 45:1,7 49:1 50:9,17 52:2 54:6,13 56:10 60:9,13 61:12 61:19 62:6,22 63:16 65:6,15 65:21 66:7,15 67:1,24 68:11 68:21 69:13 70:19 71:10,19 72:3,11,17 73:22 74:15,21 75:12 76:6 77:13,19 78:8 78:17 79:7,17 80:7,20 81:5 81:14 82:2,8 82:21 84:10 85:2,18 86:2 87:9 88:17 89:2,9,18 90:7 90:16 91:1,8 91:15 93:7 94:3,6,16,24 95:6,9,15 96:10 97:6,16 99:2,3,5 100:21 101:8 101:21 102:5 102:17 103:6 103:12,21 104:5 105:1,8 105:16 106:4 106:20 107:8 108:2 110:1,22 111:14 112:1 112:14,22 113:6,13 115:4 115:15 116:9 116:22 117:19 118:5,20 119:5 120:5,13 121:5 121:19 123:3,9 124:12 125:20 127:14 129:23 132:1 134:15 134:18,24 135:6 136:1,8 136:14,21 137:4,12 138:1 138:8,17 139:7 139:14 140:2 140:19 141:8 141:17 142:14 142:22 143:10 143:22 144:6 144:17 145:4 146:1,9,16 147:8,19 148:10,18 149:7,15 150:15 151:1 151:12 154:5 154:15 155:17 156:11 157:3 157:10,22 158:7 159:1,19 160:11 161:7 161:18 163:2 163:18 164:21 165:8 170:11 170:18 171:10 171:19 172:24 173:13,24 174:13 175:2 175:11,24 177:22 178:20 180:1,19 182:1 182:9,18 183:14 184:19 185:11,20 188:17 189:13 189:15 190:16 190:23 191:6 191:13 192:1 192:18 193:3 193:11 194:7 194:23 195:13 200:19 201:20 203:10 204:4 205:20 206:12 206:24 207:6 207:19 209:11 209:19 210:6 210:18 211:1 212:18 213:4 213:16 215:13 215:24 216:10 216:20 217:18 218:13 219:4 220:1,5 221:24 222:21 223:13 224:4,13 225:12,23 226:9 227:1,11 227:17 228:2 228:23 229:8 230:1,12,23 232:2 233:7,24 235:2,11 236:4 237:21 238:16 239:9 240:8,20 240:23 241:6 241:16,18 242:5 243:11 244:18 245:2 245:10,19 246:12,17 247:20 248:9 249:13,21 250:15 251:5 252:6,18 253:24 254:16

254:24 255:10
255:23 256:6
256:23 257:16
258:19 259:3
259:17 260:6
260:16,23
261:9,20 262:3
262:12,22
267:13 268:2
268:14 269:20
270:17 271:9
272:6,17
273:11 274:3
274:22 275:4,9
275:15 276:5
277:2,16 278:2
278:16 279:1
279:20 280:6
281:17 282:2
283:3 284:8,14
284:23 285:12
285:20 286:9
286:15,20
287:7,21
288:15,23
289:7,19 290:2
290:9,17
291:12 292:4
292:11,18
293:10 294:7
294:15,24
296:22 297:10
297:22 299:20
300:17 301:2
301:17 302:1
303:16 304:23
305:20 306:6
306:17 307:5
307:15 308:1
308:12 309:13
309:20 310:2
310:16,23
311:9,18 312:4
312:10,18
313:3,10,20
314:3,10,17,24
315:7,24
316:15 317:9
317:19 318:2
319:3 320:5,16
320:22 323:1
324:14 325:17
326:22 328:5
328:14 329:9
329:19 330:3
330:18 332:8
332:23 334:19
335:19,24
336:11,19
337:2,16
338:12 340:14
341:9 342:6,23
343:13 344:13
346:6 347:22
348:10,19
349:9,20 350:8
351:16,24
352:7 353:9,20
354:2,14,22
355:8,13

**0**

**1**

**1** 304:5
**1:20** 215:17
**1:58** 263:18
**10** 282:11,11,12
**10:45** 72:22
**10:59** 72:23
**10th** 14:12
**11** 319:8
**11/3/87** 326:9
**12:38** 195:22
**12:52** 195:23
**13** 293:22 318:15 357:20
**1303** 1:23
**132** 3:10
**13372** 133:9
**137** 334:22
**138** 335:9,10
**13th** 175:23 176:9 177:14 183:22
**14** 318:15
**15** 12:7 131:4
**1515** 2:11
**15th** 209:10 217:16
**16** 220:22,24
**16-year** 24:5
**16th** 345:18
**17** 109:12,13 110:8
**17th** 35:12 187:23
**18** 222:14
**18-foot** 16:23
**19** 204:24
**19102** 1:24 2:11
**19103** 2:17
**19106** 2:4
**1947** 39:22
**1970** 35:2,11
**1979** 188:1,3
**1980** 35:11 186:10 187:12
**1980s** 29:14
**1984** 6:7 14:10 22:6 144:15 166:5,16,18 169:13 175:23 177:14 183:22 217:24
**1985** 35:16 166:18 189:24
**1987** 14:12,18 15:5,19 18:11 18:19 20:18 21:14 32:11 93:15,18,19,21 144:15 167:2 169:13 200:15 201:13 203:2 213:23 216:15 217:3,16 258:3 258:3 265:22 266:3,17,21 267:1 281:11 291:18 302:11 302:12 322:24 324:6 328:4 343:11 353:19
**1988** 14:14 42:22
**1990** 36:24
**1990s** 29:14
**1991** 14:15 43:1
**19th** 205:17 208:3 213:22 216:15 217:3

**2**

**2** 30:20
**2:00** 263:16
**2:22-CV-0241...** 1:4
**2:33** 263:20
**20** 10:23 12:7 41:23 58:7,9
**2001** 2:16
**2015** 31:9
**2017** 26:18
**2019** 31:2
**2020** 15:15 24:16 30:21
**2022** 13:7,8
**2023** 109:7
**2024** 1:7 4:7 131:1 357:10
**2027** 357:20
**21** 217:13
**215** 2:4,12,17
**217** 280:20
**21st** 109:7 203:1 205:5
**22** 200:15 217:14
**22nd** 35:12 130:24 218:21 265:22
**23** 300:10
**230** 1:23
**24** 37:5,7,13,14
**24th** 188:7 266:3 273:6
**25** 12:13 38:1 71:6,7 83:15 83:16 107:5 125:18 218:21 263:5
**25th** 266:17 291:18
**2620** 2:16
**27th** 14:10 272:15 283:2
**280** 3:11
**297** 293:21,22 300:5,8
**298** 295:15
**299** 295:5
**2nd** 324:5

**3**

**3** 86:22 109:18 244:3,4 259:11 259:13
**3/19** 217:8
**3/19/87** 210:3
**3/21/87** 217:6
**3:10** 298:5
**3:27** 298:6
**3:40** 217:8
**30** 12:13,21 38:1 290:20,21 354:9 356:22
**300** 293:23 295:9
**308** 220:20,20 220:22,23,24
**31** 326:6
**32** 18:16
**3287** 334:3
**334** 3:12,13
**34** 6:7 212:1
**3rd** 266:24

**4**

**4/1/61** 186:6

**4/15/87** 209:14 210:4 310:20
**4/20/87** 340:7
**4/24/87** 272:4 273:17
**4:10** 338:20
**4:23** 338:21
**4:38** 355:18,21
**40** 26:18 354:9
**40s** 33:8
**43** 270:8 277:10 289:4
**435** 109:5,11,12
**436** 109:15,18
**49** 217:10
**4th** 16:23

**5**

**5** 3:5 15:8,10 45:18,20 52:18 52:21,22 53:4 55:1,3,6,7,13 56:3 58:4 167:23 168:9 168:16,19 169:5 172:12 197:16,18,24 198:8 199:5 202:11,16,16 209:14 269:9 269:18,23,24 308:21 320:4,8 320:9,10 322:9
**50,000** 40:8
**501** 1:12 2:3 4:11 357:9
**52** 79:12
**5th** 6:7 14:10

**6**

**6** 25:5 275:18
**640-8420** 2:17
**65** 34:7
**66** 34:4 35:5
**683-5448** 2:12

**7**

**7/7/87** 282:22
**7:00** 275:18
**70** 34:4 35:1,5,5
**718** 1:12 2:3 4:10 357:8
**72** 334:5
**7549** 205:7 209:17
**7th** 189:24 266:10 281:10

**8**

**8** 1:7 133:1 220:22,24 222:8 357:10
**8:30** 273:19
**80** 35:14
**801** 208:2
**80s** 144:15 161:16
**83** 132:6
**84** 14:24 18:9 131:1,3 176:9 272:1 280:18
**85** 35:14 36:2 131:3 194:15 272:1 327:9
**86** 36:2 333:23
**87** 15:1,10,20 33:10 176:8 194:15 205:5 205:17 208:3 209:10 266:10 273:6 302:23 302:23,24 324:4 340:21
**88** 33:10
**89** 338:6
**8995** 345:5,6,15
**8th** 4:7

**9**

**9** 133:8
**9:30** 1:13
**9:45** 4:8
**90** 34:17
**9001** 346:13
**925-4400** 2:4
**95** 36:23
**9th** 18:19 35:13 39:22 266:21 302:10