UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

---

CURTIS CROSLAND, : CIVIL ACTION
Plaintiff, :
vs. :
CITY OF PHILADELPHIA; JOHN:
DELLA ROCCA, as personal :
representative of the :
Estates of JOHN CIMINO AND:
ALBERT NESPOLI; DOMINICK :
MANGONI; JAMES MCNESBY; :
JOSEPH BRIGNOLA; KAREN :
ANSEL, as personal :
representative of the :
Estate of FRANCIS ANSEL; :
EDWARD HUGHES; EDWARD :
ROCKS; LINDA WESTERMAN, as:
personal representative of:
the Estate of FREDERICK :
WESTERMAN; LUIS A. SILVA, :
as personal representative:
of the Estate of JOHN :
LANZELOTTI; JOSEPH :
DESCHER; and LIEUTENANT :
THOMPSON, :
Defendants. : NO. 2:22-cv-02416-AB

---

DEPOSITION OF JOEL S. ROSEN, ESQUIRE
Tuesday, May 14, 2024

---



Videotaped deposition of JOEL S. ROSEN, ESQUIRE, taken on Tuesday, May 14, 2024, at the law offices of Kairys, Rudovsky, Messing, Feinberg & Lin, LLP, The Cast Iron Building, 718 Arch Street, Suite 501 South, Philadelphia, Pennsylvania, commencing at 10:02 a.m., before Andrea M. Brinton, Professional Court Reporter and Notary Public.

---



APPEARANCES:
KAIRYS, RUDOVSKY, MESSING, FEINBERG & LIN, LLP
BY: JONATHAN H. FEINBERG, ESQUIRE
BY: GRACE HARRIS, ESQUIRE
The Cast Iron Building
718 Arch Street
Suite 501 South
Philadelphia, Pennsylvania 19106
(215) 925-4400
jfeinberg@krlaw.com
gharris@krlaw.com
Counsel for Plaintiff

CITY OF PHILADELPHIA LAW DEPARTMENT
BY: ADAM R. ZURBRIGGEN, ESQUIRE
BY: DANIEL CERONE, ESQUIRE
One Parkway Building
1515 Arch Street, 14th Floor
Philadelphia, Pennsylvania 19102
(215) 683-5114
adam.zurbriggen@phila.gov
daniel.cerone@phila.gov
Counsel for Defendants City of Philadelphia, Dominick Mangoni, James McNesby, Edward Hughes, Edward Rocks and Joseph Descher

ARCHER & GREINER, P.C.
BY: CARLTON L. JOHNSON, ESQUIRE
BY: SIMONE M. ADKINS, ESQUIRE
Three Logan Square
1717 Arch Street
Suite 3500
Philadelphia, Pennsylvania 19103
(215) 246-3104
cjohnson@archerlaw.com
sadkins@archerlaw.com
Counsel for The Witness

ALSO PRESENT:

Mitch Berger - Videographer
Angeline Etienne - Paralegal



I N D E X


| WITNESS | PAGE |
|---|---|
| JOEL S. ROSEN, ESQUIRE | |
| EXAMINATION | |
| By Mr. Feinberg | 6 |
| By Mr. Zurbriggen | 184 |


---

E X H I B I T S


| EXHIBIT NO. | DESCRIPTION | PAGE FIRST REFERENCED |
|---|---|---|
| Exhibit 79 | 2/2/21 Letter | 38 |
| Exhibit 80 | 2/5/21 Letter | 39 |
| Exhibit 81 | 2/8/21 and 2/5/21 E-Mails | 40 |
| Exhibit 82 | Google Maps Document | 84 |
| Exhibit 83 | Declaration of Joseph Podraza, Esq. | 92 |
| Exhibit 84 | 3/20/21 E-Mail | 95 |


---

Page 5

(By agreement of counsel, the reading, signing, sealing, certification and filing are waived; and all objections, except as to the form of the question, are reserved until the time of trial.)

---

THE VIDEOGRAPHER: We are now on the record. My name is Mitch Berger and I am the videographer retained by On the Record.

This is a video deposition for the U.S. District Court, for the Eastern District of Pennsylvania.

Today is May 14th, 2024. The time is approximately 10:02 a.m. This deposition is being held at 718 Arch Street, Philadelphia, Pennsylvania, in the matter of Crosland vs. City of Philadelphia, et al.

The deponent is Joel Rosen. All counsel will be noted on the stenographic record. Our court reporter is Andrea Brinton from Kaplan, Leaman & Wolfe, and she will now swear in the witness.

Page 6

---

JOEL S. ROSEN, ESQUIRE, after having been first duly sworn, was examined and testified as follows:

---

THE COURT REPORTER: Thank you. And, Counsel, you're proceeding under the Federal Rules?

MR. FEINBERG: That's correct.

MR. JOHNSON: Yes.

---

EXAMINATION

---

BY MR. FEINBERG:

Q. Mr. Rosen, good morning.

A. Good morning.

Q. We had a brief chat before we went on the record, but let me give you a formal introduction to the case now that we are on the record.

My name is Jon Feinberg. I'm joined here by Grace Harris, an associate in my office, and Angeline Etienne, a paralegal in my office.

Our firm represents Curtis Crosland. We represent him for purposes of a lawsuit against the City of Philadelphia and several Philadelphia Police detectives who worked in the Homicide Division.

Page 7

Now, in the lawsuit, Mr. Crosland alleges that the detective defendants caused him to be falsely arrested, prosecuted, convicted and incarcerated for more than 34 years for the December 5th, 1984 robbery and murder of Il Man Heo, when Mr. Crosland was, in fact, innocent of that crime.

I want to confirm you are not a defendant in this case, no one has brought any claims against you, you are here strictly as a third-party witness because of your involvement in the prosecution; namely, the fact that you prosecuted Mr. Crosland in his first jury trial, we'll talk about the second later, but that jury trial was in 1988, before Judge Manfredi, in the Court of Common Pleas.

We scheduled your deposition today to ask you about your involvement in the case and what, if anything, you know related to Mr. Crosland's allegations about the defendant detectives.

Do you understand all that, sir?

A. Yes.

Q. You're represented in this case by counsel seated to your right, Mr. Johnson, as your -- as your first chair counsel.

Page 8

Have you had an opportunity to consult with him before we begin today?

A. Yes.

Q. Do you need any more time to consult with Mr. Johnson?

A. No.

Q. All right. If you were a lay witness, this is the time when I would give you the litany of instructions.

A. Right.

Q. As we discussed, you mentioned you have 40 years in the practice, so I will dispense with that. I will confirm on the record, however, that you told me that you have testified once in a deposition about 40 years ago; is that correct?

A. Yes.

Q. Okay. A couple of brief introductory notes just to confirm. We have a lot of material to cover today. It is my hope to go expeditiously. Some of that timing may depend on your recall, and if I need to attempt to refresh your recollection, that may take us a little bit more time.

Page 9

Bottom line, as you know, this is not a marathon. I am happy to take breaks whenever you need them. My usual practice is to take a break about every 90 minutes. If you need a break -- if you need a break before I suggest one, though, please, of course, let us know.
Is there any reason why you cannot give truthful and accurate testimony today?
A. No.
Q. Okay. What did you do to prepare for today's deposition?
A. I met with counsel yesterday and I looked at a couple documents.
Q. Okay. How many times did you meet with counsel, just once?
A. Once.
MR. JOHNSON: Objection.
BY MR. FEINBERG:
Q. How long was that meeting?
MR. JOHNSON: Objection.
THE WITNESS: Two hours.
BY MR. FEINBERG:
Q. Was anyone else present at the meeting?
MR. JOHNSON: Objection.

Page 10

THE WITNESS: This young lady over here, co-counsel.
MR. FEINBERG: Simone. And I apologize, Simone, I don't recall your last name.
MS. ADKINS: Adkins.
BY MR. FEINBERG:
Q. Okay. Ms. Adkins was also present; is that what you're saying?
A. Yes.
Q. Okay. You said you looked at a couple of documents.
A. I did.
Q. Can you give me any specific identification of documents you reviewed?
A. I know I reviewed -- I reviewed my correspondence with the DAs office, I think it was Ms. Cummings; I looked at a couple notes by homicide detectives; I might have looked at some of the testimony, also, at the trial I did.
That's -- oh, I think I looked at a news article, maybe. I didn't really look at it very -- I mean, some of the stuff I just scanned, I didn't really read it carefully, but there were some

Page 11

news articles. That's all that comes to mind right now.
Q. Okay. And just to confirm, I sent your counsel a number of different documents from the police investigation file, the DAO trial file, trial transcripts, written correspondence.
A. Right.
Q. You had access to all of those materials?
A. I did. They gave me a copy of them. Frankly, I got back to work yesterday and I was swamped, and I didn't get an opportunity to look at a lot of them, but they did provide them to me, yeah.
Q. Okay. Very good. As we go through today, I expect that most of the documents I show you will be documents that you at least have seen.
A. Uh-huh.
Q. As you know, from having been through this before, if you need time to review the documents before you answer my questions, of course, you'll let me know; is that correct?
A. Yes.
Q. Okay. Let me ask you about other people you spoke to.
Besides your counsel, have you

Page 12

spoken -- well, I'll ask that -- let me ask that question differently.
Have you spoken to anyone else, besides your counsel, about this deposition?
A. My wife.
Q. Okay. And --
A. And my -- a couple people in my law firm, I told them I'm going to be deposed today, you know.
Q. Did you discuss any of the substance of the case?
A. No.
Q. Let me mention two people to you who may have some familiarity with the case and maybe you're still in contact with. One is Shelley Robins New, a former -- retired Judge Shelley Robins New, who tried the second case for Mr. Crosland.
Have you spoken to her at any point in the past year or two?
A. No, I haven't even spoken to her in years, so --
Q. Okay. Barbara Christie is another person at the DA's office who was involved.
When was the last time you spoke to her?

Page 13

A. I couldn't even tell you. It might have been 20 years ago.
Q. A number of the detectives who have been sued in this case are deceased. I want to start asking you about the -- the detectives who are still living. My question will be have you spoken to them at any point in the past several years.
A. Can I -- I -- I don't want to cut you short, but the answer's going to be no. I haven't spoken to any homicide detectives in the last couple years.
Q. Okay. And it -- and to confirm, you haven't spoken to any of them about this case --
A. No.
Q. -- period. Fair enough.
When did you first hear about this lawsuit that Mr. Crosland has brought?
A. I first heard about the case, but I think it was before the lawsuit, when I was contacted by the DA's office. I think they were looking at it at that point.
I first heard about the lawsuit -- I mean, the first person who contacted me about the lawsuit was I got a call from Mr. Johnson not too

Page 14

long ago.
Q. Got it. Okay. So would it be fair to say that in terms of your personal interactions, you had correspondence with the DA's office back in 2020 or 2021, then the next time you heard about it was when counsel contacted you; is that correct?
A. Yes.
Q. All right. Let's go back in time. Just to set the stage, I'm going to give you a few dates so you recall the timeline of the case.
A. Uh-huh.
Q. The murder, as I mentioned, of Mr. Heo took place on December 5th, 1984, that was at 27th and Oakford Streets in South Philadelphia.
I assume you've seen that; is that correct?
A. I have.
Q. All right. Did you also see documents which showed that Mr. Crosland was arrested in December of 1987 and charged with the --
A. I mean, I don't remember the date, but that -- I'll take your word for itn, yeah.
Q. Okay. And you appear to have been involved with the case in grand jury proceedings that both

Page 15

preceded and postdated Mr. Crosland's arrest, late '87, early '88.
Does that sound familiar to you?
A. I know I was involved in grand jury proceedings that -- before or after the arrest, I'm not sure.
Q. Okay. And I -- I take it you're aware that you tried the case in December of 1988.
A. Yes.
Q. To add more to that timeline, you're aware that Mr. Crosland was convicted in the case that you tried; is that correct?
A. I am aware.
Q. That case then went up to the superior court, which reversed the conviction and sent it back for a new trial in the Court of Common Pleas.
A. Yeah, I am aware. Just to be clear, I don't remember any of this, but, yes, I'm aware.
Q. Okay. And what I'm doing, so you're -- so you're aware, is I'm building up a timeline to figure out when you were involved and when you weren't involved.
A. Okay.
Q. My understanding is that once the case came

Page 16

back to the Court of Common Pleas, Shelley Robins New then took the case over and tried it in front of a jury in January of 1991.
Does that sound right to you?
A. I'm aware of it.
Q. Okay. Let me ask this, then: At any point between 1991, when the case was tried for a second time, and when you heard from the DA's office in 2021, let's say, did you have any involvement with the case at all?
A. No.
Q. When you saw the documents that counsel showed you, did you remember any of the details of your involvement?
A. No.
Q. Two of the documents that I provided to your counsel and asked that you -- or suggested that you might review included an affidavit of probable cause and grand jury testimony.
Did you happen to review either of those things?
A. I did look at the affidavit of probable cause and -- are you talking about Ms. Tilghman's --
Q. Yes.

Page 17

A. -- grand jury -- I have seen that, yes.
Q. Okay. The reason I ask those questions is to see if you'll agree with me that the two key witnesses, from the prosecution's perspective in this case, were Rodney Everett and Delores Tilghman.
Would you agree with that assessment?
A. By reviewing the trial transcript, yes.
Q. Okay. Are you aware that Mr. Everett claimed to have -- in a police statement, claimed to have heard Mr. Crosland confess to the Heo murder; is that correct?
A. I'm aware of that from review of the trial transcript.
Q. And what Everett apparently did is told police that he heard Crosland confess, and that was used as evidence against Crosland --
A. Correct.
Q. -- correct?
The second key witness, Ms. Tilghman, that's the grand jury testimony that you're aware of?
A. Yes.
Q. You recall Ms. Tilghman testified that she overheard a conversation in which Mr. Crosland expressed concern that someone would come forward

Page 18

with information about the case in order to receive an award.
Do you recall hearing -- seeing that?
A. I recall seeing that in the testimony, yes.
Q. Okay. You're aware that there was no physical evidence connecting Mr. Crosland to the crime?
A. Correct. Yeah, I think that's correct.
Q. You're aware that there was no forensic -- putting aside physical evidence, there was no forensic evidence, like fingerprints or any biological evidence.
A. Correct.
Q. There were no eye witness identifications of Mr. Crosland?
A. Correct.
Q. The only direct evidence was the evidence that I just reviewed with you; is that correct?
A. Correct.
Q. Do you, sitting here today, have an evaluation about how strong the case was from the prosecution perspective?
A. I wouldn't call it a strong case, but I wouldn't say it's necessarily -- I mean, 24 people

Page 19

heard the case and found him guilty beyond a reasonable doubt, so I wouldn't necessarily say it was a weak case, so somewhere in between.
Q. Do you remember -- I -- I understand you told me that you -- you don't recall the specific details.
A. Yeah.
Q. Let me zoom out.
A. Okay.
Q. We're going to talk more about your background in a little bit.
You've been working as a plaintiffs' lawyer for many years; is that correct?
A. I have, yes.
Q. And I -- can I assume that, like most plaintiffs' lawyers, you pride yourself on being able to evaluate the strength of a case?
MR. JOHNSON: Objection.
BY MR. FEINBERG:
Q. Yeah, so --
A. Some people would disagree with that in my firm, so --
Q. All right. Well, that's -- that's not really an appropriate inquiry for this deposition, so

Page 20

let me -- let me ask that question differently.
Anytime you look at a case, you think to yourself this is a strong case, this is a weak case; right?
MR. JOHNSON: Objection.
THE WITNESS: I would say yeah --
BY MR. FEINBERG:
Q. Okay.
A. -- I'd say that's true.
Q. Okay. Can you remember -- put yourself back in that time frame when you were a homicide prosecutor.
Do you -- knowing what you know about this case now, going in, what level of confidence would you have had about it prevailing?
A. I don't have a memory of it nother (sic) what I -- other than what I already answered, I don't really have anything else to add.
Q. Okay. All right. Let me ask you about your -- your career and background since I hinted that -- at that just a moment ago. Let's go through this quickly.
What year did you graduate from law

Page 21

school?
A. 1981.
Q. Okay. What year --
A. Don't smile when I give you that.
Q. If you're wondering whether I pictured where I was in 1981, that's not what I was doing, and I'm not going to mention where my colleagues sitting here were.
What year did you start with the district attorney's office?
A. 1981.
Q. Okay. So you went right from law school.
A. I did.
Q. How long were you at the DA's office?
A. Oh, gosh. I would -- I stayed there until about 20 years ago.
Q. So early --
A. Twenty --
Q. -- two thousands?
A. Yeah.
Q. Okay.
A. Yeah.
Q. Where did you go -- well, strike that.
What's the name of your current firm?

Page 22

A. Cohen, Placitella, that's P-L-A-C-I-T-E-L-L-A, & Roth.
Q. Is that where you've been since you left the DA's office?
A. Yes.
Q. All right. Consecutively since you left the DA's office; is that correct?
A. Yes.
Q. All right. At any point since you left the DA's office, have you been -- I know you haven't testified in depositions, but have you been asked to provide information, subpoenaed for information, anything like that, about a prosecution that you were involved in?
A. No.
Q. Take me through your time at the DA's office, the various assignments and units that you were in.
A. I started out in preliminary hearings. Wow. I went to municipal court after that, I was in felony waivers after that, I was in majors after that, I was in the Rape Unit after that, I was in homicide after that, I ran the Major Trials Unit after that, and then I was in repeat offender after

Page 23

that, and then I left the office.
Q. Okay. Let's focus specifically on your time in homicide.
Can you tell me how many years you spent in that unit?
A. I would say about -- this is -- I'm probably going to be wrong, but maybe about eight years.
Q. Okay. Well, we know from the records in this case that you were in homicide in 1987 and 1988.
A. Right.
Q. Can you tell me how far ahead of that time period you would have entered homicide?
A. Not long.
Q. Okay. So this would have been -- this case would have arisen early in your tenure.
A. Yes.
Q. And then you would have stayed sometime into the mid-nineties, give or take?
A. Yes.
Q. Did you ever have any supervisory or administrative roles in the Homicide Unit?
A. No.
Q. So you were a line trial attorney handling

Page 24

homicide cases.
A. Yes.
Q. Take me through the life of a case, if you would, in terms of how it ends up on your desk, what stage the case is in and so on.
A. I mean, typically, in homicide back then, you would get assigned the case for trial sometime before the trial, and I don't remember the exact amount of -- exact amount of time. It wouldn't be a lot. You know, it might be a couple weeks. This is my best memory, I could be wrong, to be honest with you, but -- and you would get the binder, you'd subpoena in the detectives, get the case ready and try it.
Q. Would you ever handle homicides at the preliminary hearing stage?
A. Oh, yeah, but you would be assigned to hearings. You would do whatever was on the list that day.
Q. Got it. For trial purposes, though, someone would hand you the file a few weeks ahead of time and say, here's your case, go try it.
Is that essentially how it worked?
A. I think so, yeah. I think it would be the

assistant chief or the chief would give you a case, yeah.
Q. Okay. And during your time in homicide, would the chief and assistant chief -- did those designations change in terms of the people who were filling them?
A. I don't understand your question.
Q. Yeah, let me ask that a different way.
Barbara Christie, her name appears on some of the documents that we've reviewed in this case. My understanding is that she was the chief of homicide in the late 1980s.
Does that sound right?
A. I mean, I know she was my chief in homicide for a while. I don't know the exact time.
Q. When she was the chief, do you recall who the assistant chief was?
A. I know Dave Webb was the assistant chief for a period of time. I -- she might have had other people as well. Dave is the one I remember.
Q. Who would make the assignments?
A. I don't know. I don't remember.
Q. Okay.
A. You're talking about a long time ago.



Q. I'm aware. I'm aware.
Now, as we can tell from this case, there were grand jury proceedings --
A. Yes.
Q. -- involved.
Was that unique in your experience, that you would have homicide cases presented to a grand jury?
A. It was not usual, but it was not unique.
Q. Did -- in other words, it was -- it happened less often than in other cases.
A. Absolutely, yeah.
Q. Do you recall any particular reason why this case ended up in front of a grand jury?
A. No.
Q. Can you tell me in general reasons why a case might end up in front of a grand jury?
A. No. That -- so the grand jury work I remember -- so some of it was when I was not in homicide, I did -- I was assigned to do drug gang investigate -- murder investigations involving the Junior Black Mafia and another South Philly group that were warring, so some of that, you know, we put in front of the grand jury, but I wasn't really in



homicide. That's the best I can answer the question.
Q. What was the purpose of putting those cases in front of the grand jury?
A. I don't know. I -- I think at that time we didn't -- it may be because if you had a grand jury presentment, you wouldn't have to have a preliminary hearing, and so I think a strategic decision was made to put that in front of the grand jury.
Q. Would you also have the benefit of subpoena power which may not exist outside of a grand jury?
A. I -- I don't know. I don't recall.
Q. Okay. So you mentioned one case -- or one set of cases which you recall being involved with in front of a grand jury.
Are there any other cases that stand out in your mind?
A. Not that I recall.
Q. Okay. So, sir, you're aware that Mr. Crosland's conviction was vacated by a federal court in 2021.
A. I was aware of that.
Q. All right. And I -- and the charges were eventually dismissed against him; is that right?
A. Yes.



Q. All right. Did you learn that in connection with being invited to this deposition today or at some other earlier time?
A. I think I did find out -- I might have seen -- I don't know. I did definitely find out from counsel. I shouldn't say what my lawyer told me, but I did find out from counsel, yes.
Q. Well, I -- really what I'm getting at is can you tell me the first time you -- you learned about the -- about the vacatur of the conviction and the dismissal of the charges.
A. Yeah, I -- the only thing I remember is when I was first notified by counsel.
Q. Okay. Did you have any reaction when you learned that Mr. Crosland's conviction had been vacated?
MR. JOHNSON: Objection.
MR. ZURBRIGGEN: The City joins the objection.
THE WITNESS: I mean, yeah, you know, I was -- I had some thoughts about it, yeah. I was upset a little bit.
BY MR. FEINBERG:
Q. Okay. Were there any thoughts or any

Page 29

particular things that upset you about it?
A. Yeah, I mean, look, I don't know -- I don't know the details, so I don't know if he really did it or didn't, but if he didn't do it and I was involved in it, that upsets me as a human being.
Q. Did you review any of the briefing that was submitted in federal court leading up to the vacatur of his conviction?
A. I think I was sent a habeas petition by the DA's office.
Q. Okay. We'll come to that in a little bit. I'm going to ask you about that correspondence you had with the DA's office.
A. Okay.
Q. I'm asking -- and that's -- that's an inartfully phrased question.
What I meant to say is when you learned about the fact that the conviction was vacated, did you go, yourself, seek out any of the pleadings to review them?
A. No.
Q. Okay. I assume, from practicing in Philadelphia, you're aware -- well, I shouldn't assume.

Page 30

Let me ask you, are you aware that the district attorney's office under Larry Krasner has exonerated more than 40 people after vacating their convictions?
A. No. I mean, I know that he's -- he's dropped charges against convicted people, I don't know the number, and when you say exonerated, I don't -- I don't know.
Q. Okay. Did you ever try cases against Mr. Krasner?
A. I've been in court against him. I think I might -- this is going to sound odd. At -- I -- I may be wrong about this. There was -- during a republican convention in Philly, there were a slew of arrests made --
MR. JOHNSON: I represented --
THE WITNESS: Why are you pointing? So --
BY MR. FEINBERG:
Q. So --
MR. JOHNSON: Just so you know, I represented the City in those cases.
THE WITNESS: Well, there was a --

Page 31

MR. JOHNSON: It was RNC 2000, against them.
THE WITNESS: I won't -- I won't say anything negative, then.
MR. FEINBERG: And my office represented most of the plaintiffs, so --
THE WITNESS: Well, there was a slew of arrests and there were a bunch of bail hearings that were held, and they wanted somebody, I think, who they thought was reasonable and had experience to go in and do the bail hearings, and I thought Larry represented a bunch of people in those. That's -- I may be wrong about -- am I wrong about that?
BY MR. FEINBERG:
Q. That sounds completely accurate to me.
A. Okay. Other than that, I, you know -- no. I'm sure I did try cases, again, but do I remember one? No.
Q. The risk of asking you questions about old things that happened in Philadelphia is that we could end up telling stories all day.
I'll try not to do that and instead

Page 32

ask you this question: Have you ever spoken to any of your former colleagues from the DA's office about how the Krasner office is handling old homicide convictions?
Did you ever participate in a conversation like that?
A. I'm sure I have.
Q. Okay. Do you have any views about how the Krasner district attorney's office has --
MR. JOHNSON: Objection.
MR. ZURBRIGGEN: The City joins that objection.
BY MR. FEINBERG:
Q. You can answer.
A. My views are really -- I don't know about the details of the individual cases, so I can't comment on them. My views are more about just the office in general and the training and the movement of DAs through the office and the loss of a lot of generational knowledge of DAs. That's more the conversations I've had.
Q. Got it. Okay. Let me ask you about your time as a prosecutor.
Can I assume that when you worked as a

Page 33

prosecutor, you were conscientious about providing a fair trial to a defendant?
A. Yes.
Q. And also being fully forthcoming with defense counsel about -- about whatever you had in your case?
A. Yes.
Q. Okay. I assume you wanted to win the cases that you tried?
A. Yes.
Q. But you would never hide information from defense counsel.
A. No.
Q. And I assume you were fully familiar with your obligations under Brady vs. Maryland; is that right?
A. I was at the time, yes.
Q. Okay. And I assume you still are today; is that right?
A. I am not today. I haven't practiced criminal law in 20 years, I really don't know.
Q. Okay. But is it fair to say, sir, that you knew then and you -- well, you knew then that if you received exculpatory information, you absolutely, no

Page 34

doubts about it, had to provide it to defense counsel; is that correct?
A. I had to provide Brady material, as it's defined under the law, to defense counsel, yes.
Q. Okay. And I take it that you did that in every case that you handled; is that right?
A. Yes.
Q. Okay. From your time as a prosecutor, can you recall any case where a court dismissed charges or vacated a conviction or anything like that based on an allegation of prosecutorial misconduct?
A. By me?
Q. Yes.
A. No.
Q. All right. I assume that's something that you would remember, right, if that happened?
A. I would think so, yes.
Q. Do you recall any cases where charges were dismissed or a conviction was vacated because of something that the police did?
A. On cases that I handled?
Q. Yes.
A. I don't remember specifically, but I will tell you that I do know that when I was a young DA,

Page 35

in the municipal court unit, I handled a bunch of drug cases, and I think a bunch of those -- well, I shouldn't say bunch. A couple of those narcotics officers were arrested. I don't know if anything related directly to any of the cases I handled, but that comes to mind when you asked that question.
Q. Okay. Sounds like, bottom line, you can't control what the police do or don't do on the course of their investigations; is that correct?
MR. JOHNSON: Objection.
MR. ZURBRIGGEN: The City joins.
THE WITNESS: That's correct.
BY MR. FEINBERG:
Q. Okay. I assume you would do your best to make sure that the police complied with all rules, to the extent you had control.
A. Yes.
MR. JOHNSON: Objection.
BY MR. FEINBERG:
Q. But would it be fair to say, especially in homicide, that the investigation would -- a police investigation would be done before the file ends up on your desk?

Page 36

A. Yes.
Q. Okay. So you've got to depend on the police to tell you what happened; is that correct?
MR. ZURBRIGGEN: Objection to form.
MR. JOHNSON: Objection.
THE WITNESS: That's -- when you say what happened, that's not correct. We depend on the witnesses to tell us what happened.
BY MR. FEINBERG:
Q. And that's a fair -- I'll -- I'll accept that critique of my question.
You've got to depend on the police to tell you what they've learned in their investigation; is that correct?
A. Yes.
Q. You've got to depend on them to be transparent with you about what they've learned?
A. Yeah.
Q. You have to depend on them not to lie to you?
A. Yes.
Q. Does that always -- well, can we agree that

Page 37

there are some times that that doesn't happen, where police are not fully transparent with you?
MR. JOHNSON: Objection.
MR. ZURBRIGGEN: The City joins.
THE WITNESS: Not to my knowledge.
BY MR. FEINBERG:
Q. Okay. Well, then, yeah, let me ask you, can you recall any specific examples of -- where you learned that police had not been truthful with you or had hid information from you?
A. Not that comes to my mind.
Do you mean after the fact, it turned out that they weren't honest with me?
Q. Yes.
A. Not that I can think of.
Q. Okay. I want to ask you now about how and when you learned about the CIU's investigation, CIU meaning Conviction Integrity Unit --
A. Right.
Q. -- of the DA's office, their investigation into Curtis Crosland's case, and for that purpose, I want to show you some of the documents that we

Page 38

already forwarded to your counsel.
MR. FEINBERG: First, can I have Tab 84.
THE WITNESS: Set. Oh, thank you, I appreciate it.
MR. FEINBERG: Now I'm handing these to -- so what we're going to do with exhibits, by the way, we've been numbering them sequentially throughout the case. This will be Exhibit 79. I'll just handwrite the number, and then we can send them to you electronically once we're finished.
(Exhibit 79 marked for identification.)
BY MR. FEINBERG:
Q. So, sir, I'm presenting you with a document that we've marked as Exhibit 79.
MR. FEINBERG: Are there copies there? 79, do we have an extra? Don't worry about it.
MS. HARRIS: I'll just hand it to you.

Page 39

BY MR. FEINBERG:
Q. Bear with me for one moment, sir.
Have you seen that document before, sir?
A. Yes.
Q. Do you recall receiving this letter from Patricia Cummings in 2021?
A. I mean, I know I got a letter from her, but I don't have -- sitting here, I don't have a specific memory of it.
Q. Okay. Let me show you the next document, then.
MR. FEINBERG: This will be Exhibit 80.
(Exhibit 80 marked for identification.)
BY MR. FEINBERG:
Q. There you go. Sir, is Exhibit 80 a letter that you sent to Ms. Cummings on February 5th of 2021?
A. Yes.
Q. Okay. You note in the letter, first paragraph: I did read over the petition you attached to the letter, but that did not help in terms of my

Page 40

remembering anything about the case.
I assume that was an accurate statement?
A. Yes.
MR. FEINBERG: Okay. The next document we have is Exhibit 81.
(Exhibit 81 marked for identification.)
BY MR. FEINBERG:
Q. The text on this is a little small, but I'll ask you to do your best.
This E-mail correspondence appears to be between you and Ms. Cummings.
A. Right.
Q. Do you recall engaging in this correspondence with Ms. Cummings?
A. Yes.
Q. Now, in Ms. Cummings' message to you, if you go to the second page of that document I handed you, which is Bates-stamped City 9462, Ms. Cummings notes that she was going to send you files or a colleague of hers would be sending you files.
A. Yes.
Q. And then the files are enumerated in the

Page 41

body of the E-mail, two -- two items -- or two categories are described; is that correct?
A. Yes.
Q. Do you recall whether you ever received those files?
A. I did.
Q. Okay. Once you received them, did you review them?
A. I did.
Q. Okay. Do you recall any further conversations with Ms. Cummings after you reviewed those materials?
A. Yeah, I'm pretty sure that I either E-mailed -- I -- I know I communicated and said I still don't have a memory of the case.
Q. Okay. Did Ms. Cummings ask you to comment on any information that she believed had been withheld from Mr. Crosland or his counsel?
A. She did not.
Q. Let me note one other portion of the E-mail. In the -- below the enumerated categories of information, the second sentence of that paragraph starts: FYI.
Do you see where I am?

Page 42

A. No, I don't.
Q. The paragraph that starts: The petition for writ of habeas corpus --
A. I see that. Much of the alleged suppressed evidence, yeah. Yeah.
Q. Let me -- I'll just read that out: FYI, much of the alleged suppressed evidence was found in the Philadelphia Police Department's homicide file during our recent review of the file.
First of all, do you understand what she means by that?
A. Yeah.
Q. Okay. Tell me what your -- if you can articulate what that means.
A. It was a homicide file that the homicide detectives keep on the case.
Q. Okay. Do you -- do you recall -- let me ask it this way: Did you have any follow-up conversation with Ms. Cummings about what was found in the homicide file and what was not found in the homicide file?
A. No.
Q. Okay. Do you recall ever hearing about that in any other case, that the Philadelphia Police

Page 43

Department maintained evidence in the homicide file that was not provided to you?
A. No.
Q. Do you recall reaching any opinion about the integrity of Mr. Crosland's conviction after reviewing those documents?
MR. JOHNSON: Objection.
MR. ZURBRIGGEN: The City joins.
THE WITNESS: No. No.
BY MR. FEINBERG:
Q. Let me ask you more specifically about the homicide file and homicide binder, and to try to save some time here, I'm going to summarize what I've heard from other detectives and ask you whether it sounds familiar with your recollection.
A. Sure.
Q. So we've taken testimony from a number of detectives in this case and also in other cases, and they've described two different collections of information. One is the homicide file, which we just talked about, and the other is the homicide binder.
Do you recall those two things as different things?

Page 44

A. No.
Q. Okay. Let me tell you further about what we've learned. We've learned -- or we've heard testimony that the homicide file was a file maintained by the assigned detective, where the assigned detective put literally every piece of information they gathered from the case: handwritten notes, phone messages, forensic reports, witness statements. Anything under the sun about the case would go in that file.
Do you understand what I've said so far?
A. Yes.
Q. Okay. The homicide binder has been described to us as something different, where materials are culled from the homicide file, compiled into a neatly organized binder, ACCO-fastened, a two-prong fastener, with tabs setting things apart, and then that is what's presented to the DA's office.
A. Uh-huh.
Q. Do you recall receiving homicide binders in your time in the DA's office?
A. No.
Q. Do you recall ever -- when I described that

Page 45

binder, is that a -- you don't recall anything
like -- like that?
A. I mean, we would -- no, I mean, I -- we
would get -- I would get our file.
Q. Okay.
A. I mean, I do know that when homicide
detectives would get subpoenaed in for prep,
sometimes they would bring a -- what I called the
homicide file. That's what I thought you were
referring to.
Q. Got it. But you do not recall learning of
any distinction between the homicide file and the
homicide binder?
A. No.
Q. Now, one further piece -- piece of
information we've learned, I'll ask if this refreshes
your recollection, we've been told that the file
stayed in the Homicide Division within the police
department, the binder went to the DA's office.
Have you ever heard about that before?
A. No.
Q. I'm going to show you -- this is marked as
an exhibit. To save some time, I'm going to give you
my copy. This is an exhibit that's been previously

Page 46

marked as Exhibit 69. It's a report prepared by the
Peter L. Zimroth Center on the Administration of
Criminal Law, and I'm showing you pages 7 to 8 of
that report, which I'll hand to you in just a moment,
and the Bates stamp is NSB Crosland 13372 to 73.
Okay. Sir, on the right side of the
page, do you see text that says: Not reviewing the H
file?
A. I do.
Q. Okay. Could you read the first paragraph
to yourself and the first part of the next paragraph.
A. Okay.
Q. Did you continue on to the sentence that
said: Pursuant to this policy, trial prosecutors did
not themselves --
A. Yes --
Q. -- section?
A. -- I did.
Q. Okay. The second sentence reads: As a
result, prosecutors often did not know what they did
not know.
A. Uh-huh.
Q. My question for you is, do you have any
basis to agree or disagree with what is said in that

Page 47

document?
A. I'm not --
MR. JOHNSON: Objection.
THE WITNESS: I'm not going
to --
MR. ZURBRIGGEN: The City
joins.
THE WITNESS: I'm not going to
comment on -- I don't know who these
people --
THE COURT REPORTER: I'm sorry,
I can't hear you.
THE WITNESS: I don't know who
these people are, I don't -- I don't
really have a comment one way or the
other.
BY MR. FEINBERG:
Q. Well, do you remember -- I'm asking about
a -- a practice in the DA's office.
A. Uh-huh.
Q. Do you recall whether the DA's office
relied on the Philadelphia Police Department to
provide information or not?
A. Of course, yeah.

Page 48

Q. Okay. Do you recall whether the
Philadelphia -- the DA's office made a practice of
asking to see all of the documents in connection with
the file?
A. I honestly don't know.
Q. Okay. Do you recall a homicide detective
by the name of --
A. Do you want this back or --
Q. Yeah, I'll take that back from you, thank
you. You know what, actually, hold on to it, because
I'm going to ask you to look at another part in just
a minute.
A. Okay.
Q. Do you recall a homicide detective by the
name of James McNesby?
A. Yes.
Q. Let me show you -- I will acknowledge I did
not send you any deposition transcripts, but I'll
show you this now since we've been on the topic of
the homicide file and the homicide binder.
Please read -- this is from his
deposition, which took place February 22nd, 2024,
from page 84, line 10 to page 85, line 10.
A. Okay.

Page 49

Q. Do you see here how Detective McNesby said, on page 85, that the assigned detective could pick and choose what portions of the file to place in the binder?
A. I see that.
Q. Do you have any reason to agree -- or any basis to agree or disagree with Detective McNesby's --
A. No.
Q. -- conclusion?
A. No.
Q. No -- well, let me ask it differently.
Do you have any reason to disagree with what Detective McNesby says?
MR. JOHNSON: Objection.
MR. ZURBRIGGEN: City --
THE WITNESS: About what they would do, no, I don't.
BY MR. FEINBERG:
Q. Okay. The same question as to his last answer, where he would say -- where he said, pardon me: There would be some information that the detective could choose to keep only in the file and not share with the district attorney's office, and

Page 50

his answer was: Right.
Do you have any basis to disagree with what he said?
MR. JOHNSON: Objection.
MR. ZURBRIGGEN: I'll join.
THE COURT REPORTER: I'm sorry, I -- I can't hear you back there. Speak up.
MR. ZURBRIGGEN: Sorry. Objection, I'll join.
BY MR. FEINBERG:
Q. Sir, have you ever seen a document called a police activity sheet?
A. I saw one in this case the other day.
Q. Okay. That counsel provided to you?
A. Yeah.
Q. Have you -- do you recall hearing about activity sheets back when you were a DA?
A. I do.
Q. Do you have a basic understanding of what their purpose is?
A. My understanding is just the homicide detectives kind of writing down the history of the investigation or the activities in the investigation,

Page 51

yeah.
Q. Do you recall there ever being a change in practice, where at one point the Philadelphia Police Department did not give activity sheets to the DA's office and then they did give those activity sheets to the DA's office?
A. No.
Q. Do you recall whether you received activity sheets from the Philadelphia Police Department?
A. I would not.
Q. You -- you would not receive them?
A. Correct.
Q. Okay. Do you recall ever receiving an activity sheet from a detective, at any point in any case?
A. It's possible much later in my career I did, vague recollection, but I'm not 100 percent sure.
Q. Got it. So from your time -- and let's focus on the time period of the Crosland case, '87, '88 --
A. Right.
Q. -- you don't recall that -- receiving activity sheets in that time period?

Page 52

A. No. Yes, no, I don't recall receiving them, right.
Q. Okay. Thank you. I will take this back from you now.
A. Okay.
Q. Thank you. I want to ask some more specific questions about the Crosland case now, and for this purpose, what I think I'll do is take some liberties and give you some background information on what we've learned.
Leading up to the time of your involvement in the Crosland prosecution, there were two other cases that were being investigated by the Philadelphia Police Department. One concerned the murder of a man named Joseph Wilkerson in 1982.
Do you recall that name or that case?
A. I saw reference to it in the grand jury testimony, but I don't have any recollection of that name or case otherwise.
Q. The second case, related case, that is, involved the murder of a Jon Lamb in 1983.
Do you recall that one?
A. Again, I -- I thought a saw reference to it, but --

Page 53

Q. Okay. The -- the people who the Philadelphia Police Department were investigating in connection with those cases were a few people who were connected by family relationships, mostly as cousins. One was a man named Frank Turner who had the nickname Squirt.
Does that same sound familiar to you?
A. I saw reference to it in the grand jury testimony.
Q. The second was a man named Michael Turner, who was Frank Turner's cousin.
A. Saw reference to it in the testimony.
Q. And then a man named Lester Turner, who had the nickname Geazel, G-E-A-Z-E-L.
Do you remember his name?
A. Just from the grand jury testimony.
Q. Okay. And so in the answers that you've given to me, you recall seeing them in the -- in the documents, but they don't stand out in your memory.
A. No.
Q. Okay. Some more facts just so you have the background.
With respect to the Wilkerson murder, the police were investigating a theory that Michael

Page 54

Turner's mother, Patricia, claimed that she was raped by Wilkerson, and witnesses reported that Frank and Michael shot him in retaliation.
Do you recall seeing anything about that?
A. I saw it in the grand jury testimony.
Q. Okay. With regard to the Lamb murder, the allegation is that Mr. -- that the police were investigating, is that that Mr. Lamb robbed and assaulted our client, Curtis Crosland, and that in retaliation, Frank Turner shot Mr. Lamb sometime later.
Do you recall seeing that information?
A. I don't.
Q. Okay. Does any of this, what I've just outlined, sound familiar to you?
A. No.
Q. Okay. The reason I ask that is this, sir: I understand what your answer is, but just to set the stage, my understanding is that before Mr. Crosland was ever arrested for the Heo murder, there was grand jury testimony about those other cases --
A. Uh-huh.
Q. -- involving Wilkerson and Lamb, and that

Page 55

you were the assigned assistant district attorney handling the grand jury testimony.
Do you remember anything about how you got involved --
A. No.
Q. -- why you were asked to handle those cases?
A. No, I'm sorry, I don't.
Q. Okay. Do you have any recollection of how the Heo murder became assigned to you? Let me ask that a different way.
What I'm trying to get at is this: Do you know whether the DA's office gave you the Heo murder prosecution because you were also involved in looking at Wilkerson and Lamb?
A. Yeah, I don't know.
Q. Okay. Do you recall any recollection of -- strike that.
Do you have any recollection of discussions regarding wanting Curtis Crosland to provide testimony against his cousins?
A. No.
Q. Okay. Do you recall any discussions about the fact that charging Mr. Crosland for the Heo

Page 56

murder might give him incentive to provide testimony against his cousins?
A. No.
Q. One of the documents I showed you -- I sent to your counsel was an activity sheet relating -- or describing a conversation between you and Barbara Christie and a homicide detective named Jon Cimino.
A. Right.
Q. Did you review that document, sir?
A. I did.
Q. All right. Let me put that in front of you, and for your reference, sir, this is -- this binder is a copy of all the exhibits we've marked.
A. Sure.
Q. I'll help you out by turning to that exhibit, which has been previously marked as Exhibit 32. I'm going to ask you to put that binder in front of you.
A. Thank you.
Q. I'm going to ask you a few questions about the documents.
Do you -- do you need to take a moment to read it or is it fresh enough in your mind?
A. It's fresh enough.

Page 57

Q. Okay. All right. So the activity sheet describes a meeting between you and -- and Barbara Christie and Detective Cimino about charging Mr. Crosland for the Heo murder.
Was that a typical practice, that you would get together with the assigned detective before charges were brought?
A. No, it was not.
Q. Can you tell from the context of this activity sheet why this meeting was taking place?
A. No, I cannot.
Q. Can you recall any circumstances in other cases which would lead to a meeting like this prior to charging?
A. I mean, I'm sure it happened in other cases, it was not typical, but if you're asking me a specific memory of a specific case, I can't tell you.
Q. Okay. Now, I -- I take it one of the documents that you reviewed prior to today was the affidavit of probable cause prepared by Detective Cimino.
A. I looked at it. I didn't review it closely, but, yes.
Q. Okay. Let me -- that's one I do want to

Page 58

show you. I'll make it easier and hand you my copy.
A. Do you want this back or --
Q. No, keep that in front of you, because I may ask you about it in just a moment. I'm going to hand you my copy of Exhibit P-1, which is the affidavit of probable cause in this case. Why don't you take a moment to read this one and then I'll ask you -- I'm going to focus specifically on the final page regarding Rodney Everett, but if you read the rest of it so you have context, that will be helpful.
A. Okay.
Q. Would you agree that the only direct evidence, according to Mr. Crosland, that is relayed in this affidavit is the discussion of Mr. Everett's statement of April 15th, '87?
A. Yes.
Q. All right. Can I assume, then, sir, that if -- strike that.
If a detective who had investigated this case had information that related to the credibility of Mr. Everett, you would have expected to have received that information; is that right?
MR. JOHNSON: Objection.
MR. ZURBRIGGEN: Objection.

Page 59

The City joins.
THE WITNESS: Yes.
BY MR. FEINBERG:
Q. Okay. If the detectives had doubts about the credibility of Mr. Everett, you would expect them to provide that to you; is that correct?
MR. JOHNSON: Objection.
MR. ZURBRIGGEN: Same objection.
THE WITNESS: Yes.
BY MR. FEINBERG:
Q. Okay. And, for example, Detective Mangoni is --
A. Mangoni.
Q. The video --
A. That's how I -- that's how he was always -- said his name, so --
Q. You know, at the risk of getting into story-telling, sir, the -- the only person who has ever pronounced the name Mangoni is Detective Mangoni himself.
A. I stand corrected.
Q. You are not alone in your pronunciation. So let's -- let's use Mangoni.

Page 60

Detective Mangoni is the one who took Mr. Everett's statement on April 15th, '87.
You're aware of that from reviewing the affidavit; is that correct?
A. I see it in the affidavit, yes.
Q. Okay. So you would expect that if Detective Mangoni had doubts about the credibility of Mr. Everett, that he would communicate that to you or someone else would communicate it to you; correct?
MR. JOHNSON: Objection.
MR. ZURBRIGGEN: The City joins.
THE WITNESS: Yes.
BY MR. FEINBERG:
Q. And, of course, if you had information which related to the credibility of Mr. Everett, you would have made sure to provide that to the defense; is that correct?
A. Depending on what it was, yes, possibly; possibly no.
Q. Okay. Do you remember any discussion, going back to Exhibit 32, which is in front of you, which related to your conversation with Detective Cimino and Barbara Christie, do you recall anything

Page 61

in that discussion in which the detective communicated to you that there were doubts about Everett's credibility?
A. I have no memory of the discussion, period.
Q. Okay. Can you assume that if there were doubts about the credibility of Everett, that you would have made some note about it or it would have been communicated to the defense at some point?
MR. ZURBRIGGEN: Objection to the form.
THE WITNESS: I can't answer that question. I don't -- I don't know the answer, because it's too speculative.
BY MR. FEINBERG:
Q. Yeah, let me ask it -- well, can you recall any instance where a detective came to you and said, the witness is saying this, but we're not really sure he's telling the truth?
A. I can't recall that happening.
Q. And I'll ask it -- I'm -- I'm trying to be as generic as possible, so let me -- let me try one more time.
Do you recall any instance where a detective ever came to you and said, this witness is

Page 62

saying that so-and-so committed this crime, I'm not sure that this witness is testifying credibly or is providing credible information?
A. No, because -- no, I don't recall that.
Q. Okay. All right. I'll take the affidavit back from you, sir.
A. Sure.
Q. Thank you. Okay. Mr. Everett provided three statements to the police about this case.
Were you aware of that, sir?
A. Yes.
Q. Okay. If you want to orient yourself, I won't ask you to read them, but why don't we just -- I'll give you a tour of those statements so you're aware of what's here. If you'll back to Exhibit 21.
A. Sure.
Q. As I said, you don't need to read through all of these, but just let's confirm, Exhibit 21 is a statement prepared from Mr. Everett by Detective Mangoni and Detective Hughes on April 15th, '87; is that correct.
A. That's what it says.
Q. Okay. If you go forward to Exhibit 24, you'll see there's another statement by Mr. Everett

Page 63

taken by Hughes and Mangoni on April 21st of '87; is that correct?
A. That's what it says.
Q. And then if you go all the way back to Exhibit 10, if you could just flip back to look at the first page, you'll see a statement given by Mr. Everett to Detectives Rocks and Mangoni on July 7th, 1987; is that correct?
A. That's what it says.
Q. Okay. I want to shift topics now to ask you about what you said in your closing argument about Mr. Everett's testimony. So now we're -- we're going way ahead in time, right, to Everett gives these statements in '87, the case gets prosecuted, and you take it over for trial in December of '88.
Does -- does that sound all right to you, sir?
A. If you say so.
Q. Okay. What I will do now is show you the portion of the transcript showing your closing argument, which is -- occurred on December 15th, 1988.
MR. FEINBERG: Turning to page 114, for counsel's benefit. I'll give

Page 64

you the Bates number in just a moment. We're starting with the review of the closing argument at Bates NSB Crosland 8317.
BY MR. FEINBERG:
Q. So, sir, if you take a look at page 114 -- if you give me one moment, I'll tell you which line to start reading to yourself.
A. Sure.
Q. Okay. If you'd look -- you can read from line 3 of page 114, and read the full two paragraphs.
A. Okay.
Q. Can we agree here that what you are doing is telling the jury that Mr. Everett's statement to police, and ultimately his preliminary hearing testimony, was credible?
A. No. Actually, I don't think it's ethical for a DA to comment on whether a witness is credible or not, and I wouldn't do that.
What I'm arguing here is if you use your common sense, this is why you should believe his testimony.
Q. Okay. So whether you say credible or whether you don't use the phrase "credible," your

Page 65

argument is that the jury should believe Mr. Everett; is that correct?
MR. JOHNSON: Objection.
THE WITNESS: My argument is that the evidence shows that his testimony is correct.
BY MR. FEINBERG:
Q. Got it. And by the way, I didn't put -- confirm these facts.
You recall Mr. Everett refusing to testify at the trial -- or do you recall seeing that Mr. Everett refused to testify because he asserted his Fifth Amendment privilege --
A. I did.
Q. -- against self-incrimination?
A. I did, yeah.
Q. And then what happened is his preliminary hearing testimony was read into the record; is that correct?
A. Yes. Correct.
Q. Do you -- do you recall that the preliminary hearing testimony essentially matched the statement of April 15th of '87?
A. I don't recall that.

Page 66

Q. Do you have any reason to dispute that that was the case?
A. I don't recall.
MR. ZURBRIGGEN: Objection.
BY MR. FEINBERG:
Q. Okay. Let's go forward and look at another portion of your closing, page 117 of the transcript.
A. Okay.
Q. The paragraph that says: Now, he's not just saying, read that to yourself and let me know when you finish.
A. Okay.
Q. Now, would you agree that here what you're telling the jury is that they should believe Mr. Everett's preliminary hearing testimony because there were certain details that he provided which would only be known to the murderer or the police who investigated the crime?
A. I agree --
MR. JOHNSON: Objection.
THE WITNESS: I agree with your second part, yeah, not that they should believe, but that his testimony is credible, yeah.

Page 67

BY MR. FEINBERG:
Q. Okay. And that's something that, I take it, you would frequently -- strike that.
Anytime you're dealing with a confession or a confession to a third party, one of the ways that you can argue about the credibility is if it includes unique details that would only be known by a person with -- with information about the crime; is that correct?
A. Yes, that is correct.
Q. Okay. So -- I'll change topics. Different question about your recollection.
Do you recall ever having doubts about Mr. Everett's credibility?
A. I have no recollection of the case, so, no.
Q. All right. All right. Do you recall learning anything about Mr. Everett having reviewed newspaper articles about the crime at the time that he gave his statement?
A. No.
Q. Okay. Does that -- is that something that raises alarm bells to you about a witness's credibility?
MR. JOHNSON: Objection.

Page 68

THE WITNESS: No.
BY MR. FEINBERG:
Q. All right.
A. Not based on what you've said, no.
Q. All right. Now, we just talked about how if a witness has information which would only be known to the murderer and that makes him credible, if the witness could have gotten that information from another source, would that make you question whether the witness is providing accurate information?
A. No.
MR. JOHNSON: Objection.
Go ahead.
THE WITNESS: Can I answer?
MR. JOHNSON: Yeah.
THE WITNESS: Not necessarily.
BY MR. FEINBERG:
Q. Okay. Let me show you a portion of what happened in this case. Just to set the scene, I'm providing the deposition transcript of Detective Mangoni from November 21st of 2023.
A. Do you want me to close this up or --
Q. You can leave it, because we're going to come back to it.

Page 69

A. Okay.
Q. Feel free to move it out of your way if it's in your way.
A. I will.
Q. I'm showing you Detective Mangoni's deposition testimony. If you'd start reading 243, line 4 through 244, line 11, and let me know when you're finished.
A. I'm sorry, to two --
Q. 44, 11.
A. Okay. Okay.
Q. Do you see how Detective Mangoni describes what happened with him and -- with his interview of Mr. Everett and Mr. Massey?
A. Yeah, but it's a little confusing to me.
Q. Okay. Let me do this: Let me tell you my understanding and you'll tell me whether you agree based on what you've read; okay?
A. Okay.
Q. My understanding is that -- first, do you remember the name Massey, M-A double S-E-Y?
A. No, I don't.
Q. Okay. What the documents in this case have shown us is that Mr. Massey was a probation officer

Page 70

who had some relationship with Mr. Everett prior to his involvement with the police.
A. I saw that in the trial transcripts, so --
Q. Okay. What we also know is that Mr. Massey spoke to the police and -- the detectives, that is, and told them that Everett might have information about a homicide --
A. Right.
Q. -- and Massey himself was actually present when Mr. Everett was interviewed by homicide detectives on April 15th of '87.
Do you recall seeing that?
A. No.
Q. Okay. I'll represent that's what the documents show.
What Mr. Massey told the detectives is that before Everett came in and spoke to the police, he, Massey, went to the library, the free library, got newspaper articles about the Heo murder, brought them to Everett, presented them to him, Everett read them and then came and spoke to Detective Mangoni about it. That's my understanding of what happened.
Do you have any reason to disagree with that based on what you saw from Detective

Page 71

Mangoni's deposition?
MR. ZURBRIGGEN: Objection to form.
MR. JOHNSON: Objection.
THE WITNESS: I don't -- I -- it reads to me a little different. I mean, the way I read this is that Massey went -- that's why it's confusing. It says Mr. Everett then goes to the library and looks at newspaper articles. Answer, yes. And then it says he then goes and talks to Everett about what he found, which what makes sense to me, frankly, from reading it is that Massey went to the library, read some articles so he would know about the incident, and then he went and talked to Everett.
I don't see anything in here -- I could be wrong because I wasn't involved in this, but I don't see anything in here about Everett reading articles, but --
BY MR. FEINBERG:
Q. Okay. And I --

Page 72

A. -- but I could be wrong about that, too, honestly.
Q. The -- the question that references Everett, that is -- that's my fault for trying to cover two -- I -- my intent in this deposition is obviously not relevant.
Let's do this: What I'd like to do is show you just a couple of portions of your closing argument, which reference what was -- what were argued to be unique facts about the prosecution -- or about the statement that Everett gave and show you newspaper articles from the same time.
A. Okay.
Q. If you have your -- what -- the way we should do this is let's have your closing in front of you --
A. Okay.
Q. -- and then the particular exhibit that you'll look at is Exhibit P-42.
A. Okay.
Q. First, I'll just take it out of the binder so it's easier for you to review.
Do you recall seeing this document in the materials that were sent to you?

Page 73

A. Yes.
Q. Okay. So the first fact I'll ask you about is if you look at page 118 of your closing --
A. Okay.
Q. -- do you see reference to the cash register?
A. Yes. Line 2?
Q. Yes. And it sounds there that you were arguing that because Everett knew that Mr. Heo was found behind the cash register, that showed that he had information from the actual perpetrator; is that correct?
A. Because that -- because Everett testified that's what the defendant told him --
Q. Yes.
A. -- yes.
Q. Okay. Which showed that Everett's testimony was credible; is that correct?
A. Yes.
Q. All right. In the stack -- or the documents I gave you, if you to go the page that's labeled 5772 -- and by the way, as you're doing that, let me just explain my understanding of these documents.

Page 74

These were documents that were compiled by the Conviction Integrity Unit, they were provided to us in their file, which actually came from City Council, and the documents are printouts from maybe Lexis -- LexisNexis or other databases showing news articles that were published in and around the time of Mr. Heo's murder in December of '84.
Do you understand that?
A. I do.
Q. Okay. At the bottom of 5772, do you see the last article there has a headline, Officer is Shot by Holdup Man in South Philadelphia?
A. Do you want to just point to it?
Q. Sure. Right there.
A. Okay.
Q. That -- that's the article. If you go down to the fifth paragraph that starts: One employee.
A. I see it.
Q. One employee ran outside and the other dropped to the floor, a shot rang out and Heo collapsed behind the counter.
Do you see that?
A. I do.

Page 75

Q. Okay. Can we agree, then, that at the time that this article was published, Everett could have gotten information about the location of the body from a news article?
MR. JOHNSON: Objection.
THE WITNESS: I don't know.
BY MR. FEINBERG:
Q. Okay. This is not something that you recall addressing with the detectives.
Okay. Let's go to the next portion of your closing, page 118. You reference one shot. I'll find the specific line for you.
A. Twenty.
Q. Okay. At 20, yeah, you mention that because Mr. Everett claimed that -- that Mr. Crosland told him that he fired one shot, that made the confession, as reported by Everett, credible; is that correct?
A. Yes.
Q. Okay. In the article that you just reviewed with me, do you recall seeing: A shot rang out?
A. Do you want to point me to -- is that the same --

Page 76

Q. Yeah, the sentence that precedes what I just read to you. The paragraph reads: One employee ran outside.
A. Yeah, I'm looking at it. Bear with me.
A shot rang out, I see that.
Q. So we have reference to a single shot there; right?
A. There's reference a shot rang out, yes.
Q. Okay. Turn two more pages in that document to 5774. This is an article from the Philadelphia Daily News dated December 6th, 1984. Look at the final paragraph. The second sentence reads: Heo was shot once and collapsed behind the counter.
Do you see that?
A. Correct, I do.
Q. Can we agree that there was public information showing that Mr. Heo was shot once?
A. If this is public information. I don't -- I don't know, but if this is public information, then I'll agree.
Q. Okay.
A. So --
Q. The next portion of your closing I'll show you -- next and final portion of your closing I'll

Page 77

show you on this issue. At page 119, there's reference to, in the second paragraph, line 9: He testifies -- he meaning Everett -- at the preliminary hearing that the defendant told him that he didn't get the money and -- and was because he panicked and ran.

Do you recall seeing that?

A. I'm looking at it now.

Q. Yeah, okay. All right. Sorry, I got ahead of myself.

You argued that that was another point that made Everett's relation of Crosland's confession credible; is that correct?

A. It was corroborated.

Q. Yeah. Okay. if you go back to the first page of that exhibit in P-42, 5769, do you see there's a headline -- this is also the Philly -- Philadelphia Daily News, December 13th, '84, right under the heading, Deaths.

Do you see that on top left?

A. I do.

Q. The sentence reads: After shooting Heo, the gunmen fled empty-handed.

A. I see that.

Page 78

Q. Do you agree that that appears to be public information -- that fact appears to be reported in the public sphere?

A. Yes.

Q. Okay. I'll take that back from you.

Before we change topics, let me ask you whether -- do you recall any discussion about the fact -- strike that.

I already asked you, now what I'm going to ask you is this: Now that I have shown you these documents, does that raise any recollection for you about having concerns about the fact that Everett was just repeating information that he got from the news?

A. No.

Q. One of the other things you argued in your closing argument had to do with -- well, let's just do this to make it easier, read pages 121 to 123 of your closing, and then I'll summarize what I think you're arguing and you'll tell me if I've got it correct or not.

A. Okay.

Q. Okay. Would you agree that you are arguing to the jury that Mr. Crosland -- strike that.

Page 79

Would you agree that the facts support a conviction for Mr. Crosland because the perpetrator lived in the neighborhood of the store and knew the decedent by the name Tony?

A. That and height and build, yes.

Q. Okay. And the second part of it had to do with physical description --

A. Correct.

Q. Is that correct?

Okay. Let's talk specifically now about whether Mr. Crosland -- strike that.

Let's talk about the neighborhood. Some of the documents that I asked your counsel to provide to you concern a man named Michael Ransome.

Do you -- did you see those documents, sir?

A. I did not.

Q. Okay. Let me -- I'm going to take the trial transcript back from you and present to you three exhibits.

A. Okay.

Q. These are activity sheets concerning a Michael Ransome. They're at Exhibits P -- pardon me, 15, 16 and 17. We can do them one by one, because

Page 80

there -- there are only portions of each one that I'll ask you to read.

A. I have 15.

Q. Okay. So at 15, read, please, the first three paragraphs of that activity sheet.

A. Okay.

Q. Actually, also read the last paragraph of that activity sheet, too.

A. Okay.

Q. This document is dated December 13th, 1984; correct?

A. Yes.

Q. So eight days after the December 5th murder; correct?

A. Okay. Is that the date of the Heo murder or --

Q. Yeah, Mr. -- yeah, sorry, and I may have jumbled that question.

Mr. Heo was shot on December 5th of '84 --

A. Okay.

Q. -- so we are -- we're --

A. Eight days.

Q. -- just eight days out; correct?

Page 81

A. Right.
Q. And would you agree from this activity sheet, it appears that the police have reports that Michael Ransome might be the perpetrator; is that correct?
A. Have a report, yes.
Q. And Michael Ransome lives at 1147 South 26th Street; is that correct? Third paragraph.
A. Yes.
Q. Okay. And by the way, you mentioned unknown source. Let me note for you -- I'm going to save some time, sir, and I'll just explain why I said sources plural.
Exhibit 14 shows --
A. Do you want me to look at it or --
Q. Why don't you look at it. So --
A. Sure.
Q. -- there are four different handwritten messages on this exhibit, front and back --
A. Right.
Q. -- which are messages to Detective Nespoli, who was the assigned detective at the outset of the investigation, and I will tell you that the -- it appears that all four of them -- or, pardon me. One

Page 82

on the -- on the first page, page City 186, and two on the second page, page City 187, reference Michael Ransome as being involved in the crime.
A. Yes.
Q. Okay. Now that I've shown you this, do you recall hearing any information about tips about Mr. Ransome?
A. No.
Q. Okay. If you go back to the exhibit we were looking at just a moment ago, Exhibit 15, I give you the -- I pointed out the address of 1147 South 26th; is that correct?
A. Uh-huh.
Q. Okay. Go forward to the next one, which is Exhibit 16. Here, if you look at the last paragraph on -- on this page -- or last two paragraphs --
MR. JOHNSON: What's the document number?
MR. FEINBERG: So Exhibit 16, City 209.
MR. JOHNSON: Thank you.
THE WITNESS: I see it.
BY MR. FEINBERG:
Q. Okay. So this activity sheet is dated

Page 83

January 7th of '85, and now we're a couple of weeks out, but can we agree, just to set the scene, that we've -- we've seen evidence that the police had tips about Mr. Ransome, and here on January 7th, they're out searching for him at that address, 1147 South 26th?
A. Yes.
Q. Okay. If you flip forward to Exhibit 17, this is a photo of Mr. Ransome that was found in the police homicide file.
Down at the very bottom, do you see references to his height and weight?
A. I do.
Q. Five-six, 125; is that correct?
A. Correct.
Q. Okay. Let's break these two topics down into one, one being location, the other being physical description.
First, on location, you argued to the jury that Mr. Crosland was a likely perpetrator because when the shooter fled north on 27th, that was in the direction of where Mr. Crosland lived at the time; is that correct?
A. I didn't argue that he was a likely

Page 84

perpetrator, I argued that that evidence corroborated the other evidence in the case.
Q. That's -- that -- fair enough. And -- and the specific address was 2414 Federal Street; is that correct?
A. I don't recall.
Q. All right. I'll -- I'll represent to you that those are the documents --
A. That's fine.
Q. -- we have and that's what you argued.
Let me show you this next exhibit. This is 82.
(Exhibit 82 marked for identification.)
BY MR. FEINBERG:
Q. I have here, sir -- this has not been disclosed in this case, but this is a Google Map exhibit.
MR. FEINBERG: Pass those out to them.
BY MR. FEINBERG:
Q. Oh, here, I'll hand this to you, sir.
I will acknowledge that Google Maps was not available to you in December of 1988; agreed?

Page 85

A. Right.
Q. The first page shows the distance to get from 27th and Oakford to 1147 South 26th; agreed?
A. Okay.
Q. Google Maps tells us it's a three-minute walk; agreed?
A. Yes.
Q. The second page shows the distance between 27th and Oakford and 2414 Federal.
Do you see that?
A. I do.
Q. Google Maps tells us that's a nine-minute walk; agreed?
A. I does, but it's a weird route.
Q. Yeah, I --
A. It doesn't -- it's not a direct route, so I would assume it would be less than nine minutes --
Q. Sure.
A. -- hopefully.
Q. I will acknowledge that, and -- and in full disclosure, apparently Google Maps tells -- thinks that you cannot cross Federal Street at 25th.
A. Yes.
Q. In any event, can -- can we just agree that

Page 86

24th and Federal is further away from the store than 11 -- 1147 South 26th?
A. We can agree to that, yes.
Q. All right. Do you recall -- you've obviously been in Philadelphia for a long time; is that correct?
A. Born and raised.
Q. It's a city of neighborhoods; right?
A. Very much.
Q. And people -- would you say that people tend to use the convenience store that is closest to their home?
MR. JOHNSON: Objection.
THE WITNESS: I -- probably.
BY MR. FEINBERG:
Q. Okay. Do you have any idea how many convenience stores there were at 24th and Federal at this time period?
A. I have no clue.
Q. Okay. Bottom line, Mr. Ransome lived closer to the store than Mr. Crosland; is that correct?
MR. JOHNSON: Objection.

Page 87

BY MR. FEINBERG:
Q. Assuming the -- the accuracy of the information I've shown you.
A. Yes.
Q. All right. Let's talk about physical description.
You argued to the jury that Mr. Crosland matched the description that had been provided by people in the store; is that correct?
A. I believe so, yes.
Q. Specifically the fact that he was a black male, five feet, five inches tall; is that correct?
A. Yes.
Q. Would you agree, based on what I showed you from Mr. Ransome, that he is in close proximity to that description?
A. That -- according to this -- the photo I have, this is, you said, Mr. Turner?
Q. Ransome.
A. Mr. Ransome, I'm sorry. He's five-six and he's a black man.
Q. Okay. And I'll -- by the way, I'll note for you, without taking your time to show you the exhibits, that one of the witnesses from the scene, a

Page 88

man named Levi -- Levi Davis, said that the perpetrator was five-six or five-seven; understood?
A. I do.
Q. Okay. So there was a -- the -- the perpetrator was believed to be a man shorter in stature than your average person; is that correct?
A. Yes.
Q. And we can agree that Mr. Ransome falls within that categorical description; is that correct?
A. Yes.
Q. Okay. Okay. Do you recall whether this information that we've just reviewed, the two activity sheets, 15 -- Exhibits 15 and 16, was ever provided to you?
A. I have no recollection.
Q. Okay. Can I assume, sir, that if you received information about an alternative perpetrator who the police investigated, that you would have turned that over to the defense?
A. I would.
Q. Absolutely exculpatory; is that correct?
A. I don't know if I --
MR. JOHNSON: Objection.
THE WITNESS: -- would call

Page 89

it -- I wouldn't use that phrase, I would say it's Brady material.
BY MR. FEINBERG:
Q. Okay. Let me ask it -- I want to ask you as definitively as I can, without asking you to draw a legal conclusion, there's no question in your mind that you would have disclosed that information if you had it; is that correct?
A. All this stuff that's here together, yes.
Q. Okay. By the way, your opposing counsel in this trial was Benn Paul?
A. Yes.
Q. Do you recall Mr. Paul?
A. I do.
Q. Okay. Did you try many cases against him?
A. I recall one other case I had against him.
Q. In terms of aggressiveness of defense counsel, I mean that as a compliment, can you tell me where he ranked in terms of how he approached a case?
A. Aggressiveness? I can't -- be a little more specific.
Q. Sure. All right. Let me ask it a different way.
If Mr. Paul had information about an

Page 90

alternative perpetrator, you would have expected him to raise that with the jury; is that correct?
MR. JOHNSON: Objection.
MR. ZURBRIGGEN: Objection to form.
THE WITNESS: Depends on the evidence. I don't know.
BY MR. FEINBERG:
Q. Okay.
A. I actually had a case with him where I -- he kind of did something like that, I thought, and it was the wrong decision, and this guy ended up going to jail for life, truthfully --
Q. Sure.
A. -- where he shouldn't have.
Q. All right. Well, let me --
A. That's the case I recollect.
Q. Let me ask, have you ever worked as criminal defense counsel?
A. Yes, I have.
Q. Okay. In your current firm that -- you'll handle criminal cases on the side?
A. I had -- well, one I did -- just I did a friend -- for a neighbor's kid on a drunk driving --

Page 91

Q. Okay.
A. -- but I represented -- I did a jury trial, yeah.
Q. Okay. It sounds -- strike that.
Can we agree that Brady evidence doesn't have to actually be used by the defense to mean that it's Brady evidence; right?
MR. ZURBRIGGEN: Objection to form.
THE WITNESS: I -- I would agree with that.
BY MR. FEINBERG:
Q. In other words, you would have to turn evidence over to the defense so the defense could investigate another theory; right?
A. Yes.
Q. You would expect a defense attorney, if they received information about Michael Ransome, to, at a minimum, have investigated an alternative perpetrator defense; is that correct?
MR. ZURBRIGGEN: Objection to the form.
THE WITNESS: Yes.

Page 92

BY MR. FEINBERG:
Q. Okay. Let's do this: Let me show you one more document and then we'll take a break, as I've been advised we will need to do.
A. Whatever you need.
MR. FEINBERG: Can I have Tab 95, please. Oh, I'm -- I apologize, wrong one. 93. Thank you. My bad.
What number are we on? Is this 83? Okay.
(Exhibit 83 marked for identification.)
BY MR. FEINBERG:
Q. Sir, I'm handing you a document that's been marked as Exhibit 83. This is an affidavit prepared by Joseph Podraza, Esquire.
Do you know Mr. Podraza?
A. No.
Q. Okay. And I don't recall whether I sent this to your counsel.
Have you seen this document before?
A. I -- I think you did send it to counsel, I think he did give it to me, but I don't know that I read it.

Page 93

Q. Let me set -- set the stage, then, for you, sir. This document, the declaration from Mr. Podraza, was part of the pleadings that Mr. Crosland's post-conviction counsel submitted in federal court, and the reason that there is an affidavit from Mr. Podraza is that he represented Mr. Crosland on direct appeal after the conviction that you obtained in December of '88. In other words, Podraza was the lawyer who submitted the brief which resulted in the reversal and the return for another trial.
A. Understood.
Q. Take a look, please -- you're welcome to review the entire thing for purpose -- for our present purposes, take a look at paragraph 7 and let me know when you're finished.
A. I'm finished.
Q. Okay. So here Mr. Podraza talks about his recollection of Michael Ransome as an alternative -- alternate suspect, and he says he had never heard that information.
Do you have any reason, sitting here today, to dispute what Mr. Podraza says in this affidavit?

Page 94

MR. JOHNSON: Objection.
MR. ZURBRIGGEN: The City joins.
THE WITNESS: I have no way of disputing it, agreeing with it, anything.
BY MR. FEINBERG:
Q. Okay. Just return to the bottom line.
If you had the information about Ransome, it would have gone to Benn Paul; is that correct?
A. Yes.
MR. FEINBERG: Let's go off the record.
THE VIDEOGRAPHER: We're now going off the record. This completes DVD number one. It's 11:20.
(Brief recess.)
THE VIDEOGRAPHER: We are now back on the record. This commences DVD number two. It's 11:41. Please proceed.
BY MR. FEINBERG:
Q. Mr. Rosen, we're back on the record after a short break.
Did you realize during the break that

Page 95

any of your previous testimony was incorrect or incomplete?
A. No.
Q. All right. I'm handing you another document, sir.
MR. FEINBERG: This will be marked as Exhibit 84.
(Exhibit 84 marked for identification.)
MR. FEINBERG: And, Carlton, if you need a copy.
BY MR. FEINBERG:
Q. Sir, this is an E-mail exchange between Charles Heo, the son of the victim, Mr. Heo, and Patricia Cummings. The E-mail exchange took place during the CIU's investigation of this case. I don't recall if I sent this to your counsel or --
MR. JOHNSON: You did not.
MR. FEINBERG: All right. Then this came to my attention recently.
BY MR. FEINBERG:
Q. And I'm going to ask you just two quick questions about it. If you need time to read more, then you should -- you should, by all means, tell me.

Page 96

Please turn to the third page of the document, which is labeled City 9891. There's a handwritten number four about halfway down the page.
Do you see that?
A. I'm sorry, say that again. Number four?
Q. Yes, number four.
Do you see that?
The sentence reads: In your best judgment.
A. Okay.
Q. And just for reference, this is Mr. Heo talking to Ms. Cummings about a conversation that they had. If you need context, feel free to take the time.
What I'm specifically asking you about is this: Mr. Heo says, would you have told my mother and me, quote, we are going to put your dad's killer behind bars because we have all the evidence we need like Assistant DA Rosen did.
My question for you is, do you recall any conversation with a very young Charles Heo the --
A. No.
Q. -- son of the victim?
Okay. In paragraph 5, four lines from

the bottom, there's a sentence that says: My opinion is that Assistant DA Rosen believed he had the right guy until he didn't.
Do you see that?
A. I do.
Q. It continues on. I'm just asking you about the first part.
Do you recall having an opinion, communicating that opinion or anything like that to the family of Mr. Heo?
A. I have no recollection.
Q. Okay. All right. You can put that to the side, sir.
I want to ask you some more questions about Mr. Everett's interactions with the police. To do that, I'll ask you to go back to Exhibit 21, which is his statement of April 15th.
No need to read the entire statement now, but just to confirm, this statement was given on April 15th of '87; correct?
A. That's what it says.
Q. Yeah. And then if you go forward again to Exhibit 24, you recall there was a second statement on April 21st of '87?



A. That's what it says.
Q. Do you have any idea why the police brought Mr. Everett back six days after his first statement?
A. The only thing I would say -- give me -- give me a second.
Q. Sure.
A. I don't know that there's any formal photo identification in the first statement, and they would need that, so maybe that's why. I don't know, but --
Q. Were you aware that the detectives gave Mr. Everett a polygraph exam on April 21st?
A. I was not.
Q. Okay. And would you agree there's no reference to the fact that there was a polygraph exam in Exhibit 24, the statement of April 21st?
A. I would agree.
Q. Okay. Let me step back before I ask you more about that, I'll ask you some questions about polygraphs in general.
Were you ever involved in decisions by the police to use polygraphs?
A. On -- I've had cases where people charged with crimes have been -- been given polygraphs.
Q. So once the case has already been -- a



prosecution has already been initiated.
A. I've had that, I do recall that, I've also had cases where, when somebody was arrested, they'd give a statement and the detective would say are you willing to take a polygraph, and they do.
Q. Okay. Would you, yourself, as a prosecutor, ever be involved in that decision to suggest a polygraph?
A. I don't remember any specifically.
Q. Do you have any recollection of the factors that a detective would consider in deciding whether to give a polygraph exam?
A. Of a?
Q. Of a witness.
A. Of a witness.
Q. Yes.
A. No.
Q. Okay. Do you recall ever hearing a detective say or telling you that they would polygraph witnesses when they had concerns about their credibility?
A. No.
Q. I'll represent to you that we have some testimony from Detective Mangoni on this topic, that



sometimes that's what he would do; if he had reasons to disbelieve a witness or if he wasn't sure whether the witness was telling the truth --
A. Uh-huh.
Q. -- he would suggest that the witness would take a polygraph exam.
Does any of that surprise you?
MR. JOHNSON: Objection.
THE WITNESS: I've never heard it before.
BY MR. FEINBERG:
Q. Okay. Have you ever heard detectives talk about using polygraphs themselves as an investigative tool?
A. Could you be more specific, please?
Q. Sure. What I mean by that is if a detective says to a witness, take this polygraph exam, the exam is then conducted, the examiner says the person failed the exam or that deception was indicated, then the detective would say to the witness, look, you weren't being truthful with us, the exam showed that you were -- that you were being deceptive, let's talk more about it.
Have you ever heard of detectives

Page 101

using that kind of questioning technique?
A. Not with a witness.
Q. Okay. With a -- you're distinguishing between a witness and a suspect?
A. Yes.
Q. Okay. I'll just represent to you -- I can show you testimony if you like, but I'll represent to you --
A. No, that's okay.
Q. -- that Detective Mangoni talked about using polygraphs in that manner.
Let's discuss what happened, then, with Mr. Everett. If you turn to Exhibit 25, this is an activity sheet concerning what happened on April 21st with Mr. Everett.
A. Right.
Q. Is this one document that you reviewed?
A. This might have been one that I reviewed. I --
Q. Take a moment to read the first paragraph.
A. Okay. Right.
Q. Had you ever seen this document before?
A. No.
Q. Was this document ever provided to you in

Page 102

connection with the prosecution of Mr. Crosland?
A. I mean, I don't have a recollection.
Q. Okay. Let's confirm what the document says or what the document means.
In the third sentence: He was polygraphed.
Do you see where I am?
A. I am.
Q. He -- referring to Mr. Everett -- was polygraphed on his original statement about being told by Curtis Crosland and was DI.
DI, we've been told, means deception indicated --
A. Yes.
Q. -- in other words, a polygraph failure; agreed?
A. Agreed.
Q. And that polygraph exam was conducted by a Police Officer D. Riley, R-I-L-E-Y.
Do you recall learning about that fact?
A. No.
Q. Mr. Everett was -- continuing on with the activity sheet, was reinterviewed and maintained he

Page 103

was being honest and was told by Crosland -- what's left out, told by Crosland about the Heo murder, and he was then returned to the detention center.
Do you recall learning those facts before, sir?
A. No.
Q. Okay. Can we agree that in the statement that you reviewed a moment ago, P-24, there's no reference to the fact that a polygraph was -- was conducted.
A. Correct.
Q. There's also no reference to the fact that Mr. Everett was interviewed a second time.
Yeah, I see why you're pausing. We know that April 21st was the second interview of Mr. Everett; correct?
A. Are you talking about the handwritten one?
Q. Yes.
A. Yes.
Q. Okay.
A. Well, according to what you've shown me, yes.
Q. Okay. So can we agree, and if you need to go back to P-24 to answer this question, you -- you

Page 104

absolutely should, that there's no discussion in that statement of Mr. Crosland -- pardon me, Mr. Everett being questioned about the polygraph failure and maintaining that he was being honest?
A. Correct.
Q. Okay. Do you know why that information is not included in that statement?
A. No.
Q. Does it surprise you that that information is not included in that statement?
MR. JOHNSON: Objection.
MR. ZURBRIGGEN: City joins.
THE WITNESS: I can't speculate.
BY MR. FEINBERG:
Q. Okay.
A. I don't know.
Q. Does the fact that Everett failed a polygraph when being asked about his claim that Mr. Crosland confessed to the crime, give you reasons to question Mr. Everett's credibility?
A. Possibly.
Q. Okay. Do you recall -- now -- now that we've reviewed this information, do you recall any

Page 105

discussions with Detective Mangoni or any -- any other detective about questions concerning Mr. Everett's credibility in light of the polygraph failure?
A. No.
Q. Can I assume, sir, that if you received this information, this activity sheet describing the polygraph, that you would have passed that to the defense?
A. Yes.
Q. Can I assume that -- strike that.
Can you assume that if that information was passed to the defense, that Mr. Paul would have used it in some manner to investigate his defense or to challenge the prosecution at trial?
MR. JOHNSON: Objection.
MR. ZURBRIGGEN: City joins.
THE WITNESS: I don't know.
BY MR. FEINBERG:
Q. Okay. There's no question in your mind, however, that if this information came into your possession, it would have been passed to the defense --
A. Yes.

Page 106

Q. -- is that correct?
Yeah, I'll represent to you, sir, that based on my understanding of the investigation that the CIU conducted, they found this document, this activity sheet concerning Rodney Everett's polygraph, in the homicide file maintained by the Philadelphia Police Department, but they did not find it in the district attorney's office file, which presumably is the file that you would have relied on at trial.
Do you understand that representation that I've made?
A. I do.
Q. Okay. Does that tell you one way or another whether the document was passed to you?
MR. ZURBRIGGEN: Objection to form.
THE WITNESS: That fact in and of itself does not.
BY MR. FEINBERG:
Q. Okay.
A. The fact that I didn't pass it on tells me it wasn't passed to me.
Q. Got it. And -- and you're drawing that conclusion because if information gets passed to you,

Page 107

you're going to immediately turn around and give it to the defense?
A. It depends upon the information, but this, yes.
Q. Okay. No question in your mind.
A. No.
Q. All right. Now, I think you -- you pushed back on my question about whether Mr. Paul would have used this information as speculative about what he would have done; correct?
A. I -- no, I just said I don't -- I can't speculate --
Q. Okay.
A. -- one way or the other.
Q. Let me show you Mr. Podraza's declaration. And by the way, just so you're aware, the -- the -- my understanding is the reason that we have a declaration from Mr. Podraza, direct appeal counsel, is that Mr. Paul was deceased at the time that the CIU investigated this case, and that Mr. Podraza was asked for his recollection of his discussions with Mr. Paul, because he shared office space with him.
A. Yeah.
Q. Just so you're -- so you're aware.

Page 108

Take a look, then, at paragraph 6 of Mr. Podraza's declaration, which -- I'm sorry, I just need to read the number of the exhibit, which is on the first page, 83. Take a look at paragraph 6 and let me know when you're finished.
A. I'm finished.
Q. Okay. Do you have any reason to disagree -- disagree or dispute the things that are said in Mr. Podraza's declaration concerning this information?
A. I --
MR. JOHNSON: Objection.
THE WITNESS: I have --
MR. ZURBRIGGEN: The City joins.
THE WITNESS: I have no reason to agree or disagree.
BY MR. FEINBERG:
Q. Okay. If -- assuming that this information was not, in fact, provided to you, this meaning the activity sheet, does that concern you about the manner in which the Philadelphia Police Department conducted this investigation?
A. I can't answer that question 30 years -- 35

Page 109

years later.
Q. Okay. All right. Take a look at Exhibit 10, please.
A. Okay.
Q. Exhibit 10 is a statement that Mr. Everett gave on July 7th of 1987; is that correct?
A. That's what it says.
Q. Yeah, all right. Now, to aid you, I'm going to show you a discovery letter, a discovery transmittal letter sent by the DA's office to Mr. Crosland's then defense counsel. This has previously been marked as Exhibit P-78. Take a look at that document, sir.
Have you seen this one before?
A. Yes.
Q. I assume you've seen letters that look like that before; is that correct?
A. Probably. Is this the entire --
Q. I --
A. Is this the entire document, though?
Q. I'll tell you that's the only doc -- that's the only portion of the document that appears in the district attorney's office file that was provided to us.

Page 110

A. And the only reason I said there's no -- it feels like there might be something -- a page missing or --
Q. Okay.
A. -- there's no signature, you know.
Q. Can we agree that -- that there appears to be a complete list of the witness statements that were disclosed to the defense on the first page?
A. I don't know.
Q. All right. In fact, let me take that back from you for one second.
Do you see Category A says statements on it?
A. I do.
Q. And then the list goes one through 13 --
A. I do.
Q. -- is that correct?
And then, category B is medical examiner's report; is that correct?
A. Correct.
Q. Can we assume that if there was another statement that was provided to the defense, it would have been logically placed on that list; is that correct?

Page 111

A. Logically, yes, but I can't make that assumption if there's an order difference or -- I don't know.
Q. Okay. Do you see numbers 8A and B on the list --
A. I do.
Q. -- reference Everett's statements from 4/15/87 and 4/21/87?
A. I do.
Q. Can -- obviously, there's no reference on the July 7th, '87 statement.
A. Correct.
Q. Do you know whether that document, his July 7th, '87 statement, was ever disclosed to the defense?
A. I do not know.
Q. Okay. Can -- can I assume, sir, that if you had a statement from a witness who was testifying in the prosecution, you would absolutely provide that to the defense?
A. I -- I mean, if you're talking about this statement in particular, any statement I wouldn't -- every statement is not necessarily discoverable; it could relate to other crimes, other incidents, so the

Page 112

answer is I don't know, it depends.
Q. Okay. Take a moment to read the first paragraph of the statement --
A. Sure.
Q. -- and then I'll reask the question after you've had the context.
A. Okay.
Q. Do you see the reference to this particular case concerning --
A. I do.
Q. The Il Man Heo murder?
A. Sorry. I do.
Q. Okay. In -- now that you have that additional context, can we agree that if -- if this statement was in your possession, you absolutely would have provided it to the defense?
A. I would.
MR. ZURBRIGGEN: Objection to the form.
THE WITNESS: Certainly, at least the portion relating to my case.
BY MR. FEINBERG:
Q. Okay. And when that happens, would there -- if you recall discovery practices, would

Page 113

other portions of the statement be redacted?
A. Yes.
Q. Okay. I'll ask you just about some of the details in this statement. Before I do that, let me just note that the discovery letter that I just showed you was dated February 8th, 1988.
Do you recall that?
A. No.
Q. Okay. Well --
A. I'll take your word for it.
Q. All right. Good enough. And I'll -- if you like, I can show you this, but Mr. Paul said on the record during the trial that he received all the discovery from the defense in February of 1988.
Do you understand that representation?
A. I do.
Q. So, in other words, if we -- if we assume the truth of what Mr. Paul is saying on the record, it's not like there was ever any supplemental disclosure or at least as far as he knew; understood?
A. I understand.
Q. Okay. So with that as background, let me ask you, do you recall seeing anything, in what you've reviewed or anything from your recollection,

Page 114

about whether this July 7th, '87 statement was ever disclosed?
A. I -- I don't know.
Q. Okay.
A. I saw nothing.
Q. All right. Now, in the statements that you've reviewed from Mr. Everett, does it appear to you that the detectives investigating the case were trying to find corroborating information in the form of other people who heard Crosland confess to the crime?
MR. JOHNSON: Objection.
MR. ZURBRIGGEN: City joins.
THE WITNESS: I mean, if you're referring to this July 7th statement in the first paragraph --
BY MR. FEINBERG:
Q. Uh-huh.
A. -- the question's just is there anything else you can tell me and then he goes on and says it, so when you say detectives are trying to get him to do this or that, it just doesn't seem that way based on the question.
Q. That -- all right. And that -- that's a

Page 115

that's a fair point. Let me -- let me ask that a slightly different way.
Mr. Everett's statement references -- pardon me, Mr. Everett's answer to that first question refers to a number of people who he believes Mr. -- who he allegedly believes Mr. Crosland may have confessed to.
Would you agree with that?
A. I mean, he -- it's a pretty speculative statement, truthfully. He says Curtis may have told Talmadge Garwood.
Q. Okay.
A. That's pretty much it.
Q. Would you expect detectives, understanding that you were a prosecutor and not a detective running an investigation --
A. Right.
Q. -- would you have expected the detectives to go out and speak to these people who Mr. Everett mentions?
MR. ZURBRIGGEN: Objection.
THE WITNESS: Probably not.
BY MR. FEINBERG:
Q. Okay. Would you expect that the defense

Page 116

would want to be aware of who these people were?
MR. ZURBRIGGEN: Same objection.
THE WITNESS: I don't know.
BY MR. FEINBERG:
Q. Okay. Notwithstanding that, you are certain that this would have to be disclosed to the defense as part of your Brady obligations; is that correct?
A. I mean, I would disclose this. It's not really Brady in the sense that it's not -- I don't think it's exculpatory, but I think it should be disclosed, yes, that portion of the statement.
Q. Okay.
A. If that makes sense to you.
Q. Sure. Would you agree that if Everett is speculating that other people may have heard Mr. Crosland confess to this crime, then the defense can go out and interview those people, and if they all deny it, that's something that the defense could use affirmatively in their case?
A. I don't really agree with that. I think if he had said he definitely told this person I know it and then that -- they interviewed that person, the

Page 117

defense, and said the person said no, I didn't, then you would be correct, but just the statement that he may have said to somebody, no, I don't agree with that.

Q. Okay. There are other portions of the statement that concerned other cases --
A. Uh-huh.
Q. -- is that correct?
A. Yes.
Q. Now, if you go -- go to the third page --
A. Yes.
Q. -- you see there's reference to Curtis there and there's also discussion of the Jon Lamb case?
A. Yes.
Q. Would you agree that these portions of the statement concerning Mr. Crosland and his alleged involvement in another case should also be disclosed to counsel for Mr. Crosland?
A. I don't know.
Q. Do you recall that Mr. Crosland was, in fact, prosecuted in the Jon Lamb case?
A. No.
Q. Okay. I'll represent to you that Mr.

Page 118

Crosland was actually arrested on the Jon Lamb case first in November of '87 and then arrested on the Heo case in December of '87, both cases went to a preliminary hearing the same day, charges were dismissed as to Crosland in the Lamb case --
A. Uh-huh.
Q. -- charges were held for court against Mr. Crosland in the Heo case.
Does that background make sense?
A. I understand what you're saying.
Q. Okay. In light of all that, you would expect that counsel for Mr. Crosland would receive this information concerning the Lamb case on the third page.
A. Yeah, I don't know.
Q. Okay. And I don't mean to -- to belabor the point, you've already agreed with me, I think, that no matter what, if you had this statement, the portions referencing Mr. Crosland are getting turned over to the defense.
A. Yes.
Q. If the defense did not have this information, does that draw you to the conclusion that you did not have the information?

Page 119

MR. ZURBRIGGEN: Objection form.
MR. JOHNSON: Objection.
THE WITNESS: Yeah. Yeah, I would say so.
BY MR. FEINBERG:
Q. Okay.
A. Can I say one other thing?
I guess something can fall through -- this could have fallen through the cracks, I guess, so --
Q. How's that?
A. Well, because discovery's being provided by clerks at that time, so --
Q. Okay. That said, can I assume that you, as a prosecutor, would make sure to discharge your obligations in every case; right?
A. Yes.
MR. ZURBRIGGEN: Objection to form.
BY MR. FEINBERG:
Q. And part of that would be to ensure that you could -- pardon me.
What you would do is to go do

Page 120

everything in your power to make sure information was provided.
A. If this was in my file and I saw it and I saw the defendant didn't have it, defense, then I would send it --
Q. Okay.
A. -- a copy.
Q. Very good. The next document I want to show you, sir, concerns a question about inconsistencies.
Can we just agree that in -- in every trial that tends to be an argument about credibility -- let me not ask it that way.
If you have an inconsistent statement in one of your cases, you're going to use that to challenge a witness's credibility; right?
A. Correct.
Q. And in a criminal matter, if you, as the prosecutor, learn about evidence that a witness has made an inconsistent statement, that evidence is going to be turned over to the defense; is that correct?
A. If it relates to the crime, yes.
Q. Okay. Because an inconsistent statement

Page 121

about the crime is something that can be used to question the credibility of the witness; is that correct?
A. Correct.
Q. If the witness can't keep their story straight, then that's an argument the defense can make to the jury, that they're not telling the truth.
A. They can.
Q. Okay. That's something I'm sure you see all the time as a prosecutor; is that correct?
A. I don't know about all the time, but, yes, it happens.
Q. Okay. A defense lawyer's favorite type of impeachment would be showing an inconsistency between sworn testimony and a prior statement --
A. Yes.
Q. -- is that correct?
On that topic, let me ask you to turn to Exhibit 30.
Is this a document that you reviewed leading up to today, sir?
A. No.
Q. Take a moment to read it to yourself and let me know when you're finished.

Page 122

A. Okay.
Q. Do you see the reference -- well, let me read the entire sentence into the record, it's the third sentence of the document: She -- referring to Louise Woods, who's the girlfriend of Rodney Everett --
A. Right.
Q. -- the witness we've been discussing -- She stated that Everett called her from prison and he told her that Frank Turner, aka Squirt, the alleged shooter in the Heo case, was staying in the Tasker Homes.
I'll stop there. I take it you saw the reference to Frank Turner as the shooter of Mr. Heo; is that correct?
A. I see there's a reference to Frank Turner, and then it says, the alleged shooter in the Heo case.
Q. Okay. Can we agree that based on what you've seen, Mr. Everett gave three statements, two in April, one in July, referring to Mr. Crosland as the so-called confessed shooter of Mr. Heo?
A. Yes.
Q. Now, we have an apparent interaction

Page 123

between Detective Rocks of the Homicide Division and Louise Woods referencing Frank Turner as the shooter in the Heo case; is that correct?
MR. ZURBRIGGEN: Objection to the form.
THE WITNESS: There's a reference in the paragraph that he's the alleged shooter.
Is that what you're asking me?
BY MR. FEINBERG:
Q. Yeah.
A. It says that in the paragraph.
Q. Okay. I'll represent to you, sir, that Detective Rocks, when he was questioned about this, said that in this situation, he would have expected to either conduct a full-fledged interview with Louise Woods or another follow-up interview with Mr. Everett --
A. Uh-huh.
Q. -- to clarify any confusion about who the shooter was.
Do you understand the representation that I've made?
A. I -- I do. I -- is it clear that the

Page 124

alleged shooter is what Mr. Everett's saying to her?
That's my only question.
Q. And that's -- so to be fair -- let me reference some testimony for you if I can. Bear with me for one second, sir. Let me start by reading this to you. If you --
A. Sure.
Q. -- if you need to see he document, you'll tell me. This is Mr. Rocks' deposition testimony from November 6th, 2023, page 293, line 23, question: Louise Woods -- according to this document -- stated that Everett called her from prison and he told her that Frank Turner, the alleged shooter in the Heo case, was staying in the Tasker Homes -- and then there's an address -- agreed? Answer: Yes. Question: So this activity sheet is communicating that Mr. Everett reported to Louise Woods that Frank Turner was the shooter; is that correct? Answer: Correct. Question: Which is different from what Everett said before; is that correct? Answer: Correct.
A. Okay.
Q. So can we agree that Detective Rocks, whose activity sheet this was, is saying that this is

Page 125

different information from Mr. Everett secondhand?
A. We can agree to that.
Q. Okay.
MR. ZURBRIGGEN: Objection to form.
BY MR. FEINBERG:
Q. In -- in light of that, would you agree that this information about an inconsistent statement should be disclosed to the defense?
MR. ZURBRIGGEN: Same objection.
THE WITNESS: Yes. Yes.
BY MR. FEINBERG:
Q. Do you recall receiving this activity sheet?
A. No.
Q. If you had received this activity sheet, you would have disclosed it; is that correct?
A. Yes.
Q. Because you expect that that inconsistent statement is something that would -- might be explored by the defense at trial.
A. Correct.
Q. By the way, I mentioned before that

Page 126

Detective Rocks said that he would expect a more formal interview with Louise Woods or a follow-up interview with Rodney Everett, do you know whether any of that ever happened?
A. I don't know.
Q. Okay. If you had this information as a prosecutor, is that something that you would seek to clarify?
A. Yes.
Q. Okay. So, for example -- and I don't mean to put words in your mouth, but I'm -- I'm wondering if, if you saw this document in discovery, would you ask the detectives to go out and speak to Louise Woods or Rodney Everett just to clear it up?
A. I might do that, I might discuss it with my supervisor. I would do something.
Q. Okay. Do you recall reading Mr. Podraza's declaration, in which he said that he did not recall learning about any of the inconsistent statements?
A. No, but I'll accept your word that that's what he says.
Q. Okay.
MR. ZURBRIGGEN: Objection to the form.

Page 127

BY MR. FEINBERG:
Q. Do -- do you have any reason to dispute Mr. Podraza's --
MR. JOHNSON: Objection.
BY MR. FEINBERG:
Q. -- declaration --
A. I have no reason to agree or disagree with what he says.
Q. But as a bottom line, sir, you agree that this is information that absolutely would have been disclosed to the defense if it came into your possession?
A. Yes.
Q. Okay. And by the way, I -- I've used the phrase "your possession" a number of times. I want to be clear that I've been meaning that generally, meaning the possession of the DA's office. I know you can't control what others in the DA's office do.
So let me ask it this way: Based on office practices at the time, would you expect that other DAs would have known to disclose this information?
A. Yes.
Q. Okay. And that applies to all the

Page 128

information that we've discussed previously, the activity sheet about the polygraph, the July 7th statement?
A. Yes.
Q. Okay. One more document I want to ask you about whether you've seen, and that has to do with Mr. Everett's request for assistance with his own prosecutions.
Do you recall seeing a document to that effect?
A. I might have seen it at counsel's office yesterday.
Q. All right. I'll -- I'll show that to you in just a second.
Can we agree that communications between a witness and a detective about assistance with the witness's ongoing criminal prosecutions is discoverable information?
In fact, let me withdraw that question.
A. Sure.
Q. Would you agree that if a witness is asking a -- a detective for a deal in return for testimony, that's something that would be exculpatory?

Page 129

A. Yes.
Q. Because that person's motivations are put in issue; is that correct?
A. Correct.
Q. The person who is asking for help might have a motive to tell the detective or whatever investigator whatever that person thinks the detective wants to hear in return for assistance; is that correct?
A. That's possible.
Q. So that's often -- I assume that you saw that all the time as a prosecutor, if a -- if a witness was getting assistance in a criminal case, they would be impeached about that deal that they've gotten; is that correct?
A. Correct.
Q. All right. With that background, turn to Exhibit 27, please.
Now that you have this document in front of you, sir, does this look familiar?
A. Yes.
Q. Do you recall ever seeing this document before?
A. I think I saw it yesterday.

Page 130

Q. Okay. Before that, do you recall ever seeing it?
A. No.
Q. There are some references to you specifically, Mr. Rosen, in this document. For example, if you look at the third paragraph, Mr. Everett writes: But I had been trying to make contact with Mr. Rosen so he can view my legal work.
Did you see where I was reading from?
A. I do.
Q. Okay. Does that refresh your recollection about any conversations with Mr. Everett back in this time frame?
A. No.
Q. Just by way of further background, we've -- we've already discussed the pronunciation of Detective Mangoni's name. This one appears to be addressed to Detective Magioni, M-A-G-I-O-N-I.
Can we agree that it does appears to be sent to Detective Mangoni?
A. I have no reason to disagree with that.
Q. That would make sense, because Mangoni has already interviewed Everett three times, right, two in April and one in July of '87?

Page 131

A. If you say.
Q. And do you often see the case that detectives will build a rapport with witnesses and will continue to talk to them over the course of a case?
A. I wouldn't say often, but I would say yes --
Q. Okay.
A. -- that does happen.
Q. And this letter appears to show some familiarity between Mr. Everett and Detective Mangoni; is that -- is that correct?
MR. ZURBRIGGEN: Objection to form.
THE WITNESS: I wouldn't necessarily say that, but --
BY MR. FEINBERG:
Q. Fair enough. Can we agree that the -- that Mr. Everett, in this letter, is asking for help with his criminal cases?
I can highlight some specific text if that would be helpful.
A. Just give me a second and I'll --
Q. Sure, take your time.

Page 132

A. -- answer your question.
Yeah, why don't you -- I'm looking for something that references his cases specifically, so if you can just point it to me.
Q. Sure. In the basic halfway point of the page where it says: Because it seems.
A. I'm receiving no help.
Q. Yeah, I'm receiving no help, but I'm willing to give it.
A. Uh-huh.
Q. Can we agree that at least in -- that's an implied suggestion that he's looking for help; right?
MR. JOHNSON: Objection.
THE WITNESS: Yes --
MR. ZURBRIGGEN: The City joins.
THE WITNESS: -- I would agree with that.
BY MR. FEINBERG:
Q. Okay. And then there's -- the next paragraph starts: I want to work out a plan, but I need your help and Mr. Rosen.
And then it continues, he's talking about wearing a wire.

Page 133

A. Right.
Q. So he's talking about continued assistance; is that correct?
A. He says I want to work out a plan --
Q. Okay.
A. -- whatever that means.
Q. All right. Notwithstanding how clear Mr. Everett is, would you agree that --
MR. JOHNSON: I'm -- objection.
MR. FEINBERG: Let me finish the question.
BY MR. FEINBERG:
Q. Would you agree that the general tone of this letter is that Mr. Everett is looking for help in return for his assistance?
MR. ZURBRIGGEN: Objection.
MR. JOHNSON: Objection.
THE WITNESS: I wouldn't -- I'm not going to speculate. It says what it says.
BY MR. FEINBERG:
Q. All right.
A. I don't want to interpret.
Q. Well, if -- let's put it this way: If you

Page 134

got this letter, sir, would you disclose this to the defense?
A. Yeah.
Q. Okay. Why do you say that?
A. Because it could be read the way you just said.
Q. Okay. And perhaps that's -- the past several questions I've asked you highlight the issue, right, that this letter is subject to interpretation depending on which perspective of the case you have --
A. Yes --
Q. -- is that correct?
A. -- I would agree with that.
Q. And the important point about Brady obligations is that you don't only look at material from the perspective of the prosecutor; is that correct?
A. Honestly, it's been a long time since I did Brady, so I'm reluctant to answer Brady questions, but it sounds like what you're saying is correct.
Q. Would you agree that under the law anything that might be marginally helpful to the defense, that's got to be disclosed; is that correct?

Page 135

MR. JOHNSON: Objection.
MR. ZURBRIGGEN: The City joins.
THE WITNESS: I -- I don't know. Sitting here today, I honestly don't know.
BY MR. FEINBERG:
Q. Okay. It sounds like, though, you are not -- you don't have any uncertainty, though, as to whether this information should be disclosed, you would have disclosed it absolutely; is that correct?
A. I think it should be disclosed.
Q. Okay. If you did not have this -- or strike that.
If this was not in the possession of the defense, does that suggest to you that you never had this document?
MR. ZURBRIGGEN: Objection to form.
THE WITNESS: It would indicate to me that I did not have it because it wasn't disclosed to the defendant.
BY MR. FEINBERG:
Q. And would you expect that the defense would

Page 136

use this information to show that -- to challenge the detective -- pardon me. Let me start over.
Would you expect that the defense would in some way try to use this information to challenge Mr. Everett's credibility?
MR. JOHNSON: Objection.
MR. ZURBRIGGEN: The City joins.
THE WITNESS: I don't know.
BY MR. FEINBERG:
Q. Okay. That's -- it would not -- you wouldn't be surprised if the defense used this information to try to --
MR. JOHNSON: Objection.
BY MR. FEINBERG:
Q. -- challenge Mr. Everett.
A. I can't comment on whether they would have or not. I mean --
Q. I'm not asking -- well, let's -- let me be clear, Mr. Rosen, I'm not asking you to inhabit the mind of a defense lawyer defending Mr. Crosland at the trial of this matter.
From your perspective as a -- as a former prosecutor, if the defense had this letter in

Page 137

their hands and they stood up and waved it around in front of Mr. Everett and said he was just begging for a deal --
A. Uh-huh.
Q. -- that's something that you might expect to see; is that correct?
A. It could happen.
Q. Okay. Which is why you say that you would have absolutely disclosed it; is that correct?
A. I would have disclosed it because at least, without remembering exactly what Brady dictated, it just feels to me, sitting here today, that this would have qualified as Brady material.
Q. Okay. I think I neglected to ask you that line of questions regarding the activity sheet about the inconsistent statement pointing to Mr. Everett.
A. Uh-huh.
Q. And if I am repeating myself, then my apologies to you and to all counsel.
But you expect that the defense would have used that document to cross-examine Mr. Everett, is that correct, if they had it?
MR. ZURBRIGGEN: Objection.
MR. JOHNSON: Objection.

Page 138

THE WITNESS: No, they would not have used the document to cross-examine him.
BY MR. FEINBERG:
Q. Why do you say that?
A. Because it's not his statement, it's not his writing. They might call the witness.
Q. Are you --
A. They're not going to use the document.
Q. And that's a good point. I stand corrected.
They are going to use that information to investigate the inconsistent statement; is that correct?
A. They're going to ask the detective were you told this -- actually, not even that, because it's -- no --
Q. Okay.
A. -- wrong. It's -- it's double hearsay. They couldn't. It's Louise Woods' statement, so what you would have to do would be to call Louise Woods to get her to testify to that --
Q. Yeah.
A. -- so you couldn't use the detectives and

Page 139

you couldn't use the document.
Q. Well, at the risk of entering an evidence -- an evidence dispute with you --
A. Uh-huh.
Q. -- would you -- could you envision cross-examination asking the detective whether they ever received information about Rodney Everett identifying someone else as the shooter?
A. That would be hearsay.
Q. Then we would be on the opposite side of an objection.
A. Okay.
Q. Your -- your -- but your -- your point on that issue stands in that you would -- that information would be disclosed so the defense could conduct the investigation you're referencing; is that correct?
A. Correct.
Q. All right. Let me ask you some questions now about the arrest of Mr. Crosland. Everything that we've looked at so far, over the past 20, 25 minutes or so, have been documents that were in the Philadelphia Police Department's possession during the course of the investigation. We've reviewed

Page 140

earlier today that at the moment that the arrest was -- was initiated, you had a meeting with Mr. -- pardon me, with Ms. Christie and Detective Cimino.
Do you remember seeing that document?
A. I do.
Q. All right. By the way, do you remember -- do you remember any cases with Detective Cimino at all?
A. Not specifics. I mean, I -- I know this isn't the only case that I had with him.
Q. The reason I ask is that Detective Cimino was not the original assigned detective; he takes over this case as part of the special investigations unit.
Do you remember any discussions with him about taking on the investigation, anything like that?
A. No.
Q. Now that we've reviewed -- strike that.
Let's do this: Go back to the -- if you would, sir, Exhibit P-1, the affidavit of probable cause?
A. P-1?
Q. Yes, all the way at the beginning.

Page 141

A. Got it. Do you know what, can we go off the record, the video record, for a second?
THE VIDEOGRAPHER: We're now going off the record, 12:21.
(Brief recess.)
THE VIDEOGRAPHER: We're back on the record, 12:27.
BY MR. FEINBERG:
Q. Okay. Mr. Rosen, we're back on the record after a short break.
Did you realize during the break that any of your previous testimony was incorrect or incomplete?
A. I did not realize that, no.
Q. Okay. Do you have Exhibit 1 in front of you?
A. I do.
Q. That's the affidavit of probable cause for Mr. Crosland's arrest in the Heo murder; is that correct?
A. That's what it says.
Q. Do you see -- go to the third page, sir, which -- which references the April 15th, '87 interview with -- with Mr. Everett.

Page 142

Do you see that, sir?
A. I see the paragraph, yeah.
Q. The date of this affidavit of probable cause is -- it's faint, but down at the bottom of the page, 9th day of December '87.
A. Yes.
Q. So obviously at this point, Mr. Everett has already been -- has also been interviewed -- strike that.
The third page references the April 15th, '87 interview; correct?
A. Correct.
Q. It does not interview (sic) the April 21st interview?
A. Correct.
Q. It does not inter -- reference the July 7th interview; is that correct?
A. Correct.
Q. Do you have any idea why -- reason why the -- pardon me.
Do you have any idea why that is?
A. No.
Q. The -- also, do you know why there was an eight-month period between the April 15th, '87

Page 143

statement and the decision to arrest Mr. Crosland?
A. No.
Q. Okay.
A. I just -- no, I do not.
Q. Okay. Do you -- do you have any speculation about why that is?
MR. JOHNSON: Objection.
THE WITNESS: No.
BY MR. FEINBERG:
Q. Okay. Have you seen any evidence -- strike that.
Have you seen any information in what we've reviewed today which would explain to you why that might be the case?
A. No.
Q. All right. Now, when -- and by the way, this affidavit is prepared by Detective Cimino; agreed?
A. The signature's a little faint, but, yes, I would agree with that.
Q. And in particular, after having reviewed --
A. It's on the front, too, so --
Q. Okay. Right. And also having reviewed an activity sheet showing a conversation -- describing a

Page 144

conversation between you, Barbara Christie and Detective Cimino, it looks like Detective Cimino then went and prepared this affidavit; is that correct?
A. Yes.
Q. The -- would you agree that the description of the April 15th, '87 statement about Mr. Crosland's alleged confession to Rodney Everett presumes the credibility of that statement?
MR. ZURBRIGGEN: Objection.
MR. JOHNSON: Objection.
MR. ZURBRIGGEN: Objection.
THE WITNESS: It -- it just states what he said --
BY MR. FEINBERG:
Q. Okay.
A. -- I don't know, you know --
Q. It assumes that Everett's telling the truth; right?
MR. JOHNSON: Objection.
MR. ZURBRIGGEN: Same objection.
BY MR. FEINBERG:
Q. That he actually heard a confession.
A. I -- I don't -- I don't know that I can

Page 145

answer that question.
Q. Okay. Do you -- do you know, did you have to approve this affidavit?
A. No.
Q. Do you know whether Ms. Christie had to approve this affidavit?
A. I don't know.
Q. Okay. If -- do you recall ever being involved in discussions with detectives about affidavits of probable cause?
A. I don't have any recollection.
Q. Okay. If you had learned in that meeting on December 9th of '87, which is described in the activity sheet that I showed you, about Mr. Everett having failed a polygraph, would you expect to have raised concerns about that with Detective Cimino?
A. I'm sure it would have come up. Yeah, I have would have raised it, if not with Cimino, with Ms. Christie or my supervisor, sure.
Q. Okay. If you had seen the July 7th statement, which referenced other people who Everett speculated about, would you have discussed that with Detective Cimino?
A. I don't know.

Page 146

Q. If you had seen the July 25th activity sheet referencing the Louise Woods phone -- or discussion with Detective Rocks, would you have raised that with Detective Cimino?
A. Possibly.
Q. If you had received the -- or seen the letter that Mr. Everett sent to Detective Mangoni, would you have discussed that with Detective Cimino?
A. No, not necessarily.
Q. If you had learned about Michael Ransome as an alternative suspect in this case, would you have discussed that with Detective Cimino?
A. Cimino. Possibly.
Q. Okay. All right. And you say possibly because of the fact that you have a person who physically is -- matches the description of the perpetrator and lives in the same neighborhood; is that correct?
A. Yeah, but, I mean, I also would have -- I don't know if Cimino would have been the person I would have discussed it with.
Q. Okay. And -- and by the way, for all of these questions, the -- each thing that I asked you about would you have discussed --

Page 147

A. Uh-huh.
Q. -- these are things that you would have expected to discuss with the detective, with the supervisor.
A. Right.
Q. Okay. Do you recall whether any of the topics that I asked you about for the past two to three minutes came up during the discussion with Detective Cimino?
A. The -- that's referenced in the -- with the affidavit of probable cause?
Q. Yes.
A. I have no recollection of that event.
Q. All right. Well, in other words, are you aware one way or another whether Detective Cimino ever told the district attorney's office about the various pieces of evidence that we've discussed?
A. I have no recollection of that event.
Q. Okay. Can we assume that -- strike that.
Given what you've told me, that all of those pieces of evidence are -- are -- strike that.
You've told me already that everything that I've just discussed with you, if you had it, would have been turned over to the defense; is that

Page 148

correct?
A. The stuff that I said I would have turned over, I would have turned over.
Q. And you also told me that if the defense didn't have it, that means that you didn't have it; is that correct?
MR. ZURBRIGGEN: Objection to the form.
THE WITNESS: That would be my assumption.
BY MR. FEINBERG:
Q. Got it. Okay. And can we also assume that if you -- putting aside whether you had the documents in your hand, if you were told about the information that was in those documents, the same thing would apply?
MR. ZURBRIGGEN: Objection to the form.
THE WITNESS: If I was told about the information that was in the documents, I would ask to see the documents.
BY MR. FEINBERG:
Q. Okay. For instance, the activity sheet

that we reviewed about the polygraph, which is Exhibit 25, if a detective said to you, hey, Mr. Rosen, this guy, Everett, failed a polygraph, you would say, I would need -- I need to see a document about that; right?
A. I'd want to see the -- the polygraph report.
Q. Okay. And that way you would have -- and once you had that report, you would have disclosed it --
A. Correct.
Q. -- is that correct?
So, in other words, if information is presented orally, it doesn't just get buried, right, you're going to ask for documentary follow-up?
A. Correct.
Q. All right. Let me change topics, then. Or, I'm sorry, one more question on the affidavit of probable cause.
Do you know -- your previous answer may have already covered this, but do you recall ever reviewing affidavits of probable cause prepared by detectives to edit, give suggestions, anything like that?



A. I don't recall it, but --
Q. But --
A. -- that could have happened, but I don't -- I don't have a recollection of a specific event where it happened.
Q. Do you know whether detectives ever made a practice of including exculpatory information in the body of the affidavit?
A. I don't know.
Q. Okay. All right. Let's change topics. We've been talking about Mr. Everett. I want to ask you some questions about Delores Tilghman.
I believe you told me that you reviewed her grand jury testimony?
A. I did.
Q. And, in fact, a portion of that testimony referred to the alleged conversation that she overheard or she claimed to have overheard in -- in that testimony between Mr. Crosland and others; is that correct?
A. Correct.
Q. Do you recall, in the documents that you've seen, learning how Delores Tilghman came to the attention of the Philadelphia Police Department?



A. No.
Q. All right. Let me -- I know you've just closed the binder. Go to exhibit 61, please.
A. I'm there.
Q. All right. If you can read to yourself the first page and then the first two paragraphs on the second page and let me know when you're finished.
A. Okay.
Q. So would you agree that -- by the way, for reference, this is an affidavit of probable cause for the arrest of Michael Martin also known as Michael Turner, the father of Ms. Tilghman's children; agreed?
A. I don't know, but if you say so, that's fine --
Q. Okay. There's --
A. -- I'll accept that.
Q. There's -- if you want, there's more information on that in the activity sheet on Exhibit 60. I'll just make that representation to you for now.
A. Okay.
Q. Can we agree that Ms. Tilghman first comes to the attention of homicide detectives on March 22nd



of '87?
A. I don't agree with the first, that -- the first reference I'm seeing to contact between a homicide detective and her. I don't know if there's previous contact. I'm just reading what this says. It says on March 22nd they got a phone call from her.
Q. Okay. I'll -- I'll -- well, bear with me for one second. Let me take a look at Exhibit 60.
All right. Let me do it this way: I'll represent to you, sir, that in the documents that we've seen from the Wilkerson homicide file, which I -- I described to you, the Jon Lamb homicide file, the Il Man Heo homicide file, Delores Tilghman is not referenced at all in the investigation until this call to detectives on March 22nd, '87.
A. Okay.
Q. Understood?
A. Yes.
Q. Okay. So would you agree that as related here, Ms. Tilghman appears to have participated in an interview with detectives, specifically Detective McGuoirk, M-C-G-U-O-I-R-K, on March 22nd of '87?
A. It looks like she spoke to him over the phone.

Page 153

Q. Okay. And then, actually, on the second page, second paragraph, Delores was asked that by Detective McGuoirk, who interviewed her on 3/22/87?
A. I see that.
Q. Okay. The reason I'm asking you these questions in this fashion, sir, is that we do not have the signed written statement that's described here, so that's why I'm showing you the affidavit.
In any event, that's -- I'll represent to you that that's the first known statement that Ms. Tilghman gives. There's a second statement, and that's what I want to ask you about, that's referenced in the grand jury testimony, which is Exhibit 22.
A. Right.
Q. And can you refresh my recollection, sir.
How much of the grand jury testimony did you review?
A. I think I reviewed all of her grand jury testimony. I've seen it at some point.
Q. Okay. So I'm going to direct you to a few pages here. I'll use the Bates stamps in the bottom right corner. The first one is 8995.
A. Okay.

Page 154

Q. Now, there's no lines numbered here, but the second question on the page -- and, by the way, can we agree this is you doing the questioning of Ms. Tilghman?
A. Yes. Well, it says me, so, yes.
Q. Now, after that -- do you see where I am now, after that, on April 16th, '87?
A. I see it.
Q. You spoke with homicide detectives in the hospital; is that correct?
You see that question; is that correct?
A. I see it.
Q. Once again, I'll reference -- I'll represent to you I have not seen that signed statement that was given by Ms. Tilghman on April 16th, '87.
Do you recall learning about an interview that took place at the hospital with Ms. Tilghman?
A. I do not recall.
Q. Okay. If you'd go to page 9,000.
A. I'm there.
Q. Actually, bear with me for one second, sir.

Page 155

Do you recall reading in this grand jury testimony that the reason Ms. Tilghman was in the hospital is because she attempted suicide?
A. Yes.
Q. And what she said is that she attempted suicide because she felt bad about calling the police on the father of her children, Michael Turner?
A. Yes.
Q. That led -- that suicide attempt then led to that hospitalization; is that correct?
A. Yes.
Q. And the interaction between her and the detectives took place in the hospital; is that correct?
A. Yes.
Q. Okay.
A. I'm sorry, when you say the interaction, what -- are you talking about --
Q. The April 16th, '87 interview.
A. Can you just point me to that?
Q. Sure.
A. I'm not following.
Q. That's fair enough. So at 8995 --
A. Right.

Page 156

Q. -- your question was: Now, after that, on April 16th, 1987, you spoke with other homicide detectives in the hospital.
A. In the hospital. Okay.
Q. And then --
A. Got it.
Q. -- I omitted when I asked you before, but there is -- there -- your questions continued to ask why she was in the hospital --
A. Got it.
Q. -- and that's the topic we just covered, the attempted suicide --
A. Okay.
Q. -- okay?
Now, if you go forward to 9,000, last answer on the page, Ms. Tilghman says: And let me also state in giving that statement to them, several times Cimino got real aggressive because McNesby was quieter, Cimino practically forced me to say that Squirt was involved.
I'll stop there. She's talking about a different case. Squirt being Frank Turner.
Do you recall that?
A. No, but --

Page 157

Q. Okay. I'll represent that to you, that Squirt refers to Frank Turner.
A. Okay.
Q. And I'll also represent to you that the statement that she's describing is a statement about the Joseph Wilkerson murder.
A. Okay.
Q. All right. Now, you then proceed to read into the record the statement that Ms. Tilghman gave on April 16th, '87, and that starts at page 9002. Could you turn there.
Would you agree that from 9002 through 9006, you are reading a -- what appears to be a signed statement into the record; is that correct?
A. Yes.
Q. Okay. And can we agree from the context, that that signed statement appears to have been prepared by Detective Cimino and McNesby in the hospital while Ms. Tilghman was there inpatient.
A. Yes.
Q. And by the way, I'll represent to you Detective McNesby in his deposition denied that he ever took any statement from Ms. Tilghman. We don't have a copy of that statement.

Page 158

Can I assume that if you read a record -- pardon me. If you read into the record at the grand jury a statement that began: My name is Detective McNesby, that you actually had in your hands a statement prepared by Detective McNesby.
A. I --
MR. ZURBRIGGEN: Objection to form.
THE WITNESS: I had a document and I was reading it word-for-word.
BY MR. FEINBERG:
Q. You would not have -- you would not have made up a statement from Detective McNesby; is that correct?
A. No, I would not have done that.
Q. All right. Do you recall any details -- or strike that.
Do you recall hearing anything at all about Ms. Tilghman saying that she was pressured by the police to give this statement in the hospital?
A. No.
Q. Okay. Do you know whether detectives -- or strike that.
Were you aware of any practices that

Page 159

were used by the police department regarding interviewing a witness who was hospitalized?
A. No.
Q. Do you have any concerns one way or the other about interviewing someone in the hospital?
MR. JOHNSON: Objection.
MR. ZURBRIGGEN: City joins.
THE WITNESS: I mean, it depends on the person and the situation. The answer is no, not necessarily.
BY MR. FEINBERG:
Q. If a doctor told detectives, leave this person alone, they need to recover, they're not prepared to talk to you, would you have any concerns if the detectives then proceeded to conduct that interview?
MR. JOHNSON: Objection.
THE WITNESS: I can't answer that.
MR. ZURBRIGGEN: City joins.
MR. FEINBERG: Okay.
MR. JOHNSON: Sorry.
THE WITNESS: Sorry.
MR. ZURBRIGGEN: She's going to

Page 160

kill us.
BY MR. FEINBERG:
Q. Bear with me for one second, sir.
A. Sure.
Q. Okay. Actually, go back to 8995.
A. I'm there.
Q. I'll point you to a specific question in just a moment, sir. Yet again, I told you to go to the wrong page. Go to page 9001.
A. Okay.
Q. There's a long answer at the bottom of the page.
A. Okay.
Q. Read that to yourself and let me know when you're finished.
A. Okay.
Q. Okay. The "he" that is referred to in Ms. Tilghman's testimony there is referring, I'll represent to you, to Detective Cimino; understood?
A. Yes.
Q. Do you see the part where she's -- of the answer where she says: Then he -- meaning Detective Cimino -- came up to the hospital, and my doctor told him he couldn't come up there while I was being

Page 161

treated. Then he came back again and she was not there. That's when I gave them the statement.
A. I'm sorry, where are you now? What --
Q. The bottom portion of --
A. Oh, yes --
Q. -- that long answer.
A. -- yes. Yes, I see that.
Q. So you're -- would you agree that the testimony reflects that Ms. Tilghman is saying my doctor told him to stay away, doctor wasn't there later, and he came back and then interviewed me again?
A. That's what she's saying in this transcript.
Q. So if that's true, do you have any concerns about the tactics used by the detectives?
MR. JOHNSON: Objection.
MR. ZURBRIGGEN: City joins.
THE WITNESS: I can't answer that. I don't know.
BY MR. FEINBERG:
Q. Would you have any concerns about the credibility of her statement?
A. About this homicide, the Wilkerson

Page 162

homicide?
Q. Yeah, about the -- about the statement that is -- is obtained by the detectives in the hospital.
A. Based on this, no.
Q. Okay. Detective McNesby told us in his deposition testimony that he only recalled seeing Ms. Tilghman in a hospital to do something he called a wellness check, and that that wellness check was requested by a prosecutor.
Do you recall ever asking him to do a wellness check on Ms. Tilghman?
A. I have no recollection of the case, so --
Q. Okay. Have you ever asked a detective to interview a witness in the hospital?
A. Hmm. I don't know.
Q. If a detective told you -- this hypothetical --
A. Just -- may I just say something?
Q. Sure.
A. It's been a long, long time, and I appreciate a lot of the questions you're asking me, it's just there's a lot I don't remember, truthfully.
Q. I get that. If a detective ever came to you and said, this witness is in the hospital, their

Page 163

doctor's telling me leave them alone, would you ever tell that detective, go talk to her anyway?
MR. JOHNSON: Objection.
MR. ZURBRIGGEN: The city joins.
THE WITNESS: I don't know. I -- I would maybe ask a few more questions --
BY MR. FEINBERG:
Q. Okay.
A. -- like if -- yeah.
Q. All right. Now, let me present two dates to you. We know that Mr. Everett identified Mr. Crosland as the alleged perpetrator on April 15th of 1987.
Do you recall seeing the statement with that date?
A. No, but I'll accept your word for it.
Q. Okay. And we -- and Ms. Tilghman, we just reviewed, spoke to the police in the hospital on April 16th of 1987, so the day after.
A. Okay.
Q. All right. Do you know whether the detective specifically spoke to Mr. -- Ms. Tilghman

Page 164

about Mr. Crosland?
A. I have no idea.
Q. Okay. Now, you later presented, obviously, Ms. Tilghman's testimony about Curtis Crosland; is that correct?
A. At trial, yes.
Q. As a matter of fact, in front of the grand jury you presented it as well --
A. Did I?
Q. -- is that right?
I'll show you. We don't have to review it, but just -- just so you have a basis to answer this question, if you'd go to 8968.
A. I'm there.
Q. So the second question from the bottom: Do you know Curtis Crosland or Curtis Turner? Answer: Yes.
You're welcome to read this if you'd like --
A. No, I -- I see it now and I agree, yes, she did -- I did present her at the grand jury.
Q. Got it. And -- and specifically you presented her testimony about Curtis Crosland allegedly expressing concern about the -- someone

Page 165

coming forward to the -- for the award in this testimony; is that correct?
A. Yes.
Q. Okay. Can I assume that you would not have presented a witness's testimony on that topic unless a detective told you she had information about it?
A. Or I had a statement or I had something, yeah.
Q. Okay.
A. I'm not just going to call somebody out of the street out of the blue and put them up in front of the grand jury.
Q. So can we -- and I'll acknowledge -- I'll represent to you I don't have a statement from Delores Tilghman talking about these facts, so my question for you is, can we assume that the detectives got that information from her and then passed it on to you?
MR. ZURBRIGGEN: Objection to the form.
MR. JOHNSON: Objection.
THE WITNESS: I wouldn't assume anything, so I don't know, and I -- no, I don't know the answer to that.

Page 166

BY MR. FEINBERG:
Q. If --
A. I mean, it's a possibility. It's a possibility they got it from somebody else in homicide who passed it on to me. It would be speculative for me --
Q. Okay.
A. -- to answer that.
Q. Bottom line, you're not putting her on the witness stand in front of a grand jury to testify about something cold without knowing what she might say; is that correct?
A. Correct.
Q. So you -- you have to assume that you got that information from some other source about what she was going to say.
A. Before she hit the stand, I knew she was going to say that.
Q. Okay.
A. It might have been from her, I don't know.
Q. Okay. Putting that together, if Mr. Everett told -- told police about Mr. Crosland on April 15th and then the police go out to see Delores Tilghman on April 16th, do you have -- can you draw

Page 167

any conclusions about the fact that they were there to ask her about Mr. Crosland as well?
MR. ZURBRIGGEN: Objection to form.
MR. JOHNSON: Objection.
THE WITNESS: No.
BY MR. FEINBERG:
Q. Have you ever seen situations with -- strike that -- where a witness comes in and police will ask that witness about multiple different homicide cases?
A. Yes.
Q. In fact, we saw that with Mr. Everett in the July 7th statement, he's asked about a couple of different cases; right?
A. Yes, that's correct.
Q. Have you ever heard police use a phrase like we can use this witness to clear multiple cases?
A. No.
Q. Okay. Bottom line is, though, if a witness knows something about one homicide, there might be a chance they know something about other homicides; is that correct?
A. It's a possibility.

Page 168

Q. Okay. If Delores Tilghman is connected to the Turner family, with Michael Turner being the father of her children, he's the cousin of Frank Turner, Lester Turner, all those cases, as I told you before, are related; is that correct?
A. If you say so, yeah.
Q. Would you expect that if police have information that she is connected to the family that they've been investigating for some time, they would ask her about multiple different cases?
A. Related to that family, correct.
Q. Okay. So if there -- police are looking at that family and they know that Mr. Crosland is a cousin of the Turners, would you -- would that be an additional reason why they might ask Ms. Tilghman about Mr. Crosland?
A. Possibly.
Q. Okay. Do you recall any conversations with Delores Tilghman?
A. No.
Q. Do you -- just to put yourself back in that time frame, I'll represent to you that when the trial came back a second time, police told Shelley Robins New that they could not locate Ms. Tilghman and she

Page 169

was declared unavailable. Her prior testimony was then read to the jury, and the person who read that testimony to the jury was you.
A. Really?
Q. Yeah.
A. I don't remember that.
Q. Okay. Now that I've told you that, does that bring any memories up in your head about interactions with Ms. Tilghman, any conversations or anything like that?
A. No. No. That's -- I don't -- didn't even remember that I had read testimony at the trial.
Q. Ms. Tilghman also -- strike that -- testified at some point that on the morning that she was supposed to testify at the first trial, which is the trial that you handled, police came into her house and told her that she had to come or else she was going to be arrested.
Do you remember any conversations about that?
A. No.
Q. We've already discussed you tried the case in '88 and then it gets passed to Shelley Robins New once it gets remanded from the superior court.

Page 170

You recall that; right?
A. I recall the discussion.
Q. Do you -- would you have had any involvement in passing the trial file along to the next prosecutor to handle the case?
A. You know, I -- I think ordinarily I would have tried it again, but I think I had a different assignment at that time and I was actually not technically in homicide at the time of the second trial and I was actually on a different floor in the office at the time.
Q. What would have happened with passing the file along?
Do you know who would have been responsible for that?
A. If it was an appeal, it would have gone from the Appellate Division back to homicide.
Q. Was the -- the trial file, for lack of a better phrase, would that be made part of the same file as the appeal file?
A. I don't know.
Q. Would you have had any involvement with that process of passing the file along?
A. No.

Page 171

Q. Would you expect that any information that you had in your file would have been available to Shelley Robins New as the next trial prosecutor?
A. Yes.
MR. ZURBRIGGEN: Objection to form.
THE WITNESS: Sorry. I'm giving answers quickly.
MR. FEINBERG: Let's go off the record, please.
THE VIDEOGRAPHER: Okay. We are now going off the record, 12:55.
(Brief recess.)
THE VIDEOGRAPHER: We're back on the record, 1:02.
BY MR. FEINBERG:
Q. Okay. Mr. Rosen, we're back on the record after a short break.
I'll ask you one final time, did you realize during the break that any of your previous testimony was incorrect or incomplete?
A. No.
Q. Okay. Sir, to -- to finish up my portion of the questioning, let me ask you this: In light of

Page 172

everything that we've reviewed today, do you have any concerns about the integrity of Mr. Crosland's conviction?
A. I don't know whether he's innocent or guilty, and so in the sense that if he is innocent and he went to jail for it, that concerns me.
Q. Okay. Based on the evidence that we've discussed, do you have any concerns about the integrity of the trials that he received?
A. Hmm. I don't know that I can answer that.
Q. Okay. Let me just review a couple of things to see if -- if we can build a basis -- a foundation for you to answer the question.
Would you agree that the only real direct evidence presented against Mr. Crosland was the testimony of Mr. Everett about the alleged confession made by Mr. Crosland, number one; and, number two, the testimony from Ms. Tilghman?
A. Yes.
Q. Would you agree that in relation, the testimony from Mr. Everett was far more inculpatory than the testimony from Ms. Tilghman?
A. I would say it's the opposite.
Q. Why do you say that?

A. Because I think Mr. -- it comes out that Mr. Everett had -- was in jail, had a criminal record, whereas Ms. Tilghman, I think, would present as being more credible.
Q. Would you agree that the quality of her evidence, though, was only indirectly inculpatory, in that she's overhearing a confession where someone expresses concern?
A. I think she's the better witness.
Q. Okay. Better witness based on who she is; is that --
A. Based on everything.
Q. -- correct?
Got it. Okay. With regard to Everett's testimony --
A. Right.
Q. -- that he's allegedly heard a confession, you acknowledge that there are some weaknesses in the credibility of that testimony; is that correct?
A. Yes.
Q. And would you agree that the only person who provides so-called details about the crime and which it occurred is Mr. Everett?
A. I honestly, sitting here right now as you



ask me the question, don't recall, but the record will speak for itself. I mean --
Q. But based on your closing argument where you talked about the fact that Everett claimed -- in fact, let me ask it this way: Would you agree that the way you argued the case, based on what I showed you, you emphasized Mr. Everett's testimony in advance -- more heavily than Ms. Tilghman's?
A. I hear you, it's just, to be honest with you, sitting here I don't remember the exact details of the argument right now, so --
Q. Fair enough. Okay. Do you -- with regard to -- put aside the question of innocence and guilt. I understand that that's obviously a focus. Let's talk specifically about the trial that Mr. Crosland received.
Would you agree that it appears that Mr. Crosland and his counsel were not aware of the fact that Mr. Everett was polygraphed by the police?
A. Yes.
Q. Would you agree that it appears that Mr. Crosland and his counsel were not aware of the fact that Mr. Everett failed that polygraph?
A. Yes.



Q. Would you agree Mr. Crosland and his counsel were not aware of the fact that the police reinterviewed Mr. Everett after that polygraph? I'm -- I'm quoting --
A. I'm not as sure on that one, but --
Q. I'm quoting the activity sheet which says, because I have it committed to memory, that -- that Mr. Everett failed the polygraph and that he was reinterviewed and he maintained --
A. Oh, that reinterview, yes. Yes. Yes.
Q. Okay.
A. Correct, I would agree with it.
Q. Okay. So you agree that Mr. Crosland's counsel was not aware of everything that we discussed?
A. Correct.
Q. Would you agree that Mr. Crosland and his counsel were not aware about the encounter between Louise Woods and Detective Rocks, where that inconsistent statement was made?
MR. ZURBRIGGEN: Objection to form.
THE WITNESS: It appears that way, yeah.



BY MR. FEINBERG:
Q. Okay. Would you agree that Mr. Crosland and his counsel were not aware of the fact that Mr. Everett sent a letter to Detective Mangoni about helping his case?
MR. ZURBRIGGEN: Same objection.
THE WITNESS: It appears that way from everything you've shown me.
BY MR. FEINBERG:
Q. Okay. Would you agree that it appears, also, I skipped one, that Mr. Crosland and his counsel were not aware of the statement of July 7th, where Mr. Everett references other people who Mr. Crosland may have spoken to?
MR. ZURBRIGGEN: Same objection.
THE WITNESS: I guess based on that affidavit from the one guy, yeah.
BY MR. FEINBERG:
Q. Okay. Would you agree, based on everything that I've just outlined, that the defense, specifically Mr. Crosland and his counsel, were deprived -- appeared to be -- have been deprived of

Page 177

information that could have been used to advance a defense challenging Mr. Everett's credibility?
MR. ZURBRIGGEN: Same objection.
THE WITNESS: They were --
MR. JOHNSON: Objection.
THE WITNESS: They were deprived of information that possibly could have led to that challenge.
BY MR. FEINBERG:
Q. Okay. With regard to Ms. Tilghman, you've seen the allegations from Ms. Tilghman that she was pressured by the police when they came to see her after she attempted suicide; is that correct?
A. I saw that, yes.
Q. Without commenting on the credibility, if that is, in fact, credible, would that give you concerns about the manner in which the police conducted the investigation --
MR. ZURBRIGGEN: Objection.
BY MR. FEINBERG:
Q. -- of Ms. Tilghman?
MR. ZURBRIGGEN: Objection to the form.

Page 178

MR. JOHNSON: Objection.
THE WITNESS: Accepting it all as true? I just don't know if it's true. I mean, frankly, witnesses recant, especially when it comes to people that they know, so it's hard for me to comment on that.
BY MR. FEINBERG:
Q. So, yeah, I'll acknowledge that you're not here to comment on whether it's true or not true, but let's take an extreme situation.
If a detective goes into a hospital where someone is in a vulnerable state and says you have to sign this statement, if you don't, you're going to jail. I could give you much more extreme examples.
Would you agree that that would cause -- cause you to question the credibility of the statement?
MR. JOHNSON: Objection.
MR. ZURBRIGGEN: The City joins.
THE WITNESS: I can't answer that in a vacuum.

Page 179

BY MR. FEINBERG:
Q. Would you have -- well, how many -- did you litigate motions to suppress statements over the course of your time as a prosecutor?
A. I did, yes.
Q. So you became aware of what was permissible and not permissible for a detective to do when questioning a witness?
A. Well, motions to suppress statements are -- are a defendant's and they're very -- governed by very different rules and guidelines than taking a statement from a witness.
Q. That's --
A. You're talking apples and oranges there.
Q. That's a fair point. And I'm using that -- I'm using interrogations of defendants as -- by -- by analogy here; right?
They're -- a detective is certainly not able -- not permitted to coerce a suspect into giving a confession; is that correct?
A. Correct.
Q. They can't beat them up; right?
A. No beating up allowed, correct.
Q. They -- they cannot fabricate a statement

Page 180

and tell the defendant -- the suspect to sign it; right?
A. They cannot do that.
Q. All right. So there's similar rules about what detectives can and can't do that apply to interactions with witnesses; is that correct?
A. In terms of what you just said, yes, they can't make up a statement and have a witness sign it and they can't beat up a witness, I would agree with that.
Q. The same token -- by the same token, they can't coerce -- strike that.
They cannot threaten the witness to compel them to sign something; is that correct?
A. Give me an example and I'll tell you.
Q. Can't tell someone we're going to charge you with this crime unless you sign this statement.
A. Well, it would depend on the -- I know this is going to sound -- but it really would depend on the circumstances.
Q. They can't tell a witness that you need to cooperate with us or else we're going to prosecute you for this crime.
A. Well, I don't know, did the witness commit

Page 181

the crime or not?
In other words, you're asking me all these questions in a vacuum and they're really impossible to answer.
Q. Fair enough. All right. Let's return to the -- the facts as alleged by Ms. Tilghman.
If the police did, in fact, go to the hospital when she was recovering there from a suicide attempt, that's something that you would have liked to have known from the detectives; is that correct?
A. Yes.
Q. If the doctor who spoke to -- strike that.
If the -- if a doctor told detectives, don't talk to this woman, she's not in good enough shape to speak with you, you would have liked to have known that; is that correct?
A. In connection with a suicide attempt, yes.
Q. Okay. Return to your previous answer at the beginning of this line of questioning, you've told me before you don't know whether Mr. Crosland is guilty or innocent; is that correct?
A. I don't.
Q. You came in here today at the beginning of the deposition saying that 24 people, two separate

Page 182

juries, convicted him; is that right?
A. I did.
Q. Would you agree that it appears that those juries were deprived of information that may have been relevant to the case?
A. I don't --
MR. ZURBRIGGEN: Objection to form.
MR. JOHNSON: Objection.
THE WITNESS: I don't know what would have happened at the trial, so I can't comment on that.
BY MR. FEINBERG:
Q. I'm asking you a much narrower question. Would you agree that -- well, I'll ask it this way: Would you agree that Mr. Crosland and his defense counsel, this is just a logical extension of what I've asked you before, were not given the opportunity to present information to the jury?
MR. ZURBRIGGEN: Same objection.
MR. JOHNSON: Objection.
THE WITNESS: They were not given the opportunity to explore possible

Page 183

evidence that they could have presented to the jury.
BY MR. FEINBERG:
Q. Okay. Does that concern you about whether the jury was provided with sufficient information to evaluate the prosecution's case?
A. I don't know.
Q. You mentioned also, at the outset of the deposition, that if you were ever involved in prosecuting someone who, in fact, didn't commit the crime, that that would concern you on a human level.
A. I didn't use the word "concern." I don't -- I think that was your word, but it -- yeah, it bothered --
Q. Yeah.
A. It would bother me, yes.
Q. All right. And I -- I don't mean to attempt to misquote you, I'm just going --
A. I know.
Q. -- from my recollection.
After everything that we've reviewed with you, do you have any more -- more amplified feelings on that particular position?
MR. JOHNSON: Objection.

Page 184

MR. ZURBRIGGEN: City joins.
THE WITNESS: No more or less.
MR. FEINBERG: Okay. I don't have any further questions for you, sir.
THE WITNESS: Okay.
- - -
EXAMINATION
- - -
BY MR. ZURBRIGGEN:
Q. Good afternoon, Mr. Rosen. We met off the record, but just to introduce myself formally on the record, my name is Adam Zurbriggen, I'm with the City of Philadelphia Law Department, I represent the City of Philadelphia and several of the Philadelphia Police detectives who are defendants in this case. This is my co-counsel, Daniel Cerone.
I'll be very brief with my line of questioning. I want to just start to -- go back to your interactions with the Conviction Integrity Unit at the district attorney's office, and I'd like to direct your attention to P-81, if you still have that in front of you. This is the E-mail exchange.
MR. FEINBERG: I think it's right here.

Page 185

THE WITNESS: Oh, thank you.
Okay.
BY MR. ZURBRIGGEN:
Q. Mr. Rosen, if I could just turn your attention to that second page, the -- the E-mail from Patricia Cummings that has those two sets of documents, the Third Circuit Court pleadings and the notes of testimony.
Do you see that?
A. I do.
Q. That's a -- that's the sum of what the Conviction Integrity Unit provided you to review for this case; correct?
A. Yes.
Q. You were not provided any correspondence with regards to discovery that was passed between the district attorney's office and Mr. Crosland's trial counsel, Mr. Paul; correct?
A. Correct.
Q. And so that would include the -- I think you still have it in front of you. P-78 was the -- a letter from the district attorney's office that I believe you reviewed earlier. If you still have that in front of you.

Page 186

MR. FEINBERG: It's in the binder. It's --
THE WITNESS: I remember it.
BY MR. ZURBRIGGEN:
Q. You -- you were not provided that to review by the Conviction Integrity office; correct?
A. No. That's correct.
Q. Are you aware of any other correspondence between the district attorney's office and Mr. Paul or his previous counsel, Robert Hoffa, in terms of discovery in the criminal case?
A. I don't remember.
Q. Okay. Going back to that E-mail exchange with the Conviction Integrity Unit, I want to direct your attention -- the same E-mail, but toward the end of it, Ms. Cummings writes: While I am interested in any recollection you may have regarding discovery you or the DAO provided to defense counsel prior to trial, I would also welcome any recollection of general DAO discovery practices during the time period that covers when the case was tried.
Do you see that?
A. I do.
Q. I wanted to just ask you, was there any

Page 187

follow-up to that E-mail from Patricia Cummings or anyone else with the Conviction Integrity Unit to ask you about specific questions regarding the discovery process in the Homicide Unit when you were the assistant district attorney in that unit?
A. No.
Q. I want to ask you a couple of follow-up questions. I'll just ask one broad question about that, because Mr. Feinberg asked you a lot of questions regarding the discovery process, the process for passing discovery to defense counsel and those cases, and I believe you mentioned that the process was a little different in terms of -- back then in terms of the clerks and how discovery was passed.
Would you mind just briefly summarizing what you had said about that with regards to were there clerks in the unit that were responsible for passing the discovery and writing the correspondence with counsel?
I believe you -- you started talking about that before.
MR. FEINBERG: Objection, asked and answered.

Page 188

THE WITNESS: On a typical homicide case, at least my recollection is that we had a couple of discovery clerks who would -- or one, maybe it was two, and they would be responsible for getting the -- the discovery, the documents from the police department, putting them in binders, sending out the information and then -- actually, let me take that back.
I don't know that they were responsible from (sic) getting it from homicide, but I know they were responsible for going through everything and sending it out. As the trial DA, you get the file, you get the binder.
BY MR. ZURBRIGGEN:
Q. Would the clerk sometimes send a cover letter with -- with the discovery to defense counsel?
A. That cover letter, at least the first page -- the page that's there, that feels familiar to me, yes.
Q. Do you remember a Robert Hopkins as a clerk within the Homicide Unit?

Page 189

A. I remember Bobby Hopkins very well.
Q. Okay. So he would have been one of those clerks who would have been involved in that process?
A. He would have been the guy, yeah.
Q. Okay. Do you have a recollection of Richard Hoffa as a defense attorney?
A. I do not.
Q. Just to switch gears, Mr. Rosen, Mr. Feinberg asked you a lot of questions, too, about the difference between homicide files and homicide binders. I don't want to go through -- through all those again, but I do want to ask you, because I believe you mentioned at one point that there were occasions in which homicide detectives would be called down and bring a file with them.
Do you remember speaking with Mr. Feinberg about that?
A. I do.
Q. And I wanted to ask you, do you have any recollection of that file that you understood at least to be the homicide file, what it looked like, how it appeared?
A. Yeah, it looked like a manila container with a flap and, like, a -- you know, one of those

Page 190

stretchy things that go around it to keep the flap closed.
Q. Do you know --
A. That's my recollection at least.
Q. Is it like a Redwell, that would have individual folders within it or --
A. I think of a Redwell as being open at the top. This is more the same color, maybe, but had a lid on the top. I don't remember what the inside looked like.
Q. Do you remember -- not necessarily in this case, because I know you've said you don't have a recollection of a specific meeting with Ms. Christie about this case; correct?
A. Yes.
Q. But do you recall meeting with homicide detectives in other cases and going over that file that you described?
A. Not really. I mean, I would pretty much work from my binder.
Q. Okay. I have one other question for you and that is about polygraphs. Mr. Feinberg asked you a lot of questions about polygraphs.
Did you have -- do you have any

Page 191

recollection of what your understanding was when you were in the Homicide Unit as to the admissibility of polygraph examinations?
MR. FEINBERG: Objection. Object to the form.
You can answer.
THE WITNESS: I do.
BY MR. ZURBRIGGEN:
Q. What was that -- what's your understanding?
A. They're un -- they're inadmissible as being unreliable.
MR. ZURBRIGGEN: I think that's all the questions I have.
MR. FEINBERG: I have one quick follow-up based on that last question.
I assume you don't have any.
Thank you.
---
FURTHER EXAMINATION
---
BY MR. FEINBERG:
Q. Mr. Rosen, Brady -- your Brady obligations had nothing to do with admissibility of evidence; is that correct?

Page 192

A. I would say that in terms of the polygraph question, it would still be Brady material.
Q. Okay. So as a bottom line, if something is inadmissible as evidence, you still have to disclose it if it's potentially exculpatory.
A. Sure. It could lead to other evidence, yeah.
MR. FEINBERG: Okay. I have nothing further.
MR. ZURBRIGGEN: No follow-up to that.
MR. FEINBERG: We can go off the record. The deposition is concluded.
THE VIDEOGRAPHER: Are we done?
MR. FEINBERG: Yes.
THE VIDEOGRAPHER: This completes the deposition. We're now going off the record. It's 1:19.
THE COURT REPORTER: Mr. Johnson, do you want a copy of the transcript?
MR. JOHNSON: Yes, please.
THE COURT REPORTER: And, Mr. Zurbriggen?

Page 193

MR. ZURBRIGGEN: Oh, just a normal copy.

(Deposition concluded at 1:19 p.m.)

Page 194

CERTIFICATION

---

I Hereby Certify That The testimony and the proceedings in the aforegoing matter are contained fully and accurately in the stenographic notes taken by me, and that the copy is a true and correct transcript of the same.

----------------------------

Andrea M. Brinton, Professional
Court Reporter and Notary Public

The foregoing certification does not apply to any reproduction of the same by any means, unless under the direct control and/or supervision of the certifying reporter.

A

**a.m** 2:6 5:14
**able** 19:16 179:19
**absolutely** 26:12 33:24 88:21 104:1 111:19 112:15 127:10 135:11 137:9
**accept** 36:12 126:20 151:17 163:18
**Accepting** 178:2
**access** 11:8
**ACCO-fastened** 44:17
**accuracy** 87:2
**accurate** 9:8 31:17 40:2 68:10
**accurately** 194:5
**acknowledge** 48:17 84:23 85:20 165:13 173:18 178:9
**ACTION** 1:3
**activities** 50:24
**activity** 50:13,18 51:4,5,8,14,24 56:5 57:1,10 79:22 80:5,8 81:2 82:24 88:13 101:14 102:24 105:7 106:5 108:21 124:16,24 125:14,17 128:2 137:15 143:24 145:14 146:1 148:24 151:19 175:6
**actual** 73:11
**Adam** 3:8 184:12
**adam.zurbrig...** 3:11
**add** 15:10 20:19
**additional** 112:14 168:15
**address** 82:11 83:5 84:4 124:15
**addressed** 130:18
**addressing** 75:9
**Adkins** 3:15 10:6,6,8
**Administration** 46:2
**administrative** 23:22
**admissibility** 191:2,23
**advance** 174:8 177:1
**advised** 92:4
**affidavit** 16:18 16:22 57:20 58:6,14 60:4,5 62:5 92:15 93:6,24 140:21 141:18 142:3 143:17 144:3 145:3,6 147:11 149:18 150:8 151:10 153:8 176:19
**affidavits** 145:10 149:22
**affirmatively** 116:21
**aforegoing** 194:4
**afternoon** 184:10
**aggressive** 156:18
**aggressiveness** 89:17,20
**ago** 8:17 13:2 14:1 20:22 21:16 25:24 82:10 103:8
**agree** 17:3,6 36:24 46:24 49:6,7 58:12 64:13 66:13,19 66:21 69:17 75:1 76:16,20 78:1,23 79:1 81:2 83:2 85:24 86:3 87:14 88:8 91:5,11 98:13 98:16 103:7,23 108:17 110:6 112:14 115:8 116:16,22 117:3,16 120:11 122:19 124:23 125:2,7 127:7,9 128:15 128:22 130:19 131:18 132:11 132:17 133:8 133:13 134:14 134:22 143:20 144:5 151:9,23 152:2,19 154:3 157:12,16 161:8 164:20 172:14,20 173:5,21 174:5 174:17,21 175:1,12,13,17 176:2,11,21 178:17 180:9 182:3,15,16
**agreed** 84:24 85:3,6,13 102:16,17 118:17 124:15 143:18 151:13
**agreeing** 94:5
**agreement** 5:1
**ahead** 23:12 24:21 63:13 68:13 77:9
**aid** 109:8
**aka** 122:10
**al** 5:18
**alarm** 67:22
**ALBERT** 1:7
**allegation** 34:11 54:8
**allegations** 7:21 177:12
**alleged** 42:4,7 117:17 122:10 122:17 123:8 124:1,13 144:7 150:17 163:14 172:16 181:6
**allegedly** 115:6 164:24 173:17
**alleges** 7:5
**allowed** 179:23
**alternate** 93:20
**alternative** 88:17 90:1 91:19 93:19 146:11
**Amendment** 65:13
**amount** 24:9,9
**amplified** 183:22
**analogy** 179:17
**and/or** 194:20
**Andrea** 2:6 5:22 194:13
**Angeline** 3:22 6:22
**ANSEL** 1:8,9
**answer** 11:19 27:1 32:14 49:21 50:1 54:19 61:11,13 68:14 71:10 103:24 108:24 112:1 115:4 124:15,18,20 132:1 134:20 145:1 149:20 156:16 159:10 159:18 160:11 160:22 161:6 161:19 164:13 164:16 165:24 166:8 172:10 172:13 178:23 181:4,18 191:6
**answer's** 13:9
**answered** 20:18 187:24
**answers** 53:17 171:8
**Anytime** 20:2 67:4
**anyway** 163:2
**apart** 44:18
**apologies** 137:19
**apologize** 10:4 92:7
**apparent** 122:24
**apparently** 17:14 85:21
**appeal** 93:7 107:18 170:16 170:20
**appear** 14:23 114:7
**APPEARAN...** 3:1
**appeared** 176:24 189:22
**appears** 25:9 40:12 78:1,2 81:3,24 109:22 110:6 130:17 130:19 131:10 152:20 157:13 157:17 174:17 174:21 175:23 176:8,11 182:3
**Appellate** 170:17
**apples** 179:14
**applies** 127:24
**apply** 148:16

180:5 194:18
**appreciate** 38:5 162:21
**approached** 89:19
**appropriate** 19:24
**approve** 145:3,6
**approximately** 5:14
**April** 58:15 60:2 62:20 63:1 65:23 70:11 97:17,20,24 98:11,15 101:14 103:15 122:21 130:24 141:23 142:10 142:13,24 144:6 154:7,16 155:19 156:2 157:10 163:14 163:21 166:23 166:24
**Arch** 2:4 3:4,10 3:16 5:15
**ARCHER** 3:14
**argue** 67:6 83:24
**argued** 72:10 77:11 78:16 83:19 84:1,10 87:7 174:6
**arguing** 64:20 73:9 78:20,23
**argument** 63:11 63:21 64:3 65:1,4 72:9 78:17 120:12 121:6 174:3,11
**arisen** 23:16
**arrest** 15:1,5 139:20 140:1 141:19 143:1 151:11
**arrested** 7:6 14:19 35:4 54:21 99:3 118:1,2 169:18
**arrests** 30:15 31:8
**article** 10:22 74:12,17 75:2 75:4,20 76:10
**articles** 11:1 67:18 70:19 71:10,15,22 72:12 74:6
**articulate** 42:14
**aside** 18:10 148:13 174:13
**asked** 16:17 22:11 35:6 55:6 78:9 79:13 104:19 107:21 134:8 146:23 147:7 153:2 156:7 162:13 167:14 182:18 187:9 187:23 189:9 190:22
**asking** 13:5 29:15 31:21 47:18 48:3 57:16 89:5 96:15 97:6 123:9 128:22 129:5 131:19 136:19,20 139:6 153:5 162:10,21 181:2 182:14
**assaulted** 54:10
**asserted** 65:12
**assessment** 17:6
**assigned** 24:7,17 26:20 44:5,6 49:2 55:1,10 57:6 81:22 140:12
**assignment** 170:8
**assignments** 22:17 25:21
**assistance** 128:7 128:16 129:8 129:13 133:2 133:15
**assistant** 25:1,4 25:17,18 55:1 96:19 97:2 187:5
**associate** 6:21
**assume** 14:15 19:15 29:22,24 32:24 33:8,14 33:18 34:15 35:15 40:2 58:17 61:5 85:17 88:16 105:6,11,12 109:16 110:21 111:17 113:17 119:15 129:11 147:19 148:12 158:1 165:4,16 165:22 166:14 191:16
**assumes** 144:17
**assuming** 87:2 108:19
**assumption** 111:2 148:10
**attached** 39:23
**attempt** 8:23 155:9 181:9,17 183:18
**attempted** 155:3 155:5 156:12 177:14
**attention** 95:20 150:24 151:24 184:21 185:5 186:15
**attorney** 23:24 55:1 91:17 187:5 189:6
**attorney's** 21:10 30:2 32:9 49:24 106:8 109:23 147:16 184:20 185:17 185:22 186:9
**available** 84:24 171:2
**average** 88:6
**award** 18:2 165:1
**aware** 15:7,10 15:13,17,18,20 16:5 17:8,12 17:20 18:5,9 26:1,1 27:18 27:21 29:23 30:1 60:3 62:10,15 98:10 107:16,24 116:1 147:15 158:24 174:18 174:22 175:2 175:14,18 176:3,13 179:6 186:8

**B**

**B** 4:8 110:18 111:4
**back** 11:10 14:4 14:8 15:15 16:1 20:12 24:6 48:8,9 50:7,18 52:3 58:2 60:22 62:6,15 63:4,5 68:24 77:15 78:5 79:19 81:19 82:9 94:19,22 97:16 98:3,17 103:24 107:8 110:10 130:12 140:20 141:6,9 160:5 161:1,11 168:21,23 170:17 171:14 171:17 184:18 186:13 187:13 188:10
**background** 19:11 20:21 52:9 53:22 113:22 118:9 129:17 130:15
**bad** 92:8 155:6
**bail** 31:9,12
**Barbara** 12:21 25:9 56:6 57:2 60:24 144:1
**bars** 96:18
**based** 34:10 68:4 69:18 70:24 87:14 106:3 114:22 122:19 127:19 162:4 172:7 173:10,12 174:3,6 176:18 176:21 191:15
**basic** 50:20 132:5
**basis** 46:24 49:7 50:2 164:12 172:12
**Bates** 46:5 64:1 64:3 153:22
**Bates-stamped** 40:20
**bear** 39:2 76:4 124:4 152:7 154:24 160:3
**beat** 179:22 180:9
**beating** 179:23
**began** 158:3
**begging** 137:2
**beginning** 140:24 181:19 181:23
**belabor** 118:16
**believe** 64:21

65:1 66:14,23 87:10 150:13 185:23 187:12 187:21 189:13
**believed** 41:17 88:5 97:2
**believes** 115:5,6
**bells** 67:22
**benefit** 27:9 63:24
**Benn** 89:11 94:9
**Berger** 3:21 5:7
**best** 24:11 27:1 35:15 40:11 96:8
**better** 170:19 173:9,10
**beyond** 19:1
**binder** 24:12 43:13,22 44:14 44:17 45:1,13 45:19 48:20 49:4 56:13,17 72:21 151:3 186:2 188:16 190:20
**binders** 44:21 188:8 189:11
**biological** 18:12
**bit** 8:24 19:11 28:22 29:11
**black** 26:22 87:11,21
**blue** 165:11
**Bobby** 189:1
**body** 41:1 75:3 150:8
**Born** 86:7
**bother** 183:16
**bothered** 183:14
**bottom** 9:1 35:7 74:11 83:11 86:20 94:7 97:1 127:9 142:4 153:22 160:11 161:4 164:15 166:9 167:20 192:3
**Brady** 33:15 34:3 89:2 91:5 91:7 116:8,11 134:15,20,20 137:11,13 191:22,22 192:2
**break** 9:3,4,5 83:16 92:3 94:23,24 141:10,11 171:18,20
**breaks** 9:2
**brief** 6:17 8:19 93:9 94:17 141:5 171:13 184:17
**briefing** 29:6
**briefly** 187:16
**BRIGNOLA** 1:8
**bring** 45:8 169:8 189:15
**Brinton** 2:6 5:22 194:13
**broad** 187:8
**brought** 7:11 13:17 57:7 70:19 98:2
**build** 79:5 131:3 172:12
**building** 2:4 3:3 3:9 15:20
**bunch** 31:8,13 35:1,2,3
**buried** 149:14

**C**

**call** 13:24 18:23 88:24 138:7,21 152:6,15 165:10
**called** 45:8 50:12 122:9 124:12 162:7 189:15
**calling** 155:6
**career** 20:21 51:16
**carefully** 10:24
**Carlton** 3:15 95:10
**case** 6:19 7:11 7:19,24 12:10 12:13,16 13:4 13:13,18 14:10 14:24 15:8,11 15:14,24 16:2 16:7,10 17:5 18:1,21,23 19:1,3,17 20:2 20:3,4,15 23:10,15 24:3 24:5,7,13,22 25:1,11 26:2 26:14,17 27:12 33:6 34:6,9 37:23 38:10 40:1 41:15 42:16,24 43:19 44:7,9 50:14 51:15,20 52:7 52:16,19,20,20 57:17 58:6,20 62:9 63:14 66:2 67:15 68:19 69:23 84:2,17 89:16 89:19 90:10,17 95:16 98:24 107:20 112:9 112:21 114:8 116:21 117:14 117:18,22 118:1,3,5,8,13 119:17 122:11 122:18 123:3 124:14 129:13 131:2,5 134:10 140:10,13 143:14 146:11 156:22 162:12 169:22 170:5 174:6 176:5 182:5 183:6 184:15 185:13 186:11,21 188:2 190:12 190:14
**cases** 24:1 26:7 26:11 27:2,13 27:15 30:9,22 31:19 32:16 33:8 34:18,21 35:2,5 43:19 52:13 53:3 54:22 55:7 57:13,16 89:15 90:22 98:22 99:3 117:6 118:3 120:15 131:20 132:3 140:7 167:11 167:15,18 168:4,10 187:12 190:17
**cash** 73:5,10
**Cast** 2:4 3:3
**categorical** 88:9
**categories** 41:2 41:21
**category** 110:12 110:18
**cause** 16:19,23 57:20 58:6 140:22 141:18 142:4 145:10 147:11 149:19 149:22 151:10 178:18,18
**caused** 7:5
**center** 46:2 103:3
**Cerone** 3:9 184:16
**certain** 66:16 116:7
**certainly** 112:20 179:18
**certification** 5:2 194:1,17
**Certify** 194:3
**certifying** 194:20
**chair** 8:2
**challenge** 105:15 120:16 136:1,5 136:16 177:9
**challenging** 177:2
**chance** 167:22
**change** 25:5 51:2 67:11 78:6 149:17 150:10
**charge** 180:16
**charged** 14:20 98:22
**charges** 27:22 28:11 30:6 34:9,18 57:7 118:4,7
**charging** 55:24 57:3,14
**Charles** 95:14 96:21
**chat** 6:17
**check** 162:8,8,11
**chief** 25:1,1,4,4 25:11,14,16,17 25:18
**children** 151:12 155:7 168:3
**choose** 49:3,23
**Christie** 12:21 25:9 56:7 57:3 60:24 140:3 144:1 145:5,19 190:13
**Cimino** 1:6 56:7 57:3,21 60:24 140:3,7,11 143:17 144:2,2

145:16,18,23 146:4,8,12,13 146:20 147:9 147:15 156:18 156:19 157:18 160:19,23
**Circuit** 185:7
**circumstances** 57:12 180:20
**city** 1:5 3:8,12 5:17 7:1 28:18 30:22 32:11 35:11 37:4 40:20 43:8 47:6 49:16 59:1 60:11 74:4 82:1,2,20 86:8 94:2 96:2 104:12 105:17 108:14 114:13 132:15 135:2 136:7 159:7,20 161:18 163:4 178:21 184:1 184:12,13
**CIU** 37:19 106:4 107:20
**CIU's** 37:19 95:16
**CIVIL** 1:3
**cjohnson@arc...** 3:18
**claim** 104:19
**claimed** 17:9,9 54:1 75:15 150:18 174:4
**claims** 7:11
**clarify** 123:20 126:8
**clear** 15:17 123:24 126:14 127:16 133:7 136:20 167:18
**clerk** 188:18,23
**clerks** 119:14 187:14,18
188:4 189:3
**client** 54:10
**close** 68:22 87:15
**closed** 151:3 190:2
**closely** 57:23
**closer** 86:21
**closest** 86:11
**closing** 63:11,20 64:3 66:7 72:8 72:15 73:3 75:11 76:23,24 78:17,19 174:3
**clue** 86:19
**co-counsel** 10:2 184:16
**coerce** 179:19 180:12
**Cohen** 22:1
**cold** 166:11
**collapsed** 74:22 76:13
**colleague** 40:22
**colleagues** 21:7 32:2
**collections** 43:20
**color** 190:8
**come** 17:24 29:11 68:24 145:17 160:24 169:17
**comes** 11:1 35:6 37:13 151:23 167:9 173:1 178:5
**coming** 165:1
**commences** 94:19
**commencing** 2:6
**comment** 32:17 41:16 47:9,15 64:18 136:17 178:6,10 182:12
**commenting** 177:16
**commit** 180:24 183:10
**committed** 62:1 175:7
**common** 7:17 15:16 16:1 64:21
**communicate** 60:8,9
**communicated** 41:14 61:2,8
**communicating** 97:9 124:16
**communicatio...** 128:15
**compel** 180:14
**compiled** 44:16 74:2
**complete** 110:7
**completely** 31:17
**completes** 94:15 192:17
**complied** 35:16
**compliment** 89:18
**concern** 17:24 79:14 108:21 164:24 173:8 183:4,11,12
**concerned** 52:14 117:6
**concerning** 79:22 101:14 105:2 106:5 108:9 112:9 117:17 118:13
**concerns** 78:12 99:20 120:9 145:16 159:4 159:14 161:15 161:22 172:2,6 172:8 177:18
**concluded** 192:13 193:3
**conclusion** 49:10 89:6 106:24 118:23
**conclusions** 167:1
**conduct** 123:16 139:16 159:15
**conducted** 100:18 102:18 103:10 106:4 108:23 177:19
**confess** 17:10,15 114:10 116:18
**confessed** 104:20 115:7 122:22
**confession** 67:5 67:5 75:17 77:12 144:7,23 172:17 173:7 173:17 179:20
**confidence** 20:15
**confirm** 7:10 8:15,20 11:3 13:12 62:18 65:9 97:19 102:3
**confusing** 69:15 71:8
**confusion** 123:20
**connected** 53:4 168:1,8
**connecting** 18:6
**connection** 28:2 48:3 53:3 102:1 181:17
**conscientious** 33:1
**Consecutively** 22:6
**consider** 99:11
**consult** 8:3,6
**contact** 12:14 130:8 152:3,5
**contacted** 13:19 13:23 14:6
**contained** 194:5
**container** 189:23
**context** 57:9 58:10 96:13 112:6,14 157:16
**continue** 46:13 131:4
**continued** 133:2 156:8
**continues** 97:6 132:23
**continuing** 102:23
**control** 35:8,17 127:18 194:19
**convenience** 86:11,17
**convention** 30:14
**conversation** 17:23 32:6 42:19 56:6 60:23 96:12,21 143:24 144:1 150:17
**conversations** 32:21 41:11 130:12 168:18 169:9,19
**convicted** 7:6 15:11 30:6 182:1
**conviction** 15:15 27:19 28:10,15 29:8,18 34:10 34:19 37:20 43:5 74:2 79:2 93:7 172:3 184:19 185:12 186:6,14 187:2
**convictions** 30:4 32:4

**cooperate** 180:22
**copies** 38:19
**copy** 11:9 45:24 56:13 58:1,5 95:11 120:7 157:24 192:20 193:2 194:7
**corner** 153:23
**corpus** 42:3
**correct** 6:9 8:17 11:20 14:6,16 15:12 17:11,17 17:18 18:8,8 18:13,16,18,19 19:13 22:7 34:2 35:9,13 36:3,9,16 41:2 51:12 59:6 60:4,9,18 62:21 63:2,8 65:2,6,19,20 67:9,10 73:12 73:18 75:18 76:15 77:13 78:21 79:8,9 80:11,14,24 81:5,8 82:12 83:14,15,23 84:5 86:6,22 87:9,12 88:6,9 88:21 89:8 90:2 91:20 94:10 97:20 103:11,16 104:5 106:1 107:10 109:6 109:17 110:17 110:19,20,24 111:12 116:9 117:2,8 120:17 120:22 121:3,4 121:10,17 122:15 123:3 124:18,19,20 124:21 125:18 125:23 129:3,4 129:9,15,16 131:12 133:3 134:13,18,21 134:24 135:11 137:6,9,22 138:14 139:17 139:18 141:20 142:11,12,15 142:17,18 144:3 146:18 148:1,6 149:11 149:12,16 150:20,21 154:10,12 155:10,14 157:14 158:14 164:5 165:2 166:12,13 167:16,23 168:5,11 173:13,19 175:12,16 177:14 179:20 179:21,23 180:6,14 181:10,16,21 185:13,18,19 186:6,7 190:14 191:24 194:7
**corrected** 59:22 138:11
**correspondence** 10:17 11:6 14:4 29:12 40:12,16 185:15 186:8 187:20
**corroborated** 77:14 84:1
**corroborating** 114:9
**Council** 74:4
**counsel** 3:7,12 3:19 5:1,20 6:7 7:24 8:2 9:12 9:15 11:4,24 12:4 14:6 16:12,17 28:6 28:7,13 33:5 33:12 34:2,4 38:1 41:18 50:15 56:5 79:13 89:10,18 90:19 92:20,22 93:4 95:17 107:18 109:11 117:19 118:12 137:19 174:18 174:22 175:2 175:14,18 176:3,13,23 182:17 185:18 186:10,18 187:11,20 188:19
**counsel's** 63:24 128:11
**counter** 74:22 76:13
**couple** 8:19 9:13 10:11,18 12:7 13:10 24:10 35:3 72:8 83:1 167:14 172:11 187:7 188:3
**course** 9:6 11:19 35:8 47:24 60:15 131:4 139:24 179:4
**court** 1:1 2:7 5:11,21 6:6 7:17 15:15,16 16:1 22:20 27:19 29:7 30:11 34:9 35:1 47:11 50:6 93:5 118:7 169:24 185:7 192:19 192:23 194:13
**cousin** 53:11 168:3,14
**cousins** 53:5 55:21 56:2
**cover** 8:20 72:5 188:18,20
**covered** 149:21 156:11
**covers** 186:21
**cracks** 119:10
**credibility** 58:21 59:5 60:7,16 61:3,6 67:6,14 67:23 99:21 104:21 105:3 120:13,16 121:2 136:5 144:8 161:23 173:19 177:2 177:16 178:18
**credible** 62:3 64:16,18,23,24 66:24 68:7 73:18 75:17 77:13 173:4 177:17
**credibly** 62:2
**crime** 7:9 18:7 62:1 66:18 67:9,18 82:3 104:20 114:11 116:18 120:23 121:1 173:22 180:17,23 181:1 183:11
**crimes** 98:23 111:24
**criminal** 33:21 46:3 90:19,22 120:18 128:17 129:13 131:20 173:2 186:11
**critique** 36:13
**Crosland** 1:3 5:17 6:23 7:4,9 7:15 12:16 13:17 14:19 15:11 17:10,15 17:16,23 18:6 18:15 41:18 46:5 51:20 52:7,12 54:10 54:20 55:20,24 57:4 58:13 64:3 75:15 78:24 79:2,11 83:20,22 86:21 87:8 93:7 102:1,11 103:1 103:2 104:2,20 114:10 115:6 116:18 117:17 117:19,21 118:1,5,8,12 118:19 122:21 136:21 139:20 143:1 150:19 163:14 164:1,4 164:16,23 166:22 167:2 168:13,16 172:15,17 174:15,18,22 175:1,17 176:2 176:12,15,23 181:20 182:16
**Crosland's** 7:20 15:1 27:19 28:15 37:23 43:5 77:12 93:4 109:11 141:19 144:6 172:2 175:13 185:17
**cross** 85:22
**cross-examina...** 139:6
**cross-examine** 137:21 138:3
**culled** 44:16
**Cummings** 10:18 39:7,19 40:13,16,20

41:11,16 42:19 95:15 96:12 185:6 186:16 187:1
**Cummings'** 40:18
**current** 21:24 90:21
**Curtis** 1:3 6:23 37:23 54:10 55:20 102:11 115:10 117:12 164:4,16,16,23
**cut** 13:8

**D**

**D** 4:1 102:19
**DA** 34:24 50:18 64:18 96:19 97:2 188:15
**DA's** 12:22 13:20 14:4 16:8 21:14 22:4,7,10,16 29:10,13 32:2 37:22 44:19,22 45:19 47:19,21 48:2 51:4,6 55:13 109:10 127:17,18
**dad's** 96:17
**Daily** 76:11 77:18
**Daniel** 3:9 184:16
**daniel.cerone...** 3:12
**DAO** 11:5 186:18,20
**DAs** 10:17 32:19 32:20 127:21
**databases** 74:5
**date** 14:21 80:15 142:3 163:17
**dated** 76:11 80:10 82:24 113:6
**dates** 14:9 163:12
**Dave** 25:18,20
**Davis** 88:1
**day** 24:19 31:23 50:14 118:4 142:5 163:21
**days** 80:13,23,24 98:3
**deal** 128:23 129:14 137:3
**dealing** 67:4
**Deaths** 77:19
**deceased** 13:4 107:19
**decedent** 79:4
**December** 7:7 14:13,20 15:8 63:15,21 74:7 76:11 77:18 80:10,13,19 84:24 93:8 118:3 142:5 145:13
**deception** 100:19 102:12
**deceptive** 100:23
**deciding** 99:11
**decision** 27:7 90:12 99:7 143:1
**decisions** 98:20
**declaration** 4:14 93:2 107:15,18 108:2,9 126:18 127:6
**declared** 169:1
**defendant** 7:11 7:21 33:2 73:14 77:4 120:4 135:22 180:1
**defendant's** 179:10
**defendants** 1:15 3:12 7:5 179:16 184:15
**defending** 136:21
**defense** 33:5,12 34:1,4 60:17 61:8 88:19 89:17 90:19 91:6,14,14,17 91:20 105:9,13 105:15,23 107:2 109:11 110:8,22 111:15,20 112:16 113:14 115:24 116:8 116:18,20 117:1 118:20 118:22 120:4 120:21 121:6 121:13 125:9 125:22 127:11 134:2,23 135:16,24 136:3,12,21,24 137:20 139:15 147:24 148:4 176:22 177:2 182:16 186:18 187:11 188:19 189:6
**defined** 34:4
**definitely** 28:5 116:23
**definitively** 89:5
**DELLA** 1:5
**Delores** 17:5 150:12,23 152:13 153:2 165:15 166:23 168:1,19
**denied** 157:22
**deny** 116:20
**department** 3:8 43:1 45:19 47:22 51:4,9 52:14 53:2 106:7 108:22 150:24 159:1 184:13 188:7
**Department's** 42:8 139:23
**depend** 8:22 36:2,9,14,18 36:21 180:18 180:19
**depending** 60:19 134:10
**depends** 90:6 107:3 112:1 159:9
**deponent** 5:19
**deposed** 12:8
**deposition** 1:17 2:1 5:10,15 7:18 8:16 9:11 12:4 19:24 28:2 48:18,22 68:20 69:6 71:1 72:5 124:9 157:22 162:6 181:24 183:9 192:13 192:17 193:3
**depositions** 22:11
**deprived** 176:24 176:24 177:8 182:4
**Descher** 1:14 3:13
**described** 41:2 43:20 44:15,24 145:13 152:12 153:7 190:18
**describes** 57:2 69:12
**describing** 56:6 105:7 143:24 157:5
**description** 4:9 79:7 83:18 87:6,8,16 88:9 144:5 146:16
**designations** 25:5
**desk** 24:4 35:24
**details** 16:13 19:6 29:3 32:16 66:16 67:7 113:4 158:16 173:22 174:10
**detective** 7:5 44:5,6 48:6,14 49:1,2,7,14,23 51:14 56:7 57:3,6,20 58:19 59:12,20 60:1,7,23 61:1 61:16,24 62:19 62:20 68:20 69:5,12 70:21 70:24 81:21,22 99:4,11,19,24 100:17,20 101:10 105:1,2 115:15 123:1 123:14 124:23 126:1 128:16 128:23 129:6,8 130:17,18,20 131:11 136:2 138:15 139:6 140:3,7,11,12 143:17 144:2,2 145:16,23 146:3,4,7,8,12 147:3,9,15 149:2 152:4,21 153:3 157:18 157:22 158:4,5 158:13 160:19 160:22 162:5 162:13,16,23 163:2,24 165:6 175:19 176:4

178:12 179:7 179:18
**detectives** 7:2,21 10:19 13:3,5 13:10 24:13 42:16 43:15,19 45:7 50:23 59:4 63:7 70:5 70:11,16 75:9 98:10 100:12 100:24 114:8 114:21 115:14 115:18 126:13 131:3 138:24 145:9 149:23 150:6 151:24 152:15,21 154:9 155:13 156:3 158:22 159:12,15 161:16 162:3 165:17 180:5 181:10,13 184:15 189:14 190:17
**detention** 103:3
**DI** 102:11,12
**dictated** 137:11
**difference** 111:2 189:10
**different** 11:4 25:8 43:20,24 44:15 55:11 67:11 71:6 81:18 89:23 115:2 124:19 125:1 156:22 167:10,15 168:10 170:7 170:10 179:11 187:13
**differently** 12:2 20:1 49:12
**direct** 18:17 58:12 85:16 93:7 107:18 153:21 172:15 184:21 186:14 194:19
**direction** 83:22
**directly** 35:5
**disagree** 19:21 46:24 49:7,13 50:2 70:23 108:8,8,17 127:7 130:21
**disbelieve** 100:2
**discharge** 119:16
**disclose** 116:10 127:21 134:1 192:4
**disclosed** 84:17 89:7 110:8 111:14 114:2 116:7,13 117:18 125:9 125:18 127:11 134:24 135:10 135:11,12,22 137:9,10 139:15 149:9
**disclosure** 85:21 113:20
**discoverable** 111:23 128:18
**discovery** 109:9 109:9 112:24 113:5,14 126:12 185:16 186:11,17,20 187:3,10,11,14 187:19 188:3,6 188:19
**discovery's** 119:13
**discuss** 12:9 101:12 126:15 147:3
**discussed** 8:13 128:1 130:16 145:22 146:8 146:12,21,24 147:17,23 169:22 172:8 175:15
**discussing** 122:8
**discussion** 58:14 60:21 61:1,4 78:7 104:1 117:13 146:3 147:8 170:2
**discussions** 55:20,23 105:1 107:21 140:15 145:9
**dismissal** 28:11
**dismissed** 27:23 34:9,19 118:5
**dispense** 8:14
**dispute** 66:1 93:23 108:8 127:2 139:3
**disputing** 94:5
**distance** 85:2,8
**distinction** 45:12
**distinguishing** 101:3
**district** 1:1,1 5:11,12 21:10 30:2 32:9 49:24 55:1 106:8 109:23 147:16 184:20 185:17,22 186:9 187:5
**Division** 7:3 45:18 123:1 170:17
**doc** 109:21
**doctor** 159:12 160:23 161:10 161:10 181:12 181:13
**doctor's** 163:1
**document** 4:13 38:17 39:3,11 40:6,19 47:1 50:12 56:9 72:23 76:9 80:10 82:18 92:3,14,21 93:2 95:5 96:1 101:17,22,24 102:3,4 106:4 106:14 109:13 109:20,22 111:13 120:8 121:20 122:4 124:8,11 126:12 128:5,9 129:19,22 130:5 135:17 137:21 138:2,9 139:1 140:4 149:4 158:9
**documentary** 149:15
**documents** 9:13 10:12,15 11:4 11:14,15,18 14:18 16:12,16 25:10 37:24 43:6 48:3 53:19 56:4,21 57:19 69:23 70:15 73:21,24 74:1,4 78:11 79:13,15 84:8 139:22 148:13 148:15,21,22 150:22 152:10 185:7 188:7
**doing** 15:19 21:6 64:13 73:22 154:3
**Dominick** 1:7 3:12
**double** 69:21 138:19
**doubt** 19:2
**doubts** 34:1 59:4 60:7 61:2,6 67:13
**draw** 89:5 118:23 166:24
**drawing** 106:23
**driving** 90:24
**dropped** 30:6 74:21
**drug** 26:20 35:2
**drunk** 90:24
**duly** 6:3
**DVD** 94:15,19

## E

**E** 4:1,8
**E-Mail** 4:15 40:12 41:1,21 95:13,15 184:22 185:5 186:13,15 187:1
**E-mailed** 41:14
**E-Mails** 4:12
**earlier** 28:3 140:1 185:23
**early** 15:2 21:17 23:16
**easier** 58:1 72:22 78:18
**Eastern** 1:1 5:11
**edit** 149:23
**Edward** 1:10,10 3:13,13
**effect** 128:10
**eight** 23:7 80:13 80:23,24
**eight-month** 142:24
**either** 16:20 41:13 123:16
**electronically** 38:12
**emphasized** 174:7
**employee** 74:18 74:20 76:2
**empty-handed**

77:23
**encounter** 175:18
**ended** 26:14 90:12
**ends** 24:4 35:23
**engaging** 40:15
**ensure** 119:22
**entered** 23:13
**entering** 139:2
**entire** 93:14 97:18 109:18 109:20 122:3
**enumerated** 40:24 41:21
**envision** 139:5
**especially** 35:21 178:5
**Esq** 4:14
**Esquire** 1:17 2:2 3:2,3,8,9,15,15 4:3 6:2 92:16
**essentially** 24:23 65:22
**Estate** 1:9,11,13
**Estates** 1:6
**et** 5:18
**ethical** 64:17
**Etienne** 3:22 6:22
**evaluate** 19:17 183:6
**evaluation** 18:21
**event** 85:24 147:13,18 150:4 153:9
**eventually** 27:23
**Everett** 17:5,8 17:14 58:9,21 59:5 60:8,16 61:6 62:8,19 62:24 63:7,13 65:1,10,12 67:17 69:14 70:1,6,10,17 70:20,20 71:9 71:12,17,21 72:4,11 73:9 73:13 75:2,15 75:17 77:3 78:12 98:3,11 101:13,15 102:9,23 103:13,16 104:2,18 109:5 114:7 115:19 116:16 122:6,9 122:20 123:18 124:12,17,20 125:1 126:3,14 130:7,12,23 131:11,19 133:8,14 136:16 137:2 137:16,21 139:7 141:24 142:7 144:7 145:14,21 146:7 149:3 150:11 163:13 166:22 167:13 172:16,21 173:2,23 174:4 174:19,23 175:3,8 176:4 176:14
**Everett's** 58:14 60:2 61:3 63:12 64:14 66:15 67:14 73:17 77:12 97:15 104:21 105:3 106:5 111:7 115:3,4 124:1 128:7 136:5 144:17 173:15 174:7 177:2
**evidence** 17:16 18:6,10,11,12 18:17,17 42:5 42:7 43:1 58:13 65:5 83:3 84:1,2 90:7 91:5,7,14 96:18 120:19 120:20 139:3,3 143:10 147:17 147:21 172:7 172:15 173:6 183:1 191:23 192:4,6
**exact** 24:8,9 25:15 174:10
**exactly** 137:11
**exam** 98:11,14 99:12 100:6,18 100:18,19,22 102:18
**EXAMINATI...** 4:4 6:12 184:7 191:19
**examinations** 191:3
**examined** 6:3
**examiner** 100:18
**examiner's** 110:19
**example** 59:12 126:10 130:6 180:15
**examples** 37:10 178:16
**exchange** 95:13 95:15 184:22 186:13
**exculpatory** 33:24 88:21 116:12 128:24 150:7 192:5
**exhibit** 4:9,10,11 4:12,13,14,15 38:10,14,18 39:14,15,18 40:6,7 45:23 45:24 46:1 56:16,17 58:5 60:22 62:15,18 62:23 63:5 72:18,19 77:16 81:14,19 82:9 82:10,15,19 83:8 84:11,13 84:18 92:11,15 95:7,8 97:16 97:23 98:15 101:13 108:3 109:2,5,12 121:19 129:18 140:21 141:15 149:2 151:3,20 152:8 153:14
**exhibits** 38:8 56:13 79:20,23 87:24 88:13
**exist** 27:10
**exonerated** 30:3 30:7
**expect** 11:14 59:5 60:6 91:17 115:14 115:24 118:12 125:20 126:1 127:20 135:24 136:3 137:5,20 145:15 168:7 171:1
**expected** 58:21 90:1 115:18 123:15 147:3
**expeditiously** 8:21
**experience** 26:6 31:11
**explain** 73:23 81:12 143:13
**explore** 182:24
**explored** 125:22
**expressed** 17:24
**expresses** 173:8
**expressing** 164:24
**extension** 182:17
**extent** 35:17
**extra** 38:20
**extreme** 178:11 178:15
**eye** 18:14

## F

**fabricate** 179:24
**fact** 7:9,14 29:18 37:14 55:24 73:2 78:2,8,12 87:11 98:14 102:21 103:9 103:12 104:18 106:17,21 108:20 110:10 117:22 128:19 146:15 150:16 164:7 167:1,13 174:4,5,19,22 175:2 176:3 177:17 181:7 183:10
**factors** 99:10
**facts** 53:21 65:9 72:10 79:1 103:4 165:15 181:6
**failed** 100:19 104:18 145:15 149:3 174:23 175:8
**failure** 102:15 104:3 105:4
**faint** 142:4 143:19
**fair** 13:15 14:2 33:2,22 35:21 36:12 84:3 115:1 124:3 131:18 155:23 174:12 179:15 181:5
**fall** 119:9
**fallen** 119:10
**falls** 88:8

**familiar** 15:3 33:14 43:16 53:7 54:16 129:20 188:21
**familiarity** 12:13 131:11
**family** 53:4 97:10 168:2,8 168:11,13
**far** 23:12 44:12 113:20 139:21 172:21
**fashion** 153:6
**fastener** 44:18
**father** 151:12 155:7 168:3
**fault** 72:4
**favorite** 121:13
**February** 39:19 48:22 113:6,14
**federal** 6:8 27:19 29:7 84:4 85:9,22 86:1,17 93:5
**feel** 69:2 96:13
**feelings** 183:23
**feels** 110:2 137:12 188:21
**feet** 87:12
**Feinberg** 2:3 3:2 3:2 4:5 6:9,14 6:20 9:18,22 10:3,7 19:19 20:8 28:23 30:19 31:5,16 32:13 35:14,20 36:11 37:8 38:2,6,16,19 39:1,13,17 40:5,9 43:11 47:17 49:19 50:11 59:3,11 60:14 61:14 63:23 64:5 65:7 66:5 67:1 68:2,17 71:23 75:7 82:19,23 84:15,19,21 86:15 87:1 89:3 90:8 91:12 92:1,6 92:13 94:6,12 94:21 95:6,10 95:12,19,21 100:11 104:15 105:19 106:19 108:18 112:22 114:17 115:23 116:5 119:6,21 123:10 125:6 125:13 127:1,5 131:17 132:19 133:10,12,21 135:7,23 136:10,15 138:4 141:8 143:9 144:14 144:22 148:11 148:23 158:11 159:11,21 160:2 161:21 163:9 166:1 167:7 171:9,16 176:1,10,20 177:10,21 178:8 179:1 182:13 183:3 184:3,23 186:1 187:9,23 189:9 189:17 190:22 191:4,14,21 192:8,12,15
**felony** 22:21
**felt** 155:6
**fifth** 65:13 74:18
**figure** 15:20
**file** 11:5,5 24:21 35:23 42:8,9 42:15,20,21 43:1,13,21 44:4,4,10,16 45:4,9,12,17 46:8 48:4,20 49:3,23 74:3 83:10 106:6,8 106:9 109:23 120:3 152:11 152:13,13 170:4,13,18,20 170:20,23 171:2 188:16 189:15,20,21 190:17
**files** 40:21,22,24 41:5 189:10
**filing** 5:2
**filling** 25:6
**final** 58:8 76:12 76:24 171:19
**find** 28:4,5,7 75:12 106:7 114:9
**fine** 84:9 151:15
**fingerprints** 18:11
**finish** 66:11 133:10 171:23
**finished** 38:13 69:8 93:16,17 108:5,6 121:24 151:7 160:15
**fired** 75:16
**firm** 6:23 12:7 19:22 21:24 90:21
**first** 4:8 6:3 7:15 8:2 13:16,18 13:22,23 28:9 28:13 38:2 39:22 42:10 46:10,11 63:6 69:20 72:21 73:2 77:15 80:4 82:1 83:19 85:2 97:7 98:3,8 101:20 108:4 110:8 112:2 114:16 115:4 118:2 151:6,6 151:23 152:2,3 153:10,23 169:15 188:20
**five** 87:12,12
**five-seven** 88:2
**five-six** 83:14 87:20 88:2
**flap** 189:24 190:1
**fled** 77:23 83:21
**flip** 63:5 83:8
**floor** 3:10 74:21 170:10
**focus** 23:2 51:20 58:8 174:14
**folders** 190:6
**follow-up** 42:18 123:17 126:2 149:15 187:1,7 191:15 192:10
**following** 155:22
**follows** 6:4
**forced** 156:19
**foregoing** 194:17
**forensic** 18:9,11 44:8
**form** 5:3 36:5 61:10 71:3 90:5 91:9,22 106:16 112:19 114:9 119:2,20 123:5 125:5 126:24 131:14 135:19 148:8 148:18 158:8 165:20 167:4 171:6 175:22 177:24 182:8 191:5
**formal** 6:18 98:7 126:2
**formally** 184:11
**former** 12:15 32:2 136:24
**forthcoming** 33:4
**forward** 17:24 62:23 66:6 82:14 83:8 97:22 156:15 165:1
**forwarded** 38:1
**found** 19:1 42:7 42:19,20 71:12 73:10 83:9 106:4
**foundation** 172:13
**four** 81:18,24 96:3,5,6,24
**frame** 20:12 130:13 168:22
**FRANCIS** 1:9
**Frank** 53:5,11 54:2,11 122:10 122:14,16 123:2 124:13 124:17 156:22 157:2 168:3
**frankly** 11:10 71:13 178:4
**FREDERICK** 1:11
**free** 69:2 70:18 96:13
**frequently** 67:3
**fresh** 56:23,24
**friend** 90:24
**front** 16:2 26:14 26:17,24 27:3 27:8,14 56:11 56:18 58:3 60:22 72:15 81:19 129:20 137:2 141:15 143:22 164:7 165:11 166:10 184:22 185:21 185:24

**full** 64:11 85:20
**full-fledged** 123:16
**fully** 33:4,14 37:2 194:5
**further** 41:10 44:2 45:15 86:1 130:15 184:4 191:19 192:9
**FYI** 41:23 42:6

**G**

**G-E-A-Z-E-L** 53:14
**gang** 26:20
**Garwood** 115:11
**gathered** 44:7
**gears** 189:8
**Geazel** 53:14
**general** 26:16 32:18 98:19 133:13 186:20
**generally** 127:16
**generational** 32:20
**generic** 61:21
**getting** 28:8 59:18 118:19 129:13 188:6 188:12
**gharris@krla...** 3:6
**girlfriend** 122:5
**give** 6:18 8:10 9:8 10:14 14:9 21:4 23:19 25:1 45:23 51:4,5 52:9 56:1 62:14 63:24 64:7 82:10 92:23 98:4,5 99:4,12 104:20 107:1 131:23 132:9 149:23 158:20 177:17 178:15 180:15
**given** 53:18 63:6 97:19 98:23 147:20 154:16 182:18,24
**gives** 63:13 153:11
**giving** 156:17 171:8 179:20
**go** 8:21 11:13 14:8 20:22 21:23 24:22 29:19 31:12 39:18 40:19 44:10 62:23 63:4 66:6 68:13 73:21 74:17 75:10 77:15 82:9,14 94:12 97:16,22 103:24 115:19 116:19 117:10 117:10 119:24 126:13 140:20 141:1,22 151:3 154:22 156:15 160:5,8,9 163:2 164:13 166:23 171:9 181:7 184:18 189:11 190:1 192:12
**goes** 71:9,11 110:15 114:20 178:12
**going** 12:8 13:9 14:9 19:10 20:15 21:7 23:7 29:12 30:12 38:7 40:21 43:14 45:22,23 47:4 47:8 48:11 56:17,20 58:4 58:8 60:22 63:13 68:23 78:10 79:18 81:11 90:12 94:15 95:22 96:17 107:1 109:9 120:15 120:21 133:19 138:9,12,15 141:4 149:15 153:21 159:24 165:10 166:16 166:18 169:18 171:12 178:15 180:16,19,22 183:18 186:13 188:14 190:17 192:18
**good** 6:15,16 11:13 113:11 120:8 138:10 181:14 184:10
**Google** 4:13 84:17,23 85:5 85:12,21
**gosh** 21:15
**gotten** 68:8 75:3 129:15
**governed** 179:10
**Grace** 3:3 6:21
**graduate** 20:24
**grand** 14:24 15:4 16:19 17:1,20 26:3,8 26:14,17,18,24 27:3,5,8,10,14 52:17 53:8,16 54:6,21 55:2 150:14 153:13 153:17,19 155:1 158:3 164:7,21 165:12 166:10
**GREINER** 3:14
**group** 26:22
**guess** 119:9,10 176:18
**guidelines** 179:11
**guilt** 174:13
**guilty** 19:1 172:5 181:21
**gunmen** 77:23
**guy** 90:12 97:3 149:3 176:19 189:4

**H**

**H** 3:2 4:8 46:7
**habeas** 29:9 42:3
**halfway** 96:3 132:5
**hand** 24:21 38:22 46:4 58:1,5 84:22 148:14
**handed** 40:19
**handing** 38:6 92:14 95:4
**handle** 24:15 55:6 90:22 170:5
**handled** 34:6,21 35:1,5 169:16
**handling** 23:24 32:3 55:2
**hands** 137:1 158:5
**handwrite** 38:11
**handwritten** 44:7 81:18 96:2 103:17
**happen** 16:20 37:1 131:9 137:7
**happened** 26:11 31:22 34:16 36:3,8,10 57:15 65:17 68:19 69:13 70:22 101:12 101:14 126:4 150:3,5 170:12 182:11
**happening** 61:19
**happens** 112:23 121:12
**happy** 9:2
**hard** 178:6
**Harris** 3:3 6:21 38:22
**head** 169:8
**heading** 77:19
**headline** 74:12 77:17
**hear** 13:16 47:12 50:7 129:8 174:9
**heard** 13:18,22 14:5 16:8 17:10,15 19:1 43:15 44:3 45:20 93:20 100:9,12,24 114:10 116:17 144:23 167:17 173:17
**hearing** 18:3 24:16 27:7 42:23 50:17 64:15 65:18,22 66:15 77:4 82:6 99:18 118:4 158:18
**hearings** 22:19 24:18 31:9,12
**hearsay** 138:19 139:9
**heavily** 174:8
**height** 79:5 83:12
**held** 5:15 31:9 118:7
**help** 39:24 56:15 129:5 131:19 132:7,8,12,22

133:14
**helpful** 58:10 131:22 134:23
**helping** 176:5
**Heo** 7:8 14:12 17:10 54:21 55:10,13,24 57:4 70:19 73:9 74:21 76:12,17 77:22 80:15,19 95:14 95:14 96:11,16 96:21 97:10 103:2 112:11 118:2,8 122:11 122:15,17,22 123:3 124:13 141:19 152:13
**Heo's** 74:7
**hey** 149:2
**hid** 37:12
**hide** 33:11
**highlight** 131:21 134:8
**hinted** 20:21
**history** 50:23
**hit** 166:17
**Hmm** 162:15 172:10
**Hoffa** 186:10 189:6
**hold** 48:10
**Holdup** 74:13
**home** 86:12
**Homes** 122:12 124:14
**homicide** 7:2 10:18 13:10 20:12 22:23 23:3,10,13,22 24:1,6 25:3,12 25:14 26:7,20 27:1 32:3 35:22 42:8,15 42:15,20,21 43:1,13,13,21 43:22 44:4,14 44:16,21 45:6 45:9,12,13,18 48:6,14,20,20 50:22 56:7 70:7,10 83:10 106:6 123:1 151:24 152:4 152:11,12,13 154:9 156:2 161:24 162:1 166:5 167:11 167:21 170:9 170:17 187:4 188:2,13,24 189:10,10,14 189:21 190:16 191:2
**homicides** 24:15 167:22
**honest** 24:11 37:15 103:1 104:4 174:9
**honestly** 48:5 72:2 134:19 135:5 173:24
**hope** 8:21
**hopefully** 85:19
**Hopkins** 188:23 189:1
**hospital** 154:10 154:19 155:3 155:13 156:3,4 156:9 157:19 158:20 159:5 160:23 162:3,7 162:14,24 163:20 178:12 181:8
**hospitalization** 155:10
**hospitalized** 159:2
**hours** 9:21
**house** 169:17
**How's** 119:12
**Hughes** 1:10 3:13 62:20 63:1
**human** 29:5 183:11
**hypothetical** 162:17

**I**

**idea** 86:16 98:2 142:19,21 164:2
**identification** 10:14 38:15 39:16 40:8 84:14 92:12 95:9 98:8
**identifications** 18:14
**identified** 163:13
**identifying** 139:8
**Il** 7:8 112:11 152:13
**immediately** 107:1
**impeached** 129:14
**impeachment** 121:14
**implied** 132:12
**important** 134:15
**impossible** 181:4
**inadmissible** 191:10 192:4
**inartfully** 29:16
**incarcerated** 7:7
**incentive** 56:1
**inches** 87:12
**incident** 71:16
**incidents** 111:24
**include** 185:20
**included** 16:18 104:7,10
**includes** 67:7
**including** 150:7
**incomplete** 95:2 141:13 171:21
**inconsistencies** 120:10
**inconsistency** 121:14
**inconsistent** 120:14,20,24 125:8,20 126:19 137:16 138:13 175:20
**incorrect** 95:1 141:12 171:21
**inculpatory** 172:21 173:6
**indicate** 135:20
**indicated** 100:20 102:13
**indirectly** 173:6
**individual** 32:16 190:6
**information** 18:1 22:12,12 33:11,24 37:12 41:17,22 43:21 44:7 45:16 47:23 49:22 52:9 54:13 58:20,22 60:15 62:3 67:8 68:6 68:8,10 70:6 73:11 75:3 76:17,18,19 78:2,13 82:6 87:3 88:12,17 89:7,24 91:18 93:21 94:8 104:6,9,24 105:7,13,21 106:24 107:3,9 108:10,19 114:9 118:13 118:23,24 120:1 125:1,8 126:6 127:10 127:22 128:1 128:18 135:10 136:1,4,13 138:12 139:7 139:15 143:12 148:14,20 149:13 150:7 151:19 165:6 165:17 166:15 168:8 171:1 177:1,8 182:4 182:19 183:5 188:9
**inhabit** 136:20
**initiated** 99:1 140:2
**innocence** 174:13
**innocent** 7:9 172:4,5 181:21
**inpatient** 157:19
**inquiry** 19:24
**inside** 190:9
**instance** 61:16 61:23 148:24
**instructions** 8:11
**integrity** 37:20 43:5 74:2 172:2,9 184:19 185:12 186:6 186:14 187:2
**intent** 72:5
**inter** 142:16
**interaction** 122:24 155:12 155:17
**interactions** 14:3 97:15 169:9 180:6 184:19
**interested** 186:16
**interpret** 133:23
**interpretation**

134:9
**interrogations** 179:16
**interview** 69:13 103:15 116:19 123:16,17 126:2,3 141:24 142:11,13,14 142:17 152:21 154:19 155:19 159:16 162:14
**interviewed** 70:10 103:13 116:24 130:23 142:8 153:3 161:11
**interviewing** 159:2,5
**introduce** 184:11
**introduction** 6:18
**introductory** 8:19
**investigate** 26:21 91:15 105:14 138:13
**investigated** 52:13 58:19 66:18 88:18 91:19 107:20
**investigating** 53:2,24 54:9 114:8 168:9
**investigation** 11:5 35:22,23 36:15 37:19,22 50:24,24 81:23 95:16 106:3 108:23 115:16 139:16,24 140:16 152:14 177:19
**investigations** 26:21 35:9 140:13
**investigative** 100:13
**investigator** 129:7
**invited** 28:2
**involved** 12:22 14:23 15:4,21 15:22 22:14 26:5 27:13 29:4 52:21 55:4,14 71:20 82:3 98:20 99:7 145:9 156:20 183:9 189:3
**involvement** 7:13,19 16:9 16:14 52:12 70:2 117:18 170:4,22
**involving** 26:21 54:24
**Iron** 2:4 3:3
**issue** 77:1 129:3 134:8 139:14
**items** 41:1
**itn** 14:22

**J**

**jail** 90:13 172:6 173:2 178:15
**James** 1:7 3:13 48:15
**January** 16:3 83:1,4
**jfeinberg@krl...** 3:6
**Joel** 1:17 2:1 4:3 5:19 6:2
**JOHN** 1:5,6,13
**Johnson** 3:15 6:10 8:1,7 9:17 9:20,24 13:24 19:18 20:5 28:17 30:16,21 31:1 32:10 35:10,19 36:6 37:3 43:7 47:3 49:15 50:4 58:23 59:7 60:10 65:3 66:20 67:24 68:12,15 71:4 75:5 82:17,21 86:13,23 88:23 90:3 94:1 95:18 100:8 104:11 105:16 108:12 114:12 119:3 127:4 132:13 133:9 133:17 135:1 136:6,14 137:24 143:7 144:10,19 159:6,17,22 161:17 163:3 165:21 167:5 177:6 178:1,20 182:9,22 183:24 192:20 192:22
**join** 50:5,10
**joined** 6:20
**joins** 28:18 32:11 35:12 37:5 43:9 47:7 59:1 60:12 94:3 104:12 105:17 108:15 114:13 132:16 135:3 136:8 159:7,20 161:18 163:5 178:22 184:1
**Jon** 6:20 52:21 56:7 117:13,22 118:1 152:12
**JONATHAN** 3:2
**Joseph** 1:8,13 3:13 4:14 52:15 92:16 157:6
**Judge** 7:17 12:15
**judgment** 96:9
**July** 63:7 109:6 111:11,13 114:1,15 122:21 128:2 130:24 142:16 145:20 146:1 167:14 176:13
**jumbled** 80:18
**Junior** 26:22
**juries** 182:1,4
**jury** 7:15,16 14:24 15:4 16:3,19 17:1 17:20 26:3,8 26:14,17,18,24 27:3,5,8,10,14 52:17 53:8,16 54:6,22 55:2 64:14 65:1 66:14 78:24 83:20 87:7 90:2 91:2 121:7 150:14 153:13,17,19 155:2 158:3 164:8,21 165:12 166:10 169:2,3 182:19 183:2,5

**K**

**Kairys** 2:3 3:2
**Kaplan** 5:22
**KAREN** 1:8
**keep** 42:16 49:23 58:3 121:5 190:1
**key** 17:3,19
**kid** 90:24
**kill** 160:1
**killer** 96:17
**kind** 50:23 90:11 101:1
**knew** 33:23,23 73:9 79:3 113:20 166:17
**know** 7:20 9:1,6 10:16 11:17,20 12:8 15:4 20:14 22:10 23:9 24:10 25:14,15,18,22 26:23 27:4,11 28:5,21 29:2,3 29:3 30:5,7,8 30:21 31:18 32:15 33:21 34:24 35:4 39:8 41:14 45:6 46:20,21 47:9,13 48:5 48:10 55:13,16 59:18 61:12 66:10 69:7 70:4 71:16 75:6 76:19 88:22 90:7 92:17,23 93:16 98:7,9 103:15 104:6,17 105:18 108:5 110:5,9 111:3 111:13,16 112:1 114:3 116:4,23 117:20 118:15 121:11,24 126:3,5 127:17 135:5,6 136:9 140:9 141:1 142:23 144:16 144:16,24 145:2,5,7,24 146:20 149:20 150:6,9 151:2 151:7,14 152:4 158:22 160:14

163:6,13,23 164:16 165:23 165:24 166:20 167:22 168:13 170:6,14,21 172:4,10 178:3 178:6 180:18 180:24 181:20 182:10 183:7 183:19 188:11 188:13 189:24 190:3,12
**knowing** 20:14 166:11
**knowledge** 32:20 37:7
**known** 66:17 67:8 68:7 127:21 151:11 153:10 181:10 181:16
**knows** 167:21
**Krasner** 30:2,10 32:3,9

**L**

**L** 3:15 46:2
**labeled** 73:22 96:2
**lack** 170:18
**lady** 10:1
**Lamb** 52:21 54:7,9,11,24 55:15 117:13 117:22 118:1,5 118:13 152:12
**LANZELOTTI** 1:13
**Larry** 30:2 31:13
**late** 15:1 25:12
**law** 2:2 3:8 12:7 20:24 21:12 33:21 34:4 46:3 134:22 184:13
**lawsuit** 6:24 7:4 13:17,19,22,24
**lawyer** 19:13 28:6 93:9 136:21
**lawyer's** 121:13
**lawyers** 19:16
**lay** 8:9
**lead** 57:13 192:6
**leading** 29:7 52:11 121:21
**Leaman** 5:22
**learn** 28:1 120:19
**learned** 28:9,15 29:18 36:15,19 37:11,19 44:3 44:3 45:16 52:10 145:12 146:10
**learning** 45:11 67:17 102:20 103:4 126:19 150:23 154:18
**leave** 68:23 159:12 163:1
**led** 155:9,9 177:9
**left** 22:3,6,9 23:1 77:20 103:2
**legal** 89:6 130:8
**Lester** 53:13 168:4
**let's** 14:8 16:9 20:22 23:2 51:19 59:24,24 62:18 66:6 72:7,15 75:10 78:17 79:10,12 83:16 87:5 92:2 94:12 100:23 101:12 102:3 133:24 136:19 140:20 150:10 171:9 174:14 178:11 181:5
**letter** 4:10,11 39:6,8,18,22 39:24 109:9,10 113:5 131:10 131:19 133:14 134:1,9 136:24 146:7 176:4 185:22 188:19 188:20
**letters** 109:16
**level** 20:15 183:11
**Levi** 88:1,1
**Lexis** 74:5
**LexisNexis** 74:5
**liberties** 52:9
**library** 70:18,18 71:9,15
**lid** 190:9
**lie** 36:21
**LIEUTENANT** 1:14
**life** 24:3 90:13
**light** 105:3 118:11 125:7 171:24
**liked** 181:9,15
**Lin** 2:4 3:2
**LINDA** 1:10
**line** 9:1 23:24 35:7 48:23,23 64:7,11 69:7,7 73:7 75:12 77:2 86:20 94:7 124:10 127:9 137:15 166:9 167:20 181:19 184:17 192:3
**lines** 96:24 154:1
**list** 24:18 110:7 110:15,23 111:5
**litany** 8:10
**literally** 44:6
**litigate** 179:3
**little** 8:24 19:11 28:22 29:11 40:10 69:15 71:6 89:20 143:19 187:13
**lived** 79:3 83:22 86:20
**lives** 81:7 146:17
**living** 13:6
**LLP** 2:4 3:2
**locate** 168:24
**location** 75:3 83:17,19
**Logan** 3:16
**logical** 182:17
**logically** 110:23 111:1
**long** 9:19 14:1 21:14 23:14 25:24 86:5 134:19 160:11 161:6 162:20 162:20
**look** 10:22 11:11 16:22 20:2 29:2 48:11 63:5 64:6,10 66:6 72:19 73:3 76:11 81:15,16 82:15 93:13,15 100:21 108:1,4 109:2,12,16 129:20 130:6 134:16 152:8
**looked** 9:12 10:11,18,19,21 57:22 139:21 189:21,23 190:10
**looking** 13:20 55:15 76:4 77:8 82:10 132:2,12 133:14 168:12
**looks** 71:10 144:2 152:23
**loss** 32:19
**lot** 8:20 11:12 24:10 32:19 162:21,22 187:9 189:9 190:23
**Louise** 122:5 123:2,17 124:11,17 126:2,13 138:20,21 146:2 175:19
**LUIS** 1:12

**M**

**M** 2:6 3:15 194:13
**M-A** 69:21
**M-A-G-I-O-N-I** 130:18
**M-C-G-U-O-I...** 152:22
**Mafia** 26:22
**Magioni** 130:18
**maintained** 43:1 44:5 102:24 106:6 175:9
**maintaining** 104:4
**Major** 22:23
**majors** 22:21
**male** 87:12
**man** 7:8 52:15 53:5,10,13 74:13 79:14 87:21 88:1,5 112:11 152:13
**Manfredi** 7:17
**Mangoni** 1:7 3:13 59:13,14 59:20,20,24 60:1,7 62:20 63:1,7 68:21 69:12 70:21

99:24 101:10 105:1 130:20 130:22 131:12 146:7 176:4
**Mangoni's** 69:5 71:1 130:17
**manila** 189:23
**manner** 101:11 105:14 108:22 177:18
**Map** 84:17
**Maps** 4:13 84:23 85:5,12,21
**marathon** 9:2
**March** 151:24 152:6,15,22
**marginally** 134:23
**marked** 38:14 38:18 39:15 40:7 45:22 46:1 56:13,16 84:13 92:11,15 95:7,8 109:12
**Martin** 151:11
**Maryland** 33:15
**Massey** 69:14,21 69:24 70:4,9 70:16,18 71:7 71:14
**matched** 65:22 87:8
**matches** 146:16
**material** 8:20 34:3 89:2 134:16 137:13 192:2
**materials** 11:8 41:12 44:16 72:24
**matter** 5:17 118:18 120:18 136:22 164:7 194:4
**McGuoirk** 152:22 153:3
**McNesby** 1:7 3:13 48:15 49:1,14 156:18 157:18,22 158:4,5,13 162:5
**McNesby's** 49:8
**mean** 10:23 13:23 14:21 18:24 24:6 25:14 28:20 29:2 30:5 37:14 39:8 45:3,3,6 57:15 71:7 89:18 91:7 100:16 102:2 111:21 114:14 115:9 116:10 118:16 126:10 136:18 140:9 146:19 159:8 166:3 174:2 178:4 183:17 190:19
**meaning** 37:20 77:3 108:20 127:16,17 160:22
**means** 42:11,14 95:24 102:4,12 133:6 148:5 194:19
**meant** 29:17
**medical** 110:18
**meet** 9:14
**meeting** 9:19,23 57:2,10,13 140:2 145:12 190:13,16
**memories** 169:8
**memory** 20:17 24:11 39:10 41:15 53:19 57:17 61:4 175:7
**mention** 12:12 21:7 75:14
**mentioned** 8:13 14:12 27:12 81:10 125:24 183:8 187:12 189:13
**mentions** 115:20
**message** 40:18
**messages** 44:8 81:19,21
**Messing** 2:3 3:2
**met** 9:12 184:10
**Michael** 53:10 53:24 54:3 79:14,23 81:4 81:7 82:2 91:18 93:19 146:10 151:11 151:11 155:7 168:2
**mid-nineties** 23:19
**mind** 11:1 27:16 35:6 37:13 56:23 89:6 105:20 107:5 136:21 187:16
**minimum** 91:19
**minute** 48:12
**minutes** 9:4 85:17 139:22 147:8
**misconduct** 34:11
**misquote** 183:18
**missing** 110:2
**Mitch** 3:21 5:7
**moment** 20:22 39:2 46:4 56:22 58:4,7 64:1,7 82:10 101:20 103:8 112:2 121:23 140:1 160:8
**money** 77:5
**morning** 6:15,16 169:14
**mother** 54:1 96:16
**motions** 179:3,9
**motivations** 129:2
**motive** 129:6
**mouth** 126:11
**move** 69:2
**movement** 32:18
**multiple** 167:10 167:18 168:10
**municipal** 22:20 35:1
**murder** 7:8 14:12 17:10 26:21 52:15,21 53:23 54:7,21 55:10,14 56:1 57:4 70:19 74:7 80:14,15 103:2 112:11 141:19 157:6
**murderer** 66:17 68:7

**N**

**N** 4:1
**name** 5:7 6:20 10:5 21:24 25:9 48:7,15 52:16,19 53:15 59:17,20 69:21 79:4 130:17 158:3 184:12
**named** 52:15 53:5,10,13 56:7 79:14 88:1
**narcotics** 35:3
**narrower** 182:14
**neatly** 44:17
**necessarily** 18:24 19:2 68:16 111:23 131:16 146:9 159:10 190:11
**need** 8:6,22 9:3 9:4,5 11:18 56:22 62:17 92:4,5 95:11 95:23 96:13,18 97:18 98:9 103:23 108:3 124:8 132:22 149:4,4 159:13 180:21
**negative** 31:4
**neglected** 137:14
**neighbor's** 90:24
**neighborhood** 79:3,12 146:17
**neighborhoods** 86:8
**Nespoli** 1:7 81:21
**never** 33:11 93:20 100:9 135:16
**new** 12:14,15 15:16 16:1 168:24 169:23 171:3
**news** 10:22 11:1 74:6 75:4 76:11 77:18 78:14
**newspaper** 67:18 70:19 71:10 72:12
**nickname** 53:6 53:14
**nine** 85:17
**nine-minute** 85:12
**normal** 193:2
**north** 83:21
**Notary** 2:7 194:13

**note** 39:22 41:20 61:7 81:11 87:22 113:5
**noted** 5:20
**notes** 8:19 10:18 40:21 44:8 185:8 194:6
**nother** 20:17
**notified** 28:13
**Notwithstandi...** 116:6 133:7
**November** 68:21 118:2 124:10
**NSB** 46:5 64:3
**number** 11:4 13:3 30:7 38:11 43:18 64:1 82:18 92:9 94:16,20 96:2,5,6 108:3 115:5 127:15 172:17,18
**numbered** 154:1
**numbering** 38:9
**numbers** 111:4

**O**

**Oakford** 14:14 85:3,9
**Object** 191:5
**objection** 9:17 9:20,24 19:18 20:5 28:17,19 32:10,12 35:10 35:19 36:4,6 37:3 43:7 47:3 49:15 50:4,10 58:23,24 59:7 59:9 60:10 61:9 65:3 66:4 66:20 67:24 68:12 71:2,4 75:5 86:13,23 88:23 90:3,4 91:8,21 94:1 100:8 104:11 105:16 106:15 108:12 112:18 114:12 115:21 116:3 119:1,3 119:19 123:4 125:4,11 126:23 127:4 131:13 132:13 133:9,16,17 135:1,18 136:6 136:14 137:23 137:24 139:11 143:7 144:9,10 144:11,19,21 148:7,17 158:7 159:6,17 161:17 163:3 165:19,21 167:3,5 171:5 175:21 176:7 176:17 177:4,6 177:20,23 178:1,20 182:7 182:9,21,22 183:24 187:23 191:4
**objections** 5:3
**obligations** 33:15 116:8 119:17 134:16 191:22
**obtained** 93:8 162:3
**obviously** 72:6 86:5 111:10 142:7 164:3 174:14
**occasions** 189:14
**occurred** 63:21 173:23
**odd** 30:12
**offender** 22:24
**office** 6:21,22 10:17 12:22 13:20 14:4 16:8 21:10,14 22:4,7,10,17 23:1 29:10,13 30:2 31:5 32:2 32:3,9,18,19 37:22 44:19,22 45:19 47:19,21 48:2 49:24 51:5,6 55:13 106:8 107:22 109:10,23 127:17,18,20 128:11 147:16 170:11 184:20 185:17,22 186:6,9
**officer** 69:24 74:12 102:19
**officers** 35:4
**offices** 2:3
**oh** 10:21 21:15 24:17 38:4 84:22 92:7 161:5 175:10 185:1 193:1
**okay** 8:19 9:10 9:14 10:8,11 11:3,13,22 12:6,21 13:12 14:2,23 15:7 15:19,23 16:6 17:2,8 18:5 19:9 20:9,11 20:20 21:3,12 21:21 23:2,9 23:15 25:3,23 27:12,18 28:14 28:24 29:11,14 29:22 30:9 31:18 32:8,22 33:8,18,22 34:5,8 35:7,15 36:2 37:9,18 39:11,22 40:5 41:7,10,16 42:13,17,23 44:2,14 45:5 46:6,10,12,19 48:1,6,13,24 49:20 50:15 51:13 52:3,5 53:1,17,21 54:7,15,18 55:9,17,23 57:1,18,24 58:11 59:4,12 60:6,21 61:5 62:5,8,12,23 63:10,19 64:10 64:12,23 66:6 66:8,12 67:2 67:11,21 68:18 69:1,11,11,16 69:18,19,23 70:4,14 71:24 72:13,17,20 73:2,4,17 74:11,16 75:1 75:8,10,14,20 76:9,21 77:9 77:15 78:5,22 78:23 79:6,10 79:18,21 80:4 80:6,9,15,21 81:10 82:5,9 82:14,24 83:8 83:16 85:4 86:16,20 87:22 88:4,11,11,16 89:4,10,15 90:9,21 91:1,4 92:2,10,19 93:18 94:7 96:10,24 97:12 98:13,17 99:6 99:18 100:12 101:3,6,9,21 102:3 103:7,20 103:23 104:6 104:16,23 105:20 106:13 106:20 107:5 107:13 108:7 108:19 109:2,4 110:4 111:4,17 112:2,7,13,23 113:3,9,22 114:4 115:12 115:24 116:6 116:14 117:5 117:24 118:11 118:16 119:7 119:15 120:6 120:24 121:9 121:13 122:1 122:19 123:13 124:22 125:3 126:6,10,17,22 127:14,24 128:5 130:1,11 131:8 132:20 133:5 134:4,7 135:8,13 136:11 137:8 137:14 138:18 139:12 141:9 141:15 143:3,5 143:10,23 144:15 145:2,8 145:12,20 146:14,22 147:6,19 148:12,24 149:8 150:10 151:8,16,22 152:7,16,19 153:1,5,21,24 154:22 155:16 156:4,13,14 157:1,3,7,16 158:22 159:21 160:5,10,13,16 160:17 162:5 162:13 163:10 163:19,22 164:3 165:4,9 166:7,19,21 167:20 168:1

168:12,18 169:7 171:11 171:17,23 172:7,11 173:10,14 174:12 175:11 175:13 176:2 176:11,21 177:11 181:18 183:4 184:3,5 185:2 186:13 189:2,5 190:21 192:3,8
**old** 31:21 32:3
**omitted** 156:7
**once** 8:16 9:15 9:16 15:24 38:12 41:7 76:13,17 98:24 149:9 154:14 169:24
**ongoing** 128:17
**open** 190:7
**opinion** 43:4 97:1,8,9
**opportunity** 8:3 11:11 182:18 182:24
**opposing** 89:10
**opposite** 139:10 172:23
**orally** 149:14
**oranges** 179:14
**order** 18:1 111:2
**ordinarily** 170:6
**organized** 44:17
**orient** 62:12
**original** 102:10 140:12
**outlined** 54:16 176:22
**outset** 81:22 183:8
**outside** 27:10 74:20 76:3
**overheard** 17:23 150:18,18
**overhearing** 173:7

**P**

**P** 79:23
**P-1** 58:5 140:21 140:23
**P-24** 103:8,24
**P-42** 72:19 77:16
**P-78** 109:12 185:21
**P-81** 184:21
**P-L-A-C-I-T-...** 22:2
**P.C** 3:14
**p.m** 193:4
**page** 4:2,8 40:19 46:7 48:23,23 49:2 58:9 63:6 63:23 64:6,11 66:7 73:3,21 75:11 77:1,16 82:1,1,2,2,16 85:2,8 96:1,3 108:4 110:2,8 117:10 118:14 124:10 132:6 141:22 142:5 142:10 151:6,7 153:2 154:2,22 156:16 157:10 160:9,9,12 185:5 188:21 188:21
**pages** 46:3 76:9 78:18 153:22
**panicked** 77:5
**paragraph** 39:23 41:22 42:2 46:10,11 66:9 74:18 76:2,12 77:2 80:7 81:8 82:15 93:15 96:24 101:20 108:1,4 112:3 114:16 123:7 123:12 130:6 132:21 142:2 153:2
**paragraphs** 64:11 80:5 82:16 151:6
**paralegal** 3:22 6:22
**pardon** 49:21 79:23 81:24 104:2 115:4 119:23 136:2 140:3 142:20 158:2
**Parkway** 3:9
**part** 46:11 48:11 66:22 79:6 93:3 97:7 116:8 119:22 140:13 160:21 170:19
**participate** 32:5
**participated** 152:20
**particular** 26:13 29:1 72:18 111:22 112:8 143:21 183:23
**party** 67:5
**pass** 84:19 106:21
**passed** 105:8,13 105:22 106:14 106:22,24 165:18 166:5 169:23 185:16 187:15
**passing** 170:4,12 170:23 187:11 187:19
**Patricia** 39:7 54:1 95:15 185:6 187:1
**Paul** 89:11,13,24 94:9 105:13 107:8,19,22 113:12,18 185:18 186:9
**pausing** 103:14
**Pennsylvania** 1:1 2:5 3:5,10 3:17 5:12,16
**people** 11:22 12:7,12 18:24 19:21 25:5,20 30:3,6 31:14 47:10,14 53:1 53:3 86:10,10 87:9 98:22 114:10 115:5 115:19 116:1 116:17,19 145:21 176:14 178:5 181:24
**percent** 51:17
**period** 13:15 23:13 25:19 51:20,24 61:4 86:18 142:24 186:21
**permissible** 179:6,7
**permitted** 179:19
**perpetrator** 73:11 79:2 81:4 83:20 84:1 88:2,5,17 90:1 91:20 146:17 163:14
**person** 12:21 13:23 59:19 67:8 88:6 100:19 116:23 116:24 117:1 129:5,7 146:15 146:20 159:9 159:13 169:2 173:21
**person's** 129:2
**personal** 1:5,8 1:11,12 14:3
**perspective** 17:4 18:22 134:10 134:17 136:23
**Peter** 46:2
**petition** 29:9 39:23 42:2
**Philadelphia** 1:5 2:5 3:5,8,10,12 3:17 5:16,18 7:1,1 14:14 29:23 31:22 42:8,24 47:22 48:2 51:3,9 52:14 53:2 74:13 76:10 77:18 86:5 106:6 108:22 139:23 150:24 184:13,14,14
**Philly** 26:22 30:14 77:17
**phone** 44:8 146:2 152:6,24
**photo** 83:9 87:17 98:7
**phrase** 64:24 89:1 127:15 167:17 170:19
**phrased** 29:16
**physical** 18:6,10 79:7 83:18 87:5
**physically** 146:16
**pick** 49:2
**pictured** 21:5
**piece** 44:6 45:15 45:15
**pieces** 147:17,21
**place** 14:13 48:22 49:3 57:10 95:15 154:19 155:13

**placed** 110:23
**Placitella** 22:1
**Plaintiff** 1:4 3:7
**plaintiffs** 31:6
**plaintiffs'** 19:12 19:16
**plan** 132:21 133:4
**pleadings** 29:20 93:3 185:7
**Pleas** 7:17 15:16 16:1
**please** 9:6 48:21 80:4 92:7 93:13 94:20 96:1 100:15 109:3 129:18 151:3 171:10 192:22
**plural** 81:13
**Podraza** 4:14 92:16,17 93:3 93:6,9,18,23 107:18,20
**Podraza's** 107:15 108:2,9 126:17 127:3
**point** 12:17 13:7 13:21 16:6 22:9 51:3,14 61:8 74:14 75:23 77:11 115:1 118:17 132:4,5 134:15 138:10 139:13 142:7 153:20 155:20 160:7 169:14 179:15 189:13
**pointed** 82:11
**pointing** 30:18 137:16
**police** 7:2 11:5 17:9,15 34:20 35:8,16,22 36:3,14 37:2 37:11 42:8,24 45:18 47:22 50:13 51:3,9 52:14 53:2,24 54:8 62:9 64:15 66:17 70:2,5,17 81:3 83:3,10 88:18 97:15 98:2,21 102:19 106:7 108:22 139:23 150:24 155:6 158:20 159:1 163:20 166:22 166:23 167:9 167:17 168:7 168:12,23 169:16 174:19 175:2 177:13 177:18 181:7 184:15 188:7
**policy** 46:14
**polygraph** 98:11 98:14 99:5,8 99:12,20 100:6 100:17 102:15 102:18 103:9 104:3,19 105:3 105:8 106:5 128:2 145:15 149:1,3,6 174:23 175:3,8 191:3 192:1
**polygraphed** 102:6,10 174:19
**polygraphs** 98:19,21,23 100:13 101:11 190:22,23
**portion** 41:20 63:20 66:7 68:18 75:10 76:23,24 109:22 112:21 116:13 150:16 161:4 171:23
**portions** 49:3 72:8 80:1 113:1 117:5,16 118:19
**position** 183:23
**possession** 105:22 112:15 127:12,15,17 135:15 139:23
**possibility** 166:3 166:4 167:24
**possible** 51:16 61:21 129:10 182:24
**possibly** 60:19 60:20 104:22 146:5,13,14 168:17 177:8
**post-conviction** 93:4
**postdated** 15:1
**potentially** 192:5
**power** 27:10 120:1
**practically** 156:19
**practice** 8:14 9:3 47:19 48:2 51:3 57:5 150:7
**practiced** 33:20
**practices** 112:24 127:20 158:24 186:20
**practicing** 29:22
**preceded** 15:1
**precedes** 76:1
**preliminary** 22:19 24:16 27:6 64:15 65:17,22 66:15 77:3 118:4
**prep** 45:7
**prepare** 9:10
**prepared** 46:1 57:20 62:19 92:15 143:17 144:3 149:22 157:18 158:5 159:14
**present** 3:20 9:23 10:8 70:9 79:19 93:15 163:12 164:21 173:3 182:19
**presented** 26:7 44:19 70:20 149:14 164:3,8 164:23 165:5 172:15 183:1
**presenting** 38:17
**presentment** 27:6
**pressured** 158:19 177:13
**presumably** 106:8
**presumes** 144:7
**pretty** 41:13 115:9,13 190:19
**prevailing** 20:16
**previous** 95:1 141:12 149:20 152:5 171:20 181:18 186:10
**previously** 45:24 56:16 109:11 128:1
**pride** 19:16
**printouts** 74:4
**prior** 57:13,19 70:1 121:15 169:1 186:18
**prison** 122:9 124:12
**privilege** 65:13
**probable** 16:18 16:22 57:20 58:6 140:22 141:18 142:3 145:10 147:11 149:19,22 151:10
**probably** 23:7 86:14 109:18 115:22
**probation** 69:24
**proceed** 94:20 157:8
**proceeded** 159:15
**proceeding** 6:7
**proceedings** 14:24 15:5 26:3 194:4
**process** 170:23 187:4,10,11,13 189:3
**Professional** 2:7 194:13
**pronounced** 59:20
**pronunciation** 59:23 130:16
**prosecute** 180:22
**prosecuted** 7:6 7:14 63:14 117:22
**prosecuting** 183:10
**prosecution** 7:14 18:22 22:13 52:12 55:14 72:10 99:1 102:1 105:15 111:19
**prosecution's** 17:4 183:6
**prosecutions** 128:8,17
**prosecutor** 20:13 32:23 33:1 34:8 99:7

115:15 119:16 120:19 121:10 126:7 129:12 134:17 136:24 162:9 170:5 171:3 179:4
**prosecutorial** 34:11
**prosecutors** 46:14,20
**provide** 11:12 22:12 34:1,3 47:23 55:21 56:1 59:6 60:17 79:14 111:19
**provided** 16:16 43:2 50:15 62:8 66:16 74:3 87:9 88:14 101:24 108:20 109:23 110:22 112:16 119:13 120:2 183:5 185:12 185:15 186:5 186:18
**provides** 173:22
**providing** 33:1 62:3 68:10,20
**proximity** 87:15
**public** 2:7 76:16 76:18,19 78:1 78:3 194:13
**published** 74:6 75:2
**purpose** 27:2 37:23 50:21 52:8 93:14
**purposes** 6:24 24:20 93:15
**Pursuant** 46:14
**pushed** 107:7
**put** 20:11 26:23 27:8 44:6 56:11,17 65:8 96:17 97:12 126:11 129:2 133:24 165:11 168:21 174:13
**putting** 18:10 27:2 148:13 166:9,21 188:8

**Q**

**qualified** 137:13
**quality** 173:5
**question** 5:4 12:2 13:6 20:1 25:7 27:1 29:16 32:1 35:6 36:13 46:23 49:20 61:12 67:12 68:9 72:3 80:18 89:6 96:20 103:24 104:21 105:20 107:5,8 108:24 112:5 114:23 115:5 120:9 121:2 124:2,10 124:16,19 128:20 132:1 133:11 145:1 149:18 154:2 154:11 156:1 160:7 164:13 164:15 165:16 172:13 174:1 174:13 178:18 182:14 187:8 190:21 191:15 192:2
**question's** 114:19
**questioned** 104:3 123:14
**questioning** 101:1 154:3 171:24 179:8 181:19 184:18
**questions** 11:19 17:2 31:21 52:7 56:20 95:23 97:14 98:18 105:2 134:8,20 137:15 139:19 146:23 150:12 153:6 156:8 162:21 163:8 181:3 184:4 187:3,8,10 189:9 190:23 191:13
**quick** 95:22 191:14
**quickly** 20:23 171:8
**quieter** 156:19
**quote** 96:17
**quoting** 175:4,6

**R**

**R** 3:8
**R-I-L-E-Y** 102:19
**raise** 78:11 90:2
**raised** 86:7 145:16,18 146:4
**raises** 67:22
**ran** 22:23 74:20 76:3 77:6
**rang** 74:21 75:21 76:5,8
**ranked** 89:19
**Ransome** 79:14 79:23 81:4,7 82:3,7 83:4,9 86:20 87:15,19 87:20 88:8 91:18 93:19 94:9 146:10
**Rape** 22:22
**raped** 54:1
**rapport** 131:3
**reaching** 43:4
**reaction** 28:14
**read** 10:24 39:23 42:6 46:10 48:21 56:23 58:7,9 62:13 62:17 64:10,11 65:18 66:10 69:18 70:20 71:7,15 76:2 78:18 80:2,4,7 92:24 95:23 97:18 101:20 108:3 112:2 121:23 122:3 134:5 151:5 157:8 158:1,2 160:14 164:18 169:2,2,12
**reading** 5:1 64:8 69:6 71:14,21 124:5 126:17 130:9 152:5 155:1 157:13 158:10
**reads** 46:19 71:6 76:2,12 77:22 96:8
**ready** 24:13
**real** 156:18 172:14
**realize** 94:24 141:11,14 171:20
**really** 10:22,24 19:24 20:19 26:24 28:8 29:3 32:15 33:21 47:15 61:17 116:11 116:22 169:4 180:19 181:3 190:19
**reask** 112:5
**reason** 9:7 17:2 26:13 49:6,13 54:18 66:1 70:23 93:5,22 107:17 108:7 108:16 110:1 127:2,7 130:21 140:11 142:19 153:5 155:2 168:15
**reasonable** 19:2 31:11
**reasons** 26:16 100:1 104:20
**recall** 8:22 10:4 14:10 17:22 18:3,4 19:5 25:16 26:13 27:11,13,17 34:9,18 37:10 39:6 40:15 41:4,10 42:17 42:23 43:4,23 44:21,24 45:1 45:11 47:21 48:1,6,14 50:17 51:2,8 51:13,23 52:1 52:16,22 53:18 54:4,13 55:17 55:23 57:12 60:24 61:15,19 61:23 62:4 65:10,11,21,24 66:3 67:13,16 70:12 72:23 75:9,21 77:7 78:7 82:6 84:6 86:4 88:11 89:13,16 92:19 95:17 96:20 97:8,23 99:2 99:18 102:20 103:4 104:23 104:24 112:24 113:7,23 117:21 125:14 126:17,18

128:9 129:22 130:1 145:8 147:6 149:21 150:1,22 154:18,21 155:1 156:23 158:16,18 162:10 163:16 168:18 170:1,2 174:1 190:16
**recalled** 162:6
**recant** 178:4
**receive** 18:1 51:11 118:12
**received** 33:24 41:4,7 51:8 58:22 88:17 91:18 105:6 113:13 125:17 139:7 146:6 172:9 174:16
**receiving** 39:6 44:21 51:13,23 52:1 125:14 132:7,8
**recess** 94:17 141:5 171:13
**recollect** 90:17
**recollection** 8:23 43:16 45:17 51:17 52:18 55:9,17,19 67:12,15 78:11 88:15 93:19 97:11 99:10 102:2 107:21 113:24 130:11 145:11 147:13 147:18 150:4 153:16 162:12 183:20 186:17 186:19 188:2 189:5,20 190:4 190:13 191:1
**record** 5:7,9,21 6:18,19 8:15 65:18 94:13,15 94:19,22 113:13,18 122:3 141:2,2 141:4,7,9 157:9,14 158:2 158:2 171:10 171:12,15,17 173:3 174:1 184:11,12 192:13,18
**records** 23:9
**recover** 159:13
**recovering** 181:8
**redacted** 113:1
**Redwell** 190:5,7
**reference** 52:17 52:23 53:8,12 56:12 72:9 73:5 75:11 76:6,8 77:2 82:2 96:11 98:14 103:9,12 111:7,10 112:8 117:12 122:2 122:14,16 123:7 124:4 142:16 151:10 152:3 154:14
**referenced** 4:9 145:21 147:10 152:14 153:13
**references** 72:3 83:12 115:3 130:4 132:3 141:23 142:10 176:14
**referencing** 118:19 123:2 139:16 146:2
**referred** 150:17 160:17
**referring** 45:10 102:9 114:15 122:4,21 160:18
**refers** 115:5 157:2
**reflects** 161:9
**refresh** 8:23 130:11 153:16
**refreshes** 45:16
**refused** 65:12
**refusing** 65:10
**regard** 54:7 173:14 174:12 177:11
**regarding** 55:20 58:9 137:15 159:1 186:17 187:3,10
**regards** 185:16 187:17
**register** 73:6,10
**reinterview** 175:10
**reinterviewed** 102:24 175:3,9
**relate** 111:24
**related** 7:20 35:5 52:20 58:20 60:16,23 152:19 168:5 168:11
**relates** 120:23
**relating** 56:5 112:21
**relation** 77:12 172:20
**relationship** 70:1
**relationships** 53:4
**relayed** 58:13
**relevant** 72:6 182:5
**relied** 47:22 106:9
**reluctant** 134:20
**remanded** 169:24
**remember** 14:21 15:18 16:13 19:4 20:11 24:8 25:20,22 26:19 28:12 31:19 34:16,23 47:18 53:15 55:3 60:21 69:21 99:9 140:4,6,7,15 162:22 169:6 169:12,19 174:10 186:3 186:12 188:23 189:1,16 190:9 190:11
**remembering** 40:1 137:11
**repeat** 22:24
**repeating** 78:13 137:18
**report** 46:1,4 81:6 110:19 149:7,9
**reported** 54:2 75:17 78:2 124:17
**reporter** 2:7 5:21 6:6 47:11 50:6 192:19,23 194:13,21
**reports** 44:8 81:3
**represent** 6:24 70:14 84:7 99:23 101:6,7 106:2 117:24 123:13 152:10 153:9 154:15 157:1,4,21 160:19 165:14 168:22 184:13
**representation** 106:10 113:15 123:22 151:20
**representative** 1:6,9,11,12
**represented** 7:24 30:16,22 31:6,13 91:2 93:6
**represents** 6:23
**reproduction** 194:18
**republican** 30:14
**request** 128:7
**requested** 162:9
**reserved** 5:4
**respect** 53:23
**responsible** 170:15 187:19 188:5,12,14
**rest** 58:10
**result** 46:20
**resulted** 93:10
**retained** 5:8
**retaliation** 54:3 54:11
**retired** 12:15
**return** 93:10 94:7 128:23 129:8 133:15 181:5,18
**returned** 103:3
**reversal** 93:10
**reversed** 15:15
**review** 11:18 16:18,20 17:12 29:6,20 41:8 42:9 56:9 57:22 64:2 72:22 93:14 153:18 164:12 172:11 185:12 186:5
**reviewed** 10:15 10:16,16 18:18 25:10 41:11 57:19 67:17 75:21 88:12 101:17,18

103:8 104:24 113:24 114:7 121:20 139:24 140:19 143:13 143:21,23 149:1 150:14 153:19 163:20 172:1 183:21 185:23
**reviewing** 17:7 43:6 46:7 60:3 149:22
**Richard** 189:6
**right** 8:1,9,12 11:1,7 14:8,18 16:4 19:23 20:4,20 21:12 22:6,9 23:11 25:13 27:22,23 28:1 33:16,19 34:6,15,16 37:21 40:14 46:6 50:1 51:22 52:2 56:8,11 57:1 58:17,22 62:5 63:13,16 67:16 67:16 68:3,5 70:8 73:20 74:15 76:7 77:9,18 81:1 81:20 84:7 85:1 86:4,8 87:5 89:22 90:16 91:7,15 95:4,19 97:2 97:12 101:16 101:21 107:7 109:2,8 110:10 113:11 114:6 114:24 115:17 119:17 120:16 122:7 128:13 129:17 130:23 132:12 133:1,7 133:22 134:9 139:19 140:6 143:16,23 144:18 146:14 147:5,14 149:5 149:14,17 150:10 151:2,5 152:9 153:15 153:23 155:24 157:8 158:16 163:12,23 164:10 167:15 170:1 173:16 173:24 174:11 179:17,22 180:2,4 181:5 182:1 183:17 184:24
**Riley** 102:19
**risk** 31:21 59:18 139:2
**RNC** 31:1
**robbed** 54:9
**robbery** 7:8
**Robert** 186:10 188:23
**Robins** 12:14,15 16:1 168:23 169:23 171:3
**ROCCA** 1:5
**Rocks** 1:10 3:13 63:7 123:1,14 124:23 126:1 146:3 175:19
**Rocks'** 124:9
**Rodney** 17:5 58:9 106:5 122:5 126:3,14 139:7 144:7
**roles** 23:22
**Rosen** 1:17 2:1 4:3 5:19 6:2,15 94:22 96:19 97:2 130:5,8 132:22 136:20 141:9 149:3 171:17 184:10 185:4 189:8 191:22
**Roth** 22:2
**route** 85:14,16
**Rudovsky** 2:3 3:2
**rules** 6:8 35:16 179:11 180:4
**running** 115:16

**S**

**S** 1:17 2:1 4:3,8 6:2
**S-E-Y** 69:21
**sadkins@arch...** 3:19
**save** 43:13 45:23 81:12
**saw** 16:12 50:14 52:17,23 53:8 53:12 54:6 70:3,24 114:5 120:3,4 122:13 126:12 129:11 129:24 167:13 177:15
**saying** 10:9 61:17 62:1 66:10 113:18 118:10 124:1 124:24 134:21 158:19 161:9 161:13 181:24
**says** 46:7 49:14 62:22 63:3,9 66:9 71:9,11 93:20,23 96:16 97:1,21 98:1 100:17,18 102:3 109:7 110:12 114:20 115:10 122:17 123:12 126:21 127:8 132:6 133:4,19,20 141:21 152:5,6 154:5 156:16 160:22 175:6 178:13
**scanned** 10:23
**scene** 68:19 83:2 87:24
**scheduled** 7:18
**school** 21:1,12
**sealing** 5:2
**searching** 83:5
**seated** 8:1
**second** 7:16 12:16 16:7 17:19 40:19 41:22 46:19 52:20 53:10 66:22 76:12 77:2 79:6 82:2 85:8 97:23 98:5 103:13,15 110:11 124:5 128:14 131:23 141:2 151:7 152:8 153:1,2 153:11 154:2 154:24 160:3 164:15 168:23 170:9 185:5
**secondhand** 125:1
**section** 46:17
**see** 14:18 17:3 41:24 42:4 46:7 48:3 49:1 49:5 60:5 62:24 63:6 69:12 71:18,20 73:5 74:11,19 74:23 76:5,14 77:16,20,24 79:15 82:22 83:11 85:10 96:4,7 97:4 102:7 103:14 110:12 111:4 112:8 117:12 121:9 122:2,16 124:8 130:9 131:2 137:6 141:22 142:1,2 148:21 149:4,6 153:4 154:6,8 154:11,13 160:21 161:7 164:20 166:23 172:12 177:13 185:9 186:22
**seeing** 18:3,4 53:18 54:4,13 65:11 70:12 72:23 75:21 77:7 113:23 128:9 129:22 130:2 140:4 152:3 162:6 163:16
**seek** 29:19 126:7
**seen** 11:15 14:15 17:1 28:5 39:3 50:12 83:3 92:21 101:22 109:14,16 122:20 128:6 128:11 143:10 143:12 145:20 146:1,6 150:23 152:11 153:20 154:15 167:8 177:12
**self-incrimina...** 65:15
**send** 38:12 40:21 48:18 92:22 120:5 188:18
**sending** 40:22 188:8,15
**sense** 64:21 71:13 116:11 116:15 118:9 130:22 172:5
**sent** 11:3 15:15

29:9 39:19 56:4 72:24 92:19 95:17 109:10 130:20 146:7 176:4
**sentence** 41:22 46:13,19 76:1 76:12 77:22 96:8 97:1 102:5 122:3,4
**separate** 181:24
**sequentially** 38:9
**set** 14:9 27:13 38:4 54:19 68:19 83:2 93:1,1
**sets** 185:6
**setting** 44:18
**shape** 181:15
**share** 49:24
**shared** 107:22
**sheet** 50:13 51:14 56:5 57:1,10 80:5,8 81:3 82:24 101:14 102:24 105:7 106:5 108:21 124:16 124:24 125:15 125:17 128:2 137:15 143:24 145:14 146:2 148:24 151:19 175:6
**sheets** 50:18 51:4,5,9,24 79:22 88:13
**Shelley** 12:14,15 16:1 168:23 169:23 171:3
**shift** 63:10
**shooter** 83:21 122:11,14,17 122:22 123:2,8 123:21 124:1 124:13,18 139:8
**shooting** 77:22
**short** 13:9 94:23 141:10 171:18
**shorter** 88:5
**shot** 54:3,11 74:13,21 75:11 75:16,21 76:5 76:6,8,13,17 80:19
**show** 11:14 37:24 39:11 45:22 48:17,19 58:1 63:19 68:18 70:15 72:8,11 76:23 77:1 84:11 87:23 92:2 101:7 107:15 109:9 113:12 120:9 128:13 131:10 136:1 164:11
**showed** 14:19 16:13 56:4 73:10,17 87:14 100:22 113:6 145:14 174:6
**showing** 46:3 63:20 69:5 74:6 76:17 121:14 143:24 153:8
**shown** 69:24 78:10 82:5 87:3 103:21 176:9
**shows** 65:5 81:14 85:2,8
**sic** 20:17 142:13 188:12
**side** 46:6 90:22 97:13 139:10
**sign** 178:14 180:1,8,14,17
**signature** 110:5
**signature's** 143:19
**signed** 153:7 154:15 157:14 157:17
**signing** 5:2
**SILVA** 1:12
**similar** 180:4
**Simone** 3:15 10:3,4
**single** 76:6
**sir** 7:22 27:18 33:22 38:17 39:2,4,18 46:6 50:12 54:18 56:9,12 58:17 59:19 62:6,10 63:17 64:6 79:16 81:12 84:16,22 88:16 92:14 93:2 95:5,13 97:13 103:5 105:6 106:2 109:13 111:17 120:9 121:21 123:13 124:5 127:9 129:20 134:1 140:21 141:22 142:1 152:10 153:6,16 154:24 160:3,8 171:23 184:4
**sitting** 18:20 21:7 39:9 93:22 135:5 137:12 173:24 174:10
**situation** 123:15 159:9 178:11
**situations** 167:8
**six** 98:3
**skipped** 176:12
**slew** 30:14 31:8
**slightly** 115:2
**small** 40:10
**smile** 21:4
**so-and-so** 62:1
**so-called** 122:22 173:22
**somebody** 31:10 99:3 117:3 165:10 166:4
**son** 95:14 96:23
**sorry** 47:11 50:6 50:9 55:8 69:9 77:9 80:17 87:20 96:5 108:2 112:12 149:18 155:17 159:22,23 161:3 171:7
**sound** 15:3 16:4 25:13 30:12 53:7 54:16 63:16 180:19
**sounds** 31:17 35:7 43:16 73:8 91:4 134:21 135:8
**source** 68:9 81:11 166:15
**sources** 81:13
**South** 2:5 3:4 14:14 26:22 74:13 81:7 82:11 83:5 85:3 86:2
**space** 107:22
**speak** 50:7 115:19 126:13 174:2 181:15
**speaking** 189:16
**special** 140:13
**specific** 10:14 19:5 37:10 39:9 52:7 57:17,17 75:12 84:4 89:21 100:15 131:21 150:4 160:7 187:3 190:13
**specifically** 23:2 34:23 43:12 58:8 79:10 87:11 96:15 99:9 130:5 132:3 152:21 163:24 164:22 174:15 176:23
**specifics** 140:9
**speculate** 104:14 107:12 133:19
**speculated** 145:22
**speculating** 116:17
**speculation** 143:6
**speculative** 61:13 107:9 115:9 166:6
**spent** 23:5
**sphere** 78:3
**spoke** 11:23 12:23 70:5,17 70:21 152:23 154:9 156:2 163:20,24 181:12
**spoken** 12:1,3 12:17,19 13:6 13:10,13 32:1 176:15
**Square** 3:16
**Squirt** 53:6 122:10 156:20 156:22 157:2
**stack** 73:20
**stage** 14:9 24:5 24:16 54:20 93:1
**stamp** 46:5
**stamps** 153:22
**stand** 27:15 53:19 59:22 138:10 166:10

166:17
**stands** 139:14
**start** 13:4 21:9 64:8 69:6 124:5 136:2 184:18
**started** 22:19 187:21
**starting** 64:2
**starts** 41:23 42:2 74:18 132:21 157:10
**state** 156:17 178:13
**stated** 122:9 124:11
**statement** 17:9 40:3 58:15 60:2 62:19,24 63:6 64:14 65:23 67:19 72:11 97:17,18 97:19,23 98:3 98:8,15 99:4 102:10 103:7 104:2,7,10 109:5 110:22 111:11,14,18 111:22,22,23 112:3,15 113:1 113:4 114:1,15 115:3,10 116:13 117:2,6 117:17 118:18 120:14,20,24 121:15 125:8 125:21 128:3 137:16 138:6 138:13,20 143:1 144:6,8 145:21 153:7 153:10,11 154:16 156:17 157:5,5,9,14 157:17,23,24 158:3,5,13,20 161:2,23 162:2 163:16 165:7 165:14 167:14 175:20 176:13 178:14,19 179:12,24 180:8,17
**statements** 44:9 62:9,14 63:14 110:7,12 111:7 114:6 122:20 126:19 179:3,9
**states** 1:1 144:13
**stature** 88:6
**stay** 161:10
**stayed** 21:15 23:18 45:18
**staying** 122:11 124:14
**stenographic** 5:21 194:6
**step** 98:17
**stood** 137:1
**stop** 122:13 156:21
**store** 79:3 86:1 86:11,21 87:9
**stores** 86:17
**stories** 31:23
**story** 121:5
**story-telling** 59:19
**straight** 121:6
**strategic** 27:7
**street** 2:4 3:4,10 3:16 5:16 81:8 84:4 85:22 165:11
**Streets** 14:14
**strength** 19:17
**stretchy** 190:1
**strictly** 7:12
**strike** 21:23 55:18 58:18 67:3 78:8,24 79:11 91:4 105:11 135:14 140:19 142:8 143:10 147:19 147:21 158:17 158:23 167:9 169:13 180:12 181:12
**strong** 18:21,23 20:3
**stuff** 10:23 89:9 148:2
**subject** 134:9
**submitted** 29:7 93:4,9
**subpoena** 24:13 27:9
**subpoenaed** 22:12 45:7
**substance** 12:9
**sued** 13:4
**sufficient** 183:5
**suggest** 9:5 99:8 100:5 135:16
**suggested** 16:17
**suggestion** 132:12
**suggestions** 149:23
**suicide** 155:3,6,9 156:12 177:14 181:8,17
**Suite** 2:5 3:4,17
**sum** 185:11
**summarize** 43:14 78:19
**summarizing** 187:17
**sun** 44:9
**superior** 15:14 169:24
**supervision** 194:20
**supervisor** 126:16 145:19 147:4
**supervisory** 23:21
**supplemental** 113:19
**support** 79:1
**supposed** 169:15
**suppress** 179:3,9
**suppressed** 42:4 42:7
**sure** 15:6 31:19 32:7 35:16 41:13 43:17 51:18 56:14 57:15 60:17 61:17 62:2,7 62:16 64:9 74:15 81:17 85:18 89:22 90:14 98:6 100:2,16 112:4 116:16 119:16 120:1 121:9 124:7 128:21 131:24 132:5 145:17,19 155:21 160:4 162:19 175:5 192:6
**surprise** 100:7 104:9
**surprised** 136:12
**suspect** 93:20 101:4 146:11 179:19 180:1
**swamped** 11:11
**swear** 5:23
**switch** 189:8
**sworn** 6:3 121:15

**T**

**T** 4:8
**Tab** 38:3 92:6
**tabs** 44:18
**tactics** 161:16
**take** 8:24 9:2,3 14:22 15:7 22:16 23:19 24:3 34:5 48:9 52:3,8 56:22 57:18 58:7 62:5 63:15 64:6 67:2 72:21 78:5 79:18 92:3 93:13,15 96:13 99:5 100:6,17 101:20 108:1,4 109:2,12 110:10 112:2 113:10 121:23 122:13 131:24 152:8 178:11 188:10
**taken** 2:2 43:18 63:1 194:6
**takes** 140:12
**talk** 7:15 19:10 79:10,12 87:5 100:12,23 131:4 159:14 163:2 174:15 181:14
**talked** 43:22 68:5 71:17 101:10 174:4
**talking** 16:23 25:24 96:12 103:17 111:21 132:23 133:2 150:11 155:18 156:21 165:15 179:14 187:21
**talks** 71:12 93:18
**tall** 87:12
**Talmadge** 115:11
**Tasker** 122:11 124:14
**technically** 170:9

**technique** 101:1
**tell** 13:1 23:4,12 26:2,16 28:9 34:24 36:3,10 36:15 42:13 44:2 57:9,17 64:7 69:16,17 78:20 81:23 89:18 95:24 106:13 109:21 114:20 124:9 129:6 163:2 180:1,15,16,21
**telling** 31:23 61:18 64:14 66:14 99:19 100:3 121:7 144:17 163:1
**tells** 85:5,12,21 106:21
**tend** 86:11
**tends** 120:12
**tenure** 23:16
**terms** 14:3 24:4 25:5 39:24 89:17,19 180:7 186:10 187:13 187:14 192:1
**testified** 6:3 8:16 17:22 22:11 73:13 169:14
**testifies** 77:3
**testify** 65:11,12 138:22 166:10 169:15
**testifying** 62:2 111:18
**testimony** 9:8 10:20 16:19 17:20 18:4 43:18 44:4 52:18 53:9,12 53:16 54:6,22 55:2,21 56:1 63:12 64:16,22 65:6,18,22 66:15,23 69:6 73:18 95:1 99:24 101:7 121:15 124:4,9 128:23 141:12 150:14,16,19 153:13,17,20 155:2 160:18 161:9 162:6 164:4,23 165:2 165:5 169:1,3 169:12 171:21 172:16,18,21 172:22 173:15 173:19 174:7 185:8 194:3
**text** 40:10 46:7 131:21
**thank** 6:6 38:4 48:9 52:3,6 56:19 62:8 82:21 92:8 185:1 191:17
**theory** 53:24 91:15
**they'd** 99:3
**thing** 28:12 93:14 98:4 119:8 146:23 148:15
**things** 16:21 29:1 31:22 43:23,24 44:18 78:16 108:8 147:2 172:12 190:1
**think** 10:17,21 13:18,20 18:8 20:2 24:24,24 27:4,7 28:4 29:9 30:11 31:10 34:17 35:2 37:17 52:8 64:17 78:19 92:22,23 107:7 116:12 116:12,22 118:17 129:24 135:12 137:14 153:19 170:6,7 173:1,3,9 183:13 184:23 185:20 190:7 191:12
**thinks** 85:21 129:7
**third** 67:5 81:8 96:1 102:5 117:10 118:14 122:4 130:6 141:22 142:10 185:7
**third-party** 7:12
**THOMPSON** 1:14
**thought** 31:11 31:13 45:9 52:23 90:11
**thoughts** 28:21 28:24
**thousands** 21:19
**threaten** 180:13
**three** 3:16 62:9 79:20 80:5 122:20 130:23 147:8
**three-minute** 85:5
**Tilghman** 17:5 17:19,22 150:12,23 151:23 152:13 152:20 153:11 154:4,16,20 155:2 156:16 157:9,19,23 158:19 161:9 162:7,11 163:19,24 165:15 166:24 168:1,15,19,24 169:9,13 172:18,22 173:3 177:11 177:12,22 181:6
**Tilghman's** 16:23 151:12 160:18 164:4 174:8
**time** 5:4,14 8:6 8:10,24 11:18 12:23 14:5,8 16:8 20:12 22:16 23:3,12 24:9,22 25:3 25:15,19,24 27:4 28:3,9 32:23 33:17 34:8 43:14 44:22 45:23 51:19,20,24 52:11 61:22 63:13 67:18 72:12 74:7 75:1 81:12 83:23 86:5,18 87:23 95:23 96:14 103:13 107:19 119:14 121:10,11 127:20 129:12 130:13 131:24 134:19 162:20 168:9,22,23 170:8,9,11 171:19 179:4 186:20
**timeline** 14:10 15:10,20
**times** 9:14 37:1 127:15 130:23 156:18
**timing** 8:22
**tips** 82:6 83:3
**today** 5:13 7:18 8:4,21 9:8 11:13 12:8 18:20 28:3 33:18,20 57:19 93:23 121:21 135:5 137:12 140:1 143:13 172:1 181:23
**today's** 9:11
**token** 180:11,11
**told** 8:15 12:8 17:14 19:5 28:6 45:17 70:6,16 73:14 75:16 77:4 96:16 102:11 102:12 103:1,2 115:10 116:23 122:10 124:12 138:16 147:16 147:20,22 148:4,14,19 150:13 159:12 160:8,23 161:10 162:5 162:16 165:6 166:22,22 168:4,23 169:7 169:17 181:13 181:20
**tone** 133:13
**Tony** 79:4
**tool** 100:14
**top** 77:20 190:8 190:9
**topic** 48:19 99:24 121:18 156:11 165:5
**topics** 63:10 67:11 78:6 83:16 147:7 149:17 150:10
**tour** 62:14
**training** 32:18
**transcript** 17:7 17:13 63:20 66:7 68:20 79:19 161:14

192:21 194:7
**transcripts** 11:6 48:18 70:3
**transmittal** 109:10
**transparent** 36:19 37:2
**treated** 161:1
**trial** 5:4 7:15,16 10:20 11:5,5 15:16 17:7,12 23:24 24:7,8 24:20 33:2 46:14 63:15 65:11 70:3 79:19 89:11 91:2 93:11 105:15 106:9 113:13 120:12 125:22 136:22 164:6 168:22 169:12,15,16 170:4,10,18 171:3 174:15 182:11 185:17 186:19 188:15
**trials** 22:23 172:9
**tried** 12:15 15:8 15:12 16:2,7 33:9 169:22 170:7 186:21
**true** 20:10 161:15 178:3,3 178:10,10 194:7
**truth** 61:18 100:3 113:18 121:7 144:18
**truthful** 9:8 37:11 100:21
**truthfully** 90:13 115:10 162:22
**try** 24:14,22 30:9 31:19,24 43:13 61:21 89:15 136:4,13
**trying** 55:12 61:20 72:4 114:9,21 130:7
**Tuesday** 1:17 2:2
**turn** 76:9 91:13 96:1 101:13 107:1 121:18 129:17 157:11 185:4
**turned** 37:14 88:19 118:19 120:21 147:24 148:2,3
**Turner** 53:5,10 53:13 54:11 87:18 122:10 122:14,16 123:2 124:13 124:18 151:12 155:7 156:22 157:2 164:16 168:2,2,4,4
**Turner's** 53:11 54:1
**Turners** 168:14
**turning** 56:15 63:23
**Twenty** 21:18 75:13
**two** 9:21 12:12 12:18 16:16 17:3 21:19 41:1,1,1 43:20 43:23 52:13 64:11 69:9 72:5 76:9 82:1 82:16 83:16 88:12 94:20 95:22 122:20 130:23 147:7 151:6 163:12 172:18 181:24 185:6 188:5
**two-prong** 44:18
**type** 121:13
**typical** 57:5,16 188:1
**typically** 24:6

U

**U.S** 5:11
**Uh-huh** 11:16 14:11 44:20 46:22 47:20 54:23 82:13 100:4 114:18 117:7 118:6 123:19 132:10 137:4,17 139:4 147:1
**ultimately** 64:15
**un** 191:10
**unavailable** 169:1
**uncertainty** 135:9
**understand** 7:22 19:4 25:7 42:10 44:11 54:19 74:9 106:10 113:15 113:21 118:10 123:22 174:14
**understanding** 15:24 25:11 50:20,22 54:20 69:17,20 70:22 73:23 106:3 107:17 115:14 191:1,9
**understood** 88:2 93:12 113:20 152:17 160:19 189:20
**unique** 26:6,9 67:7 72:10
**unit** 22:22,23 23:5,22 35:1 37:20 74:2 140:14 184:19 185:12 186:14 187:2,4,5,18 188:24 191:2
**UNITED** 1:1
**units** 22:17
**unknown** 81:11
**unreliable** 191:11
**upset** 28:22 29:1
**upsets** 29:5
**use** 59:24 64:20 64:24 86:11 89:1 98:21 116:20 120:15 136:1,4 138:9 138:12,24 139:1 153:22 167:17,18 183:12
**usual** 9:3 26:9

V

**vacated** 27:19 28:16 29:19 34:10,19
**vacating** 30:3
**vacatur** 28:10 29:7
**vacuum** 178:24 181:3
**vague** 51:17
**various** 22:17 147:17
**victim** 95:14 96:23
**video** 5:10 59:15 141:2
**videographer** 3:21 5:6,8 94:14,18 141:3 141:6 171:11 171:14 192:14 192:16
**Videotaped** 2:1
**view** 130:8
**views** 32:8,15,17
**vs** 1:4 5:17 33:15
**vulnerable** 178:13

W

**waived** 5:3
**waivers** 22:21
**walk** 85:6,13
**want** 7:10 13:4,8 37:18,24 48:8 52:6 57:24 58:2 62:12 63:10 68:22 74:14 75:23 81:15 89:4 97:14 116:1 120:8 127:15 128:5 132:21 133:4,23 149:6 150:11 151:18 153:12 184:18 186:14 187:7 189:11,12 192:20
**wanted** 31:10 33:8 186:24 189:19
**wanting** 55:20
**wants** 129:8
**warring** 26:23
**wasn't** 26:24 71:19 100:2 106:22 135:22 161:10
**waved** 137:1
**way** 25:8 38:8 42:18 47:15 55:11 63:4,13 65:8 69:2,3 71:7 72:14 73:22 81:10 87:22 89:10,23 94:4 106:13 107:14,16 114:22 115:2 120:13 125:24

127:14,19 130:15 133:24 134:5 136:4 140:6,24 143:16 146:22 147:15 149:8 151:9 152:9 154:2 157:21 159:4 174:5,6 175:24 176:9 182:15
**ways** 67:6
**we'll** 7:15 29:11 92:3
**we're** 19:10 38:7 38:13 61:17 63:12,12 64:2 68:23 80:22 83:1 94:14,22 141:3,6,9 171:14,17 180:16,22 192:17
**we've** 25:10 38:8 38:18 43:18 44:3,3,3 45:16 45:17 48:19 52:10 56:13 83:3,3 88:12 102:12 104:24 122:8 128:1 130:15,16 139:21,24 140:19 143:13 147:17 150:11 152:11 169:22 172:1,7 183:21
**weak** 19:3 20:3
**weaknesses** 173:18
**wearing** 132:24
**Webb** 25:18
**weeks** 24:10,21 83:1
**weight** 83:12
**weird** 85:14
**welcome** 93:13 164:18 186:19
**wellness** 162:8,8 162:11
**went** 6:17 15:14 21:12 22:20 45:19 70:18 71:8,14,17 118:3 144:3 172:6
**weren't** 15:21 37:15 100:21
**WESTERMAN** 1:10,12
**wife** 12:5
**Wilkerson** 52:15 53:23 54:2,24 55:15 152:11 157:6 161:24
**willing** 99:5 132:9
**win** 33:8
**wire** 132:24
**withdraw** 128:19
**withheld** 41:18
**witness** 3:19 4:2 5:24 7:13 8:9 9:21 10:1 17:19 18:14 20:6 28:20 30:17,23 31:3 31:7 35:13 36:7 37:6 38:4 43:10 44:8 47:4,8,13 49:17 59:2,10 60:13 61:11,17 61:24 62:2 64:18 65:4 66:21 68:1,6,8 68:10,14,16 71:5 75:6 82:22 86:14 88:24 90:6 91:10,23 94:4 99:14,15 100:2 100:3,5,9,17 100:21 101:2,4 104:13 105:18 106:17 108:13 108:16 110:7 111:18 112:20 114:14 115:22 116:4 119:4 120:19 121:2,5 122:8 123:6 125:12 128:16 128:22 129:13 131:15 132:14 132:17 133:18 135:4,20 136:9 138:1,7 143:8 144:12 148:9 148:19 158:9 159:2,8,18,23 161:19 162:14 162:24 163:6 165:22 166:10 167:6,9,10,18 167:20 171:7 173:9,10 175:23 176:8 176:18 177:5,7 178:2,23 179:8 179:12 180:8,9 180:13,21,24 182:10,23 184:2,5 185:1 186:3 188:1 191:7
**witness's** 67:22 120:16 128:17 165:5
**witnesses** 17:4 36:9 54:2 87:24 99:20 131:3 178:4 180:6
**Wolfe** 5:23
**woman** 181:14
**wondering** 21:5 126:11
**Woods** 122:5 123:2,17 124:11,17 126:2,14 138:21 146:2 175:19
**Woods'** 138:20
**word** 14:22 113:10 126:20 163:18 183:12 183:13
**word-for-word** 158:10
**words** 26:10 91:13 93:8 102:15 113:17 126:11 147:14 149:13 181:2
**work** 11:10 26:18 130:8 132:21 133:4 190:20
**worked** 7:2 24:23 32:24 90:18
**working** 19:12
**worry** 38:21
**wouldn't** 18:23 18:24 19:2 24:9 27:6 64:19 89:1 111:22 131:6 131:15 133:18 136:12 165:22
**Wow** 22:20
**writ** 42:3
**writes** 130:7 186:16
**writing** 50:23 138:7 187:19
**written** 11:6 153:7
**wrong** 23:7 24:11 30:13 31:15,15 71:19 72:1 90:12 92:8 138:19 160:9

**X**

**X** 4:1,8

**Y**

**yeah** 11:12 14:22 15:17 18:8 19:7,20 20:7 21:20,22 24:17,24 25:2 25:8 26:12 28:12,20,22 29:2 36:20 37:9 41:13 42:5,5,12 47:24 48:9 50:16 51:1 55:16 61:15 65:16 66:22,24 68:15 69:15 75:14 76:1,4 77:9,15 80:17 80:17 85:15 91:3 97:22 103:14 106:2 107:23 109:8 118:15 119:4,4 123:11 132:2,8 134:3 138:23 142:2 145:17 146:19 162:2 163:11 165:8 168:6 169:5 175:24 176:19 178:9 183:13 183:15 189:4 189:23 192:7
**year** 12:18 20:24 21:3,9
**years** 7:7 8:14 8:17 12:19 13:2,7,11 19:13 21:16

23:4,8 33:21 108:24 109:1
**yesterday** 9:12 11:10 128:12 129:24
**young** 10:1 34:24 96:21

**Z**

**Zimroth** 46:2
**zoom** 19:8
**Zurbriggen** 3:8 4:5 28:18 32:11 35:11 36:4 37:4 43:8 47:6 49:16 50:5,9 58:24 59:8 60:11 61:9 66:4 71:2 90:4 91:8,21 94:2 104:12 105:17 106:15 108:14 112:18 114:13 115:21 116:2 119:1,19 123:4 125:4,10 126:23 131:13 132:15 133:16 135:2,18 136:7 137:23 144:9 144:11,20 148:7,17 158:7 159:7,20,24 161:18 163:4 165:19 167:3 171:5 175:21 176:6,16 177:3 177:20,23 178:21 182:7 182:20 184:1,9 184:12 185:3 186:4 188:17 191:8,12 192:10,24 193:1

**0**

**1**

**1** 141:15
**1:02** 171:15
**1:19** 192:18 193:3
**10** 48:23,23 63:5 109:3,5
**10:02** 2:6 5:14
**100** 51:17
**11** 69:7,10 86:2
**11:20** 94:16
**11:41** 94:20
**114** 63:24 64:6 64:11
**1147** 81:7 82:11 83:5 85:3 86:2
**117** 66:7
**118** 73:3 75:11
**119** 77:1
**12:21** 141:4
**12:27** 141:7
**12:55** 171:12
**121** 78:18
**123** 78:18
**125** 83:14
**13** 110:15
**13372** 46:5
**13th** 77:18 80:10
**14** 1:17 2:2 81:14
**14th** 3:10 5:13
**15** 79:24 80:3,4 82:10 88:13,13
**1515** 3:10
**15th** 58:15 60:2 62:20 63:21 65:23 70:11 97:17,20 141:23 142:11 142:24 144:6 163:14 166:23
**16** 79:24 82:15 82:19 88:13
**16th** 154:7,17
155:19 156:2 157:10 163:21 166:24
**17** 79:24 83:8
**1717** 3:16
**184** 4:5
**186** 82:1
**187** 82:2
**19102** 3:10
**19103** 3:17
**19106** 3:5
**1980s** 25:12
**1981** 21:2,6,11
**1982** 52:15
**1983** 52:21
**1984** 7:8 14:13 76:11 80:10
**1987** 14:20 23:10 63:8 109:6 156:2 163:15,21
**1988** 7:16 15:8 23:10 63:22 84:24 113:6,14
**1991** 16:3,7

**2**

**2** 73:7
**2/2/21** 4:10
**2/5/21** 4:11,12
**2/8/21** 4:12
**2:22-cv-02416...** 1:15
**20** 13:2 21:16 33:21 75:14 139:21
**2000** 31:1
**2020** 14:4
**2021** 14:5 16:9 27:20 39:7,20
**2023** 68:21 124:10
**2024** 1:17 2:2 5:13 48:22
**209** 82:20
**21** 62:15,18
97:16
**215** 3:5,11,18
**21st** 63:1 68:21 97:24 98:11,15 101:15 103:15 142:13
**22** 153:14
**22nd** 48:22 151:24 152:6 152:15,22
**23** 124:10
**24** 18:24 62:23 97:23 98:15 181:24
**2414** 84:4 85:9
**243** 69:6
**244** 69:7
**246-3104** 3:18
**24th** 86:1,17
**25** 101:13 139:21 149:2
**25th** 85:22 146:1
**26th** 81:8 82:12 83:6 85:3 86:2
**27** 129:18
**27th** 14:13 83:21 85:3,9
**293** 124:10

**3**

**3** 64:11
**3/20/21** 4:15
**3/22/87** 153:3
**30** 108:24 121:19
**32** 56:17 60:22
**34** 7:7
**35** 108:24
**3500** 3:17
**38** 4:10
**39** 4:11

**4**

**4** 69:7
**4/15/87** 111:8
**4/21/87** 111:8
**40** 4:12 8:13,17 30:3
**44** 69:10

**5**

**5** 96:24
**501** 2:5 3:4
**5769** 77:16
**5772** 73:22 74:11
**5774** 76:10
**5th** 7:8 14:13 39:19 80:13,19

**6**

**6** 4:5 108:1,4
**60** 151:20 152:8
**61** 151:3
**683-5114** 3:11
**69** 46:1
**6th** 76:11 124:10

**7**

**7** 46:3 93:15
**718** 2:4 3:4 5:15
**73** 46:5
**79** 4:10 38:10,14 38:18,20
**7th** 63:7 83:1,4 109:6 111:11 111:14 114:1 114:15 128:2 142:16 145:20 167:14 176:13

**8**

**8** 46:3
**80** 4:11 39:14,15 39:18
**81** 4:12 40:6,7
**82** 4:13 84:12,13
**83** 4:14 92:10,11 92:15 108:4
**8317** 64:4
**84** 4:13,15 38:3 48:23 74:8 77:18 80:20

95:7,8
**85** 48:23 49:2 83:1
**87** 15:2 51:20 58:15 60:2 62:20 63:1,14 65:23 70:11 97:20,24 111:11,14 114:1 118:2,3 130:24 141:23 142:5,11,24 144:6 145:13 152:1,15,22 154:7,17 155:19 157:10
**88** 15:2 51:21 63:15 93:8 169:23
**8968** 164:13
**8995** 153:23 155:23 160:5
**8A** 111:4
**8th** 113:6

**9**

**9** 77:2
**9,000** 154:22 156:15
**90** 9:4
**9001** 160:9
**9002** 157:10,12
**9006** 157:13
**92** 4:14
**925-4400** 3:5
**93** 92:8
**9462** 40:20
**95** 4:15 92:7
**9891** 96:2
**9th** 142:5 145:13