IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

PEDRO ALICEA, :
PLAINTIFF :
:
vs. : NO. 22-cv-3437-JS
:
CITY OF PHILADELPHIA, :
ET AL., :
DEFENDANTS :

---

CURTIS CROSLAND, :
PLAINTIFF :
:
vs. : NO. 22-cv-2416-AB
:
CITY OF PHILADELPHIA, :
ET AL., :
DEFENDANTS :

DEPOSITION OF BARBARA L. CHRISTIE

DATE AND TIME: Tuesday, September 24, 2024
at 10:02 a.m.

PLACE: Marzzacco Niven & Associates
945 East Park Drive
Suite 103
Harrisburg, PA 17111

---

KAPLAN LEAMAN & WOLFE
COURT REPORTING & LITIGATION SUPPORT
230 SOUTH BROAD STREET, SUITE 1303
PHILADELPHIA, PENNSYLVANIA 19102
(215) 922-7112 1-877-KLW-DEPO
www.klwreporters.com

APPEARANCES:
KAIRYS, RUDOVSKY, MESSING, FEINBERG & LIN, LLP
By: Jonathan H. Feinberg, Esquire
The Cast Iron Building
718 Arch Street, Suite 501 South
Philadelphia, PA 19106
jfeinberg@krlawphila.com

For - Plaintiffs

CITY OF PHILADELPHIA CIVIL RIGHTS UNIT
By: Daniel V. Cerone, Esquire (Via Zoom)
1515 Arch Street, 14th Floor
Philadelphia, PA 19102
daniel.cerone@phila.gov

For - Defendants - City of Philadelphia, et al.

CLARK HILL
By: John Anthony DeRose, Esquire (Via Zoom)
Two Commerce Square
2001 Market Street, Suite 2620
Philadelphia, PA 19103
jderose@clarkhill.com

For - Defendants - Ned Hark for the Estate of James Hansen, Linda Westerman for the Estate of Fredrick Westerman, Patricia Ainsley for the Estate of John Ainsley, Karen Ansel for the Estate of Francis Ansel

ARCHER & GREINER PC
By: Carlton L. Johnson, Esquire
By: Tanneika Minott, Esquire
Three Logan Square
1717 Arch Street, Suite 3500
Philadelphia, PA 19103
cjohnson@archerlaw.com
tminott@archerlaw.com
For - Deponent



I N D E X


| WITNESS | EXAMINED BY | PAGE |
|---|---|---|
| Barbara L. Christie | Mr. Feinberg | 4 |




BARBARA L. CHRISTIE, called as a witness, being duly sworn, testified as follows:

EXAMINATION

BY MR. FEINBERG:

Q Ms. Christie, good morning.

A Good morning.

Q We met briefly off the record. Let me now, that we're starting on the record, give you an introduction to who I am, who I represent and what we're here for today.

First, my name is Jon Feinberg. I'm an attorney based in Philadelphia and we're here today for your deposition to discuss two different cases. I represent the Plaintiffs in both of those cases. Their names are Curtis Crosland and Pedro Alicea.

Both men have filed lawsuits against the City of Philadelphia and various police detectives who worked in the Philadelphia Police Department's homicide division and in their lawsuits they allege that the Defendant detectives caused them to be falsely arrested, prosecuted, convicted and incarcerated for, respectively, 34



years for Mr. Crosland and 31 years for Mr. Alicea for murders that they claim they did not commit.

I want to confirm you're not a defendant in either of these cases. We've asked you for your deposition because there are police documents in both cases referencing meetings that you held many years ago at the charging stage of the cases; that is, at the stage where -- in both cases where detectives prepared affidavits of probable cause to secure arrest warrants for our respective clients.

We've scheduled your deposition today to ask about your involvement in both cases. Normal practice is to limit a deposition to a single case but because your name has come up in both cases, which are pending at the same time and involve similar issues, all the attorneys in the case have decided that for our convenience -- and, of course, for yours as well -- we've decided to do this in one deposition which addresses both cases.

Do you understand everything that I've outlined?

A I do.

Q Okay. You're represented in this case by counsel seated to your right and I understand

Page 6

that they've been retained by the City of Philadelphia to represent you for purposes of this deposition; is that correct?
A That's my understanding.
Q Okay. Have you had a chance to consult with counsel before we begin today?
A I have.
Q Do you need any more time to speak with them before --
A I do not.
Q Okay. So you're aware the defense attorneys in both the Crosland and Alicea cases are appearing via Zoom. They may have questions for you after I conclude my questioning. If you were a --
A I see one counsel on the screen, a Mr. DeRose. When you say "defense attorneys," is there another gentleman or woman that I don't see on screen?
Q Yes. So Mr. DeRose and Mr. Cerone are both defense counsel. Mr. DeRose is just off camera at this point. The only other person you should see on Zoom is me.
A So I'm looking at Mr. Cerone, and Mr. DeRose is there somewhere but off camera?

Page 7

MR. DeROSE: Hi, Ms. Christie. I'm off camera, but I am here.
A Alrighty. Thanks.
MR. JOHNSON: I'm sorry, I have a question for clarification. So there's nobody from the city present?
MR. FEINBERG: Dan Cerone is counsel for the city.
MR. JOHNSON: Oh, okay.
MR. CERONE: Carlton, I'm here. How are you?
MR. JOHNSON: Good. How are you?
MR. CERONE: I'm good, thanks.
MR. FEINBERG: All right. Let's keep going.
BY MR. FEINBERG:
Q Ms. Christie, if you were a lay witness, this is the time of the deposition when I would give you a series of instructions about what it means to testify under oath.
Given your long career, I'm going to dispense with all of that, but I do want to ask you: Have you ever testified in a deposition before?
A Yes.

Page 8

Q How many times?
A I can't recall.
Q When was the last time?
A I also can't recall that. It's been quite some time ago.
Q Okay. Have you ever taken a deposition before?
A Taken a deposition?
Q Sitting in my role, asking --
A As a private counsel?
Q Yes.
A I have not.
Q Okay. And my understanding is that you've been in government service for your entire career; is that correct?
A That's correct.
Q All right. Let me just note then -- it's probably obvious, but even though we're not in front of a judge or a jury, the same rules apply in terms of testimony under oath. I am sure you understand that; is that correct?
A Yes.
Q All right. Is there any reason why you cannot give truthful testimony today?
A No, there is not.

Page 9

Q Okay. Because we're going to be talking about two separate cases, I'm going to do my best to make clear breaks in the topics of my questioning so we are sure about what we're talking about.
A Um-hum.
Q So we'll do this in three parts. First I'll ask you some background questions about your career and various practices in the DA's office that apply to both cases and then I'll ask you about the Crosland case and then I'll ask you about the Alicea case. Understood?
A Yes.
Q Okay. I don't think we'll be too terribly long today, but there may come a point where everybody needs a break. My usual practice is to go about 90 minutes before I suggest a break. If you need one before I suggest one, just tell me and we'll accommodate that, with the only exception being if there's a question pending, you'll answer the question and then we'll take a break. Agreed?
A Yes.
Q Okay. Let's get into it then in terms of our general questioning.
A Um-hum.

Page 10

Q What did you do to prepare for today's deposition?
A I reviewed the documents that were sent to me and I spoke with counsel.
Q The documents that were sent to you included some activity sheets; is that correct?
A Yes.
Q Okay. Were there any other documents that you went out and reviewed besides what was sent to you?
A No.
Q You mentioned meeting with counsel. How many times?
MR. JOHNSON: Objection.
BY MR. FEINBERG:
Q You can answer.
A Once that I can recall. You're talking about in persona?
Q In person, on Zoom, by phone, whichever.
A Probably twice, I would guess.
Q Okay.
A A phone call to set up a meeting, if you would consider that a meeting.
Q I'm not going to ask you about what was

Page 11

said, but can you tell me how long did you spend talking with counsel?
MR. JOHNSON: Objection.
A I would say an hour.
BY MR. FEINBERG:
Q Okay. Did you talk to anybody else about this deposition besides counsel?
A No.
Q There have been a number of former prosecutors, who I assume are your former colleagues, whose names have come up in this case and in fact who have given testimony.
Let me just name them for you and you can tell me whether you've spoken to them at any time in the past six months to a year about these cases.
First is Judge Shelly Robbins-New.
A No. The answer is I have not spoken to her at any time in the last six months about these cases.
Q Okay.
A Is that your question?
Q That is my question.
A Yes, that's my answer.
Q Have you spoken to Joel Rosen about

Page 12

these cases at any point in the past six months?
A I have not.
Q Have you spoken to Richard Sachs?
A I have not.
Q Okay. There are several homicide detectives who have been named as Defendants. Let me ask you the same questions as to them.
When I say "detectives," I mean retired detectives. First is Detective Edward Rocks. Have you spoken to him?
A I have not.
Q James McNesby?
A No.
Q Descher, and I'm blanking on his first name. Descher, D-e-s-c-h-e-r.
A I have not.
Q Charles Brown?
A I have not.
Q Herbert Gibbons?
A I have not.
Q Okay. When did you leave the Philadelphia DA's office, by the way?
A I retired in 1996.
Q Have you had any regular contact with homicide detectives who you used to work with

Page 13

during that time frame?
A Since I left the office?
Q Yes.
A No.
Q Okay. Let me do this, just for the sake of completeness. There are a number of detectives who have been identified as having been involved in these investigations who are deceased. Some of them died many years ago. I'm going to list the names and my question for you is can you tell me whether you talked to them at any point since you left the DA's office.
A Before they died, I assume.
Q Well, if there's an answer that's an exception to that, I'd like you to tell me that as well and this deposition may go in a very different direction.
A We'd all be surprised.
Q Okay. All right. First is Cimino.
A No.
Q Nespoli?
A No.
Q Ansel?
A No.
Q Westerman?

Page 14

A No.
Q Lanzelotti?
A No.
Q Brignola?
A No.
Q Hughes, Edward Hughes?
A No.
Q Deyne, Miguel Deyne?
A No.
Q Ainsley?
A No.
Q Snell?
A No.
Q Snyder?
A No.
Q Miller? That would be Francis Miller.
A No.
Q Okay. That's it. To confirm, Ms. Christie, the only documents that you reviewed are the ones that were sent to you by counsel; is that correct?
A That's correct.
Q Okay. When you reviewed those documents, did you have any recollection about those cases?

Page 15

A None whatsoever.
Q Okay. We'll deal with that as we go forward then.
Let's now talk about your background so I understand what your role was in these cases. Could you walk me through your professional history from your graduation from law school.
A Well, I went from law school into the DA's office in 1972. I spent a couple years trying misdemeanor cases and felony cases. I went to homicide -- I believe it was '74, '75, stayed there trying cases, became the supervisor, the chief of the homicide unit in -- I believe it was in '87 through '91.
I left the office, retired in '96 to take a gubernatorial appointment, Governor Ridge, to his Governor's Office of General Counsel, where I started there in '96 as Chief Counsel to Pennsylvania State Police, served through two, three governors -- I'm not sure -- in that role as Chief Counsel of the State Police and also a Chief Counsel to the Board of Probation and Parole and retired from Commonwealth service in 2015.
Q Are you employed in any position -- or have you been employed in any position since 2015?

Page 16

A No.
Q Okay. You are experiencing a full retirement then?
A As full as I can make it, yes.
Q Okay. At any point since you left the DA's office have you been ever asked to come back and provide information about other homicide investigations that you worked on during your time there?
A No, not that I can recall.
Q So this will be the first occasion that you can recall?
A Yes.
Q Okay. All right. In a moment I want to come back and ask you about your position as the chief of the homicide division, but I want to confirm that you were there for -- you were in that position for a total of four years; is that right?
A That's the best of my memory, yes.
Q Okay. Was there any position when you were the chief that was an assistant chief or was kind of a leadership track that led you to that position?
A You're saying was I ever an assistant chief or did I have an assistant chief?

Page 17

Q Well, the first. Were you ever an assistant chief?
A I was never an assistant chief.
Q So you were promoted from a line homicide prosecutor to the chief of the homicide division; is that correct?
A From a senior trial prosecutor, correct.
Q Okay. Did you have an assistant?
A When I was the chief of the homicide unit -- pardon me, the Susquehanna Valley is notorious for allergies and I have them.
I did have assistants. I believe I had a couple and I frankly can't remember who they were.
Q The name David Webb has popped up in the files. Does that sound --
A That rings a bell.
Q Okay. Are there any others who come to mind?
A No. I believe there was one or two others, but I can't recall their names.
Q Okay. I want to ask you general questions about how you approached your job as a prosecutor, both when you were a trial prosecutor

Page 18

and also as the chief.
Can I assume that you were conscientious about providing a fair trial to a defendant?
A You can assume that, yes.
Q All right. And that you were -- you made every effort to be fully forthcoming with defense counsel?
A Yes. Yes, I did.
Q And I take it you understood and took very seriously your obligations under Brady to provide exculpatory information?
A Yes.
Q Okay. In fact, I think I've seen documents about you agreeing that a defendant's conviction should be vacated upon discovery of new information. Is that something that happened on occasion?
A I don't recall what you're referring to.
Q Okay. Maybe the case will come to me and I'll see if it refreshes your recollection.
The name Don Ray Adams sticks in my mind. Do you remember that case at all?
A I do not remember. Is this a case I'm

Page 19

to have tried or ...
Q I don't know. That's why I'm asking you the question.
A No, I don't. That name does not ring a bell.
Q Okay. Did you ever prosecute a police officer for misconduct?
A Yes.
Q Okay. Can you remember how many times that happened?
A Once or twice.
Q Okay. Your practice was if you got information about a case that was exculpatory you would give it to the defense; is that correct?
A We complied with Brady.
Q Okay. Did you also expect that police would provide you with exculpatory information that they had?
MR. CERONE: Objection. You can answer.
BY MR. FEINBERG:
Q Yeah, he's noting an objection for the record.
A Okay.
Q It's an objection to form, but you can

Page 20

still answer the question.
A I expected that the police would provide me with appropriate information, yes.
Q All right. And you expected that police would act in good faith in your interactions with them?
A Yes.
Q Did you ever have any concerns about police not giving you full information?
A No.
MR. CERONE: Objection.
BY MR. FEINBERG:
Q Do you recall any instances where you learned that a police officer had not been fully truthful with you?
A I recall no such instances.
Q In any event, you depended on police to tell you what they learned in an investigation; is that correct?
MR. CERONE: Objection.
A Yes, I listened to what the police advised me in making a decision with regard to approving an arrest.
BY MR. FEINBERG:
Q And would it be fair to say that there

Page 21

was a very defined role dividing responsibilities between police and prosecutors?
That's a bad question.
A I'm not quite sure what you mean by that.
Q Yeah, neither am I. Let me try again.
A Okay.
Q You weren't out on the street investigating homicides and interviewing witnesses and so on; is that correct?
A I was not out on the street interviewing witnesses. I did interview witnesses prior to placing them on the stand to try cases, if that's what you're referring to.
Q Of course. I'm talking about prior to the decision to charge a defendant with a homicide. You weren't involved in that front-line investigation; is that correct?
A That's correct.
Q You weren't interviewing witnesses over at the homicide division when an investigation was ongoing; is that correct?
A That's correct.
Q The police completed that investigation; is that correct?

Page 22

A Yes.
Q And then they turned over the investigative materials to you?
A That's -- that's correct. When you say "they turned over the investigative materials," are you talking about for purposes of approving an arrest or are you talking about for purposes of trying the case?
Q That's a fair distinction. At the time that a decision was made to charge, police would come talk to you about the case; is that correct?
A That is correct.
Q And they would tell you about their investigative findings; is that right?
A That's true.
Q And based on what you discussed with them, you would make a decision about whether charges were appropriate; is that correct?
A That is correct.
Q Okay. Before trial you would talk with police about what information they had obtained; is that correct?
A I would -- yes, I would prepare the witnesses for trial.
Q And my understanding is that police

Page 23

would disclose to you something called a homicide binder. Does that sound familiar to you?
A Yeah. They wouldn't disclose it. It was basically submitted as part of the preparation for trial.
Q Okay. In fact, let me come back to that in just a moment. The bottom line that I'm getting at here is that the police do the investigation, you're the one deciding on charging and eventually trying the case; is that correct?
A That's correct.
Q All right. And ultimately when police are doing the investigation and coming up with investigative -- or findings in their investigation, you're depending on them to truthfully tell you what they found; is that correct?
A Well, I'm expecting that that would be the case.
Q All right. Let me talk about your specific responsibilities as the chief of the homicide division.
A Um-hum.
Q Could you -- and I realize we're going back many years, but could you walk me through just

Page 24

a -- what the day-to-day life of the homicide chief was back in that time frame.
A Well, I basically supervised the senior trial attorneys. I'm trying to recall -- I guess there was somewhere between 25, 30 of them. I populated or staffed, I should say, the homicide calendar room and the trial courtrooms, of which there were approximately a dozen, by assigning the assistant DAs to various cases, and I reviewed and approved arrests, some -- I also reviewed and approved guilty pleas.
Q Did you have any active trial caseload at that time?
A Did I while I was supervising?
Q Yes.
A I'm not certain if I was finishing a case -- I may have been finishing a case while I was supervising.
Q For the most part, your responsibilities were administrative or supervisory?
A During that period of time, yes.
Q Okay. Now, you mentioned one of the responsibilities that I want to focus on today and that's the decision to approve -- or the process of

Page 25

approving arrests. How much involvement did you have in that process?
A I conferred with the investigating officer, the assigned detective. I listened to, either by phone or in person, the evidence, what had been disclosed or what had been determined in the investigation and I made a decision as to whether or not an arrest warrant would be appropriate.
Q Let me ask that a different way. I may be asking you to repeat yourself, and I -- and that's not my intention, but I want to make sure that I understand.
In the typical case, if you can give me just a hypothetical situation, homicide detectives have reached a conclusion that they want to seek an arrest warrant, I take it they come to you to ask for you to approve the charges; is that correct?
A Either to me or to whomever I might delegate, because this was a 24-by-7 situation.
Q Understood. Would you typically -- if you delegated, would it be to one of the assistant chiefs?
A Yes, most likely.
Q Would you ever delegate to someone who

was not in a supervisory position?
A Not that I can recall.
Q Okay. So let's assume that the call comes to you or the request comes to you. Tell me in a typical case how that process goes.
A Well, the detective would tell me what he had or what she had. I would listen to whatever the material was and I would determine whether or not an arrest warrant would be appropriate.
Q Was the understanding that you had to approve every homicide arrest?
A Yes.
Q Would it -- I know what the answer will be, but let me confirm. Could police ever go seek a warrant for an arrest in a homicide case without approval from you or someone to whom you delegated?
A Well, I guess they could, but they wouldn't. They didn't.
Q Okay. You mentioned that police would provide information to you --
A Right.
Q -- to obtain your approval; is that correct?
A Correct.
Q How would they provide that



information?
A Verbally, either in person or by phone. Sometimes with documents, but usually verbally.
Q Okay. You say sometimes with documents, sometimes they would sit down and show you material, but the majority of the time it was just an explanation of what the evidence was --
A Yes.
Q -- is that correct?
A Yes.
Q Was there any particular evidence that you would ask police to provide?
A No, it depended on the case.
Q Okay.
A I'd have to hear what they had.
Q Okay. Was this a dialogue that you would have? You would ask questions and they would fill in the details?
A Yes. I would hear what they had and then if I had questions, I would ask them and they would respond.
Q Okay. Can you estimate for me -- well, before we can get to an estimate, can you tell me how many situations like that where you -- let me start over.



Do you recall any specific situations where police came to you and asked for approval of an arrest warrant in a homicide case where you said, "No, you don't have it. This isn't enough"?
A Oh, I'm sure there were occasions, but can I recall any specific ones? No, I can't.
Q Okay. Did you ever keep statistics about anything like that?
A No.
Q Okay. It sounds to me -- and tell me if I've got this right -- that this was a free-flowing discussion with the detective. They'd speak to you, you'd tell them what your decision was and then the process would go from there; is that correct?
A Basically that's correct.
Q Would there -- who within the police department's homicide division would come to you? Would it be the investigating detective or would it be a supervisor?
A Normally the investigating detective.
Q And typically that was referred to as the assigned detective?
A The assigned, um-hum.
Q Whoever was assigned to lead the



investigation?
A That would be correct.
Q A slightly different topic. Both of these cases, as we'll get into in a little bit, started off as active investigations, went cold and then they were picked up by what I believe to be the special investigations unit in the homicide division, which I think is sometimes referred to as The Five Squad. Do those names sound familiar to you?
A Not now. I don't recall them.
Q Okay. How about the SIU? Does that phrase sound familiar to you?
A I really don't recall.
Q Okay. From your perspective then, all you know is that you would get a call or some outreach from a homicide detective seeking approval for an arrest warrant; is that correct?
A Or a visit to the office.
Q Okay. Was there any factor that determined it would be in person or phone or was it just ad hoc?
A No particular factor, no.
Q All right. In that process that we've been discussing, discussions with detectives about

Page 30

approving an arrest warrant, I assume, as we discussed before, you're depending on the detective to act with good faith; is that correct?
A Yes.
Q You're depending on them to provide you with truthful information about their investigation; is that correct?
A Yes.
Q Would you ever ask the detectives about whether there existed any exculpatory information as to the person they were seeking to arrest?
A Not specifically that I can recall.
Q Okay. So, for example, if a detective contacted you and said, "I've got a statement from a witness which says John Smith is the shooter and based on that statement I want to seek an arrest," would you ever say to them, "Detective, is there anyone else who contradicts that information"?
MR. CERONE: Objection.
A Not as a matter of course, no, but basically what I would do is listen to whatever the detective had information-wise, whether that information included -- whatever that information included, whether it was explanatory, whether it was incriminatory, whether it was not incriminatory

Page 31

and judge from there.
BY MR. FEINBERG:
Q Okay. So if there was any exculpatory information which undermined the -- a case against the person the police were seeking to arrest, you would expect them to affirmatively tell you; is that correct?
A I would expect them to apprise me of whatever information they had concerning the case.
Q Okay. And information that could be inculpatory information or it could be exculpatory information; is that correct?
A Whatever information they had.
Q All right. Bottom line, you're expecting detectives not to mislead you; is that correct?
A That is correct.
Q And you're depending on detectives not omitting important facts from their discussion with you; is that correct?
A I'm expecting the detective to tell me truthfully the information that that detective has.
Q Okay. I'm going to ask you about a slightly different topic which we touched on before and that concerned what information was provided to

Page 32

the DA's office in support of a prosecution, and specifically what I'm talking about there is the homicide binder.
Before we get there, though, let me just take a moment to explain -- summarize a lot of testimony from a lot of different sources so I don't have to show you multiple transcripts.
Detectives have told us that there were at least two different compilations of information, one was called the homicide file, which was kept in the Philadelphia Police Department and had literally every piece of information the police gathered during an investigation - phone messages, handwritten notes, investigative reports - that sort of thing, and the other was something called the homicide binder.
My question for you is do you recall a distinction between those two collections of information?
A I do not.
Q Okay. I used the phrase homicide binder before and that sounded familiar to you. Did I hear you correctly?
A Yes, I recall the term homicide binder.
Q Okay. And do you remember -- well,

Page 33

tell me what you remember about the homicide binder.
A That in each case a homicide binder would be prepared and presented for use in prosecution.
Q Okay. And the detectives would put that together and provide that to the DA's office; is that correct?
A It was provided to the DA's office.
Q All right. Do you recall it having a two-pronged fastener and the documents were compiled in a tabbed format?
A I believe so, Counsel.
Q Okay. Do you remember that the homicide binders would be separated into different categories of information, including police statements, forensic reports and so on?
A I believe so.
Q Okay. Now, we've had several detectives testify that their file, the homicide file, would be held in the homicide division and -- in the police department and the binder would be sent to the prosecutors. Does that sound right to you?
A I have no idea about that practice or

Page 34

that statement made by homicide detectives.
Q Okay.
A We dealt with the homicide binder.
Q Got it. That homicide binder was provided to you after the charging decision was made; is that correct?
A Yes.
Q Would it be provided leading up to trial?
A I'm sorry, say that again.
Q Yeah. Tell me what's your recollection as to when in the course of a homicide case it was provided.
A Well, it would be provided in time for not only trial but also for discovery.
Q Okay. And that makes sense to me because my understanding, from what you've described, is that the discussion before a charging decision is made is it's a phone call or a meeting where you're not reviewing every single piece of paper in the case; is that correct?
A Correct.
Q All right. The homicide binder is provided to the prosecutor or to the DA's office so that information can be passed to the defense; is

Page 35

that correct?
A Yes, as well as used by the prosecutor in preparing for trial.
Q Okay. Some of the documents that you -- were provided to you before this deposition were documents called activity sheets. Do you recall looking at those documents recently?
A I recall looking at them, yes.
Q Do you recall receiving activity sheets at any point during your career in the DA's office?
A I do not.
Q Okay. Now, my understanding, from previous testimony, is that there was a change in practice in the mid-1990s in the police department.
The practice was, prior to that change, that activity sheets stayed in the homicide division and were never sent to the DA's office and then in the mid-1990s that changed and they were provided to the DA's office.
With that as background, confirm for me you left the DA's office in 1996; is that correct?
A Correct.
Q At any time prior to 1996, do you ever remember seeing an activity sheet provided by the Philadelphia Police Department Homicide Division?

Page 36

A I can't recall, Counsel.
Q Okay. Do you remember ever hearing about activity sheets being used by the police department?
A I also can't recall.
Q When the activity sheets were provided in this case that you looked at, had you ever seen a document that looked like that before?
A I really don't know, Counsel. I can't recall.
Q Okay. Let me show you one document which may help me ask my next question. To save time, I'll pull this out of the binder. I've marked exhibits that we have.
MR. FEINBERG: For counsel who are on the Zoom, I'm looking at Alicea Exhibit 17.
BY MR. FEINBERG:
Q And I'll just take this out of the binder and hand it to you, ma'am. Could you just page through that document and tell me whether you've seen -- not this specific document but documents that looked like that?
MR. JOHNSON: And just so the record is clear, could you read the identifying numbers on the documents that you're asking her to look at?

Page 37

MR. FEINBERG: The Bates stamps?
MR. JOHNSON: Yes.
MR. FEINBERG: Sure. When I have it back, I'll put those on the record.
MR. JOHNSON: Okay.
BY MR. FEINBERG:
Q Have you seen anything that looks like that?
A When you say "anything that looks like that," frankly I'm not certain what these documents are. There's a witness index, which may or may not be the index that's in the binder. I have no recollection of what that witness index particularly looked like in the binder.
Certainly there's reference to 75-48s. They were in the binder, so I recall seeing those documents. Criminal complaints, photographs, sketches. I'm not exactly certain what your question relates to.
The items that are reflected in these documents I recall seeing during the course of my service there. If you're asking me if I saw these particular pages, I can't recall if I saw the pages.
Q Yeah, and those specific pages I'm not

Page 38

-- those were -- my understanding is that they were passed to the DA's office in 1989, so I'm not asking whether you saw these specific pages.
A Okay.
Q Really what I'm asking about is the form that is presented there. And one background point is that my understanding is that these forms are cover sheets to the homicide binder that was provided to the DA's office in a typical homicide case.
So my question is does that sound -- does that seem right to you?
A I really can't comment. I don't recall, Counsel.
Q Okay. I'm going to ask you to hand that back to me.
MR. FEINBERG: And as Counsel requested, I'll identify the Bates numbers. They are CITY 206 -- in fact, there's a whole collection here of different Bates stamps because they're pulled from different portions of the file. I can email you a copy of the exhibit after the deposition --
MR. JOHNSON: Thank you.
MR. FEINBERG: -- since it's been

Page 39

previously marked.
BY MR. FEINBERG:
Q Really my point in asking you these questions, Ms. Christie, is that a detective -- a couple of detectives have testified that they were given guidance about what documents to provide to the DA's office in the indexes to the homicide binder. Do you understand what I've outlined there?
A Not really.
Q Okay. If you look -- I'll show you one page in particular. The portion of Exhibit 17 in the Alicea case that is -- the Bates stamp is CITY 209. There are sections listed. Section A through G. Do you see that?
A I see that.
Q And Section A is homicide case summary and index, Section B is homicide reports, et cetera. Agreed?
A I agree that you're reciting what's on the paper, yes.
Q Okay. We're agreed there. One detective in particular, Detective Rocks, testified in his deposition that there was no section for the provision of activity sheets so police officers

Page 40

held the activity sheets back and did not include them in the homicide binder. Have you ever heard that before?
A No, I've never heard that before.
Q Okay. Do you recall that ever being a topic of discussion when you were in the DA's office?
A I do not recall that ever being a topic of discussion.
Q Okay. As a bottom line to confirm, then, your previous testimony, you don't recall ever seeing an activity sheet provided to you by the Philadelphia Police Department before your retirement in 1996, correct?
A Yes. As I've told you, I can't recall, Counsel, whether I did or did not see an activity sheet because I frankly don't recall the activity sheet.
Q Okay.
A And by the activity sheet, I'm referring to the two activity sheets that I was asked to review on Mr. Alicea and Mr. Crosland.
Q Okay. I'm asking a slightly different question about whether you ever recall, as a matter of course, being provided with activity sheets in

Page 41

an investigation?
A I can't recall, Counsel.
Q All right. I will fill in with one more piece of testimony from Mr. Rosen in the Crosland case, who I believe left homicide probably right around the same time as you did, in the early 1990s.
First of all, you know Joel Rosen; is that correct?
A I remember Joel, yes.
Q Okay. Mr. Rosen told me that he would not receive activity sheets at any time when he was a homicide prosecutor. Do you have any reason to disagree with his testimony?
A I have no reason to disagree with that.
Q Okay.
A And as I've told you, Counsel, I can't recall one way or the other.
Q All right. Let's switch topics now and talk specifically about the Crosland case. I think you told me when we started you don't remember any of the details about that case?
A I do not.
Q All right. What we'll do at the start is I'm just going to give you some details so you

have background for the questions that I ask you. If you need me to repeat anything or to show you any documents that outline what I'm talking about, please let me know and I'll be happy to do that.

First, the murder in the case involved the shooting of a man named Il Man Heo, I-l, M-a-n, H-e-o, who was the owner of a small grocery store at 27th and Oakford Streets in South Philadelphia. The shooting took place on December 5th of 1984.

Do you recall seeing any of those details in the documents you looked at?

A Do I recall seeing the details in the documents?

Q Yes.

A I do. Do I recall independently those details? I do not.

Q Okay. Moving forward, the police developed a suspect early on by the name of Michael Ransome, R-a-n-s-o-m-e. The investigation, however, went cold very quickly, in January 1985.

There was no investigative activity again until 1987 and what started the investigation up again in April of 1987 was when a man named Rodney Everett talked to police and told them that my client, Curtis Crosland, confessed to the crime.



Have you followed everything that I've outlined so far?

A I've followed what you told me, yes.

Q Okay. There are three separate documents that I want to ask you about which will help get to the point of the charging decision in the case.

The first I will show you -- and this should have been provided to you by counsel. This is the affidavit of probable cause that led to Mr. Crosland's arrest. This is three pages marked as Crosland Exhibit 1.

I'll ask you to take a moment and read that to yourself and then I'll ask you some follow-up questions.

A (Witness so complied.)

Okay, I've read the pages, Counsel.

Q Okay. Now that you've read that, do you remember anything about this case?

A Nothing.

Q All right. Would you agree that the only substantive evidence or only direct inculpatory evidence as to Mr. Crosland is the report from Mr. Everett that Crosland allegedly confessed to the murder?



A Well, the affidavit --

MR. CERONE: Objection.

A -- speaks for itself, but I would say that that is inculpatory.

BY MR. FEINBERG:

Q Okay. Do you see any other inculpatory evidence in the affidavit?

A Well, again, I don't know how descriptive the witness Madison's description is of the culprit and how that description may or may not comport with your client so I really can't opine on that.

Q Okay. Aside from your question about that, did you see any other --

A No.

Q Let me finish the question. Any other inculpatory evidence?

A No.

Q Okay. And by the way, to confirm, this affidavit was prepared by Detective Cimino on December 9th of 1987. Do you agree with that characterization based on what you saw?

MR. JOHNSON: Is the date on the document?

MR. FEINBERG: It is on the last page.



A Oh, I see. 9 day of December 1987, yes.

BY MR. FEINBERG:

Q Okay. And Detective Cimino is the affiant. Do you recall any interactions with Detective Cimino in that time frame?

A On this matter or on any case?

Q Yeah, that's a bad question. Do you remember John Cimino?

A I remember Detective Cimino, yes.

Q Okay. Did you have -- did you ever have any concerns about the integrity of his investigations?

A No.

Q All right. Let me show you the next relative document and this is one you likely saw recently. This will be Exhibit 32 -- or is already marked as Exhibit 32. It's an activity sheet dated December 9, 1987.

Take a moment to read that to yourself and let me know when you're finished.

A (Witness so complied.)

I have read it, Counsel.

Q Okay. You see reference in the first paragraph to Detective Cimino meeting with you and

Mr. Rosen; is that correct?
A I see that.
Q Do you recall anything about that meeting?
A Nothing.
Q All right. The activity sheet continues that a warrant of arrest was authorized for Mr. Crosland charging him with the murder in the Il Man Heo case. Agreed?
A I see that, yes.
Q Let me step back for a moment. You looked just a moment ago at the affidavit of probable cause in support of the arrest warrant for Mr. Crosland.
Would you typically review affidavits when you talked to detectives before they sought an arrest?
A No, not necessarily.
Q Okay. So to make sure I understand the procedures, detectives would tell you about the evidence that they obtained, you would give the approval based on their verbal presentation and they would go prepare the affidavit on their own; is that correct?
A Right, which would be reviewed by the



bail commissioner.
Q Okay. Would anyone in the DA's office, as a matter of procedure, review an affidavit before it was signed by a detective?
A Again, Counsel, you're asking a generality. Not that I can recall. And whether -- there could have been instances of that, there could have been, but I really can't recall.
Again, pardon my allergies.
Q Sure. Can you identify any specific circumstances --
A I can't.
Q Let me finish the question. Do you recall any specific circumstances that would have caused detectives to come to you and say, "Ms. Christie, can you please review this affidavit"?
A I cannot recall any specific circumstance. I would expect that the detective would have first wanted to get approval for preparing an arrest warrant before doing so.
Q Okay. In terms of what would make their work life most efficient; is that correct?
A Among other things, yes.
MR. CERONE: Objection.
BY MR. FEINBERG:



Q They're going to come to you, make sure they've got approval to seek the arrest warrant and then they go prepare the arrest warrant; is that correct?
A That would be my recollection, yes.
Q Okay.
A Thank you, Carlton.
Q Let me take that document back.
MR. JOHNSON: Give her a second.
MR. FEINBERG: Yeah, sure.
(Discussion held off the record.)
BY MR. FEINBERG:
Q All right. So -- are you ready to keep going?
A Um-hum.
Q Okay.
A Yes, I am.
Q So far we've discussed with the Crosland case that Detective Cimino apparently came and spoke to you about the request to arrest Mr. Crosland, there was a meeting, an affidavit of probable cause was prepared, and I'll represent to you that a warrant was ultimately issued. Are we on the same page there?
A That is what the activity sheet that



you showed me says. Do I have an independent recollection of that event? I do not.
Q Okay. The next document I want to show you has been previously marked as Exhibit P-25.
A Um-hum.
Q Please take a moment to look at that.
A (Witness so complied.)
Q Have you finished reviewing it?
A I have.
Q I don't recall whether this was sent to you. Have you looked at this document recently?
A I looked at a number of documents, Counsel. And, frankly, I can't recall if I looked at that one. I may have.
Q Okay. Let me walk you through what is said on that document and what other witnesses have testified to about this document.
First, as background, in the affidavit of probable cause that you reviewed, there was a statement from Rodney Everett that was summarized that he gave on April 15th of 1987. Understood?
A If that's what you're reading from, yes. The document, again, speaks for itself.
Q Okay. On April 21st of '87, according to this activity sheet, Mr. Everett was brought

Page 50

back in. And then, if we look halfway through the first paragraph, there's a statement "He was polygraphed on his original statement about being told by Curtis Crosland."
Did you follow along with what I read there?
A Yes, I'm following.
Q "And was DI-Police Officer D. Riley."
Do you know what DI means in connection with a polygraph?
A I would assume it means deception indicated.
Q Okay. With that as background, can we agree that this activity sheet says that the police polygraphed Mr. Everett and he was found to have been acting deceptively?
A The sheet says that he was polygraphed on his original statement and was DI.
Q Okay. I'll represent to you that we've taken testimony from one of the detectives who was heavily involved in this investigation, Detective Dominick Mangoni. Do you recall Detective Mangoni?
A I do recall. Yes, I recall him.
Q And Detective Mangoni confirmed in his review of these documents that, yes, Mr. Everett

Page 51

was brought in, he was polygraphed about his statement that Curtis Crosland confessed to the crime, and he was found to have failed the polygraph and that deception was indicated.
Do you understand my representation there?
A Yes, I understand, but are you -- are you just asking me if I understand what's on this document? Yes, I do understand what's on the document, Counsel.
Q Well, I'm leading up to the next question, which is this --
A Okay.
Q -- do you recall being told before you approved an arrest warrant for Mr. Crosland that Rodney Everett, the witness the police were relying on, had failed the polygraph?
MR. CERONE: Objection.
A I don't recall anything about any information provided to me on this -- what is the case again, the Causland case?
BY MR. FEINBERG:
Q Crosland.
A Crosland case. So I couldn't recall this, Counsel, because, as I've told you

Page 52

previously, I don't recall the case at all --
Q Sure.
A -- or anything having to do with the case.
Q If there was --
A This is some 35, 37 years later.
Q Understood. Let me ask it in a hypothetical sense. If police officers told you about a case where they were relying on a single witness who testified about a person allegedly confessing to a crime and then that same witness failed a polygraph when asked about that alleged confession, is that something that you would expect to hear from the police?
MR. JOHNSON: Objection.
MR. CERONE: Objection.
A You're asking me a hypothetical, Counsel. You're asking me a question in a vacuum without any context on circumstances or any other information about the case and I can't answer that question.
BY MR. FEINBERG:
Q Okay. Well, in this case then, would you expect the police to have told you --
A I can't answer that question because I

Page 53

have no context and I have no circumstances in this case and you're asking me a question about this case in a vacuum.
Q Let me finish the question before you answer. Would you expect the police to tell you in this case that Everett had failed a polygraph?
A My answer is the same.
MR. CERONE: Objection.
A I cannot answer that question.
MR. JOHNSON: And I have an objection too. All the document says was DI. It doesn't say he failed the polygraph. You keep saying that he failed the polygraph.
MR. FEINBERG: Well, you haven't been present for every deposition in this case. We have confirmation from the detectives that, yes, in fact Mr. Everett failed the polygraph. I'll make that representation to you. If anybody wants to see the deposition transcripts, I'll pull them out.
MR. JOHNSON: Counsel for the city?
MR. CERONE: I object to the representation made by Mr. Feinberg. I believe the deposition transcript will speak for itself.
MR. FEINBERG: Your objection is noted. We'll continue on with my next question for Ms.

Page 54

Christie.
A Okay.
BY MR. FEINBERG:
Q Would you expect that if detectives had concerns about the credibility of a witness they would tell you?
A Again, you're asking me a hypothetical question. You're asking it in a vacuum absent any context or circumstances about a case that -- which I have no recollection so I am unable to answer your question.
Q I'm trying to ask what I would expect to be a pretty narrow question. If detectives came to you and said this witness is saying that this -- let me take the names out of the equation.
I'm a detective and I come to you and I say, "Ms. Christie, we've got this witness who's telling us that so and so confessed to the crime," if that's the end of the story but I didn't tell you that I had concerns about the witness' credibility, would that bother you?
MR. CERONE: Objection.
MR. JOHNSON: Objection.
A Again, I cannot answer a question that is basically asked of me in a vacuum, yet you're

Page 55

attempting to tie it to this case about which I've told you I have no knowledge and I certainly have no knowledge about the case, have no context and no circumstances.
BY MR. FEINBERG:
Q Would you ever approve --
A So, again, I'm not able to answer your -- these hypothetical questions in a vacuum.
Q Would you ever approve an arrest warrant in any circumstance where a detective told you that they had concerns about the credibility of a witness?
A I have the same answer to the same --
MR. CERONE: Objection.
A Basically the same question that you asked me.
BY MR. FEINBERG:
Q Okay. Let me show you -- let me take that one back. If a witness -- first, as a general matter, if a witness gives inconsistent testimony or statements to police, is that something that would concern you about their credibility?
A Again --
MR. CERONE: Objection.
A -- you're asking me a question isolated

Page 56

from the case at hand. I would have to know all the circumstances of the case. I would have to know whether that witness was a paid witness, a professional recanter, whether that witness was able to con the polygraph. I would have to know what other information was available in the case, none of which is a part of your predicate in your question.
BY MR. FEINBERG:
Q Ms. Christie, how many --
A Again, I'm not able to answer questions that are basically, you know, the type of questions of when did you stop beating your wife. Your predicate is in there, but it doesn't include the context and circumstances of this or any other case.
Q How many homicide cases did you try?
A I can't number them. Many.
Q Hundreds?
A Many.
Q Thousands?
A Many.
Q Over the course of your career, would you be able to, before the case went to trial, know whether it was a good case that you were likely to

Page 57

win or a tough case that you were likely to lose?
MR. JOHNSON: Objection.
MR. CERONE: Objection.
A I frankly took whatever case was assigned to me and did the best job that I could --
BY MR. FEINBERG:
Q When a jury --
A -- for the Commonwealth.
Q When a jury would go out, did you ever say to yourself, "Wow, they're never going to come back with a conviction here"?
MR. JOHNSON: Objection.
A No, I never tried to second guess a jury.
BY MR. FEINBERG:
Q Well, I'm talking about asking -- trying to predict things about what would happen.
A I never try to predict a jury either.
Q Okay. Would you ever have concerns about the credibility of witnesses you put on the witness stand?
A Again, you're asking a question devoid of any circumstances. If you're talking about a particular case, then maybe I can answer that question --

Page 58

Q Well --
A -- but you're asking me a question in a void.
Q Ms. Christie, you've told me that you've tried possibly thousands of cases and you can't answer the question about whether you ever once, a single time, had doubts about the credibility of a witness?
MR. CERONE: Objection.
A Are you talking about a witness that I put on --
BY MR. FEINBERG:
Q Yeah.
A -- to testify?
Q Sure.
A I put witnesses on expecting that they are going to tell the truth.
Q Okay. As a -- when you put a witness on the stand, if they had made inconsistent statements, would you expect defense counsel to cross-examine based on those inconsistencies?
A Well, yes, certainly.
MR. CERONE: Objection.
BY MR. FEINBERG:
Q Okay. Because defense lawyers -- and

Page 59

I'm sure you came across many good ones in the course of your career -- would use inconsistencies to argue to a jury that a witness could not be believed; is that correct?
A I would expect a defense counsel would do whatever that defense counsel thought was appropriate.
Q Okay. So let me use this concept of what you would expect defense counsel to do, right. You -- let's back up for one moment.
If the situation -- we've been talking about your approval of charges for Mr. Crosland. You recall those questions and answers; is that correct?
A I recall you questioning me about --
Q Yes.
A -- the Crosland case.
Q Let's assume that you were going to try the case against Mr. Crosland. If you obtained information about this polygraph that had deception indicated, that's something that for sure you would turn over to defense counsel; is that correct?
MR. CERONE: Objection.
A Again, you're asking me a question in a vacuum. I don't have the full case before me. I

Page 60

don't even recall the case. I can't answer your question.
BY MR. FEINBERG:
Q You told me at the beginning that you were very clear about your obligations under Brady; is that correct?
A Yes, that is correct.
Q If you had information that was even close to the line of being exculpatory, you would turn it over; is that correct?
A Certainly it was all of our obligations, not just mine, to comply with Brady.
Q When you say "all of our," you're referring to the District Attorney's office?
A I'm referring to any prosecutor, yes.
Q Okay. So -- and let's come back to the question that I asked and see if we can get an answer.
Generally, if evidence was close to the line as to whether it was exculpatory or not, you would err on the side of exculpatory and provide it to the defense; is that correct?
A I believe that's what Brady requires.
Q And for any number of reasons. Number one, that's your legal obligation, right?

Page 61

A Right.
Q And number two, if you don't do it and you hide evidence, the whole case could blow up later on appeal or a post-conviction, right?
A True.
Q So if you ever defaulted to a position, it was "give the evidence to the defense;" is that correct?
MR. CERONE: Objection.
A Again, the obligation of any prosecutor is to abide by what Brady dictates.
BY MR. FEINBERG:
Q Okay. So if you had evidence in your hands that a prosecution witness, Rodney Everett, had been -- had found to be -- had been found deceptive on a polygraph, you would for sure give that to the defense; is that correct?
A I told you --
MR. CERONE: Objection.
A -- I cannot answer a question absent the full context of the case about which I have no information and no recollection.
BY MR. FEINBERG:
Q You can't tell me whether you would have disclosed information about a failed

Page 62

polygraph?
A I can't answer a hypothetical question.
Q Well, can we assume -- I'll represent to you that all the evidence to date in the case from Mr. Crosland's previous counsel -- his trial counsel is deceased, but his post-verdict counsel, his post-conviction counsel and so on have said that they never saw information about Mr. Everett's failed polygraph.
Do you understand the representation that I'm making?
A I understand what you're saying, yes.
Q Okay.
A Um-hum.
Q Can we assume that if they did not receive that information, then that information would not have been provided to prosecutors?
MR. CERONE: Objection.
MR. JOHNSON: Objection.
A I'm not sure I understand your question.
BY MR. FEINBERG:
Q Sure. Let me -- I'll say it to you this way: Mr. Rosen told me in his deposition that there's no question this information about a failed

Page 63

polygraph is going to get turned over to the defense counsel in his case. Do you -- in Mr. Crosland's case.
Do you understand the representation that I've made?
A I understand --
MR. CERONE: Objection.
A -- what you said, yes.
BY MR. FEINBERG:
Q Okay.
A Yes.
Q And when I asked Mr. Rosen, "If defense counsel never had this information, can we assume that you didn't have it?" and he said, "Yes, because if I had this information, for sure I would have turned it over."
Do you understand my representation?
A I do.
MR. CERONE: Objection.
BY MR. FEINBERG:
Q Do you disagree or agree with that representation --
MR. CERONE: Objection.
BY MR. FEINBERG:
Q Let me finish my question. Do you

Page 64

agree or disagree with Mr. Rosen's account?
A I really don't think --
MR. CERONE: Objection.
MR. JOHNSON: Objection.
A -- Counsel, that it's up to me to agree or disagree. Mr. Rosen was the trial attorney. His testimony -- whatever his testimony is -- and I understand you're representing it to me -- basically speaks for itself. So I really don't think it is up to me to agree or disagree.
BY MR. FEINBERG:
Q As a general matter, when you were involved in a charging decision, would you have more or less information than the trial prosecutor about the case?
MR. CERONE: Objection.
MR. JOHNSON: Objection.
A When you say "more or less," I would have -- I would have a summary of the information. I would not have the specificity of the reports, photographs and documents contained in the homicide binder.
BY MR. FEINBERG:
Q And, in fact, that's the key I think I want to make sure we're on the same page on. You

Page 65

told me before that the homicide binder was not produced until after an arrest was made; is that correct?
A Was not produced to the DA's office --
Q Correct.
A -- yes.
Q Because at the charging stage, you've told me, it's a pretty short verbal conversation where the detective is giving you a summary of what they found; is that correct?
MR. JOHNSON: Objection.
A It's not necessarily a pretty short verbal conversation. It's a conversation that should provide me whatever information I needed to review to approve or not approve an arrest warrant.
BY MR. FEINBERG:
Q Yeah, and you answered my question before I took the opportunity to withdraw it. Let me try to ask a better question.
I'm not -- I don't want to talk about the temporal nature of the conversation. Can we agree that the scope of the conversation that you have with the detective is much narrower than the scope of information that's provided with the homicide binder?

MR. CERONE: Objection.
A In the sense of the homicide binder would contain the specifics of the general information that the detective would have provided to me in reviewing the case for approval or disapproval of an arrest warrant.
BY MR. FEINBERG:
Q Okay. So in the Crosland case, from what we've seen, your involvement was to speak to Detective Cimino at the charging stage; is that correct?
A I can't recall the case, Counsel, so I can't say whether that's correct or not.
Q Well, based on the document that you've seen; is that correct?
A That's what the document says.
Q Okay.
A I have no independent recollection of that interaction at all.
Q I'll represent to you -- and, of course, counsel -- defense counsel can correct me if I'm wrong. I don't -- I don't see your name anywhere else in any other documents that are referenced in the Crosland case over thousands of pages. The only place your name appears is at the



charging stage.
So if that is in fact correct, can we assume that that was your only involvement in the case?
MR. JOHNSON: Objection.
A I can't assume that, Counsel, when I can't recall the event or the case.
BY MR. FEINBERG:
Q Okay. If you were involved in a specific stage of the case, would you expect to see your name on a document from that case?
MR. JOHNSON: Objection.
A Not necessarily, no.
BY MR. FEINBERG:
Q Why do you say that?
A Because not being the document creator, I cannot define what the person creating the document would or would not include in that document.
Q When you were the supervisor of the homicide division, after a case was past the charging stage, what involvement, if any, would you have in the case?
A I would assign the assistant DA who would handle the case at trial.



Q Did you ever get involved in the merits of the case, talk about trial strategy, investigation, anything like that?
A If there was a plea being offered, I would discuss that. We're talking about senior trial attorneys so I really did not involve myself in strategizing for them, no.
Q So in terms of the trial -- actually presenting the trial to a jury or to a judge, you would defer to the talent and experience of the lawyers working under you; is that correct?
A That's what the assigned prosecutor would do, yes.
Q Okay. So is it fair to say then that on average -- not average. That in a -- let me start that over.
In the typical case, you would be involved with the charging decision and then you would pass the case on to the trial prosecutor and then your hands would be removed from the case?
A In the sense of I wouldn't be handling the case. I would still be supervising the unit and if there was a need for discussion, there could be a discussion; if there was a need for a plea discussion, it definitely had to come to me, but I



did not try cases for my assistants.
Q Okay. So going back to Mr. Rosen, if Mr. Rosen receives the homicide binder in the Curtis Crosland case, he's going to have that information and you're not going to be looking at that information; is that correct?
A That would be correct.
Q All right. One other document that was provided in the homicide binder in the Crosland case I have right here. It's marked as Exhibit 30. Take a moment to read that to yourself and let me know when you're finished.
MR. CERONE: Jon, do you have a Bates number, by chance?
MR. FEINBERG: I do. This is CITY 218.
MR. CERONE: Thank you.
(Cellphone interruption.)
A Sorry.
(Discussion held off the record.)
BY MR. FEINBERG:
Q So where we were, ma'am, is I was asking you just to review that document and let me know when you're finished.
A (Witness so complied.)
Okay. I've read the document.

Page 70

Q I'm guessing you don't recall seeing this document way back in the late 1980s or early 1990s, is that --
A That's correct.
Q Okay. I'm going to do my best to provide some context for this document and then ask you a question.
First, the context is this, is that this obviously refers to a conversation that Detective Rocks -- who was involved in the Heo murder investigation. He spoke with Louise Woods, who was the girlfriend of Rodney Everett. You see that referenced there. And Mr. Everett, you've already seen, was the key witness in the Crosland prosecution, as identified in the affidavit of probable cause. Understood?
A That's what you showed me.
Q Okay. Now, if you look at the third sentence that starts "she stated." Do you see that?
A Yes, I see it.
Q The sentence reads "She stated that Everett called her from prison and told her that Frank Turner (a/k/a Squirt), the alleged shooter in the Heo case, was staying in the" -- and I'll stop

Page 71

there because the rest is not relevant to my question.
I'll represent to you that based on previous testimony in the Crosland civil case, detectives have acknowledged that this appears to have been an inconsistent statement made by Everett about who the shooter was in the Heo case. Do you understand my representation?
A I'm not certain -- who is the Heo case?
Q So Heo was the person that Crosland is accused of murdering.
A Oh.
Q And Crosland is accused of murdering Heo based on the statement of Rodney Everett. Understood?
A Yes.
Q Here, in this activity sheet, Everett is saying, apparently, that Frank Turner is the shooter in the Heo case.
MR. JOHNSON: Actually, another witness is saying that Everett said that. Everett -- right?
BY MR. FEINBERG:
Q Well --
MR. JOHNSON: I'm sorry.

Page 72

BY MR. FEINBERG:
Q -- this is not terribly relevant. I'm -- Ms. Christie, let me tell you what I'm doing with a lot of my questions. We have a couple thousand pages of deposition transcripts in this case.
A Um-hum.
Q I'm happy to let you read them all to answer my questions. I don't think anybody wants you to do that so I'm trying to give my best neutral summary of what that evidence is. If I'm ever incorrect about it, I'm sure someone will tell me or tell you that I'm incorrect. Okay.
The testimony from Detective Rocks, who's mentioned in this activity sheet, is that, yes, this is an inconsistency because Everett is now saying, according to this activity sheet, Frank Turner is the shooter. Do you understand what I've said?
A I understand what you said, yes.
MR. CERONE: Objection.
BY MR. FEINBERG:
Q Okay. First Everett says Crosland is the shooter, then Everett says Frank Turner is the shooter. Agreed?

Page 73

MR. CERONE: Objection.
MR. JOHNSON: Objection.
A Agreed that she says that Everett said that -- who was it, Squirt, a/k/a Turner, is the shooter.
BY MR. FEINBERG:
Q Fair enough, and I'll accept that --
A So that is what Louise -- according to this document you showed me, Louise Woods is giving this information secondhanded --
Q Right.
A -- from -- supposedly from Everett.
Q I'll acknowledge that. And what Detective Rocks said in his deposition testimony is that in light of that what should have happened is there should have been a formal interview of Louise Woods and there should have been another interview of Mr. Everett to clarify this apparent inconsistency.
My question for you is this: Is this something you would expect to hear about at the charging stage if the police wanted to arrest Curtis Crosland for the murder of Il Man Heo?
MR. CERONE: Objection.
A Again, I don't have specific



KAPLAN LEAMAN & WOLFE

Page 74

information to answer that question.
BY MR. FEINBERG:
Q Okay. If there's evidence of an inconsistent statement made by a key witness, you can't tell me whether you would expect to hear about it?
MR. JOHNSON: Objection.
MR. CERONE: Objection.
A Not based on a question in a vacuum without having access to the full information or even a recollection of the case.
BY MR. FEINBERG:
Q If you heard --
A You're just asking me a hypothetical question again, Counsel, and I can't answer and don't wish to answer hypothetical questions.
Q If you heard this information or learned of this information during the course of Mr. Crosland's prosecution, no question that information should be disclosed to the defense, correct?
A I need to know more, Counsel.
Q You told me before -- we went through --
A I need to know more. I need to know

Page 75

whether there is any intimidation involved, whether this witness is a financially motivated witness, whether this witness is familial or friendship motivated, whether this is one of the, you know, professional witnesses, so to speak, whether the witness is trying to bargain with something. I'd need to know more --
Q Well, in terms of --
A -- and your question doesn't provide that.
Q In terms of Brady, though, your obligation is not to make a decision about the reliability of the information, it's to disclose it to the defense, right?
A No, but you're asking me a question absent any further information as to what, if anything, was done with or about this particular instance.
Q If Mr. Rosen told me in his deposition testimony that there's no question in his mind this information should be disclosed to the defense, would you have any reason to disagree with him?
A Again, I don't --
MR. CERONE: Objection.
MR. JOHNSON: Objection.

Page 76

A -- speak for Mr. Rosen. I'll let him speak for himself.
BY MR. FEINBERG:
Q Okay. And once again, as we already established, Mr. Rosen has the full homicide binder and you only have a conversation with the police at the charging stage, correct?
A That is --
MR. JOHNSON: Objection.
A That is correct.
BY MR. FEINBERG:
Q All right. If you -- would you agree that if police had information about alternative suspects, other potential perpetrators, that's information that should be disclosed to the defense?
MR. CERONE: Objection.
A I have the same answer. It's a question without context, it's in a vacuum and I can't answer the question.
BY MR. FEINBERG:
Q Do you recall any cases that you prosecuted where you learned about evidence of alternative suspects known to police?
MR. CERONE: Objection.

Page 77

A I can't recall any, no.
BY MR. FEINBERG:
Q You don't remember that ever happening in any of the hundreds or thousands of cases you tried?
MR. CERONE: Objection.
A No, I don't recall that happening. You're talking about at the time I was prosecuting a case?
BY MR. FEINBERG:
Q Yes.
A No, I don't recall that ever happening.
Q It never came up?
A Not to my recollection, no.
Q Okay. Have you -- do you recall defense counsel in any of your cases ever making arguments to a jury that their client was not the actual perpetrator, it was somebody else?
A Well, that was basically a routine defense argument, wasn't it, Counsel? It was always that my client didn't do it, somebody else did.
Q Right. And if you had any other information -- strike that.
If you had information which might

Page 78

support that type of defense, you'd disclose that to defense counsel, wouldn't you?
MR. CERONE: Objection.
A Again, Counsel, you're asking me an open-ended question in a vacuum. I can't answer it.
BY MR. FEINBERG:
Q You know, Ms. Christie, perhaps this is beyond the scope of our deposition, but you went to law school, right?
MR. JOHNSON: Objection.
MR. CERONE: Objection.
A Is that a question or is --
BY MR. FEINBERG:
Q Yes, it is.
A -- that a statement or some kind of gratuitous comment?
Q Did you ever take an exam which involved a hypothetical question?
MR. CERONE: Objection.
MR. JOHNSON: Objection.
A I really don't -- I can't recall, Counsel.
BY MR. FEINBERG:
Q You can't recall going to law school

Page 79

and answering a hypothetical question?
A You didn't ask --
MR. CERONE: Objection.
A -- me that question.
BY MR. FEINBERG:
Q Well, I thought I did. Let me try again.
A No, you asked me a specific question about ever recalling whether or not I had a particular answer.
Q Okay. Have you ever answered a hypothetical question in the legal context?
A I don't recall.
MR. CERONE: Objection.
BY MR. FEINBERG:
Q Okay. When you were ever -- did you ever do an oral argument in front of a judge on a motion?
A Are you asking if I've ever done one?
Q Yes.
A Yes. Yes, of course.
Q Did the judge ever ask you a hypothetical question in your oral argument?
A None that comes to mind, Counsel.
Q You don't recall ever answering a

Page 80

single hypothetical question in the course of your legal career?
MR. JOHNSON: Objection.
A None that comes to mind.
BY MR. FEINBERG:
Q Okay. The reason I ask is because you've told me that you can't answer hypothetical questions in the course of this deposition and I'm just wondering whether you've ever done that before.
A No, I've told you more than that. I've told you that I cannot answer a question in a vacuum without having the benefit of the entire information regarding a case and not just answering a question premised on your -- and, again, you know, with all due respect, you're representing your client. I understand that your question is asked for a certain purpose, but I can't answer the question unless I have the full context of the case in which the question is involved.
And I've already told you, Counsel, that this case is, what, 35, 37 years old. I don't remember this case. I tried a lot of cases in my career. At the time I was chiefing the unit, I believe we had, what, four to 500 homicides a year.

Page 81

That's a lot of arrest warrants to review.
This case does not stand out at all in my memory and for that reason -- and not merely because it's a hypothetical question, but for that reason, as I think I've told you, I can't answer a question that is just plucked out of context and out of circumstances of a particular case about which I have no memory.
Q Is your answer done?
A I am done.
Q Okay. Let's confirm the hypotheticals that you cannot answer for me. You cannot answer whether you would provide information to the defense about a key prosecution witness failing a polygraph, correct?
MR. CERONE: Objection.
MR. JOHNSON: Objection.
A As I've told you, I cannot answer that question without having the benefit of the context of the information in the case and the circumstances, both temporally and contextually about this case.
BY MR. FEINBERG:
Q We've talked at length about it. I'm just confirming what you're telling me you can't

Page 82

answer to make sure that the record is clear.
MR. JOHNSON: Asked and answered.
MR. FEINBERG: The objection is noted.
BY MR. FEINBERG:
Q You cannot tell me whether you would disclose to the defense evidence that a key prosecution witness has failed a polygraph, correct?
MR. JOHNSON: Asked and answered.
MR. CERONE: Objection.
A I believe I have answered that question.
BY MR. FEINBERG:
Q Okay. You cannot tell me whether you would provide information to the defense about the prosecution -- a key prosecution witness giving an inconsistent statement, correct?
MR. JOHNSON: Asked and answered.
MR. CERONE: Objection.
A I've answered that question.
BY MR. FEINBERG:
Q You cannot tell me whether you would provide information to the defense about police obtaining information about alternative perpetrators?

Page 83

MR. JOHNSON: Asked and answered.
MR. CERONE: Objection.
A And I've answered that question, Counsel.
BY MR. FEINBERG:
Q Okay. And the answer is that you -- the answer that you've given is that you cannot provide me with answers to any of those questions; is that correct?
MR. JOHNSON: Without the context --
MR. CERONE: Objection.
A Yes.
MR. JOHNSON: You left out her entire -- the entirety of her answer.
BY MR. FEINBERG:
Q We've already discussed that you told me that you can't answer a hypothetical question because you don't have the full context, right?
MR. CERONE: Objection.
A I have told you -- yes. I've told you that a number of times. Without the full context, the circumstances of the case, in a case that I cannot remember that is some 35 to 37 years old, no, I am not going to answer a specific question that is plucked out of context.

Page 84

BY MR. FEINBERG:
Q What would you need to provide you with the context?
MR. CERONE: Objection.
A I think I've told you that, Counsel.
BY MR. FEINBERG:
Q I don't recall. Humor me and tell me what you would need.
A I have already said I need the context of the case, I need the temporal context, the policies of the office at the time, the concerns of the -- of the detectives, the concerns of the prosecuting DA, the evidence at hand. I have none of that, Counsel.
Q Okay.
A And you're just asking me a question in a vacuum.
Q I'll take that back from you.
MR. FEINBERG: I believe I'm going to switch tracks to the Alicea case now. Do you need a break at all or do you want to keep going?
MR. JOHNSON: The court reporter needs a break.
MR. FEINBERG: That's fine. Let's go off the record.

Page 85

(Break taken.)
MR. FEINBERG: Let's go back on the record.
BY MR. FEINBERG:
Q Ms. Christie, we had a short comfort break. Did you realize during the course of the break that any of your previous testimony was incorrect or incomplete?
A No, I did not realize --
Q Okay.
A -- that any testimony was either incomplete or incorrect.
Q I just want to confirm three final things on Crosland before we shift bases to Alicea.
A Um-hum.
Q You do not, sitting here today, have any recollection of learning that Rodney Everett failed a polygraph, correct?
A That is correct.
Q You do not have any recollection of learning that Rodney Everett, the prosecution's key witness, had provided an apparent inconsistent statement about who the shooter was, correct?
A Correct.
Q You did not learn -- you do not recall

Page 86

receiving any information about alternative perpetrators that the police investigated for the Heo murder, correct?
A That is correct.
Q All right. Now let's shift bases to Alicea. I understand that you read some documents about that case. And, once again, I'll save time to make some representations to you about the basic outlines of the prosecution.
The murder victims in the case were Hector and Luis Camacho, two brothers who were shot on the 2200 block of North 4th Street on February 19th, 1985. Do you recall seeing any information about that?
A I do not recall.
Q Okay. I'll represent to you the shooting takes place on February 19th, 1985. The police developed some suspects, including two named Wilson Santiago and his brother Manuel Santiago. The investigation proceeded in kind of fits and starts and then went cold in October of 1986.
Do you understand everything I've outlined so far?
A I do.
Q All right. So nothing really happens

Page 87

in the investigation until February of 1989, so we're now four years after the shooting takes place, and at that point police take a statement from a witness named Angel Fuentes who states that my client, Pedro Alicea, also known as Antonio Martinez, was the shooter who killed Hector and Luis Camacho.
Do you understand the representations I've made to you about the basic outlines of the case?
A Yes.
Q Okay. I want to start by showing you a document which you may have reviewed, and this is the affidavit of probable cause. It's marked as Alicea Exhibit 14. The first several pages are the warrant. The more important pages will be the last four, which are the affidavit.
Take a moment to read through those documents and let me know when you're finished.
A (Witness so complied.)
Q Have you finished your review of the document, ma'am?
A I've finished, yes.
Q Okay. Now, there are two witnesses who are referenced obliquely without mention of their

Page 88

names. Agreed?
A Yes.
Q All right. I'll represent to you that the two witnesses' names are first Angel Fuentes, that's the first statement that's described, and the second witness who is mentioned is Jose DeJesus.
So you saw reference to two witnesses with no names; is that correct?
A Yes.
Q Okay. And as became clear later in the case, once discovery was passed and once the case went to trial, is that when the detectives wrote that affidavit they were referring specifically to Mr. Fuentes and Mr. DeJesus. Understood?
A Yes.
Q Okay. First things first, the affiant on this is Detective Snell; is that correct?
A I see a Selby. Oh, no, that's the issued authority. The affiant is, yes, Robert Snell.
Q Do you recall Detective Snell?
A Yes, I recall him.
Q Okay. I'm now showing you Alicea Exhibit 64, which describes a meeting with you. So

Page 89

please take a moment to read that.
A (Witness so complied.)
Q Have you reviewed Exhibit 64?
A I have.
Q And you see there's a reference to a meeting between you, Sergeant Snyder and Detective Ainsley regarding the Camacho brothers' murder.
A I see that.
Q Do you recall that meeting at all?
A I do not.
Q The statement in the third line says "ADA Christie approved arrest warrant charging Pedro Alicea," et cetera.
Does that mean that you actually approved the specific document or does that mean that you approved the arrest in general?
A I believe it would mean I approved the arrest. I approved them obtaining or preparing an arrest warrant.
Q Okay. In other words, like what you described to me before, where detectives would provide you with a summary -- a verbal summary of the evidence they discussed; is that correct?
A Yes.
Q And you see no indication here that

would suggest a departure from that practice where detectives provided you with documents for your review?
A I see no indication in this document.
Q Okay. And to confirm, you don't recall this meeting or this case; is that correct?
A I do not recall it, Counsel.
Q Okay. Let me take that back from you then. I'll also take the affidavit back from you.
Now I'm going to show you, as I did with the Crosland case, some additional information that appears to have been available to police at the time they were conducting their investigation.
First I'm going to show you information about a suspect named Wilson Santiago. By the way, do you recall any reference to Wilson Santiago as a suspect in this case?
A No, I do not.
Q All right. The first thing I'll show you is -- I believe first in time is a document that's marked Exhibit 21. These are handwritten notes from the police homicide file.
And by the way, before I ask you my question, did police ever pass along their handwritten notes that they took at the scene of a



murder?
A Not that I recall.
Q Okay. What you'll see here, if you look -- if you turn the document -- the page on its side, at the top of the page you'll see a statement "Gibby envolved" -- with involved spelled wrong, e-n-v-o-l-v-e-d -- "and had guns." Do you see that phrase?
A I see it.
Q And then below that a statement "Wilson's envolved," with the same misspelling of involved. Do you see that?
A "Wilson's envolved."
Q Yes.
A Yes.
Q Okay. So bottom line we see two handwritten notes saying Gibby and Wilson are involved and that's all we know from this document.
A They are envolved.
Q Envolved, which --
A I'm assuming -- I don't know what that means, but it does spell envolved.
Q Okay. I'll take that back.
What I'll represent to you is that I'm making the assumption that these are notes taken at



the scene of the murder where police spoke to witnesses and jotted down these notes quickly, perhaps leading to that misspelling.
I'll just ask you to accept my representation that Wilson and Gibby are names that appear early on in this investigation. Understood?
A They're names that appear as being envolved, whatever significance that has.
Q Okay. Well, let's, perhaps, show some additional context. If I show you Exhibit 29, which is a phone message that was found in the police department's homicide file from this investigation.
MR. JOHNSON: The exhibit number?
MR. FEINBERG: This is 29.
MR. JOHNSON: Thank you.
BY MR. FEINBERG:
Q Okay. Would you agree that this phone message says that Wilson Santiago is the perpetrator on this job, meaning on this murder?
A I believe he uses the word doer.
Q You're right, doer. I've never been a homicide detective, but can we assume that doer means the perpetrator?
A I'm only telling you what the document



says.
Q Okay. When you see the word doer, what does that mean?
A To me it means some degree of responsibility.
Q Okay. I assume, over the course of your career as a homicide prosecutor, you spoke to homicide detectives quite frequently?
A Yes.
Q Do you ever recall homicide detectives using the phrase doer to refer to the perpetrator?
A I do.
Q Okay. And I take it you would read that document with the same context; is that correct?
A I'm sorry, I didn't understand your question.
Q So when you see doer, you know that the -- you can assume that the detective is referring to the perpetrator; is that correct?
A Yes, I believe so.
Q Okay. The next document I'll show you about the police investigation into Wilson Santiago and his brother named Manuel -- I'm now introducing Manuel. You haven't seen him noted in any of the

Page 94

previous documents. This is Exhibit 49. It's a longer activity sheet. Take a moment to read that to yourself.
A (Witness so complied.)
Q Have you finished reading it?
A Yes.
Q Okay. Would you agree that this activity sheet refers to a discussion with an apparent eyewitness to the Camacho brothers' murder?
A Well, she is -- Rosa is listed as an informant brought into -- as an eyewitness. So I'm assuming that she is regarded as an informant/eyewitness.
Q And, in fact, as an eyewitness, she says that she sees -- or she hears a shot and that Wilson Santiago drags a body out of a store onto the street. Agreed? It's halfway down.
A Do you want me to just read it back to you? "She hears gunshots and then she sees Wilson Santiago drag the body of a person out of the store to the sidewalk."
Q Okay. And then she continues to -- on to say that she sees Manuel Santiago shoot the other Camacho brother; is that correct?

Page 95

A That's what this document says.
Q Okay. So when you -- based on what this document communicates, the police are speaking to someone who says that they saw the shooting and they saw who did the shooting, correct?
A That's what --
MR. CERONE: Objection.
A That's what the document says, although the document speaks for itself.
BY MR. FEINBERG:
Q Okay. I'll represent to you that there's no formal interview with Ms. Torres, but you see reference to the -- in the activity sheet to the fact that the conversation took a long time so they were going to bring her back another time. Did you see that reference there?
A Yes.
Q Okay. So one other document that appeared in the homicide file is this. This is Exhibit 51.
Forget the text that's typed on there. Can I assume that you've seen forms that look like this many times?
A Yes.
Q It's an investigation interview record,

Page 96

sometimes referred to as a 75-483?
A That's what the document says, yes.
Q Okay. I'm sure you reviewed hundreds or thousands of these over the course of your career?
A I have seen these before, yes.
Q Okay. At the top of the page do you see the text that's typed Maria Torres?
A I'm sorry, what is your question?
Q Do you see the text that's typed Maria Torres?
A Yes, I do see that.
Q Okay. Now, what I think has been pieced together by witnesses in this case is that police spoke to Ms. Torres, described in the activity sheet, and she identified Wilson Santiago and Manuel Santiago as the perpetrators. The police were prepared to take a formal interview of her, but because it got late and because it was difficult for Ms. Torres, they said we'll come back and do this another time.
I'm just making that representation to you from previous testimony. Do you understand what I've outlined?
MR. CERONE: Objection.

Page 97

MR. JOHNSON: Objection.
A Yeah, I -- I hear what you're saying, Counsel. I'm trying to juxtapose the two documents together to see if they occur at the same date or not. It's difficult to read.
BY MR. FEINBERG:
Q Okay. In fact, if you'd hand me back Exhibit 51, the statement.
MR. JOHNSON: Well -- I'm sorry. So this document is dated, right, and this --
MR. FEINBERG: Yeah, and I'll read it into the record, okay, so --
MR. JOHNSON: Well, that's not my question. Is the other document also dated?
MR. FEINBERG: Yeah, and that's exactly what I'm going to tell you.
BY MR. FEINBERG:
Q Exhibit 49, the activity sheet that you looked at, the date is October 24th, the year is blanked out, but we can tell from this statement, which is Exhibit 51, 10/24/86.
So would you agree that these two documents appear to go together, that they were both generated on October 24th, 1986?
A Yeah, but this document seems to

suggest that the interview is going to occur not on the 24th but on the 27th.
Q Right, and --
A And this document appears to be dated on the -- on the 24th of '86. I thought this was -- I thought this occurred in '87.
Q So this is a -- the murder is February '85.
A Okay.
Q This encounter is taking place October of '86. Agreed?
A It depends on which encounter -- document you're talking about. On this first document, which is, I believe -- it's faded out, but I believe it's dated 10/24 -- and I can't read the year and I can't read the time. It appears to say activity sheet. At the bottom of that document it's -- it schedules an interview to occur on the 26th of 10 -- of October at 6 p.m.
Q On the 27th.
A Strike that. You're right. On the 27th of October. I'm sorry.
However, the document you just showed me that's captioned investigation interview record is dated -- place of interview, homicide date



10/24/86, where they bring in at one, brought in by self --
Q This is --
A -- time of interview two. So I'm not certain whether this interview connotes what occurred or didn't occur on the 24th or as scheduled on the 27th.
Q It's possible that I'm making a bigger deal out of this than necessary.
A Okay. Well, I'm not sure what your question is.
Q My question is this: Would you agree that on the date that the activity sheet is prepared, which appears to be 10/24/86, police obtained information that, number one, there was an eyewitness to the shooting, Maria Torres; and, number two, that she identified Wilson Santiago and Manuel Santiago as the perpetrators?
A That's what the document says.
Q Okay. Would you agree also that there's reference to another potential eyewitness by the name of Erika Wasilkowitz? I'll find you exactly where that is so you can confirm, although tell me if you remember from your reading.
Yes, at the bottom of the second



paragraph the author of this document writes: "Torres further stated that one Erika, E-r-i-k-a, Wasilkowitz, W-a-s-i-l-k-o-w-i-t-z, also witnessed the killings."
Do we agree that that's what the document says, right?
A That's what the document says, yes, Counsel.
Q Okay. So then let's revise our list of relevant information from this document. One, Maria Torres is an eyewitness. Agreed?
A That's what the document says.
Q Two, Maria Torres identifies Wilson Santiago and Manuel Santiago as the perpetrators?
A That's what the document says.
Q And, three, Maria Torres says that Erika Wasilkowitz was also an eyewitness?
A That is what the document says.
Q All right. I'll take these back from you. And let's note that this encounter appears to occur in 1986.
Now let's fast-forward to 1989. And before I do that, do you recall that the affidavit of -- strike that.
Do you recall that the meeting that you



apparently had with the investigating detectives took place on March 23rd, 1989?
A I don't recall a meeting at all, Counsel.
Q Do you recall seeing that in the activity sheet, that --
A Whatever is in the activity sheet is in the activity sheet.
Q Okay. So what I'm going to show you is a statement that was given -- well, actually, I'm going to show you an activity sheet that was created eight days before that.
So just to set the stage, we know that you met with the detectives and approved an arrest warrant on March 23rd, '89, at least that's what the documents show us, correct?
A That's what the activity sheet says.
Q Okay. We then looked at information from '85 and '86 which pointed to Wilson Santiago and Manuel Santiago as the perpetrators. Agreed?
A That's what the documents indicate.
Q The next document I'll show you is from 1989, eight days before your meeting with the detectives, and it also concerns Wilson Santiago.
Please take a look at this. This is

Page 102

Exhibit 61.
A (Witness so complied.)
Q Have you finished reviewing it?
A I have.
Q Would you agree that this activity sheet first describes a police interview with Carlos Diaz?
A Yes.
Q And Diaz provides information about the relationship between the decedents, Luis and Hector Camacho, and Wilson Santiago.
A That's what the document says.
Q The document also states that Wilson -- strike that.
The document states that Diaz was aware that Wilson Santiago had, for lack of a better word, motive to harm the Camachos.
A The document says that Diaz heard Wilson say four or five times that Wilson was going to kill the Camachos.
Q Okay. And forget this specific case, but in a typical prosecution, if you had a perpetrator say I'm going to kill the eventual victim, that's evidence that you would likely find highly probative?

Page 103

MR. CERONE: Objection.
MR. JOHNSON: Objection.
A Again, taken in and of itself, yes, it may have probative value, but I'd have to see it in the context of all of the information available.
BY MR. FEINBERG:
Q Generally, if you're prosecuting a defendant in a murder case and you have evidence that the defendant had said multiple times before the murder took place, "I'm going to kill that guy," more times than not you're going to want to introduce that evidence; is that correct?
A If I have that --
MR. CERONE: Objection.
A -- during the trial, yes, but here we're talking about an investigation where you really haven't fleshed out -- and this activity sheet doesn't flesh out what, if any, further investigation was done concerning this entry.
BY MR. FEINBERG:
Q Would you agree that this -- the evidence communicated in this activity sheet is probative as to Wilson Santiago's involvement in the murder?
MR. CERONE: Objection.

Page 104

A I would have to --
MR. JOHNSON: Objection.
A -- have more information, again, of the total context of the case and circumstances.
BY MR. FEINBERG:
Q You can't answer that hypothetical question?
A It's not just a hypothetical, Counsel. You're giving me a question in a vacuum, absent any other evidence of a case that I don't remember.
Q Did you have, when you spoke to the detectives in this case, any information about Wilson Santiago as the perpetrator of the murder?
MR. CERONE: Objection.
A In that I don't recall the meeting or discussing this case at all, I can't tell you that I had any information concerning this individual or any individual.
BY MR. FEINBERG:
Q All right. Let me ask it this way: Sitting here today, you do not have any recollection that police ever told you that Wilson and Gibby were involved in the murder of the Camacho brothers?
A I couldn't have --

Page 105

MR. CERONE: Objection.
A -- a recollection, Counsel, in that I don't recall the case or the event at all.
BY MR. FEINBERG:
Q Okay. You don't have any recollection that police told you that Wilson was the doer on this job?
A Again, my answer is that -- in that I don't recall the case or the event about which you're questioning me, I can't have a recollection about that.
Q You don't recall that police ever told you about Maria Torres being an eyewitness to the shooting?
A Again, I have no recollection of the case or the event.
Q You don't have any recollection of the police telling you -- of police telling you that Erika Wasilkowitz was an eyewitness to this event?
A Again, I have no recollection of the case or the event.
Q You have no recollection of police ever telling you that Manuel Santiago was the shooter of -- or was a shooter in this murder?
A I do not.

Page 106

Q You do not recall police ever telling you that Carlos Diaz provided evidence of Wilson Santiago's motive and plan to shoot the Camacho brothers?
A Having no recollection of the case or the event, I could not.
Q Okay. Would you agree that the information that we've reviewed over the past few minutes is exculpatory to my client, Pedro Alicea?
A I'd have to know more. I'd have to know more about this case.
Q Okay.
A I'd have to know whether or not we have a situation of a -- you know, whatever, a professional witness, a professional recanter, intimidation, financial incentives. Again, you're giving me a question in a vacuum.
Q What do you mean about a professional witness?
A A professional witness, such as a witness -- certainly, in my experience, I've had witnesses who want to become witnesses in order to get out of jail, witnesses who want to become witnesses because they have a grudge against an individual, witnesses who are afraid of an

Page 107

individual and recant and then un-recant and then recant again, individuals who get paid for their testimony. I'd need to have more information, Counsel.
Q If a witness comes forward and says that someone who was not the defendant in the case is the actual perpetrator, that's information you would disclose to the defense, isn't it?
A That's information I would want to have investigated.
Q Okay. And how would you have it investigated?
A Well, I would have it investigated by the same investigating officers who were presenting and preparing the case.
Q Even if -- and if you couldn't find any more information about it, wouldn't you still disclose it to the defense?
A Again, you're asking me a question without context. I'd need to know more.
Q Let's take specifically the activity sheet identifying Maria Torres. It's Exhibit 49. If this document were handed to you and my client, Pedro Alicea, is just about to go to trial and he's being charged with murdering the Camacho brothers

Page 108

but there in front of you you have a piece of paper that's saying Wilson Santiago and Manuel Santiago were the perpetrators, would you give that piece of paper to the defense lawyer representing Mr. Alicea?
A I would want it run down. I would want it investigated and I would want to find out the answer to the various questions raised in the activity summary.
Q Okay. So at a minimum, you would expect detectives to do additional investigative work --
A Yes, I --
Q -- is that right?
A Yes, I would.
Q And as a result of that additional investigative work -- or strike that.
Whatever the results of that additional investigative work, you would tell defense counsel?
A If it invoked the Brady obligation, then I would turn it over, yes.
Q Okay. I'll represent to you that, first of all, Mr. Alicea's trial counsel was a man named John Scott who is now deceased. He was represented by Alan Yatvin at the time of his

Page 109

post-sentence motions, Y-a-t-v-i-n. Do you know Mr. Yatvin?
A No.
MR. JOHNSON: I do.
MR. FEINBERG: I won't ask you.
BY MR. FEINBERG:
Q Do you -- I have an affidavit in here from Mr. Yatvin. I'll just summarize it for you.
Mr. Yatvin says that he would have obtained trial counsel's file in his representation and he -- if he had seen information like this, he for sure would have made it part of post-sentence proceedings in a potential direct appeal. That never happened at the time of Mr. Alicea's conviction in 1990.
Do you understand what I've represented to you?
A I hear what you're saying, yes, Counsel.
Q Okay. So if we can draw the conclusion from that that this information -- when I say "this information," I mean generally, but specifically the activity sheet concerning Maria Torres. If we can assume that this was not provided to the defense, would you also assume that it was not

Page 110

provided to the prosecution?
A I can't make an assumption but --
MR. CERONE: Objection.
A -- again, I would have to -- I would have to assume that whatever pertinent information was provided would have been contained in the homicide binder.
BY MR. FEINBERG:
Q And would then have been turned over to the defense; is that correct?
A And would have been processed for discovery.
Q Okay. Was it your recollection that all witness statements -- or strike that.
Was it your recollection that all witness -- I'm going to try it again.
Was it your recollection that all information provided in the homicide binder was turned over to the defense?
A I didn't deal with discovery. We had a unit of paralegal and secretarial staff who dealt with discovery. And I would assume that the discovery unit complied with appropriate discovery procedures.
Q Okay. I'm going to go back and show

Page 111

you something I showed you earlier today, and that is the index from the homicide binder in the Alicea case, and specifically this is Exhibit 17.
I will show you -- actually, I'll show you all of those pages. I'll ask you to flip through those pages and tell me whether you see any reference to Maria Torres or Carlos Diaz.
A (Witness so complied.)
I'm sorry, what were the two names, Counsel?
Q Maria Torres or Carlos Diaz.
A I don't see anything in the witness index -- and I'm assuming -- it says Section C. I don't know if that's the sum total of Section C, which is supposed to include, according to this document, police interviews on 75-51s, index sheet required. I'm not exactly sure if that Section C is comprised totally of this witness index or otherwise.
Q Okay. Bottom line, you don't see any reference to either of those two witnesses?
A On the witness index, I do not see either name.
Q All right. If you don't see those names provided on the index sheet to the homicide

Page 112

binder, does that make it more likely that the police department never provided information about those two people to the DA's office?
MR. CERONE: Objection.
A Again, Counsel, I don't -- I don't know if that would make it more likely because I see other sections with regard to homicide reports, homicide case summary, and I don't know if reference -- albeit maybe not statements to those witnesses -- could have been contained in other sections of the binder.
BY MR. FEINBERG:
Q If you had the information that we've reviewed, including the Maria Torres information, the Carlos Diaz information, can you tell me whether you would have approved the warrant for Mr. Alicea's arrest?
A I would have asked for further investigation.
Q Okay. And if you -- granted you don't know about -- strike that.
If you had asked for further investigation, you would have expected police to do that investigation; is that correct?
A I would.

Page 113

Q All right. And you would expect police to document that further investigation?
A I would.
Q And I take it you haven't seen any information in any of the documents that we've gone through showing that further investigation was done?
MR. CERONE: Objection.
A Again, I don't know if I've seen the entire case file or homicide binder, but in the documents that I have been shown I see no such indication.
BY MR. FEINBERG:
Q Okay. One other question about the specific witnesses whose information was used in support of the arrest warrant. Do you remember I mentioned the name Jose DeJesus as one of the witnesses who provided a statement?
A I believe so.
Q I'll represent to you that Jose DeJesus was the stepson of Wilson Santiago. So one of the witnesses the police used against Mr. Alicea was the stepson of Wilson Santiago who had earlier been identified as a perpetrator.
Do you understand those relationships

Page 114

that I've outlined?
A I understand your description.
Q Okay. Does that information cause you to have any questions about the credibility of Mr. DeJesus' statement?
A Because of the familial relationship?
Q Yes.
A I'd have to see the entirety of the information provided.
Q Okay.
A I wouldn't jump to the conclusion of discrediting or crediting someone because of a familial relationship.
Q I think we might be saying the same thing. Let me try again to see if I can get an agreement.
If Wilson Santiago was -- had been identified as the perpetrator and then his stepson came forward and gave information about someone else, that familial relation between Wilson Santiago and Jose DeJesus, the stepson, would cause you to ask for further investigation; is that correct?
A It would be a consideration, yes.
Q Okay. So the further investigation

Page 115

that you would have asked for in response to my previous questions about Maria Torres and Carlos Diaz you also would have asked for follow-up on this relationship between Wilson Santiago and Jose DeJesus; is that correct?
MR. CERONE: Objection.
A On the relationship between who again?
BY MR. FEINBERG:
Q You would have asked for follow-up about the credibility of DeJesus' statement in light of that relationship?
A In light of the relationship between DeJesus and Santiago?
Q Yes.
A Okay. I'm not sure I -- I thought you had indicated a familial -- a different familial relationship earlier. Maybe I'm getting my Santiagos confused.
Q Sure. Santiago is identified as a perpetrator early in the investigation.
A I understand that.
Q All right. DeJesus comes forward later and says it's actually Alicea who's the perpetrator, right? Understood?
A Okay.

Page 116

Q In light of that, there might be questions about DeJesus' credibility pointing to someone else who's not his stepfather?
A So your question is would I be interested in further investigation as to the relationship between DeJesus and Santiago --
Q Yes.
A -- or DeJesus and Camacho --
Q No, between DeJesus.
A -- or perhaps both?
Q Well, between DeJesus and Santiago.
A That would have been an aspect to be looked into.
Q Okay. So everything we've just been discussing, information regarding -- that pointed to Wilson -- let me start over.
All of the information pointing to Wilson Santiago and Manuel Santiago, you would have asked to have had that reinvestigated or additional investigation done when police came to you to talk about the case?
A Yes.
Q In other words, if you had that information --
A Yes.

Page 117

Q -- that's what you would have asked for?
A Yes.
Q Okay. And you have not seen any information which suggests that additional investigation was done; is that correct?
A Not in the documents that I've been provided, no.
Q Okay.
MR. FEINBERG: I believe that I'm done, but, Dan, I know it's 12 and you have your call now, right?
MR. CERONE: Yes. I have coverage for about, like, three minutes.
I actually don't have any follow-up, Ms. Christie. Thank you for your time and patience.
MR. DeROSE: I don't have any follow-up questions either.
MR. FEINBERG: Actually, can we do this, Dan? If you have three minutes, can we take a minute and a half so I can review my notes and make sure that I'm done?
MR. CERONE: Yes.
(Discussion held off the record.)

Page 118

MR. FEINBERG: Let's go back on the record and confirm.

I do not have any further questions for you, Ms. Christie. Thank you for your time.

A You're welcome.

MR. JOHNSON: Thank you all.

MR. CERONE: Thank you.

THE COURT REPORTER: Mr. Cerone, would you like a copy of the transcript?

MR. CERONE: That would be great. Thank you.

(The deposition was concluded at 12:04 p.m.)

Page 119

COMMONWEALTH OF PENNSYLVANIA : §.
COUNTY OF CUMBERLAND :

I, Teresa K. Bear, a Court Reporter and Notary Public in and for the Commonwealth of Pennsylvania and County of Cumberland, do hereby certify that the foregoing deposition was taken before me at the time and place hereinbefore set forth, and that it is the testimony of:

BARBARA L. CHRISTIE

I further certify that said witness was by me duly sworn to testify the whole and complete truth in said cause; that the testimony then given was reported by me stenographically, and subsequently transcribed under my direction and supervision; and that the foregoing is a full, true and correct transcript of my original shorthand notes.

I further certify that I am not counsel for or related to any of the parties to the foregoing cause, or employed by them or their attorneys, and am not interested in the subject matter or outcome thereof.

In testimony whereof, I have hereunto subscribed my hand this 4th day of September 2024.

__________
Teresa K. Bear, Notary Public
Court Reporter

(The foregoing certification of this transcript does not apply to any reproduction of the same by any means unless under the direct control and/or supervision of the certifying reporter.)

My commission expires:
April 25, 2027

**A**

**a.m** 1:16
**a/k/a** 70:24 73:4
**abide** 61:11
**able** 55:7 56:5 56:11,24
**absent** 54:8 61:20 75:16 104:9
**accept** 73:7 92:4
**access** 74:10
**accommodate** 9:19
**account** 64:1
**accused** 71:11 71:13
**acknowledge** 73:13
**acknowledged** 71:5
**act** 20:5 30:3
**acting** 50:16
**active** 24:12 29:5
**activity** 10:6 35:6,9,16,24 36:3,6 39:25 40:1,12,16,17 40:20,21,25 41:12 42:21 45:18 46:6 48:25 49:25 50:14 71:17 72:15,17 94:2 94:8 95:13 96:16 97:18 98:17 99:13 101:6,7,8,11 101:17 102:5 103:17,22 107:21 108:9 109:23
**actual** 77:18 107:7
**ad** 29:22
**ADA** 89:12
**Adams** 18:23
**additional** 90:11 92:10 108:11 108:16,18 116:19 117:5
**addresses** 5:20
**administrative** 24:20
**advised** 20:22
**affiant** 45:5 88:17,20
**affidavit** 43:10 44:1,7,20 46:12,23 47:3 47:16 48:21 49:18 70:15 87:14,17 88:14 90:9 100:23 109:7
**affidavits** 5:9 46:15
**affirmatively** 31:6
**afraid** 106:25
**ago** 5:7 8:5 13:9 46:12
**agree** 39:20 43:21 44:21 50:14 63:21 64:1,5,10 65:22 76:12 92:18 94:7 97:22 99:12,20 100:5 102:5 103:21 106:7
**agreed** 9:21 39:19,22 46:9 72:25 73:3 88:1 94:18 98:11 100:11 101:20
**agreeing** 18:15
**agreement** 114:16
**Ainsley** 2:16,16 14:10 89:7
**al** 1:5,10 2:10
**Alan** 108:25
**albeit** 112:9
**Alicea** 1:2 4:18 5:1 6:12 9:12 36:16 39:13 40:22 84:20 85:14 86:6 87:5,15 88:24 89:13 106:9 107:24 108:5 111:2 113:22 115:23
**Alicea's** 108:23 109:14 112:17
**allege** 4:23
**alleged** 52:12 70:24
**allegedly** 43:24 52:10
**allergies** 17:12 47:9
**Alrighty** 7:3
**alternative** 76:13,24 82:24 86:1
**and/or** 119:22
**Angel** 87:4 88:4
**Ansel** 2:16,16 13:23
**answer** 9:20 10:16 11:18,24 13:14 19:20 20:1 26:13 52:20,25 53:5 53:7,9 54:10 54:24 55:7,13 56:11 57:24 58:6 60:1,18 61:20 62:2 72:9 74:1,15 74:16 76:18,20 78:5 79:10 80:7,12,18 81:5,9,12,12 81:18 82:1 83:6,7,14,17 83:24 104:6 105:8 108:8
**answered** 65:17 79:11 82:2,9 82:11,18,20 83:1,3
**answering** 79:1 79:25 80:14
**answers** 59:13 83:8
**Anthony** 2:11
**Antonio** 87:5
**anybody** 11:6 53:18 72:9
**apparent** 73:18 85:22 94:9
**apparently** 48:19 71:18 101:1
**appeal** 61:4 109:13
**appear** 92:6,7 97:23
**APPEARAN...** 2:1
**appeared** 95:19
**appearing** 6:13
**appears** 66:25 71:5 90:12 98:4,16 99:14 100:20
**apply** 8:19 9:10 119:21
**appointment** 15:16
**apprise** 31:8
**approached** 17:24
**appropriate** 20:3 22:18 25:9 26:9 59:7 110:23
**approval** 26:16 26:22 28:2 29:17 46:22 47:19 48:2 59:12 66:5
**approve** 24:25 25:18 26:11 55:6,9 65:15 65:15
**approved** 24:10 24:11 51:15 89:12,15,16,17 89:18 101:14 112:16
**approving** 20:23 22:6 25:1 30:1
**approximately** 24:8
**April** 42:23 49:21,24 119:24
**Arch** 2:3,7,19
**ARCHER** 2:17
**argue** 59:3
**argument** 77:20 79:17,23
**arguments** 77:17
**arrest** 5:10 20:23 22:7 25:8,17 26:9 26:11,15 28:3 29:18 30:1,11 30:16 31:5 43:11 46:7,13 46:17 47:20 48:2,3,20 51:15 55:9 65:2,15 66:6 73:22 81:1 89:12,16,18,19 101:14 112:17 113:16
**arrested** 4:24
**arrests** 24:10 25:1
**Aside** 44:13
**asked** 5:4 16:6 28:2 40:22

52:12 54:25 55:16 60:17 63:12 79:8 80:18 82:2,9 82:18 83:1 112:18,22 115:1,3,9 116:19 117:1
**asking** 8:9 19:2 25:11 36:25 37:22 38:3,5 39:3 40:23 47:5 51:8 52:17,18 53:2 54:7,8 55:25 57:16,22 58:2 59:24 69:22 74:14 75:15 78:4 79:19 84:16 107:19
**aspect** 116:12
**assign** 67:24
**assigned** 25:4 28:23,24,25 57:5 68:12
**assigning** 24:8
**assistant** 16:21 16:24,25 17:2 17:3,9 24:9 25:22 67:24
**assistants** 17:13 69:1
**Associates** 1:17
**assume** 11:10 13:13 18:2,5 26:3 30:1 50:11 59:18 62:3,15 63:13 67:3,6 92:23 93:6,19 95:22 109:24,25 110:5,22
**assuming** 91:21 94:13 111:13
**assumption** 91:25 110:2
**attempting** 55:1
**attorney** 4:15 64:6
**Attorney's** 60:14
**attorneys** 5:17 6:12,17 24:4 68:6 119:12
**author** 100:1
**authority** 88:20
**authorized** 46:7
**available** 56:6 90:12 103:5
**average** 68:15 68:15
**aware** 6:11 102:15

B

**B** 39:18
**back** 16:6,15 23:6,25 24:2 37:4 38:16 40:1 46:11 48:8 50:1 55:19 57:11 59:10 60:16 69:2 70:2 84:18 85:2 90:8,9 91:23 94:19 95:15 96:20 97:7 100:19 110:25 118:1
**background** 9:8 15:4 35:20 38:6 42:1 49:18 50:13
**bad** 21:3 45:8
**bail** 47:1
**Barbara** 1:13 3:3 4:2 119:6
**bargain** 75:6
**based** 4:15 22:16 30:16 44:22 46:22 58:21 66:14 71:3,14 74:9 95:2
**bases** 85:14 86:5
**basic** 86:8 87:9
**basically** 23:4 24:3 28:16 30:21 54:25 55:15 56:12 64:9 77:19
**Bates** 37:1 38:18 38:20 39:13 69:13
**Bear** 119:3,17
**beating** 56:13
**beginning** 60:4
**believe** 15:11,13 17:13,21 29:6 33:13,18 41:5 53:22 60:23 80:25 82:11 84:19 89:17 90:20 92:21 93:21 98:14,15 113:19 117:10
**believed** 59:4
**bell** 17:18 19:5
**benefit** 80:13 81:19
**best** 9:3 16:19 57:5 70:5 72:10
**better** 65:19 102:16
**beyond** 78:9
**bigger** 99:8
**binder** 23:2 32:3 32:16,22,24 33:2,3,22 34:3 34:4,23 36:13 36:19 37:12,14 37:16 38:8 39:8 40:2 64:22 65:1,25 66:2 69:3,9 76:5 110:7,18 111:2 112:1,11 113:10
**binders** 33:15
**bit** 29:4
**blanked** 97:20
**blanking** 12:14
**block** 86:12
**blow** 61:3
**Board** 15:22
**body** 94:17,21
**bother** 54:21
**bottom** 23:7 31:14 40:10 91:16 98:17 99:25 111:20
**Brady** 18:11 19:15 60:5,12 60:23 61:11 75:11 108:20
**break** 9:16,17 9:21 84:21,23 85:1,6,7
**breaks** 9:3
**briefly** 4:10
**Brignola** 14:4
**bring** 95:15 99:1
**BROAD** 1:23
**brother** 86:19 93:24 94:25
**brothers** 86:11 104:24 106:4 107:25
**brothers'** 89:7 94:9
**brought** 49:25 51:1 94:12 99:1
**Brown** 12:17
**Building** 2:3

C

**C** 111:13,14,17
**calendar** 24:7
**call** 10:23 26:3 29:16 34:19 117:11
**called** 4:2 23:1 32:10,15 35:6 70:23
**Camacho** 86:11 87:7 89:7 94:9 94:25 102:11 104:24 106:3 107:25 116:8
**Camachos** 102:17,20
**camera** 6:22,25 7:2
**captioned** 98:24
**career** 7:21 8:15 9:9 35:10 56:23 59:2 80:2,24 93:7 96:5
**Carlos** 102:7 106:2 111:7,11 112:15 115:2
**Carlton** 2:18 7:10 48:7
**case** 5:15,18,24 9:11,12 11:11 18:21,24,25 19:13 22:8,11 23:10,19 24:17 24:17 25:14 26:5,15 27:13 28:3 31:4,9 33:3 34:12,21 36:7 38:10 39:13,17 41:5 41:20,22 42:5 43:7,19 45:7 46:9 48:19 51:21,21,24 52:1,4,9,20,23 53:2,3,6,15 54:9 55:1,3 56:1,2,6,16,24 56:25 57:1,4 57:24 59:17,19 59:25 60:1 61:3,21 62:4

63:2,3 64:15 66:5,8,12,24 67:4,7,10,11 67:21,23,25 68:2,17,19,20 68:22 69:4,10 70:25 71:4,7,9 71:19 72:6 74:11 77:9 80:14,19,22,23 81:2,7,20,22 83:22,22 84:10 84:20 86:7,10 87:10 88:12,12 90:6,11,17 96:14 102:21 103:8 104:4,10 104:12,16 105:3,9,16,21 106:5,11 107:6 107:15 111:3 112:8 113:10 116:21
**caseload** 24:12
**cases** 4:16,17 5:4 5:6,8,9,13,16 5:20 6:12 9:2 9:10 11:16,20 12:1 14:25 15:5,10,10,12 21:13 24:9 29:4 56:17 58:5 69:1 76:22 77:4,16 80:23
**Cast** 2:3
**categories** 33:16
**cause** 5:10 43:10 46:13 48:22 49:19 70:16 87:14 114:3,21 119:8,12
**caused** 4:24 47:15
**Causland** 51:21
**Cellphone** 69:17
**Cerone** 2:7 6:20 6:24 7:7,10,13 19:19 20:11,20 30:19 44:2 47:24 51:18 52:16 53:8,21 54:22 55:14,24 57:3 58:9,23 59:23 61:9,19 62:18 63:7,19 63:23 64:3,16 66:1 69:13,16 72:21 73:1,24 74:8 75:24 76:17,25 77:6 78:3,12,20 79:3,14 81:16 82:10,19 83:2 83:11,19 84:4 95:7 96:25 103:1,14,25 104:14 105:1 110:3 112:4 113:8 115:6 117:13,24 118:7,8,10
**certain** 24:16 37:10,18 71:9 80:18 99:5
**certainly** 37:15 55:2 58:22 60:11 106:21
**certification** 119:20
**certify** 119:4,7 119:11
**certifying** 119:22
**cetera** 39:19 89:13
**chance** 6:5 69:14
**change** 35:13,15
**changed** 35:18
**characterizati...** 44:22
**charge** 21:16 22:10
**charged** 107:25
**charges** 22:18 25:18 59:12
**charging** 5:7 23:9 34:5,18 43:6 46:8 64:13 65:7 66:10 67:1,22 68:18 73:22 76:7 89:12
**Charles** 12:17
**chief** 15:12,18 15:21,21 16:16 16:21,21,25,25 17:2,3,5,10 18:1 23:21 24:1
**chiefing** 80:24
**chiefs** 25:23
**Christie** 1:13 3:3 4:2,8 7:1,17 14:19 39:4 47:16 54:1,17 56:10 58:4 72:3 78:8 85:5 89:12 117:16 118:4 119:6
**Cimino** 13:19 44:20 45:4,6,9 45:10,25 48:19 66:10
**circumstance** 47:18 55:10
**circumstances** 47:11,14 52:19 53:1 54:9 55:4 56:2,15 57:23 81:7,21 83:22 104:4
**city** 1:5,10 2:6,9 4:20 6:1 7:6,8 38:19 39:14 53:20 69:15
**civil** 2:6 71:4
**cjohnson@arc...** 2:20
**claim** 5:2
**clarification** 7:5
**clarify** 73:18
**CLARK** 2:11
**clear** 9:3 36:24 60:5 82:1 88:11
**client** 42:25 44:11 77:17,21 80:17 87:5 106:9 107:23
**clients** 5:11
**close** 60:9,19
**cold** 29:5 42:20 86:21
**colleagues** 11:11
**collection** 38:19
**collections** 32:18
**come** 5:15 9:15 11:11 16:6,15 17:19 18:21 22:11 23:6 25:17 28:18 47:15 48:1 54:16 57:10 60:16 68:25 96:20
**comes** 26:4,4 79:24 80:4 107:5 115:22
**comfort** 85:5
**coming** 23:13
**comment** 38:13 78:17
**Commerce** 2:12
**commission** 119:24
**commissioner** 47:1
**commit** 5:2
**Commonwealth** 15:23 57:8 119:1,3
**communicated** 103:22
**communicates** 95:3
**compilations** 32:9
**compiled** 33:12
**complaints** 37:17
**complete** 119:8
**completed** 21:24
**completeness** 13:6
**complied** 19:15 43:16 45:22 49:7 69:24 87:20 89:2 94:4 102:2 110:23 111:8
**comply** 60:12
**comport** 44:11
**comprised** 111:18
**con** 56:5
**concept** 59:8
**concern** 55:22
**concerned** 31:25
**concerning** 31:9 103:19 104:17 109:23
**concerns** 20:8 45:12 54:5,20 55:11 57:19 84:11,12 101:24
**conclude** 6:14
**concluded** 118:12
**conclusion** 25:16 109:20 114:11
**conducting** 90:13
**conferred** 25:3
**confessed** 42:25 43:25 51:2 54:18

**confessing** 52:11
**confession** 52:13
**confirm** 5:3 14:18 16:17 26:14 35:20 40:10 44:19 81:11 85:13 90:5 99:23 118:2
**confirmation** 53:16
**confirmed** 50:24
**confirming** 81:25
**confused** 115:18
**connection** 50:9
**connotes** 99:5
**conscientious** 18:3
**consider** 10:24
**consideration** 114:24
**consult** 6:5
**contact** 12:24
**contacted** 30:14
**contain** 66:3
**contained** 64:21 110:6 112:10
**context** 52:19 53:1 54:9 55:3 56:15 61:21 70:6,8 76:19 79:12 80:19 81:6,19 83:10 83:18,21,25 84:3,9,10 92:10 93:14 103:5 104:4 107:20
**contextually** 81:21
**continue** 53:25
**continues** 46:7 94:23
**contradicts** 30:18
**control** 119:21
**convenience** 5:18
**conversation** 65:8,13,13,21 65:22 70:9 76:6 95:14
**convicted** 4:25
**conviction** 18:16 57:11 109:15
**copy** 38:22 118:9
**correct** 6:3 8:15 8:16,21 10:6 14:21,22 17:6 17:8 19:14 20:19 21:10,18 21:19,22,23,25 22:4,11,12,18 22:19,22 23:10 23:11,17 25:18 26:23,24 27:9 28:15,16 29:2 29:18 30:3,7 31:7,12,16,17 31:20 33:8 34:6,21,22 35:1,21,22 40:14 41:9 46:1,24 47:22 48:4 59:4,14 59:22 60:6,7 60:10,22 61:8 61:17 65:3,5 65:10 66:11,13 66:15,21 67:2 68:11 69:6,7 70:4 74:21 76:7,10 81:15 82:8,17 83:9 85:18,19,23,24 86:3,4 88:9,18 89:23 90:6 93:15,20 94:25 95:5 101:16 103:12 110:10 112:24 114:23 115:5 117:6 119:10
**correctly** 32:23
**counsel** 5:25 6:6 6:16,21 7:7 8:10 10:4,12 11:2,7 14:20 15:17,18,21,22 18:8 33:13 36:1,9,15 38:14,17 40:16 41:2,17 43:9 43:17 45:23 47:5 49:13 51:10,25 52:18 53:20 58:20 59:5,6,9,22 62:5,6,6,7 63:2 63:13 64:5 66:12,21,21 67:6 74:15,22 77:16,20 78:2 78:4,23 79:24 80:21 83:4 84:5,14 90:7 97:3 100:8 101:4 104:8 105:2 107:4 108:19,23 109:19 111:10 112:5 119:11
**counsel's** 109:10
**County** 119:2,4
**couple** 15:9 17:14 39:5 72:4
**course** 5:19 21:15 30:20 34:12 37:21 40:25 56:23 59:2 66:21 74:18 79:21 80:1,8 85:6 93:6 96:4
**court** 1:1,22 84:22 118:8 119:3,18
**courtrooms** 24:7
**cover** 38:8
**coverage** 117:13
**created** 101:12
**creating** 67:17
**creator** 67:16
**credibility** 54:5 54:21 55:11,22 57:20 58:8 114:4 115:10 116:2
**crediting** 114:12
**crime** 42:25 51:3 52:11 54:18
**Criminal** 37:17
**Crosland** 1:7 4:18 5:1 6:12 9:11 40:22 41:5,20 42:25 43:12,23,24 46:8,14 48:19 48:21 50:4 51:2,15,23,24 59:12,17,19 66:8,24 69:4,9 70:14 71:4,10 71:13 72:23 73:23 85:14 90:11
**Crosland's** 43:11 62:5 63:3 74:19
**cross-examine** 58:21
**culprit** 44:10
**Cumberland** 119:2,4
**Curtis** 1:7 4:18 42:25 50:4 51:2 69:4 73:23

**D**

**D** 3:1 50:8
**D-e-s-c-h-e-r** 12:15
**DA** 67:24 84:13
**DA's** 9:9 12:22 13:12 15:9 16:6 32:1 33:7 33:9 34:24 35:10,17,19,21 38:2,9 39:7 40:6 47:2 65:4 112:3
**Dan** 7:7 117:11 117:21
**Daniel** 2:7
**daniel.cerone...** 2:8
**DAs** 24:9
**date** 1:15 44:23 62:4 97:4,19 98:25 99:13
**dated** 45:18 97:10,14 98:4 98:15,25
**David** 17:16
**day** 45:1 119:15
**day-to-day** 24:1
**days** 101:12,23
**deal** 15:2 99:9 110:20
**dealt** 34:3 110:21
**deceased** 13:8 62:6 108:24
**decedents** 102:10
**December** 42:9 44:21 45:1,19
**deception** 50:11 51:4 59:20
**deceptive** 61:16
**deceptively** 50:16
**decided** 5:18,19
**deciding** 23:9
**decision** 20:22 21:16 22:10,17

24:25 25:7 28:13 34:5,19 43:6 64:13 68:18 75:12
**defaulted** 61:6
**defendant** 4:23 5:4 18:4 21:16 103:8,9 107:6
**defendant's** 18:15
**Defendants** 1:6 1:11 2:9,14 12:6
**defense** 6:11,17 6:21 18:8 19:14 34:25 58:20,25 59:5 59:6,9,22 60:22 61:7,17 63:2,12 66:21 74:20 75:14,21 76:16 77:16,20 78:1,2 81:14 82:6,15,23 107:8,18 108:4 108:19 109:25 110:10,19
**defer** 68:10
**define** 67:17
**defined** 21:1
**definitely** 68:25
**degree** 93:4
**DeJesus** 88:7,15 113:17,20 114:21 115:5 115:13,22 116:6,8,9,11
**DeJesus'** 114:5 115:10 116:2
**delegate** 25:20 25:25
**delegated** 25:22 26:16
**department** 32:11 33:22 35:14,25 36:4 40:13 112:2
**department's** 4:22 28:18 92:12
**departure** 90:1
**depended** 20:17 27:13
**depending** 23:15 30:2,5 31:18
**depends** 98:12
**Deponent** 2:22
**deposition** 1:13 4:16 5:5,12,14 5:20 6:3 7:18 7:23 8:6,8 10:2 11:7 13:16 35:5 38:23 39:24 53:15,19 53:23 62:24 72:5 73:14 75:19 78:9 80:8 118:12 119:4
**DeRose** 2:11 6:17,20,21,25 7:1 117:18
**Descher** 12:14 12:15
**described** 34:18 88:5 89:21 96:15
**describes** 88:25 102:6
**description** 44:9 44:10 114:2
**descriptive** 44:9
**details** 27:18 41:22,25 42:11 42:12,16
**detective** 12:9 25:4 26:6 28:12,19,21,23 29:17 30:2,13 30:17,22 31:21 31:22 39:4,23 39:23 44:20 45:4,6,10,25 47:4,18 48:19 50:21,22,24 54:16 55:10 65:9,23 66:4 66:10 70:10 72:14 73:14 88:18,22 89:6 92:23 93:19
**detectives** 4:21 4:23 5:9 12:6,8 12:9,25 13:7 25:15 29:25 30:9 31:15,18 32:8 33:6,20 34:1 39:5 46:16,20 47:15 50:20 53:16 54:4,13 71:5 84:12 88:13 89:21 90:2 93:8,10 101:1 101:14,24 104:12 108:11
**determine** 26:8
**determined** 25:6 29:21
**developed** 42:18 86:18
**devoid** 57:22
**Deyne** 14:8,8
**DI** 50:9,18 53:11
**DI-Police** 50:8
**dialogue** 27:16
**Diaz** 102:7,9,15 102:18 106:2 111:7,11 112:15 115:3
**dictates** 61:11
**died** 13:9,13
**different** 4:16 13:16 25:10 29:3 31:24 32:6,9 33:15 38:20,21 40:23 115:16
**difficult** 96:20 97:5
**direct** 43:22 109:13 119:21
**direction** 13:17 119:9
**disagree** 41:14 41:15 63:21 64:1,6,10 75:22
**disapproval** 66:6
**disclose** 23:1,3 75:13 78:1 82:6 107:8,18
**disclosed** 25:6 61:25 74:20 75:21 76:15
**discovery** 18:16 34:15 88:12 110:12,20,22 110:23,23
**discrediting** 114:12
**discuss** 4:16 68:5
**discussed** 22:16 30:2 48:18 83:16 89:23
**discussing** 29:25 104:16 116:15
**discussion** 28:12 31:19 34:18 40:6,9 48:11 68:23,24,25 69:19 94:8 117:25
**discussions** 29:25
**dispense** 7:22
**distinction** 22:9 32:18
**District** 1:1,1 60:14
**dividing** 21:1
**division** 4:22 16:16 17:6 21:21 23:22 28:18 29:8 33:21 35:17,25 67:21
**document** 36:8 36:11,20,21 44:24 45:16 48:8 49:3,11 49:16,17,23 51:9,10 53:11 66:14,16 67:11 67:16,18,19 69:8,22,25 70:2,6 73:9 87:13,22 89:15 90:4,20 91:4 91:18 92:25 93:14,22 95:1 95:3,8,9,18 96:2 97:10,14 97:25 98:4,13 98:14,17,23 99:19 100:1,6 100:7,10,12,15 100:18 101:22 102:12,13,15 102:18 107:23 111:16 113:2
**documents** 5:6 10:3,5,8 14:19 14:24 18:15 27:3,5 33:11 35:4,6,7 36:22 36:25 37:10,17 37:21 39:6 42:3,11,13 43:5 49:12 50:25 64:21 66:23 86:6 87:19 90:2 94:1 97:3,23 101:16,21 113:5,11 117:7
**doer** 92:21,22,23 93:2,11,18

105:6
**doing** 23:13 47:20 72:3
**Dominick** 50:22
**Don** 18:23
**doubts** 58:7
**dozen** 24:8
**drag** 94:21
**drags** 94:17
**draw** 109:20
**Drive** 1:18
**due** 80:16
**duly** 4:3 119:8

**E**

**E** 3:1
**e-n-v-o-l-v-e-d** 91:7
**E-r-i-k-a** 100:2
**earlier** 111:1 113:23 115:17
**early** 41:6 42:18 70:2 92:6 115:20
**East** 1:18
**EASTERN** 1:1
**Edward** 12:9 14:6
**efficient** 47:22
**effort** 18:7
**eight** 101:12,23
**either** 5:4 25:5 25:19 27:2 57:18 85:11 111:21,23 117:19
**email** 38:22
**employed** 15:24 15:25 119:12
**encounter** 98:10 98:12 100:20
**entire** 8:14 80:13 83:13 113:10
**entirety** 83:14 114:8
**entry** 103:19
**envolved** 91:6 91:11,13,19,20 91:22 92:8
**equation** 54:15
**Erika** 99:22 100:2,17 105:19
**err** 60:21
**Esquire** 2:2,7,11 2:18,18
**established** 76:5
**Estate** 2:14,15 2:16,16
**estimate** 27:22 27:23
**et** 1:5,10 2:10 39:18 89:13
**event** 20:17 49:2 67:7 105:3,9 105:16,19,21 106:6
**eventual** 102:23
**eventually** 23:10
**Everett** 42:24 43:24 49:20,25 50:15,25 51:16 53:6,17 61:14 70:12,13,23 71:6,14,17,21 71:21 72:16,23 72:24 73:3,12 73:18 85:17,21
**Everett's** 62:8
**everybody** 9:16
**evidence** 25:5 27:7,11 43:22 43:23 44:7,17 46:21 60:19 61:3,7,13 62:4 72:11 74:3 76:23 82:6 84:13 89:23 102:24 103:8 103:12,22 104:10 106:2
**exactly** 37:18 97:15 99:23 111:17
**exam** 78:18
**EXAMINATI...** 4:5
**EXAMINED** 3:2
**example** 30:13
**exception** 9:19 13:15
**exculpatory** 18:12 19:13,17 30:10 31:3,11 60:9,20,21 106:9
**exhibit** 36:16 38:22 39:12 43:12 45:17,18 49:4 69:10 87:15 88:25 89:3 90:21 92:10,14 94:1 95:20 97:8,18 97:21 102:1 107:22 111:3
**exhibits** 36:14
**existed** 30:10
**expect** 19:16 31:6,8 47:18 52:13,24 53:5 54:4,12 58:20 59:5,9 67:10 73:21 74:5 108:11 113:1
**expected** 20:2,4 112:23
**expecting** 23:18 31:15,21 58:16
**experience** 68:10 106:21
**experiencing** 16:2
**expires** 119:24
**explain** 32:5
**explanation** 27:7
**explanatory** 30:24
**eyewitness** 94:9 94:12,15 99:16 99:21 100:11 100:17 105:13 105:19

**F**

**fact** 11:12 18:14 23:6 38:19 53:16 64:24 67:2 94:15 95:14 97:7
**factor** 29:20,23
**facts** 31:19
**faded** 98:14
**failed** 51:3,17 52:12 53:6,12 53:13,17 61:25 62:9,25 82:7 85:18
**failing** 81:14
**fair** 18:3 20:25 22:9 68:14 73:7
**faith** 20:5 30:3
**falsely** 4:24
**familial** 75:3 114:6,13,20 115:16,16
**familiar** 23:2 29:9,13 32:22
**far** 43:2 48:18 86:23
**fast-forward** 100:22
**fastener** 33:11
**February** 86:12 86:17 87:1 98:7
**Feinberg** 2:2,2 3:3 4:7,14 7:7 7:14,16 10:15 11:5 19:21 20:12,24 31:2 36:15,17 37:1 37:3,6 38:17 38:25 39:2 44:5,25 45:3 47:25 48:10,12 51:22 52:22 53:14,22,24 54:3 55:5,17 56:9 57:6,15 58:12,24 60:3 61:12,23 62:22 63:9,20,24 64:11,23 65:16 66:7 67:8,14 69:15,20 71:23 72:1,22 73:6 74:2,12 76:3 76:11,21 77:2 77:10 78:7,14 78:24 79:5,15 80:5 81:23 82:3,4,13,21 83:5,15 84:1,6 84:19,24 85:2 85:4 92:15,17 95:10 97:6,11 97:15,17 103:6 103:20 104:5 104:19 105:4 109:5,6 110:8 112:12 113:13 115:8 117:10 117:20 118:1
**felony** 15:10
**file** 32:10 33:20 33:21 38:21 90:22 92:12 95:19 109:10 113:10
**filed** 4:19
**files** 17:17
**fill** 27:18 41:3
**final** 85:13
**financial** 106:16
**financially** 75:2

**find** 99:22 102:24 107:16 108:7
**findings** 22:14 23:14
**fine** 84:24
**finish** 44:16 47:13 53:4 63:25
**finished** 45:21 49:8 69:12,23 87:19,21,23 94:5 102:3
**finishing** 24:16 24:17
**first** 4:14 9:7 11:17 12:9,14 13:19 16:11 17:1 41:8 42:5 43:8 45:24 47:19 49:18 50:2 55:19 70:8 72:23 87:15 88:4,5 88:17,17 90:14 90:19,20 98:13 102:6 108:23
**fits** 86:20
**five** 29:9 102:19
**flesh** 103:18
**fleshed** 103:17
**flip** 111:5
**Floor** 2:7
**focus** 24:24
**follow** 50:5
**follow-up** 43:15 115:3,9 117:15 117:18
**followed** 43:1,3
**following** 50:7
**follows** 4:3
**foregoing** 119:4 119:10,12,20
**forensic** 33:17
**forget** 95:21 102:21
**form** 19:25 38:6
**formal** 73:16 95:12 96:18
**format** 33:12
**former** 11:9,10
**forms** 38:7 95:22
**forth** 119:5
**forthcoming** 18:7
**forward** 15:3 42:17 107:5 114:19 115:22
**found** 23:16 50:15 51:3 61:15,15 65:10 92:11
**four** 16:18 80:25 87:2,17 102:19
**frame** 13:1 24:2 45:6
**Francis** 2:16 14:16
**Frank** 70:24 71:18 72:17,24
**frankly** 17:14 37:10 40:17 49:13 57:4
**Fredrick** 2:15
**free-flowing** 28:12
**frequently** 93:8
**friendship** 75:3
**front** 8:19 79:17 108:1
**front-line** 21:17
**Fuentes** 87:4 88:4,15
**full** 16:2,4 20:9 59:25 61:21 74:10 76:5 80:19 83:18,21 119:10
**fully** 18:7 20:14
**further** 75:16 100:2 103:18 112:18,22 113:2,6 114:22 114:25 116:5 118:3 119:7,11

**G**

**G** 39:15
**gathered** 32:13
**general** 9:24 15:17 17:23 55:19 64:12 66:3 89:16
**generality** 47:6
**generally** 60:19 103:7 109:22
**generated** 97:24
**gentleman** 6:18
**getting** 23:8 115:17
**Gibbons** 12:19
**Gibby** 91:6,17 92:5 104:23
**girlfriend** 70:12
**give** 4:11 7:19 8:24 19:14 25:14 41:25 46:21 48:9 61:7,16 72:10 108:3
**given** 7:21 11:12 39:6 83:7 101:10 119:8
**gives** 55:20
**giving** 20:9 65:9 73:9 82:16 104:9 106:17
**go** 9:17 13:16 15:2 26:14 28:14 46:23 48:3 57:9 84:24 85:2 97:23 107:24 110:25 118:1
**goes** 26:5
**going** 7:15,21 9:1,2 10:25 13:9 23:24 31:23 38:15 41:25 48:1,14 57:10 58:17 59:18 63:1 69:2,4,5 70:5 78:25 83:24 84:19,21 90:10 90:14 95:15 97:16 98:1 101:9,11 102:19,23 103:10,11 110:16,25
**good** 4:8,9 7:12 7:13 20:5 30:3 56:25 59:1
**government** 8:14
**Governor** 15:16
**Governor's** 15:17
**governors** 15:20
**graduation** 15:7
**granted** 112:20
**gratuitous** 78:17
**great** 118:10
**GREINER** 2:17
**grocery** 42:7
**grudge** 106:24
**gubernatorial** 15:16
**guess** 10:21 24:4 26:17 57:13
**guessing** 70:1
**guidance** 39:6
**guilty** 24:11
**guns** 91:7
**gunshots** 94:20
**guy** 103:11

**H**

**H** 2:2
**H-e-o** 42:7
**half** 117:22
**halfway** 50:1 94:18
**hand** 36:19 38:15 56:1 84:13 97:7 119:15
**handed** 107:23
**handle** 67:25
**handling** 68:21
**hands** 61:14 68:20
**handwritten** 32:14 90:21,25 91:17
**Hansen** 2:15
**happen** 57:17
**happened** 18:17 19:10 73:15 109:14
**happening** 77:3 77:7,12
**happens** 86:25
**happy** 42:4 72:8
**Hark** 2:14
**harm** 102:17
**Harrisburg** 1:19
**hear** 27:15,19 32:23 52:14 73:21 74:5 97:2 109:18
**heard** 40:2,4 74:13,17 102:18
**hearing** 36:2
**hears** 94:16,20
**heavily** 50:21
**Hector** 86:11 87:6 102:10
**held** 5:7 33:21 40:1 48:11 69:19 117:25
**help** 36:12 43:6
**Heo** 42:6 46:9 70:10,25 71:7 71:9,10,14,19 73:23 86:3
**Herbert** 12:19

**hereinbefore** 119:5
**hereunto** 119:14
**Hi** 7:1
**hide** 61:3
**highly** 102:25
**HILL** 2:11
**history** 15:6
**hoc** 29:22
**homicide** 4:22 12:5,25 15:11 15:13 16:7,16 17:5,5,10 21:16,21 23:1 23:22 24:1,6 25:15 26:11,15 28:3,18 29:7 29:17 32:3,10 32:16,21,24 33:1,3,15,20 33:21 34:1,3,4 34:12,23 35:16 35:25 38:8,9 39:7,17,18 40:2 41:5,13 56:17 64:21 65:1,25 66:2 67:21 69:3,9 76:5 90:22 92:12,23 93:7 93:8,10 95:19 98:25 110:7,18 111:2,25 112:7 112:8 113:10
**homicides** 21:9 80:25
**hour** 11:4
**Hughes** 14:6,6
**Humor** 84:7
**hundreds** 56:19 77:4 96:3
**hypothetical** 25:15 52:8,17 54:7 55:8 62:2 74:14,16 78:19 79:1,12,23 80:1,7 81:4 83:17 104:6,8
**hypotheticals** 81:11

**I**

**I-l** 42:6
**idea** 33:25
**identified** 13:7 70:15 96:16 99:17 113:24 114:18 115:19
**identifies** 100:13
**identify** 38:18 47:10
**identifying** 36:24 107:22
**Il** 42:6 46:9 73:23
**important** 31:19 87:16
**incarcerated** 4:25
**incentives** 106:16
**include** 40:1 56:14 67:18 111:15
**included** 10:6 30:23,24
**including** 33:16 86:18 112:14
**incomplete** 85:8 85:12
**inconsistencies** 58:21 59:2
**inconsistency** 72:16 73:19
**inconsistent** 55:20 58:19 71:6 74:4 82:17 85:22
**incorrect** 72:12 72:13 85:8,12
**incriminatory** 30:25,25
**inculpatory** 31:11 43:23 44:4,6,17
**independent** 49:1 66:18
**independently** 42:15
**index** 37:11,12 37:13 39:18 111:2,13,16,18 111:22,25
**indexes** 39:7
**indicate** 101:21
**indicated** 50:12 51:4 59:21 115:16
**indication** 89:25 90:4 113:12
**individual** 104:17,18 106:25 107:1
**individuals** 107:2
**informant** 94:12
**informant/eye...** 94:14
**information** 16:7 18:12,17 19:13,17 20:3 20:9 22:21 26:20 27:1 30:6,10,18,23 30:23 31:4,9 31:10,11,12,13 31:22,25 32:9 32:12,19 33:16 34:25 51:20 52:20 56:6 59:20 60:8 61:22,25 62:8 62:16,16,25 63:13,15 64:14 64:19 65:14,24 66:4 69:5,6 73:10 74:1,10 74:17,18,20 75:13,16,21 76:13,15 77:24 77:25 80:14 81:13,20 82:15 82:23,24 86:1 86:13 90:11,14 99:15 100:10 101:18 102:9 103:5 104:3,12 104:17 106:8 107:3,7,9,17 109:11,21,22 110:5,18 112:2 112:13,14,15 113:5,15 114:3 114:9,19 116:15,17,24 117:5
**information-w...** 30:22
**instance** 75:18
**instances** 20:13 20:16 47:7
**instructions** 7:19
**integrity** 45:12
**intention** 25:12
**interaction** 66:19
**interactions** 20:5 45:5
**interested** 116:5 119:13
**interruption** 69:17
**interview** 21:12 73:16,17 95:12 95:25 96:18 98:1,18,24,25 99:4,5 102:6
**interviewing** 21:9,12,20
**interviews** 111:16
**intimidation** 75:1 106:16
**introduce** 103:12
**introducing** 93:24
**introduction** 4:12
**investigated** 86:2 107:10,12 107:13 108:7
**investigating** 21:9 25:3 28:19,21 101:1 107:14
**investigation** 20:18 21:18,21 21:25 23:9,13 23:15 25:7 29:1 30:7 32:13 41:1 42:19,22 50:21 68:3 70:11 86:20 87:1 90:13 92:6,13 93:23 95:25 98:24 103:16 103:19 112:19 112:23,24 113:2,6 114:22 114:25 115:20 116:5,20 117:6
**investigations** 13:8 16:8 29:5 29:7 45:13
**investigative** 22:3,5,14 23:14 32:14 42:21 108:11 108:17,19
**invoked** 108:20
**involve** 5:17 68:6
**involved** 13:8 21:17 42:5 50:21 64:13 67:9 68:1,18 70:10 75:1

78:19 80:20 91:6,12,18 104:23
**involvement** 5:13 25:1 66:9 67:3,22 103:23
**Iron** 2:3
**isolated** 55:25
**issued** 48:23 88:20
**issues** 5:17
**items** 37:20

J

**jail** 106:23
**James** 2:15 12:12
**January** 42:20
**jderose@clar...** 2:13
**jfeinberg@krl...** 2:4
**job** 17:24 57:5 92:20 105:7
**Joel** 11:25 41:8 41:10
**John** 2:11,16 30:15 45:9 108:24
**Johnson** 2:18 7:4,9,12 10:14 11:3 36:23 37:2,5 38:24 44:23 48:9 52:15 53:10,20 54:23 57:2,12 62:19 64:4,17 65:11 67:5,12 71:20,25 73:2 74:7 75:25 76:9 78:11,21 80:3 81:17 82:2,9,18 83:1 83:10,13 84:22 92:14,16 97:1 97:9,13 103:2 104:2 109:4 118:6
**Jon** 4:14 69:13
**Jonathan** 2:2
**Jose** 88:6 113:17 113:20 114:21 115:4
**jotted** 92:2
**judge** 8:19 11:17 31:1 68:9 79:17,22
**jump** 114:11
**jury** 8:19 57:7,9 57:14,18 59:3 68:9 77:17
**juxtapose** 97:3

K

**K** 119:3,17
**KAIRYS** 2:2
**KAPLAN** 1:22
**Karen** 2:16
**keep** 7:14 28:7 48:13 53:12 84:21
**kept** 32:10
**key** 64:24 70:14 74:4 81:14 82:6,16 85:21
**kill** 102:20,23 103:10
**killed** 87:6
**killings** 100:4
**kind** 16:22 78:16 86:20
**know** 19:2 26:13 29:16 36:9 41:8 42:4 44:8 45:21 50:9 56:1,3,5,12,24 69:12,23 74:22 74:25,25 75:4 75:7 78:8 80:16 87:19 91:18,21 93:18 101:13 106:10 106:11,13,14 107:20 109:1 111:14 112:5,8 112:21 113:9 117:11
**knowledge** 55:2 55:3
**known** 76:24 87:5

L

**L** 1:13 2:18 3:3 4:2 119:6
**lack** 102:16
**Lanzelotti** 14:2
**late** 70:2 96:19
**law** 15:7,8 78:10 78:25
**lawsuits** 4:19,23
**lawyer** 108:4
**lawyers** 58:25 68:11
**lay** 7:17
**lead** 28:25
**leadership** 16:22
**leading** 34:8 51:11 92:3
**LEAMAN** 1:22
**learn** 85:25
**learned** 20:14,18 74:18 76:23
**learning** 85:17 85:21
**leave** 12:21
**led** 16:22 43:10
**left** 13:2,12 15:15 16:5 35:21 41:5 83:13
**legal** 60:25 79:12 80:2
**length** 81:24
**let's** 7:14 9:23 15:4 26:3 41:19 59:10,18 60:16 81:11 84:24 85:2 86:5 92:9 100:9,20,22 107:21 118:1
**life** 24:1 47:22
**light** 73:15 115:11,12 116:1
**limit** 5:14
**LIN** 2:2
**Linda** 2:15
**line** 17:4 23:7 31:14 40:10 60:9,20 89:11 91:16 111:20
**list** 13:10 100:9
**listed** 39:14 94:11
**listen** 26:7 30:21
**listened** 20:21 25:4
**literally** 32:12
**LITIGATION** 1:22
**little** 29:4
**LLP** 2:2
**Logan** 2:19
**long** 7:21 9:15 11:1 95:14
**longer** 94:2
**look** 36:25 39:11 49:6 50:1 70:18 91:4 95:22 101:25
**looked** 36:7,8,22 37:14 42:11 46:12 49:11,12 49:13 97:19 101:18 116:13
**looking** 6:24 35:7,8 36:16 69:5
**looks** 37:7,9
**lose** 57:1
**lot** 32:5,6 72:4 80:23 81:1
**Louise** 70:11 73:8,9,16
**Luis** 86:11 87:7 102:10

M

**M-a-n** 42:6
**ma'am** 36:19 69:21 87:22
**Madison's** 44:9
**majority** 27:6
**making** 20:22 62:11 77:16 91:25 96:22 99:8
**man** 42:6,6,23 46:9 73:23 108:23
**Mangoni** 50:22 50:22,24
**Manuel** 86:19 93:24,25 94:24 96:17 99:18 100:14 101:20 105:23 108:2 116:18
**March** 101:2,15
**Maria** 96:8,10 99:16 100:11 100:13,16 105:13 107:22 109:23 111:7 111:11 112:14 115:2
**marked** 36:14 39:1 43:11 45:18 49:4 69:10 87:14 90:21
**Market** 2:12
**Martinez** 87:6
**Marzzacco** 1:17
**material** 26:8 27:6
**materials** 22:3,5
**matter** 30:20

40:24 45:7 47:3 55:20 64:12 119:13
**McNesby** 12:12
**mean** 12:8 21:4 89:14,15,17 93:3 106:18 109:22
**meaning** 92:20
**means** 7:20 50:9 50:11 91:22 92:24 93:4 119:21
**meeting** 10:12 10:23,24 34:19 45:25 46:4 48:21 88:25 89:6,9 90:6 100:25 101:3 101:23 104:15
**meetings** 5:6
**memory** 16:19 81:3,8
**men** 4:19
**mention** 87:25
**mentioned** 10:12 24:23 26:19 72:15 88:6 113:17
**merely** 81:3
**merits** 68:1
**message** 92:11 92:19
**messages** 32:13
**MESSING** 2:2
**met** 4:10 101:14
**Michael** 42:18
**mid-1990s** 35:14 35:18
**Miguel** 14:8
**Miller** 14:16,16
**mind** 17:20 18:24 75:20 79:24 80:4
**mine** 60:12
**minimum** 108:10
**Minott** 2:18
**minute** 117:22
**minutes** 9:17 106:9 117:14 117:21
**misconduct** 19:7
**misdemeanor** 15:10
**mislead** 31:15
**misspelling** 91:11 92:3
**moment** 16:14 23:7 32:5 43:13 45:20 46:11,12 49:6 59:10 69:11 87:18 89:1 94:2
**months** 11:15,19 12:1
**morning** 4:8,9
**motion** 79:18
**motions** 109:1
**motivated** 75:2 75:4
**motive** 102:17 106:3
**Moving** 42:17
**multiple** 32:7 103:9
**murder** 42:5 43:25 46:8 70:11 73:23 86:3,10 89:7 91:1 92:1,20 94:10 98:7 103:8,10,24 104:13,23 105:24
**murdering** 71:11,13 107:25
**murders** 5:2

N

**N** 3:1
**name** 4:14 5:15 11:13 12:15 17:16 18:23 19:4 42:18 66:22,25 67:11 99:22 111:23 113:17
**named** 12:6 42:6 42:23 86:18 87:4 90:15 93:24 108:24
**names** 4:18 11:11 13:10 17:22 29:9 54:15 88:1,4,9 92:5,7 111:9 111:25
**narrow** 54:13
**narrower** 65:23
**nature** 65:21
**necessarily** 46:18 65:12 67:13
**necessary** 99:9
**Ned** 2:14
**need** 6:8 9:18 42:2 68:23,24 74:22,25,25 75:7 84:2,8,9 84:10,20 107:3 107:20
**needed** 65:14
**needs** 9:16 84:22
**neither** 21:6
**Nespoli** 13:21
**neutral** 72:11
**never** 17:3 35:17 40:4 57:10,13 57:18 62:8 63:13 77:13 92:22 109:14 112:2
**new** 18:16
**Niven** 1:17
**Normal** 5:14
**Normally** 28:21
**North** 86:12
**Notary** 119:3,17
**note** 8:17 100:20
**noted** 53:24 82:3 93:25
**notes** 32:14 90:22,25 91:17 91:25 92:2 117:22 119:10
**noting** 19:22
**notorious** 17:12
**number** 11:9 13:6 49:12 56:18 60:24,24 61:2 69:14 83:21 92:14 99:15,17
**numbers** 36:24 38:18

O

**Oakford** 42:8
**oath** 7:20 8:20
**object** 53:21
**objection** 10:14 11:3 19:19,22 19:25 20:11,20 30:19 44:2 47:24 51:18 52:15,16 53:8 53:10,24 54:22 54:23 55:14,24 57:2,3,12 58:9 58:23 59:23 61:9,19 62:18 62:19 63:7,19 63:23 64:3,4 64:16,17 65:11 66:1 67:5,12 72:21 73:1,2 73:24 74:7,8 75:24,25 76:9 76:17,25 77:6 78:3,11,12,20 78:21 79:3,14 80:3 81:16,17 82:3,10,19 83:2,11,19 84:4 95:7 96:25 97:1 103:1,2,14,25 104:2,14 105:1 110:3 112:4 113:8 115:6
**obligation** 60:25 61:10 75:12 108:20
**obligations** 18:11 60:5,12
**obliquely** 87:25
**obtain** 26:22
**obtained** 22:21 46:21 59:19 99:15 109:10
**obtaining** 82:24 89:18
**obvious** 8:18
**obviously** 70:9
**occasion** 16:11 18:18
**occasions** 28:5
**occur** 97:4 98:1 98:18 99:6 100:21
**occurred** 98:6 99:6
**October** 86:21 97:19,24 98:10 98:19,22
**offered** 68:4
**office** 9:9 12:22 13:2,12 15:9 15:15,17 16:6 29:19 32:1 33:7,9 34:24 35:10,17,19,21 38:2,9 39:7 40:7 47:2 60:14 65:4 84:11 112:3
**officer** 19:7

20:14 25:4 50:8
**officers** 39:25 52:8 107:14
**Oh** 7:9 28:5 45:1 71:12 88:19
**okay** 5:24 6:5,11 7:9 8:6,13 9:1 9:14,23 10:8 10:22 11:6,21 12:5,21 13:5 13:19 14:18,23 15:2 16:2,5,14 16:20 17:9,19 17:23 18:14,21 19:6,9,12,16 19:24 21:7 22:20 23:6 24:23 26:3,19 27:4,14,16,22 28:7,10 29:12 29:15,20 30:13 31:3,10,23 32:21,25 33:6 33:14,19 34:2 34:16 35:4,12 36:2,11 37:5 38:4,15 39:11 39:22 40:5,10 40:19,23 41:11 41:16 42:17 43:4,17,18 44:6,13,19 45:4,11,24 46:19 47:2,21 48:6,16 49:3 49:15,24 50:13 50:19 51:13 52:23 54:2 55:18 57:19 58:18,25 59:8 60:16 61:13 62:13 63:10 66:8,17 67:9 68:14 69:2,25 70:5,18 72:13 72:23 74:3 76:4 77:15 79:11,16 80:6 81:11 82:14 83:6 84:15 85:10 86:16 87:12,24 88:11 88:17,24 89:20 90:5,8 91:3,16 91:23 92:9,18 93:2,6,13,22 94:7,23 95:2 95:11,18 96:3 96:7,13 97:7 97:12 98:9 99:10,20 100:9 101:9,18 102:21 105:5 106:7,12 107:11 108:10 108:22 109:20 110:13,25 111:20 112:20 113:14 114:3 114:10,25 115:15,25 116:14 117:4,9
**old** 80:22 83:23
**omitting** 31:19
**once** 10:17 19:11 58:7 76:4 86:7 88:12,12
**ones** 14:20 28:6 59:1
**ongoing** 21:22
**open-ended** 78:5
**opine** 44:11
**opportunity** 65:18
**oral** 79:17,23
**order** 106:22
**original** 50:3,18 119:10
**outcome** 119:13
**outline** 42:3
**outlined** 5:22 39:8 43:2 86:23 96:24 114:1
**outlines** 86:9 87:9
**outreach** 29:17
**owner** 42:7

**P**

**P-25** 49:4
**p.m** 98:19 118:12
**PA** 1:19 2:4,8,13 2:20
**page** 3:2 36:20 39:12 44:25 48:24 64:25 91:4,5 96:7
**pages** 37:23,24 37:25 38:3 43:11,17 66:25 72:5 87:15,16 111:5,6
**paid** 56:3 107:2
**paper** 34:21 39:21 108:1,4
**paragraph** 45:25 50:2 100:1
**paralegal** 110:21
**pardon** 17:11 47:9
**Park** 1:18
**Parole** 15:22
**part** 23:4 24:19 56:7 109:12
**particular** 27:11 29:23 37:23 39:12,23 57:24 75:17 79:10 81:7
**particularly** 37:14
**parties** 119:12
**parts** 9:7
**pass** 68:19 90:24
**passed** 34:25 38:2 88:12
**patience** 117:17
**Patricia** 2:15
**PC** 2:17
**Pedro** 1:2 4:18 87:5 89:13 106:9 107:24
**pending** 5:16 9:20
**Pennsylvania** 1:1,23 15:19 119:1,4
**people** 112:3
**period** 24:22
**perpetrator** 77:18 92:20,24 93:11,20 102:23 104:13 107:7 113:24 114:18 115:20 115:24
**perpetrators** 76:14 82:25 86:2 96:17 99:18 100:14 101:20 108:3
**person** 6:22 10:19 25:5 27:2 29:21 30:11 31:5 52:10 67:17 71:10 94:21
**persona** 10:18
**perspective** 29:15
**pertinent** 110:5
**Philadelphia** 1:5 1:10,23 2:4,6,8 2:9,13,20 4:15 4:20,21 6:2 12:22 32:11 35:25 40:13 42:8
**phone** 10:19,23 25:5 27:2 29:21 32:13 34:19 92:11,18
**photographs** 37:17 64:21
**phrase** 29:13 32:21 91:8 93:11
**picked** 29:6
**piece** 32:12 34:20 41:4 108:1,3
**pieced** 96:14
**place** 1:17 42:9 66:25 86:17 87:3 98:10,25 101:2 103:10 119:5
**placing** 21:13
**PLAINTIFF** 1:3 1:8
**Plaintiffs** 2:5 4:17
**plan** 106:3
**plea** 68:4,24
**pleas** 24:11
**please** 42:4 47:16 49:6 89:1 101:25
**plucked** 81:6 83:25
**point** 6:22 9:15 12:1 13:11 16:5 35:10 38:7 39:3 43:6 87:3
**pointed** 101:19 116:15
**pointing** 116:2 116:17
**police** 4:20,21 5:5 15:19,21 19:6,16 20:2,5 20:9,14,17,21 21:2,24 22:10 22:21,25 23:8

23:12 26:14,19 27:12 28:2,17 31:5 32:11,12 33:16,22 35:14 35:25 36:3 39:25 40:13 42:17,24 50:14 51:16 52:8,14 52:24 53:5 55:21 73:22 76:6,13,24 82:23 86:2,18 87:3 90:12,22 90:24 92:1,12 93:23 95:3 96:15,18 99:14 102:6 104:22 105:6,12,18,18 105:22 106:1 111:16 112:2 112:23 113:1 113:22 116:20
**policies** 84:11
**polygraph** 50:10 51:4,17 52:12 53:6,12,13,17 56:5 59:20 61:16 62:1,9 63:1 81:15 82:7 85:18
**polygraphed** 50:3,15,17 51:1
**popped** 17:16
**populated** 24:6
**portion** 39:12
**portions** 38:21
**position** 15:24 15:25 16:15,18 16:20,23 26:1 61:6
**possible** 99:8
**possibly** 58:5
**post-conviction** 61:4 62:7
**post-sentence** 109:1,12
**post-verdict** 62:6
**potential** 76:14 99:21 109:13
**practice** 5:14 9:16 19:12 33:25 35:14,15 90:1
**practices** 9:9
**predicate** 56:7 56:14
**predict** 57:17,18
**premised** 80:15
**preparation** 23:4
**prepare** 10:1 22:23 46:23 48:3
**prepared** 5:9 33:4 44:20 48:22 96:18 99:14
**preparing** 35:3 47:20 89:18 107:15
**present** 7:6 53:15
**presentation** 46:22
**presented** 33:4 38:6
**presenting** 68:9 107:14
**pretty** 54:13 65:8,12
**previous** 35:13 40:11 62:5 71:4 85:7 94:1 96:23 115:2
**previously** 39:1 49:4 52:1
**prior** 21:13,15 35:15,23
**prison** 70:23
**private** 8:10
**probable** 5:10 43:10 46:13 48:22 49:19 70:16 87:14
**probably** 8:18 10:21 41:5
**Probation** 15:22
**probative** 102:25 103:4 103:23
**procedure** 47:3
**procedures** 46:20 110:24
**proceeded** 86:20
**proceedings** 109:13
**process** 24:25 25:2 26:5 28:14 29:24
**processed** 110:11
**produced** 65:2,4
**professional** 15:6 56:4 75:5 106:15,15,18 106:20
**promoted** 17:4
**prosecute** 19:6
**prosecuted** 4:24 76:23
**prosecuting** 77:8 84:13 103:7
**prosecution** 32:1 33:5 61:14 70:15 74:19 81:14 82:7,16,16 86:9 102:22 110:1
**prosecution's** 85:21
**prosecutor** 17:5 17:7,25,25 34:24 35:2 41:13 60:15 61:10 64:14 68:12,19 93:7
**prosecutors** 11:10 21:2 33:23 62:17
**provide** 16:7 18:12 19:17 20:3 26:20,25 27:12 30:5 33:7 39:6 60:21 65:14 70:6 75:9 81:13 82:15,23 83:8 84:2 89:22
**provided** 31:25 33:9 34:5,8,13 34:14,24 35:5 35:19,24 36:6 38:9 40:12,25 43:9 51:20 62:17 65:24 66:4 69:9 85:22 90:2 106:2 109:24 110:1,6,18 111:25 112:2 113:18 114:9 117:8
**provides** 102:9
**providing** 18:3
**provision** 39:25
**Public** 119:3,17
**pull** 36:13 53:19
**pulled** 38:21
**purpose** 80:18
**purposes** 6:2 22:6,7
**put** 33:6 37:4 57:20 58:11,16 58:18

**Q**

**question** 7:5 9:20,21 11:22 11:23 13:10 19:3 20:1 21:3 32:17 36:12 37:19 38:11 40:24 44:13,16 45:8 47:13 51:12 52:18,21 52:25 53:2,4,9 53:25 54:8,11 54:13,24 55:15 55:25 56:8 57:22,25 58:2 58:6 59:24 60:2,17 61:20 62:2,21,25 63:25 65:17,19 70:7 71:2 73:20 74:1,9 74:15,19 75:9 75:15,20 76:19 76:20 78:5,13 78:19 79:1,4,8 79:12,23 80:1 80:12,15,17,19 80:20 81:4,6 81:19 82:12,20 83:3,17,24 84:16 90:24 93:17 96:9 97:14 99:11,12 104:7,9 106:17 107:19 113:14 116:4
**questioning** 6:14 9:4,24 59:15 105:10
**questions** 6:13 9:8 12:7 17:24 27:17,20 39:4 42:1 43:15 55:8 56:11,12 59:13 72:4,9 74:16 80:8 83:8 108:8 114:4 115:2 116:2 117:19 118:3

**quickly** 42:20 92:2
**quite** 8:5 21:4 93:8

R

**R-a-n-s-o-m-e** 42:19
**raised** 108:8
**Ransome** 42:19
**Ray** 18:23
**reached** 25:16
**read** 36:24 43:13 43:17,18 45:20 45:23 50:5 69:11,25 72:8 86:6 87:18 89:1 93:13 94:2,19 97:5 97:11 98:15,16
**reading** 49:22 94:5 99:24
**reads** 70:22
**ready** 48:13
**realize** 23:24 85:6,9
**really** 29:14 36:9 38:5,13 39:3 39:10 44:11 47:8 64:2,9 68:6 78:22 86:25 103:17
**reason** 8:23 41:13,15 75:22 80:6 81:3,5
**reasons** 60:24
**recall** 8:2,4 10:17 16:10,12 17:22 18:19 20:13,16 24:4 26:2 28:1,6 29:11,14 30:12 32:17,24 33:10 35:6,8,9 36:1,5 36:10 37:16,21 37:23 38:14 40:5,8,11,15 40:17,24 41:2 41:18 42:10,12 42:15 45:5 46:3 47:6,8,14 47:17 49:10,13 50:22,23,23 51:14,19,24 52:1 59:13,15 60:1 66:12 67:7 70:1 76:22 77:1,7 77:12,15 78:22 78:25 79:13,25 84:7 85:25 86:13,15 88:22 88:23 89:9 90:5,7,16 91:2 93:10 100:23 100:25 101:3,5 104:15 105:3,9 105:12 106:1
**recalling** 79:9
**recant** 107:1,2
**recanter** 56:4 106:15
**receive** 41:12 62:16
**receives** 69:3
**receiving** 35:9 86:1
**reciting** 39:20
**recollection** 14:24 18:22 34:11 37:13 48:5 49:2 54:10 61:22 66:18 74:11 77:14 85:17,20 104:22 105:2,5 105:10,15,17 105:20,22 106:5 110:13 110:15,17
**record** 4:10,11 19:23 36:23 37:4 48:11 69:19 82:1 84:25 85:3 95:25 97:12 98:24 117:25 118:2
**refer** 93:11
**reference** 37:15 45:24 88:8 89:5 90:16 95:13,16 99:21 111:7,21 112:9
**referenced** 66:24 70:13 87:25
**referencing** 5:6
**referred** 28:22 29:8 96:1
**referring** 18:19 21:14 40:21 60:14,15 88:14 93:19
**refers** 70:9 94:8
**reflected** 37:20
**refreshes** 18:22
**regard** 20:22 112:7
**regarded** 94:13
**regarding** 80:14 89:7 116:15
**regular** 12:24
**reinvestigated** 116:19
**related** 119:12
**relates** 37:19
**relation** 114:20
**relationship** 102:10 114:6 114:13 115:4,7 115:11,12,17 116:6
**relationships** 113:25
**relative** 45:16
**relevant** 71:1 72:2 100:10
**reliability** 75:13
**relying** 51:16 52:9
**remember** 17:14 18:24,25 19:9 32:25 33:1,14 35:24 36:2 41:10,21 43:19 45:9,10 77:3 80:23 83:23 99:24 104:10 113:16
**removed** 68:20
**repeat** 25:11 42:2
**report** 43:24
**reported** 119:9
**reporter** 84:22 118:8 119:3,18 119:22
**REPORTING** 1:22
**reports** 32:14 33:17 39:18 64:20 112:7
**represent** 4:12 4:17 6:2 48:22 50:19 62:3 66:20 71:3 86:16 88:3 91:24 95:11 108:22 113:20
**representation** 51:5 53:18,22 62:10 63:4,17 63:22 71:8 92:5 96:22 109:10
**representations** 86:8 87:8
**represented** 5:24 108:25 109:16
**representing** 64:8 80:16 108:4
**reproduction** 119:21
**request** 26:4 48:20
**requested** 38:18
**required** 111:17
**requires** 60:23
**respect** 80:16
**respective** 5:11
**respectively** 4:25
**respond** 27:21
**response** 115:1
**responsibilities** 21:1 23:21 24:20,24
**responsibility** 93:5
**rest** 71:1
**result** 108:16
**results** 108:18
**retained** 6:1
**retired** 12:8,23 15:15,23
**retirement** 16:3 40:14
**review** 40:22 46:15 47:3,16 50:25 65:15 69:22 81:1 87:21 90:3 117:22
**reviewed** 10:3,9 14:19,23 24:9 24:10 46:25 49:19 87:13 89:3 96:3 106:8 112:14
**reviewing** 34:20 49:8 66:5 102:3
**revise** 100:9
**Richard** 12:3
**Ridge** 15:16
**right** 5:25 7:14 8:17,23 13:19

16:14,18 18:6 20:4 22:14 23:12,20 26:21 28:11 29:24 31:14 33:10,23 34:23 38:12 41:3,6,19,24 43:21 45:15 46:6,25 48:13 59:9 60:25 61:1,4 69:8,10 71:22 73:11 75:14 76:12 77:23 78:10 83:18 86:5,25 88:3 90:19 92:22 97:10 98:3,21 100:6 100:19 104:20 108:14 111:24 113:1 115:22 115:24 117:12
**RIGHTS** 2:6
**Riley** 50:8
**ring** 19:4
**rings** 17:18
**Robbins-New** 11:17
**Robert** 88:20
**Rocks** 12:9 39:23 70:10 72:14 73:14
**Rodney** 42:24 49:20 51:16 61:14 70:12 71:14 85:17,21
**role** 8:9 15:5,20 21:1
**room** 24:7
**Rosa** 94:11
**Rosen** 11:25 41:4,8,11 46:1 62:24 63:12 64:6 69:2,3 75:19 76:1,5
**Rosen's** 64:1
**routine** 77:19
**RUDOVSKY** 2:2
**rules** 8:19
**run** 108:6

S

**Sachs** 12:3
**sake** 13:6
**Santiago** 86:19 86:19 90:15,16 92:19 93:23 94:17,21,24 96:16,17 99:17 99:18 100:14 100:14 101:19 101:20,24 102:11,16 104:13 105:23 108:2,2 113:21 113:23 114:17 114:21 115:4 115:13,19 116:6,11,18,18
**Santiago's** 103:23 106:3
**Santiagos** 115:18
**save** 36:12 86:7
**saw** 37:22,23 38:3 44:22 45:16 62:8 88:8 95:4,5
**saying** 16:24 53:12 54:14 62:12 71:18,21 72:17 91:17 97:2 108:2 109:18 114:14
**says** 30:15 49:1 50:14,17 53:11 66:16 72:23,24 73:3 89:11 92:19 93:1 94:16 95:1,4,8 96:2 99:19
100:6,7,12,15 100:16,18 101:17 102:12 102:18 107:5 109:9 111:13 115:23
**scene** 90:25 92:1
**scheduled** 5:12 99:7
**schedules** 98:18
**school** 15:7,8 78:10,25
**scope** 65:22,24 78:9
**Scott** 108:24
**screen** 6:16,19
**seated** 5:25
**second** 48:9 57:13 88:6 99:25
**secondhanded** 73:10
**secretarial** 110:21
**section** 39:14,17 39:18,24 111:13,14,17
**sections** 39:14 112:7,11
**secure** 5:10
**see** 6:16,18,23 18:22 39:15,16 40:16 44:6,14 45:1,24 46:2 46:10 53:18 60:17 66:22 67:10 70:12,19 70:21 88:19 89:5,8,25 90:4 91:3,5,7,9,12 91:16 93:2,18 95:13,16 96:8 96:10,12 97:4 103:4 111:6,12 111:20,22,24 112:6 113:11
114:8,15
**seeing** 35:24 37:16,21 40:12 42:10,12 70:1 86:13 101:5
**seek** 25:16 26:14 30:16 48:2
**seeking** 29:17 30:11 31:5
**seen** 18:14 36:7 36:21 37:7 66:9,15 70:14 93:25 95:22 96:6 109:11 113:4,9 117:4
**sees** 94:16,20,24
**Selby** 88:19
**self** 99:2
**senior** 17:7 24:3 68:5
**sense** 34:16 52:8 66:2 68:21
**sent** 10:3,5,10 14:20 33:23 35:17 49:10
**sentence** 70:19 70:22
**separate** 9:2 43:4
**separated** 33:15
**September** 1:15 119:15
**Sergeant** 89:6
**series** 7:19
**seriously** 18:11
**served** 15:19
**service** 8:14 15:23 37:22
**set** 10:23 101:13 119:5
**sheet** 35:24 40:12,17,18,20 45:18 46:6 48:25 49:25 50:14,17 71:17 72:15,17 94:2
94:8 95:13 96:16 97:18 98:17 99:13 101:6,7,8,11 101:17 102:6 103:18,22 107:22 109:23 111:16,25
**sheets** 10:6 35:6 35:9,16 36:3,6 38:8 39:25 40:1,21,25 41:12
**Shelly** 11:17
**shift** 85:14 86:5
**shoot** 94:24 106:3
**shooter** 30:15 70:24 71:7,19 72:18,24,25 73:5 85:23 87:6 105:23,24
**shooting** 42:6,9 86:17 87:2 95:4,5 99:16 105:14
**short** 65:8,12 85:5
**shorthand** 119:10
**shot** 86:11 94:16
**show** 27:5 32:7 36:11 39:11 42:2 43:8 45:15 49:3 55:18 90:10,14 90:19 92:9,10 93:22 101:9,11 101:16,22 110:25 111:4,4
**showed** 49:1 70:17 73:9 98:23 111:1
**showing** 87:12 88:24 113:6
**shown** 113:11

**side** 60:21 91:5
**sidewalk** 94:22
**signed** 47:4
**significance** 92:8
**similar** 5:17
**single** 5:15 34:20 52:9 58:7 80:1
**sit** 27:5
**sitting** 8:9 85:16 104:21
**situation** 25:15 25:20 59:11 106:14
**situations** 27:24 28:1
**SIU** 29:12
**six** 11:15,19 12:1
**sketches** 37:18
**slightly** 29:3 31:24 40:23
**small** 42:7
**Smith** 30:15
**Snell** 14:12 88:18,21,22
**Snyder** 14:14 89:6
**somebody** 77:18 77:21
**sorry** 7:4 34:10 69:18 71:25 93:16 96:9 97:9 98:22 111:9
**sort** 32:15
**sought** 46:16
**sound** 17:17 23:2 29:9,13 33:23 38:11
**sounded** 32:22
**sounds** 28:10
**sources** 32:6
**South** 1:23 2:3 42:8
**speak** 6:8 28:13 53:23 66:9 75:5 76:1,2
**speaking** 95:3
**speaks** 44:3 49:23 64:9 95:9
**special** 29:7
**specific** 23:21 28:1,6 36:21 37:25 38:3 47:10,14,17 67:10 73:25 79:8 83:24 89:15 102:21 113:15
**specifically** 30:12 32:2 41:20 88:14 107:21 109:22 111:3
**specificity** 64:20
**specifics** 66:3
**spell** 91:22
**spelled** 91:6
**spend** 11:1
**spent** 15:9
**spoke** 10:4 48:20 70:11 92:1 93:7 96:15 104:11
**spoken** 11:14,18 11:25 12:3,10
**Squad** 29:9
**Square** 2:12,19
**Squirt** 70:24 73:4
**staff** 110:21
**staffed** 24:6
**stage** 5:7,8 65:7 66:10 67:1,10 67:22 73:22 76:7 101:13
**stamp** 39:13
**stamps** 37:1 38:20
**stand** 21:13 57:21 58:19 81:2
**start** 27:25 41:24 68:16 87:12 116:16
**started** 15:18 29:5 41:21 42:22
**starting** 4:11
**starts** 70:19 86:21
**State** 15:19,21
**stated** 70:19,22 100:2
**statement** 30:14 30:16 34:1 49:20 50:2,3 50:18 51:2 71:6,14 74:4 78:16 82:17 85:23 87:3 88:5 89:11 91:5,10 97:8 97:20 101:10 113:18 114:5 115:10
**statements** 33:17 55:21 58:20 110:14 112:9
**states** 1:1 87:4 102:13,15
**statistics** 28:7
**stayed** 15:11 35:16
**staying** 70:25
**stenographica...** 119:9
**step** 46:11
**stepfather** 116:3
**stepson** 113:21 113:23 114:18 114:21
**sticks** 18:23
**stop** 56:13 70:25
**store** 42:7 94:17 94:21
**story** 54:19
**strategizing** 68:7
**strategy** 68:2
**street** 1:23 2:3,7 2:12,19 21:8 21:11 86:12 94:18
**Streets** 42:8
**strike** 77:24 98:21 100:24 102:14 108:17 110:14 112:21
**subject** 119:13
**submitted** 23:4
**subscribed** 119:15
**subsequently** 119:9
**substantive** 43:22
**suggest** 9:17,18 90:1 98:1
**suggests** 117:5
**Suite** 1:18,23 2:3,12,19
**sum** 111:14
**summarize** 32:5 109:8
**summarized** 49:20
**summary** 39:17 64:19 65:9 72:11 89:22,22 108:9 112:8
**supervised** 24:3
**supervising** 24:14,18 68:22
**supervision** 119:9,22
**supervisor** 15:12 28:20 67:20
**supervisory** 24:21 26:1
**support** 1:22 32:1 46:13 78:1 113:16
**supposed** 111:15
**supposedly** 73:12
**sure** 8:20 9:4 15:20 21:4 25:12 28:5 37:3 46:19 47:10 48:1,10 52:2 58:15 59:1,21 61:16 62:20,23 63:15 64:25 72:12 82:1 96:3 99:10 109:12 111:17 115:15 115:19 117:23
**surprised** 13:18
**suspect** 42:18 90:15,17
**suspects** 76:14 76:24 86:18
**Susquehanna** 17:11
**switch** 41:19 84:20
**sworn** 4:3 119:8

**T**

**tabbed** 33:12
**take** 9:21 15:16 18:10 25:17 32:5 36:18 43:13 45:20 48:8 49:6 54:15 55:18 69:11 78:18 84:18 87:3,18 89:1 90:8,9 91:23 93:13 94:2 96:18 100:19 101:25 107:21 113:4 117:21
**taken** 8:6,8 50:20 85:1 91:25 103:3

119:4
**takes** 86:17 87:2
**talent** 68:10
**talk** 11:6 15:4 22:11,20 23:20 41:20 65:20 68:2 116:20
**talked** 13:11 42:24 46:16 81:24
**talking** 9:2,4 10:17 11:2 21:15 22:6,7 32:2 42:3 57:16,23 58:10 59:11 68:5 77:8 98:13 103:16
**Tanneika** 2:18
**tell** 9:18 11:1,14 13:11,15 20:18 22:13 23:16 26:4,6 27:23 28:10,13 31:6 31:21 33:1 34:11 36:20 46:20 53:5 54:6,19 58:17 61:24 72:3,12 72:13 74:5 82:5,14,22 84:7 97:16,20 99:24 104:16 108:19 111:6 112:15
**telling** 54:18 81:25 92:25 105:18,18,23 106:1
**temporal** 65:21 84:10
**temporally** 81:21
**Teresa** 119:3,17
**term** 32:24
**terms** 8:20 9:23 47:21 68:8 75:8,11
**terribly** 9:15 72:2
**testified** 4:3 7:23 39:5,23 49:17 52:10
**testify** 7:20 33:20 58:14 119:8
**testimony** 8:20 8:24 11:12 32:6 35:13 40:11 41:4,14 50:20 55:20 64:7,7 71:4 72:14 73:14 75:20 85:7,11 96:23 107:3 119:5,8,14
**text** 95:21 96:8 96:10
**Thank** 38:24 48:7 69:16 92:16 117:16 118:4,6,7,11
**thanks** 7:3,13
**thereof** 119:13
**They'd** 28:12
**thing** 32:15 90:19 114:15
**things** 47:23 57:17 85:14 88:17
**think** 9:14 18:14 29:8 41:20 64:2,10,24 72:9 81:5 84:5 96:13 114:14
**third** 70:18 89:11
**thought** 59:6 79:6 98:5,6 115:15
**thousand** 72:5
**thousands** 56:21 58:5 66:24 77:4 96:4
**three** 2:19 9:7 15:20 43:4,11 85:13 100:16 117:14,21
**tie** 55:1
**time** 1:15 5:16 6:8 7:18 8:3,5 11:15,19 13:1 16:8 22:9 24:2 24:13,22 27:6 34:14 35:23 36:13 41:6,12 45:6 58:7 77:8 80:24 84:11 86:7 90:13,20 95:14,15 96:21 98:16 99:4 108:25 109:14 117:16 118:4 119:5
**times** 8:1 10:13 19:9 83:21 95:23 102:19 103:9,11
**tminott@arch...** 2:21
**today** 4:13,15 5:12 6:6 8:24 9:15 24:24 85:16 104:21 111:1
**today's** 10:1
**told** 32:8 40:15 41:11,17,21 42:24 43:3 50:4 51:14,25 52:8,24 55:2 55:10 58:4 60:4 61:18 62:24 65:1,8 70:23 74:23 75:19 80:7,11 80:12,21 81:5 81:18 83:16,20 83:20 84:5 104:22 105:6 105:12
**top** 91:5 96:7
**topic** 29:3 31:24 40:6,8
**topics** 9:3 41:19
**Torres** 95:12 96:8,11,15,20 99:16 100:2,11 100:13,16 105:13 107:22 109:23 111:7 111:11 112:14 115:2
**total** 16:18 104:4 111:14
**totally** 111:18
**touched** 31:24
**tough** 57:1
**track** 16:22
**tracks** 84:20
**transcribed** 119:9
**transcript** 53:23 118:9 119:10 119:21
**transcripts** 32:7 53:19 72:5
**trial** 17:7,25 18:3 22:20,24 23:5 24:4,7,12 34:9,15 35:3 56:24 62:5 64:6,14 67:25 68:2,6,8,9,19 88:13 103:15 107:24 108:23 109:10
**tried** 19:1 57:13 58:5 77:5 80:23
**true** 22:15 61:5 119:10
**truth** 58:17 119:8
**truthful** 8:24 20:15 30:6
**truthfully** 23:16 31:22
**try** 21:6,13 56:17 57:18 59:18 65:19 69:1 79:6 110:16 114:15
**trying** 15:9,12 22:8 23:10 24:4 54:12 57:17 72:10 75:6 97:3
**Tuesday** 1:15
**turn** 59:22 60:10 91:4 108:21
**turned** 22:2,5 63:1,16 110:9 110:19
**Turner** 70:24 71:18 72:18,24 73:4
**twice** 10:21 19:11
**two** 2:12 4:16 9:2 15:19 17:21 32:9,18 40:21 61:2 86:11,18 87:24 88:4,8 91:16 97:3,22 99:4 99:17 100:13 111:9,21 112:3
**two-pronged** 33:11
**type** 56:12 78:1
**typed** 95:21 96:8 96:10
**typical** 25:14 26:5 38:9 68:17 102:22
**typically** 25:21 28:22 46:15

**U**

**ultimately** 23:12 48:23
**um-hum** 9:6,25 23:23 28:24 48:15 49:5 62:14 72:7 85:15
**un-recant** 107:1
**unable** 54:10
**undermined** 31:4
**understand** 5:21 5:25 8:21 15:5 25:13 39:8 46:19 51:5,7,8 51:9 62:10,12 62:20 63:4,6 63:17 64:8 71:8 72:18,20 80:17 86:6,22 87:8 93:16 96:23 109:16 113:25 114:2 115:21
**understanding** 6:4 8:13 22:25 26:10 34:17 35:12 38:1,7
**understood** 9:12 18:10 25:21 49:21 52:7 70:16 71:15 88:15 92:6 115:24
**unit** 2:6 15:13 17:11 29:7 68:22 80:24 110:21,23
**UNITED** 1:1
**use** 33:4 59:2,8
**uses** 92:21
**usual** 9:16
**usually** 27:3

**V**

**V** 2:7
**vacated** 18:16
**vacuum** 52:18 53:3 54:8,25 55:8 59:25 74:9 76:19 78:5 80:13 84:17 104:9 106:17
**Valley** 17:11
**value** 103:4
**various** 4:20 9:9 24:9 108:8
**verbal** 46:22 65:8,13 89:22
**verbally** 27:2,3
**victim** 102:24
**victims** 86:10
**visit** 29:19
**void** 58:3
**vs** 1:4,9

**W**

**W-a-s-i-l-k-o-...** 100:3
**walk** 15:6 23:25 49:15
**want** 5:3 7:22 16:14,16 17:23 24:24 25:12,16 30:16 43:5 49:3 64:25 65:20 84:21 85:13 87:12 94:19 103:11 106:22,23 107:9 108:6,6 108:7
**wanted** 47:19 73:22
**wants** 53:18 72:9
**warrant** 25:8,17 26:9,15 28:3 29:18 30:1 46:7,13 47:20 48:2,3,23 51:15 55:10 65:15 66:6 87:16 89:12,19 101:15 112:16 113:16
**warrants** 5:10 81:1
**Wasilkowitz** 99:22 100:3,17 105:19
**wasn't** 77:20
**way** 12:22 25:10 41:18 44:19 62:24 70:2 90:15,23 104:20
**we'll** 9:7,14,19 9:21 15:2 29:4 41:24 53:25 96:20
**we're** 4:11,13,15 8:18 9:1,4 23:24 39:22 64:25 68:5 87:2 103:16
**we've** 5:4,12,19 29:24 33:19 48:18 50:19 54:17 59:11 66:9 81:24 83:16 106:8 112:13 113:5 116:14
**Webb** 17:16
**welcome** 118:5
**went** 10:9 15:8 15:10 29:5 42:20 56:24 74:23 78:9 86:21 88:13
**weren't** 21:8,17 21:20
**Westerman** 2:15 2:15 13:25
**whatsoever** 15:1
**whereof** 119:14
**whichever** 10:20
**wife** 56:13
**Wilson** 86:19 90:15,16 91:17 92:5,19 93:23 94:17,20 96:16 99:17 100:13 101:19,24 102:11,13,16 102:19,19 103:23 104:13 104:22 105:6 106:2 108:2 113:21,23 114:17,20 115:4 116:16 116:18
**Wilson's** 91:11 91:13
**win** 57:1
**wish** 74:16
**withdraw** 65:18
**witness** 3:2 4:3 7:18 30:15 37:11,13 43:16 44:9 45:22 49:7 51:16 52:10,11 54:5 54:14,17 55:12 55:19,20 56:3 56:3,4 57:21 58:8,10,18 59:3 61:14 69:24 70:14 71:20 74:4 75:2,2,3,6 81:14 82:7,16 85:22 87:4,20 88:6 89:2 94:4 102:2 106:15 106:19,20,21 107:5 110:14 110:16 111:8 111:12,18,22 119:7
**witness'** 54:20
**witnessed** 100:3
**witnesses** 21:9 21:12,12,20 22:24 49:16 57:20 58:16 75:5 87:24 88:8 92:2 96:14 106:22 106:22,23,24 106:25 111:21 112:10 113:15 113:18,22
**witnesses'** 88:4
**WOLFE** 1:22
**woman** 6:18
**wondering** 80:9
**Woods** 70:11 73:9,17
**word** 92:21 93:2 102:17
**words** 89:20 116:23
**work** 12:25 47:22 108:12 108:17,19
**worked** 4:21 16:8
**working** 68:11
**wouldn't** 23:3 26:18 68:21 78:2 107:17 114:11
**Wow** 57:10
**writes** 100:1
**wrong** 66:22 91:6
**wrote** 88:13
**www.klwrepo...** 1:24

**X**

**X** 3:1

**Y**

**Y-a-t-v-i-n** 109:1

**Yatvin** 108:25 109:2,8,9
**Yeah** 19:22 21:6 23:3 34:11 37:25 45:8 48:10 58:13 65:17 97:2,11 97:15,25
**year** 11:15 80:25 97:19 98:16
**years** 5:1,1,7 13:9 15:9 16:18 23:25 52:6 80:22 83:23 87:2

**Z**

**Zoom** 2:7,11 6:13,23 10:19 36:16

**0**

**1**

**1** 43:12
**1-877-KLW-...** 1:24
**10** 98:19
**10/24** 98:15
**10/24/86** 97:21 99:1,14
**10:02** 1:16
**103** 1:18
**12** 117:11
**12:04** 118:12
**1303** 1:23
**14** 87:15
**14th** 2:7
**1515** 2:7
**15th** 49:21
**17** 36:16 39:12 111:3
**17111** 1:19
**1717** 2:19
**19102** 1:23 2:8
**19103** 2:13,20
**19106** 2:4
**1972** 15:9
**1980s** 70:2
**1984** 42:9
**1985** 42:20 86:13,17
**1986** 86:21 97:24 100:21
**1987** 42:22,23 44:21 45:1,19 49:21
**1989** 38:2 87:1 100:22 101:2 101:23
**1990** 109:15
**1990s** 41:7 70:3
**1996** 12:23 35:21,23 40:14
**19th** 86:13,17

**2**

**2001** 2:12
**2015** 15:23,25
**2024** 1:15 119:15
**2027** 119:24
**206** 38:19
**209** 39:14
**21** 90:21
**215** 1:24
**218** 69:15
**21st** 49:24
**22-cv-2416-AB** 1:9
**22-cv-3437-JS** 1:4
**2200** 86:12
**230** 1:23
**23rd** 101:2,15
**24** 1:15
**24-by-7** 25:20
**24th** 97:19,24 98:2,5 99:6
**25** 24:5 119:24
**2620** 2:12
**26th** 98:19
**27th** 42:8 98:2 98:20,22 99:7
**29** 92:10,15

**3**

**30** 24:5 69:10
**31** 5:1
**32** 45:17,18
**34** 4:25
**35** 52:6 80:22 83:23
**3500** 2:19
**37** 52:6 80:22 83:23

**4**

**4** 3:3
**49** 94:1 97:18 107:22
**4th** 86:12 119:15

**5**

**500** 80:25
**501** 2:3
**51** 95:20 97:8,21
**5th** 42:9

**6**

**6** 98:19
**61** 102:1
**64** 88:25 89:3

**7**

**718** 2:3
**74** 15:11
**75** 15:11
**75-483** 96:1
**75-48s** 37:15
**75-51s** 111:16

**8**

**85** 98:8 101:19
**86** 98:5,11 101:19
**87** 15:13 49:24 98:6
**89** 101:15

**9**

**9** 45:1,19
**90** 9:17
**91** 15:14
**922-7112** 1:24
**945** 1:18
**96** 15:15,18
**9th** 44:21