**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **CURTIS CROSLAND,** Petitioner, | : | **Civil Action** |
| v. | : | **NO. 21-476** |
| **COMMONWEALTH OF PENNSYLVANIA,** Respondent. | : | |

**Commonwealth's Response to Petition for Habeas Relief**

Curtis Crosland's successive petition for a writ of habeas corpus stems from the Commonwealth's recent disclosure of exculpatory and impeachment information that undermines both the reliability of the evidence presented against him at trial and his conviction for murder.

In a January 1991 retrial, a Philadelphia jury found Crosland guilty of second-degree murder, robbery and possessing an instrument of crime in connection with the 1984 shooting death of Il Man Heo. No physical evidence linked Crosland to the offense. His conviction rested entirely on the testimony of two witnesses: Delores Tilghman, who was declared unavailable, but had previously testified at Crosland's first trial to overhearing a conversation among Crosland and his cousins about the murder; and Rodney Everett, who disavowed Crosland's involvement at trial, but had previously attested that Crosland confessed to him.

Crosland's current petition raises two central claims. The first is that the Commonwealth violated his right to due process under *Brady v. Maryland* by withholding material, exculpatory and impeachment information from him for over 30 years. The second is a claim that he has steadfastly maintained through all those years—that he is actually innocent of Heo's murder.

## I. The Conviction Integrity Unit (CIU) Investigation and Present Proceedings

### A. Crosland's Request for CIU Review and Ensuing Open File Discovery

In March 2020, at Crosland's request, the CIU of the Philadelphia District Attorney's Office agreed to review his case. In the course of its review and investigation, the CIU discovered materials that not only impeached the credibility of Tilghman and Everett, but also exculpated Crosland. In October 2020, as the CIU continued its investigation, it shared these materials with Crosland, informing him that they did not appear to have been previously disclosed. Pursuant to a jointly executed Discovery and Cooperation Agreement, the CIU also provided Crosland with open-file discovery of the prosecution files as well as the Philadelphia Police Department's Homicide File.

On January 11, 2021, Crosland sought authorization from the Third Circuit to file a successive petition based on this newly discovered evidence. On January 21, 2021, the Third Circuit granted the motion, authorizing Crosland to file the petition now before the Court. *See In re: Crosland*, No. 21-1048 (3d Cir. 2021).

### B. The Results of the CIU Investigation Supports *Brady* Relief

In this response to Crosland's successive petition, the Commonwealth agrees that the evidence it recently disclosed to Crosland not only undercuts the credibility of the Commonwealth's key witnesses, Tilghman and Everett, but also incriminates others, including Michael Ransome, who was the prime suspect in the original homicide investigation in 1984. Following careful review and investigation of this matter, the Commonwealth now acknowledges both factually and legally that it violated Crosland's right to due process by not disclosing this evidence to him prior to trial, resulting in his wrongful conviction.[1] Accordingly, Crosland is entitled to habeas relief.

[1] Because the Commonwealth admits that it violated Crosland's right to due process under *Brady* and its progeny, it neither addresses his freestanding claim of actual innocence under *Herrara v. Collins,* 506 U.S. 30 (1993) nor his alternative ineffective-assistance-of-counsel claim.

**C. Agreements for Habeas Relief**

Agreements for habeas relief have been routinely approved by the Courts of this district.[2] *See, e.g.*, *Speight v. Beard*, 2017 WL 914907 at *17 (E.D. Pa. March 7, 2017) (granting capital penalty phase relief on agreement of parties); *Lambert v. Folino*, No. 10-01339, Docs. 91, 95 (E.D. Pa. April 26, 2018) (granting habeas relief on agreement of parties); *Mason v. Wetzel*, No. 17-3759, Doc. 31 (E.D. Pa. Aug. 7, 2018) (so-ordered stipulation granting capital penalty phase relief); *Marshall v. Wetzel*, 2018 WL 5801313 at *37 (E.D. Pa. Nov. 6, 2018) (granting capital penalty phase relief on agreement of parties); *Whitaker v. Mooney*, No. 14-2321, Docs. 68, 69 (E.D. Pa. June 27, 2018) (granting habeas relief on agreement of parties). The Commonwealth's decision to concede relief in light of the constitutional violations infecting Crosland's trial and the risk that an innocent man[3] has now been imprisoned for over 30 years, while not binding on this Court, is entitled to "great weight." *Young v. United States*, 315 U.S. 257, 258-59 (1942).

In this case, the factual record as a whole is not largely in dispute and the relevant facts pertaining to Crosland's *Brady* claims are not in dispute. Ever mindful of what our Supreme Court stated in *Berger v. United States* and *Stickler v. Greene* about the role of a prosecutor, the Commonwealth

[2] The "elephant in the room" that the Commonwealth is compelled to address is the current debate about whether recent concessions/agreements constitute an abdication of the prosecutor's duty to advocate for the Commonwealth— in other words, must (or at a minimum, should) the Commonwealth take an adversarial position in regard to claims advanced by a habeas petitioner? Some judges have concluded that certain concessions/agreements for relief are an abdication of that duty so they have invited the Attorney General's Office to participate in the litigation. *See, e.g., Wharton v. Vaughn*, No. 01-6049, Doc. 165 (May 7, 2019). Other courts, however, have accepted the Commonwealth's concession and granted habeas relief without the appointment of amicus curiae or another third-party. Indeed, the appointment of a third-party seems antithetical to the principle that "parties are masters of their own judicial admissions." *See Wright v. Lamas*, 2019 WL 1496055, at *10 (E.D. Pa. March 29, 2019), *report and recommendation adopted*, 2019 WL 1492208 (E.D. Pa. April 3, 2019).

[3] Although it is legally unnecessary to reach the merits of Crosland's actual innocence claim as noted earlier, given the weakness of the evidence against him and the powerful nature of the *Brady* information at issue here, the Commonwealth is cognizant that Crosland may very well be actually innocent.

believes that it is ethically bound to take the position it takes today. We do not represent "an ordinary party to a controversy," but, in this case, represent the Commonwealth "whose interest [ ] in a criminal prosecution is not that it shall win a case, but that justice shall be done." *Stickler v. Greene*, 527 U.S. 263, 281 (1999) (quoting *Berger v. United States*, 295 U.S. 78, 88 (1935)). Put another way, we, as prosecutors, have "a special role . . . in the search for truth in criminal trials." *Id.*

The judicial admissions the Commonwealth makes throughout this response are binding concessions. *Anderson v. C.I.R.*, 698 F.3d 160, 167 (3d Cir. 2012). When made, the Court no longer is required to engage in fact-finding, but may rely on those admissions. *See, e.g., Parilla v. IAP Worldwide Services, VI, Inc.*, 368 F.3d 269, 275 (3d Cir. 2004). Nonetheless, in this response, the Commonwealth has outlined the factual basis for its judicial admissions as well as its reasoning for legally conceding that relief is warranted.

## II. Procedural Posture of the Case

### A. Crosland's claims are timely.

The Commonwealth agrees that Crosland's claims are timely. The evidence upon which they are based was first disclosed to him in July 2020 and October 2020; that evidence, which included previously sealed grand jury transcripts and numerous documents in the Philadelphia Police Department's Homicide file, was in the prior possession of the Commonwealth. As noted earlier, in January 2021, Crosland requested permission to file a successive petition based on this newly discovered evidence. His claims therefore were timely filed within one year of "the date on which the factual predicate of the claim[s] . . . could have been discovered through the exercise of reasonable due diligence." 28 U.S.C. § 2244(d)(1)(D).

### B. The Commonwealth expressly waives all procedural defenses, including exhaustion.

Before seeking federal habeas relief, a state prisoner ordinarily must "exhaust" available state-court remedies. 28 U.S.C. § 2254(b)(1)(A). "[G]rounded in principles of comity," this prerequisite

ensures that the State has the first opportunity to correct any purported violations of its prisoners' federal rights. *Coleman v. Thompson*, 501 U.S. 722, 731 (1991). Crosland has not filed his claims in state court. As such, they are unexhausted.

A lack of exhaustion, however, is an affirmative defense that can be waived. 28 U.S.C. § 2254(b)(3); *Sharrieff v. Cathel*, 574 F.3d 225 (3d Cir. 2009). In order to facilitate review of the constitutional errors alleged, the Commonwealth expressly waives all non-jurisdictional bars, including exhaustion. As in this case, where serious constitutional violations and a strong likelihood of actual innocence exist, a prosecutor is "obligat[ed] to see that the defendant is accorded procedural justice." Pa. R. Prof. Conduct 3.8, Comment 1 (Special Responsibilities of a Prosecutor).

### C. Crosland's claims are subject to de novo review.

Because Crosland's claims have not been addressed by the state court, the deferential standards of 28 U.S.C. § 2254(d) are inapplicable, and Crosland is entitled to de novo review of his claims. *See Cone v. Bell*, 556 U.S. 449, 472 (2009) (de novo review where state courts did not reach merits of claim).

## III. Law Applicable to Crosland's *Brady* Claims

Due process requires prosecutors to disclose information that is favorable to the guilt or punishment of a defendant. *Brady v. Maryland*, 373 U.S. 83, 87 (1963). In order to establish a due process violation under *Brady*, a defendant must show: (1) that the information was suppressed, inadvertently or willfully; (2) that it was favorable to the defense; and (3) that it was material. *Dennis v. Secretary, Pennsylvania Dept. of Corrections*, 834 F.3d 263, 284-85 (3d Cir. 2016) (en banc).

A prerequisite to suppression is that the Commonwealth must possess that information. Possession is not confined to information within the actual knowledge or possession of the prosecutor; a prosecutor also has a duty to disclose information known to others acting on the Commonwealth's behalf, including law enforcement. *Kyles v. Whitley*, 514 U.S. 419, 437-38 (1995); *United States v. Risha*, 445 F.3d 298, 303 (3d Cir. 2006).

Information is favorable if it is exculpatory or impeaching. *United States v. Bagley*, 473 U.S. 667, 676 (1985). It is material when there is a reasonable probability that, had it been disclosed, the result of the proceeding would have been different. *Cone*, 556 U.S. at 469-70. A reasonable probability means that the likelihood of a different result is great enough "to undermine confidence in the outcome" of the trial. *Kyles*, 514 U.S. at 435. Under this standard, "[t]he question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial." *Id.* at 434. In evaluating materiality, the suppressed evidence must be "considered collectively, not item by item." *Id.* at 436.

In this case, the Commonwealth agrees that it violated Crosland's right to due process by suppressing evidence that was favorable to him.

### A. The Suppressed Evidence and Its Materiality

#### 1. *Brady* Evidence Relating to Commonwealth Witness Tilghman

Tilghman was one of only two witnesses who connected Crosland to Heo's murder. On February 4, 1988, Tilghman testified before a grand jury investigating a separate matter, the 1983 homicide of Joseph Wilkerson—during which she implicated Crosland's cousin, Michael Turner. During that grand jury investigation, she also was briefly questioned about Crosland and her knowledge of Heo's shooting in 1984. In response to questions about the Heo homicide, Tilghman testified to overhearing Crosland and his cousins talking about the murder, and that Crosland was "afraid someone would tell because there was a reward out." Doc. 1-1 at 86-88.

Meanwhile, no police statement from Tilghman was provided to the defense in discovery in connection with this case. Instead, three weeks prior to Crosland's first trial, the prosecutor provided the defense with a seven-page transcript of her grand jury testimony taken in the Wilkerson homicide investigation. When trial counsel expressed concerns that the transcript was incomplete, the

prosecutor assured the court and defense counsel that what he had provided trial counsel was complete.

However, the CIU learned during the course of its investigation, that apart from testifying on February 4, 1988, Tilghman testified again before the grand jury on February 26, 1988. While she had initially implicated Turner in Wilkerson's murder, she recanted that testimony on February 26, stating her prior testimony and statements were untrue.

Tilghman explained to the grand jury that she had gone to the police about Turner because she was angry with him. She also testified that she was so upset for lying and ruining his life that she tried to commit suicide and had to be hospitalized. While hospitalized, she claimed that police forced her to give another statement, this time, implicating both Turner and his cousin, Frank Turner, in Wilkerson's murder. If she didn't, she said, she would be the one imprisoned.

On May 5, 1988, at the conclusion of the grand jury proceedings, the Commonwealth sought to charge Tilghman with "false reporting to law enforcement authorities based upon her direct admission . . . that she made such false reports." Doc. 1-1 at 141-46.

Contrary to the prosecutor's assertions, the remainder of the grand jury transcripts were wholly relevant to Crosland's case; they undermined Tilghman's credibility. *See Giglio v. United States*, 405 U.S. 150, 154 (1972) (prosecutor obligated to disclose evidence relevant to the credibility of critical prosecution witnesses). There is no record that this evidence was ever disclosed to the defense, much less known to the prosecutor who retried Crosland in 1991.[4] In fact, at Crosland's second trial, Tilghman was declared unavailable and her testimony from the first trial was read to the jury.

[4] It is important to note that the prosecutor who questioned Tilghman during the grand jury proceedings was the same prosecutor who tried Crosland in his first trial. The prosecutor who tried Crosland in his second trial, which is the subject of this litigation, was a different prosecutor. Significantly, the prosecutor's files contained neither a copy of the February 26, 1998 nor the May 5, 1988 transcripts. In fact, due to Pennsylvania grand jury secrecy laws and office policy, the

### 2. *Brady* Evidence Relating to Other Suspects

The Commonwealth also agrees with Crosland that it withheld material evidence of other suspects, including Ransome—the initial prime suspect. In the weeks following the shooting, police received a number of tips that identified Ransome as the perpetrator. As a result, they began investigating his background and surveilling his home and other locations in hopes of picking him up. Ransome, who was 5'6" and lived north of the store, matched the description witnesses had provided of the perpetrator.

In addition to evidence about Ransome, the Commonwealth suppressed evidence that the revived investigation several years after the homicide pivoted from Crosland to his cousin, Frank Turner. In July 1987 (approximately three months after Crosland became a suspect), a police activity sheet identified Frank Turner as the "alleged shooter in the HEO case." Doc. 1-1 at 171.

There is no indication that this evidence, which the CIU uncovered in activity sheets and handwritten notes from the Homicide File, was ever disclosed to Crosland. None of these documents were delineated in the discovery correspondence or pleadings or noted in the record; the trial record also is devoid of any alternate suspect theories.[5]

Nor is it likely that the prosecutor was aware of these documents. As part of its investigation, the CIU contacted the prosecutor who tried Crosland in 1991. In a letter to the CIU, the prosecutor admitted that she had no independent recollection of Crosland's case,[6] but that it was her practice to turn over the entire "Homicide File" to the defense. In a prior state proceeding, the prosecutor had similarly explained that her general discovery practices were to disclose whatever she had in her file,

---

Commonwealth had to obtain a disclosure order prior to providing the transcripts to habeas counsel for Crosland.

[5] Crosland's post-conviction counsel and Crosland himself attest that had they been provided this exculpatory evidence, they certainly would have utilized it.

[6] The CIU also contacted the prosecutor who handled Crosland's initial trial, but he too had no independent recollection of the case.

including the Homicide File. From her testimony there, it is evident that what she referred to as the "Homicide File" in her letter is actually the "Homicide Binder." This is significant because as a general matter, the Philadelphia Police Department prepared homicide binders, which were meant to contain relevant witness interviews, police documents, and forensic reports so that information could be provided to the assigned prosecutor to prepare for trial.[7] The Homicide File, in turn, is a much larger file and is created to include documents from the entire investigation and that file encompasses the homicide binder (if one was prepared).

Here, there was no homicide binder.[8] Indeed, none of this exculpatory evidence was found in the prosecution files. Nonetheless, because the existence of this exculpatory evidence was known to local police and in their possession, *Brady* requires that such knowledge be imputed to the prosecution. *Kyles*, 514 U.S. at 437.

**3. *Brady* Evidence Relating to Everett**

The Commonwealth also agrees that it suppressed information impeaching the credibility of Everett. Crosland was not a suspect in the initial police investigation in December 1984. He only became a suspect after Everett was arrested in March 1987. Evidently, in hopes of securing a deal, Everett told police that Crosland had confessed to the shooting.

Everett gave police his first statement in connection with this case on April 15, 1987 and a second statement on April 21, 1987. The record is clear that both these statements were disclosed to the defense. What was not disclosed to the defense, however, was a police activity sheet indicating that when police questioned Everett on April 21st, they polygraphed him about Crosland's alleged confession and that he failed, leading police to question him again. Nor was the subsequent activity

[7] In describing what a Homicide File was, Crosland's prosecutor testified that they were usually brown and tabbed, which matches the description of a homicide binder.
[8] The only binder in the Homicide File related to Michael Ransome's prior homicide conviction that the police had ordered in the course of their investigation of him.

sheet from July 1987 disclosed—there, it appeared that Everett, in contradiction of his earlier statements, may have identified Frank Turner as the shooter.

A letter from Everett to Detective Mangoni illustrated just how desperate Everett was to get out of prison and how desperate he was for a deal. He told the Detective that his "work is the best, because it will verify in essence that no lawyer of Curt's or Squirt's [Frank Turner] can say that your office or the district attorney's office offered me any deals." Doc. 1-1 at 260. He wanted "to work out a plan" and suggested that he could wear a wire around Michael Turner to "confirm more than just the Korean killing." *Id.* The letter was never disclosed.

It also was never disclosed that prior to Crosland's second trial, Everett testified in Frank Turner's 1989 trial, recanting his prior statement and testimony against Frank Turner and Crosland in the murder of John Lamb.[9] As he had done in this case, Everett had told police that Crosland had confessed to him about his involvement. At Frank Turner's trial, Everett testified that he lied when he implicated Crosland, and that he had done so to save himself from being charged with murder.

The CIU uncovered the activity sheets and Everett's letter in the Philadelphia Police Department's Homicide File and his testimony in Frank Turner's trial in separate prosecution files pertaining to that case.[10] There is no indication either from the record, the prosecution files or from Crosland's post-conviction counsel, that this information was ever disclosed to the defense.

**4. Materiality**

The case against Crosland was weak.[11] There was no physical evidence linking him to the murder. There were no eyewitnesses who identified him as the perpetrator. The Commonwealth's

---

[9] After finding insufficient evidence of his involvement in John Lamb's homicide at the preliminary hearing, the court dismissed the charges against Crosland.
[10] That case was tried by a separate prosecutor.
[11] When meeting with Heo's family during the course of our investigation, Heo's daughter recalled that at the close of Crosland's first trial, the prosecutor prepared her family for an acquittal.

case was built essentially on the hearsay testimony of two witnesses, one being Tilghman, who the jury heard only from the reading of her testimony from the first trial, and who unbeknownst to the defense, the Commonwealth previously sought to prosecute for false reporting. The other was Rodney Everett, whose credibility from the start was in question.

Had all this new evidence been disclosed, Crosland could have undermined the credibility of both Everett and Tilghman; challenged the thoroughness of the police investigation; pursued other avenues of investigation; provided the jury with a compelling alternate theory of the case; and tipped his deadlocked jury in favor of acquittal. In the end, it undermines any confidence in Crosland's conviction. *See Wilson v. Beard*, 589 F.3d 651, 665-67 (3d Cir. 2009).

**IV. Crosland satisfies the statutory requirements of 28 U.S.C. § 2244(b)(2).**

In order to prevail on a successive petition, a petitioner also must show: (1) that "the factual predicate for the claim could not have been discovered previously through the exercise of due diligence," and (2) that "the facts underlying the claim . . . establish by clear and convincing evidence that, but for constitutional error, no reasonable factfinder would have found [them] guilty of the underlying offense." 28 U.S.C. § 2244(b)(2)(B)(ii). The Commonwealth agrees that Crosland satisfies both requirements.

As noted earlier, Crosland satisfies the first requirement. He had no means to obtain the *Brady* evidence in this case prior to the Commonwealth's disclosures in July 2020 and October 2020. Much of this evidence was comprised of documents from the Homicide File or sealed grand jury transcripts, both of which were in the exclusive control of the Commonwealth.

Crosland also satisfies the second requirement. A petitioner satisfies this requirement by demonstrating "actual innocence" under *Schlup v. Delo*, 513 U.S. 298 (1995). *Munchinski v. Wilson*, 694 F.3d 308, 337 (3d Cir. 2012). To do so requires a showing of innocence that undermines confidence in the outcome of the trial, *Schlup*, 513 U.S. at 316, not "absolute certainty about the petitioner's guilt

or innocence." *House v. Bell*, U.S. 547 U.S. 518, 538 (2006). Put simply, a petitioner must demonstrate that "more likely than not [a] reasonable juror would have reasonable doubt." *Id.*

Here, no reasonable juror presented with all the new *Brady* evidence could find Crosland guilty of the crimes for which he was convicted. This new evidence undermines any credibility Everett or Tilghman ever had. It also points to another viable suspect, who actually was at the center of the police's initial investigation. That it's more likely no reasonable juror would now find Crosland guilty is especially true given the weakness of the Commonwealth's case in the first instance. *See Munchinski*, 694 F. 3d at 337 (*Schlup* showing of actual innocence where the prosecution's case was always close). Significantly, both Everett and Tilghman have since recanted their incriminations of Crosland.[12] Indeed, Everett has now consistently maintained for over thirty years that his initial police statement implicating Crosland was untrue.

## V. Conclusion

For these reasons, the Commonwealth respectfully requests that habeas relief be granted.

Respectfully submitted,

*/s/Banafsheh Amirzadeh*
Assistant District Attorney, Conviction Integrity Unit

*/s/ Patricia Cummings*
Supervisor, Conviction Integrity Unit
District Attorney's Office
3 S. Penn Square
Philadelphia, PA 19107
(215) 686-8000

[12] As part of its investigation, the CIU contacted both Everett and Tilghman. In a meeting with Everett, he expressed deep regret for his actions, and stated that at the time, he was battling drug addiction. The CIU has not met with Tilghman, but in a brief phone conversation with her, she also expressed deep regret for her actions.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **CURTIS CROSLAND,**<br>Petitioner | : | **Civil Action** |
| **v.** | : | **NO. 21-476** |
| **COMMONWEALTH OF PENNSYLVANIA,**<br>Respondent. | : | |

**CERTIFICATE OF SERVICE**

I, Banafsheh Amirzadeh, certify that on May 28, 2021, a copy of this Response was served via the Court's electronic case filing system on:

*Claudia B. Flores*
Assistant Federal Defender
*Arianna J. Freeman*
Managing Attorney, Non-Capital Habeas Unit
Federal Community Defender Office
for the Eastern District of Pennsylvania
601 Walnut Street, Suite 540W
Philadelphia, PA 19106

*/s/ Banafsheh Amirzadeh*
Asst. District Attorney, Conviction Integrity Unit
Philadelphia District Attorney's Office
3 South Penn Square
Philadelphia, PA 19107
(215) 686-8000